**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

| | |
|---|---|
| THE GENERAL LAND OFFICE OF THE STATE OF TEXAS, and GEORGE P. BUSH, in his official capacity as Commissioner of the Texas General Land Office,<br><br>        Plaintiffs,<br><br>    v.<br><br>JOSEPH R. BIDEN JR., in his official capacity as President of the United States; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; and ALEJANDRO MAYORKAS, in his official capacity as Secretary of the Department of Homeland Security,<br><br>        Defendants. | No. 7:21-cv-00272 |

**MOTION TO DISMISS BY THE FEDERAL GOVERNMENT DEFENDANTS**

**TABLE OF CONTENTS**

INTRODUCTION..................................................................................................................1

BACKGROUND ...................................................................................................................4

I.      DHS's Statutory Authority to Construct Border Infrastructure and Undertake
        Environmental Planning ..........................................................................................4

II.     Congressional Appropriations to DHS for Border Infrastructure and Environmental
        Planning....................................................................................................................6

III.    President Trump's Efforts to Obtain Additional Border Wall Funding Beyond
        Congress's Appropriations to DHS .........................................................................7

IV.     President Biden's Proclamation Terminating the National Emergency at the
        Southern Border and Directing Agencies to Develop Border Wall Funding Plans...................9

V.      The DoD and DHS Border Wall Plans .................................................................10

        A.      DHS Fiscal Year 2017-2020 Funds ..........................................................10

        B.      DHS Fiscal Year 2021 Funds ....................................................................11

        C.      Treasury Forfeiture Fund ...........................................................................11

VI.     The GLO Farm and the RGV-09 Border Infrastructure Project ...........................11

VII.    GLO's Alleged Injuries and Claims......................................................................12

STANDARD OF REVIEW .................................................................................................14

ARGUMENT ......................................................................................................................15

I.      The President Should Be Dismissed From This Action as to All Counts. ...................................15

II.     GLO Lacks Article III Standing to Challenge DHS's Border Barrier Policies.........................18

        A.      *Parens Patriae* Standing Is Unavailable; GLO's Standing Is Thus Limited To
                Its Interest In the GLO Farm......................................................................19

        B.      GLO's Asserted Harms Are Not Fairly Traceable to the Government's
                Actions........................................................................................................19

III.    GLO Lacks a Cause of Action to Assert its Statutory Claims in Counts V–VII.......................21

        A.      GLO Lacks a Private Right of Action Directly Under the Statutes It Invokes...........21

        B.      GLO Falls Outside the Zone of Interest of Each Statute It Invokes. ...........................22

IV.   GLO's Claims Under the APA Are Either Unreviewable or Meritless (Counts VII & VIII). .................................................................................................................27

     A.   Decisions As to How to Spend Funds Appropriated by Congress Are Committed to Agency Discretion as a Matter of Law (Counts VII & VIII). .............27

     B.   The DHS Plan Is Not Final Agency Action Challengeable Under the APA (Counts VII & VIII)....................................................................................31

     C.   There Is No Procedural Violation of the APA Because the DHS Plan Is a Statement of General Policy Exempt from Notice and Comment (Count VIII). ...................................................................................................32

V.    DHS Has Not Violated Any Statutes (Count V–VII). ......................................34

     A.   DHS Has Not Violated IIRIRA. ..........................................................35

     B.   DHS Has Not Acted Contrary to Its Congressional Appropriations. ..........................36

     C.   DHS Has Not Violated Section 739 of the 2019 Consolidated Appropriations Act.................................................................................39

     D.   DHS Has Not Violated Any Other Budgetary Statute or Rule. .......................40

VI.   GLO's Constitutional Claims Should be Dismissed (Counts I–IV). .............................41

CONCLUSION ....................................................................................................45

## TABLE OF AUTHORITIES

**CASES**

*Ala. ex rel. Baxley v. Woody,*
   473 F.2d 10 (5th Cir. 1973) ..................................................................................14

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel., Barez,*
   458 U.S. 592 (1982) ..........................................................................................19

*Arpaio v. Obama,*
   797 F.3d 11 (D.C. Cir. 2015) ............................................................................20

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ..........................................................................................15

*Association of Data Processing Serv. Orgs., Inc. v. Camp,*
   397 U.S. 150 (1970) ..........................................................................................23

*Baker v. Carr,*
   369 U.S. 186 (1962) ..........................................................................................44

*Barlow v. Collins,*
   397 U.S. 159 (1970) ..........................................................................................34

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.,*
   502 U.S. 32 (1991) ............................................................................................34

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007) ......................................................................................15, 21

*Bennett v. Spear,*
   520 U.S. 154 (1997) ......................................................................................23, 31

*Block v. Cmty. Nutrition Inst.,*
   467 U.S. 340 (1984) ..........................................................................................28

*Boston Stock Exch. v. State Tax Comm'n,*
   429 U.S. 318 (1977) ......................................................................................23, 41

*Bowsher* v. *Synar,*
   478 U.S. 714 (1986) ..........................................................................................25

*Brown Exp., Inc. v. United States,*
   607 F.2d 695 (5th Cir. 1979) ..........................................................................32, 33

*California v. Texas,*
   141 S. Ct. 2104 (2021), *remanded, Texas v. United States*, 4 F.4th 372 (5th Cir. 2021) .....................19, 20

*California v. Trump,*
   407 F. Supp. 3d 869 (N.D. Cal. 2019) ............................................................................... 9

*CASA de Md., Inc. v. Trump,*
   355 F. Supp. 3d 307 (D. Md. 2018) ............................................................................... 18

*Centro Presente v. U.S. DHS,*
   332 F. Supp. 3d 393 (D. Mass. 2018) ............................................................................ 18

*Chamber of Com. of the U.S. v. Reich,*
   74 F.3d 1322 (D.C. Cir. 1996) ...................................................................................... 18

*City of L.A. v. Lyons,*
   461 U.S. 95 (1983) ........................................................................................................ 20

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ........................................................................................ 18, 20, 21

*Clarke v. Sec. Indus. Ass'n,*
   479 U.S. 388 (1987) ..................................................................................................... 23

*Cleveland Assets, LLC v. United States,*
   132 Fed. Cl. 264 (2017), *aff'd,* 883 F.3d 1378 (Fed. Cir. 2018) ................................. 25

*Clinton v. City of N.Y.,*
   524 U.S. 417 (1998) ..................................................................................................... 44

*Cnty of El Paso v. Chertoff,*
   2008 WL 4372693 (W.D. Tex. Aug. 29, 2008) ....................................................... 5, 37

*Cobell v. Norton,*
   240 F.3d 1081 (D.C. Cir. 2001) ................................................................................... 31

*Cornerstone Christian Schs. v. Univ. Interscholastic League,*
   563 F.3d 127 (5th Cir. 2009) ....................................................................................... 14

*Ctr. for Biological Diversity v. McAleenan,*
   404 F. Supp. 3d 218 (D.D.C. 2019) ............................................................................. 22

*Ctr. for Biological Diversity v. Trump,*
   453 F. Supp. 3d 11 (D.D.C. 2020) .................................................................... 8, 17, 42

*Dalton v. Specter,*
   511 U.S. 462 (1994) ............................................................................................. *passim*

*Doe 2 v. Trump,*
   319 F. Supp. 3d 539 (D.D.C. 2018) ............................................................................. 17

*El Paso Cnty. v. Trump*,
  407 F. Supp. 3d 655 (W.D. Tex. 2019) ......................................................................9

*El Paso Cnty. v. Trump*,
  982 F.3d 332 (5th Cir. 2020), *cert. denied sub nom.*, *El Paso Cnty. v. Biden*, 141 S. Ct. 2885 (2021) ........8

*Ellison v. Connor*,
  153 F.3d 247 (5th Cir. 1998) ..............................................................................14

*Exxon Chemicals Am. v. Chao*,
  298 F.3d 464 (5th Cir. 2002) ..............................................................................35

*Franklin v. Massachusetts*,
  505 U.S. 788 (1992) ..........................................................................15, 16, 17, 44

*Gentile v. SEC*,
  974 F.3d 311 (3d Cir. 2020) ..............................................................................30

*Glass Packaging Inst. v. Regan*,
  737 F.2d 1083 (D.C. Cir. 1984) ......................................................................24, 26

*Gonzaga Univ. v. Doe*,
  536 U.S. 273 (2002) ........................................................................................22

*Green v. Forney Eng'g Co.*,
  589 F.2d 243 (5th Cir. 1979) ..............................................................................14

*Guidry v. Bank of LaPlace*,
  954 F.2d 278 (5th Cir. 1992) ..............................................................................15

*Gunpowder Riverkeeper v. FERC*,
  807 F.3d 267 (D.C. Cir. 2015) ............................................................................26

*Harrington v. Schlesinger*,
  528 F.2d 455 (4th Cir. 1975) ..............................................................................43

*Hawaii v. Trump*,
  859 F.3d 741 (9th Cir. 2017), *vacated as moot*, 138 S. Ct. 377 (2017) ..........................17

*Heckler v. Chaney*,
  470 U.S. 821 (1985) ..............................................................................28, 29, 30

*Horizon Air Indus., Inc. v. Nat'l Mediation Bd.*,
  232 F.3d 1126 (9th Cir. 2000) ............................................................................35

*I.N.S. v. Chadha*,
  462 U.S. 919 (1983) ........................................................................................44

*In re Border Infrastructure Env't Litig.*,
  284 F. Supp. 3d 1092 (S.D. Cal. 2018), *aff'd*, 915 F.3d 1213 (9th Cir. 2019) ..........................................5

*Int'l Refugee Assistance Project v. Trump*,
  857 F.3d 554 (4th Cir. 2017), *vacated and remanded*, 138 S. Ct. 353 (2017) ...............................17

*Jaxson v. Saul*,
  970 F.3d 775 (7th Cir. 2020) .......................................................................................................33, 34

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994) ...........................................................................................................................14

*La Posta Band of Diegueno Mission Indians of La Posta Reservation. v. Trump*,
  828 F. App'x 489 (9th Cir. 2020).....................................................................................................8, 9

*Leedom v. Kyne*,
  358 U.S. 184 (1958) .....................................................................................................................34, 35

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014) .....................................................................................................................23, 27

*Lincoln v. Vigil*,
  508 U.S. 182 (1993) ....................................................................................................................*passim*

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ...........................................................................................................................20

*Manzanita Band of Kumeyaay Nation v. Wolf*,
  496 F. Supp. 3d 257 (D.D.C. 2020), *remanded*,
  *Manzanita Band of Kumeyaay Nation v. Mayorkas*, 2021 WL 1921887 (D.C. Cir. May 11, 2021) ............9

*Massachusetts v. Mellon*,
  262 U.S. 447 (1923) ...........................................................................................................................19

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
  567 U.S. 209 (2012) ...........................................................................................................................23

*Miccosukee Tribe of Indians of Fla. v. United States*,
  No. 08-23523-CIV, 2009 WL 10668917 (S.D. Fla. Sept. 30, 2009) ........................................24

*Milk Train, Inc. v. Veneman*,
  310 F.3d 747 (D.C. Cir. 2002)..........................................................................................................29

*Mississippi v. Johnson*,
  71 U.S. (4 Wall.) 475 (1866) ......................................................................................................16, 44

*Nat'l Treasury Emp. Union v. Campbell*,
  654 F.2d 784 (D.C. Cir. 1981)..........................................................................................................25

*New York v. Trump,*
    485 F. Supp. 3d 422 (S.D.N.Y.), *remanded and vacated,* 141 S. Ct. 530 (2020) ........................................18

*Newdow v. Bush,*
    391 F. Supp. 2d 95 (D.D.C. 2005)........................................................................................................17

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010)...........................................................................................................17

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) ............................................................................................................................16

*Nyunt v. Chairman, Broad. Bd. of Governors,*
    589 F.3d 445 (D.C. Cir. 2009) ...........................................................................................................35

*Off. of Personnel Mgmt. v. Richmond,*
    496 U.S. 414 (1990) ............................................................................................................................43

*Pac. Gas & Elec. Co. v. Fed. Power Comm'n,*
    506 F.2d 33 (D.C. Cir. 1974) .............................................................................................................32

*Perez v. Mortg. Bankers Ass'n,*
    575 U.S. 92 (2015) ..............................................................................................................................32

*Petrobras Am. Inc. v. Samsung Heavy Indus. Co., Ltd.,*
    9 F.4th 247 (5th Cir. 2021) .................................................................................................................15

*Prof'ls & Patients for Customized Care v. Shalala,*
    56 F.3d 592 (5th Cir. 1995) ....................................................................................................32, 33, 34

*Pub. Citizen v. Stockman,*
    528 F. Supp. 824 (D.D.C. 1981).........................................................................................................25

*Puerto Rico v. United States,*
    490 F.3d 50 (1st Cir. 2007) .................................................................................................................35

*Saget v. Trump,*
    345 F. Supp. 3d 287 (E.D.N.Y. 2018) ...............................................................................................18

*Sierra Club v. Peterson,*
    228 F.3d 559 (5th Cir.2000) ...............................................................................................................14

*Sierra Club v. Trump,*
    963 F.3d 874 (9th Cir.), *cert. granted,* 141 S. Ct. 618 (2020) and *vacated sub nom.,*
    *Biden v. Sierra Club,* ____S. Ct.____, 2021 WL 2742775 (U.S. July 2, 2021) .................................8

*Sierra Club v. Trump,*
    977 F.3d 853 (9th Cir. 2020), *cert. granted and vacated and remanded,*
    *Biden v. Sierra Club,* ____S. Ct.____, 2021 WL 4507558 (U.S. Oct. 4, 2021).................................8

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 83 (1998) ........................................................................................................14

*Swan v. Clinton*,
100 F.3d 973 (D.C. Cir. 1996) ...............................................................................16, 17

*Switchmen's Union v. Nat'l Mediation Bd.*,
320 U.S. 297 (1943) ......................................................................................................34

*Taubman Realty Grp. Ltd. P'ship v. Mineta*,
320 F.3d 475 (4th Cir. 2003) ........................................................................................26

*Texas v. United States*,
809 F.3d 134 (5th Cir. 2015), *as revised* (Nov. 25, 2015),
*aff'd by equally divided court*, 136 S. Ct. 2271 (2016) ...............................15, 16, 23, 33

*Thompson* v. *North Am. Stainless, LP*,
562 U.S. 170 (2011) ................................................................................................23, 25

*TransUnion LLC v. Ramirez*,
141 S. Ct. 2190 (2021), *remanded*, 9 F.4th 1201 (9th Cir. 2021) ................................18

*Trump v. Sierra Club*,
140 S. Ct. 1 (2019), *denying mot.*, 140 S. Ct. 2620 (2020) .......................................8, 25

*U.S. Dep't of Labor v. Kast Metals Corp.*,
744 F.2d 1145 (5th Cir. 1984) ......................................................................................33

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
665 F.3d 1339 (D.C. Cir. 2012) .........................................................................37, 38, 39

*U.S. House of Representatives v. Mnuchin*,
976 F.3d 1 (D.C. Cir. 2020), *cert. granted and judgment vacated sub nom.*,
*Yellen v. House of Representatives*, ____S. Ct.____, 2021 WL 4733282 (U.S. Oct. 12, 2021) ......................8

*United States v. Arizona*,
No. CV 10-1413-PHX-SRB, 2011 WL 13137062 (D. Ariz. Oct. 21, 2011) ..................30, 36

*Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982) ......................................................................................................41

*Washington v. Trump*,
441 F. Supp. 3d 1101 (W.D. Wash. 2020) .......................................................................8

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
5 F.4th 997 (9th Cir. 2021) ...........................................................................................20

*Wise v. Glickman*,
257 F. Supp. 2d 123 (D.D.C. 2003) ...............................................................................35

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ...................................................................................................................3, 42

*Ziglar v. Abbasi*,
   137 S. Ct. 1843 (2017) .........................................................................................................16

**STATUTES**

5 U.S.C. § 553 .........................................................................................................................3, 32, 33

5 U.S.C. § 701 .........................................................................................................................3, 27, 31

5 U.S.C. §§ 702 *et seq.* ...........................................................................................................13, 22

5 U.S.C. § 704 .........................................................................................................................3, 27, 31

5 U.S.C. § 706 .........................................................................................................................34

10 U.S.C. § 284 .......................................................................................................................8, 10

10 U.S.C. § 2808 .....................................................................................................................8, 10

31 U.S.C. § 1301 .....................................................................................................................13, 22, 24, 40

31 U.S.C. § 1341 .....................................................................................................................13, 22, 24, 40

31 U.S.C. § 1532 .....................................................................................................................13, 22, 24, 40

31 U.S.C. § 9705 .....................................................................................................................8

40 U.S.C. § 3307 .....................................................................................................................25

Dep't of Homeland Security Appropriations Act, 2008,
   Pub. L. No. 110-161, 121 Stat. 1844 (Dec. 26, 2007) ......................................................4, 30

Department of Homeland Security Appropriations Act, 2017,
   Pub. L. No. 115-31, 131 Stat. 135..........................................................................................6

Department of Homeland Security Appropriations Act, 2018,
   Pub. L. No. 115-141, 132 Stat. 348.......................................................................................6, 7

Department of Homeland Security Appropriations Act, 2019,
   Pub. L. No. 116-6, 133 Stat. 13................................................................................................*passim*

Department of Homeland Security Appropriations Act, 2020,
   Pub L. No. 116-93, 133 Stat. 2317 (2019) .........................................................................6, 7

Department of Homeland Security Appropriations Act, 2021,
   Pub L. No. 116-260, 134 Stat. 1182......................................................................................6

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
    Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996), *as amended by*
    Dep't of Homeland Security Appropriations Act, 2008, Pub. L. No. 110-161, Div. E,
    Title V § 564, 121 Stat. 1844, 2090 (Dec. 26, 2007) ...................................................................*passim*

Pub. L. No. 102-381, 106 Stat. 1407 ........................................................................................................28

REAL ID Act of 2005,
    Pub. L. No. 109-13, 119 Stat. 231 (codified at 8 U.S.C. § 1103 note) ......................................4

Secure Fence Act of 2006,
    Pub. L. No. 109-367, 120 Stat. 2638 ............................................................................................4

## REGULATIONS

48 C.F.R. § 52.242-14 .................................................................................................................38, 39

Determination Pursuant to Section 102 of IIRIRA, as Amended,
    84 Fed. Reg. 58400–02 (Oct. 31, 2019) ..............................................................................22, 38

DHS Response to Public Comments Regarding the Construction of Border Wall
    Within Certain Areas in the Rio Grande Valley, Texas,
    85 Fed. Reg. 23,983-01 (Apr. 30, 2020)....................................................................................37

Presidential Proclamation on Declaring a National Emergency Concerning the Southern
    Border of the United States,
    84 Fed. Reg. 4949 (Feb. 20, 2019) .............................................................................................7

Termination of Emergency with Respect to the Southern Boarder of the United States and
    Redirection of Funds Diverted to the Boarder Wall Construction,
    Proclamation No. 10142,
    86 Fed. Reg. 7225 (Jan. 20, 2021)....................................................................................1, 9, 10

## UNITED STATES CONSTITUTION

U.S. Const. art. I, § 8 .................................................................................................................43

U.S. Const. art. I, § 9 .................................................................................................................43

U.S. Const. art. II, § 3 ...............................................................................................................44

## OTHER AUTHORITIES

1 GAO, Principles of Federal Appropriations Law ........................................................................37

DHS to Terminate Border Barrier Contracts in Laredo and Rio Grande Valley, at
    https://www.dhs.gov/news/2021/10/08/dhs-terminate-border-barrier-contracts-laredo-
    and-rio-grande-valley.......................................................................................................14

Elliot Spagat, *"Policy Changes Help Drive US Migrant Crossings to New Highs,"*
    Associated Press (Apr. 9, 2021),
    https://apnews.com/article/politics-honduras-mexico-immigration-border-patrols-
    363301dde17ae9da149a54d7885ac00c .................................................................................................20

GAO, A-35831, Comptroller General McCarl to the Secretary of the Interior,
    10 Comp. Gen. 440 (Mar. 27, 1931)...............................................................................................41

GAO, *Implementation of Army Safety Program*, B–223608 (Comp. Gen. Dec. 19, 1988) ............................37

General Accounting Office, *A Glossary of Terms Used in the Federal Budget Process* 46 (2005) .............29, 39

Letter from Acting Dir., Office of Mgmt. & Budget to Senate Comm. on Appropriations
    (Jan. 6, 2019),
    165 Cong. Rec. S1569-02 (Feb. 28, 2019)..........................................................................................7

*Making Further Continuing Appropriations for the Department of Homeland Security for Fiscal Year 2019,*
    *and For Other Purposes,*
    H. Rep. 106th Cong. (2018) ............................................................................................................29

Matter of Office of Management and Budget and U.S. Dep't of Homeland Security–Pause
    of Border Barrier Construction and Obligations, B-333110.1,
    2021 WL 2451823 (June 15, 2021)....................................................................................3, 26, 39, 41

President Donald J. Trump's Border Security Victory,
    2019 WL 643814 (Feb. 15, 2019) .....................................................................................................8

*Walls & Waivers: Expedited Construction of the Southern Border Wall and Collateral Impacts to*
    *Communities and the Environment: Joint Oversight Field Hearing Before Subcommittees to*
    *H. Comm. on Natural Resources,* 110th Cong. 25 (April 28, 2008),
    www.govinfo.gov/content/pkg/CHRG-110hhrg41959/html/CHRG-110hhrg41959.htm .............5

www.glo.texas.gov/land/state-lands/land-for-sale/index.html#item/155409.........................................12

# INTRODUCTION

1.      On the first day of his Administration, President Biden signed a Proclamation to effect a reassessment of federal policy with respect to the construction of a wall along the southern border. The Proclamation terminated the declaration of a national emergency issued by President Trump that had been relied upon to divert military construction funding to the border wall; directed federal agencies to pause ongoing construction activities to the extent permitted by law; and ordered agencies to reassess their current border wall construction projects and develop plans for the "redirection of funds concerning the southern border wall, as appropriate and consistent with applicable law." Termination of Emergency with Respect to the Southern Boarder of the United States and Redirection of Funds Diverted to the Boarder Wall Construction, Proclamation No. 10142, 86 Fed. Reg. 7225, 7225 (Jan. 20, 2021) [hereinafter "Proclamation"].  The agencies, including the Department of Homeland Security ("DHS"), completed those plans in June, and are now in the process of implementing them.

2.      After the agencies promulgated their plans, the General Land Office of the State of Texas and its Commissioner, George P. Bush (collectively, "GLO"), filed this lawsuit against the President, DHS, and Secretary of Homeland Security Mayorkas.  GLO asks the Court to prevent DHS from implementing its plan (the "DHS Plan") and force it to resume the policy of the prior administration by continuing construction, land acquisition, and related activities to advance a border wall project in the Rio Grande Valley known as RGV-09.  GLO's eight-count complaint alleges violations of the federal Constitution, federal statutes, and the Administrative Procedure Act ("APA").  For the six reasons listed below, GLO's complaint fails to state claims over which this Court has jurisdiction or under which relief could be granted as a matter of law, and should be dismissed.

3.      First, GLO has no cause of action, express or implied, for a lawsuit against the President in his official capacity.  That is particularly so in a situation where full relief (if appropriate) could be afforded to the plaintiffs by the relevant executive department and Cabinet secretary.  Because complete relief can (if legally warranted) be afforded by DHS, the Court should dismiss all claims

against the President.

4.      Second, GLO also lacks standing to sue DHS and the Secretary of Homeland Security. Although GLO frames its lawsuit as an effort to vindicate the interests of citizens of the state of Texas allegedly harmed by the Proclamation, Texas GLO has no standing to assert the interest of its citizens as *parens patriae* against the federal government.   Rather, GLO's interest is limited to the 3099-acre farm it owns in Starr County, Texas, that is the primary focus of its Complaint.  And as to that interest, GLO has failed to present the sort of "case or controversy" required by Article III of the Constitution. GLO offers little more than speculation that their alleged harms are traceable to the government actions challenged in this suit.  Article III standing cannot rest on those sorts of suppositions.

5.      Third, Congress did not give entities like GLO a cause of action that could be used to draw federal courts into this dispute.  None of the statues that GLO seeks to enforce in this case provide a cause of action or vest judicially-enforceable rights in private parties.  The statutory authority by which DHS engages in border barrier construction gives the agency broad discretion to determine how it goes about that task, including where barriers are constructed, the timetable for construction, and the level of environmental review and consultation that should occur before (or after) construction begins. Appropriations statutes (including both the appropriations themselves and the various statutory rules, such as the Transfer Statute, the Purpose Statute, and the Anti-Deficiency Act) are instructions given by Congress to the Executive Branch regarding the expenditure of funds.  None of these statutes gives entities like GLO a right to enforce their terms in court, nor is there any indication that the property interests GLO seeks to vindicate in this case fall within the zone of interests protected by the statutes they invoke.  Congress, as a politically accountable, co-equal branch of government, already has the tools at its disposal to police how the Executive Branch spends taxpayer dollars.  It has not authorized outside parties to sue about these types of spending decisions, and there is no basis for the Court to allow this suit in the absence of a cause of action created by the legislature.

6.      Fourth, GLO has not pled proper claims under the APA.  The policy decisions and discretionary spending choices reflected in the DHS Plan are all committed to agency discretion as a matter of law, and the APA does not waive the government's sovereign immunity with respect to such

decisions.  5 U.S.C. § 701(a)(2).  The DHS Plan also does not constitute a "final agency action" that can be challenged under the APA.  5 U.S.C. § 704.  And GLO's assertion that DHS did not follow appropriate procedures in promulgating the DHS Plan is also wrong because it falls under the APA's exceptions to notice-and-comment rulemaking for general statements of policy and procedural rules. 5 U.S.C. § 553(b)(3).

7.      Fifth, even if GLO were to overcome all of these threshold concerns with entertaining this suit—concerns arising from the separation of powers principles that serve as the foundation of the Constitution—it has failed to state a claim that DHS has violated any federal statute.  DHS's actions do not contravene Congress's broad authorization for border barrier construction.  They do not violate any recent appropriations of funds by Congress to DHS for purposes of constructing border infrastructure in the Rio Grande Valley.  And, consistent with the Government Accountability Office's recent conclusion that DHS's actions were an appropriate programmatic change in the use of federal funding, they do not breach any of the numerous statutory rules on the Executive's use of appropriated funds that GLO cites in its complaint.  *See* Matter of Office of Management and Budget and U.S. Dep't of Homeland Security–Pause of Border Barrier Construction and Obligations, B-333110.1, 2021 WL 2451823 (June 15, 2021) [hereinafter *GAO Opinion*].

8.      Finally, GLO has failed to state a claim as to any violation of the Constitution.  As both the Proclamation and the DHS Plan explain, DHS is not claiming an authority to act without statutory authorization, as found in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).  Rather, DHS's actions are fully justified under the existing statutory authorizations and appropriations for border barrier construction.  GLO's allegations that DHS has violated the "separation of powers," the Spending Clause, the Take Care Clause, and the Presentment Clause are all, at bottom, assertions that "the President has exceeded his statutory authority[, which] are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 473 (1994).

9.      Accordingly, the Court should dismiss all claims against President Biden, DHS, and Secretary Mayorkas under either Civil Rule 12(b)(1) (for lack of jurisdiction) or Civil Rule 12(b)(6) (for failure to state a claim on which relief can be granted).

## BACKGROUND

### I.      DHS's Statutory Authority to Construct Border Infrastructure and Undertake Environmental Planning

10.     The Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), as amended, grants broad discretionary authority to the Department of Homeland Security to construct barrier infrastructure along the border of the United States.  *See* Pub. L. No. 104-208, Div. C, Title I § 102, 110 Stat. 3009 (Sept. 30, 1996), *as amended by* Dep't of Homeland Security Appropriations Act, 2008, Pub. L. No. 110-161, Div. E, Title V § 564, 121 Stat. 1844, 2090 (Dec. 26, 2007); Secure Fence Act of 2006, Pub. L. No. 109-367, § 3, 120 Stat. 2638; REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, Title I § 102, 119 Stat. 231, 302, 306 (codified at 8 U.S.C. § 1103 note) [hereinafter "IIRIRA"]. Section 102(a) of IIRIRA states that the Secretary of Homeland Security "shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States."  In section 102(b), Congress set forth certain requirements for "carrying out subsection (a)."  IIRIRA § 102(b)(1)(A).  These requirements have varied over the years.  The most recent amendment to IIRIRA in 2007 states that the Secretary "shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective."  *Id*; Pub. L. No. 110-161, § 564.  The Secretary, however, is not required to construct border infrastructure at any particular location.  Congress vested the Secretary with discretion to determine both where and what type of infrastructure is appropriate.  *See* IIRIRA § 102(b)(1)(D).  The Secretary is free to determine that the use or placement of "fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location" is not "the most appropriate means to achieve and maintain operational control over the international border" at that location.  *Id*.

11.     The Secretary also has the "authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section."  IIRIRA § 102(c)(1).  But even where the Secretary has waived

environmental and other laws, DHS still consults with relevant stakeholders about the impacts of border infrastructure construction.   IIRIRA requires that the Secretary "shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed."  IIRIRA § 102(b)(1)(C).

12.   As explained at a congressional hearing addressing border wall construction, DHS does not "turn[] its back on environmental stewardship or continued consultation with stakeholders." *Walls & Waivers: Expedited Construction of the Southern Border Wall and Collateral Impacts to Communities and the Environment: Joint Oversight Field Hearing Before Subcommittees to H. Comm. on Natural Resources*, 110th Cong. 25 (April 28, 2008), www.govinfo.gov/content/pkg/CHRG-110hhrg41959/html/CHRG-110hhrg41959.htm (statement of Ronald D. Vitiello, United States Customs and Border Protection Chief Patrol Officer, Rio Grande Valley Sector).   On the contrary, DHS solicits and responds to feedback from a wide variety of stakeholders to inform its border infrastructure "planning efforts," which includes both engineering and environmental assessments.  *Id.*; *see also id.* (statement of Rick Shultz, Nat'l Borderland Coordinator, U.S. Dep't of the Interior) (explaining how the consultation process minimizes impacts on environmental and cultural resources near border infrastructure construction areas); *In re Border Infrastructure Env't Litig.*, 284 F. Supp. 3d 1092, 1124–25 (S.D. Cal. 2018) (summarizing DHS's consultation efforts for various border barrier projects), *aff'd*, 915 F.3d 1213 (9th Cir. 2019).   For projects covered by an IIRIRA waiver, DHS typically prepares Environmental Stewardship Plans, "which provide a comprehensive analysis of the potential environmental impacts" associated with border infrastructure construction and include appropriate best management practices to avoid or minimize potential environmental impacts from construction.  *Cnty. of El Paso v. Chertoff*, No. EP-08-CA-196-FM, 2008 WL 4372693, at *11 (W.D. Tex. Aug. 29, 2008) (citation omitted); *see In re Border Infrastructure Env't Litig.*, 284 F. Supp. 3d at 1124–25.

II.    **Congressional Appropriations to DHS for Border Infrastructure and Environmental Planning**

13.    Congress has regularly provided funding for border infrastructure projects in DHS's annual appropriations act. Over the past five fiscal years, Congress has appropriated over $5.5 billion for construction of new and replacement border barriers at various locations along the southern border. *See* Department of Homeland Security Appropriations Act, 2017, Pub. L. No. 115-31, Div. F, Title VI, 131 Stat. 135, 433–34 ($341.2 million "to replace approximately 40 miles of existing primary pedestrian and vehicle border fencing along the southwest border"); Department of Homeland Security Appropriations Act, 2018, Pub. L. No. 115-141, Div. F, § 230, 132 Stat. 348, 616 ($252 million for "approximately 14 miles of secondary fencing" in the San Diego Sector; $641 million for "primary pedestrian levee fencing" and "primary pedestrian fencing" in the Rio Grande Valley Sector; and $445 million for "replacement of existing primary pedestrian fencing along the southwest border"); Department of Homeland Security Appropriations Act, 2019, Pub. L. No. 116-6, Div. A, § 230, 133 Stat. 13, 28 ($1.375 billion "for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector"); Department of Homeland Security Appropriations Act, 2020, Pub L. No. 116-93, Div. D, § 209, 133 Stat. 2317, 2512 (2019) ($1.375 billion "for the construction of barrier system along the southwest border"); Department of Homeland Security Appropriations Act, 2021, Pub L. No. 116-260, Div. F, § 210, 134 Stat. 1182, 1456–57 (same as fiscal year 2020).

14.    In appropriating these funds, Congress was aware of the potential environmental consequences of border infrastructure construction. It therefore required DHS to submit reports addressing environmental planning. In fiscal years 2017 and 2018, Congress directed DHS to submit an annual plan addressing, *inter alia,* "the environmental impacts, including on wildlife, of the construction and placement of physical barriers planned along the Southwest border" and the "effects on communities and property owners near areas of infrastructure deployment." Department of Homeland Security Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. at 434; Department of Homeland Security Appropriations Act, 2018, Pub. L. No. 115-141, 132 Stat. at 617–18. Congress

6

required DHS to update these plans in subsequent fiscal years, including the environmental analysis of border barrier construction.  *See id.* § 231(10); Department of Homeland Security Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. at 28; Department of Homeland Security Appropriations Act, 2020, Pub. L. No. 116-93, 133 Stat. at 2512.

15.  Congress also promoted environmental stewardship by prohibiting DHS from using its appropriated funds to construct border infrastructure in environmentally sensitive areas along the border, including several locations near McAllen, Texas.  *See, e.g.*, Department of Homeland Security Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. at 28 (prohibiting expenditure of funds for "construction of pedestrian fencing" in the National Butterfly Center, La Lomita Historical Park, and the Bentsen-Rio Grande Valley State Park).

### III. President Trump's Efforts to Obtain Additional Border Wall Funding Beyond Congress's Appropriations to DHS

16.  In late 2018 then-President Trump and Congress reached an impasse over the amount of money Congress would appropriate to DHS for border wall construction.  The President sought $5.7 billion "for construction of a steel barrier for the Southwest border," but Congress refused to appropriate that amount.  *See* Letter from Acting Dir., Office of Mgmt. & Budget to Senate Comm. on Appropriations (Jan. 6, 2019), 165 Cong. Rec. S1569-02, S1570 (Feb. 28, 2019).  Rather, on February 15, 2019, with the passage of the Consolidated Appropriations Act of 2019 ("CAA"), *see* Pub. L. No. 116-6, 133 Stat. at 28, Congress appropriated $1.375 billion to DHS "for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector" of Texas.  *Id.* 133 Stat. at 28.

17.  On the same day that President Trump signed the CAA into law, he declared a national emergency authorizing the use of the armed forces at the southern border.  *See* Presidential Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States, 84 Fed. Reg. 4949 (Feb. 20, 2019).  He also released a plan to provide additional funding for border wall construction, over and above the amount appropriated in the CAA, by redirecting funds from other sources within the Department of Defense ("DoD") and the Department of the Treasury.

*See* President Donald J. Trump's Border Security Victory, at 2019 WL 643814 (Feb. 15, 2019).  The President's plan allocated: (1) approximately $601 million from the Treasury Forfeiture Fund (31 U.S.C. § 9705); (2) Up to $2.5 billion from DoD funds transferred for support of counterdrug activities (10 U.S.C. § 284); and (3) Up to $3.6 billion reallocated from DoD military construction projects under the President's declaration of a national emergency (10 U.S.C. § 2808).  *See id.*

18.     The national emergency declaration and the subsequent actions by various federal agencies to undertake border wall construction using redirected funds were immediately challenged in multiple lawsuits around the country.  *See, e.g., El Paso Cnty. v. Trump*, 982 F.3d 332 (5th Cir. 2020), *cert. denied sub nom. El Paso Cnty. v. Biden*, 141 S. Ct. 2885 (2021); *Sierra Club v. Trump*, 963 F.3d 874, 880 (9th Cir.), *cert. granted*, 141 S. Ct. 618 (2020), and *vacated and remanded sub nom. Biden v. Sierra Club*, ___ S. Ct.___, 2021 WL 2742775 (U.S. July 2, 2021); *Sierra Club v. Trump*, 977 F.3d 853 (9th Cir. 2020), *cert. granted and vacated and remanded sub nom. Biden v. Sierra Club*, __ S. Ct.___, 2021 WL 4507558 (U.S. Oct. 4, 2021); *U.S. House of Representatives v. Mnuchin*, 976 F.3d 1 (D.C. Cir. 2020), *cert. granted and judgment vacated sub. nom. Yellen v. House of Representatives,* __ S. Ct.___, 2021 WL 4733282 (U.S. Oct. 12, 2021); *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11 (D.D.C. 2020); *Washington v. Trump*, 441 F. Supp. 3d 1101 (W.D. Wash. 2020).  In July 2019, the Supreme Court granted a stay of a permanent injunction issued by a district court for the Northern District of California that would have stopped construction of border wall projects undertaken pursuant to DoD's counterdrug authority using transferred funds. *See Trump v. Sierra Club*, 140 S. Ct. 1 (2019), *denying mot. to lift stay*, 140 S. Ct. 2620 (2020).  Foremost "[a]mong the reasons" for granting a stay, the Supreme Court emphasized the Government had "made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review" of DoD's compliance with an appropriations transfer statute, namely section 8005 of the DoD Appropriations Act of 2019. *Id.*

19.     Following the Supreme Court's decision, lower courts either denied or stayed injunctions prohibiting construction of other border barrier projects, thus enabling construction of various projects to continue during the pending litigation.  *See El Paso County v. Trump*, No. 19-51144 (5th Cir. Jan. 8, 2020) (staying injunction against projects undertaken pursuant to 10 U.S.C. § 2808); *La Posta*

*Band of Diegueno Mission Indians of La Posta Reservation. v. Trump*, 828 F. App'x 489, 490 (9th Cir. 2020) (affirming denial of preliminary injunction against construction pursuant to 10 U.S.C. § 284); *El Paso Cnty. v. Trump*, 407 F. Supp. 3d 655, 665 (W.D. Tex. 2019) (denying § 284 injunction); *California v. Trump*, 407 F. Supp. 3d 869, 907 (N.D. Cal. 2019) (staying § 2808 injunction); *Manzanita Band of Kumeyaay Nation v. Wolf*, 496 F. Supp. 3d 257 (D.D.C. 2020) (denying § 284 injunction), *remanded*, *Manzanita Band of Kumeyaay Nation v. Mayorkas*, 2021 WL 1921887 (D.C. Cir. May 11, 2021).

## IV. President Biden's Proclamation Terminating the National Emergency at the Southern Border and Directing Agencies to Develop Border Wall Funding Plans

<u>20.</u>    On his first day in office, President Biden issued a Proclamation declaring that "[i]t shall be the policy of [his] Administration that no more American taxpayer dollars be diverted to construct a border wall." *See* Proclamation, 86 Fed. Reg. at 7225. The Proclamation states that the declaration of a national emergency at the southern border "is terminated and that the authorities invoked in that proclamation will no longer be used to construct a wall at the southern border." *Id.*

<u>21.</u>    The President also directed a "careful review of all resources appropriated or redirected to construct a southern border wall." *Id.* To facilitate that review, the President ordered the Secretary of Defense and the Secretary of Homeland Security to "pause work on each construction project on the southern border wall, to the extent permitted by law, as soon as possible but in no case later than seven days from the date of [the] proclamation." *Id.* The President also directed the Secretaries to "pause immediately the obligation of funds related to construction of the southern border wall, to the extent permitted by law." *Id.* The Secretaries were authorized to make an exception to the pause in construction "for urgent measures needed to avert immediate physical dangers or where an exception is required to ensure that funds appropriated by the Congress fulfill their intended purpose." *Id.* at 7226.

<u>22.</u>    During the pause, the President ordered the Secretaries, in coordination with other federal agencies, to develop a plan "for the redirection of funds concerning the southern border wall, as appropriate and consistent with applicable law." *Id.* The Proclamation stated that the plan "shall include consideration of terminating or repurposing contracts with private contractors engaged in wall

construction, while providing for the expenditure of any funds that the Congress expressly appropriated for wall construction, consistent with their appropriated purpose." *Id.* "After the plan is developed, the Secretary of Defense and the Secretary of Homeland Security shall take all appropriate steps to resume, modify, or terminate projects and to otherwise implement the plan." *Id.*

    **V.**      **The DoD and DHS Border Wall Plans**

<u>23.</u>    The planning process mandated by the President's Proclamation is now complete. In June 2021, DoD and DHS announced their border wall funding plans as required by the President's Proclamation. *See* Memorandum for Director, Office of Management and Budget re: DoD Plan for the Redirection of Border Wall Funds (June 10, 2021) (attached as Exhibit 1) [hereinafter "DoD Plan"]; DHS Border Wall Plan Pursuant to Presidential Proclamation 10142 (June 9, 2021) (attached as Exhibit 2) [hereinafter "DHS Plan"]. The DoD Plan explains that DoD has cancelled all border wall projects undertaken with DoD funds pursuant to 10 U.S.C. § 284 and 10 U.S.C. § 2808. *See* DoD Plan. Additionally, DoD restored funding to 66 domestic and international military construction projects using $2.2 billion of available unobligated military construction appropriations. *See id.* The DHS Plan addresses three different sources of border infrastructure funds: (1) funds Congress appropriated in fiscal years 2017-2020; (2) funds Congress appropriated in fiscal year 2021; and (3) funds DHS received from the Treasury Forfeiture Fund.

    **A.**      **DHS Fiscal Year 2017-2020 Funds**

<u>24.</u>    The DHS Plan states that DHS "may prioritize" using its fiscal year 2017-2020 border infrastructure appropriations on projects" that "are needed to address life, safety, environmental, or other remediation requirements." DHS Plan at 2. DHS also "will explore" using these funds "to address construction previously funded by the Treasury Forfeiture Fund." *Id.* For all other border infrastructure projects funded by appropriations in fiscal years 2017-2020, "prior to further construction, DHS will undertake a thorough review and replanning process." *Id.* Specifically, DHS "intends to engage in standard environmental planning including taking actions consistent with the

National Environmental Policy Act (NEPA) and other environmental planning and statutes."[1]   This "multistep environmental planning process" will include "public scoping and comment on potential environmental impacts;" consultation with "affected landowners, tribes, border community residents, their elected representatives, and interested non-governmental organizations and advocates;" and an assessment of ways to "remediate or mitigate environmental damage caused by past border wall construction."   *Id.* at 2–3.

### B.      DHS Fiscal Year 2021 Funds

25.      DHS intends to use its fiscal year 2021 border barrier appropriations to cover contingency costs associated with other projects, such as cost overruns and contract suspension costs.   *See id.* at 3–4.   Additionally, DHS expects to cover significant costs associated with DoD's cancellation of its border wall projects.   The DoD projects were in various states of completion at the time of their cancellation and DHS intends to fund various close-out and remediation activities at the former DoD projects sites that are turned over to DHS, including erosion control measures, water drainage features, and road construction.   *See id.* at 4.   DHS also intends to use its fiscal year 2021 appropriation for planning of future border infrastructure projects.   *See id.* at 5.

### C.      Treasury Forfeiture Fund

26.      In addition to direct appropriations from Congress, DHS received $601 million from the Treasury Forfeiture Fund in fiscal year 2019 for border wall construction.   *See id.* at 5.   The DHS Plan explains that DHS will end border wall construction using those funds and return any excess money to the Treasury Forfeiture Fund.   *See id.*

### VI.      The GLO Farm and the RGV-09 Border Infrastructure Project

27.      The Complaint in this case focuses on the construction of a proposed two-mile segment of a

---

[1] The DHS Plan notes an exception to such planning for discrete projects involving "urgent measures needed to avert immediate physical dangers" or "projects necessary to address life, safety, environmental, or other remediation requirements."   DHS Plan at 2.   In these circumstances, DHS may rely on environmental waivers issued under § 102(c) of IIRIRA by the Secretary of Homeland Security.   *See id.*   The Plan also notes that DHS "may rescind or revise waivers" to the extent DHS "in its discretion[] deems it warranted."   *Id.*

border infrastructure project in Starr County, Texas identified as "Rio Grande Valley (RGV)-09." *See* Compl. ¶¶ 46, 47, 67–68. DHS's border infrastructure appropriation from fiscal year 2019 funds the RGV-09 project; it is not one of the projects funded by money redirected from the Department of Defense or the Treasury Forfeiture Fund. *See id.* ¶ 98.

28.     GLO is the state agency responsible for managing "state-owned lands and mineral rights" in the state of Texas. *Id.* ¶ 9. Among its holdings is a 3099-acre farm in Starr County adjacent to the U.S.-Mexico border that GLO currently leases "for farming, grazing, and hunting, and receives $150,000 per month in rent." *Id.* ¶¶ 6, 47. GLO asserts that the United States Customs and Border Protection ("CBP") initiated discussions with GLO in August 2020 to acquire approximately 41 acres of the farm to build a two-mile segment of the RGV-09 project, including a monetary offer. *See id.*[2] GLO alleges that it made a counter-offer in response to CBP's offer and that "negotiations continued during the following months," but discussions stopped after President Biden took office and issued the Proclamation addressing border wall funding. *See id.* ¶ 47. By this stage, GLO contends that CBP completed another segment of the RGV-09 project on neighboring property to the west of the GLO Farm. *See id.*

**VII.     GLO's Alleged Injuries and Claims**

29.     GLO contends that the President's Proclamation and the DHS Plan halted negotiations for CBP to acquire 41 acres of the GLO Farm and CBP's plans to build a border wall segment on that land. *See id.* ¶¶ 6, 50, 67–68. GLO alleges that the completed border wall segment built on its neighbor's land has "diverted illegal crossing across the GLO Farm" and resulted in large "caravans" of migrants coming onto the Farm. *Id.* ¶¶ 6–7, 66. GLO believes that this activity has "diminished the value of the GLO Farm" and interfered with "[e]ssential farm activities" such as the "manner, method, and timing" for "the spraying of chemicals" and "the sorting of crops." *Id.* ¶¶ 66–67. GLO

---

[2] Although the Complaint alleges GLO currently owns the farm, GLO is actively working to sell the farm. GLO has posted a notice of sale and a detailed marketing package for potential buyers on its website. *See* www.glo.texas.gov/land/state-lands/land-for-sale/index.html#item/155409 (listed as Starr County, 3098.94 acres for sale) (last accessed Oct. 18, 2021).
.

argues that these injuries "would be redressed if the Proclamation is enjoined and the RGV-09 project continues" to complete the "unfinished segment of the RGV-09 project that would have been built on the GLO Farm had the Proclamation not been issued." *Id.* ¶¶ 67, 69. To redress these alleged harms, GLO brought this action in its capacity as a "landowner, landlord, and as agency of the State of Texas in *parens patriae* on behalf of all Texans" harmed by illegal activity "across the Texas border generally, and particularly concentrated on the GLO Farm." *Id.* ¶ 68.

30.     The central allegation in the Complaint is that the President and DHS have unlawfully stopped construction and land acquisition work for the RGV-09 project. *Id.* ¶¶ 8, 12, 76, 82. In doing so, GLO contends that Defendants are "unilaterally withholding funding appropriated by Congress" for border wall construction and are unlawfully spending that money to pay for other border infrastructure expenditures, such as contract suspension costs and environmental mitigation. *Id.* ¶¶ 8, 51–52, 110–111. GLO's Complaint asserts these allegations in eight separate legal claims:

- Counts I–IV assert implied equitable constitutional claims alleging violations of the Separation of Powers, the Appropriations Clause, the Take Care Clause, and the Presentment Clause. *See id.* ¶¶ 70–96.

- Count V asserts violations of various federal statutes regulating agency appropriations and expenditures, including § 739 of the 2019 CAA, the Purpose Statute (31 U.S.C. § 1301), the Transfer Statute (31 U.S.C. § 1532), and the Anti-Deficiency Act (31 U.S.C. § 134(a)(1)(A)). *See* Compl. ¶¶ 97–105. GLO brings these claims directly "under the . . . statutes" and through a "non-statutory right of action" alleging "*ultra vires*" action. *Id.* ¶ 104.

- Count VI asserts a violation of the border wall construction authorities set forth in IIRIRA. *See id.* ¶¶ 106–117. GLO asserts this claim through a "non-statutory right of action" alleging "*ultra vires*" action. *Id.* ¶ 116.

- Count VII asserts a substantive cause of action against DHS under the Administrative Procedure Act (APA), 5 U.S.C. § 702 *et seq.*, alleging arbitrary and capricious agency action as well as violations of "the budgetary statutes set forth in Count Five" and "the statutes from which the DHS derives [its] authority." Compl. ¶¶ 118–128.

- Count VIII asserts a procedural APA claim against DHS alleging that the DHS Plan is an "agency rule" that needed to comply with the APA's notice and comment rulemaking procedures. *Id.* ¶¶ 129–135.

31.     As remedy for these alleged violations, GLO's Complaint seeks a declaratory judgment that the President's Proclamation and the DHS Plan are unlawful. *See* Complaint, Prayer for Relief at 40.

The Complaint also seeks five discrete injunctions against DHS and Secretary Mayorkas that would, among other things, prohibit any further action to implement the Proclamation and DHS Plan as well as require DHS to alter its funding allocations and resume work on border wall construction contracts for the RGV-09 project and the GLO Farm. *See id.* at 41.[3]

## STANDARD OF REVIEW

<u>32.</u>      Defendants have moved, pursuant to Civil Rule 12(b)(1), to dismiss this matter on the grounds that (1) there is no jurisdiction in this Court for a suit against the President; (2) Texas GLO lacks Article III standing; and (3) the challenged actions in this case are not subject to review under the APA because they are committed to agency discretion as a matter of law and are not final agency actions. *See Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 133 (5th Cir. 2009) (reviewing motion to dismiss on standing grounds under Civil Rule 12(b)(1)); *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir. 2000) ("Absent a specific and final agency action, we lack jurisdiction to consider a challenge to agency conduct."); *Ellison v. Connor*, 153 F.3d 247, 254 (5th Cir. 1998) ("We therefore agree with the district court's decision that it lacked jurisdiction to review the substance of the Corps' decision under the APA."). "Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). If at any time the Court determines that jurisdiction is lacking, the court must dismiss the case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 84 (1998) ("[W]ithout proper jurisdiction, a court cannot proceed at all, but can only note the jurisdictional defect and dismiss the suit."). The Court "may consider outside matters which are attached to a motion to dismiss without first converting it into a motion for summary judgment 'if the material is pertinent to the question of the District Court's jurisdiction since it is always the obligation of a federal court to determine if it has jurisdiction.'" *Green v. Forney Eng'g Co.*, 589 F.2d 243, 246 (5th Cir. 1979) (quoting *Ala. ex rel. Baxley v. Woody*, 473 F.2d 10, 12 (5th Cir. 1973)).

---

[3] On October 8, 2021, DHS announced that it "intends to cancel the remaining border barrier contracts located within U.S. Border Patrol's (USBP) Laredo Sector and all border barrier contracts located in the Rio Grande Valley Sector." *See* DHS to Terminate Border Barrier Contracts in Laredo and Rio Grande Valley, at https://www.dhs.gov/news/2021/10/08/dhs-terminate-border-barrier-contracts-laredo-and-rio-grande-valley.

33.     Defendants have also moved to dismiss the complaint pursuant to Civil Rule 12(b)(6) for failure to state any claim upon which relief can be granted.  A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the complaint must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action[.]"  *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp.*, 550 U.S. at 555); *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992).  Rather, the complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Iqbal*, 556 U.S. at 678.  For purposes of deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all of the reasonably pled factual allegations in the complaint and construes reasonable inferences in favor of the plaintiff.  *Id.*   However, the Court need not accept as true "a legal conclusion couched as a factual allegation[.]"  *Id.* (quoting *Bell Atl. Corp.*, 550 U.S. at 555); *Guidry*, 954 F.2d at 281.  And the court may consider all "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice," in addition to the allegations in the complaint.  *Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*, 9 F.4th 247, 253 (5th Cir. 2021) (citation omitted).

## ARGUMENT

### I.     The President Should Be Dismissed From This Action as to All Counts.

34.     GLO's claims against the President should be dismissed because there is no cause of action against the President, and GLO may not obtain—and the Court may not order—equitable relief directly against the President for his official conduct in issuing the Proclamation.  Consequently, any potential relief in this case must be directed toward the agency Defendants, namely DHS and the Secretary of Homeland Security, not the President.[4]

35.     A plaintiff "must have a cause of action" to bring suit.  *See, e.g., Texas v. United States*, 809 F.3d

---

[4] It is appropriate to dismiss the President at the outset before resolving any other threshold issues. The Supreme Court has repeatedly described the bar against suing the President for his official duties as jurisdictional in nature.  *See Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (plurality opinion).

134, 161 (5th Cir. 2015), *as revised* (Nov. 25, 2015), *aff'd by equally divided court*, 136 S. Ct. 2271 (2016). The actions of the President are not reviewable under the cause of action provided by the APA "because the President is not an 'agency' within the meaning of the APA." *Dalton*, 511 at 469. The Supreme Court has twice held that causes of action that are available against other government officials should not be extended to the President absent a clear statement by Congress. *See Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27 (1982) (declining to assume that *Bivens* and other implied statutory damages "cause[s] of action run[] against the President of the United States"); *Franklin*, 505 U.S. at 800–01 (declining to find cause of action against the President under the APA "[o]ut of respect for the separation of powers and the unique constitutional position of the President"). Accordingly, in the absence of an express statutory cause of action against the President, there is no basis for the Court to infer a cause of action against the President.

36.     There is also no basis for a court to order equitable relief against the President. To the contrary, the Supreme Court recognized over 150 years ago in *Mississippi v. Johnson* that federal courts lack jurisdiction to "enjoin the President in the performance of his official duties." 71 U.S. at 501. And the Court reaffirmed that principle recently in *Franklin*. 505 U.S. at 802–03 (plurality opinion) ("[T]he District Court's grant of injunctive relief against the President himself is extraordinary, and should have raised judicial eyebrows.").

37.     "The reasons why courts should be hesitant to grant such relief are painfully obvious" given the President's unique constitutional role and the potential tension between such a cause of action and the separation of powers. *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). Any extension of an equitable remedy against the President here would create its own set of separation-of-powers problems by usurping "the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1858 (2017). As Justice Scalia explained in *Franklin*, both declaratory and injunctive relief "against the President" is "incompatible with his constitutional position" and "the separation of powers." 505 U.S. at 827–28 (Scalia, J., concurring in part and concurring in the judgment) ("apparently unbroken historical tradition supports the view" that courts may not order the President to "perform particular executive . . . acts").

38.     Lower courts have followed this authority by dismissing the President as a defendant in civil cases and declining to impose either declaratory or injunctive relief against him in his official capacity. *See, e.g., Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 605 (4th Cir. 2017) ("In light of the Supreme Court's clear warning that such relief should be ordered only in the rarest of circumstances we find that the district court erred in issuing an injunction against the President himself."), *vacated and remanded*, 138 S. Ct. 353 (2017); *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017) ("the extraordinary remedy of enjoining the President is not appropriate here"), *vacated as moot*, 138 S. Ct. 377 (2017); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to declaratory relief . . . .") (internal citation omitted); *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d at 34–35 (dismissing the President as a defendant in a case challenging border wall construction); *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) (dismissing "the President himself as a party to this case"); *Newdow v. Bush*, 391 F. Supp. 2d 95, 106-07 (D.D.C. 2005) (holding that plaintiff failed to show redressability "where only an injunction or declaratory judgment against the President can redress plaintiff's injury" and finding that "the Court is without the authority to grant such relief").

39.     Dismissing the President would not deprive GLO of the ability to seek a potential remedy. GLO could seek to obtain relief against DHS and the Secretary of Homeland Security. The gravamen of GLO's Complaint is that DHS, the federal agency responsible for securing the southern border, has unlawfully stopped construction of the RGV-09 project that would occur on GLO Farm. The requested injunctive relief in the Complaint thus focuses entirely on enjoining DHS from taking various action related to border wall construction and funding. *See* Compl. ¶¶ d–h, Prayer for Relief at 41. When complete relief is potentially available against other agency defendants, as is the case here, dismissal of the President is appropriate and avoids unnecessary separation of powers confrontations. *See Franklin*, 505 U.S. at 828 (Scalia, J., concurring in part and concurring in the judgment) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive."); *Swan*, 100 F.3d at 978 ("In most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to

ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials."); *Chamber of Com. of the U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("Even if the Secretary were acting at the behest of the President, this does not leave the courts without power to review the legality [of the action], for courts have power to compel subordinate executive officials to disobey illegal Presidential commands.") (citation omitted); *New York v. Trump*, 485 F. Supp. 3d 422, 479–80 (S.D.N.Y.), *vacated and remanded*, 141 S. Ct. 530 (2020) (declining to issue injunction against the President because complete relief could be granted against other defendants)[5]

## II.      GLO Lacks Article III Standing to Challenge DHS's Border Barrier Policies.

40.      To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). The burden rests on GLO to demonstrate the existence of standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). GLO asserts a right to challenge DHS's border barrier construction policy on a *parens patriae* theory of standing, but that theory is inapplicable when the federal government is the defendant. To the extent GLO has standing at all, it is limited to their proprietary interest in the GLO Farm. And with respect to that narrow interest, GLO fails to show that its injuries are traceable to DHS's actions. GLO cannot premise standing on speculation about how the situation at the border would have been different had DHS not changed its policy approach to the border wall. Accordingly, the Court should dismiss the complaint for lack of Article III standing.

---

[5] Although district courts in some cases have declined to dismiss the President at the motion-to-dismiss stage on grounds that doing so would be premature in light of uncertainty about the relief that could be provided by the defendant agencies, that is not the situation here. There is no question that relief against DHS in this case would be sufficient to redress Plaintiffs' claims related to border wall construction activity. *See Centro Presente v. U.S. DHS*, 332 F. Supp. 3d 393, 418 (D. Mass. 2018); *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307 (D. Md. 2018); *Saget v. Trump*, 345 F. Supp. 3d 287, 297 (E.D.N.Y. 2018).

A.    *Parens Patriae* **Standing Is Unavailable; GLO's Standing Is Thus Limited To Its Interest In the GLO Farm.**

<u>41.</u>    GLO avers that it has standing to sue as "*parens patriae* on behalf of all citizens of Texas" due to recent increases in, and alleged harmful effects from, unlawful migration to the United States. Compl. ¶¶ 9, 68.  But the Supreme Court has long held that "[a] State does not have standing as *parens patriae* to bring an action against the Federal Government," as GLO attempts to do here.  *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel., Barez*, 458 U.S. 592, 610 n.16 (1982); *see also Massachusetts v. Mellon*, 262 U.S. 447, 486 (1923).  GLO does not have the right to assert a "quasi-sovereign" interest "in the well-being of its populace" against the federal government.  *Alfred L. Snapp*, 458 U.S. at 602.  If it has standing at all, GLO only has standing as a landowner, landlord, and administrator of the GLO Farm, which it alleges has been harmed by DHS's change in policy with respect to border barrier construction.

B.    **GLO's Asserted Harms Are Not Fairly Traceable to the Government's Actions**

<u>42.</u>    GLO alleges that since the change in policy regarding construction at the southern border, rates of illegal entry have increased substantially, including in the Rio Grande Valley.  Compl. ¶¶ 58–62.  According to GLO, stopping the ongoing RGV-09 project led to gaps in border barrier infrastructure that have become gateways for migrants to enter the country.  *Id.* ¶¶ 63–64.  GLO claims that construction of "a wall segment on the property to the west of the GLO Farm" has "so effectively diverted illegal crossings across the GLO Farm that it has been transformed into a superhighway of illegal activity."  *Id.* ¶¶ 6, 66.  Consequently, GLO avers that a constant law enforcement presence at the GLO Farm is now required, and that "[g]roups of 100 people or more are frequently apprehended" at the farm by CBP.  *Id.* ¶ 66.  This allegedly has disrupted farming operations and damaged the marketability and value of the farm, which GLO is now actively attempting to sell.  *Id.* ¶¶ 66, 67.  These alleged harms do not give rise to Article III standing because they are not "fairly traceable to the allegedly unlawful conduct of which they complain."  *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (citation omitted).

<u>43.</u>    GLO faces an uphill battle in establishing standing because its theory rests on assumptions about the motivations of parties who are not before this Court.  "[W]here a causal relation between

19

injury and challenged action depends upon the decision of an independent third party," standing is "ordinarily substantially more difficult to establish." *Id.* at 2117; *see Clapper*, 568 U.S. at 414 (expressing "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors"). That is because "causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Lujan*, 504 U.S. at 562. The burden is even heavier when the alleged behavior is unlawful. *See City of L.A. v. Lyons*, 461 U.S. 95, 105 (1983).

44.    GLO falls well short of meeting that heightened standard here. GLO has not pled facts under which it could realistically establish the requisite nexus between government action and the alleged harms at issue. GLO asserts that "[t]he 2021 border surge is a direct result of the Proclamation" because "'nearly all' border migrants across 'dozens of interviews' said Biden's 'relatively pro-immigration positions influenced their thinking.'" Compl. ¶ 63. But the news report relied upon for this assertion actually demonstrates the opposite point: it is very difficult, if not impossible, to draw a connection between decisions to migrate and *any* particular policy of the receiving country. Elliot Spagat, "Policy Changes Help Drive US Migrant Crossings to New Highs," *Associated Press* (Apr. 9, 2021), https://apnews.com/article/politics-honduras-mexico-immigration-border-patrols-363301dde17ae9da149a54d7885ac00c ("The latest jump [in arrivals] follows ferocious storms in Central America and President Joe Biden ending his predecessor's hardline immigration policies, though many changes attributed to Biden are rumors or have been fabricated by smugglers to generate business.") (cited at Compl. ¶ 63 n.50).

45.    Other courts to consider Article III standing on this basis—that changes in immigration policy "entice" individuals to break the law—have rejected it. *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F. 4th 997, 1014–16 (9th Cir. 2021) (rejecting standing to challenge DACA on the basis that the policy "entices future unlawful entry" by those who would not benefit from the policy); *Arpaio v. Obama*, 797 F.3d 11, 19–24 (D.C. Cir. 2015) (rejecting standing on theory that third parties from other countries will be induced to enter the country by promises of benefits under DACA and DAPA, even though the policies do not apply to them). And such a correlation would be especially challenging

20

to draw here because it is implausible that an immigrant's decision to attempt an illegal entry into the United States via the GLO Farm hinged on the new administration's fiscal and policy choices regarding border infrastructure construction. *See Twombly*, 550 U.S. at 570. It is just as plausible that a prior policy which focused on erecting border barriers was an entirely ineffective means of dealing with the root causes of migration, and that the failure to deal with those root causes is now being felt. GLO has no standing to challenge the federal government's decision to shift its policy focus from the former to the latter.

46.     GLO cannot salvage standing by contending that the construction status of the RGV-09 project at the time of the change in administration left them vulnerable to migrants being "channeled" onto their property when construction was paused. Compl. ¶ 68. That alleged harm arises from the prior construction itself pushing people onto GLO's property. Although GLO seeks additional construction as a remedy for the problems created by prior construction, it has not challenged the legality of the prior construction. GLO cannot mend this rupture in the chain of traceability by assumptions about events that GLO believes would have taken place had there not been a change in presidential administration. To highlight one critical example, GLO does not allege that there was any binding obligation in place for CBP to purchase GLO Farm in order to construct a segment of the border wall over the property. Indeed, the parties were still negotiating over terms of the land acquisition when administrations changed, and GLO does not contend CBP had an obligation to buy the land. Compl. ¶ 47. The law may have "authorize[d]" CBP to consummate those negotiations by purchasing the land, but it "does not mandate or direct" those steps, and GLO can only "speculate as to how" government officials would have "exercise[d] their discretion" under hypothetical circumstances that never obtained. *Clapper*, 568 U.S. at 412 (emphasis omitted). Article III standing cannot be premised on such speculation.

**III.      GLO Lacks a Cause of Action to Assert its Statutory Claims in Counts V–VII**

      **A.      GLO Lacks a Private Right of Action Directly Under the Statutes It Invokes.**

47.     The Court should dismiss the statutory claims asserted in Counts V, VI, and VII because GLO lacks a cause of action to seek judicial relief. GLO contends that DHS has violated various statutes

by not continuing construction activity for the RGV-09 border wall project. *See* Compl. ¶¶ 98–105, 106–117, 127. The complaint alleges violations of five statutes that regulate how federal agencies expend funds: the Purpose Statute (31 U.S.C. § 1301), the Transfer Statute (31 U.S.C. § 1532), the Anti-Deficiency Act (31 U.S.C. § 1341(a)(1)(A)), and §§ 230 and 739 of the FY 2019 CAA. Additionally, GLO asserts a violation of IIRIRA, the statute that authorizes DHS to undertake border infrastructure construction. *See* IIRIRA § 102.

48.     None of the appropriations statutes GLO has invoked provides for private rights or includes an express cause of action that authorizes private parties to sue over alleged violations, and that should be the end of the matter. *See Gonzaga Univ. v. Doe,* 536 U.S. 273, 283–84 (2002) ("We have held that the question whether Congress ... intended to create a private right of action is definitively answered in the negative where a statute by its terms grants no private rights to any identifiable class") (citation omitted). Additionally, IIRIRA expressly states that a "cause of action or claim may only be brought alleging a violation of the Constitution of the United States" arising from the Secretary's decision to waive laws in furtherance of construction. IIRIRA § 102(c)(2)(A). GLO does not challenge the waiver issued for the RGV-09 project and IIRIRA expressly precludes the Court from exercising jurisdiction over other types of IIRIRA claims.[6] *Id.* (stating that courts "shall not have jurisdiction to hear any claim not specified in this subparagraph"); *see Ctr. for Biological Diversity v. McAleenan,* 404 F. Supp. 3d 218, 238 (D.D.C. 2019) (holding that IIRIRA "plainly blocks non-constitutional claims by precluding such causes of action and also stripping federal courts of the power to consider such claims"). Accordingly, the GLO cannot "sue under" these statutes directly. *See* Compl. ¶ 104.

## B.     GLO Falls Outside the Zone of Interest of Each Statute It Invokes.

49.     GLO also cannot rely on the cause of action provided by the APA, *see* 5 U.S.C. § 702, or a non-statutory implied equitable cause of action because GLO's asserted interests are not arguably within the zone of interests protected by these statutes. *See* Compl. ¶¶ 104, 116, 119 (asserting APA

---

[6] *See* Determination Pursuant to Section 102 of IIRIRA, as Amended, 84 Fed. Reg. 58400–02 (Oct. 31, 2019 (waiving various laws for border infrastructure construction in Starr County, TX).

and "non-statutory" causes of action). The zone-of-interests requirement originated in *Association of Data Processing Serv. Orgs., Inc.* v. *Camp*, 397 U.S. 150, 156 (1970), and serves as a general presumption about Congress's intended limits on the scope of causes of action. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127-33 (2014). The zone-of-interests test "is a 'requirement of general application'" that "*always* applies and is never negated[.]" *Id.* at 129 (emphasis in original) (quoting *Bennett v. Spear*, 520 U.S. 154, 163–64 (1997)); *see Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (applying zone-of-interests test to alleged statutory violation); *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 320–21 n.3 (1977) (applying the zone-of-interests requirement to alleged constitutional violation). The test requires courts to assess whether "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n of Data Processing Serv. Organizations, Inc.*, 397 U.S. at 153; *see Texas,* 809 F.3d at 161–62. The test forecloses suit where the plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit" the plaintiff to bring suit under it. *Patchak*, 567 U.S. at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)). When Congress authorizes a cause of action, it presumptively does not intend the "absurd consequences" that would follow "[i]f any person injured in the Article III sense" by an alleged violation of federal law could sue over the violation. *Thompson* v. *North Am. Stainless, LP*, 562 U.S. 170, 176–177 (2011). The "zone-of-interests" requirement thus limits the plaintiffs who "may invoke [a] cause of action" for an alleged violation of law to those whose asserted interests "fall within the zone of interests protected by the law invoked." *Lexmark*, 572 U.S. at 129–130 (citation omitted).

50. Here, GLO falls outside the zone of interests of the appropriations statutes that it seeks to enforce. GLO asserts that DHS's failure to construct a border wall across the GLO Farm has "diminished the value of the GLO Farm" and interfered with "essential farm activities." Compl. ¶¶ 66–67. But GLO's private property interests are not even "marginally related to . . . the purposes implicit" in the appropriations statutes at issue in this case. *Patchak*, 567 U.S. at 225 (citation omitted). The RGV-09 project is funded by appropriations Congress provided to DHS in § 230 of FY19 CAA,

which appropriated $1.375 billion "for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector[]" of Texas.  Pub. L. No. 116-6, 133 Stat. at 28. The Purpose Statute provides that appropriated funds may be applied only "to the objects for which the appropriations were made."  31 U.S.C. § 1301(a).  The Transfer Statute prohibits agencies from transferring appropriated funds from one account to another unless authorized by law.  *See* 31 U.S.C. § 1532 ("An amount available under law may be withdrawn from one appropriation account and credited to another or to a working fund only when authorized by law.").  Section 739 of the FY19 CAA imposes a similar restriction that agencies may not "increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act."  Pub. L. No. 116-6, 133 Stat. at 197.  The Anti-Deficiency Act prohibits federal agencies and employees from spending, or committing themselves to spending, in advance of or in excess of appropriations. 31 U.S.C. § 1341(a).

51.     These statutes regulate and protect the interests of federal agencies and Congress in the federal spending and appropriations process.  Nothing about the text or context of these statutes suggests any connection whatsoever to the interests of a state government agency or private party who asserts that federal spending decisions indirectly harm their property values.  *See Miccosukee Tribe of Indians of Fla. v. United States*, No. 08-23523-CIV, 2009 WL 10668917, at *4 (S.D. Fla. Sept. 30, 2009) (dismissing claims brought under the Purpose Statute and a statute appropriating funds to a federal agency for a construction project on zone-of-interests grounds because the statutes protected the agency's interest in "construction" and "Congress's interest in having appropriations applied to the purposes it dictates").  These statutes do not require DHS to consider the potential impact on property values or property interests before making spending decisions, nor do they limit agency discretion to expend or transfer funds in order to protect such interests.  These provisions act as limitations on the Executive vis-a-vis Congress, and do not confer judicially cognizable private rights on third parties to second-guess agency spending decisions.  *See Glass Packaging Inst. v. Regan*, 737 F.2d 1083, 1090 (D.C. Cir.

1984) (holding that a private party alleging "an injury to its competitive interests" was "not arguably within the zone of interests," of a statute intended "to regulate only a specific narrow governmental interest—protection of tax revenues"); *Cleveland Assets, LLC v. United States*, 132 Fed. Cl. 264, 277 (2017) (concluding that plaintiffs alleging an agency's violation of 40 U.S.C. § 3307 fell outside that statute's zone of interests because "its purpose is obviously to enable Congress to oversee how the money it appropriates is spent"), *aff'd*, 883 F.3d 1378 (Fed. Cir. 2018); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981) (holding that private groups do not fall within the zone of interests of the Impoundment Control Act because it was "clearly enacted to safeguard Congress's interests, not those of private citizens"); *cf Sierra Club*, 140 S. Ct. at 1 ("Among the reasons" for granting stay of injunction, environmental plaintiffs "have no cause of action to obtain review of" DoD's compliance with an appropriations transfer statute).

52.     Moreover, allowing this suit to proceed would lead to "absurd consequences" by enabling private parties or local governments to challenge the way in which federal agencies chose to spend their appropriated funds based on unrelated concerns about the downstream impact that spending may have on land use and property values. *Thompson*, 562 U.S. at 176–77. Congress, when it appropriated annual funding to DHS for border infrastructure construction or enacted various statutory limits on how agencies exercises their spending authority, could not have intended to give any landowner potentially impacted by federal spending a cause of action to sue.

53.     Permitting any party who meets the bare minimum of Article III standing to bring suit to challenge federal spending decisions could be antithetical to the interests of Congress, which has ample tools at its disposal to enforce its appropriations powers. *See Nat'l Treasury Emp. Union v. Campbell*, 654 F.2d 784, 794 (D.C. Cir. 1981) ("Congress itself is in a position to monitor and enforce its spending limitations. It is not for us to question the effectiveness of existing remedies and infer additional remedies when Congress has so strongly indicated that no private remedy was intended."). Indeed, this case starkly illustrates the concern. The nonpartisan GAO—which is headed by the Comptroller General, "an agent of the Congress," *Bowsher* v. *Synar*, 478 U.S. 714, 731 (1986) (citation omitted), and charged with examining how federal funds are spent—recently concluded that DHS did not unlawfully

impound funds from its border infrastructure appropriations while implementing the President's Proclamation. *See GAO Opinion* (holding that DHS is "not withholding funds from obligation or expenditure" and "[a]ny delayed expenditures stem from DHS taking necessary steps to comply with statutory environmental and stakeholder consultation requirements for these construction projects and do not constitute an impoundment"). Discretionary spending decisions by federal agencies should not be subject to routine second-guessing by any litigant who happens to meet the bare minimum of Article III injury. Congress did not provide a cause of action for such routine private enforcement of agency spending practices and the Court should not infer one here, particularly where GLO falls outside the zone of interests of the appropriations statutes it seeks to enforce.

54.    GLO's property interests also do not fall within the zone of interests protected by IIRIRA. Section 102 of IIRIRA broadly authorizes the Secretary of Homeland Security to take "such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." IIRIRA § 102(a). As explained above, IIRIRA does not create any private rights or a cause of action for the type of claim GLO brings here challenging DHS's border infrastructure funding decisions. Moreover, IIRIRA protects the federal government's interest in border security, not private property interests that GLO seeks to vindicate in this case. Other courts have rejected claims for failing the zone of interests test in similar situations where plaintiffs with personal property or economic injuries attempted to enforce statutes benefitting the government or the public at large. *See, e.g., Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 274 (D.C. Cir. 2015) (holding plaintiffs' alleged property interests fell outside zone of interests protected by National Environmental Policy Act and Clean Water Act because those statutes protect environmental values); *Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 481 (4th Cir. 2003) (concluding that plaintiff alleging injury to property value was outside the zone of interests protected by the Federal-Aid Highway Act, which was intended to "improve the interstate highway system" for the benefit of local and interstate commerce and the national defense); *Glass Packaging Inst.*, 737 F.2d at 1090 (holding that plaintiff failed zone of interests test where plaintiff alleged injury to competitive interests but the statute at issue regulated only a

"governmental interest—protection of tax revenues").

55.     Here, nothing in the text of the authority granted to DHS in section 102 of IIRIRA or its limited judicial review provisions evidences an intent to protect or regulate the property interests of state governments or private parties.  Moreover, Congress did not impose any limitations on DHS's authority that would arguably protect property owners potentially impacted by DHS's decisions whether to undertake border infrastructure construction.  In fact, the opposite is true.  IIRIRA only authorizes limited judicial review of constitutional claims related to DHS's waiver determinations, not challenges to decisions about whether to acquire land or undertake border barrier construction on certain plots of land.  *See* IIRIRA § 102(c)(2) (limiting judicial review); *id.* § 102(b)(1)(D) (granting DHS discretion as to placement of "fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location").  GLO thus cannot satisfy the zone of interests test because the "interests protected by" IIRIRA are unrelated to the property interests GLO asserts in this case.  *See Lexmark*, 527 U.S. at 131.

## IV.     GLO's Claims Under the APA Are Either Unreviewable or Meritless (Counts VII & VIII).

56.     Even if GLO had standing and could show that it falls within the "zone of interests" of the statutes, GLO has not stated a proper claim under the APA.  That is so for at least three reasons.  First, the decisions GLO challenges are committed to agency discretion as a matter of law, and therefore unreviewable under 5 U.S.C. § 701(a)(2).  Second, the DHS Plan does not constitute "final agency action," and review of it is therefore not authorized by 5 U.S.C. § 704.  Finally, GLO's "procedural" challenge to the DHS Plan in Count VIII is not well taken because the DHS Plan is either a "general statement of policy" or a procedural rule that does not require notice and comment rulemaking.  For these reasons, the Court should dismiss all of the APA claims in this case.

### A.     Decisions As to How to Spend Funds Appropriated by Congress Are Committed to Agency Discretion as a Matter of Law (Counts VII & VIII).

57.     Although the APA presumes that agency action can be judicially reviewed, "[t]his is 'just' a presumption …. [U]nder § 701(a)(2) agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law.'" *Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993)

27

(citing *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)). Broadly speaking, courts have found that Section 701(a)(2) precludes review where "a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Lincoln*, 508 U.S. at 191 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)), including situations where the agency decision "involves a complicated balancing of a number of factors which are peculiarly within its expertise." *Id.* (quoting *Heckler*, 470 U.S. at 830). Such is the case here. Because IIRIRA and the relevant appropriations do not provide meaningful standards against which to judge DHS's actions, the Court should decline substantive APA review here and dismiss Counts VII and VIII of the Complaint.

58.     In *Lincoln*, a leading case on § 701(a)(2), the Department of Health and Human Services received a yearly, lump sum appropriation for the operating and capital expenses of the Indian Health Service.[7] 508 U.S. at 185. For many years, the Indian Health Service operated an Indian Children's Program using money from this lump sum appropriation that provided direct clinical services to Indian children in certain parts of the country. *Id.* at 185–87. Congress never specifically appropriated funds to the Program, even though the relevant appropriations committees in Congress were aware of the Program and the legislative history of the appropriation was replete with references to the Program. *Id.* at 187. When HHS acted to end the clinical services aspect of the Program, Indian tribes sued HHS, claiming that decision violated the law. The Supreme Court concluded that the decision was committed to agency discretion as a matter of law. Because spending appropriated funds requires "a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise,"

---

[7] For example, the appropriation setting the Indian Health Service's operational budget at the time provided, in part:

> For expenses necessary to carry out the Act of August 5, 1954 (68 Stat. 674), the Indian Self-Determination Act, the Indian Health Care Improvement Act, and titles III and XXVI and section 208 of the Public Health Service Act with respect to the Indian Health Service, including hire of passenger motor vehicles and aircraft; purchase of medical equipment; purchase of reprints; purchase, renovation, and erection of modular buildings; payments for telephone service in private residences in the field, when authorized under regulations approved by the Secretary; $1,537,851,000,: . . . .

Pub. L. No. 102-381, 106 Stat. 1407.

the Court reasoned that an "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 193 (quoting *Heckler*, 470 U.S. at 831–32). Courts have extended the rationale of *Lincoln* to non-lump-sum appropriations, as well, since funding decisions relating to a specific appropriation for a specific program have the same decision-making dynamic as lump-sum appropriations. *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751–52 (D.C. Cir. 2002) (concluding decision to limit funds appropriated to "provide assistance directly to … dairy producers, in a manner determined appropriate by the Secretary" by production capacity was committed to agency discretion by law).

59.      Like the appropriation in *Lincoln*, the appropriations at issue here do not meaningfully cabin DHS's discretion. Congress appropriated the funds at issue here to CBP's general account for "procurement, construction, and improvements," *see, e.g.*, Department of Homeland Security Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. at 18, and then earmarked[8] as being "available only" for use on various border fencing projects, *see, e.g.*, *id.* § 230, 133 Stat. at 28 ("$1,375,000,000 is for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector."). But the appropriations do not mandate the use of funds on construction in any particular area on the border (or within the Rio Grande Valley, where the appropriations are focused on that region). They do not compel construction of the specific RGV-09 project GLO contends DHS should complete. Nor do they preclude or require other activities related to the purpose of the appropriation like environmental planning, stakeholder consultation, or land acquisition. The relevant legislative history reflecting the agreement of the House and the Senate on this provision does not indicate otherwise. *Making Further Continuing Appropriations for the Department of Homeland Security for Fiscal Year 2019, and For Other Purposes*, H. Rep. 106th Cong. at 478–79 (2018) ("The agreement includes $1,375,000,000 for additional pedestrian fencing to include $345,000,000 for approximately 11 miles of levee pedestrian fencing and $1,030,000,000 for approximately 44 miles of primary pedestrian fencing in the Rio Grande Valley Sector of Texas.").

---

[8] Earmarks are a "portion of a lump-sum amount for particular purposes." General Accounting Office, *A Glossary of Terms Used in the Federal Budget Process* 46 (2005).

60.     Instead of continuing on its prior trajectory, DHS chose to pause current construction and "undertake a thorough review and replanning process" with respect to border barriers, consistent with current law. DHS Plan at 2. The agency's decsion "to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way" is classically the sort of decision that cannot be reviewed under § 701(a)(2) of the APA. *Lincoln*, 508 U.S. at 192. GLO accuses DHS of only taking these steps to achieve a "de facto cancellation of the border wall projects in pursuit of [President] Biden's Policy goals," Compl. at pg. 22 (heading F) (cleaned up). But that sort of inquiry into an agency's motivations for exercising its discretion in a particular way is precisely what § 701(a)(2) was meant to preclude. *See Gentile v. SEC*, 974 F.3d 311, 319–20 (3d Cir. 2020) (holding decision to open a formal investigation was committed to agency discretion by law, even as to plaintiff's contention that it had an "allegedly retributive motive," because § 701(a)(2) "shields the entirety of an agency action that is committed to agency discretion by law"). DHS is "far better equipped" than this Court or GLO to assess the agency's priorities and needs in choosing among the many permissible uses of these appropriated funds. *Lincoln*, 508 U.S. at 193 (quoting *Heckler*, 470 U.S. at 831–32).

61.     IIRIRA similarly lacks a rigid mandate to complete particular construction projects. The statute provides for the construction of 700 miles of fencing and additional infrastructure "where [it] would be most practical and effective." Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, Div. E, § 564, 110 Stat. 1844, 2091 (amending IIRIRA § 102(b)(1)(A)). But IIRIRA "provides the DHS and the Secretary with substantial discretion in determining where to build fencing, where to use alternative infrastructure improvements rather than fencing, and how best to develop a comprehensive program to prevent illegal immigration." *See United States v. Arizona*, No. CV 10-1413-PHX-SRB, 2011 WL 13137062, at *8 (D. Ariz. Oct. 21, 2011) (dismissing IIRIRA claim brought by State of Arizona to compel border wall construction). As such, there are "no judicially manageable standards [that] permit the Court to determine how or when the DHS or the Secretary should complete the fencing and infrastructure construction contemplated by IIRIRA, the Secure Fence Act, and the Appropriations Acts." *Id.* at *9

62.     Accordingly, because the decisions GLO is challenging are committed to agency discretion as

30

a matter of law pursuant to 5 U.S.C. § 701(a)(2), Congress has not waived DHS's sovereign immunity with respect to these decisions, and the Court should dismiss Counts VII and VIII for lack of jurisdiction.

**B.     The DHS Plan Is Not Final Agency Action Challengeable Under the APA (Counts VII & VIII).**

63.     The APA generally authorizes judicial review only of *final* agency action, as opposed to action that is "preliminary, procedural, or intermediate." 5 U.S.C. § 704. For agency action to be final, it must meet two conditions: "First, the action must mark the 'consummation' of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (internal citations omitted).

64.     The DHS Plan does not meet either of the criteria of "final agency action." By its terms, the DHS Plan is not the "consummation" of DHS's decision-making process, but an interlocutory step on the road to subsequent decisions that would likely constitute final agency action. The DHS Plan is also not an action from which legal consequences flow, as it does not determine the rights and obligations of any member of the public, whether they be contractors, environmental groups, state and local governments, Indian tribes, or private landowners. For example, with respect to the use of fiscal year 2017-20 appropriations, "prior to further construction," the DHS Plan states that the agency "will undertake a thorough review and replanning process," including reconsideration of waivers, standard environmental planning, evaluation of the use of appropriated funds to mitigate environmental damage, consultation, and review of land acquisition activities. DHS Plan at 2–3. Final agency action does not occur until DHS takes steps necessary to translate the DHS Plan into actions with legal consequences. These "single step[s] or measure[s]" may be reviewable, but the "on-going program or policy" described by the DHS Plan "is not, in itself, a 'final agency action' under the APA." *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001). At this stage, GLO's complaint only challenges the Plan, and not subsequent actions taken consistent with the Plan necessary to consummate policy preferences and bring about legal consequences. Accordingly, the Court should dismiss Counts VII

and VIII of the Complaint on the ground that the DHS Plan is not final agency actions subject to judicial review under the APA.

> **C.     There Is No Procedural Violation of the APA Because the DHS Plan Is a Statement of General Policy Exempt from Notice and Comment (Count VIII).**

65.     GLO claims that DHS violated the APA by not subjecting the DHS Plan to notice-and-comment rulemaking.  Compl. ¶¶ 129–35 (Count VIII).  But GLO overlooks the fact that the RGV-09 project GLO would like the government to resume was not subjected to notice-and-comment rulemaking, either.    It would be contrary to basic principles of administrative law if DHS's reassessment of policy at border were held to a higher procedural standard than the initial policy.  *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.").    Yet even if the Court were to examine the issue anew, there is no violation of the APA here.  The APA's requirement that an agency follow notice-and-comment procedures before promulgating rules, 5 U.S.C. § 553(b), does not apply to "general statements of policy," *id.* § 553(b)(3)(A).  The APA also exempts procedural rules from notice and comment.  *See id.*  The DHS Plan fits under both of these exceptions to notice-and-comment rulemaking.  Accordingly, Count VIII must be dismissed for failure to state a claim.

66.     General statements of policy are those that "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."  *Lincoln*, 508 U.S. at 197.  By contrast, legislative rules, which must be adopted through notice-and-comment procedures, have the force and effect of law, and thus create legally enforceable rights or obligations in regulated parties.  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).  Unlike substantive rules, a general statement of policy is one "that does not impose any rights or obligations" and that "genuinely leaves the agency and its decision-makers free to exercise discretion."  *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995) ("*PPCC*").  They are designed to "presage[] an upcoming rulemaking or announce[] the course which the agency intends to follow in future adjudications."  *Brown Exp., Inc. v. United States*, 607 F.2d 695, 701 (5th Cir. 1979) (quoting *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38

32

(D.C. Cir. 1974)). The Fifth Circuit has held that "the starting point" in determining whether an agency pronouncement is a statement of policy "is 'the agency's characterization of the rule.'" *See PPCC* 56 F.3d at 596.

67.     In *PPCC*, the FDA issued a document without notice and comment outlining the factors it would consider when determining whether it would bring enforcement actions for unlawful drug compounding. 56 F.3d at 593–94. The Fifth Circuit agreed that the policy was not a "substantive rule" and therefore not subject to notice-and-comment review. *Id.* at 594–601. It also agreed that the policy fit the definition of a "general statement of policy" "to a tee, as in it the FDA announced some of the factors that it will consider in resolving a substantive question of regulation,' i.e., whether a pharmacy is engaged in traditional compounding or drug manufacturing." *Id.* at 601 (citation omitted); *see also U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984) (holding that an agency's plan for targeting employers with the highest injury rate for safety inspections was not a legislative rule that needed to be promulgated through notice-and-comment rulemaking).

68.     A rule may also be exempt from notice and comment if it is merely binds the agency as to matters of agency organization, procedure, or practice. *See Texas*, 809 F.3d at 176 (a "binding rule is not required to undergo notice and comment if it is one 'of agency organization, procedure, or practice'") (quoting 5 U.S.C. § 553(b)(A)). In the Fifth Circuit, "the substantial impact test is the primary means by which [a court would] look beyond the label 'procedural' to determine whether a rule is of the type Congress thought appropriate for public participation." *Kast Metals Corp.*, 744 F.2d at 1153; *accord Texas*, 809 F.3d at 176. In other words, the question is whether the agency action "modifies substantive rights and interests" of the public. *Kast Metals*, 744 F.2d at 1153. Typically, documents that "tell people how the agency plans to carry out its duties" are covered by this exception. *Jaxson v. Saul*, 970 F.3d 775, 777 (7th Cir. 2020) (internal claims processing memorandum for Social Security cases did not require notice-and-comment).

69.     The DHS Plan is best understood as either a general statement of policy or a rule of agency organization, procedure, or practice, rather than as a substantive rule requiring notice and comment. Like the policy guidance in *PPCC*, the DHS Plan fits the "general statement of policy" exception "to

33

a tee" because it explains "the factors that [the agency] will consider in resolving a substantive question of regulation." *PPCC*, 56 F.3d at 601. The plan leaves DHS free to exercise its discretion in the manner it sees fit moving forward as to any particular border infrastructure project. In addition, because the plan merely sets out the agency's plan to "carry out its duties," *Jaxson*, 970 F.3d at 777, without actually implementing any of the substantive actions that would be needed to carry out the plan, the DHS Plan does not modify the substantive rights and interests of the public and is properly classed as a procedural rule. Regardless of which characterization the Court finds most persuasive, one thing is certain: The DHS Plan does not have the sort of legal effect on the public that would require DHS to subject the Plan to notice and comment prior to promulgation. As such, Count VIII of GLO's complaint should be dismissed.

## V.        DHS Has Not Violated Any Statutes (Count V–VII).

70.     GLO alleges that DHS has violated IIRIRA, recent appropriations of funds to DHS for border infrastructure projects, and a variety of federal statutes intended to exert congressional control over the use of federal funds by agencies. GLO raises these claims both under its non-statutory *ultra vires* cause of action, and as an APA claim pursuant to 5 U.S.C. § 706(2). Compl. ¶ 104 (Count V, ultra vires violation of budget statutes); *id.* ¶ 116 (Count VI, ultra vires violation of IIRIRA); *id.* ¶ 127 (Count VII, substantive APA violation).

71.     As an initial matter, non-statutory review of alleged *ultra vires* action is a limited doctrine that may be invoked only when a plaintiff would otherwise be "wholly deprive[d]" of a "meaningful and adequate means of vindicating its statutory rights" and when Congress has not precluded judicial review. *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43–44 (1991) (citing *Leedom v. Kyne*, 358 U.S. 184 (1958)). GLO, however, has not established that any "private rights," *Barlow v. Collins*, 397 U.S. 159, 166 (1970), or "rights which [Congress] create[d]" are at stake. *Switchmen's Union v. Nat'l Mediation Bd.*, 320 U.S. 297, 301 (1943); *see also Leedom*, 358 U.S. at 189 ("deprived . . . of a 'right' assured to them by Congress"). Further, GLO has not been "wholly deprive[d]" of a means for review of their claims because Congress has provided the APA as the vehicle to review agency action alleged to be unlawful. *See Puerto Rico v. United States*, 490 F.3d 50, 59–60 (1st Cir. 2007); *Wise v.*

*Glickman*, 257 F. Supp. 2d 123, 127 n.1 (D.D.C. 2003).

72.     Even assuming, however, that GLO is allowed to proceed on its *ultra vires* claims, GLO has carried its burden to show that DHS acted "contrary to a 'clear and mandatory' prohibition." *Exxon Chemicals Am. v. Chao*, 298 F.3d 464, 468 (5th Cir. 2002) (quoting *Leedom*, 358 U.S. at 188); *see also Horizon Air Indus., Inc. v. Nat'l Mediation Bd.*, 232 F.3d 1126, 1131 (9th Cir. 2000) ("ultra vires review is "one of the narrowest known to the law" ) (citation omitted); *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.) (Ultra vires review is "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds"). Nor has GLO stated a claim for any statutory violations under the APA. Thus, even if the Court were to find that GLO had standing and a cause of action to bring these claims, its statutory arguments fail on the merits for the reasons explained below.

### A.     DHS Has Not Violated IIRIRA.

73.     GLO has not stated a claim for a violation of IIRIRA. *See* Compl. ¶¶ 106–117 (Count VI). As explained above, § 102 of IRRIRA is a broad statutory authorization directing that DHS "shall take such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." Section 102 vests DHS with complete discretion for determining how and where border fencing should be utilized in that effort, directing the Secretary to construct fencing "along not less than 700 miles of the southwest border where fencing would be most practical and effective." IIRIRA § 102(b)(1)(A). Indeed, Congress emphasized that DHS is not required "to install fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location along an international border of the United States, if the Secretary determines that the use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border at such location." IIRIRA § 102(b)(1)(D). Further, IIRIRA does not establish a deadline for completing the RGV-09 project at issue in this case, despite the fact that Congress established specific dates for the completion of other projects. *Compare* IIRIRA § 102(b)(1)(B) (requiring completion of projects in

certain priority areas by December 31, 2008), *with id.* § 102(b)(1)(A) (requiring construction of not less than 700 miles of fencing along the southwest border without a deadline).

74.     GLO contends that DHS has violated IIRIRA by not proceeding with construction of the RGV-09 project, but Section 102 of IIRIRA does not prescribe when, where, how, or in what manner DHS must undertake construction and placement of border fencing projects. *See Arizona*, 2011 WL 13137062, at *8 ("IRIRA and the Appropriations Acts leave the Secretary and the DHS with a great deal of discretion in deciding how, when, and where to complete the construction."). As for the RGV-09 project at issue here, IIRIRA does not mandate "completion of the fence" project or "any required discrete action by a specific time." *Id.* Moreover, Congress neither earmarked funds for the RGV-09 project nor specifically directed that the project be completed at all, let alone by a certain date. In short, there is no statutory requirement in IIRIRA that DHS build a border segment on GLO's property. The lack of any judicially enforceable mandate in the statute as to the timing or completion of any particular border infrastructure project is therefore fatal to GLO's claim. *Id.* (dismissing claim by the State of Arizona that DHS violated IIRIRA by not building border fencing in Arizona).

### B.     DHS Has Not Acted Contrary to Its Congressional Appropriations.

75.     GLO has also failed to state a claim that DHS is violating its border wall appropriations by not continuing to build the RGV-09 project on the GLO Farm. *See* Compl. ¶¶ 98–99. The RGV-09 project is funded by § 230 of FY19 CAA, which appropriated $1.375 billion "for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector" of Texas. Pub. L. No. 116-6, div. A § 230, 133 Stat. at 28; *see* Compl. ¶¶ 46, 98. But nothing in that appropriation of funds requires DHS to build border infrastructure on the GLO Farm, let alone any specific location. Nor does section 230 provide any limitations on the timing or placement of barrier fencing. Rather, as explained above, Congress left those discretionary decisions to DHS. *See* IIRIRA § 102(b)(1)(D). Accordingly, there is no basis for the Court to imply a new restriction found nowhere in the text of DHS's appropriation that would require construction of a barrier segment on the GLO Farm.

76.     The Court should also reject GLO's argument that DHS is violating section 230 by spending funds on environmental planning prior to resuming barrier construction. *See* Compl. ¶¶ 21, 111. The DHS Plan explains that DHS "intends to engage in standard environmental planning including taking actions consistent with the National Environmental Policy Act (NEPA) and other environmental planning and statutes" before resuming "further construction." DHS Plan at 2–3. This expenditure falls well within the bounds of DHS's permissible funding discretion under the necessary expense doctrine. This "rule of construction for appropriations statutes" governs situations where an appropriation for a general purpose (*i.e.*, border barrier construction) "leaves open whether a specific proposed expenditure is a legally authorized purpose for which appropriated funds may be expended." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1349 (D.C. Cir. 2012) (Kavanaugh, J.). "Under the necessary expense doctrine, 'an appropriation made for a specific object is available for expenses necessarily incident to accomplishing that object unless prohibited by law or otherwise provided for.'" *Id.* (quoting 1 GAO, Principles of Federal Appropriations Law at 4–20). Agencies are afforded deference in making this determination and the rule ensures that agency spending is not "so attenuated as to take it beyond that range of permissible discretion." *Id.* (quoting GAO, *Implementation of Army Safety Program,* B–223608 (Comp. Gen. Dec. 19, 1988)).

77.     There is no doubt that environmental planning and review is a necessary incident to border wall construction. Indeed, such construction along the southern border near the Rio Grande has the potential to impact plant and wildlife habitat, natural resources, and flood prevention infrastructure. *See* DHS Response to Public Comments Regarding the Construction of Border Wall Within Certain Areas in the Rio Grande Valley, Texas, 85 Fed. Reg. 23,983-01 (Apr. 30, 2020). DHS has a long history of addressing types of concerns as part of expending funds in furtherance of its border wall project management and development process. *See Cnty. of El Paso v. Chertoff,* No. EP-08-CA-196-FM, 2008 WL 4372693, at *11 (W.D. Tex. Aug. 28, 2008) (explaining DHS's "comprehensive analysis of the potential environmental impacts"). Moreover, Congress was well aware that DHS would undertake environmental planning when it appropriated funding for border infrastructure projects and expressly required that DHS consult with stakeholders about environmental impacts. *See supra* at

¶¶ 11–12.  The environmental planning expenditures at issue here are thus within the "range of permissible discretion" afforded to DHS in the exercise of its spending authority.  *Fed. Lab. Rels. Auth.*, 665 F.3d at 1349.

78.     The fact that DHS has waived the application of various environmental laws pursuant to § 102(c) of IIRIRA does not preclude DHS from conducting environmental planning.  *See* Complaint ¶ 111; *see also* Determination Pursuant to Section 102 of IIRIRA, as Amended, 84 Fed. Reg. 58400–02 (Oct. 31, 2019) (waiver for barrier construction in Starr County, TX).  Nothing in the text of § 102(c), the waiver, or any other provision of law prevents DHS from undertaking more environmental planning, stakeholder consultation, and mitigation measures if the DHS determines that those actions are appropriate for a particular barrier construction project.  Simply put, the waiver establishes a floor for the level of environmental planning that DHS is legally required to undertake, not a ceiling.  DHS may therefore lawfully spend money in furtherance of more robust environmental planning and outreach beyond the bare minimum level required by the terms of the wavier.  *See GAO Opinion* at 9–12 (concluding that DHS is not impounding or withholding its border wall appropriations by using that money for "environmental and stakeholder consultation").

79.     Additionally, DHS may lawfully use its border wall appropriations on costs and fees associated with the suspension of contractor performance while the environmental planning process is ongoing.  *See* Compl. ¶¶ 51, 110; *see also* DHS Plan at 4 ("DHS anticipates being able to cover other delay costs and changes as a result of the suspension of contract performance using the appropriated funds from the year in which the project was funded.").  DHS is authorized to suspend all or any part of the work called for under a contract for the period of time that it determines appropriate, "for the convenience of the Government."  *See* Federal Acquisition Regulation, Suspension of Work, 48 C.F.R. § 52.242-14(a).  Here, DHS has suspended contract performance of the RGV-09 project while the agency undertakes more extensive environmental planning and stakeholder consultation before resuming construction activity.  *See* DHS Plan at 1–3.  Costs that DHS owes its contractors during this suspension period are lawful expenditures because they are reasonably necessary to ensure compliance with terms and conditions of the border wall construction contracts.  Indeed, federal regulations

38

expressly contemplate that agencies who suspend performance of contracts must pay contractors for the increased costs incurred by the suspension. *See* 48 C.F.R. § 52.242-14. DHS does not have separate appropriations to fund increased contract costs necessitated by various factors, including suspension costs. Instead, such costs are reasonably related to the appropriations that fund the contracts. As the GAO found, the funds that DHS has obligated for border wall contracts remain available, including during the time when construction activity is suspended, and DHS is "not withholding funds from obligation or expenditure." *GAO Opinion* at 12 ("Prior year funding for border fencing or barriers remains obligated for construction projects, and continues to be spent."). These payments are reasonably related to the purpose for which Congress appropriated border infrastructure funding to DHS and therefore consistent with federal appropriations principles. *See Fed. Lab. Rels. Auth.*, 665 F.3d at 1349.

### C. DHS Has Not Violated Section 739 of the 2019 Consolidated Appropriations Act.

80. GLO claims that DHS has violated § 739 of the CAA by "redirecting funds appropriated for border barrier construction to other projects and uses." Compl. ¶ 101. That statute provides:

> None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.

Pub. L. No. 116-6, Div. D, § 739.

81. DHS's actions do not run afoul of this provision. The funds appropriated for border barrier construction are not being used to "increase, eliminate, or reduce funding" to another "program, project, or activity," a term that refers to elements within a budget account. *See GAO Glossary* at 80. DHS is not taking money from its border infrastructure appropriations to fund other DHS programs or projects, such as cybersecurity operations or airport security. Rather, DHS is expending the funds appropriated by § 230 in ways authorized by statute. *See supra* at ¶¶ 73–79; *GAO Opinion* at *4 (concluding that expenditure delays to "ensur[e] that requirements under environmental and stakeholder consultation laws are satisfied for border barrier projects" are permissible).

82.     GLO also contends that DHS ran afoul of § 739 by "redirecting appropriated funds to projects previously funded from the Treasury Forfeiture Fund or redirected from DoD funds." Compl. ¶ 102. It alleges, with respect to the RGV-09 project, that "the 2019 CAA specifically appropriates funds for the construction of border walls in the RGV sector, yet the programs the DHS Plan would redirect these appropriations to are located in different areas and would not result in new barrier construction as Congress intended." *Id.* That is not the case. Nowhere does the DHS Plan claim that FY 2019 funds appropriated for use in the Rio Grande Valley will be used anywhere other than the Rio Grande Valley. The DHS Plan does note that DHS will "explore" the use of funds appropriated between FY 2017 and FY 2020 "to address construction previously funded with Treasury Forfeiture Fund Amounts," DHS Plan at 2, but that reassessment is to be done "consistent with applicable law." *Id.* at 1. Some of the border wall appropriations implicated by the DHS Plan are geographically limited, but others are not. *See supra* at ¶ 13. Absent some plausible allegation to the contrary, GLO cannot state a claim by simply speculating that DHS may expend funds in contravention of the geographic limitations in the appropriations. And none of DHS's activities implicate § 739 in any event because, as discussed above, DHS is not using FY 2019 funds for any other program, project, or activity. The Court should dismiss this claim.

### D.      DHS Has Not Violated Any Other Budgetary Statute or Rule.

83.     Finally, GLO argues that DHS's actions represent violations of four other appropriations statutes or rules:

- The "Purpose Statute," 31 U.S.C. § 1301(a), which states that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."

- The "Transfer Statute," 31 U.S.C. § 1532, which provides, "[a]n amount available under law may be withdrawn from one appropriation account and credited to another or to a working fund only when authorized by law."

- The Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1)(A), which prohibits government officials from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation."

- GLO also cites a ninety year-old Comptroller General opinion that states, "where

either of two appropriations reasonably could be construed as available for a certain class of expenditures and the administrative office elects to and does use one of them for that purpose it can not thereafter, because of insufficient funds in said appropriation or for other reason, use the other appropriation for the same purpose." GAO, A-35831, Comptroller General McCarl to the Secretary of the Interior, 10 Comp. Gen. 440 (Mar. 27, 1931).

84.     DHS has violated none of these rules.  As explained, DHS's actions satisfy the "Purpose Statute" because all funds are being spent on border construction or necessary incidents thereof.  The "Transfer Statute" is not implicated at all because DHS is not moving funds between appropriation accounts.   And the "Anti-Deficiency Act" has not been violated because DHS is not authorizing expenditures or obligations of funds in excess of the amounts appropriated to the accounts for CBP infrastructure generally or border barrier construction specifically, which would tie Congress's hands as the branch of government responsible for making appropriations.   Finally, although the Comptroller General's opinion is not a "budgetary statute," DHS has not violated the appropriations principle it articulates because it is not using one budget account to make up for a lack of funds in another budget account; it is simply spending funds in the accounts appropriated for the border wall in a manner consistent with the purpose of the appropriation. As GAO recognized, the DHS Plan is intended to "ensur[e] that requirements under environmental and stakeholder consultation laws are satisfied for border barrier projects."   *GAO Opinion* at *4.   Expenditures from the border barrier accounts to achieve that purpose do not violate any appropriations statute.

## VI.     GLO's Constitutional Claims Should be Dismissed (Counts I–IV).

85.     As a threshold matter, GLO lacks a cause of action and cannot satisfy the zone-of-interests requirement for its constitutional claims.[9]   *See Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) ("[T]he Court has required that the plaintiff's complaint fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." (citation omitted)); *Boston Stock Exch.*, 429 U.S. at 320–21 n.3 (applying the zone-of-interests requirement to plaintiffs seeking to enforce the dormant Commerce Clause).  Just as the

---

[9] GLO brings its constitutional claims under an implied equitable cause of action.  *See* Compl. ¶¶ 78, 84, 90, 96.

GLO's private property interests are entirely unrelated to the interests protected by the statutes the GLO invokes, *see supra* at ¶¶ 49–55, these interests are also unrelated to the asserted constitutional limitations on Congress's power to authorize or appropriate funds for DHS to undertake border infrastructure projects.

86.     Additionally, GLO's constitutional claims should be dismissed because "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton*, 511 U.S. at 473. In *Dalton*, the Supreme Court rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471. Not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. In reaching this conclusion, the Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases). The Constitution is only implicated if executive officers rely on it as an independent source of authority to act or if the officers rely on an unconstitutional statute. *Id.* at 473 & n.5.

87.     Neither of those situations applies to this case. DHS is executing is border wall plan pursuant to congressional statutory authorization under IIRIRA and its border infrastructure appropriations, not independent Article II authority, as in the *Youngstown Sheet & Tube* case. Further, GLO has not suggested that any of these statutes are themselves unconstitutional. *Dalton*'s reasoning thus fully applies here and refutes GLO's argument that it has a constitutional claim or cause of action. *See Ctr. for Biological Diversity*, 453 F. Supp. 3d at 51–54 (dismissing constitutional claims challenging border wall construction based on *Dalton*). This case concerns "simply" whether DHS has "exceeded its statutory authority" and "no constitutional question whatever is raised"—"only issues of statutory interpretation." *Dalton*, 511 U.S. at 473–74 & n.6.

88.     In advancing a constitutional claim based on the separation of powers, GLO makes the same argument the Supreme Court rejected in *Dalton*. GLO asserts that DHS acted contrary to the will of Congress because it allegedly stopped spending its border infrastructure appropriations in furtherance of border wall construction. *See* Compl. ¶¶ 70–73. But that separation-of-powers claim hinges entirely

on whether DHS acted in accordance with the statutes at issue in this case. The outcome of that question depends upon resolution of statutory claims and does not involve any unique separation-of-powers principles. If GLO's theory were accepted, every garden-variety action by a federal agency alleged to be in violation of a statutory provision would also, *ipso facto*, violate the constitutional separation of powers. The Supreme Court foreclosed that line of argument in *Dalton*.

89.     GLO's Appropriations Clause claim fails for similar reasons. *See* Compl. ¶¶ 80–85. GLO does not allege any distinct violation of the Appropriations Clause.[10] That provision states that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. "[I]n other words, [a] payment of money from the Treasury must be authorized by a statute." *Off. of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990). The gravamen of GLO's claim is that DHS has acted "[i]n the absence of statutory authority" and therefore violated the Appropriations Clause. *See* Compl. ¶ 82. But spending undertaken in accordance with a statutory appropriation that authorizes an expenditure "by Law" cannot violate the Appropriations Clause. Accordingly, statutory funding disputes turn solely on "the interpretation and application of congressional statutes under which the challenged expenditures either were or were not authorized," not on a "controversy about the reach or application of" the Appropriations Clause. *See Harrington v. Schlesinger*, 528 F.2d 455, 457–58 (4th Cir. 1975). Indeed, even under GLO's own theory, there is no constitutional violation if DHS has acted in accordance with its statutory obligations. For that reason, the Appropriations Clause adds nothing to this case separate and apart from the statutory issues discussed above. *Dalton* thus requires dismissal of this claim. 511 U.S. at 474 (stating that the "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration.").

---

[10] The Complaint refers to this provision of the Constitution as the "Spending Clause," but the Spending Clause is a different provision that empowers Congress to "lay and collect Taxes, Duties, Imposts, and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States." art. I, § 8, cl. 1. GLO's claim in this case appears to be based on the Appropriations Clause. *See* U.S. Const., art. I, § 9, cl. 7

90. GLO's Take Care Clause claim similarly fails because it merely reasserts allegations of statutory violations in constitutional terms. The Take Care Clause provides that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The alleged Take Care Clause violation in this case is based entirely on allegations that Defendants have failed to comply with the statutes discussed above, including DHS's appropriations, IIRIRA, and various appropriations statutes. *See* Compl. ¶ 88 (listing statutes that form the basis for the Take Care Clause claim). But *Dalton* bars GLO's attempt to transform allegations of statutory violations into separate constitutional violations of the Take Care Clause.

91. There is no precedent for using the Take Care Clause as a mechanism to obtain affirmative relief against the President or Executive Branch agencies. As explained above, GLO has no cause of action to raise such a claim against the President. *See supra* at ¶¶ 34–39; *Franklin*, 505 U.S. at 796. Moreover, recognizing such a claim in this context would raise its own separation powers problems, as the Take Care Clause furnishes no basis for affirmative relief in an Article III court. For the Judicial Branch to undertake such an inquiry would express a "lack of the respect due" to the Nation's highest elected official, *Baker v. Carr*, 369 U.S. 186, 217 (1962), by assuming judicial superintendence over the exercise of Executive power that the Clause commits to the President. Indeed, the Supreme Court has recognized that "the duty of the President in the exercise of the power to see that the laws are faithfully executed" "is purely executive and political," and not subject to judicial direction. *Mississippi*, 71 U.S. at 499. No court has read the Take Care Clause as opening the door to any plaintiff seeking to challenge the manner in which the President or his subordinates execute the law.

92. Finally, the Court should dismiss GLO's Presentment Clause claim. *See* Compl. ¶¶ 92–96. Neither the President nor DHS have modified or repealed DHS's appropriations acts contrary to the Constitution's bicameralism and presentment requirements of Article I, § 7. This case bears no resemblance to the legislative or line-item veto authorities that the Supreme Court struck down in *I.N.S. v. Chadha*, 462 U.S. 919 (1983) and *Clinton v. City of N.Y.*, 524 U.S. 417 (1998). Rather, GLO merely contends that DHS is not expending its border infrastructure funds in accordance with the terms of the relevant appropriations statutes. That claim is purely statutory in nature and raises no

issues of any constitutional dimension. *See Dalton*, 511 U.S. at 473–74.

## CONCLUSION

93.     Accordingly, Defendants respectfully request that the Court grant this motion and dismiss the complaint in its entirety.

Dated: October 19, 2021                         Respectfully submitted,

                                                BRIAN M. BOYNTON
                                                Acting Assistant Attorney General

                                                ALEXANDER K. HAAS
                                                Director, Federal Programs Branch

                                                ANTHONY J. COPPOLINO
                                                Deputy Director, Federal Programs Branch

                                                 */s/ Michael J. Gerardi*
                                                ANDREW I. WARDEN
                                                Senior Trial Counsel
                                                MICHAEL J. GERARDI (D.C. Bar
                                                #1017949)
                                                Trial Attorney / Attorney-in-Charge
                                                U.S. Department of Justice
                                                Civil Division, Federal Programs Branch
                                                1100 L St. NW, No. 122212
                                                Washington, D.C. 20005
                                                Tel: (202) 616-0680
                                                Fax:    (202) 616-8470
                                                E-mail: michael.j.gerardi@usdoj.gov

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.5.A., Defendants believe oral argument would be helpful to the Court and respectfully request the opportunity to present oral argument in support of this motion.

*/s/ Michael J. Gerardi*
MICHAEL J. GERARDI

## CERTIFICATE OF SERVICE

I hereby certify that on October 18, 2021, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

*/s/ Michael J. Gerardi*
MICHAEL J. GERARDI

46