**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

| | |
|---|---|
| THE GENERAL LAND OFFICE OF THE STATE OF TEXAS, and GEORGE P. BUSH, in his official capacity as Commissioner of the Texas General Land Office, <br><br> Plaintiffs, <br><br> v. <br><br> JOSEPH R. BIDEN, in his official capacity as President of the United States, *et al.*, <br><br> Defendants. | No. 7:21-cv-00272 <br> Hon. Micaela Alvarez |
| THE STATE OF MISSOURI; THE STATE OF TEXAS, <br><br> Plaintiffs, <br><br> v. <br><br> JOSEPH R. BIDEN, in his official capacity as President of the United States, *et al.* <br><br> Defendants. | No. 7:21-cv-00420 <br> (formerly No. 6:21-cv-00052) <br> Hon. Micaela Alvarez |

**OPPOSITION TO MOTION FOR A PRELIMINARY INJUNCTION
BY THE *MISSOURI* PLAINTIFFS**

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BACKGROUND ................................................................................................................3

I.      DHS's Statutory Authority to Construct Border Infrastructure and Undertake
        Environmental Planning ................................................................................................3

II.     Congressional Appropriations to DHS for Border Infrastructure and Environmental
        Planning ................................................................................................................5

III.    President Trump's Efforts to Obtain Additional Border Wall Funding....................6

IV.     President Biden's Proclamation Terminating the National Emergency at the
        Southern Border and Directing Agencies to Develop Border Wall Funding Plans.........8

V.      The DoD and DHS Border Wall Plans ................................................................9

        A.      DHS Fiscal Year 2017–2020 Funds................................................................9

        B.      DHS Fiscal Year 2021 Funds ................................................................10

VI.     DHS's Current Use of Fiscal Year 2020 and 2021 Funds....................................10

        A.      Fiscal Year 2020 Funds................................................................11

        B.      Fiscal Year 2021 Funds ................................................................13

VII.    Different Parts of the Texas State Government File Separate Lawsuits Against the
        Federal Defendants................................................................14

STANDARD OF REVIEW ................................................................15

ARGUMENT................................................................16

I.      The States Have Failed to Show a Substantial Likelihood of Success on the Merits...............16

        A.      The States Lack Article III Standing to Challenge DHS's Border Barrier
                Spending Policies................................................................16

        B.      Texas Has Engaged in Improper Claim-Splitting, and as a Result, this
                Lawsuit Is Likely to Be Dismissed. ................................................22

        C.      The States' Claims Under the APA Are Unreviewable................................26

                1.      The States' Claims Are Committed to Agency Discretion ....................26

                2.      The States Have Not Challenged Final Agency Action. ..................30

i

      D.      DHS's Actions Are Not Arbitrary and Capricious.........................................30

      E.      The States' Statutory Claims Fail..............................................................34

                1.      The States Do Not Fall Within the Zone of Interests Protected by DHS's Annual Border Infrastructure Appropriations and the Impoundment Control Act. ...........................................................34

                2.      DHS Has Acted Consistent With The Requirements of its Congressional Appropriations and the Impoundment Control Act. ..............40

                        a.      DHS is Lawfully Executing its Fiscal Year 2020 Border Infrastructure Funds. ..................................................42

                        b.      DHS is Lawfully Executing its Fiscal Year 2021 Border Infrastructure Funds. ..................................................44

                3.      The GAO Agrees DHS is Lawfully Executing its Border Infrastructure Funds.........................................................46

      F.      The States' Constitutional Claims Fail.......................................................48

II.      The States Will Not Be Irreparably Injured Absent a Preliminary Injunction.........................51

III.      The Balance of Equities Favors the Defendants..........................................................52

IV.      The Requested Injunction Is Overbroad and Unworkable. ..........................................54

CONCLUSION............................................................................................................................58

# TABLE OF AUTHORITIES

## Cases

*Ameritox, Ltd. v. Aegis Sciences Corp., No. 3:08-CV-1168*,
   2009 WL 305874 (N.D. Tex. Feb. 9, 2009) ................................................................ 22, 23

*Arias v. DynCorp*,
   752 F.3d 1011 (D.C. Cir. 2014) ................................................................ 21

*Arpaio v. Obama*,
   797 F.3d 11–24 (D.C. Cir. 2015) ................................................................ 19

*Assoc. for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*,
   19 F.3d 241 (5th Cir. 1994) ................................................................ 20

*Association of Data Processing Serv. Orgs., Inc. v. Camp*,
   397 U.S. 150 (1970) ................................................................ 35

*Baker v. Carr*,
   369 U.S. 186 (1962) ................................................................ 50

*Bennett v. Spear*,
   520 U.S. 154 (1997) ................................................................ 30, 35, 48

*Block v. Cmty. Nutrition Inst.*,
   467 U.S. 340 (1984) ................................................................ 26

*Bluefield Water Ass'n v. City of Starkville*,
   577 F.3d 250 (5th Cir. 2009) ................................................................ 16

*Boston Stock Exch. v. State Tax Comm'n*,
   429 U.S. 318–21 n.3 (1977) ................................................................ 35, 48

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*,
   419 U.S. 281 (1974) ................................................................ 31

*Bowsher v. Synar*
   478 U.S. 714 (1986) ................................................................ 38

*Brewer v. Landrigan*,
   562 U.S. 996 (2010) ................................................................ 57

*Brown v. Felsen*,
   442 U.S. 127 (1970) ................................................................ 24

*California v. Texas*
   141 S. Ct. 2104 (2021) ................................................................ 19

*City of L.A. v. Lyons*,
   461 U.S. 95 (1983) ................................................................ 19

iii

*City of New Haven, Conn. v. United States,*
   809 F.2d 900 (D.C. Cir. 1987) ........................................................................ 41

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) ......................................................................... 16, 18, 19

*Clarke v. Sec. Indus. Ass'n,*
   479 U.S. 388 (1987) ........................................................................................ 35

*Cleveland Assets, LLC v. United States,*
   132 Fed. Cl. 264 (2017), *aff'd*, 883 F.3d 1378 (Fed. Cir. 2018) ...................... 37

*Cnty. of El Paso v. Chertoff,*
   No. EP-08-CA-196-FM, 2008 WL 4372693 (W.D. Tex. Aug. 29, 2008) ................... 5, 44

*Cobell v. Norton,*
   240 F.3d 1081 (D.C. Cir. 2001) ...................................................................... 30

*Ctr. for Biological Diversity v. Trump,*
   453 F. Supp. 3d 11–54 (D.D.C. 2020) .............................................................. 49

*Curtis v. Citibank, N.A.,*
   226 F.3d 133–39 (2d Cir. 2000) ...................................................................... 23

*Dalton v. Specter,*
   511 U.S. 462 (1994) ............................................................................... *passim*

*Data Sys. Corp. v. Webster,*
   744 F.2d 197 (D.C. Cir. 1984) .................................................................. 47, 48

*Dep't of Homeland Sec'y v. Regents of the Univ. of Cal.*
   140 S. Ct. 1891 (2020) ................................................................................... 33

*El Paso Cnty. v. Biden,*
   141 S. Ct. 2885 (2021) ...................................................................................... 7

*El Paso Cnty. v. Trump,*
   982 F.3d 332 (5th Cir. 2020) ...................................................................... 7, 18

*Encino Motorcars, LLC v. Navarro,*
   136 S. Ct. 2117 (2016) ................................................................................... 33

*Eubanks v. F.D.I.C.,*
   977 F.2d 166 (5th Cir. 1992) .......................................................................... 23

*E.T. v. Paxton,*
   --- F.4th ----, 2021 WL 5629045 (5th Cir. Dec. 1, 2021) ................................ 18

*F.D.I.C. v. Nelson,*
   19 F.3d 15, 1994 WL 93409 (5th Cir. Mar. 15, 1994) .................................... 23

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502–16 (2009) ......................................................................... 32

*Franklin v. Massachusetts*,
   505 U.S. 788 (1992) (plurality opinion) ............................................. 56

*General Land Office v. U.S. Dep't of Interior*,
   947 F.3d 309 (5th Cir. 2020) ............................................................. 25

*Gentile v. SEC*,
   974 F.3d 311 (3d Cir. 2020) ............................................................... 29

*Gill v. Whitford*,
   138 S. Ct. 1916 (2018) ....................................................................... 54

*Gonannies, Inc. v. GoAuPair.Com, Inc.*,
   464 F. Supp. 2d 603 (N.D. Tex. 2006) ............................................. 52

*Google, Inc. v. Hood*,
   822 F.3d 212 (5th Cir. 2016) ............................................................. 15

*Gov't of Manitoba v. Bernhardt*,
   923 F.3d 173 (D.C. Cir. 2019) .......................................................... 22

*Hazardous Waste Treatment Council v. Thomas*,
   885 F.2d 918 (D.C. Cir. 1989) .......................................................... 37

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ................................................................. 27, 28, 29

*Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*,
   804 F.2d 1390 (5th Cir. 1986) ........................................................... 51

*I.N.S. v. Legalization Assistance Project of Los Angeles Cty. Fed'n of Lab.*,
   510 U.S. 1301 (1993) ......................................................................... 39

*In re Border Infrastructure Env't Litig.*,
   284 F. Supp. 3d 1092–25 (S.D. Cal. 2018) ..................................... 4, 5

*In re Super Van, Inc.*,
   92 F.3d 366 (5th Cir. 1996) ............................................................... 22

*Iowa ex rel. Miller v. Block*,
   771 F.2d 347 (8th Cir. 1985) ............................................................. 21

*John Doe # 1 v. Veneman*,
   380 F.3d 807 (5th Cir. 2004) ............................................................. 55

*John G. & Maria Stella Kenedy Memorial Found. v. Mauro*,
   21 F.3d 667 (5th Cir. 1994) ............................................................... 23

*Knapp v. U.S. Dep't of Agric.,*
  796 F.3d 445 (5th Cir. 2015) ................................................................ 31

*La Posta Band of Diegueno Mission Indians of La Posta Reservation. v. Trump,*
  828 F. App'x 489 (9th Cir. 2020) .......................................................... 8

*Lake Charles Diesel, Inc. v. Gen. Motors Corp.,*
  328 F.3d 192 (5th Cir. 2003) ................................................................ 15

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
  572 U.S. 118 (2014) ........................................................... 35, 39, 48

*Lincoln v. Vigil,*
  508 U.S. 182 (1993) ...................................................................... *passim*

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ............................................................................ 19

*Madsen v. Women's Health Ctr., Inc.,*
  512 U.S. 753 (1994) ............................................................................ 54

*Maine Cmty. Health Options v. United States,*
  140 S. Ct. 1308 (2020) ........................................................................ 6

*Marsh v. Or. Nat. Res. Council,*
  490 U.S. 360 (1989) ............................................................................ 31

*Massachusetts v. EPA,*
  549 U.S. 497 (2007) ............................................................................ 22

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
  567 U.S. 209 (2012) ...................................................................... 35, 36

*Miccosukee Tribe of Indians of Fla. v. United States, No. 08-23523-CIV,*
  2009 WL 10668917 (S.D. Fla. Sept. 30, 2009) ................................... 36

*Milk Train, Inc. v. Veneman,*
  310 F.3d 747–52 (D.C. Cir. 2002) ...................................................... 28

*Mississippi v. Johnson,*
  71 U.S. 475 (1866) ...................................................................... 50, 56

*Moses v. Banco Mortg. Co.,*
  778 F.2d 267 (5th Cir. 1985) ........................................................ 36, 39

*Nat'l Treasury Emp. Union v. Campbell,*
  654 F.2d 784 (D.C. Cir. 1981) ............................................................ 37

*Nevada v. Dep't of Energy,*
  400 F.3d 9 (D.C. Cir. 2005) .......................................................... 38, 46

*Nken v. Holder,*
556 U.S. 418 (2009) ............................................................................. 16, 53

*Oubre v. Schlumberger, Ltd.,*
684 F. App'x 424 (5th Cir. 2017) ....................................................... 58

*O'Donnell v. Harris Cnty.,*
892 F.3d 147 (5th Cir. 2018) .............................................................. 55

*O'Shea v. Littleton,*
414 U.S. 488 (1974) ............................................................................ 51

*Payne v. Travenol Lab'ys, Inc.,*
565 F.2d 895 (5th Cir. 1978) .............................................................. 57

*Pennsylvania ex rel. Shapp v. Kleppe,*
533 F.2d 668 (D.C. Cir. 1976) ............................................................ 21

*Physicians ACO, LLC v. Computer Scis. Corp.,* No. 4:16-CV-1293,
2017 WL 3187609 (S.D. Tex. July 26, 2017) .................................... 58

*Pub. Citizen v. Stockman,*
528 F. Supp. 824 & n.1 (D.D.C. 1981) ......................................... 39, 40

*Rhode Island v. Massachusetts,*
37 U.S. (12 Pet.) 657 (1838) ............................................................... 56

*Rocky Ford Hous. Auth. v. U.S. Dep't of Agric.,*
427 F. Supp. 118 (D.D.C. 1977) .................................................... 39, 40

*Rogers v. United States,*
14 Cl. Ct. 39, 50 (1987), *aff'd*, 861 F.2d 729 (Fed. Cir. 1988) ...... 39, 40

*Scott v. Schedler,*
826 F.3d 207 (5th Cir. 2016) .............................................................. 57

*Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.,*
273 Fed. Appx. 256 (4th Cir. 2008) ................................................... 22

*Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality,*
968 F.3d 419 (5th Cir. 2020) .............................................................. 19

*Sierra Club v. Trump,*
963 F.3d 874 (9th Cir.), *cert. granted*, 141 S. Ct. 618 (2020), and *vacated and remanded sub nom. Biden v. Sierra Club,* ___S. Ct.___, 2021 WL 2742775 (U.S. July 2, 2021) ...................................... 7

*Sierra Club v. Trump,*
977 F.3d 853 (9th Cir. 2020), *cert. granted and vacated and remanded sub nom. Biden v. Sierra Club,* __S. Ct.___, 2021 WL 4507558 (U.S. Oct. 4, 2021) .................................................. 7

*Stock Equip. Co., a Unit of Gen. Signal Corp. v. Tennessee Valley Auth.,*
906 F.2d 583 (11th Cir. 1990) ............................................................ 12

*Sunshine Anthracite Coal Co. v. Adkins,*
  310 U.S. 381 (1940) ............................................................................................. 23, 25

*Texas v. United States,*
  14 F.4th 332 (5th Cir. 2021), *vacated on rehearing en banc,* 2021 WL 5578015 (5th Cir. Nov. 30 2021)
  ............................................................................................................................. 55

*Texas v. United States,*
  328 F. Supp. 3d 662–05 (S.D. Tex. 2018) ......................................................... 18, 52

*Texas v. United States,*
  524 F. Supp. 3d 598–20 (S.D. Tex. 2021) ............................................................... 18

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015) ........................................................................... *passim*

*Thompson v. North Am. Stainless, LP,*
  562 U.S. 170–177 (2011) ............................................................................... 35, 37

*TransUnion LLC v. Ramirez,*
  141 S. Ct. 2190 (2021) ...................................................................................... 16

*Trump v. Hawaii*
  138 S. Ct. 2392 (2018) ...................................................................................... 55

*Trump v. Sierra Club,*
  140 S. Ct. 1 (2019), *denying mot. to lift stay,* 140 S. Ct. 2620 (2020) ................... 8, 37

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.,*
  665 F.3d 1339 (D.C. Cir. 2012) ........................................................................... 44

*U.S. House of Representatives v. Mnuchin,*
  976 F.3d 1 (D.C. Cir. 2020), *cert. granted and judgment vacated sub. nom. Yellen v. House of Representatives,*
  ___S. Ct.___, 2021 WL 4733282 (U.S. Oct. 12, 2021) .......................................... 7, 8

*U.S. Oil Recovery Site Potentially Responsible Parties Grp. v. R.R. Comm'n of Texas,*
  898 F.3d 497 (5th Cir. 2018) ............................................................................... 23

*United States v. Arizona, No. CV 10-1413-PHX-SRB,*
  2011 WL 13137062 (D. Ariz. Oct. 21, 2011) ......................................................... 4

*United States v. Davenport,*
  484 F.3d 321 (5th Cir. 2007) ............................................................................... 24

*Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.,*
  454 U.S. 464 (1982) ........................................................................................... 48

*Whitmore v. Arkansas,*
  495 U.S. 149 (1990) ........................................................................................... 18

*Winter v. Nat. Res. Def. Council,*
  555 U.S. 7 (2008) ................................................................................... 51, 53, 54

*Wireless Agents, L.L.C. v. T–Mobile USA, Inc.,*
  2006 WL 1540587 (N.D. Tex. June 6, 2006) ............................................................... 52

*Wyoming v. Oklahoma,*
  502 U.S. 437 (1992) ............................................................................................................ 21

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ............................................................................................................ 49

*Zimmerman v. City of Austin,*
  881 F.3d 378 (5th Cir. 2018) .......................................................................................... 20

**Constitutions**

Tex. Const. Art. XIV, § 1 ........................................................................................................ 25

U.S. Const. art. II, § 3 ............................................................................................................ 50

**Statutes**

1 U.S.C. § 105 ............................................................................................................................ 5

2 U.S.C. § 682 .......................................................................................................................... 40

2 U.S.C. § 683 .......................................................................................................................... 39

2 U.S.C. § 684 .......................................................................................................................... 39

2 U.S.C. § 687 .......................................................................................................................... 40

2 U.S.C. §§ 681–688 .............................................................................................................. 38

5 U.S.C. § 701 ............................................................................................................ 26, 27, 29

5 U.S.C. § 704 .......................................................................................................................... 30

5 U.S.C. § 706 .......................................................................................................................... 30

8 U.S.C. § 1103 .......................................................................................................................... 3

10 U.S.C. § 284 ................................................................................................................ 7, 8, 9, 14

10 U.S.C. § 2301 ...................................................................................................................... 58

10 U.S.C. § 2808 ............................................................................................................. *passim*

28 U.S.C. § 1391 ...................................................................................................................... 26

28 U.S.C. § 1406 ...................................................................................................................... 26

31 U.S.C. § 1301 ........................................................................................................................ 5

31 U.S.C. § 1341 ...................................................................................................................... 42

31 U.S.C. § 1502 ........................................................................................................................ 6

31 U.S.C. § 9705 ........................................................................................................................ 7

31 U.S.C. §§ 1535–1536 ................................................................................................. 11, 12

40 U.S.C. § 3307 ...................................................................................................................... 37

DHS Appropriations Act, 2017,
Pub. L. No. 115-31, 131 Stat. 135 (2017) ................................................ 6

DHS Appropriations Act, 2018,
Pub. L. No. 115-141, 132 Stat. 348 (2018) .............................................. 6

DHS Appropriations Act, 2019,
Pub. L. No. 116-6, 133 Stat. 13 (2019) .................................................... 6

DHS Appropriations Act, 2020,
Pub L. No. 116-93, 133 Stat. 2317 (2019) ..................................... *passim*

DHS Appropriations Act, 2021,
Pub L. No. 116-260, 134 Stat. 1182 (2020) .................................... *passim*

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
Pub. L. No. 104-208, Div. C, Title I § 102, 110 Stat. 3009 (Sept. 30, 1996), *as amended by* Dep't of Homeland Security Appropriations Act, 2008, Pub. L. No. 110-161, 121 Stat. 1844 (Dec. 26, 2007) ......................................................................................................... 3

Secure Fence Act of 2006,
Pub. L. No. 109-367, 120 Stat. 2638 (Oct. 26, 2006) ............................. 3

Texas General Appropriations Act 2020–21 § 16.01(a), (Sept. 30, 2019),
https://www.lbb.state.tx.us/Documents/GAA/General_Appropriations_Act_2020_2021.pdf
............................................................................................................... 25

Tex. Gov't Code § 402.021 .............................................................................. 25

Tex. Gov't Code § 402.0212 ............................................................................ 25

## Rules

Federal Rule of Civil Procedure 65 ............................................................... 57

## Regulations

48 C.F.R. § 1 .................................................................................................... 58

DHS Response to Public Comments Regarding the Construction of Border Wall Within Certain Areas in the Rio Grande Valley, Texas,
85 Fed. Reg. 23,983-01 (Apr. 30, 2020) ................................................ 44

Presidential Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States,
84 Fed. Reg. 4949 (Feb. 20, 2019) ............................................................ 7

Termination of Emergency with Respect to the Southern Boarder of the United States and Redirection of Funds Diverted to the Boarder Wall Construction, Proclamation No. 10142,
86 Fed. Reg. 7225 (Jan. 20, 2021) ................................................. *passim*

x

**Other**

A.J. Thomas, Jr. & Ann Van Wynen Thomas, *The Texas Constitution of 1876*,
35 Tex. L. Rev. 907 (1957) ................................................................................................. 25

Congressional Committees,
B-329092, 2017 WL 6335684 (Comp. Gen. Dec. 12, 2017) .................................... 38, 41

H.R. 658, 93d Cong., 1st Sess. 41 (1971)................................................................... 41

*In re Henry M. Jackson*, United States Senate,
B-200685, 1980 WL 14499 (Comp. Gen. Dec. 23, 1980) ................................................. 41

*In re James R. Jones,* House of Representatives,
B-203057 L/M, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981) .............................. 41, 42

Letter from Acting Dir., Office of Mgmt. & Budget to Senate Comm. on Appropriations (Jan. 6, 2019),
165 Cong. Rec. S1569-02 (Feb. 28, 2019) ..................................................................... 7

Matter of: Dep't of Com.-Application of the Impoundment Control Act to Appropriations Enacted in Fiscal Years 2018 & 2019,
B-331298, 2020 WL 7641195 (Dec. 23, 2020) .................................................................. 42

Matter of: Office of Management and Budget and U.S. Dep't of Homeland Security–Pause of Border Barrier Construction and Obligations,
B-333110.1, 2021 WL 2451823 (June 15, 2021) ........................................................... *passim*

President Donald J. Trump's Border Security Victory,
2019 WL 643814 (Feb. 15, 2019) ..................................................................................... 7

Texas Legislature Online, *Actions on HB 9*,
https://capitol.texas.gov/BillLookup/Actions.aspx?LegSess=872&Bill=HB9 (last visited December 8, 2021)............................................................................................................... 20

The Honorable Barbara Boxer,
B-290659, 2002 WL 1799692 (Comp. Gen. July 24, 2002) ........................................... 46

*Walls & Waivers: Expedited Construction of the Southern Border Wall and Collateral Impacts to Communities and the Environment: Joint Oversight Field Hearing Before Subcommittees to H. Comm. on Natural Resources*,
110th Cong. 25 (April 28, 2008), www.govinfo.gov/content/pkg/CHRG-110hhrg41959/html/CHRG-110hhrg41959.htm ............................................................... 4

Walter E. Fauntroy, House of Representatives,
B-204905 L/M, 1981 WL 23166 (Comp. Gen. Nov. 2, 1981) ....................................... 46

## INTRODUCTION

1.      On the first day of his Administration, President Biden signed a Proclamation to effect a reassessment of federal policy with respect to the construction of a wall along the southern border. The Proclamation terminated the declaration of a national emergency issued by President Trump that had been relied upon to divert military construction funding to the border wall; directed federal agencies to pause ongoing construction activities to the extent permitted by law; and ordered agencies to reassess their current border wall construction projects and develop plans for the "redirection of funds concerning the southern border wall, as appropriate and consistent with applicable law." Termination of Emergency with Respect to the Southern Boarder of the United States and Redirection of Funds Diverted to the Boarder Wall Construction, Proclamation No. 10142, 86 Fed. Reg. 7225, 7225 (Jan. 20, 2021) [hereinafter "Proclamation"].   The agencies, including the Department of Homeland Security ("DHS"), completed those plans in June, and are now in the process of implementing them.  On October 8, 2021, US Customs & Border Patrol ("CBP") announced its intent to cancel remaining border barrier contracts in the Border Patrol's Laredo and Rio Grande Valley sectors in order to undergo environmental planning activities consistent with the DHS Plan.  App.055.

2.      The States of Missouri and Texas ("States") filed suit on October 21, 2021, to challenge these decisions.  They now seek a nationwide preliminary injunction that would forbid Defendants from "enforcing and implementing" the Proclamation, require them to "obligate and spend the funds appropriated for 'construction of [a] barrier system along the southwest border,'" "enforce and implement" construction of that system, and rescind the cancellation of border wall construction contracts.  States' Proposed Order.  There is no legal or factual basis for this Court to order that extraordinary relief.  Indeed, the States cannot satisfy *any* of the requisite criteria for obtaining a preliminary injunction, and the Court should deny their motion.

3.      To begin with, the States cannot demonstrate that they are likely to succeed on the merits of any of their claims, for four principal reasons.  First, the States lack standing to challenge the policies at issue here because they have not alleged an imminent injury-in-fact traceable to these policies and

capable of redress by the Court.  Second, Texas's participation in this case violates the rule against "claim splitting" because another executive branch agency of the State of Texas, the General Land Office, has already sued Defendants regarding border barrier construction issues.  As a result, the case is likely subject to dismissal because Missouri has no right to sue in this Court absent the proper joinder of Texas.  Third, this Court has no jurisdiction over the States' Administrative Procedure Act ("APA") claims because they challenge actions that are committed to agency discretion as a matter of law, or that are not final agency actions.  Finally, even if the States are able to overcome all of these formidable obstacles to their suit, Defendants would still prevail on the States' substantive claims. Defendants' decision to pause further construction while engaging in more environmental planning and stakeholder engagement does not violate the Constitution, does not violate the relevant appropriations statutes or the Impoundment Control Act, and is not arbitrary or capricious under the APA's deferential standard of review.  This position is supported by the Government Accountability Office's conclusion that DHS's actions were an appropriate programmatic change in the use of federal funding and did not violate federal appropriations laws. *See* Matter of: Office of Management and Budget and U.S. Dep't of Homeland Security–Pause of Border Barrier Construction and Obligations, B-333110.1, 2021 WL 2451823 (June 15, 2021) [hereinafter *GAO Opinion*].

4.      A preliminary injunction also requires a showing of irreparable harm in the absence of immediate relief from the Court, and the States' request fails on this score, too.  The fiscal year 2020 funds at issue in this case do not expire until September 30, 2024, while fiscal year 2021 funds do not expire until September 30, 2025.  That is the date by which Congress asked that funds be obligated (for example, through the awarding of a contract), not the date by which the relevant infrastructure must be built.  The States should not be able to achieve, in equity, a construction or spending timetable that Congress never imposed on DHS.  The States waited nine months after the Proclamation issued to file their lawsuit, and they will not be prejudiced if Defendants' planning activities continue while this case proceeds to a merits determination.

5.      Finally, the balance of equities clearly favors Defendants.  The parochial interests of the States in reducing the amount of money they spend on social programs for immigrants and taxing

government contractors are heavily outweighed by Defendants' interest in engaging in additional environmental review and stakeholder consultation to mitigate the potentially harmful effects of border barrier construction.  It is Defendants, not the States, who bear responsibility for setting immigration policy and balancing the manner in which federal funds are expended to pursue policy goals.  A preliminary injunction would infringe on Defendants' ability to carry out that responsibility. It would also harm entities, like other border states and landowners, who are impacted by border wall policy and whose interests are not represented in these proceedings.

<u>6.</u>      Accordingly, the Court should deny the States' motion for a preliminary injunction.

## BACKGROUND

**I.    DHS's Statutory Authority to Construct Border Infrastructure and Undertake Environmental Planning**

<u>7.</u>      The Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended, grants broad discretionary authority to the Department of Homeland Security to construct barrier infrastructure along the border of the United States.  *See* Pub. L. No. 104-208, Div. C, Title I § 102, 110 Stat. 3009 (Sept. 30, 1996), *as amended by* Dep't of Homeland Security Appropriations Act, 2008, Pub. L. No. 110-161, Div. E, Title V § 564, 121 Stat. 1844, 2090 (Dec. 26, 2007); Secure Fence Act of 2006, Pub. L. No. 109-367, § 3, 120 Stat. 2638 (Oct. 26, 2006); REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, Title I § 102, 119 Stat. 231, 302, 306 (codified at 8 U.S.C. § 1103 note) [hereinafter "IIRIRA"].  Section 102(a) of IIRIRA states that the Secretary of Homeland Security "shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States."  The Secretary, however, is not required to construct border infrastructure at any particular location.  Congress vested the Secretary with discretion to determine both where and what type of infrastructure is appropriate.  *See* IIRIRA § 102(b)(1)(D).  The Secretary is free to determine that the use or placement of "fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location" is not "the most appropriate means to achieve and maintain operational control over the international border" at that location.  *Id.*;

*see also United States v. Arizona*, No. CV 10-1413-PHX-SRB, 2011 WL 13137062, at *8 (D. Ariz. Oct. 21, 2011) (dismissing IIRIRA claim brought by State of Arizona to compel border wall construction).

8.     The Secretary also has the "authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section." IIRIRA § 102(c)(1). But even where the Secretary has waived environmental and other laws, DHS still consults with relevant stakeholders about the impacts of border infrastructure construction. IIRIRA requires that the Secretary "shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed." IIRIRA § 102(b)(1)(C).

9.     As explained at a congressional hearing addressing border wall construction, DHS does not "turn[] its back on environmental stewardship or continued consultation with stakeholders." *Walls & Waivers: Expedited Construction of the Southern Border Wall and Collateral Impacts to Communities and the Environment: Joint Oversight Field Hearing Before Subcommittees to H. Comm. on Natural Resources*, 110th Cong. 25 (April 28, 2008), www.govinfo.gov/content/pkg/CHRG-110hhrg41959/html/CHRG-110hhrg41959.htm (statement of Ronald D. Vitiello, United States Customs and Border Protection Chief Patrol Officer, Rio Grande Valley Sector). On the contrary, DHS solicits and responds to feedback from a wide variety of stakeholders to inform its border infrastructure "planning efforts," which includes both engineering and environmental assessments. *Id.*; *see also id.* (statement of Rick Shultz, Nat'l Borderland Coordinator, U.S. Dep't of the Interior) (explaining how the consultation process minimizes impacts on environmental and cultural resources near border infrastructure construction areas); *In re Border Infrastructure Env't Litig.*, 284 F. Supp. 3d 1092, 1124–25 (S.D. Cal. 2018) (summarizing DHS's consultation efforts for various border barrier projects), *aff'd*, 915 F.3d 1213 (9th Cir. 2019). For projects covered by an IIRIRA waiver, DHS typically prepares Environmental Stewardship Plans, "which provide a comprehensive analysis of the potential environmental impacts" associated with border infrastructure construction and include appropriate best management practices

to avoid or minimize potential environmental impacts from construction.  *Cnty. of El Paso v. Chertoff*,
No. EP-08-CA-196-FM, 2008 WL 4372693, at *11 (W.D. Tex. Aug. 29, 2008) (citation omitted); *see
In re Border Infrastructure Env't Litig.*, 284 F. Supp. 3d at 1124–25.

## II.    Congressional Appropriations to DHS for Border Infrastructure and Environmental Planning

10.    Congress has regularly appropriated funding for border infrastructure projects in DHS's
annual appropriations act.  As relevant here, in fiscal years 2020 and 2021, Congress provided border
wall construction funding through procurement, construction, and improvement appropriations for
U.S. Customs and Border Protection ("CBP").  Specifically, Congress appropriated $1.375 billion "for
the construction of barrier system along the southwest border."  DHS Appropriations Act, 2020, Pub
L. No. 116-93, Div. D, § 209(a)(1), 133 Stat. 2317, 2512 (2019); DHS Appropriations Act, 2021, Pub
L. No. 116-260, Div. F, § 210, 134 Stat. 1182, 1456–57 (2020) (appropriating "an amount equal to the
amount made available in section 209(a)(1) of division D of the Consolidated Appropriations Act,
2020 (Public Law 116–93)  . . . for the same purposes as the amount provided under such section in
such Act").

11.    The planning and execution required for large-scale barrier construction projects can be a
complex and time-consuming process.  Congress gave DHS five years to obligate its fiscal year 2020
and 2021 border infrastructure funds.  *See* DHS Appropriations Act, 2020, Pub L. No. 116-93, Div.
D, 133 Stat. at 2506 (stating that fiscal year 2020 funds "shall remain available until September 30,
2024"); DHS Appropriations Act, 2021, Pub L. No. 116-260, Div. F, 134 Stat. at 1452 (stating that
fiscal year 2021 funds "shall remain available until September 30, 2025").  The placing of time limits
on appropriations is one of the primary ways Congress exercises its Appropriations power.  Congress
generally limits the availability of appropriations to a one-year period for the fiscal year in which the
funds are appropriated.  *See* 1 U.S.C. § 105; 31 U.S.C. § 1301(c); DHS Appropriations Act, 2020, Pub
L. No. 116-93, Div. D, § 501, 133 Stat. at 2525; DHS Appropriations Act, 2021, Pub L. No. 116-260,
Div. F, 134 Stat. at 1468.  Here, however, Congress expressly authorized DHS to obligate its fiscal
year 2020 and 2021 border wall construction funds over a five-year period, ending at the conclusion

of fiscal years 2024 and 2025, respectively.[1]  Congress also did not place any limitations on the pace of DHS's obligations, such as requiring DHS to obligate a certain amount or percentage of funds each fiscal year.

12.     In appropriating funds for border wall construction, Congress recognized the potential environmental consequences of DHS's construction activities.  Congress therefore required DHS to submit reports addressing environmental planning.  In fiscal years 2017 and 2018, Congress directed DHS to submit an annual plan addressing, *inter alia,* "the environmental impacts, including on wildlife, of the construction and placement of physical barriers planned along the Southwest border" and the "effects on communities and property owners near areas of infrastructure deployment."  *See* DHS Appropriations Act, 2017, Pub. L. No. 115-31, Div. F, Title VI, 131 Stat. 135, 434 (2017); DHS Appropriations Act, 2018, Pub. L. No. 115-141, Div. F, § 230, 132 Stat. 348, 617–17 (2018).  Congress required DHS to update its plan in subsequent fiscal years, including the environmental analysis of border barrier construction.  *See, e.g.*, Department of Homeland Security Appropriations Act, 2020, Pub. L. No. 116-93, § 209(e), 133 Stat. at 2512.

13.     Congress also promoted environmental stewardship by prohibiting DHS from using its appropriated funds to construct border infrastructure in environmentally sensitive areas along the border, including several locations near McAllen, Texas.  *See, e.g.*, DHS Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13, 28 (2019) (prohibiting expenditure of funds for "construction of pedestrian fencing" in the National Butterfly Center, La Lomita Historical Park, and the Bentsen-Rio Grande Valley State Park).

### III.   President Trump's Efforts to Obtain Additional Border Wall Funding

14.     In late 2018 then-President Trump and Congress reached an impasse over the amount of money Congress would appropriate to DHS for border wall construction.  The President sought $5.7

---

[1] An obligation is a "commitment that creates a legal liability of the government for the payment of goods and services ordered or received . . . . " *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1319 (2020) (internal quotations and citation omitted); *see* 31 U.S.C. § 1502(a) (stating that funds appropriated for a definite time period are "available only for payment of expenses properly incurred during the period of availability").

billion "for construction of a steel barrier for the Southwest border," but Congress refused to appropriate that amount. *See* Letter from Acting Dir., Office of Mgmt. & Budget to Senate Comm. on Appropriations (Jan. 6, 2019), 165 Cong. Rec. S1569-02, S1570 (Feb. 28, 2019).  Rather, on February 15, 2019, with the passage of the Consolidated Appropriations Act of 2019 ("CAA"), *see* Pub. L. No. 116-6, 133 Stat. at 28, Congress appropriated $1.375 billion to DHS "for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector" of Texas. *Id.* 133 Stat. at 28.

15.     On the same day that President Trump signed the CAA into law, he declared a national emergency authorizing the use of the armed forces at the southern border.  *See* Presidential Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States, 84 Fed. Reg. 4949 (Feb. 20, 2019).  He also released a plan to provide additional funding for border wall construction by redirecting funds from other sources within the Department of Defense ("DoD") and the Department of the Treasury.  *See* President Donald J. Trump's Border Security Victory, at 2019 WL 643814 (Feb. 15, 2019).  The President's plan allocated: (1) approximately $601 million from the Treasury Forfeiture Fund (31 U.S.C. § 9705); (2) $2.5 billion from fiscal year 2019 DoD funds transferred to support counterdrug activities (10 U.S.C. § 284); and (2) $3.6 billion from other DoD military construction projects to border barrier military construction projects to be undertaken pursuant 10 U.S.C. § 2808, as made available through the President's declaration of a national emergency.

16.     The national emergency declaration and the subsequent actions by various federal agencies to undertake border wall construction using redirected DoD and Treasury funds were immediately challenged in multiple lawsuits around the country.  *See, e.g., El Paso Cnty. v. Trump*, 982 F.3d 332 (5th Cir. 2020), *cert. denied sub nom. El Paso Cnty. v. Biden*, 141 S. Ct. 2885 (2021); *Sierra Club v. Trump*, 963 F.3d 874, 880 (9th Cir.), *cert. granted*, 141 S. Ct. 618 (2020), and *vacated and remanded sub nom. Biden v. Sierra Club*, ___S. Ct.___, 2021 WL 2742775 (U.S. July 2, 2021); *Sierra Club v. Trump*, 977 F.3d 853 (9th Cir. 2020), *cert. granted and vacated and remanded sub nom. Biden v. Sierra Club*, __S. Ct.___, 2021 WL 4507558 (U.S. Oct. 4, 2021); *U.S. House of Representatives v. Mnuchin*, 976 F.3d 1 (D.C. Cir. 2020), *cert.*

*granted and judgment vacated sub. nom. Yellen v. House of Representatives,* __S. Ct.___, 2021 WL 4733282 (U.S. Oct. 12, 2021).  In July 2019, the Supreme Court granted a stay of a permanent injunction issued by a district court for the Northern District of California that would have stopped construction of border wall projects undertaken pursuant to DoD's counterdrug authority using transferred funds.  *See Trump v. Sierra Club*, 140 S. Ct. 1 (2019), *denying mot. to lift stay*, 140 S. Ct. 2620 (2020).  Foremost "[a]mong the reasons" for granting a stay, the Supreme Court emphasized the Government had "made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review" of DoD's compliance with an appropriations transfer statute, namely section 8005 of the DoD Appropriations Act of 2019.  *Id.*

17.     Following the Supreme Court's decision, lower courts either denied or stayed injunctions prohibiting construction of other border barrier projects, thus enabling construction of various projects to continue during the pending litigation.  *See, e.g., El Paso County v. Trump*, No. 19-51144 (5th Cir. Jan. 8, 2020) (staying injunction against projects undertaken pursuant to 10 U.S.C. § 2808); *La Posta Band of Diegueno Mission Indians of La Posta Reservation. v. Trump*, 828 F. App'x 489, 490 (9th Cir. 2020) (affirming denial of preliminary injunction against construction pursuant to 10 U.S.C. § 284).

## IV.    President Biden's Proclamation Terminating the National Emergency at the Southern Border and Directing Agencies to Develop Border Wall Funding Plans

18.     On his first day in office, President Biden issued a Proclamation declaring that "[i]t shall be the policy of [his] Administration that no more American taxpayer dollars be diverted to construct a border wall."  *See* Proclamation, 86 Fed. Reg. at 7225.  The Proclamation stated that the declaration of a national emergency at the southern border "is terminated and that the authorities invoked in that proclamation will no longer be used to construct a wall at the southern border."  *Id.*

19.     The President also directed a "careful review of all resources appropriated or redirected to construct a southern border wall."  *Id.*  To facilitate that review, the President ordered the Secretary of Defense and the Secretary of Homeland Security to "pause work on each construction project on the southern border wall, to the extent permitted by law, as soon as possible but in no case later than seven days from the date of [the] proclamation."  *Id.*  He also ordered the Secretaries to "pause

8

immediately the obligation of funds related to construction of the southern border wall, to the extent permitted by law." *Id.* The Secretaries were authorized to make exceptions to the pause in limited circumstances, including "where an exception is required to ensure that funds appropriated by the Congress fulfill their intended purpose." *Id.* at 7226.

20.     During the pause, the President ordered the Secretaries, in coordination with other federal agencies, to develop a plan "for the redirection of funds concerning the southern border wall, as appropriate and consistent with applicable law." *Id.* The Proclamation stated that the plan "shall include consideration of terminating or repurposing contracts with private contractors engaged in wall construction, while providing for the expenditure of any funds that the Congress expressly appropriated for wall construction, consistent with their appropriated purpose." *Id.* "After the plan is developed, the Secretary of Defense and the Secretary of Homeland Security shall take all appropriate steps to resume, modify, or terminate projects and to otherwise implement the plan." *Id.*

## V.     The DoD and DHS Border Wall Plans

21.     In June 2021, DoD and DHS announced their border wall funding plans. *See* Memorandum for Director, Office of Management and Budget re: DoD Plan for the Redirection of Border Wall Funds (June 10, 2021) (attached as Exhibit 1); DHS Border Wall Plan Pursuant to Presidential Proclamation 10142 (June 9, 2021) (attached as Exhibit 2) [hereinafter "DHS Plan"]. DoD cancelled all border wall projects undertaken with DoD funds pursuant to 10 U.S.C. § 284 and 10 U.S.C. § 2808. The DHS Plan addresses two different sources of congressionally-appropriated border infrastructure funds:   (1) funds Congress appropriated in fiscal years 2017–2020; and (2) funds Congress appropriated in fiscal year 2021.

### A.     DHS Fiscal Year 2017–2020 Funds

22.     The DHS Plan states that DHS "may prioritize" using its fiscal year 2017–2020 border infrastructure appropriations on projects that "are needed to address life, safety, environmental, or other remediation requirements." DHS Plan at 2. DHS also "will explore" using these funds "to address construction previously funded by the Treasury Forfeiture Fund." *Id.* For all other border

infrastructure projects funded by appropriations in fiscal years 2017–2020, "prior to further construction, DHS will undertake a thorough review and replanning process." *Id.* Specifically, DHS "intends to engage in standard environmental planning including taking actions consistent with the National Environmental Policy Act (NEPA) and other environmental planning and statutes."[2] This "multistep environmental planning process" will include "public scoping and comment on potential environmental impacts through the NEPA process[;]" consultation with "affected landowners, tribes, border community residents, their elected representatives, and interested non-governmental organizations and advocates;" and an assessment of ways to "remediate or mitigate environmental damage caused by past border wall construction." *Id.* at 2–3.

### B.     DHS Fiscal Year 2021 Funds

23.     DHS intends to use its fiscal year 2021 border barrier appropriations to cover significant costs associated with DoD's cancellation of its border wall projects. The DoD projects were in various states of completion at the time of their cancellation and DHS intends to fund various close-out and remediation activities at the former DoD projects sites that are turned over to DHS, including erosion control measures, water drainage features, and road construction. *See id.* at 4. DHS also intends to use its fiscal year 2021 appropriation to plan future border infrastructure projects and to cover contingency costs associated with other projects, such as cost overruns and contract suspension costs. *See id.* at 3–5.

## VI.   DHS's Current Use of Fiscal Year 2020 and 2021 Funds

24.     CBP has been actively working to obligate and utilize its fiscal year 2020 and 2021 border infrastructure appropriations in a manner consistent with its congressional appropriations and the DHS Plan. *See* Declaration of Paul Enriquez, Real Estate and Environmental Director for the Border Wall Program Management Office, ¶¶ 11–38 (attached as Exhibit 3).

---

[2] The DHS Plan notes an exception to such planning for discrete projects involving "urgent measures needed to avert immediate physical dangers" or "projects necessary to address life, safety, environmental, or other remediation requirements." DHS Plan at 2. In these circumstances, DHS may rely on environmental waivers issued under § 102(c) of IIRIRA by the Secretary of Homeland Security. *See id.*

### A.      Fiscal Year 2020 Funds

25.      As of March 2021, CBP had obligated $1.32 billion of the $1.375 billion appropriated in fiscal

year 2020 for barrier infrastructure construction.  *Id.* ¶ 14.  The obligations were incurred for, among

other things, contracts for the design and construction of border barrier system in the U.S. Border

Patrol Laredo Sector, costs associated with prior consultation and environmental surveys and

monitoring, and project oversight and engineering support services.  *Id.*

26.      DHS utilized its fiscal year 2020 appropriations to fund four contracts that would provide for

the design and construction of approximately 70 miles border barrier system in the Laredo Sector.  *Id.*

¶¶ 15–17.  CBP directly awarded two of the contracts and the U.S. Army Corps of Engineers, acting

pursuant to an Economy Act agreement with CBP, awarded the other two contracts.[3]  *Id.* ¶¶ 16–17.

Approximately $1.3 billion of the fiscal year 2020 barrier system appropriation was obligated through

the award of these four contracts.  *Id.* ¶ 18.

27.      The Laredo projects would involve new barrier construction on land that is currently owned

by individuals and entities other than the federal government.  *Id.* ¶ 21.  Consequently, CBP must

work through a process to acquire the necessary real estate interests in that land before construction

can begin.  *Id.*  At the time the President issued his Proclamation, construction had not begun on any

of the Laredo projects and CBP had not acquired any of the permanent interests in real property

necessary to support construction.  *Id.*  Rather, CBP was in the process of acquiring temporary rights

of entry to allow for the performance of real estate surveys and appraisals.  *Id.*  The start of actual

construction was subject to the acquisition of the necessary permanent real estate interests.  *Id.*

28.      CBP is now focused on conducting a thorough review and replanning process for the Laredo

projects, as set forth in the DHS Plan.  This process will include standard environmental planning,

---

[3] The Economy Act, 31 U.S.C. §§ 1535–36, provides authority for federal agencies to order goods and services from other federal agencies and to pay the actual costs of those goods and services using the purchasing agency's appropriated funds.

including taking actions consistent with NEPA;[4] additional biological, cultural, and natural resource surveys for project areas where no data have been previously collected; and consultation with interested stakeholders in the project areas.  *Id.* ¶ 22.  CBP anticipates that, depending on the level of NEPA analysis that is required, environmental planning and stakeholder engagement will take approximately 12–16 months to complete.  *Id.*  CBP will use contracts awarded with fiscal year 2020 barrier system appropriation funds for environmental planning and stakeholder engagement and expects that planning and stakeholder engagement will begin in the first quarter of 2022.  *Id.* ¶ 23

29.   CBP acquired some temporary rights-of-entry for projects in Laredo prior to January 20, 2021, and will continue to acquire additional rights-of-entry where needed to access property to perform its planning actions.  *Id.*  ¶¶ 22–23.  All real estate acquisition costs associated with the Laredo projects have and will continue to be funded from the fiscal year 2020 barrier system appropriation.  *Id.* ¶¶ 21.

30.   Because of the time required to complete environmental planning for the Laredo projects, and to ensure that the government does not incur substantial additional delay and other costs while such planning is carried out, CBP and the Army Corps of Engineers have recently taken steps to modify and terminate the contracts.  *Id.* ¶¶ 24–27.  On September 22, 2021, CBP modified the two contracts it awarded to remove the construction portion of the contracts.  *Id.* ¶ 26.  CBP estimates that final modifications to resolve final contract costs will be executed before December 31, 2021.  *Id.*  On October 8, 2021, the Army Corps of Engineers sent termination for convenience notices to the contractors on the two contracts it awarded and is administering.  *Id.*[5]  The parties are currently in the process of negotiating final contract costs and closeout.  *Id.*  The contractors will be providing CBP and the Army Corps of Engineers with partially complete design packages for the Laredo projects.

---

[4] NEPA generally requires that federal agencies examine the potential environmental effects of certain types of proposed federal actions and inform the public of those evaluations.  42 U.S.C. § 4321 *et seq.*

[5] A "termination for convenience" clause is common in federal government contracts and permits "the Government to terminate a contract, even in the absence of fault or breach by the other party, without incurring the usual financial consequences of breach."  *Stock Equip. Co., a Unit of Gen. Signal Corp. v. Tennessee Valley Auth.*, 906 F.2d 583, 586 n.3 (11th Cir. 1990).

*See id.* ¶¶ 26–27.  All costs associated with those design packages have been and will be funded by the fiscal year 2020 barrier system appropriation.  *See id.* ¶¶ 26–27.

31.     As of December 6, 2021, CBP has obligated approximately $618 million of the fiscal year 2020 barrier system appropriation.  *Id.* ¶ 28.  Funds previously obligated on the four contracts that are in excess of the amount of money needed to resolve final settlement and modification costs will be deobligated and be available for reobligation consistent with the terms of  fiscal year 2020 appropriation.  *Id.*  CBP intends to use its available fiscal year 2020 funds to conduct environmental planning, undertake robust consultation with stakeholders, and if additional permanent land acquisition is necessary to complete projects contemplated by the DHS Plan, CBP will initiate robust landowner engagement prior to acquisition.  *Id.* ¶ 29.

### B.     Fiscal Year 2021 Funds

32.     As of December 6, 2021, CBP has obligated $5.4 million of the fiscal year 2021 barrier system appropriation.  *Id.* ¶ 32.  These obligations cover various programmatic expenses, including contract costs for stakeholder engagement and environmental support services.  *Id.*

33.     In accordance with the DHS Plan, CBP intends to use fiscal year 2021 funds for environmental planning and stakeholder outreach for its next highest priority barrier segments, which are located in the El Centro Sector in California.  *Id.* ¶ 34.  CBP has awarded a contract using fiscal year 2021 barrier system appropriation funds to begin the process of environmental planning and outreach.  *Id.*  CBP anticipates work on this contract will begin in the first quarter of 2022.  *Id.*

34.     Additionally, CBP is planning to use its fiscal year 2021 funds for remediation and closeout of the former DoD border barrier project sites.  *Id.* ¶ 35.  As part of the process of closing out those projects, DoD authorized its contractors to perform a limited set of demobilization and safety activities at the former DoD project sites, and that work has been occurring over the last several months.  *Id.*  These activities include, among other things, filling exposed trenches, cutting exposed rebar, and removing materials from the project sites.  *Id.*  CBP anticipates that starting its remediation work at the DoD project sites will likely have to await demobilization of the DoD-funded contractors,

as it may not be operationally or logistically feasible in some instances to have two different sets of contractors working at the projects sites at the same time.  *Id.* ¶ 36.

35.     When it becomes feasible for CBP to begin its own remediation work at the former DoD project sites, CBP intends to obligate its fiscal year 2021 funds on contracts in support of projects that prioritize funding for those remediation projects that are needed to address life and safety, including the protection of individuals, Border Patrol agents, and nearby communities from potential harms, and avert further environmental damage or degradation.  *Id.*  ¶ 37.  Remediation activities or projects falling within these categories are likely to include, among other things, erosion control measures, water drainage work, and completion of safety work along border roads.  *Id.*  CBP estimates that the priority remediation and closeout actions at the former 10 U.S.C. § 284 project sites will cost approximately $500–$700 million and $300–$350 million at former 10 U.S.C. § 2808 project sites.  *Id.*

36.     The timeline for CBP to obligate its fiscal year 2021 funds for these remediation activities will be driven by several factors.  *Id.* ¶ 38.  First, the DoD contractors will need to complete their safety work and demobilize from the project areas.  *Id.*.  That process is expected to be completed in the majority of project areas by the second quarter of 2022.  *Id.*  Second, CBP will need to complete its own study and assessment of the project areas after the DoD contractors depart to determine what additional priority remediation activities need to be completed.  *Id.*  That process is a necessary prerequisite to contact award and obligation of funds that will inform both the scope of the work and the estimated costs.  *Id.*

**VII.     Different Parts of the Texas State Government File Separate Lawsuits Against the Federal Defendants**

37.     On July 13, 2021, the General Land Office of the State of Texas and its Commissioner (collectively "GLO") sued President Biden, Secretary of Homeland Security Mayorkas, and the Department of Homeland Security over DHS's use of funds appropriated for the southern border wall.  *See Gen. Land Off. v. Biden*, No. 7:21-cv-00272 (S.D. Tex.), Compl., ECF No. 1.  The central allegation in the GLO Complaint is that the President and DHS have unlawfully stopped construction and land acquisition work for a border wall project in the Rio Grande Valley.  *Id.* ¶¶ 8, 12, 76, 82.  In

14

doing so, GLO contends that Defendants are "unilaterally withholding funding appropriated by Congress" for border wall construction. *Id.* ¶¶ 8, 51–52, 110–111. GLO asserts statutory and constructional claims, including alleged violations of the APA various federal statutes regulating agency appropriations and expenditures, the separation of powers and the Take Care Clause. *See id.* ¶¶ 70–135. Defendants' moved to dismiss the complaint on October 18, 2021. *See Texas GLO*, ECF No. 18.

38.    On October 21, 2021, the States of Missouri and Texas filed a similar suit against President Biden; the United States of America; Secretary Mayorkas; DHS; Troy A. Miller, the Acting Commissioner of CBP; and CBP. The six-count complaint likewise focuses on the allegation that DHS has refused to spend its appropriated funds for the construction of a wall along the southern border. The complaint raises claims under the federal Constitution, the Impoundment Control Act, appropriations statutes, and the APA. *Missouri*, Compl., ECF No. 1. Many of the claims are identical to ones raised by GLO in its complaint.

39.    On November 8, 2021, over nine months after the President issued his border wall Proclamation, Texas and Missouri moved for preliminary injunction to enjoin Defendants "on a nationwide basis, from enforcing and implementing the January 20 Proclamation." *Id.*, ECF No. 19, Proposed Order. The motion also seeks a court order compelling Defendants to "obligate and spend the funds appropriated for 'construction of barrier system along the southwest border'" and "to rescind the[] cancellation of contracts executed" for border wall construction. *Id.*

### STANDARD OF REVIEW

40.    "A preliminary injunction is an 'extraordinary remedy.'" *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016). A could should grant that remedy only when the moving party "clearly shows: '(1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.'" *Id.* (quoting *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192,

195-96 (5th Cir. 2003)).  The final two factors merge when a preliminary injunction is sought against the federal government. *Nken v. Holder*, 556 U.S. 418, 435 (2009).  The plaintiff must "clearly carr[y] the burden of persuasion on all four requirements."  *Bluefield Water Ass'n v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009).

## ARGUMENT

### I.    The States Have Failed to Show a Substantial Likelihood of Success on the Merits.

<u>41.</u>    Defendants, and not the States, are likely to prevail in this case for a number of reasons.  First, the States have no standing to challenge the decisions at issue here; their purported harms, even if taken at face value, are not imminent, not traceable to Defendants' actions, and not capable of redress by this Court.  Second, the suit is subject to dismissal because the rule against claim splitting bars Texas's claims and, as a consequence, this Court is not an appropriate forum for Missouri's suit.  Third, the Court lacks jurisdiction over the States' APA claims because the challenged agency decisions are committed to agency discretion as a matter of law and are lacking in finality.  Finally, the States' claims fail on the merits.  Defendants' plan of action regarding border barrier construction is not arbitrary and capricious, and does not violate any statute or provision of the Constitution.  Because the States' claims are meritless as a matter of law, their request for a preliminary injunction should be denied.

### A.    The States Lack Article III Standing to Challenge DHS's Border Barrier Spending Policies.

<u>42.</u>    To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021).  The burden rests on the States to demonstrate the existence of standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  They have failed to so here.

<u>43.</u>    The States primarily rely upon what they refer to as the "driver's license rationale" of standing. PI Mot. 37.  The leading case on this rationale is *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015) (*Texas I*), where a coalition of states challenged the Deferred Action for Parents and Lawful Permanent Residents Program ("DAPA").  The court in *Texas I* found that, at a minimum, Texas had Article III

16

standing because DAPA would enable 500,000 unlawful migrants resident in Texas to obtain a driver license, resulting in a loss of several millions of dollars in revenue. *Texas I*, 809 F.3d at 155–62. More recently, in *Texas v. Biden*, 10 F.4th 538 (5th Cir. 2021) (*Texas II*), the Fifth Circuit, applying *Texas I*, held that the States had standing to challenge the government's rescission of the Migrant Protection Protocols ("MPP"), which authorized the federal government to return certain third-country nationals to Canada or Mexico during removal proceedings. 10 F.4th at 545–49. The court concluded that because the rescission of MPP forced DHS to parole and release migrants into the United States, and thereby contributed to the so-called "surge" of migrants at the southern border, the States had standing to challenge the policy to prevent increased costs in providing social services like driver licenses, education, and health care. *Id.* The States rely on that same rationale here, asserting that Defendants' "refusal to spend congressional appropriations mandating the construction of the southwest border wall and the termination of contracts regarding the same will lead to additional illegal aliens being present in Missouri and Texas" and impose burdens on their state fiscs. PI Mot. 36–42.

44. But even if the validity of the "driver's license rationale" is assumed correct (and Defendants do not concede that is so, even if the Fifth Circuit's rulings bind the Court here), the States still must show, in a non-speculative way, that they face an imminent harm to their fiscs based on migration that is traceable to the actions they challenge and that this Court could redress. They cannot make that showing here. Even assuming that the States have correctly described DHS's actions (they have not), the States simply speculate (1) that declines in apprehensions were actually caused by, and do not simply correlate with, barrier construction or the intent to engage in it (a possibility previous DHS press releases touting the effectiveness of the border wall did not purport to consider); (2) that declines in apprehensions at particular sections of the border where wall segments were built translate into a net decline in the total level of migration to the United States, rather than migrants being channeled to other areas of the border or obtaining admission by other means (such as claiming asylum at a port of entry); and (3) that even assuming (1) and (2) are true, future border wall projects would necessarily have the same impact as previous projects. There is no evidence in the record to support any of these claims. Indeed, the States' rhetoric undercuts them. Even though Defendants have not taken down

17

any of the border barriers built prior to 2021, there has still been, in the States view, "an explosion of illegal immigration, resulting in total encounters on pace to be the highest ever recorded." PI Mot. 1. Prior construction efforts did not prevent this "explosion" from happening, and there is no basis for the Court to conclude that a burden on the States' budgets is "certainly impending" simply because construction of new projects has been paused while DHS completes environmental planning. *Clapper*, 568 U.S. at 410 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). There is also no evidence to suggest that any supposed harms to the States' fisc caused by an influx of migration are either traceable to the Proclamation and the DHS Plan, *id.* at 410–11, or could be remedied by this Court. The States' declarations merely give information about the costs various social services agencies have incurred associated with providing immigration-related services, *see* App. at 70–72, 129–133, but fail to link how those costs are caused by DHS's spending decisions about border barrier planning. *See El Paso Cty., Texas v. Trump*, 982 F.3d 332, 344 (5th Cir. 2020) (holding that plaintiff lacked standing to challenge border wall construction where declaration did not link alleged harm to a specific construction project).

45.     In past cases, the States have successfully argued that it is non-speculative that migrants who enter the United States "will come to the States and seek a driver's license, medical care, or public education." PI Mot. 36–37. Those arguments succeeded in contexts where there was certainty (as there was in both the MPP and DAPA cases) that more migrants would be staying in the United States under the challenged policy than would otherwise be the case. *See also Texas v. United States*, 524 F. Supp. 3d 598, 618–20 (S.D. Tex. 2021) (standing to challenge 100-day moratorium on deportations based on driver license rationale); *Texas v. United States*, 328 F. Supp. 3d 662, 700–05 (S.D. Tex. 2018) (standing to challenge DACA based on driver license rationale). But here, the speculation is not only about whether migrants will avail themselves of public services, but about whether it is more likely migrants will decide to illegally enter the United States due to Defendants' border wall spending policies. Claims that immigration policy "slightly increases [the] risk of injury—or insufficiently decreases the risk compared to what some citizens might prefer" would inevitably "drain the 'actual or imminent' requirement of meaning" and eviscerate Article III's limitations. *E.T. v. Paxton*, --- F.4th

18

----, 2021 WL 5629045, at *3 (5th Cir. Dec. 1, 2021) (concluding plaintiffs were unlikely to have Article III standing to challenge Texas's ban on local mask mandates) (quoting *Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality*, 968 F.3d 419, 424 (5th Cir. 2020)).

46.     The States have also failed to meet the even heavier burden they must satisfy to challenge these policies because their standing allegations are based on assumptions of how third parties in foreign countries contemplating migration to the United States will respond to those policies. "[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party," standing is "ordinarily substantially more difficult to establish." *California v. Texas*, 141 S. Ct. 2104, 2117 (2021); *see Clapper*, 568 U.S. at 414 (expressing "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors"). That is because "causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the government action or inaction—and perhaps on the response of others as well." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992). The burden is even heavier when the alleged behavior is unlawful. *See City of L.A. v. Lyons*, 461 U.S. 95, 105 (1983). And far from attempting to meet that burden, the States have adduced no evidence at all suggesting a link between recent increased levels of migration and an alleged failure to spend border barrier appropriations in a particular way. Theories that particular government policies "entice" individuals to cross the border in greater numbers have been squarely rejected by other courts. *Arpaio v. Obama*, 797 F.3d 11, 19–24 (D.C. Cir. 2015) (rejecting standing on theory that third parties from other countries will be induced to enter the country by promises of benefits under DACA and DAPA, even though the policies do not apply to them).

47.     The States' standing to sue is even more tenuous when the particular appropriations they are challenging are parsed. For fiscal year 2020 funds, although contracts for construction had been awarded by CBP, no construction had taken place for the Laredo projects when DHS announced its intent to engage in further environmental planning. Enriquez Decl. ¶¶ 14–20. CBP was still in the process of conducting land surveys and appraisals for the Laredo projects slated to be built using fiscal year 2020 money. *Id.* ¶. 21. Actual construction start was subject to the acquisition of the necessary permanent real estate interests. *Id.* Similarly, for the fiscal year 2021 funds, no construction activities

had begun in the El Centro Sector in light of the need to conduct environmental planning and stakeholder outreach, which is scheduled to begin in the first quarter of 2022. *Id.* ¶ 34. Further, both of these appropriations have five-year availability periods, so DHS has until September 30, 2024 to obligate its fiscal year 2020 funds, and September 30, 2025 to obligate its fiscal year 2021 funds. DHS Appropriations Act, 2020, 133 Stat. 2506; DHS Appropriations Act, 2021, 134 Stat. 1452. For both appropriations, the States point to no evidence to suggest that these yet-to-be-started construction projects would have made any impact in reducing the States' social services costs.

<u>48.</u>    In addition to the types of harms the Fifth Circuit has found sufficient to ground standing in *Texas I* and *Texas II*, Texas asserts two other forms of injury. First, Texas asserts that the Texas Legislature has appropriated for border security personnel, equipment, jail space, and a border wall, and that it has standing because Defendants' policies forced Texas to take "mitigation measures" to prevent unlawful migration. PI Mot. 42–43. But the Fifth Circuit has repeatedly held that plaintiffs cannot spend their way into Article III standing, even when their fears of harm are sincere. *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018) ("standing cannot be conferred by a self-inflicted injury"); *Assoc. for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994) (rejecting standing theory that would imply "any sincere plaintiff could bootstrap standing by expending its resources in response to actions of another"). Unlike the other costs complained of by the States, the statute that appropriated these funds was not signed into law until September 17, 2021, well after the Proclamation and the DHS Plan had issued. Texas Legislature Online, *Actions on HB 9*, https://capitol.texas.gov/BillLookup/Actions.aspx?LegSess=872&Bill=HB9 (last visited December 8, 2021). That fact distinguishes these alleged forms of injury from the other types of fiscal harm the States have relied upon in previous matters. *See Texas I*, 809 F.3d at 159 (rejecting argument that States had caused their own injury by subsidizing driver licenses because the law was enacted "one year before DACA and three years before DAPA was announced, and there is no hint that the state anticipated a change in immigration policy" (footnote omitted)). Standing is not available to redress Texas's alleged need to undertake these so-called "remedial measures."

49.     Second, Texas also asserts standing based on the alleged loss of tax revenue from the cancellation of border wall contracts within the state.  *See* PI Mot. 41–42.  Texas, however, has not presented any evidence to support this claim and simply speculates that it will lose money if contracts are cancelled.  *Id.*  In any event, "[l]ost tax revenue is generally not cognizable as an injury-in-fact for purposes of standing." *Arias v. DynCorp,* 752 F.3d 1011, 1015 (D.C. Cir. 2014) (citing *Pennsylvania ex rel. Shapp v. Kleppe,* 533 F.2d 668, 672 (D.C. Cir. 1976)). That is because "virtually all federal policies" will have "unavoidable economic repercussions" on state tax revenues, and accordingly, complaints about such losses typically amount to "the sort of generalized grievance about the conduct of government, so distantly related to the wrong for which relief is sought, as not to be cognizable for purposes of standing." *Kleppe*, 533 F.2d at 672; *see Iowa ex rel. Miller v. Block*, 771 F.2d 347, 353 (8th Cir. 1985) (holding that there was an insufficiently direct link between reduced tax revenue and federal disaster relief decisions to support standing); *Arias*, 752 F.3d at 1015 (holding that loss of tax revenue from anti-drug herbicide-spraying operation resulting in damage to local crops was insufficient to establish standing).

50.     In *Wyoming v. Oklahoma,* the Supreme Court recognized standing to challenge "a direct injury in the form of a loss of specific tax revenues," but distinguished cases where "actions taken by United States Government agencies [have injured their] econom[ies] and thereby caused a decline in general tax revenues."  502 U.S. 437, 448 (1992) (discussing *Kleppe* and *Miller*).  In reaching that conclusion, the Supreme Court emphasized that states must establish a direct link between the tax at issue and the administrative action being challenged to meet the requirements for Article III standing.  The Supreme Court found such a direct link between an Oklahoma law targeting coal usage and a specific stream of tax revenue based on coal extraction.  *Id.* at 447, 451.  Here, however, Texas cannot satisfy this direct link because it relies on a general business franchise tax that taxes every taxable entity doing business in the state, not a specific tax on border barrier construction contractors.  *See* PI Mot. 41. Because the challenged action in this case is not "directly linked" to Texas's fisc, *Wyoming*, 502 U.S. at 450, any indirect reduction in general tax revenues Texas may have obtained from third party contractors is insufficient to support standing.

21

51.     Finally, the States' standing is not salvaged by assertions that they are entitled to "special solicitude" as described in *Massachusetts v. EPA*, 549 U.S. 497 (2007).   *Massachusetts* did not relieve states of their obligation to establish a cognizable injury in fact. *See Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 182 (D.C. Cir. 2019) (noting that, in *Massachusetts v. EPA*, the State was "entitled to 'special solicitude' because" it had "a quasi-sovereign interest in 'preserv[ing] its sovereign territory,'" but it still demonstrated "its own harm to establish an injury-in-fact."). Even in *Texas I*, the Fifth Circuit found that Texas had shown that "DAPA would have a major effect on the states' fiscs." 809 F.3d at 152. Nor does *Massachusetts* relieve the States of showing the other elements of standing. Here, the States have not shown an imminent injury-in-fact traceable to Defendants' change in policy that could be redressed by the Court, and so whatever "special solicitude" the States are entitled to is of no moment. And because the Court is likely to dispose of this case on standing grounds, the States are unlikely to succeed on the merits.

**B.      Texas Has Engaged in Improper Claim-Splitting, and as a Result, this Lawsuit Is Likely to Be Dismissed.**

52.     In the *Land Office* case, an executive agency of the state of Texas is already suing President Biden and DHS over the very same change in policy articulated by the Proclamation and the DHS Plan that is at issue in this lawsuit, brought by the Attorney General of Texas in the name of "the state of Texas." By breaking up its claims between different agencies within its executive branch, Texas has transgressed the common law rule against claim splitting, which prevents "a party from prosecuting its case piecemeal" by "requir[ing] that all claims arising out of a single wrong be presented in one action." *Ameritox, Ltd. v. Aegis Sciences Corp.*, No. 3:08-CV-1168, 2009 WL 305874, at *4 (N.D. Tex. Feb. 9, 2009) (quoting *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 273 Fed. Appx. 256, 265 (4th Cir. 2008) (citations and internal quotations omitted). The doctrine "protect[s] the defendant from being harassed by repetitive actions based on the same claim." *In re Super Van, Inc.*, 92 F.3d 366, 371 (5th Cir. 1996). Texas's claims are likely to be dismissed on this basis. And since Missouri has no right under the venue statute to force the federal government to defend a lawsuit in this Court if Texas is not a plaintiff, the Court is likely to dismiss the entire case if it finds Texas's claims should be

dismissed for claim splitting.

53.     The claim-splitting rule arises from the common sense principle that "plaintiffs have no right to maintain two actions on the same subject in the same court, against the same defendant at the same time." *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138–39 (2d Cir. 2000). Like the doctrine of res judicata (which, unlike claim splitting, requires a final judgment on the merits), courts in the Fifth Circuit consider whether the first and second claims "[(1)] involve[] the same parties and [(2)] arise[] out of the same transaction or series of transactions." *Ameritox*, 2009 WL 305874, at *4. Two claims arise from the "same transaction" if they are "based on the same nucleus of operative fact." *F.D.I.C. v. Nelson*, 19 F.3d 15, 1994 WL 93409, at *2 n.5 (5th Cir. Mar. 15, 1994) (table) (quoting *Eubanks v. F.D.I.C.,* 977 F.2d 166, 171 (5th Cir. 1992)). The test is satisfied here.

54.     First, the cases involve the same parties. On the defendants' side, the parties are "functionally identical." Order re. Consolidation, ECF No. 32, at 6. Both cases seek relief against the President, the Department of Homeland Security, and Secretary Mayorkas. Other defendants named by Plaintiffs here are either superfluous (like "the United States") or are components of DHS (like CBP and Director Miller). And on the plaintiffs' side, the Fifth Circuit has held the General Land Office is an "arm[] of the state" of Texas because it is "included in the state budget and is substantially funded by the state treasury's general revenue, lacks local autonomy, has statewide regulatory power, and is subject to oversight by state officials." *U.S. Oil Recovery Site Potentially Responsible Parties Grp. v. R.R. Comm'n of Texas*, 898 F.3d 497, 502 (5th Cir. 2018) (concluding the Land Office, alongside other state agencies, enjoyed state sovereign immunity from suit); *see also John G. & Maria Stella Kenedy Memorial Found. v. Mauro*, 21 F.3d 667, 672 (5th Cir. 1994) ("the relief the [plaintiff] requests, although nominally against [the Commissioner of the Land Office], is retroactive relief against the State"); *cf. Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402–04 (1940) (holding, with respect to federal government officials, that "[t]here is privity between officers of the same government" for purposes of applying res judicata). Even if the Land Office and Attorney General are "distinct" in their roles and capacities, Order Re. Consolidation at 6, it remains the case that Texas has effectively sued Defendants twice.

55.     Second, the cases arise out of the same transaction or occurrence. The gravamen of both this

complaint and the *Land Office* complaint is that the Proclamation, the DHS Plan, and actions taken by DHS and CBP pursuant thereto violated federal appropriations statutes, including the APA, and the federal Constitution.  To be sure, the two cases are not identical in how they frame the alleged violations of federal law, although they contain many overlapping claims (including APA claims, constitutional claims, and violations of appropriations statutes).  The complaints also zero in on different kinds of alleged harm to Texas's sovereign interests due to unlawful migration: the Land Office has focused on harm to a piece of state-owned land near the border that it alleges has experienced increased traffic from migrants due to already completed projects shunting migrants onto the property, while Texas has emphasized the cost to the state of providing basic services to migrants such as drivers' licenses, health care, and education, as well as "mitigation measures" it is taking related to immigration.  No matter.  As this Court already recognized, "[t]he fundamental questions in these two cases are the same: whether the Defendants acted consistent with the Constitution in effecting a change of policy with respect to the construction of the border wall[;] whether Plaintiffs have viable equitable, statutory, or APA claims; and whether Defendants' decisions complied with the relevant appropriations laws."  Order re. Consolidation at 7.  Under the "common nucleus of operative fact" test, courts have the authority to apply the rule against claim splitting to dismiss complaints averring any and "all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding."  *Brown v. Felsen*, 442 U.S. 127, 131 (1970).  "[T]he type of relief requested, substantive theories advanced, or types of rights asserted" do not change the analysis.  *United States v. Davenport*, 484 F.3d 321, 326 (5th Cir. 2007).

56.     In its opposition to Defendants' motion to consolidate, Texas asserted that "the GLO and the Land Commissioner are *not* the State of Texas and cannot bring suit on the State's behalf," citing a variety of state law authorities to the effect that only the Attorney General can represent "the state of Texas" in civil litigation.  Opp. to Mot. to Consolidate, ECF No. 22, at 4–5.  That is a non sequitur.  The critical point as far as claim splitting goes is that two entities exercising the sovereign authority of the state of Texas are suing Defendants on claims arising from the same nucleus of operative facts.  Texas's 1876 Constitution intentionally "decentralized the executive authority by vesting power in

other executive officers, most of whom were to be elected," including the Land Commissioner and the Attorney General.  A.J. Thomas, Jr. & Ann Van Wynen Thomas, *The Texas Constitution of 1876*, 35 Tex. L. Rev. 907, 914 (1957).  But regardless of which office acts, and under what banner it sues, the state of Texas is exercising sovereign power in an official capacity when its officers sue in federal court.  The Land Commissioner, no less than the Attorney General, represents the interests of the entire state when he acts in his official capacity, not just the interests of his office.  Federal law regarding claim splitting and preclusion should not hinge on the peculiarities of how a particular state organizes executive power or litigating authority.  *See Adkins*, 310 U.S. at 402–03.

57. Although Texas is likely wrong about the Land Office's authority to bring suit on behalf of the people of Texas,[6] Defendants have no stake in which department of Texas's executive branch is responsible for challenging policies regarding border barrier construction in federal court.  This is not the appropriate forum to resolve the apparent dispute between the Attorney General and the Land Office about their litigation authority, a question of state law between two parties who are not adverse to each other in either of the cases now pending before this Court.  Through legislation, executive action, or litigation in state court, Texas has the ability internally to determine who should represent

---

[6] Texas's General Appropriations Act provides that "the Attorney General shall have the primary duty of representing the State in the trial of civil cases," and generally requires that state agencies receive the Attorney General's approval before hiring outside counsel for civil litigation. General Appropriations Act 2020–21 § 16.01(a), (Sept. 30, 2019), https://www.lbb.state.tx.us/Documents/GAA/General_Appropriations_Act_2020_2021.pdf. But the Land Office is explicitly made exempt from this restriction on its funds. *Id.* § 16.01(i).

The statutes Texas relies upon are consistent with this appropriation.  Texas Gov't Code § 402.021 states that "[t]he attorney general shall prosecute and defend all actions in which the state is interested before the supreme court and courts of appeals," but this statute says nothing about actions in federal court or in trial courts. Tex. Gov't Code § 402.0212 requires the Attorney General to approve all contracts for legal services between outside attorneys and state executive departments, but the Land Office is explicitly exempt from these rules because it is an "agency established by the Texas Constitution." Tex Gov't Code § 402.0212(a); *see also* Tex. Const. Art. XIV, § 1 (establishing the Land Office).  These statutes post-date the state court cases Texas cited in its opposition to consolidation.  Those cases do not address the Land Office's unique status as a constitutionally created arm of the Texas executive branch that has the authority to hire counsel and bring civil litigation independent of the Attorney General.  *See General Land Office v. U.S. Dep't of Interior*, 947 F.3d 309 (5th Cir. 2020) (lawsuit filed by private attorney representing the General Land Office challenging the denial of a petition to delist the Golden-Cheeked Warbler as an endangered species).

the state in disputes over the border barrier to the extent there is disagreement between them as to who had the right to sue the Defendants. But if the Land Office and the Attorney General both maintain suit before this Court over border barrier construction, the rule against claim splitting must be applied to dismiss the later-in-time claim.

58.     Dismissal of Texas from this case would have unavoidable consequences for Missouri, because this Court is not a proper venue for Missouri alone. Missouri has a right under the venue statute to sue officers or employees of the United States in the place where those officers reside in their official capacity, the District of Columbia. *See* 28 U.S.C. § 1391(e)(1)(A). It can also sue those officers in the federal courts within its borders. *Id.* § 1391(e)(1)(C). But it has no right to sue in federal court in Texas unless Texas is joined as a proper plaintiff. The complaint alleges that venue is proper in this Court because "a substantial part of the events or omissions giving rise to this complaint occurred and continue to occur within the Southern District of Texas." Compl. ¶ 47; *see also* 28 U.S.C. § 1391(e)(1)(B). That would no longer be accurate if Texas's claims were dismissed. Federal agencies and government officers acting in their official capacity in Washington, DC are responsible for the policies and actions Plaintiffs challenge here; those "events or omissions" are what "giv[e] rise to this complaint" in this case. The alleged harms Missouri describes in the complaint take place within its borders, when migrants enter the state and begin using social services that cost the state money, not in Texas. Accordingly, the Court should dismiss the entire case because of Texas's claim splitting. *See* 28 U.S.C. § 1406 (district court has discretion to dismiss a case that lies in an improper venue).

### C.     The States' Claims Under the APA Are Unreviewable.

#### 1.     The States' Claims Are Committed to Agency Discretion

59.     Although the APA presumes that agency action can be judicially reviewed, "[t]his is 'just' a presumption .... [U]nder § 701(a)(2) agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law.'" *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993) (citing *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)). Broadly speaking, courts have found that Section 701(a)(2) precludes review where "a court would have no meaningful standard against

which to judge the agency's exercise of discretion," *Lincoln*, 508 U.S. at 191 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)), including situations where the agency decision "involves a complicated balancing of a number of factors which are peculiarly within its expertise." *Id.* (quoting *Heckler*, 470 U.S. at 830). Such is the case here.  The States assert that this case fits in none of the "limited categories" in which judicial review is precluded under § 701(a)(2).  PI Mot. 43–45.  In fact, DHS's plan to expend its fiscal year 2020 and 2021 funds on additional environmental review and consultation before resuming further construction is the type of quintessential policy decision concerning the prioritization and allocation of resources that is committed to DHS's discretion. DHS's decision to allocate its financial resources in this manner also bears the hallmarks of earlier Supreme Court decisions finding similar decisions exempt from APA review, such as decisions not to institute enforcement proceedings and the allocation of funds from a lump-sum appropriation.  As such, it falls outside the presumption against judicial review, and the States lack jurisdiction to challenge these decisions under the APA.

60.    In *Heckler*, a leading Supreme Court decision on § 701(a)(2), the plaintiffs challenged the FDA's decision not to take enforcement actions against drugs used to carry out capital punishment under the Federal Food, Drug and Cosmetic Act.  470 U.S. at 823.  The Court held that this "refusal[] to take enforcement action" was not subject to judicial review.  *Id.* at 831.  Prior to *Heckler*, the Court had "recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Id.*  Such choices "often involve[] a complicated balancing of a number of factors which are peculiarly within its expertise," and "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831–32.  The Supreme Court pointed out that an agency decision that involves factors such as "whether agency resources are best spent" on one or another aspect of the agency's mission, whether an action "best fits the agency's overall policies," and "whether the agency has enough resources to undertake the action" indicate that the decision is of the type which is committed to agency discretion.  *Id.* at 831.

61.    The Supreme Court extended the logic of *Heckler* to appropriations issues in *Lincoln*. The

27

Department of Health and Human Services ("HHS") received a yearly, lump sum appropriation for the operating and capital expenses of the Indian Health Service.[7]  508 U.S. at 185.  For many years, the Indian Health Service operated an Indian Children's Program using money from this lump sum appropriation that provided direct clinical services to Indian children in certain parts of the country. *Id.* at 185–87.  Congress never specifically appropriated funds to the Program, even though the relevant appropriations committees in Congress were aware of the Program and the legislative history of the appropriation was replete with references to the Program.  *Id.* at 187.  When HHS acted to end the clinical services aspect of the Program, Indian tribes sued HHS, claiming that decision violated the law.  The Supreme Court concluded that the decision was committed to agency discretion as a matter of law and not reviewable under the APA.  *Id.* at 193 (discussing *Heckler*, 470 U.S. at 831-32).  At least one court of appeals has since extended the rationale of *Lincoln* to non-lump-sum appropriations, as well, since funding decisions relating to a specific appropriation for a specific program have the same decision-making dynamic as lump-sum appropriations.  *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751–52 (D.C. Cir. 2002) (holding decision to limit distribution of funds appropriated to "provide assistance directly to ... dairy producers, in a manner determined appropriate by the Secretary" by production capacity was committed to agency discretion by law) (citation omitted).

62.    As was the case in both *Heckler* and *Lincoln*, the sources of positive law the States rely upon

---

[7] For example, the appropriation setting the Indian Health Service's operational budget at the time provided, in relevant part:

> For expenses necessary to carry out the Act of August 5, 1954 (68 Stat. 674), the Indian Self-Determination Act, the Indian Health Care Improvement Act, and titles III and XXVI and section 208 of the Public Health Service Act with respect to the Indian Health Service, including hire of passenger motor vehicles and aircraft; purchase of medical equipment; purchase of reprints; purchase, renovation, and erection of modular buildings; payments for telephone service in private residences in the field, when authorized under regulations approved by the Secretary; $1,537,851,000,: . . . .

Pub. L. No. 102-381, 106 Stat. 1407.

here do not provide guidance as to how to balance planning considerations, including environmental review and consultation, with the initiation of new construction.  Absent such guideposts, there are no judicially manageable standards for a court to review the way DHS allocates its financial resources to do more of the former until proceeding with the latter.  Congress appropriated the funds at issue here to CBP's general account for "procurement, construction, and improvements," *see, e.g.*, DHS Appropriations Act, 2020, Div. D, then earmarked[8] the funds as being "available only" for border fencing projects, *id.* § 209.  The statutes do not preclude or require other activities related to the purpose of the appropriation like environmental planning, stakeholder consultation, or land acquisition.  Nor do they explain how much of those necessary activities DHS should engage in, or how much time should be spent on them prior to obligating funds on construction contracts.

63.     Instead of continuing on its prior trajectory, DHS chose to pause current construction and "undertake a thorough review and replanning process" with respect to border barriers, consistent with current law.  DHS Plan at 2.  This decision "to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way" is classically the sort of decision that cannot be reviewed under § 701(a)(2) of the APA.  *Lincoln*, 508 U.S. at 192.  The States insinuate that Defendants have made these decisions because they do not intend to build a border wall at all, but that sort of inquiry into an agency's motivations for exercising its discretion in a particular way is precisely what § 701(a)(2) was meant to preclude.  *See Gentile v. SEC*, 974 F.3d 311, 319–20 (3d Cir. 2020) (holding decision to open a formal investigation was committed to agency discretion by law, even as to plaintiff's contention that it had an "allegedly retributive motive," because § 701(a)(2) "shields the entirety of an agency action that is committed to agency discretion by law").  DHS is "far better equipped" than this Court or the States to assess the agency's priorities and needs in choosing among the many permissible uses of these appropriated funds.  *Lincoln*, 508 U.S. at 193 (quoting *Heckler*, 470 U.S. at 831-32).  As such, the States are unlikely to succeed on their APA claims because the decisions they challenge are committed to agency discretion by law.

---

[8] Earmarks are a "portion of a lump-sum amount for particular purposes." General Accounting Office, *A Glossary of Terms Used in the Federal Budget Process* 46 (2005).

### 2. The States Have Not Challenged Final Agency Action.

64. The APA generally authorizes judicial review only of *final* agency action, as opposed to action that is "preliminary, procedural, or intermediate." 5 U.S.C. § 704. For agency action to be final, it must meet two conditions: "First, the action must mark the 'consummation' of the agency's decisionmaking process[]—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined,' or from which 'legal consequences will flow[.]'" *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citations omitted).

65. The States identify three potential final agency actions: (1) the Proclamation; (2) the DHS Plan; (3) an October 8 press release issued by DHS noting CBP's "intent" to cancel certain border construction projects. PI Mot. 46. But while some of these actions meet one of the two requirements for final agency action, none meets both. The temporary "pause" in construction mandated by the Proclamation is no longer controlling, as the agencies have now made their plans to implement the policy changes directed by the Proclamation. In any event, actions by the President are not subject to APA review because "because the President is not an 'agency' within the meaning of the APA." *See Dalton v. Specter*, 511 U.S. 462, 469 (1994). The DHS Plan is not the "consummation" of DHS's decision-making process, but an interlocutory step on the road to subsequent final decisions. Final agency action does not occur until DHS takes steps necessary to translate the DHS Plan into actions with legal consequences. These "single step[s] or measure[s]" may be reviewable, but the "on-going program or policy" described by the DHS Plan "is not, in itself, a 'final agency action' under the APA." *Cobell v. Norton*, 240 F.3d 1081, 1095 (D.C. Cir. 2001). Lastly, the October 8 press release merely states CBP's "intent" to cancel contracts. Such a statement of intent is necessarily interlocutory, nor do legal consequences flow from it. Defendants are therefore likely to succeed on their defense that Plaintiffs have failed to articulate a challenge to a proper final agency action.

### D. DHS's Actions Are Not Arbitrary and Capricious.

66. Under the APA, agency action should only be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(a)(2). Here, the States face an

uphill battle, as "[t]he arbitrary and capricious standard is highly deferential." *Knapp v. U.S. Dep't of Agric.*, 796 F.3d 445, 453 (5th Cir. 2015). The Court is limited to considering "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989); *see Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974) (court must "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned").

67.     The Court need not reach the arbitrary and capricious question to decide this motion. The States lack standing and have engaged in improper claim splitting. The decisions that the States critique here, such as the amount of environmental review that should be undertaken before initiating new construction projects, are classically the sorts of decisions that Congress commits to the discretion of agencies as a matter of law. Moreover, because DHS's reassessment of border barrier construction is ongoing and the States have not identified a final agency action to challenge, the States' APA claims are premature. But should the Court choose to reach the States' arbitrary and capricious claim, Defendants' decision to engage in thorough environmental review and stakeholder consultation before engaging in any new construction easily clears the low hurdle of rationality review.

68.     Texas first argues that Defendants failed to take account of statements made by officials of the prior administration that "walls work" to deter migrants and contraband from entering the United States. PI Mot. 18–20. In press releases issued in 2018 and 2020, DHS claimed that prior border wall projects significantly reduced apprehensions and seizures of narcotics in areas where they were built. App.007–08, 010–12. The States argue that Defendants did not adequately address such assertions by either adducing evidence that contradicted or undermined these previous statements about the effectiveness of previously constructed barriers, or by addressing the prior statements and explaining why it would proceed with the new policy anyway.

69.     At the outset, there is a mismatch between the evidence the States point to and the decisions they have challenged here. The issue in this case is the initiation of *new* border barrier projects for which construction has yet to begin. Meanwhile, the States assert that *previous* construction projects reduced immigration activity in areas where the construction had taken place. But the sources cited

do not claim that the barriers led to an overall decrease in migration levels; they do not engage in any comparative analysis of how overall migration rates fluctuated in response to the completion of segments of the barrier, taking into account broader migration patterns and other enforcement policies; and they do not examine why these benefits would continue to accrue from further construction.   It does not ineluctably follow that new projects, which are separately surveyed, approved and contracted, would achieve similar success or have a net impact on unlawful migration. Indeed, the States' alarmism about current levels of immigration, which exist despite the presence of hundreds of miles of new border wall built during the previous administration, undermines the probity of this evidence as a gauge of the effectiveness of future projects at curbing unlawful immigration.

70.     But even if the Court were to assume the States' assessment of effectiveness is correct, DHS would still be likely to prevail.   DHS's new policy does not logically require a denial or rebuttal of the evidence touted by the prior administration showing that construction of barriers correlated with lower apprehensions in segments of the border.   Prior to the Proclamation, DHS had engaged in environmental planning and stakeholder consultation activities intended to mitigate the impact of construction of the border wall.   *See* IIRIRA § 102(b)(1)(C).   This planning was allowed to proceed in an expedited fashion because DHS had issued waivers, pursuant to IIRIRA, of various federal statutes governing federal construction projects, including NEPA.   *See* IIRIRA § 102(c)(1).   As part of the "thorough review and replanning process" initiated by the DHS Plan, DHS will, going forward, "engage in standard environmental planning including taking certain actions consistent with [NEPA] and other environmental planning and statutes."   DHS Plan at 2, 5.   That decision to comply with standard environmental planning procedures articulated by Congress, even where statutes such as NEPA has been waived, will "ensure that CBP has a complete understanding of the potential impacts of those projects" before it begins construction.   Enriquez Decl. ¶ 40.   Implicit in that choice to conform environmental planning to the standards of federal law is DHS's "awareness that it is changing position" with respect to the border wall and that "there are good reasons for the new policy."   *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009).

71.     Next, the States briefly argue that Defendants have "reverse[d] their own prior position on the

importance of deterring illegal border crossings" and "utterly failed to explain why they seemingly no longer think it is important to prevent aliens from attempting to illegally gain entry into the United States." PI Mot. 20–21.   These claims are baseless.   The very first sentence of the Proclamation reaffirms that "the United States has a right and a duty to secure its borders and protect is people against threats." 86 Fed. Reg. 7225.  The States point to nothing that suggests Defendants no longer think that enforcing immigration law is important.

72.      The States' next argument is that Defendants failed to take into account their reliance interests in the construction of new border wall projects. PI Mot. 21–22.  Typically, "[w]hen an agency changes course . . . it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account'" before it does so.   *Dep't of Homeland Sec'y v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)).  But *Regents* does not apply here.  In *Regents*, DHS was attempting to rescind the Deferred Action for Childhood Arrivals ("DACA") program that individuals relied upon in order to maintain a legal immigration status in the United States.  DHS is not trying to undo previous construction projects in a way analogous to rescinding the DACA program.  Rather, it is deferring new construction that has yet to commence until it can engage in further review of the projects, including robust environmental review.  The States cannot claim reliance interests based on future construction activities in the Laredo and El Centro sectors that have not even been fully planned, let alone started.

73.      Even if the Court concludes that *Regents* should apply to the decisions at issue here, it would be more accurate to say that Defendants are in the process of complying with *Regents*, rather than violating it.  The States assert that Defendants have failed to properly consider "the costs that termination of border wall construction" would impose on them, and consequently failed to actually make a decision that other policy considerations outweighed the need to protect the States from the impact of unlawful migration and press forward with new border wall construction.  PI Mot. 21–22. But those are not the only factors relevant to border wall construction, and the States do not claim otherwise.  The relevant factors also include the impact of construction on the environment and other relevant stakeholders.  Defendants have chosen to engage in further consideration of those factors

before pressing on with additional construction.  The futility of a court attempting to adjudicate how much time, money, and consideration DHS should give to this or that factor before committing to a construction project is precisely why Defendants' decision is not reviewable.  But even if the Court reaches this question, there is nothing arbitrary and capricious about deciding to look at some relevant factor more closely before making a final decision.

74.    Finally, the States assert that Defendants actions mean they "will never be able to comply with Congress's mandate in the 2020 and 2021 CAAs," and argue that Defendants have acted in an arbitrary and capricious manner by not considering compliance with these statutes, the ICA, and the Constitution in crafting their policy.  PI Mot. 22–23.  At the same time, the States assert that Defendants have "admitted" on multiple occasions that they have an obligation to spend appropriated funds consistent with Congress's purposes and other statutory and constitutional constraints.  But there is no contradiction in Defendants' plans: as explained below, Defendants are complying with all of the laws the States have cited here, and have repeatedly maintained their commitment to spending all appropriated funds consistent with their purposes.  *See* Proclamation (directing agencies to "provid[e] for the expenditure of any funds that the Congress expressly appropriated for wall construction, consistent with their appropriated purpose").

75.    In sum, no aspect of the States' challenge to Defendants' decision-making has any merit. Accordingly, assuming the Court reaches the States' arbitrary and capricious claims, it should conclude that Plaintiffs have no likelihood of success on this claim.

### E.    The States' Statutory Claims Fail.

#### 1.    The States Do Not Fall Within the Zone of Interests Protected by DHS's Annual Border Infrastructure Appropriations and the Impoundment Control Act.

76.    The States also cannot establish a likelihood of success on the merits of their statutory claims that DHS has expended funds contrary to the provisions its fiscal year 2020 and 2021 appropriations statutes or the Impoundment Control Act ("ICA").  *See* PI Mot. 23–29.  The States' claims fail at the outset because their asserted financial interests in minimizing the costs of providing driver's licenses

and other state-funded services are not within the zone of interests protected by Congress's appropriations to DHS for border wall construction or Congress's oversight of Executive Branch funding impoundments.

77.     The States bring their statutory claims through a cause of action provided by the APA, *see id.* at 24, but the APA's express cause of action to obtain judicial review of whether a federal agency's actions are in excess of statutory authority is not available unless the States' asserted interests at least arguably "fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-130 (2014) (citation omitted).  The zone-of-interests requirement originated in *Association of Data Processing Serv. Orgs., Inc.* v. *Camp*, 397 U.S. 150, 156 (1970), and serves as a general presumption about Congress's intended limits on the scope of causes of action. *See Lexmark Int'l, Inc..*, 572 U.S. at 127-33.  The zone-of-interests test "is a 'requirement of general application'" that "*always* applies and is never negated." *Id.* at 129 (emphasis in original) (quoting *Bennett v. Spear*, 520 U.S. 154, 163–64 (1997)); *see Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (applying zone-of-interests test to alleged statutory violation); *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 320–21 n.3 (1977) (applying the zone-of-interests requirement to alleged constitutional violation).

78.     The zone-of-interests test requires courts to assess whether "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *Ass'n of Data Processing Serv. Organizations, Inc.*, 397 U.S. at 153.  The test forecloses suit where the plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit" the plaintiff to bring suit under it. *Patchak*, 567 U.S. at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)).  When Congress authorizes a cause of action, it presumptively does not intend the "absurd consequences" that would follow "[i]f any person injured in the Article III sense" by an alleged violation of federal law could sue over the violation. *Thompson* v. *North Am. Stainless, LP*, 562 U.S. 170, 176–177 (2011).  The zone-of-interests requirement thus limits the plaintiffs who may invoke a cause of action under the APA for an alleged violation of law

to those whose asserted interests are arguably "protected or regulated by the statute that they say was violated." *Texas I*, 809 F.3d at 161; *see Moses v. Banco Mortg. Co.*, 778 F.2d 267, 271 (5th Cir. 1985) ("parties who receive only unintended or incidental benefits from statutes or regulations are outside the zone of interests to be protected").

79.     Here, the States fall outside the zone of interests of the DHS appropriations statutes they seek to enforce.  Texas and Missouri brought this lawsuit to protect various state government agencies from having to expend state funds on public services for migrants, such as driver's licenses, public education, and healthcare.  *See* PI Mot. 37–41.  Texas also asserts an interest in increasing the general tax revenue it would receive from levying a "franchise tax" on government contractors who perform border wall construction activities.  *See id.* at 41–42.  Texas further seeks to protect public funds that it has expended to build its own border wall.  *See id.* at 42–43.  But the States' interest in raising more general tax revenue or protecting the operating budgets of state agencies charged with providing social services to migrants or public safety activities are not even "marginally related to . . . the purposes implicit" in the appropriations statutes at issue in this case.  *Patchak*, 567 U.S. at 225 (citation omitted).

80.     The DHS Appropriations Acts of fiscal year 2020 and 2021 appropriated $1.375 billion to CBP "for the construction of barrier system along the southwest border."  DHS Appropriations Act, 2020, Pub L. No. 116-93, Div. D, § 209(a)(1), 133 Stat. at 2512; DHS Appropriations Act, 2021, Pub L. No. 116-260, Div. F, § 210, 134 Stat. at 1456–57.  These statutes regulate and protect the interests of DHS and Congress in the federal spending and appropriations process.  Nothing about the text or context of these statutes suggests any connection whatsoever to the interests of a state government who asserts that federal spending decisions indirectly harm the state's tax base or the operating budgets of its agencies.  *See Miccosukee Tribe of Indians of Fla. v. United States*, No. 08-23523-CIV, 2009 WL 10668917, at *4 (S.D. Fla. Sept. 30, 2009) (dismissing claims brought under a statute appropriating funds to a federal agency for a construction project on zone-of-interests grounds because the statute protected the agency's interest in receiving funds for the construction project, not an Indian tribe's interests in quiet enjoyment of land near the project).  When Congress appropriated funds to DHS for border wall construction, it did not require DHS to consider the potential impact on state agency

budgets or tax revenue, nor did Congress limit DHS's discretion to expend funds in order to protect those interests. These provisions act as limitations on the Executive vis-a-vis Congress regarding federal appropriations, and do not confer judicially cognizable rights on state governments to second-guess federal spending decisions. *See Glass Packaging Inst. v. Regan*, 737 F.2d 1083, 1090 (D.C. Cir. 1984) (holding that a private party alleging "an injury to its competitive interests" was "not arguably within the zone of interests" of a statute intended "to regulate only a specific narrow governmental interest—protection of tax revenues"); *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 925 (D.C. Cir. 1989) (suggesting that a defense contractor would fall outside the zone of interests of an appropriations act because the "defense appropriation is not passed in order to benefit defense contractors, benefit them though it may"); *Cleveland Assets, LLC v. United States*, 132 Fed. Cl. 264, 277 (2017) (concluding that plaintiffs alleging an agency's violation of 40 U.S.C. § 3307 fell outside that statute's zone of interests because the statute's "purpose is obviously to enable Congress to oversee how the money it appropriates is spent"), *aff'd*, 883 F.3d 1378 (Fed. Cir. 2018); *cf Sierra Club*, 140 S. Ct. at 1 ("Among the reasons" for granting stay of injunction, environmental plaintiffs "have no cause of action to obtain review of" DoD's compliance with an appropriations transfer statute).

81.    Moreover, allowing this suit to proceed would lead to "absurd consequences" by enabling state governments to challenge the way in which federal agencies choose to spend their appropriated funds based on unrelated concerns about the downstream impact such spending may have on state agency budgets. *Thompson*, 562 U.S. at 176–77. Congress, when it appropriated annual funding to DHS for border infrastructure construction, could not have intended to give every state or local government arguably impacted by that spending a cause of action to sue. Notably, the States do not identify any history or precedent in which a state government fell within the zone of interests of a federal statute that simply appropriates funds to a federal government agency.

82.    Congress itself has ample tools to enforce its appropriations powers. *See Nat'l Treasury Emp. Union v. Campbell*, 654 F.2d 784, 794 (D.C. Cir. 1981) ("Congress itself is in a position to monitor and enforce its spending limitations. It is not for us to question the effectiveness of existing remedies and infer additional remedies when Congress has so strongly indicated that no private remedy was

intended."). Indeed, this case starkly illustrates the concern that allowing outside parties to sue over federal appropriations could conflict with the interests of Congress. The nonpartisan GAO—which is headed by the Comptroller General, "an agent of the Congress," *Bowsher* v. *Synar*, 478 U.S. 714, 731 (1986) (citation omitted), and charged with examining how federal funds are spent—recently concluded that DHS did not unlawfully impound funds from its border infrastructure appropriations while implementing the President's Proclamation. *See GAO Opinion* at *5 (stating that DHS is "not withholding funds from obligation or expenditure" and "[a]ny delayed expenditures stem from DHS taking necessary steps to comply with statutory environmental and stakeholder consultation requirements for these construction projects and do not constitute an impoundment"). The independent arm of Congress with expertise on fiscal law issues thus rejected the same impoundment argument the States are asserting in this case. *See* PI Mot. 5 n.3 (conceding the GAO's opinion is entitled to "special weight" in light of "its accumulated experience and expertise in the field of government appropriations") (quoting *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005)). In these circumstances, where the GAO has spoken and Congress did not provide a direct cause of action for parties to challenge routine agency spending practices, the Court should not permit such claims to go forward, particularly when the States fall outside the zone of interests of the appropriations statutes they seek to enforce.

83.     The States' financial interests also do not fall within the zone of interests of the ICA. Passed in 1974, *see* 2 U.S.C. §§ 681–688, the ICA "operates on the premise that when Congress appropriates money to the executive branch, the President is required to obligate the funds." *See* Congressional Committees, B-329092, 2017 WL 6335684 at *1 (Comp. Gen. Dec. 12, 2017). Under the ICA, the President must notify Congress when he proposes to withhold funds from obligation or expenditure, either permanently or temporarily. *See* 2 U.S.C. §§ 684–685. The ICA establishes procedures for the President to impound funds in two limited circumstances. First, the President may temporarily withhold budget authority from obligation within a fiscal year by proposing a "deferral." 2 U.S.C. § 684. Second, the President may permanently cancel budget authority by proposing a "rescission." 2 U.S.C. § 683. In either case, the ICA requires the President to

transmit a special message to Congress justifying the proposed action. 2 U.S.C. §§ 683–684.

84.     The ICA thus protects Congress's power of the purse by ensuring the Executive Branch incurs obligations in accordance with congressional appropriations and does not impound funds absent appropriate congressional oversight.   Nothing in the text or history of the ICA evidences an intent to protect or regulate the financial concerns of state governments who incur costs or lose tax revenue associated with federal immigration policies.   The ICA is simply not concerned with protecting the public fisc of state agencies like Driver's License Division of the Texas Department of Public Safety or the Missouri Department of Elementary and Secondary Education.   *See* PI Mot. 38–40.   The interests that the States assert here are far more attenuated from the ICA than prior cases where the Supreme Court and Fifth Circuit concluded that plaintiffs cannot satisfy the zone-of-interests test.   *See Lexmark Int'l, Inc.,* 572 U.S. at 131 (concluding that plaintiff raising a false advertising claim under the Lanham Act falls outside the zone of interests because the statute protects a plaintiff's "commercial interest in reputation or sales" and not a "consumer who is hoodwinked into purchasing a disappointing product"); *I.N.S. v. Legalization Assistance Project of Los Angeles Cty. Fed'n of Lab.,* 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers) ("The fact that the INS regulation may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect."); *Moses,* 778 F.2d at 271 ("We hold that neither the Federal Housing Act nor the HUD regulation was intended directly to benefit either owners of low income housing projects or parties bidding at the HUD mortgage auction.").

85.     Other courts have concluded the ICA does not provide for a private cause of action. *See Pub. Citizen v. Stockman*, 528 F. Supp. 824 & n.1 (D.D.C. 1981); *Rocky Ford Hous. Auth. v. U.S. Dep't of Agric.*, 427 F. Supp. 118, 134 (D.D.C. 1977); *Rogers v. United States*, 14 Cl. Ct. 39, 50 (1987), *aff'd*, 861 F.2d 729 (Fed. Cir. 1988).   The court in *Stockman* held that held that an organizational plaintiff did not fall within the zone of interests of the ICA because the statute was "clearly enacted to safeguard Congress's interests, not those of private citizens."   528 F. Supp. at 830 n.1.   There, the plaintiff sought to challenge budget deferrals issued by the Office of Management and Budget on which the Comptroller General had yet to report to Congress.   The court rejected that challenge, explaining that

the ICA "does not expressly vest in any person besides the Comptroller General the right to bring suit to enforce the Act's provisions." *Id.* at 827; *see* 2 U.S.C. § 687 (authorizing the Comptroller General to bring suit in the United States District Court for the District of Columbia to require "budget authority to be made available for obligation"); *see also Rogers*, 14 Cl. Ct. at 50 (1987) (concluding that "this lawsuit does not state a cause of action for violation of the Impoundment Control Act" because "an examination of the statute indicates that Congress did not intend to create a private cause of action in cases of unauthorized impoundments"); *Rocky Ford Hous. Auth.,* 427 F. Supp. at 134 (same). And the court in *Stockman* rejected the plaintiff's effort to proceed under the APA, concluding that its analysis of the absent private right of action "pretermit[ted] any contention that plaintiff's interest in preserving the flow of appropriations is within the zone of interest to be protected by the ICA." *Id.* at 830 n.1. Here, the States' financial and budgetary interests similarly fall outside the zone of congressional interests that the ICA protects.

### 2. DHS Has Acted Consistent With The Requirements of its Congressional Appropriations and the Impoundment Control Act.

86. Even assuming the States have a cause of action, the States cannot demonstrate a likelihood of success on the merits of their claims that DHS has unlawfully impounded funds in contravention of the fiscal year 2020 and 2021 DHS Appropriations Acts or the ICA. *See* PI Mot. 24–29.

87. The President and federal agencies, as a general matter, do not have the ability to impound or otherwise prevent the expenditure of funds appropriated by Congress to carry out legislation. *See* U.S. Dep't of Justice Office of Legal Counsel, Memorandum Opinion by William H. Rehnquist on Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools at 8 (Dec. 1, 1969) ("With respect to the suggestion that the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent."). Federal agencies therefore "must make funds available for obligation unless otherwise authorized to withhold." *See* Congressional Committees, B-329092, 2017 WL 6335684 at *1 (Comp. Gen. Dec. 12, 2017). Congress enacted the ICA to control impoundments by the Executive Branch. *See* 2 U.S.C. § 682(a); *see also* General Accounting Office,

A Glossary of Terms Used in the Federal Budget Process at 61 (Sept. 2005) (defining "impoundment" as when federal officials, though action or inaction, withhold or delay the obligation or expenditure of appropriations provided for projects or activities).  But not every delay in the obligation or expenditure of funds constitutes an unlawful impoundment or violation of the ICA.   In passing the ICA, Congress acknowledged that "the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year" and such delays may result from the "normal and orderly operation of the government." *City of New Haven, Conn. v. United States,* 809 F.2d 900, 901 (D.C. Cir. 1987) (quoting H.R. 658, 93d Cong., 1st Sess. 41 (1971)).  Indeed, the GAO has recognized that "[l]egitimate programmatic delays may occur when the agency is taking reasonable and necessary steps to implement a program, even though funds temporarily go unobligated."  *See* Congressional Committees, B-329092, 2017 WL 6335684 at *1 n.6 (Comp. Gen. Dec. 12, 2017) (citing instances of design modifications to projects and low numbers of applicants for a program).

88.    GAO has also recognized a distinction between deferrals of funds by the Executive Branch based on policy disagreements with Congress, which are prohibited by the ICA, and deferrals due to legitimate "programmatic" reasons, which are not.  *See* GAO, Principles of Federal Appropriations Law, 4th ed., 2016 rev., ch. 2, p. 2-50.  Accordingly, potential delays associated with determining how best to execute projects consistent with the policy objectives of the Executive Branch are not impoundments where the Executive has lawful discretion to choose how to execute the program.  Any such delay does not negate congressional authority to determine fiscal priorities; rather, it impacts how, not whether, a project will be carried out by the Executive Branch.

89.    Further, the ICA "does not impose any specific requirements on the Executive Branch as to the rate at which budget authority must be obligated or expended." *In re Henry M. Jackson*, United States Senate, B-200685, 1980 WL 14499 (Comp. Gen. Dec. 23, 1980).  Nor is there any legal requirement that funds be "fully obligated as soon as they first become available, regardless of any necessary programmatic or administrative considerations." *In re James R. Jones*, House of Representatives, B-203057 L/M, 1981 WL 23385 at *4 (Comp. Gen. Sept. 15, 1981).  An agency is permitted to take "the steps it reasonably believes are necessary to implement a program efficiently

and equitably, even if the result is that funds temporarily go unobligated." *Id.*

### a.  DHS is Lawfully Executing its Fiscal Year 2020 Border Infrastructure Funds.

90.     Applying these principles here, DHS did not impound appropriated funds for border barrier construction in fiscal year 2020 because none of those funds has been withheld from obligation. *See surpa* at 10–14; Enriquez Decl. ¶¶ 11–38.  Congress appropriated $1.375 billion to DHS in fiscal year 2020 "for the construction of barrier system along the southwest border."  DHS Appropriations Act, 2020, Pub L. No. 116-93, Div. D, § 209(a)(1), 133 Stat. at 2512.  DHS obligated $1.32 billion of this amount as of March 2021.[9]  Enriquez Decl. ¶ 14.  DHS utilized this money to fund four contracts that would provide for the design and construction of approximately 70 miles border barrier system in the Laredo Sector. *Id.* ¶¶ 15–18.  At the time the President issued his Proclamation, CBP had not acquired any of the land necessary to begin construction of the Laredo projects and CBP was in the process of acquiring temporary rights of entry to conduct real estate surveys and appraisals. *See id.* ¶ 21.

91.     As set forth in the DHS Plan, CBP is currently focused on conducting a thorough review and replanning process for the Laredeo projects, including taking actions consistent with NEPA and stakeholder outreach. *See* DHS Plan at 2–3.  CBP will utilize contracts awarded with fiscal year 2020 barrier system appropriation funds for environmental planning and stakeholder engagement and expects those actions will begin in the first quarter of 2022. *Id.* ¶ 23.  CBP also intends to continue to acquire temporary rights-of-entry that will permit CBP and its contractors to access property for the purpose of conducting environmental planning actions. *Id.*  These real estate activities have been, and will continue to be, funded by DHS's fiscal year 2020 appropriations. *Id.* ¶ 21.

92.     In light of the time required to complete environmental planning for the Laredo projects, and

---

[9] Although a relatively small amount of money was not obligated at this time, there was no impoundment of funds because prudent financial management often results in residual amounts of money going unobligated to cover the costs of unanticipated liabilities and to avoid potential violations of the Anti-Deficiency Act, 31 U.S.C. § 1341(a). *See Matter of: Dep't of Com.-Application of the Impoundment Control Act to Appropriations Enacted in Fiscal Years 2018 & 2019*, B-331298, 2020 WL 7641195 at *4 (Comp. Gen. Dec. 23, 2020).

to ensure that the government does not incur substantial additional delay and other costs while such planning is carried out, CBP has modified two of the contracts to remove the construction component and the Army Corps of Engineers has issued termination notices for the two other contracts. *Id.* ¶¶ 26–27. Negotiations with the contractors over final termination and contract modification costs are ongoing, and CBP will receive partial design packages for the Laredo projects. *Id.*

94. As of December 6, 2021, CBP has obligated approximately $618 million of the fiscal year 2020 barrier system appropriation. *Id.* ¶ 28. CBP intends to use its available fiscal year 2020 barrier system funds to conduct environmental planning, undertake robust consultation with stakeholders, and if additional permanent land acquisition is necessary to complete projects contemplated by the DHS Plan, CBP will initiate robust landowner engagement prior to acquisition. *Id.* ¶ 29.

94. DHS thus has not unlawfully withheld its fiscal year 2020 appropriations from obligation or expended these funds in a way that contravenes its statutory budget authority. Funds are currently obligated on contracts necessary for environmental planning and barrier construction design for the Laredo projects. Remaining unobligated funds are available for obligation until September 30, 2024, and DHS intends to use the funds to complete additional environmental planning and stakeholder consultation. Nothing in the ICA or any other statute requires that the funds be obligated or expended in accordance with a specific rate over that time. Further, DHS's decision to expend its funds in this manner is consistent with the broad discretion Congress has provided to DHS in IIRIRA to undertake border barrier construction. The programmatic decisions DHS makes as to how best to manage and prioritize its funds—whether for environmental review, land acquisition, or construction—are not unlawful impoundments, but rather prudent steps "to implement a program efficiently and equitably, even if the result is that funds temporarily go unobligated." *In re James R. Jones*, House of Representatives, B-203057 L/M, 1981 WL 23385 at *4.

95. The States' primary objection is that the DHS is not spending its funds on "actual construction of border barrier," PI Opp. at 13, but no provision of law restricts DHS's expenditures only to ground-disturbing construction activity. Expenditures for environmental planning and project review fall well within the bounds of DHS's permissible funding discretion under the necessary expense doctrine.

43

This "rule of construction for appropriations statutes" governs situations where an appropriation for a general purpose (*i.e.*, border barrier system) "leaves open whether a specific proposed expenditure is a legally authorized purpose for which appropriated funds may be expended." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1349 (D.C. Cir. 2012) (Kavanaugh, J.). "Under the necessary expense doctrine, 'an appropriation made for a specific object is available for expenses necessarily incident to accomplishing that object unless prohibited by law or otherwise provided for.'" *Id.* (quoting 1 GAO, Principles of Federal Appropriations Law at 4–20). Agencies are afforded deference in making this determination and the rule ensures that agency spending is not "so attenuated as to take it beyond that range of permissible discretion." *Id.* (quoting GAO, *Implementation of Army Safety Program,* B–223608 (Comp. Gen. Dec. 19, 1988)).

96.     There is no doubt that environmental planning and review is a necessary incident to border wall construction. Such construction has the potential to impact plant and wildlife habitat, natural resources, and flood prevention infrastructure. *See, e.g.*, DHS Response to Public Comments Regarding the Construction of Border Wall Within Certain Areas in the Rio Grande Valley, Texas, 85 Fed. Reg. 23,983-01 (Apr. 30, 2020); Enriquez Decl. ¶¶ 39–52. DHS has a long history of addressing these types of concerns as part of expending funds in furtherance of its border wall project management and development process. *See Cnty. of El Paso*, 2008 WL 4372693, at *11 (explaining DHS's "comprehensive analysis of the potential environmental impacts"). Moreover, Congress was well aware that DHS would undertake environmental planning when it appropriated funding for border infrastructure projects and expressly required that DHS consult with stakeholders about environmental impacts. *See supra* at 4–6. And for projects where DHS has not chosen to rely on a waiver of environmental laws pursuant to IIRIRA, environmental planning is legally required to avoid a violation of federal laws such as NEPA. The environmental and planning expenditures at issue here are thus well within the "range of permissible discretion" afforded to DHS in the exercise of its spending authority. *Fed. Lab. Rels. Auth.*, 665 F.3d at 1349.

**b. DHS is Lawfully Executing its Fiscal Year 2021 Border Infrastructure Funds.**

97.     DHS also has not unlawfully delayed the obligation of its fiscal year 2021 border infrastructure

funds contrary to the terms of its appropriations statutes or the ICA.  *See supra* at ¶¶ 23–36; Enriquez Decl. ¶¶ 30–38.

98.    In fiscal 2021, Congress appropriated $1.375 billion to DHS for "for the construction of barrier system along the southwest border" and gave DHS five years to obligate the funds.  DHS Appropriations Act, 2021, Pub L. No. 116-260, Div. F, 134 Stat. at 1452, 1456–57.  As set forth in the DHS Plan, DHS intends to use its fiscal year 2021 funds on various close-out and environmental remediation activities at the former DoD project sites that are turned over to DHS as well as for other contingency costs resulting from rescoping existing projects.  *See* DHS Plan at 3–5.  For these activities, DHS generally intends to engage in standard environmental planning, including taking actions consistent with NEPA.  *Id.* at 4–5.

99.    As of December 6, 2021, DHS has obligated approximately $5.4 million dollars of its fiscal year 2021 appropriation for various programmatic expenses, including contract costs for environmental support services and stakeholder engagement.  *See* Enriquez Decl. ¶ 32.  CBP intends to use fiscal year 2021 funds for environmental planning and stakeholder outreach for its next highest priority barrier segments, which are located in the El Centro Sector in California.  *Id.* ¶ 34.  CBP has awarded a contract using fiscal year 2021 barrier system appropriation funds for this work, which will begin in the first quarter of 2022.  *Id.*

100.    Additionally, CBP plans to spend its fiscal year 2021 funds on remediation and closeout of the former DoD border barrier project sites.  CBP has until September 30, 2025 to obligate these funds and the obligation timing will be informed by several factors.  *Id.* ¶¶ 35–38.  First, the DoD contractors will need to complete their safety work and demobilize from the project areas.  *Id.* ¶ 38.  Second, CBP will need to complete its own study and assessment of the project areas after the DoD contractors depart to determine what additional priority remediation activities need to be completed.  *Id.*  That process is a necessary prerequisite to contact award and obligation of funds that will inform both the scope of the work and the estimated costs.  *Id.*

101.    There is nothing unlawful about DHS's plan to expend its fiscal year 2021 appropriations in this manner.  In order to faithfully execute the law, DHS is permitted to determine how best to execute

and implement its spending authority consistent with the broad statutory authority Congress provided in IIRIRA.  Indeed, the GAO has recognized that programmatic delays are lawful and appropriate where an agency must take "necessary steps to implement a program even if funds temporarily go unobligated."  The Honorable Barbara Boxer, B-290659, 2002 WL 1799692 (Comp. Gen. July 24, 2002); *see also* Walter E. Fauntroy, House of Representatives, B-204905 L/M, 1981 WL 23166 (Comp. Gen. Nov. 2, 1981) (concluding that the Department of Education did not violate the ICA when it delayed the obligation funds due to "factors relating to the efficient operation of the grant program").  Project planning for a billion dollar appropriation is a necessary part of successful project implementation.  Such advance planning is particularly appropriate here, where IIRIRA grants broad discretionary authority to DHS to construct border barriers and Congress gave DHS five years to obligate the funds.  Given the need to undertake appropriate environmental planning and stakeholder consultation "prior to further construction," DHS Plan at 2, DHS could not award contracts or start construction activities using its fiscal year 2021 funds until that process is either fully complete or, at minimum, nearing its end.

102.    By contrast, the States' position that CBP must immediately expend funds on actual border wall construction would lead to a scenario in which agencies would be forced to spend taxpayer funds before they had even determined, as allowed within their statutory discretion, how best to do so.  No principle of federal appropriations law compels that result.

### 3.    The GAO Agrees DHS is Lawfully Executing its Border Infrastructure Funds.

103.    The GAO agrees with the foregoing analysis and concluded in June 2021 that DHS is acting in accordance with both the ICA and its appropriations statutes in the execution of its border wall funding.  *See* GAO Opinion.  The States cite the GAO Opinion on multiple occasions in their motion, but fail to note that the GAO rejected arguments similar to those of the States.  *See* PI Mot. 5, 11–12.  The States further concede the GAO's opinion is entitled to "special weight" in light of "its accumulated experience and expertise in the field of government appropriations."  *Id.* at 5 n.3 (quoting *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005)); *see Data Sys. Corp. v. Webster*, 744 F.2d 197,

201 (D.C. Cir. 1984) (Scalia, J.) (stating that the GAO reflects the "expert" view of an independent arm of Congress on fiscal issues that courts should "prudently consider").  Although the GAO decision is not binding on this Court, there is no basis for the Court to depart from the GAO's well-reasoned conclusions.

104.     In response to a complaint from a group of Senators that DHS had unlawfully impounded its border wall infrastructure funds, the GAO conducted a thorough analysis of DHS's execution of its border wall appropriations between fiscal years 2018 and 2021.  *See* GAO Opinion at *2–3.   The GAO concluded that "neither the Proclamation nor its implementation violate the ICA."  The GAO acknowledged that DHS had suspended construction of border wall projects funded with fiscal year 2018–2020 funds, but found that those actions were undertaken "in order to rescope the projects to mitigate environmental damage and minimize the impact or border communities."  *Id.* at *1.  In these circumstances, the GAO concluded that "delays in spending these funds" were "programmatic delays, not impoundments."  *Id.*; *see id.* at 4–5 ("Any delayed expenditures stem from DHS taking necessary steps to comply with statutory environmental and stakeholder consultation requirements for these construction projects and do not constitute an impoundment.").   Additionally, the GAO never suggested, let alone concluded, that DHS's use of its appropriations on environmental planning or stakeholder consultation would violate either the ICA or fall outside of the scope of DHS's permissible spending authority.

105.     With respect to funds Congress appropriated in fiscal year 2021, the GAO similarly found that DHS was engaged in responsible project planning for future border wall projects and had not unlawfully impounded funds.  *See id.* at 2, 5–7.  Although DHS had not obligated any of its fiscal year 2021 funds at that time, the GAO nevertheless agreed that a delay caused by "steps DHS is taking to ensure compliance with environmental, stakeholder consultation, and procurement statutes is a programmatic delay, not an impoundment under the ICA."  *Id.* at 5.  In addition, the GAO recognized that DHS must have flexibility "to determine its project needs" in light of changed circumstances subsequent to the enactment of the fiscal year 2021 appropriation, including the discontinuation of "DOD participation in existing barrier construction" and DHS's policy decision that future border

barrier projects "will include standard environmental planning and compliance and robust stakeholder consultation." *Id.* at *6. The GAO thus concluded "there is not an impoundment of DHS's fiscal year 2021 barrier appropriation and no violation of the ICA with respect to these funds." *Id.*

### F. The States' Constitutional Claims Fail.

106.    The States' constitutional claims alleging violations of the Separation of Powers and the Take Care Clause fare no better than their statutory claims. *See* PI Mot. 32–34. As a threshold matter, the States lacks a cause of action and cannot satisfy the zone-of-interests requirement for their constitutional claims.[10] *See Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) ("[T]he Court has required that the plaintiff's complaint fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." (citation omitted)); *Boston Stock Exch.*, 429 U.S. at 320–21 n.3 (applying the zone-of-interests requirement to plaintiffs seeking to enforce the dormant Commerce Clause). Just as the States financial interests are entirely unrelated to the interests protected by the statutes they invoke, *see supra* at ¶¶ 76–85, their interests are also unrelated to the asserted constitutional limitations on Congress's power to authorize or appropriate funds for DHS to undertake border infrastructure projects.

107.    Additionally, the States cannot establish a likelihood of success on the merits of their constitutional claims because "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton*, 511 U.S. at 473. In *Dalton*, the Supreme Court rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471. Not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472. In reaching this conclusion, the Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in

---

[10] The States bring their constitutional claims under the APA's cause of action and an implied equitable cause of action. *See* PI Mot. 31. The zone-of-interest requirement applies to both causes of action because it "is a 'requirement of general application'" that "*always applies* and is never negated." *Lexmark*, 572 U.S. at 129 (emphasis in original) (quoting *Bennett v. Spear*, 520 U.S. 154, 163–64 (1997)).

excess of his statutory authority." *Id.* (collecting cases).  The Constitution is implicated only if executive officers rely on it as an independent source of authority to act or if the officers rely on an unconstitutional statute.  *Id.* at 473 & n.5.

108.    Neither of those situations applies to this case.  DHS is executing its border wall plan pursuant to congressional statutory authorization under IIRIRA and its border infrastructure appropriations, not independent Article II authority.  This case thus presents a sharp contrast with *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), in which the President directed the Secretary of Commerce to seize the nation's steel mills relying solely upon "the aggregate of his powers under the Constitution," and conceded the absence of statutory authority.  *Id.* at 585-87.  Further, the States have not suggested that either the DHS appropriations acts or the ICA are themselves unconstitutional.  *Dalton*'s reasoning thus fully applies here and refutes the States' argument that it has a constitutional claim or cause of action.  *See Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 51–54 (D.D.C. 2020) (dismissing constitutional claims challenging border wall construction based on *Dalton*).  This case concerns "simply" whether DHS has "exceeded [its] statutory authority" and "no constitutional question whatever is raised"—"only issues of statutory interpretation."  *Dalton*, 511 U.S. at 473–74 & n.6 (citation omitted).

109.    In advancing a constitutional claim based on the separation of powers, the States make the same argument the Supreme Court rejected in *Dalton*.  *See* PI Mot. 29–32.  The States asserts that DHS violated the separation of powers because it allegedly stopped spending its statutory border infrastructure appropriations on actual border wall construction.  *See id.* at 29–31.  But that separation-of-powers claim hinges entirely on whether DHS acted in accordance with the appropriations statutes at issue in this case.  The outcome of that question depends upon resolution of statutory claims and does not involve any unique separation-of-powers principles.  If the States' theory were accepted, every garden-variety action by a federal agency alleged to be in violation of a statutory provision would also, *ipso facto*, violate the constitutional separation of powers.  The Supreme Court foreclosed that line of argument in *Dalton*.

110.    The States' Take Care Clause claim similarly fails because it merely reasserts allegations of

statutory violations in constitutional terms.   *See* PI Mot. at 32–34.  The Take Care Clause provides that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.  The alleged Take Care Clause violation in this case is based entirely on allegations that Defendants have "refused to follow Congress's commands in the 2020 and 2021" DHS appropriations acts.  *Id. at* 32, 34.  But *Dalton* bars the States' attempt to transform allegations of statutory violations into separate constitutional violations of the Take Care Clause.  The States do not argue that Defendants could be in compliance with the DHS appropriations statutes and the ICA, yet somehow violate the Take Care Clause.  The outcome of this case (to the extent it presents a justiciable controversy at all) thus turns on the meaning of the relevant statutes—a purely statutory dispute with no constitutional dimension.

111.    Moreover, the States do not cite any history or precedent for using the Take Care Clause as a mechanism to obtain affirmative relief against the President or Executive Branch agencies. Recognizing such a claim in this context would raise its own separation powers problems, as the Take Care Clause furnishes no basis for affirmative relief in an Article III court.  For the Judicial Branch to undertake such an inquiry would express a "lack of the respect due" to the Nation's highest elected official, *Baker v. Carr*, 369 U.S. 186, 217 (1962), by assuming judicial superintendence over the exercise of Executive power that the Clause commits to the President.  Indeed, the Supreme Court has recognized that "the duty of the President in the exercise of the power to see that the laws are faithfully executed" "is purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. 475, 499 (1866); *see id.* at 501 (stating that federal courts lack jurisdiction to "enjoin the President in the performance of his official duties"); *see also Dalton*, 511 U.S. at 469 (concluding that actions of the President are not reviewable under the APA).   No court has read the Take Care Clause as opening the door to a free floating cause of action for any plaintiff to challenge the manner in which the President or his subordinates execute the law.

112.    In any event, both the President and DHS have taken care to faithfully execute the relevant appropriations acts.  The President's Proclamation directs the Secretary of Defense and the Secretary of Homeland Security "to ensure that funds appropriated by the Congress fulfill their intended purpose" and mandates that federal agencies continue "the expenditure of any funds that the Congress

expressly appropriated for wall construction, consistent with their appropriated purpose." *Proclamation*, 86 Fed. Reg. at 7226.  Compliance with legal requirements is a theme running throughout the text of the Proclamation.  Accordingly, there is no basis to conclude that the President has directed his subordinates to violate any law or act in a way that is contrary to basic appropriations principles. *See id.* ("This proclamation shall be implemented consistent with applicable law"); *see also Building & Constr. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (stating that when the President "directs his subordinates how to proceed in administering federally funded projects, but only 'to the extent permitted by law,'" the consequence is that "if an executive agency . . . may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law.").

## II.    The States Will Not Be Irreparably Injured Absent a Preliminary Injunction.

113.    Even when a plaintiff can show it is likely to succeed on the merits of its claim in a preliminary injunction posture, it must also show that it faces a "likelihood of substantial and immediate irreparable injury" in the absence of the injunction.  *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974). Otherwise, there is no reason for the Court to enter this extraordinary remedy prior to a full adjudication of this case.  The States were required to show that such an irreparable injury is "likely in the absence of an injunction."  *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008) (emphasis omitted).[11]  They have failed to do so here for a number of reasons.

114.    To begin, the States' irreparable harm argument rests almost entirely on its flawed analysis of Article III standing.  Relying on *Texas I* and *Texas II*, the States assume that their irreparable harm simply follows from their arguments about standing.  PI Mot. 47–48.  That is not enough.  Even if one accepted that the States have standing, "that does not necessarily mean that the Plaintiff States

---

[11] Cases predating *Winter* which state a preliminary injunction can be entered when there is a "significant threat of injury from the impending action," *Humana, Inc. v. Avram A. Jacobson, M.D., P.A.*, 804 F.2d 1390, 1394 (5th Cir. 1986) must be read consistent with the Supreme Court's guidance in *Winter* that preliminary injunctions cannot be entered based on a mere "possibility of irreparable harm."  *Winter*, 555 U.S. at 21 (quotation marks omitted).  Injunctive relief is only appropriate if irreparable harm is "likely."  *Id.* at 22.

automatically have proven that they will suffer irreparable harm—a necessary element for obtaining a preliminary injunction." *Texas v. United States*, 328 F. Supp. 3d at 737.  For all of the reasons Defendants have already discussed with respect to standing, *see supra* at ¶¶ 42–51, the States have failed to show that they are likely to suffer any injury as a result of policy changes with respect to border barrier construction, much less the sort of "substantial and immediate" injury that would justify entry of a preliminary injunction.  In particular, Defendants note that they have until September 30, 2024 to obligate fiscal year 2020 border wall funding, and September 30, 2025 to obligate fiscal year 2021 money.  The threat of these funds lapsing and becoming unavailable for obligation is many years off, and nowhere in the States' argument do they identify a duty to expend border barrier funds at some arbitrarily faster pace.

115.    The weakness of the States' assertions of irreparable harm is underscored by their delay in bringing this case and filing this motion.  Delay militates against granting a preliminary injunction because it "demonstrat[es] that there is no apparent urgency to the request for injunctive relief." *Gonannies, Inc. v. GoAuPair.Com, Inc.*, 464 F. Supp. 2d 603, 609 (N.D. Tex. 2006) (quoting *Wireless Agents, L.L.C. v. T–Mobile USA, Inc.*, 2006 WL 1540587, *3 (N.D. Tex. June 6, 2006) (internal citations and punctuation omitted)); *see also* 11A Charles A. Wright, Arthur R. Miller, et al., *Federal Practice and Procedure* § 2948.1 (3d ed.) ("A long delay by plaintiff after learning of the threatened harm also may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction.").  Although President Biden issued the Proclamation in January, and DHS released its plans for implementing the policies of the Proclamation in June, the States waited until October to file suit.  That delay is both inconsistent with the States' insistence that the Proclamation created the current conditions at the border and with their assertions that an injunction is needed immediately, rather than at the end of merits proceedings.  Whatever else may be made of the States' legal arguments and assignations of harm, they are not entitled to having anything done immediately, and that alone is grounds for denying this motion.

### III.     The Balance of Equities Favors the Defendants.

116.     The third and fourth requirements for issuance of a preliminary injunction—the balance of harms and whether the requested injunction will disserve the public interest—"merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Defendants' interests in ensuring that future border barrier projects mitigate potentially harmful impacts on the environment, border communities, and landowners "plainly outweigh[]" the interests in taxing government contractors and minimizing social services expenditures for immigrants. *Winter*, 555 U.S. at 26, 33.

117.     The DHS Plan commits Defendants, particularly CBP, to engaging in additional environmental planning with respect to projects in the Laredo sector that are being funded by fiscal year 2020 money. Enriquez Decl. ¶¶ 40–47. This planning is "needed . . . to ensure that CBP has a complete understanding of the potential impacts of those projects." *Id.* ¶ 40. The planning will help adapt the barrier system to "the urban and rural environments where it would be situated" in the Laredo sector; minimize impact on "existing critical infrastructure such as power lines, irrigation lines, or other municipal infrastructure"; and ensure the system "does not create or exacerbate flooding hazards" or "impede transboundary waterflow." *Id.* ¶¶ 41–43. Further planning will also assist CBP to "avoid or minimize impacts to natural, historic, and cultural resources" that could be affected by the border wall network. *Id.* at ¶ 44. CBP has similar objectives in mind with respect to potential projects in the El Centro using fiscal year 21 funds. For these projects, failure to engage in "environmental planning and stakeholder outreach" would not only "make it more difficult for CBP to avoid or minimize impacts" from construction, but also "certainly result in additional litigation" regarding compliance with statutes like "NEPA, the Endangered Species Act, and the National Historic Preservation Act." *Id.* ¶ 48; *see also id.* ¶¶ 51–52. Because those projects include "a mix of federal and private land," CBP needs to engage in consultation and land acquisition activities with private owners, as well as planning activities with other governmental partners to mitigate impact of the border wall network on the environment and existing infrastructure. *Id.* ¶¶ 49–50. Both Defendants and the public at large will benefit from CBP's efforts to engage in this planning before initiating further border barrier construction.

118.    These interests significantly outweigh the States' interest in forcing Defendants to resume construction before this planning and consultation takes place.  They raise two substantive arguments about the equities, but neither has merit.  First, the States assert that Defendants "have no legitimate interest in the implementation of an unlawful Proclamation" and that a preliminary injunction serves the public's interest in Defendants following the law, PI Mot. 49–50, but as explained, there is nothing unlawful about Defendants' actions, even assuming the States have a basis to challenge them in this Court.  Second, the States assert that the public's interest in deterring unlawful immigration weighs in their favor, *id.* at 50, but the States' equities in this case are limited to the fiscal harms that form the basis of their lawsuit. Their interests in collecting extra franchise taxes or minimizing expenditures on social services are only remotely connected to the policy at issue in this case, and do not give rise to Article III standing, much less irreparable harm or an equitable interest that would justify the extraordinary remedy of a preliminary injunction.

119.    Finally, the States argue, separate from their interests in having an injunction entered, that there is no prejudice to the Defendants "from a delayed implementation" of their border barrier policies.  *Id.* at 49.  That gets the equities of an injunction backwards.  The advance planning work Defendants intend to do is critical to preventing harm to the public and border communities before construction begins.  By contrast, there is no prejudice whatsoever to the States with respect to the appropriations they challenge if Defendants' planning activities proceed while this case is resolved on the merits.  Congress did not require border barrier funds to be spent any earlier than 2024 for fiscal year 2020 funds and 2025 for fiscal year 2021 funds.  Undertaking the planning outlined in the DHS Plan is completely consistent with Congress's wishes and will serve the public interest.

## IV.    The Requested Injunction Is Overbroad and Unworkable.

120.    The Court should also reject the States' request for a sweeping nationwide injunction that would enjoin Defendants, "on a nationwide basis, from enforcing and implementing the January 20 Proclamation."  *See* PI Mot., Proposed Order.  "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), and "injunctive relief should

be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.,* 512 U.S. 753, 765 (1994) (citation omitted).  A "district court thus abuses its discretion if it does not 'narrowly tailor an injunction to remedy the specific action which gives rise to the order.'"  *O'Donnell v. Harris Cnty.,* 892 F.3d 147, 163 (5th Cir. 2018) (quoting *John Doe # 1 v. Veneman,* 380 F.3d 807, 818 (5th Cir. 2004)).  Accordingly, even if this Court were to grant the States' a preliminary injunction, it should refuse the States' request to issue a nationwide injunction and, instead, limit any injunction to Defendants' border wall activities in the State of Texas.

121.  "[I]n recent years the Supreme Court has repeatedly stayed nationwide injunctions that prevented the Executive Branch from pursuing its immigration policies."  *Texas v. United States*, 14 F.4th 332, 341 (5th Cir. 2021) (citing cases), *vacated on rehearing en banc*, 2021 WL 5578015 (5th Cir. Nov. 30 2021).  Nationwide injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch."  *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600-01 (2020) (Gorsuch, J., concurring in grant of stay) (stating that nationwide injunctions raise serious separation of powers concerns, hamper orderly judicial resolution of issues within and across cases, and improperly disadvantage the Federal Government).  While the Fifth Circuit has previously stated "it is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction," *Texas I*, 809 F.3d at 188, there is no mandatory requirement to issue such relief in every case touching on immigration matters.  Moreover, when the Fifth Circuit has granted nationwide relief in the past, it has relied upon the need to ensure "uniform" application of federal immigration laws to various individuals across the country.  *Id.* at 187–88 (stating that "a geographically-limited injunction would be ineffective because DAPA beneficiaries would be free to move among states").  But that uniformity interest is not present here.  This case focuses solely on DHS's execution of its spending authority; it does not implicate the "unified system" of immigration laws established by Congress or the need to ensure immigrants receive the same status in different parts of the country.  *Id.* at 188 (internal quotations and italics omitted).  There is nothing odd or anomalous about border barrier planning,

land acquisition, and construction activities occurring in some states, but not others.

122.    Further, a nationwide injunction in this case would be inappropriate because it would affect many parties who are not before the court, including other border States and landowners in those States, thereby exceeding this Court's authority under Article III and violating longstanding principles governing equitable relief.   *See Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 718 (1838) (stating that the equitable power of Article III courts extends "to render a judgment or decree upon the rights of the litigant parties" consistent with the exercise of such powers at common law or in English courts of equity).   California and New Mexico have filed their own lawsuits challenging border wall construction in their respective territories, *see supra* at ¶ 16, and Texas and Missouri should not be permitted to superintend border wall construction activities in those States or for the rest of the country through a single district court order.

123.    The proposed nationwide injunction enjoining implementation of the President's Proclamation also could be interpreted to cover the border wall activities of non-party federal agencies whose actions are not challenged in this case.   As explained above, both the Department of Defense and Department of the Treasury funded border wall construction activities using funds appropriated to those agencies.   Plaintiffs do not challenge those agencies' decisions to cease funding border wall construction, thus any injunction should exclude from its scope the actions of the Department of Defense and the Department of the Treasury.   Nor is there any basis for an injunction to run against the President himself.   The Supreme Court recognized over 150 years ago in *Mississippi v. Johnson* that federal courts lack jurisdiction to "enjoin the President in the performance of his official duties."   71 U.S. 475, 501.   And the Court reaffirmed that principle more recently in *Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (plurality opinion).

124.    At a minimum, the States are not entitled to any broader injunction unless they can show "a substantial likelihood that a geographically-limited injunction would be ineffective." *Texas I*, 809 F.3d at 188.   The States do not even attempt to meet that standard.   The States simply point to raw numbers of immigrants who reside in Texas or Missouri and then speculate that they arrived there by traversing areas of the southern border without barriers.   *See* PI Mot. 36–37.   But immigrants arrive in this

country through various ways other than through unfenced areas of the border, including through airports and other designated ports of entry.  There is no evidence before the Court to draw a conclusion that re-starting barrier construction activities in New Mexico, Arizona, or California will somehow shut off potential pathways in those states that immigrants might use in the future to settle in Texas or Missouri, thereby increasing the budgets of the States' social services agencies.  *Brewer v. Landrigan*, 562 U.S. 996 (2010) ("speculation cannot substitute for evidence"); *Holland Am. Ins. Co. v. Succession of Roy,* 777 F.2d 992, 997 (5th Cir. 1985) (stating that "[s]peculative injury is not sufficient" to award preliminary injunction).

125.   In addition to the problems associated with the nationwide aspect of the States' proposed injunction, the States also seek an "obey-the-law" injunction that courts, including the Fifth Circuit, routinely reject as illusory and inadequate in terms of providing fair notice as to the conduct that is enjoined.  *See Payne v. Travenol Lab'ys, Inc.,* 565 F.2d 895, 897 (5th Cir. 1978); *see also SEC v. Goble*, 682 F.3d 934, 949 (11th Cir. 2012); *City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011); *Gilday v. Dubois*, 124 F.3d 277, 287 (1st Cir. 1997).  This type of vague injunction fails to comply with the requirements of Federal Rule of Civil Procedure 65(d), which requires that an injunction "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required."  The Fifth Circuit has explained that "an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed."  *Scott v. Schedler*, 826 F.3d 207, 211 (5th Cir. 2016).

126.   The States' proposed injunction selectively copies certain language from DHS's fiscal year 2020 and 2021 appropriations statutes and would direct Defendants to "enforce," "implement," "obligate and spend funds appropriated for 'construction of barrier system along the southwest border.'"  *See* PI Mot., Proposed Order.  But as explained above, Defendants maintain that they are already in the process of complying with all relevant appropriations statutes, so it is unclear what the proposed injunction they seek would require Defendants to do.  The generality of the injunction also poses significant compliance problems.  The injunction excludes language from the appropriations that gives Defendants until September 30, 2024, at the earliest, to obligate the funds appropriated for

border barrier construction, so it is unclear to what extent the injunction requires immediate action or if the time frame imposed by Congress continues to apply.  The injunction also does not address whether its commands are in derogation of other statutes Defendants would typically comply with prior to the obligation or expenditure of funds, such as the Federal Acquisition Regulation, 48 C.F.R. § 1 *et seq.*, or the Competition in Contracting Act, 10 U.S.C. § 2301 *et seq.*

127.    There is no good solution to the problems created by the injunction's generality.  Spelling out in more detail what would constitute "compliance" would require the Court to don a hard hat and take on the role of project manager for border barrier projects nationwide.  For example, the Court would have to decide the appropriate amount of time and money Defendants spend on environmental planning and preparation activities in advance of construction across the entire southwest border. There are no standards in any of the sources of law the States rely upon that provide a basis for the Court to oversee the day-to-day activities of CBP officials in this manner and direct, by way of an injunction, what types expenses those officials can and cannot incur.  The States cite to no history or precedent where a court issued a sweeping preliminary injunction micro-managing an agency's spending practices similar to the one they seek here.  This case should not become the first.

128.    Finally, there is no basis for the Court to order Defendants to rescind the cancellation of border wall construction contracts.  *See* PI Mot., Proposed Order.  Texas and Missouri are not parties to the contracts, thus they have no standing to seek their enforcement.  "A third party may only sue to enforce a contract it did not sign when the parties to the contract entered the agreement with the clear and express intention of directly benefitting the third party."  *Oubre v. Schlumberger, Ltd.*, 684 F. App'x 424, 425 (5th Cir. 2017) (internal quotation omitted).  The States cannot meet that high standard and have not established that border wall contracts were clearly intended to protect the States' budget and tax interests.  *See Physicians ACO, LLC v. Computer Scis. Corp., No. 4:16-CV-1293,* 2017 WL 3187609, at *1 (S.D. Tex. July 26, 2017) (recognizing "the high bar" for "third-party beneficiary status" in "government contracts").

## CONCLUSION

129.   For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied.

Dated: December 8, 2021                   Respectfully submitted,

                                          BRIAN M. BOYNTON
                                          Acting Assistant Attorney General

                                          ALEXANDER K. HAAS
                                          Director, Federal Programs Branch

                                          ANTHONY J. COPPOLINO
                                          Deputy Director, Federal Programs Branch

                                          _/s/ Michael J. Gerardi_
                                          ANDREW I. WARDEN
                                          Senior Trial Counsel
                                          MICHAEL J. GERARDI (D.C. Bar
                                          #1017949)
                                          Trial Attorney / Attorney-in-Charge
                                          U.S. Department of Justice
                                          Civil Division, Federal Programs Branch
                                          1100 L St. NW, No. 122212
                                          Washington, D.C. 20005
                                          Tel: (202) 616-0680
                                          Fax:    (202) 616-8470
                                          E-mail: michael.j.gerardi@usdoj.gov

**REQUEST FOR ORAL ARGUMENT**

Pursuant to Local Rule 7.5.A., Defendants believe oral argument would be helpful to the Court and respectfully request the opportunity to present oral argument in support of this motion.

*/s/ Michael J. Gerardi*
MICHAEL J. GERARDI

**CERTIFICATE OF SERVICE**

I hereby certify that on December 8, 2021, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Michael J. Gerardi*
MICHAEL J. GERARDI