# EXHIBIT 3

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

THE STATE OF MISSOURI; THE STATE
OF TEXAS,

     Plaintiffs,

       v.

JOSEPH R. BIDEN, in his official capacity
as President of the United States; THE
UNITED STATES OF AMERICA;
ALEJANDRO MAYORKAS, in his official
capacity as Secretary of the Department of
Homeland Security, UNITED STATES
DEPARTMENT OF HOMELAND
SECURITY; TROY A. MILLER, in his
official capacity as Acting Commissioner of
the United States Customs and Border
Protection; and UNITED STATES
CUSTOMS AND BORDER
PROTECTION

     Defendants.

No. 7:21-cv-00420
Hon. Micaela Alvarez

I, Paul Enriquez, declare as follows:

1.     I am the Acquisitions, Real Estate and Environmental Director for the Border Wall Program Management Office ("Wall PMO"), U.S. Border Patrol Program Management Office Directorate, U.S. Customs and Border Protection ("CBP"), an agency of the Department of Homeland Security ("DHS").  I have held this position since August 6, 2018.  From 2013 to August 2018, I was the Real Estate and Environmental Branch Chief for the Border Patrol and Air and Marine Program Management Office ("BPAM"), Facilities Management and Engineering, Office of Facilities and Asset Management ("OFAM").  From 2011 to 2013, I was employed as an Environmental Protection Specialist in the BPAM office.  In that role, I performed environmental analyses for various border infrastructure projects.  From 2008 to 2011, I was a contractor assigned

**Defendants' Exhibit 3 - Page 1**

to the BPAM office and provided environmental support on various border infrastructure projects.

2.      CBP is the DHS component with primary responsibility for border security.   CBP constructs, operates, and maintains border infrastructure necessary to deter and prevent illegal entry on the southern border.

3.      Within CBP, the Wall PMO has expertise in managing and executing border infrastructure projects.   The Wall PMO is directly tasked with managing the schedule, finances, real estate acquisition, environmental planning, and construction of the border infrastructure system along the U.S. border.

4.      Based upon my current and past job duties, I am familiar with the funding appropriated to CBP for barrier construction and the obligations and projects associated with such funding.

5.      This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

## BACKGROUND

6.      On January 20, 2021, President Biden issued Proclamation 10142, *Termination of Emergency with Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction* (the "Proclamation"). The Proclamation ordered the Secretary of Defense and the Secretary of Homeland Security to "pause work on each construction project on the southern border wall, to the extent permitted by law, as soon as possible but in no case later than seven days from the date of [the] proclamation."   The Proclamation also ordered the Secretaries to "pause immediately the obligation of funds related to construction of the southern border wall, to the extent permitted by law."   The Secretaries were authorized to make exceptions to the pause "for urgent measures needed to avert immediate physical dangers or where an exception is required to ensure that funds appropriated by the Congress fulfill their intended purpose."

7.      During the pause, the President ordered the Secretaries, in coordination with other federal agencies, to develop a plan "for the redirection of funds concerning the southern border wall, as appropriate and consistent with applicable law."   The Proclamation stated that the plan "shall

**Defendants' Exhibit 3 - Page 2**

include consideration of terminating or repurposing contracts with private contractors engaged in wall construction, while providing for the expenditure of any funds that the Congress expressly appropriated for wall construction, consistent with their appropriated purpose." The Proclamation also stated that, "After the plan is developed, the Secretary of Defense and the Secretary of Homeland Security shall take all appropriate steps to resume, modify, or terminate projects and to otherwise implement the plan." *Id.*

8.      DHS released its *Border Wall Plan Pursuant to Presidential Proclamation 10142* (the "Plan") on June 11, 2021.  A copy of the Plan is attached as Exhibit A.    The Plan sets forth the guiding principles for barrier construction going forward using funds appropriated to DHS between fiscal years 2017-2021.  For funds appropriated between fiscal years 2017-2020, the Plan explains that DHS may use these funds on border infrastructure projects that "are needed to address life, safety, environmental, or other remediation requirements."  Plan at § 3.   DHS has already approved several projects that are necessary to address life, safety, environmental, and operational considerations in accordance with the Plan.  These projects are funded by appropriations CBP received in fiscal years 2018 and 2019 and include, among other things, completing vehicle gates used by United States Border Patrol ("USBP") agents and repairing and reinforcing a segment of barrier in the USBP San Diego Sector. *See* DHS Press Release (July 27, 2021) (attached as Exhibit B).

9.      The Plan also outlines the principles by which CBP will utilize the appropriated funds it received in fiscal years 2020 and 2021 for the construction of border barrier, which are the funds that are at issue in this litigation.  Regarding the funding CBP received in fiscal year 2020, the Plan states that, with the exception of projects that are needed to address life, safety, environmental, or other remediation requirements, prior to further border barrier construction DHS/CBP will engage in a thorough review and replanning process, to include standard environmental planning including taking actions consistent with the National Environmental Policy Act ("NEPA") and other environmental planning statutes and robust and substantive consultation with stakeholders.  Plan at § 3.

10.     Regarding the funding CBP received in fiscal year 2021, the Plan states that it will be used for contingency funding for barrier projects funded by the fiscal year 2017 through fiscal year 2020 barrier appropriations and to address the existing site conditions at the former Department of Defense ("DoD") border barrier project sites, including, among other things, completing site drainage features and finishing the construction of patrol, maintenance, and access roads.  Plan at § 4.B.  Additionally, the Plan sets out that any remaining fiscal year 2021 funding will be used to begin sequential project planning for the next highest priority barrier segments identified by DHS. Plan at § 4.C.

### STATUS OF THE FISCAL YEAR 2020 AND 2021 BARRIER SYSTEM APPROPRIATIONS

11.     As set forth in more detail below, CBP has and will continue to utilize the appropriated funds it received in fiscal years 2020 and 2021 for barrier system in a manner that is consistent with its Congressional appropriations.

### A.  FISCAL YEAR 2020 BARRIER SYSTEM APPROPRIATION

12.     In fiscal year 2020, Congress appropriated $1,375,000,000 to CBP for the construction of barrier system along the southwest border (the "FY20 barrier system appropriation").  *See* Public Law 116-93, Div. D, Tit. II, § 209(a)(1).

13.     This funding remains available for obligation until September 30, 2024.

14.     As of March 31, 2021, CBP had obligated $1,321,952,526.84 of the $1,375,000,000 appropriated in fiscal year 2020 for barrier system.  The obligations were incurred for, among other things, contracts for the design and construction of border barrier system in the USBP Laredo Sector, costs associated with prior consultation and environmental surveys and monitoring, and project oversight and engineering support services.

15.     The United States awarded four contracts for the design and construction of border barrier system in the USBP Laredo Sector with funds provided by the FY20 barrier system appropriation. The four contracts cover a total of approximately 70 miles of border barrier system in the USBP Laredo Sector.  Approximately 51 miles of border barrier system is proposed in Webb County,

**Defendants' Exhibit 3 - Page 4**

Texas, and approximately 18 miles is proposed in Zapata County, Texas.

16.     CBP awarded and is administering two of the contracts.  On May 8, 2020, CBP awarded a contract for the design and construction of approximately 14 miles of barrier system in the USBP Laredo Sector.  The project area for the approximately 14 miles of barrier system is depicted on the map attached as Exhibit C.  On August 3, 2020, CBP awarded a second contract for the design and construction of approximately 17 miles of barrier system in the USBP Laredo Sector.   The project area for the approximately 17 miles of barrier system is depicted on the attached Exhibit C.

17.      The United States Army Corps of Engineers ("USACE"), pursuant to an Economy Act agreement with CBP, awarded and is administering two additional contracts for the design and construction of barrier system in the USBP Laredo Sector.[1]  On September 28, 2020, USACE awarded a contract for the design and construction of approximately 13 miles of barrier system in the Laredo Sector.  The project area for the approximately 13 miles of barrier system is depicted on the attached Exhibit C.  On September 29, 2020, USACE awarded another contract for the design and construction of approximately 24 miles of barrier system in the Laredo Sector.  The project area for the approximately 24 miles of barrier system is depicted on the attached Exhibit C.

18.     Approximately $1.3 billion of the FY20 barrier system appropriation was obligated through the award of these contracts.

19.     The four barrier system projects covered by the contracts discussed above are referred to herein as the "Laredo Barrier Projects."

20.     As of January 20, 2021, construction had not begun on any of the Laredo Barrier Projects.

21.     The Laredo Barrier Projects would involve new barrier construction on approximately 70 miles of land that is currently owned by individuals and entities other than the federal government.

---

[1] The Economy Act, 31 U.S.C. § 1535–36, provides authority for federal agencies to order goods and services from other federal agencies and to pay the actual costs of those goods and services using the purchasing agency's appropriated funds.

Consequently, CBP must work through a process to acquire the necessary real estate interests in that land before construction can begin.  As of January 20, 2021, CBP had not acquired any of the permanent interests in real property necessary to support construction of the Laredo Barrier Projects.  Rather, CBP was in the process of acquiring temporary rights of entry to allow for the performance of real estate surveys and appraisals.  Actual construction start was subject to the acquisition of the necessary permanent real estate interests.  All real estate acquisition costs associated with the Laredo Barrier Projects have and will continue to be funded from the FY20 barrier system appropriation.

22.     CBP acquired some temporary rights-of-entry for the Laredo Barrier Projects prior to January 20, 2021, and will continue to acquire additional rights-of-entry where needed to provide access needed for standard environmental planning, including taking actions consistent with NEPA, such as completing additional biological, cultural, and natural resource surveys for project areas where no data have been previously collected; and consultation with interested stakeholders in the project areas.  *See* DHS Press Release (Oct. 8, 2021) (attached as Exhibit D).  CBP anticipates that, depending on the level of NEPA analysis that is required, environmental planning and stakeholder engagement will take approximately 12-16 months to complete.

23.     CBP will utilize contracts awarded with FY20 barrier system appropriation funds for environmental planning and stakeholder engagement and expects that planning and stakeholder engagement will commence in the first quarter of 2022.   CBP intends to continue to acquire temporary rights-of-entry that will permit CBP and its contractors to access property for the purpose of conducting environmental planning actions.  CBP intends to use the FY20 barrier system appropriation for costs associated with obtaining temporary rights-of-entry in the Laredo Sector for the completion of environmental surveys.

24.      Given the time that will be required to complete environmental planning for the Laredo Barrier Projects, and to ensure that the government does not incur substantial additional delay and other costs while such planning is carried out, CBP and USACE have taken certain actions concerning the four contracts covering the Laredo Barrier Projects.

**Defendants' Exhibit 3 - Page 6**

25.     After the Proclamation was issued in January 2021, CBP and USACE issued suspension of work notices for the four construction contracts associated with the Laredo Barrier Projects.

26.     On September 22, 2021, CBP modified the two contracts it awarded and is administering to remove the construction portion of the contracts.  The contractors will be providing CBP with design packages that were developed prior to the suspension of work, which are incomplete.  All costs associated with those design packages have been and will be funded by the FY20 barrier system appropriation.  CBP estimates that final modifications to resolve final contract costs will be executed before December 31, 2021.

27.      On October 8, 2021, USACE sent termination for convenience notices to the contractors on the two contracts it awarded and is administering.  The contractors will be providing USACE with design packages that were developed prior to the suspension of work, which are incomplete.  All costs associated with those design packages have been and will be funded by the FY20 barrier system appropriation.  The parties are in the process of negotiating final contract costs and closeout.

28.     Funds previously obligated on the four contracts that are in excess of the amount of money needed to resolve final settlement and modification costs will be deobligated and be available for reobligation consistent with the terms of fiscal year 2020 appropriation.  As of December 6, 2021, CBP has obligated approximately $618 million of the FY20 barrier system appropriation.

29.     CBP plans to use FY20 barrier system appropriation consistent with the language of the appropriation and the Plan.  This includes conducting environmental planning, undertaking robust consultation with stakeholders, and if additional permanent land acquisition is necessary to complete projects contemplated by the Plan, CBP will initiate robust landowner engagement prior to acquisition.  *See* Plan at § 3.  Costs associated with all these actions will be funded by the FY20 barrier system appropriation.

**B.     FISCAL YEAR 2021 BARRIER SYSTEM APPROPRIATON**

30.     In fiscal year 2021, Congress appropriated $1,375,000,000 for the construction of barrier system along the southwest border (the FY21 barrier system appropriation).  *See* Public Law 116-

260, Div. F, Tit. II, § 210.  The appropriation became effective on December 27, 2020.

31.      This funding remains available for obligation until September 30, 2025.

32.      As of December 6, 2021, CBP has obligated $5,442,020.60 of the FY21 barrier system appropriation.  These obligations cover various programmatic expenses, including contract costs for stakeholder engagement and environmental support services.

33.      As stated above, the Plan states that the FY21 barrier system appropriation will be used for contingency funding for barrier projects funded by the fiscal year 2017 through fiscal year 2020 barrier appropriations and to address the existing site conditions at the former DoD border barrier project sites, including, among other things, completing site drainage features and finishing the construction of patrol, maintenance, and access roads.  Plan at § 4.  It further provides that any remaining fiscal year 2021 funding will be used to being sequential project planning for the next highest priority barrier segments identified by DHS.  Plan at § 4.C.  CBP has already started to implement the actions that are called for under the Plan.

34.      As set forth in the October 8, 2021, press release that is attached hereto as Exhibit D, CBP intends to begin environmental planning and stakeholder outreach for its next highest priority barrier segments, which are located in the USBP El Centro Sector in California.  CBP has awarded a contract using FY21 barrier system appropriation funds to begin the process of environmental planning and outreach.  CBP anticipates work on this contract will begin in the first quarter of 2022.

35.      Additionally, CBP is planning to use its fiscal year 2021 funds for remediation and closeout of the former DoD border barrier project sites.  The DoD projects were in various states of completion at the time of their cancellation.  As part of the process of closing out those projects, DoD authorized its contractors to perform a limited set of demobilization and safety activities at the former DoD project sites, and that work has been occurring over the last several months.  These activities include, among other things, filling exposed trenches, cutting exposed rebar, and removing materials from the project sites.

36.      CBP anticipates that starting remediation work at the DoD project sites will likely have to

**Defendants' Exhibit 3 - Page 8**

await demobilization of the DoD-funded contractors previously undertaking border wall construction, as it may not be operationally or logistically feasible in some instances to have two different sets of contractors working at the project sites at the same time.

37.     When it becomes feasible for CBP to begin its own remediation work at the former DoD project sites in light of the DoD contractor demobilization activities, CBP intends to prioritize funding from its fiscal year 2021 barrier system appropriation for those remediation projects that are needed to address life and safety, including the protection of individuals, Border Patrol agents, and nearby communities from potential harms, and avert further environmental damage or degradation.  Remediation activities or projects falling within these categories are likely to include, among other things, erosion control measures, water drainage work, and completion of safety work along border roads.  CBP estimates that the priority remediation and closeout actions at the former 10 U.S.C. § 284 project sites will cost approximately $500 - $700 million and $300 - $350 million at the former 10 U.S.C. § 2808 project sites.

38.     The timeline for CBP to obligate its fiscal year 2021 funds for these remediation activities will be driven by several factors.   First, the DoD contractors will need to complete their safety work and demobilize from the project areas.  That process is expected to be completed in the majority of project areas by the second quarter of 2022.  Second, CBP will need to complete its own study and assessment of the project areas after the DoD contractors depart to determine what additional priority remediation activities need to be completed.  That process is a necessary prerequisite to contact award and obligation of funds that will inform both the scope of the work and the estimated costs.

### ENVIRONMENTAL PLANNING IS A CRITICAL PART OF BORDER BARRIER CONSTRUCTION AND FURTHERS THE PUBLIC INTEREST

39.     Environmental planning and stakeholder outreach informs project planning and execution. The information developed through environmental planning and stakeholder outreach is used to avoid and minimize impacts to natural, historic, and cultural resources, affected landowners, and existing infrastructure, among other things.  If CBP were prohibited from expending funds on its

environmental planning and stakeholder outreach activities, it would result in substantial harms to the government and the public.

## A. LAREDO BARRIER PROJECTS

40.     Prior to the Proclamation, CBP had conducted some environmental planning and stakeholder outreach for the proposed Laredo Barrier Projects.  Additional environmental planning and outreach is needed, however, to ensure that CBP has a complete understanding of the potential impacts of those projects.  To cite just one example, CBP needs to complete biological and cultural resource surveys in a number of the proposed project areas.  The purpose of these surveys is to assess whether plants, animals, and cultural resources are located on or near the project area and whether there might be adverse effects to such species and resources from construction.  The information obtained through such surveys will be used in planning, design, and as part of CBP's consultation with state and local resource agencies and other interested stakeholders.  In recognition of the importance of environmental planning and stakeholder outreach, the Plan requires that CBP do thorough environmental planning and outreach before any further construction, including actions consistent with NEPA.

41.     The proposed Laredo Barrier Projects would be constructed in both urban and rural environments, generally following the path of the Rio Grande starting north of the city of Laredo and continuing through the city to the south.  Information from environmental planning and stakeholder outreach will be used to develop the design and alignment of the barrier system in both the urban and rural environments where it would be situated.  This information is used, for example, to determine where to place access gates for USBP agents, first responders, and affected landowners.  Access gates ensure that USBP agents can safely patrol the border, that first responders have needed access for emergency situations, and that the barrier system does not impede affected landowners from accessing private property.

42.     The information developed through environmental planning and stakeholder outreach also ensures that barrier system does not impact existing critical infrastructure such as power lines, irrigation lines, or other municipal infrastructure.  This is particularly important in the urban

environments where barrier system would be constructed.  Portions of the barrier system that is proposed for the USBP Laredo Sector would be constructed in heavily developed areas in or near downtown Laredo or existing ports of entry.  To that end, as part of its stakeholder outreach CBP regularly meets state and local officials to discuss the design and alignment of barrier system to ensure that it does not affect existing infrastructure, including vehicle and train bridges that facilitate trade and travel both within the City of Laredo and across the international border.

43.     Information developed through environmental planning and stakeholder outreach is also used to ensure that the barrier system does not create or exacerbate flooding hazards, impede transboundary waterflow, and that the design and alignment of the barrier system is consistent with the United States' treaty obligations with Mexico.  For example, CBP has and will continue to consult with the United States International Boundary and Water Commission regarding the alignment of the barrier system and potential impacts of the barrier system within the floodplain.[2]

44.     CBP also uses information from environmental planning and stakeholder outreach to avoid or minimize impacts to natural, historic, and cultural resources.  Environmental planning and outreach is critical to the development of avoidance and mitigation measures that may be implemented before and after construction.  For example, through its environmental planning and stakeholder outreach for the Laredo Barrier Projects, CBP has been made aware of historic sites such as Fort McIntosh near the downtown area and the San Ignacio Historical District within the southerly portion of CBP's previously proposed alignment, that should be avoided during construction.  Additional survey work is needed to fully delineate the historic sites to ensure they are not impacted by construction.  In addition, CBP consults with state and local resource agencies and stakeholders regarding potential impacts to threatened or endangered species and their critical habitat.  Additional survey work and consultation is needed to ensure that CBP can avoid or minimize, to the extent practicable, impacts to sensitive plants such as Ashy Dogweed, Prostrate

---

[2] The U.S. International Boundary and Water Commission is responsible for addressing transboundary and water-related issues arising out of treaties between the United States and Mexico.

Milkweed, and Johnston's Frankenia as well as species such as the Least Tern, Jaguarundi, Ocelot, Texas Indigo Snake or their habitat that may be found in the project areas for the Laredo Barrier Projects. Alternatively, where impacts are unavoidable, CBP uses the information developed through planning and outreach to develop mitigation measures that may be implemented after construction to offset impacts.

45.     CBP also uses environmental planning and stakeholder outreach to develop construction best management practices ("BMPs") that are integrated into the construction process to avoid or minimize impacts to the greatest extent practicable. BMPs typically include, among other things, development and implementation of storm water pollution prevention plans, environmental awareness briefings for the construction contractors, pre-construction bird surveys, a stop work requirement if federally-listed species or archeological resources are discovered or are present within a work area, and measures to limit the clearing of vegetation wherever possible and prevent the introduction of invasive species and minimize noise impacts. If CBP is unable to complete its environmental planning and outreach, it will not have sufficient information to develop a robust set of BMPs, resulting in construction impacts to natural, historic, and cultural resources that could have been avoided or minimized.

46.     As noted, CBP has not acquired the permanent interests in real estate necessary to support the construction of the Laredo Barrier Projects. CBP typically consults with landowners regarding potential impacts as a part of the land acquisition process. If ordered to start construction immediately or precluded from expending funds on environmental planning and outreach, CBP would be required to fast track land acquisition and could be forced to undertake construction without sufficient input from affected landowners as to how to minimize or avoid impacts to such landowners.

47.     Finally, in light of the contract actions that have already been taken, CBP would have to take additional contract actions before it could start construction on the Laredo Barrier Projects. CBP would likely have to compete and award new contracts. The contracts will need to cover both the completion of the design of barrier system proposed for the USBP Laredo Sector and its

actual construction.   As noted, the design and alignment of barrier system is informed by CBP's environmental planning and stakeholder outreach.   Thus, if CBP were prohibited from expending funds on environmental planning and stakeholder outreach, it would lack critical information needed to compete and award such contracts.

## B.    EL CENTRO SECTOR PROJECTS

48.    Because DHS/CBP has not conducted any environmental planning or analysis related to the future construction of barrier system in CBP's next highest priority location in the USBP El Centro Sector, the concerns outlined above are even more acute.   If CBP were precluded from expending funds on environmental planning and outreach, it would lack the information necessary to plan the design, avoid resources, address existing infrastructure, and construct barrier system in the USBP El Centro Sector.   As is the case with the Laredo Barrier Projects, CBP expects that the proposed barrier system in the USBP El Centro Sector would be constructed in both urban and rural environments.   Absent environmental planning and stakeholder outreach, it will make it far more difficult for CBP to avoid or minimize impacts on existing critical infrastructure, natural, historic and cultural resources, and affected landowners.   Moreover, if CBP were ordered to begin construction immediately, it would almost certainly result in additional litigation regarding DHS/CBP's lack of compliance with required environmental planning statutes such as NEPA, the Endangered Species Act, and the National Historic Preservation Act, all of which impose mandatory procedural requirements that must be completed before a federal action can begin.

49.    CBP expects that the proposed barrier system in the USBP El Centro Sector would be constructed on a mix of federal and private land.   Regarding the private property, CBP has not acquired any of the permanent interests necessary to support construction.   As is the case for the Laredo Barrier Projects, CBP would plan to consult with private landowners regarding potential impacts as a part of the land acquisition process.   If ordered to start construction immediately or precluded from expending funds on environmental planning and outreach, CBP would be required to fast track land acquisition and could be forced to undertake construction without sufficient input

from affected landowners as to how to minimize or avoid impacts to such landowners.

50.     The issues would be no less acute on federal land.  Much of the federal land on which the proposed barrier system in the USBP El Centro Sector would be constructed is under the administrative jurisdiction of other federal agencies, including the Bureau of Land Management ("BLM") and the Bureau of Reclamation ("BOR").  As a part of its planning and outreach, CBP routinely consults with federal land managers to obtain the necessary permits or other authorizations that are needed for construction on federal property and to avoid or minimize impacts to the affected federal property.  In the USBP El Centro Sector, for example, BLM manages federal land that includes sensitive areas and habitat for threatened or endangered species. BOR manages land that includes irrigation and water infrastructure that is critical to the economy and needs of the local population.  It is through environmental planning and consultation that CBP ensures that it avoids or minimize impacts to these important federal resources.

51.      CBP has not awarded any contracts for the construction of barrier system in the USBP El Centro Sector with FY21 funds, and, thus, there would be no way to start construction without first competing and awarding a contract or contracts for the design and construction of barrier system. As noted, the design and alignment of barrier system is informed by CBP's environmental planning and stakeholder outreach.  Thus, if CBP were prohibited from expending funds on environmental planning and stakeholder outreach, it would lack critical information needed to compete and award such contracts.

52.     Finally, if ordered to immediately start construction CBP would have to divert FY21 funding away from the priority remediation measures that are required for the former DoD project sites.  This could result in substantial harms, as the existing site conditions are unsafe and will lead to further environmental degradation.  For example, at many of the DoD projects sites there are erosion control measures that must be completed to ensure that constructed assets and the surrounding areas are safe and stable.  In addition, there are site drainage features that must be completed to ensure water flows properly and does not create ponding or flooding risks, border roads that must be completed or closed to ensure they do not create hazards for USBP agents and

the general public, and temporary use areas that must be remediated to ensure they do not lead to

further environmental degradation.  These critical remediation actions could go unaddressed if

CBP were ordered to immediately start construction of the proposed barrier system in the USBP

El Centro Sector.

This declaration is made pursuant to 28 U.S.C. § 1746.  I declare under penalty of perjury that

the foregoing is true and correct.

Executed on this _8_ day of December, 2021.

Paul Enriquez
Acquisitions, Real Estate and Environmental Director
Border Wall Program Management Office
U.S. Border Patrol

# EXHIBIT A



U.S. Department of Homeland Security
Washington, DC 20528

# Department of Homeland Security
## Border Wall Plan Pursuant to Presidential Proclamation 10142
June 9, 2021

## I.     PURPOSE

On January 20, 2021, President Biden issued Proclamation 10142, *Termination of Emergency with Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction* (the Proclamation).  The Proclamation directed a pause in the construction of the southern border wall and on the obligation of funds for such construction projects to allow the Department of Homeland Security (DHS or the Department) and the Department of Defense (DoD) to:

(1) assess the legality of the funding and contracting methods used to construct the wall;
(2) assess the administrative and contractual consequences of ceasing each wall construction project; and,
(3) develop a plan for redirecting funds and repurposing contracts as appropriate and consistent with applicable law.

DHS has, without deobligating funds,[1] suspended performance of all border barrier contracts and southwest border barrier construction activities, with the exception of activities related to ensuring project sites are safe and secure in accordance with the terms and conditions of the contracts.  DHS has also completed the required assessments.

This memorandum outlines DHS's Plan pursuant to section 2 of the Proclamation for the redirection of funds appropriated or received from the Treasury Forfeiture Funds (TFF) for the construction of a border barrier at the southern border of the United States.  These activities support the Administration policy to protect national and border security and address the humanitarian challenges at the southern border while remaining consistent with President Biden's commitment that "no more American taxpayer dollars [should] be diverted to construct a border wall."

---

[1] DHS has continued to pay invoices in accordance with its obligations under existing contracts.

Subject:  Department of Homeland Security's Border Wall Plan Pursuant to Presidential
Proclamation 10142
Page 2

## II.    DHS SECRETARY'S EXCEPTIONS

DHS is continuing certain discrete projects because they are urgent measures needed to avert
immediate physical dangers.

As provided for in Section 1(b) of the Proclamation, the Secretary of Homeland Security granted
an exception to the border wall construction pause for activities that are "urgent measures needed
to avert immediate physical dangers."  DHS has re-initiated activity on two projects to protect
life and safety under the Secretary's exception.  The first is a project in the Rio Grande Valley of
Texas, where DHS will construct and/or remediate approximately 13.4 miles of compromised
levee.  The second is an erosion control project in the San Diego area along an approximately 14-
mile stretch of recently constructed barrier and associated adjacent road necessary to protect
migrants, agents, and residents.  DHS will not engage in standard environmental planning for the
work described above.  Rather, given the urgency with which such work must be undertaken, the
work described above is proceeding under previously-issued Illegal Immigration Reform and
Immigrant Responsibility Act (IIRIRA) waivers that are applicable to the projects and activities.

## III.    PLAN FOR FISCAL YEAR (FY) 2017-2020 DHS APPROPRIATIONS

DHS may prioritize projects other than those described in Section II for completion if they are
needed to address life, safety, environmental, or other remediation requirements.

DHS will explore use of its appropriated funds to address construction previously funded with
Treasury Forfeiture Fund amounts (discussed further below).  Examples of work to be performed
include grading roads and cutting slopes to resolve drainage and ponding; addressing exposed re-
bar; and installing canal crossings.  No additional real estate acquisition is required to complete
this work.

For all other projects funded by the FY 2017 – FY 2020 DHS appropriations, prior to further
construction, DHS will undertake a thorough review and replanning process, including the
following steps.

A.  To the extent DHS, in its discretion, deems it warranted, it may rescind or revise waivers
of environmental and other laws issued under IIRIRA by the Secretary of Homeland
Security.  For some segments, rescinding or revising prior environmental waivers will not
be feasible.

B.  For all activities or projects that will continue, with the exception of the projects and
activities set forth in Section II above or projects necessary to address life, safety,
environmental, or other remediation requirements, regardless of whether an applicable
IIRIRA waiver is rescinded or revised, DHS intends to engage in standard environmental
planning including taking certain actions consistent with National Environmental Policy
Act (NEPA) and other environmental planning and statutes.  DHS intends to undertake a
multistep environmental planning process, which will include public scoping and
comment on potential environmental impacts through the NEPA process.

Subject:  Department of Homeland Security's Border Wall Plan Pursuant to Presidential
Proclamation 10142
Page 3

C.  DHS, working with interagency partners such as the U.S. Fish and Wildlife Service,
intends to assess the extent to which border wall funds may be used to remediate or
mitigate environmental damage caused by past border wall construction.  Opportunities
for mitigation will be identified through the environmental planning process, including
NEPA.

D.  DHS intends to enter into robust and substantive consultation with stakeholders,
including affected landowners, tribes, border community residents, their elected
representatives, and interested non-governmental organizations and advocates.  Such
consultation will inform environmental planning and execution of the border wall
projects.

E.  DHS intends to review the status of all pending border wall land eminent domain actions
commenced between 2016 and 2020 and reassess the extent to which acquiring parcels of
land that are the subject of such actions will be necessary after environmental planning
activities are completed.  This reassessment process will include a review of existing
construction plans to determine whether they can be modified to reduce the use of land
previously acquired through adverse eminent domain proceedings.  If DHS determines
that it no longer requires the use of land that is currently the subject of an adverse
eminent domain proceeding, DHS will explore options to revest the land with its prior
owners.

If DHS determines that additional land acquisition is necessary to complete projects
contemplated by this plan, DHS will initiate robust landowner engagement and be guided
by the Uniform Relocation Assistance and Real Property Acquisition Policies Act of
1970, as amended, 42 U.S.C. §§ 4601-4655.  It is DHS's preference to obtain real estate
interests on a voluntary basis through negotiated offers to sell (OTS).  Condemnation
action to acquire additional land will be considered only as a last resort, with a focus on
life, safety, environmental, or other remediation requirements.  In those instances where
condemnation action is required in order to obtain a permanent real estate interest, DHS's
authorized official will notify the Secretary, or the Secretary's designee, prior to
proceeding with the action.

## IV.  PLAN FOR FY 2021 DHS APPROPRIATIONS

In FY 2021, DHS received funding for construction of border barrier systems along the
southwest border.

A.  Contingency Funding

Due to unforeseen delay and other costs, several projects may require additional obligations to
address necessary changes and/or cost overruns.

i.  Levee Wall Described in Section II

Subject:  Department of Homeland Security's Border Wall Plan Pursuant to Presidential Proclamation 10142

Page 4

DHS estimates up to an additional $275 million in cost overrun due to the existing suspension of contract performance for construction as well as design changes.  These will be funded through existing FY 2021 appropriations.

 ii. Other

DHS anticipates being able to cover other delay costs and changes as a result of the suspension of contract performance using the appropriated funds from the year in which the project was funded.  However, the exact financial impacts of the delay and changes must be negotiated with each contractor.  Until final costs are negotiated, DHS cannot preclude the possibility that additional contingency funding may be required to cover delay and change costs.  If such funding is required, it will be drawn from existing FY 2021 appropriations.

 B. Close out/Remediate Barrier Projects Turned Over to DHS by the Department of Defense (DoD)

DHS expects DoD will turn over multiple barrier projects, previously executed with military construction or counter-drug funding, in various stages of completion.  DHS will need to absorb some potentially significant costs related to DoD's discontinued border wall projects.  Many, if not all, of the DoD military construction-funded projects will require additional obligations from existing FY 2021 appropriations, and it is possible that DHS may also need to obligate some additional funds related to the projects funded with DoD counter-drug appropriations.  Work on the DoD projects may include but is not limited to the following:

- Completing construction of site drainage features to allow for positive drainage of the sites, ensuring no ponding, including grading sites, and installing and/or completing low water crossings and other drainage structures;
- Installing/completing permanent erosion control/slope stabilization measures to ensure constructed assets are safe and stable for their expected life cycle;
- Finishing the construction of the patrol, maintenance, and access roads to standard to ensure safe ingress/egress including guardrails and signage, and integration with existing roadways;
- Remediating temporary use areas (i.e., laydown yards, haul roads) and project areas impacted by construction; and
- Disposing of residual materials not required for completion of the work as identified above.

No new barrier construction work will occur on the DoD projects.  While DHS believes that some of the work described above may comport with the FY 2021 appropriations language, there may be limitations on the type of work that DHS can undertake.  The specific amount of funding required will depend upon the condition of the DoD projects and the amount of work DHS can undertake.

For DHS's work on the DoD military construction funded barrier projects, DHS intends to engage in standard environmental planning including taking certain actions consistent with NEPA.  The DoD counter-drug projects were executed under 10 separate waivers issued by the

Subject:  Department of Homeland Security's Border Wall Plan Pursuant to Presidential
Proclamation 10142
Page 5

Secretary Homeland Security pursuant to IIRIRA between April 2019 and March 2020.  For
DHS's work required on the DoD counter-drug projects, DHS intends to apply the criteria
outlined in Section III above; however, DHS may forego standard environmental planning and
rely on prior IIRIRA waivers where DHS must take timely action to settle pending litigation,
including, but not limited to, actions to repair private property damaged by wall construction,
remediate damage of natural, historic, or cultural resources, or avert further environmental
damage or degradation due to unaddressed site conditions.

### C.  Planning approach with NEPA for other projects

DHS will use any remaining FY 2021 funding available, after budgets for the activities above
are established, to begin the sequential project planning process for the next highest priority
barrier segments identified by DHS.  Initially, DHS will prioritize projects required for life,
safety, environmental, or other remediation requirements.  The process will begin with
environmental planning that complies with NEPA.  In order to facilitate the NEPA process,
DHS will seek Rights of Entry from landowners to allow temporary access to perform
environmental, cultural, and other survey work.  Contract solicitation would occur after NEPA
and real estate acquisition activities have been completed, or are close to completion.

## V.      TREASURY FORFEITURE FUND

In FY 2019, DHS received $601 million from the TFF for border wall construction.  Because
Treasury funds were redirected from other law enforcement purposes, DHS will end border wall
construction funded with TFF funds; terminate contracts after ensuring tasks needed to protect
life, safety, and the environment are completed; and return any excess funds to the TFF.  More
specifically, DHS has returned unobligated TFF funds (approximately $455 million) to Treasury
and will return any recovered amounts to Treasury once those funds become available in DHS's
account.

**VI.**     This Plan is not intended to and does not, create any right or benefit, substantive or
procedural, enforceable at law or in equity by any party against the United States, its
departments, agencies, or entities, its officers, or agents, or any person.

# EXHIBIT B

12/8/21, 3:40 PM    DHS to Address Life, Safety, Environmental, and Operational Considerations for Specific Border Barrier Projects | Homeland Sec…

Case 7:21-cv-00272   Document 24-3   Filed on 12/08/21 in TXSD   Page 24 of 30



🇺🇸  Official website of the Department of Homeland Security



**U.S. Department of
Homeland Security**

# DHS to Address Life, Safety, Environmental, and Operational Considerations for Specific Border Barrier Projects

**Release Date:**  July 27, 2021

WASHINGTON – Today, Secretary of Homeland Security Alejandro N. Mayorkas approved four projects in the Rio Grande Valley, San Diego, and El Centro Sectors to address life, safety, environmental, and operational considerations related to the Department's plan for the use of Border Barrier funds.

"These projects are reflective of the commitment of DHS to ensure the health, safety, and welfare of communities along the border, individuals encountered there, and our Border Patrol Agents who patrol the area," **said Secretary Mayorkas.** "We remain focused on securing the border and keeping communities safe."

These projects do not involve building new border barriers and are consistent with the guiding principles in the DHS Border Plan (https://www.dhs.gov/news/2021/06/11/dhs-releases-plan-use-border-barrier-funds) to prioritize projects needed to address life, safety, environmental, operational, or other remediation requirements.  DHS continues to prioritize the deployment of modern, effective border measures and technology as this work continues.

The projects include:

- **Ensuring power is fully restored to municipalities** on both sides of the border along the El Centro Sector Utility Relocation Project.
- **Addressing numerous serious safety risks and environmental restoration** issues at the Rio Grande Valley Sector Make Safe and Punch List Project.

**Defendants' Exhibit 3 - Page 23**

- **Powering San Diego Secondary Gates and Replacing Drainage Grates** to ensure that 33 vehicle gates that have been hung and built within the San Diego Secondary barrier alignment are operable and necessary work to address life, safety, environmental, or other remediation is carried out.  Once completed, these gates will provide Border Patrol Agents with critical access and mitigate life and safety risk for agents and migrants who may need emergency assistance in the area.  In addition, there are 15 drainage grates requiring replacement and repairs in this same area that pose a risk to migrants and agents.

- **Repairing and reinforcing a small fence** between existing San Diego border segments.

DHS continues to review other paused border barrier projects presenting life, safety, environmental, or other remediation needs and will continue to conduct environmental planning.

The Biden-Harris Administration continues to call on Congress to cancel remaining border wall funding and instead fund smart border security measures, like border technology and modernization of land ports of entry, that are proven to be more effective at improving safety and security at the border.

Keywords: Secretary Alejandro Mayorkas (/keywords/secretary-alejandro-mayorkas)

Last Published Date: July 27, 2021

**Defendants' Exhibit 3 - Page 24**

# EXHIBIT C



# Exhibit C

## LEGEND

- Existing Pedestrian Fence
- CBP Contracts
- USACE Contracts

13 miles

14 miles

Laredo - Columbia Solidarity POE

Laredo - World Trade POE

Laredo

LAREDO NORTH STATION
LAREDO SOUTH STATION

Laredo - Texas Mexican Railway International Bridge POE

Nuevo Laredo

17 miles

LAREDO SOUTH STATION

HEBBRONVILLE STATION

ZAPATA STATION

24 miles

*If sheet measures less than 11x17" it is a reduced print.
Reduce scale accordingly.*

1 in = 5 mi      1:316,650

☐ AREA ENLARGED

**WARNING:** This document is **FOR OFFICIAL USE ONLY (FOUO)**. It contains information that may be exempt from public release under the Freedom of Information Act (5 U.S.C. 552). It is to be controlled, stored, handled, transmitted, distributed, and disposed of in accordance with DHS policy relating to FOUO information and is not be released to the public or other personnel who do not have a valid "need-to-know" without prior approval of an authorized DHS official.

Map Request 601v7

**Defendants' Exhibit 3 – Page 26**

March 9, 2020

# EXHIBIT D





Official website of the Department of Homeland Security

## U.S. Department of Homeland Security

# DHS to Terminate Border Barrier Contracts in Laredo and Rio Grande Valley

**Release Date:** October 8, 2021

WASHINGTON – Consistent with the Department of Homeland Security's (DHS) border barrier plan (https://www.dhs.gov/news/2021/06/11/dhs-releases-plan-use-border-barrier-funds), U.S. Customs and Border Protection (CBP), in coordination with the U.S. Army Corps of Engineers (USACE), intends to cancel the remaining border barrier contracts located within U.S. Border Patrol's (USBP) Laredo Sector and all border barrier contracts located in the Rio Grande Valley Sector.

CBP will then begin environmental planning and actions consistent with the National Environmental Policy Act (NEPA) for previously planned border barrier system projects located within the Rio Grande Valley, Laredo, and El Centro Sectors.

Environmental planning activities will cover projects funded with DHS's Fiscal Year 2018-2021 barrier system appropriations where construction had not started. These activities include additional biological, cultural, and natural resource surveys for project areas where no data have been previously collected. CBP will also conduct comprehensive and targeted outreach with interested stakeholders, including impacted landowners, tribes, state and local elected officials, and federal agencies.

These activities will not involve any construction of new border barrier or permanent land acquisition.

The Administration continues to call on Congress to cancel remaining border wall funding and instead fund smarter border security measures, like border technology and modernization of land ports of entry, that are proven to be more effective at improving safety and security at the border. Until and unless Congress cancels those funds, the law requires DHS to use the

**Defendants' Exhibit 3 - Page 28**

funds consistent with their appropriated purpose, and beginning environmental planning activities is part of the Department's plan to do so.

This announcement has no impact on underlined previously approved (https://www.dhs.gov/news/2021/07/27/dhs-address-life-safety-environmental-and-operational-considerations-specific-border) remediation projects necessary to address life, safety, and environmental restoration issues in the Rio Grande Valley, San Diego, and El Centro Sectors in accordance with the Department's plan (https://www.dhs.gov/news/2021/06/11/dhs-releases-plan-use-border-barrier-funds).

Keywords: Southwest Border (/keywords/southwest-border)

Last Published Date: October 8, 2021