# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

| | | |
|---|---|---|
| THE GENERAL LAND OFFICE OF THE STATE OF TEXAS; and GEORGE P. BUSH, in his official capacity as Commissioner of the Texas General Land Office, | § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| JOSEPH R. BIDEN, in his official capacity as President of the United States of America; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; and ALEJANDRO MAYORKAS, in his official capacity as Secretary of the United States Department of Homeland Security, | § § § § § § § § § § | Case No. 7:21-CV-00272 |
| Defendants. | § § | |
| THE STATE OF MISSOURI; and THE STATE OF TEXAS, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| JOSEPH R. BIDEN, in his official capacity as President of the United States of America; THE UNITED STATES OF AMERICA; ALEJANDRO N. MAYORKAS, in his official capacity as Secretary of the United States Department of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY A. MILLER, in his official capacity as the Acting Commissioner of United States Customs and Border Protection; and UNITED STATES CUSTOMS AND BORDER PROTECTION, | § § § § § § § § § § § § § § § § | Case No. 7:21-CV-00420  (Formerly Case No. 6:21-CV-00052) |
| Defendants. | § | |

## FIRST AMENDED COMPLAINT
## OF THE TEXAS GENERAL LAND OFFICE AND GEORGE P. BUSH

## INTRODUCTION

1.      As the Department of Homeland Security ("DHS") wrote in its 2021 Budget in Brief, "Border Security is national security. . . . Securing our Nation's land borders is necessary to stem the tide of illicit goods and unwanted criminals across the sovereign physical border of the Nation."[1] And according to DHS, the "*bottom line*" is that "Walls Work."[2] DHS states: "When it comes to stopping drugs and illegal aliens from crossing our borders, border walls have proven to be extremely effective."[3] For that reason, Congress appropriated over a billion dollars in each of the 2018, 2019, 2020, and 2021 Consolidated Appropriations Acts for the construction of barriers along the southern border. But this lawsuit is not about whether border walls are effective. It is about whether a President may unilaterally override these duly enacted appropriations bills to fulfill a campaign promise.

2.      Candidate Joe Biden declared on the campaign trail that "[t]here will not be another foot of wall constructed in my administration."[4] On inauguration day, President Biden made good on that promise by issuing a Proclamation decrying the wall as a "waste of money" and ordering the Secretary of Homeland Security to "pause work on each construction project on the southern border wall."[5] Other than a vague reference to the "Constitution and laws of the United States,"

---

[1] Dep't of Homeland Security, Budget-in-Brief, Fiscal Year 2021, 10 (2021), https://www.dhs.gov/sites/default/files/publications/fy_2021_dhs_bib_0.pdf.

[2] Dep't of Homeland Security, *Walls Work*, DHS.gov (Dec. 12, 2018), https://www.dhs.gov/news/2018/12/12/walls-work (emphasis in original).

[3] *Id.*

[4] Barbara Sprunt, *Biden Would End Border Wall Construction, But Wouldn't Tear Down Trump's Additions,* NPR (Aug. 5, 2020), https://www.npr.org/2020/08/05/899266045/biden-would-end-border-wall-construction-but-wont-tear-down-trump-s-additions.

[5] Exec. Office of the President, Proclamation No. 10142, 86 Fed. Reg. 7225 (Jan. 27, 2021) (the "Proclamation"), https://www.govinfo.gov/content/pkg/FR-2021-01-27/pdf/2021-01922.pdf.

the Proclamation cited no basis for the President's authority to halt the border wall projects or their appropriations.

3.      Instead, the Constitution vests the power of the purse exclusively with Congress, providing that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. CONST. art. I, § 9, cl. 7. The President must "faithfully execute" the law as Congress enacts it. U.S. CONST. art. II, § 3. "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City and Cnty. of San Francisco v. Trump,* 897 F.3d 1225, 1238 (9th Cir. 2018). When a President does so, he "violates the constitutional principle of the Separation of Powers." *Id.*

4.      When President Biden issued the Proclamation and stopped construction of the border wall, his Constitutional "power was [at] its lowest ebb" because he directly contravened the will of Congress expressed in the Consolidated Appropriations Acts, which appropriated billions of dollars for border wall construction. *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637–38 (1952) (Jackson, J., concurring). No statute authorized the Proclamation. President Biden's Proclamation was therefore *ultra vires* and entirely absent statutory and constitutional authority. This suit seeks a declaration that the Proclamation is unauthorized by, and contrary to, the Constitution and laws of the United States, and seeks to enjoin Secretary Mayorkas and DHS from taking actions pursuant to or arising out of the Proclamation.

5.      President Biden's Proclamation has created a national security, public health, and humanitarian crisis at a scale never before been seen at the border. Border apprehensions set new

records by the month, up 675 percent from May 2020 to May 2021.[6] Innocent children are abandoned at the border on a daily basis.[7] The border surge created by the Proclamation has transformed the border into a "crime scene" where cartel groups freely cross through gaps in the fencing on a daily basis.[8] President Biden's former Border Patrol Chief described the operational effects of the Proclamation and DHS's implementation in a recent letter to congress, lamenting that "control of our borders has disintegrated overnight" and levying the shocking charge that leadership within the Biden Administration "openly discussed ways to slow roll any decisions as well as options to do the least action possible to control the border."[9]

6.      These harms have been particularly concentrated on a 3099-acre farm owned by the State of Texas in Starr County, Texas ("GLO Farm"). At the time of the Proclamation, Customs and Border Protection ("CBP"), which is an operational component of DHS, had already completed a wall segment on the property to the west of the GLO Farm. CBP was in negotiations with the GLO to acquire 41 acres to extend the segment by two miles. The Proclamation halted those negotiations and CBP's plans to build a wall on the GLO Farm, permanently if one believes President Biden's statements.

---

[6] U.S. CUSTOMS AND BORDER PROTECTION, *Southwest Land Border Encounters*, CBP.GOV: NEWSROOM: STATS AND SUMMARIES, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last modified June 9, 2021).

[7] Greg Norman, *Migrant Boy, 5, Seen Screaming After Being Abandoned Along US-Mexico Border, Video Shows*, YAHOO NEWS (June 2, 2021), https://news.yahoo.com/migrant-boy-5-seen-screaming-130350256.html (follow "footage was captured" hyperlink).

[8] Roman Chiarello, *Arizona Sheriff Says Biden Halting Border Wall Construction Left Area Wide Open for Cartels*, FOX NEWS (Mar. 5, 2021), https://www.foxnews.com/us/arizona-sheriff-biden-border-wall-construction-cartels.

[9] Ex. 1, Letter from Border Chief Rodney S. Scott to Senate Majority Leader, et al. (Sept. 11, 2021).

7.      Unfortunately, the wall segment already built nearby has so effectively diverted illegal crossings across the GLO Farm that it has been transformed into a superhighway of illegal activity, left defenseless by the Proclamation:



8.      By night, literal *caravans* of illegal immigrants descend upon the GLO Farm. The above picture—recently taken on the GLO Farm—is not an isolated incident on the GLO Farm, nor does the caravan stop at the edge of the frame. Illegal border crossers stream across the GLO Farm at a rate of roughly 1,500 *per week*, where they are frequently apprehended in groups of 50 to 100 or larger and taken away *by the busload*.

9.      President Biden has the right to criticize Congress's policy of building the border wall and propose alternative budgets, but he cannot usurp the power of Congress by unilaterally withholding funding appropriated by Congress in duly enacted laws. The legal result of President Biden's Proclamation is the unconstitutional withholding of appropriations. The practical result is a humanitarian crisis on the southern border at a scale never before seen in the history of this country.

## PARTIES

10.     Plaintiff the Texas General Land Office ("GLO") is an agency of the State of Texas, a sovereign State of the United States of America. The GLO manages over 13 million acres of

state-owned lands and mineral rights, with the revenue deposited into Texas's Permanent School Fund ("PSF") to educate the schoolchildren of Texas. GLO responsibilities include managing state land sales, trades, leases, and improvements, as well as the administration of contracts, and other transactions relating to leases and real property. The GLO is responsible for maximizing revenue deposited into the PSF through these activities. The GLO is the lessor of the GLO Farm and acts as its administrator on behalf of the State of Texas. The GLO sues to vindicate its interests as the landlord and landowner/administrator of the GLO Farm.

11.     Plaintiff George P. Bush is the Commissioner of the GLO, and sues in his official capacity. Under Texas law, the Commissioner is charged with the authority to "superintend, control and direct" the GLO and "execute and perform all acts and other things relating to public real property of the state." TEX. NAT. RES. CODE § 31.051.

12.     Defendant Joseph R. Biden is the President of the United States, and is sued in his official capacity. He issued the Proclamation in contravention of the United States Constitution and various statutes.

13.     Defendant United States Department of Homeland Security ("DHS") is a federal agency. The DHS is responsible for ensuring border security along the U.S.-Mexico border, including through the construction of border barriers. DHS was tasked by the Proclamation to develop a plan to terminate border wall construction contracts and redirect the appropriated funds. Pursuant to the Proclamation, DHS developed an illegal and unconstitutional plan ("DHS Plan") that intrudes on the spending power of Congress, and violates numerous statutes. Pursuant to the Proclamation and DHS Plan, DHS has ceased construction on border wall projects.

14.     Defendant Alejandro Mayorkas is the Secretary of Homeland Security and therefore the "head" of the DHS with "direction, authority, and control over it." 6 U.S.C. § 112(a)(2). Defendant Mayorkas is sued in his official capacity.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction under 28 U.S.C. § 1331, 1361, 1651, and 2201, as well as 5 U.S.C. §§ 701–706 and the IIRIRA.

16.     This Court is authorized to award the requested declaratory and injunctive relief under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, the Administrative Procedure Act 5 U.S.C. § 706 ("APA"), 28 U.S.C. § 1361, and through its inherent equitable powers.

17.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). A substantial part of the events giving rise to these claims occurred in this district, a substantial part of the property that is the subject of the action is situated in this district, and Defendants are officers of the United States acting in their official capacities.

## LEGAL BACKGROUND

**A.     The U.S. Constitution Mandates Separation of Legislative and Executive Powers.**

18.     Article I, Section 1 of the Constitution vests the legislative power exclusively in the Congress of the United States: "All legislative powers herein granted shall be vested in a Congress of the United States, which shall consist of a Senate and House of Representatives." U.S. CONST. art. I, § 1. Article II, Section 1 of the Constitution vests executive power in the President: "The executive power shall be vested in a President of the United States of America." U.S. CONST. art. II, § 1. No legislative powers are vested in the President or Executive Branch. Article I and Article II reflect the Founders' insights that "the legislative, executive, and judiciary departments ought

7

to be separate and distinct," and that this separation is an "essential precaution in favor of liberty." THE FEDERALIST NO. 47, at 301 (James Madison) (Clinton Rossiter ed., 1961).

19.     The Constitution sets forth the procedures of bicameralism and presentment, through which the President may accept or veto a bill passed by both Houses of Congress, and Congress may subsequently override a presidential veto. U.S. CONST. art. I, § 7, cl. 2, 3. The President is not vested with the power to ignore or amend duly enacted laws. *See Clinton v. City of N.Y.*, 524 U.S. 417, 438 (1998) (the Constitution does not authorize the President "to enact, to amend, or to repeal statutes"). Instead, Article II, Section 3 of the Constitution ("Take Care Clause") provides that the President "shall take care that the laws be faithfully executed." U.S. CONST. art. II, § 3. The Take Care Clause grants the President the power and duty to enforce laws that Congress makes.

20.     Any action of the Executive Branch must come from one of two sources of authority: (1) a valid delegation of authority by statute enacted by Congress, or (2) a direct exercise of one of the President's enumerated powers in Article II. "The President's power, if any, to issue [an] order must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). Where "[t]here is no statute that expressly authorizes the President to take" an action, "[n]or is there any act of Congress … from which such a power can fairly be implied," the action is not authorized by an act of Congress. *Id.* In the absence of such an express or implied authorization by act of Congress, "if the President had authority to issue the order he did, it must be found in some provisions of the Constitution." *Id.* At 587.

**B.**     **The U.S. Constitution Vests Congress with Exclusive Authority to Appropriate Public Funds.**

21.     The Appropriations Clause of the Constitution specifically vests Congress with the power of the purse, providing that "No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. CONST. art. I, § 9, cl. 7. The Constitution thus vests Congress, and only Congress, with the power to spend public funds, and it must do so by passing identical appropriations bills in both the House and the Senate. Public funds may only be expended as specified in such duly enacted appropriations laws.

22.     The Appropriations Clause plays a critical role in the Constitution's separation of powers among the three branches of government and the checks and balances between them. The Clause has a "fundamental and comprehensive purpose . . . to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual flavor of Government agents." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 427-28 (1990); *Id.* at 427 (without the Appropriations Clause, "the executive would possess an unbounded power over the public purse of the nation; and might apply all its moneyed resources at his pleasure") (quoting J. STORY, COMMENTARIES ON THE CONSTITUTION OF THE UNITED STATES § 1348 (Boston, Little, Brown & Co. 1858)).

23.     No statute can provide the President with authority to spend from the Treasury by executive declaration in a manner that contravenes the appropriations that have been made by law, or to refuse to spend funds for their appropriated purpose. "Any exercise of a power granted by the Constitution to one of the other branches of Government is limited by a valid reservation of congressional control over funds in the Treasury." *Office of Pers. Mgmt.*, 496 U.S. at 425. Nor can Congress endow the President with the power to reallocate money within the federal budget. "The Constitution is a compact enduring for more than our time, and one Congress cannot yield up its

own powers, much less those of other Congresses to follow." *Clinton v. City of New York*, 524 U.S. at 452 (1998) (Kennedy, J., concurring).

**C.      Statutes Further Restrict the Executive's Use of Appropriations.**

24.      Beyond the Constitution's separation of powers, statutes further restrict and define how the President and Executive Branch may spend appropriations. Most importantly, the Purpose Statute mandates that appropriated funds may be used only for the purpose of the appropriation, unless authorized by statute. 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law.").

25.      The Transfer Statute prohibits transfer of funds from one account to another, unless authorized by statute. See 31 U.S.C. § 1532 ("An amount available under law may be withdrawn from one appropriation account and credited to another or to a working fund only when authorized by law."). "Transfers without statutory authority are equally forbidden whether they are (1) transfers from one agency to another, (2) transfers from one account to another within the same agency, or (3) transfers to an interagency or intra-agency working fund." 4 U.S. GOV'T ACCOUNTABILITY OFFICE, GAO-16-464SP, PRINCIPLES OF FEDERAL APPROPRIATIONS LAW 38-39 (4th ed. 2016). In addition to violating the Transfer Statute, "an unauthorized transfer would violate" the Purpose Statute. *Id.* at 38.

26.      The Anti-Deficiency Act prohibits spending funds in excess of appropriations, unless authorized by statute. *See* 31 U.S.C. § 1341(a)(1)(A) (officers and employees may not "make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation").

27.      Finally, when two appropriations are available for the same purpose, the agency must select which to use—and once it has made an election, the agency may not make use of funds

from a different appropriation for the same purpose, unless the agency, at the beginning of the fiscal year, informs Congress of its intent to change for the next fiscal year. *See* Dep't of Homeland Security—Use of Management Directorate Appropriations to Pay Costs of Component Agencies, B-307382, 2006 U.S. Comp. Gen. WL 2567514, (Comp. Gen. Sept. 5, 2006); *see also* 68 Comp. Gen. 337, B-231445, 1989 U.S. Comp. Gen. WL 237462, (Comp. Gen. Mar. 20, 1989); 59 Comp. Gen. 518, 1980 U.S. Comp. Gen. WL 18032, (Comp. Gen. June 11, 1980).

28.     None of these statutes, nor does any other statute, permit the President to delay, withhold, or otherwise refuse to spend appropriated funds based on a policy disagreement with the project for which they were appropriated.

**D.     The President has No Constitutional Authority to Withhold Appropriated Funds to Effectuate Policy Goals.**

29.     The Constitution's separation of powers also prevents a President from refusing to spend appropriated funds based on disagreement with the policy for which they were appropriated. *City and Cnty. of San Francisco v. Trump,* 897 F.3d 1225, 1238 (9th Cir. 2018) ("Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals"). When a President does so, he "violates the constitutional principle of the Separation of Powers." *Id.*

30.     This is because "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter. *Id.* at 1233-34 (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J., concurring)). And when it comes to spending, the President has none of "his own constitutional powers" to rely upon. *Id.* Instead, the President's duty to enforce the laws under the Take Care Clause "necessarily extends to appropriations." *Id.* at 1234.

**E.      The President's Statutory Authority to Withhold Appropriated Funds is Extremely Limited.**

31.      The Impoundment Control Act ("ICA") strictly delineates the limited circumstances under which the President may withhold appropriated funds. Congressional Budget and Impoundment Control Act of 1974, Pub. L. No. 93-344, § 1015, 88 Stat. 297, 336 (1974), codified at 2 U.S.C. §§ 681–688. Congress enacted the ICA to address "concern[s] about the failure to prudently obligate [appropriations] according to its Congressional prerogatives when it enacted and later amended the ICA." Office of Mgmt. and Budget, B-331564, 2020 WL 241373, (Comp. Gen. Jan. 16, 2020); *see also* S. Rep. No. 93-688, at 75 (1974) (explaining that the objective was to assure that "the practice of reserving funds does not become a vehicle for furthering Administration policies and priorities at the expense of those decided by Congress"). Unless authorized by the ICA or another statute, the Take Care Clause constitutionally binds the President to take care to ensure that appropriations are prudently obligated during their period of availability. Advanced Res. Projects Agency—Energy, B-329092, 2017 WL 6335684 (Comp. Gen. Dec. 12, 2017) (explaining that the ICA operates on the premise that the President is required to obligate funds appropriated by Congress, unless otherwise authorized to withhold).

32.      The ICA vests the President with strictly circumscribed authority to "impound," meaning withhold, budget authority. The ICA separates impoundments into two exclusive categories— "deferrals" and "rescissions."

33.      The President may temporarily withhold funds from obligation—but not beyond the end of the fiscal year in which the President transmits the special message—by proposing a "deferral." 2 U.S.C. § 684. Budget authority proposed for deferral must still nonetheless be prudently obligated before the end of its period of availability. 2 U.S.C. § 684; ARPA-E, B-329092, 2017 WL 6335684 (Comp. Gen. Dec. 12, 2017). The ICA authorizes the deferral of

budget authority in a limited range of circumstances: to provide for contingencies; to achieve savings made possible by or through changes in requirements or greater efficiency of operations; or as specifically provided by law. 2 U.S.C. § 684(b). No officer or employee of the United States may defer budget authority for any other purpose. *Id.*

34.     The ICA does not permit deferrals for policy reasons. Office of Mgmt. and Budget, B-331564, 2020 WL 241373, (Comp. Gen. Jan. 16, 2020) (citing B-237297.3, (Comp. Gen. Mar. 6, 1990); B-224882, (Comp. Gen. Apr. 1, 1987)). "When Congress enacts appropriations, it has provided budget authority that agencies must obligate in a manner consistent with law." *Id.* at *5. As part of the budget process, the President may consider his own policy objectives as he crafts policy proposals for inclusion in his budget submission. *Id.* However, once an appropriations bill is enacted, the President's policy objectives must yield to his Constitutional duty under the Take Care Clause to execute the appropriations bill faithfully. *Id.* (citing U.S. CONST., art. II, § 3). "Faithful execution of the law does not permit the President to substitute his own policy priorities for those that Congress has enacted into law." *Id.*

35.     Enacted statutes, and not the President's policy priorities, necessarily provide the animating framework for all actions agencies take to carry out government programs. *Id.* (quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act . . . unless and until Congress confers power upon it")); (citing *Michigan v. EPA*, 268 F.3d 1075, 1081 (D.C. Cir. 2001) (a federal agency is "a creature of statute" and "has no constitutional or common law existence or authority, but only those authorities conferred upon it by Congress")).

36.     The President may only seek the permanent cancellation of funds for fiscal policy or other reasons, including the termination of programs for which Congress has provided budget authority, by proposing a "rescission." 2 U.S.C. § 683. Budget authority proposed for rescission

must be made available for obligation unless, within 45 calendar days of continuous congressional session, Congress has completed action on a rescission bill rescinding all or part of the amount proposed for rescission. 2 U.S.C. § 683. Thus, the ICA retains the Constitution's separation of powers and Congress's power of the purse by requiring the President to obtain rescission of an appropriation through a new law passed by Congress.

37.     Procedurally, both "deferrals" and "rescissions" require the President to transmit a special message to Congress that includes the amount of budget authority proposed for deferral or rescission and the reason for the proposal. 2 U.S.C. §§ 683–684. These special messages must provide detailed and specific reasoning to justify the withholding, as set out in the ICA. *See* 2 U.S.C. §§ 683–684; B-237297.4, (Comp. Gen. Feb. 20, 1990) (vague or general assertions are insufficient to justify the withholding of budget authority). "The burden to justify a withholding of budget authority rests with the executive branch." Office of Mgmt. and Budget, B-331564, 2020 WL 241373, (Comp. Gen. Jan. 16, 2020).

38.     President Biden's Proclamation does not reference the ICA as a source of statutory authority for the border wall spending freeze. Defendants' Motion to Dismiss (Dkt. 18) does not contend that the ICA provided President Biden with a source of statutory authority to issue the Proclamation. It is also undisputed that President Biden did not comply with the procedures set forth in the ICA to categorize the spending freeze as a "deferral" or a "rescission." And as discussed above, the President has no constitutional power to withhold appropriated funds. President Biden therefore issued the Proclamation *ultra vires*, without constitutional or statutory authority.

**F.     DHS is Charged by Statute with Securing the Nation's Borders, Including Erecting and Maintaining Barriers Along the Southwest Border.**

39.     DHS is a domestic agency charged with preventing the entry of terrorists, securing the borders, and carrying out immigration functions. Within CBP, which is an operational component of DHS, the U.S. Border Patrol's mission is to prevent illegal entry across approximately 7,000 miles of Mexican and Canadian international borders and 2,000 miles of coastal borders surrounding Florida and Puerto Rico. Under CBP's Border Wall System Program, it plans for and executes deployment of barriers and other assets intended to prevent the illegal entry of people, drugs, and other contraband along the southern border.[10]

40.     In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act ("IIRIRA"), which authorizes the Secretary of Homeland Security to "take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." Pub. L. No. 104-208, § 102(a), 110 Stat. 3009-353, 3009-554 (1996) (codified at 8 U.S.C. § 1103 note). Since then, Congress has amended IIRIRA three times to expand the Government's authority to construct barriers along the southern border.

41.     In 2005, Congress grew frustrated by "[c]ontinued delays caused by litigation" preventing border barrier construction and thus granted the Secretary of Homeland Security authority to waive any "laws that might impede the expeditious construction of security

---

[10] Gov't Accountability Office, Gao-18-614, Southwest Border Security: CBP Is Evaluating Designs and Locations for Border Barriers but Is Proceeding Without Key Information (2018), https://www.gao.gov/assets/700/693888.pdf.

Gov't Accountability Office, Gao-21-175, DHS Annual Assessment: Most Acquisition Programs Are Meeting Goals but Data Provided to Congress Lacks Context Needed For Effective Oversight (2021), https://www.gao.gov/assets/720/711969.pdf.

infrastructure along the border." *See* H.R. REP. 109-72, at 171 (2005). Section 102 of the REAL ID Act of 2005 empowers the Secretary of Homeland Security "to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section." Pub. L. No. 109-13, § 102, 119 Stat. 231, 302, 306.

42.     Congress amended IIRIRA again as part of the Secure Fence Act of 2006, requiring construction of "physical barriers, roads, lights, cameras, and sensors" across hundreds of miles of the southern border in five specified locations. Pub. L. No. 109-367, § 3, 120 Stat. 2638-39. In 2007, Congress expanded this requirement and directed "[construction] of reinforced fencing along not less than 700 miles of the southwest border." Consolidated Appropriations Act of 2008, Pub. L. No. 110-161, sec. 564, § 102(b)(1), 121 Stat. 2042, 2090 (2007)). Relying on these authorities, DHS installed approximately 650 miles of barriers along the southern border.[11]

43.     Beginning with enactment of the IIRIRA in 1996, Congress has periodically directed DHS to build fencing on the southern border. As originally enacted, section 102(b) of IIRIRA required the completion of a triple-layer fence along a 14-mile stretch of border fencing in the San Diego sector where construction had begun in the early 1990s. The Secure Fence Act of 2006 amended section 102(b) of IIRIRA to require DHS to construct at least two layers of reinforced fencing as well as physical barriers, roads, lighting, cameras, and sensors on five specific sections of the southern border totaling approximately 850 miles. Pub. L. No. 109-367, § 3, 120 Stat. 2638, 2368-69 (2006). Shortly thereafter, the Dep't of Homeland Security Appropriations Act of 2008 again amended section 102(b) of IIRIRA by removing the specific

---

[11] *Review of the FY2018 Budget Request for the U.S. Dep't of Homeland Security: Hearing Before the S. Appropriations Comm., Subcomm. on Homeland Security*, 115th Cong. (2017) (testimony of Sec'y of Homeland Security John Kelly).

location and double-layer fencing requirements, and instead directing DHS to construct not less than 700 miles of reinforced fencing where fencing would be most practical and effective. Pub. L. No. 110-161, sec. 564, § 102(b)(1), 121 Stat. 2042, 2090 (2008).

**G.      Congress Appropriated Funds for the Border Wall in Each of the Past Five Years.**

44.      Congressional Appropriations Acts ("CAAs") in recent years have demonstrated Congress's policy of securing the border through upgrades and replacement of existing border walls and the building of new sections.

45.      The 2017 CAA provided CBP with $292 million "for the replacement of primary pedestrian and vehicle fencing in high priority areas, using previously deployed and operationally effective designs, such as currently deployed steel bollard designs." Pub. L. No. 115-31, 131 Stat. 404, 433-34 (2017) (under PROCUREMENT, CONSTRUCTION AND IMPROVEMENTS ¶ 1). CBP directed those fiscal year 2017 funds to 40 miles of replacement wall construction in San Diego, El Centro, El Paso, and near Santa Teresa.

46.      In the 2018 CAA**,** Congress provided $1.57 billion to build or replace fencing on the southern border. Consolidated Appropriations Act of 2018, Pub. L. No. 115-141, § 230(1)-(6), 132 Stat. 605, 616-18 (2018). The appropriated amount provided for "more than 95 miles of 'border wall system,' including approximately 47 miles of new barriers and 48 miles of upgraded barriers."[12] DHS claimed that the 2018 appropriation would fund "approximately 84 miles of border wall in multiple locations across the Southwest border."[13] These wall sections included

---

[12] S. COMM. ON APPROPRIATIONS, HOMELAND SECURITY APPROPRIATIONS BILL, 2018: OMNIBUS AGREEMENT SUMMARY (2018).

[13] DEP'T OF HOMELAND SECURITY, *Walls Work*, DHS.gov (Dec. 12, 2018), https://www.dhs.gov/news/2018/12/12/walls-work.

secondary fencing replacement in the San Diego sector, new primary fencing in the Rio Grande Valley ("RGV") sector, and replacement of existing pedestrian fencing along the southwest border.

47.    In 2019, the level of funding for the border wall was the subject of a prolonged dispute in Congress, culminating in a government shutdown. After careful consideration and extensive political debate within each House of Congress and with President Trump, Congress appropriated $1.375 billion of funding for the border wall in the 2019 CAA, which President Trump signed into law on February 15, 2019. Pub L. No. 116-6, § 230(a)(1), 133 Stat. 15, 28-29 (2019). The 2019 CAA provided for approximately 55 miles of new border wall sections, including "currently deployed steel bollard designs," specifically to be constructed in the Rio Grande Valley sector. § 230(b), 133 Stat. at 28.

48.    The 2019 CAA placed time restrictions on the availability of the appropriation. Of the $2.52 billion total appropriation to CBP for "procurement, construction, and improvements"— within which was included the $1.375 billion appropriation for the RGV border wall— $870,656,000 shall remain available until September 30, 2021, and $1,645,222,000 shall remain available until September 30, 2023. 133 Stat. at 18 (under PROCUREMENT, CONSTRUCTION AND IMPROVEMENTS). These looming expirations of appropriations place RGV border wall projects funded from the 2019 CAA at imminent risk of cancellation in the event of any delay.

49.    The 2019 CAA also contained additional language strictly prohibiting the diversion of appropriated funds to increase funding for other programs absent action by Congress:

> "None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act."

§ 739, 133 Stat. at 197. Thus, the 2019 CAA specifically prohibits the President from diverting the appropriated funds away from the construction of the border wall in the RGV sector to fund other programs or projects.

50.     The 2020 CAA and 2021 CAA each appropriated $1.375 billion for border wall construction. DHS Appropriations Act, 2020, Pub. L. No. 116-93, § 209, 133 Stat. 2502, 2511-12 (2020); DHS Appropriations Act, 2021, Pub. L. No. 116-260, § 210, 134 Stat. 1182, 1448, 1456-1457 (2020). DHS has not obligated its 2021 border wall appropriation.

## FACTUAL BACKGROUND

**A.**     **Border Walls Have Proved Extremely Effective at Securing the Southwest Border Where Constructed.**

51.     According to DHS, for almost 30 years, border barriers "have proved to be a critical component in gaining operational control of the border."[14] This is because "Deploying the wall system in high priority areas allows U.S. Border Patrol to decide where border crossings take place, not smugglers."[15] According to CBP Acting Commissioner Mark Morgan, "Every single bit of concrete and steel that goes into the ground stops dangerous people and deadly drugs from coming into this country."[16] As DHS states, "*The Bottom Line:* Walls Work. When it comes to stopping drugs and illegal aliens from crossing our borders, border walls have proven to be extremely effective."[17]

---

[14] DEP'T OF HOMELAND SECURITY, *DHS and CBP Celebrate 400 Miles of New Border Wall System*, DHS.gov (Oct. 29, 2020), https://www.dhs.gov/news/2020/10/29/dhs-and-cbp-celebrate-400-miles-new-border-wall-system.

[15] *Id*.

[16] *Id.*

[17] DEP'T OF HOMELAND SECURITY, *Walls Work*, DHS.gov (Dec. 12, 2018), https://www.dhs.gov/news/2018/12/12/walls-work.

52.     New border wall segments constructed from the 2017-2020 appropriations began paying dividends immediately. For example, DHS states that border apprehensions decreased 90 percent in one sector where the wall was installed.[18] Another DHS anecdote contrasts the effectiveness of the outdated, easily breached, fencing located on some segments of the border with the newly constructed wall segments:

> [W]hen a violent mob of 1,000 people stormed our Southern border, we found the newly constructed portions of the wall to be very effective.  In the area of the breach, a group of people tore a hole in the old landing mat fence constructed decades ago and pushed across the border. … That evening, the fence was repaired.  There were no breaches along the newly constructed border wall areas.[19]

DHS's statements leave little doubt that the new border wall projects are essential to securing the southwest border, and to national security.

## B.     Border Wall Segments Built in the Rio Grande Valley from Recent Appropriations Staunched the Rapidly Increasing Flow of Border Crime.

53.     CBP has long recognized the RGV's Starr County as a "high-threat area for narcotics smuggling."[20] Between 2012 and 2014, CBP agents seized more than 2.3 million pounds of marijuana at the Rio Grande City Station.[21] Border-related crime in RGV has increased exponentially in recent years, and in 2019 the RVG sector "ranked first in seized cocaine and marijuana along the southwest border."[22] The RGV sector accounts for approximately 40% of

---

[18] *Id.*

[19] *Id.*

[20] U.S. CUSTOMS AND BORDER PROTECTION, *Border Patrol Agents Seize Nearly 119,000 Pounds of Marijuana*, CBP.gov (Jan. 22, 2015), https://www.cbp.gov/newsroom/local-media-release/border-patrol-agents-seize-nearly-119000-pounds-marijuana?_ga=2.196750892.1401482266.1623786775-1333410004.1623786775.

[21] *Id.*

[22] U.S. CUSTOMS AND BORDER PROTECTION, *DHS Issues Environmental Waiver to Expedite New Border Wall System in Rio Grande Valley; Busiest Border Patrol Sector in the Nation*, CBP.gov

illegal immigrant apprehensions for the entire nation.[23] The majority of this activity takes place in areas where border walls are limited.[24]

54.     Prior to the new funding, Starr County did not have any border walls, and many areas were left undefended by any barrier at all (not even outdated fencing). However, among the border walls to be constructed with this new funding were 104 "highest priority" miles located in RGV.[25] The new projects would wall off Starr County from Mexico with 52 miles of steel bollard wall 18 to 30 feet tall, reinforced with floodlights, hi-tech cameras, and a 150-foot-wide patrol road. According to CBP, these new wall projects would "significantly improve the RGV Sector's ability to impede and deny illegal border crossings and the drug and human smuggling activities of transnational criminal organizations."[26]

55.     In 2019, CBP entered several contracts for the Starr County border wall system.[27] According to CBP, these contracts were funded from fiscal year 2019 appropriations. By 2020, several sections of the border wall were completed in the RGV Sector and had proven to be

---

(Oct. 31, 2019), https://www.cbp.gov/newsroom/national-media-release/dhs-issues-environmental-waiver-expedite-new-border-wall-system-rio.

[23] *Id.*

[24] *Id.*

[25] DEP'T OF HOMELAND SECURITY, *Walls Work*, DHS.gov (Dec. 12, 2018), https://www.dhs.gov/news/2018/12/12/walls-work.

[26] U.S. CUSTOMS AND BORDER PROTECTION, *DHS Issues Environmental Waiver to Expedite New Border Wall System in Rio Grande Valley; Busiest Border Patrol Sector in the Nation*, CBP.gov (Oct. 31, 2019), https://www.cbp.gov/newsroom/national-media-release/dhs-issues-environmental-waiver-expedite-new-border-wall-system-rio.

[27] U.S. CUSTOMS AND BORDER PROTECTION, *Contract Awards for New Border Wall System in the Rio Grande Valley*, CBP.gov (Sept. 30, 2019), https://www.cbp.gov/newsroom/national-media-release/contract-awards-new-border-wall-system-rio-grande-valley; U.S. CUSTOMS AND BORDER PROTECTION, *Contract Award for New Border Wall Project in the Rio Grande Valley*, CBP.gov (June 27, 2019), https://www.cbp.gov/newsroom/local-media-release/contract-award-new-border-wall-project-rio-grande-valley?_ga=2.168895265.1401482266.1623786775-1333410004. 1623786775.

extremely effective.[28] For example, in one zone that "never had any border infrastructure," the border wall reduced apprehensions by 79 percent.[29] In another area, the border wall successfully diverted illegal immigrants away from a high-risk, heavily traveled road, forcing smugglers to take groups into areas "easier for CBP surveillance cameras to detect illicit activity."[30]

## C.     CBP Entered Negotiations with the GLO to Build a New Border Wall Segment on the GLO Farm in Starr County.

56.     The GLO administers the GLO Farm in Starr County on behalf of the Permanent School Fund. The GLO currently leases the farm for farming, grazing, and hunting, and receives $150,000 per month in rent, which ultimately flows to the Permanent School Fund and is used to educate the schoolchildren of Texas. A two-mile segment of the Starr County border wall was scheduled to be constructed on the GLO Farm as part of the RGV-09 project. On August 13, 2020, CBP sent a letter to the GLO initiating negotiations to acquire 41.423 acres of the GLO Farm for border wall construction, including a monetary offer. The GLO counter-offered, and negotiations continued during the following months, until President Biden assumed office in January 2021. By that time, CBP had already completed a segment of the RGV-09 wall abutting the GLO Farm on the property directly to the west.

## D.     The Proclamation Froze all Border Wall Projects based on President Biden's Disagreement with Congress's Border Wall Policy Embodied in the CAAs.

57.     During his campaign, President Biden made no secret of his desire to halt construction of the wall at all costs, irrespective of preexisting appropriations. During an August

---

[28] DEP'T OF HOMELAND SECURITY, *The Border Wall System is Deployed, Effective, and Disrupting Criminals and Smugglers*, DHS.gov (Oct. 29, 2020), https://www.dhs.gov/news/2020/10/29/border-wall-system-deployed-effective-and-disrupting-criminals-and-smugglers.

[29] *Id.*

[30] *Id.*

5, 2020, interview, he declared that "[t]here will not be another foot of wall constructed in my administration, number one."[31] He also pledged to cease all legal efforts to acquire land for the previously planned segments, stating "End. Stop. Done. Over. Not gonna do it. Withdraw the lawsuits. We're out."

58.     On January 20, 2021, President Biden issued the Proclamation, directing DHS to "pause work on each construction project on the southern border wall" within seven days and to "pause immediately the obligation of funds related to construction of the southern border wall."[32] The Proclamation criticized the border wall as a "waste of money" and stated that the border wall was "not a serious *policy* solution." However, it was issued without any notice and comment or interagency review.[33]

59.     The Proclamation specifically included wall projects funded by "direct appropriations" within the scope of the freeze, bringing the RGV-09 project and the planned wall segment on the GLO Farm to a dead stop. DHS implemented this Proclamation by suspending all border wall projects and ceasing land acquisition efforts (including for the GLO Farm), leaving hundreds of miles of fencing unfinished compared to what DHS had studied and planned. The termination of border wall construction left huge gaps in the border barriers, including on the GLO

---

[31] Barbara Sprunt, *Biden Would End Border Wall Construction, But Wouldn't Tear Down Trump's Actions*, NPR (Aug. 5, 2020), https://www.npr.org/2020/08/05/899266045/biden-would-end-border-wall-constructionbut-wont-tear-down-trump-s-additions.

[32] EXEC. OFFICE OF THE PRESIDENT, Proclamation No. 10142, 86 Fed. Reg. 7225 (Jan. 27, 2021), https://www.govinfo.gov/content/pkg/FR-2021-01-27/pdf/2021-01922.pdf.

[33] The Proclamation contains several savings clauses directing action "to the extent permitted by law" and "consistent with applicable law." This language does not rehabilitate the Proclamation's unconstitutionality. *City and Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018) ("If "consistent with law" precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues").

Farm and across Texas and the rest of the United States southern border. Construction machinery was left to sit idle.[34]

**E.     DHS Prepared a Plan to Implement the Biden Policy that "[t]here will not be another foot of wall constructed."**

60.     The Proclamation directed DHS Secretary Mayorkas to "develop a plan for the redirection of funds concerning the southern border wall" within 60 days of January 20, 2021. That deadline came and went with no action. On June 9, 2021, a total of 141 days after the Proclamation, DHS finally released a cursory five-page plan.[35] The DHS Plan admitted that DHS had "suspended performance of all border barrier contracts and southwest border barrier construction activities" to remain "consistent" with President Biden's commitment that "no more American taxpayer dollars [should] be diverted to construct a border wall." Rather than using appropriations to fund construction of the border wall, the DHS Plan will use them to cover "delay costs and changes as a result of the suspension of contract performance." For example, the DHS Plan calls for the use of 2021 appropriations to pay an estimated "$275 million in cost overruns due to the existing suspension of contract performance." In other words, the DHS Plan entails diverting funds Congress appropriated specifically *to build the wall* towards payment of contractual penalties incurred by *not building the wall*.

61.     The DHS Plan also unlawfully calls for redirection of appropriated funds to "address" construction previously funded from the Treasury Forfeiture Fund or redirected from the Department of Defense ("DoD"). Rather than constructing border barriers as specified by the

---

[34] *See* Mia Jankowicz, *Biden's Order to Pause Construction on Trump's Border Wall Expires on March 20. Nobody Knows What Happens Next*, BUSINESS INSIDER (Mar. 16, 2021), https:// www.businessinsider.com/what-happen-end-biden-60-day-pause-border-wall-work-2021-3.

[35] DEP'T OF HOMELAND SECURITY, BORDER WALL PLAN PURSUANT TO PRESIDENTIAL PROCLAMATION 10142 (2021), https://www.dhs.gov/sites/default/files/publications/21_0611_dhs _security_border_wall_plan.pdf.

CAAs, the DHS Plan intends to use appropriated funds for "grading roads and cutting slopes to resolve drainage and ponding; addressing exposed rebar; and installing canal crossings." DHS also intends to redirect border wall funds to "remediate or mitigate environmental damage." The DHS Plan is clear that "[n]o new barrier construction work will occur on the DoD projects," contravening the intended purpose of the appropriations.

62.     The DHS Plan also provides for land acquired by the federal government for border wall construction to be "revest[ed]" with its prior owners, again indicating a lack of intent to use the funds for their appropriated purpose.

63.     However, the DHS Plan leaves little doubt that the environmental and other statutory waivers it previously granted, including in the Starr County and RGV-09 project area, remain valid and in effect as of the filing of this suit. Instead, DHS states that in the future, it "*may* rescind or revise waivers of environmental and other laws issued under IIRIRA," although it cites no statutory authorization that would permit it to rescind or revise these waivers. Nonetheless, the DHS Plan indicates that it will halt the border wall projects to comply with NEPA, despite having already waived that statute. The DHS Plan never explains the source of its statutory authority to halt border wall projects to comply with statutes that have been waived and are of no legal effect. The DHS Plan's attempt to "comply" with these statutes is a pretext to usurp the will of Congress and avoid spending the border wall appropriations on their intended purpose, all while citizens in these vulnerable border communities remain unprotected.

**F.     The Proclamation and DHS Plan Achieved a De Facto Cancellation of the Border Wall Projects in Pursuit of President Biden's Policy Goals.**

64.     The White House's June 11, 2021, press release discussing the DHS Plan reiterates that it is the product of a policy disagreement with the purpose for which Congress appropriated the funds. The Press release describes the DHS Plan as reaffirming President Biden's

"commitment to serious policy solutions," contrasting it with the "prior Administration's misplaced priorities."[36] It reiterates President Biden's prior contention that "[b]uilding a massive wall that spans the entire southern border and costs American taxpayers billions of dollars is not a serious policy solution or responsible use of Federal funds" and frames the cessation of border wall construction as a "policy solution" no less than *four* times.

65.     The press release concedes that Congress appropriated funds specifically "for border barrier projects," and grudgingly admits that "DHS is legally required to use the funds consistent with their appropriated purpose." Yet the press release states that the DHS will "prioritize the remaining border barrier funds to address urgent life, safety, and environmental issues," rather than use them to construct border barriers. It goes on to describe how rather than constructing border barriers, "appropriated funds could also be used for mitigating some environmental damage."

66.     There is little doubt what Defendants intend by "delaying" border wall projects to "comply" with environmental statutes that have already been waived, because the average NEPA environmental impact statement takes 4.5 years to prepare after a notice of intent is submitted.[37] Moreover, there is no indication that Defendants are even *attempting* to undertake that process with the goal of eventually building new border walls. Rather, Defendant's stated goals appear to be a pretext to entirely avoid building new border walls until the appropriations have lapsed.

---

[36] Press Release, OFFICE OF MGMT. AND BUDGET, Fact Sheet: Department of Defense and Department of Homeland Security Plans for Border Wall Funds (June 11, 2021), https://www.whitehouse.gov/omb/briefing-room/2021/06/11/fact-sheet-department-of-defense-and-department-of-homeland-security-plans-for-border-wall-funds/.

[37] Ex. 2, Executive Office of the President Council on Environmental Quality, Environmental Impact Statement Timelines (2010-2018), at p.1 (June 12, 2020).

67.     In prior litigation, DHS took the position that delaying the border wall projects would result in cost overruns that would leave them financially unviable. DHS supported that proposition with the testimony of United States Army Colonel from the Army Corps of Engineers, the agency that coordinates construction of border barrier projects. The Colonel's testimony demonstrates the impact that a 4.5-year delay (or even a much shorter one) will have on the border wall construction contracts. As the Colonel testified about other border wall contracts operating under the same regulations, Federal Acquisition Regulation Clause 52.242-14 entitles the contractor to "an adjustment for any increase in the cost of performance of the contract" caused by a delay or suspension of the contract.

68.     The Colonel described numerous costs that the federal government would be required to reimburse if the border wall contracts were halted:

> [T]hese costs are likely to include significant costs for equipment the contractor must keep ready to use at multiple locations, costs for security to keep the equipment and materials from being stolen or vandalized, labor costs for the personnel managing the contract, labor costs for the personnel who have been trained and are dedicated to execute the tasks under the contract (workers whom the contractor would be reluctant to release due to the risk of not being able to rehire them), and potential costs associated with storing construction materials. Further, there will likely be increased market prices on labor, materials, and equipment (*i.e.*, steel and concrete). . . . [T]he Corps will be obligated to reimburse these additional costs from funds that would otherwise be spent on barrier construction.[38]

Even worse, contractual delays can result in unobligated funds becoming unavailable for obligation,[39] and "[a]s a consequence, the Corps will be unable to complete the projects as planned, and the contracts will have to be significantly de-scoped or terminated."[40]

---

[38] Ex. 3, Decl. of Col. Eric McFadden at ¶ 13.

[39] *Id.* ¶ 7.

[40] *Id.* ¶ 10.

27

69.     With respect to the two contracts at issue in the prior DHS litigation, the Colonel testified that just those two contracts alone would result in expenses of $6,020,000 per each month of delay.[41] The Colonel testified that these "costs will quickly become unsustainable for the government" and "if the contracts remain suspended for more than six months, the Corps will likely need to consider termination."[42] The Colonel estimated the total cost to terminate just those two contracts at a range of $80,200,000 - $113,200,000.[43] The wholesale delay and cancellation of *all* border wall projects will no doubt result in costs substantially greater than cancelling just two contracts, exhausting funds that could have been used to build border barriers and that were appropriated for that purpose. DHS admits that this is already occurring, and that rather than constructing border barriers with its 2021 appropriations, it intends to use the to cover "contract suspension costs" and costs associated with "cancellation of border wall projects."[44]

70.     The effect of the Proclamation and DHS Plan is that the border wall projects will never be carried out. According to Border Chief Scott's letter to Congressional leaders, this is by design.[45] Border Chief Scott states that he "was briefed by USBP and CBP personnel with direct knowledge that leadership within the President Biden Administration openly discussed ways to slow roll any decisions as well as options to do the least action possible to avoid an Impoundment Act violation without doing any construction as required by law," with the reported cost of the intentional delays exceeding $5 million per day.[46] As Border Chief Scott points out, "[e]ven though

---

[41] *Id.* ¶ 19.

[42] *Id.* ¶ 19.

[43] *Id.* ¶ 13.

[44] Dkt. 18, Defs. Motion to Dismiss at ¶ 25.

[45] Ex. 1, Letter from Border Chief Rodney S. Scott.

[46] *Id.*

the [P]roclamation directed that all wall construction be paused for 60 days, overs seven months has passed with little progress toward any resolution," longer than the six-month cutoff at which the Colonel testified that termination would be considered.

71.     By the time DHS's "planning" process is complete, the appropriations will have either expired, or will have been paid out as delay and termination fees incurred as a direct result of the delays caused by the Proclamation and DHS Plan. Eschewing all subtlety, a DHS press release prepared during the pendency of this litigation "call[s] on Congress to cancel remaining border wall funding and instead fund smarter border security measures," bragging that its "activities will not involve any construction of new border barrier."[47] Defendants have implemented a plan to intentionally cancel the border wall projects, regardless of the detrimental effects on the citizens of Texas and the USA. In this way, Defendants have thwarted both the will of Congress expressed in the CAAs and the Constitution itself.

72.     In a recent interview, Secretary Mayorkas reiterated that the Biden Administration refused to use the appropriations to construct the border wall: "It is the policy of this administration, we do not agree with a building of the wall."[48]

**G.     The 2021 Border Surge Occurred Immediately Following the Proclamation.**

73.     Illegal border activity skyrocketed following the Proclamation and is breaking new records each month. In May 2021, CBP reported a record-breaking 180,034 enforcement

---

[47] DHS to Terminate Border Barrier Contracts in Laredo and Rio Grande Valley (Oct. 8, 2021), https://www.dhs.gov/news/2021/10/08/dhs-terminate-border-barrier-contracts-laredo-and-rio-grande-valley.

[48] Craig Torres, *Mayorkas Says U.S. Won't Protect Southern Border With Wall*, BLOOMBERG NEWS (Sept. 26, 2021), https://www.bloomberg.com/news/articles/2021-09-26/mayorkas-says-u-s-won-t-protect-southern-border-with-wall.

encounters, up 675 percent over May 2020.[49] Indeed, "[t]he US is on track to encounter more than 2 million migrants at the US-Mexico border by the end of the fiscal year, according to internal government estimates[,] marking a record high."[50]

74.     According to one border county sheriff, the unfinished wall has transformed the southwest border into a "crime scene," where numerous cartel groups cross through gaps in the fencing on a daily basis.[51] The 2021 border surge has been particularly concentrated in the RGV area, where 50,793 apprehensions occurred in May 2021, up a staggering *1,374 percent* over May 2020.[52] According to CBP, its RGV agents are "commonly encountering families and unaccompanied alien children being smuggled into the country in groups of more than 100."[53] Starr County has become inundated with illegal immigrant "stash houses."[54]

75.     The 2021 border surge has caused a public health and humanitarian crisis in Texas and across the U.S. "[M]ore than 8,600 CBP employees have tested positive for COVID-19, and

---

[49] U.S. CUSTOMS AND BORDER PROTECTION, *Southwest Land Border Encounters*, CBP.GOV: NEWSROOM: STATS AND SUMMARIES, https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters (last modified June 9, 2021).

[50] *See* Priscilla Alvarez, *US on Track to Encounter Record 2 Million Migrants on the Southern Border, Government Estimates Show*, CNN (Mar. 31, 2021), https://www.cnn.com/2021/03/31/politics/migrants-us-southern-border/index.html.

[51] Roman Chiarello, *Arizona Sheriff Says Biden Halting Border Wall Construction Left Area Wide Open for Cartels*, FOX NEWS (Mar. 5, 2021), https://www.foxnews.com/us/arizona-sheriff-biden-border-wall-construction-cartels.

[52] Molly Hennessy-Fiske, *U.S. Apprehensions of Migrants Crossing the Border are 5 Times Higher Than Last Year,* LA TIMES (June 10, 2021), https://www.latimes.com/world-nation/story/2021-06-10/u-s-apprehensions-of-migrants-crossing-border-continue-to-soar.

[53] U.S. CUSTOMS AND BORDER PROTECTION, *Three Groups of 100+ Illegally Enter in the Rio Grande Valley,* CBP.gov (Mar. 12, 2021), https://www.cbp.gov/newsroom/local-media-release/three-groups-100-illegally-enter-rio-grande-valley.

[54] U.S. CUSTOMS AND BORDER PROTECTION, *Discovery of Four Illegal Alien Stash Houses Results in 68 Arrests in the Rio Grande Valley, Texas,* CBP.gov (Feb. 12, 2021), https://www.cbp.gov/newsroom/local-media-release/discovery-four-illegal-alien-stash-houses-results-68-arrests-rio-grande?_ga=2.196750892.1401482266.1623786775-1333410004.1623786775.

31 have passed away."[55] As CBP states, "[e]ven with the spread of the COVID-19 virus, human smugglers continue to try these brazen attempts with zero regard for the lives they endanger nor to the health of the citizens of our great nation."[56]

76.    Frequent deaths occur where migrants have "drowned in the river and nearby canals or got lost on ranches and died of exposure and dehydration as they attempted to travel deeper into Texas."[57] The Border Patrol "has conducted multiple rescues of individuals, who were set adrift by smugglers. Groups are smuggled on inflatable rafts almost always exceeding the maximum capacity of the rafts, and rarely provided life vests."[58]

77.    Most shockingly, record-breaking numbers of children are being smuggled across the border without a parent or guardian, where they are "are often abandoned by smugglers in rural places near the border in hopes that a federal agent will find the child."[59] This trend has been documented in recent months with heartbreaking videos of small children left to fend for

---

[55] U.S. CUSTOMS AND BORDER PROTECTION, *CBP Announces April 2021 Operational Update*, CBP.gov (May 11, 2021), https://www.cbp.gov/newsroom/national-media-release/cbp-announces-april-2021-operational-update.

[56] U.S. CUSTOMS AND BORDER PROTECTION, *Three Groups of 100+ Illegally Enter in the Rio Grande Valley,* CBP.gov (Mar. 12, 2021), https://www.cbp.gov/newsroom/local-media-release/three-groups-100-illegally-enter-rio-grande-valley.

[57] Molly Hennessy-Fiske, *U.S. Apprehensions of Migrants Crossing the Border are 5 Times Higher Than Last Year,* LA TIMES (June 10, 2021), https://www.latimes.com/world-nation/story/2021-06-10/u-s-apprehensions-of-migrants-crossing-border-continue-to-soar.

[58] U.S. CUSTOMS AND BORDER PROTECTION, *Three Groups of 100+ Illegally Enter in the Rio Grande Valley,* CBP.gov (Mar. 12, 2021), https://www.cbp.gov/newsroom/local-media-release/three-groups-100-illegally-enter-rio-grande-valley.

[59] Anna Giaritelli, *Illegal Border Crossing Attempts Reach New High Under Biden: 180,000 in May,* YAHOO NEWS (June 9, 2021), https://www.yahoo.com/now/illegal-border-crossing-attempts-reach-215900861.html.

themselves in dangerous border locations as they scream and wail.[60] Defendant Mayorkas stated

that "the Department of Health and Human Services doesn't have the capacity to take in the current

number of children they're encountering."[61] FEMA is building "decompression centers" in Texas

to take more of the mass backlog of children out of border patrol custody.[62]

78.     The 2021 border surge is a direct result of the Proclamation. According to Border

Chief Scott, who was serving in the Biden Administration at the time of the Proclamation, the

"unprecedented seismic shift in border security and immigration policy that was initiated on

January 20, 2021" and the "associated public statements created the current border crisis."[63] Chief

Scott personally "witnessed a lack of any meaningful effort to secure our borders," and the Biden

Administration's team at DHS is laser-focused on migrants into the U.S. and downplaying the

significant vulnerability this creates for terrorists, narcotics smugglers, human traffickers, and even

hostile nations to gain access to our homeland."

79.     "Nearly all" border migrants across "dozens of interviews" with the Associated

Press said President Biden's "relatively pro-immigration positions influenced their thinking."[64]

Over 95 percent of CBP's 180,034 border encounters in May 2021 resulted from border crossings

---

[60] Greg Norman, *Migrant Boy, 5, Seen Screaming After Being Abandoned Along US-Mexico Border, Video Shows*, YAHOO NEWS (June 2, 2021), https://news.yahoo.com/migrant-boy-5-seen-screaming-130350256.html (follow "footage was captured" hyperlink).

[61] Rebecca Shabad & Julia Ainsley, *Southwest Border Crossings on Pace for Highest Levels in 20 Years, Biden Admin Says,* NBC NEWS (Mar. 16, 2021), https://www.nbcnews.com/politics/immigration/southwest-border-crossings-pace-highest-levels-20-years-biden-admin-n1261192.

[62] *Id.*

[63] Ex. 1, Letter from Border Chief Rodney S. Scott.

[64] Elliot Spagat, *Policy Changes Help Drive US Migrant Crossings to New* Highs, ASSOCIATED PRESS (Apr. 8, 2021), https://apnews.com/article/politics-honduras-mexico-immigration-border-patrols-363301dde17ae9da149a54d7885ac00c.

in unfenced areas.[65] The unfinished sections of the wall left by the Proclamation have become "convenient gateways" for illegal immigrants to enter the U.S. because "[s]mugglers send groups of asylum seekers through the gaps [in the fencing] to overwhelm the agents. When agents leave to intercept or apprehend one group, another group scampers across."[66] Another CBP agent described the construction freeze as "insane," going on to state that the "[t]he project is ¾ done. At least, they should be allowed to tie together the primary fence. Otherwise, we're trying to catch these people in the worst possible place. It's just sucking our manpower."[67]

80.     Border Chief Scott states that DHS's implementation of the Proclamation has "as a direct result" forced the U.S. Border Patrol "to reduce patrol areas to address gaps in barrier, non-functional gates and grates and inoperable technology."[68] His letter explains that "control of our borders has disintegrated overnight," and provides a troubling example of the chaos occurring at the border in a typical day:

> "Illegal entries are being scripted and controlled by Plaza Bosses that work directly for the transnational criminal organizations (TCO) to create controllable gaps in border security. These gaps are then exploited to easily smuggle contraband, criminals, or even potential terrorists into the U.S. at will. Even when USBP detects the illegal entry, agents are spread so thin that they often lack the capability to make a timely interdiction. . . . In a 24-hour period on 8/1/21, USBP documented over 5,900 encounters of individuals illegally entering the U.S. from 33 different countries. This included over 560 unaccompanied children. Agents also documented over 1100 got-a-ways. Of note, this is at a time when hundreds of miles of border went unpatrolled due to manpower and capacity limitations."

This chaos has directly harmed the GLO.

---

[65] Anna Giaritelli, *Illegal Border Crossing Attempts Reach New High Under Biden: 180,000 in May*, YAHOO NEWS (June 9, 2021), https://www.yahoo.com/now/illegal-border-crossing-attempts-reach-215900861.html.

[66] *See* William La Jeunesse, *Migrants Stream Through Gaps in Border Wall Following Biden's Order to Halt Construction*, FOX NEWS (Mar. 31, 2021), https://www.foxnews.com/politics/migrants-stream-through-gaps-in-border-wall-following-bidens-order-to-halt-construction.

[67] *Id.*

[68] Ex. 1, Letter from Border Chief Rodney S. Chief Scott.

**H.     The GLO Farm is Ground Zero for the 2021 Border Surge.**

81.     Starr County is in the heart of RGV, the hardest hit area of the nation, and the GLO Farm itself sits next to a completed segment of the wall that has funneled the already elevated levels of illegal activity to the GLO Farm. The GLO Farm has been burdened not only with the 1,374 percent increase in activity seen generally across the RGV, but also by the nearby wall segment diverting a disproportionate portion of the 2021 border surge across the GLO Farm.

82.     The 2021 border surge has transformed the GLO Farm into a superhighway of illegal activity. The GLO's tenant has a house located on-site, and one night at 2am received a knock at the door from a group of roughly 50 people who appeared to be illegal immigrants. The law enforcement presence is now constant, with agents located on the GLO Farm almost 24/7 and helicopters regularly flying overhead. At any given time, roughly two to five government vehicles are typically present patrolling the area. Groups of 100 people or more are frequently apprehended on the GLO Farm, where nearby buses are regularly stationed to haul them away by the busload. Farming operations have been impacted in several ways, including restricting the time frames that certain farming operations are or are not performed and the manner, method, and timing in which certain operations, such as the spraying of chemicals, are being conducted on the GLO Farm. Essential farm activities such as the sorting of crops can no longer be carried on at night due to security concerns.

83.     The 2021 border surge began on the GLO Farm in the middle of January 2021, at approximately the time of the Proclamation, and has increased in the months since. DHS claims that it intends to cancel all border barrier projects in the RGV sector, presumably including the contract for the RGV-09 project.[69] The 2021 border surge and failure to complete the RGV-09

---

[69] Dkt. 18, Defs. Motion to Dismiss at ¶ 31 n.3.

project resulting from the Proclamation and DHS Plan have diminished the value of the GLO farm, which has been severely impaired in its intended use by the illegal activity. The marketability, value, and quiet use and enjoyment of the GLO Farm have been damaged, and the GLO is at risk of realizing diminished rents should the border surge continue to divert illegal border traffic to the unfinished segment of the RGV-09 project that would have been built on the GLO Farm had the Proclamation not been issued.

84.     As a result, the GLO asserts injuries in its capacity as the landowner/administrator and landlord of the GLO Farm, which has been and continues to be harmed by the dramatic increase in illegal border crossings. These injuries are directly traceable to the Proclamation because a wall segment was scheduled to be built on the GLO Farm as part of the RGV-09 project, and the Proclamation and DHS Plan halted the RGV-09 project.

85.     These injuries would be redressed if the Proclamation is enjoined and the RGV-09 project continues. As discussed above, DHS has admitted that the already-completed border wall segments effectively divert and decrease the flow of illegal border activity. Moreover, the effects of the wall segment built on the property to the west of the GLO Farm have been observed firsthand. Completion of the wall on the GLO Farm would eliminate or drastically curtail the illegal border activity on the GLO Farm and redress the GLO's injuries.

## CLAIMS FOR RELIEF

## COUNT ONE—VIOLATION OF SEPARATION OF POWERS

86.     All preceding Paragraphs of this Complaint are hereby incorporated by reference.

87.     The Constitution creates a federal government of limited and enumerated powers, and this limitation applies to the Executive Branch. As the Supreme Court held in *Youngstown*, any action by the Executive Branch must be authorized either by a statutory delegation of authority

from Congress, enacted through bicameralism and presentment, or by one of the President's enumerated powers in Article II. 343 U.S. 579 (1952).

88.     "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City and Cnty. of San Francisco v. Trump,* 897 F.3d 1225, 1238 (9th Cir. 2018). When a President does so, he "violates the constitutional principle of the Separation of Powers." *Id.*

89.     Congress appropriated funds to construct the border wall in the 2018, 2019, 2020, and 2021 CAAs. President Biden has nonetheless acted to ensure that "[t]here will not be another foot of wall constructed in [his] administration," contrary to the expressed will of Congress.

90.     The Proclamation, including its determination that "no more American taxpayer dollars be diverted to construct a border wall" because "building a massive wall that spans the entire southern border is not a serious policy solution" is not authorized by statute. The Proclamation exceeds the Executive Branch's statutory and Constitutional authority in ordering the Secretary of Homeland Security (i) to "pause work on each construction project on the southern border wall," (ii) to "pause immediately the obligation of funds related to construction of the southern border wall," and (iii) to develop and implement a plan to redirect funds concerning the southern border wall, including terminating or repurposing contracts."

91.     The Proclamation is not authorized by any power granted to the President in Article II.

92.     By adopting and implementing a policy to halt border wall construction projects and prevent taxpayer dollars from being used to construct the border wall, the Proclamation and DHS Plan unconstitutionally and unlawfully seek to exercise quintessentially legislative powers that the Constitution vests exclusively in Congress. U.S. CONST. art. I, § 1.

93.     Any rescission or modification by DHS and Secretary Mayorkas of a previously granted IIRIRA waiver "to ensure expeditious construction" of border barriers as authorized by statute is a violation of the Separation of Powers where done to pursue policies that "[t]here will not be another foot of wall constructed" and that "no more American taxpayer dollars be diverted to construct a border wall," because the waiver of statutes is a quintessentially legislative function and Congress has not passed a law delegating to DHS the power to rescind IIRIRA waivers.

94.     Plaintiffs have a right of action to declare unlawful and enjoin unconstitutional executive action. *See Armstrong v. Exceptional Child Ctr. Inc.,* 135 S. Ct. 1378, 1384 (2015); *Franklin*, 505 U.S. at 801.

95.     Plaintiffs have suffered and will continue to suffer irreparable injury if this constitutional violation is not declared unlawful and enjoined, and Plaintiffs have no adequate remedy at law.

## COUNT TWO—VIOLATION OF APPROPRIATIONS CLAUSE

96.     All preceding Paragraphs of this Complaint are hereby incorporated by reference. The Constitution provides that "no Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. CONST. art. I, § 9, cl. 7.

97.     Congress's "power of the purse" has been described as the "most important single curb" on presidential authority because it vests the powers of public revenue and public expenditures with the people's representatives in Congress. EDWARD S. CORWIN, THE CONSTITUTION AND WHAT IT MEANS TODAY 134 (13th ed. 1975).

98.     In the absence of statutory authority to adopt and implement a policy halting border wall construction projects and preventing taxpayer dollars from being used to construct the border

wall, despite the lawful appropriation of funds for these projects by Congress, the Proclamation and DHS Plan have violated the Appropriations Clause.

99.    Any rescission or modification by DHS and Secretary Mayorkas of a previously granted IIRIRA waiver "to ensure expeditious construction" of border barriers as authorized by statute is a violation of the Appropriations Clause where Congress has appropriated funds for border barriers and the rescission or modification is done to pursue policies that "[t]here will not be another foot of wall constructed" and that "no more American taxpayer dollars be diverted to construct a border wall."

100.    Plaintiffs have a right of action to declare unlawful and enjoin unconstitutional executive action. *See Armstrong v. Exceptional Child Ctr. Inc.*, 135 S. Ct. 1378, 1384 (2015); *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

101.    Plaintiffs have suffered and will continue to suffer irreparable injury if this constitutional violation is not declared unlawful and enjoined, and Plaintiffs have no adequate remedy at law.

## COUNT THREE—VIOLATION OF TAKE CARE CLAUSE

102.    All preceding Paragraphs of this Complaint are hereby incorporated by reference.

103.    The Proclamation violates the President's constitutional duty to "take care that the Laws be faithfully executed . . . ." U.S. CONST. art. II, § 3, cl. 5. The Supreme Court has called this duty the President's "most important constitutional duty." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 577 (1992). This duty of "faithful" execution of the laws imposes on the President a duty to act in good faith in his execution of the laws.

104.    The President has failed to comply with the requirements and limitations of law that the Executive Branch is required to "faithfully execute," including the Consolidated

Appropriations Acts of 2018, 2019, 2020, and 2021, the IIRIRA, the Purpose Statute (31 U.S.C. § 1301(a)), the Transfer Statute (31 U.S.C. § 1532), and the Anti-Deficiency Act (31 U.S.C. § 1341(a)(1)(A)). Accordingly, the President's issuance of the Proclamation, as well as agency actions taken or directed to be taken under the Proclamation, including the DHS Plan, violate the Take Care Clause.

105.    Any rescission or modification by DHS and Secretary Mayorkas of a IIRIRA waiver previously granted "to ensure expeditious construction" of border barriers as authorized by statute is a violation of the Take Care Clause when done to pursue policies that "[t]here will not be another foot of wall constructed" and that "no more American taxpayer dollars be diverted to construct a border wall."

106.    Plaintiffs have a right of action to declare unlawful and enjoin unconstitutional executive action. *See Armstrong v. Exceptional Child Ctr. Inc.*, 135 S. Ct. 1378, 1384 (2015); *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

107.    Plaintiffs have suffered and will continue to suffer irreparable injury if this constitutional violation is not declared unlawful and enjoined, and Plaintiffs have no adequate remedy at law.

### COUNT FOUR—VIOLATION OF PRESENTMENT CLAUSE

108.    All preceding Paragraphs of this Complaint are hereby incorporated by reference.

109.    The Constitution's Presentment Clause requires that when Congress passes an appropriations bill, the President has only two options: he must sign it, or return it with his objections so that Congress may consider them. U.S. CONST. art. I, § 7, cl. 2.

110.    Instead of following this mandatory requirement, President Biden has purported to modify or partially repeal the CAAs through the Proclamation.

111.    The GLO has suffered and will continue to suffer irreparable injury if this constitutional violation is not declared unlawful and enjoined, and the GLO has no adequate remedy at law.

112.    Plaintiffs have a right of action to declare unlawful and enjoin unconstitutional executive action. *Armstrong v. Exceptional Child Ctr. Inc.*, 135 S. Ct. 1378, 1384 (2015); *Franklin v. Massachusetts*, 505 U.S. 788, 801 (1992).

### COUNT FIVE—VIOLATION OF BUDGETARY STATUTES

113.    All preceding Paragraphs of this Complaint are hereby incorporated by reference.

114.    Congress appropriated funds to construct the border wall in the 2018, 2019, 2020, and 2021 CAAs. The 2019 CAA contains appropriations specifically for the construction of the border wall in the RGV sector, including Starr County. The RGV-09 project on the GLO Farm was funded from 2019 appropriations, and appropriated funds from the 2020 and 2021 CAAs also would have been available for the RGV-09 project but for the Proclamation.

115.    Enactment of the Proclamation to fulfill President Biden's policy that "[t]here will not be another foot of wall constructed in [his] administration" violated each of the CAAs, which expressly dedicated appropriations to border wall construction. The Proclamation denies funds from projects Congress chose to fund.

116.    Section 739 of the 2019 CAA prohibits the use of appropriated funds "to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act." § 739, 133 Stat. at 197.

117.    The DHS Plan violates Section 739 of the 2019 CAA by redirecting funds appropriated for border barrier construction to other projects and uses. Most egregiously, the DHS

Plan will redirect funds intended to pay for border barrier *construction* to pay for "delay costs and changes as a result of the suspension of contract performance" that directly resulted from the Proclamation. The DHS Plan also provides for the diversion of border barrier funds to "remediate environmental damage," while indicating that "no new barrier construction work will occur." Section 739 of the 2019 CAA leaves no doubt that a new appropriations bill must be passed to redirect the border wall funds in this manner.

118.    The DHS Plan also violates Section 739 of the 2019 CAA by redirecting appropriated funds to projects previously funded from the Treasury Forfeiture Fund or redirected from DoD funds. With respect to the 2019 CAA and the RGV-09 project, this violates Section 739 because the 2019 CAA specifically appropriates funds for the construction of border walls in the RGV sector, yet the programs the DHS Plan would redirect these appropriations to are located in different areas and would not result in new barrier construction as Congress intended. The DHS Plan cannot redirect appropriated funds from the RVG-09 project to other programs without the passage of a new appropriations bill.

119.    The above violations also represent violations of the Purpose Statute (31 U.S.C. § 1301(a)), which prevents appropriated funds from being used for purposes other than that for which they were appropriated. They likewise represent violations of the Transfer Statute (31 U.S.C. § 1532), which prohibits transfer of funds from one account to another, unless authorized by statute. The diversion of border wall funds appropriated through the 2019 CAA to Treasury Forfeiture Fund or DoD projects would also violate the Anti-Deficiency Act (31 U.S.C. § 1341(a)(1)(A)).

120.    Plaintiffs sue under the above-listed statutes, under the Administrative Procedure Act for violations of the above-listed statutes, and also have a non-statutory right of action to enjoin

41

and declare unlawful official action that is *ultra vires*.

121.    Plaintiffs have suffered and will continue to suffer irreparable injury if the above violations are not declared unlawful and enjoined, and the Plaintiffs have no adequate remedy at law.

### COUNT SIX—VIOLATION OF AGENCY STATUTES

122.    All preceding Paragraphs of this Complaint are hereby incorporated by reference.

123.    No federal statute confers upon DHS the authority to pursue policies that ensure "[t]here will not be another foot of wall constructed" and that "no more American taxpayer dollars [should] be diverted to construct a border wall." In fact, the IIRIRA requires DHS to "install additional physical barriers" to "deter illegal crossings in areas of high illegal entry into the United States." Pub. L. No. 104-208, § 102(a), 110 Stat. 3009-546, 3009-554 (1996). Congress's policy rationale underlying the grant of DHS's authority to waive "laws that might impede the *expeditious* construction of security infrastructure along the border" was to *speed up* border wall construction. H.R. REP. 109-72, at 171 (May 3, 2005). The REAL ID Act of 2005, Pub. L. No. 109-13, § 102, 119 Stat. 231, 302, 306.

124.    Under the Constitution, the President lacks the authority to direct federal officers or agencies to act in derogation of federal statutes. Through its policy determination that "no more American taxpayer dollars be diverted to construct a border wall" because "building a massive wall that spans the entire southern border is not a serious policy solution," the Proclamation intrudes upon the statutory authority conferred on DHS, an independent federal agency. The Proclamation's broad mandates that the Secretary of Homeland Security (i) "pause work on each construction project on the southern border wall," (ii) "pause immediately the obligation of funds related to construction of the southern border wall," and (iii) develop and implement a plan to

redirect funds concerning the southern border wall, including terminating or repurposing contracts, each intruded upon the statutory authority delegated to DHS.

125.     In promulgating the DHS Plan, DHS and Secretary Mayorkas acted contrary to DHS's statutory mandates and delegations of authority. Rather than prioritizing border security and "expeditiously" constructing barriers as the law requires, the DHS Plan diverts duly appropriated funds *away* from border barrier construction to pursue President Biden's political agenda, contrary to the intended purpose of the appropriations and the Constitution.

126.     Rather than "expeditiously" constructing border barriers, the DHS Plan intends to use funds appropriated for border barrier *construction* to pay contractual penalties resulting from construction delays caused by the Proclamation, all to pursue President Biden's policy that "[t]here will not be another foot of wall constructed."

127.     Moreover, the DHS Plan relies on a purported need to undertake a lengthy statutory environmental compliance process in order to delay border barrier construction, such that no construction will ever occur because contractual penalties from the delays exhaust the appropriations. However, pursuant to the IIRIRA, DHS has already waived NEPA and other statutes the DHS Plan purports to comply with as a pretext to prevent new wall segments from being built. These statutes represent an artificial, manufactured impediment to border barrier construction, rather than an actual one.

128.     Although the DHS Plan speculates that in the future, it "*may* rescind or revise waivers of environmental and other laws issued under IIRIRA," it has not yet done so. And because those laws are not in effect (and have been waived specifically in the area of the RGV-09 Project), DHS and Secretary Mayorkas cannot rely on them to delay the RGV-09 Project.

129.     Moreover, while the IIRIRA granted DHS discretion to waive these statutes "to

43

ensure expeditious construction" of barriers, the IIRIRA does not grant DHS any authority to rescind or narrow a previously granted waiver, and certainly not to fulfill a policy of *preventing* border barrier construction, which is the exact opposite of Congress's rationale in delegating waiver authority to DHS.

130.    IIRIRA authorizes such a waiver in conjunction with the statutory directive that the Secretary of Homeland Security "take such actions as may be necessary" to install "physical barriers" on the "United States border to deter illegal crossings in areas of high illegal entry into the United States." IIRIRA § 102(a). That statutory mandate includes a directive requiring DHS to "construct reinforced fencing along not less than 700 miles of the southwest border." *Id.* § 102(b)(1)(A).

131.    The Proclamation and DHS Plan are therefore *ultra vires*.

132.    Plaintiffs sue under the above-listed statutes, under the Administrative Procedure Act for violations of the above-listed statutes, and also have a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*.

133.    Plaintiffs have suffered and will continue to suffer irreparable injury if this constitutional violation is not declared unlawful and enjoined, and Plaintiffs have no adequate remedy at law.

## COUNT SEVEN—SUBSTANTIVE VIOLATION OF THE APA

134.    All preceding Paragraphs of this Complaint are hereby incorporated by reference.

135.    The GLO has a right of action to declare unlawful and enjoin final agency action in violation of the Administrative Procedure Act. 5 U.S.C. § 702.

136.    The DHS is a federal agency subject to the requirements of the APA. 5 U.S.C. § 706.

137.    The APA requires courts to hold unlawful and set aside any agency action that is

"(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2).

138.    The DHS Plan is an agency rule within the meaning of the APA. The DHS Plan outlines final agency actions within the meaning of the APA, and DHS has taken concrete actions to implement the DHS Plan.

139.    Prior to the DHS Plan, in implementing the Proclamation, DHS took additional final agency actions within the meaning of the APA, including pausing work on all border wall construction projects and pausing obligation of funds to border wall contracts. These were final agency actions to the extent they caused DHS to incur contractual penalties and delay costs that have and will divert appropriated funds away from the construction of the border wall.

140.    The DHS Plan and other acts taken to implement the Proclamation were major agency actions that could not lawfully be conducted without compliance with the APA.

141.    Neither the statutes from which the DHS derives authority nor the APA confers upon DHS the authority to pursue policies that "[t]here will not be another foot of wall constructed" and that "no more American taxpayer dollars [should] be diverted to construct a border wall," and take final agency actions based thereon. The various statutory frameworks from which DHS draws its authority to construct border barriers require the DHS to determine border barrier locations based on a policy of *securing* the border, rather than the factors set forth in the Proclamation and DHS Plan.

142.    The Proclamation directs DHS and Secretary Mayorkas to exercise their delegated authority in ways that are arbitrary, capricious, an abuse of discretion, contrary to the Constitution and the governing statutes, and in violation of the APA. The DHS and Secretary Mayorkas cannot

implement the Proclamation without violating the APA and statutes from which they derive their authority. By requiring DHS engaged to consider and take final action or to withhold final action based on factors that are impermissible and arbitrary under the governing statutes, the Proclamation purports to amend the statutes through which Congress has delegated rulemaking authority to federal agencies.

143.    Moreover, the DHS Plan itself violates the APA, the statutes from which the DHS derives its authority, and budgetary statutes as set forth in Count Five herein. The actions of DHS and Secretary Mayorkas are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right, power, privilege or immunity," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and *ultra vires*. 5 U.S.C. § 706. DHS and Secretary Mayorkas entirely abdicated their statutory mandates and responsibilities to consider border security and the current border crisis in preparing the DHS Plan, halting all border wall construction, and halting the obligation of border wall funds, and they failed to adequately explain and justify their actions.

144.    The DHS Plan and its implementation also violate the Constitutional separation of powers as alleged in Count I above and the Appropriations Clause as alleged in Count II above. The GLO has an interest in reinforcing "structural separation of powers principles under the APA." *Trump,* 963 F.3d at 943.

145.    The GLO has suffered and will continue to suffer irreparable injury if the above violations are not declared unlawful and enjoined, and the GLO has no adequate remedy at law.

### COUNT EIGHT—PROCEDURAL VIOLATION OF APA

146.    All preceding Paragraphs of this Complaint are hereby incorporated by reference.

147.    The DHS is a federal agency subject to the requirements of the APA. 5 U.S.C. § 706.

148.     The DHS Plan is an agency rule within the meaning of the APA. The DHS Plan outlines final agency actions within the meaning of the APA, and DHS has taken concrete actions to implement the DHS Plan.

149.     Prior to the DHS Plan, in implementing the Proclamation, DHS took additional final agency actions within the meaning of the APA, including pausing work on all border wall construction projects and pausing obligation of funds to border wall contracts. These were final agency actions to the extent they caused DHS to incur contractual penalties and delay costs that have and will divert appropriated funds away from the construction of the border wall.

150.     The DHS Plan and other acts taken to implement the Proclamation were major agency actions thatcould not lawfully be conducted without compliance with APA procedures such as notice-and- comment rulemaking.

151.     Under the APA, a rule is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency and includes the approval or prescription for the future of rates, wages, corporate or financial structures or reorganizations thereof, prices, facilities, appliances, services or allowances therefor or of valuations, costs, or accounting, or practices bearing on any of the foregoing."  5 U.S.C. § 551(4).

152.     The adoption and promulgation of the DHS Plan and the other actions taken by DHS to implement the Proclamation did not comply with APA procedural requirements such as notice-and-comment rulemaking, and thus the agency action is invalid and void under the APA.

### COUNT NINE—VIOLATION OF REGULATORY FLEXIBILITY ACT

153.     All preceding Paragraphs of this Complaint are hereby incorporated by reference.

154.     The Regulatory Flexibility Act ("RFA") requires governmental agencies to prepare

and make available for public comment an initial and final regulatory flexibility analysis prior to issuing rules, regulations, guidance and interpretations. 5 U.S.C. § 603(a). An agency can avoid performing a flexibility analysis if the agency's top official certifies that the rule will not have a significant economic impact on a substantial number of small entities. *Id.* § 605(b). The certification must include a statement providing the factual basis for the agency's determination that the rule will not significantly impact small entities. *Id.*

155.    Prior to issuing the DHS Plan, the DHS and Secretary Mayorkas failed to prepare and make available for public comment an initial and final regulatory flexibility analysis as required by the RFA. 5 U.S.C. § 603(a). Defendants also failed to prepare, or even attempt to prepare, a certification in lieu of a regulatory flexibility analysis. *Id.* § 605(b). The Court should therefore declare the DHS Plan unlawful, set it aside, and enjoin further actions to implement the DHS Plan.

## PRAYER

WHEREFORE, the GLO asks this Court to enter an order and a judgment:

a.    Declaring that the Proclamation, the DHS Plan, and actions taken by Secretary Mayorkas and DHS to implement the Proclamation and DHS Plan unconstitutionally purport to exercise legislative powers and violate the Constitution's separation of powers, the Appropriations Clause, the Take Care Clause, and Presentment Clause, and enjoining further constitutional violations.

b.    Declaring that the Proclamation, the DHS Plan, and actions taken by Secretary Mayorkas and DHS to implement the Proclamation and DHS Plan violated the budgetary statutes set forth herein, including the CAAs of 2018, 2019, 2020, and 2021

(including Section 739 of the 2019 CAA), the Purpose Statute, the Transfer Statute, and the Anti-Deficiency Act, and enjoining future violations of said statutes;

c.     Declaring that the DHS and Secretary Mayorkas violated the procedural requirements of the APA and RFA, and that the DHS Plan is arbitrary, capricious, unreasonable, and contrary to law;

d.     Enjoining DHS and Secretary Mayorkas from taking unlawful actions to implement the Proclamation and DHS Plan;

e.     Enjoining DHS and Secretary Mayorkas from stopping work on border wall contracts or allocation of funds thereto, including with respect to the RGV-09 Project and GLO farm;

f.     Enjoining DHS and Secretary Mayorkas from reallocating or otherwise diverting funds appropriated and/or obligated for border wall construction projects in Texas, including with respect to the RGV-09 Project and GLO Farm, and enjoining DHS from permitting border wall appropriations to expire or be used for non-appropriated purposes;

g.     Enjoining DHS and Secretary Mayorkas from diverting funds appropriated for the construction of border walls in Texas, including with respect to the RGV-09 Project and GLO Farm, to other projects, including DoD projects or Treasury Forfeiture Funds projects, and to other uses that do not involve the construction of border barriers;

h.     Enjoining DHS and Secretary Mayorkas from rescinding IIRIRA waivers previously granted, or reducing or restricting their scope in any way, including with respect to area of the RGV-09 Project and GLO Farm, or in the alternative, enjoining them from doing

so without complying with the notice and comment requirements of the APA and the

consultation requirements of IIRIRA Section 102(b);

i.      Awarding the GLO its reasonable costs of litigation, including reasonable attorneys'

fees, expert fees, and costs;

j.      Granting all such other relief that the court deems just and proper.

Respectfully Submitted,

By:*/s/ Donato D. Ramos*
DONATO D. RAMOS
Texas Bar No. 16508000
S.D. Tex. Bar No.: 563276
mrodriguez@ddrlex.com
DONATO D. RAMOS, JR.
Texas Bar No. 24041744
S.D. Tex. Bar No.: 559771
donatoramosjr@ddrlex.com
LAW OFFICES OF DONATO D. RAMOS PLLC
6721 McPherson Road, Suite 250
Laredo, Texas 78041
Telephone: (956) 722-9909
Facsimile:  (956) 727-5884

*/s/ Cory R. Liu*
CORY R. LIU
Texas Bar No. 24098003
S.D. Tex. Bar No.: 3047640
cliu@ashcroftlawfirm.com
AUSTIN R. NIMOCKS
Texas Bar No. 2972032
S.D. Tex. Bar No.: 2972032
animocks@ashcroftlawfirm.com
ASHCROFT LAW FIRM LLC
919 Congress Ave., Ste. 1325
Austin, Texas 78701
Telephone: (512) 370-1800
Facsimile:  (512) 727-5884

***Counsel for Plaintiffs Texas General Land Office and Commissioner George P. Bush***

## CERTIFICATE OF CONFERENCE

I certify that on December 15, 2021, Plaintiffs' counsel conferred with counsel for Defendants. Counsel for Defendants provided written consent to the filing of this Amended Complaint, as reflected in the Unopposed Joint Motion for Revised Scheduling Order. Dkt. 29.

*/s/ Cory R. Liu*
*Cory R. Liu*

## CERTIFICATE OF SERVICE

I hereby certify that on December 22, 2021, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

*/s/ Cory R. Liu*
Cory R. Liu