**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | |
|---|---|
| THE GENERAL LAND OFFICE OF THE STATE OF TEXAS, and GEORGE P. BUSH, in his official capacity as Commissioner of the Texas General Land Office,<br><br>        Plaintiffs,<br><br>      v.<br><br>JOSEPH R. BIDEN JR., in his official capacity as President of the United States; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; and ALEJANDRO MAYORKAS, in his official capacity as Secretary of the Department of Homeland Security,<br><br>        Defendants. | No. 7:21-cv-00272 |

| | |
|---|---|
| THE STATE OF MISSOURI; THE STATE OF TEXAS,<br><br>        Plaintiffs,<br><br>      v.<br><br>JOSEPH R. BIDEN, in his official capacity as President of the United States, *et al.*<br><br>        Defendants. | No. 7:21-cv-00420<br>(formerly No. 6:21-cv-00052)<br>Hon. Micaela Alvarez |

**FEDERAL GOVERNMENT DEFENDANTS' MOTION TO DISMISS THE**
**AMENDED COMPLAINT BY *GENERAL LAND OFFICE* PLAINTIFFS**

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................................1

BACKGROUND .....................................................................................................................4

I.   DHS's Statutory Authority to Construct Border Infrastructure and Undertake
     Environmental Planning .............................................................................................4

II.  Congressional Appropriations to DHS for Border Infrastructure and Environmental
     Planning.......................................................................................................................6

III. President Trump's Efforts to Obtain Additional Border Wall Funding Beyond
     Congress's Appropriations to DHS ............................................................................8

IV.  President Biden's Proclamation Terminating the National Emergency at the
     Southern Border and Directing Agencies to Develop Border Wall Funding Plans..................10

V.   The DoD and DHS Border Wall Plans .....................................................................10

     A.   DHS Fiscal Year 2017-2020 Funds .................................................................11

     B.   DHS Fiscal Year 2021 Funds ..........................................................................12

     C.   Treasury Forfeiture Fund .................................................................................12

VI.  The GLO Farm and the RGV-09 Border Infrastructure Project ..............................12

VII. GLO and Texas Build Their Own Border Wall on the GLO Farm..........................13

VIII. GLO's Alleged Injuries and Claims .......................................................................14

STANDARD OF REVIEW ...................................................................................................15

ARGUMENT ........................................................................................................................17

I.   GLO Lacks Article III Standing to Challenge DHS's Border Barrier Policies...........17

II.  The President Should Be Dismissed From This Action as to All Counts. ................21

III. GLO Lacks a Cause of Action to Assert its Statutory Claims in Counts V–VII......24

     A.   GLO Lacks a Private Right of Action Directly Under the Statutes It Invokes...........24

     B.   GLO Falls Outside the Zone of Interests of Each Appropriations Statute It
          Invokes. .....................................................................................................25

IV.  GLO's Claims Under the APA Are Either Unreviewable or Meritless (Counts VII &
     VIII). ..............................................................................................................31

i

A.     Decisions As to How to Spend Funds Appropriated by Congress Are Committed to Agency Discretion as a Matter of Law (Counts VII & VIII). ...............31

B.     GLO Cannot Raise a Programmatic Challenge to Defendants' Management of the Border Wall Program. ...........................................................................35

C.     There Is No Procedural Violation of the APA Because the DHS Plan Is Exempt from Notice and Comment Rulemaking (Count VIII). .....................37

V.     GLO's Regulatory Flexibility Act Claim Fails (Count IX) ...................................39

VI.    DHS Has Not Violated IIRIRA or Appropriations Statutes (Counts V–VII)..........41

A.     DHS Has Not Violated IIRIRA (Count VI). ..........................................43

B.     DHS Has Not Acted Contrary to Its Congressional Appropriations. ...........44

C.     DHS Has Not Violated Section 739 of the 2019 Consolidated Appropriations Act. ........................................................................48

D.     DHS Has Not Violated Any Other Appropriations Statute. ......................49

VII.   GLO's Constitutional Claims Should be Dismissed (Counts I–IV). ......................50

CONCLUSION ...........................................................................................54

# TABLE OF AUTHORITIES

<u>**Cases**</u>

*Ala. ex rel. Baxley v. Woody,*
   473 F.2d 10 (5th Cir. 1973) ........................................................................................16

*Allied Local and Reg'l Mfrs. Caucus v. EPA,*
   215 F.3d 61 (D.C. Cir. 2000) .....................................................................................41

*Am. Inst. of Certified Pub. Accountants v. Internal Revenue Serv.,*
   746 F. App'x 1 (D.C. Cir. 2018) ...............................................................................30

*Arizonans for Off. Eng. v. Arizona,*
   520 U.S. 43 (1997).....................................................................................................20

*Arpaio v. Obama,*
   797 F.3d 11 (D.C. Cir. 2015) .....................................................................................19

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009)...................................................................................................16

*Association of Data Processing Serv. Orgs., Inc. v. Camp,*
   397 U.S. 150 (1970)...................................................................................................25

*Baker v. Carr,*
   369 U.S. 186 (1962)...................................................................................................53

*Barlow v. Collins,*
   397 U.S. 159 (1970)...................................................................................................42

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.,*
   502 U.S. 32 (1991).....................................................................................................42

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007)............................................................................................16, 19

*Bennett v. Spear,*
   520 U.S. 154 (1997)...................................................................................................25

*Biden v. Sierra Club,*
   ___S. Ct.___, 2021 WL 2742775 (U.S. July 2, 2021) ...............................................9

*Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh,*
   295 F.3d 28 (D.C. Cir. 2002) ...........................................................................51, 52, 54

*Block v. Cmty. Nutrition Inst.,*
   467 U.S. 340 (1984)...................................................................................................31

5Border Infrastructure Envtl. Litig. v. U.S. Dep't of Homeland Sec.,
915 F.3d 1213 (9th Cir. 2019)................................................................................6

Boston Stock Exch. v. State Tax Comm'n,
429 U.S. 318 (1977) ..............................................................................25, 50

Bowsher v. Synar,
478 U.S. 714 (1986) ...............................................................................28

Brown Exp., Inc. v. United States,
607 F.2d 695 (5th Cir. 1979) ..................................................................38

Brown v. Gardner,
513 U.S. 115 (1994) ...............................................................................40

California v. Texas,
141 S. Ct. 2104 (2021)............................................................................17

CASA de Md., Inc. v. Trump,
355 F. Supp. 3d 307 (D. Md. 2018)........................................................24

Centro Presente v. U.S. DHS,
332 F. Supp. 3d 393 (D. Mass. 2018).....................................................24

Chamber of Com. of the U.S. v. Reich,
74 F.3d 1322 (D.C. Cir. 1996)................................................................23

City of L.A. v. Lyons,
461 U.S. 95 (1983)..................................................................................18

Clapper v. Amnesty Int'l USA,
568 U.S. 398 (2013) .........................................................................17, 20

Clarke v. Sec. Indus. Ass'n,
479 U.S. 388 (1987) ...............................................................................26

Cleveland Assets, LLC v. United States,
132 Fed. Cl. 264 (2017) .........................................................................27

Cleveland Assets, LLC v. United States,
883 F.3d 1378 (Fed. Cir. 2018) .............................................................27

Clinton v. City of N.Y.,
524 U.S. 417 (1998) ...............................................................................54

Cnty. of El Paso v. Chertoff,
No. EP-08-CA-196-FM, 2008 WL 4372693 (W.D. Tex. Aug. 29, 2008).........................6, 45

*Cornerstone Christian Schs. v. Univ. Interscholastic League,*
  563 F.3d 127 (5th Cir. 2009)............................................................................15

*Ctr. for Biological Diversity v. McAleenan,*
  404 F. Supp. 3d 218 (D.D.C. 2019)..................................................................25

*Ctr. for Biological Diversity v. Trump,*
  453 F. Supp. 3d 11 (D.D.C. 2020)...............................................................22, 51

*Dalton v. Specter,*
  511 U.S. 462 (1994) ................................................................................*passim*

*Data Sys. Corp. v. Webster,*
  744 F.2d 197 (D.C. Cir. 1984)..........................................................................46

*Doe v. Trump,*
  319 F. Supp. 3d 539 (D.D.C. 2018)..................................................................22

*El Paso Cnty. v. Trump,*
  982 F.3d 332 (5th Cir. 2020), *cert. denied sub nom.*
  *El Paso Cnty. v. Biden*, 141 S. Ct. 2885 (2021) ...............................................9

*Ellison v. Connor,*
  153 F.3d 247 (5th Cir. 1998).............................................................................16

*Exxon Chemicals Am. v. Chao,*
  298 F.3d 464 (5th Cir. 2002).............................................................................42

*Franklin v. Massachusetts,*
  505 U.S. 788 (1992) ..........................................................................21, 22, 23, 53

*Gentile v. SEC,*
  974 F.3d 311 (3d Cir. 2020)..............................................................................34

*Glass Packaging Inst. v. Regan,*
  737 F.2d 1083 (D.C. Cir. 1984)....................................................................27, 29

*Gonzaga Univ. v. Doe,*
  536 U.S. 273 (2002) .........................................................................................24

*Green v. Forney Eng'g Co.,*
  589 F.2d 243 (5th Cir. 1979).............................................................................16

*Guidry v. Bank of LaPlace,*
  954 F.2d 278 (5th Cir. 1992).............................................................................16

*Gunpowder Riverkeeper v. FERC,*
  807 F.3d 267 (D.C. Cir. 2015)..........................................................................29

*Harrington v. Schlesinger,*
    528 F.2d 455 (4th Cir. 1975) ................................................................52

*Hawaii v. Trump,*
    859 F.3d 741 (9th Cir. 2017) ................................................................22

*Heckler v. Chaney,*
    470 U.S. 821 (1985) ................................................................*passim*

*Horizon Air Indus., Inc. v. Nat'l Mediation Bd.,*
    232 F.3d 1126 (9th Cir. 2000) ................................................................42

*I.N.S. v. Chadha,*
    462 U.S. 919 (1983) ................................................................54

*In re Border Infrastructure Env't Litig.,*
    284 F. Supp. 3d 1092 (S.D. Cal. 2018) ................................................................6

*Int'l Refugee Assistance Project v. Trump,*
    857 F.3d 554 (4th Cir. 2017) ................................................................22

*Jaxson v. Saul,*
    970 F.3d 775 (7th Cir. 2020) ................................................................39

*Kokkonen v. Guardian Life Ins. Co. of Am.,*
    511 U.S. 375 (1994) ................................................................16

*La Posta Band of Diegueno Mission Indians of La Posta Reservation. v. Trump,*
    828 F. App'x 489 (9th Cir. 2020) ................................................................9

*Leedom v. Kyne,*
    358 U.S. 184 (1958) ................................................................42

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
    572 S. Ct. 1377 (2014) ................................................................25, 30

*Lincoln v. Vigil,*
    508 U.S. 182 (1993) ................................................................*passim*

*Lujan v. National Wildlife Fed'n,*
    497 U.S. 871 (1990) ................................................................30, 36

*Lujan v. Defs. of Wildlife,*
    504 S. Ct. 2130 (1992) ................................................................18

*Maine Cmty. Health Options v. United States,*
    140 S. Ct. 1308 (2020) ................................................................7

*Match-E-Be-Nash-She-Wish  Band of Pottawatomi Indians v. Patchak*,
    567 U.S. 209 (2012) ............................................................................25, 26, 40

*Miccosukee Tribe of Indians of Fla. v. United States*,
    No. 08-23523-CIV, 2009 WL 10668917 (S.D. Fla. Sept. 30, 2009) ........................27

*Milk Train, Inc. v. Veneman*,
    310 F.3d 747 (D.C. Cir. 2002) ................................................................................33

*Mississippi  v. Johnson*,
    71 U.S. 499 (1867) ..........................................................................................22, 53

*Moses  v. Banco Mortg. Co.*,
    778 F.2d 267 (5th Cir. 1985) ..................................................................................26

*Myers v. United States*,
    272 U.S. 52 (1926) ..................................................................................................51

*Nat'l Treasury Emp. Union v. Campbell*,
    654 F.2d 784 (D.C. Cir. 1981) ................................................................................28

*Navajo Ref. Co. v. United States*,
    58 Fed. Cl. 200 ......................................................................................................40

*Nevada v. Dep't of Energy*,
    400 F.3d 9 (D.C. Cir. 2005) ....................................................................................46

*New York v. Trump*,
    485 F. Supp. 3d 422 ..............................................................................................23

*Newdow v. Bush*,
    391 F. Supp. 2d 95 (D.D.C. 2005) ..........................................................................23

*Newdow v. Roberts*,
    603 F.3d 1002 (D.C. Cir. 2010) ..............................................................................22

*Nixon v. Fitzgerald*,
    457 U.S. 731 (1982) ..............................................................................................21

*Nken v. Holder*,
    556 U.S. 418 (2009) ..............................................................................................28

*Norton v. Southern Utah Wilderness  Alliance*,
    542 U.S. 55 (2004) ..........................................................................................36, 37

*Nyunt v. Chairman, Broad. Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009) ................................................................................42

*Off. of Personnel Mgmt. v. Richmond,*
  496 U.S. 414 (1990) ..................................................................................................52

*Pac. Gas & Elec. Co. v. Fed. Power Comm'n,*
  506 F.2d 33 (D.C. Cir. 1974) ....................................................................................38

*Perez v. Mortg. Bankers Ass'n,*
  575 U.S. 92 (2015)......................................................................................................37

*Prof'ls & Patients for Customized Care v. Shalala,*
  56 F.3d 592 (5th Cir. 1995) ..................................................................................38, 39

*Pub. Citizen v. Stockman,*
  528 F. Supp. 824 (D.D.C. 1981)................................................................................27

*Puerto Rico v. United States,*
  490 F.3d 50 (1st Cir. 2007) .......................................................................................42

*Saget v. Trump,*
  345 F. Supp. 3d 287 (E.D.N.Y. 2018) ......................................................................24

*Sierra Club v. Peterson,*
  228 F.3d 559 (5th Cir.2000) ......................................................................................15

*Sierra Club v. Trump,*
  963 F.3d 874 (9th Cir.), cert. granted, 141 S. Ct. 618 (2020) ....................................9

*Sierra Club v. Trump,*
  977 F.3d 853 (9th Cir. 2020), *cert. granted and vacated and remanded sub nom. Biden v. Sierra Club,* ___S.
  Ct.____, 2021 WL 4507558 (U.S. Oct. 4, 2021) ........................................................9

*State of Alabama v. Centers For Medicare & Medicaid Servs.,*
  No. 2:08-CV-881-MEF-TFM, 2010 WL 1268090 (M.D. Ala. Mar. 30, 2010)....................40

*Steel Co. v. Citizens for a Better Env't,*
  523 U.S. 83 (1998)................................................................................................16, 20

*Stone v. INS,*
  514 U.S. 386 (1995) ...................................................................................................40

*Swan v. Clinton,*
  100 F.3d 973 (D.C. Cir. 1996)..............................................................................22, 23

*Switchmen's Union v. Nat'l Mediation Bd.,*
  320 U.S. 297 (1943) ...................................................................................................42

*Taubman Realty Grp. Ltd. P'ship v. Mineta,*
  320 F.3d 475 (4th Cir. 2003) .....................................................................................29

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015) ................................................................21, 26, 30, 38

*Texas v. United States,*
  --- F.4th ----, 2021 WL 5882670 (5th Cir. Dec. 13, 2021) ............................19, 30, 35

*Thompson v. North Am. Stainless, LP,*
  562 U.S. 170 (2011) ...................................................................................26

*TransUnion LLC v. Ramirez,*
  141 S. Ct. 2190 (2021) ...............................................................................17

*Trump v. Hawaii,*
  138 S. Ct. 377 (2017) .................................................................................22

*Trump v. Int'l Refugee Assistance Project,*
  138 S. Ct. 353 (2017) .................................................................................22

*Trump v. New York,*
  141 S. Ct. 530 (2020) .................................................................................23

*Trump v. Sierra Club,*
  140 S. Ct. 2620 (2020) ..............................................................................9, 28

*U.S. Dep't of Labor v. Kast Metals Corp.,*
  744 F.2d 1145 (5th Cir. 1984) ......................................................................38

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.,*
  665 F.3d 1339 (D.C. Cir. 2012) ............................................................44, 45, 46

*U.S. House of Representatives v. Mnuchin,*
  976 F.3d 1 (D.C. Cir. 2020), cert. granted and judgment vacated sub. nom. Yellen v. House of
  Representatives, ___S. Ct.____, 2021 WL 4733282 (U.S. Oct. 12, 2021) ....................9

*United States v. Arizona,*
  No. CV 10-1413-PHX-SRB, 2011 WL 13137062 (D. Ariz. Oct. 21, 2011) ...................*passim*

*United States v. Texas,*
  136 S. Ct. 2271 (2016) ...............................................................................21

*Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.,*
  454 U.S. 464 (1982) ...................................................................................50

*Wilson v. State of Nevada,*
  666 F.2d 378 (9th Cir. 1982) ........................................................................20

*Wise v. Glickman,*
  257 F. Supp. 2d 123 (D.D.C. 2003) ................................................................42

ix

*Youngstown Sheet & Tube Co. v. Sawyer,*
   343 U.S. 579 (1952) ....................................................................................4, 50

*Ziglar v. Abbasi,*
   137 S. Ct. 1843 (2017) ...................................................................................22

## Statutes

1 U.S.C. § 105 .........................................................................................................7

5 U.S.C. § 551(13) .................................................................................................36

5 U.S.C. § 553(b) ...................................................................................................37

5 U.S.C. § 553(b)(3) ................................................................................................3

5 U.S.C. § 611(a) ...................................................................................................41

5 U.S.C. § 611(a)(1) ...............................................................................................40

5 U.S.C. § 701(a)(2) ....................................................................................3, 31, 35

5 U.S.C. § 702 ..................................................................................................15, 25

5 U.S.C. § 706(1) ...................................................................................................36

5 U.S.C. §§ 601–612 ........................................................................................39, 40

5 U.S.C. §§ 601(5) ...................................................................................................3

5 U.S.C. §§ 603(a) ......................................................................................3, 39, 41

8 U.S.C. § 1103 ........................................................................................................4

8 U.S.C. § 1601 ......................................................................................................30

10 U.S.C. § 284 ..................................................................................................9, 11

10 U.S.C. § 2808 ................................................................................................9, 11

31 U.S.C. § 134(a)(1)(A) ........................................................................................14

31 U.S.C. § 1112 .....................................................................................................48

31 U.S.C. § 1301 ...............................................................................................14, 24

31 U.S.C. § 1301(a) ..........................................................................................26, 49

31 U.S.C. § 1301(c) .................................................................................................7

31 U.S.C. § 1341(a) ...............................................................................................27

31 U.S.C. § 1341(a)(1)(A) ...............................................................................24, 49

31 U.S.C. § 1502(a) .................................................................................................7

31 U.S.C. § 1532 ..............................................................................14, 24, 26, 49

31 U.S.C. § 9705 .....................................................................................................9

40 U.S.C. § 3307 ...................................................................................................27

43 U.S.C. § 1782(c) ..............................................................................................36

Regulatory Flexibility Act,
    Pub. L. No. 96–354, 94 Stat. 1164 (Sept. 19, 1980) ...................................41

Department of the Interior and Related Agencies Appropriations Act,
    Pub. L. No. 102-381, 106 Stat. 1374 (Oct. 5, 1992) ...................................32

Omnibus Consolidation Appropriations Act,
    Pub. L. No. 104-208, 110 Stat. 3009 (Sept. 30, 1996) ..................................4

Secure Fence Act of 2006,
    Pub. L. No. 109-367, 120 Stat. 2638 (Oct. 26, 2006) ....................................4

REAL ID Act of 2005,
    Pub. L. No. 109-13, 119 Stat. 231, 302, 306 (May 11, 2005) ........................4

Consolidated Appropriations Act of 2008,
    Pub. L. No. 110-161, 121 Stat. 1844, 2090 (Dec. 26, 2007) .....................4, 34

DHS Appropriations Act, 2017,
    Pub. L. No. 115-31, 131 Stat. 135, 434 (May, 05, 2017) ............................6, 7

DHS Appropriations Act, 2018,
    Pub. L. No. 115-141, 132 Stat. 348, 617–17 (Mar. 23, 2018) ....................6, 7

DHS Appropriations Act, 2019,
    Pub. L. No. 116-6, 133 Stat. 13, 28 (Feb. 15, 2019) ............................*passim*

DHS Appropriations Act, 2020,
    Pub L. No. 116-93, 133 Stat. 2317, 2512 (Dec. 20, 2019) .......................6, 7, 8

Consolidation Appropriations Act, 2021,
    Pub L. No. 116-260, 134 Stat. 1182 (Dec. 27, 2020) ................................6, 7

## U.S. Constitution

U.S. Const. art. I, § 9, cl. 7 ...................................................................................52

U.S. Const. art. II, § 3 ...........................................................................................52

**Regulations**

48 C.F.R. § 52.242-14 ...........................................................................................46

48 C.F.R. § 52.242-14(a) ......................................................................................46

84 Fed. Reg. 4949 (Feb. 20, 2019) .......................................................................8

84 Fed. Reg. 58400–02 (Oct. 31, 2019 .........................................................25, 45

85 Fed. Reg. 23, 983-01 (Apr. 30, 2020) ............................................................45

86 Fed. Reg. 7225 (Jan. 20, 2021)................................................................*passim*

**Other Authorities**

Declaration of National Emergency, 165 Cong. Rec. S1569-02, S1570 (Feb. 28, 2019) ..........................8

DHS to Terminate Border Barrier Contracts in Laredo and Rio Grande Valley (Oct. 8, 2021),
    https://www.dhs.gov/news/2021/10/08/dhs-terminate-border-barrier-contracts-laredo-
    and-rio-grande-valley) ....................................................................................15

Commissioner George P. Bush Announces Agreement Authorizing Construction of
    Border Wall on State-Owned Land (Nov. 29, 2021),
    https://perma.cc/5CWR-CGWZ.\ .................................................................13

Governor Abbott Debuts Texas Border Wall In Rio Grande City (Dec. 18, 2021),
    https://perma.cc/7U9B-ZNKU......................................................................13

Letter from Acting Dir., Office of Mgmt. & Budget to Senate Comm. on Appropriations
    (Jan. 6, 2019) .................................................................................................8

Matter of Office of Management and Budget and U.S. Dep't of Homeland Security–
    Pause of Border Barrier Construction and Obligations,
    B-333110.1, 2021 WL 2451823 (June 15, 2021) ...........................................3

*President Donald J. Trump's Border Security Victory*,
    at 2019 WL 643814 (Feb. 15, 2019) ..............................................................8

"Policy Changes Help Drive US Migrant Crossings to New Highs," *Associated Press* (Apr. 9, 2021),
    https://apnews.com/article/politics-honduras-mexico-immigration-border-patrols-
    363301dde17ae9da149a54d7885ac00c..........................................................18

Texas Border Wall Construction Status (Nov. 18, 2021),
    www.tfc.texas.gov/wall. .................................................................................13

The Texas Facilities Commission Photos (Dec. 18, 2021),
www.tfc.texas.gov/wall/Border%20Wall%20Photos%2012-18-2021.pdf.............................................14

"Walls & Waivers: Expedited Construction of the Southern Border Wall and Collateral
Impacts to Communities and the Environment:  Joint Oversight Field Hearing Before
Subcommittees to H. Comm. on Natural Resources," 110th Cong. 25 (April 28, 2008),
www.govinfo.gov/content/pkg/CHRG-110hhrg41959/html/CHRG-110hhrg41959.htm.............5

"Watch Live: Debuting Texas Border Wall Construction in Rio Grande City" (Dec. 18, 2021),
www.facebook.com/TexasGovernor/videos/watch-live-debuting-texas-border-wall-
construction-in-rio-grande-city/217216753807578/ ................................................................................13

## INTRODUCTION

1.     On the first day of his Administration, President Biden signed a Proclamation to effect a reassessment of federal policy with respect to the construction of a wall along the southern border. The Proclamation terminated the declaration of a national emergency issued by President Trump that had been relied upon to divert military construction funding to the border wall. It also directed federal agencies to pause ongoing construction activities to the extent permitted by law, and ordered agencies to reassess their current border wall construction projects and develop plans for the "redirection of funds concerning the southern border wall, as appropriate and consistent with applicable law." Termination of Emergency with Respect to the Southern Boarder of the United States and Redirection of Funds Diverted to the Boarder Wall Construction, Proclamation No. 10142, 86 Fed. Reg. 7225, 7225 (Jan. 20, 2021) [hereinafter "Proclamation"].   The agencies, including the Department of Homeland Security ("DHS"), completed those plans in June, and are now in the process of implementing them.

2.     After the agencies promulgated their plans, the General Land Office of the State of Texas and its Commissioner, George P. Bush (collectively, "GLO"), filed this lawsuit against the President, DHS, and Secretary of Homeland Security Mayorkas.   GLO asks the Court to prevent DHS from implementing its plan (the "DHS Plan") and force DHS to resume the policy of the prior administration by continuing construction, land acquisition, and related activities to advance a border wall project in the Rio Grande Valley known as RGV-09 across a section of farmland owned by GLO. GLO's nine-count complaint alleges violations of the federal Constitution, federal statutes, and the Administrative Procedure Act.   For the seven reasons listed below, GLO's complaint fails to state claims over which this Court has jurisdiction or under which relief could be granted as a matter of law, and should be dismissed.

3.     First, GLO lacks Article III standing to sue.   GLO's principal interest in the border wall arises from the 3099-acre farm it owns near the southern border in Starr County, Texas.   As to that interest, GLO offers little more than speculation that migrants trespassing on its property are doing so because

1

of the specific policies at issue here, or that officials in the prior administration would have exercised their discretion differently had they remained in office. The alleged "channeling" of migrants onto the GLO Farm by other, nearby border barriers is traceable not to Defendants' decision to reassess border wall policy, but to the prior Administration's policy which created the channeling effects. And GLO's decision to begin construction of its own wall on the GLO Farm raises serious doubts about the Court's ability to continue exercising jurisdiction over this dispute.

4.     Second, GLO has no cause of action, express or implied, for a lawsuit against the President in his official capacity. That is particularly so in a situation where full relief (if appropriate) could be afforded to the plaintiffs by the relevant executive department and Cabinet secretary. Because complete relief can (if legally warranted) be afforded by DHS, the Court should dismiss all claims against the President.

5.     Third, Congress did not give entities like GLO a cause of action that could be used to draw federal courts into this dispute. None of the appropriations statues that GLO seeks to enforce in this case provide a cause of action or vest judicially-enforceable rights in private parties. The statutory authority by which DHS engages in border barrier construction gives the agency broad discretion to determine how it goes about that task, including where barriers are constructed, the timetable for construction, and the level of environmental review and consultation that should occur before (or after) construction begins. Appropriations statutes (including both the appropriations themselves and the various statutory rules, such as the Transfer Statute, the Purpose Statute, and the Anti-Deficiency Act) are instructions given by Congress to the Executive Branch regarding the expenditure of funds. None of these statutes gives entities like GLO a right to enforce their terms in court, nor is there any indication that the property interests GLO seeks to vindicate in this case fall within the zone of interests protected by the statutes they invoke. Congress, as a politically accountable, co-equal branch of government, already has the tools at its disposal to police how the Executive Branch spends taxpayer dollars. It has not authorized outside parties to sue about these types of spending decisions, and there is no basis for the Court to allow this suit in the absence of a cause of action created by the legislature.

6.      Fourth, GLO has not pled proper claims under the Administrative Procedure Act ("APA"). The policy and discretionary spending choices reflected in the DHS Plan are all committed to agency discretion as a matter of law, and the APA does not waive the government's sovereign immunity with respect to such decisions.  5 U.S.C. § 701(a)(2).   GLO is also barred from raising a programmatic challenge to Defendants' management of the border wall program in an attempt to compel specific construction activities over GLO Farm that are not mandated by federal law; it is limited to challenge discrete agency actions, not the overall management of the program.  Finally, GLO's assertion that DHS did not follow appropriate procedures in promulgating the DHS Plan is also wrong because it falls under the APA's exceptions to notice-and-comment rulemaking for general statements of policy and procedural rules.  5 U.S.C. § 553(b)(3).

7.      Fifth, even if GLO were to overcome all of these threshold concerns with entertaining this suit—concerns arising from the separation of powers principles that serve as the foundation of the Constitution—it has failed to state a claim that DHS has violated any federal statute.  DHS's actions do not contravene Congress's broad authorization for border barrier construction.  They do not violate any recent appropriations of funds by Congress to DHS for purposes of constructing border infrastructure in the Rio Grande Valley.  And, consistent with the Government Accountability Office's recent conclusion that DHS's actions were an appropriate programmatic change in the use of federal funding, they do not breach any of the numerous statutory rules on the Executive's use of appropriated funds that GLO cites in its complaint.  *See* Matter of Office of Management and Budget and U.S. Dep't of Homeland Security–Pause of Border Barrier Construction and Obligations, B-333110.1, 2021 WL 2451823 (June 15, 2021) [hereinafter *GAO Opinion*].

8.      Sixth, Defendants have not violated the Regulatory Flexibility Act ("RFA"), a new claim introduced by GLO's amended complaint.  The RFA requires agencies to engage in an analysis of regulatory flexibility whenever they are required "to publish general notice of proposed rulemaking for any proposed rule," or to certify that such an analysis is unnecessary.  5 U.S.C. §§ 603(a), 605(b). But GLO cannot bring an RFA claim because it is not a "small entity" entitled to seek judicial relief under the statute.  5 U.S.C. §§ 601(5), (6), 611(a)(1).  GLO also does not fall within the zone of interests

3

of the RFA, a statute that protects small entities and organizations from the costs of government regulation. Even if GLO could assert an RFA claim, it would fail because the DHS Plan is not subject to the RFA's requirements.

9.      Finally, GLO has failed to state a claim as to any violation of the Constitution. As both the Proclamation and the DHS Plan explain, DHS is not claiming an authority to act without statutory authorization, as found in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952). Rather, DHS's actions are fully justified under the existing statutory authorizations and appropriations for border barrier construction. GLO's allegations that DHS has violated the "separation of powers," the Spending Clause, the Take Care Clause, and the Presentment Clause are all, at bottom, assertions that "the President has exceeded his statutory authority[, which] are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 473 (1994).

10.     Accordingly, the Court should dismiss all claims against President Biden, DHS, and Secretary Mayorkas under either Civil Rule 12(b)(1) (for lack of jurisdiction) or Civil Rule 12(b)(6) (for failure to state a claim on which relief can be granted).

## BACKGROUND

## I.      DHS's Statutory Authority to Construct Border Infrastructure and Undertake Environmental Planning

11.     The Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended, grants broad discretion to the Department of Homeland Security to construct barrier infrastructure along the border of the United States. *See* Pub. L. No. 104-208, Div. C, Title I § 102, 110 Stat. 3009 (Sept. 30, 1996), *as amended by* Dep't of Homeland Security Appropriations Act, 2008, Pub. L. No. 110-161, Div. E, Title V § 564, 121 Stat. 1844, 2090 (Dec. 26, 2007); Secure Fence Act of 2006, Pub. L. No. 109-367, § 3, 120 Stat. 2638 (Oct. 26, 2006); REAL ID Act of 2005, Pub. L. No. 109-13, Div. B, Title I § 102, 119 Stat. 231, 302, 306 (codified at 8 U.S.C. § 1103 note) [hereinafter "IIRIRA"]. Section 102(a) of IIRIRA states that the Secretary of Homeland Security "shall take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas

of high illegal entry into the United States." The Secretary, however, is not required to construct border infrastructure at any particular location. Congress vested the Secretary with discretion to determine both where and what type of infrastructure is appropriate. *See* IIRIRA § 102(b)(1)(D). The Secretary is free to determine that the use or placement of "fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location" is not "the most appropriate means to achieve and maintain operational control over the international border" at that location. *Id.*; *see also United States v. Arizona*, No. CV 10-1413-PHX-SRB, 2011 WL 13137062, at *8 (D. Ariz. Oct. 21, 2011) (dismissing IIRIRA claim brought by State of Arizona to compel border wall construction).

12.    The Secretary also has the "authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction of the barriers and roads under this section." IIRIRA § 102(c)(1). But even where the Secretary has waived environmental and other laws, DHS still consults with relevant stakeholders about the impacts of border infrastructure construction. IIRIRA requires that the Secretary "shall consult with the Secretary of the Interior, the Secretary of Agriculture, States, local governments, Indian tribes, and property owners in the United States to minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites at which such fencing is to be constructed." IIRIRA § 102(b)(1)(C).

13.    As explained at a congressional hearing addressing border wall construction, DHS does not "turn[] its back on environmental stewardship or continued consultation with stakeholders." *Walls & Waivers: Expedited Construction of the Southern Border Wall and Collateral Impacts to Communities and the Environment: Joint Oversight Field Hearing Before Subcommittees to H. Comm. on Natural Resources*, 110th Cong. 25 (April 28, 2008), www.govinfo.gov/content/pkg/CHRG-110hhrg41959/html/CHRG-110hhrg41959.htm (statement of Ronald D. Vitiello, United States Customs and Border Protection Chief Patrol Officer, Rio Grande Valley Sector). On the contrary, DHS solicits and responds to feedback from a wide variety of stakeholders to inform its border infrastructure "planning efforts," which includes both engineering and environmental assessments. *Id.*; *see also id.* (statement of Rick Shultz, Nat'l Borderland Coordinator, U.S. Dep't of the Interior) (explaining how the consultation

5

process minimizes impacts on environmental and cultural resources near border infrastructure construction areas); *In re Border Infrastructure Env't Litig.*, 284 F. Supp. 3d 1092, 1124–25 (S.D. Cal. 2018) (summarizing DHS's consultation efforts for various border barrier projects), *aff'd*, 915 F.3d 1213 (9th Cir. 2019).   For projects covered by an IIRIRA waiver, DHS typically prepares Environmental Stewardship Plans, "which provide a comprehensive analysis of the potential environmental impacts" associated with border infrastructure construction and include appropriate best management practices to avoid or minimize potential environmental impacts from construction.  *Cnty. of El Paso v. Chertoff*, No. EP-08-CA-196-FM, 2008 WL 4372693, at *11 (W.D. Tex. Aug. 29, 2008) (citation omitted); *see In re Border Infrastructure Env't Litig.*, 284 F. Supp. 3d at 1124–25.

## II.   Congressional Appropriations to DHS for Border Infrastructure and Environmental Planning

14.   Congress has regularly provided funding for border infrastructure projects in DHS's annual appropriations act.  Over the past five fiscal years, Congress has appropriated over $5.5 billion for construction of new and replacement border barriers at various locations along the southern border. *See* Department of Homeland Security Appropriations Act, 2017, Pub. L. No. 115-31, Div. F, Title VI, 131 Stat. 135, 433–34 ($341.2 million "to replace approximately 40 miles of existing primary pedestrian and vehicle border fencing along the southwest border"); Department of Homeland Security Appropriations Act, 2018, Pub. L. No. 115-141, Div. F, § 230, 132 Stat. 348, 616 ($252 million for "approximately 14 miles of secondary fencing" in the San Diego Sector; $641 million for "primary pedestrian levee fencing" and "primary pedestrian fencing" in the Rio Grande Valley Sector; and $445 million for "replacement of existing primary pedestrian fencing along the southwest border"); Department of Homeland Security Appropriations Act, 2019, Pub. L. No. 116-6, Div. A, § 230, 133 Stat. 13, 28 ($1.375 billion "for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector"); Department of Homeland Security Appropriations Act, 2020, Pub L. No. 116-93, Div. D, § 209, 133 Stat. 2317, 2512 (2019) ($1.375 billion "for the construction of barrier system along the southwest border"); Department of Homeland Security Appropriations Act, 2021, Pub. L. No. 116-260, Div. F, § 210, 134 Stat. 1182,

1456–57 (same as fiscal year 2020).

15.     The planning and execution required for large-scale barrier construction projects can be a complex and time-consuming process.  Congress gave DHS five years to obligate its border infrastructure funds.  *See, e.g.*, DHS Appropriations Act, 2019, Pub. L. No. 116-6, Div. A, 133 Stat. at 18 (stating that fiscal year 2019 funds "shall remain available until September 30, 2023"); DHS Appropriations Act, 2020, Pub L. No. 116-93, Div. D, 133 Stat. at 2506 (stating that fiscal year 2020 funds "shall remain available until September 30, 2024"); DHS Appropriations Act, 2021, Pub L. No. 116-260, Div. F, 134 Stat. at 1452 (stating that fiscal year 2021 funds "shall remain available until September 30, 2025").  The placing of time limits on appropriations is one of the primary ways Congress exercises its appropriations power.  Congress generally limits the availability of appropriations to a one-year period for the fiscal year in which the funds are appropriated.  *See, e.g.*, 1 U.S.C. § 105; 31 U.S.C. § 1301(c); DHS Appropriations Act, 2020, Pub L. No. 116-93, Div. D, § 501, 133 Stat. at 2525; DHS Appropriations Act, 2021, Pub. L. No. 116-260, Div. F, 134 Stat. at 1468.  Here, however, Congress expressly authorized DHS to obligate its border wall construction funds over a five-year period.[1]  Congress also did not place any limitations on the pace of DHS's obligations, such as requiring DHS to obligate a certain amount or percentage of funds each fiscal year.

16.     In appropriating these funds, Congress was aware of the potential environmental consequences of border infrastructure construction.  It therefore required DHS to submit reports addressing environmental planning.  In fiscal years 2017 and 2018, Congress directed DHS to submit an annual plan addressing, *inter alia,* "the environmental impacts, including on wildlife, of the construction and placement of physical barriers planned along the Southwest border" and the "effects on communities and property owners near areas of infrastructure deployment."  DHS Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. at 434; DHS Appropriations Act, 2018, Pub. L. No. 115-141,

---

[1] An obligation is a "commitment that creates a legal liability of the government for the payment of goods and services ordered or received . . . . " *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1319 (2020) (internal quotations and citation omitted); *see* 31 U.S.C. § 1502(a) (stating that funds appropriated for a definite time period are "available only for payment of expenses properly incurred during the period of availability").

132 Stat. at 617–18.  Congress required DHS to update these plans in subsequent fiscal years, including the environmental analysis of border barrier construction.  DHS Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. at 28; DHS Appropriations Act, 2020, Pub. L. No. 116-93, 133 Stat. at 2512.

17.    Congress also promoted environmental stewardship by prohibiting DHS from using its appropriated funds to construct border infrastructure in environmentally sensitive areas along the border, including several locations near McAllen, Texas.  *See, e.g.*, Department of Homeland Security Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. at 28 (prohibiting expenditure of funds for "construction of pedestrian fencing" in the National Butterfly Center, La Lomita Historical Park, and the Bentsen-Rio Grande Valley State Park).

## III.    President Trump's Efforts to Obtain Additional Border Wall Funding Beyond Congress's Appropriations to DHS

18.    In late 2018, then-President Trump and Congress reached an impasse over the amount of money Congress would appropriate to DHS for border wall construction.  The President sought $5.7 billion "for construction of a steel barrier for the Southwest border," but Congress refused to appropriate that amount.  *See* Letter from Acting Dir., Office of Mgmt. & Budget to Senate Comm. on Appropriations (Jan. 6, 2019), 165 Cong. Rec. S1569-02, S1570 (Feb. 28, 2019).  Rather, on February 15, 2019, with the passage of the Consolidated Appropriations Act of 2019 ("CAA"), *see* Pub. L. No. 116-6, 133 Stat. at 28, Congress appropriated $1.375 billion to DHS "for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector" of Texas.  *Id.* 133 Stat. at 28.

19.    On the same day that President Trump signed the CAA into law, he declared a national emergency requiring the use of the armed forces at the southern border.  *See* Presidential Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States, 84 Fed. Reg. 4949 (Feb. 20, 2019).  He also released a plan to provide additional funding for border wall construction by redirecting funds from other sources within the Department of Defense ("DoD") and the Department of the Treasury.  *See* President Donald J. Trump's Border Security Victory, at 2019 WL 643814 (Feb. 15, 2019).  President Trump's plan allocated: (1) approximately $601 million

from the Treasury Forfeiture Fund (31 U.S.C. § 9705); (2) $2.5 billion from fiscal year 2019 DoD funds transferred to support counterdrug activities (10 U.S.C. § 284); and (2) $3.6 billion from other DoD military construction projects to border barrier military construction projects to be undertaken pursuant 10 U.S.C. § 2808, as made available through President Trump's declaration of a national emergency.

20.     The national emergency declaration and the subsequent actions by various federal agencies to undertake border wall construction using redirected DoD and Treasury funds were immediately challenged in multiple lawsuits around the country. *See, e.g.*, *El Paso Cnty. v. Trump*, 982 F.3d 332 (5th Cir. 2020), *cert. denied sub nom. El Paso Cnty. v. Biden*, 141 S. Ct. 2885 (2021); *Sierra Club v. Trump*, 963 F.3d 874, 880 (9th Cir.), *cert. granted*, 141 S. Ct. 618 (2020), and *vacated and remanded sub nom. Biden v. Sierra Club*, ____S. Ct.____, 2021 WL 2742775 (U.S. July 2, 2021); *Sierra Club v. Trump*, 977 F.3d 853 (9th Cir. 2020), *cert. granted and vacated and remanded sub nom. Biden v. Sierra Club*, __S. Ct.____, 2021 WL 4507558 (U.S. Oct. 4, 2021); *U.S. House of Representatives v. Mnuchin*, 976 F.3d 1 (D.C. Cir. 2020), *cert. granted and judgment vacated sub. nom. Yellen v. House of Representatives*, __S. Ct.____, 2021 WL 4733282 (U.S. Oct. 12, 2021). In July 2019, the Supreme Court granted a stay of a permanent injunction issued by a district court for the Northern District of California that would have stopped construction of border wall projects undertaken pursuant to DoD's counterdrug authority using transferred funds. *See Trump v. Sierra Club*, 140 S. Ct. 1 (2019), *denying mot. to lift stay*, 140 S. Ct. 2620 (2020). Foremost "[a]mong the reasons" for granting a stay, the Supreme Court emphasized the Government had "made a sufficient showing at this stage that the plaintiffs have no cause of action to obtain review" of DoD's compliance with an appropriations transfer statute, namely section 8005 of the DoD Appropriations Act of 2019. *Id.*

21.     Following the Supreme Court's decision, lower courts either denied or stayed injunctions prohibiting construction of other border barrier projects, thus enabling construction of various projects to continue during the pending litigation. *See, e.g., El Paso Cnty. v. Trump*, No. 19-51144 (5th Cir. Jan. 8, 2020) (staying injunction against projects undertaken pursuant to 10 U.S.C. § 2808); *La Posta Band of Diegueno Mission Indians of La Posta Reservation. v. Trump*, 828 F. App'x 489, 490 (9th Cir.

9

2020) (affirming denial of preliminary injunction against construction pursuant to 10 U.S.C. § 284).

**IV.    President Biden's Proclamation Terminating the National Emergency at the Southern Border and Directing Agencies to Develop Border Wall Funding Plans**

22.    On his first day in office, President Biden issued a Proclamation declaring that "[i]t shall be the policy of [his] Administration that no more American taxpayer dollars be diverted to construct a border wall." *See* Proclamation, 86 Fed. Reg. at 7225. The Proclamation states that the declaration of a national emergency at the southern border "is terminated and that the authorities invoked in that proclamation will no longer be used to construct a wall at the southern border." *Id.*

23.    The President also directed a "careful review of all resources appropriated or redirected to construct a southern border wall." *Id.* To facilitate that review, the President ordered the Secretary of Defense and the Secretary of Homeland Security to "pause work on each construction project on the southern border wall, to the extent permitted by law, as soon as possible." *Id.* He also ordered the Secretaries to "pause immediately the obligation of funds related to construction of the southern border wall, to the extent permitted by law." *Id.* The Secretaries were authorized to make exceptions to the pause in limited circumstances "to avert immediate physical dangers or where an exception is required to ensure that funds appropriated by the Congress fulfill their intended purpose." *Id.* at 7226.

24.    During the pause, the President ordered the Secretaries, in coordination with other federal agencies, to develop a plan "for the redirection of funds concerning the southern border wall, as appropriate and consistent with applicable law." *Id.* The Proclamation stated that the plan "shall include consideration of terminating or repurposing contracts with private contractors engaged in wall construction, while providing for the expenditure of any funds that the Congress expressly appropriated for wall construction, consistent with their appropriated purpose." *Id.* "After the plan is developed, the Secretary of Defense and the Secretary of Homeland Security shall take all appropriate steps to resume, modify, or terminate projects and to otherwise implement the plan." *Id.*

**V.    The DoD and DHS Border Wall Plans**

25.    In June 2021, DoD and DHS announced the completion of their respective border wall plans. *See* Memorandum for Director, Office of Management and Budget re: DoD Plan for the Redirection

of Border Wall Funds (June 10, 2021) (attached as Exhibit 1); DHS Border Wall Plan Pursuant to Presidential Proclamation 10142 (June 9, 2021) (attached as Exhibit 2) [hereinafter "DHS Plan"]. DoD cancelled all border wall projects undertaken with DoD funds pursuant to 10 U.S.C. § 284 and 10 U.S.C. § 2808, and redirected unobligated military construction funds toward military construction projects that had been deferred for § 2808 border wall construction.   The DHS Plan addresses three different sources of border infrastructure funds:  (1) funds Congress appropriated in fiscal years 2017-2020; (2) funds Congress appropriated in fiscal year 2021; and (3) funds DHS received from the Treasury Forfeiture Fund.

### A.        DHS Fiscal Year 2017-2020 Funds

26.      The DHS Plan states that DHS "may prioritize" using its fiscal year 2017-2020 border infrastructure appropriations on projects" that "are needed to address life, safety, environmental, or other remediation requirements."   DHS Plan at 2.  DHS also "will explore" using these funds "to address construction previously funded by the Treasury Forfeiture Fund."   *Id.*  For all other border infrastructure projects funded by appropriations in fiscal years 2017-2020, "prior to further construction, DHS will undertake a thorough review and replanning process."   *Id.*  Specifically, DHS "intends to engage in standard environmental planning including taking actions consistent with the National Environmental Policy Act (NEPA) and other environmental planning and statutes."[2]  This "multistep environmental planning process" will include "public scoping and comment on potential environmental impacts;" consultation with "affected landowners, tribes, border community residents, their elected representatives, and interested non-governmental organizations and advocates;" and an assessment of ways to "remediate or mitigate environmental damage caused by past border wall construction."   *Id.* at 2–3.

---

[2] The DHS Plan notes an exception to such planning for discrete projects involving "urgent measures needed to avert immediate physical dangers" or "projects necessary to address life, safety, environmental, or other remediation requirements."   DHS Plan at 2.  In these circumstances, DHS may rely on environmental waivers issued under § 102(c) of IIRIRA by the Secretary of Homeland Security.   *See id.*  The Plan also notes that DHS "may rescind or revise waivers" to the extent DHS "in its discretion[] deems it warranted."   *Id.*

### B.      DHS Fiscal Year 2021 Funds

27.      DHS intends to use its fiscal year 2021 border barrier appropriations to cover significant costs associated with DoD's cancellation of its border wall projects. The DoD projects were in various states of completion at the time of their cancellation and DHS intends to fund various close-out and remediation activities at the former DoD projects sites that are turned over to DHS, including erosion control measures, water drainage features, and road construction. *See id.* at 4. DHS also intends to use its fiscal year 2021 appropriation to plan future border infrastructure projects and to cover contingency costs associated with other border wall projects, such as cost overruns and contract suspension costs. *See id.* at 3–5.

### C.      Treasury Forfeiture Fund

28.      In addition to direct appropriations from Congress, DHS received $601 million from the Treasury Forfeiture Fund in fiscal year 2019 for border wall construction. *See id.* at 5. The DHS Plan explains that DHS will end border wall construction using those funds and return any excess money to the Treasury Forfeiture Fund. *See id.*

## VI.     The GLO Farm and the RGV-09 Border Infrastructure Project

29.      The Amended Complaint in this case focuses on the construction of a proposed two-mile segment of a border infrastructure project in Starr County, Texas identified as "Rio Grande Valley (RGV)-09." *See* Am. Compl. ¶¶ 56, 59, 83–85. DHS's border infrastructure appropriation from fiscal year 2019 funds the RGV-09 project; it is not one of the projects funded by money redirected from the Department of Defense or the Treasury Forfeiture Fund. *See id.* ¶¶ 55, 114.

30.      GLO is the state agency responsible for managing "state-owned lands and mineral rights" in the state of Texas. *Id.* ¶ 10. Among its holdings is a 3099-acre farm in Starr County adjacent to the U.S.-Mexico border that GLO currently leases "for farming, grazing, and hunting, and receives $150,000 per month in rent." *Id.* ¶¶ 6, 56. GLO asserts that the United States Customs and Border Protection (CBP) initiated discussions with GLO in August 2020 to acquire approximately 41 acres of the farm to build a two-mile segment of the RGV-09 project, including a monetary offer. *See id.* ¶

56.  GLO alleges that it made a counter-offer in response to CBP's offer and that "negotiations continued during the following months," but discussions stopped after President Biden took office and issued the Proclamation addressing border wall funding. *See id.*  By this stage, GLO contends that CBP completed another segment of the RGV-09 project on neighboring property to the west of the GLO Farm.  *See id.*

## VII.   GLO and Texas Build Their Own Border Wall on the GLO Farm

<u>31.</u>    On November 29, 2021, Texas Land Commissioner Bush publicly announced the signing of a lease agreement between GLO and the Texas Department of Public Safety authorizing the construction of a border wall along the GLO Farm.  *See* Press Release, Commissioner George P. Bush Announces Agreement Authorizing Construction of Border Wall on State-Owned Land (Nov. 29, 2021), at https://perma.cc/5CWR-CGWZ.  To fund wall construction on the GLO Farm, the Texas Facilities Commission awarded a design-build contract to Posillico Civil, Inc. for up to $162 million. *See* www.tfc.texas.gov/wall.

<u>32.</u>    On December 18, 2021, Texas Governor Greg Abbott, Land Commissioner Bush, and various Texas officials appeared at a press conference announcing construction of the wall on the GLO Farm. *See* Governor Abbott Debuts Texas Border Wall In Rio Grande City (Dec. 18, 2021), at https://perma.cc/7U9B-ZNKU.  Governor Abbott stated that the wall currently being built on the GLO Farm is a replica of the federal border wall that uses the same materials and concepts.  *See* Watch Live: Debuting Texas Border Wall Construction in Rio Grande City, at www.facebook.com/TexasGovernor/videos/watch-live-debuting-texas-border-wall-construction-in-rio-grande-city/217216753807578/.  A video of press conference shows, among other things, installation of a 30-foot tall steel bollard panel on the GLO Farm. *See id.*  The Chairman of the Texas Facilities Commission explained at the press conference that the contractor is authorized to construct up to 8 miles of border wall to fill various gaps, including on the GLO Farm, and can construct 200 feet of wall per day. *See id.*  The Texas Facilities Commission has posted photos on its website of the ongoing        wall        construction        on        the        GLO        Farm.                 *See*

13

www.tfc.texas.gov/wall/Border%20Wall%20Photos%2012-18-2021.pdf.

**VIII.    GLO's Alleged Injuries and Claims**

<u>33.</u>    GLO contends that the President's Proclamation and the DHS Plan halted negotiations for CBP to acquire 41 acres of the GLO Farm and CBP's plans to build a border wall segment on that land. *See* Am. Compl. ¶¶ 6, 59, 83–84.  GLO alleges that the completed border wall segment built on its neighbor's land has "diverted illegal crossing across the GLO Farm" and resulted in large "caravans" of migrants coming onto the Farm. *Id.* ¶¶ 7–8, 82.  GLO avers that this activity has "diminished the value of the GLO Farm" and interfered with "[e]ssential farm activities" such as the "manner, method, and timing" for "the spraying of chemicals" and "the sorting of crops." *Id.* ¶¶ 82–83.  GLO argues that these injuries "would be redressed if the Proclamation is enjoined and the RGV-09 project continues" to complete the "unfinished segment of the RGV-09 project that would have been built on the GLO Farm had the Proclamation not been issued." *Id.* ¶¶ 83, 85.  To redress these alleged harms, GLO brought this action in its capacity as "the landowner/administrator and landlord of the GLO Farm." *Id.* ¶ 84.

<u>34.</u>    The central allegation in the Amended Complaint is that the President and DHS have unlawfully stopped construction and land acquisition work for the RGV-09 project. *Id.* ¶¶ 9, 13, 92, 98.  In doing so, GLO contends that Defendants are "unilaterally withholding funding appropriated by Congress" for border wall construction and are unlawfully spending that money to pay for other border infrastructure expenditures, such as contract suspension costs and environmental mitigation. *Id.* ¶¶ 9, 60–61, 126–127.  GLO's Complaint asserts these allegations in nine separate legal claims:

- Counts I–IV assert implied equitable constitutional claims alleging violations of the Separation of Powers, the Appropriations Clause, the Take Care Clause, and the Presentment Clause. *See id.* ¶¶ 86–112.

- Count V asserts violations of various federal statutes regulating agency appropriations and expenditures, including § 739 of the 2019 CAA, the Purpose Statute (31 U.S.C. § 1301), the Transfer Statute (31 U.S.C. § 1532), and the Anti-Deficiency Act (31 U.S.C. § 134(a)(1)(A)). *See* Am. Compl. ¶¶ 113–121.

- Count VI asserts a violation of the border wall construction authorities set forth in IIRIRA. *See id.* ¶¶ 122–133. GLO brings the claims in Counts V and VI directly "under the . . . statutes,

14

under the Administrative Procedure Act for violations" of the statutes, and through a "non-statutory right of action" alleging "*ultra vires*" action. *Id.* ¶¶ 120, 132.

- Count VII asserts a substantive cause of action against DHS under the Administrative Procedure Act (APA), 5 U.S.C. § 702 *et seq.*, alleging arbitrary and capricious agency action as well as violations of "the budgetary statutes set forth in Count Five" and "the statutes from which the DHS derives [its] authority." Am. Compl. ¶¶ 134–145. Court VII also asserts a claim under the APA that the DHS Plan and its implementation violate the Constitutional separation of powers and the Appropriations Clause as alleged in Counts I and II. *Id.* ¶ 144.

- Count VIII asserts a procedural APA claim against DHS alleging that the DHS Plan is an "agency rule" that needed to comply with the APA's notice and comment rulemaking procedures. *Id.* ¶¶ 146–152.

- Count IX alleges a violation of the Regulatory Flexibility Act (RFA). *Id.* ¶¶ 153–155.

35.    As a remedy for these alleged violations, GLO's Amended Complaint states that "completion of the wall on the GLO Farm would eliminate or drastically curtail the illegal border activity on the GLO Farm and redress the GLO's injuries." *Id.* ¶ 85. GLO also seeks a declaratory judgment that the President's Proclamation and the DHS Plan are unlawful. *See* Complaint, Prayer for Relief at 48. Additionally, GAO requests five discrete injunctions against DHS and Secretary Mayorkas that would, among other things, require DHS to alter its funding allocations and resume work on border wall construction contracts for the RGV-09 project and the GLO Farm. *See id.* at 49.[3]

## STANDARD OF REVIEW

36.    Defendants respectfully move, pursuant to Civil Rule 12(b)(1), to dismiss this matter on the grounds that (1) GLO lacks Article III standing; (2) there is no jurisdiction in this Court for a suit against the President; and (3) GLO's complaints about the operation of the border wall program are not subject to review under the APA for a variety of reasons. *See Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 133 (5th Cir. 2009) (reviewing motion to dismiss on standing grounds under Civil Rule 12(b)(1)); *Sierra Club v. Peterson*, 228 F.3d 559, 565 (5th Cir.2000) ("Absent a specific and final agency action, we lack jurisdiction to consider a challenge to agency conduct.");

---

[3] On October 8, 2021, DHS announced that it "intends to cancel the remaining border barrier contracts located within U.S. Border Patrol's (USBP) Laredo Sector and all border barrier contracts located in the Rio Grande Valley Sector." *See* DHS to Terminate Border Barrier Contracts in Laredo and Rio Grande Valley, at https://www.dhs.gov/news/2021/10/08/dhs-terminate-border-barrier-contracts-laredo-and-rio-grande-valley.

*Ellison v. Connor*, 153 F.3d 247, 254 (5th Cir. 1998) ("We therefore agree with the district court's decision that it lacked jurisdiction to review the substance of the Corps' decision under the APA."). "Federal courts are courts of limited jurisdiction." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994). If at any time the Court determines that jurisdiction is lacking, the court must dismiss the case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 84 (1998) ("[W]ithout proper jurisdiction, a court cannot proceed at all, but can only note the jurisdictional defect and dismiss the suit."). The Court "may consider outside matters which are attached to a motion to dismiss without first converting it into a motion for summary judgment 'if the material is pertinent to the question of the District Court's jurisdiction since it is always the obligation of a federal court to determine if it has jurisdiction.'" *Green v. Forney Eng'g Co.*, 589 F.2d 243, 246 (5th Cir. 1979) (quoting *Ala. ex rel. Baxley v. Woody*, 473 F.2d 10, 12 (5th Cir. 1973)).

37.     Defendants also respectfully move to dismiss the complaint pursuant to Civil Rule 12(b)(6) for failure to state any claim upon which relief can be granted. A complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To survive a motion to dismiss for failure to state a claim under Rule 12(b)(6), the complaint must contain more than mere "labels and conclusions" or "a formulaic recitation of the elements of a cause of action[.]" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp.*, 550 U.S. at 555); *Guidry v. Bank of LaPlace*, 954 F.2d 278, 281 (5th Cir. 1992). Rather, the complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. For purposes of deciding a motion to dismiss under Rule 12(b)(6), the Court accepts as true all of the reasonably pled factual allegations in the complaint and construes reasonable inferences in favor of the plaintiff. *Id.* However, the Court need not accept as true "a legal conclusion couched as a factual allegation[.]" *Id.* (quoting *Bell Atl. Corp.*, 550 U.S. at 555); *Guidry*, 954 F.2d at 281. And the court may consider all "documents incorporated into the complaint by reference, and matters of which a court may take judicial notice," in addition to the allegations in the complaint. *Petrobras Am., Inc. v. Samsung Heavy Indus. Co., Ltd.*, 9 F.4th 247, 253 (5th Cir. 2021) (citation omitted).

## ARGUMENT

### I.   GLO Lacks Article III Standing to Challenge DHS's Border Barrier Policies.

38.     To establish standing, "a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021), *remanded*, 9 F.4th 1201 (9th Cir. 2021). GLO cannot satisfy its burden of demonstrating an Article III case or controversy exists between the parties. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).

39.     GLO alleges that since the change in policy regarding construction at the southern border, rates of illegal entry have increased substantially, including in the Rio Grande Valley. Am. Compl. ¶¶ 73–85. According to GLO, stopping the ongoing RGV-09 project led to gaps in border barrier infrastructure that permit migrants to enter the country outside of designated ports of entry. *Id.* ¶¶ 74, 79–80. GLO claims that construction of a wall segment on the property to the west of the GLO Farm has "so effectively diverted illegal crossings across the GLO Farm that it has been transformed into a superhighway of illegal activity." *Id.* ¶¶ 7, 81–82. Consequently, GLO avers that a constant law enforcement presence at the GLO Farm is now required, and that "[g]roups of 100 people or more are frequently apprehended" at the farm by CBP. *Id.* ¶ 82. In GLO's view, this has disrupted farming operations and damaged the marketability and value of the farm. *Id.* ¶¶ 81–82.

40.     GLO cannot establish standing on this theory because it rests on assumptions about how patterns in migration relate to Defendants' actions. "[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party," standing is "ordinarily substantially more difficult to establish." *Id.* at 2117; *see Clapper*, 568 U.S. at 414 (expressing "reluctance to endorse standing theories that rest on speculation about the decisions of independent actors"). Such harms are not "fairly traceable to the allegedly unlawful conduct of which" the plaintiff complains, *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (citation omitted), because "causation and redressability ordinarily hinge on the response of the regulated (or regulable) third party to the

government action or inaction—and perhaps on the response of others as well." *Lujan*, 504 U.S. at 562. The burden is even heavier when the alleged behavior is unlawful. *See City of L.A. v. Lyons*, 461 U.S. 95, 105 (1983). GLO falls well short of meeting that heightened standard here because it has not pled facts under which it could realistically establish the requisite nexus between government action and the alleged harms at issue. GLO asserts that "[t]he 2021 border surge is a direct result of the Proclamation."" Am. Compl. ¶ 78. GLO relies on two pieces of evidence in the amended complaint in an effort to meet this very high burden, but neither suffices.

41.      First, GLO cites a letter sent by former CBP Chief Rodney Scott to members of Congress which asserts that an "unprecedented seismic policy shift in border security and immigration policy initiated on January 20, 2021," along with "associated public statements[,] created the current border crisis." Ex. 1, Letter from Border Chief Rodney S. Scott to Senators, Sept. 11, 2021, at 1; Am. Compl. ¶¶ 77–78. Mr. Scott alleges that delays in border barrier construction projects, as well as other unspecified "technology deployments that were separate from the barrier construction," have forced CBP "to reduce patrol areas to address gaps in barrier, non-functional gates and grates and inoperable technology." Ex. 1 at 4. But Mr. Scott's broadside on immigration policy does not demonstrate that any particular policy, including the Proclamation and the reassessment of border barrier projects it instituted, is actually linked to the surge in unlawful migration at GLO Farm that serves as the basis for GLO's standing. Whatever "gaps" or other shortcomings in the infrastructure that existed at that time of the Proclamation were the result of the policies the current Administration inherited, not the decision to reassess those policies upon taking office.

42.      Second, GLO relies on a news article asserting that new migrants have cited the current Administration's policies as a reason for attempting to enter the country at this time. But this article actually proves Defendants' point: it is very difficult, if not impossible, to draw a connection between decisions to migrate and *any* particular policy of the receiving country. Elliot Spagat, "Policy Changes Help Drive US Migrant Crossings to New Highs," *Associated Press* (Apr. 9, 2021), https://apnews.com/article/politics-honduras-mexico-immigration-border-patrols-363301dde17ae9da149a54d7885ac00c ("The latest jump [in arrivals] follows ferocious storms in

18

Central America and President Joe Biden ending his predecessor's hardline immigration policies, though many changes attributed to Biden are rumors or have been fabricated by smugglers to generate business.") (cited at Am. Compl. ¶ 79 n.64).  That is why other courts to consider Article III standing on the premise that changes in immigration policy "entice" individuals to break immigration law have rejected it.  *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F. 4th 997, 1014–16 (9th Cir. 2021) (rejecting standing to challenge DACA on the basis that the policy "entices future unlawful entry" by those who would not benefit from the policy); *Arpaio v. Obama*, 797 F.3d 11, 19–24 (D.C. Cir. 2015) (rejecting standing on theory that third parties from other countries will be induced to enter the country by promises of benefits under DACA and DAPA, even though the policies do not apply to them).

43.     To obtain standing, GLO had to plead facts from which the Court could reasonably infer "the relevant cause-and-effect" between the policies GLO challenges and the harm it has sustained.  *Texas v. United States,* --- F.4th ----, 2021 WL 5882670, at *27 (5th Cir. Dec. 13, 2021) (*Texas II*).  It has failed to do.  Such a relationship would be challenging to show here because it is implausible that an immigrant's decision to attempt an illegal entry into the United States via the GLO Farm hinged on the policy choices outlined in the Proclamation and the DHS Plan.  *See Twombly*, 550 U.S. at 570.  It is just as plausible that a prior policy which focused on erecting border barriers was an entirely ineffective means of dealing with the root causes of migration, and that the failure to deal with those root causes is now being felt.  GLO has no standing to challenge the federal government's decision to shift its policy focus from the former to the latter.

44.     GLO cannot salvage standing by contending that the construction status of the RGV-09 project at the time of the change in administration left them vulnerable to migrants being "funneled" onto their property when construction was paused.  Am. Compl. ¶ 81.  That harm arises from the prior construction itself pushing people onto GLO's property.  Although GLO seeks additional construction as a *remedy* for the problems created by prior construction, it has not challenged the *legality* of the prior construction.  And GLO cannot mend this rupture in the chain of traceability by assumptions about events that GLO speculates would have occurred had there not been a change in

presidential administration.  To highlight one critical example, GLO does not allege that there was any binding obligation in place for CBP to purchase land on the GLO Farm in order to construct a segment of the border wall over the property.  Indeed, the parties were still negotiating over terms of the land acquisition when administrations changed.  Am. Compl. ¶ 56.  The law may have "authorize[d]" CBP to consummate those negotiations by purchasing the land, but it "does not mandate or direct" those steps, and GLO can only "speculate as to how" government officials would have "exercise[d] their discretion" under hypothetical circumstances that never obtained in the real world.  *Clapper*, 568 U.S. at 412 (emphasis omitted).

45.     Finally, GLO's decision to take matters into its own hands by building its own version of a border wall necessarily raises questions about its standing to sue.  *See supra* at ¶¶ 30–31.  The amended complaint asserts "[c]ompletion of the wall on the GLO Farm would eliminate or drastically curtail the illegal border activity on the GLO Farm and redress the GLO's injuries."  Am. Compl. ¶ 85. Construction of such a wall on GLO Farm using state funds is now underway.  That development is highly pertinent to GLO's standing for two reasons.  First, it calls into question whether GLO's injuries are actually capable of redress by this Court.  GLO seeks prospective relief in the form of actions by Defendants that they believe would lead to the completion of the wall across GLO's property, including acquisition of GLO's property.  GLO has not explained what other actions, if any, the Court could order Defendants to take that would redress GLO's prospective injury if it builds the wall itself.  Reimbursement is not an option because that sort of monetary relief would violate Defendants' sovereign immunity.  And declaratory relief, while giving GLO a degree of "psychic satisfaction," is not a basis for Article III standing.  *Steel Co.*, 523 U.S. at 107.  Second, given GLO's position that a wall across their property would "redress the GLO's injuries," eventual completion of the wall would likely render this case moot and subject to dismissal.  *See, e.g.*, *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 48 (1997) (state employee plaintiff seeking injunction against a state law mandating that English is the official language of state government functions mooted her own case by voluntarily leaving her job for the private sector); *Wilson v. State of Nevada*, 666 F.2d 378 (9th Cir. 1982) (finding request for injunctive relief moot where a plaintiff seeking an injunction against

20

Nevada's high school education requirement for state employment voluntarily obtained a high school graduation equivalency certificate).

46.     GLO cannot carry its burden of showing it has Article III standing to maintain this suit. As such, the Court lacks jurisdiction and should dismiss this case pursuant to Civil Rule 12(b)(1).

**II.     The President Should Be Dismissed From This Action as to All Counts.**

47.     GLO's claims against the President should be dismissed because there is no cause of action against the President, and GLO may not obtain—and the Court may not order—equitable relief directly against the President for his official conduct in issuing the Proclamation. Consequently, any potential relief in this case must be directed toward the agency Defendants, namely DHS and the Secretary of Homeland Security, not the President.[4]

48.     A plaintiff "must have a cause of action" to bring suit. *See, e.g.*, *Texas v. United States*, 809 F.3d 134, 161 (5th Cir. 2015), *as revised* (Nov. 25, 2015), *aff'd by equally divided court*, 136 S. Ct. 2271 (2016) ("*Texas I*"). The actions of the President are not reviewable under the cause of action provided by the APA "because the President is not an 'agency' within the meaning of the APA." *Dalton*, 511 at 469. The Supreme Court has twice held that causes of action that are available against other government officials should not be extended to the President absent a clear statement by Congress. *See Nixon v. Fitzgerald,* 457 U.S. 731, 748 n.27 (1982) (declining to assume that *Bivens* and other implied statutory damages "cause[s] of action run[] against the President of the United States"); *Franklin*, 505 U.S. at 800–01 (declining to find cause of action against the President under the APA "[o]ut of respect for the separation of powers and the unique constitutional position of the President"). Accordingly, in the absence of an express statutory cause of action against the President, there is no basis for the Court to infer a cause of action against the President.

49.     There is also no basis for a court to order equitable relief against the President. To the contrary, the Supreme Court recognized over 150 years ago in *Mississippi v. Johnson* that federal courts

---

[4] It is appropriate to dismiss the President at the outset before resolving any other threshold issues. The Supreme Court has repeatedly described the bar against suing the President for his official duties as jurisdictional in nature. *See Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (plurality opinion).

lack jurisdiction to "enjoin the President in the performance of his official duties." 71 U.S. at 501. And the Court reaffirmed that principle more recently in *Franklin*. 505 U.S. at 802–03 (plurality opinion) ("[T]he District Court's grant of injunctive relief against the President himself is extraordinary, and should have raised judicial eyebrows."): *id.* at 827–28 ("a declaratory judgment against the President" is "incompatible with his constitutional position" and "the separation of powers") (Scalia, J., concurring) (citation omitted).

50.     "The reasons why courts should be hesitant to grant such relief are painfully obvious" given the President's unique constitutional role and the potential tension between such a cause of action and the separation of powers. *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996). Any extension of an equitable remedy against the President here would create its own set of separation-of-powers problems by usurping "the role of Congress in determining the nature and extent of federal-court jurisdiction under Article III." *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1858 (2017). As Justice Scalia explained in *Franklin*, both declaratory and injunctive relief "against the President" are "incompatible with [the President's] constitutional position" and "the separation of powers." 505 U.S. at 827–28 (Scalia, J., concurring in part and concurring in the judgment) ("apparently unbroken historical tradition supports the view" that courts may not order the President to "perform particular executive . . . acts").

51.     Lower courts have followed this authority by dismissing the President as a defendant in civil cases and declining to impose either declaratory or injunctive relief against him in his official capacity. *See, e.g., Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 605 (4th Cir. 2017) ("In light of the Supreme Court's clear warning that such relief should be ordered only in the rarest of circumstances we find that the district court erred in issuing an injunction against the President himself."), *vacated and remanded*, 138 S. Ct. 353 (2017); *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017) ("the extraordinary remedy of enjoining the President is not appropriate here"), *vacated as moot*, 138 S. Ct. 377 (2017); *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him, and have never submitted the President to declaratory relief . . . .") (internal citation omitted); *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 34–35 (D.D.C. 2020) (dismissing the President as a defendant in a case challenging border wall construction); *Doe 2 v. Trump*,

319 F. Supp. 3d 539, 541 (D.D.C. 2018) (dismissing "the President himself as a party to this case"); *Newdow v. Bush*, 391 F. Supp. 2d 95, 106-07 (D.D.C. 2005) (holding that plaintiff failed to show redressability "where only an injunction or declaratory judgment against the President can redress plaintiff's injury" and finding that "the Court is without the authority to grant such relief").

52.     As was true in these earlier decisions, showing respect to the President's role by dismissing him from this case will not deprive GLO of the ability to seek a potential remedy.  GLO could seek to obtain relief against DHS and the Secretary of Homeland Security.   The gravamen of GLO's Complaint is that DHS, the federal agency responsible for securing the southern border, has unlawfully stopped border wall construction of the RGV-09 project on the GLO Farm.  The requested injunctive relief in the Amended Complaint thus focuses entirely on enjoining DHS from taking various action related to border wall construction and funding.  *See* Am. Compl. ¶¶ d–h, Prayer for Relief at 49.  When complete relief is potentially available against other agency defendants, as is the case here, dismissal of the President is appropriate and avoids unnecessary separation of powers confrontations.  *See Franklin*, 505 U.S. at 828 (Scalia, J., concurring in part and concurring in the judgment) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive."); *Swan*, 100 F.3d at 978 ("In most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials."); *Chamber of Com. of the U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("Even if the Secretary were acting at the behest of the President, this does not leave the courts without power to review the legality [of the action], for courts have power to compel subordinate executive officials to disobey illegal Presidential commands.") (citation omitted); *New York v. Trump*, 485 F. Supp. 3d 422, 479–80 (S.D.N.Y.) (three-judge panel), *vacated and remanded*, 141 S. Ct. 530 (2020) (declining to issue injunction against the President because complete

relief could be granted against other defendants).[5]

## III.   GLO Lacks a Cause of Action to Assert its Statutory Claims in Counts V–VII

### A.   GLO Lacks a Private Right of Action Directly Under the Statutes It Invokes.

53.   The Court should dismiss the statutory claims asserted in Counts V, VI, and VII because GLO lacks a cause of action to seek judicial relief.  GLO contends that DHS has violated various statutes by not continuing border construction activity on the GLO Farm.  *See* Am. Compl. ¶¶ 113–133, 106–117, 143.  The amended complaint alleges violations of five statutes that regulate how federal agencies expend funds:  the Purpose Statute (31 U.S.C. § 1301), the Transfer Statute (31 U.S.C. § 1532), the Anti-Deficiency Act (31 U.S.C. § 1341(a)(1)(A)), and §§ 230 and 739 of the Fiscal Year 2019 CAA.  Additionally, GLO asserts a violation of IIRIRA, the statute that authorizes DHS to undertake border infrastructure construction.  *See* IIRIRA § 102.

54.   None of the appropriations statutes GLO has invoked provides for private rights or includes an express cause of action for anyone to sue over alleged violations, and that should be the end of the matter.  *See Gonzaga Univ. v. Doe,* 536 U.S. 273, 283–84 (2002) ("We have held that the question whether Congress . . . intended to create a private right of action is definitively answered in the negative where a statute by its terms grants no private rights to any identifiable class") (citation omitted).  Additionally, IIRIRA expressly states that a "cause of action or claim may only be brought alleging a violation of the Constitution of the United States" arising from the Secretary's decision to waive laws in furtherance of construction.  IIRIRA § (c)(2)(A).  GLO does not challenge the waiver issued for the RGV-09 project and IIRIRA expressly precludes the Court from exercising jurisdiction over other

---

[5] Although district courts in some cases have declined to dismiss the President at the motion-to-dismiss stage on grounds that doing so would be premature in light of uncertainty about the relief that could be provided by the defendant agencies, that is not the situation here.  There is no question that relief against DHS in this case would be sufficient to redress GLO's claims related to border wall construction activity.  *See Centro Presente v. U.S. DHS*, 332 F. Supp. 3d 393, 418 (D. Mass. 2018); *CASA de Md., Inc. v. Trump*, 355 F. Supp. 3d 307 (D. Md. 2018); *Saget v. Trump*, 345 F. Supp. 3d 287, 297 (E.D.N.Y. 2018).

types of IIRIRA claims.[6]  IIRIRA § 102(c)(2)(A) (stating that courts "shall not have jurisdiction to hear any claim not specified in this subparagraph"); *see Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 238 (D.D.C. 2019) (holding that IIRIRA "plainly blocks non-constitutional claims by precluding such causes of action and also stripping federal courts of the power to consider such claims").  Accordingly, GLO cannot "sue under" these statutes directly as a legal matter.  *See* Am. Compl. ¶¶ 120, 132.

> **B.    GLO Falls Outside the Zone of Interests of Each Appropriations Statute It Invokes.**

55.    GLO also cannot rely on the cause of action provided by the APA, *see* 5 U.S.C. § 702, or a non-statutory implied equitable cause of action because GLO's asserted interests are not arguably within the zone of interests protected by these statutes.  *See* Am. Compl. ¶¶ 120, 132, 135 (asserting APA and "non-statutory" causes of action).  The zone-of-interests requirement originated in *Association of Data Processing Serv. Orgs., Inc.* v. *Camp*, 397 U.S. 150, 156 (1970), and serves as a general presumption about Congress's intended limits on the scope of causes of action.  *See Lexmark Int'l, Inc.*, 572 U.S. at 127-33.  The zone-of-interests test "is a 'requirement of general application'" that "*always* applies and is never negated." *Id.* at 129 (emphasis in original) (quoting *Bennett v. Spear*, 520 U.S. 154, 163–64 (1997)); *see Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (applying zone-of-interests test to alleged statutory violation); *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 320–21 n.3 (1977) (applying the zone-of-interests requirement to alleged constitutional violation).

56.    The zone-of-interests test requires courts to assess whether "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."  *Ass'n of Data Processing Serv. Organizations, Inc.*, 397 U.S. at 153.  The test forecloses suit where the plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that

---

[6] *See* Determination Pursuant to Section 102 of IIRIRA, as Amended, 84 Fed. Reg. 58400–02 (Oct. 31, 2019 (waiving various laws for border infrastructure construction in Starr County, TX).

Congress intended to permit" the plaintiff to bring suit under it. *Patchak*, 567 U.S. at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)). When Congress authorizes a cause of action, it presumptively does not intend the "absurd consequences" that would follow "[i]f any person injured in the Article III sense" by an alleged violation of federal law could sue over the violation. *Thompson v. North Am. Stainless, LP*, 562 U.S. 170, 176–177 (2011). The zone-of-interests requirement thus limits the plaintiffs who may invoke a cause of action under the APA for an alleged violation of law to those whose asserted interests are arguably "protected or regulated by the statute that they say was violated." *Texas I*, 809 F.3d at 161; *see Moses v. Banco Mortg. Co.*, 778 F.2d 267, 271 (5th Cir. 1985) ("parties who receive only unintended or incidental benefits from statutes or regulations are outside the zone of interests to be protected").

57.     Here, GLO falls outside the zone of interests of the appropriations statutes that it seeks to enforce. GLO asserts that DHS's failure to construct a border wall across the GLO Farm has "diminished the value of the GLO Farm" and interfered with "[e]ssential farm activities." Am. Compl. ¶¶ 82–83. But GLO's private property interests are not even "marginally related to . . . the purposes implicit" in the appropriations statutes at issue in this case. *Patchak*, 567 U.S. at 225 (citation omitted). The RGV-09 project is funded by appropriations Congress provided to DHS in § 230 of fiscal year 2019 CAA, which appropriated $1.375 billion "for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector[]" of Texas. Pub. L. No. 116-6, 133 Stat. at 28. The Purpose Statute provides that appropriated funds may be applied only "to the objects for which the appropriations were made." 31 U.S.C. § 1301(a). The Transfer Statute prohibits agencies from transferring appropriated funds from one account to another unless authorized by law. *See* 31 U.S.C. § 1532 ("An amount available under law may be withdrawn from one appropriation account and credited to another or to a working fund only when authorized by law."). Section 739 of the fiscal year 2019 CAA imposes a similar restriction that agencies may not "increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other

appropriations Act." Pub. L. No. 116-6, 133 Stat. at 197.  The Anti-Deficiency Act prohibits federal agencies and employees from spending, or committing themselves to spending, in advance of or in excess of appropriations.  31 U.S.C. § 1341(a).

58.     These statutes regulate and protect the interests of federal agencies and Congress in the federal spending and appropriations process.  Nothing about the text or context of these statutes suggests any connection whatsoever to the interests of a state government agency or private party who asserts that federal spending decisions indirectly harm their property values.  *See Miccosukee Tribe of Indians of Fla. v. United States*, No. 08-23523-CIV, 2009 WL 10668917, at *4 (S.D. Fla. Sept. 30, 2009) (dismissing claims brought under the Purpose Statute and a statute appropriating funds to a federal agency for a construction project on zone-of-interests grounds because the statutes protected the agency's interest in "construction" and "Congress's interest in having appropriations applied to the purposes it dictates").  These statutes do not require DHS to consider the potential impact on property values or property interests before making spending decisions, nor do they limit agency discretion to expend or transfer funds in order to protect such interests.  These provisions act as limitations on the Executive in relation to Congress, and do not confer judicially cognizable private rights on third parties to second-guess agency spending decisions.  *See Glass Packaging Inst. v. Regan*, 737 F.2d 1083, 1090 (D.C. Cir. 1984) (holding that a private party alleging "an injury to its competitive interests" was "not arguably within the zone of interests," of a statute intended "to regulate only a specific narrow governmental interest—protection of tax revenues"); *Cleveland Assets, LLC v. United States*, 132 Fed. Cl. 264, 277 (2017) (concluding that plaintiffs alleging an agency's violation of 40 U.S.C. § 3307 fell outside that statute's zone of interests because "its purpose is obviously to enable Congress to oversee how the money it appropriates is spent"), *aff'd*, 883 F.3d 1378 (Fed. Cir. 2018); *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981) (holding that private groups do not fall within the zone of interests of the Impoundment Control Act because it was "clearly enacted to safeguard Congress's interests, not those of private citizens").

59.     This conclusion is further reinforced by the Supreme Court's decision in 2019 to stay a permanent injunction issued by the Northern District of California against a different set of border

barrier projects because, "[a]mong other reasons," the Government had sufficiently shown that a group of environmental plaintiffs likely "have no cause of action to obtain review of the Acting Secretary's compliance with" an appropriations transfer statute, namely section 8005 of the fiscal year 2019 DoD Appropriations Act. *Sierra Club*, 140 S. Ct. 1 (2019). The Supreme Court's decision to stay an injunction is guided by the same factors that inform the issuance of an injunction. *See Nken v. Holder*, 556 U.S. 418, 434 (2009). Thus, when the Supreme Court stayed the injunction, it necessarily concluded that the Government was likely to succeed on the merits of the claim that the plaintiffs have no cause of action to bring a challenge to DoD's compliance with its appropriations transfer statute. That statute, like the appropriations statutes at issue here, did not expressly provide a cause of action or protect the interests asserted by the plaintiffs.

60.     Moreover, allowing this suit to proceed would lead to "absurd consequences" by enabling private parties or local governments to challenge the way in which federal agencies chose to spend their appropriated funds based on unrelated concerns about the downstream impact that spending may have on land use and property values. *Thompson*, 562 U.S. at 176–77. Congress, when it appropriated annual funding to DHS for border infrastructure construction or enacted various statutory limits on how agencies exercises their spending authority, could not have intended to give any landowner potentially impacted by federal spending a cause of action to sue.

61.     Congress itself has ample tools to enforce its appropriations powers. *See Nat'l Treasury Emp. Union v. Campbell*, 654 F.2d 784, 794 (D.C. Cir. 1981) ("Congress itself is in a position to monitor and enforce its spending limitations. It is not for us to question the effectiveness of existing remedies and infer additional remedies when Congress has so strongly indicated that no private remedy was intended."). Indeed, this case starkly illustrates the concern that allowing outside parties to sue over federal appropriations could conflict with the interests of Congress. The nonpartisan GAO—which is headed by the Comptroller General, "an agent of the Congress," *Bowsher* v. *Synar*, 478 U.S. 714, 731 (1986) (citation omitted), and charged with examining how federal funds are spent—recently concluded that DHS did not unlawfully impound funds from its border infrastructure appropriations while implementing the President's Proclamation. *See GAO Opinion* at *5 (stating that DHS is "not

withholding funds from obligation or expenditure" and "[a]ny delayed expenditures stem from DHS taking necessary steps to comply with statutory environmental and stakeholder consultation requirements for these construction projects and do not constitute an impoundment"). In these circumstances, where the GAO has spoken and Congress did not provide a direct cause of action for parties to challenge routine agency spending practices, the Court should not permit such claims to go forward, particularly when the States fall outside the zone of interests of the appropriations statutes they seek to enforce.

62.     GLO's property interests also do not fall within the zone of interests protected by IIRIRA. Section 102 of IIRIRA broadly authorizes the Secretary of Homeland Security to take "such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." IIRIRA § 102(a). As explained above, IIRIRA does not create any private rights or a cause of action for the type of claim GLO brings here challenging DHS's border infrastructure funding decisions. Moreover, IIRIRA protects the federal government's interest in border security, not private property interests that GLO seeks to vindicate in this case. Other courts have rejected claims for failing the zone of interests test in similar situations where plaintiffs with personal property or economic injuries attempted to enforce statutes benefitting the government or the public at large. *See, e.g.*, *Gunpowder Riverkeeper v. FERC*, 807 F.3d 267, 274 (D.C. Cir. 2015) (holding plaintiffs' alleged property interests fell outside zone of interests protected by National Environmental Policy Act and Clean Water Act because those statutes protect environmental values); *Taubman Realty Grp. Ltd. P'ship v. Mineta*, 320 F.3d 475, 481 (4th Cir. 2003) (concluding that plaintiff alleging injury to property value was outside the zone of interests protected by the Federal-Aid Highway Act, which was intended to "improve the interstate highway system" for the benefit of local and interstate commerce and the national defense); *Glass Packaging Inst.*, 737 F.2d at 1090 (holding that plaintiff failed zone of interests test where plaintiff alleged injury to competitive interests but the statute at issue regulated only a "governmental interest—protection of tax revenues").

63.     Here, nothing in the text of the authority granted to DHS in section 102 of IIRIRA or its

limited judicial review provisions evidences an intent to protect or regulate the property interests of state governments or private parties. Moreover, Congress did not impose any limitations on DHS's authority that would arguably protect property owners potentially impacted by DHS's decisions whether to undertake border infrastructure construction. To the contrary, IIRIRA permits only limited judicial review of constitutional claims related to DHS's waiver determinations, not challenges to decisions about whether to acquire land or undertake border barrier construction on certain plots of land. *See* IIRIRA § 102(c)(2) (limiting judicial review); § 102(b)(1)(D) (granting DHS discretion as to placement of "fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location"). GLO thus cannot satisfy the zone of interests test because the "interests protected by" IIRIRA are unrelated to the property interests GLO has asserted in its complaint. *See Lexmark*, 527 U.S. at 131.

64.    This case presents a very different situation from the other immigration-related cases where the Fifth Circuit has found that the State of Texas satisfied the zone-of-interest test. *See Texas I*, 809 F.3d at 162–63; *Texas II*, 2021 WL 5882670, at *32–39. In those other cases, Texas's statutory claims were based on alleged violations of the INA, and the Fifth Circuit concluded that "the INA aimed, at least in part, to protect States" from "imminent and actual harm to their fisc" resulting from an increase in the number of noncitizens within their borders. *Texas II*, 2021 WL 5882670, at *29; *see Texas I*, 809 F.3d at 162–63 (stating that the INA "reflect[s] a concern that 'aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates'") (quoting 8 U.S.C. § 1601). GLO has not invoked the INA and there is no similar concern for GLO's property or financial interests in either IIRIRA or the appropriations statutes at issue here. *See Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 886 (1990) (concluding that the relevant statute for the zone-of-interests inquiry "is the statute whose violation is the gravamen of the complaint"); *Am. Inst. of Certified Pub. Accountants v. Internal Revenue Serv.*, 746 F. App'x 1, 7 (D.C. Cir. 2018) (citing cases that the relevant zone of interests is determined by the substantive statute allegedly violated, not the APA itself).

30

IV.   **GLO's Claims Under the APA Are Either Unreviewable or Meritless (Counts VII & VIII).**

65.   Even if GLO had standing and could show that it falls within the "zone of interests" of the statutes, GLO has not stated a proper claim under the APA. That is so for at least three reasons. First, the decisions GLO challenges are committed to agency discretion as a matter of law, and therefore unreviewable under 5 U.S.C. § 701(a)(2). Second, GLO's complaint is, in substance, a programmatic challenge designed to compel Defendants to take certain actions that are not expressly mandated by statute, which is not permitted by the APA. Finally, GLO's "procedural" challenge to the DHS Plan in Count VIII is not well taken because the DHS Plan is either a "general statement of policy" or a procedural rule that does not require notice and comment rulemaking. For these reasons, the Court should dismiss all of the APA claims in this case.

A.   **Decisions As to How to Spend Funds Appropriated by Congress Are Committed to Agency Discretion as a Matter of Law (Counts VII & VIII).**

66.   Although the APA presumes that agency action can be judicially reviewed, "[t]his is 'just' a presumption …. [U]nder § 701(a)(2) agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law.'" *Lincoln v. Vigil*, 508 U.S. 182, 190-91 (1993) (citing *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)). Broadly speaking, courts have found that Section 701(a)(2) precludes review where "a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Lincoln*, 508 U.S. at 191 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)), including situations where the agency decision "involves a complicated balancing of a number of factors which are peculiarly within its expertise." *Id.* (quoting *Heckler*, 470 U.S. at 830). Such is the case here. Because IIRIRA and the relevant appropriations do not provide meaningful standards against which to judge DHS's actions, the Court should decline substantive APA review here and dismiss Count VII of the Complaint.

67.   In *Heckler*, a leading Supreme Court decision on § 701(a)(2), the plaintiffs challenged the FDA's decision not to take enforcement actions against drugs used to carry out capital punishment under the Federal Food, Drug and Cosmetic Act. 470 U.S. at 823. The Court held that this "refusal[] to take enforcement action" was not subject to judicial review. *Id.* at 831. Prior to *Heckler*, the Court

had "recognized on several occasions over many years that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." *Id.* Such choices "often involve[] a complicated balancing of a number of factors which are peculiarly within its expertise," and "[t]he agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 831–32. The Supreme Court pointed out that an agency decision that involves factors such as "whether agency resources are best spent" on one or another aspect of the agency's mission, whether an action "best fits the agency's overall policies," and "whether the agency has enough resources to undertake the action" indicate that the decision is of the type which is committed to agency discretion. *Id.* at 831.

<u>68.</u>    In *Lincoln*, the Supreme Court explained that the logic of *Heckler* applies equally to appropriations issues. The Department of Health and Human Services ("HHS") received a yearly, lump sum appropriation for the operating and capital expenses of the Indian Health Service.[7]   508 U.S. at 185.  For many years, the Indian Health Service operated an Indian Children's Program using money from this lump sum appropriation that provided direct clinical services to Indian children in certain parts of the country. *Id.* at 185–87.   Congress never specifically appropriated funds to the Program, even though the relevant appropriations committees in Congress were aware of the Program and the legislative history of the appropriation was replete with references to the Program. *Id.* at 187. When HHS acted to end the clinical services aspect of the Program, Indian tribes sued HHS, claiming

---

[7] For example, the appropriation setting the Indian Health Service's operational budget at the time provided, in relevant part:

> For expenses necessary to carry out the Act of August 5, 1954 (68 Stat. 674), the Indian Self-Determination Act, the Indian Health Care Improvement Act, and titles III and XXVI and section 208 of the Public Health Service Act with respect to the Indian Health Service, including hire of passenger motor vehicles and aircraft; purchase of medical equipment; purchase of reprints; purchase, renovation, and erection of modular buildings; payments for telephone service in private residences in the field, when authorized under regulations approved by the Secretary; $1,537,851,000,: . . . .

Pub. L. No. 102-381, 106 Stat. 1407.

that decision violated the law. The Supreme Court concluded that the decision was committed to agency discretion by law and not reviewable under the APA. *Id.* at 193 (discussing *Heckler*, 470 U.S. at 831-32). At least one court of appeals has recognized that the rationale of *Lincoln* to non-lump-sum appropriations, as well, since funding decisions relating to a specific appropriation for a specific program have the same decision-making dynamic as lump-sum appropriations. *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751–52 (D.C. Cir. 2002) (holding decision to limit distribution of funds appropriated to "provide assistance directly to . . . dairy producers, in a manner determined appropriate by the Secretary" by production capacity was committed to agency discretion by law) (citation omitted).

69.    As was the case in both *Heckler* and *Lincoln*, the sources of positive law at issue here do not meaningfully cabin DHS's discretion. Congress appropriated the funds at issue here to CBP's general account for "procurement, construction, and improvements," *see, e.g.*, Department of Homeland Security Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. at 18, and then earmarked[8] as being "available only" for use on various border fencing projects, *see, e.g., id.* § 230, 133 Stat. at 28 ("$1,375,000,000 is for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector.") But the appropriations do not mandate the use of funds on construction in any particular area on the border generally (or within the Rio Grande Valley, where the appropriations are focused on that region). They do not compel construction of the specific RGV-09 project that CBP previously chose to undertake. Nor do they preclude or require other activities related to the purpose of the appropriation like environmental planning, stakeholder consultation, or land acquisition.

70.    Instead of continuing on its prior trajectory, DHS chose to pause current construction (including, where appropriate, cancelling current construction contracts) and "undertake a thorough review and replanning process" with respect to border barriers, consistent with current law. DHS Plan at 2. The agency's decision "to adapt to changing circumstances and meet its statutory

_____

[8] Earmarks are a "portion of a lump-sum amount for particular purposes." General Accounting Office, *A Glossary of Terms Used in the Federal Budget Process* 46 (2005).

responsibilities in what it sees as the most effective or desirable way" is classically the sort of decision that cannot be reviewed under § 701(a)(2) of the APA. *Lincoln*, 508 U.S. at 192. GLO accuses DHS of only taking these steps to achieve a "de facto cancellation of the border wall projects in pursuit of [President] Biden's Policy goals," Am. Compl. at pg. 25 (heading F) (cleaned up), and avers that DHS leadership "openly discussed ways to deliberately slow roll any decisions as well as options to do the least action possible to avoid an Impoundment Act violation without doing any construction as required by law," Am. Compl. ¶ 70 (quoting Ex. 1 at 4). Of course, Defendants' actions comply with all applicable laws, as explained in greater detail below. But GLO's effort to pry into Defendants' motivations for exercising their discretion in a particular way is precisely the sort of inquiry § 701(a)(2) was meant to preclude. *See Gentile v. SEC*, 974 F.3d 311, 319–20 (3d Cir. 2020) (holding decision to open a formal investigation was committed to agency discretion by law, even as to plaintiff's contention that it had an "allegedly retributive motive," because § 701(a)(2) "shields the entirety of an agency action that is committed to agency discretion by law"). DHS is "far better equipped" than this Court or GLO to assess the agency's priorities and needs in choosing among the many permissible uses of these appropriated funds. *Lincoln*, 508 U.S. at 193 (quoting *Heckler*, 470 U.S. at 831–32).

71.     IIRIRA similarly lacks the sort of directive to engage in construction at any particular location necessary to overcome § 701(a)(2). The statute provides for the construction of 700 miles of fencing and additional infrastructure "where [it] would be most practical and effective." Consolidated Appropriations Act, 2008, Pub. L. No. 110-161, Div. E, § 564, 110 Stat. 1844, 2091 (amending IIRIRA § 102(b)(1)(A)). But IIRIRA "provides the DHS and the Secretary with substantial discretion in determining where to build fencing, where to use alternative infrastructure improvements rather than fencing, and how best to develop a comprehensive program to prevent illegal immigration." *See United States v. Arizona*, No. CV 10-1413-PHX-SRB, 2011 WL 13137062, at *8 (D. Ariz. Oct. 21, 2011) (dismissing IIRIRA claim brought by State of Arizona to compel border wall construction). As such, there are "no judicially manageable standards [that] permit the Court to determine how or when the DHS or the Secretary should complete the fencing and infrastructure construction contemplated by IIRIRA, the Secure Fence Act, and the Appropriations Acts." *Id.* at *9.

72.     Recently, the Fifth Circuit held that *Heckler* does not apply to "agency rules" in rejecting the federal government's argument that the decision to withdraw the Migrant Protection Protocols ("MPP") was committed to agency discretion as a matter of law. *Texas II*, 2021 WL 5882670, at *32–39. That decision reinforces Defendants' invocation of § 701(a)(2) here. The Fifth Circuit explained that *Lincoln* was consistent with its understanding of *Heckler* because "the discretionary allocation of funds is not the same as refusing to follow a statute" and the allocation in question in *Lincoln* was not a "rule" requiring notice and comment. *Id.* at *39. So too here. As explained below, because the actions GLO challenges here are not "rules" that needed to go through the notice-and-comment process, they do not fall within the Fifth Circuit's recent holding that "rules" are categorically excluded from § 701(a)(2).

73.     Finally, while the Fifth Circuit found that the Immigration and Naturalization Act ("INA") provided "guidelines for the agency to follow in exercising its enforcement powers," *Texas II*, 2021 WL 5882670, at *41 (quoting *Heckler*, 470 U.S. at 832–33), such is not the case here. The relevant appropriations here say only that certain funds "shall be available" for border wall construction, and they do not address the myriad planning considerations that informed the decisions the States challenge here. DHS 2020 Appropriations Act § 209(a), 133 Stat. 2512. And IIRIRA gives Defendants significant discretion about the exercise of its authority to construct border barriers. *Arizona*, 2011 WL 13137062, at *8–9.

74.     Accordingly, because the decisions GLO is challenging are committed to agency discretion as a matter of law pursuant to 5 U.S.C. § 701(a)(2), Congress has not waived DHS's sovereign immunity with respect to these decisions, and the Court should dismiss Counts VII and VIII for lack of jurisdiction.

### B.     GLO Cannot Raise a Programmatic Challenge to Defendants' Management of the Border Wall Program.

75.     Outside of their allegations about the cancellation of contracts, GLO's amended complaint makes general, programmatic complaints about the way Defendants are currently operating the border wall program in an effort to force Defendants to resume the RGV-09 project and build a barrier over

GLO's land.  But the APA does not allow such challenges; rather, a plaintiff "must direct its attack against some particular 'agency action.'"  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).  GLO lacks the authority to challenge what it perceives as Defendants' general deficiencies in their compliance with the requirements of the border barrier appropriations and IIRIRA in the hopes of forcing Defendants to engage in activities that they are not expressly required to engage in by the statutes at issue here.

76.    The leading case on the authority of courts to hear programmatic challenges to agency action is *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55 (2004).  In *Norton*, plaintiffs alleged that the Bureau of Land Management "failed to take action with respect to [off-road vehicle] use" the plaintiff deemed necessary to protect public lands in Utah.  542 U.S. at 61–62.  The relevant statute required the agency to manage the lands "so as not to impair the suitability of such areas for preservation as wilderness," *id.* at 65 (quoting 43 U.S.C. § 1782(c)), but left BLM "a great deal of discretion in deciding how to achieve it," *id.* at 66.  Plaintiffs asserted that, pursuant to 5 U.S.C. § 706(1), a district court could order BLM to comply with the "categorical imperative" in the relevant statute.  *Id.*  In ruling for BLM, the Supreme Court disagreed.  It held that the APA only permits the Court to compel "*discrete* agency action," tracking the categories of 5 U.S.C. § 551(13), and not "[g]eneral deficiencies in compliance" with a statutory mandate.  *Id.*  Otherwise, courts "would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management."  *Id.* at 66–67; *see also Lujan*, 497 U.S. at 891 (stating that plaintiff "cannot seek wholesale improvement of [a] program by court decree, rather than in the offices of the Department or the halls of Congress, where programmatic improvements are normally made").

77.    *Norton* and *Lujan* set the limits of what GLO can challenge in this case.  Like the statute at issue in *Norton*, the border wall appropriations and IIRIRA create a "broad statutory mandate[]" for DHS to carry out.  *Id.* at 66.  GLO can challenge discrete agency actions that they believe to be unlawful (such as contract cancellations), but they cannot generally challenge the failure to spend

money in a particular way or to take certain desired actions within a specified period of time, such as the construction of a wall segment across GLO Farm.  Rather, they must "assert[] that an agency failed to take a *discrete* agency action that it is *required to take*" by law.  *Id.* at 64.  Otherwise, the Court would face "[t]he prospect of pervasive oversight . . . over the manner and pace of" DHS's compliance with the border wall appropriation, an outcome "not contemplated by the APA."  *Id.* at 67.  GLO's complaint largely fails at alleging such "discrete agency action[s]," and accordingly, its claims should be limited to the contract cancellations described in the amended complaint.

### C.    There Is No Procedural Violation of the APA Because the DHS Plan Is Exempt from Notice and Comment Rulemaking (Count VIII).

<u>78.</u>    GLO claims that DHS violated the APA by not subjecting the DHS Plan to notice-and-comment rulemaking.  Am. Compl. ¶¶ 146–52 (Count VIII).  But GLO overlooks the fact that the RGV-09 project GLO would like the government to resume was not subjected to notice-and-comment rulemaking, either.  It would be contrary to basic principles of administrative law if DHS's reassessment of policy at border were held to a higher procedural bar than the initial policy.  *Cf. Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.").  Yet even if the Court were to examine the issue anew, there is no violation of the APA here.  The APA's requirement that an agency follow notice-and-comment procedures before promulgating rules, 5 U.S.C. § 553(b), does not apply to "general statements of policy," *id.* § 553(b)(3)(A).  The APA also exempts procedural rules from notice and comment.  *See id.*  The DHS Plan fits under both of these exceptions to notice-and-comment rulemaking.  Accordingly, Count VIII must be dismissed for failure to state a claim.

<u>79.</u>    General statements of policy are those that "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power."  *Lincoln*, 508 U.S. at 197.  By contrast, legislative rules, which must be adopted through notice-and-comment procedures, have the force and effect of law, and thus create legally enforceable rights or obligations in regulated parties.  *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015).  Unlike substantive rules, a general statement of policy is

one "that does not impose any rights or obligations" and that "genuinely leaves the agency and its decision-makers free to exercise discretion." *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995) ("*PPCC*"). They are designed to "presage[] an upcoming rulemaking or announce[] the course which the agency intends to follow in future adjudications." *Brown Exp., Inc. v. United States*, 607 F.2d 695, 701 (5th Cir. 1979) (quoting *Pac. Gas & Elec. Co. v. Fed. Power Comm'n*, 506 F.2d 33, 38 (D.C. Cir. 1974)). The Fifth Circuit has held that "the starting point" in determining whether an agency pronouncement is a statement of policy "is 'the agency's characterization of the rule.'" *See PPCC* 56 F.3d at 596.

80.     In *PPCC*, the FDA issued a document without notice and comment outlining the factors it would consider when determining whether it would bring enforcement actions for unlawful drug compounding. 56 F.3d at 593–94. The Fifth Circuit agreed that the policy was not a "substantive rule" and therefore not subject to notice-and-comment review. *Id.* at 594–601. It also agreed that the policy fit the definition of a "general statement of policy" "to a tee, as in it the FDA announced some of the factors that it will consider in resolving a substantive question of regulation,' i.e., whether a pharmacy is engaged in traditional compounding or drug manufacturing." *Id.* at 601 (citation omitted); *see also U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984) (holding that an agency's plan for targeting employers with the highest injury rate for safety inspections was not a legislative rule that needed to be promulgated through notice-and-comment rulemaking).

81.     A rule may also be exempt from notice and comment if it is merely binds the agency as to matters of agency organization, procedure, or practice. *See Texas I*, 809 F.3d at 176 (a "binding rule is not required to undergo notice and comment if it is one 'of agency organization, procedure, or practice'") (quoting 5 U.S.C. § 553(b)(A)). In the Fifth Circuit, "the substantial impact test is the primary means by which [a court would] look beyond the label 'procedural' to determine whether a rule is of the type Congress thought appropriate for public participation." *Kast Metals Corp.*, 744 F.2d at 1153; *accord Texas I*, 809 F.3d at 176. In other words, the question is whether the agency action "modifies substantive rights and interests" of the public. *Kast Metals*, 744 F.2d at 1153. Typically, documents that "tell people how the agency plans to carry out its duties" are covered by this exception.

38

*Jaxson v. Saul*, 970 F.3d 775, 777 (7th Cir. 2020) (internal claims processing memorandum for Social Security cases did not require notice-and-comment).

82.     The DHS Plan is best understood as either a general statement of policy or a rule of agency organization, procedure, or practice, rather than as a substantive rule requiring notice and comment. Like the policy guidance in *PPCC*, the DHS Plan fits the "general statement of policy" exception "to a tee" because it explains "the factors that [the agency] will consider in resolving a substantive question of regulation." *Shalala*, 56 F.3d at 601. The DHS Plan leaves DHS free to exercise its discretion in the manner it sees fit moving forward as to any particular border infrastructure project. In addition, because the plan merely sets out the agency's plan to "carry out its duties," *Jaxson*, 970 F.3d at 777, without actually implementing any of the substantive actions that would be needed to carry out the plan, the DHS Plan does not modify the substantive rights and interests of the public and is properly classed as a procedural rule. Regardless of which characterization the Court finds most persuasive, one thing is certain: The DHS Plan does not have the sort of legal effect on the public that would require DHS to subject the Plan to notice and comment prior to promulgation. As such, Count VIII of GLO's complaint should be dismissed.

## V.     GLO's Regulatory Flexibility Act Claim Fails (Count IX)

83.     GLO claims, in Count IX of its Amended Complaint, that DHS violated sections 603 and 605(b) of the Regulatory Flexibility Act ("RFA") because it did not prepare an initial or final regulatory flexibility analysis to accompany the DHS Plan, or a certification in lieu of a regulatory flexibility analysis. Am. Compl. ¶¶ 152–154. The RFA requires agencies to identify the potential impact of proposed and final rules on small entities. 5 U.S.C. §§ 601–612. Section 603 provides that whenever an agency is required by the APA or any other law to publish general notice of proposed rulemaking for a proposed rule, it must prepare and make available for public comment an initial regulatory flexibility analysis describing the "impact of the proposed rule on small entities." *Id.* § 603(a). Section 605(b) states that the requirements of section 603 "shall not apply to any proposed or final rule if the head of the agency certifies that the rule will not, if promulgated, have a significant economic impact

on a substantial number of small entities." GLO's claim that Defendants violated the RFA fails for four independent reasons.

84. First, GLO's claim is not eligible for judicial review. The RFA contains a narrow judicial review provision that affords only a "small entity" that has been "adversely affected or aggrieved by final agency action" an opportunity to obtain "judicial review of an agency's compliance with the requirements of sections 601, 604, 605(b), 608(b), and 610" of the RFA. 5 U.S.C. § 611(a)(1). This provision is the exclusive means of obtaining judicial review of an agency's compliance with the RFA. *See id.* § 611(c) ("Compliance or noncompliance by an agency with the provisions of this chapter shall be subject to judicial review only in accordance with this section."). The RFA identifies the only type of party that may bring an action to enforce the RFA: a "small entity." 5 U.S.C. § 611(a)(1). The RFA defines the term "small entity" to include a "small government jurisdiction," but that definition does not include state agencies like GLO. *See id.* § 601(5). Instead, the "the term 'small governmental jurisdiction' means governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand." *See id.* § 601(5)–(6). When Congress includes particular language, but excludes other language in a statutory section, the presumption is that "Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Brown v. Gardner*, 513 U.S. 115, 120 (1994); *see also Stone v. INS*, 514 U.S. 386, 405 (1995) ("Judicial review provisions . . . must be construed with strict fidelity to their terms."). Because the RFA precludes entities like GLO from obtaining judicial review of RFA violations, the Court should dismiss GLO's RFA claim. *See State of Alabama v. Centers For Medicare & Medicaid Servs.*, No. 2:08-CV-881-MEF-TFM, 2010 WL 1268090, at *8 (M.D. Ala. Mar. 30, 2010) (dismissing RFA claim brought by the State of Alabama because "Alabama is not a 'small entity' that may bring a claim under the RFA"); *Navajo Ref. Co. v. United States*, 58 Fed. Cl. 200, 206 n.7 (2003) (finding that plaintiff lacked standing to assert an RFA claim because it was not a "small entity").

85. Second, even if this clear statutory limitation on the Court's jurisdiction over judicial review of the RFA in § 611 did not exist, GLO would fall outside the RFA's zone of interests. *See Patchak*, 567 U.S. at 225. The purpose of the RFA is to require federal agencies to consider whether rules can

be tailored to reduce the burden on small entities.  *See* S. Rep. 96-878 (July 30, 198).  In the statement of purpose that accompanied the adoption of the RFA, Congress emphasized that the goal of the act was to minimize the "unnecessary and disproportionately burdensome demands including legal, accounting and consulting costs upon small businesses, small organizations, and small governmental jurisdictions with limited resources" caused by federal regulations.  *See* Pub. L. No. 96–354, § 2(a), 94 Stat. at 1164.  The RFA does not protect the property and financial interests of large State agencies with multi-million dollar budgets like GLO.  Accordingly, the interests GLO seeks to protect in this case are not within the RFA's zone of interests.

86.    Third, the Court does not have jurisdiction over any alleged violation of § 603 of the RFA.  Section 611(a) identifies the only provisions of the RFA that are judicially enforceable.  5 U.S.C. § 611(a).  Section 603, which requires preparation of an initial regulatory flexibility analysis, is not among the enumerated provisions.  Therefore, the Court cannot consider GLO's claim that Defendants violated § 603.  *See Allied Local and Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 79 (D.C. Cir. 2000) (concluding the court is without jurisdiction to consider a challenge to initial regulatory flexibility analysis under section 603 because "[s]ection 611(a) specifically lists the sections of the RFA subject to judicial review, and section 603 is not on the list").

87.    Finally, GLO's claim fails on the merits.  The RFA's requirement to prepare a regulatory flexibility analysis or a certification applies only when an agency is legally required to publish a notice of proposed rulemaking.  *See* 5 U.S.C. §§ 603(a), 604(a), 605(b); *see also id.* § 611(a) (judicial review limited to "any rule subject to this chapter").  As explained above, the DHS Plan is not a rule that is subject to the notice and comment requirement of the APA.  *See supra* at ¶¶ 76–80.  Therefore, GLO's RFA claim fails for the same reasons as its procedural APA claim.

## VI.    DHS Has Not Violated IIRIRA or Appropriations Statutes (Counts V–VII).

88.    GLO alleges that DHS has violated IIRIRA, recent appropriations of funds to DHS for border infrastructure projects, and a variety of federal statutes intended to exert congressional control over the use of federal funds by agencies.  GLO raises these claims under the statutes directly, as well as through a non-statutory *ultra vires* cause of action and the APA's cause of action.  *See* Am. Compl. ¶¶

41

120, 132, 143 104.

89.    As explained above, none of the statutes provides GLO with a direct cause of action.  Further, non-statutory review of alleged *ultra vires* agency action is a limited doctrine that the plaintiff may only invoke when it would otherwise be "wholly deprive[d]" of a "meaningful and adequate means of vindicating its statutory rights" and when Congress has not precluded judicial review. *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43–44 (1991) (citing *Leedom v. Kyne*, 358 U.S. 184 (1958)).  GLO, however, has not established that any "private rights," *Barlow v. Collins*, 397 U.S. 159, 166 (1970), or "rights which [Congress] create[d]" are at stake. *Switchmen's Union v. Nat'l Mediation Bd.*, 320 U.S. 297, 301 (1943); *see also Leedom v*, 358 U.S. at 189 ("deprived . . . of a 'right' assured to them by Congress").  Further, GLO has not been "wholly deprive[d]" of a means for review of their claims because Congress has provided the APA as the vehicle to review agency action alleged to be unlawful. *MCorp Fin., Inc.*, 502 U.S. at 43 (stating that "central to our decision in *Kyne* was the fact that the Board's interpretation of the Act would wholly deprive the union of a meaningful and adequate means of vindicating its statutory rights"); *see Puerto Rico v. United States*, 490 F.3d 50, 59–60 (1st Cir. 2007); *Wise v. Glickman*, 257 F. Supp. 2d 123, 127 n.1 (D.D.C. 2003).

90.    Even assuming, however, that GLO is allowed to proceed on its *ultra vires* claims, GLO has carried its burden to show that DHS acted "contrary to a 'clear and mandatory' prohibition." *Exxon Chemicals Am. v. Chao*, 298 F.3d 464, 468 (5th Cir. 2002) (quoting *Kyne*, 358 U.S. at 188); *see also Horizon Air Indus., Inc. v. Nat'l Mediation Bd.*, 232 F.3d 1126, 1131 (9th Cir. 2000) ("ultra vires review is "one of the narrowest known to the law" ) (citation omitted); *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.) (stating that ultra vires review is "essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds").  Nor has GLO stated a claim for any statutory violations through the APA's cause of action.  Thus, even if the Court were to find that GLO had standing and a cause of action to bring these claims, its statutory arguments fail on the merits for the reasons explained below.

### A.  DHS Has Not Violated IIRIRA (Count VI).

91.  GLO has not stated a claim for a violation of IIRIRA.  *See* Am. Compl. ¶¶ 122–133 (Count VI).  As explained above, § 102 of IRRIRA is a broad statutory authorization directing that DHS "shall take such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States."  Section 102 vests DHS with complete discretion for determining how and where border fencing should be utilized in that effort, directing the Secretary to construct fencing "along not less than 700 miles of the southwest border where fencing would be most practical and effective."  IIRIRA § 102(b)(1)(A).  Indeed, Congress emphasized that DHS is not required "to install fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location along an international border of the United States, if the Secretary determines that the use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border at such location."  IIRIRA § 102(b)(1)(D).  Further, IIRIRA does not establish a deadline for completing the RGV-09 project at issue in this case, despite the fact that Congress established specific dates for the completion of other projects.  *Compare* IIRIRA § 102(b)(1)(B) (requiring completion of projects in certain priority areas by December 31, 2008), *with id.* § 102(b)(1)(A) (requiring construction of not less than 700 miles of fencing along the southwest border without a deadline).

92.  GLO contends that DHS has violated IIRIRA by not proceeding with construction of the RGV-09 project on the GLO Farm, but Section 102 of IIRIRA does not prescribe when, where, how, or in what manner DHS must undertake construction and placement of border fencing projects.  *See Arizona*, 2011 WL 13137062, at *8 ("IRIRA and the Appropriations Acts leave the Secretary and the DHS with a great deal of discretion in deciding how, when, and where to complete the construction.").  As for the RGV-09 project at issue here, IIRIRA does not mandate "completion of the fence" project or "any required discrete action by a specific time."  *Id.*  Moreover, Congress neither earmarked funds for the RGV-09 project nor specifically directed that the project be completed at all, let alone by a certain date.  In short, there is no statutory requirement in IIRIRA that DHS build a border segment on GLO's property.  The lack of any judicially enforceable mandate in the statute as to the timing or

completion of any particular border infrastructure project is therefore fatal to GLO's claim. *Id.* (dismissing claim by the State of Arizona that DHS violated IIRIRA by not building border fencing in Arizona).

**B.     DHS Has Not Acted Contrary to Its Congressional Appropriations.**

93.     GLO has also failed to state a claim that DHS is violating its border wall appropriations by not continuing to build the RGV-09 project on the GLO Farm. *See* Am. Compl. ¶¶ 114–115. The RGV-09 project is funded by § 230 of FY19 CAA, which appropriated $1.375 billion "for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector" of Texas. Pub. L. No. 116-6, div. A § 230, 133 Stat. at 28; *see* Am. Compl. ¶¶ 55, 114. But nothing in that appropriation of funds requires DHS to build border infrastructure on the GLO Farm, let alone any specific location. Nor does section 230 provide any limitations on the timing or placement of barrier fencing. Rather, as explained above, Congress left those discretionary decisions to DHS. *See* IIRIRA § 102(b)(1)(D). Accordingly, there is no basis for the Court to imply a new restriction found nowhere in the text of DHS's appropriation that would require construction of a barrier segment on the GLO Farm.

94.     The Court should also reject GLO's argument that DHS is violating section 230 by spending funds on environmental planning prior to resuming barrier construction. *See* Am. Compl. ¶¶ 61, 66, 117. The DHS Plan explains that DHS "intends to engage in standard environmental planning including taking actions consistent with the National Environmental Policy Act (NEPA) and other environmental planning and statutes" before resuming "further construction." DHS Plan at 2–3. This expenditure falls well within the bounds of DHS's permissible funding discretion under the necessary expense doctrine. This "rule of construction for appropriations statutes" governs situations where an appropriation for a general purpose (*i.e.*, border barrier construction) "leaves open whether a specific proposed expenditure is a legally authorized purpose for which appropriated funds may be expended." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1349 (D.C. Cir. 2012) (Kavanaugh, J.). "Under the necessary expense doctrine, 'an appropriation made for a specific object is available for expenses

44

necessarily incident to accomplishing that object unless prohibited by law or otherwise provided for.'"
*Id.* (quoting 1 GAO, Principles of Federal Appropriations Law at 4–20). Agencies are afforded
deference in making this determination and the rule ensures that agency spending is not "so attenuated
as to take it beyond that range of permissible discretion." *Id.* (quoting GAO, *Implementation of Army
Safety Program,* B–223608 (Comp. Gen. Dec. 19, 1988)).

95.     There is no doubt that environmental planning and review is a necessary incident to border
wall construction. Indeed, such construction along the southern border near the Rio Grande has the
potential to impact plant and wildlife habitat, natural resources, and flood prevention infrastructure.
*See* DHS Response to Public Comments Regarding the Construction of Border Wall Within Certain
Areas in the Rio Grande Valley, Texas, 85 Fed. Reg. 23,983-01 (Apr. 30, 2020). DHS has a long
history of addressing types of concerns as part of expending funds in furtherance of its border wall
project management and development process. *See Cnty. of El Paso v. Chertoff,* No. EP-08-CA-196-FM,
2008 WL 4372693, at *11 (W.D. Tex. Aug. 28, 2008) (explaining DHS's "comprehensive analysis of
the potential environmental impacts"). Moreover, Congress was well aware that DHS would
undertake environmental planning when it appropriated funding for border infrastructure projects
and expressly required that DHS consult with stakeholders about environmental impacts. *See supra* at
¶¶ 14–17. The environmental planning expenditures at issue here are thus within the "range of
permissible discretion" afforded to DHS in the exercise of its spending authority. *Fed. Lab. Rels. Auth.,*
665 F.3d at 1349.

96.     The fact that DHS has waived the application of various environmental laws pursuant to
§ 102(c) of IIRIRA does not preclude DHS from conducting environmental planning. *See* Am.
Compl. ¶ 127; *see also* Determination Pursuant to Section 102 of IIRIRA, as Amended, 84 Fed. Reg.
58400–02 (Oct. 31, 2019) (waiver for barrier construction in Starr County, TX). Nothing in the text
of § 102(c), the waiver, or any other provision of law prevents DHS from undertaking more
environmental planning, stakeholder consultation, and mitigation measures if the DHS determines
that those actions are appropriate for a particular barrier construction project. Simply put, the waiver
establishes a floor for the level of environmental planning that DHS is legally required to undertake,

not a ceiling.  DHS may therefore lawfully spend money in furtherance of more robust environmental planning and outreach beyond the bare minimum level required by the terms of the wavier.

97.　　Additionally, DHS may lawfully use its border wall appropriations on costs and fees associated with the suspension of contractor performance while the environmental planning process is ongoing. *See* Am. Compl. ¶¶ 60, 110; *see also* DHS Plan at 4 ("DHS anticipates being able to cover other delay costs and changes as a result of the suspension of contract performance using the appropriated funds from the year in which the project was funded.").  DHS is authorized to suspend all or any part of the work called for under a contract for the period of time that it determines appropriate, "for the convenience of the Government." *See* Federal Acquisition Regulation, Suspension of Work, 48 C.F.R. § 52.242-14(a).  Here, DHS has decided to undertake more extensive environmental planning and stakeholder consultation before resuming construction activity. *See* DHS Plan at 1–3. Costs that DHS owes its contractors during any suspension period are lawful expenditures because they are reasonably necessary to ensure compliance with terms and conditions of the border wall construction contracts. Indeed, federal regulations expressly contemplate that agencies who suspend performance of contracts must pay contractors for the increased costs incurred by the suspension.  *See* 48 C.F.R. § 52.242-14. DHS does not have separate appropriations to fund increased contract costs necessitated by various factors, including suspension costs.  Consequently, such costs are reasonably related to the appropriations that fund the contracts.  These payments are reasonably related to the purpose for which Congress appropriated border infrastructure funding to DHS and therefore consistent with federal appropriations principles. *See Fed. Lab. Rels. Auth.*, 665 F.3d at 1349.

98.　　The foregoing analysis is consistent with the conclusion reached by the GAO in June 2021 that DHS is acting in accordance with both the Impoundment Control Act (ICA) and its appropriations statutes in the execution of its border wall funding. *See GAO Opinion.*  The GAO's opinion is entitled to "special weight" in light of "its accumulated experience and expertise in the field of government appropriations." *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005)); *see Data Sys. Corp. v. Webster*, 744 F.2d 197, 201 (D.C. Cir. 1984) (Scalia, J.) (stating that the GAO reflects the "expert" view of an independent arm of Congress on fiscal issues that courts should "prudently

consider"). Although the GAO decision is not binding on this Court, the Court should follow the GAO's well-reasoned and persuasive conclusions.

99.     In response to a complaint from a group of Senators that DHS had unlawfully impounded its border wall infrastructure funds, the GAO conducted a thorough analysis of DHS's execution of its border wall appropriations between fiscal years 2018 and 2021. *See GAO Opinion* at *2–3. The GAO concluded that "neither the Proclamation nor its implementation violate the ICA." The GAO acknowledged that DHS had suspended construction of border wall projects funded with fiscal year 2018–2020 funds, but found that those actions were undertaken "in order to rescope the projects to mitigate environmental damage and minimize the impact or border communities." *Id.* at *1. In these circumstances, the GAO concluded that "delays in spending these funds" were "programmatic delays, not impoundments." *Id*; *see id.* at 4–5 ("Any delayed expenditures stem from DHS taking necessary steps to comply with statutory environmental and stakeholder consultation requirements for these construction projects and do not constitute an impoundment."). Additionally, the GAO never suggested, let alone concluded, that DHS's use of its appropriations on environmental planning or suspension costs would fall outside of the scope of DHS's permissible spending authority.

100.    With respect to funds Congress appropriated in fiscal year 2021, the GAO similarly found that DHS was engaged in responsible project planning for future border wall projects and had not unlawfully impounded funds. *See id.* at 2, 5–7. Although DHS had not obligated any of its fiscal year 2021 funds at that time, the GAO nevertheless agreed that a delay caused by "steps DHS is taking to ensure compliance with environmental, stakeholder consultation, and procurement statutes is a programmatic delay, not an impoundment under the ICA." *Id.* at 5. In addition, the GAO recognized that DHS must have flexibility "to determine its project needs" in light of changed circumstances subsequent to the enactment of the fiscal year 2021 appropriation, including the discontinuation of "DOD participation in existing barrier construction" and DHS's policy decision that future border barrier projects "will include standard environmental planning and compliance and robust stakeholder consultation." *Id.* at *6. The GAO thus concluded "there is not an impoundment of DHS's fiscal year 2021 barrier appropriation and no violation of the ICA with respect to these funds." *Id.*

**C.      DHS Has Not Violated Section 739 of the 2019 Consolidated Appropriations Act.**

101.      GLO claims that DHS has violated § 739 of the CAA by "redirecting funds appropriated for border barrier construction to other projects and uses." Am. Compl. ¶ 101. That statute provides:

> None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.

Pub. L. No. 116-6, Div. D, § 739 (emphasis added).

102.      DHS's actions do not run afoul of this provision. The funds appropriated for border barrier construction are not being used to "increase, eliminate, or reduce funding" to another "program, project, or activity," a term that refers to an element within a budget account. *See* GAO, A Glossary of Terms Used in the Federal Budget Process 80 (Sept. 2005) (defining "program, project, or activity"); *see also* 31 U.S.C. § 1112 (GAO is statutorily required to publish and maintain standard terms related to the federal budget process). DHS is not taking money from its border infrastructure appropriations to fund other DHS programs or projects, such as cybersecurity operations or airport security. Rather, DHS is expending the funds appropriated by § 230 in ways authorized by statute. *See supra* at ¶¶ 23–26; *GAO Opinion* at *4 (concluding that expenditure delays to "ensur[e] that requirements under environmental and stakeholder consultation laws are satisfied for border barrier projects" are permissible).

103.      GLO also contends that DHS violated § 739 by "redirecting appropriated funds to projects previously funded from the Treasury Forfeiture Fund or redirected from DoD funds." Am. Compl. ¶ 118. It alleges, with respect to the RGV-09 project, that "the 2019 CAA specifically appropriates funds for the construction of border walls in the RGV sector, yet the programs the DHS Plan would redirect these appropriations to are located in different areas and would not result in new barrier construction as Congress intended." *Id.* That is not the case. Nowhere does the DHS Plan claim that fiscal year 2019 funds appropriated for use in the Rio Grande Valley will be used anywhere other than the Rio Grande Valley. The DHS Plan does note that DHS will "explore" the use of funds

48

appropriated between fiscal years 2017 and 2020 "to address construction previously funded with Treasury Forfeiture Fund Amounts," DHS Plan at 2, but that reassessment is to be done "consistent with applicable law." *Id.* at 1. Some of the border wall appropriations implicated by the DHS Plan are geographically limited, but others are not. *See supra* at ¶ 13. Absent some plausible allegation to the contrary, GLO cannot state a claim by simply speculating that DHS may expend funds in contravention of the geographic limitations in the appropriations. And none of DHS's activities implicate § 739 in any event because, as discussed above, DHS is not using fiscal year 2019 funds for any other program, project, or activity. The Court should dismiss this claim.

### D.  DHS Has Not Violated Any Other Appropriations Statute.

104.  GLO also argues that DHS's actions represent violations of three other appropriations statutes:

- The "Purpose Statute," 31 U.S.C. § 1301(a), which states that "[a]ppropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."

- The "Transfer Statute," 31 U.S.C. § 1532, which provides, "[a]n amount available under law may be withdrawn from one appropriation account and credited to another or to a working fund only when authorized by law."

- The Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1)(A), which prohibits government officials from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation."

105.  DHS has not violated these statutes. As explained above, DHS's actions satisfy the "Purpose Statute" because all funds are being spent on border construction or necessary incidents thereof. The "Transfer Statute" is not implicated at all because DHS is not moving funds between different appropriation accounts. The Amended Complaint contains no factual allegation that DHS has even transferred funds from one appropriations account to another. And the Anti-Deficiency Act has not been violated because DHS is not authorizing expenditures or obligations of funds in excess of the amounts appropriated to the accounts for CBP infrastructure generally or border barrier construction specifically. There is no allegation in the Amended Complaint that DHS has spent more money than is authorized by the applicable border infrastructure appropriations.

## VII.     GLO's Constitutional Claims Should be Dismissed (Counts I–IV).

106.    As a threshold matter, GLO lacks a cause of action and cannot satisfy the zone-of-interests requirement for its constitutional claims.[9]  *See Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) ("[T]he Court has required that the plaintiff's complaint fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." (citation omitted)); *Boston Stock Exch.*, 429 U.S. at 320–21 n.3 (applying the zone-of-interests requirement to plaintiffs seeking to enforce the dormant Commerce Clause).  Just as GLO's private property interests are entirely unrelated to the interests protected by the statutes GLO invokes, *see supra* at ¶¶ 53–62, these interests are also unrelated to the asserted constitutional limitations on Congress's power to authorize or appropriate funds for DHS to undertake border infrastructure projects.

107.    Additionally, GLO's constitutional claims should be dismissed because "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton*, 511 U.S. at 473.  In *Dalton*, the Supreme Court rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Id.* at 471.  Not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution." *Id.* at 472.  In reaching this conclusion, the Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases).  The Constitution is only implicated if executive officers rely on it as an independent source of authority to act or if the officers rely on an unconstitutional statute. *Id.* at 473 & n.5.

108.    Neither of those situations applies to DHS's actions in this case.  DHS is executing is border wall plan pursuant to congressional statutory authorization under IIRIRA and its border infrastructure appropriations, not independent Article II authority, as in *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952).  Further, GLO has not suggested that any of these statutes are themselves

---

[9] The GLO brings its constitutional claims under an implied equitable cause of action*, see* Am. Compl. ¶¶ 94, 100, 106, 112, and re-asserts its separation of powers and Appropriations Clause claims though the APA's cause of action.  *See id.* ¶ 144.

unconstitutional. *Dalton*'s reasoning thus fully applies here and refutes GLO's argument that it has a constitutional claim or cause of action. *See Ctr. for Biological Diversity*, 453 F. Supp. 3d at 51–54 (dismissing constitutional claims challenging border wall construction based on *Dalton*). This case concerns "simply" whether DHS has "exceeded its statutory authority" and "no constitutional question whatever is raised"—"only issues of statutory interpretation." *Dalton*, 511 U.S. at 473–74 & n.6.

<u>109.</u>    In advancing a constitutional claim based on the separation of powers, GLO makes the same argument the Supreme Court rejected in *Dalton*. GLO asserts that DHS acted contrary to the will of Congress because it allegedly stopped spending its border infrastructure appropriations in furtherance of border wall construction. *See* Am. Compl. ¶ 92. But that separation-of-powers claim hinges entirely on whether DHS acted in accordance with the statutes at issue in this case. The outcome of that question depends upon resolution of statutory claims and does not involve any unique separation-of-powers principles. If GLO's theory were accepted, every garden-variety action by a federal agency alleged to be in violation of a statutory provision would also, *ipso facto*, violate the constitutional separation of powers. The Supreme Court foreclosed that line of argument in *Dalton*.

<u>110.</u>    The Court also should reject GLO's argument that the President violated the separation of powers by issuing the Proclamation. *See* Am. Compl. ¶ 90–92. The President does not infringe on Congress's Article I power by issuing an order to guide Executive Branch officials in their implementation of existing law. Such orders carry out the President's responsibilities under Article II, Section 1, which provides that the "executive Power shall be vested in a President of the United States of America." That power "necessarily encompasses 'general administrative control of those executing the laws,' . . . throughout the Executive Branch of government." *Bldg. & Const. Trades Dep't, AFL-CIO v. Allbaugh*, 295 F.3d 28, 32 (D.C. Cir. 2002) (quoting *Myers v. United States*, 272 U.S. 52, 164 (1926)). It is, of course, open to a plaintiff with standing and a cause of action to argue that a particular agency's implementation of a Presidential order is contrary to law by challenging a final agency action. But that possibility provides no basis for the sweeping conclusion GLO seeks here that the President somehow violated the structural design of the constitution by directing other Executive Branch

officials to develop and execute plans for spending federal funds appropriated for border wall construction "consistent with applicable law." Proclamation § 2; *see Allbaugh*, 295 F.3d at 33 (rejecting separation of powers challenge to Executive Order where the President is merely exercising his "supervisory authority over the Executive Branch" when he "directs his subordinates" to take certain action "but only '[t]o the extent permitted by law'").

111.     GLO's Appropriations Clause claim fails for similar reasons.  *See* Am. Compl. ¶¶ 96–101. GLO does not allege any distinct violation of the Appropriations Clause.  That provision states that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. "[I]n other words, [a] payment of money from the Treasury must be authorized by a statute."  *Off. of Personnel Mgmt. v. Richmond*, 496 U.S. 414, 424 (1990).  The gravamen of GLO's claim is that DHS has acted "[i]n the absence of statutory authority" and therefore violated the Appropriations Clause.  *See* Am. Compl. ¶ 98.  But spending undertaken in accordance with a statutory appropriation that authorizes an expenditure "by Law" cannot violate the Appropriations Clause.  Accordingly, statutory funding disputes turn solely on "the interpretation and application of congressional statutes under which the challenged expenditures either were or were not authorized," not on a "controversy about the reach or application of" the Appropriations Clause.  *See Harrington v. Schlesinger*, 528 F.2d 455, 457–58 (4th Cir. 1975).  Indeed, even under GLO's own theory, there is no constitutional violation if DHS has acted in accordance with its statutory obligations.  For that reason, the Appropriations Clause adds nothing to this case separate and apart from the statutory issues discussed above.  *Dalton* thus requires dismissal of this claim.  511 U.S. at 474 (stating that the "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration.").

112.     GLO's Take Care Clause claim similarly fails because it merely reasserts allegations of statutory violations in constitutional terms.  The Take Care Clause provides that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3.  The alleged Take Care Clause violation in this case is based entirely on allegations that Defendants have failed to comply with the

appropriations statutes discussed above, including DHS's appropriations acts and IIRIRA. *See* Am. Compl. ¶ 104 (listing statutes that form the basis for the Take Care Clause claim). But *Dalton* bars GLO's attempt to transform allegations of statutory violations into separate constitutional violations of the Take Care Clause. GLO does not argue that Defendants could be in compliance with the these statutues, yet somehow violate the Take Care Clause. The outcome of this case (to the extent it presents a justiciable controversy at all) thus turns on the meaning of the relevant statutes—a purely statutory dispute with no constitutional dimension.

113.   There is no precedent for using the Take Care Clause as a mechanism to obtain affirmative relief against the President or Executive Branch agencies. As explained above, GLO has no cause of action to raise such a claim against the President. *See supra* at ¶¶ 45–50; *Franklin*, 505 U.S. at 796. Moreover, recognizing such a claim in this context would raise its own separation powers problems, as the Take Care Clause furnishes no basis for affirmative relief in an Article III court. For the Judicial Branch to undertake such an inquiry would express a "lack of the respect due" to the Nation's highest elected official, *Baker v. Carr*, 369 U.S. 186, 217 (1962), by assuming judicial superintendence over the exercise of Executive power that the Clause commits to the President. Indeed, the Supreme Court has recognized that "the duty of the President in the exercise of the power to see that the laws are faithfully executed" "is purely executive and political," and not subject to judicial direction. *Mississippi*, 71 U.S. at 499. No court has read the Take Care Clause as opening the door to any plaintiff seeking to challenge the manner in which the President or his subordinates execute the law.

114.   In any event, both the President and DHS have taken care to faithfully execute the relevant appropriations acts. The President's Proclamation directs the Secretary of Defense and the Secretary of Homeland Security "to ensure that funds appropriated by the Congress fulfill their intended purpose" and mandates that federal agencies continue "the expenditure of any funds that the Congress expressly appropriated for wall construction, consistent with their appropriated purpose." *Proclamation*, 86 Fed. Reg. at 7226. Compliance with legal requirements is a theme running throughout the text of the Proclamation. *See id.* (directing agencies to develop plans "consistent with applicable law"). Accordingly, there is no basis to conclude that the President has directed his subordinates to

violate any law or act in a way that is contrary to basic appropriations principles. *See id.* ("This proclamation shall be implemented consistent with applicable law"); *see also Allbaugh*, 295 F.3d 28, 33 (D.C. Cir. 2002) (stating that when the President "directs his subordinates how to proceed in administering federally funded projects, but only 'to the extent permitted by law,'" the consequence is that "if an executive agency . . . may lawfully implement the Executive Order, then it must do so; if the agency is prohibited, by statute or other law, from implementing the Executive Order, then the Executive Order itself instructs the agency to follow the law.").

115.    Finally, the Court should dismiss GLO's Presentment Clause claim. *See* Am. Compl. ¶¶ 108–112. Neither the President nor DHS have modified or repealed DHS's appropriations acts contrary to the Constitution's bicameralism and presentment requirements of Article I, § 7. This case bears no resemblance to the legislative or line-item veto authorities that the Supreme Court struck down in *I.N.S. v. Chadha*, 462 U.S. 919 (1983) and *Clinton v. City of N.Y.*, 524 U.S. 417 (1998). Rather, GLO merely contends that DHS is not expending its border infrastructure funds in accordance with the terms of the relevant appropriations statutes. That claim is purely statutory in nature and raises no issues of any constitutional dimension. *See Dalton*, 511 U.S. at 473–74.

## CONCLUSION

116.    Accordingly, Defendants respectfully request that the Court grant this motion and dismiss the complaint in its entirety.

Dated: January 10, 2021                    Respectfully submitted,

                                           BRIAN M. BOYNTON
                                           Acting Assistant Attorney General

                                           ALEXANDER K. HAAS
                                           Director, Federal Programs Branch

                                           ANTHONY J. COPPOLINO
                                           Deputy Director, Federal Programs Branch

                                           */s/ Michael J. Gerardi*
                                           ANDREW I. WARDEN
                                           Senior Trial Counsel

54

MICHAEL J. GERARDI (D.C. Bar
#1017949)
Trial Attorney / Attorney-in-Charge
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW, No. 122212
Washington, D.C. 20005
Tel: (202) 616-0680
Fax:    (202) 616-8470
E-mail: michael.j.gerardi@usdoj.gov

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.5.A., Defendants believe oral argument would be helpful to the Court and respectfully request the opportunity to present oral argument in support of this motion.

*/s/ Michael J. Gerardi*
MICHAEL J. GERARDI

## CERTIFICATE OF SERVICE

I hereby certify that on January 10, 2022, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

*/s/ Michael J. Gerardi*
MICHAEL J. GERARDI