**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

THE GENERAL LAND OFFICE OF THE
STATE OF TEXAS, and GEORGE P. BUSH, in his
official capacity as Commissioner of the Texas
General Land Office,

               Plaintiffs,

      v.

JOSEPH R. BIDEN, in his official capacity as
President of the United States, *et al.*,

             Defendants.

No. 7:21-cv-00272
Hon. Micaela Alvarez

---

THE STATE OF MISSOURI; THE STATE OF
TEXAS,

             Plaintiffs,

      v.

JOSEPH R. BIDEN, in his official capacity as
President of the United States, *et al.*

             Defendants.

No. 7:21-cv-00420
(formerly No. 6:21-cv-00052)
Hon. Micaela Alvarez

**REPLY MEMORANDUM IN SUPPORT OF THE FEDERAL GOVERNMENT
DEFENDANTS' MOTION TO DISMISS COMPLAINT BY THE *MISSOURI*
PLAINTIFFS**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................................1

ARGUMENT ............................................................................................................................2

I.     THE STATES FAIL TO ALLEGE ARTICLE III STANDING ...............................................2

     A.    The States Lack Standing Under The "Driver's License" Rationale ............................2

     B.    Texas Has No Standing Under Its "Franchise Tax" Rationale. .....................................5

II.    Texas Must Be Dismissed Due to Improper Claim Splitting, and Missouri Should Not Be Permitted to Maintain Its Suit Absent Texas's Joinder. ...................................6

III.   The States' Claims Under the APA Are Unreviewable. ...............................................9

     A.    The Defendants' Spending and Project Planning Decisions Are Committed to Agency Discretion By Law. .................................................................................9

     B.    The States Cannot Raise Programmatic Challenges to the Border Wall Program. ...................................................................................................................11

IV.   The States Lack a Cause of Action Because They Fail the Zone-of-Interests Test ................13

V.    DHS Has Complied With its Appropriations Statutes and the Impoundment Control Act. .............................................................................................................................20

VI.   The States' Constitutional Claims Should Be Dismissed. .........................................23

CONCLUSION .......................................................................................................................26

# TABLE OF AUTHORITIES

## <u>Cases</u>

*Air Courier Conference of Am. v. Am. Postal Workers Union,*
  498 U.S. 517 (1991) ........................................................................................................15

*Barlow v. Collins,*
  397 U.S. 159 (1970) ........................................................................................................13

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.,*
  502 U.S. 32 (1991) ..........................................................................................................13

*Bennett v Spear,*
  520 U.S. 154 (1997) ................................................................................................. 14, 15

*Bernard v. Cty. of Suffolk,*
  356 F.3d 495 (2d Cir. 2004) ...........................................................................................22

*Biden v. Missouri,*
  142 S.Ct. 647 (2022) .......................................................................................................21

*Biden v. Sierra Club,*
  142 S. Ct. 46 (2021) ........................................................................................................16

*Burr v. Transohio Sav.,*
  77 F.3d 477, 1995 WL 798590 (5th Cir. 1995) ...............................................................9

*California v. Texas,*
  141 S. Ct. 2104 (2021) ......................................................................................................3

*California v. Trump,*
  963 F.3d 926 (9th Cir. 2020) .....................................................................................*passim*

*City of Arlington, Tex. v. F.C.C.,*
  569 U.S. 290 (2013) ........................................................................................................22

*City of New Haven, Conn. v. United States,*
  809 F.2d 900 (D.C. Cir. 1987) ........................................................................................20

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ........................................................................................................17

*Clarke v. Securities Industry Assn.,*
  479 U.S. 388 (1987) ........................................................................................................18

*Ctr. for Biological Diversity v. Trump,*
  453 F. Supp. 3d 11 (D.D.C. 2020) ..................................................................................25

*Com. Of Pa., by Shapp v. Kleppe,*
　533 F.2d 668 (D.C. Cir. 1976) ....................................................................6

*Dalton v. Specter,*
　511 U.S. 462 (1994) .........................................................................*passim*

*Dep't of Commerce v. New York,*
　139 S. Ct. 2551 (2019) .................................................................... 10, 22

*Ecosystem Inv. Partners v. Crosby Dredging, L.L.C.,*
　729 F. App'x 287 (5th Cir. 2018) ...........................................................15

*El Paso Cnty, Texas v. Trump,*
　982 F.3d 332 (5th Cir. 2020) ....................................................................6

*E.T. v. Paxton,*
　19 F.4th 760, 766 (5th Cir. 2021) .............................................................4

*Ex parte Young,*
　209 U.S. 123 (1908) ..................................................................................8

*General Land Office v. U.S. Dep't of Interior,*
　947 F.3d 309 (5th Cir. 2020) ....................................................................6

*Gentile v. SEC,*
　974 F.3d 311 (3d Cir. 2020) ...................................................................11

*Hanson v. Veterans Admin.,*
　800 F.2d 1381 (5th Cir. 1986) .................................................................5

*Heckler v. Cheney,*
　470 U.S. 821 (1985) ..................................................................................9

*Horton v. California,*
　496 U.S. 128 (1990) ................................................................................22

*In re Enron Corp. Sec., Derivative & ERISA Litig.,*
　761 F. Supp. 2d 504 (S.D. Tex. 2011) ...................................................13

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan,*
　115 F.3d 1020 (D.C. Cir. 1997) ..............................................................22

*Kendall v. U.S. ex rel. Stokes,*
　37 U.S. (12 Pet.) 524 (1838) ..................................................................25

*Leedom v. Kyne,*
　358 U.S. 184 (1958) ................................................................................13

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
572 U.S. 118 (2014) ........................................................................................... 14, 16

*Lincoln v. Vigil*,
508 U.S. 182 (1993) ............................................................................................... 9, 10

*Lujan v. National Wildlife Fed'n*,
497 U.S. 871 (1990) ...............................................................................................*passim*

*Maine v. Goldschmidt*,
494 F. Supp. 93 (D. Me. 1980) ...................................................................................20

*Make the Rd. New York v. Pompeo*,
475 F. Supp. 3d 232 (S.D.N.Y. 2020) ......................................................................24

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
567 U.S. 209 (2012) ...............................................................................................*passim*

*Milk Train, Inc. v. Veneman*,
310 F.3d 747 (D.C. Cir. 2002) ..................................................................................10

*Mississippi v. Johnson*,
71 U.S. (Wall.) 475 (1867) ........................................................................................25

*Nat'l Treasury Emp. Union v. Campbell*,
654 F.2d 784 (D.C. Cir. 1981) ..................................................................................18

*Nevada v. Dep't of Energy*,
400 F.3d 9 (D.C. Cir. 2005)........................................................................................23

*Norton v. Southern Utah Wilderness Alliance*,
542 U.S. 55 (2004) ..........................................................................................11, 12, 13

*Pub. Citizen v. Stockman*,
528 F. Supp. 824 (D.D.C. 1981) ................................................................................19

*Puerto Rico v. United States*,
490 F.3d 50 (1st Cir. 2007).........................................................................................14

*Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality*,
968 F.3d 419 (5th Cir. 2020) .......................................................................................4

*Sierra Club v. Trump*,
929 F.3d 670 (9th Cir. 2019) ...............................................................................16, 25

*Sunshine Anthracite Coal Co. v. Adkins*,
310 U.S. 381 (1940) ....................................................................................................7

*Switchmen's Union v. Nat'l Mediation Bd.*,
    320 U.S. 297 (1943) ................................................................................13

*Texas v. Biden*,
    20 F.4th 928 (5th Cir. 2021) ............................................................*passim*

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ........................................................... 16, 19

*Thompson v. N. Am. Stainless, LP*,
    562 U.S. 170 (2011) ................................................................................16

*Trump v. Sierra Club*,
    No. 19A60, 2019 WL 3451617 (July 22, 2019) ......................................16

*Trump v. Sierra Club*,
    140 S. Ct. 1 (2019) .................................................................................16

*United States v. Baker*,
    923 F.3d 390 (5th Cir. 2019) ............................................................. 7, 8

*United States v. Richardson*,
    418 U.S. 166 (1974) ................................................................................17

*United States v. Arizona*,
    No. CV 10-1413-PHX-SRB, 2011 WL 13137062 (D. Ariz. Oct. 21, 2011) ......................................12

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*,
    429 U.S. 252 (1977) ................................................................................22

*Virginia Off. for Prot. & Advoc. v. Stewart*,
    563 U.S. 247 (2011) .................................................................................8

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992) ............................................................................ 2, 6

## Statutes

2 U.S.C. § 681–88 .................................................................................... 15, 19

5 U.S.C. § 701(a)(2) ............................................................................. 9, 10, 11

5 U.S.C. § 702 ..............................................................................................19

5 U.S.C. § 706(2)(A) ....................................................................................22

5 U.S.C. § 706(2)(C) ............................................................................. 13, 22

8 U.S.C. § 1182(f) .........................................................................................24

28 U.S.C. § 1391(e)(1)..........................................................................................................9

28 U.S.C. § 1406(a) ............................................................................................................9

DHS Appropriations Act, 2020,
  Pub L. No. 116-93, 133 Stat. 2317 (2019) ........................................ 12, 15, 20, 21

DHS Appropriations Act, 2021,
  Pub L. No. 116-260, 134 Stat. 1182 (2020) ............................................ 15, 20, 21

## Regulations

Termination of Emergency With Respect to the Southern Border of the United States and
Redirection of Funds Diverted to Border Wall Construction,
  86 Fed. Reg. 7225 (Jan. 20, 2021) ..............................................................................2

## Other Authorities

*Matter of Office of Management and Budget and U.S. Dep't of Homeland Security–Pause of Border Barrier
  Construction and Obligations*,
  B-333110.1, 2021 WL 2451823 (June 15, 2021) ......................................................18

Texas Comptroller of Public Accounts, Franchise Tax Overview,
  https://comptroller.texas.gov/taxes/publications/98-806.php ............................................6

# INTRODUCTION

1.　　Defendants' motion to dismiss explained in detail why the Complaint filed by Missouri and Texas ("States") should be dismissed for lack of jurisdiction, improper venue, and failure to state claims upon which relief can be granted. *See* Defs.' Mot. to Dismiss, ECF No. 35. The States' opposition brief fails to rehabilitate their claims. *See* States' Opp., ECF No. 37.

2.　　At the outset, the States have failed to carry their burden on the question of Article III standing. The States' alleged increases in the costs of providing driver's licenses and other social services are not sufficiently proximate or imminent to constitute injury-in-fact; cannot be traced to the discretionary manner in which the Department of Homeland Security ("DHS") chooses to spend funds Congress appropriated for construction of a border barrier system; and cannot be remedied by this Court. The States alternative theory of standing based on Texas's collection of general franchise taxes from government contractors is similarly lacking in merit.

3.　　 The Court also should dismiss Texas from this case because it has engaged in improper claim splitting. The State of Texas, representing the executive branch of the State, is in privity with the General Land Office, an agency within the Texas executive branch. The principle of fairness embodied by the rule against claim splitting dictates that Defendants should not be subject to duplicative lawsuits by the State itself and by a statewide executive agency over the same transaction or occurrence. Without Texas's joinder as a plaintiff, the Court should also dismiss Missouri for lack of proper venue.

4.　　The States' claims under the Administrative Procedure Act ("APA") likewise should be dismissed. The manner in which DHS chooses to implement its broad spending authority is committed to agency discretion by law and not subject to review under the APA. Nor can the Court compel DHS under the APA to spend its funds in particular ways that the States prefer. The APA is not a vehicle for courts to overhaul agency programs and enmesh themselves in day-to-day oversight of how agencies spend appropriated funds.

5.　　Additionally, the States lack a cause of action to bring their statutory claims because their

attenuated financial interests fall outside of the zone of interests protected by the relevant provisions of the statutes they invoke, namely the fiscal year 2020 and 2021 DHS Appropriations Acts and Impoundment Control Act. Moreover, even if the States have a right to sue, they have not demonstrated that DHS has unlawfully impounded funds or spent money on items outside the lawful scope of its budget authority, as the recent opinion from the Government Accountability Office ("GAO") confirms. The States also cannot save their statutory claims by trying to recast them as constitutional. That approach is flatly contrary to the Supreme Court's decision in *Dalton v. Specter*, 511 U.S. 462 (1994), a case the States do not meaningfully distinguish.

6.      Finally, the States agree to dismiss their claims against the President. *See* States' Opp. ¶ 2. The Court should accordingly dismiss President Biden from this action as well as all claims against him related to issuance of Proclamation No. 10142, 86 Fed. Reg. 7225 (Jan. 20, 2021).

7.      For these reasons, as explained further below, the Court should dismiss the Complaint in this case.

## ARGUMENT

## I.      THE STATES FAIL TO ALLEGE ARTICLE III STANDING

8.      The States' response brief reasserts their entitlement to Article III standing based on (1) the "driver's license" theory articulated in cases like *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021), and (2) on Texas's loss of franchise tax revenues as a result of the cancellation of federal contracts under *Wyoming v. Oklahoma*, 502 U.S. 437 (1992).[1] But the States' brief largely sidesteps the problems with standing that Defendants identified in their motion to dismiss, and dismissal for lack of Article III standing remains appropriate here.

### A.      The States Lack Standing Under The "Driver's License" Rationale.

9.      The States argue that the standing inquiry should begin and end with the "driver's license" rationale, and that *Texas v. Biden* frees them from the obligation of providing "specific evidence that

---

[1] The States dropped their argument for standing arising from the decision of Texas's legislature to take "mitigation measures" in response to the Proclamation nearly nine months after it issued. *See* Defs.' Mot. to Dismiss ¶ 44.

the presence of aliens imposing costs on the States will increase as a result of agency action." States' Opp. ¶ 5. In truth, though, the States seek a vast expansion of Article III standing beyond what Fifth Circuit law already permits. *Texas v. Biden* does *not* free plaintiffs from showing that a particular policy is actually responsible for an increase in the number of people imposing costs on the States in the first place. The States quote extensively from *Texas v. Biden*'s discussion of the likelihood that migrants will, for instance, apply for a driver's license when they arrive in the United States. *Id.* ¶¶ 5, 8. But this skirts the real problem the States' assertion of standing presents here. The "driver's license" rationale has succeeded in contexts where the challenged policy had a direct connection to whether, and how long, a person in the custody of immigration officials could stay in the United States. But that assumes an increase in the number of migrants resulting from the challenged policy is knowable. Indeed, the *Texas v. Biden* found that the district court's "most important finding" was that "MPP's termination has increased the number of aliens released on parole into the United States, including Texas and Missouri." 20 F.4th at 966.

10.     This case could not be more different. The States are asserting their harm is caused by DHS's planning and spending decisions with respect to funds that do not need to be obligated until 2024, at the earliest, in order to advance additional infrastructure projects, in the hopes that those projects will make some unquantifiable contribution to immigration enforcement, thereby reducing the number of migrants who wind up living in the United States and saving the States some money on social services. That sort of third-party-dependent, highly speculative theory of standing is "substantially more difficult to establish" than usual. *California v. Texas*, 141 S. Ct. 2104, 2117 (2021).

11.     Instead of "root[ing]" this highly speculative theory "firmly in the evidence," *Texas v. Biden*, 20 F.4th at 966, the States cite two press releases issued by the prior Administration. States Opp. at ¶ 6. As Defendants explained (and the States do not attempt to rebut), these documents focus on decreases in apprehensions in discrete areas where infrastructure exists, do not show that the net number of unlawful migrants in the country (much less the plaintiff States) decreased as a result of the construction, and do not attempt to account for other immigration policies or outside factors likely to impact the number of apprehensions. ECF No. 19-1 at App. 007–08, 11–12. For instance, even

though the global COVID-19 pandemic had a dramatic impact on immigration in fiscal year 2020 (both in terms of the motivations of individuals to attempt migration and in the federal government's policy efforts to limit entry to the United States), the October 29, 2020 press release the States rely upon does not account for COVID at all in reporting on decreases in apprehensions between fiscal year 2019 and fiscal year 2020 related to new border wall construction. *Id.* at 011–12. The States' speculation (1) that previous walls helped reduce not just apprehensions, but the number of people within the States availing themselves of social services, and (2) that future projects would have had a similar impact is not enough to pry open the doors of federal court.

12.     The States purport to rely on a "simple causal inference as to the effects of incentives on illegal immigration—as DHS's own assessments have found—and that at least some additional aliens (an increased number that would be present in the absence of the border barriers) will impose costs on the States through driver's license costs, healthcare, and education," along the lines of what courts in other circuits have found sufficient for competitive standing purposes. States' Opp. ¶¶ 9–10 (cleaned up); *see also id.* ¶ 13. But arguments that a plaintiff has standing to challenge a particular enforcement decision or policy choice because it would "slightly increase [the] risk of injury—or insufficiently decrease[] the risk"—are not a basis for standing in this Circuit. *E.T. v. Paxton*, 19 F.4th 760, 766 (5th Cir. 2021) (quoting *Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality*, 968 F.3d 419, 424 (5th Cir. 2020)). The States do not even try to distinguish *E.T.*, and insist that Fifth Circuit law "rejects any need to show that border barriers will by themselves reduce illegal immigration . . . only that they would be of *some help* in alleviating the harm" to the States. States' Opp. ¶ 13. But *E.T.* squarely rejects Article III standing arising from allegations of an increased risk of injury arising from policies that, if implemented, "might help" alleviate a plaintiff's injury. Even if the risk of migrants imposing social costs on the states is "certainly real . . . the alleged injury to plaintiffs from" changes in border wall policy is "much more abstract" and does not, on its own, give rise to standing. *Id.* at 766. The Court should reject the States' "false choice" between building walls and reducing unlawful immigration that "elides the various" enforcement measures already in place at the border, "regardless of" the Proclamation and the DHS Plan. *Id.*

13.     The States' theory of standing is also a far cry from the one blessed in *Hanson v. Veterans Admin.*, 800 F.2d 1381 (5th Cir. 1986). In that case, the plaintiff alleged that the VA had improperly appraised a house he sought to purchase. 800 F.2d at 1383–84. The Fifth Circuit took the district court to task for conflating the merits of the case with standing and concluded that the plaintiff had standing because "the relief sought—raising the VA appraisals by enjoining discriminatory appraisal practices—might permit" the plaintiff to purchase the home. *Id.* at 1386. Contrary to the States' assertion, the connection between alleged harms and asserted unlawful conduct is far more tenuous here. In *Hanson*, the alleged harm was solely the responsibility of the defendant agency, which could accord full relief by ending the discriminatory policies. Where, as here, the States' harm is contingent on highly conjectural responses by third party foreign nationals to the effects of federal spending policies, a much closer link between challenged policy and alleged harm is required.

14.     In sum, even if one assumes that the "driver's license theory" requires the Court to accept that increased numbers of migrants in the United States imposes a financial injury on the States in the form of increased social services spending, the States lack standing here. The States' purported "injury in fact" is "conjectural or hypothetical" because it is based on groundless speculation about the impact a different approach to managing the border wall appropriations would have on the number of migrants in the United States (as opposed to the actions migrants will take once they enter or are permitted to stay in the United States). Traceability is absent because the States cannot meet their heightened burden of showing that Defendants' decisions about how to spend federal funds correlate in the slightest with how many migrants will attempt to enter the country. And for much the same reasons, the States have not pled sufficient facts from which the Court could reasonably infer that the injunctive relief the States seek would redress these problems. The Court should reject standing on this theory.

## B.     Texas Has No Standing Under Its "Franchise Tax" Rationale.

15.     Texas's "franchise tax" theory of standing, States' Opp. ¶¶ 15–16, fares no better. Texas alleges that it has been injured by Defendants' decision to cancel border wall construction contracts,

thereby impeding "Texas's 'ability to collect' a specific tax—the franchise tax." *Id.* ¶ 15 (quoting *Wyoming*, 502 U.S. at 451). This misconstrues what the Supreme Court meant when it limited state standing to "a loss of specific tax revenues." *Wyoming*, 502 U.S. at 448. In *Wyoming*, the challenged statute required Oklahoma electricity producers to use a certain amount of coal mined within Oklahoma, thereby reducing purchases of Wyoming coal and diminishing the tax revenue Wyoming collected from a "severance tax" on the extraction of coal from land within its boundaries. Thus there was a "direct link between the state's status as a collector and recipient of revenues and the . . . action being challenged." *El Paso Cnty, Texas v. Trump*, 982 F.3d 332, 339 (5th Cir. 2020) (quoting *Com. Of Pa., by Shapp v. Kleppe*, 533 F.2d 668, 672 (D.C. Cir. 1976)). By contrast, the Texas franchise tax is a general tax on qualifying entities that do business in the state, not a tax on border infrastructure or federal contractors. *See* Franchise Tax Overview, Texas Comptroller of Public Accounts, https://comptroller.texas.gov/taxes/publications/98-806.php (last accessed Jan. 25, 2022). Hence, this case is governed by the Fifth Circuit's holding in *El Paso County, Texas v. Trump*, 982 F.3d 332, 340 (5th Cir. 2020), which rejected standing on the basis of a "reduction in general tax revenues" (such as income taxes, sales taxes, or franchise taxes. The loss of franchise tax revenue does not vest Texas with standing to challenge Defendants' policies with respect to the border wall.

## II.     Texas Must Be Dismissed Due to Improper Claim Splitting, and Missouri Should Not Be Permitted to Maintain Its Suit Absent Texas's Joinder.

16.     Texas's opposition to Defendants' claim-splitting argument touts this Court's conclusion that "only the Attorney General of Texas . . . may file suit on behalf of and represent Texas . . . and it is highly doubtful that the General Land Office can do so on Texas's behalf, or has any such assertable sovereign interests." Order Granting Consolidation, ECF No. 32, at 6. But as Defendants explained in their motion to dismiss, Defs.' Mot. to Dismiss at ¶ 49 n.3, the Land Office does have independent authority to litigate on behalf of Texas, separate from the Attorney General. *See General Land Office v. U.S. Dep't of Interior*, 947 F.3d 309 (5th Cir. 2020) (lawsuit filed by private attorney representing the General Land Office challenging the denial of a petition to delist the Golden-Cheeked Warbler as an endangered species). Indeed, in opposing Defendants' claim-splitting argument, Texas addresses none

of the authorities it cited in its own opposition to consolidation to show that the Land Office "cannot bring suit on the State's behalf."  States' Opp. to Mot. to Consol., ECF No. 22, at 4–5.  In any event, claim splitting does not turn on the question of litigating authority under Texas law, but on established principles of basic fairness that the rule against claim-splitting protects.  Texas does not have the right to file its own lawsuit against a defendant after one of its state agencies has already sued that defendant on claims arising from the same transaction or occurrence.

17.     Texas begins its response by citing to a couple of Fifth Circuit cases finding privity between officers of the same state government entity or agency.  States' Opp. ¶ 18.  But these cases prove *Defendants'* point, not the States.  This suit is being brought by "the State of Texas," and the Land Office (a state-wide executive agency) and Commissioner Bush (a state-wide elected official) are part of "the State of Texas."  *Cf. Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402–04 (1940) (holding, with respect to federal government officials, that "[t]here is privity between officers of the same government" for purposes of applying res judicata).  Texas tries to sidestep the issue by asserting that the rule against claim-splitting is limited to a situation where, for example, Commissioner Bush and the Land Office sue separately, but not as to a situation where the Land Office and "the Office of the Texas Attorney General" sue separately.  *Id.*  The cases cited contain no such limiting principle, but even if they did, it would not prevent application of the rule against claim splitting in *this* case.  That is because the Attorney General is not suing in his name or the name of his office, but on behalf of the entire "state of Texas."  The complaint seeks to vindicate the interests of a wide variety of executive branch agencies within Texas, the interests of the Texas legislature and governor in enacting House Bill 9, and Texas's interest in revenues received through its general franchise tax.  Compl. ¶¶ 29, 31–39.  In other words, the question here is not whether the Attorney General is the "same entity" as the Land Office, but whether the Land Office is "the same entity" as the state of Texas.  The answer to the latter question is an obvious "yes."

18.     Texas's attempts to defeat this obvious conclusion by analogy fall flat.  It first cites to a number of cases concluding that different aspects of the federal government were not the "same party" for purposes of applying the rule against hearsay.  States' Opp. ¶ 19.  But *United States v. Baker*, 923 F.3d

390 (5th Cir. 2019), rejects that analogy. Even though the court held in *Baker* that the Department of Justice and the Securities and Exchange Commission were not the same party for purposes of the rule against hearsay, it recognized that the Fifth Circuit had already "held that different government agencies *were* the same party for res judicata purposes." 923 F.3d at 400 (emphasis added). The treatment of different agencies as the "same party" for hearsay purposes therefore has no relevance to questions of preclusion and claim-splitting.

19.      Texas next argues that *Virginia Off. for Prot. & Advoc. v. Stewart*, 563 U.S. 247 (2011), "damn[s]" the claim splitting argument because, under Defendants' legal theory, "the Supreme Court of the United States blessed a lawsuit of a party against itself, which would appear to violate basic limitations on Article III." States' Opp. ¶ 21. But *Stewart* is perfectly compatible with Defendants' claim-splitting theory. The "commonwealth of Virginia" was not a party in *Stewart*, and neither res judicata nor claim splitting were at issue. Rather, *Stewart* involved a suit against state officials by an independent state agency under the exception to sovereign immunity articulated in *Ex parte Young*, 209 U.S. 123 (1908). *See Stewart*, 563 U.S. at 250. The Supreme Court held that the plaintiff, an independent state agency which Virginia created as part of a federal program to help enforce the federal rights of those with developmental disabilities, could proceed with a suit against state officers in federal court. *Id.* at 255–61. The Supreme Court's conclusion that an independent state agency seeking to vindicate federal rights could sue state officers in federal court under the "highly unusual statute" at issue in *Stewart*, 563 U.S. at 261 n.8, hardly gives license to a state suing a defendant in federal court after one of its agencies has already sued the same defendant over the same transaction or occurrence.

20.      If the Court agrees Texas has engaged in claim splitting, it should, at a minimum, dismiss Texas from this case. It should also dismiss Missouri due to lack of venue. (Missouri would then be free to refile this suit in a proper venue.) The States argue that venue is determined when a case is filed, and venue is not affected by subsequent events. *See* States Opp. ¶ 23. That rule does not help the States because the venue flaw in this case was apparent at the time the States filed this case. The General Land Office's complaint had been on file for three months before Texas brought this action. This is not a situation in which new events after the filing of the complaint change the venue analysis. Rather,

the Court may look to the facts in existence at the time this case was filed to conclude that Texas should be dismissed on claim-splitting grounds.

21.     Missouri would have no right to avail itself of this forum if it had not joined a party engaged in claim splitting to the complaint. Missouri asserts that this Court would still be an appropriate venue under 28 U.S.C. § 1391(e)(1) if Texas were dismissed because "the canceled border barrier construction contracts were to be performed within this venue." States' Opp. ¶ 23. But the "events or omissions giving rise to the claim" in this case, including the cancellation of border wall construction contracts scheduled to go forward in Texas, were carried out by federal officials who were not in Texas. The States also do not identify any case in which a single State has brought suit challenging a federal government policy outside of the federal courts of that state or the District of Columbia. Allowing Missouri to pursue its claims in this Court could encourage forum shopping by other states and local governments seeking to challenge federal policies in far flung jurisdictions outside of their own states.

22.     This Court has "broad discretion . . . on issues of venue[.]" *Burr v. Transohio Sav.*, 77 F.3d 477, 1995 WL 798590, at *4 (5th Cir. 1995) (table); *see* 28 U.S.C. § 1406(a). Accordingly, the Court should dismiss Texas from this case on claim-splitting grounds, and then dismiss the complaint as a whole for lack of proper venue.

### III.    The States' Claims Under the APA Are Unreviewable.

#### A.     The Defendants' Spending and Project Planning Decisions Are Committed to Agency Discretion By Law.

23.     The decisions the States have challenged in this case bear all the hallmarks of actions "committed to agency discretion by law," 5 U.S.C. § 701(a)(2), as articulated by the Supreme Court in cases like *Heckler v. Cheney*, 470 U.S. 821, 831–32 (1985), and *Lincoln v. Vigil*, 508 U.S. 182, 193 (1993). The States insist that these decisions are nonetheless subject to judicial review, but their arguments miss the mark.

24.     The States first insist that the appropriations at issue here fall outside § 701(a)(2) because they are not "lump sum" appropriations. States' Opp. ¶ 26. That formalistic reading of *Lincoln* is not

correct. The Supreme Court has never held that only "lump sum" appropriations qualify for § 701(a)(2), and other courts have recognized that "the principle set forth in *Lincoln v. Vigil* is not limited to lump-sum appropriations." *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). The States suggest that *Milk Train* is "irreconcilable" with *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019), but *Dep't of Commerce* was a case about the conduct of the decennial census (an area the Supreme Court characterized as not traditionally committed to agency discretion), not appropriations, so the holdings of these two cases can easily coexist. In the end, any distinction between the type of appropriation is unavailing. As the States do not deny, Congress's instruction to DHS to construct border barriers is not materially different, in form, from Congress's instruction to HHS to operate an Indian Health Service, which the Supreme Court classified as a "lump sum" appropriations in *Lincoln*. Defs.' MTD ¶ 59 & n.6. Both appropriations contain some broad policy guidelines that limit the use of appropriated funds, *see* States' Opp. ¶ 26 n.1, but nonetheless leave the agency with vast discretion as to how to allocate funds in order to "meet its statutory responsibilities in what it sees as the most effective or desirable way." *Lincoln*, 508 U.S. at 192.

25.     The States' application of § 701(a)(2) to this case is even shakier. The States argue that the border wall appropriation is only available for the construction of border barrier systems, hence providing clear guidelines against which the Court could review Defendants' decision-making. States' Opp. ¶ 28. Yet the States also concede that "activities related to the purpose of the appropriation like environmental planning, stakeholder consultation, or land acquisition" *are* permissible uses of the appropriation that fall within Defendants' discretion. *Id.* That is Defendants' point: Congress did not provide a meaningful standard against which to judge Defendants' discretionary choices as to how to balance the need to engage in lawful planning activities before initiating or resuming border barrier construction. The "reallocation of agency resources" towards these permissible activities "clearly falls with [Defendants'] statutory mandate to" construct a border wall system. *Lincoln*, 508 U.S. at 194. The States assert that they are actually challenging whether these expenditures are "furthering Congress's unambiguous command to ultimately spend funds earmarked for the construction of [a] barrier system along the southwest border." *Id.* (quotation omitted). But the States cannot avoid

§ 701(a)(2) by arguing that there might be an improper purpose behind decisions that comply with the text of the statute, or that the agency's approach does not sufficiently advance the statutory objective. When Congress commits a decision to agency discretion by law, it places the entire decision outside of APA review, including questions of why the agency chose to exercise its discretion in a particular way. 5 U.S.C. § 701(a)(2) ("This chapter applies, according to the provisions thereof, except to the extent that . . . agency action is committed to agency discretion by law."); *Gentile v. SEC*, 974 F.3d 311, 319–20 (3d Cir. 2020) (concluding that agency's decision to open a investigation was not subject to judicial review over plaintiff's allegation that the agency had a "retributory motive" for its action).

26.     As the Fifth Circuit recently stated in *Texas v. Biden*, "the discretionary allocation of funds is not the same as refusing to follow a statute." 20 F.4th at 928. The decisions in this case are clearly a an instance of the former, not the latter. Accordingly, the States' APA claims must be dismissed pursuant to § 701(a)(2).[2]

### B.     The States Cannot Raise Programmatic Challenges to the Border Wall Program.

27.     The States also concede that they are raising an agency inaction claim based on *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004), and they seek to compel DHS "to comply with Congress' mandate in the appropriations." States' Opp. ¶ 29 (internal quotation omitted). But that claim "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take.*" *Norton*, 542 U.S. at 64 (emphasis in original). This limitation "rules out judicial direction of even discrete agency action that is not demanded by law." *Id.* at 65. The Supreme Court thus held that the APA precluded review in *Norton* because the statute in question was "mandatory as to the object to be achieved, but it leaves [the agency] a great deal of discretion in deciding how to achieve it." *Id.* at 66.

28.     *Norton* precludes the States' inaction claim here. As was the case with the statute at issue in *Norton*, DHS's appropriations set forth a mandatory objective to be achieved through the

---

        [2]  When an agency action is committed to agency discretion by law under Section 701(a)(2), judicial review under the APA is unavailable. Accordingly, the States' "arbitrary and capricious" claim would be dismissed on this basis. *See* States' Opp. ¶ 3.

expenditure of funds (a border barrier system), but provide DHS with significant discretion in determining how best to spend its funds to implement that objective. Congress's appropriation to DHS states that funds "shall be available" for "the construction of barrier system along the southwest border." DHS Appropriations Act, 2020, Pub L. No. 116-93, Div. D, § 209(a)(1), 133 Stat. at 2512 (2019). That broad language provides no more specific statutory guidance as to the manner in which funds should be expended than the statute at issue in *Norton*, which required the agency to manage wilderness areas "so as not to impair the suitability of such areas for preservation as wilderness." *Norton*, 542 U.S. at 65 (citation omitted). For example, the appropriations acts do not tell DHS where to construct the border wall, when the construction should begin, how much advance planning is required for the border wall construction system, in what order activities should be completed, or how much time and money should be spent on things like environmental review, stakeholder consultation, and project planning.

29.    The appropriations also should be read in conjunction with section 102 of IIRRIA, the statute that gives DHS broad authority to undertake border wall construction. *See* Defs. Mot. to Dismiss ¶ 11. "While the construction of the fencing and infrastructure improvements may be phrased in mandatory language, the IIRIRA and the Appropriations Acts leave the Secretary and the DHS with a great deal of discretion in deciding how, when, and where to complete the construction." *United States v. Arizona*, No. CV 10-1413-PHX-SRB, 2011 WL 13137062, at *8 (D. Ariz. Oct. 21, 2011). In rejecting a similar inaction claim by the State of Arizona to force DHS to construct additional border barriers, the district court concluded that the "Acts do not mandate any discrete agency action with the clarity to support a judicial order compelling agency action." *Id.* at *8 (concluding that "no judicially manageable standards permit the Court to determine how or when the DHS or the Secretary should complete the fencing and infrastructure construction contemplated by the IIRIRA, the Secure Fence Act, and the Appropriations Acts").

30.    Additionally, like the *Norton* plaintiff, the States are not entitled to an order compelling compliance with a broad mandate to expend funds for a "barrier system." In seeking that relief, the States request a remedy that the Supreme Court has expressly forbidden: a "wholesale improvement

of [a] program by court decree, rather than in the offices of the Department or the halls of Congress." *Norton*, 542 U.S. at 64, 66-67 (explaining that the APA does not contemplate relief that would require the "supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management").

## IV.     The States Lack a Cause of Action Because They Fail the Zone-of-Interests Test.

31.     The States lack a cause of action to assert their statutory claims alleging violations of the Impoundment Control Act ("ICA") and the fiscal year 2020 and 2021 DHS Appropriations Acts because they fall outside the zone of interests protected by those statutes. *See* Defs.' Mot. to Dismiss ¶¶ 68–79.

32.     The States do not contest that they lack a private cause of action directly under the ICA or the DHS Appropriations Acts. *See id.* ¶¶ 66–67; States' Opp. ¶ 31. Instead, the States contend that they may assert their statutory claims through the cause of action provided by the APA or a non-statutory implied equitable cause of action. *See* States' Opp. ¶¶ 31–32. Defendants agree that the APA's cause of action encompasses statutory challenges to agency action, thus there is no need for the Court to decide whether an implied equitable cause of action would exist in this context. *See* 5 U.S.C. § 706(2)(C) (providing that "reviewing court shall" "hold unlawful and set aside agency action . . . in excess of statutory jurisdiction, authority, or limitations").[3] The States, however, may only bring a

---

[3] The States' non-statutory equitable claims would fail in any event. The States' complaint asserts a non-statutory equitable cause of action for their constitutional claims, but not for their statutory claims. *See* Compl. ¶ 79; *In re Enron Corp. Sec., Derivative & ERISA Litig.*, 761 F. Supp. 2d 504, 566 (S.D. Tex. 2011) ("[I]t is axiomatic that a complaint cannot be amended by briefs in opposition to a motion to dismiss.") (citation omitted). Further, non-statutory review of alleged *ultra vires* agency action is a limited doctrine that the plaintiff may only invoke when it would otherwise be "wholly deprive[d]" of a "meaningful and adequate means of vindicating its statutory rights" and when Congress has not precluded judicial review. *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin.*, Inc., 502 U.S. 32, 43–44 (1991) (citing *Leedom v. Kyne*, 358 U.S. 184 (1958)). The States, however, have not established that any "private rights," *Barlow v. Collins*, 397 U.S. 159, 166 (1970), or "rights which [Congress] create[d]" are at stake. *Switchmen's Union v. Nat'l Mediation Bd.*, 320 U.S. 297, 301 (1943); *see also Leedom*, 358 U.S. at 189 ("deprived . . . of a 'right' assured to them by Congress"). Additionally, the States have not been "wholly deprive[d]" of a means for review of their claims because Congress has provided the APA as the vehicle to review agency action alleged to be unlawful. *MCorp Fin., Inc.*, 502 U.S. at 43 (stating that "central to our decision in Kyne was the fact

cause of action for a statutory violation under the APA if their asserted interests at least arguably "fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-130 (2014) (citation omitted); *see Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012). The States cannot make that showing here. The ICA and DHS Appropriations Acts are appropriations statutes that regulate Congress's relationship to the Executive Branch in the appropriations process; they do not protect state agencies from having to spend money on driver's licenses fees and education costs. *See* Defs.' Mot. to Dismiss ¶¶ 68–79.

33.     The Fifth Circuit's recent decision in *Texas. v. Biden* does not support the States' claim that they fall within the zone of interests of the DHS Appropriations Acts or the ICA. *See* States' PI Reply at 27–29 (ECF No. 30).[4]  In *Texas v. Biden*, the States alleged that DHS's decision to terminate the Migrant Protection Protocols program violated the Immigration and Nationality Act (INA). Therefore, the Fifth Circuit focused its inquiry only on whether the States "fall within the zone of interests of the INA." *Texas v. Biden*, 20 F.4th at 975. Here, the States do not allege that DHS's border wall spending policies violate the INA. *Texas v. Biden* thus had no occasion to address Defendants' argument that the States' attenuated financial concerns fall outside the zone of interests of the DHS Appropriations Acts or the ICA. The Supreme Court has emphasized that the zone-of-interests test requires a statute-specific analysis and *Texas v. Biden* says nothing about the zone of interests for the statutes at issue in this case. *See Bennett v Spear*, 520 U.S. 154, 175–76 (1997).

34.     The States also cannot satisfy the zone-of-interest test by claiming that this case involves an immigration policy decision similar to *Texas v. Biden. See* States' PI Reply at 28. The "relevant statute" for zone-of-interests purposes "is the statute whose violation is the gravamen of the complaint," *Lujan*

---

that the Board's interpretation of the Act would wholly deprive the union of a meaningful and adequate means of vindicating its statutory rights"); *see Puerto Rico v. United States*, 490 F.3d 50, 59–60 (1st Cir. 2007) (concluding that non-statutory review is not available where the plaintiff can raise a claim under the APA's cause of action). Even if the States could overcome these obstacles, they would still fail the zone-of-interests test for the same reasons as their APA claims.

[4] In addressing the zone-of-interests issue, the States incorporate the arguments in their reply brief in support of their motion for preliminary injunction. *See* States' MTD Opp. ¶ 33.

*v. National Wildlife Fed'n*, 497 U.S. 871, 886 (1990), as confirmed "by reference to the particular provision of law upon which the plaintiff relies," *Bennett v Spear*, 520 U.S. at 175–76. Here, the States challenge compliance by DHS with its fiscal year 2020 and 2021 appropriations statutes funding border wall construction and the ICA. These statutes, therefore, provide the frame of reference for the Court's zone-of-interests analysis. The States cannot evade the zone-of-interests test for the specific statutes they seek to enforce by broadly claiming that they have an interest in immigration policy decisions that have downstream impacts on their fisc. "[T]o accept this level of generality in defining the 'relevant statute' could deprive the zone-of-interests test of virtually all meaning." *Air Courier Conference of Am. v. Am. Postal Workers Union,* 498 U.S. 517, 30 (1991); *see Ecosystem Inv. Partners v. Crosby Dredging, L.L.C.*, 729 F. App'x 287, 300 (5th Cir. 2018).

35.     The States contend that Defendants' framing of the zone-of-interest test is "too narrow" and cite *Texas v. Biden* for the proposition that the "statutes at issue must be view 'as a whole.'" States' PI Reply at 23 (quoting *Texas v. Biden*, 20 F. 4th at 975). The States, however, do not cite any other provisions of the ICA or the DHS Appropriations Acts that would support their zone-of-interest argument. In *Texas v. Biden*, the Fifth Circuit concluded the federal government's zone-of-interests argument was too narrow because it "focused on the zone of interests of *two subparagraphs* in § 1225(b)(2) rather than that of the INA (or even § 1225(b)(2)) as a whole." 20 F. 4th at 976 (emphasis in original). That concern is not present in this case. An examination of the entire ICA and every section of the DHS Appropriations Acts addressing border infrastructure funding shows that they do not "protect[] or regulate[]" State agency budgets. *Patchak*, 567 U.S. at 225; *see* 2 U.S.C. §§ 681–688; DHS Appropriations Act, 2020, Pub L. No. 116-93, Div. D, §§ 209–210, 133 Stat. at 2512; DHS Appropriations Act, 2021, Pub L. No. 116-260, Div. F, §§ 210–211, 134 Stat. at 1456–57.

36.     The States also cannot rehabilitate their zone-of-interests argument by contenting that their financial interests are harmed by DHS's border wall spending decisions. *See* States' PI Reply at 28–29. That argument simply reasserts the States' standing argument and does not address whether the DHS Appropriations Act and the ICA protect the States' financial interests. The Supreme Court has emphasized the separate nature of the standing and zone-of-interests inquiries, warning of the "absurd

consequences" that would result "[i]f any person injured in the Article III sense" could sue over a violation of law "unrelated" to his interests. *See Thompson v. N. Am. Stainless, LP*, 562 U.S. 170, 176–78 (2011); *see Lujan*, 497 U.S. at 883. The States, therefore, cannot bootstrap their standing arguments into the zone-of-interests analysis. Unlike cases where the Fifth Circuit relied on statutory text and legislative purpose to show that the INA aimed, at least in part, to protect States from financial burdens of unlawful immigration, *see Texas v. Biden*, 20 F. 4th at 975; *see Texas v. U.S.*, 809 F.3d 134, 162–63 (5th Cir. 2015), the States make no similar showing here for the DHS Appropriations Acts and the ICA.

37.     In addition to *Texas v. Biden*, the States rely on the Ninth Circuit's decision in *California v. Trump*, 963 F.3d 926 (9th Cir. 2020), but overlook the Supreme Court's vacatur of that decision. *See Biden v. Sierra Club,* 142 S. Ct. 46 (2021). Even before the vacatur, the Supreme Court concluded that the environmental plaintiffs in a companion case likely lacked a cause of action to bring a challenge to DoD's compliance with a provision of the DoD Appropriations Act authorizing transfers of funds between different budget accounts. *Sierra Club*, 140 S. Ct. 1 (2019). The Supreme Court concluded the Government was entitled to a stay of an injunction prohibiting border barrier construction funded by such transfers because, "[a]mong other reasons," it had sufficiently shown that the plaintiffs likely "have no cause of action to obtain review of the Acting Secretary's compliance with Section 8005." *Trump v. Sierra Club*, 140 S. Ct. 1 (2019). As the Supreme Court has emphasized, "a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked." *Lexmark*, 572 U.S. at 129.[5]

38.     The Ninth Circuit's merits panel decisions in the *Sierra Club* and *California* cases adopted the same flawed cause-of-action and zone-of-interests analysis as the Ninth Circuit motions panel that denied the Federal Government's initial stay application. *See Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019); *see id.* at 707–17 (N.R. Smith, J., dissenting) (stating that plaintiffs lack a cause of action to

---

[5] The litigation in Sierra Club focused on whether the plaintiffs satisfied the zone-of-interests requirement. *See* Reply in Support of Application for a Stay Pending Appeal, at *3–10, *Trump v. Sierra Club*, No. 19A60, 2019 WL 3451617 (July 22, 2019).

challenge DoD's appropriation transfer statute). The Supreme Court rejected that rationale when it granted a stay. Accordingly, there is no basis for this Court to rely on the Ninth Circuit's now-vacated decision, particularly when the Supreme Court's stay order undermines the cause-of-action analysis that the States rely on here.

39.     Even if the Court were to consider the *California* decision on its own merits, the Court should reject the panel majority's approach to zone of interests for the reasons explained in Judge Collins's dissent. *See California*, 963 F.3d at 950–976 (Collins, J., dissenting). The panel majority began by reasoning that the "field of suitable challengers" to the appropriations transfer statute "must be construed broadly in this context" in light of "restrictions on congressional standing [that] make it difficult for Congress to enforce" appropriations restrictions itself. *Id.* at 942. But the majority should not have taken it upon itself to relax the zone-of-interests requirement to achieve what it perceived to be the optimal number of "suitable challengers." The federal courts "are not entitled to bend the otherwise applicable . . . standards to ensure that someone will be able to sue in this case or others like it." *Id.* at 962 (Collins, J., dissenting). As the Supreme Court has repeatedly admonished in the Article III standing context, the "assumption that if [these plaintiffs] have no standing to sue, no one would have standing, is not a reason to find standing." *Clapper* v. *Amnesty Int'l USA*, 568 U.S. 398, 420 (2013) (citation omitted); *cf. United States* v. *Richardson*, 418 U.S. 166, 179 (1974) ("[T]he absence of any particular individual or class to litigate these claims gives support to the argument that the subject matter is committed to the surveillance of Congress, and ultimately to the political process.").

40.     The panel majority further reasoned that the States in *California* satisfied the zone-of-interests requirement because their "challenge actively furthers Congress's intent to tighten congressional control of the [appropriations] reprogramming process." *California*, 963 F.3d at 942 (citation omitted). Texas and Missouri rely on that same rationale here, arguing that this lawsuit is congruent with the interests of Congress because they seek to ensure that DHS spends its appropriations lawfully. *See* States' PI Reply at 30–31. But that reasoning—which has nothing to do with the financial interests asserted by the States—is effectively "tautological." *California*, 963 F.3d at 962 (Collins, J., dissenting). Mere "congruence between the States' legal theory and Congress's institutional interests is not

sufficient to satisfy the zone-of-interests test here." *Id.* (Collins, J., dissenting). Were that the case, any plaintiff with an Article III injury who alleges that an agency is spending funds contrary to the terms of its appropriations could be said to have the same congruence of interests with Congress in avoiding such violations. The Supreme Court has never endorsed such an expansive approach to zone of interests. *See, e.g., Thompson*, 562 U.S. at 176–78.

41.    Congress has the necessary tools to protect its own appropriations interests without any need for proxy litigation by States, whose interests may well diverge from the ultimate position of Congress. *See Nat'l Treasury Emp. Union v. Campbell*, 654 F.2d 784, 794 (D.C. Cir. 1981). That concern is evident in this case, where the nonpartisan GAO, a congressional agency with expertise in federal appropriations law, concluded that DHS did not unlawfully impound funds from its border infrastructure appropriations while implementing the President's Proclamation. *See* Matter of Office of Management and Budget and U.S. Dep't of Homeland Security–Pause of Border Barrier Construction and Obligations, B-333110.1, 2021 WL 2451823 (June 15, 2021). The States respond that the GAO was addressing the merits of the statutory dispute and said nothing about the applicable zone of interests, *see* States PI Reply at 34, but those narrow distinctions miss the larger point in this context. The States should not be able to sue based on a theory that they are acting congruent with Congress's interests in supervising agency spending when this lawsuit conflicts with the legal position adopted by the congressional agency charged with overseeing how federal funds are spent.

42.    The States also rely on the *California* panel majority in arguing that they are within the statutes' zone of interests because of their "unique" interest in enforcing the constitutional "separation of powers"—an interest they say applies with "particular force" because border wall construction impacts state sovereignty, namely their budgets. *Id.* at 32 (quoting *California*, 963 F.3d at 943). But the States do not have any "unique" interest in enforcing a statute appropriating funds to DHS or the ICA, neither of which mentions States or otherwise requires the DHS to take state fiscal interests into account before expending funds on authorized activities. Even through the zone of interests test does not require "congressional purpose to benefit the would-be plaintiff," *Clarke v. Securities Industry Assn.*, 479 U.S. 388, 399 (1987), the States must still establish that they are "arguably within the zone

of interests to be protected or regulated by the statute that [they] say[] was violated." *Patchak*, 567 U.S. at 224–25 & n.7 (citation omitted) The States cannot make that showing and do not point to any text, history, or statutory context that would indicate the DHS Appropriations Acts or the ICA protect or regulate state agency budgets from the consequences of federal spending policies. *See id.* at 225–28 (analyzing the "context and purpose" of a provision of the Indian Reorganization Act as well as the agency's regulations to determine the relevant zone of interests).

43.     The *California* panel's stated concern for state sovereign interests is of no help to the States here because it was based on preemption of state environmental laws by a federal statute. *See* States PI Reply at 32; *see California*, 963 F.3d at 943 (stating that harm to California and New Mexico's sovereign interests was due to the federal government "waiv[ing] state environmental law requirements for purposes of building the border wall"). There is no claim in this case that the DHS Appropriations Acts or the ICA prohibit the States from enforcing their own laws. Rather, the States' claim is that they have to spend money to respond to what they view as a deficiency in the way DHS is executing its border wall funding. Nothing in the appropriations acts or the ICA, however, reflects any interest in protecting the States from that type of alleged financial harm.

44.     Additionally, the States do not meaningfully distinguish the decisions of other courts concluding that various plaintiffs lack a cause of action to enforce the ICA. *See* States PI Reply at 32–33. As an initial matter, the States have no response to Defendants' argument that the ICA provides only the Comptroller General with a cause of action to enforce the statute. *See* 2 U.S.C. § 687. The States also try to diminish the force of *Pub. Citizen v. Stockman*, 528 F. Supp. 824, 830 n.1 (D.D.C. 1981), by arguing that the case involved an organizational plaintiff, not a State, but that view ignores the court's reasoning that the ICA was "clearly enacted to safeguard Congress' interests." Like the organizational plaintiff in *Stockman*, the States fall outside that zone of interests. The States contend that *Stockman* was based on § 702 of the APA and "binding Fifth Circuit precedent has held that States 'fall well within § 702.'" States PI Reply at 32–33 (quoting *Texas v. U.S.*, 809 F.3d at 152). The States, however, take that quote from the standing analysis in *Texas v. U.S.*, which merely said that Texas met the APA's definition of a party "suffering legal wrong because of agency action." *Texas v. U.S.*, 809

F.3d at 152 (quoting 5 U.S.C. § 702). That unremarkable statement says nothing about the zone-of-interests test. In any event, Supreme Court has made clear that the zone of interests is analyzed by reference to the substantive statute allegedly violated, not the APA itself. *See Patchak*, 567 U.S. at 224–25; *Lujan*, 497 U.S. at 886.

45. *Maine v. Goldschmidt*, 494 F. Supp. 93 (D. Me. 1980), also does not help the States. *See* States' PI Reply at 32–33. That case involved invocation of the ICA by the federal government as a defense to a claim by the State of Maine challenging a reduction of its share of federal highway money. *Goldschmidt,* 494 F. Supp. at 97 ("The Secretary contends, however, that the Impoundment Control Act, upon which the President relied to support the deferral, provides an independent statutory basis for the President's action."). The court made no reference to the zone of interests of the ICA, nor would there have been any reason for it to do so in that context. The same is true for *City of New Haven, Conn. v. United States,* 809 F.2d 900 (D.C. Cir. 1987), which addressed a challenge to the President's invocation of the ICA as defense to the deferral of four programs administered by the Department of Housing and Urban Development. The case did not mention zone of interests and focused on whether the unconstitutional legislative veto provision in the ICA was severable from the remainder of the statute.

46. In sum, States' financial interests are not remotely related to the congressional interests protected by the DHS Appropriations Acts and the ICA. The Court should accordingly dismiss the States' statutory claims (Counts II, IV, VII) for failure to assert a proper cause of action.

## V. DHS Has Complied With its Appropriations Statutes and the Impoundment Control Act.

47. Even if the court were to conclude that the States have a cause of action to assert their statutory claims, the States have failed to state a claim that DHS has unlawfully impounded funds in violation of the fiscal year 2020 and 2021 DHS Appropriations Acts or the ICA. *See* Defs.' Mot. to Dismiss ¶¶ 80–90.

48. As set forth in Defendants' motion, Congress appropriated $1.375 billion to DHS in fiscal years 2020 and 2021 "for the construction of barrier system along the southwest border." DHS

Appropriations Act, 2020, Pub L. No. 116-93, Div. D, § 209(a)(1), 133 Stat. at 2512; DHS Appropriations Act, 2021, Pub L. No. 116-260, Div. F, 134 Stat. at 1452, 1456–57. Congress gave DHS five years to obligate these funds and placed no limitations on the rate at which funds must be obligated over time. *See* DHS Appropriations Act, 2020, Pub L. No. 116-93, Div. D, 133 Stat. at 2506; DHS Appropriations Act, 2021, Pub L. No. 116-260, Div. F, 134 Stat. at 1452. The DHS Plan explains how DHS intends to spend these funds consistent with the appropriations statutes and the ICA. For border barrier projects funded by its fiscal year 2020 appropriations, "prior to further construction, DHS will undertake a thorough review and replanning process," including comprehensive environmental planning and consultation with interested stakeholders. DHS Plan at 2–3. DHS also intends to use its fiscal year 2021 appropriation cover the costs various remediation activities associated with the now-cancelled border wall projects funded by the Department of Defense that are turned over to DHS. *Id.* at 4.

49.    The States do not argue that DHS is spending its border wall appropriations on any improper project or activity. *See* States' Opp. ¶ 28. Indeed, the States have no response to Defendants' arguments that expenditures for border wall project planning, environmental remediation, and stakeholder consultation fall well within the scope of DHS's statutory budget authority under the necessary expense doctrine. *See* Defs.' MTD ¶¶ 86–87. That should be the end of the matter.

50.    The States, however, advance a novel theory of statutory interpretation that otherwise lawful expenditures become unlawful if they are made for pretextual reasons. *See* States Opp. ¶¶ 34–35. Although the States concede that planned expenditures by DHS would be lawful in some circumstances, *see id.* ¶ 28, they allege the expenditures here are unlawful because DHS is not spending money on these activities with the goal or mindset of eventually constructing a border wall. *See* States Opp. ¶ 34. The States do not cite any case or authority for their theory an agency's statutory authority to undertake a specific action can somehow be negated by allegation that the agency is not acting with sincere reasons. The sole issue in a challenge to an agency's statutory authority is whether the agency action "falls within the authorities that Congress has conferred upon" the agency. *Biden v. Missouri*, 142 S. Ct. 647, 652 (2022) (per curiam). There is no *mens rea* component to that analysis or inquiry

into the agency's underlying motive or rationale for the action. To be sure, the Supreme Court has recognized in the context of arbitrary and capricious review under the APA that in "unusual circumstances" a court may remand an agency decision for further explanation where there is "a disconnect between the decision made and the explanation given." *Dep't of Com.*, 139 S. Ct. at 2575–76 (evaluating whether the "Secretary's decision must be set aside because it rested on a pretextual basis"). But the Supreme Court has never grafted that type of pretext analysis into its consideration of whether an agency has statutory authority to act. *See id.* at 2571–73 (rejecting argument that the Secretary of Commerce violated the Census Act in adding question about citizenship to the 2020 census); *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 297 (2013) (stating that the question in challenges to agency authority "is always, simply, *whether the agency has stayed within the bounds of its statutory authority.*") (emphasis in original); *cf. Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977) ("judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government").[6] This distinction is consistent with the text of the APA, which differentiates between claims asserted under 5 U.S.C. § 706(2)(A) for arbitrary and capricious agency action and claims asserted under 5 U.S.C. § 706(2)(C) for agency action in violation of a statute. The States raise the latter type of claim in arguing that DHS has not complied with the ICA or the appropriations statues. Accordingly, there is no basis for this Court to take the unprecedented step of evaluating DHS's motivations for expenditures that are plainly lawful.

51. The States also cannot diminish the force of the GAO's opinion concluding that DHS acted in accordance with both the ICA and its appropriations statutes in the execution of its border wall

---

[6] In other contexts where courts assess the authority of federal officers to act, motive is similarly irrelevant. *See, e.g.*, *Bernard v. Cty. of Suffolk*, 356 F.3d 495, 504 (2d Cir. 2004) ("The appropriate inquiry" in an absolute immunity case "is not whether authorized acts are performed with a good or bad *motive,* but whether the *acts* at issue are beyond the prosecutor's authority.") (emphasis in original); *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1028 (D.C. Cir. 1997) ("[T]he relevant inquiry in determining whether an individual was acting in an official capacity focuses on the nature of the individual's alleged actions, rather than the alleged motives underlying them."); *cf. Horton v. California*, 496 U.S. 128, 138 (1990) (holding in the Fourth Amendment context that "evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer").

funding.  *See* States' Opp. ¶ 35.  The States previously advised the Court that the GAO's decision is entitled to "special weight" in light of "its accumulated experience and expertise in the field of government appropriations[,]" Compl. ¶ 9 n.7 (quoting *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005)), but they now backtrack from their reliance on that decision.  Instead of engaging with the merits of the GAO's statutory analysis, the States simply respond that the GAO did not evaluate whether DHS's border wall expenditures were pretextual or arbitrary and capricious under the APA.  *See* States Opp. ¶ 35.  That critique, however, does nothing to undermine the GAO's detailed analysis that DHS did not unlawfully impound funds or violate the ICA.  The Court should follow the GAO's well-reasoned decision and dismiss the States' statutory claims in Counts III, IV, and VII.

## VI.    The States' Constitutional Claims Should Be Dismissed.

52.     The States' constitutional claims in Counts I and II similarly fail because they are simply repackaged versions of their statutory claims "dressed up in constitutional garb."  *California*, 963 F.3d at 962–963 (Collins, J., dissenting).  The States agree that their constitutional claims hinge on the outcome of their statutory claims, *see* States PI Reply at 37, and they do not identify any unique constitutional principles separate and apart from the alleged statutory violations that would form the basis for a constitutional claim in this context.  In other words, the States' theory is that Defendants have violated the constitution solely because Defendants have not complied with the relevant appropriations statutes.  The Supreme Court rejected that line of reasoning in *Dalton*, 511 U.S. 462, and this Court should do the same here.

53.     As a threshold matter, the States argue that their constitutional claims satisfy the zone-of-interests test for the same reasons as their statutory claims, *see* States' Opp. ¶ 36, but as explained above, those arguments fail.  *See supra* ¶¶ 31–46.  The States otherwise offer no unique constitutional justification to support their zone-of-interests argument, thus further underscoring that their constitutional claims are indistinguishable from their statutory claims.

54.     The States also cite various cases for the general proposition that there is a longstanding equitable cause of action against federal officials for constitutional violations, *see* States' Opp. ¶ 37, but

these cases do not support recognition of the specific constitutional claims asserted in this case. None of the cases undermine *Dalton*'s reasoning that when an executive branch official is alleged to "ha[ve] exceeded his statutory authority," "no constitutional question whatever is raised," "only issues of statutory interpretation." *Dalton*, 511 U.S. at 473–74 & n.6. Regardless of whether a cause of action exists under the APA or in equity, the States cannot state a constitutional claim by characterizing an alleged statutory violation as a claim that Defendants are violating the Constitution. *See id.* The States' alleged constitutional violations of the separation of powers and the Take Care Clause would arise only if DHS has not complied with its statutory funding authorities. But this would still be a question of whether DHS was in compliance with its statutory obligations, not whether it violated the constitution. For this reason, the States have failed to state cognizable constitutional claims.

55.      The States' attempt to distinguish *Dalton* is unavailing. *See* States' Opp. ¶ 38. The States incorrectly contend that this case implicates "separation of powers concerns not present in *Dalton*" because their claim is that Defendants have "affirmatively displaced a congressional mandate." *Id.* (quoting *Make the Rd. New York v. Pompeo*, 475 F. Supp. 3d 232, 258 (S.D.N.Y. 2020)). That argument is flawed because, as *Dalton* explained, almost any challenge to the President's exercise of authority under a statute could be recast as an allegation that the President violated the Constitution by exceeding Congress's grant of authority. 511 U.S. at 472. In any event, this is not a case where Defendants are relying on separate statutory or constitutional authority to avoid compliance with a congressional statutory command. *Compare Make the Rd. New York*, 475 F. Supp. 3d at 258 (analyzing whether a Presidential proclamation issued pursuant to 8 U.S.C. § 1182(f) can "override the complex inadmissibility framework enacted by Congress and codified in the rest of Section 1182"). Defendants are not arguing that a provision of the Constitution or another statute authorizes DHS to impound funds appropriated by Congress. Instead, the dispute is over whether DHS's border infrastructure expenditures are consistent with the terms of its fiscal year 2020 and 2021 statutory appropriations. Like *Dalton*, this case concerns "simply" whether DHS "exceeded [its] statutory authority" in executing its appropriated funds, and raises "only issues of statutory interpretation." 511 U.S. at 473–74 & n.6. To conclude otherwise would have the radical effect of transforming every challenge to an agency's

compliance with a statute into a constitutional controversy, thereby "eviscerat[ing]" the "well established" "distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other." *Id.* at 474; *see also California*, 963 F.3d at 964–965 (Collins, J., dissenting) (relying on *Dalton* to conclude that a challenge to DoD's appropriations transfer statute raises statutory, not constitutional claims); *Sierra Club*, 929 F.3d at 709 (N.R. Smith, J., dissenting) ("viewing Plaintiffs' claim as alleging a statutory violation is the proper approach"); *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 51–54 (D.D.C. 2020) (dismissing constitutional claims challenging border wall construction based on *Dalton*).

56.     The States' reliance on *Mississippi v. Johnson*, 71 U.S. (Wall.) 475 (1867), cannot rescue their constitutional claims from dismissal. *See* States Opp. ¶ 39. *Johnson* is a case about remedies against the President and it says nothing about whether a constitutional cause of action based on the Separation of Powers or the Take Care Clause exists in this context. *Id.* at 478 (stating the question presented as, "Can the President of the United States be made a party defendant to this bill?"). As set forth in Defendants' motion to dismiss, *Johnson* and its progeny establish that courts cannot issue declaratory or injunctive relief against the President. *See* Defs.' Mot. to Dismiss ¶¶ 51–56. Indeed, the States concede the President must be dismissed from this case. *See* States' Opp. ¶ 2.

57.     The Supreme Court's decision in *Kendall v. U.S. ex rel. Stokes*, 37 U.S. (12 Pet.) 524 (1838), likewise provides no support for Plaintiffs' Take Care Clause claim. *See* States' Opp. ¶ 40. The Take Care Clause issue arose in *Kendall* as a potential affirmative defense, not as a sword by which plaintiffs could sue the Executive Branch over allegations that it did not act within statutory authority. The Supreme Court noted that the President could not invoke the Clause as a basis for his authority to forbid the execution of a law, but it also recognized that the President had claimed no such power, nor had he forbidden a lower-level Executive Branch official— the postmaster general—to abstain from executing the law. 37 U.S. at 612–13. Ultimately, the discussion had no bearing on the Court's holding, which was merely that a court could, in an appropriate case, grant mandamus relief against a lower-level employee to perform a ministerial duty. *See id.* at 613, 626 (describing the statute at issue as establishing a "precise, definite act, purely ministerial; and about which the postmaster general had

no discretion whatever"). Nothing in that case suggested that a court could go beyond the limitations of mandamus relief by ordering an Executive Branch official, or even the President, must take various discretionary actions to "take care" that a law is "faithfully executed."

## CONCLUSION

58. For the foregoing reasons, Defendants' motion to dismiss should be granted.

Dated: January 25, 2022

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

*/s/ Michael J. Gerardi*
ANDREW I. WARDEN
Senior Trial Counsel
MICHAEL J. GERARDI (D.C. Bar
#1017949)
Trial Attorney / Attorney-in-Charge
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW, No. 122212
Washington, D.C. 20005
Tel: (202) 616-0680
Fax:    (202) 616-8470
E-mail: michael.j.gerardi@usdoj.gov

## REQUEST FOR ORAL ARGUMENT

Pursuant to Local Rule 7.5.A., Defendants believe oral argument would be helpful to the Court and respectfully request the opportunity to present oral argument in support of this motion.

*/s/ Michael J. Gerardi*
MICHAEL J. GERARDI

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2022, I electronically filed a copy of the foregoing. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

*/s/ Michael J. Gerardi*
MICHAEL J. GERARDI