# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

| | | |
|---|---|---|
| THE GENERAL LAND OFFICE OF THE STATE OF TEXAS; and GEORGE P. BUSH, in his official capacity as Commissioner of the Texas General Land Office, | § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| JOSEPH R. BIDEN, in his official capacity as President of the United States of America; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; and ALEJANDRO MAYORKAS, in his official capacity as Secretary of the United States Department of Homeland Security, | § § § § § § § § § | Case No. 7:21-CV-00272 |
| Defendants. | § § | |
| THE STATE OF MISSOURI; and THE STATE OF TEXAS, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| JOSEPH R. BIDEN, JR. in his official capacity as President of the United States of America; THE UNITED STATES OF AMERICA; ALEJANDRO N. MAYORKAS, in his official capacity as Secretary of the United States Department of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY A. MILLER, in his official capacity as the Acting Commissioner of United States Customs and Border Protection; and UNITED STATES CUSTOMS AND BORDER PROTECTION, | § § § § § § § § § § § § § § § § | Case No. 7:21-CV-00420 (Formerly Case No. 6:21-CV-00052) |
| Defendants. | § | |

**RESPONSE OF THE TEXAS GENERAL LAND OFFICE AND
COMMISSIONER GEORGE P. BUSH IN OPPOSITION TO MOTION TO DISMISS**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................iv

INTRODUCTION ...........................................................................................1

ARGUMENT...................................................................................................2

    I.     GLO Has Standing..........................................................................2

    II.    The President Should Not Be Dismissed...........................................6

    III.   GLO Has Stated Plausible Claims Under the APA.........................9

          A.    The APA Provides a Cause of Action and
                   Basic Presumption of Reviewability ......................................9

          B.    The DHS Plan is Arbitrary and Capricious.......................10

               1.    DHS Previously Determined that Border Walls
                        are Highly Effective and that the RGV Sector is
                        "High Priority" for Their Construction ...................................11

               2.    The Proclamation Directed DHS to Halt Border
                        Barrier Construction Because President Biden
                        Disagreed with Congress's Policy ...........................................12

               3.    The DHS Plan Canceled All Border Wall
                        Construction to Adopt President Biden's Policy...................12

                4.    The DHS Plan Did Not Consider Border Security
                        or DHS's Prior Findings Regarding Border Walls ...............13

          C.    DHS Failed to Follow the APA's Procedural Requirements ...........15

          D.    The DHS Plan is Not in Accordance with Law .................16

                1.    DHS Violated the 2019 CAA and Has Not
                        Challenged GLO's Claims for Violations of the
                        2020 and 2021 CAAs.................................................................17

                2.    DHS Violated Budgetary Statutes ...........................................19

3.     DHS Exceeded its Statutory Authority
Under the IIRIA ...................................................................21

     i.     The IIRIRA Does Not Authorize DHS's
Nationwide Border Wall Freeze ...................................21

     ii.    DHS's Statutory Preclusion Argument Fails .............22

4.     The GAO's Spurious Reframing of the
Border Wall Freeze as a "Programmatic Delay"
Does Not Defeat GLO's Claims ................................23

E.     Defendants' Additional APA Reviewability Challenges Fail ...........25

1.     GLO Satisfies the Zone-of-Interests Test ................................25

2.     DHS's Nationwide Border Freeze is Not Action
Committed to Agency Discretion by Law ..............................28

3.     The Border Wall Freeze is Not a Statement of
General Policy or a Rule of Agency Organization,
Procedure, or Practice ................................................29

4.     GLO's Claims Are Not Programmatic Challenges ...............32

IV.     GLO Has Stated Plausible *Ultra Vires* Claims ................................33

A.     GLO Has a Cause of Action for *Ultra Vires* Review ..........................34

B.     The Zone-of-Interests Test Does Not Apply to
*Ultra Vires* Claims ...............................................................35

C.     DHS Does Not Raise a Viable Merits Challenge
to GLO's *Ultra Vires* Claims ................................................36

V.     GLO Has Plausibly Alleged Constitutional Violations ...................36

A.     GLO Has a Cause of Action for its Constitutional Claims................36

B.     The Zone-of-Interests Test Does Not Apply to
Constitutional Claims ........................................................37

C.   GLO's Constitutional Claims Satisfy the
     Zone-of-Interests Test to the Extent It Applies ..................................38

D.   GLO's Constitutional Claims Are Not
     Repackaged "Statutory" Claims ...........................................................39

CONCLUSION ...........................................................................................................41

# TABLE OF AUTHORITIES

**Cases**

*Aid Ass'n for Lutherans v. U.S. Postal Serv.*,
321 F.3d 1166 (D.C. Cir. 2003) ........................................................................... 35

*Armstrong v. Exceptional Child Center, Inc.*,
575 U.S. 320 (2015) ........................................................................... 34, 35, 36

*Barilla v. City of Houston*,
13 F.4th 427 (5th Cir. 2021) ........................................................................... 2, 3, 25

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........................................................................... 3

*Bond v. United States*,
564 U.S. 211 (2011) ........................................................................... 28, 38

*Boston Stock Exch. v. State Tax Comm'n*,
429 U.S. 318 (1977) ........................................................................... 37, 39

*BST Holdings, LLC v. OSHA*,
17 F.4th 604 (5th Cir. 2021) ........................................................................... 18

*California v. Trump*,
379 F. Supp. 3d 928 (N.D. Cal. 2019), *aff'd*, 963 F.3d 926 (9th Cir. 2020) ........................ 7

*California v. Trump*,
963 F.3d 926 (9th Cir. 2020) ........................................................................... 28

*Chamber of Commerce of U.S. v. Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ........................................................................... 34

*City and County of San Francisco v. Trump*,
897 F.3d 1225 (9th Cir. 2018) ........................................................................... 40, 41

*Clarke v. Secs. Indus. Ass'n*,
479 U.S. 388 (1987) ........................................................................... 27

*Clinton v. City of New York*,
524 U.S. 417 (1998) ........................................................................... 37, 41

*Community Nutrition Institute v. Young*,
818 F.2d 943 (D.C. Cir. 1987) ........................................................ 30, 31

*Cook County v. Wolf*,
19 C 6334, 2020 WL 3975466 (N.D. Ill. July 14, 2020) ................ 18

*Ctr. for Biological Diversity v. McAleenan*,
404 F. Supp. 3d 218 (D.D.C. 2019) ............................................ 22, 23

*Ctr. for Biological Diversity v. Trump*,
453 F. Supp. 3d 11 (D.D.C. 2020) .................................................... 27

*Dalton v. Specter*,
511 U.S. 462 (1994) ......................................................................... 40

*Dames & Moore v. Regan*,
453 U.S. 654 (1981) .................................................................... 34, 35

*Defenders of Wildlife v. Chertoff*,
527 F. Supp. 2d 119 (D.D.C. 2007) .................................................. 22

*Dep't of Commerce v. New York*,
139 S. Ct. 2551 (2019) ............................................................ 2, 12, 18

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ........................................................... 9, 10, 16

*East Bay Sanctuary Covenant v. Biden*,
993 F.3d 640 (9th Cir. 2021) ............................................................. 7

*Encino Motors, LLC v. Navarro*,
579 U.S. 211 (2016) ........................................................................ 14

*Friends of Lydia Ann Channel v. U.S. Army Corps of Engineers*,
701 F. App'x 352 (5th Cir. 2017) ....................................................... 9

*Getty v. Fed. Sav. & Loan Ins. Corp.*,
805 F.2d 1050 (D.C. Cir. 1986) ....................................................... 13

*Gomez v. Trump*,
485 F. Supp. 3d 145 (D.D.C. 2020) ................................................... 7

*In re Border Infrastructure Envtl. Litig.*,
915 F.3d 1213 (9th Cir. 2019) ......................................................... 22

*INS v. Chadha,*
   462 U.S. 919 (1983) ............................................................................ 28, 39

*Int'l Union, UMW v. MSHA,*
   407 F.3d 1250 (D.C. Cir. 2005) ......................................................... 15

*Lexmark Int'l, Inc. v. Static Control Components, Inc.,*
   572 U.S. 118 (2014) .................................................................. 26, 35, 37

*Lincoln v. Vigil,*
   508 U.S. 182 (1993) ........................................................................... 29

*Louisiana v. Biden,*
   2:21-CV-00778, 2021 WL 2446010 (W.D. La. June 15, 2021) ..................................... *passim*

*Louisiana v. United States,*
   948 F.3d 317 (5th Cir. 2020) ............................................................. 32

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992) ............................................................................. 2

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
   567 U.S. 209 (2012) ........................................................................... 26

*Medellín v. Texas,*
   552 U.S. 491 (2008) ............................................................................. 7

*Michigan v. EPA,*
   576 U.S. 743 (2015) ..................................................................... 10, 14

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ....................................................................... 10, 14

*Nevada v. Dep't of Energy,*
   400 F.3d 9 (D.C. Cir. 2005) ............................................................. 24

*Norton v. S. Utah Wilderness Alliance,*
   542 U.S. 55 (2004) ........................................................................... 32

*Phillips Petroleum Co. v. Johnson,*
   22 F.3d 616 (5th Cir. 1994) ......................................................... 15, 30

*Rollerson v. Brazos River Harbor Nav. Dist. of Brazoria County Texas,*
  6 F.4th 633 (5th Cir. 2021) ............................................................ 33

*Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.,*
  87 F.3d 1356 (D.C. Cir. 1996) ........................................................ 27

*Schumacher v. Capital Adv. Sols., LLC,*
  CV H-18-0436, 2019 WL 1026305 (S.D. Tex. Jan. 22, 2019),
  *report and recommendation adopted,* CV H-18-0436,
  2019 WL 1025894 (S.D. Tex. Mar. 4, 2019) ...................................... 6

*Shomberg v. United States,*
  348 U.S. 540 (1955) ....................................................................... 40

*Sierra Club v. Peterson,*
  228 F.3d 559 (5th Cir. 2000) .......................................................... 32

*Sierra Club v. Trump,*
  929 F.3d 670 (9th Cir. 2019) ............................................... 38, 39, 40

*Tenn. Wine & Spirits Retailers Ass'n v. Thomas,*
  139 S. Ct. 2449 (2019) ................................................................... 37

*Texas v. Biden,*
  20 F.4th 928 (5th Cir. 2021) .................................................... *passim*

*Texas v. United States,*
  787 F.3d 733 (5th Cir. 2015) ............................................................ 4

*Texas v. United States,*
  809 F.3d 134 (5th Cir. 2015) ................................................... *passim*

*Trump v. Hawaii,*
  138 S. Ct. 2392 (2018) ................................................................ 7, 36

*United States v. 6.584 Acres of Land,*
  533 F. Supp. 3d 482 (S.D. Tex. 2021) .............................................. 4

*United States v. McIntosh,*
  833 F.3d 1163 (9th Cir. 2016) ........................................................ 36

*United Techs. Corp. v. U.S. Dep't of Def.,*
  601 F.3d 557 (D.C. Cir. 2010) ........................................................ 13

*Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*,
    454 U.S. 464 (1982) ........................................................................................ 37

*Walk Haydel & Associates, Inc. v. Coastal Power Prod. Co.*,
    517 F.3d 235 (5th Cir. 2008) ........................................................................... 5

*Washington v. Trump*,
    441 F. Supp. 3d 1101 (W.D. Wash. 2020) ....................................................... 27

*Williamson v. Tucker*,
    645 F.2d 404 (5th Cir. 1981) ........................................................................... 6

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992) ........................................................................................ 37

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ........................................................................................ 7

**Statutes**

31 U.S.C. § 1301(a) ............................................................................................. 19

31 U.S.C. § 1532 ................................................................................................. 19

5 U.S.C. § 551(4) ................................................................................................. 31

5 U.S.C. § 553 ..................................................................................................... 31

5 U.S.C. § 553(b) ................................................................................................ 15

5 U.S.C. § 553(b)(A) ...................................................................................... 29, 31

5 U.S.C. § 603 ..................................................................................................... 16

5 U.S.C. § 603(a) ................................................................................................ 16

5 U.S.C. § 603(b)(1)-(2) ..................................................................................... 16

5 U.S.C. § 611(a)(1) ........................................................................................... 16

5 U.S.C. § 701(a)(2) ....................................................................................... 28, 29

5 U.S.C. § 702 ..................................................................................................... 9

5 U.S.C. § 706 .................................................................................... 9

5 U.S.C. § 706(2)(A) ........................................................................ 10

5 U.S.C. § 706(2)(D) ................................................................. 16, 31

5 U.S.C. § 706(c), (d) ...................................................................... 16

8 U.S.C. § 1103 ................................................................................ 21

# INTRODUCTION

1.       The government's motion to dismiss avoids directly addressing the issue of whether the Executive can refuse to spend appropriated funds based on a policy disagreement with Congress. Yet that is the issue before the Court, because Defendants did so without any subtlety. Both the Proclamation and DHS Plan profess to implement a policy that "no more American taxpayer dollars [should] be diverted to construct a border wall." A DHS press release prepared during the pendency of this litigation "call[s] on Congress to cancel remaining border wall funding," bragging that its current "activities will not involve any construction of new border barrier." Secretary Mayorkas publicly stated: "It is the policy of this administration, we do not agree with a building of the wall." President Biden's former Border Patrol Chief warned in a letter to Congress that leadership within the Biden Administration "openly discussed ways to slow roll any decisions as well as options to do the least action possible" with respect to border wall construction. Defendants leave no doubt that they refuse to construct border walls because they disagree with the laws Congress enacted.

2.       Defendants refuse to address this central issue because the Executive has no constitutional or statutory authority to override Congress's appropriations. Defendants instead seek dismissal premised on factual disputes—namely that the Court should disregard their stated policies of *not* constructing any new border walls, issued while canceling all border wall construction contracts and exhausting the appropriations through contractual delay and cancellation fees. These factual disputes, which required a lengthy statement of facts replete with Defendants' own allegations as foundation, cannot be resolved against the Texas General Land Office and Commissioner George P. Bush (collectively "GLO") at the motion-to-dismiss stage.

3.       In *Louisiana v. Biden*, the Biden Administration very recently tested the legal basis of its motion to dismiss against a similar scheme—a nationwide ban on oil and gas leasing on federal lands disguised as a leasing "pause"—and the court soundly rejected

its interpretations of the Constitution and APA. 2:21-CV-00778, 2021 WL 2446010 (W.D. La. June 15, 2021). This decision from a sister court within the Fifth Circuit is in accord with Fifth Circuit cases addressing the APA and constitutional separation of powers, including most recently *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021). These recent rejections of Defendants' positions provide a ready blueprint for denial of the government's motion to dismiss.

## ARGUMENT

### I.     GLO Has Standing.

4.      To establish standing, a plaintiff must show: (1) a concrete, particularized, actual or imminent injury-in-fact; (2) that is fairly traceable to the challenged action of the defendant; and (3) is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). On a motion to dismiss for lack of standing, the question is whether the complaint "allege[s] facts that give rise to a plausible claim" of standing. *Barilla v. City of Houston*, 13 F.4th 427, 431 (5th Cir. 2021) (quoting *Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 133-34 (5th Cir. 2009)). In assessing whether a plaintiff has met that standard, the Court takes "the well-pleaded factual allegations of the complaint as true" and views them "in the light most favorable to the plaintiff." *Id.*

5.      GLO's First Amended Complaint alleges a variety of harms occurring on the GLO Farm resulting from a surge of illegal border activity and that Defendants have magnified these harms by blocking completion of the RGV-09 project. *See, e.g.*, Dkt. 34 at ¶¶ 73-85. GLO alleges that by completing the RGV-09 border wall on adjacent property, and then abruptly stopping the project, Defendants diverted and magnified the flow of illegal border activity to the GLO Farm. *Id.* at ¶¶ 55, 81-83. Because Article III "requires no more than de facto causality," traceability is satisfied. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2566 (2019).

6.     Defendants do not challenge GLO's allegations with respect to the injury-in-fact and redressability elements. However, they challenge traceability by making factual arguments about the extent to which the freeze on border wall construction harmed GLO's property. These fact-based arguments are inappropriate at the motion-to-dismiss stage, where courts must assume "that all the allegations in the complaint are true." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

7.     Defendants argue that "it is very difficult, if not impossible, to draw a connection between decision to migrate *any* particular policy of the receiving country." Dkt. 36 at ¶ 42. They also argue that it is "plausible that a prior policy which focused on erecting border barriers was an entirely ineffective means of dealing with the root causes of migration." *Id.* at ¶ 43. And they contend that the initiation of preliminary steps by the State of Texas to remedy some of the security problems caused by Defendants' cessation of construction projects will eventually result in those projects becoming unnecessary, although they do not submit any evidence on that point or explain its *present* applicability to the Motion to Dismiss. *Id.* at ¶ 45. These are factual disputes about the merits of this lawsuit that can be resolved only after discovery. At the motion-to-dismiss stage, the question is whether the facts alleged in the complaint, if true, are sufficient to establish standing. *See Barilla v. City of Houston*, 13 F.4th at 431.

8.     Defendants claim that the federal government was "still negotiating" to acquire a portion of the GLO Farm at the time of the Proclamation and that GLO can only "speculate as to how government officials would have exercised their discretion." Dkt. 36 at ¶ 44. But the federal government had already planned the RGV-09 project on the GLO Farm, and contracted to carry it out. Indeed, the border walls to be constructed in the RGV area were DHS's "highest priority" miles, and it is not speculative to conclude that the government would carry out its highest priority projects if the unlawful border wall freeze is set aside. Dkt. 34 at ¶ 54. No speculation is involved in reasoning that in the absence of President Biden's unconstitutional directive to stop, the federal government

would have done what it already planned, prioritized, and contracted to do. *Texas v. United States*, 787 F.3d 733, 753 (5th Cir. 2015) (traceability inquiry satisfied where standing arose from illegal immigrants seeking driver's licenses because it was not speculative to assume they would be "eager to obtain licenses").

9. That negotiations had been ongoing does not defeat standing. The federal government made a firm offer to acquire the GLO Farm, backed by a potential threat of litigation if GLO did not accept. At the time of the Proclamation, the federal government had initiated over 100 eminent domain suits to acquire property for border projects, including litigation pending in this Court. And this Court recently ruled that the Biden Administration was "entitled to immediate possession" of property needed for border barriers, citing the government's stated need for "urgency of possession." *United States v. 6.584 Acres of Land*, 533 F. Supp. 3d 482, 501 (S.D. Tex. 2021). After President Biden's Proclamation, DHS suddenly halted the RGV-09 project and all border barrier projects generally. And it published the DHS Plan explaining that it was halting those projects because of President Biden's Proclamation. Dkt. 36-2 at 2 (noting that the "Proclamation directed a pause in the construction of the southern boder wall"). The final decision to halt all construction is ultimately traceable to Defendants' unlawful actions.

10. Furthermore, the harms suffered by GLO are traceable to Defendants' cessation of construction. As former United States Border Patrol Chief Rodney Scott explained in his letter to members of Congress, "the unprecedented seismic shift in border security and immigration policy that was initiated on January 20, 2021 . . . created the current border crisis." Dkt. 34-1 at 1. "As a direct result" of the delays in border wall construction caused by the Proclamation, "USBP has been forced to reduce patrol areas to address gaps in barriers, non-functional gates and grates and inoperable technology." *Id.* at 4. "I was briefed by USBP and CBP personnel with direct knowledge that leadership within the Biden administration openly discussed ways to slow roll any decisions as well

as options to do the least action possible to avoid an Impoundment Act violation without doing any construction as required by law." *Id.*

11.　DHS's own publications proudly proclaim the effectiveness of border walls at carrying out DHS's mandate to secure the border. According to DHS, the "*bottom line*" is that "Walls Work." Dkt. 34 at ¶ 1.[1] DHS states: "When it comes to stopping drugs and illegal aliens from crossing our borders, border walls have proven to be extremely effective." *Id.* GLO has plausibly alleged the RGV-09 project would have continued in the absence of the Proclamation and DHS Plan, and that its harms were caused by the failure to complete the RGV-09 project on the GLO Farm. The traceability element has been satisfied.

12.　Defendants distract from the standing allegations above by focusing on whether GLO can prove that Defendants "enticed" illegal immigrants to break the law. Dkt. 36 at ¶¶ 40, 42. This argument is ultimately a dispute about GLO's factual allegations: whereas the First Amended Complaint attributes  the border surge to the Biden Administration policies, Defendants trace the border surge to a failure to deal with "the root causes of migration." Dkt. 34 at ¶¶ 42-43. Factual disputes of causation cannot be aired through a motion to dismiss before discovery has occurred. *Walk Haydel & Associates, Inc. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008) (in analyzing jurisdiction on a motion to dismiss, the court "should not act as a fact finder and must construe all disputed facts in the plaintiff's favor").[2]

---

[1] Citing DEP'T OF HOMELAND SECURITY, *Walls Work*, DHS.gov (Dec. 12, 2018), https://www.dhs.gov/news/2018/12/12/walls-work (emphasis in original).

[2] The authorities Defendants rely on concerning "enticement" standing are also of dubious applicability. Dkt. 36 at ¶ 42 (citing *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F. 4th 997, 1014-16 (9th Cir. 2021); *Arpaio v. Obama*, 797 F.3d 11, 19-24 (D.C. Cir. 2015)). Even as Defendants characterize these cases, they address the limited inquiry of whether standing can be established when a policy might possibly induce future illegal immigration by migrants who would not have even benefited from the challenged policy. Here, there is no question about the likelihood of future harms. Plaintiffs have alleged, and intend to prove, that they have already been harmed by illegal border crossings that occurred during the past year.

13.     While the Biden Administration's border policies have resulted in a staggering increase in illegal border traffic, GLO also satisfies traceability by alleging that the failure to complete the RGV-09 project has diverted illegal border traffic to the GLO Farm. And while the Complaint contains ample allegations in that regard, to the extent the Court has concerns about jurisdiction, GLO respectfully asks for an opportunity to conduct discovery and an opportunity for a full and fair hearing before the Court rules. *See Williamson v. Tucker*, 645 F.2d 404, 414 (5th Cir. 1981) ("But still the district court must give the plaintiff an opportunity for discovery and for a hearing that is appropriate to the nature of the motion to dismiss."); *Schumacher v. Capital Adv. Sols., LLC*, CV H-18-0436, 2019 WL 1026305, at *4 (S.D. Tex. Jan. 22, 2019), *report and recommendation adopted*, CV H-18-0436, 2019 WL 1025894 (S.D. Tex. Mar. 4, 2019) (ordering jurisdictional discovery to supplement plaintiff's allegations on corporate veil piercing for plausibility determination).

14.     Plaintiffs are aware that DHS has records quantifying illegal border activity such as encounters and apprehensions on the GLO Farm and adjoining properties. These records would likely prove that leaving the RGV-09 project incomplete is funneling illegal border traffic to the GLO Farm. DHS and its subordinate agencies also likely possess documents and communications that would permit the GLO to further supplement its allegations regarding the causal relationship between the Proclamation/DHS Plan and the decision to halt the RGV-09 project. While these issues would be more appropriately addressed through summary judgment, if the Court finds otherwise, GLO requests leave to file a motion seeking limited jurisdictional discovery to supplement its Complaint.

## II.     The President Should Not Be Dismissed.

15.     Defendants contend that President Biden's inclusion in this suit raises grave separation of powers concerns, but they overreach by devoting the majority of their argument to attacking claims GLO never asserted. They argue that GLO cannot maintain

claims against President Biden under the APA. But neither the APA claim nor the portions of the prayer related to the APA claim mention President Biden. They seek relief only against DHS and Secretary Mayorkas. Defendants also maintain that federal courts lack jurisdiction to "enjoin" the President, but the specific injunctions sought in GLO's prayer again pertain to DHS and Secretary Mayorkas. The President is not mentioned.

16.     The relevant question is whether the President is a proper party to adjudication of the constitutionality of an executive order for the purpose of declaratory relief. He is. It is well established that a court may review a Presidential Executive Order. A President's "authority to act, as with the exercise of any governmental power, must stem either from an act of Congress or from the Constitution itself." *Medellín v. Texas*, 552 U.S. 491, 525 (2008) (cleaned up); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952); *California v. Trump*, 379 F. Supp. 3d 928 (N.D. Cal. 2019), *aff'd*, 963 F.3d 926 (9th Cir. 2020) (finding states had substantial likelihood of prevailing on separation of powers claim with respect to border wall funding).

17.     The Supreme Court and other courts have repeatedly adjudicated claims against the President without identifying any jurisdictional defect. In *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), the Supreme Court adjudicated the lawfulness of a presidential proclamation imposing restrictions on entry to the United States from certain countries. In *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640 (9th Cir. 2021), the Ninth Circuit affirmed a district court's grant of a preliminary injunction blocking the implementation of President Trump's "Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States." In *Gomez v. Trump*, 485 F. Supp. 3d 145 (D.D.C. 2020), the District Court for the District of Columbia issued a preliminary injunction blocking the implementation of two proclamations of President Trump that restricted immigration during the COVID-19 pandemic.

18.     Most recently, the Fifth Circuit affirmed a district court's permanent injunction ordering President Biden to enforce the Migrant Protection Protocols. *Texas v.*

*Biden*, 20 F.4th 928 (5th Cir. 2021). The court noted that "both courts and the executive branch itself have recognized the president's inability to suspend or dispense with the law." *Id.* at 981.

19.     And in *Louisiana v. Biden*, a district court considered whether President Biden's executive order pausing federal oil and gas leasing exceeded his authority. *Louisiana v. Biden*, 2:21-CV-00778, 2021 WL 2446010, at *3 (W.D. La. June 15, 2021). Again, the President was a proper party to the suit because a "President may not transgress constitutional limitations. Courts determine where constitutional boundaries lie." *Id.* The court recognized that the thirteen plaintiff states had shown a substantial likelihood that President Biden—just as he did here—"exceeded his powers" and usurped authority that "lies solely with congress," granting injunctive relief. *Id.*

20.     These authorities leave little doubt that the President is a proper party when his authority to issue an executive order is in question.

21.     Defendants conclude with an argument that President Biden should be dismissed because "complete relief" is available against agency defendants (while arguing elsewhere that DHS's actions are non-reviewable). Dkt. 36 at ¶ 52. But the Proclamation tasks numerous government officials, including the catch-all "heads of any other appropriate executive departments and agencies," with planning the "redirection of funds concerning the southern border wall." Many government agencies are also involved with the border wall construction and budgetary process, including at a minimum: DHS, CBP, Army Corps of Engineers, and Office of Management and Budget. To obtain relief without an adjudication of the constitutionality of the Proclamation, GLO would potentially need to drag each of those agencies to court, in addition to the government officials named in the Proclamation, if the Proclamation is allowed to stand. Presumably the unspecified heads of "other" departments would need to be served by publication, or their identities would need to be teased out over a long period of time through discovery and FOIA requests. Rather than engaging in that unworkable exercise,

this Court should follow the approach taken in the cases cited above, and address the constitutionality of the Proclamation.

### III. GLO Has Stated Plausible Claims Under the APA.

#### A. The APA Provides a Cause of Action and Basic Presumption of Reviewability.

22.     The APA establishes a "basic presumption of judicial review [for] one suffering legal wrong because of agency action." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020); 5 U.S.C. § 702. This presumption is "strong" and "well-settled," and may be rebutted only by clear and convincing evidence. *Texas v. Biden*, 20 F.4th at 976.[3] Defendants are simply *wrong* that GLO must establish a private right of action through each statute underlying their APA claims. *E.g.*, *Friends of Lydia Ann Channel v. U.S. Army Corps of Eng'rs*, 701 F. App'x 352, 357 (5th Cir. 2017) ("A NEPA challenge can only be maintained under the [APA] *because NEPA confers no private right of action*." (emphasis added)).

23.     Under the APA, the reviewing court must hold unlawful and set aside agency action that is arbitrary and capricious, not in accordance with statute, contrary to the constitution, or taken without observance of procedure required by law. 5 U.S.C. § 706. GLO asserts each of these four classes of APA claims against DHS and Secretary Mayorkas.

24.     GLO responds to the challenges to its arbitrary and capricious, procedural, and statutory APA claims in turn below, followed by responses to Defendants' reviewability arguments. GLO's constitutional APA claims are addressed in Part V.A in conjunction with GLO's independent constitutional claims.

---

[3] The presumption can be rebutted "by a showing that [1] the relevant statute precludes review, § 701(a)(1), or [2] that the agency action is committed to agency discretion by law, § 701(a)(2)." *Regents*, 140 S. Ct. at 1905 (cleaned up). DHS generally does not challenge GLO's APA claims on statutory preclusion grounds, but the narrow argument it raises with respect to environmental waivers under the IIRIRA is addressed in Part III.D.3. DHS's contentions that the border barrier freeze is committed to agency discretion are addressed in Part III.E.3.

**B.     The DHS Plan is Arbitrary and Capricious.**

25.     The APA prohibits agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). This means "[f]ederal administrative agencies are required to engage in reasoned decisionmaking." *Michigan v. EPA*, 576 U.S. 743, 750 (2015) (cleaned up). "Agency action is lawful only if it rests on a consideration of the relevant factors." *Id.* "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Texas v. Biden*, 20 F.4th at 988-89 (quoting *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021)).

26.     "Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). This review "is not toothless." *Texas v. Biden*, 20 F.4th at 989 (citing *Sw. Elec. Power Co. v. EPA*, 920 F.3d 999, 1013 (5th Cir. 2019)). "In fact, after *Regents*, it has serious bite." *Id.* (quoting *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021)). And a court cannot consider post hoc rationalizations because "[a]n agency must defend its actions based on the reasons it gave when it acted." *Regents*, 140 S. Ct. at 1908-10.

27.     When a "new policy rests upon factual findings that contradict those which underlay [an agency's] prior policy," the agency must provide "a more detailed justification" than usual to avoid arbitrariness and capriciousness. *Texas v. Biden*, 20 F.4th at 991 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). The DHS Plan is arbitrary and capricious because DHS concluded that the "bottom line" is that "Walls Work" to secure the border and made numerous findings regarding their effectiveness, Dkt. 34 at ¶¶ 51-52, 55, then froze all border wall projects without any consideration of the impact its determinations would have on border security. The DHS Plan does not

contain the "more detailed justification" needed to reverse its prior positions that the frozen border wall projects were necessary and served immediate border security needs. Rather, DHS did not even *attempt* to justify the border wall freeze in border security terms. Instead, it obediently adopted President Biden's policy of halting border barrier construction expenditures.

        **1.**     **DHS Previously Determined that Border Walls are Highly Effective and that the RGV Sector is "High Priority" for Their Construction.**

28.    DHS previously determined that border walls are highly effective at securing the border and substantially reduce the flow of illegal migrants, drugs, and crime flowing across the border. Dkt. 34 at ¶¶ 39-43, 51-55. For example, prior DHS publications state that border walls "have proved to be a critical component in gaining operational control of the border" and that "[d]eploying the wall system in high priority areas allows U.S. Border Patrol to decide where border crossings take place, not smugglers." Dkt. 34 at ¶ 51. And DHS recognizes that the RGV area where the GLO Farm is located is a "high-threat area for narcotics smuggling" that accounts for approximately 40% of illegal immigrant apprehensions for the entire nation, and that the majority of this activity takes place in areas where border walls are limited. Dkt. 34 at ¶ 53.

29.    For these reasons, DHS considered its RGV border wall projects (including the RGV-09 project on the GLO Farm) to be "highest priority" border wall miles. Dkt. 34 at ¶ 54. And CBP, a component of DHS, believed that these new wall projects would "significantly improve the RGV Sector's ability to impede and deny illegal border crossings and the drug and human smuggling activities of transnational criminal organizations." Dkt. 34 at ¶ 54. The RGV projects completed thus far have been particularly effective, and in one zone that "never had any border infrastructure," a new border wall reduced apprehensions by 79 percent. Dkt. 34 at ¶ 55. In another area, the border wall successfully diverted illegal immigrants away from a high-risk, heavily

traveled road, forcing smugglers to take groups into areas "easier for CBP surveillance cameras to detect illicit activity." Dkt. 34 at ¶ 55.

### 2. The Proclamation Directed DHS to Halt Border Barrier Construction Because President Biden Disagreed with Congress's Policy.

30. President Biden's Proclamation discloses the factors that predetermined DHS's decision-making. Namely, the Proclamation criticizes the border wall as a "waste of money" and "not a serious policy solution." Dkt. 34 at ¶ 58. The Proclamation laid out a policy for DHS that "no more American taxpayer dollars be diverted to construct a border wall." Nowhere did the Proclamation mention "environmental planning" or "substantive consultation with stakeholders," the pretextual, post hoc rationalizations eventually settled on in the DHS Plan to justify the border wall freeze. Instead, the Proclamation cited President Biden's desire to ensure a "humane immigration system."

### 3. The DHS Plan Canceled All Border Wall Construction to Adopt President Biden's Policy.

31. Under the auspices of President Biden's policy direction to stop border wall construction, DHS set out to conjure a pretextual legal rationale to support this improper objective. *Dep't of Commerce*, 139 S. Ct. at 2574 (remanding to agency where "evidence showed that the Secretary was determined to reinstate a citizenship question from the time he entered office [and] instructed his staff to make it happen"). The 60-day deadline set out by the Proclamation for DHS to develop its plan came and went. Dkt. 34 at ¶ 60. A total of 141 days after the Proclamation, DHS released a cursory five-page plan admitting that DHS had "suspended performance of all border barrier contracts and southwest border barrier construction activities" to remain "consistent" with Biden's commitment that "no more American taxpayer dollars [should] be diverted to construct a border wall." Dkt. 34 at ¶ 60.

32. The stated decision-making factors in the DHS Plan included an alleged need to conduct environmental planning and consultation, a plan to "enter robust and

substantive consultation with stakeholders," modifying existing construction plans "to reduce the use of land previously acquired through adverse eminent domain proceedings," and exploring "options to revest the land with its prior owners." Dkt. 36-2 at 4. DHS also intends to exhaust the border wall appropriations by spending them on "delay costs and changes as a result of the suspension of contract performance" and by using them to dispose of construction materials for the canceled projects—materials it has already paid for. Dkt. 36-2 at 5.

### 4. The DHS Plan Did Not Consider Border Security or DHS's Prior Findings Regarding Border Walls.

33. There is no indication that DHS considered border security needs as part of the decision-making process. The only time it even mentions border security is a conclusory statement that its activities "support the Administration policy to protect national and border security." Dkt. 36-2 at 2. But an agency merely "[s]tating that a factor was considered, however, is not a substitute for considering it." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1055 (D.C. Cir. 1986). Courts "do not defer to the agency's conclusory or unsupported suppositions." *United Techs. Corp. v. U.S. Dep't of Def.*, 601 F.3d 557, 562 (D.C. Cir. 2010). Rather, the Court "must make a "searching and careful" inquiry to determine if [DHS] actually *did* consider [the relevant factors]. *Getty*, 805 F.2d at 1055 (quoting *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)).

34. The DHS Plan does not explain how the measures it proposes will improve border security, reduce illegal immigration, and prevent drugs and crime from flowing across the border. Rather, the DHS plan does not address these relevant factors or the impacts on border landowners *at all*, even to explain, for example, why additional environmental planning beyond what it has already engaged in is both necessary, and should be prioritized over border security at a time of record-breaking illegal border activity. The DHS Plan does not even contain an exception to allow construction to continue on projects it previously recognized as "high priority" for border security needs,

such as those in the RGV area. Rather, it suspends performance of "*all* border barrier contracts." Dkt. 36-2 at 2. "Given the Supreme Court's explanation that border states bear many of the consequences of unlawful immigration, one would expect a reasonable and reasonably explained memo to mention the issue at least once." *Texas v. Biden*, 20 F.4th at 989 (citing *Arizona v. United States*, 567 U.S. 387, 397 (2012)) (cleaned up).

35.     In short, the DHS Plan contains no indication that DHS engaged in the type of reasoned decision-making, guided by all relevant factors, that the APA requires. *Michigan v. EPA*, 576 U.S. at 750. And this is particularly egregious given that the DHS Plan enacts a complete reversal of DHS's prior findings regarding border security and the pressing need for border walls. *Texas v. Biden*, 20 F.4th at 990-91. The DHS plan does not even attempt to explain its reversal by analyzing why border walls are no longer necessary or effective. Rather, it is clear—as the DHS Plan openly states—that DHS was animated by President Biden's policy goal of outright canceling all border wall projects. Dkt. 36-2 at 2 (describing goal of "remaining consistent with President Biden's commitment that 'no more American taxpayer dollars [should] be diverted to construct a border wall.'"). Thus in addition to failing to consider all relevant factors, DHS also "relied on factors which Congress ha[d] not intended it to consider." *Motor Vehicle Mfrs.*, 463 U.S. at 43. In appropriating funds to construct border walls, Congress certainly did not intend for DHS to consider future presidential commitments to *not* spend the appropriations on border walls. *Louisiana v. Biden*, 2021 WL 2446010, at *18 ("A command in an Executive Order does not exempt an agency from the APA's reasoned decisionmaking requirement.").

36.     "An '[u]nexplained inconsistency' in agency policy is 'a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motors, LLC v. Navarro*, 579 U.S. 211, 222 (2016) (quoting *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 981 (2005)). GLO has plausibly alleged that DHS violated the APA through arbitrary and capricious decisionmaking.

## C. DHS Failed to Follow the APA's Procedural Requirements.

37. GLO has plausibly alleged that Defendants' halting of border wall construction occurred "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

38. Under the APA, agencies are required to publish "[g]eneral notice of proposed rule making[s] . . . in the Federal Register." 5 U.S.C. § 553(b). After notice, the agencies must then allow "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." *Id.* § 553(c). These "requirements are designed (1) to ensure that agency regulations are tested via exposure to diverse public comment, (2) to ensure fairness to affected parties, and (3) to give affected parties an opportunity to develop evidence in the record to support their objections to the rule and thereby enhance the quality of judicial review." *Int'l Union, UMW v. MSHA*, 407 F.3d 1250, 1259 (D.C. Cir. 2005). Notice and comment ensures "that the broadest base of information [is] provided to the agency by those most interested and perhaps best informed on the subject of the rulemaking at hand." *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616, 620 (5th Cir. 1994).

39. With respect to border security, "[c]onsultation between federal and state officials is an important feature of the immigration system, and the notice-and-comment process, which is designed to ensure that affected parties have an opportunity to participate in and influence agency decision making, facilitates that communication." *Texas v. United States*, 809 F.3d 134, 170 (5th Cir. 2015) (cleaned up). DHS does not contend that it followed the APA's notice and comment requirements prior to enacting its broad nationwide border barrier construction freeze. There is no dispute that GLO was denied an opportunity to be heard and has plausibly alleged a claim for procedural violations of the APA. DHS raises only a reviewability challenge—that the DHS Plan is a "procedural" rule—which is addressed in Part III.E.3 below.

40.     The APA also provides that when an agency is required to engage in notice-and-comment rulemaking, "the agency shall prepare and make available for public comment an initial regulatory flexibility analysis." 5 U.S.C. § 603(a). The analysis "shall be published in the Federal Register at the time of the publication of general notice of proposed rulemaking for the rule." *Id.* Though one aspect of the analysis concerns the proposed rule's effects on small entities, the scope of the analysis goes much further, requiring among other things, "a description of the reasons why action by the agency is being considered" and "a succinct statement of the objectives of, and legal basis for, the proposed rule." *Id.* § 603(b)(1)-(2). It is undisputed that Defendants did not prepare or publish an initial regulatory flexibility analysis. The APA's authorization of challenges to procedural errors under 5 U.S.C. § 706(2)(D) provides GLO with a cause of action to challenge Defendants' failure to comply with the Regulatory Flexibility Act, irrespective of the provision cited by Defendants, 5 U.S.C. § 611(a)(1), which does not even apply to the statutory provision invoked by GLO, 5 U.S.C. § 603. Thus, GLO has plausibly alleged procedural violations by Defendants for both failing to engage in notice-and-comment rulemaking and for failing to prepare an initial regulatory flexibility analysis.

## D.     The DHS Plan Is Not in Accordance With Law.

41.     The APA also provides GLO with a cause of action to have agency action held unlawful and set aside when "not in accordance with law" or in "excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(c), (d). Although DHS asserts that GLO "lacks a private right of action" to sue under the statutes cited in the Complaint, Dkt. 36 at ¶¶ 53-54, the APA itself provides a cause of action. *See Regents*, 140 S. Ct. at 1905 (only statutes precluding review are excluded from APA claims). The DHS Plan either violates or exceeds DHS's statutory authority under a number of statutes related to border security and wall construction, the border wall appropriations themselves, and budgetary statutes governing the use of appropriations.

1. **DHS Violated the 2019 CAA and Has Not Challenged GLO's Claims for Violations of the 2020 and 2021 CAAs.**

42. The RGV-09 border wall project on the GLO Farm was initially funded by Congress with direct appropriations in its 2019 Consolidated Appropriations Act. Pub. L. No. 116-6, div. A § 230, 133 Stat. at 28. Dkt. 34 at ¶¶ 55, 114. This appropriation was located in Title II: Security, Enforcement, and Investigations, and part of a larger appropriation "for necessary expenses of U.S. Customs and Border Protection for procurement, construction, and improvements." *Id.* Within that appropriation, the 2019 CAA directed $1,375,000,000 "for the construction of primary pedestrian fencing" in the Rio Grande Valley Sector, to be only "available for operationally effective designs . . . such as currently deployed steel bollard designs, that prioritize agent safety." *Id.* Section 230 also directs the Secretary of Homeland Security to submit "an updated risk-based plan for improving security along the borders of the United States." *Id.* § 230(c).

43. Thus the clear congressional intent behind the CAA was to improve security in the RGV border area through the construction of "operationally effective" fences that would restrict "pedestrian" flow and "prioritize agent safety." The DHS Plan permits no room for doubt that DHS has flouted Congress's intent in the 2019 CAA, because rather than accomplishing these objectives, it enacts a rule that "no more American taxpayer dollars [should] be diverted to construct a border wall." Dkt. 36-2 at 2.

44. Defendants contend that the DHS Plan does not violate the CAA because Section 230 does not require DHS to "build border infrastructure on the GLO Farm, let alone any specific location," and because additional environmental planning is a "necessary incident" that is being expended "in furtherance of border wall construction." Dkt. 36 at ¶¶ 93-95. But this litigation is not—as Defendants wish it was—a challenge that arose from an isolated decision not to build a single wall at a single location, or a complaint that DHS is simply building walls to secure the border more slowly than GLO

17

would prefer. Rather, the DHS Plan sets out a mandatory halt to *all* border walls, and contains no allowance to continue *any* of them to address the 2019 CAA priorities of border security, restricting pedestrian flow, and agent safety. And the DHS Plan simultaneously exhausts the border wall appropriations in a way that will result in *not even a penny* spent on walls intended to secure the border, which DHS admits.[4]

45. Just as in *Department of Commerce v. New York*, "[w]e are presented . . . with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process." 139 S. Ct. at 2575. The Court is "not required to exhibit a naiveté from which ordinary citizens are free" in accepting DHS's rationale at face value. *Id.*[5] The Court should not credit Defendants' conclusory statements that DHS's actions are "in furtherance" of border wall construction when DHS has admitted that its policy is to *not* construct walls and has publicly asked Congress to cancel current the border wall appropriations. Dkt. 36 at ¶ 35 n.3 (noting that DHS "intends to cancel the remaining border barrier contracts"); *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 614 (5th Cir. 2021) (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)) ("In reviewing agency pronouncements, courts need not turn a blind eye to the statements of those issuing such pronouncements.").

46. DHS's plan to use border wall appropriations to dispose of materials already purchased and currently located at project sites is not "furthering" border wall construction; nor is using border wall appropriations to pay the contractual delay costs and penalties DHS self-inflicted by halting ongoing projects. Dkt. 34 at ¶¶ 60-71. Nor

---

[4] Dkt. 36 at ¶ 35 n.3 (citing DHS to Terminate Border Barrier Contracts in Laredo and Rio Grande Valley, at https://www.dhs.gov/news/2021/10/08/dhs-terminate-border-barrier-contracts-laredo-and-rio-grande-valley).

[5] *See also Cook County v. Wolf*, 19 C 6334, 2020 WL 3975466, at *2 (N.D. Ill. July 14, 2020) ("As in *Department of Commerce*, then, Plaintiffs allege that a federal agency (DHS) offered Rationale X (protecting the fisc) for the action in question (promulgating the Final Rule) when in fact the agency's real and undisclosed motivation was Impetus Y (suppressing nonwhite immigration). Whether or not Impetus Y amounts to an equal protection violation is immaterial; all that matters for purposes of the APA claim is the alleged 'mismatch' between Rationale X and Impetus Y.").

would "revesting" land DHS previously acquired back with the former landowners further border wall construction, because DHS would have to obtain the land again if it ever decides to build. The DHS Plan only impedes construction, which is the opposite of the 2019 CAA's intent.

47. If DHS is correct, it can thwart any border wall appropriations indefinitely into the future by engaging in limitless "planning" and "consultation," continuously redoing project phases DHS previously believed were completed and sufficient before President Biden was elected, and all without any explanation of why its prior work was insufficient. Or DHS can thwart the appropriations until they are entirely exhausted by contract delay and termination costs. Or it can give away the needed land to impede construction. And these actions are entirely insulated from judicial review as long as DHS claims they are "in furtherance" of the appropriations, even if they are directed towards DHS's stated objective of preventing funds from being spent on border wall construction.

48. Defendants have disputed or disregarded GLO's factual allegations to challenge its claims within the scope of what they view as more favorable legal precedents. They cannot do this at the motion-to-dismiss stage. They will have an opportunity to file a motion for summary judgment later. The Complaint's allegations, *taken as true*, plausibly state a violation of the 2019 CAA. Defendants have not challenged GLO's claims for violations of the 2020 and 2021 CAA's, so the Court should not dismiss those either.

### 2. DHS Violated Budgetary Statutes.

49. The Complaint also alleges violations of several budgetary statutes designed to provide oversight over the Executive's use of appropriations. The Purpose Statute prevents appropriated funds from being used for purposes other than that for which they were appropriated. 31 U.S.C. § 1301(a). The Transfer Statute prohibits transfer of funds from one account to another, unless authorized by statute. 31 U.S.C. § 1532. Section 739 of the 2019 CAA prevents its appropriations from being used to "increase,

eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget" without enacting the change in a subsequent appropriations act or satisfying other statutory requirements. Pub. L. No. 116-6, Div. D, § 739. Lastly, the Anti-Deficiency Act prohibits spending funds in excess of appropriations, unless authorized by statute, which will occur if Defendants divert the 2019 CAA appropriation towards closure and contract termination costs for projects that were funded with *other* appropriations in accordance with the DHS Plan, thereby funding those other projects in excess of their appropriations. *See* 31 U.S.C. § 1341(a)(1)(A).

50.     Defendants raise only conclusory challenges to these claims by stating that they are *not guilty* of the challenged conduct. Dkt. 36 at ¶¶ 101-105. But GLO has plausibly alleged that DHS has violated these statutes for much the same reason it violated the appropriation in the 2019 CAA: the DHS Plan sets out a policy entirely at odds with the 2019 CAA, and DHS has implemented it by ensuring that no funds will be spent on the construction of border barriers as Congress directed. DHS's policy that "no more American taxpayer dollars [should] be diverted to construct a border wall" violates both the Purpose Statute and Section 739 of the 2019 CAA, which are directed towards ensuring appropriations are spent on their intended purpose.

51.     GLO's Transfer Statute claim requires additional factual context. Whereas the GLO Farm's RGV-09 border wall project is directly funded by 2019 CAA appropriations, some other border wall projects (including outside the RGV area) have alternative sources of funding, such as Department of Defense ("DoD") funds and Treasury Forfeiture Funds ("TFF"). GLO alleges that DHS cannot use the 2019 RGV border wall appropriations to fund project shutdown and site closeout costs for these DoD and TFF projects. The Transfer Statute prevents DHS from transferring the 2019 RGV border wall appropriations to these separate accounts. DHS does not contend that it is allowed to do this. Rather, DHS disagrees that it is commingling funds between these

projects—another factual dispute that cannot be resolved through its motion to dismiss. Dkt. 36 at ¶¶ 103, 105.

### 3. DHS Exceeded its Statutory Authority Under the IIRIRA.

#### i. The IIRIRA Does Not Authorize DHS's Nationwide Border Wall Freeze.

52. Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA") to "improve deterrence of illegal immigration to the United States." Pub. L. No. 104-208, § 102(a), 110 Stat. 3009-546, 3009-554 (1996) (codified at 8 U.S.C. § 1103 note); H.R. Rep. No. 104-828, at 1. The IIRIRA states, in mandatory terms, that the Secretary of Homeland Security "*shall* take such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." *Id.* § 102(a). The IIRIRA, in combination with the CAA border wall appropriations, is DHS's claimed source of statutory authority to enact the border wall freeze.

53. DHS rests its argument on a provision of the IIRIRA stating that DHS is not required to install border walls in a particular location if "the Secretary determines that the use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border at such location." IIRIRA § 102(b)(1)(D). But DHS surely was not acting pursuant to that provision because the DHS Plan contains no determination (or even analysis) indicating that any border walls are not appropriate to maintain control over the borders at any particular location, or even generally opining on the effectiveness of walls in general.

54. Instead, DHS had already determined that a border wall *would* be appropriate to control the border on the GLO Farm. And rather than making a reasoned determination that the RGV-09 project was not an appropriate means to secure the border on the GLO Farm, DHS enacted a nationwide border wall construction freeze to

effectuate President Biden's policy. This sweeping act exceeded DHS's authority under § 102(b)(1)(D) in two ways: (1) the border wall freeze was not directed to *location-specific* determinations; and (2) the freeze was not guided by DHS's determinations of the "the most appropriate means to achieve and maintain operational control" of the border. The IIRIRA's "'general policy' is 'clearly delineated'—*i.e.*, to expeditiously 'install additional physical barriers and roads . . . to deter illegal crossings in areas of high illegal entry.'" *Defenders of Wildlife v. Chertoff*, 527 F. Supp. 2d 119, 127 (D.D.C. 2007) (citing *Mistretta v. United States*, 488 U.S. 361, 372-73 (1989)). DHS does not argue that § 102(b)(1)(D) grants authority for a nationwide border wall freeze. Instead, DHS asks the Court to disregard its own statements regarding the policies it is pursuing and accept its contrary representations at face value. Again, DHS's factual challenges should be saved for summary judgment.

### ii. DHS's Statutory Preclusion Argument Fails.

55. Defendants also contend that the IIRIRA precludes the court from exercising jurisdiction. Dkt. 36 at ¶ 54 (citing IIRIRA § 102(c)(2)(A); *Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 238 (D.D.C. 2019). But they grossly misread these authorities. The IIRIRA does indeed contain a jurisdiction-stripping provision, but as *McAleenan* repeatedly states, it applies only to a very limited class of claims: non-constitutional claims challenging DHS's waiver of environmental statutes under the IIRIRA. 404 F. Supp. 3d at 238. The Ninth Circuit examined and rejected Defendants' position that the jurisdictional bar has applicability wider than DHS's decisions to issue environmental waivers. *In re Border Infrastructure Envtl. Litig.*, 915 F.3d 1213, 1221 (9th Cir. 2019) (*ultra vires* claims not jurisdictionally barred by IIRIRA § 102(c)(2)(A) where their "origin [was] the initial decision to build the border barrier projects, not the later decision to issue a waiver related to those projects"). GLO's claims that the IIRIRA does not authorize DHS to enact a broad, nationwide border wall construction freeze fall entirely outside the scope of IIRIRA § 102(c)(2)(A).

56.     Only a limited portion of a single GLO claim could even arguably fall within the ambit of § 102(c)(2)(A). Namely, in the area of the GLO Farm, DHS previously exercised its authority under the IIRIRA to waive environmental laws that it "determine[d] necessary to ensure expeditious construction of the barriers and roads." IIRIRA §102(c). GLO alleges that this provision does not authorize DHS to un-waive these environmental laws for the purpose of delaying border wall construction, and seeks prospective declaratory and injunctive relief to prevent that outcome. After all, the text of §102(c) provides only a one-way grant of waiver power, and it does so for the purpose of *expediting* construction. The statute contains no express authorization to rescind a previously granted waiver. And this interpretation is consistent with the reason Congress amended the IIRIRA: "Continued delays caused by litigation have demonstrated the need for additional waiver authority with respect to other laws that might impede the expeditious construction of security infrastructure along the border. . . ." *McAleenan*, 404 F. Supp. 3d at 228 (citing H.R. Rep. No. 109-72, at 171).

57.     In sum, Defendants are incorrect that §102(c) broadly insulates them from IIRIRA claims unrelated to DHS's waiver authority. And the issue of whether § 102(c) authorizes DHS to rescind a prior waiver appears to be one of first impression, but DHS's interpretation is at odds with both the statutory text and history. Even if DHS were correct though, its argument would affect only a small portion of GLO's IIRIRA claim. Finally, § 102(c)(2)(A) explicitly authorizes claims alleging constitutional violations, and GLO has plausibly alleged that DHS's actions are unconstitutional, as explained in Part V.

### 4.     The GAO's Spurious Reframing of the Border Wall Freeze as a "Programmatic Delay" Does Not Defeat GLO's Claims.

58.     Defendants also justify the border wall freeze freeze with citation to a recent GAO Opinion B-333110 ("GAO Opinion") addressing the Proclamation. There, the GAO determined that the Proclamation caused only "programmatic delays" that did not

violate the Impoundment Control Act (2 U.S.C. §§ 683-88 ("ICA"), a statute that GLO did not sue under. The GAO Opinion does not address the statutes underlying GLO's claims. Even if it did, this Court is not bound by the GAO's determinations. *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (GAO opinions are "not binding" on courts). Beyond that, GAO Opinion should not guide this Court's determination of the Motion for at least three additional reasons, as discussed by GLO in its Reply in Support of Preliminary Injunction (Dkt. 32 at 11–17) and summarized below.

59.     First, the ICA provides only two methods for the President to delay the expenditure of budgeted funds ("deferrals" and "rescissions"), and Defendants do not rely on those provisions as a source of statutory authority for the border wall freeze or even contend that they have complied with the ICA's mandatory statutory prerequisites, including the transmission of a "special message" to Congress. 2 U.S.C. §§ 683–684. The plain text of the ICA does  not authorize the border wall freeze.

60.     Second, although Defendants frame the border wall freeze as a "programmatic delay," the concept of a programmatic delay is GAO-created and appears nowhere in the text of the ICA. Rather, the GAO previously recommended amending the ICA's definition of "deferrals" because its broad wording covered everything—including programmatic delays—sweeping up "purely routine or administrative deferrals" in the ICA's procedural requirements. Review of the Impoundment Control Act of 1974 After 2 Years, B-115398 at 14 (Comp. Gen. June 3, 1977). But Congress never amended the ICA to adopt the GAO's recommendation by implementing a carve-out for programmatic delays. The GAO appears to have addressed this by disregarding its prior reading of the ICA, adopting the interpretation it sought when it asked Congress to amend the statute. But this Court is obligated to interpret the ICA as written, and not as the GAO unsuccessfully asked Congress to rewrite it.

61.     Third, even looking past the the tenuous statutory underpinnings of the concept of "programmatic delays," classifying the border wall freeze as a programmatic

delay would require findings of fact that the Court cannot make when determining a motion to dismiss. As Defendants concede, deferrals "based on policy disagreements with Congress . . . are prohibited by the ICA." Dkt. 24 at ¶ 88. And the Complaint contains plausible allegations that the border wall freeze arises from a policy disagreement. Defendants' primary authority states that "[t]he critical distinction between [permissible] 'programmatic' and [impermissible] 'policy' deferrals is that the former are ordinarily intended to advance congressional budgetary policies by ensuring that congressional programs are administered efficiently, while the latter are ordinarily intended to negate the will of Congress by substituting the fiscal policies of the Executive Branch for those established by the enactment of budget legislation." *City of New Haven v. United States*, 809 F.2d 900, 901 (D.C. Cir. 1987) (cited in Dkt. 24 at ¶ 87). Determining that the border wall freeze is a programmatic delay—that Defendants halted construction and are allowing equipment and personnel to sit idle while building materials rust away in an effort to build the border wall "efficiently"—necessarily requires accepting Defendants' statements at face value (as the GAO did), and disregarding the contrary factual allegations in the Complaint. But a Rule 12(b)(6) motion is determined under the opposite presumptions, with the factual allegations in the Complaint assumed to be true. *See Barilla v. City of Houston*, 13 F.4th at 431.

62.     The GAO Opinion does not provide a reason to dismiss GLO's claims on the merits and underscores the lack of statutory authority for the border wall freeze.

**E.     Defendants' Additional APA Reviewability Challenges Fail.**

**1.     GLO Satisfies the Zone-of-Interests Test.**

63.     Defendants claim that GLO cannot sue under the APA because its claims fall outside the zone of interests for every single statute invoked. Through their overly restrictive construction of the zone-of-interests test, Defendants would require GLO to show that each statute involved evidenced a specific intent by Congress to benefit private property owners. Dkt. 36 at ¶¶ 55-64. But in the APA context, the zone-of-interests test

does "not require any indication of congressional purpose to benefit the would-be plaintiff." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (property owner alleging "economic, environmental, and aesthetic harms" from Indian casino fell within zone of interests of statute authorizing land acquisition because land acquisition was sufficiently entwined with land use considerations). The zone-of-interests test is "not especially demanding" in the APA context, and GLO's claims surely satisfy it. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014). GLO's suit can be foreclosed only if its "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Patchak*, 567 U.S. at 225. And "the benefit of any doubt goes to the plaintiff." *Id.*

64.     GLO alleges that illegal border crossings have damaged the intended use of the GLO Farm and transformed it into a "superhighway of illegal activity," where "[g]roups of 100 or more people are frequently apprehended." Dkt. 34 at ¶ 82. Adding to that, GLO alleges that DHS compounded the flow of illegal border activity to the GLO Farm by finishing part of the RGV-09 border wall on an adjacent property, leaving the GLO Farm undefended when the project was frozen midstream. Dkt. 34 at ¶ 81. These border security and safety issues fall within the zone of interests of the CAAs and the IIRIRA because the provisions GLO sues under explicitly relate to border security. And if that were not already enough, these provisions seek to achieve border security through the construction of border walls as discussed above. *Texas v. United States*, 809 F.3d at 163 (zone-of-interests test satisfied under Immigration and Naturalization Act where plaintiff state bore harms of illegal immigration); *Louisiana v. Biden*, 2021 WL 2446010, at *11 (plaintiffs were "clearly" within the zone of interests for all eight APA claims challenging federal leasing freeze).

65.     GLO's harms also arise from the DHS Plan to spend its appropriations contrary to the purposes set out in the CAAs. These harms implicate Section 739 of the

2019 CAA, which was intended to "preserve the integrity of each appropriation." *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 43 (D.D.C. 2020). The Court in *Washington v. Trump* found the zone-of-interests test satisfied under the 2019 CAA with respect to claims challenging the prior administration's diversion of Department of Defense funds to emergency border wall construction. 441 F. Supp. 3d 1101, 1117 (W.D. Wash. 2020). And the Purpose Statute and Transfer Statute are likewise directed towards ensuring that the Executive spends appropriations on the purpose Congress intended.

66.     Defendants assert that these statutes "protect the interests of federal agencies and Congress in the federal spending and appropriations process." Dkt. 36 at ¶ 58. *Washington v. Trump* considered and rejected this argument. 441 F. Supp. 3d at 1117-18 (rejecting argument that 2019 CAA solely "regulate[s] the relationship between Congress and the Executive Branch regarding federal spending and in no way protect the revenue streams of local governments to tax contractors and residents who receive federal funds"). The zone-of-interests test is satisfied with regard to GLO's budgetary claims if GLO "is a suitable challenger to enforce the statute . . . [because] its interests are sufficiently congruent with those of the intended beneficiaries." *Scheduled Airlines Traffic Offices, Inc. v. Dep't of Def.*, 87 F.3d 1356, 1359 (D.C. Cir. 1996). The zone-of-interests test only "seeks to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives." *Clarke v. Secs. Indus. Ass'n*, 479 U.S. 388, 397 n.12 (1987). GLO is a suitable challenger because its claims seek to conform DHS's spending to Congress's intended purposes and are therefore aligned with Congress's objectives.[6]

---

[6] Defendants also cite *Trump v. Sierra Club* for the proposition that GLO's claims fall outside the zone of interests of these budgetary statutes, but this argument fails for three reasons. Dkt. 36 at ¶ 59 (citing 140 S. Ct. 1 (2019)). First, the Supreme Court did not base its ruling on the zone of interests test, or even address it. Second, while the Court stayed an injunction based on the defendants' showing that the plaintiffs did not have a cause of action under Section 8005 (a statute related to reprogramming budgeted funds), the Proclamation and DHS Plan were not issued pursuant to Section 8005, Defendants do not rely on it as a source of statutory authority, and GLO has not made it the basis of any claims. Third, the Court did not provide any explanation for its ruling, which addressed the merits in a single sentence. The opinion contains no indication of

67.     The zone-of-interests test as applied to constitutional claims is discussed in Part V.C in conjunction with the remainder of GLO's constitutional arguments. It is mentioned here only to note that GLO has also asserted its claims against DHS for constitutional violations through the APA, and if the Court finds the zone-of-interests test satisfied as to any of those claims, they would provide additional basis for APA review. *See, e.g.*, *INS v. Chadha*, 462 U.S. 919, 955-57 (1983); *Bond v. United States*, 564 U.S. 211, 223 (2011); *California v. Trump*, 963 F.3d 926, 943 (9th Cir. 2020) (recognizing "interest in reinforcing . . . structural separation of powers principles" under the APA).

### 2.     DHS's Nationwide Border Wall Freeze is Not Action Committed to Agency Discretion by Law.

68.     As Defendants acknowledge, the APA presumes that agency action can be judicially reviewed. Dkt. 36 at ¶ 66. The Fifth Circuit recently rejected Defendants' precise argument concerning 5 U.S.C. § 701(a)(2)'s exemption from judicial review of agency actions "committed to agency discretion by law." "The Framers agreed that the executive should have neither suspending nor dispensing power." *Texas v. Biden*, 20 F.4th at 980. Since then, "both courts and the executive branch itself have recognized the president's inability to suspend or dispense with the law." *Id.* Nothing in the Supreme Court's precedents "should be construed to let an agency 'consciously and expressly adopt[] a general policy that is so extreme as to amount to an abdication of its statutory responsibilities.'" *Id.* at 982 (quoting *Heckler v. Chaney*, 470 U.S. 821, 833 n.4 (1985)).

69.     As the Fifth Circuit explained, the provision cited by Defendants "applies only to *orders* and not *rules*." *Id.* at 983. The APA defines an order as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including license." *Id.* at 983 (quoting 5 U.S.C. § 551(6)). By contrast, a "rule" is "the whole or a part of an agency statement of

---

whether the Supreme Court endorsed the broad proposition that no cause of action could exist under Section 8005 *ever*, or whether the ruling was confined to the facts before the court.

general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy describing the organization, procedure, or practice requirements of an agency." *Id.* at 982-83 (quoting 5 U.S.C. § 551(4)). The "Supreme Court and the Fifth Circuit have consistently read *Heckler* as sheltering one-off nonenforcement decisions rather than decisions to suspend entire statutes." *Id.* at 983. "*Heckler*'s progeny has never allowed the executive to affirmatively enact prospective, class-wide rules without judicial review." *Id.* A DHS memo that "applies to DHS operations nationwide and on a prospective basis" is "obviously a rule." *Id.* at 985.

70.     Here, Defendants' complete suspension of border wall construction and the DHS Plan, which are plainly "agency statement[s] of general or particular applicability and future effect designed to implement, interpret or prescribe law or policy," satisfy the definition of a rule under the APA. They do not purport to be a "disposition" of a particular "one-off agency enforcement decision." *Id.* at 983-84. This is not a situation in which "a court would have no meaningful standard against which to judge the agency's exercise of discretion." *Lincoln v. Vigil*, 508 U.S. 182, 191 (1993). GLO has clearly articulated numerous statutory violations (of CAAs, the Purpose Statute, the Transfer Statute, Anti-Deficiency Act, and IIRIRA) that provide "meaningful standards against which to judge" Defendants' suspension of construction and the DHS Plan. *Texas v. United States*, 809 F.3d at 169. 5 U.S.C. § 701(a)(2) does not apply, and even if it "could apply in theory," the "mandatory terms" of the statutes invoked by GLO "would suffice to overcome *Heckler*." *Texas v. Biden*, 20 F.4th at 988. Judicial review is appropriate.

### 3.     The Border Wall Freeze is Not a Statement of General Policy or a Rule of Agency Organization, Procedure, or Practice.

71.     Defendants' halting of border wall construction is not a general statement of policy under 5 U.S.C. § 553(b)(A). In *Texas v. United States*, the government argued that DAPA was a general statement of policy. 809 F.3d at 170-71. The Fifth Circuit explained that it evaluates "two criteria to distinguish policy statements from substantive rules." *Id.*

at 171. The first is whether the agency action "impose[s] any rights and obligations," and second is whether it "genuinely leaves the agency and its decision-makers free to exercise discretion." *Id.* at 171 & n.123 (quoting *Prof'ls & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995)). The court explained that "[a]lthough the DAPA Memo facially purports to confer discretion," there was evidence that its discretionary language "was pretextual," and preliminary injunctive relief was warranted. *Id.* at 171-76.

72.     In *Community Nutrition Institute v. Young*, which the Fifth Circuit relied on in *Texas v. United States*, the D.C. Circuit examined the above-mentioned two-criteria test and held that an agency action was not a statement of general policy because it had a "present effect" and was "binding." 818 F.2d 943, 946-47 (D.C. Cir. 1987) (per curiam). Similarly, in *Phillips Petroleum Co. v. Johnson*, the Fifth Circuit held that when an agency action was not a statement of general policy on the ground that it did "not set a goal that future proceedings may achieve, for the change has already been made." 22 F.3d 616, 620 (5th Cir. 1994).

73.     Here, DHS does not dispute that President Biden's Proclamation 10,142 "direct[ed]" an indefinite "pause" on the construction of "each construction project on the southern border wall . . . in no case later than seven days from the date of this proclamation." Pursuant to that directive, DHS "suspended performance of all border barrier contracts and southwest border barrier construction activities." Dkt. 36-2 at 2. DHS also identified certain categories of projects as "exceptions" to the suspension "because they are urgent measures needed to avert immediate physical dangers." *Id.* at 3. Specifically, DHS identified "a project in the Rio Grande Valley of Texas, where DHS will construct and/or remediate approximately 13.4 miles of compromised levee" and "an erosion control project in the San Diego area along an approximately 14-mile stretch of recently constructed barrier and associated adjacent road necessary to protect migrants, agents, and residents." Dkt. 36-2 at 3. Critically, no construction directed

towards border security will continue, no matter how urgent the need—the Proclamation and DHS Plan do not permit any discretion for that possibility.

74.     The DHS Plan executing the President's Proclamation had the immediate and present effect of halting border wall construction. The DHS Plan states that the President's Proclamation "directed" the halting of construction, and DHS has been following that directive faithfully up to the date of this response's filing. The DHS Plan's one-sentence of boilerplate language stating that the "Plan is not intended to and does not, create any right or benefit substantive or procedural, enforceable at law or in equity" is pretextual and does not change the reality that DHS was following a directive of the President and was not exercising discretion. *See Texas v. United States*, 809 F.3d at 171-76. That DHS felt it necessary to carve out two specific exceptions to the President's halt on construction demonstrates that the halt was a binding decision and not a statement of policy. *See Cmty. Nutrition Inst.*, 818 F.2d at 947 ("This view of action levels—as having a present, binding effect—is confirmed by the fact that FDA considers it necessary for food producers to secure *exceptions* to the action levels.").

75.     The policies described in the DHS Plan are "rules" within the meaning of the APA that should have undergone notice-and-comment rulemaking. *See* 5 U.S.C. § 551(4) (defining a "rule" as including "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy"); 5 U.S.C. § 553 (setting forth requirement of notice-and-comment rulemaking). Those policies did not undergo notice and comment, so GLO has alleged plausible violations of the procedural requirements of the APA. *See* 5 U.S.C. § 706(2)(D) ("The reviewing court shall . . . hold unlawful and set aside agency action . . . without observance of procedure required by law . . . .").

76.     The government briefly argues that the halting of border wall construction is a "rule of agency organization, procedure, or practice, rather than a substantive rule" under 5 U.S.C. § 553(b)(A). Dkt. 36 at ¶¶ 81-82. That argument is conclusory, and the

government makes no attempt to explain why a halting of border wall construction concerns "agency organization, procedure, or practice" rather than substance. The DHS Memo does not set forth procedures for determining whether to halt border wall construction—it explains that construction has been and will continue to be halted. Defendants' actions satisfy the Fifth Circuit's "substantial impact" test for whether a rule is substantive because they affect substantive policy and "narrowly constrict the discretion of agency officials by largely determining the issue addressed." *Texas v. United States*, 809 F.3d at 176 & n.145.

### 4. GLO's Claims Are Not Programmatic Challenges.

77. Defendants also contend that GLO's claims assert programmatic challenges unreviewable through the APA. A programmatic challenge "seeks *wholesale* improvement . . . by court decree" through "general orders compelling compliance with broad statutory mandates." *Norton v. S. Utah Wilderness Alliance,* 542 U.S. 55, 64-66 (2004) (citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 891 (1990)). For example, in *Norton*, the Supreme Court held that a plaintiff could not challenge the Secretary of the Interior's alleged failure to manage lands in a way that ensured their "suitability . . . for preservation as wilderness." *Id.* at 65-67. The Fifth Circuit has held that environmental groups could not challenge "past, ongoing, and future timber sales" because "the Forest Service failed to monitor and inventory properly." *Sierra Club v. Peterson*, 228 F.3d 559, 566-67 (5th Cir. 2000). And it has held that allegations of "decades of inaction" by the Army Corps of Engineers in failing to keep a waterway from expanding "failed to point to any identifiable action or event." *Louisiana v. United States,* 948 F.3d 317, 321-22 (5th Cir. 2020).

78. The GLO's claims do not present broad, generalized challenges similar to those addressed in *Norton*, *Peterson,* and *Louisiana.* Defendants even concede that GLO can challenge "discrete agency actions they believe to be unlawful (such as contract cancellations)." Dkt. 36 at ¶ 88. And they are incorrect to argue that GLO's claims are

"limited," because "a challenge to discrete agency action is permissible "even when such a challenge has the effect of requiring a whole program to be revised by the agency." *Rollerson v. Brazos River Harbor Nav. Dist. of Brazoria County Texas,* 6 F.4th 633, 646 (5th Cir. 2021) (cleaned up). That GLO's claims may have nationwide consequences for the legality of the DHS Plan does not preclude review. *Id.*

79.     Defendants are also wrong to assert that the cancellation of contracts is the only final agency action subject to review. The court in *Lousiana v. Biden* addressed a similar question with respect to the Biden Administration's ban on oil and gas leasing on federal lands, disguised as a leasing "pause." 2021 WL 2446010, at *14-15. There, the court held that "each cancellation or postponement of specific lease sales" was a discrete and final agency action, but also that the systematic "decision to pause oil and gas leases in compliance with" the executive order was a discrete and final agency action. *Id.* DHS's systematic border wall freeze to comply with the Proclamation is no doubt a discrete and final agency action in the same way. But even if the Court disagrees on that point, Defendants have not identified a single claim that should be dismissed based on their programmatic challenge argument, and they have already conceded that GLO's claims involve at least one discrete, final agency action.

## IV.    GLO Has Stated Plausible *Ultra Vires* Claims.

80.     GLO asserts its claims related to budgetary and agency statutes both through the APA and through non-statutory *ultra vires* review. Dkt. 36 at ¶ 88 (recognizing GLO alleged both classes of claims). To the extent any of GLO's claims are not reviewable under the APA, the Court may engage in non-statutory *ultra vires* review. For example, *ultra vires* review provides recourse even if GLO cannot challenge the Proclamation and President Biden's unlawful actions through the APA.

81.     Although Defendants raise a general argument that President Biden should be dismissed from the litigation (Dkt. 36 at ¶¶ 47-52), they have not challenged the *ultra vires* claims related to President Biden and the Proclamation on the merits. Dkt. 36 at

¶¶ 88-90 (raising arguments only as to DHS); *cf.* Dkt. 34 at ¶¶ 113-133 (asserting *ultra vires* claims against both President Biden and DHS). Therefore, if the Court rejects Defendants' general argument as to President Biden, the *ultra vires* claims against him should survive the the government's motion to dismiss. And as to the *ultra vires* claims against DHS, the motion presents no compelling reason for their dismissal.

## A.    GLO Has a Cause of Action for *Ultra Vires* Review.

82.    DHS begins with an argument that *ultra vires* review is unavailable because GLO's claims can be reviewed under the APA. Dkt. 36 at ¶ 89 ("Congress has provided the APA as the vehicle to review agency action alleged to be unlawful."). But this contradicts Defendants' arguments that GLO's claims are unreviewable under the APA. Dkt. 36 at ¶¶ 48, 65. The remainder of DHS's argument amounts to a general contention that *ultra vires* review is disfavored, unaccompanied by any rationale for dismissal. And even this general contention is against the weight of authority.

83.    In *Armstrong v. Exceptional Child Center, Inc.*, the Supreme Court reiterated its long-standing precedents that "relief may be given in a court of equity . . . to prevent an injurious act by a public officer." 575 U.S. 320, 327 (2015). As *Armstrong* recognized, "the ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." *Id.* The Supreme Court has never required a statutory cause of action to engage in *ultra vires* review. *Id.*; *Dames & Moore v. Regan*, 453 U.S. 654 (1981) (resolving *ultra vires* claims on the merits without any suggestion plaintiffs needed to identify a statutory cause of action).

84.    The APA therefore did "not repeal the review of *ultra vires* actions recognized long before," and "[w]hen an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) (quoting *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988)) (conducting *ultra vires* review where a potentially viable APA cause of action

was available); *Aid Ass'n for Lutherans v. U.S. Postal Serv.*, 321 F.3d 1166, 1168, 1173 (D.C. Cir. 2003) (explaining that irrespective of availability of APA review, claims that an agency "exceeded its statutory authority" are "clearly" reviewable (cleaned up)); *Dames*, 453 U.S. at 675-88 (resolving *ultra vires* claim for injunctive relief without reference to availability of APA review).

## B. The Zone-of-Interests Test Does Not Apply to *Ultra Vires* Claims.

85. DHS also argues that the zone-of-interests test applies to GLO's *ultra vires* claims. But DHS conflates two distinct classes of claims: (1) those brought through a statutory cause of action to enforce a statutorily created right, and (2) suits in equity to halt *ultra vires* or unconstitutional conduct. The zone-of-interests test applies only to the first type, because where a *statutory* cause of action is asserted, the zone-of-interests test is a "tool for determining who may invoke the cause of action." *Lexmark Int'l, Inc.*, 572 U.S. at 127-30 (the zone-of-interests test "requires [courts] to determine, using traditional tools of statutory interpretation, whether a *legislatively conferred* cause of action encompasses a particular plaintiff's claim") (emphasis added).

86. Thus in *Armstrong*, the Supreme Court recognized that whether a statute provides a cause of action is a different question than whether an equitable challenge may be brought to stop injurious conduct in excess of statutory authority. The Supreme Court therefore separately analyzed (1) whether the statute at issue provided a statutory cause of action, and (2) whether the statute foreclosed the *ultra vires* relief that would otherwise be available in equity to reign in lawless executive action. 575 U.S. at 327 ("We turn next to respondents' contention that . . . this suit can proceed against [the defendant] in equity.").

87. At bottom, DHS never reconciles the contradictions inherent in applying a test for who may invoke a *statutory cause of action* to preclude equitable claims that a defendant acted *without or in excess of statutory authority* for the lawless action. However,

to any extent the zone-of-interests test applies, GLO easily satisfies it, as discussed above with each statute in reference to the APA.

## C. DHS Does Not Raise a Viable Merits Challenge to GLO's *Ultra Vires* Claims.

88.    DHS asserts the same merits arguments against GLO's APA and *ultra vires* claims. As explained with respect to GLO's APA claims, DHS has either violated the statutes at issue, or exceeded its statutory authority. And Defendants do not even challenge the merits of GLO's *ultra vires* claims related to President Biden and the Proclamation. Accordingly, none of GLO's *ultra vires* claims should be dismissed.

## V.    GLO Has Plausibly Alleged Constitutional Violations.

### A.    GLO Has a Cause of Action for Its Constitutional Claims.

89.    Defendants begin with an undeveloped assertion that GLO "lacks a cause of action" for its Constitutional claims. But as the Supreme Court recognized in *Armstrong*, "the ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England." 575 U.S. at 327. Therefore, "in a proper case, relief may be given in a court of equity . . . to prevent an injurious act by a public officer." *Id.* (quoting *Carroll v. Safford*, 3 How. 441, 463 (1845)). In *Trump v. Hawaii*, the Supreme Court rejected the argument that the plaintiffs' Establishment Clause claim was not justiciable and instead evaluated its merits. 138 S. Ct. 2392, 2416 (2018). The viability of equitable actions specifically with respect to the Appropriations Clause was recognized in *United States v. McIntosh*, 833 F.3d 1163 (9th Cir. 2016). And GLO can also assert its constitutional claims through the APA. Defendants have not cited any authority for the proposition that a court cannot engage in APA or non-statutory review of unconstitutional actions by government officials.

**B.      The Zone-of-Interests Test Does Not Apply to Constitutional Claims.**

90.      Defendants next argue that the zone-of-interests test precludes GLO's constitutional claims. In support they cite the two isolated instances in which the Supreme Court applied the zone-of-interests test to constitutional claims. *See Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.*, 454 U.S. 464 (1982) (addressing the dormant commerce clause); *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318 (1977). However, Defendants do not address the ample contrary Supreme Court precedent in the time since, most importantly *Lexmark International, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014). In *Lexmark*, the Supreme Court clarified that the zone-of-interests test applies to statutory causes of action, guided by legislative intent and statutory interpretation. *Id.* at 129-31. This characterization is inconsistent with application of the test to constitutional claims.

91.      Defendants also do not address any of the more recent instances in which the Supreme Court failed to apply the zone-of-interest test in constitutional cases. *See, e.g.*, *Tenn. Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449 (2019) (not applying zone-of-interests test to dormant commerce clause claim); *Wyoming v. Oklahoma*, 502 U.S. 437, 469-71 (1992) (not applying zone-of-interests test to constitutional claims even when urged by dissent); *Clinton v. City of New York*, 524 U.S. 417 (1998) (addressing Presentment Clause challenge without reference to any zone-of-interests requirement). The Supreme Court's recent failure to apply the zone-of-interests test in *Tennessee Wine*, which like *Valley Forge* involved a dormant commerce clause claim, eliminates all doubt that the zone-of-interests test does not apply to constitutional claims today, if it ever did.

92.      The Ninth Circuit recently addressed this very issue in the context of a constitutional challenge to President Trump's decision to reallocate appropriations towards construction of the border wall, finding it "doubtful that any zone of interests test applies to Plaintiffs' equitable cause of action to enjoin a violation of the Appropriations Clause, particularly after *Lexmark*." *Sierra Club v. Trump*, 929 F.3d 670 (9th

Cir. 2019).[7] As the Ninth Circuit reasoned, "where the very claim is that *no* statutory or constitutional provision authorized a particular governmental action, it makes little sense to ask whether *any* statutory or constitutional provision was written for the benefit of any particular plaintiffs." *Id.* at 701. GLO asserts the same claim—that no statutory or constitutional provision authorized Defendants to unilaterally cease all border wall construction when Congress appropriated funds for that purpose.

### C. GLO's Constitutional Claims Satisfy the Zone-of-Interests Test to the Extent It Applies.

93.     Although *Sierra Club* expressed doubt that the zone-of-interests test applies to constitutional claims in the first place, the Ninth Circuit found that even if it did apply, a challenge to the President's reallocation of appropriations with respect to the border wall fell within the zone-of-interests of the Appropriations Clause. 929 F.3d at 703-704. Although DHS asserts that GLO's interests are unrelated to constitutional limitations on executive power, the "Appropriations Clause is a vital instrument of separation of powers, which has as its aim the protection of individual rights and liberties—not merely separation for separation's sake." *Id.* at 704. Because "individuals, too, are protected by the operations of separation of powers and checks and balances," it follows that "they are not disabled from relying on those principles in otherwise justiciable cases and controversies." *Bond v. United States*, 564 U.S. 211, 223 (2011). Thus in *Sierra Club*, the plaintiffs fell within the zone-of-interests of the Appropriations Clause where their claimed injuries to "environmental, professional, aesthetic, and recreational interests" were caused by allegedly unconstitutional spending on the border wall. 929 F.3d at 704.

94.     Defendants confuse the damages suffered by GLO with the question of whether their unconstitutional conduct was of the type that the constitutional guarantees at issue were designed to prevent. It clearly was. The Appropriations Clause prevents the

---

[7] Although the motion to dismiss sometimes obfuscates this issue, this litigation pertains to funds Congress directly appropriated for the construction of the border wall, rather than the "reallocated" appropriations addressed in *Sierra Club*.

Executive Branch from unilaterally overriding the intent of Congress expressed in appropriations. 929 F.3d at 704. The presentment clause prevents the Executive Branch from taking actions that are fundamentally legislative in nature—such a decision to refuse to spend appropriations on border wall construction—without going through the bicameralism and presentation requirements needed to pass legislation. *Chadha*, 462 U.S. at 955-57. And the Take Care clause bars the Executive Branch from a wholesale abdication of its duties to execute the law. GLO has plausibly alleged that it was harmed by Defendants' violations of each of these constitutional guarantees.

95.     Even the cases Defendants cite do not support how they would apply the zone-of-interests test to GLO's claims. The Supreme Court in *Boston Stock Exchange* permitted the plaintiff businesses to sue under the dormant commerce clause based on alleged financial injury from a state tax that discriminated against out-of-state businesses. 429 U.S. at 329. The plaintiff businesses "were permitted to assert that the state defendant had acted in a manner that infringed on Congress's constitutional authority," whereas Defendants' erroneous interpretation of the zone-of-interests test would require such a challenge to be brought by "Congress seeking to protect its Commerce Clause authority." *Sierra Club*, 929 F.3d at 703 (analyzing *Boston Stock Exchange*). And *Valley Forge* provides no support for Defendants' interpretation of the zone-of-interests test because the Supreme Court did not apply the test at all in that case—it was mentioned in a single sentence of dicta. 454 U.S. 464.

**D.      GLO's Constitutional Claims Are Not Repackaged "Statutory" Claims.**

96.     Defendants also seek dismissal of GLO's constitutional claims on the basis that they are "claims simply alleging that the President has exceeded his statutory authority." Dkt. 36 at ¶¶ 108-110 (citing *Dalton v. Specter*, 511 U.S. 462, 473 (1994)). But Defendants never address what—other than the Constitution—authorized the President to issue the Proclamation in the first place. And they certainly have not *disclaimed* reliance on the Constitution as a basis for the President's authority. Instead they contend that

Article II, Section 1 and the President's "general administrative control of those executing the laws" authorize the Proclamation, and that a disclaimer in the Proclamation directing DHS to take action "consistent with applicable law" insulates it from review. Dkt. 36 at ¶ 110. But if this type of savings clause "precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues." *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1240 (9th Cir. 2018); *see also Shomberg v. United States*, 348 U.S. 540, 547-48 (1955) (holding that savings clauses cannot be given effect when rescuing the constitutionality of the measure would override its language). The Proclamation's instruction to carry out the border wall freeze "consistent with applicable law" is meaningless when the instruction itself is inconsistent with law.

97. Beyond that, Defendants overstate *Dalton's* reach. As they read *Dalton*, constitutional claims could *never* exist against the federal government, because merely pointing to *any* statute as a source of potential authorization—no matter how tenuously related to a plaintiff's claims—transforms constitutional claims into statutory claims. But that is not what *Dalton* decided. *Dalton* reached the uncontroversial conclusion that "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims." *Dalton v. Specter*, 511 U.S. 462, 474 (1994). And *Dalton* leaves no doubt that claims alleging constitutional violations are a viable class of claims distinct from statutory claims. *Id.* ("The distinction between claims that an official exceeded his statutory authority, on the one hand, and claims that he acted in violation of the Constitution, on the other, is too well established to permit this sort of evisceration."). *Dalton* "did not say . . . that action in excess of statutory authority can *never* violate the Constitution or give rise to a constitutional claim." *Sierra Club*, 929 F.3d at 696 (emphasis in original).

98. The Proclamation's ban on border barrier spending and the DHS Plan implicate the Constitution because they directly usurp Congress's power to legislate.

"There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes" such as the CAAs. *Clinton v. City of New York*, 524 U.S. 417, 438 (1998). Simply put, "the President does not have unilateral authority to refuse to spend the funds." *City and County of San Francisco v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018) (quoting *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013)). As Justice Kennedy observed, if "the decision to spend [is] determined by the Executive alone, without adequate control by the citizen's Representatives in Congress, liberty is threatened." *Clinton*, 524 U.S. at 451 (Kennedy, J., concurring).

99. Here, Defendants have not even attempted to explain the source of their authorization to enact a de facto ban on border wall spending. They instead raise factual disputes with regard to whether they have enacted such a ban. Taking GLO's allegations as true, Defendants have violated the constitutional principle of separation of powers and the Appropriations Clause (Counts 1 and 2). The President has violated the Take Care Clause (Count 3). *City and County of San Francisco*, 897 F.3d at 1234 ("Because Congress's legislative power is inextricable from its spending power, the President's duty to enforce the laws necessarily extends to appropriations."). And because Congress has thus far rejected President Biden's invitation to rescind the already appropriated border wall funds, Defendants have "attempted to coopt Congress's power to legislate" for themselves, without adhering to the requirements of the Presentment clause. *Id.* (referring to the "sheer amount of failed legislation" on immigration prior to challenged unilateral executive action). Nothing in *Dalton* stands for the proposition that this Court is barred from reviewing the constitutionality of Defendants' actions.

## CONCLUSION

100. The motion to dismiss should be denied.

RESPECTFULLY SUBMITTED this the 31st day of January, 2022,

/s/Donato D. Ramos
Donato D. Ramos
Texas Bar No. 16508000
S.D. Tex. Bar No. 563276
Donato D. Ramos, Jr.
Texas Bar No. 24041744
S.D. Texas Bar No. 559771
LAW OFFICES OF DONATO D. RAMOS PLLC
6721 McPherson Road, Ste. 250
Laredo, TX 78041
Phone: (959) 722-9909
Facsimile: (956) 727-5884
Email: mrodriguez@ddrlex.com
        donatoramosjr@ddrlex.com

/s/ Cory R. Liu
Cory R. Liu
Texas Bar No. 24098003
S.D. Tex. Bar No. 3047640
Austin R. Nimocks
Texas Bar No. 24002695
S.D. Tex. Bar No. 2972032
ASHCROFT LAW FIRM LLC
919 Congress Ave., Ste. 1325
Austin, TX 78701
Phone: (512) 370-1800
Facsimile: (512) 727-8200
Email: cliu@ashcroftlawfirm.com
        animocks@ashcroftlawfirm.com

*Counsel for Plaintiffs Texas General Land Office and Commissioner George P. Bush*

## CERTIFICATE OF SERVICE

In accordance with Fed. R. Civ. P. 5(b)(2)(E) and Local Rule 5.3, I hereby certify that on January 31, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

*/s/ Donato D. Ramos*
Donato D. Ramos