**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

| | |
|---|---|
| THE GENERAL LAND OFFICE OF THE STATE OF TEXAS, and GEORGE P. BUSH, in his official capacity as Commissioner of the Texas General Land Office,<br><br>           Plaintiffs,<br><br>      v.<br><br>JOSEPH R. BIDEN JR., in his official capacity as President of the United States; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; and ALEJANDRO MAYORKAS, in his official capacity as Secretary of the Department of Homeland Security,<br><br>           Defendants. | No. 7:21-cv-00272 |

| | |
|---|---|
| THE STATE OF MISSOURI; THE STATE OF TEXAS,<br><br>           Plaintiffs,<br><br>      v.<br><br>JOSEPH R. BIDEN, in his official capacity as President of the United States, *et al.*<br><br>           Defendants. | No. 7:21-cv-00420<br>(formerly No. 6:21-cv-00052)<br>Hon. Micaela Alvarez |

**FEDERAL GOVERNMENT DEFENDANTS' REPLY IN SUPPORT OF
THEIR MOTION TO DISMISS THE AMENDED COMPLAINT BY THE
*GENERAL LAND OFFICE* PLAINTIFFS**

# TABLE OF CONTENTS

INTRODUCTION ....................................................................................................................1

ARGUMENT .........................................................................................................................2

I.      GLO Has Not Adequately Pled Article III Standing Because Its Alleged Harms Are Not Traceable to the Challenged Policies.........................................................................2

II.     The Court Must Dismiss the President from the Case Because the President is Not Subject to Declaratory Relief and GLO Can Obtain Full Relief From the Agency Defendants, If Appropriate. ........................................................................................6

III.    The Court Lacks Jurisdiction to Entertain GLO's APA Claims..................................8

        A.      Discretionary Choices as to How to Spend Border Wall Appropriations Are Not a "Rule" Requiring Notice & Comment Under the APA. ......................9

        B.      GLO Improperly Seeks to "Improve" the DHS Plan By Compelling Discrete Agency Actions That Are Not Required by Statute. ......................................12

IV.     GLO's Regulatory Flexibility Act Claim Should Be Dismissed. ................................13

V.      GLO's Statutory Claims are Not Reviewable Under the APA or a Non-Statutory Ultra Vires Cause Of Action. ................................................................................15

        A.      GLO Falls Outside the Zone of Interests of the Statutes it Seeks to Enforce. ..........15

        B.      GLO Cannot Evade the Zone-Of-Interests Requirement by Asserting its Statutory Claims Through an Ultra Vires Cause of Action............................20

VI.     GLO's Statutory Claims Should Be Dismissed. ........................................................23

        A.      GLO's Statutory Claims Fail Under APA Review or Non-Statutory Ultra Vires Review ...............................................................................................23

        B.      GLO's IIRIRA Claim Fails. ...........................................................................25

        C.      DHS Is Spending Funds Consistent With Its Congressional Appropriations. ..........28

        D.      GLO Has Not Stated Claims For Violations of Other Appropriations Statutes. ......................................................................................................32

VII.    GLO's Constitutional Claims Should Be Dismissed. .................................................34

        A.      GLO Fails the Zone-Of-Interests Test For Its Constitutional Claims. .......................34

        B.      GLO Has Failed To State Any Constitutional Claims..................................36

CONCLUSION ...................................................................................................................39

# TABLE OF AUTHORITIES

**Cases**

*Allied Local and Reg'l Mfrs. Caucus v. EPA,*
 215 F.3d 61 (D.C. Cir. 2000) ........................................................................ 14

*Am. Airlines, Inc. v. Herman,*
 176 F.3d 283 (5th Cir. 1999) ...................................................................... 25

*Arbaugh v. Y&H Corp.,*
 546 U.S. 500 (2006) .................................................................................... 35

*Arizona v. Mayorkas,*
 No. 21-cv-00617-PHX-DWL, 2022 WL 357348 (D. Ariz. Feb. 7, 2022) ............................ *passim*

*Armstrong v. Exceptional Child Ctr., Inc.,*
 575 U.S. 320 (2015) .............................................................................. 21, 23

*Ass'n of Am. Physicians & Surgeons, Inc. v. FDA,*
 539 F. Supp. 2d 4 (D.D.C. 2008) .................................................................. 22

*Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.,*
 502 U.S. 32 (1991) ...................................................................................... 24

*Bennett v Spear,*
 520 U.S. 154 (1997) .......................................................................... 17, 20, 36

*Bernard v. Cty. of Suffolk,*
 356 F.3d 495 (2d Cir. 2004) ...................................................................... 30

*Biden v. Missouri,*
 142 S. Ct. 647 (2022) ................................................................................ 29

*Block v. Cmty. Nutrition Inst.,*
 467 U.S. 340 (1984) .................................................................................. 15

*Boston Stock Exch. v. State Tax Comm'n,*
 429 U.S. 318 (1977) .................................................................................. 35

*California v. Texas*
 141 S. Ct. 2104 (2021) ................................................................................ 3

*California v. Trump,*
 963 F.3d 926 (9th Cir. 2020) .................................................................. 18, 37

*California Sportfishing Prot. All. v. United States Bureau of Reclamation,*
 2015 WL 6167521 (E.D. Cal. Oct. 20, 2015) ................................................ 24

*Cheney R. Co. v. ICC,*
 902 F.2d 66 (D.C. Cir. 1990) .................................................................... 11

*Cicalese v. Univ. of Texas Med. Branch,*
924 F.3d 762 (5th Cir. 2019) ................................................................. 33

*Citizens for Responsibility & Ethics in Washington v. Trump,*
939 F.3d 131 (2d Cir. 2019) ................................................................. 35

*City of Arlington, Tex. v. F.C.C.,*
569 U.S. 290 (2013) ................................................................. 29

*City & Cty. of San Francisco v. Trump,*
897 F.3d 1225 (9th Cir. 2018) ................................................................. 38

*Clapper v. Amnesty Int'l USA,*
568 U.S. 398 (2013) ................................................................. 3, 5, 6

*Clarke v. Securities Industry Assn.,*
479 U.S. 388 (1987) ................................................................. 16, 22

*Clinton v. City of New York,*
524 U.S. 417 (1998) ................................................................. 35

*Cmty. Nutrition Inst. v. Young,*
818 F.2d 943 (D.C. Cir. 1987) ................................................................. 9, 10, 11

*Comm. on Judiciary of U.S. House of Representatives v. Miers,*
542 F.3d 909 (D.C. Cir. 2008) ................................................................. 6

*Ctr. for Biological Diversity v. Trump,*
453 F. Supp. 3d 11 (D.D.C. 2020) ................................................................. 17

*Dalton v. Specter,*
511 U.S. 462 (1994) ................................................................. 37

*Department of Commerce v. New York*
139 S. Ct 2551 ................................................................. 29

*East Bay Sanctuary Covenant v. Biden,*
993 F.3d 640 (9th Cir. 2021) ................................................................. 7

*Exxon Chemicals Am. v. Chao,*
298 F.3d 464 (5th Cir. 2002) ................................................................. 25

*Franklin v. Massachusetts,*
505 U.S. 788 (1992) ................................................................. 6, 8, 38

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
561 U.S. 477 (2010) ................................................................. 38

*Gill v. Whitford,*
138 S. Ct. 1916 (2018) ................................................................. 28

*Gomez v. Trump*,
    485 F. Supp. 3d 145 (D.D.C. 2020) ......................................................... 7

*Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*,
    527 U.S. 308 (1999) .............................................................................. 22

*Hawaii v. Trump*,
    878 F.3d 662 (9th Cir. 2017), *rev'd and remanded*, 138 S. Ct. 2392 (2018) .......................................... 7

*Hernandez v. Mesa*,
    140 S. Ct. 735 (2020) ........................................................................... 23

*Hohn v. United States*,
    524 U.S. 236 (1998) .............................................................................. 14

*Horton v. California*,
    496 U.S. 128 (1990) .............................................................................. 30

*In re Gee*,
    941 F.3d 153 (5th Cir. 2019) ................................................................ 29

*Inst. for Tech. Dev. v. Brown*,
    63 F.3d 445 (5th Cir. 1995) .................................................................. 31

*Jaxson v. Saul*,
    970 F.3d 775 (7th Cir. 2020) ................................................................ 12

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*,
    115 F.3d 1020 (D.C. Cir. 1997) ........................................................... 30

*Leedom v. Kyne*,
    358 U.S. 184 (1958) .............................................................................. 25

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ..................................................................... *passim*

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ..................................................................... 9, 10, 12

*Louisiana v. Biden*,
    543 F. Supp. 3d 388 (W.D. La. 2021) ............................................ 13, 17

*Louisiana v. Biden*,
    No. 2:21-CV-00778, 2021 WL 2446010 (W.D. La. June 15, 2021) ................... 7

*Louisiana v. United States*,
    948 F.3d 317 (5th Cir. 2020) ................................................................ 18

*Lujan v. Def.s of Wildlife* ,
    504 U.S. 555 (1992) .............................................................................. 28

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) ............................................................................... 13

*M'Culloch v. Maryland,*
  17 U.S. 316 (1819) ................................................................................. 26

*Maher Terminals, LLC v. Port Auth. of New York & New Jersey,*
  805 F.3d 98 (3d Cir. 2015) ..................................................................... 35

*Maine Cmty. Health Options v. United States,*
  140 S. Ct. 1308 (2020) ........................................................................... 31

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak,*
  567 U.S. 209 (2012) .................................................................... 16, 20, 35

*Miccosukee Tribe of Indians of Fla. v. United States, No. 08-23523-CIV,*
  2009 WL 10668917 (S.D. Fla. Sept. 30, 2009) ...................................... 19

*Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n,*
  453 U.S. 1 (1981) ................................................................................... 15

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ................................................................................... 1

*Nat'l Treasury Emp. Union v. Campbell,*
  654 F.2d 784 (D.C. Cir. 1981) ............................................................... 18

*Navy Seal 1 v. Biden,*
  No. 8:21-CV-2429-SDM-TGW, 2021 WL 5448970 (M.D. Fla. Nov. 22, 2021) ............................ 7

*Newdow v. Roberts,*
  603 F.3d 1002 (D.C. Cir. 2010) ............................................................... 6

*Nixon v. Fitzgerald,*
  457 U.S. 731 (1982) ............................................................................... 38

*Norton v. Southern Utah Wilderness All.,*
  542 U.S. 55 (2004) ................................................................................. 13

*Ord. of Ry. Conductors of Am. v. Swan,*
  329 U.S. 520 (1947) ............................................................................... 31

*Perez v. Mortg. Bankers Ass'n,*
  135 S. Ct. 1199 (2015) ........................................................................... 12

*Philips Petroleum Co. v. Johnson,*
  22 F.3d 616 (5th Cir. 1994) ................................................................... 10

*Pros. & Patients for Customized Care v. Shalala,*
  56 F.3d 592 (5th Cir. 1995) ..................................................................... 9

*Puerto Rico v. United States,*
    490 F.3d 50 (1st Cir. 2007) ............................................................................................... 24

*Sanchez-Espinoza v. Reagan,*
    770 F.2d 202 (D.C. Cir. 1985) ............................................................................................ 6

*Sierra Club v. Trump,*
    929 F.3d 670 (9th Cir. 2019) ..................................................................................... 22, 36

*State of Alabama v. Centers For Medicare & Medicaid Servs.,*
    No. 2:08-CV-881-MEF-TFM, 2010 WL 1268090 (M.D. Ala. Mar. 30, 2010) ............................. 14

*Swan v. Clinton,*
    100 F.3d 973 (D.C. Cir. 1996) ............................................................................................ 6

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas,*
    139 S. Ct. 2449 (2019) .................................................................................................... 35

*Texas v. United States,*
    809 F.3d 134 (5th Cir. 2015) ..................................................................................... 10, 35

*Thompson v. North Am. Stainless, LP,*
    562 U.S. 170 (2011) .......................................................................................... 16, 18, 22

*Trudeau v. FTC,*
    456 F.3d 178 (D.C. Cir. 2006) .......................................................................................... 24

*Trump v. Hawaii,*
    859 F.3d 741 (9th Cir. 2017), *vacated as moot*, 138 S. Ct. 377 (2017) .................................... 7

*Trump v. Sierra Club,*
    140 S. Ct. 1 (2019) ............................................................................................ 19, 23, 36

*U.S. Dep't of Labor v. Kast Metals Corp.,*
    744 F.2d 1145 (5th Cir. 1984) ........................................................................................... 9

*U.S. Navy SEALs 1-26 v. Biden,*
    No. 4:21-CV-01236-O, 2022 WL 34443 (N.D. Tex. Jan. 3, 2022) ........................................... 7

*United States v. Arizona,*
    No. CV 10-1413-PHX-SRB, 2011 WL 13137062 (D. Ariz. Oct. 21, 2011) ...................... 13, 25, 26

*Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.,*
    454 U.S. 464 (1982) .................................................................................................. 21, 35

*Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.,*
    429 U.S. 252 (1977) ........................................................................................................ 29

*Washington v. Trump*
    441 F. Supp. 3d 1101 (W.D. Wash. 2020) ........................................................................... 17

*Waterkeeper All. v. Envt'l Prot. Agency,*
  853 F.3d 527 (D.C. Cir. 2017) ................................................................ 11

*Wyoming v. Oklahoma,*
  502 U.S. 437 (1992) ................................................................ 35

*Youngstown Sheet & Tube Co. v. Sawyer,*
  343 U.S. 579 (1952) ................................................................ 38

*Ziglar v. Abbasi,*
  137 S. Ct. 1843 (2017) ................................................................ 22

## U.S. Constitution

U.S. Const., art. I, § 9, cl. 7 ................................................................ 36

U.S. Const., art. II, § 3 ................................................................ 36

## Statutes

2 U.S.C. § 683 ................................................................ 31

2 U.S.C. § 684 ................................................................ 31

2 U.S.C. § 686 ................................................................ 31

5 U.S.C. § 601 ................................................................ 15

5 U.S.C. § 611 ................................................................ 14, 15

5 U.S.C. § 701 ................................................................ 9, 12

5 U.S.C. § 706 ................................................................ *passim*

31 U.S.C. § 1112 ................................................................ 33

31 U.S.C. § 1301 ................................................................ 15, 32

31 U.S.C. § 1341 ................................................................ 15, 33, 34

31 U.S.C. § 1532 ................................................................ 15, 32, 33

Consolidated Appropriations Act, 2014,
  Pub. L. No. 113-76, § 743, 128 Stat. 5 ................................................................ 18

Pub. L. No. 109-367, § 3, *repealed and replaced by* Pub. L. No. 110-161, Div. E, § 564 ................................................................ 27

Pub. L. No. 116-6, Div. D, § 739 ................................................................ 23, 33, 34

## Rules

Fed. R. Civ. P. 65 ................................................................ 8

## Regulations

Determination Pursuant to Section 102 of IIRIRA, as Amended,
  84 Fed. Reg. 58400–02 (Oct. 31, 2019) ................................................................ 27

Termination of Emergency with Respect to the Southern Boarder of the United States and
Redirection of Funds Diverted to the Boarder Wall Construction, Proclamation No. 10142,
86 Fed. Reg. 7225 (Jan. 20, 2021) .................................................................................................. *passim*

**Other**

33 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 8307,
3d ed. April 2020 Update ................................................................................................................... 21

Matter of Office of Management and Budget and U.S. Dep't of Homeland Security–Pause of Border
Barrier Construction and Obligations,
B-333110.1, 2021 WL 2451823 (June 15, 2021) ............................................................................. 19

Texas Facilities Commission, *Texas Border Wall Construction Status*,
https://www.tfc.texas.gov/wall/ (TFC Statement of Feb. 11, 2022) (last accessed Feb. 14, 2022)
........................................................................................................................................................... 6

# INTRODUCTION

1.      GLO's opposition to Defendants' motion to dismiss, ECF No. 39 ("GLO Opp."), would have the Court believe that Defendants have returned the federal government to 1952, when President Truman ordered the seizure of steel mills without statutory authorization during the Korean War; or to the early 1970s, when President Nixon threatened to withhold expenditures of Congressional appropriations for programs that were inconsistent with his policies, leading to the passage of the Impoundment Control Act of 1974 ("ICA").  But the decisions challenged here bear no resemblance to those circumstances, and GLO has not pled facts that suggest otherwise.  Rather, Defendants used their statutorily conferred discretion to effect a legitimate change in *how*, not *whether*, border barrier appropriations are spent, consistent with the text of the appropriations at issue and other statutes regulating government appropriations and spending, as well as the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA").  Congress's independent appropriations watchdog, the Government Accountability Office ("GAO"), reached the same conclusion when asked to look into the issue last year.  Far from being an aberration, this reordering of priorities "brought about by people casting their votes" in order to reflect "the philosophy of the [new] administration" is a seminal feature of American government.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting in part).

2.      GLO may wish that Defendants decided to use the border wall appropriations differently.  But no source of law *compels* Defendants to do what GLO wishes.  Even if GLO had Article III standing to maintain such a challenge in federal court (it does not), GLO has failed to show the Court has jurisdiction under the APA to scrutinize discretionary spending choices committed to agency discretion by law, or to compel the sort of programmatic improvements to Defendants' stewardship of the border wall program the complaint necessarily seeks.  It has failed to show that Defendants acted improperly by making these decisions without notice and comment, particularly since the policies under revision were *also* made without notice and comment.  And it has failed to show that Defendants' decisions are in conflict with any of the statutes it relies upon, or with the federal

constitution.

<u>3.</u>    Accordingly, the Court should grant Defendants' motion and dismiss GLO's first amended complaint.

## ARGUMENT

**I.    GLO Has Not Adequately Pled Article III Standing Because Its Alleged Harms Are Not Traceable to the Challenged Policies.**

<u>4.</u>    In order for the Court to have Article III standing over this dispute, GLO has the burden of establishing that its injuries in fact are traceable to the policies it is challenging in this case, as opposed to other issues that the Court lacks the power or authority to remedy. GLO has failed to make that showing here. Defs.' Mot. to Dismiss GLO First Am. Compl. ("Defs.' MTD"), ECF No. 36, ¶¶ 38–46. Recently, a district court denied a motion for a preliminary injunction brought by the State of Arizona alleging the Proclamation[1] and resulting changes in border wall construction policy left gaps in the border wall that allowed migrants to cross into Arizona, thereby harming Arizona's environmental and financial interests. *Arizona v. Mayorkas*, No. 21-cv-00617-PHX-DWL, 2022 WL 357348, at *6–12 (D. Ariz. Feb. 7, 2022). The Court denied Arizona's border wall claim for lack of standing, finding that Arizona had not established a likelihood of success on the causation element. *Id.* This Court should follow suit by dismissing GLO's claims for lack of standing.

<u>5.</u>    GLO asserts that the presence of a wall on neighboring land, but not on GLO Farm, has diminished the farm's value, and that building a wall over GLO Farm would redress its injuries. First Am. Compl. ¶ 85. The complaint sufficiently alleges (and Defendants assume as true for purposes of this motion) that (1) migrants are damaging GLO's property by trespassing over it during border crossings and (2) current border barrier infrastructure "channels" migrants towards areas of the border that are not fenced, like GLO Farm. For purposes of this motion, Defendants do not dispute these allegations, and their opposition to standing is not, as GLO attempts to characterize it, an attempt to avoid the Civil Rule 12(b) standard simply by refusing to accept the complaint's allegations as true.

---

[1] *See* Termination of Emergency with Respect to the Southern Boarder of the United States and Redirection of Funds Diverted to the Boarder Wall Construction, Proclamation No. 10142, 86 Fed. Reg. 7225 (Jan. 20, 2021) [hereinafter "Proclamation"].

GLO Opp. ¶¶ 6–7.  Rather, GLO's traceability argument falters because the First Amended Complaint does not adequately allege facts giving rise to the reasonable inference that *Defendants' spending policies* are responsible for this state of affairs.

6.      To start with the first of the two factual premises of GLO's argument for Article III standing, decisions to migrate are influenced by countless cultural, social, economic, and political factors that are beyond the federal government's control.  *See generally Whitewater Draw Natural Resource Conservation District v. Mayorkas*, 5 F.4th 997, 1015 (9th Cir. 2021).  The decision to attempt an unlawful entry as opposed to a lawful one, including where to attempt entry, are subject to still more variables.  The reluctance of courts to embrace theories of standing that rely on the actions of third parties is therefore especially pertinent in the immigration context.  *See California v. Texas*, 141 S. Ct. 2104, 2117 (2021); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013).  Indeed, courts have uniformly rejected theories of standing premised on the idea that particular policies motivate or entice individuals to migrate in greater numbers than they would otherwise.  Defs.' MTD ¶ 42.  "At bottom," GLO "is asking the Court to speculate about why aliens choose to enter the country illegally and about whether the construction of certain impediments to their entry—which would not eliminate the many other avenues of entry—would result in effective deterrence, such that the absence of those impediments may be said to be the literal cause of increased migration" over the GLO Farm.  *Arizona v. Mayorkas*, 2022 WL 357348, at *8; *see also id.* at *11 (distinguishing *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021), on causation in the context of standing).  That is not a sufficient basis for GLO's claim to be maintained in federal court.

7.      GLO accuses Defendants of disputing the facts pled in the complaint regarding immigration levels, but they do not even attempt to claim that the migrants allegedly trespassing on their property did so because they found out government officials in Washington decided to rescope border barrier projects funded by DHS's annual appropriations.  Even if the Court were to assume that the First Amended Complaint is correct to attribute "the border surge to the Biden Administration policies," GLO Opp. ¶ 12, it does not (and could not) plausibly establish that the President's Proclamation specifically, or any border wall appropriation decision that flowed from it, is responsible for any

3

decision to migrate or change in migration levels over GLO Farm. The comments of Mr. Scott, a former Border Patrol Chief, only underscore this deficiency; although he blames recent increased levels of migration on an "unprecedented seismic shift in border security and immigration policy," Rodney Scott Letter to Members of Congress ("Scott Letter"), ECF No. 34-1, at 1, not even he goes so far as to say that the challenged policies at issue in this case contributed to that shift. Moreover, even if GLO had made such an allegation, it is difficult to see how it would be plausible.

8.  As to the gaps in the infrastructure and the alleged "channeling" of migrants onto GLO's land, GLO's lawsuit seeks to blame Defendants for a policy they inherited, not one that the Proclamation and the Department of Homeland Security ("DHS") Border Wall Plan[2] created.[3] The "channeling" effect GLO complains about is the result of the prior Administration's decision to build barriers directly adjacent to the GLO Farm without having completed arrangements to build a fence over GLO Farm, as well. Likewise, the need to allocate enforcement resources to address gaps in the barriers that Mr. Scott complains about is a result of the state of the infrastructure at the time the Proclamation issued. Scott Letter at 4. GLO now wants Defendants to *remedy* this state of affairs by building a border barrier over GLO Farm, but GLO has not challenged the legality of the decision to build walls on adjacent properties that led to the channeling effect in the first place. Standing requires a plaintiff to challenge the policy that is actually cause it harm. GLO has failed to do so here.

9.  GLO tries to compensate for the disconnect between its harm (an incomplete border wall left by the prior Administration) and what it is challenging (expenditure of funds by the current Administration on additional project planning) by arguing that acquisition of its land and construction of a border wall over its property "would have continued in the absence of the Proclamation and DHS

---

[2] *See* DHS Border Wall Plan Pursuant to Presidential Proclamation 10142 (June 9, 2021) (ECF No. 36-2) [hereinafter "DHS Plan"].

[3] In *Arizona v. Mayorkas*, the district court found that a declaration from a rancher describing a "channeling" effect from the border wall was not sufficient to establish the State of Arizona had standing to sue Defendants. 2022 WL 357348, at *10. The district court did not reach the issue of whether the rancher, who was not a party to the case, would have had standing to sue the federal government.

Plan, and that its harms were caused by the failure to complete the RGV-09 project on the GLO Farm." GLO Opp. ¶ 11. But while GLO protests that there is "[n]o speculation involved in reasoning that in the absence of" the Proclamation, that is obviously not correct. *Id.* at ¶ 8. There was no binding commitment by CBP to purchase GLO Farm at the time the Proclamation issued. GLO tries to put a gloss on this situation by asserting that the wall segment over GLO Farm was a high priority project, that Defendants had already committed to undertake the contract even though they did not own the land, that CBP made a "firm offer" for the property, and that CBP threatened to sue if GLO did not accept its offer to purchase the property. *Id.* at ¶ 9. But this gloss does not change the facts pled in the complaint: GLO rejected CBP's initial offer to purchase the property by making a counter-offer instead of accepting the offer, and was still negotiating with CBP in January 2021. At that time, CBP retained complete discretion to walk away from the purchase, cancel or modify its construction contract, and rescope the projects if it so desired—which is exactly what happened here. A plaintiff cannot sue based on conjecture as to how officials with otherwise unfettered discretion would have exercised their authority under a set of circumstances that never came to pass. *Cf. Clapper v. Amnesty Int'l*, 568 U.S. 398, 412 (2013) (no standing to challenge constitutionality of statute that "authorizes—but does not mandate or direct—the surveillance that respondents fear" because plaintiffs could "only speculate as to how the Attorney General and the Director of National Intelligence will exercise their discretion in determining which communications to target"). Hence, there is no standing for GLO to challenge the policies at issue in this case.

10.     Finally, GLO acknowledges in passing that it is constructing a border wall on its own property, GLO Opp. ¶ 7, and does not seriously dispute that the construction it has initiated raises serious questions about the prospective viability of this lawsuit. GLO takes Defendants to task for "not submit[ting] any evidence" about the impact of GLO's construction, *id.*, but it is GLO's burden to demonstrate it has Article III standing, not Defendants, and GLO is in possession of all the facts about its plans. GLO could not have been clearer in its amended complaint: "Completion of the wall on the GLO Farm would eliminate or drastically curtail the illegal border activity on the GLO Farm and redress the GLO's injuries" that form the basis of its lawsuit. First Am. Compl. ¶ 85. To that

end, the Texas Facilities Commission recently announced the completion of a mile of wall over GLO Farm. Texas Facilities Commission, *Texas Border Wall Construction Status*, https://www.tfc.texas.gov/wall/ (TFC Statement of Feb. 11, 2022) (last accessed Feb. 14, 2022). GLO fails to explain what relief the Court would be able to provide if GLO has taken up construction of the wall for itself, and whether this dispute can continue once the wall project is complete.

## II. The Court Must Dismiss the President from the Case Because the President is Not Subject to Declaratory Relief and GLO Can Obtain Full Relief From the Agency Defendants, If Appropriate.

11. President Biden should be dismissed from this lawsuit because there is no cause of action against the President, and the Court lacks authority to order equitable relief against the President for issuing the Proclamation. *See* Defs.' MTD ¶¶ 47–52.

12. GLO concedes that it does not seek injunctive relief against the President. *See* GLO Opp. ¶¶ 15–16. Instead, GLO clarifies that it seeks a declaratory judgment against the President as to the constitutionality of the Proclamation. *Id.* ¶ 16. But the same separation-of-powers considerations that prohibit an injunction against the President also prohibit declaratory relief against him. With respect to Executive Branch officials, a "declaratory judgment is the functional equivalent of an injunction," *Comm. on Judiciary of U.S. House of Representatives v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008), because "it must be presumed that federal officers will adhere to the law as declared by the court," *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985). Therefore, "similar considerations regarding a court's power to issue [injunctive] relief against the President himself apply to [a] request for a declaratory judgment." *Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996). As Justice Scalia explained in *Franklin v. Massachusetts*, "a declaratory judgment against the President" is "incompatible with his constitutional position" and "the separation of powers." 505 U.S. 788, 827–28 (1992) (Scalia, J., concurring) (citation omitted).

13. Other courts have followed this reasoning and concluded that "declaratory relief" against the President "is unavailable." *See, e.g.*, *Newdow v. Roberts*, 603 F.3d 1002, 1012–13 (D.C. Cir. 2010) ("With regard to the President, courts do not have jurisdiction to enjoin him, . . . and have never submitted

the President to declaratory relief[.]"); *Navy Seal 1 v. Biden*, No. 8:21-CV-2429-SDM-TGW, 2021 WL 5448970, at *2 (M.D. Fla. Nov. 22, 2021) ("No injunctive or declaratory relief can issue against the President."). Indeed, another district court in this Circuit recently concluded that it "has no declaratory or injunctive power against President Biden" and dismissed him from that case. *U.S. Navy SEALs 1-26 v. Biden*, No. 4:21-CV-01236-O, 2022 WL 34443, at *3 (N.D. Tex. Jan. 3, 2022).

14.     Unlike the cases cited above, none of the cases GLO relies upon addresses whether a court has the power to issue a declaratory judgment directly against the President. *See* GLO Opp. ¶¶ 17–19. As explained in Defendants' motion to dismiss, *see* Defs.' MTD ¶ 51, the Ninth Circuit in *Trump v. Hawaii* vacated the district court's injunction against the President and limited its remedy to the agency defendants. *See* 859 F.3d 741, 788 (9th Cir. 2017) (injunction against the President was "not appropriate"), *vacated as moot*, 138 S. Ct. 377 (2017); *see also Hawaii v. Trump*, 878 F.3d 662, 680 (9th Cir. 2017), *rev'd and remanded*, 138 S. Ct. 2392 (2018). The Supreme Court thus had no occasion in that case to address whether a court could issue equitable relief directly against the President. Similarly, the Ninth Circuit in *East Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 680 (9th Cir. 2021), did not address declaratory or injunctive relief against the President; it simply affirmed an injunction against part of a rule concerning asylum eligibility issued by the Departments of Justice and Homeland Security. The same is true for *Texas v. Biden*, 20 F.4th at 941, which vacated under the APA DHS's decision to terminate the Migrant Protection Protocols ("MPP") without any discussion of relief against the President. *See also Louisiana v. Biden*, No. 2:21-CV-00778, 2021 WL 2446010, at *3 (W.D. La. June 15, 2021) ("Plaintiff States have based their Motion for Preliminary Injunction on violations by the Government Agencies pursuant to the APA."); *Gomez v. Trump*, 485 F. Supp. 3d 145, 190, 199 (D.D.C. 2020) (granting injunction as "to how federal agencies have implemented" a presidential proclamation).

15.     Dismissing the President would not deprive GLO of the ability to remedy their alleged harms. All of GLO's purported property injuries allegedly flow from actions taken by the agency defendants regarding the funding and construction of border barriers, not from the mere issuance of the Proclamation by the President. Thus, even if GLO ultimately were to prevail, the Court could issue

an injunction or a declaratory judgment against the agency defendants. That approach would "avoid confronting the elected head of a coequal branch of government" while also providing complete relief to Plaintiffs. *Swan*, 100 F.3d at 978; *see Franklin*, 505 U.S. at 828–29 (Scalia, J., concurring). GLO responds that the President should not be dismissed because many different government agencies and officials are involved in the border wall construction and funding process, thus it would be "an unworkable exercise" to attempt "to drag each of those agencies into court." GLO Opp. ¶ 21. But administrative inconvenience to GLO is no basis for the Court to sidestep foundational separation-of-powers principles and issue a declaratory judgment against the President. GLO cites no authority for that proposition. In any event, Civil Rule 65 addresses GLO's concern by authorizing injunctions against more than the named parties to a civil action. Rule 65 provides that persons bound by an injunction include not only the parties themselves, but the parties' "officers, agents, servants, employees, and attorneys[ ] and other persons who are in active concert or participation with anyone described [above]" so long as they receive actual notice of the order. Fed. R. Civ. P. 65(d)(2). GLO does not contend that an injunction issued in accordance with Rule 65 against the agency defendants would somehow leave it vulnerable to continued injury. The Court should accordingly dismiss the President from this case.

## III. The Court Lacks Jurisdiction to Entertain GLO's APA Claims.

16. Defendants' motion to dismiss showed that GLO's claims do not fit within the APA's waiver of sovereign immunity. Defs.' MTD ¶¶ 65–82. GLO's opposition focuses on why Defendants' actions are arbitrary and capricious, GLO Opp. ¶¶ 22–40, but Defendants did not raise this issue in their motion, and rightly so. An analysis of whether agency action is arbitrary and capricious requires an administrative record, and is therefore normally reserved for summary judgment. Nonetheless, as explained below and in Defendants' opening brief, all of GLO's APA claims, including its arbitrary and capricious claim, are subject to dismissal because the APA does not permit a challenge to the agency decision-making targeted in GLO's complaint.

### A. Discretionary Choices as to How to Spend Border Wall Appropriations Are Not a "Rule" Requiring Notice & Comment Under the APA.

17. GLO is simply incorrect that Defendants' changes to border barrier appropriations policy, as articulated in the DHS Plan, constitute an agency "rule" that had to be subjected to notice-and-comment. *Texas v. Biden*, 20 F.4th at 978–97 (rules subject to notice and comment cannot be committed to agency discretion by law, 5 U.S.C. § 701(a)(2), and are thus subject to judicial review).[4] The DHS Plan merely provides guidelines as to how Defendants intend to exercise their discretionary spending power in the future. Such a statement need not go through notice and comment; therefore, there is no procedural violation of the APA. Moreover, since GLO asserts no other basis for the Court to reject Defendants' argument that the DHS Plan is exempt from judicial review under § 701(a)(2), the Court should dismiss *all* of GLO's APA claims for lack of jurisdiction.[5]

18. An agency action is not a "rule" subject to notice and comment if it is either (1) a "general statement of policy" or (2) a procedural rule. General statements of policy are exempt from notice and comment because they "advise the public prospectively of the manner in which the agency proposes to exercise a discretionary power," and do not have the force and effect of law on the regulated public standing alone. *Lincoln v. Vigil*, 508 U.S. 182, 197 (1993); *see also Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 (5th Cir. 1995) (stating that "a general statement of policy is one that does not impose any rights and obligations") (quoting *Cmty. Nutrition Inst. v. Young*, 818 F.2d 943, 946 (D.C. Cir. 1987)). Likewise, procedural rules organize an agency's internal operations and do not "modif[y] [any] substantive rights and interests" of the public. *U.S. Dep't of Labor v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984).

19. The Supreme Court addressed the application of these exceptions to notice-and-comment

---

[4] Although this Court is bound by *Texas v. Biden*, Defendants do not concede that the Fifth Circuit's novel holding about the scope of § 701(a)(2) exception to judicial review is correct, and reserve the right to challenge that ruling in future proceedings.

[5] In the consolidated case, Texas and Missouri do not argue that Defendants' actions constitute a procedural APA violation, but contend that Defendants' actions are reviewable notwithstanding § 701(a)(2). For the reasons articulated in Defendants' motion to dismiss the *Missouri* complaint, because the DHS Plan describes the "the discretionary allocation of funds," *Texas v. Biden* 20 F.4th at 986, it is exempt from judicial review under § 701(a)(2).

rulemaking in the context of discretionary spending choices in the *Lincoln* case. In addition to rejecting the plaintiff's substantive APA challenge on the grounds that the discretionary allocation of funds was committed to agency discretion by law, the Court also rejected plaintiff's contention that the termination of a children's health program by HHS had to go through notice-and-comment rulemaking. 508 U.S. at 195–99. The Court skirted the issue of whether a "statement terminating the Program would qualify as a 'rule' within the meaning of the APA," 508 U.S. at 197, but nonetheless agreed that the defendant agency had not violated the APA by foregoing notice and comment. The Court assumed that if such a statement were deemed a "rule," it would in some way be exempt from notice and comment requirements, either as a "rule[] of agency organization" or a "general statement[] of policy." *Id.* So too here. Whether or not the DHS Plan, which is analogous to the hypothetical "statement" the Court considered in *Lincoln*, is a "rule," it would not be the type of "rule" requiring notice and comment because of the nature of discretionary spending decisions.

20.     For its part, GLO never identifies what "rights" or "obligations" it believes the DHS Plan actually creates or imposes on the public at large such that *Lincoln* does not apply here. As the authority GLO cites demonstrates, where courts have checked agencies for not following the APA's procedural requirements, it is because the agencies have taken actions that create rights or impose obligations *on the regulated public* without notice and comment. *Texas v. United States*, 809 F.3d 134, 176 (5th Cir. 2015) (concluding DAPA created legal status for 500,000 unlawful migrants); *Philips Petroleum Co. v. Johnson*, 22 F.3d 616, 620 (5th Cir. 1994) (holding so-called "procedure paper" had to be subjected to notice and comment because, "immediately upon its effective date, [a] five-factor valuation technique" promulgated as a regulation "was no longer to be followed" in assessing the value of federal offshore production for royalty purposes); *Young*, 818 F.2d at 948 (FDA's "action levels" were "not musings about what the FDA might do in the future but rather that they set a precise level of aflatoxin contamination that FDA has presently deemed permissible" in corn products). At best, the DHS Plan commits the agency itself to a particular framework for organizing its discretionary choices, but it does not directly regulate the public or the state of Texas in any way. DHS's determination that "the Plan . . . does not[] create any right or benefit substantive or procedural, enforceable at law or in equity,"

DHS Plan at 1, was therefore correct and entitled to deference. *Young*, 818 F.2d at 946.

21.     GLO is also wrong in its assertion that DHS "was following a directive of the President and was not exercising discretion" when it formed the DHS Plan. GLO Opp. ¶¶ 73–74. The Proclamation paused ongoing border barrier construction in order for the agencies to develop plans to "provid[e] for the expenditure of any funds that the Congress expressly appropriated for wall construction, *consistent with their appropriated purpose.*" Proclamation § 2. In response to this request, DHS determined that they would continue work on two urgent projects, and reserved discretion to "prioritize projects *other than those described in Section II* for completion if they are needed to address life, safety, environmental, or other remediation requirements." DHS Plan at 2 (emphasis added). Otherwise, DHS explained that it will "undertake a thorough review and replanning process" before proceeding with any additional construction. *Id.* Although GLO takes the DHS Plan to task because it does not explicitly mention "border security" as a consideration for expediting projects, nothing in the DHS Plan precludes DHS from considering it (or other unenumerated factors) in determining what projects to expedite, either. *Cf. Waterkeeper All.[ ]v. Envt'l Prot. Agency*, 853 F.3d 527, 534 (D.C. Cir. 2017) (canon of *expresio unius* is "an especially feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved." (quoting *Cheney R. Co. v. ICC*, 902 F.2d 66, 69 (D.C. Cir. 1990))). Thus, neither Congress nor the Proclamation provided guidance to DHS as to how it should prioritize projects or what amount of planning should be done before putting shovels in the ground.

22.     Once GLO's misconceptions are cleared up, the DHS Plan easily satisfies both of the exceptions to notice and comment rulemaking invoked by Defendants. Because it sets forth "the factors that [the agency] will consider in resolving a substantive question of regulation" regarding the border wall, while leaving Defendants free to choose how they ultimately decide to implement those factors in the real world, the DHS Plan is a general statement of policy. *Shalala*, 56 F.3d at 601 (5th Cir. 1995). Moreover, because the DHS Plan sets out the agency's plan to "carry out its duties," without actually implementing any of the substantive actions that would be needed to carry out the plan (such as contract cancellations, environmental review, or stakeholder consultation), the DHS Plan

can also be thought of as a procedural rule. *Jaxson v. Saul*, 970 F.3d 775, 777 (7th Cir. 2020). Under either theory, the conclusion that the DHS Plan did not require notice and comment is intuitively correct. After all, Defendants were not required to follow the APA's notice and comment procedures for the initial decision to start construction of the RGV-09 project, and the Court should reject GLO's theory that more process is required for DHS to engage in additional project planning before resuming construction than was needed to initiate the construction in the first place. *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1206 (2015) ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.").

23.     The resolution of GLO's procedural APA claim is also fatal to GLO's argument that the challenged agency decisions are not committed to agency discretion by law. *Texas v. Biden* explicitly distinguished the *Lincoln* case from its holding that the termination of MPP was not committed to agency discretion by law, acknowledging that "the discretionary allocation of funds is not the same as refusing to follow a statute." 20 F.4th at 986. The Fifth Circuit's categorical statement that § 701(a)(2) and cases interpreting it "applies only to orders and not rules," *id.* at 978, must be read in harmony with *Lincoln*, which reasoned that even if a statement about how discretionary funds are spent were deemed a "rule," that "rule" would be both exempt from notice and comment requirement and from judicial review under § 701(a)(2). Because GLO hangs both its reviewability and its procedural APA argument on the idea that the DHS Plan is a "rule," the fact that the DHS Plan is *not* a rule dooms both claims. Accordingly, GLO's APA claims, substantive and procedural, should be dismissed.

**B.      GLO Improperly Seeks to "Improve" the DHS Plan By Compelling Discrete Agency Actions That Are Not Required by Statute.**

24.     No statute invoked by GLO requires Defendants to build a border barrier across their land, or to adopt a particular plan for constructing future border barriers. Yet that is effectively what GLO's lawsuit seeks to do. Such suits are precluded by *Norton v. Southern Utah Wilderness Alliance* and *Lujan v. National Wildlife Federation*, because a plaintiff (1) "cannot seek *wholesale* improvement of" the border wall program "by court decree, rather than in the offices of the Department or the halls of Congress,

12

where programmatic improvements are normally made," *Norton*, 542 U.S. 55, 64 (2004) (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 879 (1990)), and (2) cannot compel Defendants to undertake a specific border wall project in a particular manner unless they identify "a *discrete* agency action that it is *required* to take" by statute, *Norton*, 542 U.S. at 64. Although a more narrow challenge over an individual contract cancellation or other action might be permitted under *Norton* and *Lujan* (which is not to say such a challenge would be able to go forward), GLO cannot use the APA to coerce Defendants to rewrite the DHS Plan in order to obtain a spending plan that is more amenable to their interests. As such, their current claims—which seek broad, programmatic reform of the current border wall program in the hopes that it will force Defendants to complete a wall segment over GLO Farm—must be dismissed.

25.     GLO's analogy to *Louisiana v. Biden*, 543 F. Supp. 3d 388 (W.D. La. 2021), is inapt. The plaintiff states in that case challenged an executive order "which ordered the Secretary of the Interior to pause new oil and gas leases on public lands, or in offshore waters pending completion of a comprehensive review." *Id.* at 396. The states contended that the order contravened two statutory schemes, the Outer Continental Shelf Lands Act and the Mineral Leasing Act, and the court agreed that the comprehensive review plan was inconsistent with these statutes, which "require that [the federal agencies] continue to sell eligible oil and gas leases in accordance with the statutes." *Id.* at 413. But unlike the regulatory schemes at issue in *Louisiana*, "IRIRA and the Appropriations Acts leave the Secretary and the DHS with a great deal of discretion in deciding how, when, and where to complete the construction" of border barriers. *United States v. Arizona*, No. CV 10-1413-PHX-SRB, 2011 WL 13137062, at *8 (D. Ariz. Oct. 21, 2011). GLO never explains where the duty arises in statute to adopt its preferred spending approach to border wall construction, which is precisely why its lawsuit—which seeks to force Defendants to purchase and then engage in construction over a particular parcel of land—cannot be reconciled with *Norton* and *Lujan*.

## IV.     GLO's Regulatory Flexibility Act Claim Should Be Dismissed.

26.     Defendants' motion to dismiss explained that GLO's Regulatory Flexibility Act ("RFA") claim

fails for numerous reasons, including that (1) the GLO is not a "small entity" who may invoke the RFA's limited judicial review provision and (2) § 603 of the RFA—the section that GLO alleges was violated—is specifically excluded from list of sections that Congress deemed judicially reviewable. *See* Defs.' MTD ¶¶ 83–87. GLO offers only a cursory response to these arguments and altogether fails to engage with the authority cited in Defendants' motion supporting dismissal of the RFA claim. *See, e.g., Allied Local and Reg'l Mfrs. Caucus v. EPA*, 215 F.3d 61, 79 (D.C. Cir. 2000) (concluding the court lacks jurisdiction to consider a claim based on § 603 of the RFA); *State of Alabama v. Centers For Medicare & Medicaid Servs.*, No. 2:08-CV-881-MEF-TFM, 2010 WL 1268090, at *8 (M.D. Ala. Mar. 30, 2010) (holding that the State of "Alabama is not a 'small entity' that may bring a claim under the RFA").

27.     The RFA's narrow judicial review provision authorizes lawsuits only by small entities. 5 U.S.C. § 611(a)(1). GLO cannot overcome this statutory limitation by pointing out that two of the substantive criteria that agencies must consider when conducting an initial regulatory flexibility analysis are generally applicable and not specifically tailored to small entities. *See* GLO Opp. ¶ 40 (citing requirements in § 603(b) for an agency to state the legal basis for a proposed rule, the agency's objectives, and reason why the action is being considered). These general criteria say nothing about who may bring suit under the RFA and do not reflect any intent by Congress to protect the interests of State government agencies with multi-million dollar budgets. *See* Defs.' MTD ¶ 85 (arguing that GLO falls outside the zone-of-interests of the RFA).

28.     The Court should also reject GLO's argument that it may evade the limitations on judicial review in § 611 of the RFA and instead assert its RFA claim through the cause of action provided by § 706(2)(D) of the APA. *See* GLO Opp. ¶ 40. If accepted, GLO's argument would render § 611 superfluous; Congress would not need to authorize actions brought by small entities aggrieved by final agency action, as it did in § 611, if any person, State agency, or corporation could bring suit for a violation of the RFA under the APA. *See, e.g., Hohn v. United States*, 524 U.S. 236, 249 (1998) ("We are reluctant to adopt a construction making another statutory provision superfluous."). As originally enacted, the RFA did not authorize judicial review of an agency's compliance or noncompliance with its provisions. *See* 5 U.S.C. § 611 (1995). The judicial review provisions were instead inserted into the

14

statute by the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, Title II, § 242, 110 Stat. 847. Congress added the narrowly-tailored judicial review provisions in § 611 after finding that "small entities should be given the opportunity to seek judicial review of agency actions required by [the RFA]." 5 U.S.C. § 601 note. Congress did not evince any intent to provide a similar opportunity to seek judicial review to other parties challenging a rule under the APA. The lack of such a finding suggests Congress intended to limit judicial review under the RFA to small entities. *See Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984) ("[W]hen a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded."); *Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 15 (1981) ("In the absence of strong indicia of a contrary congressional intent, we are compelled to conclude that Congress provided precisely the remedies it considered appropriate."). Because the language, intent, and structure of the RFA supports the reading offered by Defendants, the Court should conclude that judicial review under the RFA is limited to actions brought by small entities and dismiss GLO's RFA claim.[6]

## V.     GLO's Statutory Claims are Not Reviewable Under the APA or a Non-Statutory *Ultra Vires* Cause Of Action.

29.     The Court should dismiss the statutory claims GLO asserts in Counts V, VI, and VII of the Amended Complaint because GLO lacks a cause of action. The amended complaint alleges violations of the Purpose Statute (31 U.S.C. § 1301), the Transfer Statute (31 U.S.C. § 1532), the Anti-Deficiency Act (31 U.S.C. § 1341(a)(1)(A)), §§ 230 and 739 of the Fiscal Year 2019 CAA, and IIRIRA. GLO cannot assert those claims through the cause of action provided by the APA, *see* 5 U.S.C. § 706(2)(c), or a non-statutory equitable *ultra vires* cause of action because GLO's asserted interests are not arguably within the zone of interests protected by the statutes.

### A.     GLO Falls Outside the Zone of Interests of the Statutes it Seeks to Enforce.

30.     As set forth in Defendants' motion to dismiss, the zone-of-interests requirement is a general

---

[6] In any event, even if GLO could bring its RFA claim under the APA, it would still fail the zone-of-interests test. *See* Defs.' MTD ¶ 85. GLO does not respond to this argument in its opposition brief.

presumption limiting the plaintiffs who "may invoke [a] cause of action" that Congress has authorized, *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-30 (2014), and reflects the fact that Congress typically does not intend the "absurd consequences" that could result from extending a cause of action to "plaintiffs who might technically be injured in an Article III sense but whose interests are unrelated to the statutory prohibitions" they seek to enforce, *Thompson v. North Am. Stainless, LP*, 562 U.S. 170, 176-78 (2011). *See* Defs.' MTD ¶¶ 55–64. Defendants' further demonstrated that under the applicable zone-of-interests standard, GLO falls outside the zone of interests of the various statutes it seeks to enforce and therefore lacks a cause of action to assert its statutory claims. *See id.* ¶¶ 57–63.

31.    GLO does not dispute that the zone of interest requirement applies to its APA claims. Consequently, GLO must establish that it is "arguably within the zone of interests to be protected or regulated by the statute that [it] says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224–25 & n.7 (2012) (citation omitted).[7] GLO has not made that showing here. *See* GLO Opp. ¶ 63–66. GLO's private property interests are entirely unrelated to the interests arguably protected by the various appropriations statutes, which regulate and protect the interests of federal agencies and Congress in the federal appropriations process. Similarly, IIRIRA's broad authorization to DHS to undertake border wall construction does not protect or regulate the property interests of State government agencies.

32.    The Fifth Circuit's recent decision in *Texas. v. Biden* does not support GLO's claim that they fall within the zone of interests of IIRIRA or the appropriations statues. *See* GLO Opp. ¶ 64. In *Texas v. Biden*, the States alleged that DHS's decision to terminate MPP violated the Immigration and Nationality Act ("INA"). Therefore, the Fifth Circuit focused its inquiry only on whether the States "fall within the zone of interests of the INA." *Texas v. Biden,* 20 F.4th at 975. Here, GLO does not

---

[7] Contrary to GLO's argument, Defendants have not asserted an "overly restrictive construction of the zone-of-interests test" that would require GLO to establish "a specific intent by Congress to benefit private property owners." GLO Opp. ¶ 63. The Supreme Court has stated that the zone-of-interests test does not require "congressional purpose to benefit the would-be plaintiff," *Clarke v. Securities Industry Assn.*, 479 U.S. 388, 399–400 (1987).

allege that DHS's border wall spending policies violate the INA. *Texas v. Biden* thus had no occasion to address GLO's argument that its attenuated property interests fall outside the zone of interests of the appropriations statutes or IIRIRA. The Supreme Court has emphasized that the zone-of-interests test requires a statute-specific analysis and *Texas v. Biden* says nothing about the zone of interests for the statutes at issue in this case. *See Bennett v Spear,* 520 U.S. 154, 175–76 (1997).[8]

33.   GLO's reliance on *Washington v. Trump*, 441 F. Supp. 3d 1101 (W.D. Wash. 2020) to support its zone-of-interests argument for § 739 of the CAA is similarly misplaced. As an initial matter, GLO fails to note that the Ninth Circuit vacated this decision. *See Washington v. Biden*, No. 20-35371 (9th Cir. Jan. 21, 2002). In any event, *Washington* involved a claim that military construction funds appropriated by Congress for a Navy pier project on the Washington coast had been unlawfully used to fund border wall construction. In the court's view, Congress specifically included § 739 in the fiscal year 2019 CAA to prevent President Trump "from obtaining funding outside the appropriations process" and Washington raised type of claim that § 739 was intended to guard against. By contrast, GLO's alleged harm to its property interests are not even arguably related to the appropriations interests protected by § 739 as identified by the *Washington* court.

34.   GLO also overstates the impact of the decision in *Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11 (D.D.C. 2020). That court did not conclude that § 230 and § 739 of the CAA, standing alone, protect the environmental interests asserted by the plaintiffs or the property interests GLO asserts here. Rather, the court found that the plaintiffs' "environmental interests appear to align with at least some interests protected in" other provisions of the CAA that are integrally related to § 739 and § 230. *Id.* at 43. GLO does not assert environmental interests in this case or contend that other provisions in the CAA protect their property interest such that they are integrally related to the specific provisions of the CAA they seek to enforce here, namely § 230 and § 739.

---

[8] For this reason, *Louisiana v. Biden*, 543 F. Supp. 3d 388 (W.D. La. 2021), also does not support GLO's argument. That case did not address either the property interests the GLO asserts here or the statutes it invokes. Rather, as noted above, *Louisiana* focused on the States' lost revenue from oil and gas leases based on alleged statutory violations of the Outer Continental Shelf Lands Act and the Mineral Leasing Act, statutes that authorized a program for such leases. *Id.*

35.     Nothing in Congress's appropriation of funds in § 230 for DHS to carry out its statutory mission suggests that Congress intended to allow suit by plaintiffs who allege property damage as an indirect result of how those funds are spent.  Further, § 739 regulates the back-and-forth relationship between agencies and Congress regarding federal spending and reprogramming of funds.  That provision's boilerplate language, which has been included in appropriations statutes since 2014, *see e.g.*, Consolidated Appropriations Act, 2014, Pub. L. No. 113-76, § 743, 128 Stat. 5, 243, in no way suggests that Congress intended to allow suits to enforce the attenuated property interests GLO asserts here. *See Louisiana v. United States,* 948 F.3d 317, 322–23 (5th Cir. 2020) (concluding that State of Louisiana fell outside the zone-of-interests of waterway provision that "was motivated by the need for commerce on a national scale," not to protect the "interests of the landowners surrounding the Waterway"); *see also id.* (Louisiana cannot "establish that the encroachment of its land falls within the zone of interests sought to be protected by the Act") (internal quotations omitted).

36.     The Court should also reject GLO's argument that it satisfies the zone-of-interests requirement because its interests align with the interests of Congress in seeking to ensure that DHS spends its appropriations lawfully "on the purpose Congress intended."  *See* GLO Opp. ¶¶ 65–66. That reasoning—which has nothing to do with the property interests asserted by GLO—is effectively "tautological."  *California v. Trump*, 963 F.3d 926, 962–63 (9th Cir. 2020) (Collins, J., dissenting), *vacated sub nom Biden v. Sierra Club*, 142 S. Ct. 46 (2021).  Mere "congruence between the States' legal theory and Congress's institutional interests is not sufficient to satisfy the zone-of-interests test here."  *Id.* (Collins, J., dissenting).  Were that the case, any plaintiff with an Article III injury who alleges that an agency is spending funds contrary to the terms of its appropriations could be said to have the same congruence of interests with Congress in avoiding such violations.  The Supreme Court has never endorsed such an expansive approach to zone of interests.  *See, e.g., Thompson*, 562 U.S. at 176–78.

37.     Congress has the necessary tools to protect its own appropriations interests without any need for proxy litigation by state government agencies, whose interests may well diverge from the ultimate position of Congress.  *See Nat'l Treasury Emp. Union v. Campbell*, 654 F.2d 784, 794 (D.C. Cir. 1981). That concern is evident in this case, where the nonpartisan GAO, a congressional arm with expertise

in federal appropriations law, concluded that DHS did not unlawfully impound funds from its border infrastructure appropriations while implementing the President's Proclamation. *See* Matter of Office of Management and Budget and U.S. Dep't of Homeland Security–Pause of Border Barrier Construction and Obligations, B-333110.1, 2021 WL 2451823 (June 15, 2021) [hereinafter "*GAO Opinion*"]. GLO should not be able to sue based on a theory that it is "aligned with Congress's objective" when this lawsuit conflicts with the legal position adopted by the congressional office charged with overseeing how federal funds are spent. GLO Opp. ¶ 66.

38.    GLO has no response to the argument that it fails the zone-of-interests test for the Anti-Deficiency Act. Nor does GLO even attempt to distinguish the authorities cited by Defendants that GLO falls outside the zone-of-interests of the Purpose Statute or Transfer Statute. *See, e.g., Miccosukee Tribe of Indians of Fla. v. United States*, No. 08-23523-CIV, 2009 WL 10668917, at *4 (S.D. Fla. Sept. 30, 2009) (dismissing claims brought under the Purpose Statute and a statute appropriating funds to a federal agency on zone-of-interests grounds because the statutes protected "Congress's interest in having appropriations applied to the purposes it dictates").

39.    GLO also says nothing to diminish the force of the Supreme Court's decision in *Trump v. Sierra Club*, 140 S. Ct. 1 (2019), which stayed an injunction against border wall construction based on a challenge to the Department of Defense's ("DoD") compliance with a provision of the DoD Appropriations Act authorizing transfers of funds between different budget accounts. "Among other reasons," the Supreme Court concluded that the Government had sufficiently shown that a group of environmental plaintiffs likely "have no cause of action to obtain review of the Acting Secretary's compliance with" the DoD appropriations transfer statute. *Id.* at 1. GLO argues this ruling has no application here because the Supreme Court did not expressly mention the zone of interests in its order. *See* GLO Opp. ¶ 66 n.6. But that argument ignores the context of the dispute in *Sierra Club*, which focused on whether the plaintiffs satisfied the zone-of-interests requirement. *See* Reply in Support of Application for a Stay Pending Appeal, at *3–10, *Trump v. Sierra Club*, No. 19A60, 2019 WL 3451617 (July 22, 2019). As the Supreme Court has emphasized, "a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law

invoked." *Lexmark*, 572 U.S. at 129.

40.    Like the Department of Defense appropriations transfer statute at issue in *Sierra Club*, GLO alleges violations of similar appropriations acts and transfer provisions that protect congressional control over DHS's appropriations without regard to the property interests asserted by GLO. Nothing in the text or context of the statutes that GLO invokes in this case either protect or regulate state property from the consequences of federal spending policies. *See Patchak*, 567 U.S. at 225–28 (analyzing the "context and purpose" of a provision of the Indian Reorganization Act as well as the agency's regulations to determine the relevant zone of interests). The statutes do not mention property interests, nor do they require DHS to consider those interests in connection with spending the funds at issue. Accordingly, the Court should dismiss GLO's statutory claims (Counts V–VII) for failure to assert a proper cause of action.

### B. GLO Cannot Evade the Zone-Of-Interests Requirement by Asserting its Statutory Claims Through an *Ultra Vires* Cause of Action.

41.    In the event the Court concludes that GLO's statutory claims are not reviewable under the cause of action provided by the APA, GLO argues that it may nonetheless assert those same claims through an implied equitable non-statutory cause of action alleging *ultra vires* governmental conduct without having to comply with the zone-of-interest requirement. *See* GLO Opp. ¶¶ 80, 85–87. GLO, however, cannot evade the zone-of-interests requirement simply by recasting its statutory claims as seeking *ultra vires* equitable relief.

42.    The zone-of-interests requirement is a general presumption about Congress's intended limits on the scope of *all* causes of action, not just congressionally authorized causes of action under the APA or other statutes. As the Supreme Court has made clear, the zone-of-interests test "is a 'requirement of general application'" that "*always* applies and is never negated[.]" *See Lexmark*, 572 U.S. at 129 (emphasis in original) (quoting *Bennett*, 520 U.S. at 163–64). Although the Supreme Court in *Lexmark* referred to the zone-of-interests requirement as applying to "statutory" or "statutorily created" causes of action, 572 U.S. at 129, the Court did not suggest—let alone hold—that the requirement does *not* apply to non-statutory causes of action in general or to equitable constitutional

claims in particular. *Lexmark* therefore did not silently abrogate the Supreme Court's prior precedents recognizing that the zone-of-interests requirement applies to equitable actions seeking to enjoin constitutional violations. *See, e.g., Valley Forge Christian Coll. v. Am. United for Separation of Church & State, Inc.,* 454 U.S. 464, 475 (1982) ("[T]he Court has required that the plaintiff's complaint fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." (citation omitted)).

43.     In any event, the reference in *Lexmark* to "statutorily created" causes of action necessarily encompasses implied equitable causes of action to enjoin statutory or constitutional violations. The Supreme Court has explained that the "judge-made remedy" of a suit to enjoin unlawful executive action is "the creation of courts of equity" and is "subject to express and implied statutory limitations." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015). One of those implied limitations is the requirement that plaintiffs' asserted interests fall within the zone of interests arguably protected by the provision whose alleged violation forms the basis for plaintiffs' claim, as demonstrated by long-standing precedent cited above, recognizing that the zone-of-interests requirement applies to suits seeking to enforce constitutional violations. *See Lexmark*, 572 U.S.at 130 n.5 (stating that zone of interest requirement has common-law "roots"). Courts of equity can no more disregard those limitations than may "courts of law." *Id.* (citation and internal quotations omitted). Indeed, *Armstrong* held that a federal statute "implicitly preclude[d] private enforcement" actions "in equity" based on the text and structure of the statute. 575 U.S. at 327 (an implied cause of action in equity is available only in "some circumstances" that present "a proper case"). Likewise, GLO cannot invoke an equitable cause of action to assert a broader claim than would be available under the express statutory cause of action in the APA.

44.     A leading treatise supports this view, noting that the availability of an implied equitable action "raises the question of why anyone would bother to use more limited causes of action created by special statutory review proceedings and the APA." 33 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 8307 (3d ed. April 2020 Update). For that reason, "an equitable remedy via nonstatutory review ought not be available" where, as here, GLO seeks to expand the Court's

equitable jurisdiction beyond the bounds of the APA. *Id.*; *see Sierra Club v. Trump*, 929 F.3d 670, 712 (9th Cir. 2019) (N.R. Smith, J., dissenting) (plaintiffs cannot assert "an equitable claim to bypass the APA's limitations"); *Ass'n of Am. Physicians & Surgeons, Inc. v. FDA*, 539 F. Supp. 2d 4, 18 n.4 (D.D.C. 2008) (stating that plaintiffs' argument that "they may evade" the zone of interests analysis "by labeling" the agency's action as "ultra vires is equally unavailing").

45.     If anything, courts "requir[e] more" for cases where plaintiffs seek to invoke an implied right of action. *Clarke v. Securities Indus. Ass'n*, 479 U.S. at 400 n.16. The Supreme Court in *Clarke* suggested that such plaintiffs must show that they are "one of the class for whose *especial* benefit" the provision was adopted. *Id.* The very reason *Clarke* discussed the higher standard was to illustrate "[t]he difference made by the APA" and to stress the possibility of a more rigorous "inquiry under whatever constitutional or statutory provision" is invoked in non-APA cases. *See id.*

46.     Moreover, an implied cause of action is, in fact, statutorily created, as it rests on the general equitable powers that Congress by statute vested in the lower federal courts. *See Grupo Mexicano de Desarrollo S.A. v. Alliance Bond Fund, Inc.*, 527 U.S. 308, 318 (1999) (citing the statutory grant of equity jurisdiction in the Judiciary Act of 1789). Such implied causes of action are limited to "traditional equity practice," *id.* at 322, which is important given that it would lead to "absurd consequences" to allow implied equitable actions by plaintiffs whose alleged Article III injuries "are unrelated" to the interests protected by the statutory or constitutional provisions invoked. *Thompson*, 562 U.S. at 176–78.

47.     Fundamental separation-of-powers principles further underscore why the zone-of-interests requirement applies to implied equitable causes of action. "[I]t is a significant step under separation-of-powers principles for a court to determine that it has the authority, under the judicial power, to create and enforce a cause of action," because "the Legislature is in the better position" to weigh the competing considerations involved in creating private rights of action. *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1856–57 (2017). And while courts may wield "traditional equitable powers," *id.* at 1856, "Congress is in a much better position than" courts "to design the appropriate remedy" when "depart[ing] from" "traditional equity practice," *Grupo Mexicano*, 527 U.S. at 322. There is thus no basis to conclude that

Congress intended to allow courts to infer an equitable cause of action to enforce a statutory provision for individuals outside the zone of interests of the statutory limitations being enforced. It would turn the Constitution's separation of powers on its head for courts to allow a larger class of plaintiffs to sue an agency under an implied cause of action in equity than the class of plaintiffs Congress intended to allow to sue under the APA's express cause of action that it created for such challenges. *See Hernandez v. Mesa*, 140 S. Ct. 735, 747 (2020) ("It would be 'anomalous to impute . . . a judicially implied cause of action beyond the bounds Congress has delineated for a comparable express cause of action.'") (cleaned up and citation omitted).

48.     The argument that an implied equitable *ultra vires* cause of action need not comply with the zone-of-interest test was presented and rejected by the Supreme Court in *Sierra Club*, 140 S. Ct. at 1. In reaching the conclusion that the plaintiffs likely lacked a cause of action to enforce an appropriations transfer statute, the Supreme Court logically had to reject the plaintiffs' argument that the zone of interests test did not apply to such equitable claims. *See Trump v. Sierra Club*, No. 19A60 (S. Ct.), Respondents' Opposition to Application for Stay at 27–31 (arguing that "Plaintiffs have an ultra vires cause of action, and therefore need not satisfy a zone-of-interests test").

49.     The Court's authority to infer equitable claims cannot extend beyond the traditional presumption that Congress does not intend to allow a plaintiff outside the zone of interests of a statute to sue to enforce it. *See Lexmark*, 572 U.S. at 129; *Armstrong*, 325 U.S. at 326–27. The zone-of-interest test thus applies to GLO's *ultra vires* claims. Accordingly, GLO's *ultra vires* claims should be dismissed because GLO cannot satisfy the zone-of-interest requirement for the reasons explained above.

## VI.     GLO's Statutory Claims Should Be Dismissed.

50.     Even if the court were to conclude that the States have a cause of action through the APA or in equity to assert their statutory claims, GLO has not plausibly alleged violations of the statutes at issue. *See* Defs.' MTD ¶¶ 88–105.

### A.     GLO's Statutory Claims Fail Under APA Review or Non-Statutory *Ultra Vires* Review

51.     As a threshold matter, if the Court reviews GLO's statutory claims, it should do so only

through the cause of action provided by the APA, which Congress created for litigants to challenge agency action in violation of a statute. *See* 5 U.S.C. § 706(2)(c). GLO also alleges the same statutory violations through a non-statutory equitable *ultra vires* cause of action. *See* GLO Opp. ¶¶ 88. But the only reason GLO appears to assert this redundant claim is to evade the zone-of-interests test in the event its APA cause of action fails. As explained above, the Court should not imply an equitable cause of action to give GLO a second bite at the apple to re-package its failed APA claims without having to comply with the zone-of-interests requirement. *See Puerto Rico v. United States*, 490 F.3d 50, 59–60 (1st Cir. 2007) (holding that Puerto Rico must assert claims under the APA even though "nonstatutory review might have allowed Puerto Rico to obtain a more favorable standard of review and to circumvent certain of the APA's procedural requirements").

52.     Contrary to GLO's argument, Defendants have not asserted contradictory positions about the relationship between APA and *ultra vires* claims. *See* GLO Opp. ¶ 82. The APA is an available cause of action for GLO's statutory claims, but the problem for GLO is that those claims fail the zone-of-interests test (as well as other limits on APA review). GLO thus has not been "wholly deprive[d]" of a means of judicial review in a way that would potentially open the door to limited *ultra vires* review. *Bd. of Governors of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43–44 (1991). Instead, GLO's claims simply fail at the threshold of APA review. The fact that GLO's claims cannot satisfy the preliminary requirements of the APA's express cause of action is not a reason to relax the justiciability requirements for a non-statutory *ultra vires* claim. *See California Sportfishing Prot. All. v. United States Bureau of Reclamation*, 2015 WL 6167521, at *10–11 (E.D. Cal. Oct. 20, 2015) (declining to review a federal agency's compliance with water quality standards under non-statutory ultra vires cause of action where plaintiffs' APA claim failed for lack of final agency action).

53.     In any event, even if the Court were to consider GLO's *ultra vires* claims, GLO does not address Defendants' authority that such claims are subject to a heighted standard of review more demanding than the APA. *See* Defs.' Opp. ¶¶ 71–72. "There certainly is no question that nonstatutory review is intended to be of extremely limited scope . . . and hence represents a more difficult course for [plaintiff] than would review under the APA." *Trudeau v. FTC*, 456 F.3d 178, 190 (D.C. Cir. 2006)

(citation omitted). GLO's discussion of cases recognizing a long history of equitable actions is thus beside the point. *See* GLO Opp. ¶¶ 83–84. For GLO to prevail on its statutory claims based on an equitable *ultra vires* cause of action, it must show DHS acted "contrary to a 'clear and mandatory' prohibition." *Exxon Chemicals Am. v. Chao*, 298 F.3d 464, 468 (5th Cir. 2002) (quoting *Leedom v. Kyne*, 358 U.S. 184, 188 (1958)); *see also Am. Airlines, Inc. v. Herman,* 176 F.3d 283, 293 (5th Cir. 1999) (stating that *ultra vires* review is available "only in a very narrow situation in which there is a plain violation of an unambiguous and mandatory provision of the statute") (internal quotations omitted). As explained in Defendants' motion and further below, GLO has failed to plausibly allege a violation of the statutes it invokes under the heighted review standard for *ultra vires* claims or the APA. 5 U.S.C. § 706(2)(C) (courts may hold unlawful agency action "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"). Therefore, regardless of which standard the Court applies, GLO's statutory claims should be dismissed.[9]

### B.  GLO's IIRIRA Claim Fails.

54.  GLO has failed to state a claim that DHS has violated the broad statutory authorization for border wall construction in § 102(a) of IIRIRA. That provision states that the "Secretary of Homeland Security shall take such actions as may be necessary to install additional physical barriers and roads . . . in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." IIRIRA § 102(a). GLO, however, does not identify any specific limitation in the statute that would require DHS to undertake border wall construction on the GLO Farm on the schedule demanded by GLO.

55.  "While the construction of the fencing and infrastructure improvements may be phrased in mandatory language, the IIRIRA and the Appropriations Acts leave the Secretary and the DHS with a great deal of discretion in deciding how, when, and where to complete the construction." *Arizona*, 2011 WL 13137062, at *8. GLO does not even attempt to distinguish the *Arizona* decision, even though it rejected a similar claim by the State of Arizona to force DHS to construct additional border

---

[9] GLO does not challenge Defendant's position that GLO lacks a cause of action directly under the statutes at issue. *See* GLO Opp. ¶ 41; Defs.' MTD ¶¶ 53–54.

barriers within that State. This Court should similarly conclude that "no judicially manageable standards permit the Court to determine how or when the DHS or the Secretary should complete the fencing and infrastructure construction contemplated by the IIRIRA, the Secure Fence Act, and the Appropriations Acts." *Id.*

56. The text of § 102(a) broadly authorizes DHS to undertake "such actions as may be necessary to install" barriers. Contrary to the GLO's position, the statute permits far more than simply ground-disturbing construction activity. The pre-construction planning, environmental reviews, and consultations set forth in the DHS Plan fall comfortably within wide scope of § 102. *See M'Culloch v. Maryland*, 17 U.S. 316, 414–15 (1819) ("Does" [the word "necessary"] "always import an absolute physical necessity, so strong, that one thing to which another may be termed necessary, cannot exist without that other? We think it does not. If reference be had to its use, in the common affairs of the world, or in approved authors, we find that it frequently imports no more than that one thing is convenient, or useful, or essential to another."). Nothing in IIRIA provides the Court with a textual basis to require DHS to accelerate or dispense with these pre-construction activities to satisfy GLO's preferred construction schedule.

57. Indeed, DHS continues to rely on its IIRIRA authority and recently released a proposed plan and map for 86 miles of border wall construction in Starr, Cameron, and Hidalgo counties. *See* Border Barrier Environmental Planning—Starr County, Hidalgo County, and Cameron County (January 19, 2022), at www.cbp.gov/document/environmental-assessments/border-barrier-environmental-planning-starr-county-hidalgo-county. DHS is seeking input from various stakeholders about the proposal to inform its planning process. Accordingly, DHS's actions to implement its border wall plan are entirely consistent with § 102 of IIRIRA.

58. Other provisions of IIRIRA support the view that the DHS Secretary has complete discretion for determining when, where, and how to construct border fencing. Section 102(b)(1)(a) directs the Secretary to construct fencing along the southwest border "where fencing would be most practical and effective[.]" Further, DHS is not required "to install fencing, physical barriers, roads, lighting, cameras, and sensors in a particular location along an international border of the United States, if the

Secretary determines that the use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border at such location."  IIRIRA § 102(b)(1)(D).  In enacting this provision, Congress expressly repealed an earlier section of IIRIRA that mandated construction at specific locations along the border.  *Compare* Pub. L. No. 109-367, § 3, *repealed and replaced by* Pub. L. No. 110-161, Div. E, § 564.  That history and context undermines any suggestion by GLO that the Court can rely on IIRIRA as a basis to force DHS to build border barriers on the GLO Farm.

59.    GLO argues that § 102(b)(1)(D) is inapplicable here because the DHS Secretary has not made an express determination that border wall construction is not required either generally or at any specific location, such as the GLO Farm.  GLO Opp. ¶¶ 53–54.  But nothing in this provision requires the Secretary to issue individual, fact-specific decisions addressing potentially hundreds of miles of property along the border where border infrastructure will not be built.  It would turn the statute on its head to construe § 102(b)(1)(D) as a burdensome and impractical constraint on DHS's authority when it explicitly entrusts the Secretary with the ultimate discretion to determine whether fencing or other measures should be installed in any "particular location," and whether "the use or placement of such resources" is the most appropriate means of achieving operational control over the border. Congress has precluded the very relief that GLO seeks in this case—an order compelling DHS to build additional fencing along the GLO Farm.  GLO has thus not carried its burden of establishing that the absence of border wall construction on the farm violates the text of IIRIRA § 102.[10]

_____

[10] GLO also lacks standing to raise its hypothetical claim that DHS lacks legal authority to revoke waivers issued under IIRIRA.  *See* GLO Opp. ¶ 56.  The waiver issued pursuant to § 102(c) of IIRIRA for border wall construction near the GLO Farm remains in place and has not been rescinded.  *See* Determination Pursuant to Section 102 of IIRIRA, as Amended, 84 Fed. Reg. 58400–02 (Oct. 31, 2019).  GLO does not contend otherwise.  The Court, therefore, should not issue an advisory opinion addressing GLO's claim about the scope of the Secretary's waiver authority to hypothetical facts.  Unless and until the Secretary revokes a waiver that injures GLO in a way that is sufficient to provide it with Article III standing, this claim is not ripe.

**C.      DHS Is Spending Funds Consistent With Its Congressional Appropriations.**

60.      GLO has also failed to state a claim that DHS violated its appropriations statutes by not building a border wall on the GLO Farm.  *See* Defs.' MTD ¶¶ 93–100.

61.      At the outset, the Court should reject GLO's framing of the statutory issues as going beyond the GLO Farm.  Contrary to GLO's assertions, this case *is* about whether "to build a single wall at a single location[.]"  GLO Opp. ¶ 44.  To the extent that GLO seeks broader relief requiring DHS to construct fencing in areas other than the GLO Farm, its claim would be barred for lack of standing.  The requested relief would not redress the alleged injury, in that the construction of fencing on other property would not affect the specific injuries that GLO alleges are sustained due to due the absence of construction at the farm.  *See Lujan v. Def.s of Wildlife*, 504 U.S. 555, 560-61 (1992).  A federal court is not 'a forum for generalized grievances.'" *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018).  Accordingly, "a plaintiff may not invoke federal-court jurisdiction unless he can show 'a personal stake in the outcome of the controversy." *Id.* (citation omitted).  The only personal stake GLO has in this case is for the property it owns on the GLO Farm.  And, as all parties agree, the RGV-09 border barrier project is the only project that would implicate the GLO's property interests.  *See* GLO Opp. ¶ 42; Defs.' MTD ¶ 93.  The parties further agree that this project is funded by § 230 of the fiscal year 2019 DHS Appropriations Act, which appropriated $1.375 billion "for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector" of Texas.  Pub. L. No. 116-6, div. A § 230, 133 Stat. at 28.  The statutory claim in this case is thus appropriately limited to this source of funds.  *See, e.g., Gill,* 138 S. Ct. 1930–31 (rejecting standing to challenge statewide partisan gerrymandering and limiting standing only to specific locations where plaintiffs were injured).

62.      For this reason, there is no merit to GLO's argument that the Court should allow GLO to proceed with claims challenging DHS's use of its fiscal year 2020 and 2021 border wall appropriations.  GLO Opp. ¶ 48.  GLO has not alleged any plausible facts in the amended complaint that would establish DHS's use of these funds harms GLO's interests.  *See* Am Comp. ¶ 114.  "To ensure that standing is not dispensed in gross, the district court must analyze Plaintiffs' standing to challenge

each provision of law at issue." *In re Gee*, 941 F.3d 153, 161 (5th Cir. 2019). A single, conclusory statement that funds from the 2020 and 2021 appropriations "would have been available for the RGV-09 project" is not enough to establish standing, let alone survive Defendants' motion to dismiss, which was directed to all of GLO's appropriations claims. *See* Defs.' MTD ¶¶ 93.

63. The Court should also reject GLO's argument that its challenge to DHS's execution of its fiscal year 2019 funds is comparable to *Department of Commerce v. New York*, 139 S. Ct 2551 (2019). *See* GLO Opp. ¶ 45. GLO ignores the fact that the Supreme Court rejected the plaintiffs' statutory claims in that case. *See Dep't of Com.*, 139 S. Ct. at 2571–73 (rejecting argument that the Secretary of Commerce violated the Census Act in adding question about citizenship to the 2020 census). Instead, GLO mistakenly relies on the Supreme Court's discussion of the APA arbitrary and capricious claim, but that analysis has no application to the statutory analysis. GLO does not cite any case or authority for its theory an agency's statutory authority to undertake a specific action can somehow be negated by allegations that the agency is with inconsistent or insincere reasons. The sole issue in a challenge to an agency's statutory authority is whether the agency action "falls within the authorities that Congress has conferred upon" the agency. *Biden v. Missouri*, 142 S. Ct. 647, 652 (2022) (per curiam). To be sure, the Supreme Court recognized in the context of arbitrary and capricious review under the APA that in "unusual circumstances" a court may remand an agency decision for further explanation where there is "a disconnect between the decision made and the explanation given." *Dep't of Com.*, 139 S. Ct. at 2575–76 (evaluating whether the "Secretary's decision must be set aside because it rested on a pretextual basis"). But the Supreme Court has never grafted that type of pretext analysis into its consideration of whether an agency has statutory authority to act. *See id.* at 2571–73; *City of Arlington, Tex. v. F.C.C.*, 569 U.S. 290, 297 (2013) (stating that the question in challenges to agency authority "is always, simply, *whether the agency has stayed within the bounds of its statutory authority*.") (emphasis in original); *cf. Village of Arlington Heights v. Metropolitan Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18 (1977) ("judicial inquiries into legislative or executive motivation represent a substantial intrusion into the workings of other branches of government"). This distinction is consistent with the text of the APA, which differentiates between claims asserted under 5 U.S.C. § 706(2)(A) for arbitrary and capricious agency

action and claims asserted under 5 U.S.C. § 706(2)(C) for agency action in violation of a statute. GLO raises the latter type of claim in arguing that DHS has not complied with the 2019 DHS Appropriations Act. Accordingly, there is no basis for the Court to take the unprecedented step of evaluating DHS's motivations for expenditures in the context of a pure statutory analysis addressing DHS's authority. [11]

64.     Instead of intent, the proper focus of the statutory inquiry is on whether DHS is spending its fiscal year 2019 funds on projects or activities within the scope of its budget authority. As to that issue, GLO has no response to Defendants argument that DHS may lawfully spend its funds on environmental planning and consultation "prior to further construction." *See* DHS Plan at 2–3. As explained in Defendants' motion, these expenses are lawful under the necessary expense doctrine. *See* Defs.' Opp. ¶¶ 94–95. Nor has GLO overcome Defendants' showing that DHS may use its fiscal year 2019 funds on costs associated with adjustments to border wall contracts in light of reevaluations of projects. *See* Defs. Opp. ¶ 97. GLO does not engage with the authorities Defendants relied upon, including provisions of the Federal Acquisition Regulation that contemplate payment of such costs from the applicable appropriation that funds the contracts. GLO contends that using appropriated funds to pay for contact delay costs and penalties "is not 'furthering' border wall construction," GLO Opp. ¶ 46, but that is not the governing standard under the text of the appropriation or the necessary expense doctrine. GLO offers no authority for the idea that agencies cannot use their appropriated funds to pay suspension or termination fees in accordance with their contractual obligations.

65.     GLO's interpretation of federal appropriations law is further undermined by the decision of

---

[11] In other contexts where courts assess the authority of federal officers to act, motive is similarly irrelevant. *See, e.g.*, *Bernard v. Cty. of Suffolk*, 356 F.3d 495, 504 (2d Cir. 2004) ("The appropriate inquiry" in an absolute immunity case "is not whether authorized acts are performed with a good or bad *motive,* but whether the *acts* at issue are beyond the prosecutor's authority.") (emphasis in original); *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1028 (D.C. Cir. 1997) ("[T]he relevant inquiry in determining whether an individual was acting in an official capacity focuses on the nature of the individual's alleged actions, rather than the alleged motives underlying them."); *cf. Horton v. California*, 496 U.S. 128, 138 (1990) (holding in the Fourth Amendment context that "evenhanded law enforcement is best achieved by the application of objective standards of conduct, rather than standards that depend upon the subjective state of mind of the officer").

the GAO concluding that DHS did not unlawfully impound funds when implementing the President's Proclamation. *See GAO Opinion.* The fact that GLO did not bring a claim under the ICA is not a basis to disregard the GAO's analysis. *See* GLO Opp. ¶ 58. GAO discussed the ways in which DHS was expending its border wall appropriations and never suggested that "contract suspension" or "remediating or mitigating environmental damage caused by construction" would be improper uses of those funds. GAO Opinion at *4.

66. GLO also challenges the well-established basis for the GAO's conclusion that any delays in the obligation and expenditure of DHS's appropriations are "programmatic delays, not impoundments." *GAO Opinion* at *2; *see* GLO Opp. ¶¶ 59–60. That is nothing more than GAO's description of a type of agency budget action that falls outside the scope of the ICA. *See* 2 U.S.C. § 686 (authorizing the Comptroller General to issues reports about ICA compliance). The ICA defines only two narrow classes of budget actions that must be reported to Congress—a "rescission" as defined in 2 U.S.C. § 683 and a "deferral" as defined in 2 U.S.C. § 684. The parties agree that neither source of authority is implicated in this case, as Defendants are not relying on the ICA as defense against GLO's claims. *See* GLO Opp ¶ 59. Accordingly, the GAO's use of the well-established term "programmatic delay" is simply a means of explaining why DHS's use of its appropriated funds is not an unlawful impoundment. *See* GAO, Principles of Federal Appropriations Law, 4th ed., 2016 rev., ch. 2, p. 2-50 (explaining programmatic delay).[12]

67. GLO next cites a GAO review of the ICA in 1977 discussing a recommendation that Congress narrow the definition of a "deferral" in the ICA to avoid a potentially overbroad scope. *See* GLO Opp. ¶ 60. GLO suggests this legislative inaction is evidence that Congress did not approve of any programmatic delays. The Supreme Court, however, has rejected the position that courts can draw a negative inference based on congressional inaction not to amend a statute. *See Ord. of Ry. Conductors of*

---

[12] The Supreme Court and Fifth Circuit have relied on the GAO's treatise (commonly called the "Redbook") when discussing federal appropriations principles. *See, e.g.*, *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1319 (2020); *Inst. for Tech. Dev. v. Brown*, 63 F.3d 445, 450 (5th Cir. 1995).

*Am. v. Swan*, 329 U.S. 520, 529 (1947) ("the failure of Congress to amend the statute is without meaning for purposes of statutory interpretation"). If anything, the decision by Congress not to amend the ICA after several decades of decisions from the GAO—itself a congressional office —concluding that programmatic delays are not impoundments evidences ratification of the GAO's view, not a rejection of them. *See, e.g.*, *Electric Battery Co. v. Shimadzu,* 307 U.S. 5, 14 (1939) ("Congress has not seen fit to amend the statute in this respect and we must assume that it has been satisfied with, and adopted, the construction given to its enactment by the courts.").

68.     GLO cannot evade dismissal by arguing that factual disputes preclude a ruling in Defendants' favor at this stage. *See* GLO Opp. ¶¶ 48, 61. The DHS Plan sets forth the undisputed environmental and contract actions that DHS will fund using its fiscal year 2019 border wall appropriation. *See* DHS Plan at 2–3. Those activities fall within the lawful scope of DHS's appropriation authority and this question should be decided on the present record.

### D.     GLO Has Not Stated Claims For Violations of Other Appropriations Statutes.

69.     GLO also has failed to allege violations of the Purpose Statute, the Transfer Statute, the Anti-Deficiency Act, and § 739 of the fiscal year 2019 Consolidated Appropriations Act. *See* Defs.' MTD ¶¶ 101–105.

70.     GLO's claim alleging a violation of the Purpose Statue, 31 U.S.C. § 1301(a), is merely a repackaged version of its claim that DHS has not complied with § 230 of the fiscal year 2019 DHS Appropriations Act. Both claims argue that DHS is spending its appropriated funds "on purposes other than that for which they were appropriated." GLO Opp. ¶ 49. As set forth above and in Defendants' motion, there is no Purpose Statute violation in this case because DHS is spending its appropriated funds on projects and activities related to border wall construction activity that are within the lawful scope of DHS's budget authority.

71.     DHS also has not violated the Transfer Statute, 31 U.S.C. § 1532, because there has not been a transfer of funds from one appropriation account to another within the meaning of the statute. Defs.' MTD ¶ 105. GLO argues that DHS cannot use its 2019 border wall appropriations to pay for

costs associated with the now-cancelled border wall construction projects funded by the Departments of Defense and Treasury because to do so would require a transfer to "these separate accounts." GLO Opp. ¶ 51. GLO, however, fundamentally misunderstands how the federal budget process works and has not plausibly pled a violation of the Transfer Statute. *See Cicalese v. Univ. of Texas Med. Branch*, 924 F.3d 762, 766 (5th Cir. 2019) ("Under the *Twombly/Iqbal* pleading standard, a complaint must state a claim to relief that is plausible on its face." (citation omitted))

<u>72.</u>    The Transfer Statute provides that "[a]n amount available under law may be withdrawn from one appropriation account and credited to another or to a working fund only when authorized by law." 31 U.S.C. § 1532. An "appropriation account" has a specific meaning in federal appropriations law and is defined as "[t]he basic unit of an appropriation generally reflecting each unnumbered paragraph in an appropriation act." General Accounting Office, *A Glossary of Terms Used in the Federal Budget Process* 2 (2005) (stating that "[a]n appropriation account typically encompasses a number of activities or projects"); *see* 31 U.S.C. § 1112(c) (stating that GAO is required to publish and maintain standard terms related to the federal budget process). During the annual budgeting process, DHS requests funding from Congress and those funds are then appropriated to designated accounts in the appropriations act. For the fiscal year 2019 DHS Appropriations Act, border wall funding comes from the U.S. Customs and Border Protection's "Procurement, Construction, and Improvements" account. *See* Pub. L. 116-6, 133 Stat. at 18, 28 ("Of the total amount made available under 'U.S. Customs and Border Protection—Procurement, Construction, and Improvements' . . .$1,375,000,000 is for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector"). This is the relevant "appropriation account" for purposes of the Transfer Statute. GLO has not plead any facts to plausibly suggest that DHS has transferred funds from this account to another congressionally designated account listed in an appropriations act. There are no factual disputes on this point and GLO cannot survive Defendants' motion to dismiss by ignoring the basic undisputed elements of the federal budget process. *See* GLO Opp. ¶ 51.

<u>73.</u>    Similarly, there is no merit to GLO's argument that DHS is has violated the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1)(A), by allegedly using its fiscal year 2019 funds to pay costs associated with

the border wall projects previously funded by DoD and Treasury funds. *See* GLO Opp. ¶ 49. The Anti-Deficiency Act prohibits government officials from "mak[ing] or authoriz[ing] an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation." The Act thus prohibits agencies from spending funds over and above the designated amount in an "appropriation or fund." "The phrase 'appropriation or fund' refers to appropriation and fund accounts," which as discussed above, are specific accounts designated by Congress in appropriations acts. GAO, Principles of Federal Appropriations Law, 3rd ed., 2006 rev., ch. 6, p. 6-40. Here, GLO has not alleged any facts that DHS or any other agency is spending funds in excess of the amount of money Congress has appropriated to a specific appropriation account. The purpose of the Anti-Deficiency Act is to prevent federal agencies from overspending such that "there are insufficient funds in an account when a payment becomes due." *Id.* That is not the situation here, and Act is not implicated by DHS choosing to spend its border wall funds on one particular border wall project or another.

74.     GLO does not respond the Defendants' argument that § 739 of the CAA has no application to this case. *See* Defs.' MTD ¶¶ 101-103. GLO simply quotes the statute without explaining how it applies to the current context. *See* GLO Opp. ¶ 49. GLO has offered no factual allegation that DHS has altered funding levels from the amount proposed in the President's fiscal year 2019 budget or enacted by Congress in the fiscal year 2019 DHS Appropriations Act. GLO's argument is that DHS is spending its border wall funds on unauthorized activities, not that DHS has "increase[d], eliminate[d], or reduce[d] funding" for border wall construction by either adding or removing funds from the relevant appropriation account. Pub. L. No. 116-6, Div. D, § 739. Section 739 has no relevance to a claim that an agency is spending funds for improper purpose. Accordingly, GLO's claim under § 739 should be dismissed.

## VII.     GLO's Constitutional Claims Should Be Dismissed.

### A.     GLO Fails the Zone-Of-Interests Test For Its Constitutional Claims.

75.     The GLO's constitutional claims fail at the outset because it cannot satisfy the zone-of-

interests test for the provisions it invokes. Defs.' Mot. ¶ 106. As explained above, the zone-of-interests requirement is a limitation on the causes of action that "*always* applies and is never negated[.]" *See Lexmark Int'l, Inc.*, 572 U.S. at 129 (emphasis in original). Accordingly, it is beside the point whether constitutional claims can be brought under the APA or in equity as a general matter. *See* GLO Opp. ¶ 89. The zone-of-interests test is a limitation on those causes of action that the Supreme Court has applied to both APA claims and equitable constitutional claims. *See, e.g.*, *Patchak*, 567 U.S. at 224 ("This Court has long held that a person suing under the APA must satisfy" the zone-of-interest test.); *Valley Forge Christian Coll.*, 454 U.S. at 475 ("[T]he Court has required that the plaintiff's complaint fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." (citation omitted)); *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 320–21 n.3 (1977) (applying the zone-of-interests requirement to plaintiffs seeking to enforce the dormant Commerce Clause).

<u>76.</u>     GLO's argument that the zone-of-interest test does not apply to constitutional claims is contrary to this authority. *See* GLO Opp. ¶¶ 85–87. Further, as set forth above, *Lexmark* did not silently overrule these long-standing precedents or hold that constitutional challenges are exempt from the zone-of-interest requirement. Since *Lexmark*, courts have continued to apply the zone of interests test to constitutional claims. *See Citizens for Responsibility & Ethics in Washington v. Trump*, 939 F.3d 131, 153 (2d Cir. 2019); *Maher Terminals, LLC v. Port Auth. of New York & New Jersey*, 805 F.3d 98, 105 (3d Cir. 2015). And the Fifth Circuit, post-*Lexmark*, has stated that plaintiffs must fall within the zone-of-interests of "the statute or constitutional guarantee in question." *Texas v. United States*, 809 F.3d 134, 161 (5th Cir. 2015) (internal quotations omitted).

<u>77.</u>     GLO cites three Supreme Court cases that addressed the merits of constitutional claims without applying the zone-of-interests test. *See Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449 (2019); *Clinton v. City of New York*, 524 U.S. 417 (1998); *Wyoming v. Oklahoma*, 502 U.S. 437 (1992). But the majority opinions in those cases say nothing about the applicability of the zone-of-interests test to constitutional claims. Such "drive-by" rulings that do not discuss the issue have no precedential effect. *Arbaugh v. Y&H Corp.*, 546 U.S. 500, 511 (2006). Moreover, GLO does not

contend that any of the plaintiffs in those cases would fall outside the zone-of-interests of the constitutional provisions they invoke, as is the case here.

78.     GLO also relies on the Ninth Circuit motions panel's decision in *Sierra Club v. Trump*, 929 F.3d 670 (9th Cir. 2019), but fails to note that the Supreme Court stayed the district court injunction affirmed by this decision. *See Sierra Club*, 140 S. Ct. at 1. The Supreme Court rejected the Ninth Circuit's rationale when it granted the stay, concluding that the plaintiffs likely "have no cause of action to obtain review of the" DoD appropriations transfer statute at issue. *Id.* In reaching this conclusion, the Supreme Court logically had to reject the plaintiffs' argument that they have a cause of action under the Appropriations Clause and satisfied the zone-of-interest requirement for that provision.

79.     Here, GLO falls outside the zone-of-interests of the Appropriations Clause for the same reasons it cannot satisfy the test for its statutory claims. The Appropriations Clause provides that appropriations must be "made by Law," U.S. Const., art. I, § 9, cl. 7, and the fiscal year 2019 DHS Appropriations Act is the "law" at issue in this case. GLO's Appropriations Clause claims turn entirely on whether DHS is acting in accordance with this statute, making it the "particular provision of law upon which the plaintiff relies." *Bennett*, 520 U.S. at 175–76. Similarly, the Take Care Clause requires that the President "shall take Care that the Laws be faithfully executed." U.S. Const., art. II, § 3. Therefore, "the laws" that GLO alleges Defendants violated frame the zone-of-interest test. There are no Appropriations Clause or Take Care Clause principles at issue in this case separate from statutory issues. Nor has GLO has not cited any case in which a purely constitutional dispute over the appropriations power or Take Care Clause was at issue. Further, GLO fails to explain how its property interests are protected by the Presentment Clause's requirement that federal legislation is enacted in accordance with bicameralism and presentment. Accordingly, GLO cannot satisfy the zone-of-interests test for its constitutional claims.

   **B.     GLO Has Failed To State Any Constitutional Claims.**

80.     In any event, GLO's constitutional claims fail on the merits because they are simply

repackaged versions of their statutory claims "dressed up in constitutional garb." *California v. Trump*, 963 F.3d 926, 962–963 (9th Cir. 2020) (Collins, J., dissenting). GLO's constitutional claims hinge on the outcome of their statutory claims, and GLO does not identify any unique constitutional principles separate and apart from the alleged statutory violations that would form the basis for a constitutional claim in this context. The underlying premise of GLO's argument is that Defendants have violated the constitution solely because Defendants have not complied with the relevant appropriations statutes. The Supreme Court rejected that line of reasoning in *Dalton v. Specter*, 511 U.S. 462 (1994), and this Court should do the same here. *See* Defs.' MTD ¶¶ 107–115.

81.    GLO's attempt to distinguish *Dalton* is unavailing. *See* GLO Opp. ¶ 97–98. GLO argues that no constitutional claims could exist under Defendants' reading of *Dalton*, but that position overstates *Dalton*'s holding. The Constitution is implicated if a plaintiff relies on a constitutional provision as a source of individual rights (*e.g.*, Due Process Clause), executive officers rely on the constitution as an independent source of authority to act, or if the officers rely on a statute that itself violates the Constitution. *See Dalton*, 511 U.S. at 473 & n.5. But claims alleging simply that an official has "exceeded his statutory authority are not 'constitutional' claims." *Id.* at 473. GLO alleges the latter type of claim here, as the necessary gravamen of GLO's constitutional claims is that DHS is spending funds in violation of its statutory budget authority. But this type of garden-variety challenge to an agency's compliance with a statute does not implicate the Constitution.

82.    There is also no merit to GLO's argument that President's Proclamation and the DHS Plan have "usurped Congress's power to legislate." GLO Opp. ¶ 98. Even under GLO's own theory, no violation of the constitution has occurred unless DHS exceeded its appropriations authority. That claim is inherently statutory, not constitutional, and does not depend on resolution of any contested facts. If it were otherwise, a plaintiff could simply recharacterize any claim that an agency action exceeds statutory authority to be a constitutional claim: a routine statutory challenge to a regulation or order could be transformed into a claim that the agency exercised legislative power in violation of Article I's Vesting Clause and the separation of powers. No court has ever accepted that framing for a challenge to federal agency action.

83. Finally, the Court should reject GLO's argument that the President violated the constitution by issuing the Proclamation. *See* Defs.' MTD ¶ 110; GLO Opp. 96. The portions of the Proclamation that GLO challenges are not self-executing; rather, they consist of guidance provided by the President to federal agencies as to the implementation of federal law.[13] Specifically, the Proclamation instructs federal officials to take action to pause construction and obligation of funds to the extent permitted by law while federal agencies develop plans for spending border wall funds consistent with applicable law, and then directs those agencies to implement the plans when complete. See Proclamation §§ 1–2. As explained above, the proper way to challenge the President's directions to subordinate officials is to bring suit against those agencies and officials targeting a final agency action, not sue the President directly over whether he can give instructions to subordinates.[14] The President unquestionably has constitutional authority under Article II, § 1 to issue instructions and directions to Executive Branch officials. *See, e.g., Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 492 (2010); *Nixon v. Fitzgerald*, 457 U.S. 731, 749–50 (1982); *Myers v. United States*, 272 U.S. 52, 135 (1926). And contrary to GLO's reliance on *City & Cty. of San Francisco v. Trump*, 897 F.3d 1225 (9th Cir. 2018), dismissing the President and the constitutional claims against him would not prevent the Court from examining whether Defendants actions are consistent with the law because GLO has brought claims against the relevant agencies implementing the Proclamation as to the contested funds. *See Franklin*, 505 U.S. at 828 (Scalia, J., concurring in part and concurring in the judgment) ("Review of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive.").

---

[13] In contrast, the President's declaration withdrawing the national emergency at the southern border is self-executing, but GLO does not allege that presidential action was unlawful.

[14] A classic example of this approach is *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), where President Truman issued an Executive Order directing the Secretary of Commerce (Sawyer) to take possession of steel mills and keep them running. There was no suggestion by the Supreme Court that the President lacked authority to issue a directive to the Secretary. Instead, the case was brought against the Secretary arguing that the act of seizing the steel mills was not authorized pursuant to statute or the constitution. *Id.* at 583.

## CONCLUSION

84.    Accordingly, Defendants respectfully request that the Court grant Defendants' motion to dismiss the complaint in its entirety.

Dated: February 14, 2021

Respectfully submitted,

BRIAN M. BOYNTON
Acting Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

ANTHONY J. COPPOLINO
Deputy Director, Federal Programs Branch

_/s/ Michael J. Gerardi_
ANDREW I. WARDEN
Senior Trial Counsel
MICHAEL J. GERARDI (D.C. Bar #1017949)
Trial Attorney / Attorney-in-Charge
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW, No. 122212
Washington, D.C. 20005
Tel: (202) 616-0680
Fax:    (202) 616-8470
E-mail: michael.j.gerardi@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on February 14, 2022, I electronically filed a copy of the foregoing.

Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing

system. Parties may access this filing through the Court's CM/ECF System.

*/s/ Michael J. Gerardi*
MICHAEL J. GERARDI