UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| THE STATE OF MISSOURI, and <br><br> THE STATE OF TEXAS, <br><br> Plaintiffs, <br><br> v. <br><br> JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America, *et al.*, <br><br> Defendants. | Case No. 7:21-cv-00420 <br> (formerly No. 6:21-cv-00052) <br> (consolidated with No. 7:21-cv-00272) |

**PLAINTIFF STATES' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

INTRODUCTION

On February 22, 2022, the Court stayed consideration of the State of Missouri's and the State of Texas's motion for a preliminary injunction and the federal government's motion to dismiss pending the Supreme Court's opinion in *Biden v. Texas*, 142 S. Ct. 2528 (2022). *See* ECF 43.[1] The Court noted that the Supreme Court had granted certiorari in *Biden v. Texas* to review "the Fifth Circuit's holding in *Texas v. Biden*, 20 F.4th 928 (5th Cir. 2021)," which involved "crucial aspects of this case including Plaintiffs' Article III standing and the judicial reviewability, under administrative law, of the federal agency actions and statements regarding the United States-Mexico border policy at issue in this case." *Id.* at 1. The Court directed the parties, once the Supreme Court issued that decision, to file supplemental briefs "expatiating on how the Supreme Court's opinion impacts" the pending motions. ECF 43, at 2.

The Supreme Court has now decided *Biden v. Texas*, and it changes nothing. First, while the Supreme Court reversed the Fifth Circuit's decision in *Texas v. Biden*, it did not address the Fifth Circuit's standing or arbitrary-and-capricious analysis. Thus, the Fifth Circuit's decision and analysis in *Texas v. Biden* remains intact and binding as to those issues.

Indeed, the government's Amended Border Wall Plan strengthens the States' position on both those fronts. The Amended Plan underscores that "walls work" by implicitly conceding the point. That, in turn, supports the States' standing

---

[1] Unless otherwise noted, ECF citations are to citations in No. 7:21-cv-00272.

2

arguments and underscores that DHS's decision not to construct border barriers is arbitrary and capricious, that the agency's reasons for not doing so are pretextual, and that the government's arguments here constitute impermissible *post hoc* rationalizations. Finally, because the Amended Plan expressly allocates all FY 2020 and FY 2021 appropriations away from border-barrier construction, the government can no longer claim it is complying with Congress's mandate to build border barriers because it will build a border wall in the future.

Second, while the Supreme Court did discuss final agency action in *Biden v. Texas*, the issue the Court focused on was whether a particular agency act was new agency action. The Court left the framework for analyzing whether agency action is final unchanged, and thus the parties' prior analysis is unchanged.

Third, the Supreme Court's analysis of 8 U.S.C. § 1251(f)(1) has no relevance here. By its terms, § 1251(f)(1) does not prevent the Court from providing the States with injunctive relief.

## BACKGROUND OF *BIDEN V. TEXAS*

### A.  Proceedings before the Supreme Court's opinion

*Biden v. Texas* involved a challenge by Texas and Missouri to the federal government's rescission of the Migrant Protection Protocol (MPP) in a short memorandum on June 1 (the "June 1 Memorandum"). The States argued that the rescission violated the mandatory detention requirement of the Immigration and Nationality Act (INA) and was arbitrary and capricious under the APA. *See Biden v. Texas*, 142 S. Ct. at 2536.

As to the INA claim, the States argued that two provisions of the INA—

3

8 U.S.C. § 1225(b)(2)(A) and § 1225(b)(2)(C)—operated jointly to require the federal government to either detain aliens pending resolution of their asylum claim or to return aliens to the territory from where they arrived (Mexico, for example, in the case of the southern border). *See id.* at 2541. Section 1225(b)(2)(A) requires detention of aliens during their removal proceedings; section 1225(b)(2)(C) permits the government to instead return an alien to "a foreign territory contiguous to the United States" if they arrive from there. The States argued that, since the government (as the district court found as a fact) could not detain all aliens arriving at the southern border, and thus fulfill its obligations under § 1225(b)(2)(A), it had to exercise its authority to return the aliens to Mexico under § 1225(b)(2)(C). *See id.*; *see also Texas v. Biden*, 20 F.4th 928, 996 (5th Cir. 2021). If it were otherwise, the States argued, the government could violate the mandatory detention provisions of § 1225(b)(2)(A) with impunity. *See Biden v. Texas*, 142 S. Ct. at 2537–38 (discussing the Fifth Circuit's opinion).

The district court ruled for the States and vacated the June 1 Memorandum. *See id.* at 2536–37 (emphasis omitted). The government then appealed to the Fifth Circuit. Before the Fifth Circuit ruled on the merits, however, the government issued new memoranda on October 29, 2021, "that again announced the termination of MPP" and provided additional reasons for the rescission that the district court had said "were insufficiently addressed...." *Id.* at 2537 (quoting the October 29 Memoranda). The government "then moved to vacate the injunction on the ground that the October 29 Memoranda had superseded the June 1 Memorandum" and

4

constituted new, separate agency action. *Id.*

The Fifth Circuit rejected that argument. *See id.* at 2538. It also "affirmed the District Court's judgment in full." *Id.* at 2537.

B.  **The Supreme Court's ruling**

The government then appealed to the Supreme Court, which reversed the Fifth Circuit. The Supreme Court's decision contains three holdings:

1. The Supreme Court concluded it had jurisdiction to reach the merits of the government's appeal notwithstanding 8 U.S.C. § 1252(f)(1). *Id.* at 2538-40. The Court held that § 1252(f)(1) prohibits district courts from granting "a particular form of relief"—injunctive relief—with respect to certain provisions of the INA. *Id.* at 2539. Section 1252(f)(1) did not, however, "pose[] [an] obstacle to jurisdiction" in the Supreme Court. *Id.* at 2540.

2. The Supreme Court then rejected the Fifth Circuit's conclusion that the government had to exercise its authority under 8 U.S.C. § 1225(b)(2)(C) "notwithstanding any violation of section 1225(b)(2)(A)." *Id.* at 2544. The Court "merely [held] that section 1225(b)(2)(C) means what it says: 'may' means 'may,' and the INA itself does not require the Secretary to continue exercising his discretionary authority under these circumstances." *Id.*[2]

3. The Supreme Court concluded that the October 29 Memoranda "did constitute final agency action" separate and apart from the June 1 Memorandum.

---

[2] Because this case does not implicate § 1225(b)(2)(C), the States do not discuss this aspect of the Court's decision further.

5

*Id.* at 2548. The Court, pointing to language in October 29 Memoranda that stated it was superseding and rescinding the June 1 Memorandum, said that the government "accepted the District Court's vacatur and dealt with the problem afresh." *Id.* at 2532. Thus, "[t]he October 29 Memoranda were ... final agency action for the same reasons that the June 1" decision to rescind MPP "was final agency action." *Id.* at 2544–45.

Having concluded "the Government's rescission of MPP did not violate section 1225 of the INA, and the October 29 Memoranda did constitute final agency action," the Court remanded the case for the district court to consider "whether the October 29 Memoranda comply with section 706 of the APA." *Id.* at 2548; *see also id.* at 2549 (Kavanaugh, J., concurring).

## ANALYSIS

I. *Biden v. Texas* does not affect the States' right to relief or the fact that the States stated a claim.

    A. The Fifth Circuit's standing and arbitrary-and-capricious analysis in *Texas v. Biden* is binding because the Supreme Court did not address those issues.

It is well-established that Fifth Circuit decisions are precedential, and therefore binding, unless they are "overruled, expressly or implicitly, by ... the United States Supreme Court ... ." *Stewart v. Entergy Corp.*, 35 F.4th 930, 935 (5th Cir. 2022) (per curiam) (quoting *Cent. Pines Land Co. v. United States*, 274 F.3d 881, 893 (5th Cir. 2001)); *see also, e.g.*, *Sturgeon v. Strachan Shipping Co.*, 698 F.2d 798, 800 (5th Cir. 1983) ("*McDaniels*, to which the above passages refer, is a panel decision of this court, indistinguishable by us in any principled way. We, like the

district court, are bound by it."); *Perez v. Abbott*, 250 F. Supp. 3d 123, 139 (W.D. Tex. 2017) (three judge district court) ("[A] district court is bound by a circuit decision unless or until it is overturned by an en banc decision of the circuit court or a decision of the Supreme Court.").

It is equally well-established that the Supreme Court's reversal of *part* of a decision by the Fifth Circuit leaves intact, and thus as binding precedent, those parts that it did not overrule. For example, *Central Pines* rejected a claim that a Louisiana law "unconstitutionally discriminate[d] against the United States and therefore cannot be applied retroactively *or* prospectively." 274 F.3d at 893. The reason: the argument was contrary to binding circuit precedent; the panel was "foreclosed from considering the constitutionality of Act 315 as discriminatory against the United States by our prior decision in *United States v. Little Lake Misere Land Co.*[, 453 F.2d 360 (5th Cir. 1971)]." *Id.* That was so even though the Supreme Court had reversed *Little Lake*, *see* 412 U.S. 580 (1973), because "the [Supreme] Court did not address our holding that Act 315 was *not* invalid as discriminatory against the United States." *Id.* Thus, that particular part of *Little Lake* remained binding despite the Supreme Court's reversal. *See id.*; *see also id.* at 893 n.57 ("While our prior opinion in *Leiter Minerals II* did not bind the *Little Lake* panel because it was *vacated*, the opinion in *Little Lake* binds us because only the *judgment* was reversed on other grounds.").

*United States v. Kirk*, 528 F.2d 1057 (5th Cir. 1976), which *Central Pines* cites, *see Cent. Pines*, 274 F.3d at 893–94, provides another example. That case involved

7

a jury instruction that relied on the requirement that a threat on the President's life be "'knowingly and willfully' made." *Kirk*, 528 F.2d at 1063 (quoting 18 U.S.C. § 871). The Fifth Circuit construed that phrase in *United States v. Rogers*, 488 F.2d 512 (5th Cir. 1974), and the jury instruction at issue was based on that interpretation. *See Kirk*, 528 F.2d at 1063. The *Kirk* court noted that the Supreme Court had reversed *Rogers*, see 422 U.S. 35 (1975), "on the basis of a procedural violation" instead of on the merits. *Id.* Thus, the *Kirk* court concluded that *Rogers* still provided the governing law as to the meaning of "knowingly and willfully," and thus governed the propriety of the jury instruction. *See id.* at 1064.

As relevant for this case, that means two significant, relevant portions of *Texas v. Biden* remain intact, binding law in the Fifth Circuit.

*First*, the Fifth Circuit's standing analysis in *Texas v. Biden*, 20 F.4th at 966–1003, is still the law of the circuit. The Supreme Court never addressed the Fifth Circuit's standing analysis, much less reversed it. Thus, the States' theories of standing—which follow those the Fifth Circuit approved in *Texas v. Biden*, see ECF 30, at 3–8 (discussing *Texas v. Biden* and applying it to this case in the States' reply in support of their motion for a preliminary injunction); ECF 37, at 2–6 (doing the same in the States' opposition to the government's motion to dismiss)—are valid, and establish the States' standing.

Indeed, subsequent events have affirmed the rectitude of those theories. On July 12, 2022, the government filed DHS's amendment to its border wall plan (the "Amended Plan"). The Amended Plan prioritizes two categories of spending for FY

8

2020 and FY 2021 appropriations: (1) remediation and mitigation; (2) installation of barrier system attributes, such as "lighting, cameras, and detection technology," on existing border barriers. *See* ECF 52-1, at ¶¶ 13–14, 23, 28. That is, barrier system attributes are items put onto *existing* border walls.

Moreover, according to the Second Enriquez Declaration, barrier system attributes "*will enhance* the functionality of previously constructed barriers." ECF 52-1, at ¶ 13 (emphasis added). "Functionality" includes the ability to "track and respond to illicit cross-border activity," *id.* at ¶ 14, which logically includes illegal border-crossings. So barrier system attributes enhance a *preexisting* ability of border walls to prevent illicit cross-border activity like illegal migrant crossings because "enhance" requires some preexisting level of ability. *See Enhance*, Am. Heritage Dictionary (5th ed. 2018) (defining enhance as "[t]o improve or augment, especially in *effectiveness*, value, or attractiveness") (emphasis added). Thus, the premise of the government's own declaration—and of DHS's decision to use FY 2020 and FY 2021 funds to purchase barrier system attributes—is that walls work in preventing illegal border activity.

That underscores that the States have established traceability and redressability, and so have standing. Because the Amended Plan acknowledges that border walls prevent illegal migration—by acknowledging that border barrier systems "enhance" border walls' ability to prevent illegal crossings—the government's decision not to construct border barriers will logically lead to more illegal migration, which will lead to more aliens present in Texas and Missouri,

9

which will cause the harms the States have identified. *See* ECF 19 (No. 7:21-cv-00420), at 36; ECF 37, at 3-5. That is not speculation; "[t]hat is a simple causal inference based on a simple change in incentives." *Texas v. Biden*, 20 F.4th at 973. And it is an inference whose key link—the connection between border wall construction and illegal migration—the government has twice acknowledged: first by expressly concluding that walls are effective in preventing illegal border crossings before DHS decided not to construct further border-barriers, *see, e.g.*, ECF 19-1 (No. 7:21-cv-00420), at 9–10, 12–14, and now by implicitly acknowledging that walls prevent illegal crossings in the Amended Plan, *see* ECF 52-1, at ¶¶ 13–14.

The same reasoning applies to redressability. It is now basically undisputed that border barriers prevent illegal migration to some extent. Thus, the States' requested relief—an injunction requiring the government to comply with Congress's command to construct the border wall—will alleviate some of the harms Missouri and Texas suffer from illegal immigration by preventing at least some illegal border crossings. That is sufficient for standing. *See* ECF 30, at 7-8 and ECF 37, at 5–6 (discussing *Texas v. Biden*, 20 F.4th at 973).

*Second*, the Fifth Circuit's analysis of whether the government's rescission of MPP was arbitrary and capricious is also intact and binding. As Justice Kavanaugh noted, even in the immigration context the government's exercise of discretion must "be reasonable and reasonably explained." *Biden v. Texas*, 142 S. Ct. at 2548 (Kavanaugh, J., concurring).

Again, *Texas v. Biden* supports the States. There, the Fifth Circuit concluded

that the government's rescission of MPP was arbitrary and capricious because:

1) DHS failed to consider the States' reliance interests. *See Texas v. Biden*, 20 F.4th at 989–90.

2) "DHS failed to reasonably consider its own factual findings regarding the benefits of MPP." *Id.* at 990–91.

3) "DHS also insufficiently addressed alternatives to terminating MPP." *Id.* at 992.

4) And "DHS also failed to consider the legal implications of terminating MPP." *Id.*

Similar defects infect the government's decisions to end all border-barrier construction. For example, as the States point out, *see* ECF 19 (No. 7:21-CV-00420), at 18–20, the government failed to address or to consider its prior findings that border barriers are effective at preventing illegal migration. Likewise, DHS failed to consider whether there was legitimate reliance on the prior policy of constructing border walls to control illegal migration, *see id.* at 21, something which it had an obligation to do, *see Texas v. Biden*, 20 F.4th at 990 ("The [Supreme] Court was clear that agencies *must* consider reliance interests, and that failure to do so is arbitrary and capricious.") (emphasis added). Finally, as in *Texas v. Biden*, the government's failure to consider the legality of not using 2020 and 2021 CAA funds as Congress intended—*i.e.*, to build border barriers—renders the government's decision arbitrary and capricious. *See* ECF 19 (No. 7:21-cv-00420) at 22–23.

Furthermore, as with standing, the Amended Plan underscores the fact that

11

DHS acted arbitrarily. As noted above, the Amended Plan directs all FY 2020 and FY 2021 funds to (1) remediation and mitigation and (2) installation of barrier system attributes, such "lighting, cameras, and detection technology," on existing border barriers. ECF 52-1, at ¶¶ 13-14, 23, 28. None of the money will go to constructing a foot of border wall—including actions that the government had previously called preparatory, such as environmental impact planning. Rather, under the Amended Plan, "CBP will take steps to terminate the environmental planning process" for the Laredo Sector that was funded using FY 2020 appropriations. *Id.* at ¶ 24. Likewise, the government's initial plans to use FY 2021 appropriations for "environment planning and stakeholder outreach for its next highest priority barrier segments in the USBP El Centro Sector" "will no longer move forward." *Id.* at ¶ 29.

Thus, the Amended Plan makes explicit what the States have said was the government's policy all along: there will be no more border wall construction. *See, e.g.*, ECF 1 (No. 7:21-cv-00420), at ¶ 117. So to the extent that the government's arguments rely on the claim that border-barrier construction is "paused," ECF 24, at 18; *see also* ECF 35, at 15, or that the funds may be spent on border-barrier construction within the five-year appropriation, *see* ECF 24, at 31 ("Defendants' decision to engage in thorough environmental review and stakeholder consultation before engaging in any new construction easily clears the low hurdle of rationality review."), the Amended Plan totally undermines them.

It also highlights the arbitrariness of DHS's actions. The Amended Plan

12

establishes that the government's justifications for its departure from its prior policy of building border walls are pretext. *See* ECF 30, at 22. DHS has justified its departure from the prior administration's border wall-construction policy by first saying it will build the wall after doing preparatory work, and now saying that non-wall building activities need funding. The rapid shifts in position are proof that the proffered reasons are pretext for a decision that, as a matter of policy, this administration will not construct border-barriers. *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (noting that pretext exists when "an explanation for agency action ... is incongruent with what the record reveals about the agency's priorities and decisionmaking process"); *see also Biden v. Texas*, 142 S. Ct. at 2546–47 (affirming that standard). And pretext is a "hallmark[] of unlawful agency action[]." *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 614 (5th Cir. 2021). The constantly shifting reasons DHS has provided for why it will not construct border barriers also constitute impermissible *post hoc* rationalizations. *See Texas v. Biden*, 20 F.4th at 993.

Finally, as noted above, the Amended Plan implicitly acknowledges that walls work at preventing illegal immigration. Given that, DHS's failure to address that fact in deciding not to construct border-barriers is arbitrary and capricious. *See* ECF 19 (No. 7:21-cv-00420), at 18–19. That is especially so because its policy contradicts the agency's past explicit findings to that effect. *Cf. id.* (so noting); *Texas v. Biden*, 20 F.4th at 991 (failing to discuss prior factual findings is arbitrary and capricious).

**B.    The Supreme Court's discussion of final agency action in *Biden v. Texas* did not change the legal standard or the arguments currently before the Court.**

The Supreme Court's analysis of whether the October 29 Memoranda was final agency action in *Biden v. Texas* does not change the States' existing analysis.[3]

The Supreme Court discussed final agency action in determining whether the October 29 Memoranda DHS issued after the district court vacated the June 1 Memorandum was new "final agency action." That mattered because the district court's vacatur allowed the agency to address the issue one of two ways with different legal consequences; DHS could "offer a fuller explanation of the agency's reasoning at the time of the agency action" or "deal with the problem afresh by taking new agency action." *Biden v. Texas*, 142 S. Ct. at 2544 (quoting *Dep't of Homeland Sec. v. Regents of Univ. of Cal.*, 140 S. Ct. 1891, 1907–08 (2020) (quotations and emphasis omitted)). The Supreme Court, noting that the October 29 Memoranda expressly rescinded the June 1 Memorandum and offered new reasons for rescinding MPP—including "considerations that the District Court determined were insufficiently addressed in the June 1 memo"—held that the October 29 Memoranda was final agency action separate and apart from the June 1 Memorandum. *See id.* at 2544–45.

Here, however, the issue is not whether DHS has taken new, final agency action. Thus, the Court's discussion about the link—or lack thereof—between the June 1 Memorandum and the October 29 Memoranda in *Biden v. Texas*, *see* 142 S. Ct. 2544, 2545–48, is inapposite. The issue here is much more prosaic: Whether

---

[3] As the States have pointed out, whether an agency action is final matters only to their APA claims. *See* ECF 19 (No. 7:21-cv-00420), at 47.

14

DHS's refusal to spend appropriated funds to construct the border wall and its cancellation of contracts—that is, DHS's actions implementing the President's January Proclamation, which includes the cancellation and the border wall plan (now, as amended)—constitute final agency action. *See* 5 U.S.C. § 551(13) (defining "agency action"); ECF 19, at 45-47 (looking at the cancellation and actions implementing the January Proclamation); ECF 30, at 18-19 (noting, the government's concession that DHS cancelled the construction contracts); *cf. Biden v. Texas*, 142 S. Ct. at 2545 (faulting the circuit court "[t]o the extent [it] understood itself to be reviewing an abstract decision apart from specific agency action, as defined in the APA").

*Biden v. Texas* did not affect the legal framework that courts use to analyze that issue—and that is the framework the States used in their briefs before this Court. *Compare* 142 S. Ct. at 2544–45 (discussing the two-prong approach), *with* ECF 19, at 45–47, *and* ECF 30, at 18–19 (applying the framework in the States' preliminary injunction motion). Thus, *Biden v. Texas* has no bearing on the question whether the States challenge final agency action.

### C.     Section 1252(f)(1) has no relevance to this case.

Finally, the Supreme Court's analysis of 8 U.S.C. § 1252(f)(1) has no bearing here. That statute limits the ability of courts to provide injunctive relief involving the operation of 8 U.S.C. §§ 1221–1232. *See Biden v. Texas*, 142 S. Ct. at 2538. DHS's authority to construct border barriers stems from 8 U.S.C. § 1103 and the FY 2020 and FY 2021 congressional appropriations. Thus, 8 U.S.C. § 1252(f)(1) does not prevent the Court from granting the States' motion for a preliminary injunction.

## CONCLUSION

In sum, *Biden v. Texas* is important less for what it did and more for what it did not do. It did not disturb, but left intact, the relevant portions of the Fifth Circuit's decision in *Texas v. Biden*, specifically those parts of the decision relating to standing and arbitrary-and-capricious review. Those parts of *Texas v. Biden* are therefore still the law of the circuit. They also squarely support the States' arguments for a preliminary injunction and against dismissal.

Thus, the States respectfully request that the Court grant their request for a preliminary injunction and deny the government's motion to dismiss.

| | |
|---|---|
| Date: July 14, 2022 | Respectfully submitted, |
| ERIC S. SCHMITT<br>Attorney General of Missouri | KEN PAXTON<br>Attorney General of Texas |
| D. JOHN SAUER, #58720MO*<br>Solicitor General | BRENT WEBSTER<br>First Assistant Attorney General |
| /s/ *Michael E. Talent*<br>MICHAEL E. TALENT, #73339MO*<br>Deputy Solicitor General | PATRICK K. SWEETEN<br>Deputy Attorney General for Special Litigation<br>Tex. State Bar No. 00798537 |
| MADDIE M. GREEN, #73724MO*<br>Assistant Attorney General<br>for Special Litigation | WILLIAM T. THOMPSON<br>Deputy Chief, Special Litigation Unit<br>Tex. State Bar No. 24088531 |
| OFFICE OF THE ATTORNEY GENERAL<br>Supreme Court Building<br>207 West High Street<br>P.O. Box 899<br>Jefferson City, Missouri 65102<br>Tel. (573) 751-1800<br>Fax (573) 751-0774<br>John.Sauer@ago.mo.gov<br>Michael.Talent@ago.mo.gov<br>Maddie.Green@ago.mo.gov | AARON F. REITZ<br>Deputy Attorney General for Legal Strategy<br>Texas Bar No. 24105704<br>Southern Dist. of Texas Bar No. 3653771<br><br>/s/ *Ryan D. Walters*<br>RYAN D. WALTERS<br>*Attorney-in-Charge*<br>Special Counsel, Special Litigation Unit Texas<br>Bar No. 24105085<br>Southern Dist. of Texas Bar No. 3369185 |
| *Counsel for Plaintiff*<br>*State of Missouri*<br><br>*Admitted pro hac vice* | OFFICE OF THE ATTORNEY GENERAL<br>P.O. Box 12548<br>Austin, Texas 78711-2548<br>Tel.: (512) 936-1414<br>Fax: (512) 936-0545<br>patrick.sweeten@oag.texas.gov<br>will.thompson@oag.texas.gov<br>aaron.reitz@oag.texas.gov<br>ryan.walters@oag.texas.gov<br><br>*Counsel for Plaintiff State of Texas* |

## CERTIFICATE OF SERVICE

I certify that on July 14, 2022, a true and accurate copy of the foregoing document was sent by fax to the Court to be filed on the Court's electronic docket and served on Defendants consistent with Federal Rule of Civil Procedure 5(b).

/s/ *Michael E. Talent*
Counsel for Plaintiffs

## CERTIFICATE OF COMPLIANCE

This document complies with the Court's word limit, *see* ECF 43, at 2, because this document contains 3,837 words.

/s/ *Michael E. Talent*
Counsel for Plaintiffs