United States District Court
Southern District of Texas

**ENTERED**

August 03, 2022

Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

| | |
|---|---|
| THE TEXAS GENERAL LAND OFFICE; and GEORGE P. BUSH, in his official capacity as Commissioner of the Texas General Land Office, §§§§§ | |
| Plaintiffs, §§ | |
| VS. §§ | |
| JOSEPH R. BIDEN, in his official capacity as President of the United States of America; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; and ALEJANDRO MAYORKAS, in his official capacity as Secretary of the United States Department of Homeland Security, §§§§§§§§§§ | CIVIL ACTION NO. 7:21-cv-00272 |
| Defendants. § | |
| THE STATE OF MISSOURI; and THE STATE OF TEXAS, §§ | |
| Plaintiffs, §§ | |
| VS. §§ | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America; THE UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, in his official capacity as Secretary of the United States Department of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY A. MILLER, in his official capacity as the Acting Commissioner of United States Customs and Border Protection; and UNITED | CIVIL ACTION NO. 7:21-cv-00420 (Formerly CIVIL ACTION NO. 6:21-cv-00052) |

| | |
|---|---|
| STATES CUSTOMS AND BORDER | § |
| PROTECTION, | § |
| | § |
| Defendants. | § |

## **OPINION AND ORDER**

The Court first considers the "Federal Government Defendants' Motion to Dismiss the Amended Complaint by *General Land Office* Plaintiffs,"[1] Plaintiffs' response,[2] and the Government's reply.[3] The Court also considers "Defendants' Motion to Dismiss Complaint by the *Missouri* Plaintiffs,"[4] the Plaintiff States of Missouri and Texas's response,[5] and the Government's reply.[6] The Court lastly considers Plaintiff States'[7] and the Government's[8] timely supplemental briefs, which the Court ordered.[9] After considering the motions, record, and relevant authorities, the Court **GRANTS IN PART** the Government's first motion to dismiss and leaves Plaintiffs Texas General Land Office's and Commissioner Bush's counts seven and eight for an alleged violation of the Administrative Procedure Act pending. The Court **GRANTS** the Government's second motion to dismiss and **DISMISSES** all claims of Plaintiffs Texas and Missouri. As a result, the Court **DENIES AS MOOT** Texas's and Missouri's motion for preliminary injunction.[10]

---

[1] Dkt. No. 36. Docket references are to those in *Bush v. Biden*, No. 7:21-cv-00272 (S.D. Tex.) unless otherwise noted.
[2] Dkt. No. 39.
[3] Dkt. No. 42.
[4] Dkt. No. 35.
[5] Dkt. No. 37.
[6] Dkt. No. 38.
[7] Dkt. No. 54.
[8] Dkt. No. 53.
[9] Dkt. No. 43.
[10] Pls.' Mot. Prelim. Inj., *Missouri v. Biden*, No. 7:21-cv-00420 (S.D. Tex. Nov. 8, 2021), Dkt. No. 19.

TABLE OF CONTENTS

I.   Background and Procedural History ........................................................................ 4

II.  *Bush v. Biden* Motion to Dismiss ...................................................................... 5

   a.   Jurisdiction and Reviewability ...................................................................... 5

      *1.* *Article III Standing* ...................................................................... 5

      *2.* *Claims Against President Biden* .............................................. 11

      *3.* *Reviewability of Budgetary Statutes and IIRIRA Claims* ............. 14

      *4.* *Reviewability of Plaintiffs' Administrative Procedure Act Claims* ............ 17

         i.   Zone of Interests ...................................................................... 17

         ii.  Agency Discretion Reviewability ............................................ 22

         iii. Programmatic Challenge ........................................................ 29

      *5.* *Reviewability of Constitutional Claims* .................................. 30

      *6.* *Reviewability of Ultra Vires Claims* ...................................... 34

   b.   Merits ...................................................................................................... 35

      *1.* *Count VIII: Procedural Violation of APA* .............................. 35

      *2.* *Count IX: Violation of the Regulatory Flexibility Act* ............ 38

   c.   Conclusion .............................................................................................. 40

III. *Missouri v. Biden* Motion to Dismiss ................................................................ 40

   a.   Claim Splitting ........................................................................................ 40

      *1.* *Legal Standard* ...................................................................... 40

      *2.* *Analysis* .................................................................................. 41

         i.   Same-Parties Prong ................................................................ 42

         ii.  Privity Prong .......................................................................... 47

         iii. Same Transaction Element ...................................................... 51

         iv.  Conclusion .............................................................................. 52

   b.   Jurisdiction .............................................................................................. 53

      *1.* *Legal Standard* ...................................................................... 53

      *2.* *Analysis* .................................................................................. 53

   c.   Conclusion .............................................................................................. 60

IV.  Conclusion and Holding ...................................................................................... 61

## I.   BACKGROUND AND PROCEDURAL HISTORY

These consolidated cases challenge the federal Executive Branch's "southwest border policy" for alleged constitutional and statutory violations.[11] Plaintiffs States of Missouri and Texas and Plaintiffs Commissioner George P. Bush and the Texas General Land Office bring similar but non-identical claims for violation of the constitutional separation of powers and certain express constitutional provisions, statutory violations of appropriations and other related statutes, and violation of the Administrative Procedure Act against Defendants President Joseph R. Biden, Jr.; the United States Department of Homeland Security and its Secretary Alejandro N. Mayorkas; and United States Customs and Border Protection and its Acting Commissioner Troy A. Miller (together, "the Government," without respect to the slight differences in Defendants between the two consolidated cases). The Court will refer to Plaintiff States' case as *Missouri v. Biden*. The Court will refer to Plaintiffs Texas General Land Office's and Commissioner Bush's case as *Bush v. Biden*.

*Bush v. Biden* was originally filed in the McAllen Division in July 2021. *Missouri v. Biden* was originally filed in the Victoria Division in October 2021. In November 2021, District Judge Tipton noted the substantial similarity of the two cases and ordered *Missouri v. Biden* transferred to this Court's docket.[12] Later that month, this Court consolidated the cases.[13]

The parties' briefing on the Government's two motions to dismiss and Plaintiff States' motion for preliminary injunction completed in February 2022.[14] That same month, the Supreme Court granted a writ of certiorari to review a Fifth Circuit case which the parties all heavily

---

[11] Compl., *Missouri v. Biden*, No. 7:21-cv-00420 (S.D. Tex. Oct. 21, 2021), Dkt. No. 1 at 2, ¶ 1 [hereinafter Mo. Compl.].
[12] Order, *Missouri v. Biden*, No. 7:21-cv-00420 (S.D. Tex. Nov. 2, 2021), Dkt. No. 12.
[13] Dkt. No. 21.
[14] *See* Dkt. No. 42.

debated. Consequently, this Court stayed the case for four months until the Supreme Court issued its opinion.[15] Plaintiff States appealed that order,[16] but it has expired by its terms, and the Fifth Circuit dismissed the appeal as moot.[17] The parties have complied with the Court's order to brief the effect of the Supreme Court's June 2022 opinion on their positions and arguments in this case.[18] Accordingly, the parties' motions are ripe. The Court turns to their analysis, beginning with *Bush v. Biden* because that case was earlier filed and the Government contends that its earlier filing has consequential legal effect.[19]

## II. *BUSH V. BIDEN* MOTION TO DISMISS

This Part concerns only *Bush v. Biden*. Defendants in *Bush v. Biden*—namely President Joseph R. Biden, Jr.; the United States Department of Homeland Security and its Secretary Alejandro N. Mayorkas—first argue that Plaintiffs Texas General Land Office and its Commissioner George P. Bush lack Article III standing and standing under administrative law doctrines to challenge the Government's border barrier policies.[20] The Court will first confront jurisdictional and reviewability arguments before turning to the arguments on the merits of Plaintiffs' claims.

### a. Jurisdiction and Reviewability

#### 1. *Article III Standing*

The Government argues that Plaintiffs cannot establish standing on its theories resting "on assumptions about how patterns in migration relate to Defendants' actions."[21] Plaintiffs argue that

---

[15] Dkt. No. 43.
[16] *See* Dkt. Nos. 44–45.
[17] *Gen. Land Off. of Tex. v. Biden*, No. 22-40110, 2022 WL 3010699, at *1 (5th Cir. July 29, 2022) (per curiam) ("As demonstrated by both the district court's original order and the States' actions in the district court, the district court's stay is no longer in effect.").
[18] Dkt. Nos. 53–54.
[19] Dkt. No. 35 at 15, ¶ 4.
[20] Dkt. No. 36 at 31, § I.
[21] *Id.* at 31, ¶ 40.

their theories of standing regarding patterns of migration are adequate at this stage to satisfy the standing inquiry.[22]

Arguments attacking the Court's jurisdiction raised under Federal Rule of Civil Procedure 12(b)(1) are to be considered first, before addressing any attack on the merits,[23] because the Court cannot exercise any "judicial action" other than dismissal when the Court lacks jurisdiction.[24] "[I]t is always the obligation of a federal court to determine if it has jurisdiction."[25] Rule 12(b)(1) permits motions to dismiss for "lack of subject-matter jurisdiction." "Under Rule 12(b)(1), a claim is 'properly dismissed for lack of subject-matter jurisdiction when the court lacks the statutory or constitutional power to adjudicate' the claim,"[26] because federal courts only have jurisdiction to decide controversies as conferred by the United States Constitution or by statute,[27] but do have jurisdiction to determine their own jurisdiction.[28] For example, a Rule 12(b)(1) motion is the proper vehicle to test whether a plaintiff has standing to bring a claim.[29] Once the Court's jurisdiction is attacked, "the party asserting jurisdiction bears the burden of proof on a 12(b)(1) motion to dismiss."[30] In assessing the Court's jurisdiction, "the district court is to accept as true the allegations and facts set forth in the complaint,"[31] and may "dismiss for lack of subject matter jurisdiction on any one of three separate bases: (1) the complaint alone; (2) the complaint

---

[22] Dkt. No. 39 at 12–13, ¶¶ 5–7.

[23] *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, 668 F.3d 281, 286 (5th Cir. 2012) (citing *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)).

[24] *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94 (1998); *see* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

[25] *Green v. Forney Eng'g Co.*, 589 F.2d 243, 246 (5th Cir. 1979) (quotation omitted)

[26] *In re FEMA Trailer*, 668 F.3d at 286 (quoting *Home Builders Ass'n v. City of Madison*, 143 F.3d 1006, 1010 (5th Cir.1998)).

[27] *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).

[28] *United States v. Ruiz*, 536 U.S. 622, 628 (2002) ("[I]t is familiar law that a federal court always has jurisdiction to determine its own jurisdiction.").

[29] *See Cornerstone Christian Sch. v. Univ. Interscholastic League (UIL)*, 563 F.3d 127, 133–34 (5th Cir. 2009) (reviewing whether a plaintiff has standing in the context of a Federal Rule of Civil Procedure 12(b)(1) challenge).

[30] *Life Partners Inc. v. United States*, 650 F.3d 1026, 1029 (5th Cir. 2011).

[31] *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 714 (5th Cir. 2012).

supplemented by undisputed facts evidenced in the record; or (3) the complaint supplemented by undisputed facts plus the court's resolution of disputed facts."[32] Generally, the Court will look only to the allegations in the complaint when only the complaint is challenged,[33] and will evaluate the evidence when a party submits it,[34] but the Court may consider a "broader range of materials" when resolving a Rule 12(b)(1) motion.[35] "Each factual issue necessary to support subject matter jurisdiction 'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation.'"[36] In the preliminary stage of a case when a plaintiff faces a motion to dismiss, the plaintiff "must allege facts that give rise to a plausible claim" of standing,[37] and the Court does "not act as a fact finder and must construe all disputed facts in the plaintiff's favor and consider them along with the undisputed facts."[38] Ultimately, "[a] motion to dismiss for lack of subject matter jurisdiction should be granted only if it appears certain that the plaintiff cannot prove any set of facts in support of his claim that would entitle plaintiff to relief."[39]

To establish standing and vest a federal court with jurisdiction under Article III of the Constitution, a plaintiff must meet the tripartite "irreducible constitutional minimum of standing:"

> First, the plaintiff must have suffered an injury in fact—an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the

---

[32] *Id.* (quoting *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir. 1981)).

[33] *See Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981); *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980).

[34] *See Williamson*, 645 F.2d at 413 (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 890 (3d Cir. 1977)).

[35] *Williams v. Wynne*, 533 F.3d 360, 365 n.2 (5th Cir. 2008); *see Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001).

[36] *Sharkey v. Quarantillo*, 541 F.3d 75, 83 (2d Cir. 2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)), *quoted in MidCap Media Fin., L.L.C. v. Pathway Data, Inc.*, 929 F.3d 310, 315 n.* (5th Cir. 2019).

[37] *Barilla v. City of Houston*, 13 F.4th 427, 431 (5th Cir. 2021) (quoting *Cornerstone Christian Sch. v. Univ. Interscholastic League*, 563 F.3d 127, 134 (5th Cir. 2009)).

[38] *Walk Haydel & Assocs. v. Coastal Power Prod. Co.*, 517 F.3d 235, 241 (5th Cir. 2008).

[39] *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 714 (5th Cir. 2012) (quoting *Ramming*, 281 F.3d at 161).

independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.[40]

"[W]here a causal relation between injury and challenged action depends upon the decision of an independent third party . . . , 'standing is not precluded, but it is ordinarily "substantially more difficult" to establish.'"[41] The Supreme Court is generally reluctant "to endorse standing theories that rest on speculation about the decisions of independent actors."[42] However, the Supreme Court has held, in the case of plaintiffs challenging the inclusion of a citizenship question on the decennial census, that the plaintiffs' "theory of standing thus does not rest on mere speculation about the decisions of third parties; it relies instead on the predictable effect of Government action on the decisions of third parties. Because Article III requires no more than *de facto* causality, traceability is satisfied here."[43] Accordingly, to establish injury arising from the decisions of other actors, a plaintiff must show that such actions are actually occurring or at least predictable.

Plaintiffs allege that they have standing because of injuries to the "GLO Farm," which is a "3099-acre farm owned by the State of Texas in Starr County, Texas."[44] Plaintiffs allege that illegal border crossings and the movement of such immigrants are concentrated in Starr County, Texas, as a result of the Government's border policies, so:

> Farming operations have been impacted in several ways, including restricting the time frames that certain farming operations are or are not performed and the manner, method, and timing in which certain operations, such as the spraying of chemicals, are being conducted on the GLO Farm. Essential farm activities such as the sorting of crops can no longer be carried on at night due to security concerns. . . . The 2021 border surge and failure to complete the RGV-09 [border barrier construction] project resulting from the [presidential] Proclamation and DHS [Department of Homeland Security] Plan have diminished the value of the GLO farm, which has been severely impaired in its intended use by the illegal activity.

---

[40] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up).
[41] *California v. Texas*, 141 S. Ct. 2104, 2117 (2021) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)).
[42] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013).
[43] *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) (citations and quotation omitted).
[44] Dkt. No. 34 at 4, ¶ 6.

> The marketability, value, and quiet use and enjoyment of the GLO Farm have been damaged . . . .[45]

Plaintiffs connect these alleged harms to the Government's challenged border policies via a few news stories.[46] One reports that "[r]oughly 8,000 of the 180,034 people whom border authorities encountered [in May 2021] were denied entry at a port of entry, while the remainder went across the border through unfenced areas," and "a total of 929,868 people have been encountered unlawfully trying to enter the U.S. from Mexico, more than the 459,000 in all of [fiscal year] 2020."[47] Another reports that, "[f]rom Texas to California, unfinished sections of the wall have become convenient gateways for migrants to enter the U.S. . . . Smugglers send groups of asylum seekers through the gaps to overwhelm the agents. When agents leave to intercept or apprehend one group, another group scampers across."[48] There are other similar stories.[49]

The Government does not question these alleged harms or the editorial linkage between Plaintiffs' harms and the Government's policies.[50] Instead, the Government argues that Plaintiffs have failed to connect Plaintiffs' alleged harms and the Government's policies:

> because it is implausible that an immigrant's decision to attempt an illegal entry into the United States via the GLO Farm hinged on the policy choices outlined in the Proclamation and the DHS Plan. It is just as plausible that a prior policy which focused on erecting border barriers was an entirely ineffective means of dealing with the root causes of migration, and that the failure to deal with those root causes is now being felt.[51]

---

[45] *Id.* at 34–35, ¶¶ 82–83.

[46] Dkt. No. 1 at 26, ¶ 63.

[47] Anna Giaritelli, *Illegal Border Crossing Attempts Reach New High Under Biden: 180,000 in May*, YAHOO! (June 9, 2021), https://www.yahoo.com/now/illegal-border-crossing-attempts-reach-215900861.html.

[48] William La Jeunesse, *Migrants Stream Through Gaps in Border Wall Following Biden's Order to Halt Construction*, FOX NEWS (March 31, 2021), https://www.foxnews.com/politics/migrants-stream-through-gaps-in-border-wall-following-bidens-order-to-halt-construction.

[49] *See, e.g.*, Dkt. No. 1 at 4, ¶ 5 & nn.7–8.

[50] Dkt. No. 36 at 32–33, ¶¶ 41–42.

[51] *Id.* at 33, ¶ 43.

The Government insists that migrants' decisions to cross into the United States "are influenced by countless cultural, social, economic, and political factors" beyond a border wall.[52] But the Government's argument misapprehends the standard of review. A plaintiff is not limited to only challenging the *most plausible* source of the plaintiff's injury; a plaintiff has standing to challenge *any plausible* source of the plaintiff's injury.[53] Any concrete injury furnishes standing when it is "fairly traceable" to the Government's actions and redressable in court.[54] Plaintiffs have alleged, with some uncontroverted editorial evidence, all of which the Court takes as true, that illegal immigrants' decision to cross the international border, and where to cross, are influenced by barrier gaps left open by the Government's policies. The Government argues that Plaintiffs have failed to show traceability of their alleged harms to the Government's border policies because Plaintiffs can only speculate as to whether the Government would have constructed a border wall near the GLO Farm,[55] but Plaintiffs actually allege that "border wall was scheduled to be constructed on the GLO Farm as part of the RGV-09 project,"[56] and the Government's challenged policies effected a cancellation of the scheduled construction.[57] The Government perplexingly argues that Plaintiffs should be challenging "the prior Administration's decision to build barriers directly adjacent to the GLO Farm without having completed arrangements to build a fence over GLO Farm, as well," which led to the alleged channeling of illegal immigrants through the GLO Farm,[58] but Plaintiffs *are* challenging the Government's failure to complete arrangements to build a fence near the GLO Farm.[59] The Government lastly argues that the State of Texas has undertaken to construct a border

---

[52] Dkt. No. 42 at 12, ¶ 6.
[53] *See Barilla v. City of Houston*, 13 F.4th 427, 431 (5th Cir. 2021).
[54] *See supra* note 40.
[55] Dkt. No. 36 at 34, ¶ 44; *accord* Dkt. No. 42 at 14, ¶ 9.
[56] Dkt. No. 34 at 22, ¶ 56.
[57] *Id.* ¶¶ 59, 69–70.
[58] Dkt. No. 42 at 13, ¶ 8.
[59] *See* Dkt. No. 34 at 23, ¶ 59 (alleging that the Government's policies brought "the RGV-09 project and the planned wall segment on the GLO Farm to a dead stop. DHS implemented this Proclamation by suspending all border wall

wall in the RGV-09 zone, so "eventual completion of the wall would likely render this case moot and subject to dismissal."[60] But again, the Government misapprehends that the present question is whether Plaintiffs have *present* or past injuries that are likely caused by the Government that could be redressed through judicial relief.[61] Potential future solutions do not foreclose litigation today. The Court holds that Plaintiffs have sufficiently alleged standing to clear the bar of a motion to dismiss for lack of jurisdiction at this stage of the litigation, taking the allegations of their complaint as true.[62]

### 2.   *Claims Against President Biden*

The Government next argues that President Biden must be dismissed as a Defendant to this case because Plaintiffs lack any cause of action against the President and this Court lacks jurisdiction to order relief directly against the President.[63] Plaintiffs argue that this Court does have jurisdiction and authority to enter declaratory relief against the President.[64]

Plaintiffs clarify that they seek only declaratory relief against Defendant President Biden.[65] The United States Supreme Court has held that federal courts lack jurisdiction to issue injunctive relief against the President.[66] Justice Antonin Scalia, writing only for himself, opined that courts cannot issue any declaratory judgment against the President because doing so is incompatible with the constitutional separation of powers.[67] Reviewing this jurisprudence, the United States Court of

---

projects and ceasing land acquisition efforts (including for the GLO Farm), leaving hundreds of miles of fencing unfinished compared to what DHS had studied and planned.").

[60] Dkt. No. 36 at 34, ¶ 45.

[61] *See* Dkt. No. 39 at 13, ¶ 7.

[62] *See Sharkey v. Quarantillo*, 541 F.3d 75, 83 (2d Cir. 2008) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992)) (holding that proof of jurisdictional harms, at the motion to dismiss stage, need only be shown by sufficient factual allegations), *quoted in MidCap Media Fin., L.L.C. v. Pathway Data, Inc.*, 929 F.3d 310, 315 n.* (5th Cir. 2019).

[63] Dkt. No. 36 at 35, ¶ 47.

[64] Dkt. No. 39 at 17, ¶ 16.

[65] Id. at 16–17, ¶¶ 15–16.

[66] *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866).

[67] *Franklin v. Massachusetts*, 505 U.S. 788, 827–28 (1992) (Scalia, J., concurring in part and concurring in the judgment).

Appeals for the District of Columbia Circuit concluded that "declaratory judgment is the functional equivalent of an injunction,"[68] because declaratory relief constitutes "the practical equivalent of specific relief such as injunction or mandamus, since it must be presumed that federal officers will adhere to the law as declared by the court,"[69] so declaratory relief against the President "is unavailable."[70] Numerous district courts, in turn, have relied upon this jurisprudence to hold that a plaintiff has no claim for declaratory relief against the President.[71]

Arguing against this current, Plaintiffs cite numerous non-controlling precedents that they contend have adjudicated declaratory relief against the President.[72] But as the Government points out, "none of the cases GLO relies upon addresses whether a court has the power to issue a declaratory judgment directly against the President."[73] In *Hawaii v. Trump*, the Ninth Circuit held "that the extraordinary remedy of enjoining the President is not appropriate here,"[74] and the Supreme Court merely dismissed the case as moot.[75] In *Trump v. Hawaii*, the Supreme Court did consider whether the President had authority under the Immigration and Nationality Act to prohibit entry by nationals of certain countries, but the Court held that it "may assume without deciding that plaintiffs' statutory claims are reviewable, notwithstanding consular nonreviewability or any other statutory nonreviewability issue"[76] and the Court in any event rejected the plaintiffs' claims against the President.[77] *Trump v. Hawaii* does not therefore stand for the proposition that claims

---

[68] *Comm. on the Judiciary of the U.S. House of Reprs. v. Miers*, 542 F.3d 909, 911 (D.C. Cir. 2008)

[69] *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 208 n.8 (D.C. Cir. 1985); *accord Swan v. Clinton*, 100 F.3d 973, 976 n.1 (D.C. Cir. 1996) ("Although the following discussion is couched in terms of our ability to grant injunctive relief against the President, similar considerations regarding a court's power to issue relief against the President himself apply to Swan's request for a declaratory judgment.").

[70] *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010).

[71] *E.g.*, *U.S. Navy SEALs 1-26 v. Biden*, No. 4:21-CV-01236-O, 2022 WL 34443, at *3 (N.D. Tex. Jan. 3, 2022); *Navy Seal 1 v. Biden*, No. 8:21-CV-2429-SDM-TGW, 2021 WL 5448970, at *2 (M.D. Fla. Nov. 22, 2021).

[72] Dkt. No. 39 at 17–18, ¶¶ 17–19.

[73] Dkt. No. 42 at 16, ¶ 14.

[74] *Hawaii v. Trump*, 859 F.3d 741, 788 (9th Cir. 2017).

[75] *Trump v. Hawaii*, 138 S. Ct. 377 (2017).

[76] *Trump v. Hawaii*, 138 S. Ct. 2392, 2407 (2018).

[77] *Id.* at 2423.

seeking declaratory judgment against the President must be entertained. In *East Bay Sanctuary Covenant v. Trump*, the district court issued an injunction against "Defendants" including the President, but held that the "injunction applies insofar as the Rule amends the regulations governing asylum eligibility" in Title 8 of the Code of Federal Regulations.[78] On appeal, the Ninth Circuit held that the President's proclamation together with the Department of Justice and the Department of Homeland Security's Rule "create an operative rule of decision for asylum eligibility that is reviewable by this court,"[79] and ultimately upheld the injunction *against the regulations* that "announce[d] a new bar to asylum eligibility."[80] *East Bay Sanctuary Covenant* therefore did not countenance a preliminary injunction against the President qua President. The substantive effect of the preliminary injunction was directed to the rule announced by the Departments of Justice and Homeland Security regarding asylum eligibility. In light of the Supreme Court's holding that no court may issue injunctive relief *against the President*,[81] this Court does not interpret *East Bay Sanctuary Covenant* to impliedly hold that injunctive or declaratory relief is available against the President qua President. *Texas v. Biden* named President Biden as a Defendant, but the case similarly was about Department of Homeland Security actions,[82] not declaratory relief against the President himself. The remainder of Plaintiffs' cited authorities are district court decisions[83] that do not bind this Court[84] and do not dissuade the Court that declaratory relief issued directly against the President is not available here because it would

---

[78] 354 F. Supp. 3d 1094, 1121 (N.D. Cal. 2018).

[79] *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 669 (9th Cir. 2021).

[80] *Id.* at 658.

[81] *See supra* note 66.

[82] *Texas v. Biden*, 20 F.4th 928, 941 (5th Cir. 2021), *rev'd* No. 21-954, 2022 WL 2347211 (U.S. June 30, 2022).

[83] Dkt. No. 39 at 17–18, ¶¶ 17–19 (citing *Gomez v. Trump*, 485 F. Supp. 3d 145 (D.D.C. 2020); *Louisiana v. Biden*, 543 F. Supp. 3d 388, 397–98 (W.D. La. 2021), *appeal filed*, (5th Cir. Aug. 17, 2021) (No. 21-30505)).

[84] *Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) (quoting 18 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE – CIVIL § 134.02[1][d] (3d ed. 2011)) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.").

contravene the constitutional separation of powers and because the alleged injury to Plaintiffs "can be rectified by injunctive relief against subordinate officials."[85] The Court accordingly **GRANTS** the Government's motion to dismiss to the extent it seeks to dismiss claims against President Joe Biden directly and to the extent it seeks to dismiss President Biden from this case. President Biden, and all claims to the extent they are directed against him in his personal or official capacity, are **DISMISSED** from this action.

### 3.  *Reviewability of Budgetary Statutes and IIRIRA Claims*

The Government argues that one of the statutes upon which Plaintiffs predicate their arguments, the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), contains a federal court jurisdiction-stripping provision that should preclude Plaintiffs' claims under IIRIRA.[86] Plaintiffs respond that the jurisdiction-stripping statute applies only to claims regarding environmental waivers, and Plaintiffs make only a minor point regarding waiver.[87] The Government replies that an environmental waiver is at issue and Plaintiffs' claims are not ripe.[88]

The provision of IIRIRA, as amended, at issue, section 102(c)(2)(A), states that:

The district courts of the United States shall have exclusive jurisdiction to hear all causes or claims arising from any action undertaken, or any decision made, by the Secretary of Homeland Security pursuant to paragraph (1). A cause of action or claim may only be brought alleging a violation of the Constitution of the United States. The court shall not have jurisdiction to hear any claim not specified in this subparagraph.[89]

The subparagraph (1) referred to provides that:

Notwithstanding any other provision of law, the Secretary of Homeland Security shall have the authority to waive all legal requirements such Secretary, in such Secretary's sole discretion, determines necessary to ensure expeditious construction

---

[85] *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996).
[86] Dkt. No. 36 at 38–39, ¶ 54 (citing *Ctr. for Biological Diversity v. McAleenan*, 404 F. Supp. 3d 218, 238 (D.D.C. 2019)).
[87] Dkt. No. 39 at 32–33, ¶¶ 55–57.
[88] Dkt. No. 42 at 36 n.10.
[89] 8 U.S.C. § 1103 note, § 102(c)(2)(A) (2009) (Improvement of Barriers at Border).

of the barriers and roads under this section.   Any such decision by the Secretary shall be effective upon being published in the Federal Register.[90]

The Ninth Circuit concluded that claims that arise under these waiver provisions of § 102(c) are jurisdictionally barred, but claims that do not stem from the Secretary's waiver decisions and instead originate from other sections of IIRIRA are not barred by this provision.[91]

The Government appears to argue that Plaintiffs' count five claim for violation of budgetary statutes and count six claim for violation of agency statutes are jurisdictionally barred by this jurisdiction-stripping provision,[92] but Plaintiffs point out (and the Government does not dispute in reply) that Plaintiffs' counts five and six are predicated on *other* sections of IIRIRA.[93] However, Plaintiffs admit that they seek "prospective declaratory and injunctive relief to prevent"[94] the Secretary from withdrawing an October 31, 2019 IIRIRA waiver.[95] The Government correctly replies that granting such relief when the Secretary of Homeland Security has not moved to withdraw the waiver would be an impermissible advisory opinion based on hypothetical future conduct.[96] The Court therefore **DISMISSES** Plaintiffs' claims to the extent they allege or are based on any hypothetical withdrawal of the October 31, 2019 Department of Homeland Security waiver.

The Government also contends that the Court should dismiss Plaintiffs' "statutory claims asserted in Counts V, VI, and VII" because Plaintiffs lack a private right of action to invoke for judicial relief.[97] In count five, Plaintiffs invoke the Purpose Statute, 31 U.S.C. § 1301(a), the

---

[90] *Id.* § (c)(1).
[91] *In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1220–21 (9th Cir. 2019).
[92] *See* Dkt. No. 38–39, ¶ 54.
[93] Dkt. No. 39 at 32–33, ¶¶ 55–56; Dkt. No. 42 at 36 n.10.
[94] Dkt. No. 39 at 33, ¶ 56.
[95] Determination Pursuant to Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as Amended, 84 Fed. Reg. 58400-03 (Oct. 31, 2019).
[96] Dkt. No. 42 at 36 n.10.
[97] Dkt. No. 36 at 38, ¶ 53.

Transfer Statute, 31 U.S.C. § 1532, the Anti-Deficiency Act, 31 U.S.C. § 1341(a)(1)(A), and a section of the Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 739, 133 Stat. 13, 197 (2019), and assert that they "sue under the above-listed statutes, under the Administrative Procedure Act for violations of the above-listed statutes."[98] In count six, Plaintiffs appear to assert a claim under IIRIRA by alleging that the Secretary of Homeland Security violated the statutory mandate to construct border fencing.[99] In count seven, Plaintiffs claim a substantive violation of the Administrative Procedure Act.[100] The Government contends that Plaintiffs cannot invoke a private cause of action under the budgetary statutes or IIRIRA.[101]

Plaintiffs do not contend, and this Court does not independently hold, that Plaintiffs may assert an independent cause of action in counts five or six for violation of the referenced budgetary statutes or IIRIRA.[102] Indeed, Plaintiffs concede that "[a]lthough [the Government] asserts that [the Texas General Land Office] lacks a private right of action to sue under the statutes, the APA itself provides a cause of action."[103] However, Plaintiffs correctly point out that challenges under other statutes are maintained *under* the Administrative Procedure Act because other statutes often provide no private right of action in themselves.[104] The APA "permits suit for violations of numerous statutes of varying character that do not themselves include causes of action for judicial review."[105] For example, "[f]ederal courts have long exercised jurisdiction over NEPA [National Environmental Policy Act] challenges pursuant to the APA."[106] Nevertheless, Plaintiffs' argument

---

[98] Dkt. No. 34 at 41, ¶¶ 118–20.
[99] *Id.* at 44. ¶¶ 130–32.
[100] *Id.* at 38, ¶ 126.
[101] Dkt. No. 36 at 38, ¶ 54 (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 283–84 (2002) (cleaned up) ("We have held that the question whether Congress intended to create a private right of action is definitively answered in the negative where a statute by its terms grants no private rights to any identifiable class.")).
[102] *See* Dkt. No. 39 at 30, ¶¶ 49–50.
[103] *Id.* at 26, ¶ 41.
[104] Dkt. No. 39 at 19, ¶ 22.
[105] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 130 (2014).
[106] *Friends of Lydia Ann Channel v. U.S. Army Corps of Eng'rs*, 701 F. App'x 352, 358 (5th Cir. 2017).

amounts to a concession that they cannot maintain a cause of action *directly* under the budgetary statutes or IIRIRA. Accordingly, Plaintiffs' count five and count six, to the extent they are brought independently of the APA, are **DISMISSED**.

      *4.  Reviewability of Plaintiffs' Administrative Procedure Act Claims*

         *i.  Zone of Interests*

      The Court turns to whether Plaintiffs may assert claims against Defendants for violation of the Administrative Procedure Act in counts seven and eight. The Government first argues that Plaintiffs may not assert a cause of action under the APA because they are outside "the zone of interests protected by these statutes."[107]

      All statutory causes of action, including under the APA, are limited to plaintiffs whose interests fall within the zone of interests protected by the statute.[108] The test is "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question. . . . That interest, at times, may reflect aesthetic, conservational, and recreational as well as economic values."[109] "[T]he zone-of-interests test is to be determined not by reference to the overall purpose of the Act in question, . . . but by reference to the particular provision of law upon which the plaintiff relies."[110] The limitation always applies, but is not especially demanding in the APA context.[111] Actions under the APA are presumptively reviewable,[112] so there need not be "any indication of congressional purpose to benefit the would-be plaintiff" in some other statute.[113] Plaintiffs' interests only need to be

---

[107] Dkt. No. 36 at 39, ¶ 55.

[108] *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129–30 (2014).

[109] *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153–54 (1970).

[110] *Bennett v. Spear*, 520 U.S. 154, 175–76 (1997).

[111] *Lexmark Int'l*, 572 U.S. at 129–30.

[112] *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 (1987) ("The Court struck the balance in a manner favoring review . . . .").

[113] *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (quotation omitted).

arguably within the zone of interests, any benefit of the doubt favors plaintiffs, and the zone-of-interests "test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit."[114] For example, the D.C. Circuit held that a sadist who desired to see animals harmed could not be within the zone of interest of federal animal welfare statutes or capable of challenging the statutes' implementing regulations under the APA because the laws required humane treatment and recognized no interest in sadism.[115] Accordingly, the zone-of-interest test "seeks to exclude those plaintiffs whose suits are more likely to frustrate than to further statutory objectives."[116]

The parties cite various cases to support their arguments. For example, Plaintiffs point out that the Western District of Washington held that section 739 of the 2019 Consolidated Appropriations Act—a budgetary provision at issue in this case[117]—was not solely about "the relationship between Congress and the Executive Branch regarding federal spending" and that the plaintiff State's assertion of lost tax revenue and lost spending on a project in the State as a result of diverted funds was within the zone of interests of section 739.[118] Plaintiffs also point to a District of Columbia case in which the Court held that the plaintiffs' environmental interests aligned with sections 230 and 739 of the 2019 Consolidated Appropriations Act.[119] In response, the Government points to a case in which the Southern District of Florida rejected an Indian Tribe's claim under a statutory appropriation to build a scenic road because the appropriations "protect no interests in

---

[114] *Id.* (quotation omitted).

[115] *Animal Legal Def. Fund, Inc. v. Glickman*, 154 F.3d 426, 434 n.7 (D.C. Cir. 1998) (en banc).

[116] *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 397 n.12 (1987).

[117] *See* Dkt. No. 34 at 40, ¶¶ 116–17.

[118] *Washington v. Trump*, 441 F. Supp. 3d 1101, 1117–18 (W.D. Wash. 2020), *vacated as moot*, No. 20-35371, 2022 U.S. App. LEXIS 1838 (9th Cir. Jan. 21, 2022).

[119] Dkt. No. 39 at 37, ¶ 65 (citing *Ctr. for Bio. Div'y v. Trump*, 453 F. Supp. 3d 11, 43 (D.D.C. 2020)).

quiet enjoyment or against nuisance" which the Tribe sought to vindicate.[120] In another case, the D.C. Circuit held that glass bottle manufacturers could not invoke an internal revenue statute regulating containers for distilled spirits because there was "no indicia that [plaintiffs'] competitive interests" were within the zone of interests of the statute.[121] The Fourth Circuit held that the corporate owner of a mall near an interstate highway could not vindicate its private property interests under the Federal-Aid Highway Act because the "FAHA was enacted with the purpose to improve the interstate highway system," not safeguard private property values.[122] The Court is skeptical of this Fourth Circuit opinion, however, because the Fourth Circuit admitted that the express purpose of the statute was to serve local and interstate commerce and nevertheless held the mall owner and its commercial interests inarguably outside the zone of interests of the statute.[123] In any event, none of these cases are controlling or particularly persuasive, because they did not confront the fact-specific question presently before the Court.

Plaintiffs argue that harm caused by illegal border crossings, consequent harm to the General Land Office's farm, and "border security and safety issues fall within the zone of interests of the CAAs [Consolidated Appropriations Acts] and the IIRIRA because the provisions [Plaintiffs] su[e] under explicitly relate to border security. . . . [T]hese provisions seek to achieve border security through the construction of border walls . . . ."[124] The Government counters that "[n]othing about the text or context of these statutes suggests any connection whatsoever to the interests of a state government agency or private party who asserts that federal spending decisions

---

[120] Dkt. No. 36 at 41, ¶ 58 (citing *Miccosukee Tribe of Indians of Fla. v. United States*, No. 08-23523-CIV, 2009 WL 10668917, at *4 (S.D. Fla. Sept. 30, 2009)).
[121] *Glass Packaging Inst. v. Regan*, 737 F.2d 1083, 1090 (D.C. Cir. 1984).
[122] *Taubman Realty Grp. v. Mineta*, 320 F.3d 475, 481 (4th Cir. 2003).
[123] *Id.* (quoting 23 U.S.C. § 101(b)).
[124] Dkt. No. 39 at 36, ¶ 64.

indirectly harm their property values,"[125] and that "border wall construction does not protect or regulate the property interests of State government agencies."[126]

The Court agrees with Plaintiffs. For purposes of analysis, the Court will recopy the precise statutory language that Plaintiffs invoke. The parties agree that the statutory language governing the Government's discretion with respect to the challenged border policies is located in the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) and the Consolidated Appropriations Act, 2019.[127] IIRIRA as currently amended, in section 102(b), provides that:

> [T]he Secretary of Homeland Security shall construct reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective and provide for the installation of additional physical barriers, roads, lighting, cameras, and sensors to gain operational control of the southwest border.[128]

This section of IIRIRA is separate from section 102(c), and therefore not impacted by the jurisdiction-stripping provision discussed above.[129] Additionally, the 2019 Consolidated Appropriations Act provides that:

> (a) Of the total amount made available under "U.S. Customs and Border Protection—Procurement, Construction, and Improvements", $2,370,222,000 shall be available only as follows:
>
> > (1) $1,375,000,000 is for the construction of primary pedestrian fencing, including levee pedestrian fencing, in the Rio Grande Valley Sector.[130]

The same Act further provides in section 739 that:

> None of the funds made available in this or any other appropriations Act may be used to increase, eliminate, or reduce funding for a program, project, or activity as proposed in the President's budget request for a fiscal year until such proposed change is subsequently enacted in an appropriation Act, or unless such change is

---

[125] Dkt. No. 36 at 41, ¶ 58.
[126] Dkt. No. 42 at 25, ¶ 31.
[127] Dkt. No. 34 at 16, ¶¶ 42–43; Dkt. No. 36 at 47–48, ¶¶ 69, 71; Dkt. No. 39 at 31, ¶ 52.
[128] 8 U.S.C. § 1103 note, § 102(b)(1)(A) (2009) (Improvement of Barriers at Border).
[129] *See supra* note 91.
[130] Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, § 230(a)(1), 133 Stat. 13, 28 (Feb. 15, 2019).

made pursuant to the reprogramming or transfer provisions of this or any other appropriations Act.[131]

Plaintiffs also cite to numerous statutes that direct that congressional appropriations be expended for the purpose for which they were appropriated,[132] and also point to the 2020 and 2021 Consolidated Appropriations Acts,[133] which use functionally identical language to the 2019 Act.[134]

Plaintiffs' argument that they are within the zone of interests of these statutes relies on two stacked inferences: (1) the statutes are concerned with regulating illegal border crossings, and (2) illegal border crossings that affect the General Land Office's farm situate the Texas General Land Office and its Commissioner within the zone of interests of the statutes. The first inference appears implicit in the statutes and unproblematic. While the second inference is somewhat of a stretch, the Court holds that it stands up to scrutiny. Plaintiffs do not assert mere generalized economic interests in the farm and generalized interests in border security and against trespass that could be shared by any farmer nationwide. Instead, Plaintiffs allege that they are specially impacted by the Government's border policies, which have transformed the farm "into a superhighway of illegal activity":

---

[131] *Id.* § 739, 133 Stat. at 197.

[132] Dkt. No. 39 at 39, ¶ 70 (first citing 31 U.S.C. § 1301(a) ("Appropriations shall be applied only to the objects for which the appropriations were made except as otherwise provided by law."); then citing 31 U.S.C. § 1532 ("An amount available under law may be withdrawn from one appropriation account and credited to another or to a working fund only when authorized by law. Except as specifically provided by law, an amount authorized to be withdrawn and credited is available for the same purpose and subject to the same limitations provided by the law appropriating the amount. A withdrawal and credit is made by check and without a warrant."); and then citing 31 U.S.C. § 1341(a)(1)(A) ("Except as specified in this subchapter or any other provision of law, an officer or employee of the United States Government or of the District of Columbia government may not make or authorize an expenditure or obligation exceeding an amount available in an appropriation or fund for the expenditure or obligation.")).

[133] Dkt. No. 34 at 19, ¶ 50.

[134] Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, § 209(a)(1), 133 Stat. 2317, 2511 (Dec. 20, 2019) ("Of the total amount made available under 'U.S. Customs and Border Protection—Procurement, Construction, and Improvements', $1,904,468,000 shall be available only as follows: $1,375,000,000 for the construction of barrier system along the southwest border . . . ."); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 210, 134 Stat. 1182, 1456–57 (Dec. 27, 2020) ("Of the total amount made available under 'U.S. Customs and Border Protection—Procurement, Construction, and Improvements', an amount equal to the amount made available in section 209(a)(1) of division D of the Consolidated Appropriations Act, 2020 (Public Law 116–93) shall be made available for the same purposes as the amount provided under such section in such Act.").

> Groups of 100 people or more are frequently apprehended on the GLO [General Land Office] Farm, where nearby buses are regularly stationed to haul them away by the busload. Farming operations have been impacted in several ways, including restricting the time frames that certain farming operations are or are not performed and the manner, method, and timing in which certain operations, such as the spraying of chemicals, are being conducted on the GLO Farm. Essential farm activities such as the sorting of crops can no longer be carried on at night due to security concerns.[135]

Given Plaintiffs' unique circumstances, the Court holds that their interests in border security are nonmarginal, and the zone of interests of the statutes invoked may embrace Plaintiffs without being rendered so capacious that the zone is functionally unfettered. Particularly given the presumptions in Plaintiffs' favor, the Court cannot say that Plaintiffs are *inarguably* outside the zone of interests.[136] The Court rejects the argument that Plaintiffs' APA claims are unreviewable because Plaintiffs are outside the zone of interests of the statutes invoked.

### ii. Agency Discretion Reviewability

The Government next argues that "the decisions GLO challenges are committed to agency discretion as a matter of law, and therefore unreviewable" under the APA.[137] Plaintiffs contend that the Fifth Circuit has rejected the Government's unreviewability argument and that the Government policies at issue are administrative rules that are fully reviewable.[138] The Government denies that the policies and agency actions at issue constitute agency rules and argues, even if they do, they are nevertheless unreviewable.[139]

As for what precise agency action and policies are at issue, Plaintiffs contend that the "policies described in the DHS Plan are 'rules' within the meaning of the APA" and that the DHS

---

[135] Dkt. No. 34 at 34, ¶ 82.
[136] *See supra* notes 109, 114.
[137] Dkt. No. 36 at 45, ¶ 65.
[138] Dkt. No. 39 at 38–39, ¶¶ 68–70.
[139] Dkt. No. 42 at 18–19, ¶¶ 17–20.

Plan improperly halted border wall construction.[140] The "DHS Plan" is a five-page memorandum dated June 9, 2021,[141] that issued pursuant to the President's January 20, 2021, proclamation which directed the Secretary of Homeland Security and other federal officials to "develop a plan for the redirection of funds concerning the southern border wall, as appropriate and consistent with applicable law."[142] Plaintiffs argue that the DHS Plan sets forth that border wall "construction has been and will continue to be halted," so the DHS Plan affects substantive policy and constricts "the discretion of agency officials by largely determining the issue addressed."[143] Plaintiffs appear to argue that, because the DHS Plan effects a "complete suspension of border wall construction" prospectively and across the country, without any discretion on the part of any official to construct any border wall, it is therefore a substantive rule that must have undergone notice-and-comment rulemaking and should be set aside for its failure to do so.[144]

Unfortunately, the parties gloss over a crucial part of the Court's analysis.[145] "Final agency action . . . is a jurisdictional prerequisite of judicial review."[146] The APA permits judicial review only of final agency action.[147] If the DHS Plan does not constitute final agency action, it is judicially unreviewable.[148] Therefore, the Court must analyze whether the DHS Plan "(1) marks the consummation of the agency's decisionmaking process and (2) [is the agency action] by which rights or obligations have been determined, or from which legal consequences will flow. The Supreme Court has long taken a pragmatic approach to finality, viewing the APA's finality

---

[140] Dkt. No. 39 at 41, ¶¶ 74–75.

[141] Dkt. No. 36-2.

[142] Proclamation No. 10142, § 2, 86 Fed. Reg. 7,225, 7,226 (Jan. 20, 2021).

[143] Dkt. No. 39 at 42, ¶ 76 (quoting *Texas v. United States*, 809 F.3d 134, 176 n.145 (5th Cir. 2015), *aff'd by an equally divided court*, 579 U.S. 547 (2016) (mem.)).

[144] *Id.* at 39–42, ¶¶ 70–76.

[145] *But see* Dkt. No. 39 at 43, ¶ 79 (citing *Louisiana v. Biden*, 543 F. Supp. 3d 388 (W.D. La. 2021)).

[146] *Louisiana v. U.S. Army Corps of Eng'rs*, 834 F.3d 574, 584 (5th Cir. 2016).

[147] *Texas v. Biden*, 20 F.4th 928, 947 (5th Cir. 2021) (quoting 5 U.S.C. § 704), *rev'd on other grounds*, 142 S. Ct. 2528 (2022)).

[148] *See Texas v. EEOC*, 933 F.3d 433, 440 n.8 (5th Cir. 2019).

requirement as flexible."[149] That agency action is later revisable "does not make an otherwise definitive decision nonfinal."[150]

The Court holds that the June 2021 DHS Plan constitutes final agency action. The President's January 20, 2021 proclamation immediately paused construction of a border wall and directed the Secretary of Homeland Security and other federal officials to "develop a plan for the redirection of funds concerning the southern border wall" by March 21, 2021.[151] The "Department of Homeland Security Border Wall Plan Pursuant to Presidential Proclamation 10142" was released on June 9, 2021, and set forth the agency's plan for the redirection of funds.[152] The DHS Plan does not purport to be interim or leave any southwest border wall matters pending for a later determination. The DHS Plan is therefore the consummation of the agency's decision-making process respecting the plan and policies for the southwest border. Indeed, the Plan "bound DHS staff by forbidding them to continue the program [of border wall construction] in any way from that moment on."[153] Furthermore, the legal consequences of the DHS Plan are obvious. The Department of Homeland Security "suspended performance of all border barrier contracts and southwest border barrier construction activities,"[154] and "DHS estimates up to an additional $275 million in cost overrun due to the existing suspension of contract performance,"[155] all of which cause legal consequences to taxpayers, construction contracting parties and their subcontractors, and to Plaintiffs who are allegedly harmed by the Government's failure to construct the border wall. That DHS's policies may change in the future does not make their presently definitive

---

[149] *Id.* at 441 (cleaned up).
[150] *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 598 (2016).
[151] Proclamation No. 10142, 86 Fed. Reg. 7,225 (Jan. 20, 2021).
[152] *See* Dkt. No. 36-2.
[153] *Biden v. Texas*, 142 S. Ct. 2528, 2545 (2022) (quoting *Texas v. Biden*, 20 F.4th 928, 947 (5th Cir. 2021)).
[154] Dkt. No. 36-2 at 2.
[155] *Id.* at 5.

decision nonfinal.[156] Furthermore, the fact that the DHS Plan suspends border barrier activity, rather than permanently cancels or terminates any future activity outright, is of no moment to ascertaining that the DHS Plan constitutes final agency action.[157] For example, this Court held that the DHS's "100-day pause on removals" of aliens already subject to an order of removal constituted final agency action, even though the policy was a definite pause.[158] The D.C. Circuit held that "the Environmental Protection Agency's decision to stay implementation of portions of a final rule concerning methane and other greenhouse gas emissions," pending reconsideration of that final rule, nevertheless constituted final agency action.[159] The DHS Plan constitutes "final agency action" under 5 U.S.C. § 704 and is subject to judicial review.

The Court pauses here to note that DHS has undertaken additional agency action since the advent of this case. For example, in May 2022, DHS announced that it was moving forward "with projects in the . . . Rio Grande Valley Secto[r] to address life, safety, environmental, or other remediation requirements in accordance with the Department's [June 2021] plan for the use of border barrier funds."[160] In July 2022, DHS promulgated a three-page amendment to its June 2021 plan.[161] The "Amendment to DHS Border Wall Plan Pursuant to Presidential Proclamation 10142" is not a complete revision.[162] DHS explains that it "found that the remediation and mitigation requirements from past barrier construction are more substantial than anticipated" and that

---

[156] *See supra* note 150.

[157] *See Louisiana v. Biden*, 543 F. Supp. 3d 388, 408 (W.D. La. 2021) (collecting cases), *appeal filed*, (5th Cir. Aug. 17, 2021) (No. 21-30505).

[158] *Texas v. United States*, 524 F. Supp. 3d 598, 642 (S.D. Tex. 2021) (Tipton, J.).

[159] *Clean Air Council v. Pruitt*, 862 F.3d 1, 7 (D.C. Cir. 2017) (per curiam).

[160] *DHS to Address Life, Safety, Environmental, and Operational Considerations for Border Barrier Projects in California, Arizona, and Texas*, U.S. DEP'T OF HOMELAND SEC. (May 27, 2022), https://www.dhs.gov/news/2022/05/27/dhs-address-life-safety-environmental-and-operational-considerations-border-barrier.

[161] *DHS Update on Border Wall Remediation Efforts*, U.S. DEP'T OF HOMELAND SEC. (July 11, 2022), https://www.dhs.gov/news/2022/07/11/dhs-update-border-wall-remediation-efforts [https://perma.cc/NRA6-ZU4Z].

[162] *See* Dkt. No. 52-1 at 36–38.

"installation of barrier system attributes, which may include, as appropriate to each location, lighting, cameras, and detection technology, in areas where physical barrier has already been constructed," is consistent with its appropriations.[163] Accordingly, DHS will be spending its appropriations on, for example, "close out or remediation actions" including mitigation of environmental damage, and "installation of barrier system attributes" such as lighting and detection technology.[164] The July 2022 amendment does not indicate that DHS will undertake any new border barrier or fencing construction, and is consistent with the June 2021 plan.[165] Lastly, a recent DHS press release indicates the Government will "execute the Yuma Morelos Dam Project to close four gaps located within an incomplete border barrier project near the Morelos Dam in the U.S. Border Patrol's Yuma Sector" using fiscal year 2021 appropriations.[166] However, this single exception does not represent a sea change to the Government's 2021 and 2022 DHS plans. Therefore, for purposes of analysis, the Court will focus on the June 2021 DHS Plan.

The Court now turns to whether the DHS Plan is judicially reviewable. The APA embodies a basic presumption of judicial review, but "agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law.'"[167] Plaintiffs first contend that the exemption from judicial review of agency action that is committed to agency discretion by law does not apply at all to agency rules, and the agency action at issue is a rule as opposed to an order, so it cannot be exempted from judicial review.[168] Plaintiffs invoke a recent Fifth Circuit holding

---

[163] *Id.* at 36, § I.

[164] *Id.* at 37, § III.

[165] *See* Dkt. No. 54 at 3 ("[B]ecause the Amended Plan expressly allocates all FY 2020 and FY 2021 appropriations away from border-barrier construction, the government can no longer claim it is complying with Congress's mandate to build border barriers because it will build a border wall in the future.").

[166] *DHS to Address Life, Safety, and Operational Requirements in the U.S. Border Patrol's Yuma Sector*, U.S. Dep't of Homeland Sec. (July 28, 2022), https://www.dhs.gov/news/2022/07/28/dhs-address-life-safety-and-operational-requirements-us-border-patrols-yuma-sector.

[167] *Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993) (quoting 5 U.S.C. § 701(a)(2)).

[168] Dkt. No. 39 at 38, ¶¶ 68–69.

to argue that the agency action at issue is a rule subject to judicial review.[169] Plaintiffs also argue that the DHS Plan is an agency rule that is judicially reviewable because it violates numerous statutes.[170]

Under the APA, certain governmental decisions are committed to agency discretion and are not subject to judicial review.[171] The APA in section 701(a)(2) exempts federal agency decisions from judicial review to the extent that "agency action is committed to agency discretion by law."[172] "To 'honor the presumption of review, [the United States Supreme Court has] read the exception in § 701(a)(2) quite narrowly,' confining it to those rare 'administrative decision[s] traditionally left to agency discretion.'"[173] The APA "makes it clear that 'review is not to be had' in those rare circumstances where the relevant statute 'is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'"[174] For example, the D.C. Circuit dealt with a federal statute that directed that money appropriated "shall be available to provide assistance to dairy producers in a manner determined by the Secretary," and held that the statutory language provided "no relevant 'statutory reference point' for the court other than the decisionmaker's own views of what is an 'appropriate' manner of distribution . . . ."[175] The D.C. Circuit therefore concluded that the district court lacked subject matter jurisdiction under the APA to second-guess the Secretary's allocation.[176] Conversely, the presumption of agency action unreviewability "may be rebutted where the substantive statute has provided guidelines for

---

[169] *Id.* (quoting *Texas v. Biden*, 20 F.4th 928, 980 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022)).
[170] *Id.* at 38–39, ¶¶ 68–70.
[171] *Lincoln v. Vigil*, 508 U.S. 182, 190–91 (1993).
[172] 5 U.S.C. § 701(a)(2).
[173] *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1905 (2020) (second alteration in original) (first quoting *Weyerhaeuser Co.* v. *U.S. Fish and Wildlife Serv.*, 139 S.Ct. 361, 370 (2018); and then quoting *Lincoln*, 508 U.S. at 191).
[174] *Lincoln*, 508 U.S. at 191 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)).
[175] *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002).
[176] *Id.* at 752.

the agency to follow in exercising its enforcement powers. Thus, in establishing this presumption in the APA, Congress did not set agencies free to disregard legislative direction in the statutory scheme that the agency administers."[177] The Fifth Circuit colorfully elaborated, "[i]n other words, the executive *cannot* look at a statute, recognize that the statute is telling it to enforce the law in a particular way or against a particular entity, and tell Congress to pound sand."[178]

Again, the parties agree that the statutory language governing the Government's discretion with respect to the challenged policies is located in IIRIRA and the Consolidated Appropriations Act, 2019.[179] The governing statutory language is the same.[180]

The Court holds that the agency action at issue is not committed to agency discretion by law under 5 U.S.C. § 701(a)(2) such that it is judicially unreviewable. The IIRIRA specifically directs the Secretary of Homeland Security to construct reinforced fencing and the 2019 Consolidated Appropriations Act appropriates funds for the construction of primary pedestrian fencing, but the Department of Homeland Security's stated plan developed after months of consideration is to suspend all fencing construction indefinitely. Specifically, the DHS Plan states that the Department:

> has, without deobligating funds,[1] suspended performance of all border barrier contracts and southwest border barrier construction activities, with the exception of activities related to ensuring project sites are safe and secure in accordance with the terms and conditions of the contracts.
> [1] DHS has continued to pay invoices in accordance with its obligations under existing contracts.[181]

The Court holds that this Plan substantively and justiciably conflicts with the relevant statutes. IIRIRA directs that the Secretary *shall* construct 700 miles of border fencing and the 2019

---

[177] *Heckler v. Chaney*, 470 U.S. 821, 833 (1985) (footnote omitted).
[178] *Texas v. Biden*, 20 F.4th 928, 982 (5th Cir. 2021), *rev'd*, 142 S. Ct. 2528 (2022).
[179] Dkt. No. 36 at 47–48, ¶¶ 69, 71; Dkt. No. 39 at 31, ¶ 52.
[180] *See supra* notes 128, 130.
[181] Dkt. No. 36-2 at 2.

Consolidated Appropriations Act directs funds to be expended *only* for the construction of pedestrian fencing, but the DHS Plan purports to suspend all fencing construction everywhere indefinitely. This is a substantive conflict.[182] Moreover, the fact that the DHS Plan merely suspends border barrier construction—as opposed to outright terminating construction permanently—does not save the DHS Plan from substantively conflicting with the governing statutes.[183]

### iii. Programmatic Challenge

The Government next argues that Plaintiffs' attacks constitute impermissible generalized programmatic challenges to the Government's southwest border policies that are nonjusticiable.[184] Plaintiffs argue that their challenges are not generalized and do attack particular policies and discrete agency actions.[185] The Government contends that Plaintiffs effectively seek wholesale overhaul of the Government's border wall program which cannot be accomplished by court decree.[186]

Under the APA, Plaintiffs will not be heard to generally complain of an agency program. A plaintiff "must direct its attack against some particular 'agency action' that causes it harm."[187] Lawsuits seeking to enforce a "categorical imperative" of a statute or correct "[g]eneral deficiencies" in an agency program will fail.[188] This is because:

> [i]f courts were empowered to enter general orders compelling compliance with broad statutory mandates, they would necessarily be empowered, as well, to determine whether compliance was achieved—which would mean that it would ultimately become the task of the supervising court, rather than the agency, to work out compliance with the broad statutory mandate, injecting the judge into day-to-day agency management.[189]

---

[182] *See supra* notes 177–178.
[183] *See Texas v. United States*, 524 F. Supp. 3d 598, 649–50 (S.D. Tex. 2021) (Tipton, J.) (collecting authorities).
[184] Dkt. No. 36 at 49–50, ¶ 75.
[185] Dkt. No. 39 at 42–43, ¶ 78.
[186] Dkt. No. 42 at 21–22, ¶ 24.
[187] *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990).
[188] *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66 (2004).
[189] *Id.* at 66–67.

Thus, attacks under § 706(1) of the APA "can proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*."[190] However, "a challenge to discrete agency action is permissible even when such a challenge has the effect of requiring a whole program to be revised by the agency."[191] Plaintiffs point to a Western District of Louisiana opinion in which the court held the Biden Administration's decision to pause all oil and gas leases as systematically violative of two governing statutes.[192] The Government counters with a District of Arizona opinion that held that IIRIRA's requirement for the Secretary to gain "operational control" over the southwest border was not sufficiently discrete to be subject to APA challenge.[193]

For the same reasons discussed above, the Court holds that Plaintiffs are not asserting an impermissible programmatic challenge. IIRIRA and the 2019 Consolidated Appropriations Act require the construction of border fencing. The June 2021 DHS Plan indefinitely suspends all "southwest border barrier construction activities" except safety cleanup.[194] Plaintiffs challenge this discrete agency action. Their challenge is not directed to general and nondiscrete deficiencies, even if their challenge will ultimately require the Government to revise its southwest border policies.[195]

### 5. *Reviewability of Constitutional Claims*

The Government asserts that Plaintiffs' constitutional claims (counts one through four) should all be dismissed because they are not within the zone of interests of the constitutional

---

[190] *Id.* at 64 (emphases in original).

[191] *Rollerson v. Brazos River Harbor Nav. Dist.*, 6 F.4th 633, 646 n.7 (5th Cir. 2021) (cleaned up).

[192] Dkt. No. 39 at 43, ¶ 79 (quoting *Louisiana v. Biden*, 543 F. Supp. 3d 388, 409 (W.D. La. 2021)).

[193] Dkt. No. 42 at 22, ¶ 25 (quoting *United States v. Arizona*, No. CV 10-1413-PHX-SRB, 2011 WL 13137062, at *8 (D. Ariz. Oct. 21, 2011)).

[194] Dkt. No. 36-2 at 2.

[195] *See supra* notes 190–191.

guarantees.[196] Plaintiffs respond that the zone-of-interest test does not apply to constitutional claims,[197] and even if it does, Plaintiffs satisfy the test.[198]

The first question is whether Plaintiffs' claims must satisfy the zone of interest test. The United States Supreme Court "has required that the plaintiff's complaint fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'"[199] The Supreme Court has previously applied the zone-of-interest test to certain plaintiffs' claim under the Commerce Clause.[200] Plaintiffs assert that *Lexmark International, Inc. v. Static Control Components, Inc.* overruled the notion that the zone of interest applies to constitutional claims, and that the Supreme Court has repeatedly analyzed constitutional claims without analyzing the respective zones of interest.[201] In *Lexmark*, however, the Supreme Court merely held that the zone-of-interest test applies to all statutory claims.[202] To read that opinion as holding that the zone-of-interest test *does not apply* to *any* constitutional claims is fallacious. It is the logical equivalent of asserting: "If it is a cat, then it needs a collar. Therefore, if it is a dog, it must not have a collar." Moreover, even if Plaintiffs correctly identify that the Supreme Court has ruled on constitutional claims without addressing the zones of interest, it is again fallacious to contend that silence on an issue constitutes assent or dissent. Plaintiffs' argument is the logical equivalent of witnessing a street speaker declare a person guilty of crimes, then assuming that everyone in the audience by their silence agrees with the speaker's judgment of guilt. Post-*Lexmark*, the Third Circuit still requires the zone-of-interest test applied to constitutional claims.[203] Most importantly, in a post-

---

[196] Dkt. No. 36 at 64, ¶ 106.
[197] Dkt. No. 39 at 47, ¶¶ 90–92.
[198] *Id.* at 49, ¶¶ 94–95.
[199] *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)).
[200] *Bos. Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 320 n.3 (1977).
[201] Dkt. No. 39 at 47, ¶¶ 90–91.
[202] 572 U.S. 118, 129–30 (2014).
[203] *See Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 805 F.3d 98, 105–06 (3d Cir. 2015)).

*Lexmark* case, the Fifth Circuit—while not addressing the plaintiffs' constitutional claim—quoted the longstanding Supreme Court precedent that a plaintiff "must be defending concerns that are 'arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'"[204] This Court does not hold that the zone-of-interest test—which the Supreme Court has characterized as a "limitation [that] *always* applies and is never negated"[205]— has been *sub silentio* rendered inapplicable to constitutional claims.

Plaintiffs' counts one through four are cast as constitutional claims. Specifically, count one alleges violation of the constitutional separation of powers. Count two alleges violation of the Appropriations Clause, Article I, section 9, clause 7. Count three alleges violation of the Take Care Clause, Article II, section 3, clause 5. Count four alleges violation of the presentment clause, Article I, section 7, clause 2.[206] The Government argues that these claims are actually statutory claims foreclosed by *Dalton v. Specter*.[207] In *Dalton*, shipyard employees sought to enjoin the President from closing a Navy shipyard. In pertinent part, the Supreme Court held that not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution," so claims alleging statutory violations are not necessarily constitutional claims subject to judicial review.[208] Applying this jurisprudence, the D.C. Circuit, in dealing with claims that President Trump's proclamation unconstitutionally reallocated funds to support border wall construction, held that the plaintiffs' claims were merely recast statutory claims and must be dismissed.[209]

---

[204] *Texas v. United States*, 809 F.3d 134, 161 (5th Cir. 2015) (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 396 (1987)).

[205] *Lexmark Int'l, Inc.*, 572 U.S. at 129 (emphasis in original).

[206] Dkt. No. 34 at 35–39.

[207] Dkt. No. 36 at 64, ¶ 107 (citing 511 U.S. 462, 472–73 (1994)).

[208] 511 U.S. at 472–73.

[209] *Ctr. for Bio. Div'y v. Trump*, 453 F. Supp. 3d 11, 53 (D.D.C. 2020).

This Court agrees with the D.C. Circuit's analysis and applies that holding here. Plaintiffs contend that the only source of authority for President Biden's January 20, 2021 proclamation ordering the "redirection of funds concerning the southern border wall"[210] must have been the Constitution,[211] but Article II vests the President with *unquestionable* executive authority to direct and control subordinate federal officials,[212] the Court has already dismissed President Biden from this action,[213] and the focal point of Plaintiffs' claims and this Court's analyses are whether the Government violated IIRIRA and the border barrier appropriations.[214] Indeed, Plaintiffs claim that "the [President's] Proclamation intrudes upon the *statutory authority* conferred on DHS."[215] Plaintiffs do allege that "the Proclamation *and* DHS Plan unconstitutionally and unlawfully seek to exercise quintessentially legislative powers that the Constitution vests exclusively in Congress,"[216] but the proclamation itself is not self-executing and instead merely directs federal officials.[217] When challenged on the particulars, Plaintiffs only respond that *generally* they may attack unconstitutional executive action, without *specifically* showing why the President's proclamation in and of itself violated the Constitution in a way distinct from Plaintiffs' statutory claims.[218] Therefore, "[a]t bottom," Plaintiffs only allege that the Government exceeded its statutory authority.[219] The Court agrees that, under *Dalton*, Plaintiffs' alleged constitutional claims are not subject to judicial review.[220] The Court therefore **DISMISSES** counts one through four.[221]

---

[210] Proclamation No. 10142, 86 Fed. Reg. 7,225 (Jan. 20, 2021).

[211] Dkt. No. 39 at 49–50, ¶ 96.

[212] *See Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982).

[213] *See supra* note 85 and surrounding text.

[214] *See supra* notes 124 and 179 and surrounding text.

[215] Dkt. No. 34 at 42, ¶ 124 (emphasis added).

[216] Dkt. No. 34 at 36, ¶ 92 (emphasis added).

[217] *See* Dkt. No. 42 at 47, ¶ 83.

[218] *See* Dkt. No. 39 at 51–52, ¶ 98.

[219] *Ctr. for Bio. Div'y v. Trump*, 453 F. Supp. 3d 11, 53 (D.D.C. 2020).

[220] *See Dalton v. Specter*, 511 U.S. 462, 473–74 (1994).

[221] *See supra* note 206.

### 6.  *Reviewability of Ultra Vires Claims*

In Plaintiffs' count five for violation of budgetary statutes, count six for violation of IIRIRA, and count seven for substantive violation of the APA, Plaintiffs assert that they "have a non-statutory right of action to enjoin and declare unlawful official action that is *ultra vires*."[222] The Government argues that Plaintiffs may not invoke an ultra vires cause of action.[223]

The Supreme Court has rejected the view that its jurisprudence authorizes "judicial review of any agency action that is alleged to have exceeded the agency's statutory authority."[224] Interpreting this precedent, the D.C. Circuit recognized "that nonstatutory review is intended to be of extremely limited scope" and is a difficult course for plaintiffs to tread,[225] and the First Circuit held that plaintiffs must show (1) nonfinal agency action that wholly deprives plaintiffs of a meaningful opportunity to vindicate their rights, and (2) Congress must not have intended to preclude review of the agency action.[226] Then-Judge Kavanaugh, speaking for the majority of the D.C. Circuit, elaborated that an ultra vires claim "is essentially a Hail Mary pass—and in court as in football, the attempt rarely succeeds."[227] Importantly, the Fifth Circuit held that:

> [T]he exception allowing review of an "agency action allegedly 'in excess of authority' must not simply involve a dispute over statutory interpretation . . . . [T]he agency's challenged action [must be] so contrary to the terms of the relevant statute that it necessitates judicial review independent of the review provisions of the relevant statute."[228]

---

[222] Dkt. No. 34, ¶¶ 120, 132, 143.
[223] Dkt. No. 36 at 56, ¶ 89.
[224] *Bd. of Govs. of Fed. Reserve Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991).
[225] *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 190 (D.C. Cir. 2006) (quotation omitted).
[226] *R.I. Dep't of Env't Mgmt. v. United States*, 304 F.3d 31, 42–43 (1st Cir. 2002) (quoting *MCorp Fin., Inc.*, 502 U.S. at 43–44).
[227] *Nyunt v. Chairman, Broad. Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009).
[228] *Am. Airlines, Inc. v. Herman*, 176 F.3d 283, 293 (5th Cir. 1999) (quoting *Kirby Corp. v. Pena*, 109 F.3d 258, 269 (5th Cir. 1997)).

While Plaintiffs correctly note that the ultra vires cause of action has not been rendered unavailable by the APA,[229] the rule remains that ultra vires claims are rarely successfully invoked and only lie when judicial review is necessitated independent of statute,[230] or when a plaintiff would otherwise be wholly deprived of a meaningful opportunity of vindicating its rights.[231] Plaintiffs should not be entitled to circumvent statutes or obtain a more favorable standard of review via ultra vires claims.[232] The Court holds that the APA furnishes Plaintiffs with an adequate and meaningful cause of action to set aside agency action not in accordance with law or the Constitution or in excess of statutory jurisdiction or authority.[233] Indeed, the APA challenge is the heart of Plaintiffs' claims.[234] Therefore, to the extent Plaintiffs allege ultra vires claims, such claims are **DISMISSED**.

The foregoing addresses all of the parties' arguments concerning the jurisdiction and justiciability of Plaintiffs' claims. The Court now turns to whether remaining claims are well-pled or should be dismissed.

### b. Merits

#### 1. *Count VIII: Procedural Violation of APA*

The Court now turns to the parties' arguments concerning Plaintiffs' allegation that the Government procedurally violated the Administrative Procedure Act. Plaintiffs allege that "[t]he DHS Plan and other acts taken to implement the Proclamation were major agency actions that could not lawfully be conducted without compliance with APA procedures such as notice-and-

---

[229] *See Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988).
[230] *Kirby Corp.*, 109 F.3d at 269; *accord Herman*, 176 F.3d at 293–94.
[231] *See Bd. of Govs. of Fed. Rsrv. Sys. v. MCorp Fin., Inc.*, 502 U.S. 32, 43 (1991).
[232] *See Puerto Rico v. United States*, 490 F.3d 50, 60 (1st Cir. 2007).
[233] *See* 5 U.S.C. § 706(2) (the Court may set aside agency action "in excess of statutory jurisdiction, authority, or limitations").
[234] *See* Dkt. No. 34 at 44, ¶ 132; *see supra* notes 104 and 124 and accompanying text.

comment rulemaking," so Plaintiffs claim that such agency actions are void under the APA.[235] The Government moves to dismiss this claim, arguing that the agency actions are policy statements or interpretive rules that are exempt from notice-and-comment rulemaking requirements.[236] Plaintiffs respond that the agency actions were plainly substantive rules.[237]

The parties are invoking the distinction between substantive and interpretative rules or policy statements "that courts and commentators have described . . . as, inter alia, tenuous, fuzzy, blurred, baffling, and enshrouded in considerable smog."[238] Adjudicating whether promulgation of the DHS Plan is a substantive rule is not simple. The APA defines a rule as:

> the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy or describing the organization, procedure, or practice requirements of an agency . . . .[239]

However, while this definition is broad enough "to include virtually every statement an agency may make,"[240] substantive rules that require notice-and-comment rulemaking—as distinguished from nonsubstantive or interpretive rules—are those that "grant rights, impose obligations, or produce other significant effects on private interests. They also narrowly constrict the discretion of agency officials by largely determining the issue addressed."[241] "An agency rule that modifies substantive rights and interests can only be nominally procedural, and the exemption [from notice and comment] for such rules of agency procedure cannot apply."[242]

---

[235] Dkt. No. 34 at 47, ¶¶ 150–52.
[236] Dkt. No. 36 at 51, ¶ 78.
[237] Dkt. No. 39 at 41, ¶¶ 74–76.
[238] *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 595 n.14 (5th Cir. 1995) (internal quotation marks omitted).
[239] 5 U.S.C. § 551(4).
[240] *Avoyelles Sportsmen's League, Inc. v. Marsh*, 715 F.2d 897, 908 (5th Cir. 1983).
[241] *Texas v. United States*, 809 F.3d 134, 176 n.145 (5th Cir. 2015) (quoting *Marsh*, 715 F.2d at 908), *quoted in* Dkt. No. 39 at 42, ¶ 76.
[242] *U.S. Dep't of Lab. v. Kast Metals Corp.*, 744 F.2d 1145, 1153 (5th Cir. 1984), *quoted in Texas*, 809 F.3d at 176.

The Court holds, for essentially the same reasons that promulgation of the DHS Plan constituted judicially reviewable final agency action, that Plaintiffs adequately allege that the DHS Plan is a substantive rule subject to notice-and-comment rulemaking.[243] The Government first contends that the "RGV-09 project GLO would like the government to resume was not subjected to notice-and-comment rulemaking," so its repeal also cannot be.[244] But as the Government's own cited case explains, that principle only applies if the rule is interpretive in the first place,[245] so the Government's argument fallaciously begs the question. The Government then argues that the DHS Plan is an interpretive rule because it "leaves DHS free to exercise its discretion in the manner it sees fit moving forward as to any particular border infrastructure project," it does not implement any substantive actions to carry out the plan, and it does not have a legal effect on the public.[246] The Court disagrees. The DHS Plan suspends "performance of all border barrier contracts and southwest border barrier construction activities," without any further discretion on the part of any official.[247] Pursuant to that plan, DHS intended to "cancel . . . all border barrier contracts located in the Rio Grande Valley Sector."[248] There is no discretionary play in the joints; while the DHS Plan is revisable, the current plan substantively halts all border barrier construction. Also, again, this agency decision has multiple effects on public and on private interests[249]: it impacts taxpayers and their expenditures, it impacts contractors and subcontractors interested in border wall construction, and it allegedly impacts Plaintiffs harmed by consequent illegal border crossings.

---

[243] *See supra* note 155 and surrounding text.

[244] Dkt. No. 36 at 51, ¶ 78.

[245] *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 101 (2015) ("Because an agency is not required to use notice-and-comment procedures to issue an initial interpretive rule, it is also not required to use those procedures when it amends or repeals that interpretive rule.").

[246] Dkt. No. 36 at 53, ¶ 82.

[247] Dkt. No. 36-2 at 2, § I.

[248] *DHS to Terminate Border Barrier Contracts in Laredo and Rio Grande Valley*, U.S. DEP'T OF HOMELAND SEC. (Oct. 8, 2021), https://www.dhs.gov/news/2021/10/08/dhs-terminate-border-barrier-contracts-laredo-and-rio-grande-valley.

[249] *See supra* note 155 and accompanying text.

These are plainly significant effects on private interests.[250] The DHS Plan therefore meets the definitional test of a substantive rule because it constrains agency discretion and produces significant effects on private interests.

The Government last contends that the DHS Plan is no more than a general statement of policy not subject to notice and comment.[251] However, general statements of policy are only explanations of how an agency will exercise its discretionary power, such as in allocating funds from a lump sum appropriation,[252] or what factors an agency will consider in making classifications,[253] which are distinct from the current agency action at issue which directly affects public and private interests. The Court therefore **DENIES** the Government's motion to dismiss to the extent it seeks to dismiss Plaintiffs' count eight for a procedural violation of the APA by promulgating a substantive rule without notice and comment under 5 U.S.C. § 553.

### 2. *Count IX: Violation of the Regulatory Flexibility Act*

Plaintiffs allege that the Government failed to publish an initial and final regulatory flexibility analysis as required by the Regulatory Flexibility Act.[254] The Government moves to dismiss this claim for four reasons, including the argument that Plaintiffs' RFA claim is not subject to judicial review.[255]

The Regulatory Flexibility Act generally requires an agency to describe a rule's impact on small entities.[256] The RFA strictly circumscribes judicial review.[257] First, alleged noncompliance with section 603, requiring publication of an initial regulatory flexibility analysis, is not judicially

---

[250] *See* supra note 241.
[251] Dkt. No. 42 at 20–21, ¶ 22.
[252] *See Lincoln v. Vigil*, 508 U.S. 182, 197 (1993)
[253] *Pros. & Patients for Customized Care v. Shalala*, 56 F.3d 592, 601 (5th Cir. 1995).
[254] Dkt. No. 34 at 48, ¶ 155.
[255] Dkt. No. 36 at 53–54, ¶¶ 83–84.
[256] *See* 5 U.S.C. § 603(a).
[257] *Id.* § 611(c) ("Compliance or noncompliance by an agency with the provisions of this chapter shall be subject to judicial review only in accordance with this section.").

reviewable.[258] Second, alleged noncompliance with section 604, requiring publication of a final regulatory flexibility analysis, is generally a claim limited to small entities.[259] A small entity may include a small government jurisdiction, such as "governments of cities, counties, towns, townships, villages, school districts, or special districts, with a population of less than fifty thousand," unless the agency at issue creates an exception.[260] Plaintiffs Texas General Land Office and its Commissioner are statewide offices, elected statewide,[261] with statewide jurisdiction.[262] Plaintiffs do not meet the definition of a small entity and cannot invoke the RFA under section 611(a)(1).[263] Third, section 611(a)(2) provides that "[e]ach court having jurisdiction to review such rule [that is, any rule subject to the RFA] for compliance with section 553, or under any other provision of law, shall have jurisdiction to review any claims of noncompliance" with, *inter alia*, section 604. This confusingly written statute has bedeviled more than one court.[264] However, section 611(a)(2) does not expand the class of plaintiffs that may seek judicial review.[265] Instead, 5 U.S.C. § 704 furnishes judicial review over "[a]gency action made reviewable by statute," and section 611(a)(2) simply makes RFA claims justiciable when brought by a proper plaintiff. As provided in the immediately following subsection, only "[a] *small entity* may seek such review."[266] Accordingly, Plaintiffs also cannot invoke the RFA under section 611(a)(2). Lacking any viable Regulatory Flexibility Act cause of action, the Court **GRANTS** the

---

[258] *Allied Local & Reg'l Mfrs. Caucus v. U.S. EPA*, 215 F.3d 61, 79 (D.C. Cir. 2000) (citing 5 U.S.C. §§ 611(a)(1)–(2)).

[259] *See* 5 U.S.C. § 611(a)(1).

[260] 5 U.S.C. §§ 601(5)–(6).

[261] Tex. Const. art. IV, § 23.

[262] *See* Tex. Const. art. IV, § 1; Tex. Nat. Res. Code Ann. § 31.051(2) (West 2022).

[263] *See Alabama v. Ctrs. for Medicare & Medicaid Servs.*, No. 2:08-CV-881-MEF-TFM, 2010 WL 1268090, at *7 (M.D. Ala. Mar. 30, 2010).

[264] *See id.* at *8 (citing *Navajo Ref. Co., L.P. v. United States*, 58 Fed. Cl. 200, 206 n.7 (2003)).

[265] *See id.*

[266] 5 U.S.C. § 611(a)(3)(A) (emphasis added).

Government's motion to dismiss to the extent it seeks to dismiss Plaintiffs' count eight. Plaintiffs'

claim for a violation of the Regulatory Flexibility Act is **DISMISSED**.

### c.   Conclusion

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** the

Government's motion to dismiss.[267] The Government's motion is **GRANTED** to the extent that

Plaintiffs' counts one through six and nine are **DISMISSED**. Plaintiffs' counts seven and eight

claims for violations of the Administrative Procedure Act survive.

### III. *MISSOURI V. BIDEN* MOTION TO DISMISS

Having resolved the Government's first motion to dismiss, the Court turns in this Part to

the *Missouri v. Biden* motion to dismiss.

### a.   Claim Splitting

First, the Government argues that Plaintiff State of Texas's case must be dismissed in its

entirety because it violates the rule against claim splitting.[268] The Court will first address this global

argument.

#### 1.   *Legal Standard*

In the Fifth Circuit, there is a "rule preventing claim splitting . . . to protect the defendant

from being harassed by repetitive actions based on the same claim."[269] "When a plaintiff files a

second complaint alleging the same cause of action as a prior, *pending,* related action, the second

complaint may be dismissed."[270] The rule "prohibits a plaintiff from prosecuting its case piecemeal

and requires that all claims arising out of a single wrong be presented in one action. In a claim

---

[267] Dkt. No. 36.
[268] Dkt. No. 35 at 33, ¶ 44.
[269] *In re Super Van Inc.*, 92 F.3d 366, 371 (5th Cir. 1996), *quoted in Bank of N.Y. Mellon v. Riley*, No. 21-40383, 2022 WL 1773364, at *3 (5th Cir. June 1, 2022) (per curiam).
[270] *Oliney v. Gardner*, 771 F.2d 856, 859 (5th Cir. 1985); *accord Friends of the Earth, Inc. v. Crown Cent. Petrol. Corp.*, 95 F.3d 358, 362 (5th Cir. 1996); *see Elgin v. Dep't of Treasury*, 567 U.S. 1, 34 (2012) (Alito, J., dissenting) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)).

splitting case, the second suit will be barred if the claim involves the same parties and arises out of the same transaction or series of transactions as the first claim."[271] In other words, "[c]laim-splitting occurs when a single 'cause of action' is split by advancing one part in an initial suit and another part in a later suit."[272]

The rule against claim-splitting is based on principles of res judicata and uses much of the same analytical touchstones.[273] First, the plaintiffs in both proceedings must be identical or in privity with each other.[274] "There must be the same parties, or, at least, such as represent the same interests . . . ."[275] Second, the Court evaluates whether the two cases involve the same claim or cause of action. Courts "apply the transactional test. The critical question in applying the transactional test is whether the two actions were based on the same nucleus of operative facts. This means courts evaluate the factual predicate of the claims asserted, not the legal theories upon which the plaintiff relies."[276] When the wrong to be corrected is the same and the claims arise from the same series of connected transactions, the transactional test is likely met.[277] Even when complaints and claims vastly differ, the rule against claim-splitting may still apply.[278]

### 2. Analysis

The Government argues that the Court should apply the rule against claim splitting in this case to dismiss Plaintiff State of Texas because "the cases involve the same parties or, at minimum,

---

[271] *Ameritox, Ltd. v. Aegis Scis. Corp.*, No. 3:08-CV-1168-D, 2009 WL 305874, at *4 (N.D. Tex. Feb. 9, 2009) (quoting *Sensormatic Sec. Corp. v. Sensormatic Elecs. Corp.*, 273 F. App'x 256, 265 (4th Cir. 2008); and citing *FDIC v. Nelson*, No. 93-1590, 1994 WL 93409, at *2 n.5 (5th Cir. Mar. 15, 1994)).

[272] *Nelson*, 1994 WL 93409, at *2 n.5.

[273] *Riley*, 2022 WL 1773364, at *3 (citing *In re Super Van Inc.*, 92 F.3d at 371) ("The prohibition on claim splitting is a principle based in *res judicata*.").

[274] *See Nelson*, 1994 WL 93409, at *2 n.5; *Meza v. Gen. Battery Corp.*, 908 F.2d 1262, 1266 (5th Cir. 1990); *Igal v. Brightstar Info. Tech. Grp.*, 250 S.W.3d 78, 86 (Tex. 2008) (applying res judicata when "the same parties or those in privity with them" are involved).

[275] *United States v. Haytian Republic*, 154 U.S. 118, 124 (1894) (quotation omitted).

[276] *Riley*, 2022 WL 1773364, at *3 (cleaned up).

[277] *See Jackson v. U.S. Postal Serv.*, 799 F.2d 1018, 1021 (5th Cir. 1986).

[278] *LaCroix v. Marshall County*, 409 F. App'x 794, 801 & n.31 (5th Cir. 2011) (per curiam).

41 / 61

parties in privity with each other" with Plaintiffs Texas General Land Office and Commissioner George P. Bush, and the same cause of action for relief against the Department of Homeland Security agency actions.[279] Texas responds that Commissioner Bush and the Texas General Land Office are distinct from the State of Texas and do not constitute the same party or privy for purposes of claim splitting.[280]

There is no authority clearly declaring whether the Texas General Land Office and its Commissioner constitute the same parties or parties in privity with the State of Texas, represented by its Attorney General. Firstly, descriptions are illuminating. The State of Texas has divided its government "into three distinct departments, each of which shall be confided to a separate body of magistracy, to wit: Those which are Legislative to one; those which are Executive to another, and those which are Judicial to another," and no person or department "shall exercise any power properly attached to either of the others" without express exception.[281] The executive department is further atomized: "The Executive Department of the State shall consist of a Governor, who shall be the Chief Executive Officer of the State, a Lieutenant Governor, Secretary of State, Comptroller of Public Accounts, Commissioner of the General Land Office, and Attorney General."[282] The Texas Attorney General and the Commissioner of the Texas General Land Office are thus two aspects of the same executive department of the State of Texas. For the following reasons, the Court holds that both the same-parties prong and the parties-in-privity prong of the claim-splitting analysis are met in this case.

      *i.*   *Same-Parties Prong*

---

[279] Dkt. No. 35 at 34, ¶ 46.
[280] Dkt. No. 37 at 15–16, ¶¶ 18–21.
[281] TEX. CONST. art. II, § 1.
[282] TEX. CONST. art. IV, § 1.

The Texas Attorney General and the Commissioner of the Texas General Land Office are functionally identical parties for purposes of the claim-splitting analysis. Both officers are elected in statewide elections and remain democratically accountable.[283] "The Attorney General serves as the State of Texas' legal counsel and the Office of the Attorney General therefore represents state agencies and institutions of higher education."[284] "The Attorney General is the chief law officer of the State, and it is incumbent upon him to institute in the proper courts proceedings to enforce or protect any right of the public that is violated."[285] For example, the Texas Attorney General represents the State of Texas against claims that a State statute is unconstitutional.[286] The Texas Attorney General is required to represent Texas before the Texas Supreme Court,[287] and "shall prosecute and defend all actions in which the state is interested before the supreme court and courts of appeals,"[288] and has the power to institute certain other suits in which Texas is interested,[289] but the Texas Attorney General lacks the *exclusive* right to represent the State of Texas in judicial proceedings. Unlike Virginia law,[290] the Texas Constitution does not vest its sovereign voice in the Texas Attorney General alone: "Great powers have been conferred upon him [the Texas Attorney General] by the Constitution and statutes of the State. His power, however, may be and has been limited by its source. His acts beyond the scope of his delegated power are not binding on the State."[291] The Texas Attorney General "is not the political authority of the State, nor is he its guardian to determine when its rights of property have been invaded, unless when specially

---

[283] TEX. CONST. art. IV, § 23.

[284] 1 TEX. ADMIN. CODE § 57.3(a).

[285] *Agey v. Am. Liberty Pipe Line Co.*, 172 S.W.2d 972, 974 (Tex. 1943); *see Charles Scribner's Sons v. Marrs*, 262 S.W. 722, 727 (1924) (citing *Lewright v. Bell*, 63 S.W. 623 (1901)).

[286] *Baker v. Wade*, 743 F.2d 236, 242 (5th Cir. 1984).

[287] TEX. CONST. art. IV, § 22.

[288] TEX. GOV'T CODE ANN. § 402.021 (West 2022).

[289] *See Yett v. Cook*, 281 S.W. 837, 843 (Tex. 1926); *Brady v. Brooks*, 89 S.W. 1052, 1057 (Tex. 1905); 7 Tex. Jur. 3d *Attorney General* § 6 (Supp. July 2022).

[290] *See Va. House of Delegates v. Bethune-Hill*, 139 S. Ct. 1945, 1951–52 (2019).

[291] *Texas v. Reagan Cnty. Purchasing Co.*, 186 S.W.2d 128, 135 (Tex. Civ. App.—El Paso 1944, writ ref'd w.o.m.).

directed by legitimate power to investigate those rights, and to take the necessary legal steps to preserve them."[292] The Texas Attorney General cannot bind State officials to his policy preferences.[293] Texas's currently effective general appropriations bill confers the "*primary* duty" on the Texas Attorney General to represent "the State in the trial of civil cases,"[294] but the appropriations act does not grant funding to the General Land Office because it recognizes that the latter has independent litigating authority under Texas law.[295] "[T]here is no general statute authorizing the Attorney General to represent the State and its agencies in district court," but the Texas Legislature has provided for the Texas Attorney General to do so in certain cases.[296] As an example of his limited authority, only County Attorneys may seek the removal of county officers.[297] Texas agencies, like the General Land Office, established by the Texas Constitution may contract with attorneys to represent the agency independently and without the permission of the Texas Attorney General.[298] The Texas Attorney General therefore has *concurrent* executive authority[299] with other Texas executive officers over the executive power of Texas, that is "[t]he power to see that the laws are duly executed and enforced."[300] Indeed, the Commissioner of the Texas General Land Office "shall execute and perform all acts and other things relating to public real property of the state or rights of individuals in public real property which is required by law,"[301] including by the executive power of Texas.[302]

---

[292] *State v. Delesdenier*, 7 Tex. 76, 84 (1851).
[293] *League of United Latin Am. Citizens, Council No. 4434 v. Clements*, 999 F.2d 831, 840 (5th Cir. 1993).
[294] Act of June 18, 2021, ch. 1035, 2021 Tex. S.B. 1, § 16.01(a)(1) (emphasis added).
[295] *See id.* § 16.01(i)(4).
[296] *El Paso Elec. Co. v. Tex. Dep't of Ins.*, 937 S.W.2d 432, 438 (Tex. 1996).
[297] *Garcia v. Laughlin*, 285 S.W.2d 191, 194–95 (Tex. 1955).
[298] TEX. GOV'T CODE ANN. § 402.0212(a) (West 2022); 1 TEX. ADMIN. CODE § 57.2(b) (2022).
[299] *Cf. State v. Stephens*, No. PD-1032-20, 2021 WL 5917198 (Tex. Crim. App. Dec. 15, 2021) (discussing limitations on the Texas Attorney General's authority).
[300] *Executive Power*, BLACK'S LAW DICTIONARY (11th ed. 2019).
[301] TEX. NAT. RES. CODE ANN. § 31.051(2) (West 2022).
[302] TEX. CONST. art. IV, § 1.

In the foregoing analysis, the Court is not unmindful that its consolidation order held that "only the Attorney General of Texas (or a county or district attorney) may file suit on behalf of and represent Texas."[303] The Court is also not ignorant of the Fifth Circuit's holding that, "[u]nder Texas law, the Attorney General enjoys an exclusive right to represent state agencies; other attorneys who may be permitted to assist the Attorney General are subordinate to his authority."[304] However, in the Court of Civil Appeals of Austin case that this Court and the Fifth Circuit cited for this point of law, that appellate court cited a 1918 Texas Supreme Court precedent for the proposition that the Texas Attorney General exclusively represented the State.[305] In the latter case, the Texas Supreme Court confronted a contractor's claim that he was entitled to recover from the Texas Comptroller of Public Accounts his contractual compensation for collecting taxes in Travis County.[306] On the advice of the Texas Attorney General, the Comptroller had refused to pay.[307] On appeal, the Texas Attorney General's Office argued that the Texas Constitution did not permit the Comptroller to contract with others to do what the Texas Constitution empowered County Attorneys and the Attorney General to do and thereby supplant the State attorneys' authority.[308] The Texas Supreme Court agreed, holding in relevant part:

> [T]he powers thus conferred by the Constitution upon these officials are exclusive. The Legislature cannot devolve them upon others. Nor can it interfere with the right to exercise them. It may provide assistance for the proper discharge by these officials of their duties, but since in the matter of prosecuting the pleas of the State in the courts the powers reposed in them are exclusive in their nature, it cannot, for the performance of that function, obtrude other persons upon them and compel the acceptance of their services. Wherever provision is made for the services of other persons for the express purpose, it is the constitutional right of the Attorney-General

---

[303] *Tex. Gen. Land Office v. Biden*, No. 7:21-CV-00272, 2021 WL 5588160, at *3 (S.D. Tex. Nov. 29, 2021) (Alvarez, J.) (citing *Att'y Gen. Hill v. Tex. Water Quality Bd.*, 568 S.W.2d 738, 741 (Tex. Civ. App.—Austin 1978, writ ref'd n.r.e.) and *Bullock v. Tex. Skating Ass'n*, 583 S.W.2d 888, 894 (Tex. Civ. App.—Austin 1979, writ ref'd n.r.e.)).
[304] *Sierra Club v. City of San Antonio*, 115 F.3d 311, 314 (5th Cir. 1997) (citing *Hill*, 568 S.W.2d at 741).
[305] *Hill*, 568 S.W.2d at 741 (citing *Maud v. Terrell*, 200 S.W. 375 (Tex. 1918)).
[306] *Maud*, 200 S.W. at 375.
[307] *Id.* at 376.
[308] *Id.*

and the county and district attorneys to decline them or not at their discretion, and, if availed of, the services are to be rendered in subordination to their authority.[309]

The Texas Supreme Court has long held that the Texas Legislature may not deprive the Texas Attorney General of his constitutional authority.[310]

But nothing in the Texas Supreme Court's holdings conflict with this Court's present holding that the Texas Attorney General is not the *exclusive* representative of the entirety of the State's executive power. The Texas Supreme Court merely holds that constitutionally conferred powers may not be abrogated as they are the exclusive purview of their respective designees. In other words, the Texas Attorney General's power is exclusive to him, and he may delegate it as he sees fit, but the Texas Attorney General does not have *all* the executive power that exists in Texas. Indeed, the Texas General Land Office, without jurisdictional issue, recently exercised its own executive power in federal court including the Fifth Circuit to challenge the United States Fish and Wildlife Service's decision not to delist as an endangered species the Golden-Cheeked Warbler.[311] The Court's consolidation order merely analyzed whether common parties were involved in the litigation; it did not purport to decide that the State of Texas and Texas General Land Office and Commissioner could not be the same party for purposes of claim splitting.[312] Even if it did, the Court is entitled to revise interlocutory orders.[313] In sum, the "State of Texas as represented by its Attorney General" and the "Texas General Land Office and General Land Office Commissioner"

---

[309] *Id.* (citations omitted).
[310] *E.g.*, *Texas v. Int'l & G.N. Ry. Co.*, 35 S.W. 1067, 1068 (Tex. 1896) ("It must be presumed that the constitution, in selecting the depositaries of a given power, unless it be otherwise expressed, intended that the depositary should exercise an exclusive power, with which the legislature could not interfere by appointing some other officer to the exercise of the power.").
[311] *Gen. Land Office v. U.S. Dep't of the Interior*, 947 F.3d 309 (5th Cir. 2020).
[312] *Tex. Gen. Land Off. v. Biden*, No. 7:21-CV-00272, 2021 WL 5588160, at *3 (S.D. Tex. Nov. 29, 2021) (Alvarez, J.).
[313] *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 185 (5th Cir. 1990), *abrogated on other grounds by Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 n.14 (5th Cir. 1994) (en banc).

are merely different labels for the substantively identical party which is the executive department of the State of Texas. Therefore, the first prong of the claim-splitting test is met.[314]

### ii. *Privity Prong*

Even if this Court is incorrect that Plaintiff State of Texas and Plaintiffs Texas General Land Office and its Commissioner are the same parties for purposes of the claim-splitting analysis, the Court would still hold the first prong of the test met because the Texas Plaintiffs in the two cases are in privity with each other. The principles of res judicata and claim splitting do "not require the parties of the two actions to be identical, as long as they are in privity."[315] As the Supreme Court stated, "[w]here the issues in separate suits are the same, the fact that the parties are not precisely identical is not necessarily fatal."[316] Analyzing privity is difficult and often "nothing more than a 'legal conclusion that the relationship between the one who is a party on the record and the non-party is sufficiently close to afford application of the principle of preclusion,'"[317] but privity may be supported by an independent legal analysis that the parties in question are sufficiently close.[318] The Ninth Circuit similarly holds that privity may exist "if there is substantial identity between parties, that is, when there is sufficient commonality of interest."[319] The Fifth Circuit has recognized privity in three narrowly defined situations, one of which is applicable here: "where the non-party's interests were adequately represented by a party to the original suit."[320]

---

[314] *See supra* notes 274–275.

[315] *Clyce v. Farley*, 836 F. App'x 262, 269 (5th Cir. 2020).

[316] *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402 (1940).

[317] *Meza v. Gen. Battery Corp.*, 908 F.2d 1262, 1266 (5th Cir. 1990) (quoting *Sw. Airlines Co. v. Tex. Int'l Airlines, Inc.*, 546 F.2d 84, 95 (5th Cir. 1977)).

[318] *Id.*

[319] *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Plan. Agency*, 322 F.3d 1064, 1081 (9th Cir. 2003) (internal quotation marks omitted).

[320] *Clyce*, 836 F. App'x at 269 (quoting *Meza*, 908 F.2d at 1266).

While different approaches are recommended by scholars,[321] the governing test for whether Plaintiffs Texas General Land Office and Commissioner Bush are in privity with Plaintiff State of Texas is whether the former two parties adequately represent Texas in their lawsuit against the Government.[322] "The concept of adequate representation does not refer to apparently competent litigation of an issue in a prior suit by a party holding parallel interests; rather, it refers to the concept of virtual representation, by which a nonparty may be bound because the party to the first suit is so closely aligned with the nonparty's interests as to be his virtual representative."[323] Privity is not established by entities interested in proving the same claims; it is established when the party to be bound has effectively already had its day in court.[324] "The question of virtual representation is one of fact and is to be kept within 'strict confines'" such that the parties to the later suit are effectively accountable to the parties of the earlier suit.[325] The Supreme Court has noted that "[t]here is privity between officers of the same government so that a judgment in a suit between a party and a representative of the United States is res judicata in relitigation of the same issue between that party and another officer of the government,"[326] and the Fifth Circuit has "approved a district court's determination that the interests of two government entities were so closely aligned that a prior judgment against one entity bound the other."[327] "The general rule is that litigation by one agency is binding on other agencies of the same government . . . ."[328] "In short, parties which are sufficiently related to merit the application of claim preclusion are in privity."[329] "Ultimately,

---

[321] *See* Joel DeJesus, Note, *Interagency Privity and Claim Preclusion*, 57 U. CHI. L. REV. 195, 209 (1990).
[322] *See id.*
[323] *Freeman v. Lester Coggins Trucking, Inc.*, 771 F.2d 860, 864 (5th Cir. 1985) (cleaned up), *quoted in Clyce*, 836 F. App'x at 269–70.
[324] *Id.* at 865.
[325] *Benson & Ford, Inc. v. Wanda Petrol. Co.*, 833 F.2d 1172, 1175 (5th Cir. 1987) (quoting *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 339 (5th Cir. 1982)).
[326] *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402–03 (1940).
[327] *Hardy*, 681 F.2d at 340 (citing *Aerojet-Gen. Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir. 1975)).
[328] 18A EDWARD H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 4458 (3d ed. 1998 & Supp. Apr. 2022).
[329] *Russell v. SunAmerica Sec., Inc.*, 962 F.2d 1169, 1174 (5th Cir. 1992).

a determination that privity exists represents a legal conclusion that the relationship between the one who is a party on the record and the non-party is sufficiently close."[330]

The Court holds that the State of Texas is adequately represented by, and virtually represented by, and is in privity with the Texas General Land Office and Commissioner Bush in this case. While there is no definitive proof that privity exists, a gedankenexperiment helps prove the point. If the Government had been subjected to six simultaneous claims by each executive officer of Texas,[331] would courts require the expenditure of party and judicial time and resources to defend each claim individually? The Court doubts that the six simultaneous claims would not run afoul of claim splitting, which lends credence to the notion that privity exists between the executive officers. Indeed, the Fifth Circuit "has held there is privity between officers of the same government entity."[332] The General Land Office also could not litigate its claims against the Government over the Government's southwest border policy to final consummation, only for the Government to face practically identical challenges to its border policy from the State of Texas with no valid res judicata defense.[333] The executive officers of Texas are all accountable to the Executive Department,[334] and to the people of Texas,[335] and to each other, and are empowered to represent Texas's interests. The Court adjudges that the Texas Plaintiffs are sufficiently related to merit a holding precluding claim splitting.

---

[330] *Texas v. U.S. Dep't of Labor*, 929 F.3d 205, 211 (5th Cir. 2019).
[331] *See* TEX. CONST. art. IV, § 1.
[332] *Fregia v. Bright*, 750 F. App'x 296, 300 (5th Cir. 2018) (per curiam).
[333] *See United States v. ITT Rayonier, Inc.*, 627 F.2d 996, 1003 (9th Cir. 1980) ("The relationship between DOE [the Washington Department of Ecology] and the EPA [the United States Environmental Protection Agency], however, it may be labeled, is sufficiently 'close' under the circumstances to preclude relitigation of the issue already resolved in state court.").
[334] TEX. CONST. art. IV, § 1.
[335] TEX. CONST. art. IV, § 23.

Plaintiff State of Texas challenge this holding by pointing to cases in which the court held that two government agencies did not constitute the same party.[336] For example, in *United States v. Baker*, the Fifth Circuit dealt with a criminal appeal challenging an evidentiary ruling, specifically the district court's exclusion of a deposition transcript of a witness created during a Securities and Exchange Commission civil investigation. Federal Rule of Evidence 804(b)(1)(B) will permit former testimony that "is now offered against a party who had--or, in a civil case, whose predecessor in interest had--an opportunity and similar motive to develop it by direct, cross-, or redirect examination," so the Fifth Circuit needed to ascertain whether the SEC and prosecuting U.S. Department of Justice met the exception's language. The Fifth Circuit simply held, "[a]lthough there was some cooperation between the two agencies, it was not extensive enough for the SEC and the DOJ to be deemed the same party."[337] This case is unilluminating not only because it utilizes a different test than the one at issue, but because it analyzes substantially different factual circumstances than the ones present here in comparing the two federal agencies.

Plaintiff State of Texas also asserts that one Supreme Court precedents damns the argument that the State of Texas and the Texas General Land Office could be treated as the same party.[338] In *Virginia Office for Protection & Advocacy v. Stewart*, the Supreme Court dealt with federal statutes that conditioned federal funding to states on the state's establishment of an advocacy program for people with mental and developmental disabilities.[339] The federal statutes empowered the program with investigative powers.[340] The State of Virginia created a state agency to carry out the advocacy program.[341] The state agency then attempted to investigate deaths at a state-run

---

[336] Dkt. No. 37 at 15–16, ¶ 19.
[337] *United States v. Baker*, 923 F.3d 390, 401 (5th Cir. 2019).
[338] Dkt. No. 37 at 16, ¶ 21 ("Perhaps the case most damning for Defendants' claim-splitting theory is . . . .").
[339] 563 U.S. 247, 250 (2011).
[340] *Id.* at 250–51.
[341] *Id.* at 251.

mental hospital, but the state officials in charge refused to produce records.[342] Upon challenge by the advocacy agency plaintiffs, the Supreme Court noted that "federal courts have not often encountered lawsuits brought by state agencies against other state officials. That does give us pause,"[343] but nevertheless held that the state advocacy agency possessed an actionable federal right against its parent state and the authority to sue state officials to enforce the right in the absence of effective state veto.[344] Texas argues that the Supreme Court could not have countenanced a lawsuit by a party against itself.[345] But this case hardly supports Texas's argument, because the Supreme Court only held that Virginia's state advocacy agency could invoke the *Ex parte Young* exception to sue state officials under the "highly unusual statute at issue" to vindicate a federal right.[346] This special case therefore does not support the proposition that Texas seeks to use it for. *Stewart* does not hold that a state and statewide agency cannot be in privity for purposes of claim-splitting.

With the first prong satisfied, the Court turns to the second element of the claim-splitting test.

### iii. Same Transaction Element

The Government asserts that the "gravamen of both this [Texas's and Missouri's] complaint and the *Land Office* complaint is that the Proclamation, the DHS Plan, and actions taken by DHS and CBP pursuant thereto violated federal appropriations statutes, including the APA, and the federal Constitution."[347] Plaintiffs do not dispute this assertion.[348]

---

342 *Id.* at 252.
343 *Id.* at 260.
344 *Id.* at 260–61.
345 Dkt. No. 37 at 16–17, ¶ 21.
346 *Stewart*, 563 U.S. at 261 & n.8.
347 Dkt. No. 35 at 35, ¶ 47.
348 *See* Dkt. No. 37 at 14–18, ¶¶ 17–24.

The Court holds that the transactional test is met.[349] Texas effectively states as much in their opening paragraph: "This is an action challenging the Executive Branch's pervasive violations of the Constitution and federal law in its southwest border policy."[350] Both complaints allege that their harms stem from the President's January 20, 2021 proclamation concerning the border wall.[351] Both complaints allege that the President contravened congressional appropriations in refusing to construct border wall.[352] Both complaints assert similar constitutional and statutory claims against Federal Government officials.[353] Both complaints seek similar injunctive relief.[354] In consolidating the cases, the Court held that they involve common questions of law and fact and that conservation of judicial resources is served by consolidating the cases.[355] Therefore, even if the two complaints use slightly different framing, arguments, and claims, the alleged wrong to be corrected, and reasons why the correction should be ordered, are virtually identical. When the wrong to be corrected is the same and arises from the same series of connected transactions (i.e. the President's proclamation and DHS's subsequent actions in furtherance thereof), the transactional test is satisfied.[356] The transactional test of claim splitting is therefore met in this case.[357]

### iv. Conclusion

For the foregoing reasons, the Court agrees with the Government that "[b]y breaking up its claims between different agencies within its executive branch, Texas has transgressed the common

---

[349] *See supra* note 276.
[350] Mo. Compl. at 2, ¶ 1.
[351] Mo. Compl. at 3, ¶ 6; Dkt. No. 34 at 32, ¶ 78.
[352] Mo. Compl. at 2, ¶ 4; Dkt. No. 34 at 36, ¶ 89.
[353] Mo. Compl. at 21–35; Dkt. No. 34 at 35–48.
[354] Mo. Compl. at 35–36; Dkt. No. 34 at 48–50.
[355] *Tex. Gen. Land Office v. Biden*, No. 7:21-cv-00272, 2021 WL 5588160, at *4–5 (S.D. Tex. Nov. 29, 2021) (Alvarez, J.).
[356] *Bank of N.Y. Mellon v. Riley*, No. 21-40383, 2022 WL 1773364, at *4 (5th Cir. June 1, 2022) (per curiam) (quoting *Jackson v. U.S. Postal Serv.*, 799 F.2d 1018, 1021 (5th Cir. 1986)).
[357] *See supra* notes 277–278.

law rule against claim splitting."[358] Dismissal of the State of Texas's claims and the State of Texas as an independent party is therefore warranted "to protect the defendant from being harassed by repetitive actions based on the same claim,"[359] to conserve judicial and party resources, "to discourage unsavory tactical maneuvers,"[360] and to preclude relitigation of the same issues. The Court **GRANTS** the Government's motion to dismiss[361] to the extent it seeks to dismiss the State of Texas and Texas's claims from this lawsuit.

### b. Jurisdiction

The Government moves to dismiss all of Plaintiffs Missouri's and Texas's claims, arguing that the States lack Article III standing.[362] Now that Texas is dismissed, this argument is directed at Missouri. Plaintiff Missouri responds that it has standing "based on the now-familiar driver's license rationale" established by the Fifth Circuit.[363] The Government replies that the driver's license rationale is not a panacea for all standing ailments and that Missouri cannot satisfy the test.[364]

### 1. *Legal Standard*

The Court set forth all legal standards applicable to motions to dismiss for lack of subject matter jurisdiction due to a plaintiff's lack of Article III standing in the previous Part and need not recopy them here.[365] The legal standards are identical.

### 2. *Analysis*

---

[358] Dkt. No. 35 at 33, ¶ 44.
[359] *In re Super Van Inc.*, 92 F.3d 366, 371 (5th Cir. 1996).
[360] *Id.*
[361] Dkt. No. 35.
[362] Dkt. No. 35 at 28, ¶ 35.
[363] Dkt. No. 37 at 8, ¶ 5 (quoting *Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022)).
[364] Dkt. No. 38 at 10, ¶¶ 9–10; Dkt. No. 53 at 4, ¶ 6.
[365] *See supra* notes 23–43.

Plaintiff Missouri invokes the driver's license rationale and the harm to its public fisc to establish the State's standing to challenge the Government's southwest border policy. Specifically, Plaintiff alleges:

> When Defendants violate the Constitution and fail to comply with federal law on immigration policy, Missouri and Texas end up footing the bill. The Biden Administration's refusal to spend congressional appropriations mandating the construction of the wall and the termination of contracts regarding the same allow more illegal aliens to enter and remain in Missouri and Texas, resulting in increased costs to issue driver's licenses, provide public education, provide healthcare for such aliens, and process and incarcerate aliens in their criminal-justice systems, which in turn results in irreparable injuries to these States.[366]

However, demarcating the driver's license rationale exposes the fatal flaw in Missouri's argument.

This Court originally accepted the driver's license rationale in the context of the Deferred Action for Parents of Americans and Lawful Permanent Residents (DAPA) program, which alone "create[d] a new class of individuals eligible to apply for driver's licenses" and imposed enormous costs on Texas because Plaintiff intromitted *evidence* that, at minimum, tens of thousands of newly eligible individuals would apply and Texas would incur costs to process each license application.[367] The Fifth Circuit affirmed that rationale.[368] Missouri heavily relies on a similar, subsequent Fifth Circuit case, *Texas v. Biden*, which the Supreme Court reversed and remanded in June 2022.[369] The Fifth Circuit decision remains binding on this Court except to the extent it was reversed.[370] *Texas v. Biden* involved Missouri's and Texas's claims that the Department of Homeland Security's suspension of the Migrant Protection Protocols (MPP) a.k.a. "Remain in Mexico" policy was improper under the Administrative Procedure Act and other law.[371] *After a*

---

[366] *Missouri* Compl. at 8, ¶ 25.

[367] *Texas v. United States*, 86 F. Supp. 3d 591, 616–17 (S.D. Tex. 2015) (Hanen, J.).

[368] *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015).

[369] *E.g.*, Dkt. No. 37 at 9, ¶¶ 5–7 (quoting *Texas v. Biden*, 20 F.4th 928, 971 (5th Cir. 2021), *rev'd*, 142 S. Ct. 2528 (2022)).

[370] *Stroman Realty, Inc. v. Wercinski*, 513 F.3d 476, 489 (5th Cir. 2008) (citing *Cent. Pines Land Co. v. United States*, 274 F.3d 881, 894 (5th Cir. 2001)).

[371] *Texas v. Biden*, 20 F.4th at 941.

*bench trial*, the district adjudged that the Government's suspension of the MPP violated the law.[372] The Fifth Circuit affirmed, holding in relevant part that Texas was entitled to special solicitude in the standing analysis and *Texas* had standing because it incurred an injury to its public fisc that was traceable to the Government's decision to terminate the MPP.[373] The Fifth Circuit held that the "district court's most important finding was that MPP's termination has increased the number of aliens released on parole into the United States, including Texas and Missouri,"[374] and that MPP's termination caused border enforcement encounters in Texas to greatly increase, so those two "pieces of record evidence make it eminently plausible that DHS's termination of MPP has increased the total number of aliens paroled into the United States,"[375] who would then be eligible for and seek driver's licenses.[376] The Supreme Court reversed on the ground of immigration statutes not at issue in this case and on the ground that the Fifth Circuit misperceived the effect of a subsequent agency action.[377]

These cases illuminate that the scope of the driver's license rationale does not extend to every state in the nation. Both appellate cases involved specific evidence of harm *to Texas*, largely resulting from aliens paroled into the United States, whereas Missouri offers no specific evidence that aliens who are not yet in the United States will enter illegally because of border wall gaps. More importantly, both cases elaborated that DAPA and MPP, in and of themselves, substantively impacted whether a particular immigrant would be eligible for a driver's license under Texas Transportation Code § 521.142(a).[378] In other words, because illegal immigrants were paroled

---

[372] *Id.* at 945.
[373] *Id.* at 969.
[374] *Id.* at 966.
[375] *Id.* (quotation omitted).
[376] *Id.* at 970.
[377] *Biden v. Texas*, 142 S. Ct. 2528 (2022).
[378] *Texas v. United States*, 809 F.3d 134, 155 (5th Cir. 2015); *Texas v. Biden*, 20 F.4th 928, 970 (5th Cir. 2021), *rev'd*, 142 S. Ct. 2528 (2022).

under those programs into the United States and thereby authorized to be present in the United States, the Fifth Circuit held that they were *rendered eligible* and would naturally seek driver's licenses.[379] This case is different: Plaintiff is not challenging any policy that authorizes immigrants to be in the United States or substantively modifies their eligibility for state benefits. Aliens who enter illegally are not in the same class as aliens who are paroled into the United States, and Missouri does not claim that nonparoled aliens are eligible for a Missouri driver's license. Accordingly, Plaintiff Missouri fails to identify a concrete and particularized injury that is actual or imminent and fairly traceable to the Government's challenged border policies.[380] In short, the driver's license rationale does not cover Missouri's allegations here.

But even if it did, the Court would still hold Missouri's allegations too attenuated to establish Article III standing. Plaintiff Missouri does not point to any case in which an appellate court held that a landlocked internal State could trace its particularized harms to federal policy concerning an international border multiple states away. *Texas v. Biden*,[381] and a similar subsequent case,[382] only held that *Texas* has standing to challenge federal immigration policies. For the following additional reasons, the Court holds that Missouri has not independently demonstrated its Article III standing to challenge the Government's southwest border policy.

Plaintiff Missouri is contending that it has standing because: (1) border walls block or reduce illegal immigration in general, (2) the Government's refusal to construct the border wall leads to more illegal immigration, (3) increased influxes of illegal immigrants who would have been stopped by the border wall will travel to Missouri, and (4) illegal immigrants in Missouri will seek state benefits and cause Missouri to incur costs. The Court need not uncritically accept this

---

[379] *Texas v. Biden*, 20 F.4th at 970.
[380] *See supra* note 40.
[381] *Texas v. Biden*, 20 F.4th 928, 969 (5th Cir. 2021).
[382] *Texas v. United States*, No. 22-40367, 2022 WL 2466786, at *3 (5th Cir. July 6, 2022) (per curiam).

inferential chain,[383] and may evaluate Missouri's evidence of its alleged harms.[384] With respect to the first and second points, Missouri alleges that walls are effective in preventing *border crossings*, not necessarily illegal immigration in general.[385] Plaintiff repeatedly references a 2018 DHS press release that states in relevant part, "Walls Work. When it comes to stopping drugs and illegal aliens from crossing our borders, border walls have proven to be extremely effective. . . . [W]hen we installed a border wall in the Yuma Sector, we have seen border apprehensions decrease by 90 percent."[386] As the Government points out regarding this press release, "DHS did not claim that construction reduced migration as a whole; the assertion was only that construction of such barriers reduced the need for *apprehensions* in a particular *sector*."[387] Nothing in the press release analyzed whether border wall construction causes general decreases in migration.[388] As the District of Arizona held in Arizona's own litigation over the Government's immigration and border policy, Arizona failed to "persuade the Court that aliens are entering the country illegally *because* of certain gaps in the border wall (which would remain gap-filled regardless of the termination decision) . . . ."[389] Moreover, even if the Government were compelled to complete more of the border wall, "[i]t is speculative that the less-incomplete version of the border wall the State wishes to compel Defendants to build would necessarily deter migrants from entering Arizona. An incomplete wall is an incomplete wall."[390] Moreover, even if the border wall was completed in

---

[383] *See supra* note 32.

[384] *See supra* notes 34–35.

[385] *See* Mo. Compl. at 2, ¶ 3; *id.* at 8, ¶ 26.

[386] *Id.* at 2, ¶ 3 (quoting Mo. Compl. Ex. A at 4–5, *reprinting Walls Work*, U.S. DEP'T OF HOMELAND SEC., https://www.dhs.gov/news/2018/12/12/walls-work (Dec. 12, 2018)).

[387] Dkt. No. 35 at 28, ¶ 35 (emphases added).

[388] *Id.*

[389] *Arizona v. Mayorkas*, No. CV-21-00617-PHX-DWL, 2022 WL 1289301, at *7 (D. Ariz. Apr. 28, 2022).

[390] *Arizona v. Mayorkas*, No. CV-21-00617-PHX-DWL, 2022 WL 2304527, at *2 (D. Ariz. June 27, 2022) (quotation omitted).

full, illegal immigrants frequently bypass the barrier.[391] Missouri's first two inferences in its chain are therefore questionable at best.

Missouri's argument in its supplemental brief does not save its contentions. A U.S. Customs and Border Protection official entered a declaration in this case which states in part, "DHS determined that the installation of barrier system attributes [such as cameras] in areas where physical barrier has already been constructed . . . will enhance the functionality of previously constructed barrier."[392] Plaintiffs Missouri and Texas attempt to make hay of this statement, arguing that the premise of the declaration that barrier "functionality" is capable of being "enhanced" with additional attributes is a concession that "walls work in preventing illegal border activity" such as illegal border crossings.[393] Again, even assuming that a border barrier would prevent or reduce illegal border crossings, many more inferential steps are required to actuate Missouri's alleged harms from illegal immigration.[394]

With respect to Missouri's third and fourth contentions, Missouri alleges that 0.6% of all "illegal aliens entering the United States ente[r] and remai[n] in Missouri," and Missouri will therefore face "a cost of verifying lawful immigration status for each additional customer seeking a Missouri driver's license."[395] Missouri provides no reference or citation whatsoever for this conclusory claim. Neither does Missouri indicate whether this is a historical number or projection. Furthermore, Missouri does not allege that this small percentage of all illegal immigrants in the United States would have been stopped by or even affected by a southwest border wall vel non, or that such border crossings have anything to do with whether greater numbers of immigrants will

---

[391] *See id.*
[392] Dkt. No. 52-1 at 6–7, ¶ 13.
[393] Dkt. No. 54 at 9.
[394] *See supra* notes 389–391.
[395] Mo. Compl. at 9, ¶¶ 27, 30 (quoting *Texas v. Biden*, 554 F. Supp. 3d 818, 838 (N.D. Tex. 2021)).

entreat Missouri's State facilities such as its drivers' license offices.[396] Missouri effectively asks the Court to speculate that, because of the change in border policy, aliens who would not otherwise enter the United States illegally will do so, such illegal aliens will make their way to Missouri, and they will then seek state benefits. In light of the Supreme Court's refusal to abandon its "usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors,"[397] this Court will similarly abstain. In sum, significant speculation is required "about whether the unfilled gaps, as opposed to the myriad other economic, social, and political realities that might influence an alien's decision to risk life and limb to come to the United States, are the cause of increased migration."[398]

  With all inferences taken together, Plaintiff Missouri's standing theory "relies on a highly attenuated chain of possibilities, [and] does not satisfy the requirement that threatened injury must be certainly impending."[399] The Supreme Court has "consistently held that a plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large," simply does not have standing under Article III.[400] As the Fifth Circuit held, standing theories grounded on generalized increased probabilities of harm do not satisfy standing; if they did, federal courts would be constantly embroiled in litigation testing Federal Government policy and essentially exercising executive power.[401] If Missouri's dubious chain of inferences concerning only 0.6% of all illegal immigrants

---

[396] *See* Dkt. No. 35 at 28, ¶ 36 (arguing that Missouri failed "to draw a connection between those costs and DHS's spending decisions about border barrier planning").
[397] *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 414 (2013).
[398] *Arizona v. Mayorkas*, No. CV-21-00617-PHX-DWL, 2022 WL 357348, at *11 (D. Ariz. Feb. 7, 2022) (cleaned up).
[399] *Clapper*, 568 U.S. 410.
[400] *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 573–74 (1992).
[401] *Shrimpers & Fishermen of RGV v. Tex. Comm'n on Env't Quality*, 968 F.3d 419, 424 (5th Cir. 2020) (collecting cases).

entering the United States furnish Missouri with standing, then every state no matter how remote from the southwest border would have standing to challenge the Government's southwest border policy and the concrete, particularized, and actual or imminent requirements of standing would be rendered toothless.[402]

The Court adds that Missouri's assertion of standing is distinct from the *Bush v. Biden* Plaintiffs. Whereas the Texas General Land Office and Commissioner Bush alleged that the Government planned to complete a *specific* border barrier construction project, but cancelled that project, which resulted in a concentration of *illegal border crossings* in one specific county abutting the border where Plaintiffs' specific property is located and therefore harmed;[403] Missouri alleges that failure to complete border barrier construction *in general*, about a thousand miles from the State, causes *general* increases in illegal immigration that *generally* harm the state's public treasury.[404] The Court clarifies that its standing holdings are not inconsistent; rather they properly account for the differences in attenuation between the two theories. The Court therefore holds that Plaintiff State of Missouri lacks Article III standing to assert its claims.

### c.  Conclusion

Because Missouri lacks Article III standing to assert its claims and this Court consequently lacks subject matter jurisdiction over Missouri's claims, the Court **GRANTS** the Government's motion to dismiss to the extent it seeks to dismiss the State of Missouri and Missouri's claims from this lawsuit.

---

[402] *Cf. Arizona v. Biden*, No. 22-3272, 2022 WL 2437870, at *6 (6th Cir. July 5, 2022) (Sutton, C.J.).
[403] *See supra* note 45.
[404] *See supra* notes 366, 395.

## IV. CONCLUSION AND HOLDING

For the foregoing reasons, the Court **GRANTS** the Government's motion to dismiss the *Missouri v. Biden* case.[405] The State of Texas is an improper party and must be dismissed because it has impermissibly split its claims against the Government amongst state executive department officials. The State of Missouri lacks independent standing to challenge international border policy operating about a thousand miles from the State. Accordingly, the Court lacks subject matter jurisdiction over *Missouri v. Biden*. The Court **DISMISSES** Texas's and Missouri's claims in their entirety. As a result, Texas's and Missouri's motion for a preliminary injunction is **DENIED AS MOOT**.[406]

The Court **GRANTS IN PART** and **DENIES IN PART** the Government's motion to dismiss the *Bush v. Biden* case.[407] Plaintiffs may not assert claims against the President directly, or constitutional claims as recast statutory claims, or raise statutory claims under statutes that do not independently furnish a cause of action, or assert ultra vires claims when a statute already furnishes meaningful judicial review, or assert a Regulatory Flexibility Act claim when that Act only empowers small entities, but may raise substantive and procedural Administrative Procedure Act claims against the Government's agency actions concerning the southwest international border. Plaintiff Texas General Land Office's and Plaintiff Commissioner George P. Bush's counts one through six and nine are **DISMISSED**, but counts seven and eight remain pending.

Remaining parties are **ORDERED** to appear at an initial pretrial and scheduling conference on **September 13, 2022, at 9:00 a.m.** and to file their joint discovery/case management plan consistent with the Court's order[408] no later than **September 2, 2022**.

IT IS SO ORDERED.

DONE at McAllen, Texas, this 3rd day of August 2022.

_____
Micaela Alvarez
United States District Judge

---

[405] Dkt. No. 35.
[406] Pls.' Mot. Prelim. Inj., *Missouri v. Biden*, No. 7:21-cv-00420 (S.D. Tex. Nov. 8, 2021), Dkt. No. 19.
[407] Dkt. No. 36.
[408] Dkt. No. 3.