# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

June 16, 2023

Lyle W. Cayce
Clerk

No. 22-40526

---

THE GENERAL LAND OFFICE OF THE STATE OF TEXAS, ET AL.,

*Plaintiffs*,

v.

PRESIDENT JOSEPH R. BIDEN, ET AL.,

*Defendants*,

---

STATE OF MISSOURI; STATE OF TEXAS,

*Plaintiffs—Appellants*,

*versus*

JOSEPH R. BIDEN, JR., IN HIS OFFICIAL CAPACITY AS PRESIDENT OF THE UNITED STATES OF AMERICA; UNITED STATES OF AMERICA; ALEJANDRO MAYORKAS, IN HIS OFFICIAL CAPACITY AS SECRETARY OF THE UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY A. MILLER, IN HIS OFFICIAL CAPACITY AS ACTING COMMISSIONER OF THE UNITED STATES CUSTOMS AND BORDER PROTECTION; UNITED STATES CUSTOMS AND BORDER PROTECTION,

*Defendants—Appellees.*

---

Appeal from the United States District Court
for the Southern District of Texas
USDC Nos. 7:21-CV-420 & 7:21-CV-272

---

Before JONES, SMITH, and GRAVES, *Circuit Judges*.

EDITH H. JONES, *Circuit Judge*:

In 2018, the Department of Homeland Security declared, "Walls Work." Indeed, DHS touted the effectiveness of its newly constructed border wall system. But in January 2021, President Biden ordered DHS to reverse course, ending all new border wall construction. Since then, encounters along the U.S.-Mexico border (the "southwest border") have increased fivefold, from 458,088 in fiscal year 2020 to nearly 2.38 million in fiscal year 2022.[1]

Texas and Missouri filed suit seeking to compel DHS to employ the $2.75 billion Congress allocated "for the construction of [a] barrier system along the southwest border" before those funds expire. The district court dismissed Texas for "claim splitting," held that Missouri did not have standing to sue, and denied the States' motion for a preliminary injunction as moot. We REVERSE and REMAND with instructions that the court expeditiously consider the States' motion for a preliminary injunction.

---

[1] *Southwest Land Border Encounters*, U.S. CUSTOMS & BORDER PROTECTION (last modified May 3, 2023), https://www.cbp.gov/newsroom/stats/southwest-land-border-encounters.

No. 22-40526

## BACKGROUND

The Department of Homeland Security began construction of a new wall on the U.S. border with Mexico in February 2018. By October 2020, it had completed 386 miles of wall and had another 352 miles in progress. DHS declared the new border wall system a success: "[I]llegal drug, border crossings, and human smuggling activities" all decreased in areas where barriers were deployed. For instance, in the Yuma Sector, illegal entries in areas with a new border wall fell 87% between fiscal years 2019 and 2020. Likewise, the El Paso Sector "experienced a significant reduction in drug and smuggling activities in areas where the new border wall system was built."

Congress appropriated $1.375 billion in fiscal year 2020 "for the construction of [a] barrier system along the southwest border."[2] DHS used those funds to award two contracts to construct approximately thirty-one miles of border wall in the Laredo Sector and entered into an Economy Act agreement with the U.S. Army Corps of Engineers for thirty-seven more miles in the same area. Congress appropriated an additional $1.375 billion "for the same purposes" for fiscal year 2021.[3]

DHS abruptly reversed its position in January 2021. President Biden declared that a southern border wall was "not a serious policy solution," ordered DHS to "pause work on each construction project on the southern border wall," and directed the agency to "develop a plan for the redirection

---

[2] Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, Div. D, § 209(a)(1), 133 Stat. 2317, 2511 (2019).

[3] Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Div. F, § 210, 134 Stat. 1182, 1456–57 (2020).

of funds concerning the southern border wall."[4] DHS subsequently issued a "Border Wall Plan" in June 2021, in which the agency determined it would redirect fiscal year 2020 border wall funds as "needed to address life, safety, environmental, or other remediation requirements." It thus terminated or modified its contracts relating to construction of the Laredo Sector border wall. DHS also reallocated fiscal year 2021 funds for "contingency funding for barrier projects funded by the fiscal year 2017 through fiscal year 2020 barrier appropriations" and for the remediation of "existing site conditions at the former [Department of Defense] border barrier project sites." Such remediation efforts included "completing site drainage features and finishing the construction of patrol, maintenance, and access roads."

That same month, the Texas General Land Office and its commissioner ("the GLO") filed suit against President Biden, DHS, and DHS's secretary, alleging that DHS's diversion of fiscal year 2020 and 2021 border funds violated the Constitution, appropriations legislation, and the Administrative Procedure Act. Missouri and Texas asserted similar claims against those defendants as well as the United States, Customs and Border Protection, and CBP's acting commissioner (together "the Federal Defendants") in an action commenced six months later in October 2021. They also sought a preliminary injunction.

The cases were consolidated, the GLO amended its complaint, and the federal defendants moved to dismiss both cases. The district court held that the GLO had standing to sue, but it dismissed all claims except for the GLO's APA challenges. The court dismissed Texas for improperly splitting its claims, and it dismissed Missouri for lack of standing. The States' request

---

[4] Termination of Emergency with Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction, 86 Fed. Reg. 7225, 7225–26 (Jan. 20, 2021).

for a preliminary injunction was consequently denied as moot. The States appeal that judgment.[5]

## DISCUSSION

The States request that this court reinstate Texas, hold the States have standing to pursue their claims, and grant their preliminary injunction. We agree that Texas should not have been dismissed for claim splitting and that Texas's Article III standing confers federal jurisdiction. But we must decline to grant the requested preliminary injunction and instead remand for the district court's consideration in the first instance.

### A. Claim Splitting

The district court abused its discretion in dismissing Texas on the ground that it improperly split its claims.[6] The rule against claim splitting prohibits a party or parties in privity from simultaneously prosecuting multiple suits involving the same subject matter against the same defendants. *See Oliney v. Gardner*, 771 F.2d 856, 859 (5th Cir. 1985); *see also Gulf Island-IV, Inc. v. Blue Streak-Gulf Is Ops*, 24 F.3d 743, 746 (5th Cir. 1994). This principle is rooted in *res judicata* and primarily serves "to protect the defendant from being harassed by repetitive actions based on the same claim." *Matter of Super Van, Inc.*, 92 F.3d 366, 371 (5th Cir. 1996).

The parties agree that the two lawsuits here involve the same claims and different parties.[7] The question, then, is whether the GLO and the State

---

[5] This appeal does not consider the GLO's claims that the district court dismissed.

[6] Though the "standard of review in this court for the dismissal of duplicative litigation is not a settled matter," our sister circuits "review for abuse of discretion." *Cambridge Toxicology Grp. v. Exnicios*, 495 F.3d 169, 178 (5th Cir. 2007); *see, e.g., Scholz v. United States*, 18 F.4th 941, 950–51 (7th Cir. 2021). We follow their lead.

[7] The district court held that the GLO and the Texas Attorney General are "functionally identical parties," as both represent "the executive department of the State

of Texas are in privity. The district court held that they are. That conclusion is incorrect.

This court has found parties in privity "where the non-party's interests were adequately represented by a party to the original suit." *Meza v. Gen. Battery Corp.*, 908 F.2d 1262, 1266 (5th Cir. 1990). Privity "is not established by the mere fact that persons may be interested in the same question or in proving the same set of facts." *Freeman v. Lester Coggins Trucking, Inc.*, 771 F.2d 860, 865 (5th Cir. 1985) (quoting *Hardy v. Johns-Manville Sales Corp.*, 681 F.2d 334, 340 (5th Cir. 1982)). And it "requires more than a showing of parallel interests or, even, a use of the same attorney in both suits." *Id.* at 864. Where lawsuits involve different agencies of the same state, the "crucial point is whether or not in the earlier litigation the representative of [the state] had authority to represent [the state's] interests in a final adjudication of the issue in controversy." *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 403, 60 S. Ct. 907, 917 (1940).[8]

Here, the GLO's interests are not adequately aligned, factually or legally, with those of Texas. Factually, the GLO alleges that the Biden administration's changed border wall policy inflicts harms "particularly

---

of Texas." That conclusion is clearly erroneous for the simple fact that the State of Texas is not a party in the GLO action. *See Nagle v. Lee*, 807 F.2d 435, 440 (5th Cir. 1987) ("A party to a cause of action is a person who is both named as a party and subject to the court's jurisdiction."). The Federal Defendants rightly do not defend this portion of the opinion.

[8] "Indeed, courts have recognized in the preclusion context the folly of treating the government as a single entity in which representation by one government agent is necessarily representation for all segments of the government." *United States v. Ledee*, 772 F.3d 21, 30 (1st Cir. 2014); *see, e.g.*, *United States v. Baker*, 923 F.3d 390, 401 (5th Cir. 2019) (Securities and Exchange Commission and Department of Justice not the "same party" because "SEC is an independent agency with its own litigating authority"); *Hercules Carriers, Inc. v. Claimant State of Fla., Dep't of Transp.*, 768 F.2d 1558, 1580 (11th Cir. 1985) (Florida Department of Professional Regulation and Department of Transportation were not the same parties or in privity because agencies "had different functions and interests").

concentrated on a 3099-acre farm owned by the State of Texas in Starr County, Texas ('GLO Farm')." The GLO is the lessor of the GLO Farm and sues to vindicate its interests as the landlord and landowner/administrator of that property. The agency asserts the following injuries: diminished marketability, value, quiet use and enjoyment, and rental income; restrictions on the manner, methods, and timing for conducting certain farming operations, such as the spraying of chemicals; and the limiting of "[e]ssential farm activities such as the sorting of crops" to daylight hours "due to security concerns." And its request for relief focuses on the Rio Grande Valley-09 Project, a "two-mile segment of the Starr County border wall [that] was scheduled to be constructed on the GLO Farm."

The State of Texas, in comparison, sues to vindicate its "fiscal interests from the increase in unlawful migrants entering and remaining in the State[ ]." These fiscal interests include the additional costs of issuing driver's licenses, educating, providing healthcare, and criminal-justice processing. Texas therefore broadly asks the court to compel DHS to build a barrier system along the southwest border. The fiscal interests asserted by Texas are plainly distinct from the GLO's narrower proprietary interests, and Texas's broader interests would justify broader relief in a final injunction.

Further, the GLO has no legal authority to represent the interests Texas asserts here "in a final adjudication of the issue in controversy." *Sunshine Anthracite Coal*, 310 U.S. at 403, 60 S. Ct. at 917; *see also Saldano v. Roach*, 363 F.3d 545, 552 (5th Cir. 2004) (only "the Attorney General or a county or district attorney may represent the State" *qua* state (quoting *Hill v. Tex. Water Quality Bd.*, 568 S.W.2d 738, 741 (Tex. Civ. App.—Austin 1978, writ ref'd n.r.e.))). State law in fact limits the GLO Commissioner's authority to direction of the land office, management of Texas's public real

property, creation of suitable rules, and reporting to the governor and legislature. Tex. Nat. Res. Code § 31.051. *Cf. Sierra Club v. City of San Antonio*, 115 F.3d 311, 315 (5th Cir. 1997) (on motion by State of Texas to intervene pursuant to Federal Rule of Civil Procedure 24(a)(2), state agencies did not adequately represent the interests of the State of Texas, "and, under Texas law, may not do so").

In sum, the State of Texas and the GLO are not in privity for the purpose of claim splitting. The district court consequently erred in dismissing Texas.[9]

## B. Standing

Each State asserts it has standing. But only one needs standing for the action to proceed.[10] *Texas v. United States (DAPA Case)*, 809 F.3d 134, 151

---

[9] As explained above, we disagree with Judge Graves's assertion that the GLO has authority to represent the broader interests asserted by Texas. But even if the dissent is correct and the parties were in privity, the district court should not have dismissed Texas after it consolidated the cases. *See Miller v. U.S. Postal Serv.*, 729 F.2d 1033, 1036 (5th Cir. 1984) (consolidation of duplicative suits is preferable to dismissal of the second suit); *see also Curtis v. Citibank, N.A.*, 226 F.3d 133, 138–39 (2d Cir. 2000) (when a district court is faced with duplicative suits, it should select *one* of the available remedies, such as consolidation *or* dismissal). At the very least, the district court should have given Texas the choice as to which action to dismiss. *See Sierra Club*, 115 F.3d at 314 ("Under Texas law, the Attorney General enjoys an exclusive right to represent state agencies; other attorneys who may be permitted to assist the Attorney General are subordinate to his authority.").

[10] The district court addressed and rejected only Missouri's standing. We concur in Judge Graves's analysis that Missouri should not have been dismissed. But also, with Texas reinstated, its standing may now be considered. Neither party disputes that the issue of Texas's standing is properly before this court. We agree. *See Glass v. Paxton*, 900 F.3d 233, 243 (5th Cir. 2018) ("When the only remaining issues are purely legal questions that were briefed below, we have been willing to resolve those issues on appeal to avoid a waste of judicial resources."); *see also Cuba v. Pylant*, 814 F.3d 701, 710 (5th Cir. 2016) (considering issue that was "extensively briefed in the district court and would be subject to *de novo* review on appeal").

No. 22-40526

(5th Cir. 2015), *aff'd by an equally divided Court*, 579 U.S. 547, 136 S. Ct. 2271 (2016) (per curiam); *Texas v. Biden (Texas II)*, 20 F.4th 928, 969 (5th Cir. 2021), *rev'd on other grounds*, 142 S. Ct. 2528 (2022). Focusing on Texas, there is no doubt about the state's Article III standing.

"As the parties invoking federal jurisdiction, the States bear the burden of establishing standing." *Texas v. United States (DACA Case)*, 50 F.4th 498, 513 (5th Cir. 2022). Texas must therefore show (i) "an injury in fact that is concrete, particularized, and actual or imminent," (ii) that the defendant "likely caused" the injury, and (iii) "that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez,* 141 S. Ct. 2190, 2203 (2021). Texas "must make this showing 'with the manner and degree of evidence required at the successive stages of the litigation.'" *DACA Case*, 50 F.4th at 513 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2136 (1992)). At the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we 'presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" *Lujan*, 504 U.S. at 561, 112 S. Ct. at 2137 (alteration in original) (citation omitted).

*Injury in fact* is not at issue. Texas has alleged that if border wall construction does not proceed, the State will "incur unrecoverable costs in issuing driver's licenses, providing education, and administering healthcare" to illegal aliens who would not otherwise be in the State. The Federal Defendants do not contest the sufficiency of this pleading. Nor could they, as such financial harms are readily cognizable and well-established in this court's precedents.[11]

---

[11] For driver's licenses, *see DAPA Case*, 809 F.3d at 155; *State v. Biden* (*Texas I*), 10 F.4th 538, 547 (5th Cir. 2021); *Texas II*, 20 F.4th at 970–71. For education, *see Texas I*,

*As to causation,* Texas needs only to have alleged facts showing the Federal Defendants' conduct is a cause-in-fact of the injury that the State asserts. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2566 (2019) ("Article III requires no more than *de facto* causality." (quotation marks and citation omitted)); *see also DACA Case*, 50 F.4th at 519. Texas has done so here, alleging facts that, if true, demonstrate DHS's June 2021 decision[12] to divert 2020 and 2021 funds away from the creation of a border wall will result in fiscal injuries to the State. Specifically, Texas alleges (and the DHS has in the past affirmed) border barriers (i) reduce illegal entries in areas where constructed, and (ii) increase the rate at which illegal aliens are detected and apprehended. These benefits reduce some number of illegal immigrants entering Texas, even if they do not fully stem the tide, and thereby reduce Texas's costs relative to a non-border wall policy.

The Federal Defendants respond that Texas failed to demonstrate DHS's 2021 spending plan "will cause a net increase in the number of undocumented immigrants who enter the United States." In other words, the Federal Defendants argue that DHS's 2021 plan is at least as effective in reducing the relative amount of illegal immigration as building additional border barriers. This argument fails on several levels. First, it is inconsistent with the government's administrative record, filed in *GLO v. Biden,* 7:21-cv-272 (S.D. Tex.), that says deterrence of illegal border activities "is achieved

---

10 F.4th at 547–48; *DACA Case*, 50 F.4th at 517–19. And for healthcare, *see Texas I*, 10 F.4th at 547–48; *Texas II*, 20 F.4th at 972; *DACA Case*, 50 F.4th at 517–19.

[12] "While the proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734, 128 S. Ct. 2759, 2769 (2008). As this action was filed in October 2021, developments since then, such as the issuance of DHS's June 2022 border wall plan, will not be considered.

*primarily* through" border barriers. Second, the effectiveness of the Federal
Defendants' 2021 border wall plan raises a factual merits defense, not a
response cognizable on a motion to dismiss where allegations in Texas's
complaint must be taken as true. *See Lujan*, 504 U.S. at 561, 112 S. Ct. at
2137; *see also Massachusetts v. EPA*, 549 U.S. at 523–25, 127 S. Ct. at 1457–58
(causation established where State alleged EPA's non-action would cause
people to drive less fuel-efficient vehicles, which would contribute to a rise
in sea levels, which would cause the erosion of Massachusetts's shoreline).
Third, even if the installation of system-enhancing technology assists in
border control, "that does not negate Texas's injury, because we consider
only those offsetting benefits that are of the same type and arise from the
same transaction as the costs." *DAPA Case*, 809 F.3d at 155.[13]

 The Federal Defendants also contend that Texas's alleged injuries are
attributable to third parties—the illegal immigrants. To the contrary, Texas
alleges that increased miles of border wall will make the border harder to
cross. That hard barrier, in turn, will disincentivize illegal immigration and
reduce the number of illegal aliens who successfully cross into Texas. This
argument "does not rest on mere speculation about the decisions of third
parties." *Dep't of Com. v. New York*, 139 S. Ct. at 2566. It has already proven
true. For example, DHS has affirmed that border barriers funnel illegal
immigrants to areas where Customs and Border Protection is better prepared
to intercept them, thus reducing illegal immigration. In the absence of longer
walls, at least some illegal aliens who otherwise would have been prevented
from entering Texas will seek driver's licenses, education, and healthcare

---

[13] "Once injury is shown, no attempt is made to ask whether the injury is
outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant.
Standing is recognized to complain that some particular aspect of the relationship is
unlawful and has caused injury." 13A CHARLES ALAN WRIGHT ET AL., FEDERAL
PRACTICE AND PROCEDURE § 3531.4, AT 147 (3d ed. 2015) (footnote omitted).

from Texas. *See Texas II*, 20 F.4th at 969. Texas's allegations appropriately rely "on the predictable effect of Government action on the decisions of third parties." *Dep't of Com. v. New York*, 139 S. Ct. at 2566; *see also Texas II*, 20 F.4th at 972. The State has sufficiently alleged a causal connection between the Federal Defendants' failure to comply with the statutory mandate to build more miles of border wall and damage to the state from increased illegal immigration.

*As to redressability,* Texas alleges that constructing additional border barriers will reduce illegal entries in areas where those walls are constructed, increase detection rates across the entire border, and generally disincentivize illegal immigration. A declaratory judgment and injunction requiring DHS to spend 2020 and 2021 funds for border wall construction would, based on Texas's allegations, "slow or reduce" the relative number of illegal aliens entering Texas. *Massachusetts v. EPA*, 549 U.S. at 525, 127 S. Ct. at 1458. Such a reduction would lessen the relative costs Texas must expend on driver's licenses, education, and health care. *Cf. Texas II*, 20 F.4th at 973. These allegations are sufficient to show redressability at this stage of litigation.

The Federal Defendants' contentions to the contrary are unavailing. They first argue that an order compelling DHS to comply with the appropriations acts will not result in the construction of the Laredo projects. But that misconstrues what the States have alleged. They do not challenge DHS's decision to terminate particular construction contracts. They instead argue DHS's decision not to construct *any* new border wall is unlawful. A declaration that DHS's border wall plan expenditures are unlawful, and an injunction requiring DHS to spend the 2020 and 2021 appropriations on additional border barriers—wherever those might be constructed—would thus remedy the alleged harm.

The Federal Defendants also assert that new construction could not commence until DHS satisfied its obligation under Section 102(c) of IIRIRA to consult with relevant stakeholders and acquire any necessary property from private landowners. "[T]he fact that the effectiveness of a remedy might be delayed" is here irrelevant to the question whether relief would ameliorate the burdens faced by Texas from an ongoing tide of unlawful immigration. *Massachusetts v. EPA*, 549 U.S. at 525, 127 S. Ct. at 1458; *see also Arizona v. United States*, 567 U.S. 387, 397, 132 S. Ct. 2492, 2500 (2012).

Finally, the Federal Defendants argue that the States have not cited evidence demonstrating their "preferred" border-barrier system would be more effective than the system DHS has elected to construct. This argument again ignores the procedural posture of a motion to dismiss. Because the States' allegations are taken as true at the pleading stage, they are not yet obliged to produce specific evidence to counter the Federal Defendants' merits arguments. *See Lujan*, 504 U.S. at 561, 112 S. Ct. at 2137. And as noted above, once an "injury is shown, no attempt is made to ask whether the injury is outweighed by benefits the plaintiff has enjoyed from the relationship with the defendant." *DAPA Case*, 809 F.3d at 155–56.

"To eliminate any doubt as to standing, we emphasize that the States are entitled to 'special solicitude' in the standing analysis," at least in regard to their APA claim. *Texas v. Biden (Texas I)*, 10 F.4th 538, 549 (5th Cir. 2021) (citation omitted). To receive this benefit, a state must demonstrate (i) it has a "procedural right to challenge the action in question," and (ii) the challenged action affects one of its "quasi-sovereign interests." *Id.*

For good reason, the Federal Defendants do not challenge Texas's claim that it is entitled to special solicitude in this action. Texas proceeds under the APA, which this court has held sufficient to satisfy the first prong of the analysis. *See, e.g.*, *DACA Case*, 50 F.4th at 514. Regarding the second

prong, Texas contends it will be forced to spend millions of taxpayer dollars on driver's licenses, health care, and education as a result of DHS's refusal to allocate 2020 and 2021 funds for border wall construction. Such injuries implicate the States' sovereign interest in its fiscal policy and lawmaking authority, as Texas becomes pressed to redirect resources and alter its laws. *See, e.g.*, *DAPA Case*, 809 F.3d at 153–55 (pressure to change state law affects quasi-sovereign interest); *Texas II*, 20 F.4th at 970 (same). For example, Texas alleges that, as a direct result of DHS's decisions regarding border wall funding, the State was compelled to allocate $1.8 billion for border security, $750 million of which was dedicated to the construction of border barriers. Texas is thus entitled to special solicitude, meaning "imminence and redressability are easier to establish here than usual." *Texas II*, 20 F.4th at 970. To be clear, "Texas would be able to establish redressability without this special solicitude—but it reinforces our conclusion that the States have standing." *See Texas I*, 10 F.4th at 549. Texas has satisfied the third prong of the standing analysis.

In sum, Texas's pleadings suffice to establish Article III's standing requirements. The States' claims may advance.

### C. Preliminary Injunction

After dismissing the consolidated cases, the district court did not address the States' motion for a preliminary injunction. The States now ask this court to remand with instructions to grant that injunction.

"The matter of what questions may be taken up and resolved for the first time on appeal is one left primarily to the discretion of the courts of appeals, to be exercised on the facts of individual cases." *Singleton v. Wulff*, 428 U.S. 106, 121, 96 S. Ct. 2868, 2877 (1976). The general rule is "that a federal appellate court does not consider an issue not passed upon below." *Id.* at 120, 2877. But it is within the court's discretion to address such

questions "where the proper resolution is beyond any doubt or where injustice might otherwise result." *Id.* at 121, 2877 (internal quotation marks and citation omitted); *see also Glass v. Paxton*, 900 F.3d 233, 242–43 (5th Cir. 2018).

We decline to exercise discretion to address the States' motion for a preliminary injunction in the first instance. The question whether the States are substantially likely to succeed on the merits of one or more of their claims may largely pose questions of law, but ordering an injunction is ultimately "a matter of sound judicial discretion." *Yakus v. United States*, 321 U.S. 414, 440, 64 S. Ct. 660, 675 (1944). The district court can thoroughly address the motion, with an important caveat: The fiscal year 2020 and 2021 appropriations at issue expire, respectively, in September 2024 and September 2025. Moreover, the construction of physical barriers takes time even in the best of circumstances. And the tide of illegal immigration has been dramatically increasing ever since this case was filed. To the extent the facts have vindicated the States' position, significant delay will exacerbate their costs. For the purpose of expediting the continued development of this case, we urge the district court, on this limited remand, to act expeditiously, and any future appeal taken shall be directed to this panel.

## CONCLUSION

For the foregoing reasons, we REVERSE and REMAND with instructions to consider the States' motion for a preliminary injunction in an expeditious manner. It is ORDERED that any future request for appellate relief shall be directed to the panel consisting of Judges JONES, SMITH, and GRAVES.

James E. Graves, Jr., *Circuit Judge*, concurring in part and dissenting in part:

I would find that the district court did not clearly err in determining that Texas's General Land Office ("GLO") is Texas's virtual representative for purposes of this litigation. Thus, I dissent from the majority's conclusion that the district court erred by dismissing Texas. I would however conclude that the district court erred by dismissing Missouri for lack of standing at this stage. Accordingly, I concur in part with the majority to the extent it holds that Missouri should remain a party to this case.

## A. Claim Splitting

The district court found privity between Texas and its GLO for purposes of this litigation based on virtual representation. A "nonparty may be bound because the party to the first suit is so closely aligned with [the nonparty's] interests as to be [its] virtual representative." *Freeman v. Lester Coggins Trucking, Inc.*, 771 F.2d 860, 864 (5th Cir. 1985) (internal quotation marks and citation omitted). Virtual representation is a finding of fact subject to clear error review. *Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 599 (5th Cir. 1985) ("The trial court's finding that Sundman was not the virtual representative of Shinohara is one of fact, to be reviewed under the 'clearly erroneous' standard.") (citing *Aerojet-Gen. Corp. v. Askew*, 511 F.2d 710, 719 (5th Cir. 1975)). For virtual representation between officers or agencies of the same government, the "crucial point is whether or not in the earlier litigation the representative of [the state] had authority to represent [the state's] interests in a final adjudication of the issue in controversy." *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 403 (1940).

Addressing the GLO's legal authority, the majority points out that only the Attorney General or a county or district attorney may represent the State of Texas qua state. *Saldano v. Roach*, 363 F.3d 545, 552 (5th Cir. 2004). But *Sunshine Anthracite Coal* does not instruct us to ask whether the representative had authority to represent the State as such—we instead ask whether it had authority to represent the State's interests. We also do not ask whether it had authority to represent the State's interests in all proceedings, only whether it had authority to represent the State's interests in the issue in controversy. Here, the issue in controversy is whether the Federal Defendants violated various constitutional and statutory provisions by pausing the construction of border barriers and diverting congressionally appropriated funds to other border infrastructure projects.

As the GLO notes in its first amended complaint, it is charged with managing state-owned land and brought this suit to "vindicate its interests as the landlord and landowner/administrator of" a state-owned property in Starr County, Texas. Its commissioner sues under his official capacity based on his authority to "superintend, control and direct" the GLO and "execute and perform all acts and other things relating to public real property of the state [or rights of individuals in public real property which is required by law]." Tex. Nat. Res. Code § 31.051. Significantly, Texas has not argued that its GLO lacked authority to file this suit in the first place. Based on the relevant state law, the district court plausibly concluded that the GLO had authority to pursue this litigation.

The majority also finds various factual dissimilarities between the GLO's and Texas's interests in the issue in controversy. They distinguish Texas's asserted fiscal interests from its property interests. They also claim that Texas broadly asks the court to compel the DHS to build a barrier system while the GLO's request for relief focuses on a two-mile segment of the Rio Grande Valley-09 Project. The GLO's requested relief is not so limited. Like

Texas, the GLO seeks declaratory and injunctive relief preventing the DHS "from reallocating or otherwise diverting funds appropriated and/or obligated for border wall construction projects in Texas." It also seeks an injunction against the rescission of border wall contracts, the pause on construction, and the reallocation of funds for *all* border wall construction projects in Texas, including the two-mile segment in the Rio Grande Valley-09 Project. While Texas may have other interests in pursuing this litigation, the GLO does seek to vindicate Texas's property interests by requesting essentially the same relief that Texas seeks in its complaint. Accordingly, I would find no clear error in the district court's determination that Texas's GLO has authority to represent Texas's interests in a final adjudication of this issue.[1]

## B. Standing

"[T]he presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 53 n.2 (2006) (citation omitted). The majority concluded that Texas should not have been dismissed, so it went on to address Texas's standing. After it found that Texas had standing to pursue its claims, there was no need for it to address Missouri's standing. Since I

---

[1] In the alternative, the majority holds that, under *Miller v. U.S. Postal Serv.*, the district court should not have dismissed Texas after the cases were consolidated. 729 F.2d 1033, 1036 (5th Cir. 1984). In *Miller*, this court concluded that the district court erred when it dismissed a second suit filed by the same plaintiff against the same defendant involving the same set of facts instead of consolidating the cases. *Id.* ("The proper solution to the problems created by the existence of two or more cases involving the same parties and issues, simultaneously pending in the same court would be to consolidate them under Rule 42(a) of the Federal Rules of Civil Procedure.") (citation omitted). As the majority points out, the State of Texas and its GLO are not the same party. Thus, *Miller* did not bind the district court to keep Texas as a party after the cases were consolidated.

would find that the district court properly dismissed Texas, I review the district court's analysis of Missouri's standing.

Here, the Federal Defendants brought a facial challenge, not a factual challenge, to Missouri's standing because they did not support their motion with any additional evidentiary materials. *Paterson v. Weinberger*, 644 F.2d 521, 523 (5th Cir. 1981) (An attack is "factual" rather than "facial" if the defendant "submits affidavits, testimony, or other evidentiary materials."). "Where, as here, the movant mounts a 'facial attack' on jurisdiction based only on the allegations in the complaint, the court simply considers 'the sufficiency of the allegations in the complaint because they are presumed to be true.'" *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 533 (5th Cir. 2016) (citation omitted).

The district court treated the Federal Defendants' motion to dismiss as a factual challenge and evaluated whether there was evidence to support Missouri's standing. *See Texas Gen. Land Off. v. Biden*, 619 F. Supp. 3d 673, 716 (S.D. Tex. 2022) ("The Court need not uncritically accept this inferential chain, and may evaluate Missouri's evidence of its alleged harms."). For instance, the district court faulted Missouri for not providing any evidence to supports its allegation that "6 out of every 1,000 illegal aliens entering the United States enters and remains in Missouri." *Id.* at 717 ("Missouri provides no reference or citation whatsoever for this conclusory claim."). It also relied on cases where defendants raised factual challenges to the plaintiff's standing. *See, e.g.*, *Arizona v. Mayorkas*, 600 F. Supp. 3d 994, 1004 (D. Ariz. 2022) ("Defendants are mounting a factual attack on the Court's subject-matter jurisdiction. . . No presumptive truthfulness attaches to plaintiff's allegations.").

If the Federal Defendants had brought a factual challenge to Missouri's standing, these inquiries would have been appropriate because

Missouri would have to sustain its burden of proof by submitting evidence. *Irwin v. Veterans Admin.*, 874 F.2d 1092, 1096 (5th Cir. 1989), *aff'd sub nom. Irwin v. Dep't of Veterans Affs.*, 498 U.S. 89 (1990). However, confining the analysis to the complaint, Missouri has sufficiently alleged standing. As to causation, Missouri alleges that border security measures such as border barriers decrease the rate of illegal immigration into this country. It also alleges that dismantling such measures has increased the number of people attempting to illegally enter the country in the past. More specifically, it alleges that the Federal Defendants' termination of border wall contracts and construction allows more people to enter and remain in Missouri illegally. For its injury, it alleges that this increase in immigrants illegally present in Missouri will cause it to incur additional costs in issuing driver's licenses, providing education, and administering healthcare. Taking these allegations as true, Missouri's alleged injuries would at least be redressed in part by its requested declaratory and injunctive relief requiring DHS to spend 2020 and 2021 funds on border wall construction. The Federal Defendants challenge the truth of these assertions on appeal, but we must presume their truth in a facial challenge to subject-matter jurisdiction. Missouri has sufficiently alleged standing at this stage, so the district court erred by concluding otherwise.

## C. Conclusion

For these reasons, I would affirm the district court's dismissal of Texas but reverse the district court's dismissal of Missouri. I respectfully concur in the judgment in part and dissent in part.