**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

| | |
|---|---|
| THE GENERAL LAND OFFICE OF THE STATE OF TEXAS, and GEORGE P. BUSH, in his official capacity as Commissioner of the Texas General Land Office,<br><br>      Plaintiffs,<br><br>   v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; and ALEJANDRO MAYORKAS, in his official capacity as Secretary of the Department of Homeland Security,<br><br>      Defendants. | Civil Action No. 7:21-cv-00272 |
| THE STATE OF MISSOURI; THE STATE OF TEXAS,<br><br>      Plaintiffs,<br><br>   v.<br><br>JOSEPH R. BIDEN, in his official capacity as President of the United States, *et al.*<br><br>      Defendants. | Civil Action No. 7:21-cv-00420 (formerly No. 6:21-cv-00052) |

**DEFENDANTS' SUPPLEMENTAL OPPOSITION TO PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION**

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

BACKGROUND ..................................................................................................................3

I.     Statutory Background ...................................................................................................3

       A.     DHS's Statutory Authority to Construct Border Barrier Infrastructure and Undertake Environmental Planning ...................................................................3

       B.     Congressional Appropriations to DHS for Border Barrier Infrastructure and Environmental Planning .................................................................................4

II.    Factual Background ......................................................................................................5

       A.     President Trump's Plan to Obtain Additional Funding for Border Barriers from the Departments of Defense and Treasury .............................................5

       B.     President Biden's Proclamation Terminating the National Emergency at the Southern Border and Directing Agencies to Develop Border Wall Funding Plans ...........................................................................................................6

       C.     DoD and DHS Border Wall Plans ................................................................7

III.   Prior Proceedings ......................................................................................................11

STANDARD OF REVIEW ...............................................................................................13

ARGUMENT ....................................................................................................................13

I.     The States Have Failed to Show a Likelihood of Success on the Merits. ....................13

       A.     The States Lack Article III Standing to Challenge DHS's Border Barrier Spending Policies. ....................................................................................13

             1.     The Supreme Court's Decision in the *Enforcement Priorities* Case. ....................15

             2.     The States Have Failed to Show an Injury-in-Fact for Purposes of Article III Standing. ....................................................16

              3.     The States Have Failed to Demonstrate Traceability and Redressability. .........................................................................23

       B.     The States Are Unlikely to Succeed on Their APA Claims Because Funding Decisions Are Committed to Agency Discretion. ........................................27

       C.     The States' Claims Under the DHS Appropriations Acts and the Impoundment Control Act Fail. ..................................................................32

i

1. The States Do Not Fall Within the Zone of Interests Protected by the Statutes. ....................................................................................32

2. DHS Has Acted Consistent with The Requirements of its Congressional Appropriations and the Impoundment Control Act. .............39

D. DHS Did Not Violate the Constitution. ..........................................................46

E. DHS's Funding Decisions Are Not Arbitrary or Capricious. ........................50

II. The Remaining Factors Weigh Strongly Against Granting a Preliminary Injunction. ..............57

III. The Requested Injunction Is Overbroad and Unworkable. ........................................................59

CONCLUSION ..........................................................................................................................64

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Alan Guttmacher Institute v. McPherson,*
    597 F. Supp. 1530 (S.D.N.Y. 1984) ........................................................................... 18, 30

*Anibowei v. Morgan,*
    70 F.4th 898 (5th Cir. 2023) ........................................................................................ 14

*Arias v. DynCorp,*
    752 F.3d 1011 (D.C. Cir. 2014) ................................................................................... 22

*Arizona v. Biden,*
    31 F.4th 469 (6th Cir. 2022) ....................................................................................... 61

*Arizona v. Mayorkas,*
    584 F. Supp. 3d 783 (D. Ariz. 2022) ......................................................................... 25

*Arizona v. Mayorkas,*
    600 F. Supp. 3d 994 (D. Ariz. 2022) ..................................................................... 25, 49

*Ass'n for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trustees,*
    19 F.3d 241 (5th Cir. 1994) ......................................................................................... 22

*Ass'n of Data Processing Serv. Orgs., Inc. v. Camp,*
    397 U.S. 150 (1970) ..................................................................................................... 33

*Baker v. Carr,*
    369 U.S. 186 (1962) ..................................................................................................... 49

*Bennett v. Spear,*
    520 U.S. 154 (1997) ..................................................................................................... 33

*Biden v. Nebraska,*
    143 S. Ct. 2355 (2023) ................................................................................................. 20

*Block v. Cmty. Nutrition Inst.,*
    467 U.S. 340 (1984) ..................................................................................................... 27

*Bluefield Water Ass'n v. City of Starkville,*
    577 F.3d 250 (5th Cir. 2009) .................................................................................. 13, 24

*Boston Stock Exch. v. State Tax Comm'n,*
    429 U.S. 318 (1977) ..................................................................................................... 33

*Bowsher v. Synar,*
    478 U.S. 714 (1986) ..................................................................................................... 36

*California v. Texas,*
   141 S. Ct. 2104 (2021)............................................................................................24

*City of N.Y. v. Mickalis Pawn Shop, LLC,*
   645 F.3d 114 (2d Cir. 2011) ................................................................................63

*City of New Haven v. United States,*
   809 F.2d 900 (D.C. Cir. 1987) ............................................................................40

*Clarke v. Sec. Indus. Ass'n,*
   479 U.S. 388 (1987) ............................................................................................33

*Cleveland Assets, LLC v. United States,*
   132 Fed. Cl. 264 (2017), *aff'd,* 883 F.3d 1378 (Fed. Cir. 2018)............................35

*Cmty. Action of Laramie Cnty., Inc. v. Bowen,*
   866 F.2d 347 (10th Cir. 1989) ............................................................................30

*Cnty. of El Paso v. Chertoff,*
   No. EP-CA-196-FM, 2008 WL 4372693 (W.D. Tex. Aug. 29, 2008) .........................4, 45

*Crane v. Johnson,*
   783 F.3d 244 (5th Cir 2015) ...............................................................................25

*Ctr. for Biological Diversity v. Trump,*
   453 F. Supp. 3d 11 (D.D.C. 2020) ......................................................................48

*Dalton v. Specter,*
   511 U.S. 462 (1994) ..............................................................................47, 48, 49

*Daves v. Dallas Cnty.,*
   22 F.4th 522 (5th Cir. 2022)................................................................................14

*Dep't of Homeland Sec. v. New York,*
   140 S. Ct. 599 (2020) ..........................................................................................60

*Dep't of Homeland Security v. Regents of the Univ. of Cal.,*
   140 S. Ct. 1891 (2020).........................................................................................55

*E.T. v. Paxton,*
   41 F. 4th 709 (5th Cir. 2002)...............................................................................24

*El Paso County. v. Trump,*
   982 F.3d 332 (5th Cir. 2020), *cert. denied sub nom. El Paso Cnty. v. Biden,*
   141 S. Ct. 2885 (2021)................................................................................*passim*

*Encino Motorcars, LLC v. Navarro,*
   136 S. Ct. 2117 (2016)........................................................................................55

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) .................................................................................53

*FCC v. Prometheus Radio Project,*
    141 S. Ct. 1150 (2021) ..........................................................................50, 51

*Feds for Med. Freedom v. Biden,*
    63 F.4th 366 (5th Cir. 2023) ................................................................60, 62

*Florida v. HHS,*
    19 F.4th 1271 (11th Cir. 2021) ................................................................61

*Florida v. Mellon,*
    273 U.S. 12 (1927) ...............................................................................19, 23

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992) .............................................................................49, 62

*General Land Office v. Biden,*
    71 F.4th 264 (5th Cir. 2023) ................................................................*passim*

*Gilday v. Dubois,*
    124 F.3d 277 (1st Cir. 1997) ....................................................................63

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) .............................................................................59

*Glass Packaging Inst. v. Regan,*
    737 F.2d 1083 (D.C. Cir. 1984) ................................................................35

*Google, Inc. v. Hood,*
    822 F.3d 212 (5th Cir. 2016) .....................................................................13

*Hazardous Waste Treatment Council v. Thomas,*
    885 F.2d 918 (D.C. Cir. 1989) ..................................................................34

*Heckler v. Cheney,*
    470 U.S. 821 (1985) .............................................................................*passim*

*Holland Am. Ins. Co. v. Succession of Roy,*
    777 F.2d 992 (5th Cir. 1985) .....................................................................62

*Huss v. Gayden,*
    571 F.3d 442 (5th Cir. 2009) .....................................................................25

*In re Border Infrastructure Env't Litig.,*
    915 F.3d 1213 (9th Cir. 2019) ................................................................4, 44

*In re Border Infrastructure Env't Litig.*,
   284 F. Supp. 3d 1092 (S.D. Cal. 2018), *aff'd*, 915 F.3d 1213 (9th Cir. 2019) ......................................4

*INS v. Legalization Assistance Project of Los Angeles Cty. Fed'n of Lab.*,
   510 U.S. 1301 (1993) ......................................................................................................38

*Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*,
   746 F.2d 855 (D.C. Cir. 1984) ......................................................................................46

*Iowa ex rel. Miller v. Block*,
   771 F.2d 347 (8th Cir. 1985) ........................................................................................22

*John Doe # 1 v. Veneman*,
   380 F.3d 807 (5th Cir. 2004) ........................................................................................59

*Lake Charles Diesel, Inc. v. Gen. Motors Corp.*,
   328 F.3d 192 (5th Cir. 2003) ........................................................................................13

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   572 U.S. 118 (2014) ..................................................................................... 32, 33, 35, 38

*Lincoln v. Vigil*,
   508 U.S. 182 (1993) ..............................................................................................*passim*

*Louisiana v. Becerra*,
   20 F.4th 260 (5th Cir. 2021) ........................................................................................60

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ......................................................................................................14

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) ......................................................................................................59

*Maine Cmty. Health Options v. United States*,
   140 S. Ct. 1308 (2020) ....................................................................................................4

*Massachusetts v. EPA*,
   549 U.S. 497 (2007) ................................................................................................20, 24

*Massachusetts v. Laird*,
   400 U.S. 886 (1970) ......................................................................................................19

*Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*,
   567 U.S. 209 (2012) ..............................................................................................*passim*

*Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*,
   602 F.3d 687 (5th Cir. 2010) ........................................................................................51

*Miccosukee Tribe of Indians of Fla. v. United States,*
   No. 08-23523-CIV, 2009 WL 10668917 (S.D. Fla. Sept. 30, 2009) .................................34

*Milk Train, Inc. v. Veneman,*
   310 F.3d 747 (D.C. Cir. 2002) ...............................................................................29

*Mississippi v. Johnson,*
   71 U.S. (4 Wall.) 475 (1866) ..........................................................................49, 62

*Moses v. Banco Mortg. Co.,*
   778 F.2d 267 (5th Cir. 1985) ...........................................................................33, 38

*Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
   463 U.S. 29 (1983) ...............................................................................................53

*Nat'l Treasury Emp. Union v. Campbell,*
   654 F.2d 784 (D.C. Cir. 1981) .............................................................................36

*Nevada v. Dep't of Energy,*
   400 F.3d 9 (D.C. Cir. 2005)............................................................................36, 46

*Nken v. Holder,*
   556 U.S. 418 (2009) .......................................................................................13, 57

*O'Shea v. Littleton,*
   414 U.S. 488 (1974) ............................................................................................57

*Oubre v. Schlumberger, Ltd.,*
   684 F. App'x 424 (5th Cir. 2017) .......................................................................64

*Payne v. Travenol Lab'ys, Inc.,*
   565 F.2d 895 (5th Cir. 1978)...............................................................................62

*Pennsylvania ex rel. Shapp v. Kleppe,*
   533 F.2d 668 (D.C. Cir. 1976) ......................................................................22, 23

*Physicians ACO, LLC v. Computer Scis. Corp.,*
   No. 4:16-CV-1293, 2017 WL 3187609 (S.D. Tex. July 26, 2017) ......................64

*Pub. Citizen v. Stockman,*
   528 F. Supp. 824 &  (D.D.C. 1981) ................................................................38, 39

*Raines v. Byrd,*
   521 U.S. 811 (1997) .......................................................................................15, 19

*Rhode Island v. Massachusetts,*
   37 U.S. (12 Pet.) 657 (1838) ...............................................................................61

*Rocky Ford Hous. Auth. v. U.S. Dep't of Agric.*,
    427 F. Supp. 118 (D.D.C. 1977) ........................................................................... 38, 39

*Rogers v. United States*,
    14 Cl. Ct. 39 (1987), *aff'd*, 861 F.2d 729 (Fed. Cir. 1988) ..................................... 39

*SEC v. Goble*,
    682 F.3d 934 (11th Cir. 2012) ................................................................................. 63

*Sierra Club v. Trump*,
    963 F.3d 874 (9th Cir.), *cert. granted*, 141 S. Ct. 618 (2020), and *vacated and remanded sub nom.*
    *Biden v. Sierra Club*, 142 S. Ct. 46 (2021) ............................................................. 6

*Speech First, Inc. v. Fenves*,
    979 F.3d 319 (5th Cir. 2020) .................................................................................. 14

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016) ................................................................................................ 13

*State of Louisiana v. Biden*,
    45 F.4th 841 (5th Cir. 2022) ................................................................................... 63

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*,
    143 S. Ct. 2141 (2023) ............................................................................................ 19

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) ............................................................................... 49

*Texas Oil & Gas Ass'n v. U.S. EPA*,
    161 F.3d 923 (5th Cir. 1998) .................................................................................. 51

*Texas v. United States*,
    14 F.4th 332 (5th Cir. 2021), *vacated on rehearing en banc*, 24 F.4th 407 (5th Cir. 2021) ...................... 60

*Texas v. United States*,
    809 F.3d 134 (5th Cir. 2015) ................................................................... 22, 33, 60, 62

*Thompson* v. *North Am. Stainless, LP*,
    562 U.S. 170 (2011) ........................................................................................... 33, 36

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ............................................................................................ 13

*Trump v. Hawaii*,
    138 S. Ct. 2392 (2018) ............................................................................................ 60

*Trump v. Sierra Club*,
    140 S. Ct. 1 (2019) .................................................................................................. 35

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*,
   665 F.3d 1339 (D.C. Cir. 2012) ................................................................ 44, 45

*U.S. House of Representatives v. Mnuchin*,
   976 F.3d 1 (D.C. Cir. 2020), *cert. granted and judgment vacated sub nom.*
   *Yellen v. U.S. House of Representatives*, 142 S. Ct. 332 (2021) ..................... 6

*United States v. Arizona*,
   No. CV 10-1413-PHX-SRB, 2011 WL 13137062 (D. Ariz. Oct. 21, 2011) ................................ 3, 26

*United States v. Matthews*,
   312 F.3d 652 (5th Cir. 2002) .................................................................... 14

*United States v. Texas* (*Enforcement Priorities*),
   143 S. Ct. 1964 (2023) ........................................................................ *passim*

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
   454 U.S. 464 (1982) ................................................................................ 47

*Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*,
   5 F.4th 997 (9th Cir. 2021) ...................................................................... 25

*Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ............................................................................. 13, 56

*Wyoming v. Oklahoma*,
   502 U.S. 437 (1992) ................................................................................ 23

*Youngstown Sheet & Tube Co. v. Sawyer*,
   343 U.S. 579 (1952) ........................................................................... 47, 48

*Zimmerman v. City of Austin*,
   881 F.3d 378 (5th Cir. 2018) .................................................................... 22

**STATUTES**

2 U.S.C. §§ 681–688 ........................................................................... 26, 37

2 U.S.C. § 682 ...................................................................................... 40

2 U.S.C. § 683 ...................................................................................... 38

2 U.S.C. § 684 .................................................................................. 37, 38

2 U.S.C. § 685 ...................................................................................... 37

2 U.S.C. § 687 .................................................................................. 21, 38

5 U.S.C. § 701 ...................................................................................... 27

10 U.S.C. § 284 ................................................................................................................41

10 U.S.C. §§ 2301 *et seq.* ...............................................................................................63

23 U.S.C. § 210 ................................................................................................................30

31 U.S.C. § 1301 ................................................................................................................5

31 U.S.C. § 1502 ................................................................................................................4

31 U.S.C. § 1552 ................................................................................................................4

40 U.S.C. § 3307 ..............................................................................................................35

Budget and Accounting Act, 1921,
    Pub. L. No. 67-13, 42 Stat. 20 ..................................................................................19

Dep't of the Interior & Related Agencies Appropriations Act, 1993,
    Pub. L. No. 102-381, 106 Stat. 1374 (1992) ............................................................31

Illegal Immigration Reform and Immigrant Responsibility Act of 1996,
    Pub. L. No. 104-208, 110 Stat. 3009 (1996) (codified as amended at 8 U.S.C. § 1103 note) .....*passim*

Secure Fence Act of 2006,
    Pub. L. No. 109-367, *repealed and replaced by* Pub. L. No. 110-161, Div. E, § 564 ...............................3

Dep't of Homeland Securitey Appropriations Act, 2008,
    Pub. L. No. 110-161, 121 Stat. 1844 (2007) ..............................................................3

DHS Appropriations Act, 2017,
    Pub. L. No. 115-31, 131 Stat. 135 ..............................................................................5

DHS Appropriations Act, 2018,
    Pub. L. No. 115-141, 132 Stat. 348 ......................................................................5, 30

DHS Appropriations Act, 2019,
    Pub. L. No. 116-6, 133 Stat. 13 ..................................................................................5

DHS Appropriations Act, 2020,
    Pub L. No. 116-93, 133 Stat. 2317 .....................................................................*passim*

DHS Appropriations Act, 2021,
    Pub L. No. 116-260, 134 Stat. 1182 ...................................................................*passim*

**RULES**

Fed. R. Civ. P. 65 ............................................................................................................63

## REGULATIONS

48 C.F.R. §§ 1 *et seq.* ...........................................................................................................63

Presidential Proclamation on Declaring a National Emergency Concerning the Southern
    Border of the United States,
    84 Fed. Reg. 4949 (Feb. 20, 2019) ................................................................ 5, 6

Termination of Emergency with Respect to the Southern Border of the United States and
    Redirection of Funds Diverted to the Border Wall Construction,
    Proclamation No. 10142, 86 Fed. Reg. 7225 (Jan. 20, 2021) ............................................*passim*

Executive Order 14010, Executive Order on Creating a Comprehensive Regional Framework to
    Address the Causes of Migration, to Manage Migration Throughout North and Central America,
    and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border,
    86 Fed. Reg. 8267 (Feb. 2, 2021) .............................................................................................7

## UNITED STATES CONSTITUTION

U.S. Const. art. II, § 3 .............................................................................................................48

U.S. Const. art. III, § 2 ...........................................................................................................13

## OTHER AUTHORITIES

1 GAO, Principles of Federal Appropriations Law (4th ed., 2016 rev.) ...................................40, 45, 46

*Congressional Committees,*
    B-329092, 2017 WL 6335684 (Comp. Gen. Dec. 12, 2017) ........................................... 37, 40

GAO, *Implementation of Army Safety Program,* B–223608 (Comp. Gen. Dec. 19, 1988) ..........................45

General Accounting Office, A Glossary of Terms Used in the Federal Budget Process
    (Sept. 2005)
    https://www.gao.gov/assets/gao-05-734sp.pdf ....................................................................40

H.R. Rep. No. 658, 93d Cong., 1st Sess. 41 (1971) .................................................................40

*In re Henry M. Jackson,*
    United States Senate, B-200685, 1980 WL 14499 (Comp. Gen. Dec. 23, 1980) ....................... 40, 41

*In re James R. Jones,*
    House of Representatives, B-203057 L/M, 1981 WL 23385 (Comp. Gen. Sept. 15, 1981) ..... 41, 43

Letter from Acting Dir., Office of Mgmt. & Budget to Senate Comm. on Appropriations
    (Jan. 6, 2019), 165 Cong. Rec. S1569 (Feb. 28, 2019) .........................................................5

*LTV Aerospace Corp.,*
    55 Comp. Gen. 307 (1975) ................................................................................... 17, 18

Matter of: Office of Management and Budget and U.S. Dep't of Homeland Security–Pause of
    Border Barrier Construction and Obligations,
    B-333110.1, 2021 WL 2451823 (June 15, 2021) ............................................................ 36, 46

President Donald J. Trump's Border Security Victory, 2019 WL 643814 (Feb. 15, 2019) .................... 6

S. Rep. No. 116-125 (2019) ....................................................................................................44

*System*, Merriam-Webster,
    https://www.merriam-webster.com/dictionary/system ......................................................44

Texas Legislature Online, *Actions on HB 9*,
    https://capitol.texas.gov/BillLookup/Actions.aspx?LegSess=872&Bill=HB9 ..............................22

*Trump v. Sierra Club*,
    No. 19A60, 2019 WL 3451617 (July 22, 2019) .........................................................................35

U.S. Dep't of Justice Office of Legal Counsel, Memorandum Opinion by William H. Rehnquist on
    Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted
    Schools (Dec. 1, 1969),
    www.justice.gov/file/20816/download........................................................................ 39, 40

## INTRODUCTION

The motion for preliminary injunction filed by the States of Texas and Missouri, and joined by the Texas General Land Office, should be denied.  Since the parties completed briefing on the preliminary injunction motion nearly two years ago, there have been significant legal and factual developments that further undermine Plaintiffs' extraordinary request to enjoin the way in which the Department of Homeland Security (DHS) expends its border barrier system funds.  These developments include (1) a recent Supreme Court decision undercutting the States' theory of Article III standing, (2) an amended plan issued by DHS setting forth additional lawful expenditures for its border barrier system appropriations, (3) the submission of the administrative record, and (4) recent construction activity along the southern border to improve the Nation's barrier infrastructure.  To ensure the Court has a current and complete record when deciding the motion, Defendants submit this supplemental memorandum in opposition to Plaintiffs' motion to replace the opposition brief Defendants filed in December 2021 (ECF No. 24).

Congress appropriated funds in fiscal years 2020 and 2021 to DHS for "construction barrier system along the southwest border," but left to the discretion of DHS how to spend those funds.  Based on its experience and expertise, DHS is prioritizing spending its funds on (1) installing barrier system attributes such as lights, cameras, and other detection technologies that will make existing barriers more effective, and (2) remediating barrier projects formerly undertaken by the Department of Defense (DoD) to ensure that those areas are safe and effective.  These projects are necessary to address life, safety, environmental, and operational concerns with existing barrier infrastructure.  They include construction of new barriers at specific locations where necessary to fill gaps that pose security risks, installation of technological attributes that help Border Patrol agents respond to illicit activity, addressing erosion and water drainage problems that threaten the integrity of existing barriers, and remediation of roads near barriers that inhibit access by Border Patrol agents.  These expenditures are lawful and consistent with a January 2021 presidential proclamation directing DHS to spend its barrier system funds consistent with their appropriated purpose.

The Court should accordingly deny the States' request to enter a nationwide preliminary injunction prohibiting DHS from spending its funds on these lawful projects.  As an initial matter, the States lack Article III standing in light of the Supreme Court's recent decision in *United States v. Texas* (*Enforcement Priorities*), 143 S. Ct. 1964 (2023), which rejected a similar theory of state standing based on the indirect effects of federal immigration policies on the States' social service expenditures.  The States also are unlikely to prevail because the challenged spending decisions are committed to agency discretion by law and because the States do not even arguably fall within the zone of interests protected by the appropriations statutes they challenge or the Impoundment Control Act.  DHS's spending plan is fully consistent with those statutory provisions, which appropriated funds simply "for the construction of barrier system."  That phrase plainly encompasses not only physical barriers but also other projects that make the barrier system infrastructure safe and effective, as both Congress and DHS have recognized.  Nothing in the Constitution prohibits DHS from spending its appropriated funds in this manner.  Further, DHS's spending plan is both reasonable and amply justified, as set forth in the administrative record.  Any indirect financial harms that the States might incur from DHS's expenditures are insufficient even to support standing, much less the extraordinary remedy of a preliminary injunction.  In any event, those harms are significantly outweighed by the benefit to the federal government and the public of allowing DHS to spend its appropriations on ongoing projects that improve the safety and effectiveness of the border barrier system.

The States' proposed injunction is also inappropriate and overbroad. The requested nationwide injunction, which simply restates the terms of the fiscal year 2020 and 2021 appropriations statutes, is a disfavored "obey-the-law" injunction incapable of providing fair notice of the conduct prohibited.  Longstanding precedent prohibits an injunction against the President.  And the States cannot seek rescission and reinstatement of terminated contracts to which the States were not a party. The States are not entitled to any equitable relief, let alone a sweeping nationwide injunction.

For these reasons, as explained further below, the Court should deny the motion for preliminary injunction.

# BACKGROUND

I. **Statutory Background**

A. **DHS's Statutory Authority to Construct Border Barrier Infrastructure and Undertake Environmental Planning**

Section 102(a) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA), Pub. L. No. 104-208, div. C, tit. I, § 102(a), 110 Stat. 3009 (1996) (codified as amended at 8 U.S.C. § 1103 note), authorizes the federal government to construct border barrier infrastructure. The statute directs the Secretary of Homeland Security (Secretary) to "take such actions as may be necessary to install additional physical barriers and roads (including the removal of obstacles to detection of illegal entrants) in the vicinity of the United States border to deter illegal crossings in areas of high illegal entry into the United States." IIRIRA § 102(a).

Section 102 vests broad discretion in the Secretary. In December 2007, Congress amended IIRIRA to require that DHS construct "reinforced fencing along not less than 700 miles of the southwest border where fencing would be most practical and effective . . . ." IIRIRA § 102(b)(1)(A); *see* Dep't of Homeland Security Appropriations Act, 2008, Pub. L. No. 110-161, Div. E, Title V § 564, 121 Stat. 1844, 2090 (2007). But Congress made clear that those instructions did not require the Secretary to "install fencing, physical barriers, roads, lighting, cameras, and sensors" at any given location "if the Secretary determine[d] that the use or placement of such resources is not the most appropriate means to achieve and maintain operational control over the international border at such location." IIRIRA § 102(b)(1)(D); *see also United States v. Arizona*, No. CV 10-1413-PHX-SRB, 2011 WL 13137062, at *8 (D. Ariz. Oct. 21, 2011) (dismissing IIRIRA claim brought by State of Arizona to compel border wall construction). In enacting this provision, Congress expressly repealed a section of IIRIRA that mandated construction at specific locations along the border. *Compare* Secure Fence Act of 2006, Pub. L. No. 109-367, § 3, *repealed and replaced by* Pub. L. No. 110-161, Div. E, § 564.

IIRIRA also grants the Secretary "sole discretion" to waive "all legal requirements" the Secretary "determines necessary to ensure expeditious construction" of barrier and roads. IIRIRA § 102(c). But even where the Secretary has waived environmental and other laws, DHS must consult

3

with various stakeholders— including other federal agencies, States, local governments, Indian tribes, and private property owners—to "minimize the impact on the environment, culture, commerce, and quality of life for the communities and residents located near the sites where such fencing is to be constructed." IIRIRA § 102(b)(1)(C). For projects covered by an IIRIRA waiver, DHS may, in its discretion, prepare Environmental Stewardship Plans, "which provide a comprehensive analysis of the potential environmental impacts" associated with border infrastructure construction and include appropriate best management practices to avoid or minimize potential environmental impacts from construction. *Cnty. of El Paso v. Chertoff*, No. EP-08-CA-196-FM, 2008 WL 4372693, at *11 (W.D. Tex. Aug. 29, 2008) (citation omitted); *see In re Border Infrastructure Env't Litig.*, 284 F. Supp. 3d 1092, 1123–25 (S.D. Cal. 2018) (summarizing DHS's consultation efforts for various border barrier projects), *aff'd*, 915 F.3d 1213 (9th Cir. 2019).

### B.    Congressional Appropriations to DHS for Border Barrier Infrastructure and Environmental Planning

Congress has regularly provided funding for border infrastructure projects in DHS's annual appropriations act. For fiscal years 2020 and 2021, the two appropriations that the States invoke here, Congress appropriated $1.375 billion each year "for the construction of barrier system along the southwest border." DHS Appropriations Act, 2020, Pub L. No. 116-93, Div. D, § 209, 133 Stat. 2317, 2511; DHS Appropriations Act, 2021, Pub L. No. 116-260, Div. F, § 210, 134 Stat. 1182, 1456–57.

Congress gave DHS five years to obligate its barrier system funds.[1] DHS Appropriations Act, 2020, Pub L. No. 116-93, Div. D, 133 Stat. at 2506 (stating that fiscal year 2020 funds "shall remain available until September 30, 2024"); DHS Appropriations Act, 2021, Pub L. No. 116-260, Div. F, 134 Stat. at 1452 (stating that fiscal year 2021 funds "shall remain available until September 30, 2025"). The imposition of time limits on appropriations is one of the primary ways Congress exercises control

---

[1] An obligation is a commitment by a federal agency, such as entering into a contract, "that creates a legal liability of the government for the payment of goods and services ordered or received . . . ." *Maine Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1319 (2020) (internal quotations and citation omitted). Federal law also provides that time-limited appropriations expire at the end of their period of availability if they are not obligated by the expiration date. *See* 31 U.S.C. §§ 1502(a), 1552.

over its Appropriations Clause power.  Congress generally limits the availability of appropriations to a one-year period for the fiscal year in which the funds are appropriated.  *See* 31 U.S.C. § 1301(c).  Here, however, Congress expressly authorized DHS to obligate its border wall construction funds over a five-year period and did not place any limitations on the pace of DHS's obligations, such as requiring DHS to obligate a certain amount or percentage of funds each fiscal year.

In appropriating these funds, Congress was aware of the potential environmental consequences of border infrastructure construction.  Congress therefore required DHS to submit reports addressing environmental planning.  In fiscal years 2017 and 2018, Congress directed DHS to submit an annual plan addressing, *inter alia,* "the environmental impacts, including on wildlife, of the construction and placement of physical barriers planned along the Southwest border" and the "effects on communities and property owners near areas of infrastructure deployment."  DHS Appropriations Act, 2017, Pub. L. No. 115-31, Div. F, Title VI, 131 Stat. 135, 434; DHS Appropriations Act, 2018, Pub. L. No. 115-141, Div. F, § 231, 132 Stat. 348, 617-18.  Congress required DHS to update these plans in subsequent fiscal years, including the environmental analysis of border barrier construction.  DHS Appropriations Act, 2019, Pub. L. No. 116-6, 133 Stat. 13, 28; DHS Appropriations Act, 2020, Pub. L. No. 116-93, 133 Stat. at 2512.

## II.    Factual Background

### A.    President Trump's Plan to Obtain Additional Funding for Border Barriers from the Departments of Defense and Treasury

In late 2018, then-President Trump and Congress reached an impasse over the amount of money Congress would appropriate to DHS for border wall construction.  The President sought $5.7 billion "for construction of a steel barrier for the Southwest border," but Congress did not appropriate that amount.  *See* Letter from Acting Dir., Office of Mgmt. & Budget to Senate Comm. on Appropriations (Jan. 6, 2019), 165 Cong. Rec. S1569, S1570 (Feb. 28, 2019).  In response, President Trump declared a national emergency at the southern border and released a plan to provide additional funding for border barrier construction by utilizing funds from other sources within DoD and the Department of the Treasury.  *See* Presidential Proclamation on Declaring a National Emergency

Concerning the Southern Border of the United States, 84 Fed. Reg. 4949 (Feb. 20, 2019); President Donald J. Trump's Border Security Victory, 2019 WL 643814 (Feb. 15, 2019).

Various plaintiffs around the country filed lawsuits challenging the national emergency declaration and the construction of border barrier projects using DoD and Treasury funds that were not specifically appropriated for that purpose. *See, e.g.*, *El Paso County. v. Trump*, 982 F.3d 332 (5th Cir. 2020), *cert. denied sub nom. El Paso Cnty. v. Biden*, 141 S. Ct. 2885 (2021); *Sierra Club v. Trump*, 963 F.3d 874, 880 (9th Cir.), *cert. granted*, 141 S. Ct. 618 (2020), and *vacated and remanded sub nom. Biden v. Sierra Club*, 142 S. Ct. 46 (2021); *U.S. House of Representatives v. Mnuchin*, 976 F.3d 1 (D.C. Cir. 2020), *cert. granted and judgment vacated sub. nom. Yellen v. U.S. House of Representatives*, 142 S. Ct. 332 (2021).

### B. President Biden's Proclamation Terminating the National Emergency at the Southern Border and Directing Agencies to Develop Border Wall Funding Plans

On January 20, 2021, President Biden issued a proclamation terminating the national emergency declaration and ending the use of diverted funds for border barrier construction. *See* Termination of Emergency with Respect to the Southern Border of the United States and Redirection of Funds Diverted to the Border Wall Construction, Proclamation No. 10142, 86 Fed. Reg. 7225, 7225 (Jan. 20, 2021). The President declared that "[i]t shall be the policy of [his] Administration that no more American taxpayer dollars be diverted to construct a border wall." *See* Proclamation, 86 Fed. Reg. at 7225. The Proclamation further stated that, although the "United States has a right and a duty to secure its borders and protect its people against threats," constructing "a massive wall that spans the entire southern border is not a serious policy solution" for targeting and addressing "genuine threats to our homeland security." *Id.*

The Proclamation therefore directed a "careful review of all resources appropriated or redirected to construct a southern border wall." *Id.* To facilitate that review, the President ordered the Secretary of Defense and the Secretary of Homeland Security to "pause work on each construction project on the southern border wall, to the extent permitted by law, as soon as possible." *Id.* He also ordered the Secretaries to "pause immediately the obligation of funds related to construction of the

southern border wall, to the extent permitted by law." *Id.* The Secretaries were authorized to make exceptions to the pause in limited circumstances "to avert immediate physical dangers or where an exception is required to ensure that funds appropriated by the Congress fulfill their intended purpose." *Id.* at 7226

During the construction pause, the Proclamation directed DHS and DoD to develop a plan "for the redirection of funds concerning the southern border wall, as appropriate and consistent with applicable law." *Id.* In addition, the Proclamation required the plan to "provid[e] for the expenditure of any funds that the Congress expressly appropriated for wall construction, consistent with their appropriated purpose." *Id.* After completion of the plan, the Proclamation ordered DoD and DHS to "take all appropriate steps to resume, modify, or terminate projects and to otherwise implement the plan." *Id.*

President Biden also revoked Executive Order 13767, 82 Fed. Reg. 8793 (Jan. 25, 2017), which set forth former President Trump's border wall construction policies and directives to federal agencies. *See* Executive Order 14010, Executive Order on Creating a Comprehensive Regional Framework to Address the Causes of Migration, to Manage Migration Throughout North and Central America, and to Provide Safe and Orderly Processing of Asylum Seekers at the United States Border § 4.a.ii.F.1, 86 Fed. Reg. 8267, 8270 (Feb. 2, 2021).

### C.    DoD and DHS Border Wall Plans

In June 2021, DoD and DHS announced the completion of their respective border wall plans. *See* Memorandum for Director, Office of Management and Budget re: DoD Plan for the Redirection of Border Wall Funds (June 10, 2021) (attached as Exhibit 1); DHS Border Wall Plan Pursuant to Presidential Proclamation 10142 (June 9, 2021) (Administrative Record (AR) at 4–8, ECF No. 66-3). DoD's plan provided for the cancellation of all DoD-funded border barrier projects and the transfer of all existing barrier infrastructure under DoD's control to DHS. *See* Ex. 1. DHS's plan set forth guiding principles to frame future decisions about how the agency would expend funds Congress appropriated to DHS for border system construction in fiscal years 2017–2021. *See* AR at 4–8.

For border-barrier projects funded by appropriations to DHS in fiscal years 2017–2020, the DHS plan states that, "prior to further construction, DHS will undertake a thorough review and replanning process." AR at 5. For the projects that will continue, DHS "intends to engage in standard environmental planning including taking actions consistent with the National Environmental Policy Act (NEPA) and other environmental planning and statutes." *Id.* This "multistep environmental planning process" includes "public scoping and comment on potential environmental impacts;" consultation with "affected landowners, tribes, border community residents, their elected representatives, and interested non-governmental organizations and advocates;" and an assessment of ways to "remediate or mitigate environmental damage caused by past border wall construction." AR at 5–6. The DHS plan also provides that discrete projects involving "urgent measures needed to avert immediate physical dangers" or "projects necessary to address life, safety, environmental, or other remediation requirements" may be exempt from the standard environmental planning process. AR at 5 (citing, as one example, the need to repair a compromised levee in the Rio Grande Valley). In those urgent circumstances, DHS would rely on existing waivers of environmental laws issued under § 102(c) of IIRIRA to expedite the necessary project work. *Id.* Additionally, the DHS plan contemplates using funds appropriated to DHS in fiscal years 2017–2020 to pay for construction work previously funded by money from the Treasury Forfeiture Fund. *See* AR at 5, 8.

The DHS plan further explained that DHS would use funds appropriated in fiscal year 2021 to cover costs associated with the DoD-funded projects for which DHS had now become responsible. *See* AR at 6–8. Those projects were "in various stages of completion" at the time DoD terminated its funding of them and the DHS plan recognized that DHS "will need to absorb some potentially significant costs related to DoD's discontinued border wall projects." AR at 7; *see* AR at 78–90 (memorandum explaining remediation and safety measures needed at DoD project sites, including photos of incomplete DoD barrier projects). The DHS plan therefore contemplates using funds appropriated in fiscal year 2021 for remediating these projects by undertaking tasks such as completing site drainage features and installing erosion-control and slope-stabilization measures to "ensure" that transferred DoD assets are "safe and stable." AR at 7. The DHS plan also recognized that fiscal year

2021 appropriations would be available to pay for contingency costs associated with other DHS-funded border wall projects, such as cost overruns, design changes, and contract suspension costs. *See* AR at 6–7. Any remaining 2021 funds would be dedicated to beginning project planning for future barrier construction projects. AR at 8.

On July 11, 2022, DHS amended its spending plan to reflect the agency's experiences over the previous year. *See* AR at 9–11, Amendment to DHS Border Wall Plan Pursuant to Presidential Proclamation 10142. The amendment explained that the need for remediation work at the project sites previously funded by DoD was "more substantial than anticipated." AR at 9. DHS found that site conditions had deteriorated, and additional remediation actions were "required to address a broader range of safety and environmental issues at the project sites." AR at 12–13. If not addressed, DHS assessed that the site conditions will "affect long term ingress and egress by [Border Patrol] agents and pose potential safety risks to agents, the general public, and migrants." AR at 13. Further, DHS concluded that remediation work in these areas would "enhance the long-term structural integrity" of the barrier infrastructure and reduce risks of environmental degradation. *Id.* Accordingly, the amended plan announced that DHS would prioritize using both its fiscal year 2020 and 2021 barrier appropriations to pay for the "[c]lose out, remediation, and mitigation" costs "of the barrier projects turned over to DHS by DoD." AR at 10–11; *see* AR at 113–116 & 122–149 (stating that the DoD "project site conditions create safety risks" and listing categories of proposed remediation projects supported by photos of example projects).

Additionally, the amended plan explained that DHS would prioritize using its fiscal year 2018–2021 funds to install "barrier system attributes" such as "lighting, cameras, and detection technology in areas where physical barrier has already been constructed." AR at 9. DHS found through its evaluation that many of the DoD-funded project sites lacked the necessary attributes to accompany the fencing. *See* AR at 18–19. DHS therefore determined that installation of these systemic improvements would "enhance the overall effectiveness of the previously constructed barrier." *Id.* at 9. System attributes are a "key component" of the barrier system. *See* AR at 14. The technologies provide "Border Patrol agents with domain awareness," allowing them to minimize response times

for emergency situations and to "track and respond to illicit cross-border activity more efficiently and effectively." *Id.* The attributes also are expected "to reduce long-term maintenance and repair costs" by providing alerts to agents when damage to the barrier is detected from breaching activity, such as an attempt to cut through the barrier. *Id.* In light of the expected "operational benefits" from installing system attributes, DHS concluded that these expenditures would be "an effective use of remaining" barrier infrastructure appropriations from fiscal years 2018–2021. *Id.*; *see* AR at 18–20 (explaining the positive operational impacts of barrier system attributes and the drain on Border Patrol resources in areas without such attributes); AR at 66 (illustration showing how barrier attributes work to enhance situational awareness for Border Patrol officers).

In addition to the priorities set forth in the amended plan, DHS has continued to use its barrier appropriations to construct new barriers in certain locations where necessary to protect life and safety and address operational concerns. For example, DHS has substantially completed a significant project to address 13.4 miles of compromised levee in the Rio Grande Valley that posed a significant flood risk. *See id.* at 68–69; Third Declaration of Paul Enriquez ¶ 10.j (Exhibit 2). The project involved construction of a 6–14 foot high earthen and concrete levee with a 4–6 foot "guardrail structure or short barrier" on the top of the levee. AR at 69; *see* Third Enriquez Decl. ¶ 10.j. DHS also approved various types of new barrier construction projects in other areas along the border. The projects include installing grates in the San Diego Sector where individuals were attempting entry through below-ground stormwater channels (AR at 94–95, 102), closing gaps in the San Diego and Yuma Sectors where incomplete barrier sections had become funnel points for illicit cross border activity (AR at 94–95, 153), and completing access gates in the barrier to address security vulnerabilities in the Rio Grande Valley, El Centro, and El Paso Sectors. *See* AR at 94, 151–153; *see also* AR at 99–103, 155–169 (photos of project areas). CBP has closed over 68 gaps in the barrier and an additional 50 gap and gate locations are under construction, with more planned construction in fiscal year 2024. *See* Third Enriquez Decl. ¶ 31. Many of these projects are funded by DHS's fiscal year 2020 or 2021 appropriations. *See id.* ¶¶ 10, 21 (describing projects with photos of project areas).

More recently, on June 30, 2023, DHS announced two fence replacement projects in the Yuma and El Centro Sectors, in addition to plans to construct approximately 20 miles of new border barrier system in Starr County, Texas.  *See id.* ¶¶ 10.i & k.  The replacement fencing will install new bollard barriers in locations where old fencing has become dilapidated and unsafe.  *See id.* ¶ 10.i.  The project in Starr County involves land acquisition as well as installation of 18-foot steel bollard fence panels and system attributes, such as detection technology, lighting, and roads.  *See id.* ¶ 10.k.  The projects will be funded by a combination of DHS's fiscal year 2018, 2019, and 2020 appropriations.  *See id.* ¶¶ 10.i & k.

### III.   Prior Proceedings

In July 2021, the Texas General Land Office and its Commissioner (GLO) sued the President, DHS, and the Secretary of Homeland Security in the McAllen Division of the Southern District of Texas alleging that the President's Proclamation and DHS's spending plan violated the Constitution, the Administrative Procedure Act (APA), and various statutes regulating federal appropriations and expenditures.  *See* ECF No. 1.  Three months later, Missouri and Texas filed a separate lawsuit in the Victoria Division against the same defendants raising substantially similar claims.  *See* Case No. 6:21-cv-00052 (S.D. Tex.).  The two lawsuits were subsequently consolidated in the McAllen Division.  *See* ECF No. 23.[2]

On November 8, 2021, Texas and Missouri moved for a preliminary injunction to enjoin Defendants "on a nationwide basis, from enforcing and implementing the January 20 Proclamation." Pls.' Motion For Preliminary Injunction, No. 7:21-cv-420, ECF No. 19 (PI Mot.).  The motion also sought a court order compelling Defendants to "obligate and spend the funds appropriated for 'construction of barrier system along the southwest border'" as provided in DHS's fiscal year 2020 and 2021 appropriations statutes and "to rescind the[] cancellation of contracts executed" for border wall construction.  *Id.*  At the Court's invitation, GLO filed a reply brief in support of the States'

---

[2] All docket citations are to Case No. 7:21-cv-272 unless otherwise noted.

motion. *See* ECF Nos. 23, 32. Defendants opposed the motion for preliminary injunction (ECF No. 24) and moved to dismiss both lawsuits. *See* ECF Nos. 35 & 36.

On August 3, 2022, the Court issued an opinion and order granting Defendants' motions to dismiss in part. *See* ECF No. 57. With respect to Missouri, the Court concluded that Missouri lacked Article III standing because it had failed to trace any of its alleged harms to border barrier construction decisions "multiple states away." *Id.* at 56. With respect to Texas, the Court concluded that the State had violated the common law rule against claim splitting "by breaking up its claims between different agencies within its executive branch." *Id.* at 52–53. The Court thus dismissed the States' complaint in full and denied their motion for a preliminary injunction motion as moot. *Id.* at 61.

The Court also dismissed all but two of the claims GLO asserted in its Amended Complaint. *Id.* Specifically, the Court dismissed the President and all claims directed against him. *Id.* at 14. Further, the Court dismissed all constitutional claims, *id.* at 33, and all statutory claims to the extent they were asserted independently of the cause of action provided by the APA. *Id.* at 15, 35. The Court also dismissed GLO's claim based on the Regulatory Flexibility Act. *Id.* at 39–40. The Court found that only "counts seven and eight" of the Amended Complaint asserting "claims for violations of the Administrative Procedure Act survive." *Id.* at 40.

The States appealed dismissal of their case. ECF No. 58. While that appeal was pending, the Court entered a case management order governing further proceedings in the *GLO* case. ECF No. 64. GLO and Defendants exchanged limited discovery and litigated the contents of the administrative record. ECF Nos. 74, 75, 80. Following the close of the discovery period and the Court's resolution of the administrative record issues, GLO and Defendants agreed to stay further proceedings pending the outcome of the States' appeal. ECF No. 81.

On June 16, 2023, the Fifth Circuit decided the States' appeal. *See General Land Office v. Biden*, 71 F.4th 264 (5th Cir. 2023) (*GLO*). The Fifth Circuit found at the pleading stage that both Missouri and Texas have standing, and that Texas should not have been dismissed on claim-splitting grounds. *Id.* at 269–75. The Fifth Circuit reversed and remanded the case with instruction for the district court "to consider the States' motion for a preliminary injunction in an expeditious manner." *Id.* at 275.

## STANDARD OF REVIEW

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). The moving party must "clearly show[]: '(1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) granting the preliminary injunction will not disserve the public interest.'" *Google, Inc. v. Hood*, 822 F.3d 212, 220 (5th Cir. 2016) (quoting *Lake Charles Diesel, Inc. v. Gen. Motors Corp.*, 328 F.3d 192, 195–96 (5th Cir. 2003)). The final two factors merge when a preliminary injunction is sought against the federal government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The plaintiff must "clearly carr[y] the burden of persuasion on all four requirements." *Bluefield Water Ass'n v. City of Starkville*, 577 F.3d 250, 253 (5th Cir. 2009) (internal quotation omitted).

## ARGUMENT

### I.    The States Have Failed to Show a Likelihood of Success on the Merits.

#### A.    The States Lack Article III Standing to Challenge DHS's Border Barrier Spending Policies.

Article III of the Constitution empowers federal courts to decide only "Cases" and "Controversies." U.S. Const. art. III, § 2, Cl. 1. "Federal courts do not . . . exercise general legal oversight of the Legislative and Executive Branches." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2203 (2021). Rather, a case or controversy exists only if the plaintiff has standing. *Id.*

To establish standing, a plaintiff "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). These elements are "essential to the Constitution's separation of powers" and ensure that federal courts exercise "their proper function in a limited and separated government." *TransUnion LLC*, 141 S. Ct. at 2203, 2207; *see Enforcement Priorities*, 143 S. Ct. at 1969.

As the party invoking federal court jurisdiction, the States "bear[] the burden of establishing these elements." *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "At the preliminary-injunction stage, the plaintiffs must make a clear showing that they have standing to maintain the preliminary injunction." *Daves v. Dallas Cnty.*, 22 F.4th 522, 542 (5th Cir. 2022) (internal quotations omitted). The States cannot rest on mere allegations to support a preliminary injunction. *See Anibowei v. Morgan*, 70 F.4th 898, 903 (5th Cir. 2023); *see also Lujan*, 504 U.S. at 561 (stating that "each element [of standing] must be supported ... with the manner and degree of evidence required at the successive stages of the litigation"). The States must instead "clearly show" that they likely meet each Article III standing element. *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020). The States have failed to do so here.

The Fifth Circuit on June 16, 2023, held that the States pled standing with sufficient plausibility to withstand Defendants' motion to dismiss. *See GLO*, 71 F.4th at 271–75. One week after that decision, however, the Supreme Court decided *Enforcement Priorities*, 143 S. Ct. 1964 (2023). In that case, Texas and Louisiana sued DHS seeking to have the courts vacate new immigration enforcement policy guidelines as inconsistent "with two federal statutes that purportedly require [DHS] to arrest more criminal noncitizens pending their removal." *Id.* at 1968. The States argued that DHS's failure to follow those statutory requirements imposed various costs on the States, such as "healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government." *Id.* at 1969. The Supreme Court rejected the States' challenge for lack of standing, emphasizing that the States had "not cited any precedent, history, or tradition of courts ordering the Executive Branch to change its arrest or prosecution" priorities. *Id.* at 1973.

The Supreme Court's decision is an intervening change of law and is irreconcilable with the theory of standing presented by the States and accepted by the Fifth Circuit in the earlier appeal in this case. *See United States v. Matthews*, 312 F.3d 652, 657 (5th Cir. 2002) (explaining that the law-of-the-case doctrine has an exception where "there has been an intervening change of law by a controlling authority"). The States here similarly invoke indirect social services costs from noncitizens who enter the country and seek an injunction from this Court ordering the federal government to change its

barrier system spending priorities and reallocate its funds to the types of construction projects the States would prefer. *See* PI Mot. at 34–41. The States' argument mirrors the argument advanced in *Enforcement Priorities* that the Supreme Court rejected. The Supreme Court's reasoning thus precludes the States' assertion of standing in this case. Additionally, the States have not adduced sufficient evidence to carry their burden for a preliminary injunction that their indirect social services costs are traceable to the DHS's funding decisions and redressable by this Court.

1.      **The Supreme Court's Decision in the *Enforcement Priorities* Case.**

In *Enforcement Priorities*, two States—Texas and Louisiana—challenged DHS guidelines that established priorities for immigration enforcement, arguing that the guidelines contravened two federal statutes that the States asserted required DHS to arrest certain noncitizens. *Enforcement Priorities*, 143 S. Ct. at 1968–69. The States alleged they were injured by DHS's guidelines because DHS's alleged failure to arrest and detain noncitizens "impose[d] costs" on the States, including by having to "supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government," and the States sought an injunction to "order the Executive Branch to alter its arrest policy so as to make more arrests." *Id.* at 1968–70.

The Supreme Court held that the States lacked an Article III injury. Although the Court acknowledged that "monetary costs are of course an injury," it stressed that to satisfy Article III standing, an injury must be "'legally and judicially cognizable,'" meaning, "'among other things,' that the 'dispute is traditionally thought to be capable of resolution through the judicial process'—in other words, that the asserted injury is traditionally redressable in federal court." *Id.* (quoting *Raines v. Byrd*, 521 U.S. 811, 819 (1997)). Applying that rule to the case before it, the Court concluded that there was no "precedent, history, or tradition of courts ordering the Executive Branch to change its arrest or prosecution policies so that the Executive Branch makes more arrests or initiates more prosecutions." *Id.* at 1970–71.

The Court identified several reasons why "federal courts have not traditionally entertained lawsuits of [the] kind" brought by the States there. *Id.* First, the Executive Branch "does not exercise

coercive power over an individual's liberty or property" when it declines to arrest or prosecute someone, and therefore "does not infringe upon the interests that courts often are called upon to protect." *Id.* at 1971. Second, lawsuits of this kind "run up against the Executive's Article II authority to enforce federal law." *Id.* at 1971–72. Third, analogizing to the Court's decisions in *Heckler v. Cheney*, 470 U.S. 821 (1985), and *Lincoln v. Vigil*, 508 U.S. 182 (1993), the Court explained that "courts generally lack meaningful standards for assessing the propriety of enforcement choices" with respect to arrest and detention, given the needs of the Executive Branch to weigh "resource constraints and regularly changing public-safety and public-welfare needs" when devising policy. *Id.* at 1972.

The Court also stressed the need to be "mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer." *Id.* at 1972 n.3. It did not dispute that States must "continue to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government," and incur costs by doing so. *Id.* at 1969. But it also stressed that "in our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending," and that when "a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id.* at 1972 n.3. The Court held that "none of the various theories of standing asserted by the States in this case overcomes the fundamental Article III problem with this lawsuit." *Id.*

Three Justices concurred in the Court's judgment, reasoning that plaintiffs lacked standing because their injuries were not capable of redress. *Id.* at 1976–80 (Gorsuch, J., concurring in the judgment). In sum, eight Justices of the Supreme Court concluded that the States lacked Article III standing to challenge federal immigration policy based on the policy's alleged fiscal burdens upon the States.

### 2. The States Have Failed to Show an Injury-in-Fact for Purposes of Article III Standing.

The Supreme Court's *Enforcement Priorities* decision—which was issued after the Fifth Circuit's decision holding that the States had sufficiently alleged standing at the pleading stage and is intervening precedent—makes clear that the States lack standing here. The States assert that the way in which

DHS has chosen to spend its barrier system appropriations has imposed indirect costs on the States in the form of increased social services, and the States have asked this Court to enjoin DHS's spending plan and to reverse cancellations of contracts that were entered into by the previous Administration to construct border barriers.  But like the States in *Enforcement Priorities*, the States here point to no precedent, history, or tradition for a suit challenging an agency's choice among permissible uses of a particular appropriation, or for requiring the federal Government to re-enter contracts it has already cancelled.  To the contrary, as was true in *Enforcement Priorities*, the States' claim here is not the sort thought to be "redressable in federal court," *Enforcement Priorities*, 143 S. Ct. at 1970.

First, as in *Enforcement Priorities*, this case does not involve the government's exercise of "coercive power over an individual's liberty or property."  *Id.* at 1970.  It involves DHS's budget priorities with respect to the construction of infrastructure at the southern border, and the States allege only an indirect injury as a result of DHS's discretionary spending decisions.  *See id.*  In such a case, "much more is needed to establish standing." *Id.* at 1971.  As the Supreme Court recognized, "federal policies frequently generate indirect effects on state revenues or state spending." *Id.* at 1972 n.3.  And when a State asserts . . . that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id.*  That is particularly true for the States' theory of injury here.  Whereas *Enforcement Priorities* involved speculation about the federal government's arrest and prosecution of individuals already present in the United States and presumably already availing themselves of social services, the States' theory of injury here turns on an even more attenuated causal chain.  Specifically, the States' theory depends on their speculation that (1) DHS's decision to prioritize spending to remediate and improve existing border infrastructure will cause more undocumented immigrants to enter the United States than would otherwise enter if DHS prioritized the projects the States would prefer; (2) that those noncitizens might choose to stay and live in Texas or to travel to Missouri; and (3) that, as a result, Texas and Missouri will have to spend state funds on social services that they would not otherwise spend.

Second, the States' suit runs headfirst into "the Executive's Article II authority." *Enforcement Priorities*, 143 S. Ct. at 1971.  It is "a fundamental principle of appropriations law . . . that where

'Congress merely appropriates lump-sum amounts without statutorily restricting what can be done with those funds, a clear inference arises that it does not intend to impose legally binding restrictions'" on the executive branch beyond those listed in the statute. *Lincoln*, 508 U.S. at 192 (quoting *LTV Aerospace Corp.*, 55 Comp. Gen. 307, 319 (1975)). Consistent with this "fundamental principle," choices between permissible expenditures of lump sum funds have long been thought to be the sort of decision committed to Executive Branch discretion as a matter of law, as outlined in *Lincoln v. Vigil*, 508 U.S. at 192. *See Enforcement Priorities*, 143 S. Ct. at 1972 (citing *Lincoln*, 508 U.S. at 190–92). Appropriations are finite; not every project that would qualify for funding under an appropriation can be funded. As with enforcement priority decisions, "inevitable resource constraints and regularly changing public-safety and public-welfare needs" require the Executive Branch to "balance many factors" when making spending decisions. *Enforcement Priorities*, 143 S. Ct. at 1972; *see Lincoln*, 508 U.S. at 192 (stating that agencies must have "flexibility" to make "necessary adjustments for 'unforeseen developments' and 'changing requirements'" when deciding how to spend lump sum appropriations) (quoting *LTV Aerospace Corp.*, 55 Comp. Gen. at 318). Courts therefore "generally lack meaningful standards for assessing the propriety of enforcement choices in this area." *See Enforcement Priorities*, 143 S. Ct. at 1972; *see also, e.g.*, *Alan Guttmacher Institute v. McPherson*, 597 F. Supp. 1530, 1536 (S.D.N.Y. 1984) (explaining that, when an appropriation gives "no clue" as to what projects that fall within a lump sum appropriation are "desirable candidates," courts have "no law to apply" in determining which projects the agency should fund, among the many possible projects it could fund).

Third, the States' "novel standing argument, if accepted, would entail expansive judicial direction" of DHS's spending priorities and would take courts down an "uncharted path" of reviewing agencies' discretionary spending decisions. *Enforcement Priorities*, 143 S. Ct. at 1973. The States offer no limiting principle for their expansive standing theory, as nearly every dollar of federal spending arguably has an indirect effect on some third party. Allowing this suit to proceed could open the floodgates to lawsuits about Executive Branch implementation of a wide array of appropriation statutes based on little more than the trickle-down effect that spending might have on State government budgets, local economies, or individual businesses. "Our constitutional system of

separation of powers 'contemplates a more restricted role for Article III courts.' *Id.* (quoting *Raines*, 521 U.S. at 825).  This separation-of-powers concern is particularly forceful in the appropriations context where Congress, not the courts, controls the power of the purse and exercises primary oversight responsibility over Executive Branch spending.  For example, when Congress was concerned about unauthorized Executive Branch spending in the aftermath of World War I, it responded not by creating a cause of action for States to sue the federal government, but by creating the General Accounting Office (now the Government Accountability Office) to provide independent oversight of the Executive Branch's use of appropriated funds.  *See* Budget and Accounting Act, 1921, Pub. L. No. 67-13, § 312(a), 42 Stat. 20, 25.

For all of these reasons, the "indirect effects on state revenues" asserted here do not establish the States' standing to sue DHS for its discretionary spending decisions on barrier system construction.  Even assuming such allegations were sufficient under Fifth Circuit precedent prior to *Enforcement Priorities*, that case makes clear that "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer," and that the States' assertions here do not suffice.  *See id.* at 1972 n.3.

To the extent the States contend that *Enforcement Priorities* has no application to appropriations matters, the Supreme Court made clear that the decision's foundational standing principles extend beyond the context of nonenforcement policies.  That much is evident from the Court's reliance on *Lincoln,* a case that focused on discretionary spending choices, as well as *Florida v. Mellon*, 273 U.S. 12 (1927) and *Massachusetts v. Laird*, 400 U.S. 886 (1970)—none of which involved challenges to nonenforcement policies.[3]  *Enforcement Priorities*, 143 S. Ct. at 1972 & n.3.

_____

[3] Although the dissent in *Enforcement Priorities* argues that the majority decision is limited to "arrest and prosecution policies," 143 S. Ct. at 1990 (Alito, J., dissenting), the majority was only clarifying the scope of the issues before it when discussing the difference between challenges to "arrest and prosecution policies" and "detention," *id.* at 1974 n.5, not limiting the opinion's applicability to other lawsuits lacking allegations of an injury traditionally cognizable by the judiciary. "A dissenting opinion is generally not the best source of legal advice on how to comply with the majority opinion." *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, 143 S. Ct. 2141, 2176 (2023).

The indirect social services expenditures the States asserted in *Enforcement Priorities* and this case also stand in contrast to the direct injury to Missouri that the Supreme Court recognized in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023).   There, the Supreme Court explained that the Secretary of Education's plans to discharge certain student loan debt would directly harm a public instrumentality of the state—which had entered contracts with the Department of Education and was set up to service student loans—by causing the closure of accounts and the loss of approximately $44 million in revenue from existing customers that the public instrumentality "otherwise would have earned under its contract with the Department of Education." *Id.* at 2365–66.   The States here do not allege that DHS's border wall expenditures will have any comparable direct loss of state revenue.   The States are not parties to any barrier construction contracts that would have provided direct revenue to their fiscs. Rather, their argument is that DHS's spending choices "generate indirect effects on state revenues or state spending." *Enforcement Priorities*, 143 S. Ct. at 1972 n.3.   That alleged harm is not at all similar to the direct loss of revenue in *Nebraska*.   Indeed, the inapposite nature of *Nebraska* to the States' standing theory in this case is illustrated by the fact that *Nebraska* did not cite or discuss *Enforcement Priorities*.

The States' standing also is not salvaged by *Massachusetts v. EPA*, 549 U.S. 497 (2007).   That case "involved a challenge to the denial of a statutorily authorized petition for rulemaking"—an agency action that is ordinarily subject to judicial review—and the Supreme Court extended a "special solicitude" to the State in that context. *See Enforcement Priorities*, 143 S. Ct. at 1975 n.6.   The majority in *Enforcement Priorities* recognized that *Massachusetts* "d[id] not control" where the States challenged "an exercise of the Executive's enforcement discretion," which ordinarily is not subject to judicial review. *See Enforcement Priorities*, 143 S. Ct. at 1975 n.6.   The same is true here, where the States seek to challenge the Executive's discretionary spending decisions, which also are not ordinarily subject to judicial review. *See Lincoln*, 508 U.S. at 192.   Moreover, because "special solicitude" relates to the issues of "imminence" and "redressability," it does not undermine the conclusion that, under *Enforcement Priorities*, this case does not present the *type* of injury that a court can redress. *GLO*, 71 F.4th at 274.

Finally, none of the factors that might weigh in favor of a different outcome is present in this case. *See Enforcement Priorities*, 143 S. Ct. at 1973–74.   Notably here, Congress has not provided specific

authorization to States to enforce appropriations guarantees.  To the contrary, Congress has vested exclusive authority in the Comptroller General to bring suit to require "budget authority to be made available for obligation."  *See* 2 U.S.C. § 687.  Indeed, the States do not identify any "case or historical practice" of a State seeking enjoin the way a federal agency spends its appropriations based on "indirect effects" to the State's budget or tax base.  *Enforcement Priorities*, 143 S. Ct. at 1970 & 1972 n.3. There is certainly no "precedent, history, or tradition of courts ordering the Executive Branch to" spend its appropriations in specific ways that would benefit a State's fisc.  *Id.* at 1970.  "A telling indication of the severe constitutional problem with the States' assertion of standing to bring this lawsuit is the lack of historical precedent supporting it."  *Id.* (internal quotations omitted); *see El Paso County*, 982 F.3d at 341 (holding El Paso County lacked standing to challenge DoD's decision to reallocate funding for a roads project to border wall construction based on the loss of local economic revenue from the cancelled project).

Nor has the United States utterly abdicated its responsibilities over barrier system construction.  *See Enforcement Priorities*, 143 S. Ct. at 1973–74.  DHS is filling gaps in existing barriers, constructing new barriers, adding system attributes to improve the effectiveness of barrier segments that lack cameras and other essential technology, and completing important remediation projects to improve the safety of incomplete barrier project areas.  The record amply demonstrates DHS has been spending the challenged fiscal year 2020 and 2021 funds consistent with their appropriated purpose.

Texas's arguments fail even apart from the Supreme Court's *Enforcement Priorities* decision. Texas asserts that the Texas Legislature has appropriated funds for border security personnel, equipment, jail space, and a border wall, and that it has standing because Defendants' policies forced Texas to take "mitigation measures" to prevent unlawful migration.[4]  PI Mot. at 42–43.  But these asserted costs also depend on Texas's assertion that DHS's spending priorities on barrier system construction have indirectly injured the State.  That Texas has spent its own funds to "mitigate[e]"

---

[4]  In *GLO*, the Fifth Circuit alluded to Texas's decision to appropriate funds to border security measures in analyzing the question of whether Texas was entitled to "special solicitude" in the consideration of its standing.  *GLO*, 71 F.4th at 274.  But the Fifth Circuit did not consider whether these expenditures could give rise to an injury-in-fact for purposes of standing.

those perceived indirect costs does not create standing.  The Fifth Circuit has repeatedly held that plaintiffs cannot spend their way into Article III standing, even when their fears of harm are sincere. *Zimmerman v. City of Austin*, 881 F.3d 378, 389 (5th Cir. 2018) ("standing cannot be conferred by a self-inflicted injury"); *Ass'n for Retarded Citizens of Dallas v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trustees*, 19 F.3d 241, 244 (5th Cir. 1994) (rejecting standing theory that would imply "any sincere plaintiff could bootstrap standing by expending its resources in response to actions of another").  Moreover, unlike the other costs complained of by the States, the Texas statute that appropriated these funds was not signed into law until September 17, 2021, well after the Proclamation and the initial DHS spending plan had issued.  Texas Legislature Online, *Actions on HB 9*, https://capitol.texas.gov/BillLookup/Actions.aspx?LegSess=872&Bill=HB9 (last visited Aug. 18, 2023).  That fact distinguishes these alleged forms of injury from the other types of fiscal harm the States have relied on in previous matters.  *See Texas v. United States*, 809 F.3d 134, 159 (5th Cir. 2015) (rejecting argument that States had caused their own injury by subsidizing driver licenses because the law was enacted "one year before DACA and three years before DAPA was announced, and there is no hint that the state anticipated a change in immigration policy" (footnote omitted)).  Standing is not available to redress Texas's alleged need to undertake these so-called "remedial measures."

Texas also asserts standing based on the alleged loss of tax revenue from the cancellation of border wall contracts within the state.  *See* PI Mot. at 41–42.  Texas, however, has not presented any evidence to support this claim and simply speculates that it will lose money if contracts are cancelled. *Id.*  In any event, the "loss of general tax revenues as an indirect result of federal policy is not a cognizable injury in fact."  *El Paso County*, 982 F.3d at 339; *see Arias v. DynCorp,* 752 F.3d 1011, 1015 (D.C. Cir. 2014) ("Lost tax revenue is generally not cognizable as an injury-in-fact for purposes of standing.") (citing *Pennsylvania ex rel. Shapp v. Kleppe,* 533 F.2d 668, 672 (D.C. Cir. 1976)).  That is because "virtually all federal policies" will have "unavoidable economic repercussions" on state tax revenues, and accordingly, complaints about such losses typically amount to "the sort of generalized grievance about the conduct of government, so distantly related to the wrong for which relief is sought, as not to be cognizable for purposes of standing." *Kleppe*, 533 F.2d at 672; *see Iowa ex rel. Miller*

*v. Block*, 771 F.2d 347, 353 (8th Cir. 1985) (holding that there was an insufficiently direct link between reduced tax revenue and federal disaster relief decisions to support standing); *Arias*, 752 F.3d at 1015 (holding that loss of tax revenue from anti-drug herbicide-spraying operation resulting in damage to local crops was insufficient to establish standing).

In *Wyoming v. Oklahoma,* the Supreme Court recognized standing to challenge "a direct injury in the form of a loss of specific tax revenues," but distinguished cases where "actions taken by United States Government agencies had injured a State's economy and thereby caused a decline in general tax revenues." 502 U.S. 437, 448 (1992) (discussing *Kleppe* and *Miller*). In reaching that conclusion, the Supreme Court emphasized that States must establish a direct link between the tax at issue and the administrative action being challenged to meet the requirements for Article III standing. *See id.* The Supreme Court found such a direct link between an Oklahoma law targeting coal usage and a specific stream of tax revenue based on coal extraction. *Id.* at 447, 451. Applying *Wyoming v. Oklahoma*, the Fifth Circuit found standing lacking in another border wall case challenging the federal government's spending decisions, holding that El Paso County could not establish standing based on "a reduction in general tax revenues." *El Paso County*, 982 F.3d at 338–42. The same problem dooms Texas's standing argument in this case. Texas cannot satisfy the direct link required by *Wyoming* because it relies on a general business franchise tax that taxes every taxable entity doing business in the state, not a specific tax on border barrier construction contractors. *See* PI Mot. at 41. Because the challenged action in this case is not "directly linked" to Texas's fisc, *Wyoming*, 502 U.S. at 450, any indirect reduction in general tax revenues Texas may have obtained from third party contractors is insufficient to support standing. *See Mellon*, 273 U.S. at 17-18 (holding Florida lacked standing to challenge the constitutionality of federal inheritance tax based on the theory that the tax would cause Florida' financial harm by diminishing its tax revenue).

### 3. The States Have Failed to Demonstrate Traceability and Redressability.

In *GLO*, the Fifth Circuit concluded that Plaintiffs sufficiently "allege[d] . . . border barriers (i) reduce illegal entries in areas where constructed, and (ii) increase the rate at which illegal aliens are

detected and apprehended." 71 F.4th at 272.  Because these alleged impacts would necessarily "reduce some number of illegal immigrants entering Texas, even if they do not fully stem the tide," they would "reduce Texas's costs relative to a non-border wall policy."  *Id.*  It further concluded that this injury was redressable because a "declaratory judgment and injunction requiring DHS to spend 2020 and 2021 funds for border wall construction would, based on Texas's allegations, 'slow or reduce' the relative number of illegal aliens entering Texas." *Id.* at 273 (quoting *Massachusetts*, 549 U.S. at 525).

But Plaintiffs may not rely on mere allegations, or on statements made in favor of their preferred policy by the prior administration, to prove causation for the purpose of establishing standing to obtain a preliminary injunction.  Rather, Plaintiffs must "must clearly carr[y] the burden of persuasion." *Bluefield Water Ass'n*, 577 F.3d at 253.  Plaintiffs offer little more than speculation that (1) previously observed declines in immigration were caused by, and not merely correlated with, efforts to construct barriers; (2) declines in apprehensions in areas where border barriers were built actually reduce net migration, instead of simply channeling migrants to other areas of the border or motivating them to use other techniques to obtain entry (such as claiming asylum at a port of entry); and (3) even assuming prior border barrier projects had a net downward effect on migration, future projects would have a similar impact.  The States make no effort to prove up any of these conclusions, relying instead on correlative fallacies and out-of-context soundbites.  The States' evidence at most shows that migrants coming to the United States sought social services such as public education, health care, and driver's licenses.  *See* PI Mot. at 37–41.  But that is as far as it goes.  The States have not carried their burden to produce evidence establishing a causal connection between those expenses and DHS's barrier system expenditures, as opposed to other factors that impact migration or utilization of state services.  *See California v. Texas*, 141 S. Ct. 2104, 2116–19 (2021) (holding that Texas lacked standing because it failed to "show that [the challenged statutory] provision was the cause of added enrollment to state health plans" where there were "many benefits" to the plans that plausibly caused higher enrollment); *E.T. v. Paxton*, 41 F. 4th 709, 718–20 (5th Cir. 2002) (holding schoolchildren lacked standing to challenge Texas's prohibition on local mask mandates and could not establish traceability because complications from COVID-19 "could be attributed to any number of variables that have

24

nothing to do with mask mandates"); *Crane v. Johnson*, 783 F.3d 244, 252 (5th Cir 2015) (finding no standing where "there was no concrete evidence that Mississippi's costs had increased or will increase as a result of DACA" and Mississippi had only offered general evidence that the "state provides social benefits to illegal immigrants.").

The States cannot establish traceability for the same reasons that the State of Arizona lacked standing in a similar challenge to DHS's border wall spending decisions. *See Arizona v. Mayorkas*, 584 F. Supp. 3d 783 (D. Ariz. 2022) (denying preliminary injunction); *Arizona v. Mayorkas*, 600 F. Supp. 3d 994, 998 (D. Ariz. 2022) (dismissing case). The district court in *Arizona* rejected a similar standing theory on traceability grounds. The court concluded that Arizona failed to establish that DHS's decision to stop 18 miles of barrier construction "was the cause of increased immigration, as opposed to 'the myriad [other] economic, social, and political realities that might influence an alien's decision to risk life and limb to come to the United States.'" *Arizona*, 584 F. Supp. 3d at 795 (quoting *Whitewater Draw Nat. Res. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1015 (9th Cir. 2021)). The court acknowledged evidence that migration had increased since 2021, but at most that showed a "temporal correlation" with the decision to stop the barrier construction project, not causation. *Id.* at 798; *see Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009) ("correlation is not causation"). Arizona could not establish a direct "connection between border-wall construction and migration" because "any number of variables might influence an alien's independent decision to enter the country illegally[.]" *Arizona*, 584 F. Supp. 3d at 797 (internal quotations omitted). Arizona's standing theory required the "Court to speculate about why aliens choose to enter the country illegally and about whether the construction of certain impediments to their entry—which would not eliminate the many other avenues of entry— would result in effective deterrence, such that the absence of those impediments may be said to be the literal cause of increased migration to Arizona." *Id.* at 797. Like the States here, Arizona failed to show that migrants are entering the country "*because of* Defendants' failure to build portions of an incomplete border wall." *Id.* (emphasis in original); *see id.* at 797-98 (stating that Arizona "fails to show that the [migration] increase was caused *by the cessation of construction on the border wall*, as compared to

economic, social, and political factors (or due to the many other immigration-related policies and programs the State seeks to challenge in this action).") (emphasis in original).

The three-Justice concurrence in *Enforcement Priorities* also confirms that redressability is absent here.  Justice Gorsuch, joined by Justices Thomas and Barrett, concluded that the States lacked standing because their injuries were not capable of redress.  *Id.* at 1976–80 (Gorsuch, J., concurring in the judgment).  Because federal law prohibited the district court from entering an injunction against DHS, the district court "purported to 'vacate' the [immigration-enforcement] Guidelines" under the APA.  *Id.* at 1978.  The concurring justices concluded that vacatur did not redress the underlying injury identified by the plaintiffs:

> The Guidelines merely advise federal officials about how to exercise their prosecutorial discretion when it comes to deciding which aliens to prioritize for arrest and removal. A judicial decree rendering the Guidelines a nullity does nothing to change the fact that federal officials possess the same underlying prosecutorial discretion. Nor does such a decree require federal officials to change how they exercise that discretion in the Guidelines' absence.

*Id.* at 1978–79.

The States in this case run up against the same problem.  Even if the DHS spending plan was enjoined, DHS would still be legally required to spend appropriated funds consistent with the terms of the appropriations statutes.  *See generally* 2 U.S.C. §§ 681–688 (Impoundment Control Act).  Those statutes and IIRIRA give DHS broad discretion to determine where, when, and how to spend funds on barrier system projects nationwide.  *Arizona*, 2011 WL 13137062, at *8 (stating that "IIRIRA and the Appropriations Acts provide the DHS and the Secretary with substantial discretion in determining where to build fencing").  Nothing in the appropriations acts or IIRIRA would require DHS to spend its remaining available funds on the States' preferred projects.  *See El Paso County*, 982 F.3d at 341 (concluding that the County "fail[ed] to demonstrate that the injury is redressable by a favorable decision in this case" because "enjoining the Government from spending the diverted funds on border wall construction does not necessarily result in the Government's use of those funds on the Fort Bliss project").

Although the Fifth Circuit assumed that DHS had decided "not to construct *any* new border wall" in light of Plaintiffs' allegations, *GLO*, 71 F.4th at 274, the record here demonstrates that is not the case.  There is substantial evidence that DHS is engaged in numerous projects to construct, repair, and remediate barrier system infrastructure.  There is no power in equity for this Court to enter an injunction that would, in effect, direct the Executive Branch to "obey the law," commandeer the Executive Branch's authority to execute the law by telling it what it should spend its money on and when it should spend it, or force Defendants to revive cancelled contracts entered with third parties (assuming the contractors themselves are even willing to reengage).  *See infra* at 59–64.  Absent such powers, any relief the Court could feasibly award in this case would have the same redressability problem as the vacatur remedy in *Enforcement Priorities*: it would "do[] nothing to change the fact that federal officials possess the same underlying . . . discretion" to spend appropriated funds in a variety of ways consistent with statutory purpose, and would not "require federal officials to change how they exercise that discretion in the [DHS spending plan's] absence."  143 S. Ct. at 1978–79 (Gorsuch, J., concurring in the judgment).  Accordingly, denial of the preliminary injunction on standing grounds remains appropriate even if the Court concludes there is an injury-in-fact in this case.

### B.    The States Are Unlikely to Succeed on Their APA Claims Because Funding Decisions Are Committed to Agency Discretion.

The States are unlikely to succeed on their APA claims for preliminary injunctive relief because they challenge funding decisions by DHS that are committed to the agency's discretion by law.  *See* 5 U.S.C. § 701(a)(2).[5]  Although the APA presumes that agency action can be judicially reviewed, "under § 701(a)(2) agency action is not subject to judicial review 'to the extent that' such action 'is committed to agency discretion by law.'"  *Lincoln*, 508 U.S. at 190–91 (citing *Block v. Cmty. Nutrition Inst.*, 467 U.S. 340, 349 (1984)).  Courts have found that Section 701(a)(2) precludes review where "a court would have no meaningful standard against which to judge the agency's exercise of discretion," *Lincoln*, 508 U.S. at 191 (quoting *Heckler*, 470 U.S. at 830), including situations where the agency decision "involves

---

[5] Because the Fifth Circuit in *GLO* decided the case on standing and claim-splitting grounds, it did not address this argument or any other merits arguments.

a complicated balancing of a number of factors which are peculiarly within its expertise." *Id.* (quoting *Heckler*, 470 U.S. at 830).  Such is the case here.

In appropriating funds in fiscal years 2020 and 2021 "for construction of border barrier system," Congress gave DHS broad discretion to decide how to spend funds consistent with that purpose.  The statutes specify only that the system should be located at the Nation's southwest border.  They do not otherwise constrain DHS's broad authority—embodied in Section 102 of IIRIRA—to decide where, when, and how to construct barrier system.[6]  Congress's appropriation provides no standards "against which to judge the agency's exercise of discretion" in choosing how to allocate those funds among a range of lawful expenditures, such as installation of additional system attributes on existing barriers, remediation of incomplete DoD barrier project areas, or whether to prioritize actions at project sites that pose an immediate safety and security threat over new construction projects.  *Heckler*, 470 U.S. at 830.  Congress vested those funding prioritization decisions in DHS's unreviewable discretion.  *See Lincoln*, 508 U.S. at 192.

The Supreme Court's decision in *Lincoln* supports the conclusion that DHS's funding allocation decisions are exempt from APA review.  In *Lincoln*, the Supreme Court held that "allocation of funds from a lump sum appropriation is another administrative decision traditionally regarded as committed to agency discretion." *Id.*  The Department of Health and Human Services (HHS) received a yearly, lump sum appropriation for the operating and capital expenses of the Indian Health Service.  *Id.* at 185.  For many years, the Indian Health Service operated a program providing treatment services to children in the Southwest United States, but HHS "decided to reallocate the Program's resources to a nationwide effort to assist such children."  *Id.* at 184.  The Supreme Court concluded that this funding choice was committed to agency discretion as a matter of law and not reviewable under the APA.  *Id.* at 193.  The Supreme Court explained that "an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within

---

[6] The fiscal year 2020 appropriation included a requirement that the funds be used in priority locations on southern border; however, Congress left it to DHS to identify those priority locations.  *See* DHS Appropriations Act, 2020, Pub L. No. 116-93, Div. D, § 209(b), 133 Stat. at 1523.  The requirement was not included in the fiscal year 2021 appropriation.

its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id.* (quoting *Heckler*, 470 U.S. at 831–32). That reasoning applies equally to this case. Here, DHS is engaging in the same type of discretionary spending choices in deciding how to best allocate its barrier system appropriations to various types of border barrier projects. Congress merely appropriated funds for "construction of border barrier system"—it did not further delineate how the agency should spend those funds or what type of projects DHS should undertake. DHS thus has lawful discretion to decide how to spend its appropriations across a range of permissible activities, including remediation of existing barrier systems to ensure their safety and effectiveness, modernization of such barrier systems with new technologies, and construction of new barriers to fill gaps between existing ones. These funding choices are committed to DHS's discretion. *See Milk Train, Inc. v. Veneman*, 310 F.3d 747, 751–52 (D.C. Cir. 2002) (holding that statutory appropriations language "left to the Secretary the decision about how" funding "could best be distributed," and that decision was committed to agency discretion by law).

The Fifth Circuit relied on *Lincoln* in another border wall case to describe a similar funding decision under an appropriations statute as committed to agency discretion. *See El Paso County*, 982 F.3d at 341. El Paso County challenged a decision by DoD to redirect $20 million originally allocated by the agency for a road construction project at Fort Bliss to border wall construction. *See id.* at 337. The County argued that cancellation of the road project harmed its local economy and it sought an injunction prohibiting DoD from spending the challenged funds on the border wall. *See id.* at 338. For the County to receive the economic benefit of the roads project, the Fifth Circuit observed that DoD "would have to proceed with the $20 million Fort Bliss project." *Id.* However, "Congress did not directly appropriate $20 million for the Fort Bliss project. Instead, funds for a defense access roads project are sourced from a lump-sum appropriation for the construction of defense access roads generally." *Id.* Like the barrier system appropriations at issue in this case, the defense roads appropriation simply provided funding for a general purpose, namely "the Defense Access Road

29

Program." *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. J, § 131, 132 Stat. 348, 805 (2018); *see also* 23 U.S.C. § 210 (authorization for DoD to construct defense access roads). Relying on *Lincoln*, the Fifth Circuit described the general roads appropriation as a "lump sum" and stated that "allocation of funds from a lump-sum appropriation is . . . traditionally regarded as committed to agency discretion." *El Paso*, 982 F.3d at 341 (quoting *Lincoln*, 508 U.S. at 192). The same reasoning applies here. Congress's appropriation of funds for "border barrier system" is the same type of lump sum appropriation that identifies only the broad purpose for which spending is authorized. That statutory language does not provide any guidance as to how DHS should allocate funding to any particular barrier system project or activity. Absent such specific guideposts, there are no judicially manageable standards for a court to review the way DHS chooses to expend its financial resources or to issue an injunction that DHS must, as a matter of law, complete the types of new construction projects that the States prefer. The States' attempt to have the Court compel DHS to use its appropriated funds in the manner that the States would most prefer—rather than in the manner that DHS has determined would be most effective—invites precisely the sort of judicial second-guessing over spending decisions that Congress has foreclosed. *Lincoln*, 508 U.S. at 192; *see Cmty. Action of Laramie Cnty., Inc. v. Bowen*, 866 F.2d 347, 354 (10th Cir. 1989) ("Funding determinations are 'notoriously unsuitable for judicial review, for they involve the inherently subjective weighing of the large number of varied priorities which combine to dictate the wisest dissemination of an agency's limited budget.'") (quoting *Alan Guttmacher Inst.*, 597 F. Supp. at 1536–37).

It is no answer for the States to say that DHS's discretionary funding choices are reviewable because the fiscal year 2020 and 2021 appropriations statutes identify a broad purpose for which the funds may be directed. Congress does not provide federal agencies with a blank check. Even unreviewable lump sum appropriations include broad purposes or policy goals for which the funds must be expended. The lump sum appropriation in *Lincoln*, for example, provided funding to the

Indian Health Service to carry out various statutory requirements.[7]  Similarly, the lump sum appropriation in *El Paso County* supplied funding to DoD for the "Defense Access Road Program." But the inclusion of these broad "statutory objectives" was not enough to subject the agencies' specific funding allocation decisions to judicial review.  *Lincoln*, 508 U.S. at 192.  The same is true here.  The appropriation of funds to DHS in fiscal years 2020 and 2021 for the general purpose of "construction of barrier system" does not provide the States license to second guess DHS's allocation of those funds to particular priorities, projects, or activities.

For these reasons, the Court should not follow the prior decision in these cases addressing Defendants' motion to dismiss GLO's Amended Complaint where the Court concluded that DHS's spending decisions are not committed to agency discretion.  *See* ECF No. 57 at 28–29.  The prior decision focused on whether there was a conflict between the original DHS spending plan and the statutes that GLO challenged, namely § 102 of IIRIRA and the fiscal year 2019 DHS barrier system appropriation.  *Id.*  But that approach to whether funding allocation decisions are subject to judicial review under the APA is in tension with the analysis adopted by the Supreme Court in *Lincoln* and the way in which the Fifth Circuit described an analogous lump sum appropriation in *El Paso County*.  The operative section of the Court's analysis did not discuss either of these cases, *see id.*, and Defendants submit that the States cannot make the required "clear showing" of an entitlement to a preliminary injunction in the face of those contrary authorities.  The fiscal year 2020 and 2021 lump sum appropriations at issue in the States' motion are broadly "drawn so that a court would have no

---

[7] For example, the appropriation setting the Indian Health Service's operational budget at the time provided, in relevant part:

> [F]or expenses necessary to carry out the Act of August 5, 1954 (68 Stat. 674), the Indian Self-Determination Act, the Indian Health Care Improvement Act, and titles III and XXVI and section 208 of the Public Health Service Act with respect to the Indian Health Service, including hire of passenger motor vehicles and aircraft; purchase of medical equipment; purchase of reprints; purchase, renovation, and erection of modular buildings; payments for telephone service in private residences in the field, when authorized under regulations approved by the Secretary; $1,537,851,000, . . .

Pub. L. No. 102-381, 106 Stat. 1374, 1407 (1992).

meaningful standard against which to judge the agency's exercise of discretion." *Heckler*, 470 U.S. at 830. Additionally, the prior decision focused exclusively on the perceived conflict between the original DHS spending plan and the relevant statutes based on allegations in the complaint that construction activity was suspended indefinitely. *See* ECF No. 57 at 29. The amended DHS plan, however, explains that the fiscal year 2020 and 2021 appropriations will be used to pay for installation of system attributes on existing barrier and remediation of the DoD barrier project sites. These two categories of expenditures are well within the scope of DHS's permissible spending discretion for a "border barrier system." *See infra* at 39–46. Further, the factual record confirms that barrier system construction projects are ongoing. *See* Third Enriquez Decl. Where, as here, "the agency allocates funds from a lump-sum appropriation to meet permissible statutory objectives, § 701(a)(2) gives the courts no leave to intrude." *Lincoln*, 508 U.S. at 193.

## C. The States' Claims Under the DHS Appropriations Acts and the Impoundment Control Act Fail.

Even if funding decisions were not committed to agency discretion by law, the States still have not established that they are likely to succeed on their APA claims based on DHS's purported violations of the fiscal year 2020 and 2021 appropriations statutes or the Impoundment Control Act (ICA). *See* PI Mot. at 23–29. Those claims also fail because the States' asserted financial interests in minimizing the costs of providing driver's licenses and other state-funded services are not within the zone of interests protected by Congress's appropriations to DHS for border barrier system construction or Congress's oversight of Executive Branch funding impoundments. And in any event, DHS's expenditures are fully consistent with those statutes.

### 1. The States Do Not Fall Within the Zone of Interests Protected by the Statutes.

The States bring their statutory claims through a cause of action provided by the APA, *see id.* at 24, but the APA's express cause of action to obtain judicial review of whether a federal agency's actions are in excess of statutory authority is not available unless the States' asserted interests at least arguably "fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static*

*Control Components, Inc.*, 572 U.S. 118, 129–30 (2014) (citation omitted).   The zone-of-interests requirement originated in *Ass'n of Data Processing Serv. Orgs., Inc.* v. *Camp*, 397 U.S. 150, 156 (1970), and serves as a general presumption about Congress's intended limits on the scope of causes of action. *See Lexmark Int'l, Inc.*., 572 U.S. at 127-33.   The zone-of-interests test "is a 'requirement of general application'" that "*always* applies and is never negated."   *Id.* at 129 (emphasis in original) (quoting *Bennett v. Spear*, 520 U.S. 154, 163–64 (1997)); *see Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (applying zone-of-interests test to alleged statutory violation); *Boston Stock Exch. v. State Tax Comm'n*, 429 U.S. 318, 320–21 n.3 (1977) (applying the zone-of-interests requirement to alleged constitutional violation).

The zone-of-interests test requires courts to assess whether "the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question."   *Ass'n of Data Processing Serv. Orgs., Inc.*, 397 U.S. at 153.   The test forecloses suit where the plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit" the plaintiff to bring suit under it.   *Patchak*, 567 U.S. at 225 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399 (1987)).   When Congress authorizes a cause of action, it presumptively does not intend the "absurd consequences" that would follow "[i]f any person injured in the Article III sense" by an alleged violation of federal law could sue over the violation.   *Thompson* v. *North Am. Stainless, LP*, 562 U.S. 170, 176–177 (2011).   The zone-of-interests requirement thus limits the plaintiffs who may invoke a cause of action under the APA for an alleged violation of law to those whose asserted interests are arguably "protected or regulated by the statute that they say was violated."   *Texas*, 809 F.3d at 161; *see Moses v. Banco Mortg. Co.*, 778 F.2d 267, 271 (5th Cir. 1985) (stating that "parties who receive only unintended or incidental benefits from statutes or regulations are outside the zone of interests to be protected[]").

Here, the States fall outside the zone of interests of the fiscal year 2020 and 2021 DHS appropriations statutes they seek to enforce.   Texas and Missouri brought this lawsuit to protect various state government agencies from having to expend state funds on public services for migrants,

such as driver's licenses, public education, and healthcare. *See* PI Mot. at 37–41. Texas also asserts an interest in increasing the general tax revenue it would receive from levying a "franchise tax" on government contractors who perform border wall construction activities. *See id.* at 41–42. Texas further seeks to protect public funds that it has expended to build its own border wall. *See id.* at 42–43. But the States' interest in raising more general tax revenue or protecting the operating budgets of state agencies charged with providing social services to migrants or public safety activities are not even "marginally related to . . . the purposes implicit" in the appropriations statutes at issue in this case. *Patchak*, 567 U.S. at 225 (citation omitted).

The DHS Appropriations Acts of fiscal year 2020 and 2021 appropriated $1.375 billion "for the construction of barrier system along the southwest border." DHS Appropriations Act, 2020, Pub L. No. 116-93, Div. D, § 209(a)(1), 133 Stat. at 2512; DHS Appropriations Act, 2021, Pub L. No. 116-260, Div. F, § 210, 134 Stat. at 1456–57. These statutes regulate and protect the interests of DHS and Congress in the federal spending and appropriations process. Nothing about the text or context of these statutes suggests any connection whatsoever to the interests of a state government who asserts that federal spending decisions indirectly harm the state's tax base or the operating budgets of its agencies. *See Miccosukee Tribe of Indians of Fla. v. United States*, No. 08-23523-CIV, 2009 WL 10668917, at *4 (S.D. Fla. Sept. 30, 2009) (dismissing claims brought under a statute appropriating funds to a federal agency for a construction project on zone-of-interests grounds because the statute protected the agency's interest in receiving funds for the construction project, not an Indian tribe's interests in quiet enjoyment of land near the project). When Congress appropriated funds to DHS for barrier system construction, it did not require DHS to consider the potential impact on state agency budgets or tax revenue, nor did Congress limit DHS's discretion to expend funds in order to protect those interests. The appropriations statutes govern the relationship between the Executive and Congress regarding federal spending, and do not confer judicially cognizable rights on state governments to second-guess federal spending decisions. *See Glass Packaging Inst. v. Regan*, 737 F.2d 1083, 1090 (D.C. Cir. 1984) (holding that a private party alleging "an injury to its competitive interests" was "not arguably within the zone of interests" of a statute intended "to regulate only a specific narrow

governmental interest—protection of tax revenues"); *Hazardous Waste Treatment Council v. Thomas*, 885 F.2d 918, 925 (D.C. Cir. 1989) (suggesting that a defense contractor would fall outside the zone of interests of an appropriations act because the "defense appropriation is not passed in order to benefit defense contractors, benefit them though it may"); *Cleveland Assets, LLC v. United States*, 132 Fed. Cl. 264, 277 (2017) (concluding that plaintiffs alleging an agency's violation of 40 U.S.C. § 3307 fell outside that statute's zone of interests because the statute's "purpose is obviously to enable Congress to oversee how the money it appropriates is spent"), *aff'd*, 883 F.3d 1378 (Fed. Cir. 2018).

The States identify no case in which a state government was found to be within the zone of interests protected by a federal appropriations statute.  The absence of such authority is reinforced by the Supreme Court's decision in *Trump v. Sierra Club*, 140 S. Ct. 1 (2019).  In that case the Supreme Court stayed an injunction against border wall construction based on a challenge to DoD's compliance with a provision of the DoD Appropriations Act authorizing transfers of funds between different budget accounts.  The Supreme Court concluded that the Government had sufficiently shown that a group of environmental plaintiffs likely "have no cause of action to obtain review of the Acting Secretary's compliance with" the DoD appropriations transfer statute.  *Id.* at 1.  The dispute in *Sierra Club* focused on whether the environmental plaintiffs fell within the zone of interests of the appropriations transfer provision they sought to enforce.  *See* Reply in Support of Application for a Stay Pending Appeal, at *3–10, *Trump v. Sierra Club*, No. 19A60, 2019 WL 3451617 (July 22, 2019).  As the Supreme Court emphasized, "a statutory cause of action extends only to plaintiffs whose interests fall within the zone of interests protected by the law invoked."  *See Lexmark Int'l, Inc.*., 572 U.S. at 129 (quotations omitted).

Like the DoD appropriations transfer statute at issue in *Sierra Club*, the States allege violations of federal appropriations acts that protect congressional control over DHS's appropriations, not the States' budgets or tax revenues.  Nothing in the text or context of the appropriations acts either protects or regulates the States' fiscs from the consequences of federal spending policies.  *See Patchak*, 567 U.S. at 225–28 (analyzing the "context and purpose" of a provision of the Indian Reorganization Act as well as the agency's regulations to determine the relevant zone of interests).  The appropriations

35

acts do not mention the States' interests, nor do they require DHS to consider those interests in connection with spending the funds at issue.

Moreover, allowing this suit to proceed would lead to "absurd consequences" by enabling state governments to challenge the way in which federal agencies choose to spend their appropriated funds based on unrelated concerns about the downstream impact such spending may have on state agency budgets. *Thompson*, 562 U.S. at 176–77. Congress, when it appropriated annual funding to DHS for barrier system construction, could not have intended to give every State or local government arguably impacted by the downstream economic consequence of that spending a cause of action to sue. There is no limiting principle for such an extreme position.

Moreover, allowing outside parties to sue over federal appropriations could conflict with the interests of Congress. Congress itself has ample tools to enforce its appropriations powers. *See Nat'l Treasury Emp. Union v. Campbell*, 654 F.2d 784, 794 (D.C. Cir. 1981) ("Congress itself is in a position to monitor and enforce its spending limitations. It is not for us to question the effectiveness of existing remedies and infer additional remedies when Congress has so strongly indicated that no private remedy was intended."). The nonpartisan GAO—which is headed by the Comptroller General, "an agent of the Congress," *Bowsher v. Synar*, 478 U.S. 714, 731 (1986) (citation omitted), and charged with examining how federal funds are spent—concluded in 2021 that DHS did not unlawfully impound funds from its border infrastructure appropriations while implementing the President's Proclamation. *See Matter of: Office of Management and Budget and U.S. Dep't of Homeland Security–Pause of Border Barrier Construction and Obligations*, B-333110.1, 2021 WL 2451823 at *6 (June 15, 2021) (GAO Opinion) ("We see nothing to indicate that either OMB or DHS is attempting to override congressional intent that these funds be used for constructing barriers at the southern border"). The independent arm of Congress with expertise on fiscal law issues thus rejected the same impoundment argument the States are asserting in this case. *See* PI Mot. at 5 n.3 (conceding the GAO's opinion is entitled to "special weight" in light of "its accumulated experience and expertise in the field of government appropriations") (quoting *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005)). In these circumstances, where the GAO has spoken and Congress did not provide an express cause of action

36

for parties to challenge routine agency spending practices, the Court should not permit such claims to go forward, particularly when the States fall outside the zone of interests of the appropriations statutes they seek to enforce.  At a minimum, the States have not established a clear showing of likely success on their statutory claims to warrant the extraordinary remedy of a preliminary injunction.

The prior decision addressing the zone-of-interests issue in the *GLO* case is no help to the States here.  *See* ECF No. 57 at 17-22.  In deciding Defendants' motion to dismiss GLO's Amended Complaint, the Court found that the unique property interests GLO asserted were within the zone of interests of IIRIRA and the fiscal year 2019 DHS barrier system appropriations statute.  *See id.* at 20-22.  The Court acknowledged that it was "somewhat of a stretch" to conclude that border crossings impacting the GLO's farm in Starr County are within the statutes' zone of interests, but at the pleading stage the Court could "not say that Plaintiffs are *inarguably* outside the zone of interests."  *Id.* at 21–22 (emphasis in original).  In reaching that conclusion, the Court focused on the GLO's "unique circumstances" as a landowner directly adjacent to the border that alleged property harms from migration.  *Id.*  The States do not assert similar property interests.  *See Patchak*, 567 U.S. at 227 (finding that a "neighboring landowner" was within zone of interests to enforce statute about land acquisition).  Rather, the States seek to protect the type of "generalized economic interests" that the Court emphasized were not asserted by GLO.  ECF No. 57 at 21.  As explained above, such indirect financial harms to the States' budgets from migrants who utilize social services are not within the zone of interests of the DHS appropriations statutes that the States seek to enforce here.

The States' financial interests also do not fall within the zone of interests of the ICA.  Passed in 1974, *see* 2 U.S.C. §§ 681–688, the ICA "operates on the premise that when Congress appropriates money to the executive branch, the President is required to obligate the funds."  *See Congressional Committees*, B-329092, 2017 WL 6335684, at *1 (Comp. Gen. Dec. 12, 2017).  Under the ICA, the President must notify Congress when he proposes to withhold funds from obligation or expenditure, either permanently or temporarily.  *See* 2 U.S.C. §§ 684–685.  The ICA establishes procedures for the President to impound funds in two limited circumstances.  First, the President may temporarily withhold budget authority from obligation within a fiscal year by proposing a "deferral."  2 U.S.C.

37

§ 684. Second, the President may permanently cancel budget authority by proposing a "rescission." 2 U.S.C. § 683.  In either case, the ICA requires the President to transmit a special message to Congress justifying the proposed action. 2 U.S.C. §§ 683–684.

The ICA thus protects Congress's power of the purse by ensuring the Executive Branch incurs obligations in accordance with congressional appropriations and does not impound funds absent appropriate congressional oversight.  Nothing in the text or history of the ICA establishes an intent to protect or regulate the budgets of state governments who may incur costs or lose tax revenue associated with federal spending policies.  The ICA is simply not concerned with protecting the funding levels of state agencies like Driver's License Division of the Texas Department of Public Safety or the Missouri Department of Elementary and Secondary Education.  *See* PI Mot. at 38–40. The interests that the States assert here are far more attenuated from the ICA than even prior cases where the Supreme Court and Fifth Circuit concluded that plaintiffs could not satisfy the zone-of-interests test.  *See Lexmark Int'l, Inc.,* 572 U.S. at 132 (concluding that plaintiff raising a false advertising claim under the Lanham Act falls outside the zone of interests because the statute protects a plaintiff's "commercial interest in reputation or sales" and not a "consumer who is hoodwinked into purchasing a disappointing product"); *INS v. Legalization Assistance Project of Los Angeles Cty. Fed'n of Lab.,* 510 U.S. 1301, 1305 (1993) (O'Connor, J., in chambers) ("The fact that the INS regulation may affect the way an organization allocates its resources . . . does not give standing to an entity which is not within the zone of interests the statute meant to protect."); *Moses,* 778 F.2d at 271 ("We hold that neither the Federal Housing Act nor the HUD regulation was intended directly to benefit either owners of low income housing projects or parties bidding at the HUD mortgage auction.").

Congress has made clear, moreover, that only the Comptroller General is authorized to enforce the ICA.  *See* 2 U.S.C. § 687 (empowering the Comptroller General to bring a civil action in the United States District Court for the District of Columbia to require "budget authority to be made available for obligation").  For that reason, other courts have concluded the ICA does not provide a private cause of action.  *See Pub. Citizen v. Stockman*, 528 F. Supp. 824 & n.1 (D.D.C. 1981); *Rocky Ford Hous. Auth. v. U.S. Dep't of Agric.*, 427 F. Supp. 118, 134 (D.D.C. 1977); *Rogers v. United States*, 14

Cl. Ct. 39, 50 (1987), *aff'd*, 861 F.2d 729 (Fed. Cir. 1988).  The court in *Stockman*, for example, held that an organizational plaintiff did not fall within the zone of interests of the ICA because the statute was "clearly enacted to safeguard Congress's interests, not those of private citizens."  528 F. Supp. at 830 n.1.  The plaintiff sought to challenge budget deferrals issued by the Office of Management and Budget on which the Comptroller General had yet to report to Congress.  The court rejected that challenge, explaining that the ICA "does not expressly vest in any person besides the Comptroller General the right to bring suit to enforce the Act's provisions."  *Id.* at 827; *see Rogers*, 14 Cl. Ct. at 50 (concluding that "this lawsuit does not state a cause of action for violation of the Impoundment Control Act" because "an examination of the statute indicates that Congress did not intend to create a private cause of action in cases of unauthorized impoundments"); *Rocky Ford Hous. Auth.,* 427 F. Supp. at 134 (same).  *Stockman* also rejected the plaintiff's effort to proceed under the APA, concluding that the absence of a private right of action "pretermit[ted] any contention that plaintiff's interest in preserving the flow of appropriations is within the zone of interest to be protected by the ICA."  528 F. Supp. at 830 n.1.  The States' attempt to enforce the ICA fails for the same reasons.  The States are not "reasonable" or "predictable" litigants under a statute that defines the financial relationship between two branches of the federal government, and that contains an exclusive remedial scheme without any private enforcement whatsoever.  *See Patchak*, 567 U.S. at 227–28.

### 2. DHS Has Acted Consistent with The Requirements of its Congressional Appropriations and the Impoundment Control Act.

Even assuming the States have a cause of action, the States cannot demonstrate a likelihood of success on the merits of their claims that DHS has unlawfully impounded funds in contravention of the fiscal year 2020 and 2021 DHS Appropriations Acts or the ICA.  *See* PI Mot. at 24–29.

The President and federal agencies, as a general matter, do not have the ability to impound or otherwise prevent the expenditure of funds appropriated by Congress to carry out legislation.  *See* U.S. Dep't of Justice Office of Legal Counsel, Memorandum Opinion by William H. Rehnquist on Presidential Authority to Impound Funds Appropriated for Assistance to Federally Impacted Schools at 8 (Dec. 1, 1969), at www.justice.gov/file/20816/download ("With respect to the suggestion that

the President has a constitutional power to decline to spend appropriated funds, we must conclude that existence of such a broad power is supported by neither reason nor precedent.").  Federal agencies therefore "must make funds available for obligation unless otherwise authorized to withhold."  *See Congressional Committees*, 2017 WL 6335684 at *1.  Congress enacted the ICA to control Executive Branch impoundments, which occur "when federal officials, through action or inaction, withhold or delay the obligation or expenditure of appropriations provided for projects or activities."  GAO, A Glossary of Terms Used in the Federal Budget Process at 61 (Sept. 2005) (defining "impoundment") at https://www.gao.gov/assets/gao-05-734sp.pdf; *see* 2 U.S.C. § 682(a).  But not every delay in the obligation or expenditure of funds constitutes an unlawful impoundment or violation of the ICA.  In passing the ICA, Congress acknowledged that "the executive branch necessarily withholds funds on hundreds of occasions during the course of a fiscal year" and such delays may result from the "normal and orderly operation of the government."  *City of New Haven v. United States,* 809 F.2d 900, 901 (D.C. Cir. 1987) (quoting H.R. Rep. No. 658, 93d Cong., 1st Sess. 41 (1971)).  Indeed, the GAO has recognized that "[l]egitimate programmatic delays may occur when the agency is taking reasonable and necessary steps to implement a program, even though funds temporarily go unobligated."  *See Congressional Committees*, 2017 WL 6335684 at *1 n.6  (citing instances of design modifications to projects and low numbers of applicants for a program).

GAO also has recognized a distinction between deferrals of funds by the Executive Branch based on policy disagreements with Congress, which are prohibited by the ICA, and deferrals due to legitimate "programmatic" reasons, which are not.  *See* GAO, Principles of Federal Appropriations Law, ch. 2, 2-50 (4th ed., 2016 rev.).  Accordingly, potential delays associated with determining how best to execute projects consistent with the policy objectives of the Executive Branch are not impoundments where the Executive has lawful discretion to choose how to execute the program.  Any such delay does not negate congressional authority to determine fiscal priorities; rather, it impacts how, not whether, a project will be carried out by the Executive Branch.

Further, the ICA "does not impose any specific requirements on the Executive Branch as to the rate at which budget authority must be obligated or expended."  *In re Henry M. Jackson*, United

States Senate, B-200685, 1980 WL 14499, at *2 (Comp. Gen. Dec. 23, 1980).  Nor is there any legal requirement that funds be "fully obligated as soon as they first become available, regardless of any necessary programmatic or administrative considerations."  *In re James R. Jones*, House of Representatives, B-203057 L/M, 1981 WL 23385, at *4 (Comp. Gen. Sept. 15, 1981).  An agency is permitted to take "the steps it reasonably believes are necessary to implement a program efficiently and equitably, even if the result is that funds temporarily go unobligated."  *Id.*

Applying these principles here, DHS did not impound appropriated funds for border barrier construction in fiscal year 2020 or 2021 because none of those funds have been withheld from obligation.  *See* Third Enriquez Decl. ¶¶ 10–33.  Congress appropriated $1.375 billion to DHS in fiscal years 2020 and 2021 "for the construction of barrier system along the southwest border."  DHS Appropriations Act, 2020, Pub L. No. 116-93, Div. D, § 209(a)(1), 133 Stat. at 2512; DHS Appropriations Act, 2021, Pub. L. No. 116-260, Div. F, § 210, 134 Stat. at 1456–57.  The amended DHS plan explains that DHS will prioritize using these funds to pay for two categories of lawful barrier system expenses:  (1) "[c]lose out, remediation, and mitigation" costs "of the barrier projects turned over to DHS by DoD" and (2) installation of "barrier system attributes" such as "lighting, cameras, and detection technology in areas where physical barrier has already been constructed."  AR at 9–11; *see* Third Enriquez Decl. ¶ 20.

As of August 17, 2023, CBP has obligated approximately $683 million (50%) in fiscal year 2020 barrier system funds and approximately $531 million (38%) in fiscal year 2021 barrier system funds.  *See* Third Enriquez Decl. ¶ 19.  CBP has awarded six contracts with these appropriations for remediation work within the project areas where DoD previously engaged in barrier construction pursuant to 10 U.S.C. § 284.  *Id.* ¶ 21.  The contracts generally include requirements for closing gaps in the existing barrier, completing or installing gates, fixing or improving patrol roads, installing drainage and erosion control measures, and addressing other environmental requirements.  *Id.*  The ongoing remediation work is intended to ensure that the border infrastructure functions as it was intended, improve operational conditions for Border Patrol agents, make the project areas safe, and prevent further environmental degradation in areas impacted by prior border barrier construction.  *Id.*;

*see also id.* ¶¶ 10, 21, 23 (description of contracts, geographic location of project work, photos of work sites, and summary of work status).  Specific examples of projects funded with fiscal year 2020 and 2021 appropriations include:

- In the Yuma Sector, as part of the "Yuma Hill" project, CBP is filling an approximately 500-foot gap in the existing barrier with 18-foot bollard-style barrier and installing a maintenance road.  If not completed, the gap could be a funnel point for illicit activity that would pose significant risks to migrants or groups who continue north into the adjacent Barry M. Goldwater bombing range.  *Id.* ¶ 10.g; *see* AR at 37, 153, 168.

- Also in the Yuma Sector, as part of the "Morelos Dam" project, CBP is filling four gaps between approximately 50 and 1300 feet in the existing barrier with a combination of barrier and mechanized vehicle gates.  The gaps are a dangerous funnel point for migrants attempting to cross into the United States.  In order to access the gaps from Mexico, migrants must cross the Morelos Dam and the Colorado River.  Crossing the dam and the river creates a life and safety hazard, as there have been incidents where attempted crossings have resulted in drownings and injuries from falls.  Such attempted crossings create safety risks to Border Patrol agents and first responders who are required to enter the water to save migrants who are in distress.  Third Enriquez Decl. ¶ 10.h.

- In the San Diego Sector, CBP is replacing primary and secondary barrier with new bollard barrier.  CBP is also installing pedestrian and vehicle gates.  The existing primary barrier that is being replaced was not properly treated to withstand corrosion when it was installed in 2008–2009 and poses a safety risk if not replaced.  *Id.* ¶ 10.a; *see* AR at 44, 152–53, 166–67.

- In the Yuma and El Centro sectors, CBP will replace dilapidated legacy barrier that poses safety and security concerns with new bollard-style barrier.  A portion of the fencing began to collapse into Mexico and requires replacement, while another section would help secure an urban area that allows for quick vanishing times for illicit cross-border activity.  Third Enriquez Decl. ¶ 10.i.

DHS is working toward awarding additional contracts for remediation and mitigation work at the

42

former DoD project sites in the coming months, including a contract for approximately $334 million that is expected to be awarded in August 2023 for work in Arizona.  *Id.* ¶¶ 24–26.

DHS also has obligated funds for installation of barrier system attributes and plans to award additional attribute contracts before the end of the fiscal year.  *See id.* ¶¶ 23–24, 27.  System attributes such as lighting, cameras, and detection technology are a key component of the barrier system that enhance its effectiveness.  *Id.* ¶ 27; *see supra* at 9–10.  Attributes provide Border Patrol agents with domain awareness, which is critical in both remote and urban areas.  Third Enriquez Decl. ¶ 27. Domain awareness also provides agents with the ability to track and respond to illicit cross-border activity more effectively and minimizes the response times for urgent or emergency situations involving migrants.  *Id.*  Further, the lighting, cameras, and detection technology that are part of the barrier system will provide awareness when breaching activity, *i.e.*, attempts to cut or otherwise damage or undermine the physical barrier, is detected, and likely reduce long-term maintenance and repair costs.  *Id.*

DHS thus has not unlawfully withheld its fiscal year 2020 or 2021 appropriations from obligation or expended these funds in a way contravenes the purpose of the appropriations, namely "construction of barrier system."  DHS has obligated over one billion dollars for remediation of the DoD barrier system projects and installation of system attributes.  The remaining unobligated funds are available until September 30, 2024 (for fiscal year 2020 funds) and 2025 (for fiscal year 2021 funds), and DHS will continue to prioritize expending the remaining funds for these same purposes.  *See id.* ¶¶ 15–20.  Nothing in the ICA or any other statute requires that the funds be obligated or expended in accordance with a specific rate over that time.  DHS is not withholding, delaying, or effectively precluding the obligation of its appropriated funds.  To the contrary, DHS has been spending its funds in a manner consistent with their congressionally designated purpose:  to construct a "barrier system" at the southwest border.  The programmatic decisions DHS makes as to how best to manage and prioritize expenditure of its funds are not unlawful impoundments, but rather prudent steps "to implement a program efficiently and equitably, even if the result is that funds temporarily go unobligated."  *In re James R. Jones*, B-203057 L/M, 1981 WL 23385, at *4.  That DHS is prioritizing

43

different projects than the States would prefer does not convert DHS's expenditures into an unlawful impoundment.

The States principally contend that DHS is not spending its funds on "actual construction of barrier systems at the southwest border." PI Mot. at 13. But DHS's amended spending plan and its contracting actions show that DHS is spending its fiscal year 2020 and 2021 appropriations in a manner that is fully consistent with the text of those statutes. The term "system" refers to "a regularly interacting or interdependent group of items forming a unified whole," such as "a group of devices or artificial objects or an organization forming a network especially for . . . serving a common purpose." *System*, Merriam-Webster, https://www.merriam-webster.com/dictionary/system. The phrase "construction of barrier system" is thus more than capacious enough to cover not only physical barriers but also the technological and physical infrastructure necessary to make those barriers safe and effective. Indeed, Congress has recognized that "physical barrier[s]" are but "one component of a border security system," and that an effective system should incorporate other elements—such as "appropriate sensor technology, including fiber optics and camera systems"—"with[in] the barrier system." S. Rep. No. 116-125, at 44 (2019). That is why, in Section 102 of IIRIRA, Congress granted DHS general authority to "install additional physical barriers and roads," IIRIRA § 102(a), and also directed DHS to "provide for the installation of . . . roads, lighting, cameras, and sensors to gain operational control of the southwest border," *id.* § 102(b)(1); *see In re Border Infrastructure Env't Litig.*, 915 F.3d 1213, 1223 (9th Cir. 2019) (concluding that DHS's authority in IIRIRA "extends beyond the erection of entirely new barriers and encompasses the maintenance, enhancement, and replacement of existing barriers"). Further, the 2020 DHS press release cited extensively by the States itself acknowledges that a "border wall system" "includes" installation of "roads," "lighting," "cameras," and "[o]ther related technology." *See* PI Mot. at 1–3, 7–8, 18, 36 (citing App.009-013). And as the examples described above illustrate, DHS is also spending money on installing new physical barriers. Accordingly, there is no merit to the States' contention that every dollar must be spent exclusively on the actual of construction of new barrier fencing.

DHS's expenditures are also consistent with a well-established rule of federal appropriations

law known as the "necessary expense doctrine." This "rule of construction for appropriations statutes" governs situations where an appropriation for a general purpose (*i.e.*, border barrier system) "leaves open whether a specific proposed expenditure is a legally authorized purpose for which appropriated funds may be expended." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1349 (D.C. Cir. 2012) (Kavanaugh, J.). "Under the necessary expense doctrine, '[a]n appropriation made for a specific object is available for expenses necessarily incident to accomplishing that object unless prohibited by law or otherwise provided for.'" *Id.* (quoting 1 GAO, Principles of Federal Appropriations Law at 4–20). Agencies are afforded deference in making this determination and the rule ensures that agency spending is not "'so attenuated as to take it beyond that range' of permissible discretion." *Id.* (quoting *Implementation of Army Safety Program,* B–223608 (Comp. Gen. Dec. 19, 1988)).

Remediation of the DoD barrier projects and installation of system attributes are necessary incidents to construction of the entire barrier system. The incomplete DoD-funded barrier projects that were transferred to DHS required significant remediation work to avert potential harms to life, safety, and the environment. *See* AR at 9, 78–81, 112–149 (listing various categories of remediation actions needed at the DoD projects, including photos of project sites in need of repair). DHS thus lawfully exercised its spending discretion to address myriad problems associated with that previous construction activity by appropriating funds for, among other things, erosion and drainage control projects, flood prevention infrastructure, securing open trenches, stabilizing slopes, environmental restoration, and safety work near border roads. *See id.*; Third Enriquez Decl. ¶¶ 10–33. Such expenditures are consistent with DHS's long history of addressing the impacts of construction using its barrier appropriations. *See Cnty. of El Paso*, 2008 WL 4372693, at *11 (explaining DHS's "comprehensive analysis of the potential environmental impacts associated with the construction of the fence") (citation omitted). Additionally, as explained above, barrier system attributes are a critical component of the barrier system that enhance its effectiveness. Third Enriquez Decl. ¶ 27; *see supra* ¶ 20. Those expenditures fall well within the "range of permissible discretion" afforded to DHS in the exercise of its spending authority. *Fed. Lab. Rels. Auth.*, 665 F.3d at 1349 (citation omitted); *see* 1 GAO, Principles of Federal Appropriations Law at 4–20 ("The spending agency has reasonable

discretion in determining how to carry out the objects of the appropriation.").

This position is further supported by a decision from the GAO addressing DHS's execution of its barrier system appropriations. *See* GAO Opinion, 2021 WL 2451823. In response to a complaint from a group of Senators that DHS had unlawfully impounded its border wall funds, GAO conducted a thorough analysis of DHS's execution of its border wall appropriations as of June 2021 and found "nothing to indicate that . . . DHS is attempting to override congressional intent that these funds be used for constructing barriers at the southern border." *Id.* at *6; *see id.* at *1 ("[W]e conclude that neither the Proclamation nor its implementation violate the ICA."). As the States have previously acknowledged, PI Mot. 5 n.3, GAO's views are entitled to "special weight" in light of "its accumulated experience and expertise in the field of government appropriations." *Nevada*, 400 F.3d at 16 (quoting *Int'll Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984)). At the time GAO conduced its analysis in June 2021, DHS was in the initial stages of its assessing how to spend its appropriation. DHS had just issued its initial spending plan, construction activity was largely suspended while the plan was developed, and DHS had not obligated any funds from its 2021 appropriation. *See* GAO Opinion at *3–6. Even in those circumstances, GAO concluded that any "[d]elays in spending these funds" were "programmatic delays, not impoundments." *Id.* at *1. In the two years since the GAO decision, construction activity at various project sites has resumed, DHS has obligated over one billion dollars from its appropriations, and plans are in place to continue expending the remaining funds on lawful barrier system projects before the funds expire. *See* Third Enriquez Decl. These subsequent events, in combination with the GAO decision, establish that DHS has not unlawfully withheld its fiscal year 2020 and 2021 appropriations from obligation or expended these funds in a way that contravenes its statutory budget authority.

### D.       DHS Did Not Violate the Constitution.

The States' constitutional claims alleging violations of the separation of powers and the Take Care Clause fare no better than their statutory claims. *See* PI Mot. at 32–34. As a threshold matter, the States lacks a cause of action and cannot satisfy the zone-of-interests requirement for their

constitutional claims.  *See Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475 (1982) ("[T]he Court has required that the plaintiff's complaint fall within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." (citation omitted)).  Just as the States financial interests are entirely unrelated to the interests protected by the statutes they invoke, *see supra* at 32–39, their interests are also unrelated to the asserted constitutional limitations on Congress's power to authorize or appropriate funds for DHS to undertake border infrastructure projects.

The States also cannot establish a likelihood of success on the merits of their constitutional claims because "claims simply alleging that the President has exceeded his statutory authority are not 'constitutional' claims."  *Dalton v. Specter*, 511 U.S. 462, 473 (1994).  The Court previously dismissed GLO's constitutional claims for this reason, and the States' identical claims cannot provide a basis for a preliminary injunction.  *See* ECF No. 57 at 30-33 ("The Court agrees that, under *Dalton*, Plaintiffs alleged constitutional claims are not subject to judicial review.").

In *Dalton*, the Supreme Court rejected the proposition that "whenever the President acts in excess of his statutory authority, he also violates the constitutional separation-of-powers doctrine." *Dalton*, 511 U.S. at 471.  Not "every action by the President, or by another executive official, in excess of his statutory authority is *ipso facto* in violation of the Constitution."  *Id.* at 472.  In reaching this conclusion, the Supreme Court carefully "distinguished between claims of constitutional violations and claims that an official has acted in excess of his statutory authority." *Id.* (collecting cases).  The Constitution is implicated only if executive officers rely on it as an independent source of authority to act or if the officers rely on an unconstitutional statute.  *Id.* at 473 & n.5.

Neither of those situations applies to this case.  DHS is spending its barrier system funds pursuant to congressional statutory authorization under IIRIRA and its statutory appropriations, not independent Article II authority.  This case thus presents a sharp contrast with *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579 (1952), in which the President directed the Secretary of Commerce to seize the nation's steel mills relying solely on "the aggregate of his powers under the Constitution," and conceded the absence of statutory authority.  *Id.* at 585–87.  Further, the States have not suggested

that either the DHS appropriations acts or the ICA are themselves unconstitutional. *Dalton*'s reasoning thus fully applies here and refutes the States' argument that they have a constitutional claim or cause of action. *See Ctr. for Biological Diversity v. Trump*, 453 F. Supp. 3d 11, 51–54 (D.D.C. 2020) (dismissing constitutional claims challenging border wall construction based on *Dalton*); ECF No. 57 at 33 ("This Court agrees with the D.C. Circuit's analysis and applies that holding here."). This case concerns "simply" whether DHS has "exceeded [its] statutory authority" and "no constitutional question whatever is raised"—"only issues of statutory interpretation." *Dalton*, 511 U.S. at 473–74 & n.6 (citation omitted).

In advancing a constitutional claim based on the separation of powers, the States make the same argument the Supreme Court rejected in *Dalton*. *See* PI Mot. at 29–32. The States assert that DHS violated the separation of powers because it allegedly stopped spending its appropriations on actual border wall construction. *See id.* at 29–31. But that separation-of-powers claim hinges entirely on whether DHS acted in accordance with the appropriations statutes at issue in this case. *See* ECF No. 57 at 33 (stating that "the focal point of Plaintiffs' claims and this Court's analysis are whether the Government violated IIRIRA and the border barrier appropriations"). The outcome of that question depends on resolution of statutory claims and does not involve any unique separation-of-powers principles. If the States' theory were accepted, every garden-variety action by a federal agency alleged to be in violation of a statutory provision would also, *ipso facto*, violate the constitutional separation of powers. The Supreme Court foreclosed that line of argument in *Dalton*.

The States' Take Care Clause claim similarly fails because it merely reasserts allegations of statutory violations in constitutional terms. *See* PI Mot. at 32–34. The Take Care Clause provides that the President "shall take Care that the Laws be faithfully executed." U.S. Const. art. II, § 3. The alleged Take Care Clause violation in this case is based entirely on allegations that Defendants have "refus[ed] to follow Congress's commands in the 2020 and 2021" DHS appropriations acts. *Id. at* 32, 34. But *Dalton* bars the States' attempt to transform allegations of statutory violations into separate constitutional violations of the Take Care Clause. As the Court recognized in the *GLO* case, the "focal point of Plaintiffs' claims" (to the extent it presents a justiciable controversy at all) turns on the

meaning of the relevant statutes—a purely statutory dispute with no constitutional dimension. *See* ECF No. 57 at 32–33 (dismissing GLO's Take Care Clause claim); *Arizona,* 600 F. Supp. 3d at 1009–13 (dismissing Take Care Clause claim brought by State of Arizona challenging border barrier spending decisions).

Moreover, the States do not cite any history or precedent for using the Take Care Clause as a mechanism to obtain affirmative relief against the President or Executive Branch agencies. Recognizing such a claim in this context would raise its own separation powers problems, as the Take Care Clause furnishes no basis for affirmative relief in an Article III court. For the Judicial Branch to undertake this inquiry would express a "lack of the respect due" to the Nation's highest elected official, *Baker v. Carr*, 369 U.S. 186, 217 (1962), by assuming judicial superintendence over the exercise of Executive power that the Clause commits to the President. *See Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (plurality opinion); *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996) (observing that "the President, like Congress, is a coequal branch of government, and for the President to be ordered to perform particular executive . . . acts at the behest of the Judiciary . . . at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers") (citation omitted). Indeed, the Supreme Court has recognized that "the duty of the President in the exercise of the power to see that the laws are faithfully executed" "is purely executive and political," and not subject to judicial direction. *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 499 (1866); *see id.* at 501 (stating that federal courts lack jurisdiction to "enjoin the President in the performance of his official duties"); *see also Dalton*, 511 U.S. at 469 (concluding that actions of the President are not reviewable under the APA).

In any event, both the President and DHS have taken care to faithfully execute the relevant appropriations acts. The President's Proclamation directs the Secretary of Defense and the Secretary of Homeland Security "to ensure that funds appropriated by the Congress fulfill their intended purpose" and mandates that federal agencies continue "the expenditure of any funds that the Congress expressly appropriated for wall construction, consistent with their appropriated purpose." Proclamation, 86 Fed. Reg. at 7226. And DHS, consistent with the President's directive and the

congressional mandate, is spending its appropriations "for the construction of barrier system along the southwest border" in furtherance of that purpose.  DHS Appropriations Act, 2020, Pub L. No. 116-93, Div. D, § 209(a)(1), 133 Stat. at 2512.  Accordingly, there is no basis to conclude that the President has directed his subordinates to violate any law or act in a way that is contrary to basic appropriations principles.  Proclamation, 86 Fed. Reg. at 7226 ("This proclamation shall be implemented consistent with applicable law").

### E.  DHS's Funding Decisions Are Not Arbitrary or Capricious.

DHS's funding decisions are not subject to review under the APA for the reasons explained above.  But even if they were, the States have not demonstrated that they are likely to succeed on their claim that those decisions were arbitrary and capricious.

The President's proclamation was clear and expressly consistent with legislative mandates: DHS must provide "for the expenditure of any funds that the Congress expressly appropriated for wall construction, consistent with their appropriated purpose."  Proclamation, 86 Fed. Reg. at 7226. DHS's amended plan and implementation of this directive are faithful to the terms of DHS's appropriations "for the construction of barrier system along the southwest border."   DHS Appropriations Act, 2020, Pub L. No. 116-93, Div. D, § 209(a)(1), 133 Stat. at 2512.  In particular, DHS is prioritizing its fiscal year 2020 and 2021 funds on "[c]lose out, remediation, and mitigation" costs "of the barrier projects turned over to DHS by DoD" and installation of "barrier system attributes" such as "lighting, cameras, and detection technologies."  *See* AR at 9–11.  DHS's decision to fund projects within these two categories falls well within the agency's statutory discretion, and is not arbitrary or capricious.

The arbitrary-and-capricious standard of review is "deferential" to the agency charged with administering the statute, and the "court may not substitute its own policy judgment for that of the agency."  *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021).  Rather, the court must "simply ensure[] that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained [its] decision."  *Id.*  Applying this "narrow and

highly deferential standard," *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 699 (5th Cir. 2010), DHS's explanations for its border barrier expenditures more than satisfy the "minimal standards of rationality" that the APA imposes. *Texas Oil & Gas Ass'n v. U.S. EPA*, 161 F.3d 923, 934 (5th Cir. 1998).

The President's Proclamation terminated the national emergency declaration and policy of the prior Administration that had been the basis for transferring military funds from DoD to fund border barrier construction. *See* Proclamation, 86 Fed. Reg. at 7225. In light of the President's lawful decision to discontinue diverting money from DoD military projects to fund border wall construction (a decision the States do not challenge here), DHS had to make important programmatic decisions about where and how to allocate the funds Congress had specifically appropriated for border barrier system construction. The termination of DoD funding and cancellation of the DoD barrier projects resulted in DHS becoming financially and operationally responsible for the partial barrier infrastructure that DoD had built. *See* AR at 7–8, 78–81, 119–120; DoD Plan at 3; Third Enriquez Decl. ¶ 29. Without the additional DoD funding, DHS could no longer proceed along the same course DoD had chosen and had to decide how to prioritize the use of its appropriated barrier system funds to manage the DoD infrastructure. *See* AR at 7–11

The DoD projects were in "various stages of completion" at time of their cancellation and DHS reasonably assessed that it would "need to absorb some potentially significant costs related to DoD's discontinued border wall projects." AR at 7. Many of the terminated DoD projects were adjacent to DHS-funded projects, and the incomplete nature of the DoD projects risked harming "the overall function of the entire system." AR at 19–20. After DHS evaluated the state of the DoD projects, DHS "found that the remediation and mitigation requirements" were "more substantial than anticipated." AR at 9, 12–14. The administrative record shows the incomplete state of the DoD projects, including detailed photos and descriptions of project sites in need of extensive repair. *See* AR at 13–14, 19–20, 78–90, 112–149. The scope of remedial measures needed to avert potential harms to life, safety, and the environment, is substantial. *See id.* The sites required a wide range of remediation actions, including erosion control projects, slope stabilization, flood and drainage

infrastructure, road repair, completing gates and closing gaps, grading work, equipment removal, and restoration of staging areas.  *See id.* at 7, 13, 79–81, 112–116.  These projects took on added importance because conditions at the sites "deteriorated" after the DoD contractors stopped work.  *Id.* at 13.  Heavy rains continued to erode "slopes and drainages that were not adequately stabilized" and monsoons risked "possible flooding due to inadequate drainage features . . . in certain areas."  *Id.*

Given the unfinished and incomplete state of the DoD projects, DHS reasonably decided to prioritize spending its fiscal year 2020 and 2021 barrier system appropriations to address the "remediation and mitigation requirements" at the DoD project sites.  *Id.* at 9–13.  DHS determined that completing these projects "will ensure that the physical infrastructure that was constructed by DoD will function as it was intended and enhance the long-term structural integrity of such infrastructure."  *Id.* at 13.  If the site conditions went unaddressed, they would "pose potential safety risks to [Border Patrol] agents, the general public, and migrants."  *Id.*; *see id.* at 78 (stating that "there exists a significant risk of bodily harm and property damage to Border Patrol agents, the public, landowners, and migrants" from the "deficient and unsafe infrastructure").  DHS was also cognizant of potential "treaty violations as a result of improper transboundary water flows, failures in the fence, road failures, and flooding liability to private and public lands."  *Id.* at 78.  Further, the site conditions created "a risk for further degradation of the environment, including nearby wildlife refuges, sensitive waterways, cultural and historical areas, habitat for threatened and endangered species, designated wilderness, and National Park lands."  *Id.* at 13; *see id.* at 128, 137–41 (examples and photos of environmental restoration projects).

DHS also reasonably decided to prioritize using its fiscal year 2020 and 2021 appropriations to install "barrier system attributes" such as "lighting, cameras, and detection technology, in areas where physical barrier has already been constructed."  AR at 9–15, 18–19.  DHS found that many of the DoD-funded projects lacked the necessary system attributes and the DoD barriers in their "current unfinished condition" do not "have the necessary persistent impedance."  *See* AR at 19.  Without such technological attributes to provide situational awareness, additional Border Patrol agents must be assigned to monitor and patrol these areas.  *Id.*  "This detection and monitoring mission requires

significant manpower" and the added "staffing requirement" would be reduced by installing system attributes. AR at 18–20 (describing barrier system attribute technology and its positive operational impacts). The technologies thus enable agents to minimize response times for emergency situations and to "track and respond to illicit cross-border activity more efficiently and effectively." AR at 14; *see id.* at 66 (slide showing how barrier attributes work to enhance situational awareness for Border Patrol officers). The attributes also are expected "to reduce long-term maintenance and repair costs" by providing alerts to agents when damage to the barrier is detected from breaching activity, such as an attempt to cut through the barrier. AR at 14; *see id.* at 20. "Given the operational benefits that are conferred by system attributes," DHS concluded that these expenditures would be "an effective use" of its barrier system appropriations. AR at 14; *see supra* at 9–10.

DHS's decision to allocate its funds in this manner was product of reasoned decisionmaking that was neither arbitrary nor capricious. The States claim that DHS did not provide an "explanation or justification" for its decision, but as explained above, DHS's explanation is clear. PI Mot. at 22. DHS explained that it would prioritize spending its fiscal year 2020 and 2021 appropriated funds on two "priority actions"—"remediation and mitigation of the former DoD project sites and the installation of barrier system attributes"—and set forth the reasons and considerations for that decision. *See supra* at 50–52. DHS "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). That the States would have prioritized funding different barrier projects as a policy matter does not mean that DHS's contrary determination was unreasonable. "[I]t suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). Given the changes to the availability of DoD funding for border barrier construction—changes the federal Government was unquestionably entitled to make to return available DoD funds to their originally appropriated purpose—it would not have been consistent with prudent financial management to continue unthinkingly along the course set for the DoD projects as

if those additional DoD funds had still been available. DHS needed to evaluate the DoD projects that it had now become responsible for, identify potential life and safety issues associated with those incomplete projects, and prioritize its available resources accordingly. The record here more than adequately explains the reasons for DHS's decisions.

The States' other arguments similarly miss the mark. The States contend that DHS "failed to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, namely the border security benefits from barrier construction. *See* PI Mot. at 18–20. But DHS has not disavowed border barrier construction activities altogether and the administrative record shows that DHS considered the efficacy of a fully functional border barrier system in deciding how to allocate its appropriations. As explained above, remediating the incomplete DoD border barrier projects allows the projects to function safely and effectively, as they were intended. Projects such as closing gaps, fixing gates, and addressing environmental problems that could impact structural integrity of the barrier and hinder the ability of Border Patrol agents to respond to incidents, are intended to ensure that the barrier system performs its intended function to "slow and/or stop . . . illicit cross-border activity." AR at 18; *see id.* at 78–81, 112–116. Additionally, system attributes such as cameras and detection sensors serve as critical "force multipliers" by allowing Border Patrol agents to "identify, classify, and track" activity as it is occurring and enable "a timely law enforcement response" in appropriate situations. *Id.* at 18–19 (stating that barriers "are most effective when paired with complementary investments in solutions that improve situational awareness . . . and access and mobility"). Without a fully complete and functional barrier system, the barrier merely "serves as a temporary impediment to an individual determined to illegally cross the border." *Id.* at 19. The DoD barrier projects in their "unfinished condition" did "not have the necessary persistent impedance" as compared to a fully integrated barrier system. *Id.* Indeed, DHS considered the type of data that the States claim DHS ignored showing that apprehensions and assaults decreased in areas "where a border barrier system was implemented and completed in 2020." *Id.*; *see* PI Mot. at 18. DHS also recognized that unfinished gaps in the incomplete barrier "are currently funnel points for illicit cross border activity, to include narcotics and smuggling" and require allocating additional personnel that remove "resources aways from other border security

operations along the border." AR at 113.  Thus, far from ignoring an important aspect of the problem, DHS expressly considered the border security benefits expected to result from spending funds on projects that would enhance the effectiveness of the border barrier system and Border Patrol resources.

The States also are mistaken in arguing that DHS was required to consider whether the States had any "reliance interests" on the prior Administration's "method of using border walls" to further border security.  PI Mot. at 21–22.  Typically, "[w]hen an agency changes course . . . it must 'be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account'" before it does so.  *Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (quoting *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016)).  But there is no analogue in this case to the reliance interests in *Regents*.  That case challenged the termination of a program that provided immigration benefits to a specific group of individuals brought to the United States as children, and the Court recognized the reliance interests of those beneficiaries.  *See id.* at 1914  Here, the States do not have any comparable cognizable interest in the way DHS decides to allocate its barrier system appropriations.  Nor do the appropriations impose any requirement that DHS consider potential indirect downstream economic effects on State budgets "in areas like driver's licenses, education, or healthcare."  PI Mot. at 21.  This case involves DHS's discretionary decisions about how to allocate its appropriated funds, not any federal regulation of the States.  Whatever incidental effects DHS's spending policies might have on the States are not the kind of "serious reliance interests" that DHS was required to consider in exercising its discretion about how best to spend its barrier system appropriations.  *Regents*, 140 S. Ct. at 1913–14 (stating that agency was required to at least consider potential reliance interests where it reversed a five-year-old policy on which directly affected recipients could have relied to "enroll[] in degree programs, embark[] on careers, start[] businesses, purchase[] homes, and even marr[y] and [have] children") (citation omitted).  Indeed, the States have not identified a single decision that they made in reliance on DHS adhering to planned expenditures with its fiscal year 2020 and 2021 appropriations prior to the President's Proclamation.  It strains credulity to think that elementary schools in St. Louis or driver's license offices in Dallas

planned their operating budgets around how DHS's planned to spend its barrier system appropriations.  Nor would any such reliance have been reasonable given that, when the President issued the Proclamation, DHS was not close to breaking ground on any of the projects that DHS had originally planned to fund with its fiscal year 2020 and 2021 appropriations prior to the President's Proclamation.  *See* First Enriquez Decl. ¶¶ 12–34 (ECF No. 24-3) (explaining DHS had awarded contracts in 2020 for new barrier system in the Laredo Sector, and for future project planning in the El Centro Sector, but no land had been acquired and construction had not begun); Second Enriquez Decl. ¶¶ 20–29 (ECF No. 52-1) (stating DHS cancelled contracts and would no longer move forward with the planned barrier system construction projects in Laredo or El Centro).

The States are likewise wrong to assert that DHS failed to consider the legality of its spending decisions.  *See* PI Mot. at 22–23.  The President's Proclamation directed DHS to develop a plan to "provid[e] for the expenditure of any funds that the Congress expressly appropriated for wall construction, consistent with their appropriated purpose."  Proclamation, 86 Fed. Reg. at 7226.  DHS expressly considered the legality of its actions in announcing its spending priorities.  *See* AR at 4 (recognizing that priorities under the plan must be "appropriate and consistent with applicable law"); *id.* at 9 (explaining that in amending the plan DHS has "continued to assess how to best utilize the FY 2018–2021 barrier system appropriations, in accordance with the purposes of those prior year appropriations).  DHS found that "remediation and mitigation requirements from past barrier construction . . . can be addressed through the lawful expenditure of DHS funds."  *Id.* at 9.  Similarly, DHS determined that installation of system attributes would be "consistent with the purpose of the FY18–2021 appropriations."  *Id.*  These decisions were correct and in accordance with the terms of the fiscal year 2020 and 2021 appropriations statutes, as set forth above.

## II.    The Remaining Factors Weigh Strongly Against Granting a Preliminary Injunction.

The harm to the federal government from an injunction "plainly outweighs" the attenuated and indirect financial injury advanced by the States.  *Winter*, 555 U.S. at 26.  The States' sole allegation of irreparable harm is that they will be required to pay an unspecified amount of money to cover the

social services costs for an unknown number of immigrants who would have been prevented from entering the United States had DHS spent its barrier system appropriations according to the States' preferences.  PI Mot. at 47–48.  Such speculation is not sufficient even to support Article III standing in light of *Enforcement Priorities*, much less a clear showing "of substantial and immediate irreparable injury" to justify the extraordinary remedy of a preliminary injunction.  *O'Shea v. Littleton*, 414 U.S. 488, 502 (1974).  The States "must demonstrate that irreparable injury is *likely* in the absence of an injunction."  *Winter*, 555 U.S. at 22 (emphasis in original).  But the States have not carried their burden to present evidence showing that an injunction would cause comparatively fewer migrants to enter the country than DHS's spending plan.

By contrast, the harms of an injunction to the government and the public—which "merge when the Government is the opposing party"—are significant.  *Nken*, 556 U.S. at 435.  An injunction preventing DHS from completing the ongoing and planned projects utilizing its fiscal year 2020 and 2021 barrier system appropriations would impose substantial harms to border security and public safety.  *See* Third Enriquez Decl. ¶¶ 28–33.  As explained above, contracts have been awarded and contractors are currently on site at various locations along the southwest border to address myriad life, safety, environmental, and operational requirements with damaged or incomplete barrier system infrastructure.  *See id.* ¶¶ 10, 21–23.  Additional contracts for remediation and system attribute projects are expected to begin later this year.  *See id.* ¶¶ 24–27.  Completing this work is critical to ensuring that the barrier system functions as it was intended and that both the infrastructure and site conditions do not pose unnecessary risk to Border Patrol agents who work in these areas and the public.  *See id.* ¶ 29. For example, if remediation requirements for roads near barriers are not addressed, Border Patrol Agents will have limited access to certain areas and would have to utilize roads that are not safe for regular travel.  *Id.* ¶ 30.  If water drainage projects are not completed, flood risks will increase and existing patrol roads will wash out more frequently, thereby increasing long-term maintenance and repair costs.  *Id.*  Further, unfinished drainage projects will erode the foundation of the barriers and undermine their structural integrity, putting them at risk of failure.  *Id.*  Additionally, numerous areas within the former DoD project sites require significant erosion control measures to prevent rockfall

57

and address other hazards that pose safety risks to Border Patrol agents and the public.  *Id.*

The ongoing remediation work across the southwest border also includes filling gaps and fixing gates in the existing barrier.  *Id.* ¶ 31.  To date, CBP has closed over 68 gaps and an additional 50 gap and gate locations are under construction, with more planned construction in fiscal year 2024. *Id.*  Incomplete barrier sections with gaps and inoperable access gates can become funnel points for illicit cross border activity and create security vulnerabilities.  *Id.*  An injunction prohibiting DHS from completing this important work would compromise border security and public safety.  *Id.*

DHS also has awarded one contract that includes installation of system attributes and additional contracts are expected in the coming months.  *Id.* ¶¶ 23–24, 27.  As explained above, system attributes such as cameras and detection technology are a key component of the border barrier system that provide important security and public safety benefits, such as reducing Border Patrol response times, providing agents with domain awareness, and reducing repair costs.  *Id.* ¶ 32; *see supra* at 9–10 & 52–53.  A prohibition on funding system attributes would adversely impact both the effectiveness of the barrier system and its longevity.  *See* Third Enriquez Decl. ¶ 32.

The States would apparently have the Court order the contractors stop this critical ongoing work, require DHS to cancel the contracts, and reallocate whatever money is leftover to a lengthy planning and real estate acquisition process for new barrier construction that was in the planning stages when the prior Administration left office.  *See* First Enriquez Decl. ¶¶ 20–22, 40-51 (explaining planning actions for new barrier construction as of January 2021).  That new construction would not start overnight.  Indeed, there would be significant administrative and financial burdens associated with abruptly changing direction, including costs associated with terminating contracts and reinvesting agency resources in planning, soliciting, and evaluating bids for new contracts as well as pre-construction environmental and stakeholder consultation.  *See* Third Enriquez Decl. ¶ 33.  Neither border security nor public safety is furthered by an injunction that would stop ongoing improvements to the barrier system and force DHS to start over with a planning process for new construction.

The States raise two substantive arguments about the equities, but neither has merit.  First, the States assert that Defendants "have no legitimate interest in the implementation of an unlawful

Proclamation" and that a preliminary injunction serves the public's interest in Defendants following the law, PI Mot. 49–50, but as explained, there is nothing unlawful about Defendants' actions. Second, the States assert that the public's interest in deterring unlawful immigration weighs in their favor, *id.* at 50, but the States' equities in this case are limited to the fiscal harms that form the basis of their lawsuit. Their interests in collecting extra franchise taxes or minimizing expenditures on social services are only remotely connected to the spending decisions at issue in this case, and do not give rise to Article III standing, much less irreparable harm or an equitable interest that would justify the extraordinary remedy of a preliminary injunction. In any event, the ongoing projects that DHS is funding with its appropriations further border security and public safety goals, and the States cannot prevail on the balance of equities simply by speculating that their preferred projects might be a better use of funds.

### III. The Requested Injunction Is Overbroad and Unworkable.

The Court should also reject the States' request for a sweeping nationwide injunction that would enjoin Defendants, "on a nationwide basis, from enforcing and implementing the January 20 Proclamation." *See* PI Mot., Proposed Order. "A plaintiff's remedy must be tailored to redress the plaintiff's particular injury," *Gill v. Whitford*, 138 S. Ct. 1916, 1934 (2018), and "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). A district court "fails to meet these standards" when it does not "narrowly tailor an injunction to remedy the specific action which gives rise to the order." *John Doe # 1 v. Veneman*, 380 F.3d 807, 818 (5th Cir. 2004).

The States must identify particularized injuries capable of meaningful legal redress, and they must tailor any remedy they seek to those specific injuries. They must also explain why an injunction remedying their injuries is appropriate notwithstanding countervailing equities—including those of DHS in implementing its spending priorities, and of other entities and individuals not before this Court who might conclude that the priorities are sound, such as other States or landowners who do not want ongoing remediation projects on or near their land abruptly stopped. The States' failure to

make this showing underscores why their request for a nationwide injunction is inappropriate.

"[I]n recent years the Supreme Court has repeatedly stayed nationwide injunctions that prevented the Executive Branch from pursuing its immigration policies." *Texas v. United States*, 14 F.4th 332, 341 (5th Cir. 2021) (citing cases), *vacated on rehearing en banc*, 24 F.4th 407 (5th Cir. 2021); *see Feds for Med. Freedom v. Biden*, 63 F.4th 366, 387 (5th Cir. 2023) (en banc).  Nationwide injunctions "take a toll on the federal court system—preventing legal questions from percolating through the federal courts, encouraging forum shopping, and making every case a national emergency for the courts and for the Executive Branch." *Trump v. Hawaii*, 138 S. Ct. 2392, 2425 (2018) (Thomas, J., concurring); *see Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600–01 (2020) (Gorsuch, J., concurring in grant of stay) (stating that nationwide injunctions raise serious separation of powers concerns, hamper orderly judicial resolution of issues within and across cases, and improperly disadvantage the Federal Government); *Enforcement Priorities*, 143 S. Ct. at 1980-81 (Gorsuch, J., concurring in the judgment) (reiterating concerns with "universal injunctions" and noting that "[m]atters have not improved with time").  While the Fifth Circuit has previously stated "it is not beyond the power of a court, in appropriate circumstances, to issue a nationwide injunction," *Texas*, 809 F.3d at 188, there is no mandatory requirement to issue such relief in every case touching on immigration matters.  *See Louisiana v. Becerra*, 20 F.4th 260, 263 (5th Cir. 2021) (per curiam) (stating that *Texas* "does not hold that nationwide injunctions are required or even the norm.").

Moreover, when the Fifth Circuit has granted nationwide relief in the past, it has relied on the need to ensure "uniform" application of federal immigration laws to various individuals across the country.  *Texas*, 809 F.3d at 187–88 (stating that "a geographically-limited injunction would be ineffective because DAPA beneficiaries would be free to move among states").  But that uniformity interest is not present here.  This case focuses solely on DHS's execution of its spending authority; it does not implicate the "unified system" of immigration laws established by Congress or the need to ensure immigrants receive the same status in different parts of the country.  *Id.* at 188 (internal quotations and italics omitted).  There is nothing odd or anomalous about barrier system construction occurring in some locations, but not others.  *See Louisiana*, 20 F.4th at 264 (staying nationwide

injunction because "[l]acking is either the constitutional uniformity principle in *Texas* or that case's concern that patchwork rulings would undermine an injunction limited to certain jurisdictions"); *see also Florida v. HHS*, 19 F.4th 1271, 1283 (11th Cir. 2021) (rejecting uniformity argument); *Arizona v. Biden*, 31 F.4th 469, 483–85 (6th Cir. 2022) (Sutton, C.J., concurring) (same).

Further, a nationwide injunction in this case would be inappropriate because it would affect many parties who are not before the Court, including other border States and landowners in those States, thereby exceeding this Court's authority under Article III and violating longstanding principles governing equitable relief.  *See Rhode Island v. Massachusetts*, 37 U.S. (12 Pet.) 657, 718 (1838) (stating that the equitable power of Article III courts extends "to render a judgment or decree upon the rights of the litigant parties" consistent with the exercise of such powers at common law or in English courts of equity); *see also Enforcement Priorities*, 143 S. Ct. at 1980-81 (Gorsuch, J., concurring in the judgment) (observing that "in recent years a number of lower courts have asserted the authority to issue decrees that purport to define the rights and duties of sometimes millions of people who are not parties before them").  Texas and Missouri should not be permitted to superintend border barrier spending policies for other property owners and States along the southern border through a single district court order.

The proposed nationwide injunction enjoining implementation of the President's Proclamation also could be interpreted to cover the border wall activities of non-party federal agencies whose actions are not challenged in this case.  As explained above, both the Department of Defense and Department of the Treasury funded border wall construction activities using transferred funds that were appropriated to those agencies.  The States do not challenge those agencies' decisions to cease funding border wall construction, thus any injunction should exclude from its scope the actions of the Department of Defense and the Department of the Treasury.  Nor is there any basis for an injunction to run against the President himself.  *See Feds for Med. Freedom v. Biden*, 63 F.4th at 387–88 (stating that the district court "carefully carved the President out of its injunction").  The Supreme Court recognized over 150 years ago in *Mississippi v. Johnson* that federal courts lack jurisdiction to "enjoin the President in the performance of his official duties." 71 U.S. at 501.  And the Supreme Court reaffirmed that principle more recently in *Franklin*, 505 U.S. at 802–03 (plurality opinion).

Relying on that authority, the Court previously dismissed the President and all claims against him in the *GLO* case. *See* ECF No. 57 at 11–13.

At a minimum, the States are not entitled to any broader injunction unless they can show "a substantial likelihood that a geographically-limited injunction would be ineffective." *Texas*, 809 F.3d at 188. The States do not even attempt to meet that standard. Instead, the States simply point to raw numbers of immigrants who reside in Texas or Missouri and then speculate that they arrived there by traversing areas of the southern border without barriers. *See* PI Mot. at 36–37. But immigrants arrive in this country through various ways other than through unfenced areas of the border, including through designated ports of entry. There is no evidence before the Court to draw a conclusion that the States' preferred form of barrier spending will somehow shut off potential pathways in those states that immigrants might use in the future to settle in Texas or Missouri, thereby increasing the budgets of the States' social services agencies. *See Holland Am. Ins. Co. v. Succession of Roy,* 777 F.2d 992, 997 (5th Cir. 1985) (stating that "[s]peculative injury is not sufficient" to award preliminary injunction). In any event, Texas and Missouri have not explained why the Court should enjoin ongoing barrier construction projects in others States along the border to redress Texas and Missouri's speculative financial harms. *See Enforcement Priorities*, 143 S. Ct. at 1985 (Gorsuch, J., concurring in the judgment) (stating that "a district court should 'think twice—and perhaps twice again—before granting' such sweeping relief")

In addition to the problems associated with the nationwide aspect of the States' proposed injunction, the States also seek an "obey-the-law" injunction that courts, including the Fifth Circuit, routinely reject as illusory and inadequate in terms of providing fair notice as to the conduct that is enjoined. *See Payne v. Travenol Lab'ys, Inc.*, 565 F.2d 895, 897 (5th Cir. 1978); *see also SEC v. Goble*, 682 F.3d 934, 949 (11th Cir. 2012); *City of N.Y. v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 144 (2d Cir. 2011); *Gilday v. Dubois*, 124 F.3d 277, 287 (1st Cir. 1997). This type of vague injunction fails to comply with the requirements of Federal Rule of Civil Procedure 65(d), which provides that an injunction must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." *See State of Louisiana v. Biden*,

45 F.4th 841, 846 (5th Cir. 2022).  The Fifth Circuit has explained that "an ordinary person reading the court's order should be able to ascertain from the document itself exactly what conduct is proscribed."  *Id.* (citation omitted).

The States' proposed injunction selectively copies certain language from DHS's fiscal year 2020 and 2021 appropriations statutes and would direct Defendants to "enforce," "implement," "obligate and spend the funds appropriated for 'construction of barrier system along the southwest border.'"  *See* PI Mot., Proposed Order.  But as explained above, Defendants maintain that they are already in the process of complying with all relevant appropriations statutes, so it is unclear what the proposed injunction they seek would require Defendants to do.  The generality of the injunction also poses significant compliance problems.  The injunction excludes language from the appropriations that gives Defendants until September 30, 2024, at the earliest, to obligate the funds appropriated for border barrier construction in fiscal year 2020, so it is unclear to what extent the injunction requires immediate action or if the time frame imposed by Congress continues to apply.  The injunction also does not address whether its commands are in derogation of other statutes Defendants would typically comply with prior to the obligation or expenditure of funds, such as the Federal Acquisition Regulation, 48 C.F.R. §§ 1 *et seq.*, or the Competition in Contracting Act, 10 U.S.C. §§ 2301 *et seq.*

There is no good solution to the problems created by the injunction's generality.  Spelling out in more detail what would constitute "compliance" would require the Court to don a hard hat and take on the roles of project manager and accountant for border barrier projects nationwide.  For example, the Court would have to decide the appropriate amount of time and money DHS could spend on various projects across the entire southwest border.  There are no standards in any of the sources of law the States rely on that provide a basis for the Court to oversee the day-to-day activities of DHS officials in this manner and direct, by way of an injunction, what types expenses those officials can and cannot incur.  The States cite to no history or precedent where a court issued a sweeping preliminary injunction micro-managing an agency's spending practices similar to the one they seek here.  This case should not become the first.

Finally, there is no basis for the Court to order Defendants to rescind the cancellation of

border barrier construction contracts. *See* PI Mot., Proposed Order. Texas and Missouri are not parties to the contracts, thus they have no standing to seek their enforcement. "[A] third party may only sue to enforce a contract it did not sign when the parties to the contract entered the agreement with the clear and express intention of directly benefitting the third party." *Oubre v. Schlumberger, Ltd.*, 684 F. App'x 424, 425 (5th Cir. 2017) (citation omitted). The States cannot meet that high standard and have not established that border barrier contracts were clearly intended to protect the States' budget and tax interests. *See Physicians ACO, LLC v. Computer Scis. Corp.,* No. 4:16-CV-1293, 2017 WL 3187609, at *1 (S.D. Tex. July 26, 2017) (recognizing "the high bar" for "third-party beneficiary status" in "government contracts"). Nor do the States cite any authority for the novel position that a court, at the request of a non-party to a contract, can issue an injunction to rescind cancellation of a contract and force the contracting parties resume commitments they otherwise have agreed to end.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a preliminary injunction should be denied. A proposed order is attached.


Dated:  August. 18, 2023

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

 */s/ Andrew I. Warden*[8]
ANDREW I. WARDEN (IN Bar #23840-49)
Senior Trial Counsel
MICHAEL J. GERARDI
(D.C. Bar #1017949)
Trial Attorney / Attorney-in-Charge
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW, No. 7506
Washington, D.C. 20005

---

[8] Signed with permission of the attorney-in-charge in accordance with Local Rule 11.3.

Tel: (202) 616-5084
Fax: (202) 616-8470
E-mail: Andrew.Warden@usdoj.gov

## CERTIFICATE OF WORD COUNT

I certify that the total number of words in this opposition brief, exclusive of the matters designated for omission, is 25267, as counted by Microsoft Word.

*/s/ Andrew I. Warden*
ANDREW I. WARDEN

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2023, I electronically filed a copy of the foregoing opposition memorandum.  Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Andrew I. Warden*
ANDREW I. WARDEN