# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

| | |
|---|---|
| THE GENERAL LAND OFFICE OF THE STATE OF TEXAS, and DAWN BUCKINGHAM, M.D., in her official capacity as Commissioner of the Texas General Land Office, <br><br>         Plaintiffs, <br><br>    v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY; and ALEJANDRO MAYORKAS, in his official capacity as Secretary of the Department of Homeland Security, <br><br>         Defendants. | No. 7:21-cv-00272 |
| THE STATE OF MISSOURI; THE STATE OF TEXAS, <br><br>         Plaintiffs, <br><br>    v. <br><br> JOSEPH R. BIDEN, in his official capacity as President of the United States, *et al.* <br><br>         Defendants. | No. 7:21-cv-00420 <br> (formerly No. 6:21-cv-00052) |

## PLAINTIFFS' SUPPLEMENTAL BRIEF IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................. i

TABLE OF AUTHORITIES ...................................................................................... iii

INTRODUCTION ....................................................................................................... 1

BACKGROUND ......................................................................................................... 6

A.     Procedural background and scope of remand ................................................ 6

B.     Additional Factual Developments. ................................................................ 8

ARGUMENT ............................................................................................................ 10

I.     Plaintiffs are likely to succeed on the Merits. ............................................. 10

    A.   The APA claims are reviewable. .............................................................. 10

    B.   Defendants' actions are arbitrary and capricious. .................................... 14

        1.   Defendants' continue to offer different pretextual and post-hoc
             rationalizations explanations for their policy. ..................................... 14

        2.   Defendants' change in course is arbitrary and capricious. ................... 20

    C.   Defendants' actions are contrary to federal law....................................... 24

        1.   Plaintiff States fall within the zone of interests of the statutes at
             issue. ................................................................................................. 25

        2.   Defendants' actions violate the 2020 and 2021 CAAs and the
             ICA… ................................................................................................ 33

    D.   Defendants' actions are contrary to the Constitution. ............................. 38

    E.   The States have standing. ........................................................................ 41

        1.   Standing is determined by facts in existence when the complaint
             is filed............................................................................................... 41

        2.   Texas's mitigation measures are not mere "self-inflicted" injury. ....... 43

        3.   *Enforcement Priorities* should not affect this Court's
             determination of the Plaintiff States' standing in this case................ 43

            a.   The rule articulated in *Enforcement Priorities* does not apply to this
                 case. ............................................................................................. 44

            b.   Even if the general rule in *Enforcement Priorities* applied, two

exceptions would grant Plaintiffs standing. ..................................... 49

    (1)  The Plaintiff States have standing because the agency action challenged here constitutes an abdication of Defendants' statutory responsibilities............................................................. 49

    (2)  Plaintiff States have standing because the failure to build border barriers is not a mere policy of nonenforcement. ............ 51

    (3)  Nothing in *Enforcement Priorities* raises questions about traceability or redressability in this case. .................................. 55

C.      Plaintiffs have shown irreparable harm. ........................................................ 58

D.      The equities and public interest favor Plaintiffs. ............................................ 59

E.      The injunction is both reasonable and warranted............................................ 61

CONCLUSION...................................................................................................... 63

CERTIFICATE OF SERVICE................................................................................ 66

CERTIFICATE OF COMPLIANCE ....................................................................... 66

# TABLE OF AUTHORITIES

***Cases***                                                                  ***Page(s)***

*Agostini v. Felton,*
   521 U.S. 203 (1997) ................................................................................ 47

*Ala. Ass'n of Realtors v. HHS,*
   141 S. Ct. 2485 (2021) ............................................................................ 58

*American School of Magnetic Healing v. McAnnulty,*
   187 U.S. 94 (1902) .................................................................................. 38

*Arizona v. United States,*
   567 U.S. 387 (2012) ................................................................................ 61

*Axon Enter., Inc. v. FTC,*
   142 S. Ct. 890 (2023) .............................................................................. 48

*Biden v. Nebraska,*
   143 S. Ct. 2355 (2023) .......................................................... 3, 39, 53, 54

*Biden v. Texas,*
   142 S. Ct. 2528 (2022) ..................................................................... 17, 51

*Bowen v. Georgetown Univ. Hosp.,*
   488 U.S. 204 (1988) ................................................................................ 20

*BST Holdings, LLC v. OSHA,*
   17 F.4th 604 (5th Cir. 2021) ........................................................... passim

*Califano v. Yamasaki,*
   442 U.S. 682 (1979) ................................................................................ 60

*California v. Trump,*
   963 F.3d 926 (9th Cir. 2020) .......................................................... passim

*Carr v. Alta Verde Indus., Inc.,*
   931 F.2d 1055 (5th Cir. 1991) ................................................................ 41

*Chamber of Commerce of U.S. v. Reich,*
   74 F.3d 1322 (D.C. Cir. 1996) ............................................................... 38

*City & Cty. of San Francisco v. Trump,*
   897 F.3d 1225 (9th Cir. 2018) .......................................... 25, 28, 37, 38

*City of New Haven v. United States,*
    809 F.2d 900 (D.C. Cir. 1987) ................................................................ 30

*Cochran v. SEC,*
    20 F.4th 194 (5th Cir. 2021) ................................................................. 48

*Collum v. Edwards,*
    578 F.2d 110 (5th Cir. 1978) ................................................................. 34

*Connecticut v. Dep't of Interior,*
    363 F. Supp. 3d 45 (D.D.C. 2019) ......................................................... 18

*Dalton v. Specter,*
    511 U.S. 462 (1994) .............................................................................. 38

*Dart v. United States,*
    848 F.2d 217 (D.C. Cir. 1988) ............................................................... 38

*Davis v. FEC,*
    554 U.S. 724 (2008) .............................................................................. 41

*Dennis Melancon, Inc. v. City of New Orleans,*
    703 F.3d 262 (5th Cir. 2012) ................................................................. 57

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020) ................................................................... passim

*Dep't of Com. v. New York, ,*
    139 S. Ct. 2551 (2019). ..................................................... 11, 17, 47, 55

*El Paso County, Texas v. Trump,*
    982 F.3d 332 (5th Cir. 2020) ................................................................. 11

*Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana,*
    762 F.2d 464 (5th Cir. 1985) ................................................................. 57

*FCC v. Fox Television Stations, Inc.,*
    556 U.S. 502 (2009) ......................................................................... 16, 21

*Fisher v. Univ. of Texas at Austin,*
    758 F.3d 633 (5th Cir. 2014) ................................................................. 43

*Free v. Abbott Labs., Inc.,*
    164 F.3d 270 (5th Cir. 1999) ................................................................. 42

*Gen. Land Off. v. Biden,*
    71 F.4th 264 (5th Cir. 2023) .......................................................... 6, 7, 41

iv

*Heckler v. Chaney,*
470 U.S. 821 (1985) ................................................................. 10, 48, 49

*INS v. Legalization Assistance Project,*
510 U.S. 1301 (1993) ................................................................. 31

*Kendall v. United States ex rel. Stokes,*
37 U.S. (12 Pet.) 524 (1838) ..................................................... 39

*Lincoln v. Vigil,*
508 U.S. 182 (1993) ................................................................... 10

*Linda R.S. v. Richard D.,*
410 U.S. 614 (1973) ............................................................. 44, 45

*Loa-Herrera v. Trominksi,*
231 F.3d 984 (5th Cir. 2000) ..................................................... 41

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ................................................................... 40

*Maine v. Goldschmidt,*
494 F. Supp. 93 (D. Me. 1980) .................................................. 30

*Make the Rd. N.Y. v. Pompeo,*
475 F. Supp. 3d 232 (S.D.N.Y. 2020) ........................................ 38

*Milk Train, Inc., v. Veneman,*
310 F.3d 747 (D.C. Cir. 2002) .................................................. 11

*Missouri v. Biden,*
No. 3:22-CV-01213, 2023 WL 4335270 (W.D. La. July 4, 2023) .............................. 56

*Mississippi v. Johnson,*
71 U.S. (4 Wall.) 475 (1867) ..................................................... 39

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
463 U.S. 29 (1983) ................................................................... 23

*Nevada v. Dep't of Energy,*
400 F.3d 9 (D.C. Cir. 2005) ................................................. 32, 34

*Pederson v. Louisiana State Univ.,*
213 F.3d 858 (5th Cir. 2000) ..................................................... 41

*Public Citizen v. Stockman,*
    528 F. Supp. 824 (D.D.C. 1981) ............................................................... 30

*Rodriguez de Quijas v. Shearson/Am. Express, Inc.,*
    490 U.S. 477 (1989) ................................................................................... 47

*Scenic Am., Inc. v. United States Dep't of Transportation,*
    836 F.3d 42 (D.C. Cir. 2016) ..................................................................... 55

*SEC v. Chenery Corp.,*
    318 U.S. 80 (1943) ..................................................................................... 20

*Sobley v. S. Natural Gas Co.,*
    302 F.3d 325 (5th Cir. 2002) ..................................................................... 42

*Stark v. Wickard,*
    321 U.S. 288 (1944) ................................................................................... 38

*State Oil Co. v. Khan,*
    522 U.S. 3 (1997) ....................................................................................... 47

*Texas v. Biden,*
    10 F.4th 538 (5th Cir. 2021) ............................................................... 19, 21

*Texas v. Biden,*
    554 F. Supp. 3d 818 (N.D. Tex. 2021) ....................................... 22, 52, 60

*Texas v. EEOC,*
    933 F.3d 433 (5th Cir. 2019) ..................................................................... 41

*Texas v. United States,*
    2023 WL 5951196 (S.D. Tex. Sept. 13, 2023) ......................................... 50

*Texas v. United States,*
    50 F.4th 498 (5th Cir. 2022) ....................................................... 52, 53, 56

*Texas v. United States,*
    524 F.Supp.3d 598 (S.D. Tex. 2021) ................................................. 60, 61

*Texas v. United States,*
    549 F. Supp. 3d 572 (S.D. Tex. 2021) ..................................................... 53

*Texas v. United States,*
    787 F.3d 733 (5th Cir. 2015) ..................................................................... 61

*Texas v. United States,*
    86 F. Supp. 3d 591 (S.D. Tex. 2015) ................................................. 49, 50

*Texas v. United States*,

   809 F.3d 134 (5th Cir. 2015)..................................................................... passim

*Trump v. Sierra Club*,

   140 S. Ct. 1 (2019)..................................................................................28, 29

*United States v. Becerra*,

   155 F.3d 740 (5th Cir. 1998).......................................................................42

*United States v. Lee*,

   358 F.3d 315 (5th Cir. 2004).......................................................................42

*United States v. Texas*,

   143 S. Ct. 1964 (2023)......................................................................... passim

*Washington v. Trump*,

   847 F.3d 1151 (2017)..................................................................................61

### *Constitutional and Statutory Provisions*

5 U.S.C. § 701(a) ..........................................................................................18

5 U.S.C. § 702...............................................................................................38

5 U.S.C. § 706...............................................................................................43

8 U.S.C. § 1103.............................................................................................42

Fiscal Year 2020 DHS Appropriations Act,

Pub. L. No.  116-93, 133 Stat. 2511, Div. D (2020)............................................ passim

Immigration Reform and Control Act of 1986,

Pub. L. No. 99-603, § 115, 100 Stat 3359 (1986) ...............................................36, 69

Consolidated Appropriations Act, 2018,

Pub. L. No. 115-141, div. J, 132 Stat. 348, (2018) .......................................................19

Department of Defense Appropriations Act, 2019

Pub. L. No. 115-245, Div. A, § Tit. VIII, 132 Stat. 2999 (2019) .................................37

U.S. Const. art. I, § 8, cl. 4............................................................................69

***Rules***

Federal Rule of Civil Procedure 5(b) ............................................................. 73

***Regulations***

8 C.F.R. § 1.3(a)(4)(vi) .................................................................................. 59

8 C.F.R. § 274a.12(c)(14) (2022) ................................................................. 59

42 C.F.R. § 417.422(h) .................................................................................. 59

***Other Authorities***

U.S. Gov't Accountability Office*, Matter of Off. of Mgmt. & Budget & U.S. Dep't of Homeland Sec.-Pause of Border Barrier Constr. & Obligations*, B-333110.1, 2021 WL 2451823 (Comp. Gen. June 15, 2021) .................................... 14, 32, 35, 42

## INTRODUCTION

The southern border remains in crisis, as shown by caravans of immigrants overrunning GLO's farm in Starr County.  So many people come through the GLO Farm that U.S. Customs and Border Patrol brings buses to the GLO Farm to remove them.



Supp. App. 25.  This photo (taken by a GLO employee in 2021), and the photos contained in the Supplemental Appendices (produced during discovery) collected from GLO employees and a camera positioned on the property evidence that the number of illegal immigrants continues to surge.  *See* McWilliams Decl. Supp. App. 2–3.

Border walls work, as the Administration has implicitly conceded.  Supp. Opp. 10 (noting "incomplete barrier sections had become funnel points for illicit cross border activity.").  Of course, the Department of Homeland Security's prior assessments concluded that "[w]hen it comes to stopping drugs and illegal aliens from crossing our borders, border walls have proven to be extremely effective."  No. 21-420

ECF[1] 1-1;  *Id.* at 4–5 ("For example, when we installed a border wall in the Yuma sector, we have seen border apprehensions decrease by 90 percent.").  That is why Congress appropriated billions of dollars "for the construction of barrier system along the southwest border."  Fiscal Year 2020 DHS Appropriations Act, Pub. L. No.  116-93, 133 Stat. 2511, Div. D, § 209(a)(1) (FY 2020 Appropriations).

Still, the Administration continues to use appropriated funds for *anything but walls*.  In its first plan for spending appropriated border wall funds, DHS announced that the purpose was to use border wall appropriations "for additional environmental remediation and mitigation requirements at the former DoD project sites" and "installation of system attributes in those areas where CBP or DoD had already constructed physical barriers."  ECF 52-1, at 14.  DHS's "new" amended plan prioritizes (1) remediation and mitigation; (2) installation of barrier system attributes, such as "lighting, cameras, and detection technology," on existing border barriers.  ECF 52-1, at 6–7, 9–10 (*Second Enriquez Declaration* at ¶¶ 13–14, 23, 28).  When announcing the amended plan, DHS expressly emphasized that funds would be used "for installing updates … in places with previously built barrier."  DHS believes that funds appropriated for the "construction of a barrier system" should be used for "a structure for crossing over the Tijuana River channel" for US agents "to drive across the river for quicker access to both sides."  ECF 96-2, *Third Enriquez Declaration* at 5.  The funds are also being used for "important erosion and drainage

---

[1] Unless otherwise noted, all ECF references will be to the consolidated docket in No. 21-272.

control projects in the USBP San Diego Sector," *id.* at 6, "projects aimed at life, safety, environmental, and operational requirements" that "address[] flood control levees" to include a "guardrail to protect pedestrians and vehicles from falling off the levee," *id.* at 12–13.  The Court should believe DHS when it says it is not constructing border barriers because that is what President Biden told it to do on day 1.  No. 21-420 ECF 1-4, at 1 (Presidential proclamation ordering halt to barrier construction because "building a massive wall that spans the entire southern border is not a serious policy solution.").

The evidence before the Court shows that the motion for a preliminary injunction should be granted.  Plaintiffs are likely to succeed on the merits as it is clear that DHS's decision to stop obligating funds for border wall construction is contrary to specific congressional appropriations and arbitrary and capricious.  Any review of the agency's border wall plan, amended border wall plan (to the extent it differs), DHS's actions, and statements from the Administration make plain that DHS does not intend to another foot of border wall.  The constitutional and statutory claims are also meritorious because the executive's failure to comply with the Impoundment Control Act means the cancellation of that funding is unlawful.  Furthermore, the Constitution prohibits the President and DHS from commandeering the Congress' power of the purse to use funds Congress appropriated to build border walls to *not* build border walls.  *See Biden v. Nebraska*, 143 S. Ct. 2355, 2373 (2023) (courts may prevent "one branch of government arrogating to itself power belonging to another").

The equities justify injunctive relief because the ongoing harms far outweigh the Administration's lawless refusal to do what Congress requires. The harms suffered by the States include increased expenditures for processing driver's license requests and for providing educational and healthcare services to illegal aliens who would not be present in the States but for DHS's failure to build border barriers. The harms also include GLO's proprietary interests in the integrity of the GLO Farm and other properties owned by Texans (and managed by GLO) that are harmed by those that unlawfully cross the border, trespass on Texas-owned land, and damage Texas-owned land. Those costs are non-compensable and thus irreparable—and vastly outweigh the government's non-existent interest in engaging in unlawful activity. Furthermore, an injunction requiring DHS to stop implementing its no-construction policy would serve the public interest in ensuring that the government follows the law and in preventing illegal immigration.

DHS's supplemental, or really substitute,[2] opposition alleges that the Court should consider "significant legal and factual developments" to deny the motion for a preliminary injunction. Supp. Opp. 1. None of those developments support denying Plaintiffs relief. *First,* the amended plan is not a "new" development as the Administration argued that it was relevant to the district court in 2021 and later to the Fifth Circuit. ECF 53; Govt. CA 5 (No. 22-40526) Br. 1 (Oct. 26, 2022). More

---

[2] Due to Defendants' decisions to abandon previous arguments and failing to focus on providing legal and factual updates, Plaintiffs have attempted to treat this Supplemental Response as a comprehensive Reply in support of their motion for a preliminary injunction.

importantly, the amended plan simply confirms that the Administration is spending appropriated funds on updates and enhancements to existing barriers to paper over its refusal to construct a barrier system.  The amended plan does not contemplate constructing any new barriers.

*Second*, DHS wishes the Court to consider the administrative record and recent "construction activity along the southern border to improve the Nation's barrier infrastructure."  DHS claims that the record shows the need for extensive repair to DOD projects, Supp. Opp. 51, and that it "considered the efficacy of a fully functional border barrier system in deciding how to allocate its appropriations," *id.* at 54.  The citations to the administrative record do not help Defendants because they focus on the explanation for why DHS is choosing to use barrier construction funds for "barrier system attributes" on existing barriers noting that "installation of these systemic improvements" would improve a barrier's effectiveness.  *Id.* at 9–10.  DHS explains that the expenditures would be an "effective use" of "barrier infrastructure appropriations."  *Id.*  But the same appropriations granted funds for "acquisition and deployment of border security technologies and trade and travel assets and infrastructure," "integrated operations assets and infrastructure," and "mission support and infrastructure."  FY 2020 Appropriations § 209(a)(1).  Even if "barrier system attributes" are the barrier system itself (and they are not), these arguments exemplify impermissible *post hoc* rationalizations for the declared policy.

*Third*, the Supreme Court's decision in *United States v. Texas*, 143 S. Ct. 1964 (2023) (*Enforcement Priorities*), does not change the standing analysis here.  The

Court explained that "[t]his case concerns only arrest and prosecution policies." *Id.* at 1974 n.5. It further explained that "[t]his case is categorically different, however, because it implicates only one discrete aspect of the executive power--namely, the Executive Branch's traditional discretion" to prosecute offenders. *Id.* at 1975. The decision in *Enforcement Priorities* "should in no way be read to suggest or imply that the Executive possesses some freestanding or general constitutional authority to disregard statutes *requiring* or prohibiting executive action." *Id.* (emphasis added). And to the extent it is relevant, the decision confirms that "under the Administrative Procedure Act, a plaintiff arguably could obtain review of agency non-enforcement if an agency has consciously and expressly adopted a general policy that is so extreme as to amount to an abdication of its statutory responsibilities." *id.* at 1973–74 (quotations omitted). Plaintiffs have alleged and shown that the Administration has "wholly abandoned" its statutory duty to spend appropriations to construct the border wall. *See id.* at 1974 (The "standing calculus might change if the Executive Branch wholly abandoned its statutory responsibilities to make arrests or bring prosecutions.").

The Court should grant the motion for a preliminary injunction.

## BACKGROUND

### A.   Procedural background and scope of remand

By December 17, 2021, Plaintiff States (Missouri and Texas) had fully briefed their motion for a preliminary injunction. ECF 30. On July 12, 2022, DHS filed the amended border plan. ECF 52. Two weeks later, the district court improperly dismissed Plaintiff States for lack of standing. *See* ECF No. 57, at 56. The court also

dismissed all claims by the GLO except counts seven and eight asserting violations of the APA. *Id.* at 40.

The court of appeals reversed the district court's dismissal of Missouri and Texas. *Gen. Land Off. v. Biden*, 71 F.4th 264, 275 (5th Cir. 2023). Per the Court, "[*i*]*njury in fact* [wa]s not at issue." *Id.* at 272. On causation, the Court found that the Administrative Record showed that the "deterrence of illegal border activities 'is achieved *primarily* through' border barriers." *Id.* (emphasis in original). And it also explained that "even if the installation of system-enhancing technology assists in border control, 'that does not negate Texas's injury, because we consider only those offsetting benefits that are of the same type and arise from the same transaction as the costs." *Id.* (quotation omitted). And as "DHS has affirmed that border barriers funnel illegal immigrants to areas where Customs and Border Protection is better prepared to intercept them, thus reducing illegal immigration," *id.* at 273, there was a "causal connection between the Federal Defendants' failure to comply with the statutory mandate to build more miles of border wall and damage to the state from increased illegal immigration," *id.* The Court also found that redressability is met with "an injunction requiring DHS to spend the 2020 and 2021 appropriations on additional border barriers." *Id.* at 274. The panel "urge[d] the district court, on this limited remand, to act expeditiously," to consider the motion for a preliminary injunction. *Id.*

On remand, GLO joined Plaintiff States' motion for a preliminary injunction, *see* August 16, 2023 Docket entry, and the Court entered a case management order

for supplemental briefing, ECF 98.

**B.  Additional Factual Developments.**

As the GLO has joined the motion for a preliminary injunction, there are specific factual developments the Court should consider.

Texas owns the GLO Farm, a 3,099 acre farm in the heart of the Rio Grande Valley.  Carter Decl. ¶ 3, Supp. App. 7. GLO acts as the administrator of the farm on Texas's behalf.  *Id.*  This state owned-land generates revenue that goes to Texas's Permanent School Fund.  *Id.* at ¶ 2.  GLO receives $138,000 per month in rent for the property.  *Id.* at ¶ 4.  The rent was previously $150,000 per month, but was reduced in an agreement with the tenant in part because of the damage done to the property by the surge in trespassing and unlawful activity on the GLO Farm following the Proclamation.

Since the Proclamation, "GLO has and continues to observe a public health and humanitarian crisis at a scale on Texas lands not seen by GLO."  *Id.* at ¶ 5; Supp. App 8.  It "has been burdened with a substantial increase in activity in border-crossing activity."  *Id.* at ¶ 6.  The GLO Farm is situated next to a property with a completed border wall segment.  *Id.*  Before the Proclamation, GLO had been in negotiations with CBP for construction of new border wall on its property as part of the Rio Grande Valley-09 project.  *Id.* at ¶ 7.  The CBP halted those negotiations and brought the planned wall segment to a "dead stop."  *Id.* at ¶¶ 7–8.

The border surge and the gap in the border wall has "transformed the GLO Farm into a superhighway of illegal activity."  *Id.* at ¶ 9.  There have been reports of disturbances and trespasses.  *Id.*  The GLO Farm is now occupied nearly 24/7 with

law enforcement and government vehicles patrolling the land.  *Id.*  "Groups of people are frequently apprehended on the GLO Farm, where nearby buses are regularly stationed to haul them away by the busload."  *Id.*  The Appendices to this brief contain photos taken by a camera positioned on the GLO Farm and by GLO staff after the Proclamation.



Supp. App. 107. [3]

---

[3] Though the time stamp on GLO864 is Jan. 21, 2020, this photograph was taken recently—between July 18, 2023 and August 15, 2023.  McWilliams Decl. ¶¶ 6–8, Supp. App. 3.



Supp. App. 91.

The illegal activity has impacted farming, including by "restricting the time frames that certain farming operations" can be performed, "such as the spraying of chemicals."  Carter Decl. ¶ 9, Supp. App.9.  "Essential farm activities such as the sorting of crops can no longer be carried on at night due to security concerns."  "The marketability, value, and quiet use and enjoyment of the GLO Farm have been damaged, and the GLO is at risk of realizing diminished rents" with the increased illegal border traffic.  *Id.* at ¶ 10.

## ARGUMENT

**I.   Plaintiffs are likely to succeed on the Merits.**

    **A.   The APA claims are reviewable.**

Defendants make no argument that any statute precludes judicial review. U.S.C. § 701(a)(1), so they are limited to arguing (at 27-32) that the challenged actions here are examples of "those rare administrative decisions traditionally left to agency discretion" by 5 U.S.C. § 701(a)(2).  *Dep't of Homeland Sec. v. Regents of the Univ. of*

*Cal.*, 140 S. Ct. 1891, 1905 (2020). Defendants rely (at 27–29) on the extension of the unreviewable category of nonenforcement actions set forth in *Heckler v. Chaney*, 470 U.S. 821 (1985), to lump-sum appropriations in *Lincoln v. Vigil*, 508 U.S. 182 (1993). And in doing so, they have completely abandoned their previous arguments that the statute's silence on activities "like environmental planning, stakeholder consultation, or land acquisition" grant plenary discretion, ECF 24, at 29, and that there is no "final agency action," *id.* at 30. They even urge the Court not to follow "the prior decision in these cases addressing Defendants' motion to dismiss GLO's Amended Complaint where the Court concluded that DHS's spending decisions are not committed to agency discretion." Supp. Opp. 31.

Of course, the specific appropriations provisions here are not lump-sum appropriations, taking it out of the category of unreviewability. *See* FY 2020 Appropriations § 209(b). Indeed, GAO acknowledges that the "respective appropriation act *designates a certain amount of funding from the PC&I lump sum that is specifically available for fencing or barrier system." Matter of: Off. of Mgmt. & Budget & U.S. Dep't of Homeland Sec.-Pause of Border Barrier Constr. & Obligations*, B-333110.1 (June 15, 2021) (emphasis added). In other words, the appropriation is a specific authorization for a particular use.

Defendants cite *Milk Train, Inc., v. Veneman*, 310 F.3d 747 (D.C. Cir. 2002), as authority to extend this presumption to appropriations for a specific program. But there, the relevant appropriation provided enormous discretion to the Secretary of Agriculture. *Id.* at 751 (appropriated funds were to be used "to provide assistance

11

directly to … dairy producers, in a manner determined appropriate by the Secretary."). And *Milk Train*'s finding of unreviewability due to the breadth of the phrase "in a manner determined appropriate by the Secretary" is irreconcilable with a recent decision of the Supreme Court. *See Dep't of Com. v. New York,* 139 S. Ct. 2551, 2567–68 (2019) (holding a statute granting the Secretary of Commerce broad discretion to take the census "in such form and content as he may determine" did not commit the decision to reinstate a citizenship question to the Secretary's discretion (quotation omitted)).

So too, with Defendants' newly found decision, *El Paso County, Texas v. Trump*, 982 F.3d 332 (5th Cir. 2020). They argue that because the "Defense Access Road Program" was a "lump-sum" appropriation, that the specific appropriation here is also committed to agency discretion. Supp. Opp. 29–30. The appropriations are completely different, whereas the Congress provided that an additional amount, "for the Defense Access Road Program, $20,000,000, to remain available until expended." Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, div. J, § 131, 132 Stat. 348, 805 (2018). Here, the funds "shall only be available for barrier systems" and provides for specific criteria on their use and where they barrier systems may be constructed. FY 2020 Appropriations § 209(b). Unlike *El Paso County*, the Court need not guess whether the funds would be expended in the particular areas[4] to

---

[4] Defendants also allege that because "Congress left it to DHS to identify those priority locations" it has unfettered discretion. Not so. DHS cannot use these funds to construct a border wall on the northern border, and the appropriation requires them to be identified in the "Border Security Improvement Plan." Moreover, there is no dispute as the "highest priority" locations to construct the barrier system.

combat illegal immigration, because Congress directed Defendants to do so in the highest priority locations.   The standards in FY 2020 Appropriations provide a judicially manageable standard to govern the expenditures.

The Fifth Circuit's MPP ruling sets out the limits even within the categories where executive discretion is presumed, such as lump-sum appropriations:   the presumption may be rebutted where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers.   In other words, the executive *cannot* look at a statute, recognize that the statute is telling it to enforce the law in a particular way or against a particular entity, and tell Congress to pound sand.  *Texas v. Biden*, 20 F.4th 928, 986 (5th Cir. 2021) (*MPP II*), *as revised* (Dec. 21, 2021), *rev'd and remanded,* 142 S. Ct. 2528 (2022).

Defendants attempt to justify departing from this Court's previous ruling by claiming that appropriations are being "used to pay for installation of system attributes on existing barrier and remediation of the DoD barrier project sites." Supp. Opp. 31–32.   But the amended plan underscores that none of the money will go to constructing a foot of border wall—including to actions that the government had previously labeled preparatory, such as environmental impact planning.   Rather, under the Amended Plan, "CBP will take steps to terminate the environmental planning process" for the Laredo Sector that was funded using FY 2020 appropriations.   ECF 52-1, *Second Enriquez Declaration* at ¶ 24.   Likewise, the government's initial plans to use FY 2021 appropriations for "environment planning and stakeholder outreach for its next highest priority barrier segments in the USBP

13

El Centro Sector" "will no longer move forward."  *Id.* at ¶ 29.  Though the FY 2020

Appropriation has some flexibility, the judicially manageable standards that

Defendants construct that "barrier systems" such as "steel bollard designs,"  do not

mean "primary pedestrian fencing, including levee pedestrian fencing," ECF 57, at

20, such as the levee walkways that DHS now touts.  ECF 96-2, *Third Enriquez*

*Declaration* at 12–13.  Defendants can engage in those activities so long as they are

furthering Congress's unambiguous command to ultimately spend funds earmarked

for "the construction of barrier system along the southwest border." FY 2020

Appropriations § 209(a).

### B.    Defendants' actions are arbitrary and capricious.

As the Fifth Circuit recently explained in *Texas*, this Court's review under the

APA for arbitrary and capricious agency action "is not toothless" and, "[i]n fact, after"

*Department of Homeland Security v. Regents of the University of California*, 140 S.

Ct. 1891 (2020), "it has serious bite."  *MPP II*, 20 F.4th at 989 (cleaned up). Applying

that standard here, Defendants' actions implementing the January 20 Proclamation

fail to pass muster under the APA.

### 1.    Defendants' continue to offer different pretextual and post-hoc rationalizations explanations for their policy.

Defendants first argued that their "decision to engage in thorough

environmental review and stakeholder consultation before engaging in any new

construction" satisfied arbitrary and capricious review.  ECF 24, at 31.  Now, after

the Fifth Circuit said that the motion for a preliminary injunction must be decided,

they argue that prioritizing funds for ""[c]lose out, remediation, and mitigation" costs

14

"of the barrier projects turned over to DHS by DoD" and installing "barrier system attributes" such as "lighting, cameras, and detection technologies" are not arbitrary and capricious.  Supp. Opp. 50.  But these post-hoc rationalizations are pretext.  Both the 2021 plan and the 2022 amended plan confirm that the funds will not be used for new barrier construction—their only appropriated purpose.

From Day One, the President proclaimed that new construction of a border wall (1) "is not a serious policy solution"; (2) is "a waste of money"; and thus (3) "no more American taxpayer dollars" will be spent on such construction.   No. 21-470 ECF 1-4, at 1. Moreover, the President's Budget for Fiscal Year 2022 proposed the cancellation of all prior year border barrier construction funding that remains unobligated at the time of enactment of the Appropriations Act for Fiscal Year 2022.  *See* U.S. Gov't Accountability Office, *Matter of Off. of Mgmt. & Budget & U.S. Dep't of Homeland Sec.-Pause of Border Barrier Constr. & Obligations*, B-333110.1, 2021 WL 2451823 (Comp. Gen. June 15, 2021) (*Pause of Border Barrier Constr & Obligations*).  When asked why the current Administration "did not build a barrier, such as a wall, to keep [Haitian] migrants out," Secretary Mayorkas replied that "[i]t is not the policy of this administration" because "[w]e do not agree with the building of a wall."  DHS has expressed its intention to "end wall expansion[.]" ECF 19, App. 25.  And the current Administration has repeatedly "call[ed] on Congress to cancel remaining border wall funding and instead fund smart border security measures[.]"   ECF 24-3, at 25, 29.  To this day, the Administration continues to call on the cancellation of these funds—instead of

using them to expand the barrier system.   *See* ECF 96-2, *Third Enriquez Declaration* ¶ 10(i) (citing CBP Moves Forward on RGV Barrier and Yuma Andrade and El Centro Calexico Fence Replacement Projects to Mitigate Immediate Life, Safety and Operational Risks at https://www.cbp.gov/newsroom/local-media-release/cbp-moves-forward-rgvbarrier-and-yuma-andrade-and-el-centro-calexico).   These statements, taken individually and collectively, support the States' theory that the Administration has no intention to build the wall.

Defendants' actions confirm that they have no plans to build new wall segments.   The 2021 plan outlines activities that are "consistent with President Biden's commitment that 'no more American taxpayer dollars [should] be diverted to construct a border wall.'" ECF 52-1, at 12 (alteration in original).   The projects in the 2021 plan "do not involve building new border barriers[.]"  ECF 52-1, at 20.   To that end, DHS (1) has modified contracts awarded during the prior Administration to "remove the construction portion of the contracts," (2) has outright cancelled all remaining construction contracts, and (3) for other prior projects, intends to "fill[  ] exposed trenches, cut[  ] exposed rebar, and remov[e] materials  from the project sites." ECF 24-3, at 8-9, 29-30.   "No new barrier construction work will occur on the DoD projects."  ECF 52-1, at 15.   Put simply, "hard hats and safety goggles, this is not."  *BST Holdings, LLC v. OSHA*, 17 F.4th 604, 617 n.20 (5th Cir. 2021).   These actions, taken individually and collectively, support the States' theory that the Administration has no intention to build the wall.

16

The amended plan offers no shelter for Defendants.  It further confirms that funds will be used "to remediate or mitigate environmental damage caused by past barrier construction" and as appropriate, "barrier system attributes," such as "lighting, cameras, and detection technologies."  ECF 52-1 at 37.  Under the Amended Plan, "CBP will take steps to terminate the environmental planning process" for the Laredo Sector that was funded using FY 2020 appropriations.  ECF 52-1, *Second Enriquez Decl.* ¶ 24.  And the initial plans to use FY 2021 appropriations for "environment planning and stakeholder outreach for its next highest priority barrier segments in the USBP El Centro Sector" "will no longer move forward."  *Id.* at ¶ 29.  It does not rescind the 2021 plan's instructions that no new barrier construction will occur.

The Amended Plan makes explicit what the States have said was the government's policy all along:  there will be no more border wall construction.  *See*, *e.g.*, No. 21-420 ECF 1, at ¶ 117.  Defendants claim that "DHS has not disavowed border barrier construction activities altogether," Supp. Opp. 54, but "[i]n reviewing agency pronouncements, courts need not turn a blind eye to the statements of those issuing such pronouncements."  *BST Holdings*, 17 F.4th at 614 (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).  "In fact, courts have an affirmative duty *not* to do so."  *Id.*  Defendants thus cannot ignore their own prior statements— *i.e.*, no wall will be built—simply because they prefer to contrive a new justification— *i.e.*, environmental remediation and border detection technologies that are allegedly "construction of a barrier system."  The FY 2020 Appropriations contradicts that

17

these funds can be used for this other kind of infrastructure, as Congress provided finds "for the acquisition and deployment of border security technologies and … infrastructure." § 209(a).  This continues to confirm that Defendants justifications are mere pretext rendering their actions arbitrary and capricious.  *Dep't of Com.*, 139 S. Ct. at 2575–76; *see also BST Holdings*, 17 F.4th at 614 (identifying pretext as a "hallmark[] of unlawful agency actions").

It also highlights the arbitrariness of DHS's actions.  The amended plan establishes that the government's justifications for its departure from its prior policy of building border walls are pretext.  *See* ECF 30, at 22.  DHS has justified its departure from the prior administration's border wall-construction policy by first saying it will build the wall after doing preparatory work, and now saying that non-wall building activities need funding.  The rapid shifts in position are proof that the proffered reasons are pretext for a decision that, as a matter of policy, this administration will not construct border-barriers.  *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (noting that pretext exists when "an explanation for agency action … is incongruent with what the record reveals about the agency's priorities and decisionmaking process"); *see also Biden v. Texas*, 142 S. Ct. 2528, 2546–47 (2022) (affirming that standard).  These kinds of "sudden[] revers[als]" of course "create[] the plausible inference that political pressure may have caused the agency to take action it was not otherwise planning to take."  *Connecticut v. Dep't of Interior*, 363 F. Supp. 3d 45, 64–65 (D.D.C. 2019).  And pretext is a "hallmark[] of unlawful agency action[]."  *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 614 (5th

Cir. 2021).  The constantly shifting reasons DHS has provided for why it will not construct border barriers also constitute impermissible *post hoc* rationalizations.  *See MPP II*, 20 F.4th at 993.

The Amended Plan implicitly acknowledges that walls are effective at preventing illegal immigration.  Given that, DHS's failure to address that crucial fact when deciding not to construct border-barriers is arbitrary and capricious.  *See* No. 21-420 ECF 19, at 18–19.  That is especially so because its policy contradicts the agency's past explicit findings to that effect.  *Cf. id.* (so noting); *MPP II*, 20 F.4th at 991 (failing to discuss prior factual findings is arbitrary and capricious).  Defendants respond that no failure occurred because DHS continues to remediate the DoD barrier projects to "allow[] the projects to function safely and effectively" and "address[] environmental problems that could impact structural integrity of the barrier and hinder" Border Patrol response.  Supp. Opp. 54.  But the appropriations do not provide for *remediation* of current barrier system nor enhancing.  Defendants object that they should not be forced to adopt the "States preferred" solution, but Defendants' use of appropriated funds to change newly constructed border wall to their specifications merely second guesses the previous Administration.  And when Defendants' claim that "enhancements" are part of a barrier system, they are substituting the Administration's preference for non-barriers for Congress' requirement for barriers.  Defendants can point to no statement that they intend to build a *better* wall.

Defendants' arguments asserted now can only be seen as *post hoc* rationalization

"for a decision … made many months earlier[.]"  *Texas v. Biden*, 10 F.4th 538, 559 (5th Cir. 2021) (per curiam).   Their arguments, therefore, are "not a good faith explanation for [the] decision[.]"  *Id.*

### 2.    Defendants' change in course is arbitrary and capricious.

Defendants' decision to end new barrier construction is a change in course that they have not explained.  As a threshold issue, the Court should be aware that in their previous opposition, Defendants conceded that DHS had previously announced a causal connection between building walls and decreases in apprehensions, ECF 24, at 31–32, and that the costs the States have alleged are "factors relevant to border wall construction," *id.* at 33.   Substituting their brief does not change these concessions, especially as Defendants have implicitly conceded that border walls prevent illegal immigration.  Supp. Opp. 10.

Other than repeating the January 20 Proclamation's "commitment that 'no more American taxpayer dollars [should] be diverted to construct a border wall[,]' " ECF 24-3, at 18 (first alteration in original)—a Proclamation that simply dismissed such construction as a "waste of money" and "not a serious policy solution[,]" No. 21-420, ECF 1-4, at 1—Defendants didn't provide any justification to explain *why* they were halting new construction—much less the explanations they have now given in litigation.  That alone makes Defendants' actions here arbitrary and capricious under the APA.  *See SEC v. Chenery Corp.*, 318 U.S. 80, 87 (1943) ("The grounds upon which an administrative order must be judged are those upon which the record discloses that its action was based."); *cf. Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 213 (1988) (rejecting "[d]eference to what appears to be nothing more than an agency's

convenient litigating position" as "entirely inappropriate" especially "where the agency itself has articulated no position on the question").   Nor can those statements be justified when Defendants have conceded that border walls prevent illegal immigration.   Because Defendants failed to provide reasoned grounds for their actions, they are precluded from asserting new ones before this Court.

Previously Defendants tried to argue that any reduction in illegal activity due to past construction projects has no bearing to whether any *new* construction will have a similar effect.   *See* ECF 24, at 33.   They have abandoned that justification. Now, they try to justify the end of barrier construction by their decision to prioritize spending on remediating claimed insufficiencies of previous border wall construction and adding enhancements.   Supp. Opp. 52–54.   A few problems plague this rationale.

*First,* Defendants admit that the prioritization arose from the pause and that this cessation jeopardized DHS projects and caused conditions at the sites to "deteriorate[] after the DoD contractors stopped work."   Supp. Opp. 51–52 (citing administrative record noting "projects were in 'various stages of completion' at time of their cancellation.").   And of course, this cessation was self-inflicted as is the border wall's alleged failure to "function as intended" and have the "necessary persistent impedance."   *Id.* at 52.   They note that if "the site conditions went unaddressed, they would "pose potential safety risks," a "significant risk of bodily harm and property damage," potential treaty violations, and "further degradation of the environment." Supp. Opp. 52.   Defendants cannot justify a policy change by relying on harms that policy change caused.

*Second*, Defendants failed to consider DHS's prior assessments before changing course.  Whether or not Defendants agreed with those prior assessments, their total failure to consider them, standing alone, was also arbitrary and capricious.  *See MPP II*, 20 F.4th at 990–91 (DHS's failure to consider prior assessment highlighting the benefits of prior Administration's immigration policy was arbitrary and capricious because DHS simply changed policies without "a more detailed justification") (cleaned up).  And Defendants' decision to halt new barrier construction fails to explain why they could not assess the barrier system while continuing to construct new barriers.  Indeed, they previously acknowledged that "[i]mplicit" in the choice to undergo environmental planning activities before construction is their "awareness" that they're changing course "with respect to the border wall" and that "there are good reasons for the new policy."  ECF 24, at 32. These concedes that the agency failed to "expressly mention, let alone meaningfully discuss," its decision *to* change course. *Texas*, 10 F.4th at 554; *see  also Fox*, 556 U.S. at 515 ("An agency may not … depart from a prior policy *sub silentio*[.]").   Indeed, Defendants' *sub silentio* departure from the prior policy is per se arbitrary and capricious agency action, "particularly when the prior policy has engendered serious reliance interests."  *BST Holdings*, 17 F.4th at 614 (cleaned up).  Defendants must "show[ their] work and actually consider[  ] the factor[s] on paper."   *MPP II*, 20 F.4th at 993.

*Third*, where, as here, "an agency changes course, … it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account.   It would be arbitrary and capricious to ignore such matters."

*Regents*, 140 S. Ct. at 1913 (cleaned up).   Plaintiffs were entitled to rely on DHS's prior findings that building walls results in decreases in apprehensions—particularly where such effective border security measures are directly tied to the States' costs for providing social services to illegal aliens.   *Accord  MPP II*, 20 F.4th at 990 (Supreme Court in *Regents* "faulted" DHS for ignoring States' reliance interests in losing tax revenue due to change in immigration policy).   Defendants have admitted that these interests were relevant factors in the decision, and "any" agency "action premised on reasoning that fails to account for relevant factors" "must [be] set aside" under the APA.  *Id.* at 989.   Even if Defendants concluded that "other interests and policy concerns"—environmental review and stakeholder consultation—"outweigh" fiscal burdens on States, such costs were still relevant factors the agency had to consider but didn't—even though it was its job to do so. *Texas v. Biden*, 554 F. Supp. 3d 818, 848 (N.D. Tex. 2021) (citing *Regents*, 140 S. Ct. at 1914), *enforcement granted in part,* No. 2:21-CV-067-Z, 2021 WL 5399844 (N.D. Tex. Nov. 18, 2021), and *aff'd,* 20 F.4th 928 (5th Cir. 2021), *as revised* (Dec. 21, 2021).

Defendants now disclaim that their decision to make "programmatic changes" to a policy that benefitted a specific group implicates any reliance interests. *See* Supp. Opp. 55.  Not so.  As explained in the Part I.C.1, the States sovereign interests are directly implicated in the decision to halt construction of the border wall.   But Defendants' decision to halt construction when they knew the border wall was in "various stages of completion," and the concession that gaps in the border wall that create "funnel points for illicit cross border activity," Supp. Opp. 54, confirm that the

decision does not involve "potential indirect downstream economic effects on State budgets," *id.* at 55. Illicit cross border activity has direct impacts on State resources, as do site conditions that cause "significant risk of bodily harm and property damage" to the public and landowners and potential "flooding liability to private and public lands." *Id.* at 52. These certainly have impacts to Texas and GLO, because the GLO Farm is situated in a border wall gap and the border surge impairs its operations. Carter Decl. ¶¶ 5–10, Supp. App. 8–10. And Texas certainly has the necessary reliance interests engendered by the continuation of border wall policy required by law. Whether or not the specific projects for the GLO Farm were "close to breaking ground," Supp. Opp. 56, is immaterial when no reasons justify halting such beneficial border policy.

Defendants cannot choose to comply with the APA only at their convenience. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part & dissenting in part) (agencies must engage in reasoned decision-making, must act "within the bounds established by Congress," and "may not choose not to enforce laws of which it does not approve, or to ignore statutory standards in carrying out its regulatory functions").

For all these reasons and those explained in the States' initial memorandum, Defendants' implementation of the January 20 Proclamation is arbitrary and capricious.

### C. Defendants' actions are contrary to federal law.

The States are also likely to prevail on the merits of their statutory claims.

Defendants argue (at 32, 37) that the States do not fall within the zone of interests of the statutes at issue and, even if they did, they have failed to show that Defendants are violating those statutes.  Defendants are incorrect.

### 1. Plaintiff States fall within the zone of interests of the statutes at issue.

The Fifth Circuit's recent decision in *MPP II* is instructive again: "The States must have a cause of action to sue.  And because this is an APA case, the States' claims must fall within the zone of interests of the" appropriations at issue and the Impoundment Control Act.  20 F.4th at 975.   This "zone-of-interests inquiry is not especially demanding."   *Id.* (cleaned up).  Indeed,

> to satisfy the test, the States must show only that their asserted interest is arguably within the zone of interests to be protected or regulated by the statutes they claim have been violated. And though the test is rooted in legislative intent, the States need not point to any indication of congressional purpose to benefit them.  Instead, the test forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.

*Id.* (cleaned up).  The States here "easily clear this low bar."   *Id.*

First, termination of border wall construction "poses imminent and actual harm to" the States' fisc.   *Id.*  Because—as Defendants concede—spending on border infrastructure *is* immigration policy, *see, e.g.*, ECF 24-3, at 3 (construction of border infrastructure—such as a barrier system—is "necessary to deter and prevent illegal entry on the southern border"), "[i]t's clear that the [statutes] aimed, at least in part, to protect States from just those kinds of harms."   *MPP II*, 20 F.4th at 975; *cf. City & Cty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) ("Congress's

25

power to spend is directly linked to its power to legislate.").

Defendants' concession is consistent with DHS's prior assessments in 2018 and 2020 highlighting the causal link between border infrastructure and decreased border apprehensions. *See, e.g.*, ECF 19-1, App. 11 ("[B]order crossings … have decreased in areas where barriers are deployed."); *id.* at App. 7–08 ("When it comes to stopping drugs and illegal aliens from crossing our borders, border walls have proven to be extremely effective."); *id.* at App. 10 (citing empirical data and concluding that border walls "have proved to be a critical component in gaining operational control of the border"); *id.* at App. 11 (in one location alone "that has never had any border infrastructure," "apprehensions have decreased since the construction of the border wall system"); *id.* at App. 12 (noting almost 80% "decrease in apprehensions" in one area alone "since the completion of border wall system").

Based on DHS's findings, it's no coincidence Congress appropriated billions of dollars for the "construction of barrier system along the southwest border[.]" FY 2020 Appropriations § 209(a). Thus, ending construction of the southwest border wall has pernicious effects for Missouri, Texas, and their citizens. *See, e.g.*, ECF 19-1, App. 3, ¶ 11,: *id.* at App. 64–83, 98–128, 129-63.

Indeed, the Fifth Circuit's recent decision in *Texas* reaffirmed its prior holding in DAPA on this very point: Texas fell "within the INA's zone of interests because" it sought "to participate in notice and comment before the Secretary changes the immigration classification of millions of illegal aliens in a way that forces the state to the Hobson's choice of spending millions of dollars to subsidize driver's licenses or

changing its statutes." *MPP II*, 20 F.4th at 975 (cleaned up). "Under the Supreme Court's lenient test for APA cases, that is more than enough." *Id.*

Second, Missouri and Texas fall within the zone of interests of the appropriations at issue here just as California and New Mexico fell within the zone of interests of the appropriation at issue in *California v. Trump*, 963 F.3d 926 (9th Cir. 2020). In *California*, the States challenged the Department of Defense's diversion of funds to pay for construction of the wall on the Southern border. *Id.* at 931. The States alleged the diversion violated the constitutional separation of powers, the Appropriations Clause, and the Administrative Procedure Act. *Id.* at 934. The Government argued that the States had no cause of action under the APA to challenge the diversion of funds because they did not fall within the zone of interest of the DoD appropriation. *Id.* at 941.

The Ninth Circuit rejected that argument. *Id.* While the court acknowledged that the appropriation did "not confer a private right of action[,]" delegated "a narrow slice of Congress's appropriation power to DoD[,]" and ultimately imposed obligations upon DoD, the Court concluded that the States were allowed to sue over whether DoD "satisf[ied] these obligations." *Id.* Noting Congress's intent to "make agency action presumptively reviewable" and giving the "benefit of any doubt" to the States, *id.* at 942 (cleaned up), the court found that California and New Mexico fell within the zone of interest of the DoD appropriation for two primary reasons.

*First*, although in enacting the appropriation, "Congress primarily intended to benefit itself and its constitutional power to manage appropriations[,]" the States

were "suitable challengers" to enforce the statute because "their interests [were] congruent with those of Congress" and were not "inconsistent with the purposes implicit in the statute."  *Id.* (cleaned up).   Though the statute's "obligations were intended to protect Congress," the States' lawsuit in *California* furthered "Congress's intent to tighten congressional control of the reprogramming process."  *Id.* (cleaned up).

*Second*, the States' challenge in *California* sought "to reinforce the same structural constitutional principle Congress sought to protect through [the DoD appropriation]: congressional power over appropriations."  *Id.*  Indeed,

> California and New Mexico's interest in reinforcing these structural separation of powers principles is unique but aligned with that of Congress because just as those principles are intended to protect each branch of the federal government from incursion by the others, the allocation of powers in our federal system also preserves the integrity, dignity, and residual sovereignty of the States, because federalism has more than one dynamic. This interest applies with particular force here because the use of [the DoD appropriation statute] here impacts California's and New Mexico's ability to enforce their state environmental laws.

*Id.* at 943 (cleaned up).

Because the appropriation in *California* "protect[ed]" the States' "sovereign interests," the Ninth Circuit held that the States "easily fall within the zone of interests of" the DoD appropriation "and are suitable challengers to enforce its obligations."  *Id.* at 943–44.

Applying *California* here, Missouri and Texas "easily fall within the zone of interests of" the DHS appropriations at issue and are thus "suitable challengers to

28

enforce" them. *Id.* at 943–44. The States' interests here in enforcing Congress's obligation on Defendants—the "construction of barrier system along the southwest border"—are plainly "congruent with those of Congress" and Defendants do not (and cannot) claim that the States' interests are "inconsistent with the purposes implicit in the statute." The States' lawsuit here furthers Congress's intent to "tighten" control over the border. *Cf.* Immigration Reform and Control Act of 1986, Pub. L. No. 99-603, § 115, 100 Stat 3359, 3384 (1986) ("[T]he immigration laws of the United States should be enforced vigorously and uniformly."). And the States' challenge here seeks to reinforce Congress's power over appropriations, which "is directly linked to its power to legislate" in the immigration context. *San Francisco*, 897 F.3d at 1231. To be sure, the States' interest in reinforcing constitutional separation-of-powers principles "is unique"; "but [it's] aligned with that of Congress" and "those principles" not only protect Congress, but "also preserves the integrity, dignity, and residual sovereignty of the States[.]" *California*, 963 F.3d at 943 (cleaned up). The States' interest "applies with particular force here because the" DHS appropriations "impact[]" Missouri's and Texas's budgets. *Id.*

Defendants' reliance on *Trump v. Sierra Club*, 140 S. Ct. 1 (2019), is misplaced. *First*, the district court's injunction expressly rested solely on "the court's equitable power to enjoin public officials from violating federal law, rather than under a specific grant of statutory authority, such as the Administrative Procedure Act (APA)." Application for Stay Pending Appeal, *Trump v. Sierra Club*, No. 19A60, at 11 (July 12, 2019) (Stay Application); *id.* at 13 (noting court "did not identify any new basis

for the injunction."). *Second*, the statutory provision is inapposite to the current appropriation and individual members of the Sierra Club do not have interests in military functions or requirements.   There, the provision allowed the Defense Secretary to transfer funds made available by the act for "military functions" to other appropriations for the purposes "as the appropriation or fund to which transferred." Department of Defense Appropriations Act, 2019 (DoD Appropriations Act), Pub. L. No. 115-245, Div. A, § 8005, Tit. VIII, 132 Stat. 2999, Congress limited the appropriation stating that funds may not be transferred "unless for higher priority items, based on unforeseen military requirements," and "in no case where the item for which funds are requested has been denied by the Congress." *Id.*  The Sierra Club members' interests in the "recreational or aesthetic interests in public lands" is not close to the interests of Section 8005's limitations—requiring "higher priority items, based on unforeseen military requirements" and no previous denial by Congress. Stay Application at 24.   Indeed, the appropriation's remedy was Congressional oversight because the statute required that "the Secretary notify Congress of any transfer." *Id.* at 25.  Defendants completely fail to show that any of those conditions apply here.

Because the appropriations here "protect" the States' "sovereign interests," the States "easily fall within the zone of interests of" the DHS appropriations "and are [thus] suitable challengers to enforce [Defendants'] obligations." *California*, 963 F.3d at 943–44.

The same conclusion extends to the ICA, which Defendants concede (at 38) was

enacted to "protect[] Congress's power of the purse[.]"  Defendants cite (at 39) *Public Citizen v. Stockman*, 528 F. Supp. 824 (D.D.C. 1981), but that case did not involve States.   Though the court in *Public Citizen* held that the plaintiffs there lacked standing under 5 U.S.C. § 702 of the APA, *id.* at 830 n.1, binding Fifth Circuit precedent has held that States "fall well within" § 702.   *Texas v. United States*, 809 F.3d 134, 152 (5th Cir. 2015) *(DAPA)*. Because the States' interests are congruent with those of Congress and, indeed, seek to safeguard them, the States arguably fall within the zone of interests protected by the ICA.   *California*, 963 F.3d at 941–44; *cf. Public Citizen*, 528 F. Supp. at 830 n.1; *Maine v. Goldschmidt*, 494 F. Supp. 93, 98–99 (D. Me. 1980) (state suit involving whether ICA authorized agency action deferring obligation of funds); *see also* ECF 24, at 53 (citing *City of New Haven v. United States*, 809 F.2d 900 (D.C. Cir. 1987) (involving non-APA challenge by non-state plaintiff over deferral of funds under the ICA).

Defendants' arguments to the contrary are meritless.  They first argue (at 34–35) that the States' "financial interests in minimizing the costs of providing driver's licenses and other state-funded services are not within the zone of interests protected by Congress's appropriations to DHS for border wall construction or Congress's oversight of Executive Branch funding impoundments."   But this is directly contrary to the Fifth Circuit's recent decision in *Texas*, as explained above.   It's also too narrow of a focus; the statutes at issue must be viewed "as a whole."   *MPP II*, 20 F.4th at 976.

Defendants further argues (at 37–39) that nothing in the text or structure of

31

the statutes at issue suggests that Congress had the States' interests in mind—either benefiting them or saving them from financial burdens.   But that same argument was soundly rejected in *MPP II*.  20 F.4th at 976.  The Court should do the same here. Again, this argument "focuses too narrowly on" the statutes at issue, *id.*, and, in any event, it's a "rehash" of Defendants' "failed standing arguments" rejected in *Texas*.  *Id.* Defendants' "cases to the contrary are entirely inapposite"— none of them even involved States.   *Id.* (citing *INS v. Legalization Assistance Project*, 510 U.S. 1301, 1302, 1305 (1993) (O'Connor, J., in chambers), and explaining that *INS* was "a suit that did not involve States").   Moreover, this fails to account for Texas's harm to its revenue as a landowner of properties situated on the border.  *See, e.g.*, Carter Decl. ¶ 4, Supp. App. 7.  Defendants concede that the gaps in border wall segments "funnel illicit cross border activities"—activities causing harm to Texas's land interests from gaps the appropriations were meant to fill.

Finally, Defendants argue (at 38) that the GAO has determined that "DHS did not unlawfully impound funds from its border infrastructure appropriations while implementing the President's Proclamation[,]" so the States fall outside the zone of interests of the statutes.  This reasoning is legally flawed because it improperly conflates the merits with whether the States have a cause of action under the APA. *See  MPP II*, 20 F.4th at 975 (distinguishing the merits from the zone-of- interests inquiry).  The GAO's determinations are not binding on the Court—especially on questions of law.   *See Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (GAO's findings are "not binding" on courts) (cleaned up).   Moreover, GAO's decision

32

does not address whether the States fell within the zone-of-interests of the ICA, and GAO simply credited Defendants pretextual justifications—that have now changed. *See Pause of Border Barrier Constr. & Obligations*, 2021 WL 2451823, at *1, *6. And GAO did exhibit concern that though this "appropriation was provided several months ago, and none of the funds have yet been obligated." *Id.* at *7.

### 2.   Defendants' actions violate the 2020 and 2021 CAAs and the ICA.

Defendants concede (at 40) that some delays in spending funds Congress appropriated "constitutes an unlawful impoundment[.]"  They further concede that deferrals of funds "based on policy disagreements with Congress … are prohibited by the ICA[.]"  *Id.*  Defendants argue, however, that their actions here merely constitute what the GAO calls a "legitimate programmatic delay" because Defendants are "taking reasonable and necessary steps to implement" the appropriations at issue. *Id.* (cleaned up).

Setting aside that Defendants fail to point to any *text* in the ICA that mentions "programmatic delays," even assuming such delays were in fact authorized, the States here are likely to show that the delay here is illegitimate because Defendants have no intention to implement the construction of a border wall.   That puts Defendants' actions here more in line with an impermissible deferral of funds due to a policy disagreement with Congress.   Put differently, any programmatic delay assumes Defendants intend to actually build the wall, but their prior statements and even ones as late as June 30, 2023, paint a very different picture.

The Court need not look any further than the 2021 plan and the amended plan.

There, DHS repeats the January 20 Proclamation's "commitment that 'no more American taxpayer dollars [should] be diverted to construct a border wall[.]'" ECF 24-3, at 18 (first alteration in original).   The whole purpose of the DHS Plan is to implement the Proclamation—a document that simply dismisses border wall construction as a "waste of money" and "not a serious policy solution[,]" No. 21-420 ECF 4-1, at 1.   As stated previously, Defendants' previous litigation position that a wall will be built *after* environmental planning and stakeholder consultation is pretext to cover the Administration's announced policy that no wall will be built at all.   *See supra* Part I.D.1.  And as noted, the amended plan merely confirms that appropriated funds will not be spent on any new border construction.

Lest there be any doubt, it is of no coincidence that the five-year appropriations at issue expire in 2024 and 2025, but environmental activities take an average of almost five years.   *See* Executive Office of the President, Council on Environmental Quality,  Environmental Impact Statement Timelines  (2010-2018), at p.1 (June 12, 2020) (finding average NEPA environmental impact statement completion time to be 4.5 years).   Once those appropriations lapse, Defendants will have successfully avoided building a wall.   If the current Administration shared the prior Administration's goal of securing the border through "extremely effective" measures such as walls,  then waivers  would be  issued without hesitation.   *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, § 102(c)(1), Pub. L. No. 104-208, Div. C, 110 Stat. 3009-546 (codified as amended at 8 U.S.C. § 1103 note) (Secretary has "the authority to waive all legal requirements"—including NEPA—

34

that, in his "sole discretion" are "necessary to ensure expeditious construction" of physical barriers along the border).  Instead, the Administration has made a contrary decision, reinforcing its policy choice that "[n]o new barrier construction work will occur[.]"  ECF 52-1, at 15.

To be sure, the States will probe Defendants' intention to build the border wall during the discovery phrase of this case.   In the meantime, the status quo should be preserved pending trial on the merits and Defendants should be enjoined from implementing the January 20 Proclamation to avoid ongoing irreparable harms to Plaintiffs.  *See Collum v. Edwards*, 578 F.2d 110, 113 (5th Cir. 1978) ("[T]he function of a preliminary injunction is to preserve the status quo pending a trial on the merits.").

Finally, that the GAO concluded in its June 15 decision that DHS had not unlawfully impounded the appropriations at issue but rather had engaged in programmatic delays makes no difference.   As Defendants concede (at 47), the GAO's decision is not binding on this Court.  *See Nevada*, 400 F.3d at 16.  And though such a decision would ordinarily be entitled to "special weight," *id.*, the Court should not give it no weight here.   Critically, the GAO's decision simply credited Administration's statements that it had "not directed the withholding of this appropriation." *Pause of Border Barrier Constr. & Obligations*, 2021 WL 2451823  at *6.  It failed to mention, much less analyze, the significance of the Proclamation's statements that support the States' theory of pretext here: (1) "building a massive wall that spans the entire southern border is not a serious policy solution"; (2) it is "a waste of money"; and (3)

"[i]t shall be the policy of [the Biden] Administration that no more American taxpayer dollars be diverted to construct a border wall[.]"  *See supra* Part I.D.1; *see also Pause of Border Barrier Constr. & Obligations*, 2021 WL 2451823, at *3–4 (discussing Proclamation without mentioning any of these statements).  More fundamentally, Congress vested this Court—not the GAO—with determining whether agency action was arbitrary and capricious, contrary to federal law, and contrary to the Constitution.  5 U.S.C. § 706.  Unlike the GAO, this Court can (and should) determine through the adversarial system whether Defendants' delay in building the wall is made in good faith or mere pretext.

Defendants' attempt to show that they have obligated the barrier system funds (at 41–43) merely confirm that they will use those funds for *anything but* new barrier construction.  The listed projects indicate that Defendants are remediating harms they caused by pausing construction or simply replacing existing barrier.  *E.g.*, Supp. Opp. 42 ("CBP is replacing primary and secondary barrier").  That Defendants only plan to replace rather than construct is confirmed by new estimates that DHS will start new projects within the year or so, when environmental studies for new actions typically take 4.5 years.  Defendants provide abundant examples of appropriated funds being used for infrastructure and not barrier construction.  ECF 96-2, *Third Enriquez Declaration* at 5 (building "structure for crossing over the Tijuana River channel"); *id.* at 6 "important erosion and drainage control projects in the USBP San Diego Sector"); *id.* 12–13 (projects that "address[] flood control levees" to include a "guardrail to protect pedestrians and vehicles from falling off the levee.").

Nor should the Court credit appropriations from barrier construction to the "barrier system attributes" that merely enhance existing barrier structures with border security technologies—a separate appropriation under FY 2020 Appropriations § 209(b).   Defendants argument that the definition of "system" incorporates non-physical barriers is belied by the very appropriations that they rely on.  Supp. Opp. 44.  As Defendants point out, Section 102 of the IIRIRA explicitly provided for both physical barriers as well as installation of roads, lighting cameras, and sensors to gain *operational control*.  *Id.* at 44 (emphasis added).   Congress expressly mentioned physical barriers for one purpose and DHS's enhancements for another.  And Congress describing that physical barriers are "one component of a border *security* system," *id.*, merely shows that Congress meant something different when it required "construction of barrier system" in §209(a) and further limited it by "operationally effective designs … such as operationally effective designs" in § 209(b).  FY 2020 Appropriations.  These statutory terms reflect that Congress knew what it wanted when it said "border security system" and "construction of a barrier system."

Finally, Defendants have switched rationales (again) for why the "necessary expense doctrine" applies.  *Compare* ECF 24 at 44, *with* Supp. Opp. at 45.  The new rationale—that remediation and system attributes are authorized—falls flat.  Supp. Opp. 45.  They claim that remediation of DoD projects, due to their own actions to stop border wall construction, is somehow a necessary expense of § 209(a) appropriations.  Defendants should not be allowed to turn a rule of construction into a substantive canon through their own acts to create consequences that the

37

appropriation did not envision.

### D.    Defendants' actions are contrary to the Constitution.

Because the States are likely to succeed on their statutory arguments, the Court need not reach their constitutional claims.  *BST Holdings*, 17 F.4th at 611.  But if the Court does reach them, it should conclude that the States' are likely to prevail on their constitutional claims because, as Defendants concede (at 49–50), the States' likelihood of success on their constitutional claims "hinges" on their likelihood of success on their statutory claims.[5]

Defendants argue (at 48) that the States do not fall within the zone of interests of the constitutional provisions they invoke for the same reasons Defendants argue the States purportedly do not fall within the zone of interests of the statutes they invoke. For the reasons the States provide above, *supra* Part I.E.1, the Court should reject Defendants' argument here too. *Accord California*, 963 F.3d at 943 (under the APA, States have an "interest in reinforcing … structural separation of powers principles"); *San Francisco*, 897 F.3d at 1233–34 (separation-of-powers considerations in the appropriation context also raise considerations under the take care clause).

Defendants appear to deny (at 47) that there is an equitable cause of action

---

[5] To be sure, the Proclamation contains several savings clauses directing agency action "to the extent permitted by law" and "consistent with applicable law." But this language does not rehabilitate the Proclamation's unconstitutionality. *San Francisco*, 897 F.3d at 1240 ("If 'consistent with law' precludes a court from examining whether the Executive Order is consistent with law, judicial review is a meaningless exercise, precluding resolution of the critical legal issues."). Defendants' arguments (at 50-51) on this score are thus without merit.

against federal officials for violating the law, but they ignore the long history of federal courts granting relief on such claims. *See, e.g.*, *American School of Magnetic Healing v. McAnnulty*, 187 U.S. 94, 108 (1902); *Stark v. Wickard*, 321 U.S. 288, 310 (1944). "Nothing in the subsequent enactment of the APA altered the *McAnnulty* doctrine of review. It does not repeal the review of *ultra vires* actions recognized long before, in *McAnnulty*." *Dart v. United States*, 848 F.2d 217, 224 (D.C. Cir. 1988). "When an executive acts *ultra vires*, courts are normally available to reestablish the limits on his authority." *Id.* Thus, Plaintiffs can bring a "non-statutory review action," and courts have authority to review federal executive action that violates statutory commands. *Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1327–32 (D.C. Cir. 1996).

Contrary to Defendants' argument (at 47, citing *Dalton v. Specter*, 511 U.S. 462, 471 (1994)), Plaintiffs States' constitutional claims are not that the President is acting "in excess of his statutory authority" but "that the President's actions affirmatively displaced a congressional[] mandate[.]" *Make the Rd. N.Y. v. Pompeo*, 475 F. Supp. 3d 232, 258 (S.D.N.Y. 2020). They therefore implicate "constitutional separation of powers concerns not present in *Dalton*" and should be "appropriately considered as constitutional claims subject to judicial review." *Id.* at 258–59; *see also San Francisco*, 897 F.3d at 1232 (President "may not decline to follow a statutory mandate … simply because of policy objections") (cleaned up). Just this June the Supreme Court approved judicial relief for States suffering injury from the Education Secretary's attempt to arrogate Congress's power of the purse. *Nebraska*, 143 S. Ct.

at 2373.  It is no answer that a constitutional claim only exists "if executive officers rely on [the Constitution] as an independent source of authority."  Supp. Opp. 47. Here, Defendants cannot rely on a statute to halt the construction of the border wall as the funds "shall only be available for barrier systems."  FY 2020 Appropriations § 209(b).

*Mississippi v. Johnson* does not preclude review either because Plaintiff States do not seek an order directing the President's "exercise of judgment."  71 U.S. (4 Wall.) 475, 499 (1867).  Instead, Plaintiffs seek an injunction prohibiting implementation of unlawful agency action.  Because Congress has removed any discretion the Executive Branch might have previously had to spend or not spend funds on construction of a border wall in these circumstances, there is no "exercise of judgment" with which an injunction could interfere.

What's more, courts can and do enforce the presidential duty to faithfully execute congressional commands through relief granted against his subordinates. Because the termination of border wall construction necessarily causes Defendants to violate the law, terminating construction is, in these circumstances, to claim "a dispensing power, which has no countenance for its support in any part of the constitution." *Kendall v. United States ex rel. Stokes*, 37 U.S. (12 Pet.) 524, 613 (1838). "To contend that the obligation imposed on the President to see the laws faithfully executed, implies a power to forbid their execution, is a novel construction of the constitution, and entirely inadmissible." *Id.*; *cf.  MPP II*, 20 F.4th at 981 (discussing *Kendall* in the context of reviewability under the APA).

40

### E.      The States have standing.

Defendants' arguments against the Plaintiff States' standing based on loss of revenues via its franchise tax. ECF No. 96 at 22–23. Plaintiff States have already addressed these arguments is issue in their preliminary-injunction briefing. ECF No. 19 (in Case No. 7:21-cv-420) at 41–43; ECF No. 30 at 9–10.

They also argue that Texas's mitigation measures, described in ECF No. 19 (in Case No. 7:21-cv-420) at 42–43, are "self-inflicted" injuries not permitted to demonstrate standing. ECF No. 96 at 21–22.

Finally, Defendants primarily argue that the Supreme Court's recent decision in *United States v. Texas (Enforcement Priorities)*, 143 S. Ct. 1964 (2023), undermines the Plaintiff States' standing in this case. ECF No. 96 at 14–21, 26–27. Defendants give that ruling a broad interpretation, but the majority opinion repeatedly emphasizes how narrow it is and how it does not apply to cases like this one.

### 1.      Standing is determined by facts in existence when the complaint is filed.

Defendants cite to facts purporting to show that they are now complying with Congress's commands in the Consolidated Appropriations Acts.  ECF No. 96-2 (*Third Enriquez Declaration*). This supposedly constitutes "substantial evidence that DHS is engaged in numerous projects to construct, repair, and remediate barrier system infrastructure."  Supp. Opp. at 27.  As described above regarding the merits, this is not true.  But even if it were, "[t]he existence of federal jurisdiction ordinarily depends on the facts *as they exist when the complaint is filed*." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 571 n.4 (1992) (emphasis in original; citation omitted); *Carr v. Alta Verde*

*Indus., Inc.,* 931 F.2d 1055, 1061 (5th Cir. 1991) ("As with all questions of subject matter jurisdiction except mootness, standing is determined as of the date of the filing of the complaint, and subsequent events do not deprive the court of jurisdiction.").

"While the proof required to establish standing increases as the suit proceeds, the standing inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. FEC*, 554 U.S. 724, 734 (2008) (citation omitted); *see also Texas v. EEOC*, 933 F.3d 433 (5th Cir. 2019) ("'In identifying an injury that confers standing, courts look exclusively to the time of filing.'") (citing *Loa-Herrera v. Trominksi*, 231 F.3d 984, 987 (5th Cir. 2000); *Pederson v. Louisiana State Univ.*, 213 F.3d 858, 870 (5th Cir. 2000) ("[A fact concerning injury in existence] at the time of trial, however, implicates mootness; it has no bearing on the particular litigant's standing at the time the suit was filed.").

This suit was filed on October 21, 2021. ECF No. 1 (in Case No. 6:21-cv-52). None of the subsequent facts cited by Defendants can serve to retroactively defeat standing. *See Gen. Land Off. v. Biden,* 71 F.4th at 272 n.12 (5th Cir. 2023) ("As this action was filed in October 2021, developments since then, such as the issuance of DHS's June 2022 border wall plan, will not be considered" in evaluating standing). And given that courts "assume, for purposes of the standing analysis, that Texas is correct on the merits of its claim[s]," *EEOC*, 933 F.3d at 447, this Court must accept that Defendants' actions in existence at the time of filing the complaint were unlawful when evaluating standing at this preliminary-injunction stage.

### 2.  Texas's mitigation measures are not mere "self-inflicted" injury.

Defendants maintain that Texas allocating state funds to build its own border barriers is not a cognizable injury because it is self-inflicted. ECF No. 96 at 21–22. But "the fact that Texas sued in response to a significant change in the [D]efendants' policies shows that its injury is not self-inflicted." *DAPA*, 809 F.3d at 158. Defendants' about-face on building border barriers is such a significant change. Texas could also not "achieve[] [its] policy goal," *id.* at 159, in any other way—the loss of a border barrier is most directly remedied by creating another one. "The fact that Texas had no [alternative] option means its injury is not self-inflicted." *Id.*

### 3.  *Enforcement Priorities* should not affect this Court's determination of the Plaintiff States' standing in this case.

The law-of-the-case doctrine applies to determinations of subject matter jurisdiction. *See Free v. Abbott Labs., Inc.,* 164 F.3d 270, 272–73 (5th Cir. 1999) (joining other circuits in refusing to recognize a jurisdictional exception to the law of the case doctrine and explaining that although a federal court must examine each case to determine the basis for subject matter jurisdiction, "perpetual re-examination of precisely the same issue of subject matter jurisdiction" is not required) (citing *United States v. Becerra,* 155 F.3d 740, 753 (5th Cir. 1998)).  And "[i]n implementing the mandate, the district court must 'take into account the appellate court's opinion and the circumstances it embraces.'" *United States v. Lee,* 358 F.3d 315, 321 (5th Cir. 2004) (quoting *Sobley v. S. Natural Gas Co.,* 302 F.3d 325, 333 (5th Cir. 2002)).

And "the 'mandate rule,' a corollary of the law of the case doctrine, 'compels

43

compliance on remand with the dictates of a superior court and forecloses relitigation of issues expressly or *impliedly* decided by the appellate court.'" *Fisher v. Univ. of Texas at Austin*, 758 F.3d 633, 639–40 (5th Cir. 2014), *aff'd*, 579 U.S. 365 (2016) (emphasis added; citation omitted); *United States v. Castillo,* 179 F.3d 321, 329 (5th Cir. 1999) ("The mandate rule requires a district court on remand to effect our mandate and to do nothing else.").

This Court is therefore bound by any legal determinations related to standing in the Fifth Circuit's decision in *Gen. Land Off. v. Biden*, 71 F.4th 264. Defendants maintain that the Supreme Court's decision in *Enforcement Priorities* is an intervening authority sufficient to justify a refusal to follow this rule. ECF No. 96 at 14–15. But that case explicitly does not apply to cases like this one.

### a. The rule articulated in *Enforcement Priorities* does not apply to this case.

*Enforcement Priorities* addressed Texas's and Louisiana's challenge to the Department of Homeland Security's guidelines, which stated that DHS would not arrest certain criminal aliens whom Congress provided "shall" be arrested. *Enforcement Priorities*, 143 S. Ct. at 1968. "The [challenged] Guidelines prioritize the arrest and removal from the United States of noncitizens who are suspected terrorists or dangerous criminals, or who have unlawfully entered the country only recently, for example," over the categories of criminal aliens that Congress mandated be arrested. *Id*. The Court characterized the case as "[t]he States essentially want[ing] the Federal Judiciary to order the Executive Branch to alter its arrest policy so as to make more arrests." *Id*. The Supreme Court held that Article III standing was lacking because

"a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* (quoting *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973)).

This holding was based *solely* on the rule that a party typically lacks standing to compel the arrest and prosecution of another. *See id.* The majority emphasized the narrowness of this holding, noting that "[t]he discrete standing question raised by this case rarely arises because federal statutes that purport to *require* the Executive Branch to make arrests or bring prosecutions are rare…. This case therefore involves both a highly unusual provision of federal law and a highly unusual lawsuit." *Id.* at 1974.

The Court held that "our Article III decision today should in no way be read to suggest or imply that the Executive possesses some freestanding or general constitutional authority to disregard statutes requiring or prohibiting executive action." *Id.* It held that "[t]his case is categorically different" from other standing decisions "because it implicates only one discrete aspect of the executive power— namely, the Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law." *Id.* It noted that "this case raises only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law—here, by making more arrests." *Id.*

The Court emphasized that "[t]he Court's standing decision today is narrow and simply maintains the longstanding jurisprudential status quo." *Id.* at 1975 (citing

*Linda R.S.*, 410 U.S. at 619). It described the States' standing argument as a "novel" one that "if accepted, would entail expansive judicial direction of the Department's arrest policies." *Id*. at 1973. And it described the case as an "extraordinarily unusual lawsuit" because the States "want[ed] a federal court to order the Executive Branch to alter its arrest policies so as to make more arrests." *Id*. at 1976. "This case concerns *only* arrest and prosecution policies, and we therefore address *only* that issue" *Id*. at 1974 n.5 (emphases added); *see also id*. at 1990 (Alito, J., dissenting) (recognizing that "[t]he Court … holds only that, with some small and equivocal limitations that I will discuss, no party may challenge the Executive's 'arrest and prosecution policies.'").

This extremely narrow and "highly unusual" case does not apply here. That is because Plaintiff States' injuries are not based on a mere failure to arrest particular aliens on the border—they are based on Defendants' flagrant disobedience to Congress's commands to build a border wall. Indeed, unlike the mere arrest or prosecution policies at issue in *Enforcement Priorities*, this case involves clear commands from Congress that direct DHS to construct border barriers to prevent illegal aliens from coming into Plaintiff States and costing them millions of dollars. That is why the Fifth Circuit previously held that that injury in fact was "not an issue" here because Texas would "incur unrecoverable costs in issuing driver's licenses, providing education, and administering healthcare to illegal aliens who would not otherwise be in the State" "if the border wall construction does not proceed." *Gen. Land Off. v. Biden*, 71 F.4th at 272 (emphasis and internal quotation

46

marks omitted).

This case does not involve any attempt to compel the arrest or prosecution of anyone, so *Enforcement Priorities* does not undermine standing here; none of the relief sought here requires Defendants to take any immigration, deportation, or criminal action against any aliens.

The *Enforcement Priorities* majority cautioned that, while "States sometimes have standing to sue the United States or an executive agency or officer," 143 S. Ct. at 1972 n.3, "federal policies frequently generate indirect effects on state revenues or state spending and when a State asserts, for example, that a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated," *id.* (cleaned up; citations omitted). Note that this mild language—"can become attenuated"—does not preclude standing based on indirect costs to States in all cases.

The *Enforcement Priorities* Court recognized that the States had asserted an injury due to monetary costs, *see id.* at 1970, given their evidence that "the Department's failure to comply with those statutory mandates imposes costs on the States" including "that they must continue to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government." *Id.* at 1969. But *those* indirect injuries were not "judicially cognizable" because they were indirect costs *that arose from the Federal Government's failure to arrest certain criminal aliens. Id.* at 1970; *see also id.* at 1993 (Alito, J., dissenting) (describing States' injuries as increased criminal justice,

education, and healthcare costs due to criminal aliens "who were released" and "not detained" by federal immigration authorities); *id.* at 1994 (States' concrete injuries were from "the cost of criminal supervision of aliens who should have been held in DHS custody"). That situation does not hold in this case.

Regardless, *Enforcement Priorities* did not overrule *Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019), which upheld indirect injury as a basis for States' standing to challenge federal agency action, *see id.* at 2565 ("diminishment of political representation, loss of federal funds, degradation of census data, and diversion of resources" were sufficient to give States and municipalities standing to sue over the proposed inclusion of a citizenship question on the 2020 census); *see also Enforcement Priorities*, 143 S. Ct. at 1977 (Gorsuch, J., concurring in the judgment) (noting "this Court has allowed other States to challenge other Executive Branch policies that indirectly caused them monetary harms." (citing *Dep't of Commerce*, 139 S. Ct. at 2565–66)).

Lower courts may not preemptively refuse to apply on-point Supreme Court precedent even where subsequent Supreme Court cases are in tension with it:

> "We reaffirm that '[i]f a precedent of this Court has *direct application* in a case, yet appears to rest on reasons rejected in some other line of decisions,' the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions." *Agostini v. Felton*, 521 U.S. 203, 237 (1997) (emphasis added) (quoting *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989)); *see also* Bryan A. Garner et al., *The Law of Judicial Precedent* 302 (2016). Indeed, even if the tension between the two cases was so stark that we could confidently predict *Free Enterprise Fund*'s impending demise, we would still have

48

> to follow it—it is the Supreme Court's "prerogative alone to
> overrule one of its precedents." *State Oil Co. v. Khan*, 522
> U.S. 3, 20 (1997).

*Cochran v. SEC*, 20 F.4th 194, 206 n.11 (5th Cir. 2021) (citations truncated), *aff'd and*

*remanded sub nom. Axon Enter., Inc. v. FTC*, 142 S. Ct. 890 (2023). This Court should

continue to apply *Dep't of Commerce* and existing Fifth Circuit precedent in this area.

### b.   Even if the general rule in *Enforcement Priorities* applied, two exceptions would grant Plaintiffs standing.

The Court took pains to note that it was "not suggest[ing] that federal courts

may never entertain cases involving the Executive Branch's alleged failure to make

more arrests or bring more prosecutions." *Enforcement Priorities*, 143 S. Ct. at 1973.

Although the *Enforcement Priorities* rule does not apply to this case because the

Plaintiff States do not seek judicial relief ordering the Defendants to arrest aliens,

two exceptions articulated by the Court would apply even if it did.

### (1)   The Plaintiff States have standing because the agency action challenged here constitutes an abdication of Defendants' statutory responsibilities.

The *Enforcement Priorities* majority noted that "a plaintiff arguably could

obtain review of agency non-enforcement if an agency 'has consciously and expressly

adopted a general policy that is so extreme as to amount to an abdication of its

statutory responsibilities.'" *Id.* at 1973–74 (citing *Heckler v. Chaney*, 470 U.S. 821,

833 n.4 (1985)). "So too, an extreme case of non-enforcement arguably could exceed

the bounds of enforcement discretion and support Article III standing." *Id.* at 1974.

"But the States have not advanced a *Heckler*-style 'abdication' argument in this case

or argued that the Executive has entirely ceased enforcing the relevant statutes," so

49

the Court did not analyze this potential basis for standing. *Id.*

As described above on the merits, Defendants' conduct challenged here is just such an extreme example that constitutes abdication of their statutory responsibilities.

Judge Hanen had previously found that States had standing to challenge DAPA based on this abdication theory. *See Texas v. United States*, 86 F. Supp. 3d 591, 636–41 (S.D. Tex. 2015) (Hanen, J.); *id.* at 641 ("The States claim that, unlike the FDA's action at issue in *Heckler,* the DAPA program is a total abdication and surrender of the Government's statutory responsibilities. They contend that the DAPA Directive basically concedes this point, and this Court agrees."). Indeed, Judge Hanen relied on APA reviewability under *Heckler v. Chaney, id.* at 641, to also find standing—the same analysis adopted by the *Enforcement Priorities* majority.

The *Enforcement Priorities* majority found that the States there had "not advanced a *Heckler*-style 'abdication' argument in this case or argued that the Executive has entirely ceased enforcing the relevant statutes." 143 S. Ct. at 1974. But here, the Plaintiff States have thoroughly briefed an abdication claim under the Take Care Clause. *See* ECF No. 19 (in Case No. 7:21-cv-420) at 32–34; ECF No. 30 at 37– 40; *see also Enforcement Priorities*, 243 S. Ct. at 1978 (Gorsuch, J., concurring in the judgment) (noting that a properly advanced Take Care Clause claim is "an abdication argument").

Just recently, Judge Hanen found States had standing on this basis to challenge the DACA program:

> Texas and the other Plaintiff States have clearly raised that very issue in this case. They have repeatedly pleaded that DHS has abdicated or abandoned its enforcement duties and, by doing so, violated the Take Care Clause of the Constitution. They have consistently urged this Court to address this issue and even raised it again after the remand. This Court has followed the general jurisprudential rule of constitutional avoidance in declining to address this contention. *Texas I* and *Texas II* were both resolved on issues related to the Administrative Procedure Act; however, the fact that this Court has declined to address the Take Care Clause issue does not mean that the Plaintiff States have not pleaded such a cause of action. Standing has never been determined solely by those issues upon which the Court ultimately rules. The Plaintiff States have clearly pleaded into this very exception to the "no standing" rule outlined by the Supreme Court [in *Enforcement Priorities*].

*Texas v. United States*, No. 1:18-CV-00068, 2023 WL 5951196, at *9–10 (S.D. Tex. Sept. 13, 2023).

Now that the Supreme Court has explicitly approved abdication as a basis for standing, the Court should find standing for the States in this case on this additional ground, even if declines to rule on the Take Care Clause claim.

### (2) Plaintiff States have standing because the failure to build border barriers is not a mere policy of nonenforcement.

The *Enforcement Priorities* majority also noted that "a challenge to an Executive Branch policy that involves both the Executive Branch's arrest or prosecution priorities *and* the Executive Branch's provision of legal benefits or legal status could lead to a different standing analysis. … because the challenged policy might implicate more than simply the Executive's traditional enforcement discretion." 143 S. Ct. at 1974. The Court cited two cases challenging DACA as exemplars of this exception: *DHS v. Regents of Univ. of Cal.,* 140 S. Ct. 1891, 1906–

51

07 (2020) (benefits such as work authorization and Medicare eligibility accompanied by non-enforcement meant that the policy was "more than simply a non-enforcement policy"); and *DAPA*, 809 F.3d at 154 (*Linda R.S.* "concerned only nonprosecution," which is distinct from "both nonprosecution and the conferral of benefits")).  DACA counted as the provision of benefits even though that agency action did not itself supply those benefits. *See. Regents,* 140 S. Ct. at 1902 (explaining that work authorization for deferred action recipients is "permitted under regulations long predating DACA's creation" and that "[p]ursuant to other regulations, deferred action recipients are considered 'lawfully present' for purposes of, and therefore eligible to receive, Social Security and Medicare benefits"); *see also* 8 C.F.R. § 274a.12(c)(14) (2022) (work authorization); 8 C.F.R. § 1.3(a)(4)(vi) (Social Security); 42 C.F.R. § 417.422(h) (Medicare).

This exception applies to this case due to Defendants' policy of paroling—rather than detaining— the vast majority of aliens arriving at the border. *See Enforcement Priorities*, 143 S. Ct. at 1974 (citing its previous decision reaching the merits of the termination of MPP, *Biden v. Texas*, 142 S. Ct. 2528 (2022) (*MPP III*), as raising different standing issues). Parole makes recipients eligible for various federal and state benefits. "When the Department of Homeland Security lacks sufficient capacity to detain noncitizens at the southern border pending their immigration proceedings (often asylum proceedings), the immigration laws afford DHS two primary options," returning to Mexico (MPP) or parole.  *MPP III*, 142 S. Ct. at 2548 (Kavanaugh, J., concurring). "Due to the huge numbers of aliens who attempt

to enter illegally from Mexico, DHS does not have the capacity to detain all inadmissible aliens encountered at the border," *MPP III*, 142 S. Ct. at 2550 (Alito, J., dissenting), and the Administration is no longer placing aliens into MPP. That means aliens arriving at the border are being granted parole.

"Although the [failure to build border barriers] *itself* does not confer affirmative benefits [on aliens], the interaction between [that failure] and the lack of detention capacity necessarily means more aliens will be released and paroled into the Plaintiff States. And parole *does* create affirmative benefits for aliens such as work authorization." *Texas v. Biden*, 554 F. Supp. 3d 818, 845 (N.D. Tex. 2021) (emphases in original). Because the district court in the *MPP* litigation had found "that MPP's termination has increased the number of aliens released on parole into the United States, including Texas and Missouri," due to a lack of detention capacity, *Texas v. Biden*, 20 F.4th 928, 966 (5th Cir. 2021) (*MPP II*), that meant that more aliens were being released into the States to use healthcare services—and parole made them eligible for subsidized driver's licenses. *Id*. at 968. This was sufficient for Article III standing.

These costs injure Plaintiff States, as the Fifth Circuit explained that injury in fact "is not an issue" here because Texas would "incur unrecoverable costs in issuing driver's licenses, providing education, and administering healthcare to illegal aliens who would not otherwise be in the State" "if the border wall construction does not proceed." *Gen. Land Off. v. Biden,* 71 F.4th at 272 (emphasis and internal quotation marks omitted).

53

Plaintiff States' injuries on this basis are not indirect—courts in the *DACA* litigation described these same injuries as *direct* costs to the States. *See Texas v. United States*, 50 F.4th 498, 517 (5th Cir. 2022) (*DACA)* ("Texas asserts standing based on direct injury. It claims that DACA inflicts pocketbook injuries on the State in the form of healthcare, education, and social services costs."); *id.* at 520 ("Accordingly, Texas has demonstrated standing based on its direct injury."); *Texas v. United States*, 549 F. Supp. 3d 572, 589 (S.D. Tex. 2021) (Hanen, J.) ("DACA recipients' presence also represents direct costs in the areas of healthcare, education, and social services."). The DACA program did not directly provide these benefits, "but an agency action need not directly confer public benefits to be more than nonenforcement. Instead, removing a categorical bar on receipt of governmental benefits and thereby making a class of persons newly eligible for them provides a focus for judicial review." *MPP II*, 20 F.4th at 987 (cleaned up). The failure to build border barriers increases the flow of aliens across the border, and the combination of the lack of capacity to detain all of them and the exercise of parole makes them eligible for benefits, imposing direct costs on the Plaintiff States.

The Supreme Court's recent decision in *Nebraska* reinforces that the costs to the Plaintiff States in this case are direct rather than indirect. 143 S. Ct. 2355 (2023). That case upheld Missouri's standing to challenge the Biden Administration's student loan forgiveness program. Missouri had "created MOHELA as a nonprofit government corporation to participate in the student loan market," *id.* at 2365, and it interacted with the federal government to service student loans and received

administrative fees for these services, *id.*  The loss of those fees was "an injury in fact *directly* traceable to the" loan forgiveness program, *id.* (emphasis added), as it "will cut MOHELA's revenues, impairing its efforts to aid Missouri college students.  This acknowledged harm to MOHELA in the performance of its public function is necessarily a *direct injury* to Missouri itself," *id.* at 2366 (emphasis added).

This is most closely analogous to the driver's license costs imposed on the Plaintiff States here.  Texas interacts with the federal government through the REAL ID Act, *see DAPA*, 809 F.3d at 155 n.58 (5th Cir. 2015), and ties eligibility for subsidized licenses to lawful presence—as aliens with parole status are eligible to receive subsidized licenses from Texas, ECF 19-1, App. 129–41, and "[b]ecause driving is a practical necessity in most of the state, there's little doubt many newly paroled aliens have applied—and without the district court's injunction, will apply in the future—for Texas driver's licenses." *MPP II*, 20 F.4th at 970–71 (citing *DAPA*, 809 F.3d at 156).

Just as the financial harm to MOHELA was "directly traceable" to the challenged agency action in *Nebraska*, 143 S. Ct. at 2366, the financial injuries imposed on the Plaintiff States here are direct rather than indirect.

### (3)   Nothing in *Enforcement Priorities* raises questions about traceability or redressability in this case.

The *Enforcement Priorities* majority addressed only whether there was a judicially cognizable injury in fact, not whether the traceability and redressability prongs were satisfied.  *Enforcement Priorities*, 143 S. Ct. at 1970–71; *id.* at 1995 (Alito, J. dissenting). That decision therefore has no effect on those two prongs of the

standing analysis, leaving the Fifth Circuit's holdings in *GLO* the law of the case.

Defendants attempt to muddy the waters as to whether border barriers actually reduce the flow of migrants, making traceability lacking. ECF No. 96 at 25–26. But "the government's own administrative record … says deterrence of illegal border activities is achieved *primarily* through border barriers." *Gen. Land Off. v. Biden,* 71 F.4th at 273 (emphasis in original). "DHS has affirmed that border barriers funnel illegal immigrants to areas where Customs and Border Protection is better prepared to intercept them, thus reducing illegal immigration," and "[i]n the absence of longer walls, at least some illegal aliens who otherwise would have been prevented from entering Texas will seek driver's licenses, education, and healthcare from Texas." *Id.*; *see also MPP II*, 20 F.4th 928, 966 (5th Cir. 2021) ("DHS's own publications" on immigration effects sufficient to show traceability in bench trial).

Because Plaintiff States "appropriately rely 'on the predictable effect of Government action on the decisions of third parties,'" *Gen. Land Off. v. Biden*, 71 F.4th at 273 (quoting *Dep't of Commerce*, 139 S. Ct. at 2566), they satisfy the causation prong for standing.

Justice Gorsuch, for himself and two other Justices, questioned the majority's holding on legally cognizable injury in fact, but would have ruled against Texas on redressability grounds.[6] *Enforcement Priorities*, 143 S. Ct. at 1976 (Gorsuch, J., concurring in the judgment).

---

[6] "[C]ausation and redressability are closely related, and can be viewed as two facets of a single requirement." *Scenic Am., Inc. v. United States Dep't of Transportation*, 836 F.3d 42, 54 (D.C. Cir. 2016).

Defendants urge the Court that this "three-Justice concurrence" somehow "confirms that redressability is absent" in this case. ECF No. 96 at 26.  But that opinion has no legal effect—the majority had five different Justices supporting its holding—and cannot somehow allow this Court to ignore binding Fifth Circuit precedent in this area, including the law-of-the-case determination by the Fifth Circuit in this case.

The Plaintiff States here are entitled to special solicitude.  *See* ECF No. 19 (in Case No. 7:21-cv-420) at 35; ECF No. 30 at 5–6; *Gen. Land Off. v. Biden*, 71 F.4th at 274–75.  The *Enforcement Priorities* majority never used the phrase "special solicitude" or addressed it in its analysis.  *See Missouri v. Biden*, No. 3:22-CV-01213, 2023 WL 4335270, at *64 (W.D. La. July 4, 2023) (Doughty, J.) (explaining continued viability of special solicitude doctrine post-*Enforcement Priorities*).

Defendants claim a lack of redressable injury here because nothing would guarantee that any of the funds would be spent "on the States' preferred projects." ECF No. 96 at 26.  But when special solicitude applies, "a state can establish standing without meeting all the normal standards for redressability and immediacy," and "[s]tanding will exist if there is *some possibility* that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Texas v. United States (DACA)*, 50 F.4th 498, 514 (5th Cir. 2022) (emphasis added).  The Fifth Circuit has already rejected Defendants' argument on this point. *See Gen. Land Off. v. Biden*, 71 F.4th at 273–74 (Defendants "argue that an order compelling DHS to comply with the appropriations acts will not result in the

construction of the Laredo projects … But [the States] do not challenge DHS's decision to terminate particular construction contracts [but instead] argue DHS's decision not to construct *any* new border wall is unlawful"; therefore, relief "requiring DHS to spend the 2020 and 2021 appropriations on additional border barriers—wherever those might be constructed—would thus remedy the alleged harm.").

Plaintiff States have demonstrated redressability because "constructing additional border barriers will reduce illegal entries in areas where those walls are constructed, increase detection rates across the entire border, and generally disincentivize illegal immigration." *Gen. Land Off. v. Biden*, 71 F.4th at 273. Indeed, an order and injunction from this Court that requires DHS to spend congressionally appropriated funds on the border barrier construction would "'slow or reduce the relative number of illegal aliens entering Texas" and "would lessen the relative costs Texas must expend on driver's licenses, education, and health care." *Id.* And because Plaintiff States' requested remedy would resolve—or at least, reduce—the harms they suffer, redressability has been established.

## C.   Plaintiffs have shown irreparable harm.

Defendants claim that there is no irreparable harm—asserting that Plaintiffs failed to show "an injunction would cause comparatively fewer migrants to enter the country than DHS's spending plan." Supp. Opp. 56. This should be rejected as it merely rehashes attacks on Plaintiffs' standing. Plaintiffs have shown that they are injured by Defendants' failure to follow Congress's commands. And "when 'the threatened harm is more than de minimis, it is not so much the magnitude but the irreparability that counts for purposes of a preliminary injunction.'" *Dennis Melancon, Inc. v. City*

*of New Orleans*, 703 F.3d 262, 279 (5th Cir. 2012) (quoting *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985)).   There is no question that Plaintiffs have no avenue to recover their damages from Defendants.

Moreover, the harms to Texas and GLO due to Defendants' actions to funnel illegal border activity onto the GLO Farm are irreparable and ongoing.   Trespass is a typical "irreparable" harm, and the GLO Farm experiences it nearly every day and at levels previously unseen.   Carter Decl. ¶¶ 5–9, Supp. App. 7–9.   These harms would be directly redressed by resumption of the cancelled construction contracts and contract negotiations for landowners, like Texas and GLO.   *See* ECF 24-3, at ¶¶ 24–27.

Plaintiffs have shown that absent an injunction they will continue to suffer irreparable harm.

## D.   The equities and public interest favor Plaintiffs.

The equities and public interest overwhelmingly favor Plaintiffs.   Defendants have abandoned their previous frivolous claims that environmental planning and stakeholder consultation before further construction  favors them on the equities.   As they should, because these activities are pretextual and should not be afforded any weight.   *See MPP II,* 20 F.4th at 1002 (citing *Ala. Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2490 (2021) (per curiam) ("[O]ur system does not permit agencies to act unlawfully even in pursuit of desirable ends.")).

Instead, Defendants claim (at 56-59) that the injunction would prevent "DHS from completing the ongoing and planned projects utilizing its fiscal year 2020 and

2021 barrier system appropriations" and harm border security.  At no point could anyone claim that Plaintiffs—seeking more border security—would seek to undermine more efforts to control the rampant illegal immigration.  Nowhere does the injunction prevent DHS from completing the tasks it currently has planned.  What it does do, is prevent DHS from using appropriated border barrier construction funds for non-barrier construction.  Congress has appropriated other funds, and DHS fails to claim that it does not have funds for these projects.  Thus, Defendants doomsday claims that the injunction would harm its agents, border security, and the environment are red-herrings.

Defendants argue (at 59) that Plaintiffs "equities in this case are limited to [their] fiscal harms" and thus their interests "are only remotely connected to the policy at issue in this case[.]"  As shown throughout the brief, Plaintiffs harms are more than just fiscal harms, ranging from harms to their sovereign interests to the deprivation of their property rights.  But the public interest equities go far beyond Plaintiffs.  Failing to control immigration at the southern border injures not only Texas and Missouri, it has devastating effects across the country.  Emma G. Fitzsimmons, *In Escalation, Adams says Migrant Crisis 'Will Destroy New York City'*, NYT Sec. A, at 16 ( Sept. 7, 2023) ("Mayor Eric Adams claimed in stark terms that New York City was being destroyed by an influx of 110,000 asylum seekers from the southern border.").  This Court should reject Defendants' improper balancing of the equities as the Fifth Circuit did in  *MPP II*. 20 F.4th at 976.

60

**E.     The injunction is both reasonable and warranted.**

Defendants claim (at 59) that Plaintiffs' proposed preliminary injunction is overbroad and unworkable—invoking the spectre of nationwide injunctions.   But there's nothing impractical about a negative injunction that forbids Defendants[7] from implementing the January 20 Proclamation as applied to DHS's 2020 and 2021 appropriations.  No. 21-420 ECF 19-2, at 1.  Nationwide injunctive relief is a remedy consistently awarded in analogous immigration cases because immigration policy is inherently national in scope.  *See Texas*, 809 F.3d at 187–88; *Texas v. United States*, 524 F.Supp.3d 598, 666–68 (S.D. Tex. 2021) (Tipton, J.); *see also Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (the "scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class"); *Texas*, 2021 WL 3603341, at *27–28 (issuing nationwide permanent negative and positive injunction in "immigration related case[]"), *aff'd*, 20 F.4th at 941, 943, & 1003–4 (5th Cir. Dec. 13, 2021) (noting Supreme Court "affirmed … denial" of stay over injunction).  Here, Defendants' amended plan confirms that border walls prevent illegal immigration where they exist and have effects on areas without border walls.  Following Congress' instructions to construct border walls in the "highest priority locations," FY 2020 Appropriation § 209(b), reflects that national uniform immigration policy.  So the same nationwide relief is warranted here.

There Defendants argue (at 60-61) for a geographically limited injunction, but

---

[7] Plaintiffs acknowledge that an injunction may not lie against the President, *Massachusetts v. Franklin* (1982), but Defendants' attempt (at 61) to invoke parties not before the Court must fail because the injunction will operate on Defendants.

that argument contradicts governing Fifth Circuit precedent.  In the *DAPA* case, the Government "claim[ed] that the nationwide scope of the injunction is an abuse of discretion and requests that it be confined to Texas or the plaintiff states." *Texas*, 809 F.3d at 187.  The Fifth Circuit rejected this argument: "the Constitution requires 'a uniform Rule of Naturalization'; Congress has instructed that 'the immigration laws of the United States should be enforced vigorously and uniformly'; and the Supreme Court has described immigration policy as 'a comprehensive and unified system.'" *Id.* at 187–88 (emphases added by the Fifth Circuit) (citing U.S. CONST. art. I, § 8, cl. 4; Immigration Reform and Control Act of 1986, Pub. L. No. 99–603, § 115(1), 100 Stat. 3359, 3384; and *Arizona v. United States*, 567 U.S. 387, 401 (2012)); *see also Texas,* 524 F.Supp.3d at 666-68.  "Partial implementation of DAPA would detract from the integrated scheme of regulation created by Congress, and there is a substantial likelihood that a geographically-limited injunction would be ineffective because [aliens] would be free to move among states" once inside the *United States*. *Texas*, 809 F.3d at 188 (quotation marks omitted); *see also Washington v. Trump*, 847 F.3d 1151, 1166–67 (2017) (holding that "a fragmented immigration policy would run afoul of the constitutional and statutory requirement for uniform immigration law and policy"); *Texas v. United States*, 787 F.3d 733, 769 (5th Cir. 2015) (rejecting a "patchwork system").  The crisis at the southern border, including in this district, is judicially noticeable as shown by the unrelenting waves of immigrants that cross the GLO Farm.

Nor does the preliminary injunction require the Court to "don a hard hat,"

Supp. Opp. at 63, because the injunction requires Defendants to obligate the funds as Congress instructed—for new barrier construction.  Despite Defendants' claims, the amended plan does not provide for a single foot of border wall construction. Defendants can obligate other monies and funds for other infrastructure and border technologies as they wish, but Defendants must spend the border barrier funds on border barriers.  As a result, this is not an "obey the law" injunction, because the injunction prohibits Defendants from using these funds for other purposes—an eminently workable[8] standard.

The same concerns for a nationally uniform immigration policy, and the problem that the mobility of aliens among the States would render narrower relief ineffective for fully redressing Plaintiffs' injuries, are equally applicable here.

## CONCLUSION

For the reasons stated in their motion and this reply, Plaintiffs respectfully request that the Court grant their motion for preliminary-injunctive relief.

---

[8] Defendants' assertion that border barrier construction contracts do not intend to benefit Missouri—and especially as to Texas and GLO are incorrect.  Supp. Opp. 63. Controlling where immigration will not occur, by requiring barrier construction in high priority areas, most certainly goes to benefit that State.

Date: September 15, 2023

ANDREW BAILEY
Attorney General of Missouri

JOSHUA M. DIVINE, #69875MO*
Solicitor General

/s/ *Jeff P. Johnson*
JEFF P. JOHNSON,
*Attorney-in-Charge*
Dist. of Columbia Bar No. #102921
Southern Dist. of Texas Fed. ID No. 3849778
Deputy Solicitor General

SAMUEL FREEDLUND, #73707MO*
Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, Missouri 65102
Tel. (573) 751-1800
Fax (573) 751-0774
josh.divine@ago.mo.gov
jeff.johnson@ago.mo.gov
samuel.freedlund@ago.mo.gov

*Counsel for Plaintiff
State of Missouri*

**\*Admission** *pro hac vice pending*

Respectfully submitted,

ANGELA COLMENERO
Provisional Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

/s/ *Ryan D. Walters*
RYAN D. WALTERS
*Attorney-in-Charge*
Deputy Chief, Special Litigation Division
Texas Bar No. 24105085
Southern Dist. of Texas Bar No. 3369185

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545
ryan.walters@oag.texas.gov

*Counsel for Plaintiff State of Texas*

64

<u>/s/ Austin R. Nimocks</u>
AUSTIN R. NIMOCKS
*Attorney-in-Charge*
 Texas Bar No. 24002695
S.D. Tex. Bar No. 2972032
Email: austin@peelenimocks.com

CHRISTOPHER L. PEELE
Of Counsel
Texas Bar No. 24013308
S.D. Tex. Bar No. 31519
Email: chris@peelenimocks.com

PEELE | NIMOCKS LAW FIRM
6836 Bee Caves Rd. Bldg. 3, Ste. 201
Austin, TX 78746
Phone: (512) 522-4893

*Counsel for Plaintiffs Texas General Land Office and Commissioner Dawn Buckingham, M.D.*

65

## CERTIFICATE OF SERVICE

I certify that on September 15, 2023, a true and accurate copy of the foregoing document was sent by fax to the Court to be filed on the Court's electronic docket and served on Defendants consistent with Federal Rule of Civil Procedure 5(b).

/s/ *Jeff P. Johnson*
Counsel for Plaintiffs

## CERTIFICATE OF COMPLIANCE

I certify that the total number of words in this supplemental response brief, exclusive of the matters designated for omission, and as permitted by the Court, *see* ECF 98, at 2, is 16,658 as counted by Microsoft Word.

/s/ *Jeff P. Johnson*
Counsel for Plaintiffs