**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION**

| | |
|---|---|
| THE GENERAL LAND OFFICE OF THE STATE OF TEXAS, and DAWN BUCKINGHAM, M.D., in her official capacity as Commissioner of the Texas General Land Office,<br><br>                 Plaintiffs,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; and ALEJANDRO MAYORKAS, in his official capacity as Secretary of the Department of Homeland Security,<br><br>                 Defendants. | Civil Action No. 7:21-cv-00272 |
| THE STATE OF MISSOURI; THE STATE OF TEXAS,<br><br>                 Plaintiffs,<br><br>     v.<br><br>JOSEPH R. BIDEN, in his official capacity as President of the United States, *et al.*,<br><br>                 Defendants. | Civil Action No. 7:21-cv-00420 (formerly No. 6:21-cv-00052) |

**TABLE OF CONTENTS**

INTRODUCTION. ...................................................................................................... 1

ARGUMENT. .......................................................................................................... 1

    I.      The States Lack Standing Under *Enforcement Priorities*. ............................................. 1

    II.     "Special Solicitude" Does Not Provide the States with Standing. ................................. 6

    III.    The States Lack a Cause of Action to Assert their Statutory
          and Constitutional Claims. ............................................................................... 7

    IV.    DHS is Lawfully Spending its Barrier System Funds. ................................................ 9

    V.      The Court Should Reject The States' Request for Prohibitory and Mandatory
          Injunctions. ................................................................................................... 11

    VI.    The Absence of a Mandate Rases Potential Jurisdicitonal Issues. ............................... 16

CONCLUSION ........................................................................................................ 16

# TABLE OF AUTHORITIES

**Cases**

*Arbaugh v. Y&H Corp.*,
    546 U.S. 500 (2006) ................................................................................................ 4

*Bennett v. Spear*,
    520 U.S. 154 (1997) ................................................................................................ 8

*Biden v. Nebraska*,
    143 S. Ct. 2355 (2023) ........................................................................................... 6

*California v. Texas*,
    141 S. Ct. 2104 (2021) ........................................................................................... 6

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................................................ 3

*Daves v. Dallas Cnty.*,
    22 F.4th 522 (5th Cir. 2022) ................................................................................ 14

*Florida v. Mellon*,
    273 U.S. 12 (1927) .................................................................................................. 5

*Gahagan v. USCIS*,
    911 F.3d 298 (5th Cir. 2018) ................................................................................. 3

*General Land Office v. Biden*,
    71 F.4th 264 (5th Cir. 2023) ............................................................................ 3, 14

*Haaland v. Brackeen*,
    143 S. Ct. 1609 (2023) ........................................................................................... 6

*Harris v. Wilters*,
    596 F.2d 678 (5th Cir. 1979) ............................................................................... 14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014) ................................................................................................ 8

*Lincoln v. Vigil*,
    508 U.S. 182 (1993) ..................................................................................... 5, 6, 7, 8

*Louisiana ex rel. Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*,
    70 F.4th 872 (5th Cir. 2023) ............................................................................. 6, 7

*Massachusetts v. EPA*,
    549 U.S. 497 (2007) ............................................................................................ 6, 7

*Massachusetts v. Laird*,
  400 U.S. 886 (1970) ............................................................................................... 5

*Nielsen v. Preap*,
  139 S. Ct. 954 (2019) ........................................................................................... 11

*Tenth St. Residential Ass'n v. City of Dallas*,
  968 F.3d 492 (5th Cir. 2020) ............................................................................... 12

*Texas General Land Office v. Biden*,
  619 F. Supp. 3d 673 (S.D. Tex. 2022) .................................................................. 9

*Texas v. Biden* ("*MPP*"),
  20 F.4th 928 (5th Cir. 2021),
  *rev'd and remanded*, 597 U.S. 785 (2022) ..................................................... 4, 5, 8

*Texas v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
  No. 6:23-CV-00013, 2023 WL 7116844 (S.D. Tex. Oct. 27, 2023) ..................... 15

*United States v. Jackson*,
  549 F.3d 963 (5th Cir. 2008) ............................................................................... 16

*United States v. Texas* ("*Enforcement Priorities*"),
  599 U.S. 670 (2023) .................................................................................... *passim*

**Statutes**

Secure Fence Act of 2006, Pub. L. No. 109-367 ...................................................... 13

DHS Appropriations Act, 2018, Pub. L. No. 115-141 ............................................... 13

Pub L. No. 116-93, 133 Stat. 2317 (2020) ...................................................... 9, 10, 11

Pub L. No. 116-260, 134 Stat. 1182 (2021) .............................................................. 11

**Rules**

Fed. R. App. P. 36, 41 .............................................................................................. 16

**Legislative Materials**

S. Rep. No. 116-125 (2019) ...................................................................................... 10

**Regulations**

Proclamation No. 10142, 86 Fed. Reg. 7225 (Jan. 20, 2021) ............................. 12, 13

iv

## INTRODUCTION

Defendants submit this supplemental brief to respond to the issues discussed at the status conference held on November 29, 2023.  For the reasons set forth below, as well as in Defendants' prior filings (ECF Nos. 96, 107, 110), the States' motion for preliminary injunction should be denied.

## ARGUMENT

### I.     The States Lack Standing Under *Enforcement Priorities*.

The Supreme Court's decision in *United States v. Texas* ("*Enforcement Priorities*"), 599 U.S. 670 (2023), governs the standing analysis is this case.

In *Enforcement Priorities*, the States argued that DHS's arrest policies did not comply with statutory detention mandates.  *Id.* at 676.  Here, the States similarly contend that DHS's spending policies for border barrier system do not comply with statutory appropriations mandates.  *See* States' Mot. for Prelim. Inj. at 24 (ECF No. 19).  To support standing in *Enforcement Priorities*, the States argued that DHS's "failure to comply with those statutory mandates imposes costs on the States" because they "must continue to incarcerate or supply social services such as healthcare and education to noncitizens who should be (but are not being) arrested by the Federal Government."  *Enforcement Priorities*, 599 U.S. at 674.  The States assert the same standing theory in this case, arguing that "[t]he harms suffered by the States include increased expenditures for processing driver's license requests and for providing educational and healthcare services to illegal aliens who would not be present in the States but for DHS's failure to build border barriers."  States' Supp. PI Brief at 4 (ECF No. 101).  In both cases, the States presented nearly identical evidence from the same declarants to support their indirect social services costs.  *Compare* Decl. of Leonardo Lopez *and* Decl. of Lisa Kalakanis (ECF No. 19,

App. 142-45 & 154-59) *with* Decl. of Leonardo Lopez *and* Decl. of Lisa Kalakanis (ECF No. 115-7 & 8 in Case No. 6:21-cv-0016 (S.D. Tex.)).

The Supreme Court held the States lacked standing in *Enforcement Priorities*, and this Court should reach the same conclusion here. *See* Defs.' Supp. PI Brief at 13-23 (ECF No. 96). *Enforcement Priorities* teaches that States cannot base standing on the theory that a change in federal immigration policy allegedly causes a downstream increase in a State's population, which in turn causes indirect changes in the State's expenditures for driver's licenses, education, or healthcare. 599 U.S. at 680 n.3. This rule applies with particular force in this case, where DHS's barrier system expenditures do not directly regulate the States or "exercise coercive power" over them. *See id.* at 678. The Supreme Court explained that "in our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending," and that when "a federal law has produced only those kinds of indirect effects, the State's claim for standing can become more attenuated." *Id*. at 680 n.3. As was true in *Enforcement Priorities*, "none of the various theories of standing asserted by the States in this case overcomes the fundamental Article III problem with this lawsuit." *Id.*

*Enforcement Priorities* also emphasized that courts must consider "history and tradition" as "a meaningful guide to the types of cases that Article III empowers federal courts to consider." *Id.* at 676-77. The States have not identified any "precedent, history, or tradition of courts ordering the Executive Branch to" spend federal appropriations in ways that would avoid indirect costs to the States. *Id.* at 677. "A telling indication of the severe constitutional problem with the States' assertion of standing to bring this lawsuit is the lack of historical precedent supporting it." *Id.* (quotation omitted).

Separation-of-powers concerns are particularly forceful in the appropriations context where Congress, not the courts, controls the power of the purse and exercises primary oversight over federal spending.  Finding standing whenever Executive spending policies might impose downstream costs to States would allow any State to challenge how agencies spend their funds, and improperly draw courts into generalized policy grievances between the States and Federal Government.  "The law of Article III standing, which is built on separation-of-powers principles, serves to prevent the judicial process from being used to usurp the powers of the political branches" in this manner.  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013).  These "considerations help explain why federal courts have not traditionally entertained lawsuits of this kind."  *Enforcement Priorities*, 599 U.S. at 681.

The States' attempts to distinguish *Enforcement Priorities* are unavailing.  *See* States' Supp. Brief at 4-7 (ECF No. 120).  The States continue to cling to the Fifth Circuit's injury-in-fact analysis in *General Land Office v. Biden*, 71 F.4th 264 (5th Cir. 2023), but that analysis is irreconcilable with the way *Enforcement Priorities* resolved the same indirect injury theory asserted in this case.  *See Gahagan v. USCIS*, 911 F.3d 298, 302 (5th Cir. 2018) ("Fifth Circuit precedent is implicitly overruled if a subsequent Supreme Court opinion establishes a rule of law inconsistent with that precedent.") (quotation omitted).  The Fifth Circuit stated that the States have "alleged that if border wall construction does not proceed, the State will incur unrecoverable costs in issuing driver's licenses, providing education, and administering healthcare to illegal aliens who would not otherwise be in the State."  *General Land Office*, 74 F.4th at 272.  As explained above, the Supreme Court rejected the same standing argument in *Enforcement Priorities*.  *See* 599 U.S. at 674.  The Fifth Circuit also remarked that such indirect injuries "are readily cognizable and well-established in this court's precedents."  *General Land*

*Office*, 74 F.4th at 272.  But those precedents have been superseded by *Enforcement Priorities*, which expressly held that the States' indirect costs allegedly traceable to federal immigration enforcement policy were not a "legally and judicially cognizable" injury "traditionally redressable in federal court."  599 U.S. at 676.

The same reasoning from *Enforcement Priorities* also undercuts the States' continued reliance on the Fifth Circuit's standing discussion in the Migrant Protection Protocols case.  *See Texas v. Biden*, 20 F.4th 928, 966-75 (5th Cir. 2021), *rev'd and remanded*, 597 U.S. 785, (2022) (*MPP*).  In *MPP*, the Fifth Circuit held that the States had standing based on findings that migrants "who would have otherwise been" returned to Mexico were being "released or paroled into the United States, thereby "caus[ing] the States financial harm by way of driver's license applications" and "healthcare costs."  *Id.* at 968-71.  *Enforcement Priorities*, however, rejected that theory of harm, concluding that such "attenuated" and "indirect" financial costs allegedly attributed to changes in federal immigration policy are not judicially cognizable injuries.  599 U.S. at 680 n.3.

The Supreme Court's decision in *MPP* also cannot help the States.  The Supreme Court's silence on the standing issue does not establish that the States have standing here.  *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 511 (2006) (explaining that "drive-by jurisdictional rulings . . . should be accorded no precedential effect") (internal quotations omitted).  Contrary to the State's argument, there was no "standing analysis" in the Supreme Court's *MPP* decision.  States' Supp. Brief at 7.  The Supreme Court simply noted that policies "governing the continued detention of noncitizens . . .  might raise a different standing question" than the issue presented in *Enforcement Priorities*.  599 U.S. at 683 (*Cf.* citation to *MPP*).  This case, like *Enforcement Priorities*, "does not concern a detention policy," thus *MPP* is inapposite.  *Id.*

The indirect costs the States assert here are even more speculative and attenuated than *Enforcement Priorities* or *MPP*. In both of those cases, migrants were either already residing in the United States or were subject to processing pursuant to federal immigration law. But here, the speculation is not only about whether future migrants outside the country will one day avail themselves of public services, but also about whether DHS's use of its funds in a different manner would reduce the States' social services costs, particularly given the numerous variables that impact immigration. Those added layers of speculation further attenuate the State's basis for standing.

The Court also should reject the States' exceptionally narrow reading of *Enforcement Priorities* as having no application outside of challenges to Executive arrest policies. The States invoke rhetoric similar to Justice Alito's solo dissent, but dissenting opinions do not restrict the scope of binding precedent. *See* Defs.' Supp. PI Brief at 19 n.3. *Enforcement Priorities* followed a long line of Supreme Court decisions holding that States lack standing when they are not directly regulated by the challenged policy and allegations of downstream costs are thus "attenuated" and "indirect." *See* 599 U.S. at 680 n.3 (citing *Massachusetts v. Laird*, 400 U.S. 886 (1970); *Florida v. Mellon*, 273 U.S. 12, 16-18 (1927)). The Supreme Court drew on prior precedent that did not involve arrest policies, including a case involving the appropriations context, *see* 599 U.S. at 680 (citing *Lincoln v. Vigil*, 508 U.S. 182, 190-92 (1993), and its reasoning applies to cases like this one where State standing is premised on indirect costs attributable to federal spending policy.

Applying the reasoning of *Enforcement Priorities* to this case is straightforward, as the appropriations context implicates the same justiciability concerns identified by *Enforcement Priorities*. There is no "precedent, history, or tradition" of courts entertaining lawsuits based on

attenuated theories of harm to State budgets allegedly caused by the Executive's expenditure of its own appropriations. *Enforcement Priorities*, 599 U.S. at 677. The States' lawsuit "run[s] up against the Executive's Article II authority" to decide how to spend and allocate its own funds. *Id.* at 678. This case also involves the same factors that the Supreme Court held have traditionally weighed against finding such injuries cognizable. *Id.* at 679-80. "[I]nevitable resource constraints and regularly changing public-safety and public-welfare needs[]" require the Executive Branch to "balance many factors" when choosing among lawful appropriations expenditures. *Id.* at 680. Courts accordingly lack "meaningful standards for assessing" the Executive Branch's discretionary spending decisions, which are not ordinarily subject to judicial review. *Id.* at 679-80 (citing *Lincoln*, 508 U.S. at 190-92). The States' "novel standing argument, if accepted, would entail expansive judicial direction" of federal spending priorities and would take courts down an "uncharted path" of reviewing discretionary spending decisions. *Id.* at 681. By concluding that the States lack standing in this case, the Court would "abide by and reinforce the proper role of the Federal Judiciary under Article III." *Id.*

## II.  "Special Solicitude" Does Not Provide the States with Standing.

The States cannot overcome these standing deficiencies by invoking "special solicitude" from *Massachusetts v. EPA*, 549 U.S. 497, 520 (2007). As the Fifth Circuit recently explained, special solicitude "is not a standing shortcut when standing is otherwise lacking," nor "does it absolve States from substantiating a cognizable injury[.]" *Louisiana ex rel. Dep't of Wildlife & Fisheries v. Nat'l Oceanic & Atmospheric Admin.*, 70 F.4th 872, 882 (5th Cir. 2023). Further, the Supreme Court has required States in recent cases to establish the same Article III standing as nonstate litigants, with no mention of special solicitude. *See, e.g., Biden v. Nebraska*, 143 S. Ct. 2355 (2023); *Haaland v. Brackeen*, 143 S. Ct. 1609, 1640 (2023); *California v. Texas*, 141 S. Ct. 2104, 2116-20 (2021).

6

*Enforcement Priorities* confirms that special solicitude does not apply to this case.  The Supreme Court highlighted that *Massachusetts* "involved a challenge to the denial of a statutorily authorized petition for rulemaking," and its standing analysis "d[id] not control" where the States challenged "an exercise of the Executive's enforcement discretion," which is not typically subject to judicial review.  *Enforcement Priorities*, 599 U.S. at 685 n.6.  The same is true here. The States do not sue over denial of a rulemaking petition and instead challenge DHS's expenditures of a lump sum appropriation, which the Supreme Court also has found committed to agency discretion.  *See id.* at 680 (citing *Lincoln*, 508 U.S. at 190-92).  As Justice Gorsuch cautioned, special solicitude has not played "a meaningful role in this Court's decisions in the years since" *Massachusetts* and "lower courts should just leave that idea on the shelf in future ones."  *Enforcement Priorities*, 599 U.S. at 688-89 (Gorsuch, J., concurring in the judgment).

Even in cases where the Fifth Circuit has applied special solicitude, it "merely changes the normal standards for redressability and immediacy."  *Louisiana ex rel. Dep't of Wildlife & Fisheries*, 70 F.4th at 882 (quotation omitted).  Neither the Supreme Court nor Fifth Circuit "has held that it alters the requirements that the injury must be concrete and particularized."  *Id.* Special solicitude therefore cannot help the States in this case, where the fundamental flaw is the States' reliance on attenuated social services costs that are not judicially cognizable or consistent with "bedrock Article III constraints."  *Enforcement Priorities*, 599 U.S. at 676, 680 n.3.[1]

## III.   The States Lack a Cause of Action to Assert their Statutory and Constitutional Claims.

The States confirm that they bring their statutory and constitutional claims under the Administrative Procedure Act's (APA) cause of action.  *See* States' Supp. Brief at 10-11.  The

---

[1] The States concede they are not asserting *parens patriae* standing, so they also do not receive special solicitude in purporting to protect their citizens' welfare.  *See* States' Supp. Brief at 10.

APA's cause of action is not available, however, unless the States' asserted interests arguably "fall within the zone of interests protected by the law invoked." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 129-30 (2014) (quotation omitted). Here, the States' financial interests in minimizing the costs of providing social services are not within the zone of interests protected by DHS's barrier system appropriations, the Impoundment Control Act, or the Constitution. *See* Defs.' Supp. PI Brief at 32-39, 46-50.

The Fifth Circuit's *MPP* decision does not support the States' position on zone of interests. The Fifth Circuit focused solely on whether the States "fall within the zone of interests of the INA." *MPP*, 20 F.4th at 975. The Fifth Circuit thus had no occasion to address whether the State's indirect social services costs are protected by the statutes at issue here. *See Bennett v. Spear*, 520 U.S. 154, 175-76 (1997) (holding that that zone of interests is determined "by reference to the particular provision of law upon which the plaintiff relies").

Additionally, the States lack a cause of action under the APA because the challenged spending decisions are committed to agency discretion. In *Lincoln v. Vigil*, the Supreme Court held that an agency's expenditures from a "lump sum appropriation" is a "decision traditionally regarded as committed to agency discretion." 508 U.S. at 192. Defendants have previously explained why *Lincoln* and its progeny warrant the same conclusion in this case. Defs.' Supp. PI Brief at 27-32. Although the Fifth Circuit held in *MPP* that DHS's termination of that policy was not committed to agency discretion by law, it expressly distinguished *Lincoln* as involving "the discretionary allocation of funds." *MPP*, 20 F.4th at 986. This case, like *Lincoln*, involves discretionary spending decisions and is not covered by the Fifth Circuit's *MPP* decision.

Defendants also dispute that the States may assert their constitutional claims through an equitable cause of action when the APA's cause of action is available. *See* States' Supp. Brief at

11-12.  Judge Alvarez rejected the same argument at an earlier stage of this case and this Court should follow that same approach.  *See Texas General Land Office v. Biden*, 619 F. Supp. 3d 673, 701-02 (S.D. Tex. 2022) (dismissing non-statutory causes of action because "the APA furnishes Plaintiffs with an adequate and meaningful cause of action").  In any event, whether asserted through the APA or a non-statutory cause of action, the States' constitutional claims fail.  *See* Defs.' Supp. PI Brief at 46-50.

## IV.   DHS is Lawfully Spending its Barrier System Funds.

DHS is lawfully expending its fiscal 2020 and 2021 barrier system funds consistent with its appropriations statutes.  DHS's decision to build gap-filling barriers, undertake remediation work that, among other things, protects the structural integrity of existing barriers and enhances the safety of Border Patrol agents, and complete the barrier system by installing system attributes is well within the scope of authority Congress provided to spend funds for "border barrier system."  *See id.* at 39-53.  Neither of the two statutory provisions that the parties discussed during the status conference alters that conclusion.

The States argue that DHS cannot use the "barrier system" appropriation in section 209(a)(1) for system attributes (*e.g.*, cameras, detection sensors, lighting), which enhance safety for Border Patrol agents, increase the barriers' efficacy, and alert DHS to possible breaches of the physical barrier, reasoning that section 209(a)(2) appropriates separate funding for "border security technologies."  DHS Appropriations Act, 2020, Pub L. No. 116-93, Div. D, § 209 (2019).  But the text of the appropriation, its legislative history, and DHS's budget request to Congress all show that Congress appropriated funds for barrier attributes as part of the barrier system appropriation, while the separate border security technologies appropriation addresses technology unrelated to barrier system.  When DHS submitted its budget request to Congress for fiscal year 2020, it requested separate funding streams for "border barrier system" and other

border security technologies.  *See* DHS Fiscal Year 2020 Congressional Budget Justification for CBP's Procurement, Construction, and Improvements Appropriation at 19-24 (Exhibit 1).  For "border barrier system," DHS explained that funding would pay for "a combination of various types of infrastructure such as an internally hardened steel-bollard barrier, all-weather roads, lighting, enforcement cameras and other related technology."  *Id.* at 23.  DHS also requested separate funding for border security technologies unconnected to the barrier system, such as detection towers and mobile surveillance systems.  *Id.* at 19-20, 29, 36.

The Senate Appropriations Committee's report in response to DHS's funding request adopted this distinction between the two funding sources.  *See* S. Rep. No. 116-125 at 44 (2019). The report stated that "physical barrier[s]" are but "one component of a border security system," and that an effective system should incorporate other elements—such as "appropriate sensor technology, including fiber optics and camera systems[]"—"with[in] the barrier system."  *Id.* at 44.  In a different section of the report titled "Border Security Technology," the Committee explained the need to allocate funding for technology separate from the barrier system, such as "innovative tower technology" and "mobile surveillance" capabilities.  *Id.* at 44-45.

When Congress enacted the fiscal year 2020 DHS Appropriations Act, it included this distinction between funding for "barrier system" in section 209(a)(1) and "border security technologies" in section 209(a)(2).  Pub L. No. 116-93, Div. D, § 209.  Congress also adopted the same funding structure in the fiscal year 2021 DHS Appropriations Act, with separate allocations for barrier system and border security technology.  *See* DHS Appropriations Act, 2021, Pub L. No. 116-260, Div. F, § 209-10.

Given this history and the shared understanding between the Executive and Congress about the meaning of the appropriations statutes, there is no basis for the Court to adopt the

States' contrary interpretation that would prevent DHS from funding attributes with its barrier system appropriations. Further, as explained previously, the phrase "construction of barrier system" is broad enough to cover not only physical barriers but also the technological and physical infrastructure necessary to make those barriers safe and effective. *See* Defs.' Supp. PI Brief at 44-46. By contrast, the States' narrow reading would render the "system" language meaningless, thereby "flout[ing] the interpretive canon against surplusage[.]" *Nielsen v. Preap*, 139 S. Ct. 954, 969 (2019).

The States also incorrectly seek to limit the scope of DHS's barrier system appropriation by pointing to the requirement in section 209(b)(1) of the fiscal year 2020 appropriation, which states that funding "shall only be available for barrier systems" that use "operationally effective designs . . . such as currently deployed steel bollard designs, that prioritize agent safety." Pub L. No. 116-93, Div. D, § 209(b)(1).[2] This provision details the design of the kinds of physical barriers that a barrier system should include; it does not mean that DHS is restricted to spending its barrier system appropriations solely on physical barriers, without regard for such necessary components as lights, patrol roads, cameras, or other detection technology that is part of the barrier system. To the contrary, the statute reaffirms that funding is "available for barrier systems" as a whole. Nothing in this provision prohibits DHS from spending funds on other important elements of the barrier system.

## V. The Court Should Reject the States' Request for Prohibitory and Mandatory Injunctions.

The States have not carried their burden of establishing a legal or factual basis for an injunction that "forbids Defendants from implementing the January 20 Proclamation." States'

---

[2] This design limitation was not included in the fiscal year 2021 DHS appropriations act.

Supp. Brief at 16.  The Court has no authority to enjoin the President, nor may it enjoin the actions of non-party federal agencies referenced in the President's Proclamation whose actions are not challenged here.  *See* Defs.' Supp PI Brief at 61.  As relevant to the DHS defendants in this case, the Proclamation simply required DHS to prepare a plan "providing for the expenditure of any funds that the Congress expressly appropriated for wall construction, consistent with their appropriated purpose," and then directed DHS to "implement the plan."  *See* Proclamation No. 10142, 86 Fed. Reg. 7225, 7226 (Jan. 20, 2021).  That work is finished.  DHS issued its Border Wall Plan in June 2021 and a subsequent amendment in July 2022.  *See* Defs.' Supp PI Brief at 7-11.  In light of DHS's completion of its border wall plan, the States request to "enjoin[] implementation of the January 20 Proclamation" would accomplish nothing, let alone remedy the States' indirect social services costs.  States' Supp. Brief at 13; *see Tenth St. Residential Ass'n v. City of Dallas, Texas*, 968 F.3d 492, 503 (5th Cir. 2020) (finding no standing where requested injunction would not redress the plaintiff's injury).

The States also misunderstand the important distinction in the Proclamation between "diverted" military funds and "direct appropriations."  *See* States' Supp. Brief at 14 & n.2.  This case does not challenge any actions to "redirect" military funds that the prior Administration "diverted" to border barrier construction.  86 Fed. Reg. 7225-76.  Contrary to the States' characterization, DHS has not diverted any of its funds away from barrier system projects.  To the contrary, DHS has acted consistent with the Proclamation's uncontroversial direction to spend funds "that the Congress expressly appropriated for wall construction, consistent with their appropriated purpose."  *Id.* at 7226.  Nothing in the Proclamation impedes the expenditure of those appropriations in the manner Congress directed.

12

To the extent the States seek an injunction prohibiting DHS from executing its amended Border Wall Plan, separate from the Proclamation, that request runs headlong into the same redressability problems identified by Justice Gorsuch in his concurring opinion in *Enforcement Priorities*. *See* Defs.' Supp. PI Brief at 26-27. Even if the Court enjoined the plan, such an order would do "nothing to change the fact that federal officials possess the same underlying . . . discretion" to spend appropriated funds on the barrier system projects they deem appropriate. *Enforcement Priorities*, 599 U.S. at 691 (Gorsuch, J., concurring in the judgment). Nor would "such a decree require federal officials to change how they exercise that discretion in the [plan's] absence." *Id.*

The States argue this case differs from *Enforcement Priorities* because DHS does not have "discretion on the question whether to build new physical barriers." States' Supp. Brief at 13. Not so. In the appropriations act at issue here, Congress did not mandate construction of new physical barriers in unfenced locations on the southern border. Congress knows how to require the construction of barrier in specific locations. *See* Secure Fence Act of 2006, Pub. L. No. 109-367, § 3. Congress also has specified when funding is available only for a specific geographic location or type of barrier. *See* DHS Appropriations Act, 2018, Pub. L. No. 115-141, Div. F, § 230. Congress did not do that in either the fiscal year 2020 or 2021 appropriations, which make funds available for "barrier system along the southwest border." The appropriations therefore provide DHS with discretion to allocate funds to a wide array of projects that benefit the system as a whole. As explained previously, DHS is spending its funds lawfully on installation of new barrier segments, completing the barrier system through the installation of system attributes, and remediation work that ensures the safety and efficacy of existing barriers. *See* Defs.' Supp. PI Brief at 10-11, 41-43; Fifth Declaration of Paul Enriquez (ECF No. 110).

13

The States also have not carried their heavy burden for a mandatory preliminary injunction. *See Harris v. Wilters*, 596 F.2d 678, 680 (5th Cir. 1979) ("Only in rare instances is the issuance of a mandatory preliminary injunction proper."). The States ask the Court to re-write the appropriations acts via a mandatory injunction to require DHS to spend its appropriations "only" for the construction of "new barrier systems" that "include actual physical barrier" and "not just repair old ones." States' Supp. Brief at 16. The States never explain how they arrive at this strained construction of the statutory text. The inclusion of the word "system" is an expanding modifier to "barrier"; it does not limit DHS to building only new barrier fencing or restrict DHS from undertaking projects to improve the safety and effectiveness of existing structures, or complete barrier system through the installation of attributes in locations where physical barrier has already been constructed. Additionally, Congress's use of "shall be available only" in the capstone to section 209(a) merely directs DHS to allocate specific portions of its overall appropriation for "Procurement, Construction, and Improvements" to the items enumerated in the subjections (1-5), including border barrier system, to the exclusion of items that are not specifically listed. That statutory language does not speak to *how* DHS should spend its lump sum appropriation for barrier system construction.

Although the Fifth Circuit found that that the States' "allegations are sufficient to show redressability at [the pleading] stage of litigation," *General Land Office*, 74 F.4th at 273, this case is no longer at the pleading stage. The States have not presented sufficient evidence to make "a clear showing that they have standing to maintain the preliminary injunction." *Daves v. Dallas Cnty.,* 22 F.4th 522, 542 (5th Cir. 2022) (citation and quotation omitted). The States' evidence at most shows that migrants coming to the United States sought various social services, but they have not established causal connection between those expenses and DHS's barrier

system expenditures, nor presented specific evidence that a different use of the appropriations at issue will reduce their costs in light of the many other variables that impact immigration. The States concede that DHS has discretion to choose where along the southern border it may construct new barriers, *see* State' Supp. Brief at 16, but they fail to present evidence establishing how new barriers in California or New Mexico would reduce education costs in Missouri or healthcare expenses in Texas. It is not sufficient for the States to speculate that someone might cross an unfenced section of the border in California and then one day apply for a driver's license in Kansas City or Houston. This Court recently rejected a similar speculative statistical argument in denying a preliminary to Texas in the handgun brace case. *See Texas v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, No. 6:23-CV-00013, 2023 WL 7116844, at *8-9 (S.D. Tex. Oct. 27, 2023).

The States proposed mandatory injunction also would harm the federal government and the public. *See* Defs.' Supp. PI Brief at 56-64. DHS should not be prohibited from using its only available source of funding to improve the safety and effectiveness of existing barriers, or enhance border security through the installation of system attributes. In managing hundreds of miles of existing infrastructure susceptible to impacts ranging from floods to breaching activity, DHS should not be prevented from spending funds to address inevitable problems that will arise by an injunction that allows only "new barrier systems." Nor should DHS be required to return to this Court to seek clarification about permissible expenditures under pain of contempt from a vague injunction that purports to specify the only expenditures DHS is allowed to undertake. For example, the States offer no clarity about whether their proposed injunction would apply to funds DHS has already obligated, thus potentially requiring termination of existing contracts and closure of ongoing worksites, or only to remaining unobligated funds. Defendants should not

have to guess how to comply with a vague injunction that would cause significant disruption to ongoing and planned work that furthers public safety and border security.  *See generally* Third & Fifth Enriquez Declarations (ECF Nos. 96-2, 110).

## VI.     The Absence of a Mandate Raises Potential Jurisdictional Issues.

Finally, Defendants note a potential jurisdictional problem identified by the States in their objection to consolidating the preliminary injunction and the merits.  *See* ECF No. 118.  As the States observed, the Fifth Circuit does not appear to have issued a mandate or judgment reversing Judge Alvarez's final order dismissing Texas and Missouri's claims in their entirety. *See* Fed. R. App. P. 36, 41.  Although the Fifth Circuit's opinion instructed the Court to consider the States' motion for preliminary injunction, the absence of a mandate or judgment reversing the final order of dismissal and returning jurisdiction to this Court creates uncertainty about whether the Court has jurisdiction to grant relief to the States, other than potentially issuing an indicative ruling pursuant to Federal Rule of Civil Procedure 62.1.  *Cf. United States v. Jackson,* 549 F.3d 963, 980 (5th Cir. 2008) (concluding that "the original district court judgment remained in effect" even after a panel opinion remanded with instructions "[b]ecause the mandate had not yet issued").  Defendants would not object to the States seeking appropriate clarification from the Fifth Circuit on these issues.

## <u>CONCLUSION</u>

For these reasons, the States' motion for preliminary injunction should be denied.


Dated:  December 15, 2023                              Respectfully submitted,

                                                       BRIAN M. BOYNTON
                                                       Principal Deputy Assistant Attorney General

                                                       ALEXANDER K. HAAS
                                                       Director, Federal Programs Branch

*/s/ Andrew I. Warden[3]*
ANDREW I. WARDEN (IN Bar #23840-49)
Senior Trial Counsel
MICHAEL J. GERARDI
(D.C. Bar #1017949)
Trial Attorney / Attorney-in-Charge
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW, No. 7506
Washington, D.C. 20005
Tel: (202) 616-5084
Fax: (202) 616-8470
E-mail: Andrew.Warden@usdoj.gov

## CERTIFICATE OF WORD COUNT

I certify that the total number of words in this opposition brief, exclusive of the matters designated for omission by the Court's rules, is 4982, as counted by Microsoft Word.

*/s/ Andrew I. Warden*
ANDREW I. WARDEN

## CERTIFICATE OF SERVICE

I hereby certify that on December 15, 2023, I electronically filed a copy of the foregoing opposition memorandum. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

*/s/ Andrew I. Warden*
ANDREW I. WARDEN

---

[3] Signed with permission of the attorney-in-charge in accordance with Local Rule 11.3.