# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

|  |  |
|---|---|
| THE STATE OF MISSOURI; THE STATE OF TEXAS,<br><br>          Plaintiffs,<br><br>     v.<br><br>JOSEPH R. BIDEN, in his official capacity as President of the United States, *et al.*<br><br>          Defendants. | No. 7:21-cv-00420<br>(formerly No. 6:21-cv-00052) |
| THE GENERAL LAND OFFICE OF THE STATE OF TEXAS, and DAWN BUCKINGHAM, M.D., in her official capacity as Commissioner of the Texas General Land Office,<br><br>          Plaintiffs,<br><br>     v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; and ALEJANDRO MAYORKAS, in his official capacity as Secretary of the Department of Homeland Security,<br><br>          Defendants. | No. 7:21-cv-00272 |

**PLAINTIFFS' SUPPLEMENTAL REPLY BRIEF IN RESPONSE TO ADDITIONAL QUESTIONS PRESENTED BY THE COURT**

1

## INTRODUCTION

Up against the Fifth Circuit's holding that Plaintiffs have standing, Defendants tout the Supreme Court's *Enforcement Priorities* decision—actually, just one footnote in that decision—in their effort to circumvent Plaintiffs' standing. Yet the Supreme Court said its decision "is narrow and simply maintains the longstanding jurisprudential status quo." *United States v. Texas* ("*Enforcement Priorities*"), 599 U.S. 670, 686 (2023).

No better are Defendants' other arguments. Defendants contend Plaintiffs' claims fall outside APA's "zone of interest" and that the Federal Government's use of the funds is committed to agency discretion and thus beyond review. But the zone-of-interest test "is not meant to be especially demanding." And Congress *restricted* Defendants' discretion as the funds must be used to "construct" "barrier systems" and must be used "only" for that purpose. Indeed, while Defendants try to use funds for other purposes—cameras, sensor technology, and anything *other* than actual barriers—Congress's appropriations language in fact created separate categories of funding for those other things.

So, to avoid injunctive relief, Defendants resort to their 2020 budget request to Congress. But even that request—which does not overcome plain statutory language—is clear that actual barriers are the central feature of "barrier systems." The budget request, for example, measures progress in "miles" of physical barriers, not number of cameras.

It is only by repeatedly disregarding the express statutory constraints that Defendants argue that mandatory injunctive relief is inappropriate.  But Plaintiffs simply ask this Court (in addition to seeking a prohibitive injunction) to compel Defendants to do what the plain text says they must do: construct new barrier systems, to include actual physical barriers, and use funds "only" for this purpose.  That injunction still permits Defendants to take other actions, such as land acquisition, that facilitate the central purpose of this project: constructing actual physical barriers and making them operational.

Finally, the Court should reject Defendants' suggestion that the Court delay further and await "clarification" from the Fifth Circuit.  The Fifth Circuit's decision—already six months old now—is clear that this Court should expeditiously rule on the preliminary injunction motion.

## I.  The Supreme Court's 2023 *United States v. Texas* decision does not overturn the Fifth Circuit's holding that the States have standing.

Before the Fifth Circuit, Defendants did not contest that the States establish injury in fact.  *General Land Office v. Biden*, 71 F.4th 264, 272 (5th Cir. 2023) ("Injury in fact is not at issue.").  But now they assert the opposite, claiming that a lack of injury in fact is a "fundamental flaw" in Plaintiffs' case.  Defs.' Br., ECF 124 at 7.  Defendants were right not to contest injury in fact the first time.  Their only support for their new contention is the single footnote in *Enforcement Priorities*.  *Id.* at 2.  But far from rejecting long-established doctrine on standing, *Enforcement Priorities* broke no new ground and did not overrule the Fifth Circuit's detailed standing analysis.

3

Defendants ignore the many statements in *Enforcement Priorities* stressing that the decision was narrow.  The Court was clear that the case concerned "both a highly unusual provision of federal law and a highly unusual lawsuit," *id*. at 684, and stressed that its decision "raises only the narrow Article III standing question of whether the Federal Judiciary may in effect order the Executive Branch to take enforcement actions against violators of federal law—here, by making more arrests"—a "discrete standing question" that "rarely arises," *id.* at 684–85.  And the Court noted its decision "is narrow and *simply maintains the longstanding jurisprudential status quo.*"  *Id.* at 686 (emphasis added).

Against this, Defendants rely on a single footnote—that when a State asserts "indirect effects on state revenues or state spending" and "only those kinds of indirect effects, the State's claim for standing can become more attenuated."  *Id.* at 680 n.3. But it is hardly controversial that establishing redressability and causation is more difficult when a plaintiff State asserts "only … indirect effects" rather than direct effects.  The Supreme Court so ruled 30 years ago.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992) (requiring plaintiffs to show that the decisions of third parties "will be made in such manner as to produce causation and permit redressability of injury").  So Defendants' footnote restates existing law, which the Fifth Circuit already applied. *General Land Office*, 71 F4th at 272–74 (citing *Lujan* four times).

Nor can Defendants deny that States often satisfy standing based on an established chain of indirect effects.  The Supreme Court's census case is illustrative. There, the Supreme Court permitted States to challenge a question on the census on

4

the theory that the question would cause private third parties not to fill out the census (a "violat[ion]" of "their legal duty to respond to the census"), causing a population undercount that would itself cause funding decreases. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2565–66 (2019). Though the theory of loss of funds was indirect, standing existed because an indirect loss of funds is a "predictable effect of Government action." *Id.*

Defendants are also wrong to assume that the States' standing is "indirect." One week after *Enforcement Priorities*, the Supreme Court determined that Missouri had standing to challenge a student-loan cancellation rule, and the Court described Missouri's harm as a "direct" injury. The Court noted that the rule would decrease revenue to a corporate student loan servicer, and because that public corporation used its profits to finance scholarships "at Missouri colleges and universities," financial harm to the loan servicer would inhibit Missouri's ability as a State to provide funding for higher education. *Biden v. Nebraska*, 143 S. Ct. 2355, 2366 (2023). Although there were several steps in the chain of causation—financial harm to a public corporation, reducing funding available for scholarships, thus impeding Missouri's ability to fund higher education—the Court described the challenged rule as imposing not just an injury to the corporate loan servicer, but also a "direct injury to Missouri itself." *Id.*

There is also nothing "indirect" about an unlawful policy that harms Texas's (and the country's) borders—borders that define the geographic area of the State (and country) itself. The Supreme Court has recognized a direct sovereign interest in "the

maintenance and recognition of borders." *Alfred L. Snapp & Son, Inc. v. Puerto Rico, ex rel., Barez*, 458 U.S. 592, 601 (1982).

Finally, the footnote on which Defendants rely undercuts their position. Far from announcing a new doctrine prohibiting standing any time a plaintiff asserts an "indirect injury theory," Defs.' Br., ECF 124 at 3, the footnote recognizes that States *can* establish standing through indirect-injury theories. The States in that case failed to do so because their theories did not "overcome[ ] the fundamental Article III problem with this lawsuit." *Enforcement Priorities*, 599 U.S. at 680 n.3. But the "fundamental" problem in *Enforcement Priorities* was that the suit sought to interfere with "the Executive Branch's traditional discretion over whether to take enforcement actions against violators of federal law." *Id.* at 684. That problem is not present here.

Refuting Defendants' contention that footnote 3 eliminates State standing in cases like these, the Supreme Court also made clear that States *can* establish standing when they challenge policies that "implicate more than simply the Executive's traditional enforcement discretion" "to make arrests or bring prosecutions." *Id.* at 682–83. For example, the Court noted that States can bring a challenge "[u]nder the Administrative Procedure Act" against an agency's "abdication of its statutory responsibilities." *Id.*

Here, this suit in no way seeks to interfere with traditional enforcement discretion "to make arrests or bring prosecutions," so *Enforcement Priorities* does not apply. Further, the Executive Branch has abdicated its statutory and constitutional responsibilities. The States, for example, allege a violation of the Take Care Clause

(Count II) and an abdication of the Federal Government's statutory responsibilities under the appropriations acts and the Impoundment Control Act (Counts III and VII). States' Compl., No. 21-420, ECF No. 1 at 23–29, 34–35. This case thus "implicate more than simply the Executive's traditional enforcement discretion" "to make arrests or bring prosecutions." *Id.* at 682–83; *see also E. Bay Sanctuary Covenant v. Biden*, No. 18-CV-06810-JST, 2023 WL 4729278, at *6 (N.D. Cal. July 25, 2023) (finding standing where "[t]he [immigration] Rule Plaintiffs challenge does not seem to implicate the Executive's exercise of enforcement discretion over whether to arrest or prosecute").

Defendants are thus wrong to contend that *Enforcement Priorities* creates a broad rule "that States cannot base standing on the theory that a change in federal immigration policy allegedly causes … indirect changes in the State's expenditures for driver's licenses, education, or healthcare." Defs.' Br., ECF 124 at 2.[1] The Supreme Court carefully cabined its decision.

And for good reason. The logic of Defendants' argument is that States can *never* challenge the federal government's abdication of immigration-related responsibilities. Defendants assert that Congress, if upset about an agency's

---

[1] Defendants also accuse Plaintiffs, without support, of failing to marshal "history and tradition" identifying cases just like this one. But this case is not about qualified immunity. And *Enforcement Priorities* expressly observed that "the Federal Judiciary of course routinely and appropriately decides justiciable cases involving statutory requirements or prohibitions on the Executive." *Enforcement Priorities* at 684; *see also id.* (collecting cases). Plaintiffs have repeatedly cited examples of federal courts finding standing to bring suits raising claims invoking federal immigration agency actions, congressional appropriations, and the Impound Control Act. *See, e.g.*, States' Reply, ECF 30 at 3–7, 27–34.

approach to immigration, can use "the power of the purse."  Defs.' Br., ECF 124 at 7. But Congress did that, and Defendants ignored Congress's express direction. *Enforcement Priorities* "should in no way be read to suggest or imply that the Executive possesses some freestanding or general constitutional authority to disregard statutes requiring or prohibiting executive action."  599 U.S. at 684. Defendants' sweeping reading of that decision does just that.

## II.  Binding Supreme Court and Fifth Circuit precedents establish that the States may rely on special solicitude as an alternative means for standing.

Plaintiffs demonstrated at length—and the Fifth Circuit held—that the States' may invoke special solicitude as an independently sufficient (but not necessary) basis for standing.  *See* Pls.' Br., ECF 120 at 8–10.

Rather than dispute facts raised by the States demonstrating special solicitude, Defendants argue that *Enforcement Priorities* narrowed the doctrine of special solicitude to only the facts of *Massachusetts v. EPA*.  Defs.' Br., ECF 124 at 7. Again, *Enforcement Priorities* does no such thing.  It does not alter standing doctrine. The majority was that clear that its decision "is narrow and *simply maintains the longstanding jurisprudential status quo*."  599 U.S. at 686 (emphasis added).  The "longstanding jurisprudential status quo" is that the States are "entitled to special solicitude in [the Supreme Court's] standing analysis."  *Massachusetts v. EPA*, 549 U.S. 497, 519 (2007).

Nor have the States "conceded" anything about *parens patriae* standing.  Defs.' Br., ECF 124 at 7 n.1.  Instead, the States merely note that *parens patriae* is a distinct

concept from standing to pursue a sovereign interest; thus, "the *parens patriae* doctrine does not apply with respect to that interest." Pls.' Br., ECF 120 at 10.

## III.    Plaintiffs' claims lie within the zone of interest.

Defendants dispute whether "the States" assert claims that lie within the APA's zone of interest, but never question whether the Government Land Office's claims lie within the zone of interest. *Compare* Pls.' Br., ECF 120 at 10–12 (arguing that the "APA provides a cause of action for each claim" and specifically citing claims by the States as well as claims by the GLO), *with* Defs.' Br., ECF 124 at 7–9 (mentioning only the States). Regardless, Defendants are incorrect about the States.

Citing many decisions, Plaintiffs previously provided substantial briefing on why they "easily fall within the zone of interests" of an appropriation "and are suitable challengers to enforce its obligations." *See* States' Reply Brief, ECF 30 at 27–34; *California v. Trump*, 963 F.3d 926, 943–44 (9th Cir. 2020). The zone of interest test "'is not meant to be especially demanding,'" and "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit.'" *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012) (quoting *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399 (1987)). Plaintiffs easily clear that standard here, and Defendants' attempt to rebrief that issue falls outside the scope of supplemental briefing that the Court invited during the November 29, 2023 hearing.

Citing *Lincoln v. Vigil*, 508 U.S. 182 (1993), Defendants also argue that Plaintiffs' cause of action must fail because they believe "the challenged spending decisions are committed to agency discretion." ECF 124 at 8. But *Lincoln* does not help Defendants. Pls.' Supp. Br., ECF 101 at 11–13. *Lincoln* confirmed the "basic presumption of judicial review" and stressed that agency action is "committed to agency discretion by law"—and thus unreviewable—only in "rare circumstances." *Lincoln*, 508 U.S. at 190–91. *Lincoln* involved a rare circumstance because Congress issued a lump-sum appropriation "without statutorily restricting what can be done with those funds." *Id.* at 192. There, "Congress never authorized or appropriated moneys expressly for the Program" that had been cancelled, so the agency had complete discretion about whether to fund the program. *Id.* at 186. Here, Congress appropriated funds for a program that Defendants then cancelled: the funds "shall only be available for barrier systems" along the southern border. FY 2020 Appropriations § 209(b). So Congress "statutorily restrict[ed] what can be done with those funds." This case is the opposite of *Lincoln*.

Finally, Defendants also "dispute" that Plaintiffs may bring an equitable cause of action. Defts.' Br., ECF 124 at 8–9. But they provide no legal support for that proposition. The prior decision that declined to consider equitable causes of action, *Texas General Land Office v. Biden*, 619 F. Supp. 3d 673, 701–02 (S.D. Tex. 2022), was reversed by the Fifth Circuit. *General Land Office*, 71 F.4th at 275. Plaintiffs have briefed the "long history of judicial review of illegal action" that the Constitution permits for suits in equity, even absent an express cause of action under the APA.

10

*Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320, 327–28 (2015); *see also* States' Reply, ECF 30 at 37–40; Pls.' Supp. Brief, ECF 101 at 39.

**IV.    Defendants continue to implement their unlawful, arbitrary and capricious agency action.**

Rather than focus on the plain language of the 2020 and 2021 appropriations, Defendants resort to "legislative history"—principally, language in DHS' FY2020 budget request. Defs.' Br., ECF 124 at 9. That fails for two reasons.

First, the plain text passed by Congress does not copy DHS' budget request. Rather, the text contradicts Defendants' suggestion that the funds of § 209(a)(1) can be exhausted on things *other* than barriers, like (as Defendants suggest) "sensor technology" and "camera systems." Defs.' Br., ECF 124 at 10. Section 209(a)(1) of the FY2020 bill, for example, reserves more than a billion dollars for "construction of barrier system along the southwest border," and § 209(b) states that "[t]he amount designated in subsection (a)(1) shall only be available for barrier systems." Congress then provides in subsections (a)(2) and (a)(3) *separate and distinct* categories of funds "for the acquisition and deployment of border security technologies and … infrastructure" and "for facility construction and improvements." These are *wholly distinct* categories from the amount in § 209(a)(1) that "shall be available only" for "the construction of barrier system along the southwest border." Defendants' argument asks the Court to read the distinctions of categories in § 209(a) as meaningless, despite Congress's use of specific, discrete appropriations categories of "border security technologies" and "facility construction." Their reading would make

one category ("construction of barrier system along the southwest border") subsume all others.

Second, the budget request undercuts Defendants' argument. Even though a "barrier system" may include things ancillary to a barrier, such as land acquisition, a "barrier system" must have the construction of an actual barrier as its central feature. DHS's budget request states that the barrier system must be measured in "miles"—206 miles, to be exact. ECF 124-1 at 23. It is not measured in number of cameras or environmental remediation projects. The text of the FY2020 appropriations bill further confirms this. Section 209(b) is clear that the "barrier system" *must* include "steel bollard" barriers or other barriers that are similarly "operationally effective."

Rather than follow that text, Defendants proclaimed that they will not build an actual barrier. The President proclaimed that construction of a border wall: (1) "is not a serious policy solution"; (2) is "a waste of money"; and thus (3) "no more American taxpayer dollars" will be spent on border wall construction. No. 21-470, ECF 1-4, at 1; *see also* Pls.' Supp. Br., ECF 101 at 15–16 (listing additional similar statements by the Administration).[2]

Defendants subsequently contravened Congress even further, going so far as to remove existing barriers. For example, Texas "launched Operation Lone Star in 2021 to aid Border Patrol in its core functions," which included the "laying of

---

[2] Defendant Secretary Mayorkas, for his part, has expressed that "[i]t is not the policy of this administration" to "agree with the building of a wall." Pls.' Supp. Br., ECF 101 at 15.

concertina wire along several sections of [the Rio Grande] riverfront." *Texas v. DHS*, No. DR-23-cv-00055-AM, 2023 WL 8285223, at *3 (W.D. Tex. Nov. 29, 2023) (Moses, C.J.), *appeal filed*, No. 23-50869 (5th Cir. Nov. 30, 2023). "[T]he wire was so successful that illegal border crossings dropped to less than a third of their previous levels" at locations where that border barrier was placed. *Id.* But Defendants "cut[] … holes in the concertina wire for no apparent purpose other than to allow migrants easier entrance further inland." *Id.* at *4; *see also id.* at *5. Defendants did this while simultaneously conceding "the wire helps." *Id.* at *5. Just earlier today, December 19, the Fifth Circuit entered an order enjoining the Federal Government from continuing to destroy border barriers while the case is appealed. *Texas v. Dep't of Homeland Sec.*, No. 23-50869 (5th Cir., Dec. 19, 2023).

Finally, Defendants' arguments focus exclusively on the question whether their actions are statutorily lawful. But Plaintiffs have also established that Defendants' actions are arbitrary and capricious—that is, procedurally unlawful. *See, e.g.*, States' Motion for Preliminary Injunction, No. 21-470, ECF 19 at 17–23; States' Reply, ECF 30 at 19–27; Plaintiffs' Supp. Br., ECF 101 at 14–24. This Court's review under the APA for an arbitrary and capricious agency action "is not toothless" and, "[i]n fact, … has serious bite." *Texas v. Biden ("MPP II")*, 20 F.4th 928, 989 (5th Cir. 2021) (cleaned up).

## V.    The January 20 Proclamation is an unlawful agency action, and its implementation may be enjoined.

Defendants also attempt to defeat meaningful review of their unlawful, arbitrary, and capricious agency actions. DHS and other Defendants repeatedly

affirm the January 20 Proclamation's "commitment" against using "American taxpayer dollars" to construct a border barrier.  ECF 24-3, at 18 (alteration in original).  And Defendants have put these words into action, harming Plaintiffs.  *See, e.g.*, States' Motion for Preliminary Injunction, No. 21-470, ECF 19 at 35–43.  GLO joined the motion for preliminary injunction, and Plaintiffs briefed additional harms. Pls.' Supp. Br., ECF 101 at 8.  GLO "has been burdened with a substantial increase in … border-crossing activity," and the border surge and gap in the border wall has "transformed the GLO Farm into a superhighway of illegal activity."  *Id*. at 8.

The Fifth Circuit has already held that these kinds of facts support redressability: "constructing additional border barriers will reduce illegal entries in areas where those walls are constructed, increase detection rates across the entire border, and generally disincentivize illegal immigration."  *General Land Office*, 71 F.4th at 273.  And Plaintiffs have marshaled more than sufficient facts to make this showing, especially at the preliminary injunction stage.  *See, e.g.*, States' Motion for Preliminary Injunction, No. 21-470, ECF 19 at 36–43; States' Reply, ECF 30 at 3–11; Pls.' Supp. Br., ECF 101 at 8–10, 58–59; Pls.' Resp. to Defs.' Sur-reply, ECF 111 at 4–7.  Indeed, DHS's own reports demonstrate the causal connection and redressability between Plaintiffs' harms and Defendants' actions.  DHS's 2018 assessment concluded that border wall construction in a single sector decreased border crossings by 90 percent.  No. 21-470, ECF 19-1 at App.008.  DHS's 2020 assessment, meanwhile, concluded that illegal entries significantly decreased in at least three

different sectors along the southwest border which had border wall constructions. *Id.* at 011–012.

But Defendants again raise arguments that have already been extensively briefed. The 2020 and 2021 appropriations are not general, but specific authorizations for a particular use. Pls.' Supp. Br. ECF 101 at 11–13. Rather than give Defendants lump-sum discretion, Congress was clear in FY2020, for example, that the funds "shall only be available for barrier systems" and provided specific criteria on both their use and where the barrier systems must be constructed. FY 2020 Appropriations § 209(b). This included both that the amount appropriated be "for the *construction* of [a] barrier system along the southwest border," § 209(a)(1) (emphasis added), and that this "construction of [a] barrier system" use "operationally effective designs … such as currently deployed steel bollard designs" or "operationally effective adaptions of such designs." § 209(b)(1). What's more, this barrier system must be "*constructed* in the highest priority locations as identified in the Border Security Improvement Plan." § 209(b)(2) (emphasis added).

Contrary to Defendants' assertion of unrestrained discretion, Defendants must "construct" barrier systems—that is, create new barrier systems, not just repair old ones. They must include actual physical barriers—because a physical barrier is the central feature of a "barrier system." And the funds must be used "only" for this purpose.

Defendants take issue with Plaintiffs' request for a mandatory injunction, claiming it would "re-write the appropriations acts." ECF 124 at 14. To the contrary,

Plaintiffs' suggested mandatory injunction is entirely appropriate because it carefully tracks the text of the appropriations. And an injunction need not prohibit Defendants from using funds for things like land acquisition or building roads—so long as those activities are done to facilitate the central purpose of the project: constructing physical barriers and making them operational.

This is what the Fifth Circuit already concluded provides Plaintiffs redress: an "injunction requiring DHS to spend 2020 and 2021 funds for border wall construction" that will "slow or reduce the relative number of illegal aliens entering Texas." *General Land Office*, 71 F.4th at 273. Defendants provide no support for their argument that a mandatory injunction thrusts upon the Court the duty to micromanage construction.

The Fifth Circuit similarly has already rejected Defendants' argument that Plaintiffs cannot establish redressability because "DHS has discretion to choose where along the southern border it may construct new barriers." Defs.' Br., ECF 124 at 15; *General Land Office*, 71 F.4th at 273–74 ("[Defendants] argue that an order compelling DHS to comply with the appropriations acts will not result in the construction of the Laredo projects."). As the Fifth Circuit noted, this argument "misconstrues" Plaintiffs' claims. Plaintiffs "do not challenge DHS's decision to terminate particular construction contracts" but "instead argue DHS's decision not to construct *any* new border wall is unlawful." *Id.* at 274 (emphasis in original). As such, "[a] declaration that DHS's border wall plan expenditures are unlawful, and an injunction requiring DHS to spend the 2020 and 2021 appropriations on additional

16

border barriers—*wherever* those might be constructed—would thus remedy the alleged harm." *Id*. (emphasis added). Plaintiffs have demonstrated harm from Defendants' actions, causation from Defendants' actions, and redressability if this Court enters an injunction "requiring DHS to spend the 2020 and 2021 appropriations on additional border barriers." *Id*.

Finally, Defendants claim that an injunction would harm the federal government because "DHS should not be prohibited from using its only available source of funding to improve the safety and effectiveness of existing barriers." Defs.' Br., ECF 124 at 15. But this argument rests on their merits argument, which is incorrect. Because their merits argument fails, their harm argument fails. *See League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action.").

## VI.    The Fifth Circuit's direction is clear, and this Court should reject any attempt to delay.

In a final attempt to continue using funds contrary to Congress's direction, Defendants suggest the Court should further delay resolution because they believe the Fifth Circuit "create[d] uncertainty" about the scope of the Court's authority. Defs.' Br., ECF 124 at 16.

But the Fifth Circuit was clear: "[t]he district court can thoroughly address" the motions for preliminary injunction and should "consider the States' motion for a preliminary injunction in an expeditious manner." *General Land Office*, 71 F.4th at

275. While the Fifth Circuit did not issue a general mandate, it did expressly issue a "limited remand" so this Court could rule on the preliminary injunction motion. *Id.*

The Fifth Circuit observed that "the tide of illegal immigration has been dramatically increasing ever since this case was filed" and that "[t]he fiscal year 2020 and 2021 appropriations" that Defendants are unlawfully using "expire, respectively, in September 2024 and September 2025." *General Land Office*, 71 F.4th at 275. The Fifth Circuit therefore "urge[d] the district court … to act expeditiously" on the motion for preliminary injunction, as "significant delay will exacerbate [Plaintiffs'] costs." *Id.* This Court should accept the Fifth Circuit's invitation for speedy resolution, not Defendants' invitation for further delay.

## <u>CONCLUSION</u>

For the foregoing reasons, along with the reasons stated in Plaintiffs' initial supplemental brief and all previous briefing in this case, Plaintiffs respectfully request the Court grant Plaintiffs' motion for preliminary injunction.

Date: December 19, 2023

ANDREW BAILEY
Attorney General of Missouri

/s/ *Joshua M. Divine*
JOSHUA M. DIVINE, #69875MO
Solicitor General
*Attorney-in-Charge*
Southern Dist. of Texas Bar No.
3833606

SAMUEL FREEDLUND, #73707MO*
Deputy Solicitor General

OFFICE OF THE ATTORNEY GENERAL
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, Missouri 65102
Tel. (573) 751-1800
Fax (573) 751-0774
josh.divine@ago.mo.gov
samuel.freedlund@ago.mo.gov

*Counsel for Plaintiff*
*State of Missouri*

*Admitted pro hac vice

Respectfully submitted,

KEN PAXTON
Attorney General of Texas

BRENT WEBSTER
First Assistant Attorney General

GRANT DORFMAN
Deputy First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

/s/ *Ryan D. Walters*
RYAN D. WALTERS
*Attorney-in-Charge*
Chief, Special Litigation Division
Texas Bar No. 24105085
Southern Dist. of Texas Bar No. 3369185

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545
ryan.walters@oag.texas.gov

*Counsel for Plaintiff State of Texas*

/s/ *Austin R. Nimocks*

AUSTIN R. NIMOCKS
*Attorney-in-Charge*

Texas Bar No. 24002695
S.D. Tex. Bar No. 2972032
austin@peelenimocks.com

CHRISTOPHER L. PEELE
Of Counsel
Texas Bar No. 24013308
S.D. Tex. Bar No. 31519
chris@peelenimocks.com

PEELE | NIMOCKS LAW FIRM
6836 Bee Caves Rd. Bldg. 3, Ste. 201
Austin, TX 78746
Phone: (512) 522-4893

*Counsel for Plaintiffs Texas General Land*
*Office and Commissioner Dawn*
*Buckingham, M.D.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on December 19, 2023, a true and accurate copy of the foregoing document was electronically filed through the Court's CM/ECF System and that a copy of the foregoing will be sent via email to all parties by operation of the Court's electronic filing system, all consistent with Federal Rule of Civil Procedure 5(b). I further certify that the foregoing document contains 4,327 words and complies with the Court's December 6, 2023 scheduling order.

<u>/s/ *Joshua M. Divine*      </u>

Counsel for Plaintiffs