United States District Court
Southern District of Texas
**ENTERED**

March 08, 2024

Nathan Ochsner, Clerk

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

| | | |
|---|---|---|
| THE GENERAL LAND OFFICE OF THE STATE OF TEXAS, and GEORGE P. BUSH, in his official Capacity as Commissioner of the Texas General Land Office, | § § § § § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| JOSEPH R. BIDEN, in his official capacity as President of the United States of America; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; and ALEJANDRO MAYORKAS, in his official capacity as Secretary of the United States Department of Homeland Security, | § § § § § § § § § | Civil Action No. 7:21-CV-00272 |
| Defendants. | § § | |

| | | |
|---|---|---|
| THE STATE OF MISSOURI; and THE STATE OF TEXAS, | § § § | |
| Plaintiffs, | § § | |
| v. | § § | |
| JOSEPH R. BIDEN, JR. in his official capacity as President of the United States of America; THE UNITED STATES OF AMERICA; ALEJANDRO N. MAYORKAS, in his official capacity as Secretary of the United States Department of Homeland Security UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY A. MILLER, in his official capacity as the Acting | § § § § § § § § § § § § | Civil Action No. 7:21-CV-00420 |

| | |
|---|---|
| **Commissioner of the United States** | § |
| **Border Protection; and UNITED** | § |
| **STATES CUSTOMS AND BORDER** | § |
| **PROTECTION,** | § |
| **United States Department of** | § |
| **Homeland Security; UNITED** | § |
| **STATES DEPARTMENT OF** | § |
| **HOMELAND SECURITY; TROY A.** | § |
| **MILLER, in his official capacity as the** | § |
| **Acting Commissioner of the United** | § |
| **States Border Protection; and** | § |
| **UNITED STATES CUSTOMS AND** | § |
| **BORDER PROTECTION,** | § |
| | § |
| **Defendants.** | § |

## MEMORANDUM OPINION AND ORDER

Walls and fences have existed at the border between the United States and Mexico for years.  In 2016, however, former President Donald J. Trump made "building a wall" a key component of his presidential campaign.  During his presidency, various efforts were made to either construct more walls or expand existing barriers along the border. This case focuses on two of Congress's efforts in that regard.

In 2020 and 2021, Congress funded roughly $1.4 billion "for the construction of [a] barrier system along the southwest border."  President Jospeh R. Biden, Jr., who assumed office on January 20, 2021, had a different view of how these funds should be spent. President Biden, via proclamation, paused obligation of these funds the day he was inaugurated and ordered the Department of Homeland Security ("DHS") to reassess the situation.  DHS issued two plans under this directive.  Two now-consolidated lawsuits emerged from these actions: one by the Texas General Land Office ("GLO") and another by the States of Missouri and Texas (the "State Plaintiffs").

2

Now pending before the Court is the State Plaintiffs' Motion for Preliminary Injunction, (7:21-CV-00420, Dkt. No. 19), which GLO has joined.  The State Plaintiffs and GLO (collectively, the "Plaintiffs") move to enjoin the United States from implementing President Biden's proclamation and to order DHS to obligate the funds that have been congressionally appropriated for the construction of a barrier system at the Southwest border.  DHS argues in response that, notwithstanding the language in the statute, an injunction would be inappropriate because the challenged spending decisions are committed to its discretion.  The Court disagrees.  Whether the Executive Branch must adhere to federal laws is not, as a general matter, an area traditionally left to its discretion.  And without that discretion, DHS's spending decisions run afoul of the APA.  After careful consideration, the Court **GRANTS** the Motion in part, (7:21-CV-00420, Dkt. No. 19).

## I.   BACKGROUND[1]

The procedural background of this case is extensive.  In addition to providing an overview of the facts underlying the present dispute, the Court will outline the procedural twists and turns presented along the way.

### A.   GENERAL BACKGROUND

The Constitution disallows any expense by the Government not authorized by statute.  *See* U.S. Const. art. I, § 9, cl. 7; *United States v. MacCollom*, 426 U.S. 317, 321, 96

---

[1]    The factual and legal statements (except where the Court is discussing a factual dispute or competing legal theories) should be considered as findings of fact and conclusions of law regardless of any heading or lack thereof.

S.Ct. 2086, 2089, 48 L.Ed.2d 666 (1976).  In this sense, fiscal law is distinct from most other areas of federal law.[2]  Agencies, when afforded congressionally appropriated funds, may expend them only for the proper purpose and amount, and within the authorized period of time.  *See U.S. ex rel. Becker v. Westinghouse Savannah River Co.*, 305 F.3d 284, 286 n.1 (4th Cir. 2002); *Consumer Fin. Prot. Bureau v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 225 (5th Cir. 2022) (Jones, J., concurring).

In December 2019, Congress provided funding for border infrastructure in the DHS annual appropriations act for fiscal year ("FY") 2020.  *See* Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, § 209, 133 Stat. 2317, 2511 (2019).  Of the total amount of $1,904,468,000 made available to the agency, the statute allotted $1,375,000,000 "for the construction of [a] barrier system along the southwest border[.]"  *Id.* § 209(a)(1).  Roughly a year later, Congress provided additional funding for the construction of a barrier system in DHS's annual appropriations act for FY 2021 for the same amount—$1,375,000,000.  *See* Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 210, 134 Stat. 1182, 1456–57 (2020).  In both appropriations,[3] Congress gave DHS up to five years to obligate the funds.  133 Stat. at 2506; 134 Stat. at 1452.

---

[2]     In most other areas of federal law, a statute or regulation prescribes actions which are prohibited, and actions not prohibited are generally permitted; conversely, under federal fiscal law, spending is prohibited absent authorization to the contrary.  *MacCollom*, 426 U.S. at 321, 96 S.Ct. at 2089 ("The established rule is that the expenditure of public funds is proper only when authorized by Congress, not that public funds may be expended unless prohibited by Congress."); *see also All Am. Check Cashing, Inc.*, 33 F.4th at 225 (Jones, J., concurring).

[3]     The Court refers to these Consolidated Appropriations Acts as the "CAAs" throughout this opinion.

In February 2019, the Trump Administration declared a national emergency at the Southern border and used funds from the Department of Defense ("DoD") and the Department of the Treasury to fund barrier construction projects. *See* Proclamation No. 9844, 84 Fed. Reg. 4949 (Feb. 15, 2019). Upon assuming office in January 2021, the Biden Administration issued a proclamation terminating the national emergency at the Southern border. *See* Proclamation No. 10142, 86 Fed. Reg. 7225 (Jan. 27, 2021). In so doing, the Biden Administration ordered a pause on the construction of the border wall and held the funds obligated to it while relevant agencies reviewed their approach to the Southern border. *Id.* at 7225–26.

In June 2021, the DoD and DHS announced a new border plan for spending the funds provided under the CAAs. *See* Department of Homeland Security, DHS Border Wall Plan Pursuant to Presidential Proclamation 10142 (June 9, 2021) (the "Plan"); (Dkt. No. 66-3 at 4–8). The Plan cancelled most projects that were directed toward building additional walls and transferred all the existing barrier infrastructure previously funded by the DoD to DHS's control. (Dkt. No. 66-3 at 5–8). Among other goals, DHS contemplated using these funds from the CAAs to remediate projects that were "in various stages of completion" to ensure that they were safe and stable. (*Id.* at 7). In July 2022, DHS amended the Plan to reflect the insights gathered by the agency over the previous year. *See* Amendment to DHS Border Wall Plan Pursuant to Presidential Proclamation 10142 (July 11, 2022) (the "Amended Plan"); (Dkt. No. 66-3 at 9–11). The Amended Plan specified several projects, including (1) remediation projects at sites previously funded by the DoD, and (2) the addition of "barrier system attributes" such

as lighting, cameras, and detection technology where a physical barrier has already been constructed.  (Dkt. No. 66-3 at 9–11).

Plaintiffs challenge the Biden Administration's spending decisions.  Plaintiffs allege that the Biden Administration is refusing to spend the funds on the construction of additional physical barriers along the Southwest border as required and is instead using those funds for other priorities at the border.  (*See* 7:21-CV-00420, Dkt. No. 19 at 22).  More specifically, Plaintiffs assert that President Biden has "refuse[d] to spend funds Congress authorized mandating the construction of the border wall, and thus DHS acted without any authority in implementing the January 20 Proclamation[.]"  (*Id.* at 13).  According to Plaintiffs, Congress made clear that the funds at issue were to be used only on "the construction of [a] barrier system along the southwestern border[.]"  (7:21-CV-00420, Dkt. No. 19 at 22).  And because the agency's newly planned uses for the funds—"environmental remediation, flood-control, and cleanup projects" as well as "smarter border security measures"—are inconsistent with Congress's instructions, Plaintiffs maintain that the new uses constitute misappropriation of the funds.  (*Id.* at 18–20).

### B.   PROCEDURAL BACKGROUND

This litigation began when GLO sued the named Defendants (collectively, the "Government"), in the McAllen Division asserting eight causes of action.[4]  (Dkt. No. 1).

---

[4]    GLO asserted the following: (1) a constitutional claim for a violation of the Separation of Powers Clause; (2) a constitutional claim for a violation of the Spending Clause; (3) a constitutional claim for a violation of the Take Care Clause; (4) a constitutional claim for a violation of the Presentment Clause; (5) an APA claim for a violation of certain budgetary statutes; (6) an APA claim for a violation of certain agency statutes; (7) a claim for a substantive violation of the APA; and (8) a claim for a procedural violation of the APA.  (Dkt. No. 1 at 28–40).

The Government moved to dismiss that case several months later.  (Dkt. No. 18).  The State Plaintiffs subsequently sued the Government in a different division within the Southern District of Texas asserting seven causes of action.[5]  (7:21-CV-00420, Dkt. No. 1).  The Government moved to consolidate, and the subsequently filed case was transferred to the McAllen Division.  (7:21-CV-00420, Dkt. No. 12).  Shortly after, the State Plaintiffs filed their Motion for Preliminary Injunction.  (7:21-CV-00420, Dkt. No. 19).  The two cases were ultimately consolidated.  (Dkt. No. 23).

Roughly a month later, GLO filed a First Amended Complaint. (Dkt. No. 34). Following were two motions to dismiss filed by the Government: (1) a motion to dismiss the State Plaintiffs, (Dkt. No. 35), and (2) a motion to dismiss GLO's First Amended Complaint, (Dkt. No. 36).  Judge Micaela Alvarez, then presiding, entered an order as to both, granting the motion to dismiss the State Plaintiffs from the case and granting in part and denying in part the motion to dismiss GLO's complaint.  (Dkt. No. 57). Consequently, the State Plaintiffs' motion for preliminary injunction was denied as moot. (*Id*. at 2, 61).  The State Plaintiffs appealed, (Dkt. No. 58), and this action was stayed in the meantime, (Dkt. No. 81).

---

5    The State Plaintiffs assert (1) an APA and constitutional claim for a violation of the Separation of Powers Clause; (2) an APA and constitutional claim for a violation of the Take Care Clause; (3) an APA claim for violations of the Impoundment Control Act of 1974; (4) an APA claim based on a lack of reasoned decision-making and action contrary to law; (5) an APA claim based on a failure to consider state reliance interests; (6) an APA claim based on a failure to state a basis for agency action; and (7) an APA claim for violations of the CAAs.  (7:21-CV-00420, Dkt. No. 1 at 21–35).

On June 16, 2023, the Fifth Circuit reversed and remanded with instructions to "expeditiously" consider the State Plaintiffs' preliminary-injunction motion.  *Gen. Land Off. v. Biden*, 71 F.4th 264, 268 (5th Cir. 2023) ("*GLO*"); (Dkt. No. 85 at 2).  Two months after the Fifth Circuit's ruling, this action was transferred to the undersigned.  (Dkt. No. 92).  The Court subsequently held a hearing and requested that the Parties submit a proposed schedule in light of the Fifth Circuit's ruling and other intervening cases.  With briefing complete, the Motion for Preliminary Injunction, (7:21-CV-00420, Dkt. No. 19), is now ripe for review.

## II.    STANDING

"The Constitution confers limited authority on each branch of the Federal Government."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 337, 136 S. Ct. 1540, 1546, 194 L.Ed.2d 635 (2016).    Article III empowers federal courts to decide only "Cases" and "Controversies."  U.S. Const. art. III, § 2, cl. 1.  Several doctrines have developed from the understanding of what these terms mean, *see Texas v. United States*, 524 F.Supp.3d 598, 617 n.24 (S.D. Tex. 2021) ("*100-Day Pause*"), one of which is the standing-to-sue doctrine. *See*, *e.g.*, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–62, 112 S.Ct. 2130, 2136–2137, 119 L.Ed.2d 351 (1992).  This doctrine "focuses on whether the plaintiff is the proper party to bring [the] suit[.]"  *Raines v. Byrd*, 521 U.S. 811, 818, 117 S.Ct. 2312, 2317, 138 L.Ed.2d 849 (1997) (citing *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 38, 96 S.Ct. 1917, 1924, 48 L.Ed.2d 450 (1976)).  To establish whether a plaintiff is the proper party to bring a suit, a plaintiff must show that he has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that it is likely to be redressed by a

favorable judicial decision." *Spokeo*, 578 U.S. at 338, 136 S.Ct. at 1547 (citing *Lujan*, 504 U.S. at 560–61, 112 S.Ct. at 2136–37; *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 180–81, 120 S.Ct. 693, 704, 145 L.Ed.2d 610 (2000)).

"At the preliminary injunction stage, the movant must clearly show only that each element of standing is likely to obtain in the case at hand." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 330 (5th Cir. 2020), *as revised*, (Oct. 30, 2020) (comparing and collecting cases). Because "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirements[,]" the Court discusses only Texas's standing for purposes of this Motion.[6]  *Rumsfeld v. F. for Acad. and Institutional Rts., Inc.*, 547 U.S. 47, 52 n.2, 126 S.Ct. 1297, 1303 n.2, 164 L.Ed.2d 156 (2006).

The Fifth Circuit determined that Texas possessed Article III standing for purposes of Rule 12(b) in this case.  *See GLO*, 71 F.4th at 275.  Although "the proof required to establish standing increases as the suit proceeds," the "inquiry remains focused on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734, 128 S.Ct. 2759, 2769, 171 L.Ed.2d 737 (2008) (citations omitted).   Further, revisiting standing in this case is

---

[6]     Appellate courts, including the Fifth Circuit, generally adopt the approach that courts need not consider the standing of the remaining plaintiffs upon determining that at least one plaintiff has standing.  *See, e.g., McAllen Grace Brethren Church v. Salazar*, 764 F.3d 465, 471 (5th Cir. 2014) ("It is well settled that once we determine that at least one plaintiff has standing, we need not consider whether the remaining plaintiffs have standing to maintain the suit."); Joan Steinman, *The Effects of Case Consolidation on the Procedural Rights of Litigants: What They Are, What They Might Be Part 1: Justiciability and Jurisdiction (Original and Appellate)*, 42 UCLA L. Rev. 717, 728–31 (1995).

particularly appropriate where there has been an intervening change of law. *United States v. Becerra*, 155 F.3d 740, 752–53 (5th Cir. 1998). Or at least there may have been.

The Government points to *United States v. Texas*, 599 U.S. 670, 143 S.Ct. 1964, 216 L.Ed.2d 624 (2023) ("*Enforcement Priorities*"), as an intervening and controlling change of law demonstrating that Plaintiffs lack standing in this case. (Dkt. No. 96 at 27). Plaintiffs insist that *Enforcement Priorities* has no bearing on standing here, and the Fifth Circuit's determination should remain undisturbed pursuant to the law-of-the-case doctrine. (Dkt. No. 101 at 52–67). Because the standard of proof is heightened at the preliminary-injunction stage, *see Davis*, 554 U.S. at 734, 128 S.Ct. at 2769 (citation omitted), and because the Fifth Circuit's standing analysis (1) was conducted on a Rule 12 posture and (2) pre-dated *Enforcement Priorities*, the Court reassesses each prong of Article III standing.

### A.    INJURY-IN-FACT

Plaintiffs' first task is to establish an injury-in-fact. To do so, Plaintiffs must show that if the funds in question are not spent on additional border walls, Texas would incur unrecoverable costs based on "illegal aliens who would not otherwise be in the State."[7] *GLO*, 71 F.4th at 272. To meet this showing, Texas must demonstrate that additional physical barriers, if built, would result in fewer illegal aliens entering the country. Texas has done so.

---

[7]    The Government responds that Plaintiffs cannot establish a causal connection between the increased unrecoverable costs Texas will allegedly suffer and the barrier system expenditures. (*See* Dkt. No. 96 at 37). The Court finds this argument to be more properly directed at the traceability element.

Texas points to DHS reports detailing the effectiveness of border walls in deterring illegal immigration.  (7:21-CV-00420, Dkt. No. 19-1 at 7–14).  For example, in the Yuma Sector, DHS found in 2020 that "[i]llegal entries in areas with [a] new border wall system plummeted over 87% in FY 20 compared to FY 19."  (*Id.* at 13).  In the Rio Grande Valley Sector, "completion of [the] border wall system" resulted in a "79% decrease in apprehensions[.]"  (*Id.* at 14).  DHS also reported that the "El Paso Sector has experienced a significant reduction in drug and smuggling activities in areas where the new border wall system was built."  (*Id.*).  The El Paso Sector wall also reduced illegal entries as DHS reported decreases in total apprehensions rates from two key zones within the sector "by 60% and 81% respectively when comparing the last half of FY 20 to the first half of FY 20."  (*Id.*).

In a report titled "Walls Work", DHS details the efficacy of new border barriers.  (*Id.* at 7–10).  DHS refers to the newly constructed bollard-steel wall in the Yuma Sector.  (*Id.* at 9–10).  The agency explained that "when we installed a border wall in the Yuma Sector, we have seen border apprehensions decrease by 90 percent."  (*Id.*).  DHS also cited a more tangible example of the border wall serving its purpose:

> [W]hen a violent mob of 1,000 people stormed our Southern border, we found the newly constructed portions of the wall to be very effective.  In the area of the breach, a group of people tore a hole in the old landing mat fence constructed decades ago and pushed across the border.  U.S. Border Patrol agents who responded to the area ultimately dispersed the crowd, which had become assaultive, and apprehended several individuals.  All of the individuals were either apprehended or retreated into Mexico.  That evening, the fence was repaired.  There were no breaches along the newly constructed border wall areas.

(*Id.* at 9).

This evidence led DHS to conclude, "[t]he results speak for themselves: illegal drug, border crossings, and human smuggling activities have decreased in areas where barriers are deployed." (*Id.* at 13). And "[w]hen it comes to stopping drugs and illegal aliens from crossing our borders," DHS emphasized that "border walls have proven to be extremely effective." (*Id.* at 9).

These DHS findings and reports show that walls, and the addition of walls, lower the volume of illegal immigration. The Court finds that in the absence of these walls, some illegal immigration into Texas will occur that otherwise would not. And in turn, that increase will impose additional costs to the State, including in the areas of driver's licenses,[8] education[9] and healthcare.[10]

The Government also argues that Plaintiffs lack standing in this case, regardless of the evidence that walls work, because the Supreme Court's decision in *Enforcement Priorities* requires a finding that Plaintiffs cannot establish an injury-in-fact. (Dkt. No. 96 at 29–36). There, Texas and Louisiana challenged an immigration policy that prioritized which aliens DHS would arrest and prosecute. *Enforcement Priorities,* 599 U.S. at 673, 143 S.Ct. at 1968. As explained by the Supreme Court, the plaintiffs "essentially [asked] the Federal Judiciary to order the Executive Branch to alter its arrest policy so as to make more arrests." *Id.* at 674, 143 S.Ct. at 1968. The Supreme Court denied the states' request,

---

[8]    (7:21-CV-00420, Dkt. No. 19-1 at 131–35).

[9]    (7:21-CV-00420, Dkt. No. 19-1 at 144–47).

[10]   (7:21-CV-00420, Dkt. No. 19-1 at 156–61).

finding that they lacked an Article III injury because the suit was "not the kind redressable by a federal court." *Id.* at 678, 143 S.Ct. at 1971.  To reach its finding, the Court primarily relied on the longstanding principle that "a citizen lacks standing to contest the policies of the prosecuting authority when he himself is neither prosecuted nor threatened with prosecution." *Id.* at 677, 143 S.Ct. at 1970 (quoting *Linda R.S. v. Richard D.*, 410 U. S. 614, 619, 93 S.Ct. 1146, 1149, 35 L.Ed.2d 536 (1973)).

The Supreme Court made clear that its decision in *Enforcement Priorities* is "narrow and simply maintains the longstanding jurisprudential status quo." *Id.* at 686, 143 S.Ct. at 1975.  The Court's opinion addresses a "discrete standing question" which only arose thanks to "a highly unusual provision of federal law and a highly unusual lawsuit." *Id.* at 684, 143 S.Ct. at 1974.  It is for that reason that *Enforcement Priorities* should "in no way be read to suggest or imply that the Executive possesses some freestanding or general constitutional authority to disregard statutes requiring or prohibiting executive action." *Id.*

Two courts have recently recognized the limited nature of this holding.  *See Florida v. United States*, ____ F.Supp.3d ____, ____, 2024 WL 677713, at *2 (N.D. Fla. Feb. 20, 2024); *Texas v. Mayorkas*, No. 2:22-CV-00094, 2024 WL 455337, at *2 (N.D. Tex. Feb. 6, 2024).  In *Florida*, the State of Florida sued various federal immigration agencies and officials alleging that they violated statutory detention mandates by using their parole authority to release "aliens who are already in DHS custody" after arriving at the border.  *Florida*, ____ F.Supp.3d at ____, 2024 WL 677713 at *2.  In analyzing the impact of *Enforcement Priorities*, the Florida district court followed the Supreme Court's instructions and read

the case narrowly. *Id.* at *2–4. Specifically, the court reasoned that because the policies at issue in *Florida* did not involve "arrest or prosecution," *Enforcement Priorities* did not apply. *Id.* In *Texas v. Mayorkas*, another district court similarly rejected a broad reading of *Enforcement Priorities*. 2024 WL 455337, at *2. There, the court allowed an immigration challenge to proceed because the suit did not seek the relief forbidden by *Enforcement Priorities*—i.e, forcing "the Executive Branch [to] make more arrests or bring more prosecutions." *Id.*

The Court holds that *Enforcement Priorities* is inapplicable to this case for the same reason. Plaintiffs are not requesting "that the Executive Branch . . . make more arrests or bring more prosecutions." 599 U.S. at 680, 143 S.Ct. at 1972. Nor have Plaintiffs "ask[ed] the Federal Judiciary . . . [to] order the Executive Branch to take enforcement actions against violators of federal law[.]" *Id.* at 685, 143 S.Ct. at 1975. Instead, Plaintiffs' injuries in this case arise from the Executive Branch's alleged failure to comply with Congress's instructions to construct additional border walls. (Dkt. No. 101 at 55). This case therefore avoids the "Article II problems raised by judicial review of the Executive Branch's arrest and prosecution policies" articulated in *Enforcement Priorities*. 599 U.S. at 679, 143 S.Ct. at 1972.

The Government also argues that the costs incurred by Plaintiffs are the type of indirect effects on state revenues that are insufficient under *Enforcement Priorities*, which observed that a "State's claim for standing can become more attenuated" when that State's injuries are of an indirect nature "frequently generate[d]" by federal policies. (Dkt. No. 96 at 29–33) (quoting *Enforcement Priorities*, 599 U.S. at 680 n.3, 143 S.Ct. at 1972 n.3).

These observations, however, were (1) expressed in the context of arrest and prosecution policies, and (2) indicated only that standing "can become more attenuated" when it is based only on indirect effects. *See Enforcement Priorities*, 599 U.S. at 680 n.3, 143 S.Ct. at 1972 n.3. The Fifth Circuit's holdings that these financial injuries are sufficient to establish an injury-in-fact remain clear and binding. *See In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792–94 (5th Cir. 2021) (discussing how to determine whether the Supreme Court has overruled circuit precedent).

In sum, Texas has suffered an injury-in-fact for purposes of Plaintiffs' Motion.

### B.   TRACEABILITY

Having found that Texas established an injury-in-fact at this stage, the Court now turns to whether there is a fairly traceable link between Texas's injuries and the Government's action. To establish traceability, Texas must prove that DHS's diversion of the FY 2020 and FY 2021 funds was a de facto cause of their injuries. *See Dep't of Com. v. New York*, 588 U.S. ____, ____, 139 S.Ct. 2551, 2566, 204 L. Ed. 2d 978 (2019) ("Article III requires no more than *de facto* causality[.]" (quotations omitted)). In other words, Texas must show that "DHS's June 2021 decision to divert 2020 and 2021 funds away from the creation of a border wall will result in fiscal injuries to the State." *GLO*, 71 F.4th at 272.

The Government contends that Texas has not established that the failure to build more border wall will result in increased numbers of illegal immigrants. (*See* Dkt. No. 96 at 36–39). As the Supreme Court has explained, standing is more difficult to establish "where a causal relation between injury and challenged action depends upon the decision of an independent third party" — here, the decision of illegal aliens to cross into the United

15

States from Mexico. *California v. Texas*, 593 U.S. 659, 675, 141 S.Ct. 2104, 2117, 210 L.Ed.2d 230 (2021). Emphasizing this point, the Government argues that Texas has "not carried [its] burden to produce evidence establishing a causal connection between [its] expenses and DHS's barrier system expenditures, as opposed to other factors that impact migration or utilization of state services." (Dkt. No. 96 at 37). Relying on an Arizona district court opinion finding that the causation requirement had not been satisfied, the Government argues that the migration increase could have been caused by various social, economic, and political factors, such as other immigration-related policies and programs, "that might influence an alien's decision to risk life and limb to come to the United States." (*Id.* at 38) (quoting *Arizona v. Mayorkas*, 584 F.Supp.3d 783, 795 (D. Ariz. 2022)). The Government argues that Texas has "ma[de] no effort to prove up any of [its] conclusions, relying instead on correlative fallacies and out-of-context soundbites." (*Id.* at 37).

Texas counters that it has provided sufficient proof of causation. The Fifth Circuit observed, albeit at the 12(b)(6) stage, that Texas's allegations as to causation, if proven, would demonstrate that DHS's spending decisions caused fiscal injuries to the State. *GLO*, 71 F.4th at 272. Specifically, the Fifth Circuit considered Texas's allegations that "border barriers (i) reduce illegal entries in areas where constructed, and (ii) increase the rate at which illegal aliens are detected and apprehended." *Id.* These facts, accepted as true, would show that spending the funds on more border walls would have "reduce[d] some number of illegal immigrants entering Texas, even if they do not fully stem the tide, and thereby reduce Texas's costs relative to a non-border wall policy." *Id.* For both of these propositions, Texas cites the agency's own past findings and statements attesting

to the efficacy of border walls, (*see* 7:21-CV-00420, Dkt. No. 19-1 at 7–14), and the Government has offered no evidence to the contrary.[11]  As to the first proposition, the Government suggests that while illegal entries have gone down in areas where barriers have been constructed, those barriers might have "simply channel[ed] migrants to other areas of the border or motivate[ed] them to use other techniques to obtain entry[.]"  (Dkt. No. 96 at 37).  The Government does not provide any evidentiary support for this theory, but even taken as true, it does nothing to refute Texas's evidence that barriers increase detection and apprehension rates, (*see* 7:21-CV-00420, Dkt. No. 19-1 at 7–14).  DHS has stated publicly, for example, that border walls force illegal aliens to areas "where we are best prepared to catch them—our ports of entry."  (*Id.* at 13).  Additionally, the walls force illegal aliens to go "further west into areas that are less dense with brush and easier for CBP surveillance cameras to detect[.]"  (*Id.* at 14).  And DHS has even boasted about at least one incident where the physical barrier was "very effective" in stopping "a violent mob of 1,000 people" from entering, many of whom were ultimately apprehended.  (*Id.* at 9).

The foregoing statements by DHS show that at the very least, physical barriers reroute aliens to other entry points where they can be detained and, in some cases, deter aliens from crossing illegally altogether.  If walls are rerouting aliens to areas "where we

---

[11]     As referenced earlier, one such statement came after DHS assessed the effectiveness of physical barriers on the Southwest border in controlling illegal immigration and drug trafficking. The agency explained in its report: "Walls Work. When it comes to stopping drugs and illegal aliens from crossing our borders, border walls have proven to be extremely effective."  (7:21-CV-00420, Dkt. No. 19-1 at 8).

are best prepared to catch them," (*id.* at 13), DHS's admissions establish that more aliens would be caught if there were more walls. That means fewer illegal entries. And while it may be true that "'any number of variables might influence an alien's independent decision' to enter the country illegally," *Arizona*, 584 F.Supp.3d at 797 (quoting *Whitewater Draw Nat. Conservation Dist. v. Mayorkas*, 5 F.4th 997, 1017 (9th Cir. 2021)), DHS has stated that additional barriers would make it more likely that those aliens would be intercepted regardless of their motivation. (7:21-CV-00420, Dkt. No. 19-1 at 13). The DHS statements provided by Texas demonstrate that barriers reduce illegal immigration, which is sufficient to find that the rise in illegal entries is attributable, at least in part, to the failure to build more physical barriers. Therefore, the Court finds that Texas has demonstrated that its injuries are traceable to DHS's funding decisions.

### C.   REDRESSABILITY

The third element of standing, redressability, requires a plaintiff to show that their injuries are likely to be redressed by a favorable judicial decision. *See Lujan*, 504 U.S. at 561, 112 S.Ct. at 2136. "The relief sought needn't completely cure the injury, however; it's enough if the desired relief would lessen it." *Inclusive Cmtys. Project, Inc. v. Dep't of Treasury*, 946 F.3d 649, 655 (5th Cir. 2019); *see also Sanchez v. R.G.L.*, 761 F.3d 495, 506 (5th Cir. 2014) ("When establishing redressability, a plaintiff need only show that a favorable ruling could potentially lessen its injury; it need not definitively demonstrate that a victory would completely remedy the harm." (cleaned up)).

Texas alleges, and the Court has found, that constructing additional border barriers will reduce illegal entries in areas where those walls are constructed, increase

detection rates across the entire border, and generally disincentivize illegal immigration. *See also GLO*, 71 F.4th at 273.  As stated, DHS has made clear that "walls work" (7:21-CV-00420, Dkt. No. 19-1 at 7), and that construction of additional border barriers will funnel immigrants to areas "where we are best prepared to catch them—our ports of entry." (*Id.* at 13).  After arresting, detaining or refusing entry to illegal immigrants at the ports of entry, there would, of course, be fewer aliens entering the country illegally.  Plaintiffs' requested relief, a declaratory judgment and injunction requiring DHS to spend the 2020 and 2021 funds for border wall construction, therefore, would slow or reduce the relative number of illegal aliens entering the United States.  (*Id.* at 54–57); *see GLO*, 71 F.4th at 273 (citing *Massachusetts v. E.P.A.*, 549 U.S. 497, 525, 127 S.Ct. 1438, 1458, 167 L.Ed.2d 248 (2007)).  That reduction, in turn, would lower the relative costs Texas must expend on driver's licenses, education, and health care.[12] *Id.*  This evidence is sufficient to show redressability at this stage of litigation.

Still, the Government disagrees arguing that even if DHS's Plan was enjoined, DHS would have broad discretion as to how the appropriated funds would be spent, and there is no requirement that DHS spend a dollar of those funds on the construction of new border barriers in Texas.  (Dkt. No. 96 at 39).  But that argument misapprehends the basis of Plaintiffs' claims.  Plaintiffs are not challenging the decision to terminate a

---

[12]   Even if DHS chose to construct these barriers in other states, say, New Mexico, Arizona or California, the Court finds that Texas would benefit from the decline in illegal immigration there because, as the Fifth Circuit has recognized, illegal aliens are "free to move among states" and some would ultimately make their way to Texas.  *Texas v. United States*, 809 F.3d 134, 188 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ("*DAPA*"), *aff'd by an equally divided court sub nom. United States v. Texas*, 597 U.S. 547, 548, 136 S.Ct. 2271, 2272, 195 L.Ed.2d 638 (2016).

particular contract, nor have they asked the Court to order construction of a wall at any particular location.  Instead, Plaintiffs argue that DHS was specifically obligated to spend the CAA funds to construct border walls, and the decision to not do so via the Plan was outside DHS's discretion and violated the law.  (7:21-CV-00420, Dkt. No. 19 at 21); (Dkt. No. 101 at 12).  Therefore, as the Fifth Circuit has already held in this case, "[a] declaration that DHS's border wall plan expenditures are unlawful, and an injunction requiring DHS to spend the 2020 and 2021 appropriations on additional border barriers—wherever those might be constructed—would thus remedy the alleged harm."  *GLO*, 71 F.4th at 274.

Texas also benefits from having special solicitude, as the Fifth Circuit has already found in this case.[13]  *Id.* at 274–75.  To be clear, the Court has found that Texas has satisfied the redressability prong (as well as the other standing prongs to which special solicitude applies) *without* the need for special solicitude.  Nonetheless, the Fifth Circuit specifically noted in this case:

> To eliminate any doubt as to standing, we emphasize that the States are entitled to special solicitude in the standing

---

[13]    The Court recognizes that there is an ongoing discussion in the higher courts about whether the special solicitude doctrine remains viable.  *See Enforcement Priorities*, 599 U.S. at 688-89, 143 S.Ct. at 1977 (Gorsuch, J., concurring) (explaining that "it's hard not to wonder why the Court says nothing about 'special solicitude' in this case.  And it's hard not to think, too, that lower courts should just leave that idea on the shelf in future ones.").  But the Supreme Court did not declare as much in *Enforcement Priorities*, and the Fifth Circuit has yet to tinker with special solicitude as it noted recently:

> We will merely make the related and additional point, perhaps for the benefit of a future panel or en banc court, that the "special solicitude" once afforded to states under *Massachusetts v. EPA*, . . . with respect to justiciability doctrines like standing, seems to also be falling out of favor with the Supreme Court.

*Netflix, Inc. v. Babin*, 88 F.4th 1080, 1089 n.12 (5th Cir. 2023).  Therefore, the Court will engage in the special solicitude analysis until it receives orders to the contrary.

> analysis, at least in regard to their APA claim.  To receive this
> benefit, a state must demonstrate (i) it has a procedural right
> to challenge the action in question, and (ii) the challenged
> action affects one of its quasi-sovereign interests.
>
> Texas proceeds under the APA, which this court has held
> sufficient to satisfy the first prong of the analysis. Regarding
> the second prong, Texas contends it will be forced to spend
> millions of taxpayer dollars on driver's licenses, health care,
> and education as a result of DHS's refusal to allocate 2020 and
> 2021 funds for border wall construction. Such injuries
> implicate the States' sovereign interest in its fiscal policy and
> lawmaking authority, as Texas becomes pressed to redirect
> resources and alter its laws.  Texas is thus entitled to special
> solicitude, meaning "imminence and redressability are easier
> to establish here than usual."

*Id.* at 274-75 (cleaned up).  Plaintiffs enjoy special solicitude in this standing analysis.

With special solicitude, the redressability standard relaxes from "likely" to "some possibility" that the requested relief will reduce the harm.  *Texas v. United States*, 50 F.4th 498, 520 (5th Cir. 2022).  Here, when afforded special solicitude, Texas satisfies the redressability prong even more easily.  It cannot be seriously disputed that with this record, there is at least some possibility that building more border walls would redress Texas's injuries.  As noted above, regardless of where DHS elected to construct new walls, those barriers would have the ultimate effect of decreasing the number of illegal entries into Texas that would otherwise have occurred.  *See supra* n.12.

In sum, the Court holds that Texas has satisfied each element of Article III standing.  Texas has shown injury-in-fact through costs that it has incurred in administering driver's licenses, education, and healthcare to a rising number of illegal aliens.  Traceability is met because Texas has sufficiently demonstrated that the failure to

build more physical barriers will reduce the number of apprehensions that otherwise would have occurred.  And finally, this controversy is redressable because it is likely that a favorable judicial decision would reduce the financial harms that Texas otherwise would incur.

## III.   JUDICIAL REVIEW

Because Texas has established standing, the Court has jurisdiction.  Still, the Court must respect Congress's legislative power and the discretion enjoyed by executive agencies by evaluating whether Plaintiffs' specific causes of action are reviewable.  *See Lexmark Int'l v. Static Control Components, Inc.*, 572 U.S. 118, 128, 134 S.Ct. 1377, 1387–88, 188 L.Ed.2d 392 (2014).  Before the Court are seven causes of action[14] asserted by the State Plaintiffs:

1) An APA and constitutional claim for a violation of the Separation of Powers Clause ("Count I");

2) An APA and constitutional claim for a violation of the Take Care Clause ("Count II");

3) An APA claim for violations of the Impoundment Control Act of 1974 ("Count III");

4) An APA claim based on a lack of reasoned decision-making and action contrary to law ("Count IV");

5) An APA claim based on a failure to consider state reliance interests ("Count V");

6) An APA claim based on a failure to state a basis for agency action ("Count VI");

---

[14]   While GLO originally brought its own causes of action, it has not moved separately for injunctive relief.  Instead, GLO joined Plaintiff States' Motion, which is based only on Plaintiff States' claims.

> 7) An APA claim for violations of the Consolidated Appropriations
> Acts of 2020 and 2021 ("Count VII").

(7:21-CV-00420, Dkt. No. 1 at 21–35). The Government argues that Plaintiffs' claims are not judicially reviewable for three reasons: (1) Plaintiffs' APA claims—that is, Counts I through VII—fail because they are committed to agency discretion under Section 701(a)(2) of the APA, (Dkt. No. 96 at 40–45); (2) Plaintiffs do not fall within the zone of interests protected by those statutes with respect to Counts III and VII, (*id.* at 45–52); and (3) there is no cause of action for Plaintiffs' constitutional claims—Counts I and II, (*id.* at 59–63). The Court addresses each of these assertions in turn.[15]

### A.   COMMITTED TO AGENCY DISCRETION

The Government argues that under Section 701(a)(2) of the APA, agency action is not subject to judicial review to the extent that it is committed to agency discretion. (Dkt. No. 96 at 40). In appropriating funds for FY 2020 and 2021, Congress prescribed those funds toward "construction of [a] barrier system." § 209(a), 133 Stat. at 2511. The Government argues that Congress has "provide[d] no standards 'against which to judge the agency's exercise of discretion' in choosing how to allocate those funds among a range of lawful expenditures." (Dkt. No. 96 at 41). Thus, according to DHS, whether it decides to install additional barriers or engage in remediation of incomplete DoD barrier project sites, DHS's allocation decisions "are exempt from APA review." (*Id.*).

---

[15] The Government originally argued that Plaintiffs "failed to articulate a challenge to a proper final agency action." (Dkt. No. 24 at 42). However, Judge Alvarez rejected this argument in her analysis as to the viability of GLO's claims. (Dkt. No. 57 at 23–25). Since then, the Government's supplemental briefing on the preliminary injunction omits any argument that DHS's Plan did not constitute "final agency action" under the APA. (*See* Dkt. No. 96). So, the Government has abandoned that argument.

The Court first considers whether Plaintiffs' APA arbitrary-and-capricious claims are reviewable on the basis that the agency's allocation of funds is committed to its discretion.  Then, the Court considers whether Plaintiffs' APA contrary to law claim is reviewable.

### 1.    Arbitrary and Capricious

The Court now turns to Plaintiffs' arbitrary and capricious claims.[16]  Plaintiffs claim that the agency failed to adequately explain its decision and consider the relevant factors.  (*See* 7:21-CV-00420, Dkt. No. 1 at 29–34).  The Government insists that these claims are unreviewable because they challenge a funding decision committed to the agency's discretion.  (Dkt. No. 96 at 40–45).

The APA directs courts to "hold unlawful and set aside" agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."

---

[16]    Plaintiffs appear to make multiple arguments as to how DHS's June 2021 and July 2022 Plans are arbitrary and capricious.  At base, Plaintiffs challenge whether DHS has satisfied the second prong of the requirement that agency action must be "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423, 141 S.Ct. 1150, 1158, 209 L.Ed.2d 287 (2021).  There is a distinction between "reasonable" and "reasonably explained." *See Multicultural Media, Telecom & Internet Council v. FCC*, 873 F.3d 932, 936 (D.C. Cir. 2017).  A challenge as to the former is a "substantive unreasonableness claim" which "ordinarily is an argument that, given the facts, the agency exercised its discretion unreasonably." *Id.*  Such a finding would "generally mean[] that on remand, the agency must exercise its discretion differently and reach a different bottom-line decision." *Id.*  By contrast, a challenge as to the latter "ordinarily consists of a more modest claim that the agency has failed to adequately address all of the relevant factors or to adequately explain its exercise of discretion in light of the information before it." *Id.*  Plaintiffs submit that DHS failed to consider all of the relevant factors, (*see* 7:21-CV-00420, Dkt. No. 1 at 32–33) (Count V), and that DHS failed to adequately explain its decision, (*see id.* at 33–34) (Count VI).  But while Plaintiffs plead Count IV as a separate cause of action from Count VI, the substance is very similar, contending that "DHS provided no reasoning, much less sufficient reasoning, for its actions" and "failed to consider important aspects of the problem before it[.]" (*Id.* at 29–30).  Each of these arguments go toward the "reasonably explained" prong, challenging the sufficiency of DHS's justification (Counts IV and VI), and whether DHS considered all the relevant factors (Count V).

5 U.S.C. § 706(2). "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423, 141 S.Ct. 1150, 1158, 209 L.Ed.2d 287 (2021). This standard "is deferential," and the Court "may not substitute its own policy judgment for that of the agency." *Id*. But the Court must also ensure "that the agency has acted within a zone of reasonableness and, in particular, has reasonably considered the relevant issues and reasonably explained the decision." *Id*.

Agency action is arbitrary and capricious when:

> the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2867, 77 L.Ed.2d 443 (1983). Indeed, the agency action must rise or fall on the reasons the agency gave when it acted.[17] *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. ____, ____, 140 S.Ct. 1891, 1909, 207 L.Ed.2d 353 (2020). And the Court must not consider post hoc rationalizations. *State Farm*, 463 U.S. at 50, 103 S.Ct. at 2870. While arbitrary and capricious review is deferential, it "is not toothless[.]" *Sw. Elec. Power Co.*

---

[17]   Known as the "record rule," evaluation of an agency's actions is generally confined to the administrative record alone. *Medina Cnty. Envir. Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010). For good reason, absent this rule, "there would be little hope that the administrative process could ever be consummated in an order that would not be subject to reopening." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 555, 98 S.Ct. 1197, 1217, 55 L.Ed.2d 460 (1978). While there are exceptions to the record rule, *see Medina*, 602 F.3d at 706, supplementation of the administrative record is only allowed in "unusual circumstances." *Id*.

*v. United States Envtl. Prot. Agency*, 920 F.3d 999, 1013 (5th Cir. 2019).  "In fact, after

*Regents*, it has serious bite." *Wages & White Lion Investments, L.L.C. v. United States Food &*

*Drug Admin.*, 16 F.4th 1130, 1136 (5th Cir. 2021) (citation omitted).

"The APA establishes a basic presumption of judicial review for one suffering a

legal wrong because of agency action."  *Regents,*  591 U.S. at ____, 140 S.Ct. at 1905

(cleaned up).  This presumption can be rebutted by a showing that the "agency action is

committed to agency discretion by law[.]"  *Id.* (quoting 5 U.S.C. § 701(a)(2)).  However,

"to honor the presumption of review," this exception in Section 701(a)(2) is to be

construed "quite narrowly," *Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 586 U.S. ____,

____, 139 S.Ct. 361, 370, 202 L.Ed.2d 269 (2018), and applies only "in those rare

circumstances where the relevant statute 'is drawn so that a court would have no

meaningful standard against which to judge the agency's exercise of discretion.'"  *Lincoln*

*v. Vigil*, 508 U.S. 182, 191, 113 S.Ct. 2024, 2030–31, 124 L.Ed.2d 101 (1993) (quoting *Heckler*

*v. Chaney*, 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985)).

"The allocation of funds from a lump-sum appropriation is [an] administrative

decision traditionally regarded as committed to agency discretion."[18]  *Lincoln*, 508 U.S. at

192, 113 S.Ct. at 2031.  The seminal example of such an appropriation comes from *Lincoln*,

which concerned a challenge to a spending decision by the Indian Health Service.  *See id.*

at 184–85, 113 S.Ct. at 2027–28.  There, Congress authorized the Service to "'expend such

---

[18]   A lump-sum appropriation is simply "one that is made to cover a number of specific
programs, projects, or items," and "is available for more than one specific object."  *Ramah Navajo
Chapter v. Salazar*, 644 F.3d 1054, 1066 (10th Cir. 2011) (cleaned up).

moneys as Congress may from time to time appropriate, for the benefit, care, and assistance of the Indians,' for the 'relief of distress and conservation of health.'" *Id.* at 185, 113 S.Ct. at 2027–28 (quoting 25 U.S.C. § 13).  At issue was the Service's decision to discontinue the Indian Children's Program—which provided diagnostic and treatment services directed at disabled Indian children in the Southwest—and instead allocate those funds to a nationwide version of the program.  *Id.* at 184, 113 S.Ct. at 2027.  The *Lincoln* Court rejected the challenge, holding that that funding-allocations decisions from lump-sum appropriations are committed to agency discretion because "the very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way."  *Id.* at 192, 113 S.Ct. at 2031.

Post-*Lincoln*, the D.C. Circuit faced a similar challenge involving congressionally appropriated funds that subsidized milk production in *Milk Train Inc. v. Veneman*, 310 F.3d 747, 748–50 (D.C. Cir. 2002).  There, Congress appropriated funds "to provide assistance directly to . . . dairy producers, in a manner determined appropriate by the Secretary."  *Id.* at 751.  Milk producers challenged a regulatory cap on each farm's payment.  *Id.* at 749.  By compensating each farm up to a maximum amount "approximately equivalent to a herd of 150 cows," the Secretary of Agriculture's allocation decision had the effect of "bestow[ing] the bulk of the funding on smaller dairy farmers."  *Id.* at 749–50 (internal quotations omitted).  The D.C. Circuit ruled that the choice as to how to distribute the funds among eligible producers was "left to the Secretary's sole judgment" and therefore unreviewable under the APA.  *Id.* at 751.

In this case, like the challenges found unreviewable in *Lincoln* and *Milk Train*, Plaintiffs' arbitrary and capricious claims challenge discretionary agency spending. Just as the *Lincoln* appropriations were to be spent on "the benefit, care, and assistance of the Indians" and "relief of distress and conservation of health," 508 U.S. at 185, 113 S.Ct. at 2027–28, and the *Milk Train* appropriations were to be spent on "provid[ing] assistance directly to . . . dairy producers," 310 F.3d at 751, the $1,375,000,000 appropriations in both FY 2020 and 2021 must be spent on "construction of [a] barrier system[,]" *see* § 209(a)(1), 133 Stat. at 2511; § 210, 134 Stat. at 1456–57. To that end, "the agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Heckler,* 470 U.S. at 831–32, 105 S.Ct. at 1656. And that leaves "no meaningful standard against which to judge the agency's exercise of discretion," thereby precluding judicial review. *Lincoln*, 508 U.S. at 191, 113 S. Ct. at 2030–31. "In such a case, the statute ('law') can be taken to have 'committed' the decisionmaking to the agency's judgment absolutely." *Id.* at 191, 113 S.Ct. at 2031 (quoting *Heckler*, 470 U.S. at 830, 105 S.Ct. at 1655).

Courts are not empowered to review the adequacy of agency explanations regarding their discretionary spending of lump-sum appropriations. *See Milk Train*, 310 F.3d at 750–51; *Lincoln*, 508 U.S. at 194, 113 S.Ct. at 2032. Plaintiffs' arbitrary-and-capricious claims are therefore precluded from judicial review under Section 701(a)(2).

### 2.    <u>Contrary to Law</u>

Plaintiffs also claim that DHS's actions violate the APA because they are "contrary to the plain language of the 2020 and 2021" CAAs. (7:21-CV-00420, Dkt. No. 19 at 31). They argue that the CAAs directed that the funds at issue be spent only on the

construction of a barrier system along the Southwest border, and DHS is not using the funds for that purpose.  (*See* Dkt. No. 101 at 33–47).

While agencies are afforded discretion for certain lump-sum appropriations decisions, *see Milk Train*, 310 F.3d at 750–51, their actions still must remain within the bounds of the statute.  As *Lincoln* made clear, "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes[.]"  508 U.S. at 193, 113 S.Ct. at 2032.  While courts have rejected reviewability where it was undisputed that the funds were used in a statutorily permissible manner, courts have correspondingly determined that judicial review is available where an agency allegedly acted in a "statutorily *impermissible* manner."  *California v. Trump*, 379 F.Supp.3d 928, 953 (N.D. Cal. 2019), *aff'd*, 963 F.3d 926 (9th Cir. 2020).

As put by the Third Circuit, while "the specific execution by the agency to meet [permissible statutory] objectives may . . . be left entirely within its discretion," an aggrieved party can still "bring an action to challenge an agency's expenditures as inconsistent with the 'permissible statutory objectives' for which Congress appropriated the funds."  *Raymond Proffitt Found. v. U.S. Army Corps of Eng'rs*, 343 F.3d 199, 207–08 (3d Cir. 2003) (quoting *Lincoln*, 508 U.S. at 193, 113 S.Ct. at 2032; *accord Ramah Navajo Chapter v. Salazar*, 644 F.3d 1054, 1068 (10th Cir. 2011) (explaining that courts have no room to intrude as long as the agency is allocating lump-sum appropriations "to meet *permissible* statutory objectives" (emphasis added) (quotation omitted)).

Here, while the Government argues that DHS is given broad discretion "in choosing how to allocate [the funds at issue] among a range of lawful expenditures," (Dkt. No. 96 at 41), this position presupposes, and is contingent upon the Court finding, that the Government's choices are within the permissible statutory objectives for which Congress appropriated the funds.  The Government would have the Court assume that the challenged expenditures, such as "remediation of incomplete DoD barrier project areas," are within the range of lawful expenditures.  (*Id.*).  But one of Plaintiffs' central claims is that the agency's spending does not fall within this lawful range at all.  And this is a question for which there is an unmistakable limitation on agency discretion, i.e., whether the funds are being spent in a statutorily permissible manner—toward "construction of [a] barrier system."  The Court therefore finds that Plaintiffs' contrary-to-law claim—specifically, that DHS violated the 2020 and 2021 CAAs under the APA—is not precluded from judicial review under 5 U.S.C. § 701(a)(2).

## B.   ZONE OF INTERESTS

The APA generally provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof."  5 U.S.C. § 702.  But "Congress has placed limits on *who* can sue the Executive for violating the law and *how* they can do it."  *100-Day Pause*, 524 F.Supp.3d at 631 (emphasis in original).  "Congress, through the APA, has provided a cause of action for persons seeking redress against the federal government for violating other federal laws."  *Id.* (citing 5 U.S.C. §§ 702, 706).  But review of this kind is limited to plaintiffs whose interests fall within the zone of interests

protected by the statute allegedly violated.  *See, e.g.*, *Lexmark Int'l*, 572 U.S. at 129–30, 134 S.Ct. at 1388–89.

The zone-of-interests inquiry is not especially demanding in the APA context.  *See id.* at 130, 134 S.Ct. at 1389.  "In that context [the Supreme Court has] often 'conspicuously included the word arguably in the test to indicate that the benefit of any doubt goes to the plaintiff,' and ha[s] said that the test 'forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot be assumed that' Congress authorized that plaintiff to sue."  *Id.* (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225, 132 S.Ct. 2199, 2210, 183 L.Ed.2d 211 (2012)).  Crucially, the relevant statute in whose zone of interests the plaintiff's injury must reside "is to be determined not be reference to the overall purpose of the Act in question," but rather, "by reference to the particular provision of law upon which the plaintiff relies."  *Bennet v. Spear*, 520 U.S. 154, 175–76, 117 S.Ct. 1154, 1167, 137 L.Ed.2d 281 (1997).  Put differently, a court must review those "substantive provisions" of law that the plaintiff relies on for "the gravamen" of its complaint.  *Id.* at 175–76, 117 S.Ct. at 1167.

The Government argues that Plaintiffs do not fall within the zone of interests of the Impoundment Control Act ("ICA") and the 2020 and 2021 CAAs with respect to their

APA claims in Counts III and VII.[19]   (Dkt. No. 96 at 45–51).  The Court considers each statute.

### 1.      Impoundment Control Act

In Count III, Plaintiff States bring a claim under the APA alleging that DHS's actions violate the ICA.  (7:21-CV-00420, Dkt. No. 1 at 24–29).  The Government argues that Plaintiffs are not within the ICA's zone of interests for APA-reviewability purposes. (Dkt. No. 96 at 50–51).   However, the Court need not make a zone-of-interests determination because regardless of whether Plaintiffs are within the ICA's zone of interests, the Court finds that the ICA bars APA review.

The ICA was passed "in an effort to resolve disagreement between the Executive and Legislative branches over which has ultimate control of government program and fiscal spending policies."  *Dabney v. Reagan*, 542 F.Supp. 756, 760 (S.D.N.Y. 1982) (citing Decision of the Comptroller General B-115398, 54 Comp. Gen. 453, 453–54 (1974)).  Put simply, whenever the President determines that congressionally appropriated funds should be withheld from certain programs for one reason or another,[20] the ICA mandates

---

19      The Government also argues that Plaintiffs' constitutional claims, Counts I and II, are unreviewable because they do not "fall within the zone of interests to be protected or regulated by the . . . constitutional guarantee in question."  (Dkt. No. 96 at 60) (quoting *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 475, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982)).  But the Court need not consider this argument for the reasons stated in Section III.C, *infra*.

20      The ICA provides two ways for the President to withhold funds. The first is called a "deferral," by which the President may temporarily withhold budget authority from obligation within a fiscal year.  2 U.S.C. § 684.  And the second is called a "recission," by which the President may permanently cancel budget authority.  2 U.S.C. § 683.

that the President communicate the message to Congress in a particular way.  *See* 2 U.S.C. § 683.

As the Government points out, the ICA is enforced exclusively by the Comptroller General via civil suit.[21]  (Dkt. No. 96 at 51) (citing 2 U.S.C. § 687).  Moreover, these cases may only be brought in the United States District Court for the District of Columbia.  *See* 2 U.S.C. § 687.  And suits under Section 687 are not to be brought "until the expiration of 25 calendar days of continuous session of the Congress following the date on which an explanatory statement by the Comptroller General of the circumstances giving rise to the action contemplated has been filed with the Speaker of the House of Representatives and the President of the Senate."  *Id.*

The APA generally presumes reviewability.  *See* 5 U.S.C. § 701(a).  Still, Congress's inclusion of a cause of action—one that may only be brought by the Comptroller General

---

[21]   Section 687 reads in full:

> If, under this chapter, budget authority is required to be made available for obligation and such budget authority is not made available for obligation, *the Comptroller General is hereby expressly empowered*, through attorneys of his own selection, to bring a civil action in the United States District Court for the District of Columbia to require such budget authority to be made available for obligation, and such court is hereby expressly empowered to enter in such civil action, against any department, agency, officer, or employee of the United States, any decree, judgment, or order which may be necessary or appropriate to make such budget authority available for obligation. No civil action shall be brought by the Comptroller General under this section until the expiration of 25 calendar days of continuous session of the Congress following the date on which an explanatory statement by the Comptroller General of the circumstances giving rise to the action contemplated has been filed with the Speaker of the House of Representatives and the President of the Senate.

2 U.S.C. § 687 (emphasis added).

in the District of Columbia with strict temporal restraints—invokes the "ancient maxim" of *expressio unis est exclusion alterius*, i.e., the express mention of one thing excludes all others. *See Nat'l R.R. Passenger Corp. v. Nat'l Ass'n of R.R. Passengers*, 414 U.S. 453, 458, 94 S.Ct. 690, 693, 38 L.Ed.2d 646 (1974); *accord Stockman v. Fed. Election Comm'n*, 138 F.3d 144, 153–54 (5th Cir. 1998) (holding that the limited causes of action created under a statute were exclusive).

Most instructive here is *Block v. Community Nutrition Institute*, 467 U.S. 340, 104 S.Ct. 2450, 81 L.Ed.2d 270 (1984). There, in rejecting an APA claim on reviewability grounds, the Supreme Court explained that "when a statute provides a detailed mechanism for judicial consideration of particular issues at the behest of particular persons, judicial review of those issues at the behest of other persons may be found to be impliedly precluded." *Id.* at 349, 104 S.Ct. at 2456 (citations omitted). So too here, where the ICA provides that the Comptroller General may bring suit for alleged ICA violations and meticulously outlines the mechanism for doing so. *See* 2 U.S.C. § 687. Accordingly, Section 687 creates a strong "inference of intent" that is sufficient to draw the conclusion that APA review for ICA violations is improper. *See Bowen v. Mich. Acad. of Fam. Physicians*, 476 U.S. 667, 673 n.4, 106 S.Ct. 2133, 2137 n.4, 90 L.Ed.2d 623 (1986) ("[T]he presumption favoring judicial review of administrative action may be overcome by inferences of intent drawn from the statutory scheme as a whole."). In short, an alleged ICA violation has only one proper plaintiff: the Comptroller General. Plaintiffs' ICA-based APA claim is therefore precluded from judicial review.

Plaintiffs have made no showing to the contrary.  Plaintiffs rely on *California v. Trump*, 963 F.3d 926 (9th Cir. 2020), to demonstrate that Count III is reviewable.  (Dkt. No. 101 at 40).  But *California* does not apply, as that case did not concern the ICA; rather, it concerned certain provisions of the Department of Defense Appropriations Act of 2019.  *See* 963 F.3d at 931, 941.  Nothing in the statute challenged in *California* precluded judicial review.  In this instance, Section 687 makes clear that it is the Comptroller General—and only the Comptroller General—that may prosecute an alleged ICA violation.  The Court therefore finds Count III unreviewable.

### 2.       Consolidated Appropriations Acts

In Count VII, Plaintiffs bring an action under the APA alleging that that DHS's actions violate the 2020 and 2021 CAAs. (*See* 7:21-CV-00420, Dkt. No. 1 at 34–35).  The Government argues that this claim is unreviewable because Plaintiffs fall outside the zone of interests for the CAAs. (Dkt. No. 96 at 46–47).  The Court disagrees.

Plaintiffs essentially argue that they lie within the statutes' zone of interest because their interests align with Congress's interests.  (Dkt. No. 101 at 38).  They argue that they have an interest in "reinforcing constitutional separation-of-powers principles" and an interest in "enforcing Congress's obligation on" the agency.  *Id.*  Plaintiffs further argue that their separation-of-powers interests also preserve their integrity, dignity, and residual sovereignty.  *Id.*

The focus of Count VII is on Section 209(a) of the 2020 CAA and Section 210 of the 2021 CAA.  Section 209(a) of the CAA of 2020 provides:

Of the total amount made available under ''U.S. Customs and Border Protection—Procurement, Construction, and Improvements'', $1,904,468,000 shall be available only as follows:

(1) $1,375,000,000 for the construction of barrier system along the southwest border;

(2) $221,912,000 for the acquisition and deployment of border security technologies and trade and travel assets and infrastructure;

(3) $62,364,000 for facility construction and improvements;

(4) $199,519,000 for integrated operations assets and infrastructure; and

(5) $45,673,000 for mission support and infrastructure.

§ 209(a), 133 Stat. at 2511.  Section 210 of the CAA of 2021 obligates "an amount equal"

for FY 2021.  § 210, 134 Stat. at 1456–57.  While these sections do not expressly state that

Plaintiffs benefit from them, the zone-of-interests test does "not require any 'indication

of congressional purpose to benefit the would-be plaintiff.'"  *Patchak*, 567 U.S. at 225, 132

S.Ct. at 2210 (quoting *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399–400, 107 S.Ct. 750, 757,

93 L.Ed.2d 757 (1987)).

In enacting these CAAs, Congress's intentions were twofold.  First, Congress

intended to benefit itself, by placing certain restrictions on how obligated funds could be

spent.  *See Texas Educ. Agency v. United States Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir.

2021) ("Congress and Congress alone [has] the power of the purse.") (citations omitted.

And second, Congress intended to benefit the public at-large by providing for the

construction of a barrier system along the Southwest border.  *See, e.g., United States v.*

*Elder*, 601 F.Supp. 1574, 1578 (S.D. Tex. 1985) (recognizing that "[t]he ability to control

entry" into the United States "remains vital to the welfare and security of" all citizens and

"[p]rotection of the borders . . . benefit[s] . . . all Americans").  Plaintiffs' interests align

with both.  *California* shows why.

As mentioned, in *California*, a collation of states brought an APA challenge with

respect to the Department of Defense Appropriations Act of 2019 ("DAA").  *See* 963 F.3d

at 931.  Specifically, the case involved whether the DAA authorized the DoD to make

budgetary transfers from funds appropriated by Congress to it for other purposes in

order to fund the construction of a wall on the Southern border of the United States in

California and New Mexico.  *Id.*  Section 8005 of the DAA authorized the at-issue

budgetary transfer.[22]  *Id.* at 934 (quotation omitted).  Section 8005 was invoked to transfer

$2.5 billion of DoD funds appropriated for other purposes to fund border-wall

construction.  *Id.*  Sixteen states challenged this action under the APA, including on a

theory that the federal defendants violated Section 8005 of the DAA.  *Id.*  Relevant to this

---

[22]   Section 8005 provides, in relevant part, that:

> Upon determination by the Secretary of Defense that such action is
> necessary in the national interest, he may, with the approval of the
> Office of Management and Budget, transfer not to exceed
> $4,000,000,000 of working capital funds of the Department of Defense
> or funds made available in this Act to the Department of Defense for
> military functions (except military construction) between such
> appropriations or funds or any subdivision thereof, to be merged with
> and to be available for the same purposes, and for the same time
> period, as the appropriation or fund to which transferred[.]

Pub. L. No. 115-245, 132 Stat. 2981, 2999 (2018).

case, the court held that the states fell within Section 8005's zone of interests for three reasons. *See id.* at 942–43.

First, the Ninth Circuit found that the states' interests were congruent with Congress's interests in that their challenge furthered Congress's intent to tighten their control of the reprogramming process. *Id.* at 942. The Ninth Circuit reasoned that the states furthered Congress's intent because "even though Section 8005 does not require formal congressional approval to reprogram funds, the congressional committees expressly disapproved of DoD's use of the authority" in that case. *Id.* Second, the states' challenge strived to reinforce the same constitutional principle that Congress sought to protect through Section 8005, i.e., congressional power over appropriations. *Id.* The court reasoned that this was so because the states' interests "in reinforcing these structural separation of powers principles is unique but aligned with that of Congress because just as those principles are intended 'to protect each branch of [the federal] government from incursion by the others,' the 'allocation of powers in our federal system [also] preserves the integrity, dignity, and residual sovereignty of the States,' because '[f]ederalism has more than one dynamic.'" *Id.* at 943 (quoting *Bond v. United States*, 564 U.S. 211, 221–22, 131 S.Ct. 2355, 2364–65, 180 L.Ed.2d 269 (2011)). Those interests applied with "particular force because the use of Section 8005 . . . impact[ed] [the states'] ability to enforce their state environmental laws." *Id.* (citing *Massachusetts*, 549 U.S. at 518–19, 127 S.Ct. at 1454). And third, the Ninth Circuit reasoned that the historical use of Section 8005—e.g., invoking Section 8005 in 2004 to transfer funds to pay for storm damages incurred by air

force bases across Florida after a hurricane—demonstrated that the states benefitted from Section 8005 and therefore their interests were not too attenuated.  *See id.* at 943–44.

Two points from *California* are applicable here. First, like the states in *California*, Plaintiffs possess an interest in reinforcing Congress's power over appropriations.  And as *California* recognized, although federal separation-of-powers principles primarily benefit the federal branches of government in that they protect one from incursion by the other, Plaintiffs also benefit from federal separation of powers because these principles preserve Plaintiffs' integrity, dignity, and residual sovereignty.  Second, similar to how the states' interest in environmental legislation in *California* was linked to the DAA, Plaintiffs' interests in their territorial sovereignty and budgetary interests are linked to the relevant provisions of the CAAs.  For APA-reviewability purposes, Plaintiffs need only be *arguably* within the zone of interests protected by the CAAs.  *See Clarke*, 479 U.S. at 397, 107 S.Ct. at 756.  The Court finds that not only are Plaintiffs arguably within the zone of interests, they have clearly shown that they fall comfortably within it.

## C.   REVIEWABILITY OF CONSTITUTIONAL CLAIMS

The Government argues that Plaintiffs' constitutional claims fail because they merely "reassert[] allegations of statutory violations in constitutional terms."  (Dkt. No. 96 at 61).  It argues that because the separation-of-powers claim and Take Care Clause claim are simply allegations that the agency has exceeded its statutory authority, there is no real constitutional controversy.  (*See id.* at 59–63).

"Under well-settled precedent, courts must avoid deciding a constitutional issue if there is also present some other ground upon which the case may be disposed of."  *St.*

*Joseph Abbey v. Castille*, 700 F.3d 154, 165 (5th Cir. 2012) (cleaned up); *see also Neese v. S. Ry. Co.*, 350 U.S. 77, 78, 76 S.Ct. 131, 132, 100 L.Ed. 60 (1955) (observing "the traditional practice of . . . refusing to decide constitutional questions when the record discloses other grounds of decision"). Because the Court finds that the challenged agency action violates the APA, *see infra* Section IV, the Court declines to reach Plaintiffs' separation-of-powers and Take Care Clause claims (Counts I and II, respectively).[23]

## IV.   DISCUSSION

The Court has determined that Counts III through VI are not judicially reviewable, and the Court need not consider Counts I and II. Accordingly, the Court will now address Count VII—the contrary-to-law CAA claim.

### A.   LEGAL STANDARD

A preliminary injunction is an extraordinary remedy never awarded as a matter of right. *Benisek v. Lamone*, 585 U.S. 155, 158, 138 S.Ct. 1942, 1943, 201 L.Ed.2d 398 (2018). "In each case, courts must balance the competing claims of injury and consider the effect" on each party of the granting or withholding of the requested relief. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S.Ct. 365, 376, 172 L.Ed.2d 249 (2008). And in determining whether injunctive relief is proper, "courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982).

---

[23]   The relief sought by Plaintiffs on their constitutional claims is co-extensive with the relief sought on their APA claims.

A preliminary injunction should be granted where a movant shows (1) a substantial likelihood of success on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief, (3) that the balance of the equities tips in his favor, and (4) that an injunction is in the public interest.  *E.g.*, *Benisek*, 585 U.S. at 158, 138 S.Ct. at 1944–45.  "[N]one of the four prerequisites has a fixed quantitative value[;] [r]ather, a sliding scale is utilized, which takes into account the intensity of each in a given calculus."  *Texas v. Seatrain Int'l, S.A.*, 518 F.2d 175, 180 (5th Cir. 1975).

B.  APPLICATION

1.  <u>Substantial Likelihood of Success</u>

Plaintiffs argue that DHS violated the APA by acting contrary to the 2020 and 2021 CAAs when they obligated funds to something other than physical barriers at the Southwest border.  (Dkt. No. 101 at 45–47).  Plaintiffs argue that the Government was required to obligate roughly $1.4 billion towards construction of new border walls in each CAA and failed to do so.  (*See id.*).  The Government responds that it has complied with the plain language of the CAAs because its spending fits within the phrase "construction of [a] barrier system" and that even if it does not, the spending is a necessary expense. (Dkt. No. 96 at 57–59).

A core tenet of appropriations law is that the funds "shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a).  Ordinarily, federal appropriations disputes focus on whether an agency is permitted to obligate funds toward a certain purpose.  *See, e.g., U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1349 (D.C. Cir. 2012) (Kavanaugh, J.) (assessing

whether federal appropriations law permitted the purchase of bottled water) ("*The Navy Case*"); U.S. Government Accountability Office, *Principles of Appropriations Law* 3-17 (4th ed. 2017) (listing other examples of impermissible obligations).  Here, Plaintiffs contend that DHS has failed to properly obligate funds under Subsection 209(a)(1), while the Government says that it has.  The central question in this case, then, is this: Has the Government obligated FY 2020 and FY 2021 funds for the "construction of [a] barrier system"?  The answer is largely no.

Although Section 1301(a)'s language that "[a]ppropriations shall be applied *only* to the objects for which the appropriations were made" appears rigid, its application is somewhat flexible.  *See* 31 U.S.C § 1301(a) (emphasis added).  Indeed, the D.C. Circuit, Court of Federal Claims, Government Accountability Office, and Comptroller General have all recognized that Section 1301(a) "does not require that every authorized expenditure be expressly authorized in an appropriations act."  *Ass'n of Civilian Technicians v. Fed. Lab. Rels. Auth.*, 370 F.3d 1214, 1221 (D.C. Cir. 2004); *see also The Navy Case*, 665 F.3d at 1349; *South Carolina v. United States*, 144 Fed. Cl. 277, 284 (Fed. Cl. 2019) ("*The Claims Case*"); *Principles of Appropriations Law*, *supra*, at 3-14–17; 6 Comp. Gen. 619, 621 (1927).  This application is called the necessary expense doctrine, which courts employ to determine whether obligations comport with corresponding appropriations. *See The Navy Case*, 665 F.3d at 1349.

Applying the doctrine is a three-part process.  *See The Claims Case*, 144 Fed. Cl. at 284.  "For an expense to be found necessary, (1) there must be a logical relationship between the expenditure and the appropriation; (2) the expenditure must not be

prohibited; and (3) the expenditure must not be provided for in another appropriation." *Id.* (citation omitted).

The first step requires an assessment of the "purposes of the corresponding appropriation[,]" *Principles of Appropriations Law*, *supra*, at 3-17, which hinges on an examination of "the language of the appropriation," *id.* at 3-19. The Court starts with, of course, plain meaning. *See, e.g.*, *United States v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023), *cert. denied*, 144 S.Ct. 551 (2024). "When interpreting statutory language, words are given their ordinary, plain meanings, and language must be enforced unless ambiguous." *Id.* (citing *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 251, 130 S.Ct. 2149, 2156, 176 L.Ed.2d 998 (2010)). The Court may "deviate from the literal language of a statute only if the plain language would lead to absurd results, or if such an interpretation would defeat the intent of Congress." *Kornman & Assocs., Inc. v. United States*, 527 F.3d 443, 451 (5th Cir. 2008) (citation omitted).

Although plain meaning is the starting point, "[t]ext should never be divorced from context." *United States v. Koutsostamatis*, 956 F.3d 301, 306 (5th Cir. 2020). Depending on the phrase, context can mean both the immediate clause and "the broader context of the statute as a whole." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341, 117 S.Ct. 843, 846, 136 L.Ed.2d 808 (1997)). At times, "[s]tatutory history, 'the record of enacted changes Congress made to the relevant statutory text over time,' can also provide helpful context." *See Moore*, 71 F.4th at 395 (quoting *BNSF Ry. Co. v. Loos*, 586 U.S. ____, ____, 139 S.Ct. 893, 906, 203 L.Ed.2d 2019). "If applicable, canons of construction can be used to resolve remaining ambiguity." *Id.* (citing *Yates v. United States*, 574 U.S. 528, 1353 S.Ct.

1074, 191 L.Ed.2d 64 (2015)).  And, although "generally discouraged in this circuit," courts sometimes look to legislative history *after* applying other statutory-construction principles.  *Id.*  With the foregoing principles in mind, the Court turns its eyes to the CAAs.

Section 209 of the CAA of 2020 provides:

(a)  Of the total amount made available under ''U.S. Customs and Border Protection—Procurement, Construction, and Improvements'', $1,904,468,000 shall be available only as follows:

(1)  $1,375,000,000 for the construction of barrier system along the southwest border;

(2)  $221,912,000 for the acquisition and deployment of border security technologies and trade and travel assets and infrastructure;

(3)  $62,364,000 for facility construction and improvements;

(4)  $199,519,000 for integrated operations assets and infrastructure; and

(5)  $45,673,000 for mission support and infrastructure.

(b)  The amount designated in subsection (a)(1) shall only be available for barrier systems that—

(1)  use—

(A)  operationally effective designs deployed as of the date of enactment of the Consolidated Appropriations Act, 2017 (Public Law 115–31), such as currently deployed steel bollard designs, that prioritize agent safety; or

(B)  operationally effective adaptations of such designs that help mitigate community or environmental impacts of barrier system construction, including

> adaptations based on consultation with jurisdictions within which barrier system will be constructed; and

> (2) are constructed in the highest priority locations as identified in the Border Security Improvement Plan.

§ 209(a)–(b), 133 Stat. at 2511–12.  And as mentioned, the CAA of 2021 provides for "an amount equal" to that made available under Section 209(a)(1).  § 210, 134 Stat. at 1456–57.

The Court begins by looking to Subsection 209(a)(1).  The phrase "construction of [a] barrier system" is not defined in Section 209.  *See* § 209, 133 Stat. at 2511.  Accordingly, the Court looks to the "plain meaning at the time of enactment."  *Tanzin v. Tanvir*, 592 U.S. 43, 48, 141 S. Ct. 486, 491, 208 L.Ed.2d 295 (2020).  Dictionaries from the time of enactment are useful in this pursuit.  *See, e.g.*, *United States v. Radley*, 632 F.3d 177, 182–83 (5th Cir. 2011).

Three words in particular matter here: "construction," "barrier," and "system."  In 2019, Merriam-Webster's defined "construction" as "the process, art, or manner of building."  *Construction*, Merriam-Webster's Dictionary (11th ed. 2019).  "Barrier" was defined as "something that separates, demarcates, or serves as a barricade."  *Barrier*, Merriam-Webster's Dictionary (11th ed. 2019).  And "system" was defined as "a group of units so combined as to form a whole and to operate in unison."  *System*, Merriam-Webster's Dictionary (11th ed. 2019).  The definitions of "construction" and "barrier" connote building a physical structure that would serve as a barricade and a line of demarcation between the United States and Mexico at the Southwest border.  And "system" accounts for the large scale of the U.S.–Mexico border requiring different kinds of barriers such as walls, fencing, buoys and the like depending on the topography.  Thus,

when considered together, the plain meaning of these words indicate that Subsection 209(a)(1) appropriates funding for building physical barriers—i.e., additional walls, fencing, buoys, etc.  This plain meaning does not include the Government's definition, which it contends permits DHS to obligate funds to "[c]lose out/remediate in areas where the [DoD] previously constructed barrier[s] with military construction or counter-drug funding[,]"  and for the "[i]nstallation of barrier system attributes in areas where DoD previously constructed barrier[s] with military construction or counter-drug funding[.]"  (Dkt. No. 66-3 at 10).

Context confirms the Court's reading of the text.  Words are interpreted "in their context and with a view to their place in the overall statutory scheme."  *Davis v. Mich. Dep't of Treasury*, 489 U.S. 803, 809, 109 S.Ct. 1500, 1504, 103 L.Ed.2d 891 (1989).  Section 209(b) elaborates on or gives an example of the type of new barrier that should be built.  It states that funds under Subsection (a)(1) "shall only be available for barrier systems that . . . use . . . operationally effective designs deployed as of the date of enactment of the Consolidated Appropriations Act, 2017 (Public Law 115–31), *such as currently deployed steel bollard designs*, that prioritize agent safety[,]" § 209(b)(1)(A), 133 Stat. at 2512 (emphasis added), or "operationally effective adaptations of such designs[,]" *id.* § 209(b)(1)(B), 133 Stat. at 2512.  And so, by its plain terms, Section 209(b) provides an example of what spending on a "construction of [a] barrier system" looks like—in this case, spending on new steel bollard walls.[24]

---

[24]   While "bollard" is undefined, it means "a series of posts."  *Bollard*, The American Heritage Dictionary (5th ed. 2011).

Looking at Subsections 209(a)(1) through (5) as a whole for context is instructive and also points toward a requirement that the funds be spent on physical barriers. In total, Section 209(a) appropriates roughly $1.9 billion in funds. It provides further that these funds "shall be available *only* as follows[.]" § 209(a), 133 Stat. at 2511 (emphasis added). Inclusion of the term "only" indicates an intent by Congress to place the following items into separate and distinct buckets. *See N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1258 (D.C. Cir. 2020) (explaining that the CAA of 2020 "continue[s] to fund 'the acquisition and deployment of border security technologies and trade and travel assets and infrastructure' *separately* from construction of a 'barrier system'" (emphasis added)); *United States v. 0.720 Acres of Land*, 603 F.Supp.3d 482, 488–90 (S.D. Tex. 2022) (adopting interpretation of a similarly-worded appropriations act) ("*Acres*"). There are five buckets in this case.

The first bucket, Subsection 209(a)(1) allocates the bulk of the funds—roughly 72%—toward the "construction of [a] barrier system along the southwest border[.]" § 209(a)(1), 133 Stat. at 2511. The remaining 28% is shared between subsections (a)(2) through (5). *See id.* § 209(a)(2)–(5). The meaning of these other subsections further indicates that Subsection 209(a)(1) only allocates funds toward the construction of a physical barrier. The Court begins with Subsection 209(a)(1)'s next-door neighbor— Subsection 209(a)(2).

Subsection 209(a)(2) allocates funds toward "the acquisition and deployment of border security technologies and trade and travel assets and infrastructure." § 209(a)(2) 133 Stat. at 2511. This subsection funds, then, two sets of items—(1) "border security

technologies" and (2) "trade and travel assets and infrastructure." *Id.*; *see also Acres*, 603 F.Supp.3d at 488–89. And they have distinct meanings. The term "border security technologies" encompasses security cameras, sensors, and the like. *See Acres*, 603 F.Supp.3d at 489. "[T]rade and travel assets and infrastructure" is a term of art used by DHS. *Id.* It means "those assets and infrastructure needed to conduct the Trade and Travel mission, including integrated screening, scanning, biometric, and transaction processing systems to enhance the interception of potential threats before they can cause harm while expediting legal trade and travel[.]" *Id.* (cleaned up). Accordingly, Subsection (a)(2)'s language indicates that it allocates funding for non-barrier items crucial to border security—much like many of the items on which DHS would like to spend Subsection (a)(1) allocated money.

Subsection 209(a)(3) allocates funding toward "facility construction and improvements[.]" § 209(a)(3) 133 Stat. at 2511. This appropriation, like Subsection 209(a)(1), funds construction. But Subsection 209(a)(3) is different from Subsection (a)(1) in two distinct ways. First, unlike Subsection 209(a)(1), which funds *barrier system* construction, Subsection 209(a)(3) funds *facility* construction. *Compare* § 209(a)(1) 133 Stat. at 2511, *with id.* § 209(a)(3), 133 Stat. at 2512. Congress's decision to separately appropriate funds toward *facility* work indicates that Subsection 209(a)(1)'s "barrier system" is not an all-encompassing system. And second, unlike Subsection 209(a)(1), which only funds *construction*, Subsection 209(a)(3) funds both construction and improvements. The inclusion of both terms suggests that they each mean something different. *See, e.g., Latiolais v. Huntington Ingalls, Inc.*, 951 F.3d 286, 294 (5th Cir. 2020) (en banc) (opining on

48

surplusage canon). Construction means the addition of new physical entities, and for Subsection 209(a)(3) purposes, that means the addition of new facilities.   An improvement, on the other hand, is "something that enhances value or appearance," or "the act or process of improving[.]"   *Improvement*, Merriam-Webster's Dictionary (11th ed. 2019).   Unlike the process of construction, which in some instances can transform once-empty fields into whole developments, improvements require pre-existing structure.   *See Beaver Lakes Corp. v. Ponzie*, 484 P.2d 1255, 1257 (Colo. App. 1971) ("[C]onstruction . . . [involves] new structure[s] . . . not before existing as differentiated from betterments, repairs, improvements, and the like, on previously constructed or existing improvements.").   Congress's use of different phrases—"construction" and "improvement" in Subsection 209(a)(3)—weighs against adopting DHS's reading of Subsection 209(a)(1) that enhancements, improvements, environmental remediation efforts and the like constitute "construction of [a] barrier system."   In sum, Subsection 209(a)(3)'s limitations confirm that Subsection 209(a)(1)'s appropriation is limited to the construction of new physical barriers (or their equivalents) at the Southwest border.

Subsection 209(a)(4) allocates funding for "integrated operations assets and infrastructure[.]"   § 209(a)(4), 133 Stat. at 2511.   The term "integrated operations" is undefined in the statute.   Merriam-Webster defines "integrate" as "to form, coordinate, or blend into a functioning whole" or "to incorporate into a larger unit[.]"   *Integrate*, Merriam-Webster's Dictionary (11th ed. 2019).   "Operations" is defined as "a military action or mission[.]"   *Operation*, Merriam-Webster's Dictionary (11th ed. 2019).   Taking these terms together, the purpose of Subsection 209(a)(4) is to fund DHS's actions,

missions, and plans involving different facets of DHS or involving DHS and its interactions with different agencies.  Further, Subsection 209(a)(4) lays out the universe of items that may be funded—assets and infrastructure.  This language is broad.  An "asset" is defined as "the entire property of a person or company[.]"  *Asset*, Merriam-Webster's Dictionary (11th ed. 2019).  And "infrastructure" is defined as a "system of public works of a country, state, or region"; "the resources . . . required for an activity[,]" *Infrastructure*, Merriam-Webster's Dictionary (11th ed. 2019), or "the permanent installations required for military purposes[,]" *Infrastructure*, https://www.merriam-webster.com/dictionary/infrastructure (last visited Mar. 8, 2024).  And so, Subsection 209(a)(4) allocates funding to property pertaining to DHS personnel missions and plans involving different facets of DHS or involving DHS and its interactions with different agencies.

Finally, Subsection 209(a)(5) allocates funding for "mission support and infrastructure[.]"  § 209(a)(5), 133 Stat. at 2511.  These terms are also in the statute.  Merriam-Webster defines "mission" as a "task" or "objective," *Mission*, Merriam-Webster's Dictionary (11th ed. 2019), or "a definite military, naval, or aerospace task[,]" *Mission*, https://www.merriam-webster.com/dictionary/mission  (last visited Mar. 8, 2024).  "Support" is defined as "the act of supporting"; "the state of being supported," *Support*, Merriam-Webster's Dictionary (11th ed. 2019), "giv[ing] assistance to, especially financially; enable to function or act[,]" or "material assistance[.]"  *Support*, https://www.merriam-webster.com/dictionary/support (last visited Mar. 8, 2024).  And, as stated above,  "infrastructure" is defined as a "system of public works of a

country, state, or region"; "the resources . . . required for an activity[,]" *Infrastructure*, Merriam-Webster's Dictionary (11th ed. 2019), or "the permanent installations required for military purposes[,]" *Infrastructure*, https://www.merriam-webster.com/dictionary/infrastructure (last visited Mar. 8, 2024).  Taken together, Subsection 209(a)(5)'s allocation represents a catch-all provision that funds anything that supports DHS's objective.  In other words, it is designed to give DHS broad flexibility but only as to the total amount appropriated for this bucket (roughly $46 million, by far the smallest amount appropriated under Section 209).

In sum, Congress broke Section 209(a) down into five distinct subsections.  *See Wolf*, 977 F.3d at 1258.  As laid out above, with the exception of Subsection 209(a)(5), which is a generalized catch-all, each of these subsections have clearly separate and distinct purposes.  This distinctness goes for Subsection 209(a)(1) as well, as it pertains to the construction of a barrier system, and a barrier system alone.  In light of this context, the Court finds that Subsection 209(a)(1) pertains solely to the construction of new barriers at the Southwest border.

The vast majority of the Government's FY 2020 and 2021 obligations are not allocated to new wall construction.  The Government offers the declaration of Paul Enriquez, a U.S. Customs and Border Patrol official, to support its contention that it complied with the CAAs' requirements.  (*See* Dkt. No. 96-2).  But the declaration tells a different story.  In fact, Enriquez makes clear that the only new wall that is being constructed is in two locations where they are filling gaps in existing walls.  (*Id.* at 5, 10).  Specifically, the Government is constructing "a structure for crossing over the Tijuana

River channel" because of a "current gap in infrastructure[.]"  (*Id.* at 5).  And the Government is "filling an approximately 500-foot gap in the existing barrier with 18-foot bollard-style barrier" at the Yuma Hill project.  (*See id.* at 10).  So, in those instances, the Government is complying with Subsection 209(a)(1)'s requirements.  But the remainder of the other obligations are for costs that fall outside of Subsection 209(a)(1).  Indeed, the bulk of the declaration discusses remediation, replacement of existing barrier, and so-called "system attribute" installation at various project sites, which lay outside Subsection 209(a)(1)'s requirements.  (*See* Dkt. No. 96-2).

In sum, the bulk of the Government's obligations in the Plan do not comply with Subsection 209(a)(1), which requires that those appropriations be obligated for the construction of barriers at the Southwest border.  Therefore, the Court finds Texas has shown a substantial likelihood of success on the merits of its contrary-to-law claim under the APA in Count VII.

### 2.   Irreparable Harm

In addition to demonstrating a substantial likelihood of success on the merits, Plaintiffs must demonstrate "a substantial threat of irreparable injury if the injunction is not issued[.]"  *Texas v. United States*, 809 F.3d 134, 150 (5th Cir. 2015), *as revised* (Nov. 25, 2015) ("*DAPA*"), *aff'd by an equally divided court sub nom. United States v. Texas*, 597 U.S. 547, 548, 136 S.Ct. 2271, 2272, 195 L.Ed.2d 638 (2016) (quotation omitted).  Put another way, Plaintiffs must show they are "*likely* to suffer irreparable harm in the absence of preliminary relief."  *Winter*, 555 U.S. at 20, 129 S.Ct. at 374 (emphasis added).  For an injury to be sufficiently "irreparable," Plaintiffs need only show that the injury "cannot

be undone through monetary remedies." *Burgess v. Fed. Deposit Ins. Corp.*, 871 F.3d 297, 304 (5th Cir. 2017) (quotation omitted).

Plaintiffs have presented evidence demonstrating that the Government's failure to comply with the CAAs will result in greater numbers of illegal aliens entering the United States and Texas than would otherwise enter if the CAAs were spent as Congress specified.  The anticipated increase in the number of illegal aliens in Texas will impose costs on Texas, including in the areas of driver's licenses, education, and healthcare.  The Court finds that these injuries are concrete, imminent, and traceable to the conduct about which Plaintiffs complain.  The Court further finds that the threat of injuries to Plaintiffs is "likely" as that term is used by the Supreme Court.  *See Winter*, 555 U.S. at 20, 129 S.Ct. at 374.

There is also no indication Plaintiffs will ever be able to recover for their injuries. Indeed, there is no immediately discernable theory under which a state can pierce the federal government's usual sovereign immunity or contrive a remedial cause of action sufficient to recover from its budgetary harm.  *DAPA*, 809 F.3d at 186 (observing that the states' likelihood of "retracting . . . benefits" from the federal government "would be 'substantially difficult—if not impossible'").  To that point, no Party has suggested that Plaintiffs can recover any of their likely financial injuries.  In fact, the Fifth Circuit rebuffed an attempt by Texas in the late 1990s to force the federal government to pay medical, educational, and criminal justice expenditures caused by illegal immigration. *See Texas v. United States*, 106 F.3d 661, 663–64 (5th Cir. 1997) ("The State of Texas and its political subdivisions . . . appeal a Fed. R. Civ. P. 12(b)(6) dismissal of their complaint

seeking declaratory and injunctive relief which would require that the United States pay the educational, medical, and criminal justice expenses allegedly incurred as a result of the presence of undocumented or illegal aliens in Texas.  Concluding that the complaint raises questions of policy rather than colorable claims of constitutional or statutory violations, we affirm.").  Thus, Plaintiffs' financial injury is irreparable.

The Court finds that Plaintiffs have demonstrated they are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20, 129 S.Ct. at 374; *see also Wages,* 16 F.4th at 1142 ("Indeed, complying with an agency order later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs." (cleaned up)).

### 3.   The Balance of Equities and the Public's Interest

Having concluded Plaintiffs have satisfied the first two elements for obtaining a preliminary injunction, the Court must now determine whether "the threatened injury outweighs any harm that may result from the injunction to the non-movant" and whether "the injunction will not undermine the public interest." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997); *see also Gonzales v. Mathis Indep. Sch. Dist.*, 978 F.3d 291, 294 (5th Cir. 2020).  Federal courts often consider the balance-of-equities and public-interest elements together, as they overlap considerably.  *DAPA*, 809 F.3d at 187; *Franciscan All., Inc. v. Burwell*, 227 F.Supp.3d 660, 694 n.36 (N.D. Tex. 2016).  And because the Government is the nonmoving party, these two elements "merge."  *Nken v. Holder*, 556 U.S. 418, 435, 129 S.Ct. 1749, 1762, 173 L.Ed.2d 550 (2009).

In weighing the equities, a court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542, 107 S.Ct. 1396, 1402, L.Ed.2d (1987). When determining whether an injunction will undermine the public interest, a court should consider the public interests that may be injured and those that may be served by granting or denying a preliminary injunction. *See Sierra Club v. U.S. Army Corps of Eng'rs*, 645 F.3d 978, 997–98 (8th Cir. 2011) (citations omitted).

Here, without a preliminary injunction, Plaintiffs will be "threatened with substantial harm" to their state budgets. *See Burwell*, 227 F. Supp. 3d at 694. As discussed earlier, the Court has found Plaintiffs' injuries are traceable to the implementation of the Plan. And because "the public is served when the law is followed," *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013), the public would be served if the Executive Branch is enjoined from obligating funds in a manner that conflicts with the plain language of an appropriations bill. *See League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action."); *Blackie's House of Beef, Inc. v. Castillo*, 659 F.2d. 1211, 1221 (D.C. Cir. 1981) ("[T]he public interest in enforcement of the immigration laws is significant." (collecting cases)).

Here, the Government lacks an interest in the perpetuation of a plan that is unlawful. Given the discussion above, the Court concludes that the potential harms to Plaintiffs outweigh any potential harms to the Government. The Court also concludes the public interest is served, rather than undermined, by an injunction. Thus, Plaintiffs have

satisfied all four elements for a preliminary injunction.  Because these factors weigh in favor of issuing an injunction, the Court finds that one should issue here.

## V.   CONCLUSION

For the foregoing reasons, the Court **GRANTS** the Motion for Preliminary Injunction in part.  (Dkt. No. 19).  Therefore, it is hereby **ORDERED** that:

1.   The Government and all its respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them are hereby **ENJOINED** and **RESTRAINED** from implementing the July 2022 Amended Plan to the extent that its obligations are not authorized under Subsection 209(a)(1) and Section 210 as laid out in this Order.

2.   The Government is prohibited from obligating funds under Subsection 209(a)(1)—and corresponding funds under Section 210—toward mitigation and remediation efforts, repair of existing barrier, so-called system attribute installation at existing sites, or other similar purposes.  Those types of expenses may be authorized under Subsections (a)(2) through (a)(5) where appropriate, however, Subsection (a)(1) permits only the construction of physical barriers, such as additional walls, fencing, buoys, etc.

3.   This preliminary injunction shall remain in effect pending a final resolution of the merits of this case or until a further Order from this Court, the United States Court of Appeals for the Fifth Circuit or the United States Supreme Court.

This Order shall not affect obligations that are permissible under other Subsections of the CAAs.

No security bond is required under Federal Rule of Civil Procedure 65(c).

The Court **STAYS** the effect of this Final Judgment for seven days from the date of entry to allow the Defendants to seek relief at the appellate level.

It is SO ORDERED.

Signed on March 8, 2024.

_____
**D**REW **B.** **T**IPTON
**UNITED STATES DISTRICT JUDGE**