# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF TEXAS
# MCALLEN DIVISION

| | |
|---|---|
| THE STATE OF MISSOURI; THE STATE OF TEXAS,<br><br>     Plaintiffs,<br><br>  v.<br><br>JOSEPH R. BIDEN, in his official capacity as President of the United States, *et al.*<br><br>     Defendants. | No. 7:21-cv-00420<br>(formerly No. 6:21-cv-00052) |
| THE GENERAL LAND OFFICE OF THE STATE OF TEXAS, and DAWN BUCKINGHAM, M.D., in her official capacity as Commissioner of the Texas General Land Office,<br><br>     Plaintiffs,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; and ALEJANDRO MAYORKAS, in his official capacity as Secretary of the Department of Homeland Security,<br><br>     Defendants. | No. 7:21-cv-00272 |

# PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION FOR CLARIFICATION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 3

STANDARD OF REVIEW ................................................................................... 4

ARGUMENT ........................................................................................................ 5

    I.   Defendants Can Pay for Their Activities Using Billions of Dollars in Discretionary Funds Provided by Congress, Including Funds Provided as Recently as Last Saturday. ................................................................................. 6

    II.  The Court's Order Prohibits the Use of Subsection (a)(1) Funds for Defendants' "Additional Projects," and it Is Improper for Defendants to Request That This Court Bless Projects by Name........................................... 16

CONCLUSION................................................................................................... 19

CERTIFICATE OF COMPLIANCE .................................................................. 22

CERTIFICATE OF SERVICE ........................................................................... 22

## INTRODUCTION

The "motion for clarification" should be denied because Defendants can obtain their goals using other available buckets of funding.[1]  As this Court held, "Subsection 209(a)(1) pertains solely to the construction of new barriers at the Southwest border." Op. at 51.  Defendants nonetheless seek to use these subsection (a)(1) funds for activities *other* than directly building border barriers, including "support services," "oversight" and "close-out activities."  ECF 133 at 10, 13.

But Congress gave Defendants tools to accomplish these tasks through other sources of funding.  In fact, just last Saturday, the funding bill for Fiscal Year 2024 was signed into law, providing Defendants immediately with $18 billion of largely discretionary dollars for general "operations and support," as well as an additional $17.67 million "for mission support and infrastructure."  H.R. 2882, Further Consolidated Appropriations Act, 2024, Division C, Title II at 332–33, 346.[2]  This Court interpreted this exact same language to be a "catch-all provision" that funds all the ancillary activities Defendants want to undertake.  Op. at 51 (ECF 128).

The $18 billion for "operations and support" that Defendants just received likewise is a catch-all provision.  The FY 2024 Act expressly says that "operations and support" includes projects as diverse as construction of "roads," "enforcement or administration of laws enforced by the Department of Homeland Security" (*e.g.,*

---

[1]    This Court requested that Plaintiffs respond to Defendants' stay request (ECF 133) by March 22, 2024, and to what Defendants style a "motion for clarification" by close of business March 27.  Plaintiffs timely responded to the stay request (ECF 134), and the Court extended the stay through March 28, 2024 (ECF 135).  Plaintiffs now respond to Defendants' "clarification" request.

[2]    https://www.congress.gov/118/bills/hr2882/BILLS-118hr2882eah.pdf

immigration laws), and provision of "support to Federal, State, and local agencies"—all things Defendants now say they want to accomplish with the much smaller subsection (a)(1) bucket. *Id.* at 332–34. Indeed, the Act even acknowledges that "operations and support" includes "construction of fencing." *Id.* at 345. These provisions are longstanding. Although the numbers have changed, these provisions are substantively the same as the FY 2023 Act. Consolidated Appropriations Act, 2023, Pub. L. No. 117–328, Division F, Title II; 136 Stat. 4729–30, 4735.[3]

Defendants' motion thus threatens the fundamental and basic design of Congress's funding bills. Each year, Congress gives Defendants enormous sums of money for its general discretionary use—even saying Defendants can use those funds to construct border barriers. But rather than rely on those enormous discretionary buckets to conduct their activities that are not wall construction, Defendants seek to tap the only sources of funds that are reserved exclusively for constructing border barriers. They have not met their burden of justifying relief from the PI.

Defendants' motion was wrong at the outset, but it is especially incorrect in light of the large influx of discretionary cash Congress gave Defendants just days ago.

## STANDARD OF REVIEW

The Federal Rules of Civil Procedure do not expressly recognize motions styled as a "motion for clarification" or "motion for reconsideration." *See Vladmir Ltd. v. Pac. Parts Supply Co., Inc.*, 75 Fed. R. Serv. 3d 80 (W.D. Tex. 2009). Indeed, neither Rule 54(b) (nonfinal orders) nor Rule 59(e) (final judgments) specifies any standard

---

[3] https://www.govinfo.gov/content/pkg/PLAW-117publ328/pdf/PLAW-117publ328.pdf

for assessing these motions.  Courts have nonetheless held that these motions are cognizable: "a district court 'possesses the inherent procedural power to reconsider, rescind, or modify an interlocutory order for cause seen by it to be sufficient.'" *Colli v. So. Methodist Univ.*, No. 08-CV-1627, 2011 WL 3524403 at *1 (N.D. Tex. Feb. 14, 2011) (quoting *Melancon v. Texaco, Inc.*, 659 F.2d 551, 553 (5th Cir.1981)).

But reconsideration is generally appropriate only in limited circumstances. Such a motion is not an opportunity "to rehash … previously made arguments or … raise an argument for the first time without justification." *Dos Santos v. Bell Helicopter Textron, Inc. Dist.*, 651 F. Supp. 2d 550, 553 (N.D. Tex. 2009) (citing *McLaughlin v. Unum Life Ins. Co. of Am.*, 212 F.R.D. 40, 41 (D. Me. 2002)).  "Relief on reconsideration is an extraordinary remedy that should be granted sparingly." *Par Sys., Inc. v. iPhoton Sols.*, LLC, No. 4:10-CV-393-Y, 2012 WL 12885086, at *1 (N.D. Tex. May 8, 2012) (citing *Templet v. HydroChem, Inc.*, 367 F.3d 473, 479 (5th Cir. 2004)).  "Reconsideration under Rule 59(e) is appropriate only where (1) it can be clearly established that the court committed either a manifest error of law or fact; (2) the court is presented with newly discovered evidence; or (3) there has been an intervening change in controlling law." *Id.* (citing *Schiller v. Physicians Res. Group, Inc.*, 342 F.3d 563, 567-68 (5th Cir. 2003)).

## ARGUMENT

This Court should deny what Defendants stylize as a "motion for clarification." This Court already concluded that "the bulk of the Government's obligations in the Plan do not comply with subsection 209(a)(1), which requires that those

appropriations be obligated for the construction of barriers at the Southwest border." Op. at 52. None of the activities raised in the motion provides sufficient justification for modifying the Court's order. Defendants seek to use funds under subsection (a)(1) for purposes *other* than constructing new physical barriers—even though they have plenty of other funds they can use for those ancillary activities. Defendants' other request asks this Court to bless by name projects Defendants believe comply with this Court's order, but that request is both unnecessary and comes dangerously close to seeking an advisory opinion. Plaintiffs address these issues in turn.

## I.    Defendants Can Pay for Their Activities Using Billions of Dollars in Discretionary Funds Provided by Congress, Including Funds Provided as Recently as Last Saturday.

In proposing to use subsection (a)(1) funds for activities that are not wall construction, Defendants not only run headlong against the Court's order; they also seek unnecessary relief. That relief is unnecessary because Defendants can fund those activities using other available buckets of funding. Defendants raise several categories of spending they believe the Court should permit: (1) "Project Costs Required to Support Construction of Physical Barrier;" (2) "Replacement Barrier Projects;" (3) "Disposition of Excess Bollards and Construction Materials;" and (4) "Wind Down Costs to Comply with the Court's Injunction." ECF 133 at 5–20. As none of these activities are the "construction of physical barriers, such as additional walls, fencing, buoys, etc.," Op. at 56, the Court should reiterate that Defendants are prohibited from paying for these activities by obligating funds from subsection (a)(1).

Instead, Defendants must fund those activities using other buckets, and they have plenty to choose from.  As the movants, they bear the burden of establishing that this Court should modify the preliminary injunction.  They have made no effort to explain why they must use funds within subsection (a)(1) given that the plain text of recent spending bills—including one enacted just last week—shows that Congress each year gives Defendants billions of dollars to fund the activities they raise in their motion.

This Court identified one bucket that provides funding for these activities: subsection 209(a)(5) of the FY 2020 Act, which is a "catch-all provision that funds anything that supports DHS's objectives." Op. at 51. That subsection provides $45.67 million "for mission support and infrastructure." *Id.* at 44.  And last Saturday, Congress refilled that bucket with $17.67 million.  H.R. 2882 at 346.

Much larger sources of funding are also available.  Each year, Congress designates *billions* of dollars for general operational expenses without imposing restrictions in ways that would prohibit Defendants from using those funds for the activities they identify.  The bill enacted last week provides an excellent—and archetypal—example.  It provides $18.43 billion for general "operations and support" and notes that "operations and support" includes, but is not limited to, diverse activities such as:

(1) "maintenance and repair of roads … used by the U.S. Border Patrol"

(2) supporting "enforcement or administration of laws enforced by the Department of Homeland Security"

(3) "the provision of such support to Federal, State, and local agencies in other law enforcement and emergency humanitarian efforts"

(4) "compensation to informants," and

(5) obtaining "rental space"[4]

*Id.* at 332–34.

Indeed, this fund is so diverse that Defendants can even use it "for the construction of fencing"—as long as they do not put fences in "historic cemeteries" or wildlife refuges such as the "Santa Anna Wildlife Refuge Center."  *Id.* at 345 (incorporating areas identified in FY 2021 Act); *see also* Department of Homeland Security Appropriations Act, 2021, Division F, § 211, Pub. L. No. 116–260, 134 Stat. 1457 (identifying six conservation areas or cemeteries where construction of border barriers is prohibited).[5]

There is nothing unusual about this bill.  Although the numbers are different from the FY 2023 Act, the substance of both bills is the same.  As is typical for appropriations bills, Congress largely copies and pastes most language from year to year, updating only the numbers.  With respect to the provisions described in this brief, the FY 2024 and FY 2023 Acts are substantively identical.  Both appropriate multi-billion-dollar funds for Defendants to use with their discretion for general "operations and support."  *See* Consolidated Appropriations Act, 2023, Pub. L. No. 117–328, Division F, Title II; 136 Stat. 4459, 4729–30, 4735 (providing $15.6 billion for general "operations and support").[6]

---

[4] Appropriations Acts have also stated that "Operations and Support" includes "border road maintenance." *E.g.*, Consolidated Appropriations Act, 2017, Pub. L. No. 115-31, 131 Stat. 433, Division F, Title VI, *available at* https://www.govinfo.gov/content/pkg/PLAW-115publ31/pdf/PLAW-115publ31.pdf

[5] https://www.congress.gov/116/plaws/publ260/PLAW-116publ260.pdf

[6] https://www.govinfo.gov/content/pkg/PLAW-117publ328/pdf/PLAW-117publ328.pdf

Although the substance of the FY 2024 Act is not meaningfully different, the $18.43 bucket reflects a substantial increase.  The FY 2023 Act included $15.6 billion for the fiscal year.  The Act passed last week, amounts to an 18% increase—even though there are only six months left in the fiscal year.

The $18.43 billion bucket in 2024 and $15.6 billion bucket in 2023 are not even the only buckets available.  About $9.5 billion is provided in the FY 2024 Act to Immigration and Customs Enforcement "for operations and support."  *See* H.R. 2882 at 334.  The FY 2023 Act provided $8.4 billion for the same purpose.  136 Stat. 4725, 4730.

Congress imposed only minimal restrictions on these funds, leaving Defendants with billions of dollars they can use at their discretion for their general operations.  For example, the FY 2024 Act directs Defendants to set aside 3.5% of the $18 billion fund for the Federal Emergency Management Agency, and it places ceilings on some activities, but not any activities that Defendants seek to do.  H.R. 2882 at 333.  For example, the provision says that Defendants cannot "exceed $2,500,000" in costs for building roads "on Native American reservations used by the U.S. Border Patrol," but it includes no ceiling for building roads *off* reservations.  *Id.* at 334.  And it says that Defendants cannot use the $18 billion to build border barriers in historic cemeteries or six identified conservation areas.  *Id.* at 345.  But it leaves Defendants otherwise free to build border barriers wherever they like—and to also conduct the ancillary activities they identify in their motion.  Again, these are not

new.  They are identical to the provisions passed in the FY 2023 Act.  *E.g.*, 136 Stat. at 4730, 4735.

This broad authority contrasts sharply with the limits Congress imposed on Defendants in the appropriations provisions this Court assessed in the preliminary injunction.  For example, the FY 2020 Act provides $1,904,468,000 for "procurement, construction, and improvements" and then mandates that $1,375,000,000 *must* be used solely "for the construction of barrier system along the southwest border." Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, 133 Stat. 2317, 2506, 2511; *see also* Op. at 44.  In other words, Defendants *can* use the $18-billion bucket to construct border barriers, conduct ancillary activities, or a mix.  But Defendants *must* use the $1.375-billion bucket solely for constructing barriers.

That exposes just how odd Defendants' request is.  They have an $18-billion fund, enacted just days ago, that they can freely use for all the activities they identify in their motion.  Instead, they try to use the much smaller subsection (a)(1) funds. The only apparent purpose is to spend down as much of the subsection (a)(1) funds as possible so that the administration can continue—in direct contravention of law—to dodge a policy the administration does not like.

Defendants are thus wrong to suggest that they must use subsection (a)(1) funds to acquire land, build roads, and supervise projects.  They have plenty of other resources to do those things.  Each of Defendants' proposed activities is assessed in turn.

**"Project Costs Required to Support Construction."** ECF at 5–11. Defendants first contend that various activities support barrier construction and should be funded by subsection (a)(1), including: land acquisition; road construction; erosion and drainage control; power and utilities installation; project oversight and management; and ancillary support services. *Id.* at 7–11.

Although these projects *might* in some circumstances relate to construction of border barriers, none of these activities involves actual "construction of new barriers at the Southwest border." Op. at 51. And Defendants make no attempt to explain why they cannot use other buckets of funding, including buckets that were expected to (and in fact were) enacted into law just last week. Appropriations acts, including the ones passed for FY 2024 and 2023, expressly acknowledge that expenditures for roads fall within the catchall category of "operations and support." *See* H.R. 2882 at 334; 136 Stat. at 4730. So too do things like land acquisition, project oversight and "ancillary support." Indeed, Defendants have not explained why they need to acquire land at all given that the Federal Government owns much of the land along the Southwest border.

Defendants' lengthy explanation of "ancillary" activities that "support" border barrier construction is also notable for what it doesn't include: reference to a single inch of anticipated new barrier construction funded under subsection (a)(1).[7] Instead, Defendants provide various activities that *could* relate to the construction of new

---

[7] Costs for constructing the Starr County border barrier were "paid for by DHS's fiscal year 2019 barrier appropriation." ECF 133 at 8. The FY 2019 Act is not at dispute in this lawsuit.

barriers in some circumstances. But without specific plans for the same, these activities are untethered to physical barrier construction.

Even if these activities could be said to directly support construction of new barrier, and even if there were no other bucket of funds available, Defendants' position would still fail because it offers no limiting principle. Under their view, the Government could continue its current pattern and spend 100% of appropriated funds on "close-out," "management," or "environmental assessment" costs or anything else tangentially related to constructing actual physical barriers—all without building a single inch of barrier. That flouts the plain-text reading of the statute under this Court's interpretation and transforms the Court's injunctive relief into a nullity. And it flouts the basic structure whereby Congress gave Defendants billions of dollars and then limited discretion for only a small fraction of that overarching amount.

The central premise and purpose of subsection (a)(1) is the specific allocation of funds to "construct" barrier systems—that is, create *new* barrier systems in places where no barrier previously existed. In other words, even if Defendants could use subsection (a)(1) funds for ancillary projects, those projects at the very least would be permitted *only* to the extent necessary to facilitate the central purpose of subsection (a)(1): construction of new border barriers. Defendants' motion offers no specifics— numbers or otherwise—to ensure that funds would in fact still be spent constructing border barriers. The "clarification" they seek would permit them to spend 100% of the funds on activities other than building barriers. That "clarification" would gut the preliminary injunction.

12

Finally, even accepting the implausible assertion that no other bucket is available now, Defendants have not identified anything that would prohibit them from obligating subsection (a)(1) funds *now* and then waiting for catchall funds from future fiscal years.  Indeed, Defendants received $17.67 million "for mission support and infrastructure" just last week, and Congress used the exact same language this Court described as a "catch-all provision."  *See* FY 2024 Act, *supra*.  That "catch-all" provision appears to be refilled every year.  *See, e.g.*, Consolidated Appropriations Act, 2022, Pub. L. No. 117-103, § 209(a)(5), 136 Stat. 49, 322 (2022) ("$30,610,000 for mission support and infrastructure."); Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 212(a)(5), 136 Stat. 4459, 4736 (2022) ("$32,673,000 for mission support and infrastructure.").

**"Replacement Barrier Projects."**  ECF133 at 13–17.  Defendants next contend that "*replacing* dilapidated, failing, or ineffective fencing with new, operationally effective barrier should be permitted."  *Id.* at 13.  This argument fails on two fronts.  For starters, the Court's order explicitly rules out this use by finding "replacement of existing barrier … lay[s] outside Subsection 209(a)(1)'s requirements."  Op. at 52.  Furthermore, replacing barriers does not provide any *new* and *additional* wall, as required by this Court's interpretation of subsection (a)(1).  Instead, it simply substitutes in barrier where a barrier already exists.  This does not lengthen the barrier system by one inch or further the purpose of the appropriation.  Plaintiffs do not doubt the general good policy or necessity of repairing or updating older barriers, but Defendants have access to plenty of other funds for those purposes.

13

They cannot use funds reserved for "construction of *new* barriers at the Southwest border." Op. at 51.

**Additional Work on Projects Where Construction of Barriers Is "Now Complete."** Third, Defendants identify projects throughout their motion where the actual construction of physical barriers is "now complete," and yet they ask this Court for permission to use subsection (a)(1) funds for activities like "closeout costs" that are not wall construction. *E.g.*, ECF 133 at 17 (seeking to use subsection (a)(1) funds even though "grate installation is now complete"); *see also id.* at 13 (seeking permission to use subsection (a)(1) for "close-out activities" even though "physical installation of the new barrier and gates is substantially complete"); *id.* at 15 (asking to use these funds for "close out activities" on a project that is "substantially complete"); *id.* at 16 ("The new bollard barrier *is now installed*, but additional contracting actions are needed to *close out* the project and comply with the terms of the contract." (emphasis added)). This Court already and correctly rejected that argument. "Closeout" activities lie outside subsection (a)(1). Defendants can use other buckets of funding, including the one they received last week, for closeout activities.

**"Disposition of Excess Bollards and Construction Materials."** ECF 133 at 17–18. Fourth, Defendants ask the Court to permit them to use "barrier system funds to pay costs associated with disposing of excess barrier construction materials" in coordination with the United States Army Corps of Engineers ("USACE"). *Id.* at 17–18. Yet Defendants do not offer an explanation for why its partner, USACE,

14

cannot fund these activities or why excess bollards cannot be disposed through the Federal Surplus Property (FSP) Program.  Nevertheless, disposal of barrier materials is by definition not the "construction of physical barriers," and does not fit within the requirements of subsection (a)(1).  Defendants can use their $18-billion bucket or other buckets for these purposes.

**"Wind Down Costs."**  ECF 133 at 18–20.  Finally, Defendants ask the Court to permit the expenditure of subsection (a)(1) funds to clean up its mess for improperly obligating these funds.  *Id.* at 18–20.  Defendants argue that various wind-down activities are necessary because of the preliminary injunction, and implore the Court to allow subsection (a)(1) expenditures for that purpose.  *Id.*  This overlooks that the public interest was undermined when Defendants improperly used barrier system funds for non-barrier activities and continued to obligate disputed funds after this lawsuit began, and it will be further undermined if Defendants use those very funds to clean up the mess they made rather than using those funds for their intended purpose.  "Such inconveniences are common incidental effects of injunctions, and the government could have avoided them by delaying preparatory work until the litigation was resolved." *Texas v. United States*, 809 F.3d 134, 187 (5th Cir. 2015).  Defendants just received more than $18 billion that they can use for wind-down activities.

## II.    The Court's Order Prohibits the Use of Subsection (a)(1) Funds for Defendants' "Additional Projects," and it Is Improper for Defendants to Request That This Court Bless Projects by Name.

Defendants note that this Court identified two projects—Yuma Hill and Tijuana River Channel—as in compliance with subsection (a)(1), and they ask this Court to declare that other projects are in compliance. *Id.* at 12. The Court should decline for several reasons.

First, Defendants seek an advisory opinion. Part I.B of Defendants' submission does not contend that the terms of the Court's opinion are unclear. It instead asks this Court to issue a declaration that certain projects comply with the Court's order—while simultaneously conceding that these projects are *not* yet in compliance. ECF 133 at 13 ("Defendants will suspend those aspects of the remediation contracts that are prohibited by the Court's order …."). But courts are not in the business of "exercise[ing] general legal oversight of the Legislative and Executive Branches." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021). The case or controversy between the parties concerns not specific projects, but the overarching policy that the administration unlawfully adopted. Having already explained what the Federal Government can and cannot do under the statute, this Court need not individually bless or condemn projects by name—especially when those projects are poorly defined. If Defendants alter their projects to bring them into compliance, that is great. But this Court need not offer a stamp of approval each time.

16

If Defendants are worried about compliance, though, there is a different resolution that does not require this Court to sift through each project. In other immigration cases, the Federal Government has filed regular reports with the court explaining how the Federal Government is complying with the order. *E.g.*, *Texas v. Biden*, 554 F. Supp. 3d 818, 857–58 (N.D. Tex. 2021), *reversed on other grounds* 597 U.S. 785 (2022).[8] That would be a better approach than asking the Court to bless ahead of time poorly defined projects that Defendants admit are not yet in compliance.

Second, the Court already addressed projects for which Defendants now seek "clarification." In their motion, Defendants direct the Court to the Third Declaration of Paul Enriquez for "additional projects … [that] satisfy the Court's criteria for lawful expenditures that may be funded with the fiscal year 2020 and 2021 barrier systems appropriations." ECF 133 at 12. But it appears the Court already considered that declaration, as it served as the basis for this Court's finding that beyond the Yuma Hill project and Tijuana River Channel project, "*the remainder of the other obligations* are for costs that fall outside of Subsection 209(a)(1)." Op. at 51–52 (emphasis added). That includes each and every project identified in the Third Declaration of Paul Enriquez (ECF 110). Defendants do not raise projects previously

---

[8] "To ensure compliance with this order, starting September 15th, 2021, the Government must file with the Court on the 15th of each month, a report stating (1) the total monthly number of encounters at the southwest border; (2) the total monthly number of aliens expelled under Title 42, Section 1225, or under any other statute; (3) Defendants' total detention capacity as well as current usage rate; (4) the total monthly number of 'applicants for admission' under Section 1225; (5) the total monthly number of 'applicants for admission' under Section 1225 paroled into the United States; and (6) the total monthly number of 'applicants for admission' under Section 1225 released into the United States, *paroled or otherwise*." *Id.* (emphasis in original).

unconsidered, but instead ask the Court to reconsider its prior ruling on these exact projects. The Court should decline the request.

Third, even if the Court entertained Defendants' request, and considered projects not explicitly referenced in the Court's ruling, a review of the record makes plain that the Court's order explicitly foreclosed the expenditure of subsection (a)(1) funds on these projects. This Court ruled that "[t]he vast majority of the Government's FY 2020 and 2021 obligations are not allocated to new call construction," but instead are impermissibly apportioned for "remediation, replacement of existing barrier, and so called 'system attribute' installation at various project sites." Op. at 51–52. As such, they "lay outside Subsection 209(a)(1)'s requirements." *Id.* at 52.

Defendants ask that the Court reconsider various projects in the third, fifth, and seventh declarations of Paul Enriquez, and suggest that "all … involve construction of new physical barrier." ECF 133 at 12. This is not true. Instead, every project is simply comprised of obligations that lie outside the parameters of subsection (a)(1). Take for example the four projects identified in the Fifth Declaration of Paul Enriquez. *See* ECF 110. The declaration explains that each is for "remediation work and system attribute installation." *Id.* ¶ 12. Three of the projects obligate subsection (a)(1) funds for "system attribute installation" alone. Use of those funds for these projects is explicitly forbidden under the Court's order. Op. at 52. The remaining project allegedly includes "remediation work," which is defined as "closing gaps in the existing barrier, completing or installing gates, fixing or

improving patrol roads, installing drainage and erosion control measures, including repair of existing drainage gates, and addressing other environmental requirements specific to the project areas." ECF 133 at 12. This remedial work says nothing about new wall construction, and thus funding thereof by subsection (a)(1) is explicitly forbidden by this Court's order.

The new, Seventh Declaration of Paul Enriquez does not identify new construction projects, but does provide important color on those raised earlier. *See* ECF 133-1. Specifically, the affiant explains that while "[i]nstallation of the physical barrier to fill the gaps and gates is now substantially complete," Defendants believe subsection (a)(1) funds can be obligated to "close out actions," including "contractor warranty requirements, completing the as built drawings of the gates and gaps … and any remaining drainage or erosion control measures that ensure the long-term stability of the bollards and gates." *Id.* ¶ 24. As discussed above, "close out actions" are not "construction of new barriers," Op. at 51, and thus necessarily fall outside of subsection (a)(1).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request the Court deny Defendants' Motion for Clarification.

Date: March 26, 2024

Respectfully submitted,

ANDREW BAILEY
Attorney General of Missouri

KEN PAXTON
Attorney General of Texas

/s/ *Joshua M. Divine*
JOSHUA M. DIVINE, #69875MO
Solicitor General
*Attorney-in-Charge*
Southern Dist. of Texas Bar No.
3833606

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy Attorney General for Legal Strategy

SAMUEL FREEDLUND, #73707MO*
Deputy Solicitor General

/s/ *Ryan D. Walters*
RYAN D. WALTERS
*Attorney-in-Charge*
Chief, Special Litigation Division
Texas Bar No. 24105085
Southern Dist. of Texas Bar No. 3369185

OFFICE OF THE ATTORNEY GENERAL
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, Missouri 65102
Tel. (573) 751-1800
Fax (573) 751-0774
josh.divine@ago.mo.gov
samuel.freedlund@ago.mo.gov

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
Tel.: (512) 936-1414
Fax: (512) 936-0545
ryan.walters@oag.texas.gov

*Counsel for Plaintiff*
*State of Missouri*

*Counsel for Plaintiff State of Texas*

*Admitted *pro hac vice*

20

/s/ *Austin R. Nimocks*

AUSTIN R. NIMOCKS
*Attorney-in-Charge*

Texas Bar No. 24002695
S.D. Tex. Bar No. 2972032
austin@pntlawfirm.com

CHRISTOPHER L. PEELE
Of Counsel
Texas Bar No. 24013308
S.D. Tex. Bar No. 31519
chris@pntlawfirm.com

PEELE | NIMOCKS | TOTH
6836 Bee Caves Rd. Bldg. 3, Ste. 201
Austin, TX 78746
Phone: (512) 522-4893

*Counsel for Plaintiffs Texas General Land*
*Office and Commissioner Dawn*
*Buckingham, M.D.*

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing document contains 4,372 words, exclusive of matters designated for omission, as counted by Microsoft Word.

*/s/ Joshua M. Divine*
Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I certify that on March 26, 2024, a true and accurate copy of the foregoing document was electronically filed through the Court's CM/ECF System and that a copy of the foregoing will be sent via email to all parties by operation of the Court's electronic filing system, all consistent with Federal Rule of Civil Procedure 5(b).

*/s/ Joshua M. Divine*
Counsel for Plaintiffs