Case 2:20-cv-02470-CRC Document 1-1 Filed 10/14/20 Page 1 of 9

# Exhibit 1

PAUL E. SALAMANCA
Deputy Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

TYLER M. ALEXANDER (CA 313188)
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611

*Attorneys for Defendants*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| DIAMOND A RANCH, WESTERN DIVISION, L.L.C., *et al.*, </br></br>Plaintiffs; </br></br>v. </br></br>CHAD F. WOLF, *et al.*, </br></br>Defendants. | Case No. 1:20-CV-03478-CRC |

## DECLARATION OF PAUL ENRIQUEZ

I, Paul Enriquez, declare as follows:

1. I am the Acquisitions, Real Estate and Environmental Director for the Border Wall Program Management Office ("Wall PMO"), U.S. Border Patrol Program Management Office Directorate, U.S. Customs and Border Protection ("CBP"), an agency of the Department of Homeland Security ("DHS"). I have held this position since August 6, 2018. From 2013 to August 2018, I was the Real Estate and Environmental Branch Chief for the Border Patrol and Air and Marine Program Management Office ("BPAM"),

Facilities Management and Engineering, Office of Facilities and Asset Management ("OFAM"). From 2011 to 2013, I was employed as an Environmental Protection Specialist in the BPAM office. In that role, I performed environmental analyses for various border infrastructure projects. From 2008 to 2011, I was a contractor assigned to the BPAM office and provided environmental support on various border infrastructure projects.

2. CBP is the DHS component with primary responsibility for border security. CBP constructs, operates, and maintains border infrastructure necessary to deter and prevent illegal entry on the southern border.

3. Within CBP, the Wall PMO has expertise in managing and executing border infrastructure projects. The Wall PMO is directly tasked with managing the schedule, finances, real estate acquisition, environmental planning, and construction of the border infrastructure system along the U.S. border.

4. Based upon my current and past job duties, I am familiar with past and planned border infrastructure projects supporting border security. I am personally aware of the border barrier project known as "Tucson A-5," which is the subject of this lawsuit.

5. This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

## BACKGROUND

6. The Secretary of DHS has determined that the United States Border Patrol ("USBP") Tucson Sector is an area of high illegal entry. The USBP apprehension statistics for the Tucson Sector bear this out. In fiscal year 2019, USBP apprehended over 63,000 illegal aliens attempting to enter the United States between border crossings in the Tucson

Sector. *See* 85 Fed. Reg. 28660 (May 13, 2020). Also in fiscal year 2019, there were over 1,200 drug-related events between border crossings in the Tucson Sector, through which USBP seized over 59,000 pounds of marijuana, over 150 pounds of cocaine, over 155 pounds of heroin, over 2,700 pounds of methamphetamine, and over 12 pounds of fentanyl. (Id.) Additionally, Cochise County, which is where Tucson A-5 is being constructed, has been identified as a High Intensity Drug Trafficking Area by the Office of Drug Control Policy. (Id.)

7. Because the Tucson Sector is an area of high illegal entry, Section 102 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended ("IIRIRA"), requires DHS to construct physical barriers and roads to deter and prevent illegal entry of people and drugs into the United States.

8. To support DHS's action under Section 102 of IIRIRA, on January 12, 2020, DHS, acting through CBP, sent DOD a request for assistance, requesting that the Secretary of Defense, pursuant to 10 U.S.C. § 284(b)(7), assist by constructing fences, roads, and lighting in certain locations within the six USBP Sectors, including the Tucson Sector.

9. On February 13, 2020, the Secretary of Defense concluded that the support requested satisfies the statutory requirements of 10 U.S.C. § 284(b)(7) and that DOD would provide the requested support. The Secretary of Defense approved for construction 31 border barrier projects (the "§ 284 Projects"). Tucson A-5 is among § 284 Projects approved for construction by the Secretary of DOD.

10. Tucson A-5 is being carried out under a waiver issued by the Secretary of DHS pursuant to Section 102(c) of IIRIRA. 85 Fed. Reg. 28660 (May 13, 2020).[1] The project area for

---

[1] The waiver was originally published on March 16, 2020. *See* 85 Fed. Reg. 14961 (March 16, 2020). However, due to an inadvertent omission, a corrected waiver was published on May 13, 2020.

3

Tucson A-5 is in rural southeastern Arizona. It is described in the waiver as starting approximately one-half mile (0.5) west of Border Monument 74 and extending east to the Arizona-New Mexico state line. The Tucson A-5 project area, including the portions of the project area that are adjacent to Plaintiffs' property, is extremely rugged and remote. The project area includes steep hills and mountains and within the low-lying areas of the project area there are naturally occurring rocks, boulders, and outcroppings that are a natural part of the desert landscape in this area. There is little to no development. To my knowledge, there are no existing facilities, structures, or improvements within or adjacent to the Tucson A-5 project area.

11. As a part of Tucson A-5, DHS and DOD will construct approximately five miles of new steel bollard fencing. Tucson A-5 will also include the installation of a linear ground detection system, road construction or road improvement, and the installation of lighting, which will be supported by grid power and include embedded cameras. The design of the new steel bollard fencing will include 30-foot steel bollards that measure approximately 6" by 6" and are spaced 4" apart.

12. Given its expertise in managing border infrastructure projects, the Wall PMO, on behalf of CBP, is working in coordination with DOD on the § 284 Projects, including Tucson A-5.

13. For all of the § 284 Projects, including Tucson A-5, the Wall PMO, on behalf of CBP, among other things, reviews technical specifications, reviews and approves barrier alignments and locations, and provides feedback and input on other aspects of project planning and execution.

14. In addition, the Wall PMO, on behalf of CBP, is responsible for all environmental planning, including stakeholder outreach and consultation. In my capacity as the Acquisitions, Real Estate, and Environmental Director, I am responsible for overseeing the environmental planning and stakeholder outreach.

## PLAINTIFFS' ALLEGATIONS

15. As a part of CBP's outreach and coordination with stakeholders for the § 284 Projects, I have consulted with Plaintiffs on the issues and concerns they have raised regarding the construction of Tucson A-5. I have been consulting with Plaintiffs regarding Tucson A-5 for over 10 months, including meetings, letters, emails, and a site visit to their property. Plaintiffs now allege, however, that that my attempts to acknowledge and address their concerns are part of a "deliberate policy" that was designed to allow the government to "intrud[e] on Plaintiffs' property by stealth." (Pls. Br. at 8; Goodwin Decl. Ex. W.) They further allege that it was my goal to "actively mislead" them regarding the government's "intentions to interfere with their property rights." (Pls. Br. at 7 – 8.)

16. These allegations are false. They are not only false, they are fantastic. There is no deliberate policy to mislead Plaintiffs or intrude on their property by stealth. I have, at every turn, engaged with Plaintiffs in good faith. I state this unequivocally. Plaintiffs' evidence does not show otherwise.

17. One of Plaintiffs' principal complaints is that construction traffic has sometimes strayed outside the Roosevelt Reservation onto Plaintiffs' property. (Goodwin Decl. ¶ 41, Ex. O.) In response to this concern, the construction contractor re-surveyed and staked the boundary of the Roosevelt Reservation and the United States Army Corps of Engineers ("USACE") sought confirmation of the Roosevelt Reservation boundary from the

5

International Boundary and Water Commission. (Goodwin Decl. Ex. O). I personally visited Plaintiffs' property to discuss this concern, among others. (Goodwin Decl. ¶ 43.) Further, as stated in my letter dated November 11, 2020, CBP environmental monitors are on site to note instances where construction vehicles may travel outside the Roosevelt Reservation. (Goodwin Decl. Ex. X.) USACE is notified of these infractions and asked to correct them. (Id.) I have encouraged Plaintiffs to bring any intrusions to CBP's attention so they can be addressed. (Id.) This is hardly a pattern and obfuscation and deception, as Plaintiffs suggest. Rather, it reflects both my and the government's genuine attempt to address the issue.

18. Plaintiffs have also expressed concern about rockfall on their property. (*E.g.* Pls. Br. at 5 – 6; Goodwin Decl. ¶¶ 41 – 43, Ex. P.) As Plaintiffs point out, during my site visit to the project area, I noted that the rockfall on Plaintiffs' property was "unacceptable." (Goodwin Decl. ¶ 43.) I meant it. Steps were taken to try to prevent it. In a genuine attempt to address rockfall on Plaintiffs' property, the construction contractor and USACE developed measures to try to collect or stop the rockfall before it reached Plaintiffs' property. (Goodwin Decl. Ex. S.) Plaintiffs allege that the measures were unsuccessful. (*E.g.*, Goodwin Decl. ¶ 52, Ex. W.) I acknowledged Plaintiffs' claims that the measures were not successful and informed Plaintiffs I would once again engage with USACE regarding their concerns. (Goodwin Decl. X.) Here again, this is hardly a pattern of obfuscation and obstruction. Plaintiffs concerns were acknowledged and addressed.

19. Plaintiffs go beyond simply alleging that the measures were not successful, however. They make far more egregious claims. They allege that contractor never "actually carried

6

out the plans Mr. Enriquez described." (Goodwin Decl. ¶ 52.) This unsupported allegation is false, as is Plaintiffs' speculation that these mitigations were instead designed "to catch material for later use in road construction, rather than to help mitigate any impact on the Ranch." (Id.) These measures were taken to attempt to keep construction debris on the Roosevelt Reservation and off Plaintiffs' property. Perhaps the most egregious allegation, however, is that I was somehow responsible for approving the construction contractor's blasting plans, which allowed me to "simultaneously tolerat[e] if not encourag[e] the contractor's acceleration of intrusions and damage to our property." (Goodwin Decl. ¶¶ 50, 53.) Like Mr. Goodwin, I am not a blasting expert. (Goodwin Decl. ¶ 51.) I am not, nor have I ever been, responsible for approving the construction contractor's blasting plans. And, I have never approved—nor would I ever approve—a blasting plan for the express purpose of "encouraging and accelerating" damage to Plaintiffs' property.

20. Plaintiffs have also expressed concerns about the culvert that is planned for Guadalupe Creek and the potential for it to exacerbate an existing risk of flooding. (Pls. Br. at 9 – 10; Goodwin Decl. ¶¶ 59 – 70.) Plaintiffs assert that the government's consultation on the culvert design has not been sufficient. (*E.g.*, Goodwin Decl. ¶¶ 74 – 75.) Consultation is on-going. Plaintiffs were provided a copy of the initial design and offered an opportunity engage with the construction contractor. (Goodwin Decl. Ex. U.) I asked Plaintiffs to share their own data so it could be considered in the design process (Goodwin Decl. Ex. X). In addition, Plaintiffs and other stakeholders will have an opportunity to comment on the design. (Goodwin Decl. ¶ X.) CBP and USACE are planning additional stakeholder meetings to discuss the design and the results of the

government hydrological studies.  Plaintiffs' characterize these efforts as "meaningless." (Goodwin Decl. ¶ 87.)  Plainly, I disagree with that characterization.

This declaration is made pursuant to 28 U.S.C. § 1746.  I declare under penalty of perjury that the foregoing is true and correct to the best of my current knowledge.

Executed on this 14th day of December, 2020.

Paul Enriquez
Acquisitions, Real Estate and Environmental Director
Border Wall Program Management Office
U.S. Border Patrol