# Exhibit 2

PAUL E. SALAMANCA
Deputy Assistant Attorney General
United States Department of Justice
Environment & Natural Resources Division

TYLER M. ALEXANDER (CA 313188)
Trial Attorney
Natural Resources Section
Environment & Natural Resources Division
P.O. Box 7611
Washington, D.C. 20044-7611
Tel: (202) 305-0238
Fax: (202) 305-0506
tyler.alexander@usdoj.gov

*Attorneys for Defendants*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DIAMOND A RANCH, WESTERN DIVISION, L.L.C., *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> CHAD F. WOLF, *et al.*, <br><br> Defendants. | Case No. 1:20-CV-03478-TNM <br><br> SECOND DECLARATION OF COLONEL ANTOINETTE R. GANT |

1

I, Antoinette R. Gant, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

1. This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

2. I am a Colonel in the United States Army, and I am currently the Commanding Officer for the South Pacific Border District ("Border District") for the U.S. Army Corps of Engineers ("Corps"), South Pacific Division. I am stationed in Phoenix, Arizona.

3. The Border District's primary mission is to plan, design, and construct Department of Defense-approved border barrier projects on the southern border of the United States.

4. In my capacity as the Commanding Officer of the Border District, I have overall responsibility for, and authority over, the Border District and its operations, consistent with relevant policy, regulations, and laws. In this respect, my responsibilities include providing oversight, direction, and management of all systems and personnel, including contracting officers involved in executing the Border District's mission. In particular, I currently oversee performance of work on border barrier construction projects either under contract or soon to be awarded, and that are funded under the authority of 10 U.S.C. § 284 ("Section 284").

5. In response to requests for assistance from the Department of Homeland Security (DHS), the Secretary of Defense has approved the Fiscal Year 2020 ("FY20") Section 284 Tucson A-5 project, otherwise known as Tucson 9-5, potentially impacted by this lawsuit, for construction of bollard-style barrier along the United States' southern border pursuant to 10 U.S.C. § 284. This project consists of 4.7 miles of 30-foot primary pedestrian bollard-style barrier ("border barrier") construction starting near Douglas, Arizona and continuing towards the border between Arizona and New Mexico. In FY20, $3.831 billion was transferred into the Drug Interdiction and

2

Counter-Drug Activities, Defense, account for barrier construction. The funds were allocated to the Department of the Army, and further allocated to the Corps to undertake initial project scoping, contracting for construction, construction management, and necessary Corps' management and oversight expenses for projects in FY20.

6. Plaintiffs make the following three allegations related to the Tucson A-5 project: (1) personnel from the Border District, Customs and Border Protection ("CBP") and a Border District contractor have trespassed onto Plaintiffs' property, (2) border barrier construction has destroyed private property belonging to the Plaintiffs, and (3) installation of culverts within the Guadalupe Creek will result in flooding of the Plaintiffs' property. Each of the Plaintiffs' allegations are addressed below.

## I. Fiscal Year 2020 Section 284 Project: Tucson A-5

### *Summary*

7. Although the authorized Tucson A-5 project consists of a total of 4.7 miles of border barrier, approximately 1.496 miles, or 7898.88 feet, are adjacent to Plaintiffs' property. To date, the Southwest Valley Constructors ("Contractor") has emplaced an assortment of 8-foot, 4-foot, and 2-foot panels totaling 2,024 panels or 2.04 miles of border barrier. Border barrier panels have not yet been installed on the 1.496 miles of the project adjacent to Plaintiffs' property; however, all blasting activities adjacent to Plaintiffs' property are complete. Current blasting activities are taking place over 1,100 feet east of the Plaintiffs' property.

### *Timeline*

8. On February 18, 2020, during the initial review stage of the proposed project, the Contractor conducted a site-visit, accompanied by CBP and Border District personnel. The group briefly crossed onto the Plaintiffs' property through the main gate entrance.

9. On May 21, 2020, the contract modification for the Tucson A-5 and B-6 projects was awarded to the Contractor in the amount of $291,000,000.00. The amount associated with the A-5 project is $198,332,206.00.

10. On June 10, 2020, a ranchers-meeting was conducted via tele-conference with CBP, the Plaintiffs, and the Contractor, during which the Border District provided a status update of construction and design efforts for the project.

11. On June 25, 2020, the Border District approved the Contractor's Tucson A-5 blast plan for excavation to begin in early July.

12. On June 30, 2020, the Contractor met with Plaintiffs on Guadalupe Canyon Road. The Contractor discussed the project and supplied the Plaintiffs with project roll plots[1] showing the access road proposed to be built on the Plaintiffs' property.

13. On July 6, 2020, significant construction activities, *i.e.*, clearing, grubbing and blasting began adjacent to the Plaintiffs' property. The purpose of the blasting is to clear a pathway through rugged, mountainous terrain to construct the border barrier.

14. On July 21, 2020, the Border District received an initial civil, drainage and structural design from the Contractor. The design was later shared with the International Boundary and Water Commission (IBWC) on October 30, 2020.

15. On July 22, 2020, a blast monitor working for the Contractor was approached by the Plaintiff. The Plaintiff requested a copy of the Contractor's shot reports from the blast monitor.[2] The Contractor provided shot reports to the Plaintiffs.

---

[1] A Project roll plot is a visual representation of the proposed vertical and horizontal layouts of the wall alignment.

[2] Shot reports are detailed reports that contain information about particles and debris per excavation blast. There are pre-shot reports and post-shot reports.

4

16. On or about July 25, 2020, the Contractor ceased construction operations and, through July 27, 2020, drove outside the Roosevelt Reservation[3] onto the Plaintiffs' property in an attempt to remove large boulders that escaped the designed blasting catch[4] and rolled onto the Plaintiffs' property on or about July 25, 2020 after blasting activities on Shadow Mountain. On or about July 27, 2020, CBP reminded the Contractor they are not authorized to access Plaintiffs' property to attempt to remove boulders.[5] As a result, the Contractor ceased entering the Plaintiffs' property.

17. On September 29, 2020 the Contractor met with the Border District to discuss the Shadow Mountain construction plan and schedule, as well as potential solutions for keeping rocks off of the Plaintiffs' property. During this meeting, the Contractor informed the Border District that the Plaintiffs' had instructed the Contractor not to disturb any boulders that fall onto their property. Blasting adjacent to the Plaintiffs' property had been ongoing from July 6, 2020 through November 19, 2020.

18. On October 6, 2020, Plaintiffs communicated with the Border District that CBP had not responded to their request for copies of Hydrologic & Hydraulic Report ("H&H Report"). The Plaintiffs also requested the H&H Report from the Border District. On this same day, the Border District assured Plaintiffs that they would receive relevant information from the H&H report at the next ranchers-meeting. To date, this meeting has not yet taken place. Design of the Guadalupe Creek crossing, raised by the Plaintiffs as having the potential to flood with added

---

[3] The Roosevelt Reservation is a 60-foot swath of land along the U.S.-Mexico border that is owned by the Federal Government, and, in this case, abuts Plaintiffs' property. The section of the border barrier at issue here is constructed within the Roosevelt Reservation adjacent to Plaintiffs' property.

[4] A wall of rock and sand, approximately 40-50 feet in height on its north face, made from drilling, dozing and blasting adjacent to the Plaintiffs' property.

[5] USACE does not coordinate real estate actions under the Section 284 project. CBP is responsible for all real estate matters associated with the Tucson A-5 project.

5

construction, and referred to as Crossing 2125 in the H&H Report, still requires additional analysis and planning from the Contractor at this time.

19. On November 19, 2020, an excavation blast was conducted adjacent to the Plaintiffs' property. This was the final blast adjacent to the Plaintiffs' property. On this same day, the Contractor noticed pockets of incompetent rock and soil in the north face of the Shadow Mountain cut bordering the Plaintiffs' property. Incompetent rock and soil in the north face of the Mountain could compromise the Plaintiffs' property without mitigation. Mitigation measures to address this are discussed below.

## II. Allegations of Trespass and Destruction of Property

20. As the Commander of the Border District, I am aware of Plaintiffs allegations that the Border District and its Contractors have trespassed onto and destroyed the Plaintiffs' private property.

### *A. Allegations of Trespass*

21. Plaintiffs allege that a border wall team, comprised of Border District staff and the Contractor entered the Property on February 18, 2020 without authorization. They also allege that sometime in early July 2020, Contractors operated heavy machinery on the Plaintiffs' property.

22. Border District personnel, accompanied by CBP, briefly crossed onto the Plaintiffs' property through the main gate entrance during a site visit, as discussed in Paragraph 8 above. Since the discovery of the mistaken entry, Border District personnel have been directed to confirm with CBP, the agency responsible for coordinating access with landowners, for future border wall site visits.

23. The Contractor, in an attempt to remove boulders from the Plaintiffs' land between July 25 and 27, 2020, entered the Plaintiffs' property without authorization, as described in Paragraph 16 above.

### B. Allegations of Destruction of Property

24. Plaintiffs allege that clouds of demolition dust, shrapnel, and car-sized boulders have tumbled down from the Roosevelt Reservation onto the Property and tons of debris entered the Property. In addition, Plaintiffs allege the blasting intrusions on the Ranch's property were exacerbated by the Agencies' and the Contractor's decision not to use blast mats[6] to contain the fallout of construction debris.

25. The Border District received a report from CBP that boulders rolled onto Ranch property immediately following the excavation blast on July 25, 2020. The Border District confirmed some debris and large boulders on Plaintiffs' property. In an attempt to remove the boulders, the Contractor briefly drove heavy equipment onto the Plaintiffs' land.

26. Prior to igniting a blast for excavation, a shot report is submitted to the Border District by the Contractor. Within 24 hours of the blast, a post-shot report is submitted. In addition to providing specific details on weather, amounts of explosives, and types of material being blasted, pre-shot reports estimate the peak particle velocity expected from the blast. A low velocity number, *i.e.*, 1.0, lowers the risk of flying debris; conversely, a high velocity number increases the risk of flying debris. Upon review of each shot plan prior to ignition, the Border District works with the Contractor to maintain a low risk of fly-rock to surrounding areas. From the beginning of blasting operations in July 2020 through today, pre-shot reports and post-shot

---

[6] A blast mat is a mat woven of steel, wire, rope, scrap tires, or other suitable material or construction to cover holes for the purpose of preventing flying rock missiles. Clean fill material can be used in lieu of traditional blasting mats.

7

reports are carefully reviewed by the Border District to ensure safety.

27. Shadow Mountain ("Mountain"), which is adjacent to Plaintiffs' property, is the area where most of the blasting previously occurred. The Mountain itself required approximately 75,000 cubic yards of rock removal via blasting. Here, the Contractor drilled 90, 12-foot deep, 3.5-inch wide holes, loaded each of them with 1/3 pounds of Pentex explosive booster, and filled each hole with 7-feet of clean fill and 13 pounds of Amex bagged Ammonium Nitrate Fuel Oil (ANFO). The Contractor planned to mitigate debris and fly-rock by using construction methods consistent with conditions for the proximity to the Plaintiffs' property:

a. *Notice.* CBP notifies adjacent landowners daily when blasting is planned to occur. Each pre-shot plan is submitted both to the Border District and CBP in order to allow for nearby areas to receive adequate notice of impending blasting operations.

b. *Time Delay.* The Contractor times the blasts, which are collectively referred to as *shots*, in order to relieve the rock so the shot material heaves directly east or directly west, staying on the Roosevelt Reservation. This is completed by slightly offsetting each individual explosion comprising the total shot to move, rather than obliterate, material. These shots were designed to mitigate creation of excess debris and, in more condensed rock, produce a clean face with minimal disturbance to the north and south.

c. *Drill, Shoot, and Slot Dozing Plan.* The Contractor planned to cut through the Mountain adjacent to the Plaintiffs' property by drilling holes (Drill) into the Mountain, filling them with explosives (Shoot), and moving the excess material with a dozer in a front-to-back method (Slot Dozing). In its plan, the Contractor, in accordance with SPB blasting experts' guidance, mitigated fall-rock and debris from blasting by designing a catch point, using clean fill, and notifying landowners prior to each blast. The catch, running parallel to the Plaintiffs' property,

8

was formed by many incremental blasts, in 8X8 foot patterns, from the center and highest point within the Roosevelt Reservation downward, in an alternating pattern, to the lowest point. The walls of the ditch, 40-50 feet high on its northern face and 80 feet high on the southern face, prevented the majority of the post-blast material from rolling down the Mountain onto Plaintiffs' property.

d. *Blasting Mats*. Blasting mats are large, thick mats comprised of heavy plastics and steel cables 10-inches thick and 50-pounds in weight per square foot equating to 6000-pounds in some cases. Usually made from hundreds of used tires, the mat is laid over the shot to absorb blasts, prevent fly-rock from escaping, and lessen noise. When used on flat ground, the significant weight of the mat combined with its heavy plastic thickness will overpower debris, noise, and fly-rock by, essentially, muffling it. However, when used on slopes, the full weight of the blasting mat is no longer evenly distributed over the blast and, as a result, can have the opposite and unintended result of redirecting the force of the blast in an unsafe direction. In some cases, the mat itself can be turned into a dangerous projectile by the blast. The blasting mats also create a significant safety risk when placed, by increasing the possibility of accidental ignition of explosives and cut-offs[7] during an explosion. As such, blasting mats were not used due to the significant steepness of the terrain. During discussions with the Border District, the Contractor identified an unacceptable level of risk to its operators' health and safety from the use of blasting mats on the Mountain. The Border District agreed with the Contractor's safety-concerns and approved the Contractor's proposed blast plan without the use of blasting mats.

e. *Clean Fill*. Clean fill was used throughout the blasting excavation. Clean fill, also referred to as stemming, is highly filtered sediment that fills and encapsulates 3.5-foot diameter,

---

[7] Where a portion of a column of explosives has failed to detonate.

9

12-foot holes in which Pentex explosives are lowered. Each hole, of the many used in any one shot, is tightly filled with highly filtered, clean fill as to avoid the inadvertent inclusion of hazardous fragmentary material, *i.e.*, sticks, large rocks, small rocks. With each hole essentially plugged, the direction of each blast is directed internally, towards the desired material to be moved, as opposed to externally, out of the hole and onto nearby land. Post-shot reports capture data of debris and are used by both the Border District and the Contractor to make necessary changes to ensure safety.

28. With blasting activities adjacent to Plaintiffs' property complete, additional mitigation measures are now planned in order to protect the structural integrity of the Roosevelt Reservation and further protect Plaintiffs' property from rock fall. The following mitigation measures would not have been possible to implement during explosive blasting operations.

a. *Rock Bolts & Mesh.* The Contractor plans to use a combination of rock bolts and mesh to transfer any uneven loads of weight caused by naturally occurring incompetent rock and soil to more competent rock and soil. The redistribution of weight caused by the combination of heavy bolts and mesh will strengthen the Mountain's northern face and prevent further rock fall adjacent to the Plaintiffs' property and reinforce the structural integrity of the Roosevelt Reservation.

b. *Debris Netting.* During construction and emplacement of border barrier through the Mountain, the Contractor plans to use debris netting, adjacent to the Plaintiffs' property. The netting, ranging in materials and thicknesses, is not designed to prevent large material from rolling down the Mountain, *i.e.* a boulder, but is designed to stop smaller dislodged rock and soil material from reaching Plaintiffs' property during construction and emplacement of border barrier. This mitigation measure was not employed during the blasting, because it would not

10

have prevented heavier boulders from rolling as described in Paragraph 16, and the netting would likely have been destroyed by the blasts.

   c. *Temporary Construction Easement* (TCE). In response to its discovery made on November 19, 2020 noted above, the Contractor has proposed to attempt to obtain a TCE from the Plaintiffs to grant the Contractor access to 30 feet of the Plaintiffs' property, in order to adjust the slope of the Mountain respective to the Plaintiffs' property and prevent further rock fall. As currently proposed, the TCE would be used solely to protect Plaintiffs' property from any further rock fall. In addition, the Contractor proposed to offer to topsoil and seed the 30-foot edge, in order to return the Plaintiffs' vegetation to the original edge of the Mountain, once the adjustment to the Mountain's slope is complete.

## III. Allegations of Creating Risk of Flooding

29. Plaintiffs allege that the Border District's proposed culverts, under a portion of the proposed wall which crosses Guadalupe Creek ("Crossing 2125"), will worsen flooding events on the Plaintiffs' property. Further, Plaintiffs allege that the Border District has not completed sufficient hydrologic studies necessary to determine what culvert size and design will be needed to prevent flooding of the Property. Plaintiffs state that the Agencies have not even asked for, let alone taken account of, the rainfall records maintained by the Ranch for Guadalupe Canyon. Each of the Plaintiffs' allegations are further addressed below.

30. In summary, the Border District completed hydrologic studies in accordance with industry standards and used data from industry standard sources. The data obtained made the Border District aware of the potential for flooding in close proximity to planned Crossing 2125. The Contractor has been directed to further review the design alternatives. No construction activities associated with Crossing 2125 will commence until this review is completed, and construction

11

on the crossing will not begin before mid-February at the earliest.

31. The Border District was made aware of the Plaintiffs' request for the H&H report from CBP on October 6, 2020. CBP is the lead agency responsible for coordinating with landowner(s) on border wall projects funded under the authority Section 284. It is my understanding that CBP was in the process of scheduling a meeting with the Plaintiffs to discuss the status and conclusions of this report prior to this litigation.

32. The Contractor has completed a detailed hydrologic, hydraulic and erosion analysis, which was reviewed and updated four times by a multidisciplinary team of engineers, constructors and agencies. The H&H report incorporated criteria from the Tactical Infrastructure Design Standards and the Arizona Department of Transportation (ADOT). As of today, a copy of the final H&H report for Tucson A-5, Segments A and B, has been shared with CBP.

33. Plaintiffs' allege that the Border District did not incorporate Plaintiffs' precipitation data into its H&H analysis. Precipitation data was obtained from National Oceanic and Atmospheric Administration (NOAA) Atlas 14, Volume 1, Version 5, using the Precipitation Frequency Data Server (PFDS), United States Geological Survey, and the United States Department of Agriculture. The data gathered from NOAA is currently being used in an ongoing review process.

34. Plaintiffs further allege that Crossing 2125 will cause seasonal flooding to intrude on their property. The proposed design for the Crossing, consisting of three 12'x14' concrete box culverts and four 12'x10' concret box culverts, remains in draft form and requires additional review. As such, this is not currently the final design for this work. One mitigation measure currently being considered for potential seasonal flooding is the installation of large, manually raised drainage gates, which will allow large debris, such as tree limbs or downed trees, to pass

12

without clogging the natural waterways. CBP would be responsible for manually raising the gates during heavy rainfall events.

35. The construction plans for the Crossing are subject to IBWC and CBP criteria. These criteria collectively state that the water surface elevation at an existing crossing shall not raise more than 6-inches in rural areas and 3-inches in urban areas. This is a conservative criteria established by IBWC for the purpose of maintaining status quo along the border and in accordance with CBP Tactical Infrastructure (TI) guidelines that require close coordination with IBWC.

36. The Crossing is a major drainage crossing and was identified to convey nearly 7,500 cubic feet of water per second during the hypothetical 100-year rainfall event, with respect to a contributing area of nearly 30,000 acres. This 100-year rainfall event assumes even distribution rainfall over the entire 30,000 acre basin. The 100-year rainfall event has a one percent chance of occurring in any given year and is industry standard across the country for projects adhering to Federal Emergency Management Agency (FEMA) regulations.

37. As discussed above, the Border District is not yet certain the number or size of culverts that will be installed in Crossing 2125. Once the study and analysis is approved by IBWC, it is the Border District's intent, after consultation with CBP, to share the contents of the H&H report as it pertains to Crossing 2125 with Plaintiffs. As noted above, as a result of the ongoing study, construction on Crossing 2125 will not begin any earlier than mid-February.

### IV. Harms to the Government

38. Were the Court to grant Plaintiffs' request for an enjoinment of the Tucson A-5 Project, the Government will suffer irreparable harm. The Contractor and Government personnel are actively working on extensive construction and pre-construction activities in this project area,

13

but an injunction immediately stops these activities[8] and prevents the Government from taking necessary steps to complete the barrier construction project. Additionally, each day an injunction continues and contract performance on the Tucson A-5 is suspended, the Government will be required to pay costs incurred by the Contractor during the period of inactivity – costs that the Government would not have to pay but for an injunction. These costs and fees will quickly become unsustainable for the Government, and if the work remains suspended for too long, the Government will be forced to reduce the scope or terminate the contract. Moreover, even if an injunction were to be lifted at the conclusion of litigation, the Government would then face additional costs for re-procuring new contracts to complete the unfinished work left after termination. The Government will have to pay these additional, unnecessary costs from the finite funds available for Section 284 border barrier construction, thus diminishing the money available for actual border barrier construction and irreparably harming the Government's ability to complete the border barrier construction projects.

39. The daily suspension costs for the Tucson A-5 project are estimated to be $332,284.85. The monthly suspension costs for this project are estimated to be $10,101,459.41. These suspension costs will quickly become unsustainable for the Government, and if work on the project remains suspended for too long, the Corps will be forced to de-scope, partially terminate, or fully terminate the contract. The affirmative responsibility to mitigate cost impacts to protect the best interests of the United States and the best interests of the Contractor would require the Corps to consider de-scoping or partially terminating Tucson A-5 within a matter of weeks or months,

---

[8] In the event of an injunction, I would direct the contracting officer to suspend all work on these projects and segments, pursuant to Federal Acquisition Regulation ("FAR") Clause 52.242-14, SUSPENSION OF WORK (APR 1984). Pursuant to FAR 52.242-14, the contractor is entitled to an adjustment for any increase in the cost of performance of the contract (excluding profit) necessarily caused by an unreasonable period of time during which these projects and segments are suspended or delayed.

14

rather than leaving the contracts in a suspended status. As such, the costs for fully terminating the contract is estimated to be $7,305,566.81. In the event a final judicial ruling favors the Government, but comes after partial termination of these contracts, the Government would also face onerous administrative costs for procuring new contracts to complete the unfinished work left after partial termination. The Corps estimates the reprocurement cost would be approximately $89,555.00 for the Tucson A-5 contract, in addition to any market escalations in the cost for construction services and materials. But for the injunction, the Corps would not need to expend duplicative administrative costs procuring the same requirement twice.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

*Antoinette R. Gant*

Executed this 14 Day of December, 2020.

Antoinette R. Gant

Colonel, United States Army

15