# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

| | |
|---|---|
| THE GENERAL LAND OFFICE OF TEXAS, and DAWN BUCKINGHAM, M.D., in her official capacity as Commissioner of the Texas General Land Office,<br><br>    Plaintiffs,<br><br>  v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; and ALEJANDRO MAYORKAS, in his official capacity as Secretary of the Department of Homeland Security,<br><br>    Defendants. | No. 7:21-cv-00272 |
| THE STATE OF MISSOURI; THE STATE OF TEXAS,<br><br>    Plaintiffs,<br><br>  v.<br><br>JOSEPH R. BIDEN, in his official capacity as President of the United States, *et al.*<br><br>    Defendants. | No. 7:21-cv-00420<br>(formerly No. 6:21-cv-00052) |

## DEFENDANTS' MOTION TO MODIFY FINAL JUDGMENT AND PERMANENT INJUNCTION TO FACILITATE NEW BORDER WALL CONSTRUCTION

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................. 3

ARGUMENT ...................................................................................................................... 4

I.      The Court Should Amend the Permanent Injunction Because the Prohibition on
Expending Barrier System Funds for Drainage and Erosion Features in New Barrier
Construction Projects Harms Border Security and Public Safety ...................................... 4

II.     DHS May Lawfully Expend the Fiscal Year 2020 and 2021 Barrier System Funds on
Drainage and Erosion Control Features .......................................................................... 17

CONCLUSION .................................................................................................................. 25

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Baum v. Blue Moon Ventures, LLC,*
   513 F.3d 181 (5th Cir. 2008) ............................................................................... 4

*Chrysler Corp. v. United States,*
   316 U.S. 556 (1942) ........................................................................................... 16

*Horne v. Flores,*
   557 U.S. 433 (2009) .................................................................................. *passim*

*League of United Latin Am. Citizens, Dist. 19 v. City of Boerne,*
   659 F.3d 421 (5th Cir. 2011) ............................................................................... 5

*Morton v. Ruiz,*
   415 U.S. 199 (1974) ........................................................................................... 21

*Nevada v. Dep't of Energy,*
   400 F.3d 9 (D.C. Cir. 2005) ......................................................................... 22, 23

*Rufo v. Inmates of Suffolk Cnty. Jail,*
   502 U.S. 367 (1992) ..................................................................................... 16, 17

*SEC v. Novinger,*
   40 F.4th 297 (5th Cir. 2022) ............................................................................... 4

*Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright,*
   364 U.S. 642 (1961) ......................................................................................... 5, 6

*U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.,*
   665 F.3d 1339 (D.C. Cir. 2012) ........................................................................ 19

*United States v. Lawrence Cnty. Sch. Dist.,*
   799 F.2d 1031 (5th Cir. 1986) ....................................................................... 5, 16

*United States v. Swift & Co.,*
   286 U.S. 106 (1932) ........................................................................................... 5

**Statutes**

10 U.S.C. § 2291a ................................................................................................ 20

41 U.S.C. § 6303 ................................................................................................. 21

Consolidated Appropriations Act, 2020,
    Pub. L. No. 116-93, 133 Stat. 2317 (2019).......................................................*passim*

Consolidated Appropriations Act, 2021,
    Pub. L. No. 116-260, 134 Stat. 1182 (2020).....................................................*passim*

**Rules**

Federal Rule of Civil Procedure 60 ...................................................................*passim*

**Other Authorities**

2 Comp. Dec. 492 (1896)...................................................................................... 23

11 C. Wright & A. Miller, *Federal Practice and Procedure,* § 2961 (1973)............................ 16

Gov't Accountability Off., *Principles of Federal Appropriations Law* (4th Ed. 2017).......... 22, 23

H.R. Rep. 116-180 (2019)..................................................................................... 21

RFQ for Design-Build-Services MATOC for the Tex. Border Infrastructure Program
    (Apr. 16, 2024), www.txsmartbuy.gov/esbd/303-3-04702 ........................................ 10

S. Rep. No. 116-125 (2019) .................................................................................. 21

U.S. Comp. Gen., B-277905 (Mar. 17, 1998)............................................................ 20

U.S. Gen. Accounting Office, B-105977, Dec. 3, 1951,
    www.gao.gov/products/b-105977 .................................................................. 20

## INTRODUCTION

Defendants respectfully move the Court pursuant to Federal Rule of Civil Procedure 60 to amend the Final Judgment and Permanent Injunction entered in these cases to confirm that Defendants do not violate the injunction by expending the Department of Homeland Security's fiscal year 2020 and 2021 barrier system appropriations on drainage and erosion features necessary for the construction of new border barriers.

Since the Court entered its injunction, the Department of Homeland Security (DHS) has been planning new barrier construction projects along the southwest border, including conducting site visits and surveys of potential construction sites in California, Arizona, New Mexico, and Texas. DHS has identified 19 new barrier projects in those States, totaling approximately 40 linear miles, in areas where new barriers are needed because of border security and public safety risks. DHS intends to move forward with these projects and has recently awarded several construction contracts, but DHS is concerned that an aspect of the Court's injunction prevents the construction of safe and effective barriers.

In clarifying the scope of the injunction during a motion hearing on March 28, 2024, the Court stated that DHS's fiscal year 2020 and 2021 barrier system appropriations could not be used to pay for "drainage" features. During the planning process for the new barrier projects since that decision, DHS identified that several of the areas most in need of new barriers have challenging natural terrain, such as rocky inclines, steep descents, and creeks and rivers that flow across the international boundary during rain events. Accordingly, DHS has concluded that construction of safe and effective barriers in these areas will require construction features that include appropriate water drainage and erosion control measures in the border barrier system. These barrier construction features, which are longstanding components of DHS's barrier system

1

design, further border security and public safety by enhancing the stability of the barrier against threats posed by the surrounding natural terrain and anticipated weather events.

Without proper drainage and erosion control, barriers in these terrains would suffer damage and could collapse, as has happened in the past. For that reason, the government's barrier system design has previously required drainage and erosion control, including during past administrations, and Texas itself also includes such features in its border wall construction.

Traditional tools of statutory interpretation establish that drainage and erosion measures fall within the permissible scope of DHS's budget authority to expend funds for a "barrier system along the southwest border." Similar to the use of concrete and rebar, drainage and erosion features are necessary elements of barrier system construction that stabilize barriers from external threats. Without them, there is a substantial risk of damage or eventual failure.

DHS currently faces a dilemma because of the Court's injunction. DHS intends to move forward with 40 new miles of barrier construction projects, using the same uniform design standards the agency has developed over many years and that the State of Texas has adopted for its state-funded border barriers. DHS, however, cannot construct projects that require appropriate drainage and erosion features. The inability to fund drainage and erosion features from the fiscal year 2020 and 2021 barrier system appropriations—the only available source of funding—harms border security and public safety by preventing DHS from responsibly building new barriers in priority areas along the southwest border most in need of new security infrastructure. The equities and the public interest thus strongly favor amending the injunction to allow new barrier construction to proceed.

For these reasons, as set forth further below, Defendants respectfully request that the Court amend its Final Judgment and Permanent Injunction to confirm that DHS does not violate

the injunction by expending the fiscal year 2020 and 2021 barrier system funds on drainage and erosion features necessary for the construction of new physical border barriers.

## BACKGROUND

On March 8, 2024, the Court issued a memorandum opinion concluding that Congress's appropriation of funds to DHS for "construction of barrier system" in fiscal years 2020 and 2021 "permits only the construction of physical barriers, such as additional walls, fencing, buoys, etc." Mem. Op. & Order at 56 (ECF No. 128) (hereinafter "PI Opinion").  The Court preliminarily enjoined Defendants from obligating those funds for any other purpose, including for "mitigation and remediation efforts, repair of existing barrier, so-called system attribute installation at existing sites, or other similar purposes." *Id.*

Defendants moved for clarification of the Court's injunction (ECF No. 133) and the Court issued oral rulings during a hearing on March 24, 2024.  *See* Transcript (ECF No. 147). As relevant here, the Court clarified the types of construction costs that could be paid for with the fiscal year 2020 and 2021 "barrier system" funds, *i.e.*, the money appropriated in section 209(a)(1).  *See* Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, § 209(a)(1), 133 Stat. 2317, 2511 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 210, 134 Stat. 1182, 1456–57 (2020).  The relevant portion of the Court's ruling is copied below:

> THE COURT: All right. So here's what I'm going to do on that.
>
> I'm going to say that (a)(1) can apply to the land acquisition, provided it is a dedicated-to building in the near future wall. It's not for -- it's not for purchase and then sit on it. It's, you know, something that's part of a new wall construction that's contemplated right now, the roads, and the power.
>
> (Pause in the proceeding.)
>
> THE COURT: Not the drainage, or the project oversight.
>
> (Pause in the proceeding.)

3

> THE COURT: That's the way I interpreted the building of the new barrier
> system.

Transcript (ECF No. 147) at 20-21.  Later during the hearing, the Court concluded that project

oversight was a necessary part of new barrier construction, but did not mention drainage.  *Id.* at

27–28.  The Court subsequently entered Final Judgment and a Permanent Injunction that

mirrored the preliminary injunction, as clarified by the Court's oral ruling.  *See* ECF No. 208.

Defendants have interpreted the Court's oral ruling—specially the reference, "not the

drainage"—to prohibit spending the fiscal year 2020 and 2021 barrier system funds on water

drainage or erosion features in new border barrier construction projects.

## **ARGUMENT**

I.    **The Court Should Amend the Permanent Injunction Because the Prohibition on
      Expending Barrier System Funds for Drainage and Erosion Features in New
      Barrier Construction Projects Harms Border Security and Public Safety.**

Federal Rule of Civil Procedure 60 authorizes the Court to modify a final order when

"applying it prospectively is no longer equitable," Fed. R. Civ. P. 60(b)(5).  "A Rule 60(b)(5)

motion is the appropriate vehicle for modifying a permanent injunction that has prospective

effect, regardless of whether the modification expands restrictions or eliminates restrictions in

the injunction."  *Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 190 (5th Cir. 2008).  The rule

"provides a means by which a party can ask a court to modify or vacate a judgment or order if a

significant change either in factual conditions or in law renders continued enforcement

detrimental to the public interest."  *SEC v. Novinger*, 40 F.4th 297, 307 (5th Cir. 2022) (cleaned

up).  The Supreme Court has explained that Rule 60(b)(5) "serves a particularly important

function" in cases involving prospective injunctive relief where "changed circumstances" call for

"reexamination of the original judgment."  *Horne v. Flores*, 557 U.S. 433, 447–48 (2009).  "The

party seeking relief bears the burden of establishing that changed circumstances warrant relief,

4

but once a party carries this burden, a court abuses its discretion 'when it refuses to modify an injunction or consent decree in light of such changes.'" *Id.* at 447 (cleaned up).

Rule 60(b)(5) incorporates the longstanding "inherent equitable power" of federal courts to modify their injunctions. *League of United Latin Am. Citizens, Dist. 19 v. City of Boerne,* 659 F.3d 421, 436 (5th Cir. 2011). "The power of a federal court that enters an equitable injunction is not spent simply because it has once spoken. The federal courts have always affirmed their equitable power to modify any final decree that has prospective application." *United States v. Lawrence Cnty. Sch. Dist.*, 799 F.2d 1031, 1046 (5th Cir. 1986). As the Supreme Court has explained, an injunction "is subject always to adaptation as events may shape the need." *United States v. Swift & Co.*, 286 U.S. 106, 114–15 (1932). District courts thus have "wide discretion" to modify the terms of "an injunctive decree if the circumstances, whether of law or fact, obtaining at the time of its issuance have changed, or new ones have since arisen." *Sys. Fed'n No. 91, Ry. Emp. Dep't, AFL-CIO v. Wright*, 364 U.S. 642, 647 (1961).

Here, there has been a significant change in factual circumstances that renders the injunction's prohibition on expending the fiscal year 2020 and 2021 barrier system funds on drainage and erosion features contrary to the public interest and inconsistent with the purpose of this Court's judgment that DHS construct new border barriers. Prior to the Court's preliminary injunction and subsequent clarification, DHS had been expending the barrier system funds on adding system attributes to improve the effectiveness of barrier segments that lack cameras and other essential technology, and completing important remediation projects to improve the safety of incomplete barrier project areas. *See* Defs.' Supp. Opp. to Pls.' Mot. for Prelim. Inj. at 39–52 (ECF No. 96). The Court concluded those activities were inconsistent with the purpose of the fiscal year 2020 and 2021 barrier system appropriations and enjoined further such expenditures.

*See* PI Opinion at 41-52, 56; Final Judgment and Permanent Injunction at 2–3 (ECF No. 208).

In response, DHS initiated a planning process to identify new border barrier construction projects that could be funded with fiscal year 2020 and 2021 barrier system funds consistent with the Court's injunction.  *See generally* Eighth Declaration of Paul Enriquez (attached as Exhibit 1).  DHS's planning process identified the locations on the southern border in need of new barrier construction and the design features required for construction of safe and effective barriers in those areas.  As explained below, these changed circumstances warrant modification of the Court's injunction because the prohibition on using barrier system funds to pay for drainage and erosion control measures restricts DHS's ability to build safe and effective barriers in high priority locations, contrary to the public's interest in effective border security and safety.

In planning for new barrier construction projects after the Court's injunction, DHS focused its efforts on identifying areas along the southwest border without current pedestrian barrier, in U.S. Border Patrol's highest priority areas, that would benefit from the construction of new physical barriers.  Eighth Enriquez Decl. ¶ 11.  Among other things, DHS conducted site visits and surveys of potential construction sites along the southwest border.  *Id.*  Further, DHS considered the improvements to border security and public safety likely to result from new barrier construction, focusing on areas without current pedestrian barrier that have experienced high levels of migration traffic.  *Id.*

Based on this planning process, DHS identified 19 new border barrier construction projects that the agency is planning to execute with the fiscal year 2020 and 2021 barrier system funds, totaling approximately 40 miles, in California, Arizona, New Mexico, and Texas.  *Id.* ¶ 12.  The projects will close gaps in existing barrier fencing, ranging from several hundred feet to several miles, where Border Patrol agents report significant migrant traffic.  *See id.*, Ex. 1

(chart summarizing the projects).  These projects are a priority for DHS because many of the gaps have become funnel points for pedestrian migrant crossings, narcotics, and drive-throughs. *See id.*

Building new border barriers in some of these areas will be challenging.  During the planning process, DHS identified that several of the proposed construction locations sit within challenging natural terrain, such as rocky inclines, steep descents, and creeks and rivers that flow across the international boundary during rain events.  *Id.* ¶ 13.  Due to the often dry and arid environment along the southern border, summer monsoons and winter storm events can cause extreme surface water flows.  *Id.*  Rain events occurring hundreds of miles south or north of the border often result in large volume surface waters that cross the international boundary.  *Id.*

Based on these conditions, DHS has concluded that construction of a safe and effective barrier in these areas will require construction features that include appropriate water conveyance and drainage and erosion control measures.  *Id.*  The purpose of these construction features, which are longstanding components of DHS's border wall design, is to channel or direct water away from the barrier and accompanying patrol road, thereby ensuring the stability of the barrier and enhancing border security by allowing agents to traverse the patrol road and respond to emergencies during and after storm events.  *Id.*  Water conveyance and drainage features also minimize the barrier's impact on storm related surface water flows as well as water flows in creeks and rivers that cross or abut the international border.  *Id.*  Without these features, the planned barrier risks causing flooding in the United States and/or in Mexico, potentially impacting private and federal lands in the border region.  *Id.*

The new barriers that DHS intends to construct would fill gaps between barriers built during the prior Administration that have their own drainage and erosion features.  *Id.* ¶ 14.  The

goal of the new construction projects is to complete contiguous segments of border barrier with complementary drainage and erosion features across both the new and existing barriers. *Id.* The completed projects would facilitate unimpeded border security operations and emergency response actions across the border during and after storm events. *Id.*

The Jacumba Gap project in eastern San Diego County illustrates the importance of including drainage and erosion features in new border barrier construction. *Id.* ¶ 15. The Jacumba Gap project would install two-layers of new barrier fencing to close a 2.1 mile gap between existing barrier fencing where Border Patrol agents report significant migrant traffic. *Id.* ¶¶ 15–16 & Ex. 2 (map of project area). Closing this gap is a priority for DHS. *Id.* ¶ 15.

The Jacumba Gap project, however, presents some of the greatest topographic, geotechnical, and drainage challenges of any barrier project DHS has ever undertaken. *Id.* ¶ 17. Due to the mountainous terrain throughout the gap, there are numerous existing washes throughout the barrier alignment that will either cross through or flow adjacent to the alignment. *Id.* Additionally, the composition of the soils and intermittent rainfall often cause the washes to go from dry to heavy flows in minutes. *Id.* Preliminary design plans indicate that one wash along approximately ¼ of the project increases 11 feet in depth during a 25-year storm event. *Id.* In addition to drainage control challenges, the alignment will require the barrier to traverse substantial elevations and descents across rocky terrain. *Id.* DHS expects that areas of the planned alignment that encounter large boulders and bedrock could include the use of controlled detonations of explosives. *Id.* Areas of steep terrain will require cut and fill slopes or terracing to facilitate construction of the barrier and patrol road. *Id.* Without drainage and erosion control features included in the Jacumba design and construction, exposed slopes due to cuts/fills and detonations will be highly susceptible to failure and falling, leaving a gap in the barrier. *Id.*

8

When this challenging landscape is combined with the uncontrolled drainage conveyance across

the project site, severe damage and outright collapse of the barrier and patrol road is inevitable.

*See id.* & Ex. 3 (topographical map of the proposed barrier alignment that includes elevation

data). The photo below shows the challenging terrain in the Jacumba Gap project area. *Id.* ¶ 17.



Other project areas have similarly challenging terrain and location features, including

steep slopes, mountainous terrain, washes, and river crossings, that require appropriate drainage

and erosion control measures. *Id.* ¶ 18. These areas include the San Diego Sector 4 project,

which is located approximately 14-miles east of the Pacific coast, and the El Paso Sector 16-4

project, which is located in New Mexico just west of the New Mexico-Texas state line. *Id.*

To ensure that the foundation of the barrier is not compromised due to the steepness and

other challenges of barrier alignments adjacent to the border, DHS must incorporate drainage and

erosion control measures to ensure the long-term stability of the barrier and associated patrol

roads for their planned 30-year life cycle. *Id.* Drainage and erosion features mitigate

uncontrolled water from storm events and channel water away from the barrier's foundation to

protect the integrity of the barriers and ensure safe travel along the border road. *Id.* ¶ 19. They

also provide long term protection against foundation and soil erosion that could threaten the

9

stability of the barriers and patrol roads and substantially increase the maintenance costs over time. *Id.* Proper drainage and erosion control incorporated into the barrier and patrol road allows agents to respond to border threats or emergencies involving other agents, migrants, or the public in a safe and efficient manner. *Id.* Without such measures, the life cycle of the barrier is anticipated to be much shorter and more costly to maintain. *Id.* ¶ 18.

DHS has established design requirements for Border Patrol infrastructure, including border barriers and roads, in DHS's Tactical Infrastructure Design Standards (TIDS). *Id.* ¶ 21. DHS first created the TIDS in 2012 based on experiences and lessons learned from the hundreds of miles of barrier that were constructed beginning in 2008. *Id.* The TIDS have been updated over the years based on operational updates and additional experience in the field from more recent barrier construction in a wide range of terrain and conditions. *Id.* The current version of the TIDS (version 5) was most recently updated in August 2020 and remains unchanged since the prior Administration. *Id.* As relevant here, the TIDS includes specific design and construction requirements for drainage and erosion features, including the installation of, among other things, drainage gates, ditches, culverts, low water crossing, and rip rap. *Id.* & Ex. 4 (public version of TIDS addressing drainage and erosion design). Inclusion of the drainage and erosion control requirements set forth in the TIDS are critical to new barrier construction where project site conditions warrant such requirements. *Id.*

Notably, the State of Texas relies on the TIDS for its state-funded border wall projects. Texas includes requirements in its contract solicitations that new border barrier projects must comply with the federal government's design requirements in the TIDS. *Id.* ¶ 25 (citing RFQ for Design-Build-Services MATOC for the Texas Border Infrastructure Program, Attachment 2, at www.txsmartbuy.gov/esbd/303-3-04702). Like Texas, DHS will require that federal contractors

adhere to the TIDS for construction of the 19 proposed border barrier projects. *Id.* ¶ 21.

The specific drainage and erosion control measures that are required for each barrier project are informed by site conditions, terrain, expected weather events, and hydraulic analysis as dictated by the standards set forth in the TIDS. *Id.* ¶ 22. Common drainage and erosion measures range from standard construction practices such as the placement of concrete low water crossings, rip rap, or culverts, to more complex measures where site conditions and terrain demand it. Examples of these features are described in more detail below.

Rip Rap: Rip rap is the layered placement of angular rocks to protect soil from erosion due to water flow. *Id.* ¶ 22.b. Rip rap is a common erosion control technique used in border barrier construction to slow the speed of water as it approaches a low water crossing and protects against scour as water exits the crossing. *Id.* Rip rap reduces erosion along the foundation of the barrier, thereby providing protection and increasing the longevity of the infrastructure. *Id.*

Culverts: A culvert is a tunnel or pipe structure that allows water to flow under a roadway or structure. *Id.* ¶ 22.c. To protect the barriers and prevent flooding, culverts are designed to convey water underneath barriers to ensure their long-term stability. *Id.* The size and number of culverts on a particular project is based on the size of the wash, the amount of water to be conveyed, and the target elevation. *Id.* The two photos below show examples of simple and complex culverts, with rip rap, that allow water to flow under the border barrier without damaging the foundation or bollard fencing and minimize the potential for flooding. *Id.*

 

*Examples of Riprap and Culverts*

Concrete Low Water Crossings:  A concrete low water crossing typically consists of concrete pavement placed at grade through the limits of a wash where water flows naturally across the international boundary.  *Id.* ¶ 22.a.  It provides a solid surface to keep the patrol roads passable during and after typical rain event scenarios and, with the addition of rip rap or other erosion control materials on the edge of the road, prevents water flowing across the paved road from deteriorating or undermining the barrier.  *Id.*  The decision to install a concreate low water crossing is based on thorough engineering analysis, including consideration of the existing soil composition, volume of flow, and velocity of the flow, based on requirements set forth in the TIDS.  *Id.*  The photo below shows an example of a patrol road at a concrete low water crossing location.[1]  *Id*

Roadside Ditches:  Roadside ditches are ditches constructed parallel to patrol and access roads for the purposes of collecting storm water surface flow and convey it to the nearest low water crossing.  *Id.* ¶. 22.d.  Roadside ditches are important tools that protect the barrier and patrol road by controlling water drainage throughout project sites.  *See id.*  A photo of a roadside ditch adjacent to the border barrier and patrol road is below.  *Id.*

---

[1] While DHS typically uses concrete as the surface for a low water crossing, the need for paved roads at locations other than low water crossing is not based on drainage requirements and is guided by different requirements as informed by the TIDS.  Eighth Enriquez Decl. ¶ 22.a & n.1.

Slope Paving or Matting:  Construction of barriers and roads within hilly or mountainous terrain require slopes to be cut and/or filled, as described for the Jacumba project.  *Id.* ¶ 22.e.  In addition, soil embankments must be constructed in certain areas to provide a level surface for barrier construction.  *Id.*  If slopes are left unprotected, uncontrolled water from storms will cause ruts to form into the slopes.  *Id.*  These ruts can become deep enough to cause failure of the slopes and ultimately lead to failure of the barrier or patrol road as well as compromise agent safety.  *Id.*  Slope paving protects against these risks and can include a variety of materials such as concrete paving, riprap or high strength flexible matting anchored to the slopes.  *Id.*  The photo below shows slope paving to create a level surface for barrier construction.



*Roadside Ditch        Concrete Low Water Crossing        Slope Paving*

DHS's incorporation of drainage and erosion control features into new construction is consistent with common practice by federal, state and local public agencies, and private entities regardless of the type of construction.  *Id.* ¶ 20.  Drainage and erosion control measures are included in public agency design and construction codes for vertical construction (*e.g.*, new homes and buildings) and horizontal construction (*e.g.*, roads, utilities, fencing/walls).  *Id.*  Indeed, the State of Texas includes similar drainage and erosions features in its State-funded border wall projects.  *Id.* ¶ 25.  Texas has posted photos of its completed drainage and erosion

13

projects on the Texas Facilities Commission website (https://www.tfc.texas.gov/wall/), including large-scale culverts, bank stabilizations, and low water crossings. *Id.*

Constructing new barriers without appropriate drainage and erosion control measures will significantly increase the risk of failure of the barrier and the potential to cause flooding in the United States and/or Mexico. *Id.* ¶ 23. DHS has seen firsthand how barriers constructed without appropriate drainage and erosion features can undermine border security. *Id.* Surging water from heavy storm events has caused barriers to collapse. *Id.* For example, a summer monsoon event in 2014 in the Nogales area of Arizona caused flash flooding in Mexico sending surface water and debris flows north through a normally dry ravine, toward the United States. *Id.* Due to a lack of appropriate use of drainage and erosion controls at this location, the surface waters and debris flowing south from Mexico first began to collect against the south side of the barrier, eventually forcing water vertically against the foundation to the point of undermining the foundation, thus resulting in the eventual collapse of the barrier. *Id.*

Additionally, uncontrolled water due to a lack of proper drainage and erosion control can create a risk of more gradual deterioration and failure over time. *Id.* ¶ 24. The photo below shows how insufficient drainage and erosion measures can lead to degradation of the barrier's foundation and lead to potential safety and border security risks. *Id.* At this location west of Nogales, Arizona, drainage culverts were not installed beneath the barrier as part of a former project. *Id.* Without a culvert to divert the water flow, storm related surface water is channeled through the bollard barrier on top of the barrier foundation instead of underneath the foundation. *Id.* The surface water flows from the recent monsoon seasons have eroded the slope on the south side of the barrier, exposing the foundation of the barrier. *Id.* The erosion will increase progressively with each rain event as the surface water creates a waterfall effect further deepening

the erosion and transporting soils south into Mexico.  *Id.*  The barrier at this location will collapse without proper drainage conveyance and erosion control measures installed on the slopes.  *Id.*



*Barrier foundation erosion and collapse near Nogales, AZ*

DHS has reached the point in its planning process where the inability to fund drainage and erosion from the fiscal year 2021 barrier system appropriation will be a significant impediment to DHS's ability to execute several of the newly approved barrier projects in such a way as to mitigate against the security and safety risks discussed above. *See id.* ¶ 26.  On September 28, 2024, DHS obligated approximately $242 million through contract task order awards and modifications for construction of 12 of the 19 recently approved barrier projects (Project #1-8, 11-14 on Exhibit 1).  *Id.*  Based on information currently available, DHS has assessed that four of these projects require drainage and erosion features because of the terrain and site conditions (Project # 1, 2, 4, 6).  *Id.*  Due to the restrictions imposed by the Court's injunction, however, DHS limited the contracts for these four projects to base construction requirements for new border barriers without any drainage or erosion control measures in the scopes of work.  *Id.*  The contracts include options that would allow DHS to add drainage and erosion features to the projects at a later date in the event the injunction is modified to allow DHS to spend fiscal year 2021 barrier system funds for those purposes.[2]

---

[2] These contracts are funded by the fiscal year 2020 barrier system appropriation, which expired at the end of the fiscal year 2024 and is no longer available for new obligations.  The

Border security and public safety are not furthered by the injunction's continued prohibition on drainage and erosion features.  As the Fifth Circuit has explained, "a court must continually be willing to redraft" an injunction "in order to insure that the decree accomplishes its intended result." *Lawrence Cnty. School Dist.*, 799 F.2d at 1046 (quoting 11 C. Wright & A. Miller, *Federal Practice and Procedure,* § 2961 at 599–600 (1973)).  Here, Defendants' requested modification would "effectuate" rather than "thwart the basic purpose of the original" injunction by facilitating the construction of new and effective border barriers.  *Chrysler Corp. v. United States*, 316 U.S. 556, 562 (1942).  If the barrier system funds cannot be used to pay for drainage and erosion features in new border barrier construction projects, DHS may have to stop work on some of the newly approved projects that require drainage and erosion features, and avoid future barrier construction in other locations that might require those features.  Such a result would be "detrimental to the public interest." *Horne*, 557 U.S. at 447 (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 384 (1992)).

Border security and public safety considerations should determine where border barriers are constructed.  As things stand now, however, the injunction dictates where DHS can build new barriers.  Instead of building barriers at locations chosen by DHS based on factors such as border security concerns and cross-border migration data, DHS must instead search the southwest border for geographic areas that happen to have topographical features and expected climate that would permit barrier construction without any drainage and erosion control measures.  Such a regime undermines border security, leads to potentially wasteful federal spending, and does nothing to further the States' asserted interests in this case.  The public

---

fiscal year 2021 barrier system appropriation remains available for new obligations until the end of fiscal year 2025.

interest and balance of equities thus strongly favors a "suitably tailored" modification to the injunction that allows DHS to expend the barrier system funds on drainage and erosion features necessary for the construction of new border barriers.  *Rufo*, 502 U.S. at 383.

The proposed modification of the injunction would not harm the Plaintiff States. Throughout this litigation, the States have consistently advocated for DHS to expend the challenged funds on the construction of new physical barriers.  DHS is prepared to do exactly that; the agency has identified 40 miles of new barrier construction projects and has taken steps to move forward with those projects.  DHS simply wants to build those projects in a responsible way, where barriers are constructed in locations that further security and public safety interests, and include appropriate drainage and erosion control features to ensure stability and longevity. The States are not injured by permitting DHS to expend the barrier system funds in that fashion. DHS seeks nothing more than the ability to expend its barrier system funds to construct new barriers with the same erosion and drainage design features that Texas includes in its barriers and that DHS has included in its previous barrier construction projects.

## II.    DHS May Lawfully Expend the Fiscal Year 2020 and 2021 Barrier System Funds on Drainage and Erosion Control Features.

Traditional tools of statutory interpretation establish that drainage and erosion measures fall within the scope of DHS's authority to expend money on construction of a "barrier system." For fiscal years 2020 and 2021, Congress appropriated $1.375 billion each year "for the construction of barrier system along the southwest border."  DHS Appropriations Act, 2020, Pub L. No. 116-93, Div. D, § 209, 133 Stat. 2317, 2511; DHS Appropriations Act, 2021, Pub L. No. 116-260, Div. F, § 210, 134 Stat. 1182, 1456–57.  As the Court explained in its Memorandum Opinion granting the States' motion for preliminary injunction, "[t]hree words in particular matter here: 'construction,' 'barrier,' and 'system.'"  PI Opinion at 45.  After surveying

17

dictionary definitions, the Court concluded that "[t]he definitions of 'construction' and 'barrier' connote building a physical structure that would serve as a barricade and a line of demarcation between the United States and Mexico at the Southwest border." *Id.*  DHS's proposed barrier construction projects fit comfortably within the Court's understanding of those terms, as the projects would involve building new vertical fencing along 40 miles of the southwest border.

The Court also recognized that Congress's use of the word "system" expanded the components included in a border barrier.  A "system" is defined "as group of units so combined as to form a whole and to operate in unison." *Id.*  (quoting *System*, Merriam-Webster's Dictionary (11th ed. 2019)).  A barrier system is therefore a collection of different units that combine to form a cohesive whole and operate together in unison as a barricade.  As the Court observed, the term "system" provides DHS with flexibility to pay for "different kinds of barriers such as walls, fencing, buoys and the like depending on the topography."  PI Opinion at 45.

Here, drainage and erosion features are component "units" that DHS must include in the overall "system" to ensure the barrier is safe and effective based on an assessment of "topography" of the construction locations.  As the photos and descriptions above illustrate, drainage and erosion features are integrated into the construction of physical barrier, such as culvert pipes flowing under the barrier and rip rap that stabilizes the barrier's foundation.  These component units are critical to the overall stability and longevity of the barriers, in the same way that concrete, rebar, and other construction materials combine together to form a system of components that solidifies the barriers.  Drainage and erosion features also "operate in unison" with the other components by diverting uncontrolled water away from the steel bollard components and protecting the foundation of the barrier from both rapid and sustained erosion.  When combined together, these component drainage and erosion units form a collective system

that, as a whole, functions together in furtherance of a common purpose to stabilize and protect the barrier.

The necessary expense doctrine further reinforces the conclusion that DHS is authorized to expend its barrier system funds on drainage and erosion features. As the Court recognized in the preliminary injunction opinion, the necessary expense doctrine is a well-established principle that "courts employ to determine whether obligations comport with corresponding appropriations." PI Opinion at 42. This "rule of construction for appropriations statutes" governs situations where an appropriation for a particular object (*i.e.*, border barrier system) provides authorization to fund a more "specific proposed expenditure" (*i.e.*, drainage and erosion features) "necessarily incident to accomplishing that object." *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1349 (D.C. Cir. 2012) (Kavanaugh, J.).

The three-part test that the Court articulated for the necessary expense doctrine is satisfied here. PI Opinion at 42–43. First, there is a "logical relationship" between construction of new border barriers and the inclusion of drainage and erosion features in the barrier system. *Id.* As explained above, drainage and erosion features ensure the stability and efficacy of the border barrier by channeling water away from the barrier's foundation, providing long term protection, and preventing foundation erosion. Drainage and erosion features thus logically and directly contribute to the purpose of the appropriation to construct new physical barrier on the southwest border. These are core construction costs that are not "so attenuated as to take [them] beyond that range of permissible discretion." *Fed. Lab. Rels. Auth.*, 665 F.3d at 1339 (cleaned up).

Second, drainage and erosion costs for border barriers are not an expense that Congress has prohibited by statute. *See* PI Opinion at 42–43. Congress placed certain restrictions on the

use of the DHS's fiscal year 2020 and 2021 barrier system funds, but none of those limitations prevents DHS from including drainage and erosion features in new barrier construction, as the agency has done for many years.  *See* DHS Appropriations Act, 2020, Pub L. No. 116-93, Div. D, §§ 219–10, 133 Stat. at 2512 (prohibiting expenditure of federal funds for the "construction of fencing" in designated areas and requiring funds be spent on "operationally effective designs"); DHS Appropriations Act, 2021, Pub L. No. 116-260, Div. F, § 211, 134 Stat. at 1457 (expanding list of prohibited construction areas).  This case in no way resembles other situations where a statutory restriction prevented the agency's proposed expenditure.  *See, e.g.*, U.S. Comp. Gen., B-277905 (Mar. 17, 1998) (concluding that expenditures for the installation of water pipelines at a military base golf course were not permissible because 10 U.S.C. § 2291a prohibits Department of Defense appropriated funds to "equip, operate, or maintain a golf course").

Third, drainage and erosion features for border barrier construction projects are not otherwise provided for by a separate appropriation.  *See* PI Opinion at 42–43.  Congress has not appropriated money to DHS for drainage and erosion costs associated with construction of homeland security projects generally, nor within the specific context of border barrier construction.  Consequently, there is not another, more specific, appropriation that Congress has designated for drainage and erosion costs in new border barrier construction.

None of the other "buckets" of funding that Congress appropriated to DHS in subsection 209(a) of the larger Procurement, Construction, and Improvements appropriation is available to pay for drainage and erosion features in new border barriers.  As the Court explained, "Congress broke Section 209(a) down into five distinct subsections" and these subsections "have clearly separate and distinct purposes."  PI Opinion at 51.  Drainage and erosion features for new barrier construction fits most naturally and logically within the appropriation of funds in subsection

(a)(1) for "construction of [a] barrier system along the southwest border[.]" § 209(a)(1), 133

Stat. at 2511. By contrast, drainage and erosion control measures are not "border security

technologies" or "travel and trade assets and infrastructure." *See* PI Opinion at 47–48

(discussing meaning of subsection 2). Similarly, drainage and erosion features cannot be funded

by appropriations for "facility construction and improvements" or "integrated operations assets

and infrastructure." *Id.* at 48–50 (discussing meaning of subjections 3–4).[3] Moreover, DHS

cannot use other, more general, appropriations that Congress did not intend for construction.

Indeed, by statute, federal agencies cannot undertake construction projects without a specific

appropriation for the project. *See* 41 U.S.C. § 6303.

Longstanding appropriation principles also prohibit DHS from relying on the final

"bucket" of funding in subsection (a)(5)—"mission support and infrastructure" —to pay for

drainage and erosion expenses. § 209(a)(5), 133 Stat. at 2511. The Court interpreted this

provision as a "catch-all provision that funds anything that supports DHS's objective." PI

Opinion at 50–51. Even if this appropriation were broad enough to cover drainage and erosion

expenses for border barrier construction,[4] DHS cannot rely on this appropriation to fund those

---

[3] The government also notes that the appropriations in FY20 and FY21 for subsections (2), (4), and (5) have expired and are no longer available to incur new obligations for anything. *See* Pub. L. No. 116-93, 133 Stat. at 2506; Pub. L. No. 116-260, 134 Stat. at 1452.

[4] DHS and Congress had a narrower understanding of the "mission support and infrastructure" appropriation. As set forth in DHS's budget request, funding from this appropriation was for the purpose of "revenue modernization" and "enterprise assets and information technology systems and services that support business administrative services and back office operations." *See* DHS Fiscal Year 2020 Congressional Budget Justification for CBP's Procurement, Construction, and Improvements Appropriation at 10 (ECF No. 124-1). The House and Senate shared that view, noting the importance of these funds for modernizing CBP's procurement and revenue systems, among other support functions. *See* S. Rep. No. 116-125 at 47 (2019); H.R. Rep. 116-180 at 28 (2019). Nothing in the back and forth with Congress leading to the passage of the appropriation suggests it could used to pay for "anything that supports DHS's objective." PI Opinion at 51; *see Morton v. Ruiz*, 415 U.S. 199, 207 (1974)

costs because it would run afoul of the principle that "[a]n appropriation for a specific purpose is exclusive of other appropriations in general terms which might be applicable in the absence of the specific appropriation." *Nevada v. Dep't of Energy*, 400 F.3d 9, 16 (D.C. Cir. 2005) (quoting 4 Comp. Gen. 476, 476 (1924)). "Established from time immemorial, this rule makes applicable to appropriations bills the general principle of statutory construction, reiterated repeatedly by the Supreme Court, that a more specific statute will be given precedence over a more general one." *Id.* at 16 (cleaned up). The rule also furthers the separation of powers by preventing federal agencies from evading spending limitations on items that Congress has specifically chosen to fund at certain levels. *See* GAO, Principles of Federal Appropriations Law 3-408 (4th Ed. 2017).

Here, Congress appropriated $1.375 billion in fiscal years 2020 and 2021 for construction of a "barrier system"—a specific purpose that covers the components necessary for the construction of safe and effective vertical fencing, including drainage and erosion features integrated into the barrier system. By contrast, Congress appropriated $45.6 million for "mission support and infrastructure," a "broad" and "generalized catch-all" appropriation that is far less specific and does not mention border barrier construction. PI Opinion at 51. Applying the specific-over-general rule of statutory construction to these two provisions, Congress's specific appropriation of funds for a "barrier system" construction precludes reliance on the more general appropriation for "mission support and infrastructure." *See* Principles of Federal Appropriations Law at 3-409 ("The cases illustrating this rule are legion."). Consequently, drainage and erosion features for new barrier construction must funded from the barrier system appropriation, as it is the most specific source of available funding.

---

(making use of an agency's congressional budget justifications and other legislative history to determine the intended scope of "grants and other assistance" funded in an appropriation).

In addition to both the ordinary meaning of the text and the necessary expense canon, longstanding decisions from the Comptroller General establish that appropriations for construction projects provide agencies with authority to expend those funds on appropriate features to protect the object of construction and ensure its efficient operation. *See Nevada*, 400 F.3d at 16 (stating that Comptroller General opinions are entitled to "special weight" in light of "its accumulated experience and expertise in the field of government appropriations"). For example, in 1896, the Comptroller General concluded that an appropriation to erect a monument at the birthplace of George Washington could be used to construct an iron fence around the monument, where the fence was deemed necessary to protect the monument. *See* Principles of Federal Appropriations Law at 3–20 (citing 2 Comp. Dec. 492 (1896)). Additionally, in 1951, the Comptroller General determined that an appropriation for construction and administration of power lines was lawfully available for the "purchase of arms and ammunition for the purpose of safeguarding Government-owned transmission line structures from damage caused by woodpeckers." U.S. Gen. Accounting Office, B-105977, Dec. 3, 1951, at www.gao.gov/products/b-105977 (explaining that "marauding woodpeckers cause considerable monetary damage to the wooden transmission line structures"). The same rationale underlying these decisions applies in this case, as the inclusion of drainage and erosion control measures in new barrier construction projects provides important protection that extends the lifespan and efficacy of the barrier. Accordingly, the cost of drainage and erosion features are lawfully funded from the fiscal year 2020 and 2021 appropriations for the construction of barrier system.

When the Court stated that drainage costs could not be funded from the barrier system appropriations, *see* Transcript at 20–21, the Court did not have the benefit of the new information that DHS acquired during its subsequent planning process about the necessity of

including drainage and erosion features, where appropriate, in new barrier construction projects. In accordance with Rule 60(b)(5), these changed circumstances call for a re-examination of the Court's prior conclusion about the permissible scope of the barrier system appropriations and a corresponding modification of the permanent injunction. *Horne*, 557 U.S. at 448 (stating that "a court abuses its discretion when it refuses to modify an injunction" based on changed circumstances). As explained above, both traditional tools of statutory interpretation and well-established appropriations principles support the conclusion that Congress's appropriation of funds for construction of barrier system includes necessary drainage and erosions features to ensure the barrier is safe and functional.

The Court's consideration of the drainage and erosion issue during the March hearing was necessarily succinct given the range of issues before the Court at that time concerning both new barrier construction and remediation of existing barrier. Indeed, when the Court considered the question, the Court appeared to be concerned that the funds be used for construction of new barrier in the near future rather than used for existing barrier. *See* Transcript at 20–21 ("THE COURT: I'm going to say that (a)(1) can apply to the land acquisition, provided it is a dedicated-to building in the near future wall. … It's, you know, something that's part of a *new wall construction that's contemplated right now*, the roads, and the power. …Not the drainage, or project oversight." (emphasis added)). The drainage and erosion control measures at issue here are construction features that DHS has identified as necessary to construct new barriers. The Court's reasoning thus reinforces that such necessary expenses for *new* construction are allowed—particularly since the Court later recognized that project oversight, which it had mentioned alongside drainage, was a permissible expense for new construction, *id.* at 27.

To be clear, Defendants are not seeking to use any of the fiscal year 2020 and 2021

24

barrier system funds on drainage or erosion control measures associated with existing barriers, remediation of former barrier construction project sites, or general environmental mitigation. The focus of this motion is solely on modifying the injunction so DHS can expend the barrier system funds on new barrier construction projects in areas where fencing does not currently exist, and include appropriate drainage and erosion measures in those projects as required by specific site conditions.  This proposed modification is consistent with equitable principles because it furthers the public interest in border security and public safety, will help close gaps in the barrier in high traffic areas, and imposes no harm on the Plaintiff States.

## **CONCLUSION**

For the reasons stated above, the Court should confirm that Defendants do not violate the permanent injunction by expending DHS's fiscal year 2020 and 2021 barrier system funds on drainage and erosion features necessary for the construction of new border barriers.

Date: November 22, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

 */s/ Andrew I. Warden*
ANDREW I. WARDEN (IN Bar #23840-49)
Senior Trial Counsel
MICHAEL J. GERARDI
(D.C. Bar #1017949)
Trial Attorney / Attorney-in-Charge
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW, No. 7506
Washington, D.C. 20005
Tel: (202) 616-5084

Fax: (202) 616-8470
E-mail: Andrew.Warden@usdoj.gov


ALAMDAR S. HAMDANI
United States Attorney

DANIEL D. HU
Chief, Civil Division
Assistant United States Attorney
Southern District No. 7959
Texas Bar No. 10131415
1000 Louisiana, Suite 2300
Houston, Texas 77002
Tel: (713) 567-9000
Fax: (713) 718-3303
E-mail: Daniel.Hu@usdoj.gov

ALYSSA IGLESIAS
Assistant United States Attorney
Southern District of Texas No.: 3610302
1701 W. Bus. Highway 83, Suite 600
McAllen, TX 78501
Telephone: (956) 618-8010
Facsimile: (956) 618-8016
E-mail: Alyssa.Iglesias@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on November 22, 2024, I electronically filed a copy of the foregoing motion.  Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's CM/ECF System.

*/s/ Andrew I. Warden*
ANDREW I. WARDEN

## CERTIFICATE OF CONFERRAL

I hereby certify that counsel for the Plaintiffs and Defendants conferred on multiple occasions in good faith via email and video conference about the relief sought in this motion. The discussions began in late August 2024 and concluded in November 2024 prior to the filing of this motion.  The discussions were productive, but the parties were unable to reach an agreement.  Plaintiffs oppose this motion.

*/s/ Andrew I. Warden*
ANDREW I. WARDEN

.