# EXHIBIT A

Proposed Brief of *Amicus Curiae*
President Donald J. Trump

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

| | | |
|---|---|---|
| THE GENERAL LAND OFFICE OF THE STATE OF TEXAS, and GEORGE P. BUSH, in his official capacity as Commissioner of the Texas General Land Office, | § § § § § § | |
| **Plaintiffs,** | § § | |
| v. | § § | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; and ALEJANDRO MAYORKAS, in his official capacity as Secretary of the United States Department of Homeland Security, | § § § § § § § § § | Civil Action No. 7:21-CV-00272 |
| **Defendants.** | § | |

| | | |
|---|---|---|
| THE STATE OF MISSOURI; and THE STATE OF TEXAS, | § § § | |
| **Plaintiffs,** | § § § | |
| v. | § § | |
| JOSEPH R. BIDEN, JR., in his official capacity as President of the United States of America; THE UNITED STATES OF AMERICA; ALEJANDRO N. MAYORKAS, in his official capacity as Secretary of the United States Department of Homeland Security; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; TROY A. MILLER, in his official capacity as the Acting Commissioner of the United States Border Protection; and UNITED | § § § § § § § § § § § § § § | Civil Action No. 7:21-CV-00420 |

**STATES CUSTOMS AND BORDER**　　　§
**PROTECTION, Unites States**　　　　§
**Department of Homeland Security,**　§
　　　　　　　　　　　　　　　　§
　　　**Defendants.**　　　　　　　§


**BRIEF OF *AMICUS CURIAE* PRESIDENT DONALD J. TRUMP
IN SUPPORT OF PLAINTIFFS' OPPOSED MOTION TO ENFORCE PERMANENT
<u>INJUNCTION AND FOR A STATUS CONFERENCE</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................................ ii

I.   INTEREST OF *AMICUS CURIAE* PRESIDENT DONALD J. TRUMP ......................... 1

II.  SUMMARY OF THE ARGUMENT ................................................................... 3

III. STATEMENT OF FACTS ................................................................................. 4

     A.  This Court Correctly Enjoined Defendants From Using Funds Appropriated to
         Construct the Border Wall for Other Purposes. ............................................ 4

     B.  The Government's Reported Sale of Border Wall Materials at Fire Sale Prices. .......... 8

     C.  The Biden Administration's Reported Fire Sale Appears To Implement the Amended
         Plan That the Court Enjoined. .............................................................. 9

IV.  ARGUMENT ................................................................................................. 11

     A.  The Court Should Order an Immediate Stop of the Sale of Border-Wall Materials and
         Conduct a Searching Examination of the Facts. ............................................ 11

     B.  The Government's Conduct, If Proven, Is Unlawful on Multiple Grounds ................ 13

         1.  The Government's Conduct Likely Violates the Appropriations Acts .................. 13

         2.  The Government's Conduct Raises Serious Concerns of Possible Circumvention
             of this Court's Injunction. .......................................................... 14

         3.  The Biden Administration's Misconduct, if Proven, Encroaches on the Executive
             Power of President Trump's Incoming Administration. ............................. 16

         4.  The Suspected Conduct, If Proven, May Constitute Criminal Fraud. ................ 19

V.   CONCLUSION ............................................................................................. 21

CERTIFICATE OF SERVICE ................................................................................. 22

## **TABLE OF AUTHORITIES**

**Cases**                                                                          **Page(s)**

*Dennis v. United States*,
    384 U.S. 855 (1966)............................................................................20

*Dep't of Commerce v. New York*,
    588 U.S. 752 (2019)............................................................................13

*El Paso Cnty. v. Trump*,
    982 F.3d 332 (5th Cir. 2020) ..............................................................9

*Florida v. United States*,
    660 F. Supp. 3d 1239 (N.D. Fla. 2023) ........................................6, 16

*Gen. Land Office v. Biden*,
    71 F.4th 264 (5th Cir. 2023) ................................................................6

*Gen. Land Office v. Biden*,
    722 F. Supp. 3d 710 (S.D. Tex. 2024).............................. 5-7, 9, 12, 18

*Haas v. Henkel*,
    216 U.S. 462 (1910)............................................................................20

*Hammerschmidt v. United States*,
    265 U.S. 182 (1924)...................................................................... 20-21

*In re Aiken County*,
    725 F.3d 255 (D.C. Cir. 2013)...........................................................17

*Institute of Cetacean Research v. Sea Shepherd Conservation Society*,
    774 F.3d 935 (9th Cir. 2014) ..............................................................15

*Louisiana v. CDC*,
    603 F. Supp. 3d 406 (W.D. La. 2022) ...............................................16

*Missouri v. Biden*,
    112 F.4th 531 (8th Cir. 2024) ..............................................................8

*Tanner v. United States*,
    483 U.S. 107 (1987)............................................................................20

*Texas v. Biden*,
    589 F. Supp. 3d 595 (N.D. Tex. 2022) ..............................................16

*Texas v. Biden*,
    646 F. Supp. 3d 753 (N.D. Tex. 2022) .............................................................16

*Texas v. United States*,
    524 F. Supp. 3d 598 (S.D. Tex. 2021) .............................................................16

*Trump v. United States*,
    603 U.S. 593 (2024)..........................................................................................16

*United States v. Trump*,
    No. 23-80101-CR, 2024 WL 3404555 (S.D. Fla. July 15, 2024) ....................14

*Waffenschmidt v. MacKay*,
    763 F.2d 711 (5th Cir. 1985) ...................................................................... 14-15

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)..................................................................................... 16-18

## Constitutional, Statutory & Regulatory Authority

18 U.S.C. § 371 ......................................................................................................20

31 U.S.C. § 1535 ....................................................................................................12

Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, Div. D, § 209(a)(1), 133 Stat. 2317,
    2511 (2019) .......................................................................................................5

Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Div. F, § 210, 134 Stat. 1182,
    1456–57 (2020)..................................................................................................5

National Defense Authorization Act for Fiscal Year 2024, Pub. L. No. 118-31, 137 Stat. 136
    (2023)....................................................................................................... 9-11, 18-19

Termination of Emergency With Respect to the Southern Border of the United States and
    Redirection of Funds Diverted to Border Wall Construction, 86 Fed. Reg. 7,225 (Jan. 20,
    2021) ...........................................................................................................6, 12

U.S. Const. art. II, § 1 .............................................................................................2

## Other Authorities

James Lalino, *Exclusive: Biden Races to Sell Off Border Wall Parts Before Trump Takes Office*,
    The Daily Wire (Dec. 12, 2024), https://www.dailywire.com/news/exclusive-biden-
    races-to-sell-off-border-wall-parts-before-trump-takes-office?topStoryPosition=1............8

Joey Garrison, *Trump Asks Biden to 'Stop Selling' Unused Parts of Border Wall*, USA TODAY (Dec. 16, 2024), https://www.usatoday.com/story/news/politics/elections/2024/12/16/trump-biden-border-wall-parts/77026990007/.....................................................................8

Josh Blackman, *How Do You Challenge a Student Loan Forgiveness Rule That Does Not Exist?*, REASON: THE VOLOKH CONSPIRACY (Sept. 30, 2022), https://reason.com/volokh/2022/09/30/how-do-you-challenge-a-student-loan-forgiveness-rule-that-does-not-exist/.....................................................................................................8

Peter Pinedo, *Trump Calls for End to Border Wall Auctions: 'Almost Criminal Act'*, Fox News (Dec. 17, 2024), https://www.foxnews.com/politics/trump-calls-end-border-wall-auctions-almost-criminal-act......................................................................... 1-2, 8

Republican Nat'l Comm., *2024 GOP Platform: Make America Great Again!* 8 (2024) ...............1

iv

I.        **INTEREST OF *AMICUS CURIAE* PRESIDENT DONALD J. TRUMP[1]**

*Amicus curiae* President Donald J. Trump ("President Trump") is the 45th and soon-to-be 47th President of the United States.  President Trump is a visionary leader who has transformed American politics and unified our Nation's contending sides around his policy of American greatness.  On November 5, 2024, he was reelected by American voters with an overwhelming margin of victory, including winning a historic majority of the popular vote, granting President Trump a decisive mandate to Make America Great Again.

President Trump's electoral mandate includes his commitment to securing America's border and ending the unprecedented chaos, lawlessness, illegal migration, smuggling of fentanyl and other drugs, and vicious human trafficking that has marred the Nation's southwestern border and decimated American national security under the Biden Administration.  In his first Administration, President Trump pioneered some of the most resoundingly successful border-security policies in American history, including the "Remain in Mexico" policy, a strict protocol of border enforcement, and the "Walls Work" policy that is at issue in this case.  During the recent campaign and Presidential transition, President Trump has reaffirmed his support for building a system of border barriers at the southwestern border as a crucial tool for checking the influx of illegal immigration.  *See, e.g.,* Republican Nat'l Comm., *2024 GOP Platform: Make America Great Again!* 8 (2024) ("Republicans will restore every Border Policy of the Trump administration ... . We will complete the Border Wall."); Peter Pinedo, *Trump Calls for End to Border Wall Auctions: 'Almost Criminal Act'*, Fox News (Dec. 17, 2024), https://www.foxnews.com/politics/trump-calls-end-border-wall-auctions-almost-criminal-act

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity other than *amicus curiae* or its counsel has made a monetary contribution toward the brief's preparation or submission.

1

(quoting President Trump as saying about the sold material, "They know we're going to use it and if we don't have it, we're going to have to rebuild it."). Building the border wall is the clear and emphatic policy of the incoming Trump Administration.

Accordingly, President Trump is deeply troubled by recent reports that officials in the Biden Administration have been selling off border-wall materials at rock-bottom prices, especially during this lame-duck period. On December 17, 2024, President Trump stated that he has received reports that the Biden Administration is selling border-wall materials at "five cents on the dollar," and that this is "almost a criminal act." Pinedo, *supra*. He highlighted reporting that purchasers of the materials, who acquired them at a steep discount, are now offering to sell the materials back to the Trump Administration for "hundreds of times more" than they spent on them. *Id.* (embedded video).

President Trump has a paramount interest in preventing any unlawful sell-off of border-wall materials that may be occurring. One of President Trump's dominant priorities for the next four years—building the border wall—could be unlawfully hampered, delayed, or obstructed by such efforts. Moreover, as the incoming President, President Trump represents the interests of all American taxpayers, and he has a compelling interest in preventing waste, fraud, and abuse of taxpayer resources—as evidenced by the historic creation of the new Department of Government Efficiency (DOGE). Further, as discussed in greater detail below, the reported actions of the lame-duck Biden officials, if proven, threaten to encroach unlawfully on President Trump's exercise of the "executive Power … of the United States of America," U.S. CONST. art. II, § 1, once he assumes office on January 20, 2025. To address and vindicate these interests, President Trump submits this brief of *amicus curiae*.

II.    **SUMMARY OF THE ARGUMENT**

The outgoing Biden Administration's reported "fire sales" of border-wall materials to private parties raise grave concerns about the legality of Defendants' conduct and their compliance with this Court's permanent injunction in this case.  The Court should order an immediate stop of all such sales and perform a searching examination of the Government's conduct—by ordering formal discovery if necessary—to ensure compliance with the Constitution, the law, and the Court's orders.

This Court previously enjoined Defendants from implementing their "Amended Plan," which would have disposed of nearly $3 billion in funds appropriated for the specific purpose of constructing a barrier system at the southwestern border without actually constructing any barriers at the southwestern border.  The Government's reported conduct raises concerns that Defendants may be acting in concert with other federal agencies—all under the aegis of the same lame-duck Administration—to evade or defeat this Court's injunction.  The reported fire sale of border-wall materials raises vital questions as to why those materials were not being used to implement the Congressional directive to expend almost $3 billion to construct a border wall.

If such actions have been taken, the Government's conduct violates a series of legal obligations.  First, it is likely inconsistent with Defendants' straightforward obligation, imposed by Congress's Appropriations Acts and reinforced by this Court's injunction, to construct border barriers at the southwestern border.  Defendants cannot invoke the FY 2024 National Defense Authorization Act to justify their reported sales, because that Act authorizes the transfer of border-wall materials to States constructing their own barrier system, and it clearly reflects the same Congressional policy in favor of border-wall construction as the Appropriations Acts at issue. Second, if federal officials are selling off border-wall materials at a significant loss in an attempt

3

to avoid constructing border barriers, that would indicate an attempt to evade the Government's obligations under the Court's injunction. Third, to the extent officials in the outgoing Administration are engaging in unlawful behavior to obstruct or thwart the pro-wall policy of President Trump's incoming Administration, they encroach on the Executive Power that will soon be lawfully vested in President Trump under Article II. Fourth, the reported conduct raises serious concerns under federal criminal prohibitions against defrauding the United States.

In sum, the Court should order an immediate stop of the sale of all border-wall materials to private parties and conduct a searching inquiry into the Government's conduct—including through formal discovery as needed—to examine whether Defendants are complying with the law and the Court's injunction.

## III. STATEMENT OF FACTS

### A. This Court Correctly Enjoined Defendants From Using Funds Appropriated to Construct the Border Wall for Other Purposes.

"Walls Work." App. in Supp. of Pls.' Mot. for Prelim. Inj. at 5, *Missouri v. Biden*, No. 7:21-cv-420 (S.D. Tex. Nov. 8, 2021), ECF No. 19-1 [hereinafter "PI App."].[2] President Trump has been steadfast in that position. Securing the nation's southern border was a goal and vital achievement of his first term, and it will be an even more pressing goal and achievement of his second term—especially after the indefensible open-border policies of the past four years. To that end, President Trump prioritizes and values the unparalleled advantages of building physical barriers to curb illegal immigration and all the evils that come with it—fentanyl smuggling, human trafficking, sexual abuse, entry of violent criminals and potential terrorists, disruption of the American work force, overburdens on taxpayers, and all the other problems that have skyrocketed

---

[2] The appendix was filed with the preliminary injunction motion of the State plaintiffs before their case was consolidated with No. 7:21-cv-272.

during the Biden Administration's mismanagement of the border. Among other accomplishments, President Trump worked with Congress to secure funding for barrier construction in the Consolidated Appropriations Acts for fiscal year 2020 (the "CAA of 2020") and for fiscal year 2021 (the "CAA of 2021") (together, the "CAAs")—both of which are directly implicated in this case. *See Gen. Land Office v. Biden (GLO III)*, 722 F. Supp. 3d 710, 719 (S.D. Tex. 2024) (discussing Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, Div. D, § 209(a)(1), 133 Stat. 2317, 2511 (2019), and Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, Div. F, § 210, 134 Stat. 1182, 1456–57 (2020)).

As this Court has recognized, that policy was a resounding success. DHS issued "reports detailing the effectiveness of border walls in deterring illegal immigration." *Id.* at 722. "For example, in" one area where border barriers were constructed, illegal entries fell "over 87% in FY 20 compared to FY 19." *Id.* (quotations omitted) (quoting a DHS report). In another, apprehensions fell nearly 80 percent. *See id.* A third area "experienced a significant reduction in drug and smuggling activities in areas where the new border wall system was built," with illegal entries declining in "two key zones … by 60% and 81%" over the relevant timeframes. *Id.* at 722–23 (quotations omitted) (quoting a DHS report). DHS also discussed the fact that a 1,000-strong mob that stormed the Southern border was able to breach an old barrier but "[t]here were no breaches along the newly constructed border wall areas." *Id.* at 723 (quoting a DHS report).

"This evidence led DHS to conclude, '[t]he results speak for themselves: illegal drug, border crossings, and human smuggling activities have decreased in areas where barriers are deployed.' And '[w]hen it comes to stopping drugs and illegal aliens from crossing our borders,' DHS emphasized that 'border walls have proven to be extremely effective.'" *Id.* (citations

omitted).  "These DHS findings and reports show that walls, and the addition of walls, lower the volume of illegal immigration."  *Id.*

In contrast to President Trump, President Biden's border policies are "akin to posting a flashing 'Come In, We're Open' sign on the southern border."  *Florida v. United States*, 660 F. Supp. 3d 1239, 1253 (N.D. Fla. 2023).  Consistent with his open-borders governing, President Biden—with no evidence or reasoning—asserted that "building a massive wall that spans the entire southern border is not a serious policy solution."  Termination of Emergency With Respect to the Southern Border of the United States and Redirection of Funds Diverted to Border Wall Construction, 86 Fed. Reg. 7,225, 7,225 (Jan. 20, 2021).  As a result, "DHS abruptly reversed its position" and stopped constructing border barriers—in contravention of an express Congressional policy.  *Gen. Land Office v. Biden (GLO II)*, 71 F.4th 264, 269 (5th Cir. 2023).  Instead, DHS issued a new, unlawful plan (what this Court has called the "Amended Plan") for the funds the CAAs appropriated, which involved doing everything *but* building the border wall, "including (1) remediation projects at sites previously funded by the DoD, and (2) the addition of 'barrier system attributes' such as lighting, cameras, and detection technology where a physical barrier has already been constructed."  *GLO III*, 722 F. Supp. 3d at 720 (quoting Doc. 66-3, at 9–11).

This Court correctly held that the Amended Plan violated the plain language of the CAAs, "which requires that those appropriations be obligated for the construction of barriers at the Southwest border."  *Id.* at 743.  The Court's analysis focused on the text and context of the pertinent section of the CAA of 2020, § 209, since § 210 of the CAA of 2021 appropriated "an amount equal" to the amount made available in section 209(a)(1) of the CAA of 2020 "for the same purposes . . . ."  *Id.* at 739; *see id.* at 736 n.22.  Subsection 209(a)(1) of the CAA of 2020, the Court noted, directed $1.375 billion—roughly 72 percent of funds allocated in the section—"for the

6

construction of barrier system along the southwest border." *Id.* at 739 (quoting the CAA of 2020). That phrase, the Court found, "indicate[s] that Subsection 209(a)(1) appropriates funding for building physical barriers." *Id.* at 740. So did the broader statutory context. For example, "Section 209(b) provides an example of what spending on a 'construction of [a] barrier system' looks like," and that example involved a physical barrier. *Id.* (alteration in original). "Looking at Subsections 209(a)(1) through (5) as a whole for context is instructive and also points toward a requirement that the funds be spent on physical barriers." *Id.* "[E]ach of these subsections have clearly separate and distinct purposes," two of which—Subsections 209(a)(2) and (a)(3)—better describe the priorities set out in the Amended Plan. *See id.* at 741–42. But "[t]he vast majority of the Government's FY 2020 and 2021 obligations are not allocated to new wall construction," *id.* at 743, despite Congress directing that the vast majority of those funds be allocated to exactly that, *see id.* at 741 (noting "roughly 72%" of the funds appropriated in Section 209 of the CAA of 2020 be used to build physical barriers). Thus, "the bulk of the Government's obligations in the Plan do not comply with Subsection 209(a)(1)," and the Plaintiffs, the States of Missouri and Texas and the General Land Office, established their entitlement to a preliminary injunction, which issued on March 8, 2024. *Id.* at 743.

On May 29, 2024, this Court issued a final judgment making permanent the preliminary injunction as clarified at a March 28, 2024, hearing. *See* Doc. 208, at 2. As relevant here, the order enjoined "[t]he Government and all its respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them" from implementing DHS's Amended Plan or "obligating funds under Subsection 209(a)(1)—and corresponding funds under Section 210—toward mitigation and remediation efforts, repair of

existing barrier, so-called system attribute installation at existing sites, or other similar purposes." *Id.* at 3.

**B.      The Government's Reported Sale of Border Wall Materials at Fire Sale Prices.**

Missouri and Texas have now identified for this Court a seemingly flagrant attempt by the Biden Administration to evade this Court's final judgment and permanent injunction. *See* Doc. 230. As the States note, the flouting of the rule of law by the Biden Administration is nothing new. *See id.* at 2 (discussing *Missouri v. Biden*, 112 F.4th 531 (8th Cir. 2024)); *see also* Josh Blackman, *How Do You Challenge a Student Loan Forgiveness Rule That Does Not Exist?*, REASON: THE VOLOKH CONSPIRACY (Sept. 30, 2022)[3] ("[T]he Administration appears to be making changes to the policy on the fly for the express purpose of blocking law suits.").

Specifically, there are prevalent reports about the DoD selling "unused border wall panels." Doc. 230, at 2; *see also* James Lalino, *Exclusive: Biden Races to Sell Off Border Wall Parts Before Trump Takes Office*, THE DAILY WIRE (Dec. 12, 2024).[4]  It has reportedly done so at fire sale prices—possibly, as President Trump observes, at "'five cents on the dollar.'"  Joey Garrison, *Trump Asks Biden to 'Stop Selling' Unused Parts of Border Wall*, USA TODAY (Dec. 16, 2024) (quoting President Trump).[5]  That is material that should be used in future border construction, including under President Trump once he takes office in a month—and the people who purchase the material know that.  President Trump stated that they "are trying to make a deal with us to sell it back at hundreds of times more … than we paid."  Pinedo, *supra.*

---

[3]    *Available at* https://reason.com/volokh/2022/09/30/how-do-you-challenge-a-student-loan-forgiveness-rule-that-does-not-exist/.
[4]    *Available at* https://www.dailywire.com/news/exclusive-biden-races-to-sell-off-border-wall-parts-before-trump-takes-office?topStoryPosition=1.
[5]    *Available at* https://www.usatoday.com/story/news/politics/elections/2024/12/16/trump-biden-border-wall-parts/77026990007/.

C.    **The Biden Administration's Reported Fire Sale Appears To Implement the Amended Plan That the Court Enjoined.**

The Government's response, included in the certification to the States' motion, attempts to justify the sale as required by Section 2890 of the National Defense Authorization Act for Fiscal Year 2024, Pub. L. No. 118-31, 137 Stat. 136 (2023).  *See* Doc. 230, at 8.  But the record here links the excess building material to the Amended Plan and the Government's decisions regarding the funds appropriated in the CAAs.

As the Court observed, part of President Trump's plan to secure the border included using "funds from the Department of Defense ('DoD') … to fund barrier construction projects." *GLO III*, 722 F. Supp. 3d at 719.  The statutory authority for those programs and their funding is found in Title 10, at 10 U.S.C. § 284 and § 2808.  *See El Paso Cnty. v. Trump*, 982 F.3d 332, 336–37 (5th Cir. 2020) (providing the background); Doc. 66-3, at 13 (Administrative Record, at 13). After President Biden, in a move that damaged America and our national security, ended President Trump's policy of securing the southern border in Proclamation 10142, DHS developed a plan in June 2021 for "redirecting funds and repurposing contracts as appropriate and consistent with applicable law."  Doc. 66-3, at 4 (Administrative Record, at 4).  The plan expressly contemplated DoD turning "over multiple barrier projects, previously executed with" Title 10 funds, to DHS. *Id.* at 7 (Administrative Record, at 7).  When DHS issued the Amended Plan in July 2022, the agency directed that appropriations from the CAAs would be used to close out or remediate and to install barrier system attributes in those areas.  *Id.* at 10–11 (Administrative Record, at 10–11). This included "gap closures" in the barriers DoD had constructed.  Doc. 66-7, at 2 (Administrative Record, at 113).  Pursuant to the Amended Plan, DHS issued contracts to close gaps in existing segments of the border wall using appropriations from the CAAs.  *See*, *e.g.*, Doc. 96-2 ¶¶ 21, 25.

When DoD transferred its barrier projects to DHS, it also transferred the assets it acquired pursuant to its Title 10 work to DHS, *see* Doc. 66-7 at 8 (Administrative Record, at 119) (saying "formal transfer of assets to CBP" follows DoD's "contract termination and project close out/demobilization"), though the record is not clear whether that includes raw materials or only constructed "border barrier infrastructure," Doc. 66-4, at 11 (Administrative Record, at 78) (quotations omitted) (quoting a DoD memorandum); Doc. 96-1, at 3–4 (providing the DoD memorandum, which only references real property).   But in all events, the 2024 FY NDAA applies to "construction materials currently possessed by the United States Government that were purchased under section 2808 and 284 of title 10, United States Code, *from fiscal years 2017 through 2021*." § 2890(f) (emphasis added).   Thus, it appears that the material authorized to be sold by the 2024 FY NDAA may have been transferred from DoD to DHS as "assets" remaining from DoD's border projects—when DHS is under a legal obligation (and this Court's injunction) to construct border barriers.

Thus, the record suggests—but, admittedly, is not perfectly clear—that DoD may have transferred the relevant border-wall materials to DHS as part of its transfer of barrier projects to DHS under the Biden Administration.   If so, the current reports of "fire sales" of such materials raise grave concerns that DHS is not acting in good faith to comply with the Court's injunction to expend appropriated funds to construct border barriers.   But even if DoD never transferred those materials to DHS, grave concerns remain, because the Court's injunction extends to "the Government" as a whole, including everyone acting in "active concert" with DHS, Doc. 208, at 2, and DoD and DHS have been working in close concert on border-barrier issues during the Biden Administration pursuant to President Biden's directive.   Under either scenario, grave doubts about the legality of the Government's conduct remain—as discussed in detail below.

## IV.    ARGUMENT

### A.    The Court Should Order an Immediate Stop of the Sale of Border-Wall Materials and Conduct a Searching Examination of the Facts.

As the Defendants represented to Missouri and Texas, their defense of the fire sale of border-wall materials appears to rely on the claim the sale is required by § 2890 of the 2024 FY NDAA.  *See* Doc. 230, at 8.  But that raises more questions than it answers.  Besides the fact the claim misinterprets the law, *see infra*, the statue applies to "construction materials currently possessed by the United States Government that were purchased under section 2808 and 284 of title 10, United States Code, *from fiscal years 2017 through 2021*, including bollards and Nucor tubular square structural tubes." § 2890(f) (emphasis added).  As discussed above, that covers the work DoD preformed pursuant to Title 10 in President Trump's first term.

As a result, there is a troubling question on this record whether those materials were provided to DHS when DoD transferred its prior Title 10 projects to the agency.  If so, as the States point out, DoD's reacquisition and sale of the material would be "as if DHS took the congressional appropriation and gave the funds to a third party." Doc. 230, at 4.  For that reason alone, the States' request for an immediate status conference for the Government to provide "the origin, manufacture date, original funding source, and other identifying information regarding each section of border wall, and other items being remitted for auction," *id.* at 5, is warranted and eminently reasonable.

Further, Defendants should not be let off the hook even if the border-wall material DoD sold never went to DHS.  First, this Court's injunction extends to "the Government and all its respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them." Doc. 208, at 3.  There can be no doubt that DoD has been acting in "active concert or participation with DHS" on border-barrier issues during the Biden Administration.  Indeed, both agencies were involved in President Biden's unlawful decision not

11

to construct border barriers—regardless of the proven efficacy of the policy or contrary congressional directive. *See* 86 Fed. Reg. at 7,225–26 (tasking the two agencies, among others, with creating plans to end border barrier construction and to redirect the related funding). DoD's decision to hold on to the border-wall material—if it did—assisted DHS in its attempt to avoid the plain language of the CAAs. To illustrate, the constructed border barriers that DoD completed included gaps that DHS then used CAA appropriations to close. *See*, *e.g.*, Doc. 96-2 ¶¶ 21, 25. Had DoD also transferred the building material to DHS, there is every reason to believe that DHS could have filled those gaps more cheaply using the appropriated funds, and thus increased the money available for additional border-barrier construction. DoD's action meant DHS effectively overpaid for the border wall—something far removed from Congress's directive in the CAAs to construct a "barrier system along the southwest border." *GLO III*, 722 F. Supp. 3d at 739 (quoting § 209(a)(1) of the CAA of 2020). Yet, DHS is arguing that it is complying with the Court's injunction by obligating CAA funds to fill those gaps. *See* Doc. 227-1 ¶ 12 (pointing to "new border barrier construction projects that [DHS] is planning to execute with CAAs" funds); Doc. 227-1, Ex. 1 (listing sites, including gap closures from prior DoD projects). Planned waste in filling those gaps would satisfy neither the CAAs nor this Court's injunction.

The logic extends further. DoD could have provided DHS with the building material at five cents on the dollar—the prices that it apparently received from a commercial reseller, *see supra*. *See* 31 U.S.C. § 1535 (authorizing agencies to "place an order … for goods" in certain contexts). Other than thwarting the will of Congress as expressed in the CAAs, this Court's order, and President Trump's plan as Chief Executive to restart border wall construction to secure the Southern border, DoD's decision to sell border-wall material to private parties who will then resell

12

it to the federal government at a massive mark-up makes no sense—in fact, it perpetrates a massive fraud on the U.S. Government and its taxpayers.

This decision, therefore, demands the strictest scrutiny from the Court. Indeed, it likely warrants additional discovery. To be sure, "in reviewing agency action, a court is ordinarily limited to evaluating the agency's contemporaneous explanation in light of the existing administrative record." *Dep't of Commerce v. New York*, 588 U.S. 752, 780 (2019). But there is an exception where there is "a strong showing of bad faith or improper behavior." *Id.* at 781 (quotations omitted). As discussed herein, the 2024 FY NDAA did not require DoD to sell those materials— much less to sell them for a steep discount. A voluntary sale to the public instead of a transfer or a sale to an agency under a court order to construct barriers that use those materials, *see* Doc. 230, at 8 (acknowledging that CBP received some of the material), is suspicious enough on its own to warrant investigation. But, in light of this administration's routine use of unlawful methods to accomplish its open-borders policy, *see infra* (gathering cases), the need for a searching examination of the Government's behavior is compelling.

**B.    The Government's Conduct, if Proven, Is Unlawful on Multiple Grounds.**

If, as discussed above, the Biden Administration's conduct constitutes an attempted end-run around this Court's injunction and the Congressional policy that it enforces, that conduct is unlawful on a series of deeply troubling grounds.

**1.    The Government's Conduct Likely Violates the Appropriations Acts.**

First, as noted above, the Government's conduct likely violates the CAAs. Those Acts provide "$1,375,000,000 for the construction of [a] barrier system along the southwest border," PI App., at 15 (Pub. L. No. 116-93 (Dec. 20, 2019), 133 Stat. 2511, § 209(a)(1)), and direct that the "barrier systems" must have "operationally effective designs," and be "constructed in the highest

priority locations as identify in the Border Security Improvement Plan," *id.* at 16 (§ (b)(1)(A)-(B)); *see also id.* at 19 (H.R. 133-276, § 210). Dismantling and selling off the materials for building those "barrier systems" with "operationally effective designs" is the opposite of "construct[ing]" barrier systems in "the highest priority locations." *Id.* Thus, this apparent conduct contravenes the plain language of these statutes, and it exacerbates the unlawfulness that led this Court to issue a permanent injunction in the first place.

The Executive branch's violation of Congress's clear instructions in an appropriation statute is also an error of constitutional dimensions. As the Southern District of Florida recently observed, "[t]he Appropriations Clause plays a critical role in our constitutional scheme of separated powers. It is Congress—not the executive or judicial branches—that controls government spending." *United States v. Trump*, No. 23-80101-CR, 2024 WL 3404555, at *43 (S.D. Fla. July 15, 2024). By disregarding the plain language of two appropriation bills, Defendants encroached on Congress's core authority under Article I.

**2.    The Government's Conduct Raises Serious Concerns of Possible Circumvention of This Court's Injunction.**

If the actions of the Government are an attempt to circumvent the Court's injunction, or to obstruct or defeat the incoming Administration's ability to comply with the injunction, such facts would likely subject Defendants to sanctions for contempt. These scenarios raise the concern that DHS may be coordinating with DoD in an attempt to evade or defeat DHS's obligations under the injunction.

It is well established that indirect attempts to circumvent or defeat lawful injunctions are just as contemptuous as direct violations. "An injunction binds not only the parties subject thereto, but also nonparties who act with the enjoined party." *Waffenschmidt v. MacKay*, 763 F.2d 711, 717 (5th Cir. 1985). For example, "defendants may not nullify a decree by carrying out prohibited

14

acts through aiders and abettors, although they were not parties to the original proceeding." *Id.* (citation omitted). Where "the respondents undertook to render this judgment nugatory and valueless by lending their aid to remove the only tangible property of the judgment debtor beyond the reach of process, they were as guilty of violating the court's order as though it had forbidden their acts in positive terms." *Id.* (citation omitted). By the same logic, if government officials here "undertook to render this judgment nugatory and valueless by lending their aid to remove the … tangible property" that is central to complying with the injunction—*i.e.*, the materials needed to construct the border wall—then "they [a]re as guilty of violating the court's order as though it had forbidden their acts in positive terms." *Id.*

Indeed, "a party who acts knowing that his conduct is highly likely to cause a violation of an injunction may not avoid liability simply because another person outside his immediate control actually carried out the violation." *Inst. of Cetacean Research v. Sea Shepherd Conservation Soc'y*, 774 F.3d 935, 951 (9th Cir. 2014). The Court's "orders would have little practical force, and would be rendered essentially meaningless, if [the Court] were unable to prevent parties bound by them from flagrantly and materially assisting others to do what they themselves are forbidden to do." *Id.* at 952. "To find the Defendants' self-serving interpretation of their obligations under [the] injunction reasonable would be to invite 'experimentation with disobedience.' The schemes available to those determined to evade injunctions are many and varied, and no injunction can explicitly prohibit every conceivable plan designed to defeat it." *Id.* at 954 (citations omitted).

This Court should carefully probe the facts, including the Government's account of its behavior—through formal discovery, if necessary—to determine whether these reported fire sales are an "experimentation with disobedience." *Id.* This scrutiny should be particularly exacting and skeptical because the Biden Administration has been an egregious repeat violator of the law—

15

especially when it comes to its mismanagement of the border.  *See, e.g.*, *Florida*, 660 F. Supp. 3d at 1278–83 (finding the administration's mass parole policy unlawful and arbitrary and capricious); *Texas v. Biden*, 646 F. Supp. 3d 753, 771–80 (N.D. Tex. 2022) (holding that the termination of the Migrant Protection Protocols was arbitrary and capricious); *Louisiana v. CDC*, 603 F. Supp. 3d 406, 433–38 (W.D. La. 2022) (finding the termination of health-based limits on entry violated the APA's procedural requirements); *Texas v. Biden*, 589 F. Supp. 3d 595, 618–20 (N.D. Tex. 2022) (finding that exempting unaccompanied alien children from expulsion based on COVID-19 public health emergency was arbitrary and capricious); *Texas v. United States*, 524 F. Supp. 3d 598, 651–62 (S.D. Tex. 2021) (finding a pause on removal unlawful, arbitrary and capricious, and procedurally defective).

### 3.  The Biden Administration's Misconduct, if Proven, Encroaches on the Executive Power of President Trump's Incoming Administration.

As noted above, Defendants conduct has already inflicted an injury to the separation of powers by encroaching on Congress's Article I authority.  Their current conduct, moreover, may constitute another constitutional violation.  If proven, the Government raises grave concerns under Article II of the Constitution.  If the current Administration is selling off border-wall materials at rock-bottom prices, imposing financial losses on the United States in an attempt to defeat the pro-wall policy of President Trump, it is unlawfully encroaching on the incoming Administration's exercise of the Executive Power.

Justice Jackson's concurring opinion in *Youngstown Sheet and Tube Co. v. Sawyer* provides the oft-cited three-part framework for analyzing exercises of Presidential power.  343 U.S. 579, 635-38 (1952) (Jackson, J., concurring); *see also, e.g., Trump v. United States*, 603 U.S. 593, 607-08 (2024) (employing Justice Jackson's tripartite *Youngstown* framework to analyze a critical question of Executive power).  Under that framework, first, "[w]hen the President acts pursuant to

an express or implied authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring).  Second, "[w]hen the President acts in absence of either a congressional grant or denial of authority, he can only rely upon his own independent powers, but there is a zone of twilight in which he and Congress may have concurrent authority, or in which its distribution is uncertain." *Id.* at 637.  Third, "[w]hen the President takes measures incompatible with the expressed or implied will of Congress, his power is at its lowest ebb, for then he can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." *Id.*

Here, the Biden Administration's actions, if proven, would fall within the third prong of the three-prong framework.  By apparently selling off sections of the border wall at fire sale prices, the Government acts in open defiance of an express Congressional policy directing the Executive Branch to *construct* a barrier system on the southwest border.  *See supra*.  Accordingly, the current Administration's "power is at its lowest ebb," for President Biden "can rely only upon his own constitutional powers *minus* any constitutional powers of Congress over the matter." *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring) (emphasis added).  Because the outgoing President has *no* constitutional power to disregard the statutory policy requiring border-barrier construction, *see id.*, the outgoing Administration has no residual authority under Article II to undertake the reported fire sale.  *See In re Aiken County*, 725 F.3d 255, 259 (D.C. Cir. 2013) ("If the President has a constitutional objection to a statutory mandate or prohibition, the President may decline to follow the law *unless and until a final Court order dictates otherwise*.") (emphasis added).

By contrast, when President Trump again takes office on January 20 and resumes construction of the border wall, he will be acting in *Youngstown*'s first zone—he will be exercising

17

his own authority under Article II while "act[ing] pursuant to an express or implied authorization of Congress." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). His actions will be consistent with, and will directly advance, the express Congressional policy in favor of border-barrier construction expressed in the CAAs, *see GLO III*, 722 F. Supp. 3d at 719 ("Congress gave DHS up to five years to obligate the funds," which means at least the CAA of 2021 is not expired), and other Congressional enactments, including the 2024 FY NDAA. Therefore, "his authority" will be "at its maximum," because it will "include[] all that he possesses in his own right plus all that Congress can delegate." *Youngstown*, 343 U.S. at 635 (Jackson, J., concurring). The outgoing Administration's unauthorized actions, therefore, threaten to interfere with the incoming Administration's exercise of the Executive Power "at its maximum." *Id.* If they are so unauthorized, they also violate the Executive Vesting Clause of Article II by unlawfully encroaching upon, and undermining, the exercise of core Executive authority by the incoming Administration of President Trump.

To be sure, Defendants incorrectly claim that § 2890 of the 2024 FY NDAA authorizes the sales. *See* Doc. 230, at 8. But § 2890 directs the Secretary of Defense to develop "a plan to use, transfer, or donate to States on the southern border" the material that DoD has now sold. § 2890(a). Textually, that language does not mandate or authorize DoD to sell the excess border wall material at a steep discount to private parties. Nor does the fact that the law requires DoD to execute that "plan until the date on which [DoD] is no longer incurring any costs to maintain, store, or protect the covered materials." § 2890(d). Again, there is no indication that DoD is to achieve that by essentially giving the material away—especially since the United States would then have to repurchase the material at *higher* prices. Indeed, that runs counter to the law's purpose of ending DoD's wasteful practice of paying others to store the material—that is, its goal of *saving* money.

Furthermore, practically giving away material that could go towards building the wall also runs counter to § 2890's manifest purpose that the material is meant to be used to construct physical barriers. Subsection 2890(a) requires that DoD prioritize uses or transfers to parties for the purpose of refurbishing or maintaining "ports of entry along the southwest border" or "construction projects aimed at stopping illicit human and vehicle traffic along the border . . . ." *See also* § 2890(c) (requiring a certification from States that material received pursuant to § 2890 be used "exclusively" for such projects). By contrast, holding on to the material while DHS is—as Congress said it must—constructing border barriers is wholly consistent with § 2890. DoD could have, for example, planned to maintain the material for DHS's use while the CAA appropriations were still in place as part of its "timeline for disposition" of those materials. § 2890(b)(1). Nothing in § 2890 says that is inappropriate.

That is a wholly feasible solution that makes far more sense than what DoD did. Defendants represented that "nearly 60% of the border wall materials were transferred to authorized recipients, including [CBP] and the states of Texas and California" while "40% was sold to" private entities. Doc. 230, at 8. The decision to offload *all* the border-barrier material— material that the transfer to CBP shows can be used for border-barrier construction—instead of planning for future, congressionally directed border-wall building is nonsensical and only serves to thwart Congress's clear directive that the border wall be built.

### 4. The Suspected Conduct, If Proven, May Constitute Criminal Fraud.

Further, if officials in the current Administration are acting *ultra vires* and deliberately selling off border-wall materials at a major financial loss to the Government to obstruct the pro-wall policy of Congress and President Trump, such conduct likely constitutes a criminal act, such

as a conspiracy to defraud the United States under 18 U.S.C. § 371. At the very least, the reported conduct raises troubling concerns of potentially criminal behavior.

Section 371, for example, provides: "If two or more persons conspire … to *defraud the United States*, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both." 18 U.S.C. § 371 (emphasis added). For decades, the Supreme Court "ha[s] stated repeatedly that the fraud covered by the statute reaches any conspiracy for the purpose of impairing, obstructing or defeating the lawful function of any department of Government." *Tanner v. United States*, 483 U.S. 107, 128 (1987) (quotation marks omitted) (quoting *Dennis v. United States*, 384 U.S. 855, 861 (1966), and *Haas v. Henkel*, 216 U.S. 462, 479 (1910)). As interpreted by the Supreme Court, the statute prohibits both conduct that dishonestly inflicts monetary losses on the Government, and conduct that dishonestly obstructs lawful government functions:

> To conspire to defraud the United States means primarily *to cheat the government out of property or money*, but it also means *to interfere with or obstruct one of its lawful governmental functions by deceit, craft or trickery, or at least by means that are dishonest*. It is not necessary that the government shall be subjected to property or pecuniary loss by the fraud, but only that its legitimate official action and purpose shall be defeated by misrepresentation, chicane, or the overreaching of those charged with carrying out the governmental intention.

*Hammerschmidt v. United States*, 265 U.S. 182, 188 (1924) (emphasis added).

Here, the reported conduct raises serious concerns under both aspects of this statute. It raises the concern that government officials may be, in fact, selling off border-wall materials at rock-bottom prices—and thus imposing significant, artificial financial losses on the Government—for the purpose of obstructing both Congress's and the incoming President's pro-border-barrier policy. If so, such conduct would appear to *both* "cheat the government out of

property or money" *and* "interfere with or obstruct … lawful government functions by deceit, craft or trickery," *id.*—a double violation of the statute committed at a single stroke.

## V.    CONCLUSION

The Court should issue an order directing the Defendants to immediately stop any ongoing sale of border-barrier materials to private parties pending the Court's review of Defendants' conduct, and the Court should swiftly conduct a searching examination of the Government's conduct, by formal discovery if necessary, to examine the Government's compliance with the law, the Constitution, and the Court's injunction.

Dated: December 19, 2024                          Respectfully submitted,

                                                  */s/ D. John Sauer*
                                                  D. John Sauer
                                                  *Attorney in Charge*
                                                  Mo. Bar # 58721*
                                                  James Otis Law Group, LLC
                                                  13321 N. Outer Forty Rd.
                                                  Suite 300
                                                  St. Louis, Missouri 63017
                                                  (314) 562-0031
                                                  John.Sauer@james-otis.com

                                                  *Counsel for Amicus Curiae*
                                                  *President Donald J. Trump*

                                                  *Pro Hac Vice *application pending*

## **CERTIFICATE OF SERVICE**

I hereby certify that, on December 19, 2024, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*