IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| THE GENERAL LAND OFFICE OF THE STATE OF TEXAS, and DAWN BUCKINGHAM, M.D., in her official capacity as Commissioner of the Texas General Land Office,<br><br>        Plaintiffs,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; and ALEJANDRO MAYORKAS, in his official capacity as Secretary of the Department of Homeland Security,<br><br>        Defendants. | Civil Action No. 7:21-cv-00272 |
| THE STATE OF MISSOURI; THE STATE OF TEXAS,<br><br>        Plaintiffs,<br><br>    v.<br><br>JOSEPH R. BIDEN, in his official capacity as President of the United States, *et al.*<br><br>        Defendants. | Civil Action No. 7:21-cv-00420<br>(formerly No. 6:21-cv-00052) |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION TO ENFORCE PERMANENT INJUNCTION AND FOR A STATUS CONFERENCE**

Plaintiffs' assertions in their motion for a status conference are incorrect. Defendants have fully complied with the requirements of the Court's permanent injunction that limits the activities that Defendants can fund with Department of Homeland Security's fiscal year 2020 and 2021 barrier system appropriations. The media reports that form the basis of Plaintiffs'

1

motion describe a process that Congress expressly required the Department of Defense (DoD) to undertake to dispose of excess border barrier construction materials that DoD purchased with *DoD appropriations* during the prior administration. These construction materials were DoD's property, they were purchased with DoD funds, and the administrative costs associated with carrying out this congressionally mandated disposal process have been paid exclusively from DoD's budget. The enjoined DHS's fiscal year 2020 and 2021 barrier system funds have not been used in any way to pay for any aspect of DoD's disposition of excess barrier construction materials. For these reasons, as set forth below, Defendants have not violated the Court's injunction and the Court should cancel the status conference currently set for December 27, 2024.

## BACKGROUND

**A. President Trump's Use of Military Appropriations to Pay for Border Wall Construction.**

In late 2018, President Trump and Congress reached an impasse over the amount of money Congress would appropriate to the Department of Homeland Security (DHS) for border wall construction. The President sought $5.7 billion "for construction of a steel barrier for the Southwest border," but Congress did not appropriate that amount. *See* Letter from Acting Dir., Office of Mgmt. & Budget to Senate Comm. on Appropriations (Jan. 6, 2019), 165 Cong. Rec. S1569, S1570 (Feb. 28, 2019). President Trump subsequently declared a national emergency at the southern border and implemented a plan to provide additional funding for border barrier construction by utilizing certain other funds that Congress appropriated to DoD. *See* Presidential Proclamation on Declaring a National Emergency Concerning the Southern Border of the United States, 84 Fed. Reg. 4949 (Feb. 20, 2019); President Donald J. Trump's Border Security Victory, 2019 WL 643814 (Feb. 15, 2019).

President Trump's plan to use military appropriations to pay for border wall construction proceeded in three steps. First, DoD transferred $2.5 billion from fiscal year 2019 DoD funds to support DoD's barrier construction projects under the authority of 10 U.S.C. § 284. *See State of California et. al., v. Biden et al.*, Case No. 4:19-CV-872-HSG (N.D. Cal.) (ECF No.173) (administrative record setting forth funding sources for fiscal year 2019 § 284 border wall construction projects). Section 284(b)(7) authorizes DoD to provide counter-drug support for the "[c]onstruction of roads and fences and installation of lighting to block drug smuggling corridors across international boundaries of the United States." Second, DoD deferred $3.6 billion from various military construction projects funded by DoD military construction appropriations between fiscal years 2016 and 2019, and reallocated that money to pay for border barrier construction projects undertaken pursuant to 10 U.S.C. § 2808. *See California*, ECF No. 212 (administrative record setting forth funding sources for § 2808 border wall construction projects). Section 2808 authorizes the Secretary of Defense, upon a Presidential declaration of a national emergency requiring the use of the armed forces, "to undertake military construction projects, not otherwise authorized by law that are necessary to support such use of the armed forces." 10 U.S.C. § 2808(a). Third, DoD transferred $3.8 billion of fiscal year 2020 DoD funds to pay for additional border wall construction under § 284. *See State of California et. al. v. Biden et. al.*, Case No. 4:20-CV-1563-HSG (N.D. Cal.) (ECF No. 32) (administrative record setting forth funding sources for fiscal year 2020 § 284 border wall construction projects).

**B. President Biden Ends the Use of Diverted Military Funds to Pay for Border Wall Construction.**

On January 20, 2021, President Biden issued a proclamation terminating the national emergency at the southern border and ending the use of diverted military appropriations to construct border barriers. *See* Termination of Emergency with Respect to the Southern Border of

3

the United States and Redirection of Funds Diverted to the Border Wall Construction, Proclamation No. 10142, 86 Fed. Reg. 7225 (Jan. 20, 2021). In accordance with the President's Proclamation, DoD terminated the DoD-funded border barrier projects under sections 284 and 2808, and implemented procedures for an orderly wind down of the projects and associated contracts. *See* Department of Defense Plan for the Redirection of Border Wall Funds (ECF No. 96-1). As part of this process, DoD transferred to DHS "custody of border barrier infrastructure constructed pursuant section 284" as well as "administrative jurisdiction of any lands" where the barriers were constructed under section 2808, so DHS could "operate and maintain the infrastructure" going forward. *See* ECF No. 96.

### C. Congress Requires DoD to Dispose of Border Barrier Construction Materials Purchased with DoD Funds.

At the time the DoD terminated the contracts associated with the DoD border wall projects, DoD and its contractors were in possession of approximately $260 million worth of unused border barrier construction materials, including steel bollard panels, that "had been acquired using DoD appropriations." *See* Letter from Assistant Secretary of Defense for Homeland Defense and Hemispheric Affairs Melissa Dalton to Sen. Roger Wicker (Aug. 1, 2023) (Dalton Letter) (attached as Exhibit 1). DoD began disposing of these excess construction materials in accordance with the Federal Property Management Regulations, 41 C.F.R. § 101 *et seq.*, and DoD regulations for the disposal of DoD property. *See* Letter from Secretary of Defense Lloyd Austin to Sen. Roger Wicker (Sept. 5, 2023) (Austin Letter) (attached as Exhibit 2). Consistent with this process, the Defense Logistics Agency transferred materials to various entities in phased cycles, including to other DoD components, U.S. Customs and Border Protection (CBP), and the State of Texas. *See* Austin Letter; Dalton Letter. For example, the State of Texas received several thousand prefabricated bollard panels in late November 2021 for

approximately 1.3 miles of new border wall construction. *See* Texas Border Wall Construction Status, at www.tfc.texas.gov/wall. DoD provided multiple updates to Congress about its disposal efforts, including information about the costs DoD was incurring to store and secure the materials pending completion of the disposition process. *See* Austin Letter (stating that DoD had disposed of more than $154 million in surplus border barrier construction materials as of September 2023).

In December 2023, Congress passed a statute requiring DoD to dispose of the remaining border barrier construction materials purchased with DoD funds. Section 2890 of the National Defense Authorization Act for Fiscal Year 2024 required DoD to "submit to Congress a plan to use, transfer, or donate to States on the southern border of the United States all 'covered materials,' with prioritization given to the refurbishment and or maintenance of ports of entry along the southwest border and construction projects aimed at stopping illicit human and vehicle traffic along the border of the United States with Mexico." *See* Pub. L. 118-31, Tit. XXVIII, § 2890(a), 137 Stat. 136, 785-86 (Dec. 22, 2023). Congress defined the term "covered materials" to mean "all remaining construction materials currently possessed by the United States Government that were purchased under section 2808 and 284 of title 10, United States Code, from fiscal years 2017 through 2021, including bollards and Nucor tubular square structural tubes." *Id.*, § 2890(f). Within 100 days of submitting the plan, Congress required DoD to "commence execution of such plan until the date on which the Department of Defense is no longer incurring any costs to maintain, store, or protect the covered materials." *Id.*, § 2890(d).

### D. DoD's NDAA Plan to Dispose of the Remaining DoD-Funded Border Barrier Materials

In accordance with Section 2890, DoD submitted a plan to Congress on March 14, 2024 setting forth procedures for the disposition of the remaining border barrier materials that were

purchased with DoD funds. *See* Department of Defense Plan for Use of Excess Construction Materials on Southwest Border (March 2024) (attached as Exhibit 3) (DoD NDAA Plan); Declaration of Greg E. Hegge, United States Army Corps of Engineers, ¶ 7 (attached as Exhibit 4). The DoD NDAA Plan stated that DoD will use, transfer, or donate covered materials through implementation of existing policies, federal regulations, and processes governing the disposition of excess and surplus materials. *See* DoD NDAA Plan at 1. Specifically, the plan established a tiered process by which federal, State, local, and private entities could screen and then claim the remaining construction materials according to different priority timelines. *See id.* The process involves a DoD internal screening cycle, a "special programs" screening cycle, and federal agencies screening cycle prior to the transfer of items outside of the federal government. *See id.* Section 2890 then gives States on the southern border a preference for the covered materials and allowed the covered material to be donated to these States at no cost. *See id.*; Declaration of Michael Cannon, Defense Logistics Agency, ¶ 5 (attached as Exhibit 5). There was no limit on the amount of material that other federal agencies or States on the southern border could request. Cannon Decl. ¶¶ 5-6. States receiving this donated material were only responsible for the transportation costs to move material from its stored location. *Id.* ¶ 5. The Defense Logistics Agency (DLA) managed this disposition process for DoD. *Id.*

Pursuant to the DoD NDAA Plan, since late March 2024, DLA has received from the U.S. Army Corps of Engineers approximately 26,000 items for disposition. *Id.* ¶ 7. The items primarily consisted of steel bollard panels, in addition to a small number of other non-bollard barrier construction materials such as gate parts and drainage material. *Id.* Working through the priority disposition process set forth in DoD NDAA Plan, DoD transferred approximately 12,000

bollard panels to CBP, approximately 2,500 panels to the State of Texas, and 50 miscellaneous items to State and local agencies in California. *Id.*

At the conclusion of the initial priority distribution process, roughly 10,700 panels remained unclaimed by federal, State, and local government entities as of June 2024, along with other items. *Id.* In order to dispose of the remaining material, DLA followed established processes and regulations for the sale of surplus material, as set forth in DoD NDAA Plan. *Id.* ¶ 9. DLA had two preexisting sales contracts with IronPlanet (aka GovPlanet) for the disposition of any useable surplus DoD property in the United States. *Id.* ¶ 10. DLA negotiated a contract modification with IronPlanet to set specific conditions for the removal of over 6,000 items of surplus covered material from six storage sites. *Id.* ¶ 11. The modification required IronPlanet to "remove all property from all sites in an expedited manner" with final removals "as soon as practicable." *Id.* This provision was included to reduce the storage costs to DoD as soon as possible, in order to comply with Section 2890. *Id.* IronPlanet submitted a detailed removal plan on June 24, 2024 for all six sites, and removals began on June 25. *Id.* IronPlanet's removal plan contemplated completion of removals at all six sites by September 22, 2024, with one site receiving as many as 16 trucks per day. *Id.* IronPlanet utilized flatbed tractor trailer trucks on a nearly daily basis between late June and early September to move the bollards (approx. 4-5 per truck) to IronPlanet's own storage yards. *Id.* Under the terms of the contract modification, title of the surplus property would pass on each truckload of material after review of the items and signature by an IronPlanet representative and a DLA representative. *Id.* ¶ 11. DoD has no involvement or control over IronPlanet's decisions with regard to the re-sale of material purchased from DLA on their auction site. *Id.* ¶ 12.

IronPlanet was initially unwilling to accept the remaining approximately 4,500 items of covered material due to the remote locations where this material was being stored and because many of the bollard panels were filled with concrete grout, which made them more difficult to transport. *Id.* ¶ 13. Accordingly, in late June 2024, DLA publicly solicited bids for this material on SAM.GOV, the federal government contracting website, in accordance with DLA's normal sales processes. *Id.* DLA vetted potential buyers in accordance with its existing sales processes, but DLA cancelled the solicitation in early October 2024 after determining that none of the bidders had the requisite capability to remove the panels in a timely enough manner to support reduced storage costs to DoD. *Id.*

After cancellation of this solicitation, DLA re-approached IronPlanet about buying the remaining items. *Id.* ¶ 14. IronPlanet agreed to a second sale, and DLA executed a second contract modification with IronPlanet under substantially the same terms as the first modification. *Id.* Even though these bollards were stored at three sites in remote areas of Arizona that presented unique transportation challenges for heavy-duty flatbed trucks, IronPlanet submitted their removal plan with the goal of having all three sites emptied within 43 days. *Id.* IronPlanet began removing the remaining bollards from the 3 sites in Arizona on October 28, 2024. *Id.* Since that date, IronPlanet has transported bollards via flatbed trucks from these sites on a nearly daily basis to IronPlanet's own storage yards. *Id.* ¶ 15.

As of December 23, 2024, DLA has disposed of nearly all of the 26,000 items it received for disposition under the DoD NDAA Plan. *Id.* ¶ 16. There are 4 bollard wall panels at Nogales, AZ that IronPlanet has scheduled to pick up on December 23. *Id.* Additionally, 182 items going through the reutilization, transfer and donation cycle mandated in Section 2890. *Id.* The 182 items consist of low water crossing gates, and miscellaneous gate and drainage parts. *Id.*

## ARGUMENT

### A. DoD's Disposal of Excess and Surplus Construction Materials Purchased with DoD Funds Does Not Violate the Court's Injunction.

Defendants have not violated the Court's injunction because the congressionally authorized process by which DoD has disposed of border barrier construction materials purchased with DoD appropriations does not implicate any of the DHS fiscal year 2020 or 2021 barrier system appropriations that are subject to the Court's injunction. Defendants take their compliance obligations seriously and have not violated the Court's order, nor evaded its requirements. The sworn declarations attached here, in additional to the multiple representations from senior Executive Branch officials to Congress, fully and unequivocally refute the speculative assertions in Plaintiffs' motion as well as the concerns expressed in the amicus brief.

The Court's injunction applies only to Defendants' use of DHS's fiscal year 2020 and 2021 border barrier system appropriations. *See* Permanent Injunction and Final Judgment (ECF No. 208) (citing Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, § 209(a)(1), 133 Stat. 2317, 2511 (2019), and the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 210, 134 Stat. 1182, 1456–57 (2020)). The Court's order specifically prohibits Defendants from "obligating funds under Subsection 209(a)(1)—and corresponding funds under Section 210— toward mitigation and remediation efforts, repair of existing barrier, so-called system attribute installation at existing sites, or other similar purposes." *Id.* The injunction further provides that Defendants are enjoined from "implementing the July 2022 Amended Plan to the extent that its obligations are not authorized under Subsection 209(a)(1) and Section 210 as laid out in this Order." *Id.* The injunction does not apply to any Department of Defense appropriations, which Plaintiffs did not challenge in this litigation, nor any other source of DHS funds. Indeed, as the Court previously emphasized, this case concerns only DHS's Subsection (a)(1) barrier system

funds and "whatever the Federal Defendants do with (a)(2) through (a)(5) is really none of my business as far as I'm concerned." *See* Transcript of March 24, 2024 Hearing at 6 (ECF No. 147) (cleaned up).

DHS's fiscal 2020 and 2021 barrier system appropriations are not and have not been used to pay for DoD's disposal of excess and surplus barrier construction materials purchased with DoD funds. DoD's construction of border barriers was funded under 10 U.S.C. § 284 (support for counterdrug activities) and 10 U.S.C. § 2808 (Military Construction). *See* Hegge Decl. ¶ 4. Congress provided this funding in DoD's appropriations bill; it did not come through DHS. *Id.* All of DoD's construction materials (including bollards) were purchased with the § 2808 and § 284 funding. *Id.*; *see* Dalton Letter. In other words, none of the construction material DoD purchased under § 2808 and § 284 was funded by DHS's fiscal year 2020 or 2021 barrier system appropriations. *See* Ninth Declaration of Paul Enriquez, U.S. Customs & Border Protection, ¶ 12 (attached as Exhibit 6). The administrative records cited above from cases in which various States challenged DoD's border barrier funding decisions further confirm that all funding for DoD's barrier construction came from DoD appropriations, not from DHS. *See supra* at 3. Thus, contrary to Plaintiffs' speculation, there is no evidentiary basis to conclude that the DHS funds subject to the Court's injunction were used in any way to purchase the DoD barrier construction materials going through the DoD disposition process.

After DoD terminated the contracts associated with the DoD border barrier construction projects in 2021, DoD began disposing of the excess construction materials that had been purchased with DoD funds in an open and transparent process. *See* Austin Letter; Dalton Letter. Congress specifically required DoD to complete this task. Section 2890 of the Fiscal Year 2024 National Defense Authorization Act directed DoD to submit a plan to dispose of "all remaining

construction materials currently possessed by the United States Government that were purchased under section 2808 and 284 of title 10, United States Code, from fiscal years 2017 through 2021, including bollards and Nucor tubular square structural tubes." *See* Pub. L. 118-31, Tit. XXVIII, § 2890(f), 137 Stat. at 785-86. Congress further directed that DoD execute its disposal plan until "the date on which the Department of Defense is no longer incurring any costs to maintain, store, or protect" these materials. *Id.*, § 2890(d). In accordance with that statutory requirement, DoD worked through the priority disposition process set forth in the plan, ultimately providing surplus bollard panels to various State, federal, and local governments, including CBP and the State of Texas. *See* Cannon Decl. ¶ 8. Indeed, Texas had the opportunity to take possession of as much of the DoD construction materials as it wanted at no cost; there was no limit on the amount of material it could request. *Id.* ¶ 5. Texas accepted approximately 2,500 panels as part of the DoD NDAA Plan, and both Texas and Missouri claimed other construction materials during DoD's initial disposition process before Congress enacted Section 2890. *See* Austin Letter; Dalton Letter; Cannon Decl. ¶ 7.

After the initial reuse, transfer, and donation process, DoD transitioned to disposing of the remaining unclaimed materials through sales to IronPlanet. Since June 2024, IronPlanet has been picking up construction materials from storage sites along the southwest border on a nearly daily basis according to its contractual obligations. Indeed, DoD's disposal of the construction materials and IronPlanet's public auctions of surplus material have been well known to Congress and the public for months. *See* Austin Letter (responding to congressional inquiry about commercial auction of steel tubes in August 2023); Cannon Decl. ¶ 8 (reporting that IronPlanet's public auctions of remaining bollards have been occurring regularly since July 2024); *see also e.g.*, Ryan Phillips, Why Tuscaloosa Developer Stan Pate Bought Sections Of The Southern

Border Wall (Sept. 24, 2024), at www.patch.com/alabama/tuscaloosa/why-tuscaloosas-stan-pate-bought-sections-southern-border-wall. Contrary to Plaintiffs' claim that Defendants are engaging in a "last-minute fire sale" before the upcoming change in Presidential Administration, *see* Pls.' Mot at 3, Defendants have been carrying out the congressionally directed DoD disposition plan in an orderly fashion for the past nine months.

The costs associated with disposing of the DoD-funded border wall materials have been paid for exclusively with DoD funds. *See* Cannon Decl. ¶ 17; Hegge Decl. ¶ 11. DoD has not obligated or expended any of the fiscal year 2020 or 2021 DHS barrier system funds to dispose of DoD's excess border barrier construction materials. *See* Cannon Decl. ¶ 17; Hegge Decl. ¶ 12. CBP also has not provided any funding, including funding from the fiscal year 2020 or fiscal year 2021 barrier system appropriations, to DoD to assist with DoD's disposal of border barrier construction material purchased by DoD appropriations. *See* Enriquez Decl. ¶ 12. Plaintiffs do not contend otherwise. Indeed, Plaintiffs concede that their "concern is not that the Defendants are using [the enjoined DHS] funds for disposing of the border wall materials." Pls.' Mot at 4.

In sum, the DoD border barrier construction materials going through the DoD disposition process were purchased with DoD funds and the administrative costs associated with carrying out this statutorily required disposal process are paid for from DoD's budget. The enjoined DHS fiscal year 2020 and 2021 barrier system funds have no involvement whatsoever in the DoD disposal process.

> **B. Defendants Are Not Disposing of Any Border Barrier Construction Materials Purchased with The Fiscal Year 2020 or 2021 DHS Barrier System Funds.**

There also is no basis for Plaintiffs' speculation that "border wall materials funded by DHS's Consolidated Appropriations Acts barrier system funds were sold to third parties" instead

12

of used for "construction of physical barrier." *See* Pls.' Mot. at 4. Since the Court issued its preliminary injunction in March 2024, CBP has not disposed of any steel bollards purchased with the fiscal year 2020 and 2021 DHS barrier system appropriations. Ninth Enriquez Decl. ¶ 9. CBP has not provided any funding, including funding from the fiscal year 2020 and 2021 barrier system appropriations, to DoD to pay for the disposition of steel bollards purchased with the fiscal year 2020 and 2021 DHS barrier system appropriations. *Id.* ¶ 10. Nor has CBP authorized or instructed DoD to dispose of any steel bollards purchased with the fiscal year 2020 and 2021 DHS barrier system appropriations on CBP's behalf. *Id.* ¶ 11. As explained above, the DoD construction materials sold to IronPlanet were paid for exclusively with DoD funds, not the enjoined DHS funds.

CBP has no current plans to dispose of any of the steel bollards that are within its inventory. *Id.* ¶ 14. As part of the DoD disposition process described above, CBP has taken possession of approximately 12,500 steel bollard panels purchased by DoD under § 2808 and § 284. *Id.* ¶ 13. CBP will use these bollards for the construction of new physical barriers. *Id.*

In addition to the DoD-funded bollards, CBP's inventory of border barrier construction materials also includes unused bollards resulting from the termination of various CBP-funded border barrier projects managed by the Army Corps of Engineers.[1] *See* Declaration of Richard Dill, U.S. Army Corps of Engineers, ¶¶ 4-7 (attached as Exhibit 7). After termination of DHS-funded barrier construction projects in accordance with DHS Border Wall Plan in June 2021,

---

[1] In the context of the DHS-funded border barrier construction, the Army Corps of Engineers has a longstanding relationship with CBP and has been executing the construction of border infrastructure under the interagency agreements since 2007. Dill Decl. ¶ 4. In accordance with these interagency agreements and the requirements of the Economy Act, CBP's appropriated funds are used to pay the costs of the border wall projects executed by the Army Corps of Engineers on CBP's behalf, to include labor and construction materials. *Id.* ¶ 5.

there were approximately 47,000 unused bollard panels stored on Army Corps of Engineers construction contractor storage yards. *Id.* ¶ 7. The Army Corps has since facilitated the transfer of 17,507 of these unused bollard panels to CBP storage yards for use on barrier construction projects, including the 17-mile Starr County barrier project in the Rio Grande Valley. *Id.* To date, approximately 29,559 unused bollard panels remain stored on Army Corps construction contractor storage yards, which are funded as part of the original construction contracts with either fiscal year 2018 or 2019 DHS funds. *Id.* No fiscal year 2020 or 2021 DHS barrier system funds are being utilized to pay for storage yard costs. *Id.* The Army Corps has no CBP directive, and has not otherwise arranged, for the movement, transfer, disposal, or other disposition of any remaining unused bollard panels purchased with CBP funds, including the fiscal year 2020 and 2021 barrier system appropriations. *Id.*; Hegge Decl. ¶ 12.

CBP has been disposing of certain non-bollard material, consisting of items such as conduit, fiber optic cable, rebar, light poles, and PVC components. Ninth Enriquez Decl. ¶ 15. These materials are going through the standard federal property disposal process because they have deteriorated to the point that they are no longer usable or because disposition is required to complete the contract close-out and termination process. *Id.* ¶¶ 17-18. None of this non-bollard material was purchased with the fiscal year 2020 or 2021 barrier system appropriations. *Id.* ¶ 16. All of the non-bollard material was funded by fiscal year 2018 and fiscal year 2019 barrier system appropriations. *Id.* Further, none of the labor or administrative costs associated with the disposition the non-bollard material has been or will be funded by the fiscal year 2020 or 2021 barrier system appropriations. *Id.* ¶ 20. The disposal of this material thus does not implicate any of the funds subject to the Court's injunction.

## **CONCLUSION**

Defendants have not violated the Court's injunction. The fiscal year 2020 and 2021 DHS barrier system appropriations have not been used in any way to pay for any aspect of DoD's disposal of construction materials purchased with DoD funds. Nor has CBP disposed of any steel bollards purchased with the fiscal year 2020 and 2021 DHS barrier system appropriations. Accordingly, Plaintiffs' motion should be denied and the Court should cancel the status conference currently scheduled for December 27, 2024.

Date: December 23, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

ALEXANDER K. HAAS
Director, Federal Programs Branch

 */s/ Andrew I. Warden*
ANDREW I. WARDEN (IN Bar #23840-49)
Senior Trial Counsel
MICHAEL J. GERARDI
(D.C. Bar #1017949)
Trial Attorney / Attorney-in-Charge
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW, No. 7506
Washington, D.C. 20005
Tel: (202) 616-5084
Fax: (202) 616-8470
E-mail: Andrew.Warden@usdoj.gov

ALAMDAR S. HAMDANI
United States Attorney

DANIEL D. HU
Chief, Civil Division
Assistant United States Attorney

Southern District No. 7959
Texas Bar No. 10131415
1000 Louisiana, Suite 2300
Houston, Texas 77002
Tel: (713) 567-9000
Fax: (713) 718-3303
E-mail: Daniel.Hu@usdoj.gov

ALYSSA IGLESIAS
Assistant United States Attorney
Southern District of Texas No.: 3610302
1701 W. Bus. Highway 83, Suite 600
McAllen, TX 78501
Telephone: (956) 618-8010
Facsimile: (956) 618-8016
E-mail: Alyssa.Iglesias@usdoj.gov

## CERTIFICATE OF SERVICE

  I hereby certify that on December 23, 2024, I electronically filed a copy of the foregoing opposition brief. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

                */s/ Andrew I. Warden*
                ANDREW I. WARDEN