# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 15, 2025

Lyle W. Cayce
Clerk

————————

No. 24-40447

————————

THE GENERAL LAND OFFICE OF THE STATE OF TEXAS; DAWN BUCKINGHAM, *Commissioner, Medical Doctor*,

*Plaintiffs—Appellees*,

*versus*

DONALD J. TRUMP, *in his official capacity as President of the United States of America*; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM SECRETARY, *U.S. Department of Homeland Security*; UNITED STATES OF AMERICA; TROY A. MILLER, *in his official capacity as Acting Commissioner of the United States Customs and Border Protection*; UNITED STATES CUSTOMS AND BORDER PROTECTION,

*Defendants—Appellees*,

*versus*

RANDY KINDER EXCAVATING, INCORPORATED, *doing business as* RKE CONTRACTORS; POSILLICO CIVIL, INCORPORATED; COASTAL ENVIRONMENTAL GROUP, INCORPORATED; TEXAS STERLING CONSTRUCTION COMPANY; SIERRA CLUB; SOUTHERN BORDER COMMUNITIES COALITION,

*Movants—Appellants*,

————————————————————————

STATE OF MISSOURI; STATE OF TEXAS,

*Plaintiffs—Appellees*,

*versus*

Donald J. Trump, *in his official capacity as President of the United States of America*; United States Department of Homeland Security; Kristi Noem Secretary, *U.S. Department of Homeland Security*; United States of America; Troy A. Miller, *in his official capacity as Acting Commissioner of the United States Customs and Border Protection*; United States Customs and Border Protection,

*Plaintiffs- Appellees*,

*versus*

Randy Kinder Excavating, Incorporated, *doing business as* RKE Contractors; Posillico Civil, Incorporated, Coastal Environmental Group, Incorporated; Texas Sterling Construction Company; Sierra Club; Southern Border Communities Coalition,

*Movants- Appellants*.

———————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC Nos. 7:21-CV-272, 7:21-CV-420

———————————————————

Before King, Ho, and Ramirez, *Circuit Judges*.

Per Curiam:[*]

After lengthy litigation between the federal government and various state governments and agencies, the district court entered a preliminary

———————————————

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

injunction that prohibited the federal government from spending certain Department of Homeland Security appropriations on anything other than new border wall construction. The federal government then alerted several border wall contractors and environmental groups that it could no longer fulfill contracts with them because of the injunction. After the federal government declined to appeal the injunction, the border wall contractors and environmental groups moved to intervene. The district court denied those motions, finding that they were untimely, and that denial would not impair the would-be intervenors' ability to protect their interests. We REVERSE.

## I. Background

Beginning in 2019, Congress provided a combined $2.75 billion in funding "for the construction of [a] barrier system along the southwest border" in the annual appropriations acts of the Department of Homeland Security ("DHS") for fiscal years 2020 and 2021 and gave the agency five years to obligate the funds. *See* Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, § 209, 133 Stat. 2317, 2511 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 210, 134 Stat. 1182, 1456–57 (2020). Prior to these appropriations, the first Trump administration had sought alternative sources of funding to build segments of a border wall, resulting in lengthy, separate litigation.

After a change in administrations, then-President Biden issued a proclamation on January 20, 2021, regarding the government's border wall policy. Pursuant to this proclamation, on June 9, 2021, DHS announced new priorities for its barrier system funding, focusing on remediation of existing barriers, environmental mitigation and remediation, and current barrier efficacy.

No. 24-40447

In the underlying case, Plaintiff-Appellee the General Land Office ("GLO") of Texas first sued Defendants-Appellees Joseph Biden, Alejandro Mayorkas, and DHS on July 13, 2021, to enjoin then-President Biden's proclamation as a violation of the Separation of Powers, Spending, Take Care, and Presentment Clauses of the United States Constitution. On October 21, 2021, the states of Texas and Missouri filed a similar suit against Biden, Mayorkas, DHS, Troy Miller, and United States Customs and Border Protection ("CBP") because of the President's "refusal to spend funds appropriated by Congress." On November 29, 2021, the district court ordered these two cases consolidated. As a result, the case now involved Plaintiff-Appellees GLO, Texas, and Missouri (collectively, "the states") and Defendant-Appellees Biden, DHS, Mayorkas, Miller, and CBP (collectively, "the federal government").

Three years of litigation followed, including two appeals to the Fifth Circuit. *See General Land Office v. Biden*, No. 22-40110, 2022 WL 3010699 (5th Cir. July 29, 2022) (per curiam); *General Land Office v. Biden*, 71 F.4th 264, 268 (5th Cir. 2023). The district court initially dismissed some of the states' claims on claims-splitting and standing grounds, but in June 2023, this court reversed the dismissal and remanded for "expeditiou[]" consideration of the states' motion for a preliminary injunction. *See General Land Office*, 71 F.4th at 268. This court further noted that the appropriations at issue were set to expire in September 2024 and September 2025 respectively, the nature of the border wall construction is time intensive and time sensitive, and that "[t]o the extent the facts have vindicated the States' position, significant delay will exacerbate their costs." *Id.* at 275.

On remand, the parties filed a combined seven supplemental briefs between August 18 and December 19, 2023. Throughout these briefs, the parties maintained their adversarial positions.

No. 24-40447

On March 8, 2024, the district court issued a preliminary injunction enjoining the federal government from spending DHS FY 20 and 21 funds allocated under Appropriations Act Subsection 209(a)(1) for "mitigation and remediation efforts, repair of existing barrier . . . or other similar purposes." Instead, such funds could be spent only on "new wall construction." The district court then stayed the order for seven days to allow the federal government "to seek relief at the appellate level." On March 14, 2024, the federal government asked the district court for an additional one-week stay "to assess the necessary actions . . . to comply with the Court's order and to take appropriate steps to implement those actions to align . . . with the requirements of the Court's order." Then, on March 22, 2024, the government moved for clarification as to "the scope of the preliminary injunction as to five categories of costs." At the clarification hearing on March 28, 2024, the district court rendered its decision from the bench, ruling that the injunction prohibited use of funding for replacement of existing barrier, allowed only construction of new barrier, and emphasized that because of "the tight timeframe" imposed by the expiration of the funds, there was a need to move to judgment "as quickly as possible."

After the clarification hearing, the federal government interpreted the injunction "to preclude [federal agencies] from using DHS FY 2020/21 funds to pay" the federal agencies' labor costs necessary to administer a variety of contracts. Federal agencies sent letters on March 28 informing impacted parties of that interpretation.

After receiving such letters, three border wall contractors—Movant Appellants Southern Border Constructors ("SBC"), Randy Kinder Excavating, Inc., ("RKE"), and Texas Sterling Construction, Co. ("TSC") (collectively, "the Border Wall Contractors" ("BWCs"))—moved to intervene. Both SBC and RKE had contracts from 2019 for barrier construction work that the government terminated in 2021 following

No. 24-40447

President Biden's Proclamation. Although the appropriations bills at issue here provided no funding for these terminated contracts, DHS had been using the FY 21 appropriations funding to pay for its in-house labor costs to process and complete the contract termination claims. In 2022, DHS awarded TSC part of a federal contract to remove old legacy fencing and install replacement gates. As a result of the preliminary injunction, DHS ordered TSC to immediately suspend all work and informed it that "invoices cannot be processed for payment for suspended work."

After receiving a similar letter, Movant Appellants Sierra Club and Southern Border Communities Coalition (collectively, "the Sierra Club Intervenors" ("SCIs")) moved to intervene on April 19. As a result of the prior litigation[1] stemming from the Trump administration's search for alternative construction funds, the Sierra Club (along with eighteen states) had entered into a settlement agreement with the federal government that required the government to allocate $45 million from the DHS FY 2020 and 2021 funds for projects to mitigate environmental and ecological damage from certain border wall construction. As part of the settlement agreement, the federal government agreed to "take all reasonable steps to ensure that such funds remain available to comply with this Agreement." However, after the district court issued its preliminary injunction here, the federal government informed the SCIs that the injunction forced it to stop mitigation projects required under the settlement agreement.

Meanwhile, the federal government and the states conferred and agreed not to appeal the preliminary judgment. On April 5, 2024, the states filed an unopposed motion in the Fifth Circuit stating that "neither party

---

[1] *Sierra Club v. Biden*, No. 19-cv-892-HSG (N.D. Cal. compl. filed Feb. 19, 2019), and *Sierra Club v. Biden*, No. 20-cv1494-HSG (N.D. Cal. compl. filed Feb. 28, 2020).

No. 24-40447

intends to appeal the order in this preliminary posture," and that "[t]he parties have instead agreed to pursue final judgment in the district court." On April 10, the federal government and the states jointly moved for entry of final judgment and a permanent injunction in district court.

On May 29, 2024, the district court denied both the BWCs' and SCIs' motions for intervention as of right and permissive intervention. The same day, the district court entered final judgment and a permanent injunction. The BWCs and SCIs now appeal the denial of intervention.

## II. Standard of Review

"A ruling denying intervention of right is reviewed *de novo*." *Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir. 1996). However, "if a district court denies a motion to intervene because it was untimely and explains its reasoning . . . we review that decision for abuse of discretion." *Rotstain v. Mendez*, 986 F.3d 931, 936 (5th Cir. 2021).

## III. Discussion

Intervention of right is governed by Federal Rule of Civil Procedure 24(a). *Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015). If the party seeking intervention has not been given an unconditional right to do so by federal statute, it must meet four requirements set out by Rule 24(a)(2):

> (1) the application for intervention must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; (4) the applicant's interest must be inadequately represented by the existing parties to the suit.

*Id.* (quoting *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 463 (5th Cir.1984)). "Failure to satisfy any one requirement precludes

7

intervention of right." *Haspel & Davis Milling & Planting Co. v. Bd. of Levee Comm's of the Orleans Levee Dist.*, 493 F.3d 570, 578 (5th Cir. 2007). However, "[t]he rule 'is to be liberally construed,' with 'doubts resolved in favor of the proposed intervenor.'" *Entergy Gulf States Louisiana, L.L.C. v. U.S. E.P.A.*, 817 F.3d 198, 203 (5th Cir. 2016) (quoting *In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 248 (5th Cir.2009)).

Here, the district court denied the BWCs' and SCIs' motions for intervention for being untimely under requirement one and for failing to demonstrate that denial would impair or impede the would-be intervenors' ability to protect their interests under requirement three.[2] On appeal, the states also argue that neither the BWCs nor SCIs have an interest in the litigation under requirement two.[3]

## A. Timeliness

When assessing the first requirement—timeliness—courts conduct a "contextual" analysis where "absolute measures of timeliness should be ignored." *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994). Instead, courts consider the four *Stallworth*[4] factors:

---

[2] No party argues that the would-be intervenors currently fail to meet 24(a)(2)'s fourth requirement—inadequate representation by the current parties.

[3] The states also argue that both groups of would-be intervenors failed to satisfy the formalities required under Federal Rule of Civil Procedure 24(c). Although the states argued this point thoroughly in their opposition to the motions to intervene, on appeal they relegated the position to a single footnote while still asserting that the failure to comply provided another basis to affirm denial of intervention. The states inadequately briefed, and therefore forfeited, this argument. *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021); *see also United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review.").

[4] *Stallworth v. Monsanto Co.*, 558 F.2d 257 (5th Cir. 1977).

(1) The length of time during which the would-be intervenor actually knew or reasonably should have known of its interest in the case before it petitioned for leave to intervene; (2) the extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as it knew or reasonably should have known of its interest in the case; (3) the extent of the prejudice that the would-be intervenor may suffer if intervention is denied; and (4) the existence of unusual circumstances militating either for or against a determination that the application is timely.

*Id.* Here, the district court found that "the second, third, and fourth considerations weigh heavily in favor of finding that the motions to intervene are untimely." The would-be intervenors argue the district court erred in assessing each factor.

### 1. Length of delay

"Determining the length of delay requires identifying the starting point." *Rotstain*, 986 F.3d at 937. "Courts should discourage premature intervention [because it] wastes judicial resources." *Espy*, 18 F.3d at 1206. Therefore, the relevant date for assessing timeliness under the first factor is not "the date on which the would-be intervenor became aware of the pendency of the action," but instead when a would-be intervenor "became aware that its interests would no longer be protected by the original parties." *Id.* That is because a "nonparty movant's awareness of a case's existence says little about whether their interests are protected," and therefore a "court must also look to the actions of the litigants." *United States ex rel Hernandez v. Team Fin., L.L.C.*, 80 F.4th 571, 578 (5th Cir. 2023). However, a would-be intervenor need not know that its interests *will* be adversely affected, but merely that the existing parties no longer protect those interests. *Sommers v. Bank of Am., N.A.*, 835 F.3d 509, 513 (5th Cir. 2016).

No. 24-40447

Here, the district court made no explicit finding about when either the BWCs or SCIs knew that the original parties no longer protected their interests, instead stating that the motions to intervene "should have been filed closer to the inception of this case when the motion to dismiss—which clearly identified the disputed issues in this action—was filed, briefed, and appealed." But "the need for intervention is not immediately apparent at the onset of litigation." *Team Fin., L.L.C.*, 80 F.4th at 578. And although the motion to dismiss, filed by the federal government on October 18, 2021, clearly identified the key issues in the action, it also demonstrated that the federal government actively protected both the BWCs' and SCIs' interests.

The district court, the states, and the federal government all stress the long-running nature of the underlying litigation. Even assuming the BWCs and SCIs had long been aware of the ongoing litigation, it does not follow that they should have long been aware that the federal government would not represent their interests.[5] *Cf. Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 280 (2022) (finding length of litigation was not dispositive because the "attorney general's need to seek intervention did not arise until the secretary ceased defending the state law, and the timeliness of his motion should be assessed in relation to that point in time"). Instead, to start the timeliness clock, "a court would need to observe that the parties were complacent or non-adversarial as to not protect the interests of potential intervenors." *Team Fin., L.L.C.*, 80 F.4th at 578–79. That the district court

———————————

[5] The states also argue that the BWCs *never* had "reason to believe the federal government would protect contractual and financial rights it holds adverse to the government," because they "solely seek to collect money from the federal government." But as the BWCs respond, because the federal government had the contractual right to terminate those contracts for any reason so long as it then negotiated with the BWCs and paid for work done, it was not until the federal government ceased negotiation and payment because of the preliminary injunction that the BWCs' breach of contract claims arose.

here made no such observation further suggests it wrongly anchored its analysis.

The states and federal government suggest alternate dates on which the intervention clock began to run. The states suggest June 16, 2023, when the Fifth Circuit issued its prior opinion instructing the district court to address the question of injunctive relief expeditiously.[6] The federal government both suggests that the would-be intervenors had reason to know "far earlier" about the potential impact to their interests, but also that the intervention motions were untimely even with a start date of March 6, 2024, when the district court issued the preliminary injunction. Yet when the injunction was issued, it was still unclear that the federal government no longer protected the would-be intervenors' interests. Indeed, in a March 14, 2024, request for an extension of the stay of the preliminary injunction, the federal government still "disagree[d] with the Court's conclusion that entry of a preliminary injunction was warranted in this case," and was "working diligently to assess the full range of contracting and fiscal actions required to comply with the requirements of the Court's order." Plainly, the federal government was unclear about the impacts of the court's injunction, and took no action to suggest it was abandoning its defense of any specific interests. As late as the March 28 clarifying conference, the states and federal government still disagreed about key aspects of the scope of the injunction.

Therefore, it was not until the federal government sent letters to the would-be intervenors explaining the impact on their interests that they should have become aware the federal government no longer protected those

---

[6] As the SCIs note, their interest in the suit likely did not even *exist* (let alone cease to be protected) prior to July 2023, when the settlement agreement committed appropriations funds to fulfill contractual commitments.

interests.[7] *See Espy*, 18 F.3d at 1206 (noting it was only when the Forest Service announced "that it would apply the preliminary injunction to all timber sales (not merely the nine sales challenged by the plaintiffs)" that "movants became aware that the Forest Service would not protect their interests"); *Edwards*, 78 F.3d at 1001 (finding intervention timely, despite multi-month delay between various communications and informal meetings between would-be intervenors and parties discussing the ongoing litigation and motion to intervene, because would-be intervenors "had no knowledge of the specific terms of [a] Consent Decree . . . until the office notice ordered by the district court was distributed," and prior communication "indicated no potential infringement on the rights of these nonparties"). And because the parties all moved to intervene within weeks of receiving those letters, their motions were not unduly delayed. *See Nat'l Wildlife Fed'n v. Burford*, 878 F.2d 422, 434 (D.C. Cir. 1989), *rev'd on other grounds sub nom. Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 110 (1990) (holding motion to intervene, filed three years after litigation began, timely because intervenor only learned its interests were directly affected 73 days prior when an agency changed the way it construed its own policy). Thus, the first factor weighs in favor of finding the motions timely.

---

[7] The federal government notes that the would-be intervenors' motions for intervention "argued that the government's failure to raise project-specific arguments was sufficient reason to demonstrate that it was an inadequate representative." As the federal government sees it, because it had *never* sought project-specific carve outs, its failure to do so at the injunction stage was not a "recent development[]" and therefore could not be when the clock started running. *See Save Our Springs All. Inc. v. Babbitt*, 115 F.3d 346, 348 (5th Cir. 1997). But this misses the point—there was no specific need to seek carve outs before because the federal government had previously asserted that *all* its spending under the appropriations bills was proper.

No. 24-40447

## 2. Prejudice to the original parties

"The second factor is concerned 'only [with] that prejudice which would result from the would-be intervener's failure to request intervention as soon as he knew or reasonably should have known about his [stake] in the action.'" *John Doe No. 1 v. Glickman*, 256 F.3d 371, 378 (5th Cir. 2001) (quoting *Stallworth*, 558 F.2d at 265). "Courts should ignore the likelihood that intervention may interfere with orderly judicial processes." *Id.* And "[p]rejudice must be measured by the delay in seeking intervention, not the inconvenience to the existing parties of allowing the intervenor to participate in the litigation." *Espy*, 18 F.3d at 1206. Here, the district court agreed with the government that the would-be intervenors "seek to inject a wide range of new fact-specific interests," that would "significantly expand the scope of the issues," amounting to "starting five new lawsuits at a time when the case is on the doorstep of final judgment."

This analysis is flawed. First, without any finding of when the would-be intervenors should have known their interests were no longer protected, it is impossible to correctly identify the prejudice caused by any delay. *See Stallworth*, 558 F.2d at 265. Second, the district court's concerns "are general and speculative and concern inconvenience and not prejudice." *Glickman*, 256 F.3d at 378. Third, at least some of those concerns are misplaced because the would-be intervenors have "no right to relitigate issues already decided." *Espy*, 18 F.3d at 1206 n.3. And further, "no prejudice can come from renewed discovery or pretrial proceedings, because an intervenor must accept the proceedings as he finds them." *Id.* (internal quotations and citations omitted). Therefore, "it is difficult to understand

how either [of the parties] could have been harmed by what was at most less than thirty days 'delay.'" *Stallworth*, 558 F.2d at 267.[8]

Ultimately, the failure to tether the second factor analysis to the dates on which the would-be intervenors became aware their interests would no longer be protected, combined with the questionable prejudice that would occur regardless of the proper date, suggest the second factor weighs in favor of finding the motions to intervene timely.

### 3. Prejudice to the would-be intervenors

"The third Stallworth factor 'focuses on the prejudice the potential intervenor would suffer if not allowed to intervene.'" *Ross v. Marshall*, 426 F.3d 745, 756 (5th Cir. 2005) (quoting *Glickman*, 256 F.3d at 378–79). Courts have held that there is no prejudice and therefore "[i]ntervention generally is not appropriate where the applicant can protect its interests and/or recover on its claim through some other means." *Deus v. Allstate Ins. Co.*, 15 F.3d 506, 526 (5th Cir. 1994). But a would-be intervenor may still be prejudiced where the resolution of the current case could limit the relief available in separate future litigation. *See Glickman*, 256 F.3d at 379.[9] Here, the district

---

[8] Further, "whether the request for intervention came before or after the entry of judgment [is] of limited significance." *Stallworth*, 558 F.2d at 226; *see also Ross v. Marshall*, 426 F.3d 745, 755 (5th Cir. 2005) ("A common example of post-judgment intervention that satisfies these criteria is intervention for the purpose of appealing a decision that the existing parties to a suit have decided not to pursue.").

[9] *Compare Deus*, 15 F.3d at 525-26 (no prejudice to would-be intervenor who had no rights or claims for district court to adjudicate, but sought access to documents subject to protection order where already litigating against party in other federal court and therefore could protect interest by filing discovery request in other case); *and St. Bernard Parish v. Lafarge North America, Inc.*, 914 F.3d 969, 975 (5th Cir. 2019) (no prejudice to would-be intervenor who "suggested that he *preferred* not to bring a separate action because it would be difficult to obtain discovery of a confidential settlement agreement" where such discovery is generally available and state-law action for claims remained (emphasis added)); *with Adam Joseph Res. v. CNA Metals Ltd.*, 919 F.3d 856, 865–66 (5th Cir. 2019) (prejudice

court found no prejudice to the would-be intervenors, reasoning that those "who allege that they are financially impacted by how the Government is reacting to the Preliminary Injunction are able to bring separate lawsuits focused on their individual claims."

The district court's analysis failed to assess how "any potential remedy will be restricted" by the injunction. *Ford v. City of Huntsville*, 242 F.3d 235, 240 (5th Cir. 2001). As the SCIs point out, a separate court hearing a separate suit by the SCIs would "either deny any enforcement motion based on [this] injunction or issue an order that, according to the United States, conflicts with [this] injunction." *Cf. Stallworth*, 558 F.3d at 268 ("[I]f a state or federal judge in a separate proceeding decided that the appellants' contentions were meritorious, he would be unable to award them effective relief without generating an injunctive command that would overlap or conflict with the [prior] order."); *Lease Oil Antitrust*, 570 F.3d at 249–50 (finding prejudice where prevailing in alternative litigation would create "conflicting federal and state orders regarding the same property," and thus intervention was the "most efficient, and most certain, way" to pursue claim).

The federal government counters that, notwithstanding the injunction, the BWCs can still seek judicial relief in the Court of Federal Claims under The Contract Disputes Act of 1978 and thus will not be prejudiced. Similarly, the states argue that because the injunctions were limited to funds under Subsection 209(a)(1) and Section 210, the federal

---

where denying intervention would require would-be intervenor to institute new proceeding at substantial cost in a court unfamiliar with dispute with questionable jurisdiction, and raise potential statute of limitations and res judicata defenses); *and Ford v. City of Huntsville*, 242 F.3d 235, 240 (5th Cir. 2001) (prejudice where confidentiality order at issue in instant litigation would limit would-be intervenor's ability to gain access to information under separate suit).

government could honor the settlement agreement with the SCIs through funds authorized by the unaffected Subsections (a)(2) through (a)(5). Both arguments miss the mark.

First, as the BWCs allege, they are currently suffering practical consequences based on the federal government's interpretation of the injunction because one of the contractors "incur[s] tens of thousands of dollars a month storing border wall components." And the injunction forces the BWCs to litigate where they would otherwise have no need to do so. *Cf. Adam Joseph Res. v. CNA Metals Ltd.*, 919 F.3d 856, 867 (5th Cir. 2019).

Second, as to the SCIs, despite the states' argument that other appropriations funds remain available, the injunction "would still restrict what is by far the largest category of funds identified in the Settlement Agreement and the only one the government identified as available for performance." Further, as the federal government has admitted in later, ongoing motions in the case below, "the appropriations in FY20 and FY21 for subsections (2), (4), and (5) have expired and are no longer available to incur new obligations for anything." *See* Case No. 7:21-CV-00272, Dckt. 227 at 25 n.3 (Defendant's Motion to Modify Final Judgment and Permanent Injunction to Facilitate New Border Wall Construction).

### 4. Unusual Circumstances

"The last timeliness factor is '[t]he existence of unusual circumstances militating either for or against a determination that the application is timely.'" *Rotstain*, 986 F.3d at 941 (quoting *Stallworth*, 558 F.2d at 266). The district court found this factor weighed against intervention because "permitting intervention here would encourage late-arriving parties to join litigation over the federal agency actions near the conclusion of litigation after the merits of the case have been decided" and because "injunctions against federal officials charged with carrying out

agency policies will likely have downstream impacts on a diverse collection of people and organizations." The states argue that there are unusual circumstances weighing against timeliness because the Fifth Circuit previously "'urge[d] the district court' to 'act expeditiously' to resolve this matter in light of 'the tide of illegal immigration [that] has been dramatically increasing ever since this case was filed.'" Further, the funds have a limited window in which they can be obligated. Other circuits have approved similar rationales. *See, e.g.*, *Farmland Dairies v. Comm'r of New York State Dep't of Agric. & Markets*, 847 F.2d 1038, 1044 (2d Cir. 1988) (noting potential disruptive effect of intervention on negotiated settlement by state as against public interest).[10]

The would-be intervenors argue multiple factors constitute unusual circumstances. Both groups note that the case implicates existing contracts with the federal government. But impairment of existing contracts alone does not suffice to create unusual circumstances. *See Espy*, 18 F.3d at 1207. The BWCs next argue that the parties' decision "to prematurely (and voluntarily) finalize litigation" may constitute unusual circumstances. The SCIs similarly note that "[t]he federal government went further to commit that it would work to ensure the necessary funds would remain available," and yet the parties then engaged in "unforeseeable coordination to accelerate the matter towards final judgment." Taken together, the would-be intervenors essentially argue that it was sufficiently unusual for the federal government to alter its position so suddenly, so dramatically, and after seeming to give assurances to the SCIs. While at least one circuit has found induced reliance constitutes an unusual circumstance, *see United States v. Alcan Aluminum,*

---

[10] This argument is somewhat undercut by the fact that both parties have returned to the district court with attempts to modify the injunction for other reasons.

*Inc.*, 25 F.3d 1174, 1183 (3d Cir. 1994), nothing the would-be intervenors point to rises to this level. Therefore, factor (iv) disfavors timeliness.

### 5. Timeliness Conclusion

Although we review a district court's timeliness analysis for abuse of discretion, the district court's flawed starting date for determining delay and prejudice constituted such an abuse. *See Glickman*, 256 F.3d at 378 (noting this court has "held that [a] trial court abused its discretion when it 'mistakenly used an unspecified time when it supposed that the appellants must have learned of the pendency of the action rather than the time when they knew or should have known of their [stake] in the action as its starting point in assessing whether they acted promptly to protect themselves'" (quoting *Stallworth*, 558 F.2d at 267)). Here, factors (i), (ii), and (iii) all weigh in favor of allowing intervention, while factor (iv) weighs against. Therefore, we find the motions timely.

### B. Interest

"Although there is not any clear definition of the nature of the interest that is required for intervention of right, we previously have interpreted Rule 24(a)(2) to require a direct, substantial, legally protectable interest in the proceedings." *Texas*, 805 F.3d at 657 (cleaned up). "[T]he inquiry turns on whether the intervenor has a stake in the matter that goes beyond a generalized preference that the case come out a certain way." *Id.* Property interests are almost always adequate, but non-property interests also suffice when they are concrete, personalized, and legally protectable. *Id.* at 658. Ultimately, "[t]his focus on the party's interest is 'primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process.'" *DeOtte v. State*, 20 F.4th 1055, 1068 (5th Cir. 2021) (quoting *Espy*, 18 F.3d at 1207).

No. 24-40447

Here, the district court did not address whether the would-be intervenors had an interest in the property at issue. However, on appeal the states argue that neither the SCIs nor BWCs have any interest in the litigation.

First, the states argue that SCI's settlement agreement with the federal government "only gives Sierra Club a mere contingent interest" while "limit[ing] (both temporally and jurisdictionally) where Sierra Club may exercise any of the contingent contractual rights it may have." The states cite to several out-of-circuit decisions to argue that such "contingent interests are insufficient to satisfy Rule 24(a)(2)." While it is true that a series of contingencies may render a would-be intervenor's interest insufficiently direct or substantial, *see, e.g.*, *Standard Heating & Air Conditioning Co. v. City of Minneapolis*, 137 F.3d 567, 571 (8th Cir. 1998), that does not mean that a contract that includes any sort of conditions or contingencies is per se incapable of supporting intervention, *see, e.g.*, *Sierra Club v. Glickman*, 82 F.3d 106, 109 (5th Cir. 1996) (finding sufficient interest where proposed remedy "potentially interferes" with contractual rights by seeking to enjoin government agency from awarding funds to certain businesses); *Espy*, 18 F.3d at 1207.

Second, the states argue that the BWCs "don't possess the interest they claim to have" because "what the [BWCs] really don't like" is that the injunction prevents them from receiving payment for work only "relating" to constructing a border wall. But as the BWCs make clear throughout their briefing, they assert that they "have legally protectable contractual interests in their border wall contracts that have affirmatively been affected by the district court's injunction." As with the SCIs, this contractual interest suffices. Therefore, the SCIs and BWCs satisfy Rule 24(a)(2)'s second requirement.

19

No. 24-40447

## C. Impairment

"The impairment requirement does not demand that the movant be bound by a possible future judgment." *Brumfield v. Dodd*, 749 F.3d 339, 344 (5th Cir. 2014). Therefore, would-be intervenors "do not need to establish that their interests *will* be impaired," but rather "only that the disposition of the action 'may' impair or impede their ability to protect their interests." *Id.* Our precedent "focuses on practical consequences." *CNA Metals Ltd.*, 919 F.3d at 867.

Here, the district court held that the would-be intervenors failed to satisfy the impairment prong because they "may seek relief in other jurisdictions and nothing in this case would prevent them from doing so," noting "[c]ourts have denied intervention on this basis," and pointing to two unpublished district court cases. The would-be intervenors disagree, raising the same arguments they raised under *Stallworth* factor three. Under these facts, the impairment analysis mirrors the *Stallworth* factor three analysis. *See Lease Oil Antitrust*, 570 F.3d at 251–52 (noting that the possibility of bringing a separate action to protect interests "as described" under *Stallworth* factor three similarly "does not change the analysis" under the impairment factor). As this circuit has made clear, a mere possibility of bringing another suit does not suffice to deny intervention. *See CNA Metals Ltd.*, 919 F.3d at 867 (rejecting same argument because it "runs counter to the text of Rule 24 and our precedent").

\*      \*      \*

Because the district court abused its discretion in finding the motions to intervene untimely, and the would-be intervenors had an interest in the

litigation that would be impeded by denying intervention, the district court erred in denying intervention.[11]

## IV. Conclusion

Because Movant Appellants have demonstrated an error on the part of the district court, we REVERSE the order of the district court denying intervention.

---

[11] Although the would-be intervenors also challenge the district court's denial of permissive intervention, where a district court improperly denies mandatory intervention, this court "need not reach the issue of permissive intervention." *Espy*, 18 F.3d at 1208.