IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | |
|---|---|
| THE GENERAL LAND OFFICE OF THE STATE OF TEXAS, *et al.*,<br><br>    Plaintiffs,<br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants | No. 7:21-cv-00272 |
| THE STATE OF MISSOURI; THE STATE OF TEXAS,<br><br>    Plaintiffs,<br>    v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>    Defendants. | No. 7:21-cv-00420<br>(formerly No. 6:21-cv-00052)<br>Hon. Drew B. Tipton |

### NINTH DECLARATION OF PAUL ENRIQUEZ

I, Paul Enriquez, declare as follows:

1. I am the Director, Infrastructure Portfolio, U.S. Border Patrol Program Management Office Directorate ("PMOD"), U.S. Customs and Border Protection ("CBP"), an agency of the Department of Homeland Security ("DHS"). I have held this position since January 2023 and support the planning and execution of border infrastructure projects from construction to maintenance. From May 2021 to December 2022, I served as the Deputy Director for the Infrastructure Portfolio and from August 2018 to

May 2021, I served as the Real Estate and Environmental Director for the Infrastructure Portfolio. From 2013 to August 2018, I was the Real Estate and Environmental Branch Chief for the Border Patrol and Air and Marine Program Management Office ("BPAM"), Facilities Management and Engineering, Office of Facilities and Asset Management. From 2011 to 2013, I was employed as an Environmental Protection Specialist in the BPAM office. In that role, I performed environmental analyses for various border infrastructure projects. From 2008 to 2011, I was a contractor assigned to the BPAM office and provided environmental support on various border infrastructure projects.

2. CBP is the DHS component with primary responsibility for border security. CBP constructs, operates, and maintains border infrastructure necessary to deter and prevent illegal entry on the southern border.

3. Within CBP, PMOD has expertise in managing and executing border infrastructure projects. PMOD is tasked with managing the schedule, finances, real estate acquisition, environmental planning, and construction of the border infrastructure system along the U.S. border.

4. Based upon my current and past job duties, I am familiar with the funding appropriated to CBP for barrier construction, the obligations and projects associated with such funding, and the process by which new barrier infrastructure is constructed.

5. I previously submitted declarations on December 8, 2021, July 12, 2022, August 18, 2023, September 27, 2023, October 17, 2023, March 14, 2024, March 21, 2024, and November 22, 2024 that outlined, among other things, how CBP was using the appropriated funds it received in fiscal years ("FY") 2020 and 2021 for barrier system and the steps CBP is taking to comply with the Court's order of March 8, 2024 and Permanent Injunction.

6. This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

## BACKGROUND

7. On March 8, 2024, the Court issued an order stating that CBP's FY20 and FY21 barrier system appropriations may only be used for the "construction of physical barriers, such as walls, fencing, buoys, etc." The Court's order prohibits "the Government and all its respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them" from obligating FY20 or FY21 barrier system funds "toward mitigation and remediation efforts, repair of existing barrier, so-called system attribute installation at existing sites, or other similar purposes." The Court's order was converted to a Final Judgment and Permanent Injunction, as clarified by the Courts' oral ruling of March 21, 2024, on May 29, 2024. The Court issued a second order clarifying the permanent injunction on February 7, 2025.

8. Since March 2024, CBP has worked diligently to not only comply with the Court's injunction but also make maximum use of the FY20 and FY21 funds in a manner that is consistent with the injunction.

9. In response to the Court's injunction, CBP took various actions to suspend, modify, or terminate, as appropriate, various contracts and interagency agreements that relied on the FY20 and FY21 barrier system funds to pay for projects and activities prohibited by the Court's injunction, such as installation of barrier system attributes, environmental mitigation projects, and replacement of existing barriers.

10. Additionally, CBP initiated a planning process to identify new border barrier construction projects that could be funded with FY20 and FY21 barrier system funds consistent with the Court's injunction. CBP focused its efforts on identifying areas along the southwest border without current pedestrian barrier, in United States Border Patrol's ("USBP") highest priority areas, that would benefit from the construction of new physical barriers. Among other things, CBP conducted site visits and surveys of potential construction sites in California, Arizona, New Mexico, and Texas. Further, CBP considered the improvements to border security and public safety likely to result from new barrier construction, focusing on areas without current pedestrian barrier that have experienced high levels of illegal entry.

11. Based on this planning process, CBP identified new border barrier construction projects in California, Arizona, New Mexico, and Texas that it is executing with the FY20 and FY21 barrier system funds.

12. Since the Court's injunction, CBP has used the FY20 and FY21 funds to award four construction contracts and 53 contract options for the construction of new border barrier. The total contract value of those contracts and contract options is approximately $727M. When work under those contracts is complete, CBP will have constructed approximately 55 miles of new barrier in high priority locations in the USBP San Diego, Yuma, Tucson, El Paso, and Rio Grande Valley Sectors.

## REMAINING FUNDS

13. CBP currently has approximately $203M in unobligated FY21 barrier system funds. The period of availability for those funds expires on September 30, 2025.[1] After September 30, 2025, the FY21 barrier system funds will no longer be available for new obligations. CBP has a contracting and execution plan for the approximately $203M in FY21 funds that remain unobligated, as follows:

- Approximately $153M of the remaining unobligated FY21 barrier system funds will be used to construct approximately 17 miles of waterborne barrier in the USBP Rio Grande Valley Sector. In order to ensure expeditious construction of the waterborne barrier, the Secretary of Homeland Security, pursuant to her authority under § 102(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended ("IIRIRA"), 8 U.S.C. § 1103 note, has issued a waiver for this project. 90 Fed. Reg. 29574 (July 3, 2025). CBP has solicited a contract for the project and plans to make contract award before the end of the fiscal year.

- Approximately $25M of the remaining unobligated FY21 barrier system funds will be used to exercise contract options in furtherance of new barrier construction in the USBP Tucson Sector.

---

[1] The period of availability for the FY20 barrier system funds expired on September 30, 2024, and they are no longer available for new obligations.

Like the waterborne barrier contract noted above, the Secretary of Homeland Security has issued an IIRIRA waiver to ensure the expeditious construction of barrier in the USBP Tucson Sector. 90 Fed. Reg. 23946 (June 5, 2025). CBP has already awarded the base construction contract. CBP expects to exercise the contract options before the end of the fiscal year.

- Approximately $20M of the remaining unobligated FY21 barrier system funds will be used to exercise a contract option in furtherance of new barrier construction in the USBP Rio Grande Valley Sector. The Secretary has issued an IIRIRA waiver for the RGV barrier project. 90 Fed. Reg. 26060 (June 18, 2025). CBP has already awarded the base construction contract. CBP plans to award the option before the end of the fiscal year.

- The remaining approximately $6M in unobligated FY21 barrier system funds will most likely be used for change management for barrier contracts that are funded by the FY21 barrier system appropriation. Some portion of this funding may be used for support contracts or other programmatic costs. However, CBP expects that most of it will be used for change management. Even after the FY21 barrier system funds lapse, they will remain available for an additional five years for change management or upward adjustments on existing barrier contracts that are funded by the FY21 barrier system appropriation. 31 U.S.C. § 1502(a); 31 U.S.C. § 1553(a). It is standard practice for agencies to hold back some funding to ensure they can cover potential upward adjustments on existing contracts. *See,* GAO, Principles of Federal Appropriations Law, 3th ed. 2004, ch. 5, pg. 5-36 (Washington, D.C. Jan. 2004) ("In order to avoid over-obligating the original appropriation, the contracting officer must estimate the expected net additional obligations to insure that available appropriations are not committed to other purposes.") *citing* 61 Comp. Gen. 609, 612 (1982); B-192036, (Sept. 11, 1978).

- Between now and the end of fiscal year, CBP may also de-obligate FY21 funds from contracts that had to be suspended as a result of the Court's injunction. Consistent with the terms of the

injunction, any funds that are de-obligated from suspended contracts will be used for costs associated with the construction of new barrier or held back for change management on existing FY21-funded contracts. CBP is planning to hold back approximately 13% of the awarded value of the existing FY21-funded barrier contracts (approximately $75M) to fund change management. This is consistent with the percentage of awarded value that CBP has held back for other construction contracts.

14. CBP has devoted substantial time and resources to planning the projects described above, including identifying areas for new barrier construction, preparing for potential real estate acquisitions, and planning the necessary contracting actions to execute the projects. Because the FY21 funds will lapse on September 30, 2025, any deviation from the contracting plan laid out above puts the remaining FY21 funding at risk of lapsing before the money can be obligated to new contracts.

15. The federal procurement process can be time-consuming and complex. It requires multiple steps, including the identification of new requirements, market research, acquisition plans, developing and issuing solicitation documents, obtaining proposals, and evaluating proposals before a contract can be awarded and funds obligated. For each step in the process, the Federal Acquisition Regulation may impose various requirements, many of which add time to the procurement process. For example, the government is typically required to issue a solicitation so interested parties can submit proposals. After receipt of proposals, the government must evaluate each proposal. After that review is completed, but prior to contract award, the government is typically required to document and explain its award decision. Given the process set out above, as noted, any deviation from CBP's current contracting plan puts the FY21 funds at risk of lapse, as it is not at all clear that CBP can solicit, evaluate, and award new contracts before the end of the fiscal year.

## STATUS OF CONTRACTOR INTERVENORS' CLAIMS

16. There are three contractor intervenors in this case: (1) Southern Border Constructors ("SBC"), (2) Randy Kinder Excavating, Inc. ("RKE"), and Texas Sterling Construction Co. ("Texas Sterling"). The status of the contractor intervenor claims are detailed below.

17. <u>SBC and RKE</u>: The United States Army Corps of Engineers ("USACE"), through interagency agreements with CBP, has assisted CBP with border barrier construction, including awarding and administering border barrier construction contracts on CBP's behalf. In 2019, USACE awarded task orders under federal contracts to SBC and RKE to build border barrier in Texas. ECF No. 148-1—3, ECF. No. 149-1—2. Following then President Biden's Proclamation in January 2021 requiring a re-evaluation of the use of funding concerning barriers on the southern border, USACE suspended and then subsequently terminated the task orders and contracts under which SBC and RKE had been performing work. *See* ECF No. 148-4-7, ECF No. 149-3-6. Although funding for the construction costs of the projects undertaken by SBC and RKE came from appropriations in prior years that were not affected by the Court's injunction, *see, e.g.,* Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, Div. A, § 230, 133 Stat. 13, 28, USACE was relying on the FY21 barrier system funds to pay for its in-house labor costs to process and complete SBC and RKE's contract termination claims. *See* Declaration of Anjna O'Connor ¶ 4, ECF No. 133-2. In light of the Court's injunction, USACE could no longer use FY21 funds to process SBC and RKE's termination claims.

18. Since the Court's injunction, however, CBP has provided USACE with other funding that is not subject to the Court's injunction to pay for USACE's in-house labor costs to process and complete SBC and RKE's contract termination claims. This alternative funding has been in place for approximately 14 months. It is my understanding that USACE has estimated that the alternative funds it still has on hand will cover at least five more months of in-house labor costs. If USACE exhausts all of the current alternative funding before resolving SBC and RKE's termination claims, CBP has other available funding

separate from the FY21 enjoined funds that it can provide to USACE for any remaining in-house labor costs that would be required to resolve SBC and RKE's claims. Any actual payments or settlements that are made to SBC and RKE to resolve their termination claims will be paid from the prior year appropriations that were used to fund the SBC and RKE contracts. Those prior year appropriations are unaffected by the Court's injunction.

19.    Texas Sterling.  In 2022, CBP awarded a task order under a federal contract to Texas Sterling to remove old legacy fencing and install replacement gates and barrier in the USBP El Paso Sector. *See* ECF No. 172-3. This task order was awarded with FY20 and FY21 barrier system funds. In February 2024, after certain tasks had been completed, CBP notified Texas Sterling that the agency had decided to descope several remaining components from the task order and directed Texas Sterling to cease those remaining construction activities. *See* ECF No. 172-4. CBP and Texas Sterling then began discussions to resolve outstanding claims associated with the replacement barrier construction performed under the task order and the descoping decision.[2] Following entry of the Court's injunction, CBP notified Texas Sterling of the Court's decision and the agency's inability to pay costs prohibited by the injunction, such as payments for replacement barrier projects. *See* ECF No. 172-1. In September 2024, CBP issued a contract termination notice to Texas Sterling. Texas Sterling has yet to submit a Termination Settlement Proposal to CBP.

---

[2] Texas Sterling characterizes the descoping action as a termination of the contract for convenience. *See* ECF No. 172 at 5. Defendants do not agree with that characterization. The effect of descoping decision was among the issues under discussion at the time of the Court's injunction.

This declaration is made pursuant to 28 U.S.C. 1746. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 15th day of August 2025

Paul Enriquez
Infrastructure Portfolio Director
Program Management Office Directorate
U.S. Border Patrol