## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
## MCALLEN DIVISION

| | |
|---|---|
| THE STATE OF MISSOURI; THE STATE OF TEXAS,<br><br>_Plaintiffs,_<br><br>v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, _et al._<br><br>_Defendants._<br><br>_and_<br><br>SIERRA CLUB, _et al._<br>_Defendants-Intervenors_ | No. 7:21-cv-00420<br>(formerly No. 6:21-cv-00052) |
| THE GENERAL LAND OFFICE OF TEXAS, and DAWN BUCKINGHAM, M.D., in her official capacity as Commissioner of the Texas General Land Office,<br><br>_Plaintiffs,_<br><br>v.<br><br>UNITED STATES DEPARTMENT OF HOMELAND SECURITY; and KRISTI NOEM, in her official capacity as Secretary of the Department of Homeland Security,<br><br>_Defendants._<br><br>_and_<br><br>SIERRA CLUB, _et al._<br>Intervenors | No. 7:21-cv-00272 |

## NOTICE

Plaintiffs respectfully file this Notice to advise the Court of recent judicial activity by Intervenors Sierra Club and Southern Border Communities Coalition relevant to proceedings in this case. Last week, Intervenors filed a Motion to Enforce Settlement and for Emergency Relief, and Memorandum of Points and Authorities in Support in the Northern District of California. *See Sierra Club v. Trump*, No. 4:20-cv-01494, ECF Nos. 99, 100, and 102 (N.D. Cal. Sept. 4, 2025), attached hereto as Exhibit A. The California litigation has been discussed at length before this Court.

Intervenors' filing in the Northern District of California asserts that the Government Defendants breached the Settlement Agreement in that case. *Id.* at 9–11. Notably, the motion states that the FY 2020 and FY 2021 barrier system appropriations are not the "exclusive funding source" of the Settlement Agreement between Intervenors and the Federal Government. *Id.* at 9. Intervenors also argue that the Federal Defendants can "identif[y] alternative funding sources or accept[ ] reasonable exchanges or modifications" beyond the FY 2020 or FY 2021 barrier system appropriations that his Court enjoined for mitigation and remediation activities. *Id.* at 10. Beyond these arguments, Intervenors assert that the Northern District of California "can apply traditional tools of contract interpretation" to circumvent this Court's injunction. *Id.* at 10. On September 5, 2025, the Northern District of California ordered further briefing on September 15, 2025 and September 16, 2025. On September 9, 2025, the Northern District of California ordered that an in-person hearing shall be held on September 18, 2025 at 2:00 p.m. PDT.

Date: September 10, 2025

Respectfully submitted,

ANDREW BAILEY
Attorney General of Missouri

KEN PAXTON
Attorney General of Texas

/s/ *Louis J. Capozzi III*
LOUIS J. CAPOZZI III, #900187664DC*
Solicitor General
*Attorney-in-Charge*

BRENT WEBSTER
First Assistant Attorney General

RALPH MOLINA
Deputy First Assistant Attorney General

SAMUEL FREEDLUND, #73707MO*
Deputy Solicitor General

RYAN D. WALTERS
Deputy Attorney General for Legal Strategy

OFFICE OF THE ATTORNEY GENERAL
Supreme Court Building
207 West High Street
P.O. Box 899
Jefferson City, Missouri 65102
Tel. (573) 751-1800
Fax (573) 751-0774
louis.capozzi@ago.mo.gov
samuel.freedlund@ago.mo.gov

RYAN G. KERCHER
Chief, Special Litigation Division

*/s/ Zachary L. Rhines*
ZACHARY L. RHINES
Special Counsel
*Attorney-in-Charge*
Texas Bar No. 24116957
Southern Dist. of Texas Bar No. 3688738

*Counsel for Plaintiff*
*State of Missouri*

MUNERA AL-FUHAID
Special Counsel
Texas Bar No. 24094501
Southern Dist. of Texas Bar No. 3379673

*Admitted *pro hac vice*

OFFICE OF THE ATTORNEY GENERAL
P.O. Box 12548
Austin, Texas 78711-2548
Tel.: (512) 936-2567
Fax: (512) 936-0545
Zachary.Rhines@oag.texas.gov
Munera.Al-Fuhaid@oag.texas.gov

*Counsel for Plaintiff State of Texas*

/s/ *Austin R. Nimocks*
AUSTIN R. NIMOCKS
*Attorney-in-Charge*

Texas Bar No. 24002695
S.D. Tex. Bar No. 2972032
austin@pntlawfirm.com

CHRISTOPHER L. PEELE
Of Counsel
Texas Bar No. 24013308
S.D. Tex. Bar No. 31519
chris@pntlawfirm.com

PNT LAW FIRM
206 Wild Basin Rd. S.
Bldg. A, Ste. 206
Austin, TX 78746
Phone: (512) 522-4893

*Counsel for Plaintiffs Texas General Land Office and Commissioner Dawn Buckingham, M.D.*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on September 10, 2025, a true and accurate copy of the foregoing document was electronically filed through the Court's CM/ECF System and that a copy of the foregoing will be sent via email to all parties by operation of the Court's electronic filing system, all consistent with Federal Rule of Civil Procedure 5(b).

<u>*/s/ Austin R. Nimocks*</u>
Austin R. Nimocks

# Exhibit A

Cecilia D. Wang (SBN 187782)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (415) 343-0770
*cwang@aclu.org*

David A. Donatti*
ACLU OF TEXAS
P.O. Box 8306
Houston, TX 77288
Tel: (713) 942-8146
*ddonatti@aclutx.org*

Gloria D. Smith (SBN 200824)**
SIERRA CLUB ENVIRONMENTAL
LAW PROGRAM
2102 Webster Street, Suite 1300
Oakland, CA 94612
Tel: (415) 977-5532
*gloria.smith@sierraclub.org*

*Admitted Pro Hac Vice
**Attorney for Plaintiff Sierra Club only

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| SIERRA CLUB, *et al.*,<br>　　　　　　Plaintiffs,<br>　　　　*v.*<br>DONALD J. TRUMP, *et al.*,<br>　　　　　　Defendants. | No. 19-cv-892-HSG<br>No. 20-cv-1494-HSG<br>No. 19-cv-00872-HSG<br>No. 20-cv-01563-HSG |
| STATE OF CALIFORNIA, *et al.*,<br>　　　　　　Plaintiffs,<br>　　　　*v.*<br>JOSEPH R. BIDEN, *et al.*,<br>　　　　　　Defendants. | **PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AND FOR EMERGENCY RELIEF, AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** |

Defendants are currently in breach of the Settlement Agreement in this case, assertedly because they were constrained from fulfilling certain of their obligations by an injunction issued in litigation in the U.S. District Court for the Southern District of Texas limiting the uses of Fiscal Year 2020-21 barrier system appropriations. Plaintiffs Sierra Club and Southern Border Communities Coalition ("Plaintiffs" here, and "*Sierra Club* Intervenors" in the Texas action) have diligently pursued relief in the Texas litigation; they have won their Fifth Circuit appeal from an order by the Texas district court denying their motion to intervene; and Plaintiffs' motion to modify or vacate the injunction is now pending in the Texas district court. Plaintiffs also are in ongoing negotiations with Defendants about potential alternative funding sources and modifications to the Settlement Agreement. But because the remaining FY 2020-21 funds expire on September 30, 2025, and the government has stated its intention to spend down the funds before that date, Plaintiffs request urgent but limited relief from this Court to preserve the funding source specified in some provisions of the Settlement Agreement so that Defendants may cure their breach.

Specifically, Plaintiffs request: (1) an immediate accounting of the funds that are available to fulfill the Settlement Agreement, (2) an order requiring Defendants to give at least seven business days' notice before undertaking any new obligations that threaten to reduce available funds below $50 million, (3) an order preserving at least $50 million beyond September 30, 2025, to ensure that funds are not spent for other purposes and do not expire while enforcement litigation proceeds,[1] and (4) prompt referral of the matter back to the Magistrate Judge for a mediation on modifications to the Settlement Agreement to avoid reopening the judgment. ECF No. 372-1 ("Settlement Agreement"), ¶ 73.

---

[1] The Defendants have not stated the full cost of Settlement Agreement projects that were paused due to the injunction. At least $23 million in Phase 3 mitigation projects were frozen, in addition to the cost of all Phase 2 projects, including the installation of large and small wildlife passages, described below.

I.     **BACKGROUND**

A.     *The Settlement Agreement and Texas* GLO *Litigation*

On July 17, 2023, this Court granted Plaintiffs' motion for voluntary dismissal in light of the Settlement Agreement, which it incorporated into its order, and retained jurisdiction "for the purpose of enforcement of the parties' settlement agreement." ECF No. 375.

The Settlement Agreement committed the Defendants to undertake significant environmental mitigation and remediation work at project sites throughout the Southwest where they had constructed border walls using diverted DoD funds. Settlement Agreement obligations included a series of "Phase 2" commitments, including the installation of small and large wildlife passages, ¶¶ 4-7, invasive species management, *id.* ¶ 33, erosion and drainage control, *id.* ¶¶ 40, 42-44, endangered and at-risk species monitoring, *id.* ¶ 53, and additional "Phase 3" projects addressing the environmental and community impacts of barrier system construction, ¶¶ 54-55.

The Settlement Agreement stated that "Defendants' responsibility under this agreement is contingent upon the availability of appropriated funds." *Id.* ¶ 57. Defendants specifically represented in the Settlement Agreement "that such funding is currently available and that they will take all reasonable steps to ensure that such funds remain available to comply with this Agreement." *Id.*

While many of the Settlement Agreement's terms requiring Defendants to spend money do not specify a funding source, some provisions specify funding "exclusively from DHS's fiscal year 2020 or 2021 barrier system appropriations[.]" *See id.* ¶ 16 (study on the impact of barrier lighting within the 284 and 2808 project areas); *id.* ¶ 48; *id.* ¶ 53 (monitoring of endangered or at-risk species). The specified appropriation act allocates $1.375 billion "for the *construction of barrier system … that utilizes currently deployed steel bollard designs* **or** *operationally effective adaptations of such designs that help mitigate community or environmental impacts* … including adaptations based on consultation with [local jurisdictions]." Fiscal Year 2020 DHS Appropriations Act, P.L. 116-93, 133 Stat. 2511 Div. D, § 209(a) (emphasis added).

In March 2024, a district court in the Southern District of Texas issued a preliminary injunction in a case brought by a Texas state agency and the states of Missouri and Texas against

President Biden's Proclamation No. 10142, 68 Fed. Reg. 7225, 7225 (Jan. 20, 2021), relating to his administration's border wall policy, and a related DHS Border Wall Plan. *General Land Office v. Biden*, 722 F. Supp. 3d 710 (S.D. Tex. 2024) (hereinafter, "*GLO* injunction"). The plaintiffs in that case had alleged that the Proclamation and Plan reflected a policy not to build border walls and argued that such a policy was contrary to the FY20 and FY21 border barrier appropriations act. The preliminary injunction prohibited "the Government and all its respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them" from obligating FY20 or FY21 funds "toward mitigation and remediation efforts, repair of existing barrier, so-called system attribute installation at existing sites, or other similar purposes." *Id.* at 745.

After the government sought a stay (twice) and clarification of the Texas district court's order, on April 5, 2024, the *GLO* parties indicated for the first time that the federal defendants would not appeal the *GLO* injunction. Shortly thereafter, the parties filed a joint motion for a final judgment and permanent injunction, subject only to a dispute about vacatur.

Nine days later, and before the *GLO* court entered judgment, the *Sierra Club* Intervenors moved to intervene in that litigation based on the government's assertion that it could not comply with certain provisions of the Settlement Agreement here because of the *GLO* injunction. Both the federal defendants and the *GLO* plaintiff states opposed intervention, and the judge uniformly denied it to several intervenors including *Sierra Club* Intervenors. The *Sierra Club* Intervenors appealed.

On May 15, 2025, the Fifth Circuit ruled for the *Sierra Club* Intervenors, holding that their intervention motion should have been granted. *Gen. Land Off. v. Trump*, No. 24-40447, 2025 WL 1410414, at *1 (5th Cir. May 15, 2025). The Fifth Circuit held that the *GLO* injunction could threaten the Settlement Agreement and ruled that the United States failed to adequately protect the *Sierra Club* Intervenors' interests in the availability of FY20 and FY21 funds. *Id.* at *6-7.

Since the Fifth Circuit's decision and remand to the district court on July 7, 2025, the *Sierra Club* Intervenors, now parties to the *GLO* litigation, have moved to vacate, modify, or clarify the *GLO* injunction to remove any asserted impediment to the Defendants' performance under the

Settlement Agreement. The *GLO* plaintiffs are opposed to such relief, while Defendants do not oppose vacatur. That motion has been pending before the Texas district court since July 25, 2025.

### B. Notice of Breach and Meet and Confer

Shortly after Defendants notified Plaintiffs they would pause work on the Settlement Agreement in light of the *GLO* injunction, Plaintiffs sent a formal notice of breach.  Since then, the parties have met and conferred on multiple occasions while Plaintiffs sought relief in the Southern District of Texas and the Fifth Circuit, as set forth below.

On March 14, 2024, counsel for the Defendants informed Plaintiffs that, because of the *GLO* injunction, Defendants had stopped work on several Settlement Agreement projects. After meeting with Defendants and discussing how to keep the Settlement Agreement on track, Plaintiffs sent a notice of breach on April 3, 2024. *See* Notice of Breach, Donatti Decl. Exhibit A.

On May 17, 2024, Defendants sent Plaintiffs a letter memorializing the scope of work it asserted to be barred by the *GLO* injunction, including the construction of wildlife passages, erosion/drainage measures, culvert work, and invasive-species removal. Defendants stated in the letter that CBP had paused or modified related contracts. Letter from Andrew Warden, Dep't of Justice, to Cecilia Wang et al., May 17, 2024, Donatti Decl. Exhibit B.

Throughout 2024, Plaintiffs repeatedly pressed the Defendants for updates in writing and in virtual meetings, asked about alternative funding sources, and offered proposed solutions to the disruptions caused by the *GLO* injunction, including "swaps" of other mitigation measures for the provisions of the Settlement Agreement that Defendants asserted they were unable to perform.  For example, on August 22, 2024, Plaintiffs wrote to Defendants asking them to identify alternative funding and outlining priorities for a reduced scope of work. Letter from Cecilia Wang, Counsel for SCM, to Andrew Warden, Aug. 22, 2024, Donatti Decl. Exhibit C.

In October and November 2024, Defendants provided charts and GPS-identified project lists for nineteen possible "new [border wall] construction" segments using FY 20 and 21 barrier system funds. Defendants stated that these plans were consistent with construction limitations in the

---

PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AGREEMENT
CASE NOS. 19-CV-00892-HSG; 20-CV-01494-HSG; 4:19-CV-00872-HSG; NO.4:20-CV-01563-HSG

Settlement Agreement and that construction would begin "no earlier than September 2025." Email from Andrew Warden to Cecillia Wang, et al., Nov. 11, 2025, Donatti Decl. Exhibit D.

In December 2024, Plaintiffs proposed additional solutions to the breach assertedly precipitated by the *GLO* injunction, including opening existing stormwater gates (which would require no expenditure of funds) in exchange for constructing certain large wildlife passages. Email from Cecillia Wang to Andrew Warden, Jan. 17, 2025, Donatti Decl. Exhibit E.

In June 2025, Plaintiffs supplemented their notice of breach. Letter from David Donatti, Counsel for Plaintiffs, to Andrew Warden, June 9, 2025, Donatti Decl. Exhibit F. Plaintiffs requested information, including an accounting of remaining barrier system funds, and offered again to work toward alternative mitigation ideas and funding solutions absent additional congressional appropriations. Further, Plaintiffs identified an independent breach of the Settlement Agreement— new border wall construction in areas prohibited under the Settlement Agreement.

Defendants responded on June 13, 2025. They stated that $566 million in FY 21 barrier system funds remained unobligated. They declined Plaintiffs' request that they "establish[] an escrow or other account that is insulated from further injunction-related restrictions." Letter from Andrew Warden to David Donatti, June 13, 2025, Donatti Decl. Exhibit G. Defendants emphasized that "DHS/CBP has not received an appropriation for barrier construction or the necessary expenses thereof since FY21," and stated:

> all DHS/CBP's prior year barrier system funds have been obligated, expended, or have lapsed. Beyond the approximately $566M in unobligated FY21 barrier system funds, there is no other funding that is legally available for the Phase 2 remediation and Phase 3 mitigation projects and activities that are outlined in the Settlement.

*Id.*

The parties met and conferred on August 25, 2025, to discuss the potential expiration and obligation of FY21 funds and Plaintiffs' intention to return to this Court for enforcement proceedings. Plaintiffs shared a mitigation plan indicating that FY21 funds could be used to mitigate the community and environmental impacts of ongoing and planned construction. Mitigation Plan,

PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AGREEMENT
CASE NOS. 19-CV-00892-HSG; 20-CV-01494-HSG; 4:19-CV-00872-HSG; NO.4:20-CV-01563-HSG

Donatti Decl. Exhibit H. While Defendants have indicated they will consider Plaintiffs' proposals, they have made no commitments to undertake any of Plaintiffs' proposals. Defendants have not changed their position that they will not escrow or reserve any FY21 funds for performance of their obligations under the Settlement Agreement.

### C. Defendants Plan to Exhaust Remaining FY21 Funds Imminently

Several circumstances have changed that make it imperative for the Court to grant Plaintiffs' requested relief to preserve the availability of FY21 funds as a specified source of funding for Defendants' obligations under the Settlement Agreement. Without judicial intervention, the remaining FY21 border barrier funds will lapse on September 30, 2025. And, moreover, Defendants have expressed their intention to spend down those funds on purposes other than performance of their Settlement Agreement obligations. Although Plaintiffs are now parties in the *GLO* litigation pursuant to the Fifth Circuit's order, their sole objective in that court is to undo or modify the injunction and remove the obstacle it has imposed on Defendants' performance. This Court retains jurisdiction to enforce the Settlement Agreement.

Preserving Defendants' ability to use FY21 funds to fulfill their contractual obligations under the Settlement Agreement has become even more important in the past two weeks, as CBP's Infrastructure Portfolio Director Paul Enriquez testified on August 15, 2025, that DHS has obligated or will obligate the remaining FY21 funds to purposes other than those agreed to in the Settlement Agreement. Ninth Enriquez Declaration, Donatti Decl. Ex. H. Only $203 million remains unobligated, and "CBP has a contracting and execution plan" which may reduce the amount to as little as $6 million.[2]

---

[2] On July 4, 2025, Congress allocated $46,550,000,000 for a "border infrastructure and wall system," including "[c]onstruction, installation, or improvement of new or replacement primary, waterborne, and secondary barriers," roads, system attributes including cameras, lights, "and other detection technology," and "[a]ny work necessary to prepare the ground at or near the border to allow U.S. Customs and Border Protection to conduct its operations, including the construction and maintenance of the barrier system." 139 Stat. 358, sec. 90001, *available at* https://www.congress.gov/bill/119th-congress/house-bill/1/text. This is the first allocation for barrier systems since the FY20 and FY21 funds. Plaintiffs asked Defendants if these funds would be

**II.     ARGUMENT**

Plaintiffs respectfully request targeted, near-term relief to ensure that bargained-for mitigation provisions in the Settlement Agreement will not be nullified by Defendants' breach even if Plaintiffs prevail here and in the *GLO* litigation. Specifically, this Court should order Defendants to provide an accounting of the funds that are available to perform under the Settlement Agreement. The Court should also require notice before available funds are obligated or allocated below $50 million and exercise its equitable authority to preserve at least $50 million of FY21 funds for Settlement Agreement commitments beyond the statutory lapse date of September 30, 2025. Free from the time pressure created by the scheduled expiration of FY21 funds, Plaintiffs further request that this Court refer the matter back to Magistrate Judge Ryu for further settlement negotiations. These measures will serve the interests of justice guaranteed by the Settlement Agreement, mitigate the urgency caused by the United States' litigation and spending decisions and the expiration of the FY21 funds, and respect comity with a sister federal court.

**A.     *The Court Has Jurisdiction to Preserve Funds to Ensure that Defendants Can Ultimately Comply with the Settlement Agreement.***

Federal courts may enforce settlement agreements where, as here, the dismissal order retains jurisdiction and incorporates the agreement. ECF No. 375; *see also, e.g.*, *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381-82 (1994). This Court retains jurisdiction to enforce the Settlement Agreement for at least four years from its execution in July 2023. ECF. No. 375. Such jurisdiction can be extended "if settlement obligations are not completed within those four years." *Id.*

The Settlement Agreement permits either party to seek relief from the dismissal of the lawsuits pursuant to Federal Rule of Civil Procedure 60(b)(6). Settlement Agreement ¶ 73. According to the Settlement Agreement, the prerequisites for such a motion are timely notices of breach and efforts to meet and confer. *Id.* The Plaintiffs have submitted timely notices of breach and have met and conferred with the United States on multiple occasions to try to narrow the issues.

available for Settlement Agreement projects, and Defendants stated they have not made a determination.

Although the FY21 funds will expire on September 30, 2025, this Court has the equitable power to "simply suspend the operation of a lapse provision and extend the term of already existing budget authority." *City of Houston v. Dep't of Hous. & Urb. Dev.*, 24 F.3d 1421, 1426 (D.C. Cir. 1994) (quoting *Nat'l Ass'n of Reg'l Councils v. Costle,* 564 F.2d 583, 588 (D.C. Cir. 1977)); *Wilson v. Watt*, 703 F.2d 395, 403 (9th Cir. 1983) (reversing denial of injunction and ordering district court to "order that such funds be held available as is necessary to implement its order"); *see also* 31 U.S.C. § 1502(b) ("A provision of law requiring that the balance of an appropriation or fund be returned to the general fund of the Treasury at the end of a definite period does not affect the status of lawsuits or rights of action involving the right to an amount payable from the balance.").

While the Court may preserve funds against expiration, it cannot do so if the relevant funds are obligated. Thus, Plaintiffs seek this Court's limited intervention to ensure that funds are available for Defendants to cure their breach and comply with the Settlement Agreement while the parties litigate Plaintiffs' claim of breach and the parties negotiate potential resolutions.

## B. *The United States Has Breached the Settlement Agreement*

The United States has stopped work on several obligations. Letter from Andrew Warden, May 17, 2024, Donatti Decl. Exhibit B; Letter from Andrew Warden, June 13, 2025, Donatti Decl. Exhibit G ("[N]one of the Phase 3 mitigation projects shown on the May 3, 2024, chart have been restarted or rescoped.").

The United States argues that its work stoppage is not a breach of the Settlement Agreement because its commitments are "subject to the availability of funds." The argument fails for three reasons.

First, the United States has not shown that funding is unavailable. While some Settlement Agreement provisions name the FY20 and FY21 barrier system funds as their exclusive funding source, several others, including the installation of large and small wildlife passages, do not specify a funding source. *See, e.g.*, Settlement Agreement ¶¶ 4-7. Indeed, the Settlement Agreement's standalone section on "Availability of Appropriations" does not refer to FY20 or FY21 funds and contemplates, without guaranteeing, that Congress may later "appropriate funds sufficient to meet

any deficiencies." *Id.* ¶ 57. Further, the Settlement Agreement identifies funding deficiencies as a potential basis for a breach of the Settlement Agreement and reinstating proceedings. *Id.* ¶ 58. Even if the Defendants maintain that the FY21 funds are unavailable (and Plaintiffs disagree), they must at minimum show that *no* funds are available.

Second, the United States represented in the Settlement Agreement not only that funding was available, but that they "w[ould] take all reasonable steps to ensure that such funds remain available to comply with this Agreement." *Id.* ¶ 57. Defendants indisputably did not adequately represent the Plaintiffs' interests in protecting the availability of funding in the *GLO* litigation. *See Gen. Land Off.*, 2025 WL 1410414, at *3 n.2 ("No party argues that the would-be intervenors currently fail to meet 24(a)(2)'s fourth requirement—inadequate representation by the current parties."). The government's decision not to appeal the categorical, nationwide *GLO* injunction, along with its opposition to Plaintiffs' intervention in the *GLO* case, has delayed compliance by over one-and-a-half years. Throughout this time, the United States has not identified alternative funding sources or accepted reasonable exchanges or modifications. Even if accepting the injunction was "reasonable," and it was not, the United States has consistently declined to propose or accept solutions to address the impact caused by the *GLO* injunction.

Third, either those provisions that do explicitly name the FY20 and FY21 funds can be modified, or this Court can apply traditional tools of contract interpretation and hold that those funds *are* available for Settlement Agreement projects. *See Flores v. Sessions*, 394 F. Supp. 3d 1041, 1048 (C.D. Cal. 2017) ("The motion to enforce the settlement agreement essentially is an action to specifically enforce a contract.") (quoting *Adams v. Johns-Manville Corp.*, 876 F.2d 702, 704, 709 (9th Cir. 1989)). The FY21 appropriation expressly authorizes consultation and design adaptations to barrier system construction "that help mitigate community or environmental impacts." CAA 2020, Div. D, § 209(a)(1); CAA 2021, Div. F, § 210(a)(1). The mitigation contemplated by the Settlement Agreement, like design adaptations, wildlife passages, erosion/drainage control, culvert realignments, and invasive-species removal, fits the funds' authorization of barrier system construction using "operationally effective adaptations . . . that help mitigate community or

1  environmental impacts." Especially where, as here, the United States is using FY21 funds to build

2  new border walls in the same sectors targeted by 2808 and 284 construction, the government may

3  incorporate design elements in those new sections that serve to mitigate the harms addressed by the

4  Settlement Agreement—for example, subtly increasing the spacing between bollards, incorporating

5  large and small wildlife passages similar to those specified in the Settlement Agreement but never

6  installed as promised, or modifying the position of crossbars to permit wildlife, but not human,

7  migration.

8          Finally, as documented more recently, the Defendants' breach is not limited to the

9  impairment caused by the *GLO* injunction. *See, e.g.*, Letter from David Donatti to Andrew Warden,

10  June 10, 2025, Donatti Decl. Ex. F, at 3 (describing construction in areas prohibited under the

11  settlement and the closure of stormwater gates). The United States admits that it has "constructed

12  approximately 950 feet of new bollard barrier" in a location prohibited by the Settlement Agreement.

13  Letter from Andrew Warden to David Donatti, June 13, 2025, Donatti Decl. Exhibit G. While

14  Defendants maintain that their "mistake" was mutual, *id.* at 4, their prior communication about these

15  projects stated that they *would not* build in prohibited areas, and that they would not build before

16  September 2025. *See* Email from Andrew Warden to Cecillia Wang, et al., Nov. 11, 2024, Donatti

17  Decl. Exhibit G.  Neither representation has turned out to be true.

18          Enforcing the Settlement with narrow, time-limited measures, including an accounting and a

19  preservation floor through and beyond September 30, 2025, would ensure that performance remains

20  feasible without dictating project-by-project outcomes.

21          **C.  *This Court Should Grant Emergency, Time-Limited Relief***

22          Plaintiffs request four tailored measures to preserve the Settlement Agreement against the

23  imminent expiration of the FY21 funds. First, this Court should order an immediate accounting of all

24  funds that are available to fulfill the Settlement Agreement. Second, this Court should order a

25  preservation floor of $50 million by requiring notice and leave of Court before the United States

26  depletes remaining FY21 funds for non-settlement projects. Third, this Court should order the

27

28

PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AGREEMENT
CASE NOS. 19-CV-00892-HSG; 20-CV-01494-HSG; 4:19-CV-00872-HSG; NO.4:20-CV-01563-HSG

preservation of $50 million to ensure that funds are available for the Settlement Agreement if Plaintiffs prevail.

The relief requested is modest. The $50 million required for performance would fund approximately $23 million in frozen Phase 3 mitigation projects, Settlement Agreement ¶ 48, and provide some financing for several stalled Phase 2 projects, including installation of additional small and large wildlife passages, *id.* ¶¶ 4-7, environmental impact studies of new border barrier lighting, ¶¶ 15-16, invasive species management, promised erosion and drainage control measures, ¶¶ 40, 42-44, the remediation of the Arizona Trail Head, ¶ 47, and monitoring of endangered and at-risk species, ¶ 53. Plaintiffs are not asking the Court to dictate how these funds will be spent. Instead, they ask that the Court order an accounting, a preservation floor, and the creation of a dispute-resolution process, so that finite FY21 dollars are not lost while the parties and this Court consider appropriate relief.

Urgent relief is required to prevent irreparable harm. The FY21 funds, which are the only funds the United States has so far considered to be available to fund the Settlement Agreement, expire on September 30, 2025, if they are not obligated beforehand. Once they are obligated, and without judicial preservation against their imminent expiration, mitigation cannot be funded from this source. An urgent accounting, preservation floor, and creation of a process for negotiation would help to prevent irreparable harm. These limited measures are also equitable and in the public interest. Enforcing settlements, honoring Congress's mitigation directive in its FY21 appropriation act, and preventing waste of appropriated funds serve the public interest; so, too, do simple mitigation measures intended to preserve treasured public lands and at-risk wildlife against unnecessary harm.

## III.    CONCLUSION

Plaintiffs did not rush to court. They first pursued remedies under the Settlement Agreement through a meet-and-confer process—notice, consultation, and offered proposals—while seeking relief to protect the availability of funds in the *GLO* litigation. The *GLO* court is now considering vacatur or modification of its injunction. Recent developments suggest several pathways to relief, but these solutions require time, and time is running out on the FY21 funds. Plaintiffs need modest,

practical relief now so that the parties can perform under the Settlement Agreement before and beyond September 30, 2025.

Plaintiffs therefore respectfully ask the Court to:

1. ORDER Defendants to file an accounting of unobligated FY 2021 barrier system balances and a list of Settlement-related mitigation items with estimated obligation amounts on or before September 12, 2025.

2. PROHIBIT Defendants from obligating or otherwise making unavailable more than $50 million of FY 2021 barrier system funds without 7 business days' notice and leave of this Court.

3. PRESERVE at least $50 million of FY 2021 § 210(a)(1) funds beyond September 30, 2025, to ensure this Court's ability to provide relief.

4. REFER the case to Magistrate Judge Donna M. Ryu for settlement negotiations.


Dated:  September 4, 2025                         Respectfully submitted,

                                                 By:____/s /_David A. Donatti_____
                                                 David A. Donatti*
                                                 ACLU OF TEXAS
                                                 P.O. Box 8306
                                                 Houston, TX 77288
                                                 Tel: (713) 942-8146
                                                 *ddonatti@aclutx.org*

                                                 Cecillia D. Wang (SBN 187782)
                                                 AMERICAN CIVIL LIBERTIES UNION
                                                 FOUNDATION
                                                 39 Drumm Street
                                                 San Francisco, CA 94111
                                                 Tel: (415) 343-0770
                                                 *cwang@aclu.org*

                                                 Gloria D. Smith**
                                                 SIERRA CLUB ENVIRONMENTAL
                                                 LAW PROGRAM
                                                 2102 Webster Street, Suite 1300
                                                 Oakland, CA 94612
                                                 Tel: (415) 977-5532
                                                 *gloria.smith@sierraclub.org*

*Counsel for Plaintiffs*

*Admitted Pro Hac Vice
**Attorney for Plaintiff Sierra Club only

**CERTIFICATE OF SERVICE**

I hereby certify that on September 4, 2025, I electronically filed a copy of the foregoing document. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

                                       _/s/*David A. Donatti*_____
                                       David A. Donatti

PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AGREEMENT
CASE NOS. 19-CV-00892-HSG; 20-CV-01494-HSG; 4:19-CV-00872-HSG; NO.4:20-CV-01563-HSG

Cecillia D. Wang (SBN 187782)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (415) 343-0770
*cwang@aclu.org*

David A. Donatti*
ACLU OF TEXAS
P.O. Box 8306
Houston, TX 77288
Tel: (713) 942-8146
*ddonatti@aclutx.org*

Gloria D. Smith (SBN 200824)**
SIERRA CLUB ENVIRONMENTAL
LAW PROGRAM
2102 Webster Street, Suite 1300
Oakland, CA 94612
Tel: (415) 977-5532
*gloria.smith@sierraclub.org*

*Admitted Pro Hac Vice
**Attorney for Plaintiff Sierra Club only

*Attorneys for Plaintiffs*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| SIERRA CLUB, *et al.*, <br> Plaintiffs, <br> *v.* <br> DONALD J. TRUMP, *et al.*, <br> Defendants. | No. 19-cv-892-HSG <br> No. 20-cv-1494-HSG <br> No. 19-cv-00872-HSG <br> No. 20-cv-01563-HSG |
| STATE OF CALIFORNIA, *et al.*, <br> Plaintiffs, <br> *v.* <br> JOSEPH R. BIDEN, *et al.*, <br> Defendants. | **DECLARATION OF DAVID A. DONATTI IN SUPPORT OF MOTION TO ENFORCE SETTLEMENT AGREEMENT** |

I, David A. Donatti, declare as follows:

1.   I am an attorney admitted to practice and in good standing in Texas and New York and represent Plaintiffs Sierra Club and Southern Border Communities Coalition. I am admitted to appear pro hac vice in this matter. I make the following declaration based on my personal knowledge, except where indicated.

2.   On July 17, 2023, this Court dismissed this long-running matter while retaining jurisdiction "for the purpose of enforcement of the parties' settlement agreement," which it incorporated into its order. ECF. No. 375.

3.   On April 3, 2024, Plaintiffs served Defendants with a notice of breach of the Settlement Agreement, attached hereto as Exhibit A.

4.   The Defendants attributed the alleged breach to an injunction issued in the United States District Court for the Southern District of Texas, McAllen Division, prohibiting the use of barrier system funds toward "mitigation and remediation efforts." *General Land Office v. Biden*, 722 F.Supp.3d 710 (S.D. Tex. 2024).

5.   On May 17, 2024**,** the Defendants sent Plaintiffs a letter memorializing the scope of work it understood to be barred by the *GLO* injunction. Letter from Andrew Warden, Dep't of Justice, to Cecilia Wang et al., May 17, 2024, attached hereto as Exhibit B.

6.   The Parties have remained in communication about performance under the Settlement Agreement and the limitations allegedly imposed by the *GLO* injunction. For example, the Plaintiffs have asked the Defendants to identify alternative funding sources, stated priorities for a reduced scope of work, suggested private financing for small wildlife passages and proposed swapping stormwater gates for large wildlife passages. Communications regarding these proposals are attached hereto as Exhibits C and E.

7.   In October and November 2024, the Defendants provided a list and, subsequently, GPS coordinates for nineteen possible new construction segments. The Defendants stated that these construction segments were consistent with the Settlement Agreement, and construction would not

begin until September 2025. *See* Email from Andrew Warden to Cecilia Wang, et al., Nov. 11, 2025, attached hereto as Exhibit D.

8.   In June 2025, Plaintiffs supplemented their notice of breach, requesting an accounting of remaining barrier system funds and again proposing Settlement Agreement modifications. Letter from David Donatti, Counsel for Plaintiffs, to Andrew Warden, June 9, 2025, attached hereto as Exhibit F. The Defendants responded that $566 million in FY21 barrier system funds remained unobligated, but it also declined to set aside funds for Settlement Agreement projects. *See* Letter from Andrew Warden to David Donatti, June 13, 2025, Exhibit G.

9.   On August 15, 2025, CBP's Infrastructure Portfolio Director Paul Enriquez testified in the *GLO* litigation that only $203 million in FY21 funds remained unobligated, and CBP intended to reduce the amount to $6 million. A copy of Mr. Enriquez's declaration is attached hereto as Exhibit H.

10. On August 25, 2025, the parties met and conferred about returning to this Court for enforcement actions. The Plaintiffs proposed a mitigation plan which the Defendants committed to consider. A copy of the proposal is attached hereto as Exhibit I.

I hereby declare that the foregoing is true and correct under penalty of perjury pursuant to 28 U.S.C. § 1746.

Executed at Houston, Texas, this 3rd day of September 2025.


            /s/*David A. Donatti*
        David A. Donatti

**CERTIFICATE OF SERVICE**

I hereby certify that on September 4, 2025, I electronically filed a copy of the foregoing document. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.

      /s/*David A. Donatti*

David A. Donatti (TX Bar No. 24097612)*

# Exhibit A



**Cecillia D. Wang**
Deputy Legal Director &
Director, Center for Democracy
ACLU National Legal Department

April 3, 2024

**BY EMAIL**

Andrew Warden
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, DC 20530

> **Re:** ***Sierra Club v. Biden*** and ***State of California v. Biden***
> **WRITTEN NOTICE OF BREACH OF SETTLEMENT**
> **AGREEMENT**

Dear Andrew:

Thank you for meeting and conferring with us today concerning the impact of the preliminary injunction order issued by the district court in the Southern District of Texas in *General Land Office v. Biden*, Nos. 21-CV-272, 21-CV-420 ("*GLO*"), on the government's compliance with the Settlement Agreement in our case.

You confirmed that during a March 28 hearing on the United States' motion to clarify in the *GLO* case, the district court clarified that under its injunction order of March 4, 2024, FY20 and FY21 funds appropriated to the Department of Homeland Security under Section 209(a)(1) of the Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, 133 Stat. 2317, 2511 (2019) and Section 210 of the Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, 134 Stat. 1182, 1456–57 (2020), may be used by DHS only for new border wall construction.

You also notified us that the government has stopped all remediation work related to the Section 2808 and Section 284 border wall construction projects at issue in our litigation, including Defendants' obligations under our Settlement Agreement that require funding.

Plaintiffs Sierra Club and Southern Border Communities Coalition therefore write, pursuant to Paragraph 73 of the Settlement Agreement, to provide written notice that Defendants are in breach of the Settlement Agreement.



We look forward to continuing to confer with you on this matter.

Sincerely,

Cecillia D. Wang
Counsel for Plaintiffs Sierra Club and Southern Border Communities Coalition

cc:    Michael Cayaban, California Department of Justice
       Janelle Smith, California Department of Justice
       James Richardson, California Department of Justice

# Exhibit B



**U.S. Department of Justice**

Civil Division

_Washington, DC 20530_

May 17, 2024

**<u>VIA EMAIL</u>**

Cecillia Wang
ACLU
39 Drumm Street
San Francisco, CA 94111
E-Mail: cwang@aclu.org

Michael Cayaban
California Department of Justice
600 West Broadway, Suite 1800
San Diego, CA 92101
Email: Mike.Cayaban@doj.ca.gov

William Grantham
New Mexico Department of Justice
408 Galisteo St.
Santa Fe, NM 87501
Email: wgrantham@nmag.gov

  Re: _California v. Biden_, 4:19-cv-00872-HSG; 4:20-cv-01563-HSG
    _Sierra Club v. Biden_, 4:19-cv-00892-HSG; 4:20-cv-01494-HSG

Dear Cecillia, Mike, and Bill:

  I am writing in response to your respective letters dated April 3 and May 7, 2024, alleging that the federal Defendants have breached the settlement agreement in the above-referenced cases. We disagree with your assertions. Defendants have worked diligently to implement the terms of the settlement and remain committed to complying with our agreement.

  Defendants reached an agreement with Sierra Club, Southern Border Communities Coalition, and a group of States (including California and New Mexico) in July 2023 to settle four civil actions challenging the government's funding and construction of barriers along the southern border. Over the past ten months, Defendants have taken significant steps toward fulfilling their settlement obligations, including contributing $25 million to fund the acquisition of mitigation property in southern California to offset the environmental impacts of barrier construction, paying a half million dollars to study the barrier's impact on Peninsular bighorn sheep, and facilitating wildlife passages to assist with cross-border wildlife migration.

- 2 -

On March 8, 2024, the United States District Court for the Southern District of Texas issued a preliminary injunction that severely restricts the range of activities that the federal government may lawfully fund with DHS's fiscal year (FY) 2020 and 2021 border barrier system appropriations. *See Texas General Land Office v. Biden*, No. 7:21-CV-00272, 2024 WL 1023047 (S.D. Tex. Mar. 8, 2024). The court concluded that Congress's appropriation of funds to DHS in FY20 and FY21 for "construction of barrier system" permits "only the construction of physical barriers, such as walls, fencing, buoys, etc." *Id.* at *24. The court's order specifically prohibits the government from obligating or expending the funds "toward mitigation and remediation efforts, repair of existing barrier, so-called system attribute installation at existing sites, or other similar purposes." *Id.*

Several provisions of the settlement agreement require Defendants to fund projects to mitigate and remediate the impacts from barrier construction undertaken by the prior Administration pursuant to 10 U.S.C. § 284 and 10 U.S.C. § 2808. As set forth in the agreement, these projects were to be funded by the FY20 or FY21 barrier system funds that are now subject to the injunction in the *Texas General Land Office* case. *See, e.g.*, Settlement Agreement ¶¶ 16, 18. As a result of the injunction's prohibition on the use of FY20 and FY21 barrier system funds for "mitigation and remediation efforts" or "other similar purposes," those funds are no longer lawfully available to pay for remediation and mitigation projects in the settlement. *See Texas General Land Office*, 2024 WL 1023047 at *24.

The specific provisions of the settlement affected by the injunction are set forth below. As discussed during our bi-monthly consultation meetings and in recent correspondence, the government had completed some of the work in these categories at the time of the court's injunction, while other work in these categories remained in progress. *See* Email from Andrew Warden dated May 3, 2024.

- Remove remaining construction equipment, materials, and debris (¶ 3)
- Installation of additional small and large wildlife passages (¶¶ 4–7)
- Environmental impact studies of new border barrier lighting (¶¶ 15–16)[1]
- Remediation of mountain areas in Luna and Hidalgo Counties, NM (¶¶ 20–22)
- Remediation projects in the Jacumba Wilderness area (¶¶ 23–29)
- Invasive species management (¶¶ 33)
- Remediation of encroachment on New Mexico's land (¶¶ 34–36)[2]
- Decommission water wells and temporary roads (¶¶ 38–39)
- Erosion and drainage control measures (¶¶ 40, 42–44)
- Remediation of livestock fencing (¶ 41)
- Cap open bollards (¶ 45)
- Backfill remaining open trenches (¶ 46)
- Remediation of Arizona Trail Head (¶ 47)

---

[1] Because of the court's injunction, the government cannot install any new barrier lighting with the FY20 or FY21 funds. Consequently, there is no occasion for the government to undertake environmental studies.

[2] The injunction does not prohibit the encroaching contractor from taking remediation actions, but the government cannot use the enjoined funds to pay for additional actions.

- Monitoring of endangered and at-risk species (¶ 53)[3]
- Phase 3 mitigation projects (¶ 54–55)

Although the FY20 and FY21 barrier system funds are unavailable to pay for the remediation and mitigation activities listed above, we disagree with the assertions in your letters that Defendants have breached the settlement agreement. The parties actively discussed the possibility that funds might not be available to pay for remediation and mitigation projects in the settlement, whether because of a court injunction or a rescission of funds by Congress. *See, e.g.,* Defs.' Exchanged Settlement Conference Statement at 2, 4, (Nov. 9, 2021); Letters to ACLU and State of California at 2–3 (Feb. 4 & April 13, 2022). Accordingly, Paragraph 57 conditions the government's compliance with the settlement on the availability of funds: "In accordance with 31 U.S.C § 1341, 41 U.S.C. § 6301, and Federal law, Defendants' responsibility under this agreement is contingent upon the availability of appropriated funds." In addition to this general provision applicable to the entire agreement, the settlement also reiterates at various places that the government's ability to complete specific remediation and mitigation projects is "subject to the availability of funds." *See* Settlement Agreement ¶¶ 16, 28, 48, 49, 53.

Under longstanding appropriations principles, "in order for appropriated funds to be legally available for an expenditure, 'the purpose of the obligation or expenditure must be authorized.'" *U.S. Dep't of Navy v. Fed. Lab. Rels. Auth.*, 665 F.3d 1339, 1348 (D.C. Cir. 2012) (Kavanaugh, J.) (quoting 1 Government Accountability Office, Principles of Federal Appropriations Law at 4-6). Notwithstanding the government's arguments to the contrary, the court in *Texas General Land Office* concluded that "mitigation and remediation" projects were not an authorized purpose of the FY20 and FY21 barrier system funds. The government disagrees with that decision, but we are obligated to follow the requirements of the court's injunction and cannot spend the challenged funds on unauthorized purposes, such as remediation and mitigation projects in the settlement agreement. Accordingly, the FY20 and FY21 barrier system funds are not available under the terms of the settlement agreement.

We reiterate that many provisions of the settlement agreement are unaffected by the court's injunction. These provisions are set forth below and Defendants remain committed to complying with these obligations, notwithstanding the injunction:

- No barrier construction using specified funds (¶ 1)
- Restore funding to military construction projects (¶ 2)
- Open stormwater gates to facilitate wildlife movement (¶¶ 8–9)
- No additional barrier construction in specified areas using specified funds (¶¶ 10–13, 30–32)
- Orient existing lighting in the Yuma 1 project area to avoid upward light spillage (¶ 14)
- Prohibition on using specified funds for new road construction in the § 284 and § 2808 project areas (¶¶ 17–19)
- Commitment to seek New Mexico's consent to store materials in New Mexico for future barrier construction (¶ 37)

---

[3] Of the $1.1M allocated for these studies in the settlement, the government provided $500,000 to the State of California before the injunction took effect.

- Funding for the Proctor Valley / Village 14 purchase, which was completed before the injunction took effect (¶ 49–52)

Throughout the litigation in the *Texas General Land Office* case, the government vigorously opposed the injunction sought by the plaintiff States and explained the importance of using the barrier system funds on remediation and mitigation projects to address the impacts of the former DoD barrier projects. Defendants understand your frustration with the current situation and the disruptions caused by the injunction. As noted above, however, important provisions of the settlement remain unaffected by the Court's injunction and we remain committed to complying with our agreement.

We look forward to continuing to confer with you about the settlement agreement.

Sincerely,

/s/ *Andrew I. Warden*
Andrew I. Warden
Senior Trial Counsel

cc:   David Donatti (DDonatti@aclutx.org)
Ricky Garza (ricky@alliancesd.org)
Gloria Smith (gloria.smith@sierraclub.org)
Sean Riordan (SRiordan@aclunc.org)
Janelle Smith (Janelle.Smith@doj.ca.gov)
James Zahradka (James.Zahradka@doj.ca.gov)
James Richardson (James.Richardson@doj.ca.gov)
Julie Meade (jmeade@nmdoj.gov)
Kathryn Becker (kathryn.becker@env.nm.gov)

Case 1:20-cv-02494-HSG Document 1-1 Filed 09/10/20 Page 33 of 64119

Exhibit C



**AMERICAN CIVIL LIBERTIES UNION
FOUNDATION**

**Cecilia D. Wang**
**Deputy Legal Director &**
**Director, Center for Democracy**
**ACLU National Legal Department**

August 22, 2024

**FOR SETTLEMENT DISCUSSION
SUBJECT TO FEDERAL RULE OF EVIDENCE 408**

**VIA E-MAIL**

Andrew Warden
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20530

      Re:   *Sierra Club v. Biden*

Dear Andrew:

We write to continue our meet-and-confer process following the district court's ruling in the *GLO v. Biden* case in the Southern District of Texas, and particularly concerning the availability of alternative funding for Defendants to comply with the terms of our Settlement Agreement.

During our ongoing discussion, you have said that Defendants have not identified any such alternative funding sources. In the hope of reaching a compromise to avoid further litigation, we would like to confer about whether there could be adequate funding for a reduced scope of work under the Settlement Agreement, focusing on Plaintiffs' top priorities. In particular, Plaintiffs would like to discuss alternative funding for large wildlife passages, erosion control, invasive plant species management, and restoration of construction staging areas and temporary roads in the 284 and 2808 project areas.

We also have a question about paragraphs 15-16 of the Settlement Agreement, concerning lighting in the 284 and 2808 project areas. In your letter of May 17, 2024, you indicated that Defendants are enjoined under the *GLO* order from complying with the Settlement Agreement's requirement that they do environmental impact studies prior to installing any new border lighting. However, you have also told us during our meet-and-confer that Defendants believe the *GLO*



order prohibits any use of "border barrier system" funding for lighting. Are Defendants willing to commit to not installing any additional lighting installation in the 284 and 2808 project areas, thus forgoing the need for environmental planning pursuant to paragraphs 15-16 of the Settlement Agreement?

We look forward to your response.

Sincerely yours,

Cecillia D. Wang
Counsel for Sierra Club and SBCC

cc:    Michael Cayaban, California Department of Justice
       Janelle Smith, California Department of Justice
       James Richardson, California Department of Justice
       William Grantham, New Mexico Department of Justice
       Kathryn Becker, Office of the General Counsel, New Mexico Environment
       Department

Exhibit D

**CBP Proposed Border Barrier Projects (November 5, 2024)**

| No. | Project Name | Project Length | Project Coordinates | Location | Project Information |
|---|---|---|---|---|---|
| 1 | San Diego Jacumba Gap Closure | 2.1 miles | Start: 32.60616, -116.26171<br><br>End: 32.609067, -116.225077 | San Diego County, California, near Jacumba Hot Springs | This project will close a two-mile gap between existing barrier fencing in the Jacumba area of eastern San Diego County where Border Patrol agents report significant migrant traffic. |
| 2 | San Diego 4 Gap Closure Project | 600 feet & 1500 feet | 600' gap:<br>Start: 32.55556318, -116.87534568<br><br>End: 32.55574627, -116.8732002<br><br>1500' gap:<br>Start: 32.55691686, -116.85950496<br><br>End: 32.55768939, -116.8531846 | San Diego County, California, approximately four miles east of the Otay Mesa Port of Entry (POE) | These projects will close three gaps in the barrier constructed by the Department of Defense during the prior Administration. The gaps have become funnel points for crossing migrants. Rescues are common in these areas due to challenging terrain and extreme temperatures. The gap in Smugglers Gluch is adjacent to a viaduct construction project by the Government of Mexico and closure will reduce current and anticipated foot traffic. |
| 3 | San Diego Smugglers Gluch Gap Closure Project | 350 feet | Start: 32.53773237, -117.08507507<br><br>End: 32.53778534, -117.08418182 | San Diego County, California, near Imperial Beach approximately three miles west of San Ysidro POE | |

**CBP Proposed Border Barrier Projects (November 5, 2024)**

| No. | Project Name | Project Length | Project Coordinates | Location | Project Information |
|---|---|---|---|---|---|
| 4 | El Paso Santa Teresa Secondary Barrier Project | 7 miles | Start: 31.78433573, -106.58074539<br><br>End: 31.78427849, -106.69822319 | Dona Ana County, New Mexico, starting at the Santa Teresa POE and continuing east approximately seven miles | This project will construct secondary barrier adjacent to inferior legacy mesh barrier. The project is located in the Border Patrol's Santa Teresa Area of Responsibility, which is the second busiest in the country for migrant flow. |
| 5 | El Paso 2 Gap Closure Project | 950 feet | Start: 31.78373463, -108.15912426<br><br>End: 31.78370561, -108.15578836 | Luna County, New Mexico, approximately 26 miles west of Columbus, New Mexico | This project will close a gap in the barrier constructed by the Department of Defense during the prior Administration. Gap closure is needed because drive-throughs and pedestrian crossing have increased in this location. |
| 6 | El Paso 16-4 Gap Closure Project | 1.3 miles | Start: 31.7830397, -106.55832217<br><br>End: 31.7839446, -106.53567646 | Dona Ana County, New Mexico, approximately ½ mile west of the Texas-New Mexico border | This project will close a gap in the barrier constructed by the Department of Defense during the prior Administration. This area has become a security vulnerability as a crossing point for migrants and narcotics. |

**CBP Proposed Border Barrier Projects (November 5, 2024)**

| No. | Project Name | Project Length | Project Coordinates | Location | Project Information |
|---|---|---|---|---|---|
| 7 | El Paso Monument Gate | 40 feet | Start: 31.33336671, -108.53027833<br><br>End: 31.33336941, -108.53017685 | Hidalgo County, New Mexico, at the Antelope Wells POE | This project would install a gate that was never completed by the Department of Defense during its barrier construction. The project is located near the Antelope Wells Port of Entry and the absence of a gate has become a security vulnerability. |
| 8 | Yuma 10/27 Barry M. Goldwater Range Gap Closure Project | 1021 feet (total length for all seven gaps) | Start: 32.418317, -114.559724<br><br>End: 32.267051, -114.064602 | Yuma County, Arizona, approximately 20 miles east of San Luis POE | This project will close seven gaps between 40 and 240 feet in the barrier constructed by the Department of Defense during the prior Administration near the Barry M. Goldwater Range. Five gaps will be filled with steel bollards and two gaps will be filled with new gates. |
| 9 | Tucson 10-4 Gap Closure Project | 0.2 miles | Start: 31.33370233, -110.85119216<br><br>End:31.33376796, -110.84778967 | Santa Cruz County, Arizona, approximately 10 miles east of Nogales, Arizona | These two projects will close gaps in the barrier constructed by the Department of Defense during the prior Administration. The gaps create security vulnerabilities because of increased migration traffic. |
| 10 | Tucson 10-6 Gap Closure Project | 2.1 miles | Start: 31.33360405, -110.29111687<br><br>End: 31.33374401, -110.25723435 | Cochise County, Arizona, approximately 15 miles south of Sierra Vista, Arizona | |

**CBP Proposed Border Barrier Projects (November 5, 2024)**

| No. | Project Name | Project Length | Project Coordinates | Location | Project Information |
|---|---|---|---|---|---|
| 11 | RGV Gates Project | 900 feet (multiple locations) | Start: 25.85898, -97.417407<br><br>End: 26.06647, -98.054335 | Hidalgo and Cameron Counties, Texas | Installation of 9 gates varying between 40 and 150 feet in length to close gaps in existing barrier. |
| 12 | RGV-02 Gaps Project | 3.5 miles (multiple locations) | Start: 26.06433108, -97.90337011<br><br>End: 26.0762564, -98.12197911 | Hidalgo and Cameron Counties, Texas | These projects will close gaps in the existing barrier in the Rio Grande Valley that are funnel points for traffic and pose hazards to migrants and Border Patrol Agents. |
| 13 | RGV-03 Gaps Project | 1.7 miles (multiple locations) | Start: 26.17552748, -98.36878746<br><br>End: 26.18841051, -98.3975498 | | |
| 14 | RGV-04 Gaps Project | 3.8 miles (multiple locations) | Start: 26.08213533, -98.16480248<br><br>End: 26.16818071, -98.33416786 | | |
| 15 | RGV-10 Gaps Project | 16.9 miles (multiple locations) | Start: 26.07162969, -97.89038621<br><br>End: 25.8897, -97.47114 | | |

# Exhibit E

**Subject:** Re: Border Wall (N.D. Cal.) - Follow Up Items
**Date:** Wednesday, November 13, 2024 at 1:29:52 PM Central Standard Time
**From:** Warden, Andrew (CIV)
**To:** Erick Meza
**CC:** Mike Cayaban, Ricky Garza, Lilian Serrano, AndreaGuerrero, Gloria Smith, David Donatti, Janelle Smith, William Grantham, James Richardson, My Khanh Ngo - she/her/hers, Cecillia Wang, Annie Mason, James Zahradka

> **Caution:** This is an external email and has a suspicious subject or content. Please take care when clicking links or opening attachments. When in doubt, contact your IT Department
>
> CAUTION: This message is from an external sender. Please be cautious of links & attachments.

Erick:

Following up on your question below about the timing for the proposed projects, based on current estimates, CBP anticipates construction would begin no earlier than September 2025.

Best,
Andrew

Andrew I. Warden
U.S. Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 616-5084

---

**From:** Erick Meza <erick.meza@sierraclub.org>
**Sent:** Tuesday, November 05, 2024 1:27 PM
**To:** Warden, Andrew (CIV) <Andrew.Warden@usdoj.gov>
**Cc:** Mike Cayaban <Mike.Cayaban@doj.ca.gov>; Ricky Garza <ricky@alliancesd.org>; Lilian Serrano <lilian@alliancesd.org>; AndreaGuerrero <andrea@alliancesd.org>; Gloria Smith <gloria.smith@sierraclub.org>; David Donatti <DDonatti@aclutx.org>; Janelle Smith <Janelle.Smith@doj.ca.gov>; William Grantham <wgrantham@nmag.gov>; James Richardson <James.Richardson@doj.ca.gov>; My Khanh Ngo - she/her/hers <MNgo@aclu.org>; Cecillia Wang <Cwang@aclu.org>; Annie Mason <AMason@aclu.org>; James Zahradka <James.Zahradka@doj.ca.gov>
**Subject:** [EXTERNAL] Re: Re: Border Wall (N.D. Cal.) - Follow Up Items

Thanks so much for this information.

I was wondering if we could get a timeline on the development of these projects.

Erick Meza
Sierra Club Borderlands Coordinator
Pronouns: He, him, el
Phone (520) 403 43 25



erick.meza@sierraclub.org
@de_cierto_sonora

Based out of Tucson Arizona, *Ancestral and occupied lands of the Tohono O'odham,
Pascua Yaqui and many other tribes who may call this place home*

On Tue, Nov 5, 2024 at 8:18 AM Warden, Andrew (CIV) <Andrew.Warden@usdoj.gov> wrote:

> In response to the request for more precise location information about the proposed projects, attached
> is an updated chart that includes start and stop GPS coordinates for each project.
>
> Thanks,
> Andrew
>
>
> Andrew I. Warden
> U.S. Department of Justice
> Civil Division, Federal Programs Branch
> Tel: (202) 616-5084
>
> ---
>
> **From:** Warden, Andrew (CIV)
> **Sent:** Tuesday, October 29, 2024 3:08 PM
> **To:** 'Erick Meza' <erick.meza@sierraclub.org>
> **Cc:** Mike Cayaban <Mike.Cayaban@doj.ca.gov>; Ricky Garza <ricky@alliancesd.org>; Lilian Serrano
> <lilian@alliancesd.org>; AndreaGuerrero <andrea@alliancesd.org>; Gloria Smith
> <gloria.smith@sierraclub.org>; David Donatti <DDonatti@aclutx.org>; Janelle Smith
> <Janelle.Smith@doj.ca.gov>; William Grantham <wgrantham@nmag.gov>; James Richardson
> <James.Richardson@doj.ca.gov>; My Khanh Ngo - she/her/hers <MNgo@aclu.org>; Cecillia Wang
> <Cwang@aclu.org>; Annie Mason <AMason@aclu.org>; James Zahradka
> <James.Zahradka@doj.ca.gov>
> **Subject:** Re: Border Wall (N.D. Cal.) - Follow Up Items
>
> Erick:
>
> Yes, you may share my response and the list of projects outside this group.
>
> Best,
> Andrew
>
> Andrew I. Warden
> U.S. Department of Justice
> Civil Division, Federal Programs Branch
> Tel: (202) 616-5084
>
> ---
>
> **From:** Erick Meza <erick.meza@sierraclub.org>
> **Sent:** Monday, October 28, 2024 2:55 PM

**To:** Warden, Andrew (CIV) <Andrew.Warden@usdoj.gov>
**Cc:** Mike Cayaban <Mike.Cayaban@doj.ca.gov>; Ricky Garza <ricky@alliancesd.org>; Lilian Serrano <lilian@alliancesd.org>; AndreaGuerrero <andrea@alliancesd.org>; Gloria Smith <gloria.smith@sierraclub.org>; David Donatti <DDonatti@aclutx.org>; Janelle Smith <Janelle.Smith@doj.ca.gov>; William Grantham <wgrantham@nmag.gov>; James Richardson <James.Richardson@doj.ca.gov>; My Khanh Ngo - she/her/hers <MNgo@aclu.org>; Cecillia Wang <Cwang@aclu.org>; Annie Mason <AMason@aclu.org>; James Zahradka <James.Zahradka@doj.ca.gov>
**Subject:** [EXTERNAL] Re: Re: Border Wall (N.D. Cal.) - Follow Up Items

Hi Andrew, I was wondering if this is shareable information that I could share outside of this group? thanks



**Erick Meza**
**Sierra Club Borderlands Coordinator**
**Pronouns: He, him, el**
**Phone (520) 403 43 25**
erick.meza@sierraclub.org
@de_cierto_sonora

Based out of Tucson Arizona, *Ancestral and occupied lands of the Tohono O'odham, Pascua Yaqui and many other tribes who may call this place home*

On Fri, Oct 25, 2024 at 1:39 PM Warden, Andrew (CIV) <Andrew.Warden@usdoj.gov> wrote:

Mike & Erick:

I'll confer with CBP to see if we can provide more detailed location information about the projects.

Best regards,
Andrew

Andrew I. Warden
U.S. Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 616-5084

**From:** Erick Meza <erick.meza@sierraclub.org>
**Sent:** Friday, October 25, 2024 3:57 PM
**To:** Mike Cayaban <Mike.Cayaban@doj.ca.gov>
**Cc:** Warden, Andrew (CIV) <Andrew.Warden@usdoj.gov>; Ricky Garza <ricky@alliancesd.org>; Lilian Serrano <lilian@alliancesd.org>; AndreaGuerrero <andrea@alliancesd.org>; Gloria Smith <gloria.smith@sierraclub.org>; David Donatti <DDonatti@aclutx.org>; Janelle Smith <Janelle.Smith@doj.ca.gov>; William Grantham <wgrantham@nmag.gov>; James Richardson <James.Richardson@doj.ca.gov>; My Khanh Ngo - she/her/hers <MNgo@aclu.org>; Cecillia Wang <Cwang@aclu.org>; Annie Mason <AMason@aclu.org>; James Zahradka <James.Zahradka@doj.ca.gov>
**Subject:** [EXTERNAL] Re: Border Wall (N.D. Cal.) - Follow Up Items

Thanks Andrew for your email and information of upcoming closures of "gaps' on the border.

I agree with Mike, that it will be very useful to have coordinates as some of these projects are hard to understand.

For example near California Gulch there is a gap in the Pajarito Mountains that is close to 9 miles long and the project describes the closure of only 2.6 mile gap.

Same with the .2 mile gap described 10 miles east of Nogales, that is where a large section that remains unwalled in the Patagonia Mountains starts.

Thanks in advance for the clarification.



**Erick Meza**
**Sierra Club Borderlands Coordinator**
**Pronouns: He, him, el**
**Phone (520) 403 43 25**
erick.meza@sierraclub.org
@de_cierto_sonora

Based out of Tucson Arizona, *Ancestral and occupied lands of the Tohono O'odham, Pascua Yaqui and many other tribes who may call this place home*

On Fri, Oct 25, 2024 at 10:30 AM Mike Cayaban <Mike.Cayaban@doj.ca.gov> wrote:

Hello Andrew,

Could you provide us with GPS coordinates for each of the projects described in paragraph 3 (and the attachment)?

Thanks, Mike

**Michael Cayaban**
Supervising Deputy Attorney General
California Office of the Attorney General
Public Rights Division | Natural Resources Law Section
600 West Broadway, Suite 1800, San Diego CA 92101
Office: (619) 738-9313
Cell: (619) 514-7129

**From:** Warden, Andrew (CIV) <Andrew.Warden@usdoj.gov>
**Sent:** Friday, October 25, 2024 10:19 AM
**To:** Erick Meza <erick.meza@sierraclub.org>; Ricky Garza <ricky@alliancesd.org>; Lilian Serrano <lilian@alliancesd.org>; AndreaGuerrero <andrea@alliancesd.org>; Gloria Smith

<gloria.smith@sierraclub.org>; David Donatti <DDonatti@aclutx.org>; Janelle Smith
<Janelle.Smith@doj.ca.gov>; William Grantham <wgrantham@nmag.gov>; Mike Cayaban
<Mike.Cayaban@doj.ca.gov>; James Richardson <James.Richardson@doj.ca.gov>; My Khanh Ngo
- she/her/hers <MNgo@aclu.org>; Cecillia Wang <Cwang@aclu.org>; Annie Mason
<AMason@aclu.org>
**Subject:** Border Wall (N.D. Cal.) - Follow Up Items

> **EXTERNAL EMAIL:** This message was sent from outside DOJ. Please do not click links or open
> attachments that appear suspicious.

Cecillia, Janelle, William, *et al.*,

I am writing to follow up on several items we discussed during our most recent conferral meeting
in September.

1. <u>Status of Large Wildlife Passages.</u>  Before the preliminary injunction in the Texas litigation
   took effect, CBP installed two of the four large wildlife passages called for in paragraph 6 of
   the settlement agreement.  Passages are currently open in the Mule Mountain and Perilla
   Mountain Corridors (sites #2 & #3 on the chart in paragraph 6).   Both sites had existing
   drainage gates that met the height specifications for the large wildlife passages in the
   settlement.  CBP has opened those gates to serve as wildlife passages.  The two
   remaining passages at Cabeza Prieta and Antelope Wells (sites #1 and #4) were not
   installed prior to the injunction.  Those two sites are in § 2808 project areas and the
   environmental planning process for those projects was ongoing at time of the injunction.
   CBP cannot complete installation of the final two passages because of the funding
   limitations imposed by the Texas injunction.

2. <u>Gap Filling Work in § 284 Project Areas.</u>  As discussed in our recent meeting, CBP is
   working to install new barriers in small gaps that were left unfinished at the time
   construction work stopped in the § 284 project areas following the President's border wall
   Proclamation in January 2021.  CBP has not filled, and has no plans to fill, any of the gaps
   specifically identified in the settlement agreement that CBP committed to remain open (¶¶
   10 & 30), subject to the conditions in the agreement.  Prior to the injunction, CBP had
   contracts in place to fund a broad scope of remediation and mitigation activities in the §
   284 areas with the FY20 and FY21 barrier system appropriations.  To comply with the
   injunction, CBP was required to take various contracting actions to descope components of
   the remediation and mitigation work that was inconsistent with the injunction.  CBP
   continued to fund gap filling work in § 284 project areas as consistent with the limitations
   imposed by the injunction.  CBP has one remaining gap to fill in the § 284 project areas.
   The 2.7 mile gap is located in an area known as California Gulch, located approximately
   11.35 miles west of Nogales Mariposa POE in Nogales, AZ.  CBP estimates that
   construction work will be completed in early November 2024.

3. <u>Gap Filling Work in § 2808 Project Areas & Other New Barrier Projects.</u>  After entry of the

Texas injunction, CBP initiated a planning process to identify new border barrier construction projects to fund with the FY20 and FY21 barrier system appropriations consistent with the terms of the injunction. CBP has identified 19 projects, totaling approximately 40 linear miles, in California, Arizona, New Mexico, and Texas. Many of the projects would fill gaps that remain open following termination of the § 2808 projects undertaken by the Department of Defense. A chart with information about each project, including geographic locations and total mileage is attached. None of the proposed projects would fill gaps specifically identified in the settlement agreement that CBP agreed would remain open (¶¶ 10 & 30), subject to the conditions in the agreement. Planning for the projects remains ongoing and subject to change. As things currently stand, the Texas injunction prohibits CBP from expending any FY20 and FY21 barrier system appropriations on drainage and erosion features in the new barriers. Given the challenging terrain and anticipated weather events at some of the proposed project locations, CBP may not be able to proceed with barrier construction without appropriate drainage and erosion features. CBP estimates that construction of these projects would begin no earlier than September 2025.

**

The federal defendants want to maintain the settlement agreement, but we must do so within the currently appropriations limitations on DHS's funds. Although we can no longer spend the enjoined FY20 and FY21 barrier system funds on remediation and mitigation projects, we are open to discussing alternative commitments that would not require exceeding the limitations on the use of the enjoined funds. If you have suggestions of cost-free or prohibitory commitments that plaintiffs would consider sufficient to keep the settlement agreement in place, we would welcome discussing those ideas with you. We look forward to your response.

Best regards,
Andrew

Andrew I. Warden
U.S. Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 616-5084

CONFIDENTIALITY NOTICE: This communication with its contents may contain confidential and/or legally privileged information. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

# Exhibit F

Sunday, August 17, 2025 at 12:01:40 PM Central Daylight Time

| | |
|---|---|
| **Subject:** | Re: Sierra Club and SBCC meet/confer |
| **Date:** | Friday, January 17, 2025 at 8:04:09 PM Central Standard Time |
| **From:** | Cecillia Wang |
| **To:** | Warden, Andrew (CIV), Ricky Garza, ENRIQUEZ, PAUL, Lilian Serrano, Gloria Smith, David Donatti, Janelle Smith, William Grantham, Mike Cayaban, James Richardson, My Khanh Ngo - she/her/hers, ROBERTS, AMANDA M (CTR), albert.l.johns@associates.cbp.dhs.gov, ARROYO, VIRGINIA Q (CTR), SHAW, CHRISTOPHER D (OCC), BARNES, MICHELLE L, AndreaGuerrero, Addison Ball - she/her/hers, Erick Meza |
| **Attachments:** | image001.gif, image002.jpg, image003.png |

> **Caution:** This is an external email and has a suspicious subject or content. Please take care when clicking links or opening attachments. When in doubt, contact your IT Department
>
> CAUTION: This message is from an external sender. Please be cautious of links & attachments.

Thank you for the update, Andrew.

**From:** Warden, Andrew (CIV) <Andrew.Warden@usdoj.gov>
**Sent:** Friday, January 17, 2025 2:17 PM
**To:** Cecillia Wang <Cwang@aclu.org>; Ricky Garza <ricky@alliancesd.org>; ENRIQUEZ, PAUL <paul.enriquez@cbp.dhs.gov>; Lilian Serrano <lilian@alliancesd.org>; Gloria Smith <gloria.smith@sierraclub.org>; David Donatti <DDonatti@aclutx.org>; Janelle Smith <Janelle.Smith@doj.ca.gov>; William Grantham <wgrantham@nmag.gov>; Mike Cayaban <Mike.Cayaban@doj.ca.gov>; James Richardson <James.Richardson@doj.ca.gov>; My Khanh Ngo - she/her/hers <MNgo@aclu.org>; ROBERTS, AMANDA M (CTR) <amanda.m.roberts@associates.cbp.dhs.gov>; albert.l.johns@associates.cbp.dhs.gov <ALBERT.L.JOHNS@associates.cbp.dhs.gov>; ARROYO, VIRGINIA Q (CTR) <VIRGINIA.S.QUIAMBAO@associates.cbp.dhs.gov>; SHAW, CHRISTOPHER D (OCC) <CHRISTOPHER.D.SHAW@cbp.dhs.gov>; BARNES, MICHELLE L <MICHELLE.L.BARNES@cbp.dhs.gov>; AndreaGuerrero <andrea@alliancesd.org>; Addison Ball - she/her/hers <aball@aclu.org>; Erick Meza <erick.meza@sierraclub.org>
**Subject:** RE: Sierra Club and SBCC meet/confer

Cecillia:

We are still considering your request to amend the settlement agreement. I wanted to let you know that our internal process will not be completed before the change of Presidential administration on Monday. We'll need to raise the matter with new leadership at the various agencies involved in the cases once new folks come on board. I expect that process may take some time and wanted to keep the group updated of where things stand on our end.

Thanks,
Andrew

Andrew I. Warden
U.S. Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 616-5084

1 of 3

**From:** Warden, Andrew (CIV)
**Sent:** Thursday, January 09, 2025 4:30 PM
**To:** Cecilia Wang <Cwang@aclu.org>; Ricky Garza <ricky@alliancesd.org>; ENRIQUEZ, PAUL <paul.enriquez@cbp.dhs.gov>; Lilian Serrano <lilian@alliancesd.org>; Gloria Smith <gloria.smith@sierraclub.org>; David Donatti <DDonatti@aclutx.org>; Janelle Smith <Janelle.Smith@doj.ca.gov>; William Grantham <wgrantham@nmag.gov>; Mike Cayaban <Mike.Cayaban@doj.ca.gov>; James Richardson <James.Richardson@doj.ca.gov>; My Khanh Ngo - she/her/hers <MNgo@aclu.org>; ROBERTS, AMANDA M (CTR) <amanda.m.roberts@associates.cbp.dhs.gov>; albert.l.johns@associates.cbp.dhs.gov; ARROYO, VIRGINIA Q (CTR) <VIRGINIA.S.QUIAMBAO@associates.cbp.dhs.gov>; SHAW, CHRISTOPHER D (OCC) <CHRISTOPHER.D.SHAW@cbp.dhs.gov>; BARNES, MICHELLE L <MICHELLE.L.BARNES@cbp.dhs.gov>; AndreaGuerrero <andrea@alliancesd.org>; Addison Ball - she/her/hers <aball@aclu.org>; Erick Meza <erick.meza@sierraclub.org>
**Subject:** RE: Sierra Club and SBCC meet/confer

Cecillia:

Thanks for sending this proposal.  We appreciate your team formalizing the ideas we discussed into a settlement proposal.  We'll discuss here and get back to you.

Thanks,
Andrew

Andrew I. Warden
U.S. Department of Justice
Civil Division, Federal Programs Branch
Tel: (202) 616-5084

**From:** Cecilia Wang <Cwang@aclu.org>
**Sent:** Wednesday, January 08, 2025 2:28 PM
**To:** Warden, Andrew (CIV) <Andrew.Warden@usdoj.gov>; Ricky Garza <ricky@alliancesd.org>; ENRIQUEZ, PAUL <paul.enriquez@cbp.dhs.gov>; Lilian Serrano <lilian@alliancesd.org>; Gloria Smith <gloria.smith@sierraclub.org>; David Donatti <DDonatti@aclutx.org>; Janelle Smith <Janelle.Smith@doj.ca.gov>; William Grantham <wgrantham@nmag.gov>; Mike Cayaban <Mike.Cayaban@doj.ca.gov>; James Richardson <James.Richardson@doj.ca.gov>; My Khanh Ngo - she/her/hers <MNgo@aclu.org>; ROBERTS, AMANDA M (CTR) <amanda.m.roberts@associates.cbp.dhs.gov>; albert.l.johns@associates.cbp.dhs.gov; ARROYO, VIRGINIA Q (CTR) <VIRGINIA.S.QUIAMBAO@associates.cbp.dhs.gov>; SHAW, CHRISTOPHER D (OCC) <CHRISTOPHER.D.SHAW@cbp.dhs.gov>; BARNES, MICHELLE L <MICHELLE.L.BARNES@cbp.dhs.gov>; AndreaGuerrero <andrea@alliancesd.org>; Addison Ball - she/her/hers <aball@aclu.org>; Erick Meza <erick.meza@sierraclub.org>
**Subject:** [EXTERNAL] Sierra Club and SBCC meet/confer

Dear Andrew,

We write to follow up on our last meet-and-confer on December 19.

First, after further deliberation, we would prefer to address the possibility of private funding for wildlife passages through a separate channel and not through this ongoing consultation

and meet/confer process. Such funding would not be offered by any of the parties or counsel in this case, but by private individuals, so it does not make sense for us to proceed with this idea in this context.

Second, during the December 19 meeting, we proposed four specific locations (attached here) where additional existing stormwater gates could be opened, to offset the impacts of the government's decision not to install large wildlife passages at four other locations as provided in Paragraphs 6-7 of the settlement agreement. Is the government amenable to doing so?

If so, then we would propose to all parties that the following terms to be memorialized in an addendum to the settlement agreement:

· Rescind paragraphs 6 and 7 of the existing settlement agreement.
· Amend paragraph 8 to add the four new locations for existing gates to be opened.
· Amend paragraphs 9(d) and (e) to extend the initial period during which gates will be open full-time to two years from the date of the addendum. This would account for the loss of the large mammal passages and for the long periods during which the gates in existing paragraph 8 have been closed pursuant to the government's invocation of paragraph 9(a).

We look forward to hearing from you all.

**Cecillia D. Wang**
Pronouns: she, her, hers
National Legal Director
American Civil Liberties Union Foundation
425 California Street, Suite 700
San Francisco, CA 94104
415.343.0775 | cwang@aclu.org
aclu.org



*This message may contain information that is confidential or legally privileged. If you are not the intended recipient, please immediately advise the sender by reply email that this message has been inadvertently transmitted to you and delete this email from your system.*

Exhibit G

# United States Court of Appeals for the Fifth Circuit

———————————

No. 24-40447

———————————

United States Court of Appeals
Fifth Circuit

**FILED**

May 15, 2025

Lyle W. Cayce
Clerk

THE GENERAL LAND OFFICE OF THE STATE OF TEXAS; DAWN
BUCKINGHAM, *Commissioner, Medical Doctor*,

*Plaintiffs—Appellees*,

*versus*

DONALD J. TRUMP, *in his official capacity as President of the United States
of America*; UNITED STATES DEPARTMENT OF HOMELAND
SECURITY; KRISTI NOEM SECRETARY, *U.S. Department of Homeland
Security*; UNITED STATES OF AMERICA; TROY A. MILLER, *in his
official capacity as Acting Commissioner of the United States Customs and
Border Protection*; UNITED STATES CUSTOMS AND BORDER
PROTECTION,

*Defendants—Appellees*,

*versus*

RANDY KINDER EXCAVATING, INCORPORATED, *doing business as*
RKE CONTRACTORS; POSILLICO CIVIL, INCORPORATED,
COASTAL ENVIRONMENTAL GROUP, INCORPORATED; TEXAS
STERLING CONSTRUCTION COMPANY; SIERRA CLUB;
SOUTHERN BORDER COMMUNITIES COALITION,

*Movants—Appellants*,

———————————————————————

STATE OF MISSOURI; STATE OF TEXAS,

*Plaintiffs—Appellees*,

*versus*

DONALD J. TRUMP, *in his official capacity as President of the United States of America*; UNITED STATES DEPARTMENT OF HOMELAND SECURITY; KRISTI NOEM SECRETARY, *U.S. Department of Homeland Security*; UNITED STATES OF AMERICA; TROY A. MILLER, *in his official capacity as Acting Commissioner of the United States Customs and Border Protection*; UNITED STATES CUSTOMS AND BORDER PROTECTION,

*Plaintiffs- Appellees*,

*versus*

RANDY KINDER EXCAVATING, INCORPORATED, *doing business as* RKE CONTRACTORS; POSILLICO CIVIL, INCORPORATED, COASTAL ENVIRONMENTAL GROUP, INCORPORATED; TEXAS STERLING CONSTRUCTION COMPANY; SIERRA CLUB; SOUTHERN BORDER COMMUNITIES COALITION,

*Movants- Appellants*.

---

Appeal from the United States District Court
for the Southern District of Texas
USDC Nos. 7:21-CV-272, 7:21-CV-420

---

Before KING, HO, and RAMIREZ, *Circuit Judges*.

PER CURIAM:[*]

After lengthy litigation between the federal government and various state governments and agencies, the district court entered a preliminary

---

[*] This opinion is not designated for publication. *See* 5TH CIR. R. 47.5.

2

injunction that prohibited the federal government from spending certain Department of Homeland Security appropriations on anything other than new border wall construction. The federal government then alerted several border wall contractors and environmental groups that it could no longer fulfill contracts with them because of the injunction. After the federal government declined to appeal the injunction, the border wall contractors and environmental groups moved to intervene. The district court denied those motions, finding that they were untimely, and that denial would not impair the would-be intervenors' ability to protect their interests. We REVERSE.

## I. Background

Beginning in 2019, Congress provided a combined $2.75 billion in funding "for the construction of [a] barrier system along the southwest border" in the annual appropriations acts of the Department of Homeland Security ("DHS") for fiscal years 2020 and 2021 and gave the agency five years to obligate the funds. *See* Consolidated Appropriations Act, 2020, Pub. L. No. 116-93, § 209, 133 Stat. 2317, 2511 (2019); Consolidated Appropriations Act, 2021, Pub. L. No. 116-260, § 210, 134 Stat. 1182, 1456–57 (2020). Prior to these appropriations, the first Trump administration had sought alternative sources of funding to build segments of a border wall, resulting in lengthy, separate litigation.

After a change in administrations, then-President Biden issued a proclamation on January 20, 2021, regarding the government's border wall policy. Pursuant to this proclamation, on June 9, 2021, DHS announced new priorities for its barrier system funding, focusing on remediation of existing barriers, environmental mitigation and remediation, and current barrier efficacy.

In the underlying case, Plaintiff-Appellee the General Land Office ("GLO") of Texas first sued Defendants-Appellees Joseph Biden, Alejandro Mayorkas, and DHS on July 13, 2021, to enjoin then-President Biden's proclamation as a violation of the Separation of Powers, Spending, Take Care, and Presentment Clauses of the United States Constitution. On October 21, 2021, the states of Texas and Missouri filed a similar suit against Biden, Mayorkas, DHS, Troy Miller, and United States Customs and Border Protection ("CBP") because of the President's "refusal to spend funds appropriated by Congress." On November 29, 2021, the district court ordered these two cases consolidated. As a result, the case now involved Plaintiff-Appellees GLO, Texas, and Missouri (collectively, "the states") and Defendant-Appellees Biden, DHS, Mayorkas, Miller, and CBP (collectively, "the federal government").

Three years of litigation followed, including two appeals to the Fifth Circuit. *See General Land Office v. Biden*, No. 22-40110, 2022 WL 3010699 (5th Cir. July 29, 2022) (per curiam); *General Land Office v. Biden*, 71 F.4th 264, 268 (5th Cir. 2023). The district court initially dismissed some of the states' claims on claims-splitting and standing grounds, but in June 2023, this court reversed the dismissal and remanded for "expeditious[]" consideration of the states' motion for a preliminary injunction. *See General Land Office*, 71 F.4th at 268. This court further noted that the appropriations at issue were set to expire in September 2024 and September 2025 respectively, the nature of the border wall construction is time intensive and time sensitive, and that "[t]o the extent the facts have vindicated the States' position, significant delay will exacerbate their costs." *Id.* at 275.

On remand, the parties filed a combined seven supplemental briefs between August 18 and December 19, 2023. Throughout these briefs, the parties maintained their adversarial positions.

No. 24-40447

On March 8, 2024, the district court issued a preliminary injunction enjoining the federal government from spending DHS FY 20 and 21 funds allocated under Appropriations Act Subsection 209(a)(1) for "mitigation and remediation efforts, repair of existing barrier . . . or other similar purposes." Instead, such funds could be spent only on "new wall construction." The district court then stayed the order for seven days to allow the federal government "to seek relief at the appellate level." On March 14, 2024, the federal government asked the district court for an additional one-week stay "to assess the necessary actions . . . to comply with the Court's order and to take appropriate steps to implement those actions to align . . . with the requirements of the Court's order." Then, on March 22, 2024, the government moved for clarification as to "the scope of the preliminary injunction as to five categories of costs." At the clarification hearing on March 28, 2024, the district court rendered its decision from the bench, ruling that the injunction prohibited use of funding for replacement of existing barrier, allowed only construction of new barrier, and emphasized that because of "the tight timeframe" imposed by the expiration of the funds, there was a need to move to judgment "as quickly as possible."

After the clarification hearing, the federal government interpreted the injunction "to preclude [federal agencies] from using DHS FY 2020/21 funds to pay" the federal agencies' labor costs necessary to administer a variety of contracts. Federal agencies sent letters on March 28 informing impacted parties of that interpretation.

After receiving such letters, three border wall contractors—Movant Appellants Southern Border Constructors ("SBC"), Randy Kinder Excavating, Inc., ("RKE"), and Texas Sterling Construction, Co. ("TSC") (collectively, "the Border Wall Contractors" ("BWCs"))—moved to intervene. Both SBC and RKE had contracts from 2019 for barrier construction work that the government terminated in 2021 following

President Biden's Proclamation. Although the appropriations bills at issue here provided no funding for these terminated contracts, DHS had been using the FY 21 appropriations funding to pay for its in-house labor costs to process and complete the contract termination claims. In 2022, DHS awarded TSC part of a federal contract to remove old legacy fencing and install replacement gates. As a result of the preliminary injunction, DHS ordered TSC to immediately suspend all work and informed it that "invoices cannot be processed for payment for suspended work."

After receiving a similar letter, Movant Appellants Sierra Club and Southern Border Communities Coalition (collectively, "the Sierra Club Intervenors" ("SCIs")) moved to intervene on April 19. As a result of the prior litigation[1] stemming from the Trump administration's search for alternative construction funds, the Sierra Club (along with eighteen states) had entered into a settlement agreement with the federal government that required the government to allocate $45 million from the DHS FY 2020 and 2021 funds for projects to mitigate environmental and ecological damage from certain border wall construction. As part of the settlement agreement, the federal government agreed to "take all reasonable steps to ensure that such funds remain available to comply with this Agreement." However, after the district court issued its preliminary injunction here, the federal government informed the SCIs that the injunction forced it to stop mitigation projects required under the settlement agreement.

Meanwhile, the federal government and the states conferred and agreed not to appeal the preliminary judgment. On April 5, 2024, the states filed an unopposed motion in the Fifth Circuit stating that "neither party

---

[1] *Sierra Club v. Biden*, No. 19-cv-892-HSG (N.D. Cal. compl. filed Feb. 19, 2019), and *Sierra Club v. Biden*, No. 20-cv1494-HSG (N.D. Cal. compl. filed Feb. 28, 2020).

intends to appeal the order in this preliminary posture," and that "[t]he parties have instead agreed to pursue final judgment in the district court." On April 10, the federal government and the states jointly moved for entry of final judgment and a permanent injunction in district court.

On May 29, 2024, the district court denied both the BWCs' and SCIs' motions for intervention as of right and permissive intervention. The same day, the district court entered final judgment and a permanent injunction. The BWCs and SCIs now appeal the denial of intervention.

## II. Standard of Review

"A ruling denying intervention of right is reviewed *de novo.*" *Edwards v. City of Houston*, 78 F.3d 983, 995 (5th Cir. 1996). However, "if a district court denies a motion to intervene because it was untimely and explains its reasoning . . . we review that decision for abuse of discretion." *Rotstain v. Mendez*, 986 F.3d 931, 936 (5th Cir. 2021).

## III. Discussion

Intervention of right is governed by Federal Rule of Civil Procedure 24(a). *Texas v. United States*, 805 F.3d 653, 657 (5th Cir. 2015). If the party seeking intervention has not been given an unconditional right to do so by federal statute, it must meet four requirements set out by Rule 24(a)(2):

> (1) the application for intervention must be timely; (2) the applicant must have an interest relating to the property or transaction which is the subject of the action; (3) the applicant must be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest; (4) the applicant's interest must be inadequately represented by the existing parties to the suit.

*Id.* (quoting *New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co.*, 732 F.2d 452, 463 (5th Cir.1984)). "Failure to satisfy any one requirement precludes

intervention of right." *Haspel & Davis Milling & Planting Co. v. Bd. of Levee Comm's of the Orleans Levee Dist.*, 493 F.3d 570, 578 (5th Cir. 2007). However, "[t]he rule 'is to be liberally construed,' with 'doubts resolved in favor of the proposed intervenor.'" *Entergy Gulf States Louisiana, L.L.C. v. U.S. E.P.A.*, 817 F.3d 198, 203 (5th Cir. 2016) (quoting *In re Lease Oil Antitrust Litig.*, 570 F.3d 244, 248 (5th Cir.2009)).

Here, the district court denied the BWCs' and SCIs' motions for intervention for being untimely under requirement one and for failing to demonstrate that denial would impair or impede the would-be intervenors' ability to protect their interests under requirement three.[2] On appeal, the states also argue that neither the BWCs nor SCIs have an interest in the litigation under requirement two.[3]

## A. Timeliness

When assessing the first requirement—timeliness—courts conduct a "contextual" analysis where "absolute measures of timeliness should be ignored." *Sierra Club v. Espy*, 18 F.3d 1202, 1205 (5th Cir. 1994). Instead, courts consider the four *Stallworth*[4] factors:

---

[2] No party argues that the would-be intervenors currently fail to meet 24(a)(2)'s fourth requirement—inadequate representation by the current parties.

[3] The states also argue that both groups of would-be intervenors failed to satisfy the formalities required under Federal Rule of Civil Procedure 24(c). Although the states argued this point thoroughly in their opposition to the motions to intervene, on appeal they relegated the position to a single footnote while still asserting that the failure to comply provided another basis to affirm denial of intervention. The states inadequately briefed, and therefore forfeited, this argument. *Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021); *see also United States v. Restrepo*, 986 F.2d 1462, 1463 (2d Cir. 1993) ("We do not consider an argument mentioned only in a footnote to be adequately raised or preserved for appellate review.").

[4] *Stallworth v. Monsanto Co.*, 558 F.2d 257 (5th Cir. 1977).

> (1) The length of time during which the would-be intervenor actually knew or reasonably should have known of its interest in the case before it petitioned for leave to intervene; (2) the extent of the prejudice that the existing parties to the litigation may suffer as a result of the would-be intervenor's failure to apply for intervention as soon as it knew or reasonably should have known of its interest in the case; (3) the extent of the prejudice that the would-be intervenor may suffer if intervention is denied; and (4) the existence of unusual circumstances militating either for or against a determination that the application is timely.

*Id.* Here, the district court found that "the second, third, and fourth considerations weigh heavily in favor of finding that the motions to intervene are untimely." The would-be intervenors argue the district court erred in assessing each factor.

### 1. Length of delay

"Determining the length of delay requires identifying the starting point." *Rotstain*, 986 F.3d at 937. "Courts should discourage premature intervention [because it] wastes judicial resources." *Espy*, 18 F.3d at 1206. Therefore, the relevant date for assessing timeliness under the first factor is not "the date on which the would-be intervenor became aware of the pendency of the action," but instead when a would-be intervenor "became aware that its interests would no longer be protected by the original parties." *Id.* That is because a "nonparty movant's awareness of a case's existence says little about whether their interests are protected," and therefore a "court must also look to the actions of the litigants." *United States ex rel Hernandez v. Team Fin., L.L.C.*, 80 F.4th 571, 578 (5th Cir. 2023). However, a would-be intervenor need not know that its interests *will* be adversely affected, but merely that the existing parties no longer protect those interests. *Sommers v. Bank of Am., N.A.*, 835 F.3d 509, 513 (5th Cir. 2016).

Here, the district court made no explicit finding about when either the BWCs or SCIs knew that the original parties no longer protected their interests, instead stating that the motions to intervene "should have been filed closer to the inception of this case when the motion to dismiss—which clearly identified the disputed issues in this action—was filed, briefed, and appealed." But "the need for intervention is not immediately apparent at the onset of litigation." *Team Fin., L.L.C.*, 80 F.4th at 578. And although the motion to dismiss, filed by the federal government on October 18, 2021, clearly identified the key issues in the action, it also demonstrated that the federal government actively protected both the BWCs' and SCIs' interests.

The district court, the states, and the federal government all stress the long-running nature of the underlying litigation. Even assuming the BWCs and SCIs had long been aware of the ongoing litigation, it does not follow that they should have long been aware that the federal government would not represent their interests.[5] *Cf. Cameron v. EMW Women's Surgical Ctr., P.S.C.*, 595 U.S. 267, 280 (2022) (finding length of litigation was not dispositive because the "attorney general's need to seek intervention did not arise until the secretary ceased defending the state law, and the timeliness of his motion should be assessed in relation to that point in time"). Instead, to start the timeliness clock, "a court would need to observe that the parties were complacent or non-adversarial as to not protect the interests of potential intervenors." *Team Fin., L.L.C.*, 80 F.4th at 578–79. That the district court

---

[5] The states also argue that the BWCs *never* had "reason to believe the federal government would protect contractual and financial rights it holds adverse to the government," because they "solely seek to collect money from the federal government." But as the BWCs respond, because the federal government had the contractual right to terminate those contracts for any reason so long as it then negotiated with the BWCs and paid for work done, it was not until the federal government ceased negotiation and payment because of the preliminary injunction that the BWCs' breach of contract claims arose.

here made no such observation further suggests it wrongly anchored its analysis.

The states and federal government suggest alternate dates on which the intervention clock began to run. The states suggest June 16, 2023, when the Fifth Circuit issued its prior opinion instructing the district court to address the question of injunctive relief expeditiously.[6] The federal government both suggests that the would-be intervenors had reason to know "far earlier" about the potential impact to their interests, but also that the intervention motions were untimely even with a start date of March 6, 2024, when the district court issued the preliminary injunction. Yet when the injunction was issued, it was still unclear that the federal government no longer protected the would-be intervenors' interests. Indeed, in a March 14, 2024, request for an extension of the stay of the preliminary injunction, the federal government still "disagree[d] with the Court's conclusion that entry of a preliminary injunction was warranted in this case," and was "working diligently to assess the full range of contracting and fiscal actions required to comply with the requirements of the Court's order." Plainly, the federal government was unclear about the impacts of the court's injunction, and took no action to suggest it was abandoning its defense of any specific interests. As late as the March 28 clarifying conference, the states and federal government still disagreed about key aspects of the scope of the injunction.

Therefore, it was not until the federal government sent letters to the would-be intervenors explaining the impact on their interests that they should have become aware the federal government no longer protected those

---

[6] As the SCIs note, their interest in the suit likely did not even *exist* (let alone cease to be protected) prior to July 2023, when the settlement agreement committed appropriations funds to fulfill contractual commitments.

interests.[7] *See Espy*, 18 F.3d at 1206 (noting it was only when the Forest Service announced "that it would apply the preliminary injunction to all timber sales (not merely the nine sales challenged by the plaintiffs)" that "movants became aware that the Forest Service would not protect their interests"); *Edwards*, 78 F.3d at 1001 (finding intervention timely, despite multi-month delay between various communications and informal meetings between would-be intervenors and parties discussing the ongoing litigation and motion to intervene, because would-be intervenors "had no knowledge of the specific terms of [a] Consent Decree . . . until the office notice ordered by the district court was distributed," and prior communication "indicated no potential infringement on the rights of these nonparties"). And because the parties all moved to intervene within weeks of receiving those letters, their motions were not unduly delayed. *See Nat'l Wildlife Fed'n v. Burford*, 878 F.2d 422, 434 (D.C. Cir. 1989), *rev'd on other grounds sub nom. Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 110 (1990) (holding motion to intervene, filed three years after litigation began, timely because intervenor only learned its interests were directly affected 73 days prior when an agency changed the way it construed its own policy). Thus, the first factor weighs in favor of finding the motions timely.

---

[7] The federal government notes that the would-be intervenors' motions for intervention "argued that the government's failure to raise project-specific arguments was sufficient reason to demonstrate that it was an inadequate representative." As the federal government sees it, because it had *never* sought project-specific carve outs, its failure to do so at the injunction stage was not a "recent development[]" and therefore could not be when the clock started running. *See Save Our Springs All. Inc. v. Babbitt*, 115 F.3d 346, 348 (5th Cir. 1997). But this misses the point—there was no specific need to seek carve outs before because the federal government had previously asserted that *all* its spending under the appropriations bills was proper.

## 2. Prejudice to the original parties

"The second factor is concerned 'only [with] that prejudice which would result from the would-be intervener's failure to request intervention as soon as he knew or reasonably should have known about his [stake] in the action.'" *John Doe No. 1 v. Glickman*, 256 F.3d 371, 378 (5th Cir. 2001) (quoting *Stallworth*, 558 F.2d at 265). "Courts should ignore the likelihood that intervention may interfere with orderly judicial processes." *Id.* And "[p]rejudice must be measured by the delay in seeking intervention, not the inconvenience to the existing parties of allowing the intervenor to participate in the litigation." *Espy*, 18 F.3d at 1206. Here, the district court agreed with the government that the would-be intervenors "seek to inject a wide range of new fact-specific interests," that would "significantly expand the scope of the issues," amounting to "starting five new lawsuits at a time when the case is on the doorstep of final judgment."

This analysis is flawed. First, without any finding of when the would-be intervenors should have known their interests were no longer protected, it is impossible to correctly identify the prejudice caused by any delay. *See Stallworth*, 558 F.2d at 265. Second, the district court's concerns "are general and speculative and concern inconvenience and not prejudice." *Glickman*, 256 F.3d at 378. Third, at least some of those concerns are misplaced because the would-be intervenors have "no right to relitigate issues already decided." *Espy*, 18 F.3d at 1206 n.3. And further, "no prejudice can come from renewed discovery or pretrial proceedings, because an intervenor must accept the proceedings as he finds them." *Id.* (internal quotations and citations omitted). Therefore, "it is difficult to understand

how either [of the parties] could have been harmed by what was at most less than thirty days 'delay.'" *Stallworth*, 558 F.2d at 267.[8]

Ultimately, the failure to tether the second factor analysis to the dates on which the would-be intervenors became aware their interests would no longer be protected, combined with the questionable prejudice that would occur regardless of the proper date, suggest the second factor weighs in favor of finding the motions to intervene timely.

### 3. Prejudice to the would-be intervenors

"The third Stallworth factor 'focuses on the prejudice the potential intervenor would suffer if not allowed to intervene.'" *Ross v. Marshall*, 426 F.3d 745, 756 (5th Cir. 2005) (quoting *Glickman*, 256 F.3d at 378–79). Courts have held that there is no prejudice and therefore "[i]ntervention generally is not appropriate where the applicant can protect its interests and/or recover on its claim through some other means." *Deus v. Allstate Ins. Co.*, 15 F.3d 506, 526 (5th Cir. 1994). But a would-be intervenor may still be prejudiced where the resolution of the current case could limit the relief available in separate future litigation. *See Glickman*, 256 F.3d at 379.[9] Here, the district

---

[8] Further, "whether the request for intervention came before or after the entry of judgment [is] of limited significance." *Stallworth*, 558 F.2d at 226; *see also Ross v. Marshall*, 426 F.3d 745, 755 (5th Cir. 2005) ("A common example of post-judgment intervention that satisfies these criteria is intervention for the purpose of appealing a decision that the existing parties to a suit have decided not to pursue.").

[9] *Compare Deus*, 15 F.3d at 525-26 (no prejudice to would-be intervenor who had no rights or claims for district court to adjudicate, but sought access to documents subject to protection order where already litigating against party in other federal court and therefore could protect interest by filing discovery request in other case); *and St. Bernard Parish v. Lafarge North America, Inc.*, 914 F.3d 969, 975 (5th Cir. 2019) (no prejudice to would-be intervenor who "suggested that he *preferred* not to bring a separate action because it would be difficult to obtain discovery of a confidential settlement agreement" where such discovery is generally available and state-law action for claims remained (emphasis added)); *with Adam Joseph Res. v. CNA Metals Ltd.*, 919 F.3d 856, 865–66 (5th Cir. 2019) (prejudice

court found no prejudice to the would-be intervenors, reasoning that those "who allege that they are financially impacted by how the Government is reacting to the Preliminary Injunction are able to bring separate lawsuits focused on their individual claims."

The district court's analysis failed to assess how "any potential remedy will be restricted" by the injunction. *Ford v. City of Huntsville*, 242 F.3d 235, 240 (5th Cir. 2001). As the SCIs point out, a separate court hearing a separate suit by the SCIs would "either deny any enforcement motion based on [this] injunction or issue an order that, according to the United States, conflicts with [this] injunction." *Cf. Stallworth*, 558 F.3d at 268 ("[I]f a state or federal judge in a separate proceeding decided that the appellants' contentions were meritorious, he would be unable to award them effective relief without generating an injunctive command that would overlap or conflict with the [prior] order."); *Lease Oil Antitrust*, 570 F.3d at 249–50 (finding prejudice where prevailing in alternative litigation would create "conflicting federal and state orders regarding the same property," and thus intervention was the "most efficient, and most certain, way" to pursue claim).

The federal government counters that, notwithstanding the injunction, the BWCs can still seek judicial relief in the Court of Federal Claims under The Contract Disputes Act of 1978 and thus will not be prejudiced. Similarly, the states argue that because the injunctions were limited to funds under Subsection 209(a)(1) and Section 210, the federal

---

where denying intervention would require would-be intervenor to institute new proceeding at substantial cost in a court unfamiliar with dispute with questionable jurisdiction, and raise potential statute of limitations and res judicata defenses); *and Ford v. City of Huntsville*, 242 F.3d 235, 240 (5th Cir. 2001) (prejudice where confidentiality order at issue in instant litigation would limit would-be intervenor's ability to gain access to information under separate suit).

government could honor the settlement agreement with the SCIs through funds authorized by the unaffected Subsections (a)(2) through (a)(5). Both arguments miss the mark.

First, as the BWCs allege, they are currently suffering practical consequences based on the federal government's interpretation of the injunction because one of the contractors "incur[s] tens of thousands of dollars a month storing border wall components." And the injunction forces the BWCs to litigate where they would otherwise have no need to do so. *Cf. Adam Joseph Res. v. CNA Metals Ltd.*, 919 F.3d 856, 867 (5th Cir. 2019).

Second, as to the SCIs, despite the states' argument that other appropriations funds remain available, the injunction "would still restrict what is by far the largest category of funds identified in the Settlement Agreement and the only one the government identified as available for performance." Further, as the federal government has admitted in later, ongoing motions in the case below, "the appropriations in FY20 and FY21 for subsections (2), (4), and (5) have expired and are no longer available to incur new obligations for anything." *See* Case No. 7:21-CV-00272, Dckt. 227 at 25 n.3 (Defendant's Motion to Modify Final Judgment and Permanent Injunction to Facilitate New Border Wall Construction).

### 4. Unusual Circumstances

"The last timeliness factor is '[t]he existence of unusual circumstances militating either for or against a determination that the application is timely.'" *Rotstain*, 986 F.3d at 941 (quoting *Stallworth*, 558 F.2d at 266). The district court found this factor weighed against intervention because "permitting intervention here would encourage late-arriving parties to join litigation over the federal agency actions near the conclusion of litigation after the merits of the case have been decided" and because "injunctions against federal officials charged with carrying out

agency policies will likely have downstream impacts on a diverse collection of people and organizations." The states argue that there are unusual circumstances weighing against timeliness because the Fifth Circuit previously "'urge[d] the district court' to 'act expeditiously' to resolve this matter in light of 'the tide of illegal immigration [that] has been dramatically increasing ever since this case was filed.'" Further, the funds have a limited window in which they can be obligated. Other circuits have approved similar rationales. *See, e.g.*, *Farmland Dairies v. Comm'r of New York State Dep't of Agric. & Markets*, 847 F.2d 1038, 1044 (2d Cir. 1988) (noting potential disruptive effect of intervention on negotiated settlement by state as against public interest).[10]

The would-be intervenors argue multiple factors constitute unusual circumstances. Both groups note that the case implicates existing contracts with the federal government. But impairment of existing contracts alone does not suffice to create unusual circumstances. *See Espy*, 18 F.3d at 1207. The BWCs next argue that the parties' decision "to prematurely (and voluntarily) finalize litigation" may constitute unusual circumstances. The SCIs similarly note that "[t]he federal government went further to commit that it would work to ensure the necessary funds would remain available," and yet the parties then engaged in "unforeseeable coordination to accelerate the matter towards final judgment." Taken together, the would-be intervenors essentially argue that it was sufficiently unusual for the federal government to alter its position so suddenly, so dramatically, and after seeming to give assurances to the SCIs. While at least one circuit has found induced reliance constitutes an unusual circumstance, *see United States v. Alcan Aluminum,*

---

[10] This argument is somewhat undercut by the fact that both parties have returned to the district court with attempts to modify the injunction for other reasons.

No. 24-40447

*Inc.*, 25 F.3d 1174, 1183 (3d Cir. 1994), nothing the would-be intervenors point to rises to this level. Therefore, factor (iv) disfavors timeliness.

### 5. Timeliness Conclusion

Although we review a district court's timeliness analysis for abuse of discretion, the district court's flawed starting date for determining delay and prejudice constituted such an abuse. *See Glickman*, 256 F.3d at 378 (noting this court has "held that [a] trial court abused its discretion when it 'mistakenly used an unspecified time when it supposed that the appellants must have learned of the pendency of the action rather than the time when they knew or should have known of their [stake] in the action as its starting point in assessing whether they acted promptly to protect themselves'" (quoting *Stallworth*, 558 F.2d at 267)). Here, factors (i), (ii), and (iii) all weigh in favor of allowing intervention, while factor (iv) weighs against. Therefore, we find the motions timely.

### B. Interest

"Although there is not any clear definition of the nature of the interest that is required for intervention of right, we previously have interpreted Rule 24(a)(2) to require a direct, substantial, legally protectable interest in the proceedings." *Texas*, 805 F.3d at 657 (cleaned up). "[T]he inquiry turns on whether the intervenor has a stake in the matter that goes beyond a generalized preference that the case come out a certain way." *Id.* Property interests are almost always adequate, but non-property interests also suffice when they are concrete, personalized, and legally protectable. *Id.* at 658. Ultimately, "[t]his focus on the party's interest is 'primarily a practical guide to disposing of lawsuits by involving as many apparently concerned persons as is compatible with efficiency and due process.'" *DeOtte v. State*, 20 F.4th 1055, 1068 (5th Cir. 2021) (quoting *Espy*, 18 F.3d at 1207).

Here, the district court did not address whether the would-be intervenors had an interest in the property at issue. However, on appeal the states argue that neither the SCIs nor BWCs have any interest in the litigation.

First, the states argue that SCI's settlement agreement with the federal government "only gives Sierra Club a mere contingent interest" while "limit[ing] (both temporally and jurisdictionally) where Sierra Club may exercise any of the contingent contractual rights it may have." The states cite to several out-of-circuit decisions to argue that such "contingent interests are insufficient to satisfy Rule 24(a)(2)." While it is true that a series of contingencies may render a would-be intervenor's interest insufficiently direct or substantial, *see, e.g.*, *Standard Heating & Air Conditioning Co. v. City of Minneapolis*, 137 F.3d 567, 571 (8th Cir. 1998), that does not mean that a contract that includes any sort of conditions or contingencies is per se incapable of supporting intervention, *see, e.g.*, *Sierra Club v. Glickman*, 82 F.3d 106, 109 (5th Cir. 1996) (finding sufficient interest where proposed remedy "potentially interferes" with contractual rights by seeking to enjoin government agency from awarding funds to certain businesses); *Espy*, 18 F.3d at 1207.

Second, the states argue that the BWCs "don't possess the interest they claim to have" because "what the [BWCs] really don't like" is that the injunction prevents them from receiving payment for work only "relating" to constructing a border wall. But as the BWCs make clear throughout their briefing, they assert that they "have legally protectable contractual interests in their border wall contracts that have affirmatively been affected by the district court's injunction." As with the SCIs, this contractual interest suffices. Therefore, the SCIs and BWCs satisfy Rule 24(a)(2)'s second requirement.

No. 24-40447

## C. Impairment

"The impairment requirement does not demand that the movant be bound by a possible future judgment." *Brumfield v. Dodd*, 749 F.3d 339, 344 (5th Cir. 2014). Therefore, would-be intervenors "do not need to establish that their interests *will* be impaired," but rather "only that the disposition of the action 'may' impair or impede their ability to protect their interests." *Id.* Our precedent "focuses on practical consequences." *CNA Metals Ltd.*, 919 F.3d at 867.

Here, the district court held that the would-be intervenors failed to satisfy the impairment prong because they "may seek relief in other jurisdictions and nothing in this case would prevent them from doing so," noting "[c]ourts have denied intervention on this basis," and pointing to two unpublished district court cases. The would-be intervenors disagree, raising the same arguments they raised under *Stallworth* factor three. Under these facts, the impairment analysis mirrors the *Stallworth* factor three analysis. *See Lease Oil Antitrust*, 570 F.3d at 251–52 (noting that the possibility of bringing a separate action to protect interests "as described" under *Stallworth* factor three similarly "does not change the analysis" under the impairment factor). As this circuit has made clear, a mere possibility of bringing another suit does not suffice to deny intervention. *See CNA Metals Ltd.*, 919 F.3d at 867 (rejecting same argument because it "runs counter to the text of Rule 24 and our precedent").

\*     \*     \*

Because the district court abused its discretion in finding the motions to intervene untimely, and the would-be intervenors had an interest in the

litigation that would be impeded by denying intervention, the district court erred in denying intervention.[11]

## IV. Conclusion

Because Movant Appellants have demonstrated an error on the part of the district court, we REVERSE the order of the district court denying intervention.

---

[11] Although the would-be intervenors also challenge the district court's denial of permissive intervention, where a district court improperly denies mandatory intervention, this court "need not reach the issue of permissive intervention." *Espy*, 18 F.3d at 1208.

Case 2:20-cv-02494-DSC Document 1-1 Filed 05/04/25 Page 475 of 1119

# Exhibit H

June 9, 2025
(VIA E-MAIL)

Andrew Warden
Senior Trial Counsel
Federal Programs Branch, Civil Division
U.S. Department of Justice
1100 L Street NW
Washington, DC 20530

Re: Supplemental Notice of Breach, *Sierra Club et al. v. Biden* (N.D. Cal.)
Intervention by Right, *Missouri, Texas v. Trump* (S.D. Tex.)

Dear Mr. Warden:

We write to follow up on (1) our April 3, 2024, notice of breach and your May 17, 2024, response, (2) the preliminary and permanent injunctions entered in *Missouri v. Trump*, and our right to intervene in that case, and (3) the potential expiration of the FY 2020–2021 barrier-system appropriations this September. Our goals are to:

1. Obtain information necessary to assess the Federal Government's present ability to comply with the July 17, 2023, Settlement Agreement without further enforcement in the Northern District of California.
2. Identify concrete steps that will keep the Settlement Agreement funded and effective notwithstanding the *Missouri* injunction; and
3. Streamline or avoid the need for additional litigation in the *Missouri* litigation.

To these ends, we ask for immediate answers to urgent questions that are necessary to inform our next steps. We categorize a list of concerns and conclude with proposals for collaborative next steps.

## II. Information Needed Immediately

Over one year ago, you stated that several provisions of the Settlement Agreement were impacted by a preliminary injunction issued by Judge Tipton in the *Missouri* litigation. Despite the Federal Government's obligation to "take all reasonable steps to ensure that [necessary] funds remain available to comply with the [Settlement Agreement]," and the claimed impacts of the preliminary injunction, the Federal Government did not challenge the March 8, 2024, preliminary injunction, and instead rushed to convert the preliminary injunction to a permanent one, opposing the *Sierra Club* plaintiffs' right to intervene and then declining to appeal the adverse judgment.

Indeed, the Federal Government claimed throughout the briefing that it had *never* adequately represented the Sierra Club Plaintiffs' interests in the *Missouri* litigation, notwithstanding its commitment in the Settlement Agreement to ensure that the necessary funds remained available.

Even though the Fifth Circuit has held that the Plaintiffs have a right to intervene, the Federal Government's choices have cost Plaintiffs over a year's worth of work pursuant to the Settlement Agreement. Commitments that were scheduled to run for two years are approaching their sunset. The clock toward the expiration of the funds needed for compliance continues to count down.

Without adequate assurances that our interests will be protected according to the terms and purpose of the Settlement Agreement, we will file for emergency injunctive relief to compel fund segregation and specific performance of Settlement Agreement obligations.

**Please answer the following questions.**

1. **Balance of FY 2020–2021 Barrier-System Funds.**
   - What amount of those funds remains unobligated today?
   - Of the unobligated balance, what portion has the Department set aside (or will it set aside) to fulfill its $45 million Phase 3 mitigation commitment?
2. **Segregation of Funds.**
   - Has DHS established (or will it establish) an escrow or other account that is insulated from further injunction-related restrictions?
   - If not, please explain why such relief is infeasible.
3. **Status of Suspended Projects.**
   - Please provide an updated version of the "Status of Phase 3 Mitigation Projects" chart (May 3, 2024), showing whether any projects have restarted or been re-scoped.
4. **Phase 2 Projects.**
   - Your May 17, 2024, letter asserted that the *GLO* injunction rendered mitigation and remediation work "unavailable." Since Judge Tipton's February 7, 2025, order permits FY 2020–2021 funds to be spent on drainage and erosion features, please explain what steps DHS has taken to resume (a) Phase 2 life-and-safety remediation and (b) Phase 3 mitigation planning.

---

## III. Current Compliance with the Settlement Agreement

In addition to the breach precipitated by the *Missouri* injunction and the Federal Government's failure to ensure that necessary funds remain available, the Plaintiffs are concerned about apparent violations of other provisions of the Settlement Agreement.

1. **Use of Funds for New Wall Construction.**
   The Enriquez declaration (Nov. 22, 2024) states that CBP intends to obligate FY 2020–2021 funds for 19 new barrier projects totaling approximately 40 miles. Please confirm that none of those dollars will fund construction in locations the Settlement Agreement

expressly protects for wildlife connectivity.

2. **Construction in Areas Prohibited Under the Settlement**
   Wall construction prohibited under Paragraph 10 of the Settlement Agreement appears already to have been undertaken at former gap Locations 7 and 8, in Luna County, New Mexico. Specifically, Paragraph 10 states that "Defendants agree not to fund construction of bollard-style barrier fencing or similar fencing that precludes the transit of large mammals in the approximate locations listed in the charts in Paragraphs 10 and 11 using (a) money transferred pursuant to § 8005 of the Department of Defense Appropriations Act of 2019 and 2020, and undertaken pursuant to § 284; and (b) fiscal year 2015–2019 military construction funds made available pursuant to § 2808. DHS also agrees not to fund construction of bollard-style barrier fencing or similar fencing that precludes the transit of large mammals at the approximate locations listed in the charts in Paragraphs 10 and 11 using DHS's fiscal years 2020, 2021, 2022, or 2023 barrier system appropriations." Despite these clear prohibitions, DHS has constructed barriers in violation of Paragraph 10 at the gaps described above.

   Please state the status of construction in these Locations, including what was or is being built, when, and using what funding.

3. **Stormwater Gates.**
   Specific stormwater gates described in Settlement Agreement Paragraph 8, Locations 1 and 2, remain closed despite Paragraph 8's instruction that "DHS agrees to open on a full-time basis the stormwater gates."

   Please describe the status of the gates identified in Paragraph 8 and plans to open the gates at Locations 1 and 2.

---

## IV. Proposed Alternatives and Cooperative Solutions

We share the goals of avoiding multiple court proceedings, demonstrating good faith compliance with the Settlement Agreement, and efficient resource use. To that end, we want to resolve ongoing disputes with minimal need for court intervention. It is imperative and urgent to discuss a path forward in the *Sierra Club* and *Missouri* litigations.

1. **Commitments That Avoid Enjoined Funds.**
   To keep Phase 3 advancing even if some FY 2020–2021 dollars remain restricted, we propose (a) reallocating unobligated FY 2022-2023 barrier-system appropriations or (b) using CBP's Environmental Management accounts to initiate design and consultation for large and small wildlife passages at GPS-identified locations. These have been previously provided and are available at this link:
   https://www.google.com/maps/d/edit?mid=1cZGp02yAQa-v5b8VHtmqAy-6uArWFtA&ll=31.361802175740785%2C-110.78030873338015&z=10

We believe that good-faith, formalized consultation could achieve several shared interests, and we are primarily interested in securing and extending rights to consultation and collaboration with the Federal Government, including resource agencies, regarding planned and likely projects. We have created the above map where we would like to see large and small wildlife openings. As new projects get implemented in wildlife-sensitive areas, we would like to be included in the design and to make sure wildlife passages and open storm gates are opened to mitigate harm to endangered species. To be emphatic, such consultation towards adaptive designs is expressly contemplated by the funds enjoined in the *Missouri* litigation.

We remain open to discussing other means of collaboration, including limited access to construction areas to document and ensure that contractors are using Best Management Practices (BMPs) defined by or in coordination with the Federal Government. We are not presently disclaiming our interest in work that requires funding.

2. **Targeted Modification of the *GLO* Injunction.**
   Should DHS need judicial clarification to spend mitigation money, we ask you to join a narrowly-tailored motion to modify the injunction in the Southern District of Texas, like the ultimately agreed motion resulting in modification earlier this year, to authorize obligations that are indispensable to the Settlement Agreement and are environmentally neutral or beneficial. We request your cooperation in this effort, as recent experience suggests that agreed motions between the federal and state governments will be swiftly granted. We are otherwise prepared to proceed as parties to protect our interests.

## V. Timeline and Next Steps

Given that FY 2020 funds will expire for new obligations on **September 30, 2025,** and our status as parties in *GLO* becomes effective on **July 7, 2025**, time is of the essence. We therefore request:

- A written response to the questions in Parts II–III, no later than **June 13, 2025**; and
- A meeting during the week of **June 16, 2025,** to:
  - Negotiate a concrete funding path and procedural rights to ensure fulfillment of the Settlement Agreement. Progress toward this end could mitigate emergency proceedings in the Northern District of California.
  - Discuss modifications to the injunction in the *Missouri* litigation.

If we do not receive satisfactory assurances, we will take appropriate steps to protect the Settlement Agreement, including seeking escrow or injunctive relief in the Northern District of California pursuant to Settlement Agreement paragraph 73 and Federal Rule 60(b)(6).

## VI. Conclusion

We remain committed to a cooperative resolution that honors the bargain the parties struck in July 2023 and avoids duplicative or inconsistent court orders. We look forward to your prompt response and to working together to achieve compliance.

Sincerely,

*David Donatti*

David Donatti
Counsel for Sierra Club and Southern Border Communities Coalition

ddonatti@aclutx.org
346-299-6817

# Exhibit I



**U.S. Department of Justice**

Civil Division

*Washington, DC 20530*

June 13, 2025

**<u>VIA EMAIL</u>**

David Donatti
American Civil Liberties Union Foundation of Texas
1018 Preston St.,
Houston, TX 77002

      Re:    *California v. Biden*, 4:19-cv-00872-HSG; 4:20-cv-01563-HSG
              *Sierra Club v. Biden*, 4:19-cv-00892-HSG; 4:20-cv-01494-HSG

Dear David:

I'm writing in response to your letter dated June 9, 2025.  In an effort to further our continued consultations regarding the settlement in the above-referenced cases, we have provided responses below to your requests for information in Sections II-IV of your letter.

**Section II**

1. **Balance of FY 2020–2021 Barrier-System Funds.**
   - What amount of those funds remains unobligated today?
   - Of the unobligated balance, what portion has the Department set aside (or will it set aside) to fulfill its $45 million Phase 3 mitigation commitment?

**<u>Response</u>:**

DHS/CBP has approximately $566M in unobligated fiscal year 2021 (FY21) barrier system funds.  The fiscal year 2020 (FY20) barrier system funds lapsed on September 30, 2024, and are no longer available for obligation.

No portion of the remaining unobligated balance of FY21 barrier system funds has been set aside for Phase 3 mitigation projects.  The remaining FY21 barrier system funds are subject to the *Texas/Missouri* injunction.  Because the *Texas/Missouri* injunction prohibits DHS/CBP from using the FY20 and FY21 barrier system funds for mitigation, they are not legally available for that purpose and therefore cannot be set aside to fulfill the $45M mitigation commitment that is set forth the Settlement.

- 2 -

2. **Segregation of Funds.**
- Has DHS established (or will it establish) an escrow or other account that is insulated from further injunction-related restrictions?
- If not, please explain why such relief is infeasible.

**Response**:

DHS/CBP has not established an escrow or other account that is insulated from further injunction-related restrictions and has no plans to do so going forward. DHS/CBP has not received an appropriation for barrier construction or the necessary expenses thereof since FY21. With the exception of the remaining unobligated balance of FY21 barrier system funds, which are already subject to the *Texas/Missouri* injunction, all DHS/CBP's prior year barrier system funds have been obligated, expended, or have lapsed. Beyond the approximately $566M in unobligated FY21 barrier system funds, there is no other funding that is legally available for the Phase 2 remediation and Phase 3 mitigation projects and activities that are outlined in the Settlement.

3. **Status of Suspended Projects.**
- Please provide an updated version of the "Status of Phase 3 Mitigation Projects" chart (May 3, 2024), showing whether any projects have restarted or been rescoped.

**Response**:

The Settlement provides that the Phase 3 mitigation projects are to be funded exclusively from the FY20 or FY21 barrier system appropriations. (Settlement ¶ 48). The *Texas/Missouri* injunction, however, prohibits DHS/CBP from using the FY20 or FY21 barrier system appropriations for mitigation. Therefore, none of the Phase 3 mitigation projects shown on the May 3, 2024, chart have been restarted or rescoped. In light of the *Texas/Missouri* injunction, any activity on the Phase 3 mitigation projects has ceased.

4. **Phase 2 Projects.**
- Your May 17, 2024, letter asserted that the *GLO* injunction rendered mitigation and remediation work "unavailable." Since Judge Tipton's February 7, 2025, order permits FY 2020–2021 funds to be spent on drainage and erosion features, please explain what steps DHS has taken to resume (a) Phase 2 life-and-safety remediation and (b) Phase 3 mitigation planning.

**Response**:

DHS/CBP has not taken any steps to install drainage and erosion features as part of the Phase 2 remediation work or the Phase 3 mitigation planning. Given the limits imposed by the *Texas/Missouri* injunction, the Phase 2 and Phase 3 work was suspended after the injunction was issued. My email dated May 3, 2024, sets for the status of those projects at the time of the injunction. Judge Tipton's February 7, 2025, order permits DHS/CBP to use the FY20 or FY21 barrier system funds for drainage and erosion control features that are "necessary for the construction of new border barriers." Neither the Phase 2 remediation work nor the Phase 3

mitigation projects outlined in the Settlement are related to the construction of new border barriers and therefore do not fall within the exception that was carved out in Judge Tipton's February 7 order.

---

### Section III

#### 1. **Use of Funds for New Wall Construction.**

The Enriquez declaration (Nov. 22, 2024) states that CBP intends to obligate FY 2020–2021 funds for 19 new barrier projects totaling approximately 40 miles. Please confirm that none of those dollars will fund construction in locations the Settlement Agreement expressly protects for wildlife connectivity.

**Response**:

As the government noted in its email correspondence of April 11, 2025, there are 20 barrier projects that will be executed with the FY20 and FY21 barrier system funds: the nineteen projects listed in the chart that was included in Paul Enriquez's November 22, 2024, declaration and one additional project in Arizona that was identified subsequent to the declaration being filed.  With the exception of one project in Luna County, New Mexico (see response No. 2 below), none of the projects are in locations that are identified in ¶¶ 10, 11, or 30 of the Settlement.

#### 2. **Construction in Areas Prohibited Under the Settlement**

Wall construction prohibited under Paragraph 10 of the Settlement Agreement appears already to have been undertaken at former gap Locations 7 and 8, in Luna County, New Mexico. Specifically, Paragraph 10 states that "Defendants agree not to fund construction of bollard-style barrier fencing or similar fencing that precludes the transit of large mammals in the approximate locations listed in the charts in Paragraphs 10 and 11 using (a) money transferred pursuant to § 8005 of the Department of Defense Appropriations Act of 2019 and 2020, and undertaken pursuant to § 284; and (b) fiscal year 2015–2019 military construction funds made available pursuant to § 2808. DHS also agrees not to fund construction of bollard-style barrier fencing or similar fencing that precludes the transit of large mammals at the approximate locations listed in the charts in Paragraphs 10 and 11 using DHS's fiscal years 2020, 2021, 2022, or 2023 barrier system appropriations." Despite these clear prohibitions, DHS has constructed barriers in violation of Paragraph 10 at the gaps described above.

Please state the status of construction in these Locations, including what was or is being built, when, and using what funding.

**Response**:

DHS/CBP has not constructed any new barrier in gap Location 8.  As part of the El Paso 2 project, which is project number 5 on list that was attached to the Enriquez declaration, DHS/CBP constructed approximately 950 feet of new bollard barrier in gap Location 7.  This was an inadvertent error that we discovered after reviewing your letter.  DHS/CBP mistakenly

overlooked that the project was situated in one of the locations identified in ¶ 10 of the Settlement.  It is a mistake that was unfortunately shared by all parties to the Settlement.  On November 5, 2024, the government sent plaintiffs the GPS start/stop coordinates for all the projects that are included in the Enriquez declaration, including the El Paso 2 project.  Sierra Club, SBCC, and the other parties to the Settlement also overlooked that the El Paso 2 project is situated in Location 7 and did not bring it to the government's attention.

The El Paso 2 project was approved for execution in July 2024 by then-Secretary Mayorkas, after it was clear that the FY20 and FY21 barrier system funds could no longer be used Phase 2 remediation or Phase 3 mitigation projects because of the *Texas/Missouri* injunction.  After approval by then-Secretary Mayorkas, and consistent with ¶ 13 f. of the Settlement, DHS/CBP engaged in an environmental planning process prior to construction.  In October 2024, CBP completed a record of consideration to support a Categorical Exclusion under NEPA.  After consultation, the New Mexico State Historic Preservation Officer concurred with DHS/CBP's determination that the project would have no effect on historic properties, and after consultation with U.S. Fish and Wildlife Service, CBP determined that the project would have no effect on threatened or endangered species.  The project was funded by the FY20 barrier system appropriation and construction was recently completed.  In addition to environmental planning, CBP implemented best management practices (BMPs) during construction, including, among other things, implementation of a storm water pollution prevention plan and measures to prevent the introduction of invasive species.

3. **Stormwater Gates.**
Specific stormwater gates described in Settlement Agreement Paragraph 8, Locations 1 and 2, remain closed despite Paragraph 8's instruction that "DHS agrees to open on a full-time basis the stormwater gates."

Please describe the status of the gates identified in Paragraph 8 and plans to open the gates at Locations 1 and 2.

**<u>Response</u>:**

Regarding the stormwater gates at Locations 1 and 2, they are currently closed.  The decision to close them was made by local Border Patrol based on operational conditions in the area.  Both gates will be re-opened or about June 15th for monsoon season, and DHS/CBP expects that both gates will remain open through monsoon season.

In addition to the Location 1 and 2 gates, we have an update on the stormwater gates that were the subject of prior notices.  Locations 3 and 6, which were the subject of a notice dated May 1, 2025, were re-opened on June 1st.  DHS/CBP expects that, like the gates at Locations 1 and 2, they will remain open through monsoon season.  Locations 7 and 8, which were the subject of a notice dated April 30, 2025, remain closed.  Local Border Patrol reports that large groups are either staging or attempting to make entry at or near the storm gates, including a group of 40 just a few days ago.  While that activity persists, Border Patrol has determined that operational conditions warrant that the gates remain closed.

- 5 -

**Section IV**

**Commitments That Avoid Enjoined Funds.**
1. To keep Phase 3 advancing even if some FY 2020–2021 dollars remain restricted, we propose (a) reallocating unobligated FY 2022-2023 barrier-system appropriations or (b) using CBP's Environmental Management accounts to initiate design and consultation for large and small wildlife passages at GPS-identified locations.

We believe that good-faith, formalized consultation could achieve several shared interests, and we are primarily interested in securing and extending rights to consultation and collaboration with the Federal Government, including resource agencies, regarding planned and likely projects. We have created the above map where we would like to see large and small wildlife openings. As new projects get implemented in wildlife-sensitive areas, we would like to be included in the design and to make sure wildlife passages and open storm gates are opened to mitigate harm to endangered species. To be emphatic, such consultation towards adaptive designs is expressly contemplated by the funds enjoined in the Missouri litigation.

We remain open to discussing other means of collaboration, including limited access to construction areas to document and ensure that contractors are using Best Management Practices (BMPs) defined by or in coordination with the Federal Government. We are not presently disclaiming our interest in work that requires funding.

**<u>Response:</u>**

DHS/CBP did not receive any barrier system funds in the FY2022 or FY2023 appropriations. *See* Department of Homeland Security Appropriations Act, 2022, Pub. L. No. 117-103, Div. D, 136 Stat. 49, 312-348 (2022); Department of Homeland Security Appropriations Act, 2023, Pub. L. No. 117-328, Div. F, 136 Stat. 4459, 4725-4759 (2022). Similarly, CBP does not have a dedicated environmental management appropriation. *Id.* Rather, DHS/CBP treats environmental planning, compliance, and other related environmental expenses as a "necessary expense" of the appropriation that Congress makes available for the project or activity at issue. DHS/CBP has not received an appropriation for border barrier since FY21, thus DHS/CBP does not have any post-FY21 funding for border barrier environmental mitigation or remediation projects. As we have discussed during prior consultation meetings, the only appropriated funds that were legally available for the Phase 3 mitigation projects were the FY20 and FY21 barrier system appropriations, which are subject to the *Texas/Missouri* injunction.

Regarding the design and construction of the 20 barrier projects that are to be executed with the FY20 and FY21 funds, there are avenues for Sierra Club and SBCC to provide input. CBP is currently accepting public input on barrier projects in both the Tucson and El Paso Sector. *See* [*Border Barrier Construction – Doña Ana County, New Mexico – June 2025 | U.S. Customs and Border Protection*](); [*Border Barrier Construction – Santa Cruz and Cochise Counties, Arizona– June 2025 | U.S. Customs and Border Protection*](). DHS/CBP expects there will be additional opportunities to provide input on additional FY20 and FY21-funded barrier projects going forward. With that said, DHS/CBP does not have any flexibility as to the installation of large and small wildlife passages in prior construction. As I believe we have discussed as part of prior

consultation meetings, given the limits imposed by the *Texas/Missouri* injunction, DHS/CBP does not have any funding that is legally available for the installation of large and small wildlife passages as part of legacy barrier construction, including for § 284 and § 2808 projects. Regarding any additional border barrier projects that may be executed with future year appropriations, DHS/CBP cannot make any commitments in advance of any additional barrier funding it may receive from Congress. *See* 31 U.S.C. § 1341.


2. **Targeted Modification of the *GLO* Injunction.**

Should DHS need judicial clarification to spend mitigation money, we ask you to join a narrowly-tailored motion to modify the injunction in the Southern District of Texas, like the ultimately agreed motion resulting in modification earlier this year, to authorize obligations that are indispensable to the Settlement Agreement and are environmentally neutral or beneficial. We request your cooperation in this effort, as recent experience suggests that agreed motions between the federal and state governments will be swiftly granted. We are otherwise prepared to proceed as parties to protect our interests.

**Response:**

The government is still in the process of reviewing the 5th Circuit's intervention decision and considering whether or not to seek further review. Prior to issuance of the mandate and remand to the district court, we are not in a position to assess whether we would join a motion to modify the *Texas/Missouri* injunction.


Sincerely,


/s/ *Andrew I. Warden*
Andrew I. Warden


cc:
     Ricky Garza (ricky@alliancesd.org)
     Gloria Smith (gloria.smith@sierraclub.org)
     Sean Riordan (SRiordan@aclunc.org)
     Janelle Smith (Janelle.Smith@doj.ca.gov)
     James Zahradka (James.Zahradka@doj.ca.gov)
     James Richardson (James.Richardson@doj.ca.gov)
     Julie Meade (jmeade@nmdoj.gov)
     William Grantham (wgrantham@nmag.gov)
     Kathryn Becker (kathryn.becker@env.nm.gov)
     Adriana Pinon (APinon@aclutx.org)
     Cecillia Wang (Cwang@aclu.org)
     Mike Cayaban (Mike.Cayaban@doj.ca.gov)
     Minju Cho (mcho@aclunc.org)
     My Khanh Ngo (mngo@aclu.org)

Case 1:20-cv-02702-DLC Document 71 Filed 09/10/25 Page 88 of 119

# Exhibit J

| | |
|---|---|
| **Subject:** | RE: GLO, Sierra Club Litigations |
| **Date:** | Wednesday, July 23, 2025 at 2:01:58 PM Central Daylight Time |
| **From:** | Bean, Samuel B (CIV) |
| **To:** | David Donatti, Warden, Andrew (CIV) |
| **CC:** | 'Cecillia Wang', Ricky Garza, Adriana Pinon, Sarah Corning |

**Caution:** This is an external email and has a suspicious subject or content. Please take care when clicking links or opening attachments. When in doubt, contact your IT Department

CAUTION: This message is from an external sender. Please be cautious of links & attachments.

David,

The federal government defendants, at this time, are only prepared to state that we reserve our position pending the filing of a motion to vacate. Because the plaintiff States intend to oppose your motion, it seems that we are headed to motions practice regardless of the federal government defendants' position .

With regard to the buoy-barrier funding source – CBP intends to use FY 21 funds for that project.

With regard to preservation of FY 21 funds – As stated in our June 13, 2025 letter, DHS/CBP has not established an escrow or other account that is insulated from further injunction-related restrictions and has no plans to do so going forward.

Best,
Sam

**Sam Bean**
Trial Attorney
Federal Programs Branch, Civil Division
Department of Justice
Phone: 202-455-9619

---

**From:** David Donatti <ddonatti@aclutx.org>
**Sent:** Wednesday, July 23, 2025 9:46 AM
**To:** Warden, Andrew (CIV) <Andrew.Warden@usdoj.gov>; Bean, Samuel B (CIV) <Samuel.B.Bean2@usdoj.gov>
**Cc:** 'Cecillia Wang' <cwang@aclu.org>; Ricky Garza <ricky@alliancesd.org>; Adriana Pinon <APinon@aclutx.org>; Sarah Corning <scorning@aclutx.org>
**Subject:** [EXTERNAL] GLO, Sierra Club Litigations

Good morning, Andrew and Sam.

I'm writing considering DOJ's statement to Judge Tipton that "the federal defendants respectfully reserve their position on the intervenors' anticipated motion to vacate the injunction pending review of any such motion." As you know, Sierra Club and SBCC have now moved to intervene in the S.D. Tex. case to protect the FY 2020–21 barrier-system appropriations that the Government committed — see *Sierra Club v. Trump*, N.D. Cal. No. 4:19-cv-00892, ECF 372-1 — to use for settlement-related mitigation. DOJ also represented in that proceeding that it would "take all reasonable steps to ensure that such funds remain available."

For purposes of conferring under Local Rule 7 and to avoid unnecessary motion practice, could you please let us know:

1. **Vacatur** – Under what circumstances, if any, would the United States oppose a motion to vacate the GLO permanent injunction in whole or in part?
2. **Modification** – Would the United States support a targeted modification deleting the words "mitigation and remediation efforts" (or, in the alternative, adding an express carve-out for "mitigation and remediation necessary to comply with the *Sierra Club* Settlement Agreement, ECF 372-1")?
3. **Preservation of FY 21 funds** – What concrete steps, if any, is DHS/CBP taking to ensure the FY 2021 rider funds remain unobligated and available for settlement mitigation should the injunction be vacated or modified?
4. **Buoy-barrier funding source** – Public releases indicate CBP plans to use FY 2021 money for the 17-mile buoy barrier in the Rio Grande. Can you confirm whether FY 2021 rider funds are being (or will be) obligated for that project, or identify the appropriation that will be used?

Given the September 30, 2025, lapse date for the FY 2021 account, time is of the essence. We would appreciate your reply by close of business **5 p.m. Eastern** today so that we can inform the court of the parties' respective positions.

Thank you for your prompt attention.

Best regards,

David
Counsel for Sierra Club & Southern Border Communities Coalition

Case 2:20-cv-02494-HSG Document 1-11 Filed 05/04/25 Page 091 of 119

# Exhibit K

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

| | |
|---|---|
| THE GENERAL LAND OFFICE OF THE STATE OF TEXAS, *et al.,*<br><br>     Plaintiffs,<br>     v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>     Defendants | No. 7:21-cv-00272 |
| THE STATE OF MISSOURI; THE STATE OF TEXAS,<br><br>     Plaintiffs,<br>     v.<br><br>DONALD J. TRUMP, in his official capacity as President of the United States, *et al.*,<br><br>     Defendants. | No. 7:21-cv-00420<br>(formerly No. 6:21-cv-00052)<br>Hon. Drew B. Tipton |

## <u>NINTH DECLARATION OF PAUL ENRIQUEZ</u>

I, Paul Enriquez, declare as follows:

1.     I am the Director, Infrastructure Portfolio, U.S. Border Patrol Program Management Office Directorate ("PMOD"), U.S. Customs and Border Protection ("CBP"), an agency of the Department of Homeland Security ("DHS"). I have held this position since January 2023 and support the planning and execution of border infrastructure projects from construction to maintenance. From May 2021 to December 2022, I served as the Deputy Director for the Infrastructure Portfolio and from August 2018 to

May 2021, I served as the Real Estate and Environmental Director for the Infrastructure Portfolio. From 2013 to August 2018, I was the Real Estate and Environmental Branch Chief for the Border Patrol and Air and Marine Program Management Office ("BPAM"), Facilities Management and Engineering, Office of Facilities and Asset Management. From 2011 to 2013, I was employed as an Environmental Protection Specialist in the BPAM office. In that role, I performed environmental analyses for various border infrastructure projects. From 2008 to 2011, I was a contractor assigned to the BPAM office and provided environmental support on various border infrastructure projects.

2.     CBP is the DHS component with primary responsibility for border security. CBP constructs, operates, and maintains border infrastructure necessary to deter and prevent illegal entry on the southern border.

3.     Within CBP, PMOD has expertise in managing and executing border infrastructure projects. PMOD is tasked with managing the schedule, finances, real estate acquisition, environmental planning, and construction of the border infrastructure system along the U.S. border.

4.     Based upon my current and past job duties, I am familiar with the funding appropriated to CBP for barrier construction, the obligations and projects associated with such funding, and the process by which new barrier infrastructure is constructed.

5.     I previously submitted declarations on December 8, 2021, July 12, 2022, August 18, 2023, September 27, 2023, October 17, 2023, March 14, 2024, March 21, 2024, and November 22, 2024 that outlined, among other things, how CBP was using the appropriated funds it received in fiscal years ("FY") 2020 and 2021 for barrier system and the steps CBP is taking to comply with the Court's order of March 8, 2024 and Permanent Injunction.

6.     This declaration is based on my personal knowledge and information made available to me in the course of my official duties.

## **BACKGROUND**

7.      On March 8, 2024, the Court issued an order stating that CBP's FY20 and FY21 barrier system appropriations may only be used for the "construction of physical barriers, such as walls, fencing, buoys, etc." The Court's order prohibits "the Government and all its respective officers, agents, servants, employees, attorneys, and other persons who are in active concert or participation with them" from obligating FY20 or FY21 barrier system funds "toward mitigation and remediation efforts, repair of existing barrier, so-called system attribute installation at existing sites, or other similar purposes." The Court's order was converted to a Final Judgment and Permanent Injunction, as clarified by the Courts' oral ruling of March 21, 2024, on May 29, 2024. The Court issued a second order clarifying the permanent injunction on February 7, 2025.

8.      Since March 2024, CBP has worked diligently to not only comply with the Court's injunction but also make maximum use of the FY20 and FY21 funds in a manner that is consistent with the injunction.

9.      In response to the Court's injunction, CBP took various actions to suspend, modify, or terminate, as appropriate, various contracts and interagency agreements that relied on the FY20 and FY21 barrier system funds to pay for projects and activities prohibited by the Court's injunction, such as installation of barrier system attributes, environmental mitigation projects, and replacement of existing barriers.

10.      Additionally, CBP initiated a planning process to identify new border barrier construction projects that could be funded with FY20 and FY21 barrier system funds consistent with the Court's injunction. CBP focused its efforts on identifying areas along the southwest border without current pedestrian barrier, in United States Border Patrol's ("USBP") highest priority areas, that would benefit from the construction of new physical barriers. Among other things, CBP conducted site visits and surveys of potential construction sites in California, Arizona, New Mexico, and Texas. Further, CBP considered the improvements to border security and public safety likely to result from new barrier construction, focusing on areas without current pedestrian barrier that have experienced high levels of illegal entry.

11.     Based on this planning process, CBP identified new border barrier construction projects in California, Arizona, New Mexico, and Texas that it is executing with the FY20 and FY21 barrier system funds.

12.     Since the Court's injunction, CBP has used the FY20 and FY21 funds to award four construction contracts and 53 contract options for the construction of new border barrier.  The total contract value of those contracts and contract options is approximately $727M.  When work under those contracts is complete, CBP will have constructed approximately 55 miles of new barrier in high priority locations in the USBP San Diego, Yuma, Tucson, El Paso, and Rio Grande Valley Sectors.

## REMAINING FUNDS

13.     CBP currently has approximately $203M in unobligated FY21 barrier system funds.  The period of availability for those funds expires on September 30, 2025.[1]  After September 30, 2025, the FY21 barrier system funds will no longer be available for new obligations.  CBP has a contracting and execution plan for the approximately $203M in FY21 funds that remain unobligated, as follows:

- Approximately $153M of the remaining unobligated FY21 barrier system funds will be used to construct approximately 17 miles of waterborne barrier in the USBP Rio Grande Valley Sector. In order to ensure expeditious construction of the waterborne barrier, the Secretary of Homeland Security, pursuant to her authority under § 102(c) of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, as amended ("IIRIRA"), 8 U.S.C. § 1103 note, has issued a waiver for this project.  90 Fed. Reg.  29574 (July 3, 2025).  CBP has solicited a contract for the project and plans to make contract award before the end of the fiscal year.

- Approximately $25M of the remaining unobligated FY21 barrier system funds will be used to exercise contract options in furtherance of new barrier construction in the USBP Tucson Sector.

---

[1] The period of availability for the FY20 barrier system funds expired on September 30, 2024, and they are no longer available for new obligations.

Like the waterborne barrier contract noted above, the Secretary of Homeland Security has issued an IIRIRA waiver to ensure the expeditious construction of barrier in the USBP Tucson Sector. 90 Fed. Reg. 23946 (June 5, 2025). CBP has already awarded the base construction contract. CBP expects to exercise the contract options before the end of the fiscal year.

- Approximately $20M of the remaining unobligated FY21 barrier system funds will be used to exercise a contract option in furtherance of new barrier construction in the USBP Rio Grande Valley Sector. The Secretary has issued an IIRIRA waiver for the RGV barrier project. 90 Fed. Reg. 26060 (June 18, 2025). CBP has already awarded the base construction contract. CBP plans to award the option before the end of the fiscal year.

- The remaining approximately $6M in unobligated FY21 barrier system funds will most likely be used for change management for barrier contracts that are funded by the FY21 barrier system appropriation. Some portion of this funding may be used for support contracts or other programmatic costs. However, CBP expects that most of it will be used for change management. Even after the FY21 barrier system funds lapse, they will remain available for an additional five years for change management or upward adjustments on existing barrier contracts that are funded by the FY21 barrier system appropriation. 31 U.S.C. § 1502(a); 31 U.S.C. § 1553(a). It is standard practice for agencies to hold back some funding to ensure they can cover potential upward adjustments on existing contracts. *See,* GAO, Principles of Federal Appropriations Law, 3[th] ed. 2004, ch. 5, pg. 5-36 (Washington, D.C. Jan. 2004) ("In order to avoid over-obligating the original appropriation, the contracting officer must estimate the expected net additional obligations to insure that available appropriations are not committed to other purposes.") *citing* 61 Comp. Gen. 609, 612 (1982); B-192036, (Sept. 11, 1978).

- Between now and the end of fiscal year, CBP may also de-obligate FY21 funds from contracts that had to be suspended as a result of the Court's injunction. Consistent with the terms of the

injunction, any funds that are de-obligated from suspended contracts will be used for costs associated with the construction of new barrier or held back for change management on existing FY21-funded contracts. CBP is planning to hold back approximately 13% of the awarded value of the existing FY21-funded barrier contracts (approximately $75M) to fund change management. This is consistent with the percentage of awarded value that CBP has held back for other construction contracts.

14. CBP has devoted substantial time and resources to planning the projects described above, including identifying areas for new barrier construction, preparing for potential real estate acquisitions, and planning the necessary contracting actions to execute the projects. Because the FY21 funds will lapse on September 30, 2025, any deviation from the contracting plan laid out above puts the remaining FY21 funding at risk of lapsing before the money can be obligated to new contracts.

15. The federal procurement process can be time-consuming and complex. It requires multiple steps, including the identification of new requirements, market research, acquisition plans, developing and issuing solicitation documents, obtaining proposals, and evaluating proposals before a contract can be awarded and funds obligated. For each step in the process, the Federal Acquisition Regulation may impose various requirements, many of which add time to the procurement process. For example, the government is typically required to issue a solicitation so interested parties can submit proposals. After receipt of proposals, the government must evaluate each proposal. After that review is completed, but prior to contract award, the government is typically required to document and explain its award decision. Given the process set out above, as noted, any deviation from CBP's current contracting plan puts the FY21 funds at risk of lapse, as it is not at all clear that CBP can solicit, evaluate, and award new contracts before the end of the fiscal year.

## STATUS OF CONTRACTOR INTERVENORS' CLAIMS

16.    There are three contractor intervenors in this case: (1) Southern Border Constructors ("SBC"), (2) Randy Kinder Excavating, Inc. ("RKE"), and Texas Sterling Construction Co. ("Texas Sterling").   The status of the contractor intervenor claims are detailed below.

17.    SBC and RKE: The United States Army Corps of Engineers ("USACE"), through interagency agreements with CBP, has assisted CBP with border barrier construction, including awarding and administering border barrier construction contracts on CBP's behalf.   In 2019, USACE awarded task orders under federal contracts to SBC and RKE to build border barrier in Texas.  ECF No. 148-1—3, ECF. No. 149-1—2. Following then President Biden's Proclamation in January 2021 requiring a re-evaluation of the use of funding concerning barriers on the southern border, USACE suspended and then subsequently terminated the task orders and contracts under which SBC and RKE had been performing work.  *See* ECF No. 148-4-7, ECF No. 149-3-6.  Although funding for the construction costs of the projects undertaken by SBC and RKE came from appropriations in prior years that were not affected by the Court's injunction, *see, e.g.,* Consolidated Appropriations Act, 2019, Pub. L. No. 116-6, Div. A, § 230, 133 Stat. 13, 28, USACE was relying on the FY21 barrier system funds to pay for its in-house labor costs to process and complete SBC and RKE's contract termination claims.  *See* Declaration of Anjna O'Connor ¶ 4, ECF No. 133-2.  In light of the Court's injunction, USACE could no longer use FY21 funds to process SBC and RKE's termination claims.

18.    Since the Court's injunction, however, CBP has provided USACE with other funding that is not subject to the Court's injunction to pay for USACE's in-house labor costs to process and complete SBC and RKE's contract termination claims.  This alternative funding has been in place for approximately 14 months.  It is my understanding that USACE has estimated that the alternative funds it still has on hand will cover at least five more months of in-house labor costs.  If USACE exhausts all of the current alternative funding before resolving SBC and RKE's termination claims, CBP has other available funding

separate from the FY21 enjoined funds that it can provide to USACE for any remaining in-house labor costs that would be required to resolve SBC and RKE's claims. Any actual payments or settlements that are made to SBC and RKE to resolve their termination claims will be paid from the prior year appropriations that were used to fund the SBC and RKE contracts. Those prior year appropriations are unaffected by the Court's injunction.

19. <u>Texas Sterling</u>. In 2022, CBP awarded a task order under a federal contract to Texas Sterling to remove old legacy fencing and install replacement gates and barrier in the USBP El Paso Sector. *See* ECF No. 172-3. This task order was awarded with FY20 and FY21 barrier system funds. In February 2024, after certain tasks had been completed, CBP notified Texas Sterling that the agency had decided to descope several remaining components from the task order and directed Texas Sterling to cease those remaining construction activities. *See* ECF No. 172-4. CBP and Texas Sterling then began discussions to resolve outstanding claims associated with the replacement barrier construction performed under the task order and the descoping decision.[2] Following entry of the Court's injunction, CBP notified Texas Sterling of the Court's decision and the agency's inability to pay costs prohibited by the injunction, such as payments for replacement barrier projects. *See* ECF No. 172-1. In September 2024, CBP issued a contract termination notice to Texas Sterling. Texas Sterling has yet to submit a Termination Settlement Proposal to CBP.

---

[2] Texas Sterling characterizes the descoping action as a termination of the contract for convenience. *See* ECF No. 172 at 5. Defendants do not agree with that characterization. The effect of descoping decision was among the issues under discussion at the time of the Court's injunction.

This declaration is made pursuant to 28 U.S.C. 1746. I declare under penalty of perjury that the foregoing is true and correct.

Executed on this *15th* day of August 2025

Paul Enriquez
Infrastructure Portfolio Director
Program Management Office Directorate
U.S. Border Patrol

# Exhibit L

**Wildlife Mitigation Recommendations**                                     **August 24, 2025**

Successful wildlife crossing structures in border wall are large enough for target species, placed in locations where they have clear access to the opening, have smooth edges and no concertina wire nearby to prevent injury, and installed frequently enough for animals to find the structures within their home ranges. Based on recent wildlife crossing research published in Frontiers in Ecology and Evolution ([Harrity et al. 2024](#))[1], here are four recommendations to accommodate movements of medium-large wildlife species through bollard walls:

1. **Frequent installation of 8.5x11-inch wildlife passages:**
   *Will benefit female mountain lion, coyote, javelina, bobcat, and smaller species (Figures 1-3).*
   - Install wildlife passages at least every 0.25 mile, or ideally, in every panel of border wall.
   - If passages are installed only every 0.25 mile, consider installing passages in multiples (e.g., 2 passages in adjacent panels) to allow herding animals to more easily cross.
   - Install wildlife passages near flood gates.
   - Install wildlife passages in a variety of habitat types and elevations.
   - Ensure the approach to the passage is clear and free of obstruction (e.g., avoid placing passages next to rip-rap piles).
   - Do not install horizontal support bars above the small wildlife openings as this obscures them from taller animals (e.g., mountain lions, coyotes, etc.) making it harder for these animals to locate the openings.
   - Cut the openings flush to the ground to facilitate the passage of larger animals and ensure edges are smooth (Figure 3).




*Figure 1. Bobcat using an 8.5 x 11" wildlife passage at the San Pedro River.*

*Figure 2. Coyote using an 8.5 x 11" wildlife passage at the San Pedro River.*



*Figure 3. Ensure small wildlife passages are installed flush with the ground (right side) and not above the base of the bollards (left side).*

---

[1] Harrity. E. J, M. Traphagen, M. Bethel, A. N. Facka, M. Dax, and E. Burns. 2024. USA-Mexico border wall impedes wildlife movement. Frontiers in Ecology and Evolution. 12:1487911.

2. **Increase spacing between prefabricated panels to facilitate wildlife movement:**
   *Will benefit mid-sized species including coyote, javelina, and bobcats.*
   - Increase the spacing between border wall panels to at least 5.5 inches (Figure 4). Crossing rates for coyote, bobcat, and javelina increase significantly at incidental inter-panel spaces that are wider than 5.5 inches (Figure 5). Currently, such spaces are rare and incidental, but significant improvements in wildlife connectivity could be achieved by increasing all inter-panel spaces to at least 5.5 inches.
   - Trim horizontal support bars so that the vertical space between panels is unobstructed (Figure 4).





*Figure 4. Increasing the spacing between panels to at least 5.5 inches will faciliate more animal movement. It is also crucial to remove the horizontal support bar from this space.*

*Figure 5. Average crossing rates for javelina increase when the inter-panel spacing is greater than 5.5 inches. Data from cameras in Cochise and Santa Cruz Counties.*

3. **Install large wildlife openings (~7 x 5 feet) to facilitate movement of large animals:**
   *Will benefit large species including pronghorn, deer, bear, and jaguar.*
   - Complete installation of large wildlife openings as agreed to in Sierra Club et. al. v. Biden et. al., Case No. 4:19-cv-00892-HSG.

4. **Keep floodgates open year-round to allow large wildlife to cross:**
   *Will benefit large species including pronghorn, deer, bear, and jaguar.*
   - Keep at least 1 gate per drainage open and select gates that are not at the drainage bottom so they are accessible even during high flow events.
   - Select gates with as few obstacles for wildlife as possible. For example, open gates with low cement footers and an approach that is clear of riprap.

***For more information, please contact:***
*Eamon Harrity (Sky Island Alliance) at eamon@skyislandalliance.org*
*Myles Traphagen (Wildlands Network) at myles@wildlandsnetwork.org*

*Table 1. List of coordinates for wildlife crossing structures along the US-Mexico border in Arizona and New Mexico. These coordinates are also displayed as a map: https://www.google.com/maps/d/u/0/viewer?mid=1vk2RAIpdF93Idr4Vq7nEXPh7DfgBbEg*

| Structure | Latitude | Longitude | Detailed species summary |
|---|---|---|---|
| Storm gate large wildlife passage | 31.33361 | -110.27537 | Mountain lion, black bear |
| Storm gate large wildlife passage | 31.33356 | -110.29602 | Bear, Mountain lion, mule deer, white-tailed deer, skunks, ringtail, gray foxes |
| Storm gate large wildlife passage | 31.33339 | -110.33258 | Black bear, Mountain lion, mule deer, white-tailed deer, skunks, jackrabbits, ringtail, gray foxes |
| Storm gate large wildlife passage | 31.33290 | -110.50488 | Black bear, coyote, white-tailed deer |
| Storm gate large wildlife passage | 31.33332 | -110.67937 | Mountain lion, black bear |
| Storm gate large wildlife passage | 31.33316 | -110.59767 | Mountain lion, American badger, Virginia Opossum |
| Storm gate large wildlife passage | 31.33301 | -110.56525 | North American Porcupine, Mountain lion |
| Storm gate large wildlife passage | 31.33345 | -110.31957 | Black bear, Mountain lion |
| Storm gate large wildlife passage | 31.33334 | -110.35335 | Mountain lion, black bear |
| Storm gate large wildlife passage | 31.33354 | -110.33236 | hog-nosed skunk, bobcat, white-nosed coati, raccoon, mule deer, gray fox, mountain lion, hooded skunk, ringtail, coyote, white-tailed deer, javelina, gould's turkey, black-tailed jackrabbit, striped skunk, antelope jackrabbit, american black bear, western spotted skunk |
| Storm gate large wildlife passage | 31.33298 | -110.505 | coyote, bobcat, raccoon, javelina, antelope jackrabbit, gould's turkey, mule deer, white-tailed deer, gray fox, hooded skunk, american badger, hog-nosed skunk, black-tailed jackrabbit, american black bear, mountain lion |
| Storm gate large wildlife passage | 31.33366 | -110.31963 | hog-nosed skunk, javelina, gray fox, black-tailed jackrabbit, coyote, mountain lion, jackrabbit species, antelope jackrabbit, raccoon, bobcat, white-tailed deer, mule deer, gould's turkey, american black bear, ringtail |
| Storm gate large wildlife passage | 31.33332 | -110.67937 | white-tailed deer, hog-nosed skunk, hooded skunk, bobcat, western spotted skunk, virginia opossum, coyote, american black bear, javelina, striped skunk, gray fox, mountain lion, white-nosed coati, gould's turkey |
| Storm gate large wildlife passage | 31.33316 | -110.59767 | white-nosed coati, mountain lion, raccoon, hog-nosed skunk, white-tailed deer, american badger, coyote, skunk species, gray fox, javelina, virginia opossum, striped skunk |
| Storm gate large wildlife passage | 31.33301 | -110.56525 | coyote, javelina, bobcat, north american porcupine, raccoon, hooded skunk, mule deer, white-tailed deer, gray fox, black-tailed jackrabbit, antelope jackrabbit, mountain lion, american badger |
| Storm gate large wildlife passage | 31.33341 | -110.35769 | coyote, gray fox, hog-nosed skunk, white-nosed coati, white-tailed deer, hooded skunk, striped skunk, american black bear, mountain lion, gould's turkey, mule deer, javelina, bobcat |
| Storm gate large wildlife passage | 31.33385 | -110.2944 | white-tailed deer, antelope jackrabbit, mountain lion, coyote, striped skunk, gould's turkey, gray fox, hog-nosed skunk, black-tailed jackrabbit, hooded skunk, bobcat, white-nosed coati, javelina |
| Storm gate large wildlife passage | 31.333 | -110.46688 | antelope jackrabbit, gray fox, coyote, javelina, bobcat, virginia opossum, white-tailed deer, raccoon, american badger, hooded skunk, mule deer, black-tailed jackrabbit |
| Storm gate large wildlife passage | 31.33362 | -110.31123 | coyote, javelina, gray fox, white-tailed deer, black-tailed jackrabbit, jackrabbit species, antelope jackrabbit, mule deer, bobcat, hog-nosed skunk, hooded skunk, ringtail |
| Storm gate large wildlife passage | 31.33335 | -110.65939 | bobcat, hooded skunk, gray fox, striped skunk, hog-nosed skunk, white-tailed deer, javelina, gould's turkey, coyote, mule deer |

| Storm gate large wildlife passage | 31.33296 | -110.53288 | coyote, gray fox, mule deer, javelina, american badger, white-tailed deer, hooded skunk, pronghorn, bobcat, american black bear |
|---|---|---|---|
| Storm gate large wildlife passage | 31.33335 | -110.68298 | white-tailed deer, white-nosed coati, bobcat, javelina, gray fox, coyote, mountain lion, striped skunk, american black bear |
| Storm gate large wildlife passage | 31.33292 | -110.49282 | javelina, bobcat, white-tailed deer, raccoon, coyote, gray fox, gould's turkey |
| Storm gate large wildlife passage | 31.33356 | -110.3279 | coyote, gray fox, black-tailed jackrabbit, raccoon, antelope jackrabbit, mule deer, white-tailed deer |
| Storm gate large wildlife passage | 31.33364 | -110.30388 | black-tailed jackrabbit, white-tailed deer, coyote, gray fox, hog-nosed skunk, american black bear |
| Storm gate large wildlife passage | 31.33342 | -110.70571 | striped skunk, white-tailed deer, gray fox, hooded skunk, coyote |
| Storm gate large wildlife passage | 31.33396 | -110.27555 | american black bear, white-tailed deer, coyote, cottontail, hog-nosed skunk |
| Storm gate large wildlife passage | 31.33343 | -110.347721 | white-tailed deer, coyote, gould's turkey, antelope jackrabbit, mule deer, |
| Small wildlife passage | 31.33353 | -110.30612 | Proposed opening, no pre-wall observations |
| Small wildlife passage | 31.33306 | -110.42333 | Proposed opening, no pre-wall observations |
| Small wildlife passage | 31.33290 | -110.44974 | Proposed opening, no pre-wall observations |
| Small wildlife passage | 31.33293 | -110.47272 | Proposed opening, no pre-wall observations |
| Small wildlife passage | 31.33288 | -110.49309 | Proposed opening, no pre-wall observations |
| Small wildlife passage | 31.33289 | -110.50858 | Proposed opening, no pre-wall observations |
| Small wildlife passage | 31.33289 | -110.51527 | Proposed opening, no pre-wall observations |
| Small wildlife passage | 31.33342 | -110.38207 | Proposed opening, no pre-wall observations |
| **From July 2023 DHS-States settlement- Large Wildlife Openings that were NOT constructed due to injunction** | | | |
| Large Wildlife Opening | 32.05936 | -113.40033 | Sonoran pronghorn, desert bighorn sheep, mule deer |
| Large Wildlife Opening | 31.3334 | -108.5036 | Bison, Chihuahuan pronghorn, Mexican wolf |

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| SIERRA CLUB, *et al.*,<br>                    Plaintiffs,<br>            *v.*<br>DONALD J. TRUMP, *et al.*,<br>                    Defendants. | No. 19-cv-892-HSG<br>No. 20-cv-1494-HSG<br>No. 19-cv-00872-HSG<br>No. 20-cv-01563-HSG |
| STATE OF CALIFORNIA, *et al.*,<br>                    Plaintiffs,<br>            *v.*<br>JOSEPH R. BIDEN, *et al.*,<br>                    Defendants. | **[PROPOSED] ORDER<br>GRANTING PLAINTIFFS' MOTION<br>TO ENFORCE SETTLEMENT<br>AGREEMENT** |

Upon consideration of the Motion to Enforce the Parties' Settlement Agreement filed by Plaintiffs Sierra Club and Southern Border Communities Coalition, the responsive briefs filed by Defendants and the Plaintiff States, and Plaintiffs' reply, and after hearing argument by the parties, the Court hereby **ORDERS**:

1.  Defendants must file (a) an accounting of unobligated FY 2021 barrier system funding balances and (b) a list of all of Defendants' outstanding commitments under the Settlement Agreement  with estimated costs for each item, on or before September 12, 2025.

2.  Defendants shall not obligate or otherwise make unavailable more than $50 million of FY 2021 barrier system funds without 7 business days' notice and leave of this Court.

3.  At least $50 million of FY 2021 § 210(a)(1) funds shall remain available after September 30, 2025.

/ / /

/ / /

/ / /

1      4.   The Court further **REFERS** the case to Magistrate Judge Donna M. Ryu for

2  proceedings consistent with this Order.

3          **SO ORDERED.**

4

5  Dated:  September ___, 2025

                                                    _____

6                                                   HAYWOOD S. GILLIAM, JR.
                                                    United States District Judge

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1  Cecilia D. Wang (SBN 187782)
2  AMERICAN CIVIL LIBERTIES UNION
   FOUNDATION
3  425 California Street, Suite 700
   San Francisco, CA 94104
4  Tel: (415) 343-0770
5  *cwang@aclu.org*

6  David A. Donatti*
   ACLU OF TEXAS
7  P.O. Box 8306
   Houston, TX 77288
8  Tel: (713) 942-8146
9  *ddonatti@aclutx.org*

10  Gloria D. Smith**
    SIERRA CLUB ENVIRONMENTAL
11  LAW PROGRAM
    2102 Webster Street, Suite 1300
12  Oakland, CA 94612
    Tel: (415) 977-5532
13  *gloria.smith@sierraclub.org*
14

15  *Admitted Pro Hac Vice
    **Attorney for Plaintiff Sierra Club only
16

17  *Attorneys for Plaintiffs*

18            **IN THE UNITED STATES DISTRICT COURT**
19          **FOR THE NORTHERN DISTRICT OF CALIFORNIA**
                      **OAKLAND DIVISION**
20

| | |
|---|---|
| 21  SIERRA CLUB, *et al.*, <br> 22         Plaintiffs, <br> 23     *v.* <br>    DONALD J. TRUMP, *et al.*, <br> 24         Defendants. | No. 19-cv-892-HSG <br> No. 20-cv-1494-HSG <br> No. 19-cv-00872-HSG <br> No. 20-cv-01563-HSG |
| 25  STATE OF CALIFORNIA, *et al.*, <br> 26         Plaintiffs, <br> 27     *v.* <br>    JOSEPH R. BIDEN, *et al.*, <br> 28         Defendants. | **STIPULATED ADMINISTRATIVE MOTION TO SHORTEN TIME RE PLAINTIFFS' MOTION TO ENFORCE** |

1     In accordance with Civil Local Rules 6-3 and 7-11, Plaintiffs Sierra Club and Southern

2 Border Communities Coalition in the *Sierra Club v. Trump* litigation (Nos. 19-cv-892-HSG and

3 20-cv-1494-HSG ("Plaintiffs") respectfully move the Court to modify the briefing schedule with

4 respect to Plaintiffs' Motion To Enforce Settlement Agreement, filed herewith on September 4,

5 2025. In support of this Administrative Motion for Order Shortening Time and Setting Schedule

6 ("Motion"), Plaintiffs submit that good cause exists to shorten time as set forth below:

7     1.     Plaintiffs are simultaneously filing the Motion To Enforce Settlement Agreement

8 in the above-captioned *Sierra Club* cases and related cases filed by the State of California. The

9 default hearing date for the Motion To Enforce would be October 9, 2025 (35 days from the

10 filing date for the Motion To Enforce).

11     2.     As set forth in the Motion To Enforce and supporting Declaration of David

12 Donatti ("Donatti Declaration") Plaintiffs submit that Defendants are in ongoing breach of the

13 Settlement Agreement that was approved by the Court and that resulted in the voluntary

14 dismissal of both the *Sierra Club v. Trump* and *California v. Trump* cases. Donatti Decl. ¶¶ 2, 3.

15 Defendants have taken the position that their performance of certain provisions of the Settlement

16 Agreement has been excused or made impossible by an injunction order issued in an unrelated

17 litigation in the U.S. District Court for the Southern District of Texas, *Texas General Land Office*

18 *v. Biden*, 722 F. Supp. 3d 710 (S.D. Tex. 2024). Donatti Decl. ¶ 4. Plaintiffs succeeded in their

19 appeal from that district court's denial of their motion to intervene in the *Texas General Land*

20 *Office* case. *See General Land Office of the State of Texas, et al. v. Trump*, No. 24-40447, 2025

21 WL 1410414 (5th Cir. May 15, 2025). Plaintiffs' motion to modify or vacate the *General Land*

22 *Office* injunction is currently pending before the district court in the Southern District of Texas.

23     3.     As also set forth in the Motion To Enforce and the Donatti Declaration, the

24 Settlement Agreement provides that the source of funding for some (but not all) of the

25 Defendants' obligations under the Settlement Agreement shall be the Department of Homeland

26 Security's Fiscal Year 2020 (FY20) and Fiscal Year 2021 (FY21) border barrier appropriations.

27 The FY20 funds expired on September 30, 2024. The FY21 funds will expire on September 30,

2025.

4. The parties continue to meet and confer about alternative funding sources and modifications to the Settlement Agreement. Donatti Decl. However, U.S. government officials have stated publicly that they are spending down the remaining FY 21 border barrier funds on projects other than performing their obligations under the Settlement Agreement in this case. Donatti Decl. ¶¶ 8, 9. As a result, absent action by this Court as requested in the Motion To Enforce, the specified funding source for certain of Defendants' obligations under the Settlement Agreement may be exhausted, or will expire, by September 30, 2025, before the regular hearing date for Plaintiffs' Motion To Enforce.

5. Plaintiffs have met and conferred with attorneys for the United States and the States of California and New Mexico. *See* Decl. of Cecilia D. Wang (filed herewith) ¶ 3. All parties have stipulated to the following proposed briefing schedule and hearing date on Plaintiffs' Motion To Enforce Settlement Agreement. *Id.*

- Plaintiffs' Motion To Enforce Settlement Agreement: Filed September 4, 2025
- Defendants' and California's Response Briefs: Due September 15, 2025 at 9:00 a.m. Pacific time
- Plaintiffs' Reply: Due September 16, 2025
- Hearing date: September 18, 2025

6. Based on a review of the ECF docket in the two *Sierra Club v. Trump* cases, it appears that the Court has previously granted three requests to modify deadlines in this litigation, all on briefing deadlines in 2020. *See Sierra Club v. Trump*, No. 19-cv-89-HSG, ECF No. 268 (in 19-cv-892-HSG) (granting stipulated request at ECF No. 267), ECF No. 276 (granting stipulated request at ECF No. 275); *Sierra Club v. Trump*, No. 20-cv-1494-HSG, ECF No. 22 (granting stipulated request at ECF No. 21).

/ / /

/ / /

---

Plaintiffs' Administrative Motion For Order Shortening Time And Setting Schedule
Case Nos. 19-CV-00892-HSG; 20-CV-01494-HSG; 19-cv-00872-HSG; 20-cv-01563-HSG
3

1

2
Date: September 4, 2025,                              Respectfully submitted,

3
                                                     By: ___/s /*Cecillia D. Wang*_____
4                                                    Cecillia D. Wang (SBN 187782)
5                                                    AMERICAN CIVIL LIBERTIES UNION
                                                     FOUNDATION
6                                                    39 Drumm Street
                                                     San Francisco, CA 94111
7                                                    Tel: (415) 343-0770
8                                                    *cwang@aclu.org*

9                                                    David A. Donatti*
10                                                   ACLU OF TEXAS
                                                     P.O. Box 8306
11                                                   Houston, TX 77288
                                                     Tel: (713) 942-8146
12                                                   *ddonatti@aclutx.org*

13
                                                     Gloria D. Smith**
14                                                   SIERRA CLUB ENVIRONMENTAL
15                                                   LAW PROGRAM
                                                     2102 Webster Street, Suite 1300
16                                                   Oakland, CA 94612
                                                     Tel: (415) 977-5532
17                                                   *gloria.smith@sierraclub.org*

18
19                                                   *Counsel for Plaintiffs*

20                                                   *Admitted Pro Hac Vice
                                                     **Attorney for Plaintiff Sierra Club only
21

22

23

24

25

26

27

28

---

# CERTIFICATE OF SERVICE

I hereby certify that on September 4, 2025, I electronically filed a copy of the foregoing document. Notice of this filing will be sent via email to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's CM/ECF System.


                        */s/Ceccilia Wang*
                       Cecillia D. Wang (SBN 187782)

Cecilia D. Wang (SBN 187782)
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
425 California Street, Suite 700
San Francisco, CA 94104
Tel: (415) 343-0770
*cwang@aclu.org*

David A. Donatti*
ACLU OF TEXAS
P.O. Box 8306
Houston, TX 77288
Tel: (713) 942-8146
*ddonatti@aclutx.org*

Gloria D. Smith (SBN 200824)**
SIERRA CLUB ENVIRONMENTAL
LAW PROGRAM
2102 Webster Street, Suite 1300
Oakland, CA 94612
Tel: (415) 977-5532
*gloria.smith@sierraclub.org*

*Admitted Pro Hac Vice
**Attorney for Plaintiff Sierra Club only

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
## OAKLAND DIVISION

| | |
|---|---|
| SIERRA CLUB, *et al.*,<br>Plaintiffs,<br>*v.*<br>DONALD J. TRUMP, *et al.*,<br>Defendants. | No. 19-cv-892-HSG<br>No. 20-cv-1494-HSG<br>No. 19-cv-00872-HSG<br>No. 20-cv-01563-HSG<br><br>**DECLARATION OF CECILLIA D. WANG** |
| STATE OF CALIFORNIA, *et al.*,<br>Plaintiffs,<br>*v.*<br>JOSEPH R. BIDEN, *et al.*,<br>Defendants. | |

I, Cecillia D. Wang, declare as follows:

1.     I am an attorney licensed to practice in California and New York and admitted to the bar of this Court. I represent Plaintiffs Sierra Club and Southern Border Communities Coalition in the above-captioned *Sierra Club v. Trump* cases. I have personal knowledge of the facts set forth in this declaration and, if called as a witness, I could and would testify competently thereto.

2.     I file this Declaration in support of Plaintiffs' Administrative Motion To Shorten Time, which proposes a briefing schedule and September 18, 2025, hearing date on Plaintiffs' Motion To Enforce Settlement Agreement, filed on September 4, 2025.

3.     On September 4, 2025, I communicated by e-mail with Andrew Warden and Samuel Bean, counsel for the Defendants; Michael Cayaban, Janelle Smith, and James Richardson, counsel for the State of California; and William Grantham, counsel for the State of New Mexico. All counsel stipulated to the following proposed briefing schedule and hearing date:

- Plaintiffs' Motion To Enforce Settlement Agreement: Filed September 4, 2025
- Defendants' and California's Response Briefs: Due September 15, 2025 at 9:00 a.m. Pacific time
- Plaintiffs' Reply: Due September 16, 2025
- Hearing date: September 18, 2025

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 4, 2025, in San Francisco, California.

                    /s/*Cecillia D. Wang*

                    Cecillia D. Wang (SBN 187782)

**CERTIFICATE OF SERVICE**

I hereby certify that on September 4, 2025, I electronically filed a copy of the foregoing

document. Notice of this filing will be sent via email to all parties by operation of the Court's

electronic filing system. Parties may access this filing through the Court's CM/ECF System.


By:\_\_\_\_\_/s/*Cecillia D. Wang*_____
Cecillia D. Wang (SBN 187782)

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| SIERRA CLUB, *et al.*,<br>Plaintiffs,<br>*v.*<br>DONALD J. TRUMP, *et al.*,<br>Defendants. | No. 19-cv-892-HSG<br>No. 20-cv-1494-HSG<br>No. 19-cv-00872-HSG<br>No. 20-cv-01563-HSG |
| STATE OF CALIFORNIA, *et al.*,<br>Plaintiffs,<br>*v.*<br>JOSEPH R. BIDEN, *et al.*,<br>Defendants. | **[PROPOSED] ORDER<br>GRANTING PLAINTIFFS'<br>ADMINISTRATIVE MOTION FOR<br>ORDER SHORTENING TIME AND<br>SETTING SCHEDULE RE:<br>PLAINTIFFS' MOTION TO ENFORCE<br>SETTLEMENT AGREEMENT (ECF 99)** |

1   Having considered Plaintiffs' Stipulated Administrative Motion To Shorten Time for briefing

2   and hearing on their Motion To Enforce Settlement Agreement pursuant to Civ. L.R. 6-3 and L.R. 7-

3   11, and based upon the parties' stipulated proposed briefing schedule and hearing date, the

4   Court finds good cause, GRANTS the Request, and ORDERS the following briefing schedule:

5   • Plaintiffs' Motion To Enforce Settlement Agreement:  Filed September 4, 2025

6   • Defendants' and Plaintiff States' Response Briefs:  Due September 15, 2025 at 9:00

7       a.m. Pacific time

8   • Plaintiffs' Reply:  Due September 16, 2025

9   The Court will hear argument on Plaintiffs' Motion To Enforce Settlement Agreement on

10  September 18, 2025 at 2:00 p.m. Pacific time.

11  SO ORDERED.

12

13  Date:  September __, 2025

    _____
    The Honorable Haywood S. Gilliam
14  UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
OAKLAND DIVISION

| | |
|---|---|
| SIERRA CLUB, *et al.*,<br>                Plaintiffs,<br>     *v.*<br>DONALD J. TRUMP, *et al.*,<br>                Defendants. | No. 19-cv-892-HSG<br>No. 20-cv-1494-HSG<br>No. 19-cv-00872-HSG<br>No. 20-cv-01563-HSG<br><br>**ORDER AS MODIFIED GRANTING PLAINTIFFS SIERRA CLUB AND SOUTHERN BORDER COALITION'S ADMINISTRATIVE MOTION FOR ORDER SHORTENING TIME AND SETTING SCHEDULE RE: PLAINTIFFS' MOTION TO ENFORCE SETTLEMENT AGREEMENT** |
| STATE OF CALIFORNIA, *et al.*,<br>                Plaintiffs,<br>     *v.*<br>JOSEPH R. BIDEN, *et al.*,<br>                Defendants. | |

1    Having considered Plaintiffs Sierra Club and Southern Border Communities Coalition's

2 Administrative Motion to Shorten Time for briefing and hearing on their Motion to Enforce

3 Settlement Agreement, the Court finds good cause to shorten time, **GRANTS** the Request, and

4 **SETS** the following briefing schedule:

5

6    •  Defendants' and Plaintiff States' Response Briefs:  Due September 15, 2025, at

7      9:00 a.m. PDT

8    •  Plaintiffs' Reply:  Due September 16, 2025

9

10    The Court will hear argument on Plaintiffs' Motion to Enforce Settlement Agreement in

11 person in Courtroom 2, 4th Floor, 1301 Clay Street, Oakland, CA, on September 18, 2025, at

12 2:00 p.m. PDT.

13    **IT IS SO ORDERED.**

14

15 Date:  September 5, 2025

                 The Honorable Haywood S. Gilliam, Jr.

16                UNITED STATES DISTRICT JUDGE

17

18

19

20

21

22

23

24

25

26

27

28